**Kathryn P. Salyer**, OSB #883017
ksalyer@tsbnwlaw.com
**Eleanor A. DuBay**, OSB #073755
edubay@tsbnwlaw.com
Tomasi Salyer Baroway
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>Plaintiff,<br><br>v.<br><br>**UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC.**, and **UPM MARKETING, INC.**, an Oregon corporation; **UPM TELECOM, INC.**, an Oregon a/b/n; **UPM MARKETING, INC.**, an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; and **TYLER ALLEN**, an Oregon resident,<br><br>Defendants. | Case No. 3:15-CV-00185-SI<br><br>**MOTION TO DISMISS AMENDED COMPLAINT**<br><br>**Pursuant to Fed. R. Civ. P. 12(b)(6)**<br><br>**ORAL ARGUMENT REQUESTED** |

Page 1 – MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

CERTIFICATION ................................................................................................1

MOTION ............................................................................................................1

LEGAL MEMORANDUM ...................................................................................1

I.    INTRODUCTION AND PROCEDURAL HISTORY ...................................1

II.   ARGUMENT .............................................................................................2

A.    Digicel Must Plead Its Allegations With Both Specificity and Plausibility Pursuant to Federal Rules of Civil Procedure 8(a) and 9(b). .........2

B.    Digicel's Fraud Claims Must Be Dismissed Because Digicel Does Not Sufficiently Plead Any Misrepresentation By Defendants. ............................5

1.    Digicel's allegations that Defendants made misrepresentations when purchasing SIM cards are inadequate. .........................................5

2.    Digicel's allegations that Defendants made misrepresentations through their purchase and use of the RLYH plan are insufficient.. ................................................................................................9

3.    Digicel's fraud allegations based on Defendants' use of VoIP are insufficient. ..............................................................................................11

C.    Digicel's RICO Claims Should Be Dismissed. .............................................13

1.    Because Digicel cannot demonstrate Defendants' specific intent to defraud, its RICO claims based on predicate acts of mail and wire fraud should be dismissed. ..............................................................14

2.    Digicel's RICO claims based on alleged violations of 18 U.S.C. § 1029 should be dismissed because Digicel cannot establish Defendants' intent to defraud... ..............................................16

D.    Digicel's Civil Conspiracy Claim Should Be Dismissed. ............................18

E.    Digicel's Conversion Claim Should Be Dismissed. ....................................18

F.    Digicel's Unjust Enrichment Claim Should Be Dismissed. .........................19

G.    Digicel's Claim for Injunction Should Be Dismissed. ................................20

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page**

*Alan Neuman Productions, Inc. v. Albright,*
862 F.2d 1388, 1392 (9th Cir. 1988), *cert. denied*, 493 U.S. 858, 110 S. Ct. 168,
107 L. Ed. 2d 124 (1989)............................................................................................................3

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451, 482 – 83, 126 S. Ct. 1991, 2011, 164 L. Ed. 2d 720 (2006)............................15

*Ashcroft v. Iqbal,*
556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).............................3, 4, 13

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)) .....................3, 4, 15, 18

*Bonds v. Landers,*
279 Or. 169, 174, 566 P.2d 513 (1977) ...................................................................................18

*Cafasso ex rel. United States v. General Dynamics C4 Sys., Inc.,*
637 F.3d 1047, 1055 (9th Cir. 2011) ....................................................................................3, 7

*Carpenter v. United States,*
484 U.S. 19, 27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987)) ..............................................15

*Craven v. Wright,*
114 Or. 692, 236 P. 1043 (1925) .............................................................................................18

*Ebeid ex rel. United States v. Lungwitz,*
616 F.3d 993, 998 (9th Cir.), *cert. denied*, 562 U.S. 1102, 131 S. Ct. 801, 178 L. Ed. 2d
546 (2010)) ...........................................................................................................................3, 7

*Eclectic Properties East, LLC v. Marcus & Millichap Co.,*
751 F.3d 990, 997 (9th Cir. 2014) ..............................................................................13, 14, 16

*Farmers Ins. Exch. v. First Choice Chiropractic & Rehab.,*
2014 WL 3591558, at *7 (D. Or. Jul. 18, 2014).......................................................................5

*Gonzalez v. Planned Parenthood of Los Angeles,*
759F.3d 1112, 1115 (9th Cir. 2014) .........................................................................................9

*In re Conduct of Martin,*
328 Or. 177, 184, 970 P.2d 638 (1998) ...................................................................................18

*Lacey v. Maricopa Cnty.,*
693 F.3d 896, 926 (9th Cir. 2012) ...........................................................................................13

*Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,*
940 F.2d 397, 405 (9th Cir. 1991), *cert. denied*, 502 U.S. 1094, 112 S. Ct. 1168, 117
L. Ed. 2d 414 (1992)..................................................................................................................3

*Moore v. Kayport Package Express, Inc.,*
885 F.2d 531, 540 (9th Cir. 1989) .............................................................................................3

Page ii – MOTION TO DISMISS AMENDED COMPLAINT

*Morasch v. Hood,*
232 Or. App. 392, 402, 222 P.3d 1125 (2009) ................................................................18

*Mustola v. Toddy,*
253 Or. 658, 663-64, 456 P.2d 1004 (1969) ................................................................19

*Naas v. Lucas,*
86 Or. App. 406, 409, 739 P.2d 1051, *rev. denied,* 304 Or. 680, 748 P.2d 142 (1987) ..........19

*Odom v. Microsoft Corp.,*
486 F.3d 541, 551 (9th Cir. 2007) (en banc) ................................................................3

*Salem Light & Traction Co. v. Anson,*
41 Or. 562, 69 P. 675 (1902) ................................................................18

*Semegen v. Weidner,*
780 F.2d 727, 731 (9th Cir. 1985) ................................................................3

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.,*
806 F.2d 1393, 1399 (9th Cir. 1986)) ................................................................14

*Somers v. Apple, Inc.,*
729 F.3d 953, 964 (9th Cir. 2013) ................................................................9

*Sprewell v. Golden State Warriors,*
266 F.3d 979, 988 (9th Cir. 2001)) ................................................................9

*Starr v. Baca,*
652 F.3d 1202, 1216 (9th Cir. 2011) ................................................................4

*Strawn v. Farmers Ins. Co.,*
350 Or. 336, 351–52, 258 P.3d 1199 (Or. 2011)) ................................................................5

*Sun Sav. and Loan Ass'n v. Dierdorff,*
825 F.2d 187, 196 (9th Cir. 1987) ................................................................3

*United States v. Peters,*
962 F.2d 1410, 1414 (9th Cir. 1992) ................................................................14, 15

*United States v. Bailey,*
41 F.3d 413, 418 (9th Cir. 1994) ................................................................17

*United States v. Bohonus,*
628 F.2d 1167, 1172 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S. Ct. 3026, 65 L. Ed. 2d
1122 (1980)) ................................................................15

*Wagh v. Metris Direct, Inc.,*
363 F.3d 821, 828 (9th Cir. 2003) ................................................................3

*Walchli v. Community Bank,*
2010 WL 2105163 at *1 (D. Or. May 25, 2010) ................................................................15, 16

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*Webb v. Clark,*
274 Or. 387, 391, 546 P.2d 1078 (Or. 1976) ............................................................................5

## STATUTES

18 U.S.C. § 1029 ............................................................................................................16, 17, 18

18 U.S.C. § 1341 ..........................................................................................................................14

18 U.S.C. § 1343 ..........................................................................................................................14

18 U.S.C. § 1961-1968 ..................................................................................................................1

18 U.S.C. § 1961(1)(B) ...............................................................................................................14

18 U.S.C. § 1962 ...........................................................................................................2, 13, 14, 16

## OTHER AUTHORITY

FRCP 8(a) ...................................................................................................................................2, 3

FRCP 9(b) ...............................................................................................................................2, 3, 7

FRCP 12(b)(6) ...............................................................................................................................1

Restatement (Second) of Torts § 222A ......................................................................................19

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATION

Pursuant to Local Rule 7.1, the undersigned attorney hereby certifies that defendants UPM Technology, Inc., UPM Telecom, Inc., UPM Marketing, Inc., Benjamin Sanchez, Baltazar Ruiz, and Tyler Allen, (collectively, "Defendants") conferred with Plaintiff's counsel by telephone in an attempt to resolve the dispute presented by the Motion set forth below.

## MOTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss all of Plaintiff's claims for relief. This motion is supported by the record herein and the authorities set forth below.

## LEGAL MEMORANDUM

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Like the original Complaint, Plaintiff's Amended Complaint purports to allege violations of the Racketeer Influenced and Corrupt Organizations act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), as wells as claims for fraud, conspiracy, conversion, unjust enrichment, and a permanent injunction. This Court previously recognized that the essence of each of Plaintiff's claims was fraud, and dismissed the Complaint because it was lacking in clarity and specificity as to the nature and substance of any misrepresentation.

After querying the parties as to the misrepresentations that were or could be alleged the Court identified two potential types of misrepresentations. The first type of potential misrepresentation that this Court identified is a "non-technological misrepresentation" that Defendants may have allegedly made in the course of purchasing the Digicel SIM cards. The original Complaint contained no allegations of any specific misrepresentation. The second type of potential misrepresentation the court recognized is an "electronic misrepresentation" made to the Digicel computers and system in the transmission of calls UPM transmits to Haiti via Voice Over Internet Protocol ("VoIP"). The Court expressed skepticism as to whether the facts alleged in the Complaint constituted an electronic misrepresentation.

Page 1 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Plaintiff's Amended Complaint contains more than 50 new paragraphs containing allegations presumably intended to more specifically and plausibly allege a misrepresentation.[1] For the convenience of the court a copy of the Amended Complaint redlined to the original Complaint is attached hereto as Exhibit 1. For the reasons set forth below, Plaintiff's Amended Complaint still fails to allege any sufficient misrepresentations. Digicel's amended complaint alleges nine claims (styled as "counts") for relief: three RICO claims (for violation of 18 §§ 1962(c), 1962(b), and 1962(d)), two claims of fraud (one based on UPM's use of Digicel's RLYH plan and one based on calls routed to Haiti via VOIP), civil conspiracy, conversion, unjust enrichment, and for a permanent injunction. With this motion, Defendants seek to dismiss all of Digicel's claims.

## II.    ARGUMENT

All of Digicel's claims have a common thread: they are based on Defendants' alleged misrepresentations regarding the telephone calls that UPM routes from international locations and that terminate in Haiti. Those alleged misrepresentations form the basis of Digicel's two fraud claims, its three RICO claims (which require an intent or scheme to defraud), civil conspiracy (requiring an unlawful overt act), conversion (needing the defendant to exercise control over a chattel inconsistently with the plaintiff's rights) and permanent injunction. Notwithstanding that fact, and this Court's admonition that Digicel needed to plead those misrepresentations with more specificity to survive dismissal, the Amended Complaint still falls far short of both the specificity and plausibility that Federal Rules of Civil Procedure 8(a) and 9(b) require. For that reason, Digicel's Amended Complaint should be dismissed.

### A.    Digicel Must Plead Its Allegations With Both Specificity and Plausibility Pursuant to Federal Rules of Civil Procedure 8(a) and 9(b).

As the Court knows, Federal Rule of Civil Procedure 9(b) requires that a complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

---

[1] Digicel has also removed all references to the Haiti National Education Fund, which was the alleged recipient of a 5¢-per-minute tax levy on all international calls.

Page 2 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Rule 9(b)'s particularity requirement is satisfied if the complaint "identifies the circumstances constituting fraud so that [the] defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). In other words, the allegations must be specific enough "to give defendants notice of the particular misconduct which is alleged to constitute the fraud … so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). The complaint must specify "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso ex rel. United States v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.), *cert. denied*, 562 U.S. 1102, 131 S. Ct. 801, 178 L. Ed. 2d 546 (2010)). RICO claims based upon predicate acts involving fraud must also be pleaded with particularity under Rule 9(b). *See Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule 9(b) to allegations of mail fraud as RICO predicate acts), *cert. denied*, 502 U.S. 1094, 112 S. Ct. 1168, 117 L. Ed. 2d 414 (1992); *Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) (applying Rule 9(b) to allegations of mail and wire fraud as RICO predicate acts), *cert. denied*, 493 U.S. 858, 110 S. Ct. 168, 107 L. Ed. 2d 124 (1989); *Sun Sav. and Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir. 1987).

In addition to complying with Rule 9(b)'s requirements, a complaint must also fulfill Rule 8's obligation to allege "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *See Cafasso*, 637 F.3d at 1055; *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 828 (9th Cir. 2003) ("[C]omplaints alleging fraud must comply with both [Federal Rules of Civil Procedure] 8(a) *and* 9(b)."), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc) (emphasis in original). Compliance with Rule 8(a) means that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atlantic*

Page 3 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Identifying whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. The court must first "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Assuming that there are "well-pleaded factual allegations," the court is then to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* The fact that the plaintiff's allegations may be consistent with one explanation of the defendant's conduct is insufficient; the plaintiff must "nudge[ its] claims across the line from conceivable to plausible" or else those claims must be dismissed. *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. In determining whether the plaintiff's claim is plausible, the court should also consider whether there is an "obvious alternative explanation" for the defendant's behavior. *Id.* at 567, 127 S. Ct. at 1972.

The Ninth Circuit has distilled the Supreme Court's plausibility inquiry into these principles:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Page 4 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

In light of these principles, and even after amendment, the Amended Complaint fails to adequately state any of its claims.

**B.    Digicel's Fraud Claims Must Be Dismissed Because Digicel Does Not Sufficiently Plead Any Misrepresentation By Defendants.**

Defendants will once again begin by examining the flaws with Digicel's two fraud claims because those claims' deficiencies carry over into all of the rest of Digicel's claims. Recall that, under Oregon law:

> [t]he essential elements of a common-law fraud claim are: the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance.

*Farmers Ins. Exch. v. First Choice Chiropractic & Rehab.*, 2014 WL 3591558, at *7 (D. Or. Jul. 18, 2014) (quoting *Strawn v. Farmers Ins. Co.,* 350 Or. 336, 351–52, 258 P.3d 1199 (Or. 2011)); *see also Webb v. Clark,* 274 Or. 387, 391, 546 P.2d 1078 (Or. 1976).

The heart of a fraud claim is therefore the defendant's alleged misrepresentation, which starts the chain of events that leads to the plaintiff's reliance upon that misrepresentation and consequent damages. Digicel's Amended Complaint, however, suffers from the same flaws that plagued the original, a lack of specifically pleaded misrepresentations by Defendants that plausibly establish a claim of fraud. In an attempt to bolster its earlier generic allegations of "bypass fraud," Digicel now alleges a series of "misrepresentations" that begin with Defendants' purchase of Digicel SIM cards. Digicel then alleges that Defendants make misrepresentations in the two methods by which their telephone calls reach Haiti, either (1) via Digicel's RLYH plan, or (2) via VoIP. Defendants will examine each series of allegations in turn.

**1.    Digicel's allegations that Defendants made misrepresentations when purchasing SIM cards are inadequate.**

As it did in the original complaint, once again Digicel alleges generally that, in the context of "bypass fraud:"

Page 5 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

> SIM cards are purchased under the false pretext that they will be used by an individual for that individual's personal calls in a unique cellular device, when in fact they are being purchased for use in a SIM Server to re-direct international calls. It is beyond the contractual and commercial expectations of Digicel and its authorized retailers that an individual SIM card would be used for anything other than an individual's personal cellular calls and communications.

(Am. Cmplt., ¶ 32.) Purchasers of SIM cards are required to fill out a registration card, a tactic Digicel claims to have devised "to prevent the acquisition and use of SIM cards for improper or illegal purposes." (Am. Cmplt., ¶ 34.) This registration card, which is attached as Exhibit A to the Amended Complaint, is written in French or Creole. Even so, it appears only to require the purchaser to list information such as name, birth date, government identification number, address, occupation, telephone number, SIM card number, and the date of sale. On its face, it does not purport to ask for any attestation or acknowledgement that the SIM card will be used only for a personal cellular telephone, nor does Digicel allege that Defendants made any such promise. (Am. Cmplt. Exh. A.) Digicel also alleges that its SIM cards are sold "only … by Digicel's authorized retailers and representatives," (Am. Cmplt., ¶ 33), who are "cautioned through communications from Digicel, Dealer Circulars, not to sell SIM Cards to anyone that the dealer may think is going to resell the SIM Card."[2] (Am. Cmplt., ¶ 35.) But that Dealer Circular has no bearing on what, if any, representations *Defendants* made to Digicel dealers when they purchased the SIM cards. The Amended Complaint contains no allegations that any Digicel dealer asked Defendants or their agents what they intended to do with the SIM cards, what Defendants' agents told the dealers, or how that representation was false. Similarly, the fact that "Digicel does not allow for the unauthorized bulk purchase of SIM Cards," (Am. Cmplt., ¶ 36), cannot substitute for a specific allegation that Defendants misrepresented to a Digicel dealer that they were aware of Digicel's desire that the SIM card not be resold and/or affirmed that they would not do so. In other words, Digicel's sales policies that it promulgates to its dealers are not a sufficient basis upon which to rest an allegation of fraud.

---

[2] A version of such a "Dealer Circular" is attached to the Amended Complaint as Exhibit. 2.

Page 6 – MOTION TO DISMISS AMENDED COMPLAINT

The only allegation related to Defendants' specific conduct—as opposed to what generally happens in cases of so-called "bypass fraud"—is this: "To obtain Digicel SIM Cards, the Defendants' Haitian agents go to a Digicel authorized retailer and purchase SIM Cards under the false premise that those SIM Cards are for their own individual, retail use in cellular handset devices." (Am. Cmplt., ¶ 65.) As just explained, that allegation is insufficient. What was the nature of that "false premise?" Did the Digicel dealer ask Defendant's agents about their intended use for the SIM cards? Were Defendants' agents even aware that Digicel purportedly did not want them to use the SIM cards other than in a personal cell phone? What, if anything, did Defendants' agents communicate to the Digicel dealers? When were these representations made? How were they false? How did Digicel rely on them? Where are the registration cards associated with the SIM cards purchased by Defendants?

Even after repleading, Digicel's allegations related to Defendants' fraudulent misrepresentations in obtaining the SIM cards clearly fall short of Rule 9(b)'s requirement to state "the who, what, when, where, and how of the misconduct charged." *Cafasso*, 637 F.3d at 1055 (quoting *Ebeid*, 616 F.3d at 998). More fundamentally, Digicel does not explain "what is false or misleading about [the purportedly fraudulent] statement, and why it is false," because it does not even allege that Defendants made *any* fraudulent statements. *Id.*

One other set of allegations regarding Defendants' acquisition of SIM cards needs to be addressed: Digicel claims that Defendants "clone" the SIM cards they purchase:

> The SIM Cards housed in Oregon[] are manipulated or cloned to retrieve and then transmit the unique identifying information off each SIM Card, so that the information can be sent to Haiti. This allows UPM to pretend to initiate a call in Haiti when the call was in fact initiated in the USA. Using the "cloned" SIM Card, the Receiver located in Haiti completes the call to the ultimate recipient using Digicel's telecom network.

(Am. Cmplt., ¶ 69.)[3] These allegations are insufficient for the simple reason that they are implausible on the face of the Amended Complaint and are contradicted by Digicel's other allegations.[4]

---

[3] It is worth noting that, in the immediately preceding paragraph, Digicel claims that, "[i]n order to complete the bypass, the SIM Card is *typically* cloned . . . ." (Am. Cmplt. ¶ 68 (emphasis added).

Page 7 – MOTION TO DISMISS AMENDED COMPLAINT

To understand why Digicel's cloning allegations are implausible, an explanation of cloning is in order. A SIM card contains two codes, an IMSI (International Mobile Subscriber Identifier) number, and a 128-bit "Ki" value used in authenticating the SIM card on a mobile network. These codes enable the operator to authenticate the customer and accurately bill her. Cloning a SIM card would enable more than one handset to be operated from the same identifying information contained on the original SIM card. Cloning is illegal because it would allow the cloner to operate a cell phone for free, while the holder of the original SIM card would be billed both for her own and the cloner's calls. The Federal Communications Commission has explained cloning in the context of cell phones, but the basic premise applies to SIM cards as well:

> What is Cell Phone Cloning Fraud?
>
> Every cell phone is supposed to have a unique factory-set electronic serial number (ESN) and telephone number (MIN). A cloned cell phone is one that has been reprogrammed to transmit the ESN and MIN belonging to another (legitimate) cell phone. Unscrupulous people can obtain valid ESN/MIN combinations by illegally monitoring the radio wave transmissions from the cell phones of legitimate subscribers. After cloning, both the legitimate and the fraudulent cell phones have the same ESN/MIN combination and cellular systems cannot distinguish the cloned cell phone from the legitimate one. The legitimate phone user then gets billed for the cloned phone's calls.

Federal Communications Commission, *Cell Phone Fraud Guide*, (Sept. 25, 2015, 5:13 p.m.), https://www.fcc.gov/guides/cell-phone-fraud. "Cloning" is therefore an illegal mechanism that allows the cloner to obtain access, either to a cell phone's or a SIM card's unique identifying information, and to use that information to place calls, while causing the true owner of the cell phone or SIM card to incur the charges that result from the cloner's activities.

The reason why Digicel's cloning allegations are implausible on their face is because Digicel simultaneously alleges that Defendants *purchased* the Digicel SIM cards that they then purportedly cloned. (Am. Cmplt., ¶¶ 32 – 36, 57, 65, 99, 101, 126, 130, 139, and 145.)

---

[4] They are also categorically untrue, a fact that Defendants recognize will be appropriately argued at a later time if necessary.

Page 8 – MOTION TO DISMISS AMENDED COMPLAINT

Once Defendants purchased the Digicel SIM cards, they legitimately acquired access to Digicel's local network. There is no plausible reason for Defendants to clone SIM cards that they already own; it is implausible that Defendants would need to obtain by fraud that which they had just purchased. Because cloning is illegal, it would help Digicel's cause if it could claim that Defendants were engaging in it. But the Court should not accept implausible allegations that are contradicted by the rest of the complaint.[5] *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (dismissing as implausible plaintiff's allegations of antitrust injury as a result of alleged overcharging in light of contradictory market facts of lower prices alleged in the complaint). Digicel's allegations that Defendants have "cloned" Digicel SIM cards in order to access Digicel's network are therefore not entitled to a presumption of truth.

### 2. Digicel's allegations that Defendants made misrepresentations through their purchase and use of the RLYH plan are insufficient.

Digicel next lists a series of allegations through which it claims that Defendants made misrepresentations in how they used Digicel's RLYH plan to access Digicel's network. Digicel alleges that the RLYH home plan "is intended to be used by an individual customer for a finite period of time while they are roaming outside of their 'home' network in Haiti." (Am. Cmplt., ¶ 77.) Digicel alleges that a UPM-originated call that uses SIM cards registered for the RLYH plan "represents itself to towers in the United States and ultimately in Haiti as coming from a RLYH subscriber when the call is actually from an individual that is subscribed to a third-party carrier and has no relationship with Digicel and is **not** registered on the plan."

---

[5] Cloning of the current iteration of SIM cards (version 2 or 3G, both of which have been manufactured since 2002) is also so difficult as to be effectively impossible because of the difficulty in reading the "Ki" code on those chips. *See* Pentura Labs's Blog, *Sim Cloning*, (Sept. 26, 2015, 7:33 a.m.), https://penturalabs.wordpress.com/2013/11/22/sim-cloning/. Under Rule 8(a), the court "need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Gonzalez v. Planned Parenthood of Los Angeles*, 759F.3d 1112, 1115 (9th Cir. 2014) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Digicel's claim of cloning is not the only example of a factually incorrect allegation. For example, Digicel alleges that "[e]ach SIM Card has a separate International Mobile Equipment Identity (IMEI), making it look to the network like it is registered within a unique handset or cellular device." (Am. Cmplt., ¶ 38.) In fact, the IMEI is an identifying number for a cell phone, much like a VIN for an automobile. *International Mobile Station Equipment Identity*, (Sept. 28, 2015, 9:49 a.m.), https://en.wikipedia.org/wiki/International_Mobile_Station_Equipment_Identity.

Page 9 – MOTION TO DISMISS AMENDED COMPLAINT

(Am. Cmplt., ¶ 81 (emphasis in original).)  Digicel claims that Defendants "sign[ed] up for [the RLYH plan] with the specific intent of using the Pla[]n for unauthorized, commercial purposes" which purportedly thwarts the "intended purpose" of the RLYH plan "to provide individuals traveling outside of Haiti to make calls at the going-rate for domestic calls."  (Am. Cmplt., ¶¶ 152, 153.)

These allegations are also insufficient.  Regardless of Digicel's "intended purpose" for the RLYH plan, Digicel cannot make a cognizable claim of fraud unless it can allege that Defendants were aware of that intended purpose and intentionally represented to Digicel that they meant to use RLYH in accordance with that purpose, while knowing at the time of the representation that they would not.  Digicel alleges nothing of the kind.  Indeed, Digicel alleges nothing more than the fact that Defendants purchased Digicel SIM cards and then "signed up" for the RLYH plan (Am. Cmplt., ¶ 153), just as any individual Haitian Digicel customer might.  Defendants paid Digicel the $20 - $25 needed to activate RLYH on each of the SIM cards, which enabled the SIM cards to access the Digicel network at the discounted rate.  Digicel alleges that Defendants purchased both SIM cards and access to the RLYH plan; Digicel therefore received the benefit of that bargain.  Digicel's irritation that Defendants are using the RLYH plan in a way that it did not anticipate does not make Defendants' actions fraudulent.

Digicel alleges that "[b]y causing international calls to represent themselves as domestic calls, Defendants made specific misrepresentations to Digicel," which "caused the calls to be improperly accounted for and to be billed at a lesser domestic rate."  (Am. Cmplt., ¶ 156.)  That allegation is implausible because it was *Digicel's own programming* of those SIM cards, through the RLYH plan, that enabled those calls to enter the Digicel network at the discounted rate.  It is Digicel's technology that is making the representations to Digicel, not Defendants.  Indeed, there is no difference—nor does Digicel allege that there is—between a call that enters the local network through Defendants' use of the RLYH plan and one that enters from a call made by an individual Haitian Digicel subscriber who has signed up for RLYH and is using his cell phone to call Port-au-Prince while traveling in the United States.  Defendants do not "caus[e]

Page 10 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

international calls to represent themselves as domestic calls;" rather, it is the SIM cards themselves and Defendants' purchase of the FLYH plan, in conjunction with the RLYH plan, that allow those calls to enter Digicel's local network. And, based on Digicel's own RLYH plan, those calls are not "international" but are instead treated as local calls, just as they would if they were made by an individual Haitian RLYH subscriber traveling outside Haiti. These allegations, therefore, are really a rehash of Digicel's claim that UPM is using the RLYH plan in a way that Digicel never intended. But that is not fraud; without any specific, plausible allegations that Defendants misrepresented to Digicel how they intended to use the RLYH plan, Digicel's fraud claim based on RLYH must be dismissed.

### 3. Digicel's fraud allegations based on Defendants' use of VoIP are insufficient.

Finally, Digicel claims Defendants are making misrepresentations in the second manner that calls reach Digicel's local network, via VoIP. According to the Amended Complaint, UPM's SIM servers (using SIM cards that Defendants purchased from Digicel) "select a telephone number associated with one of the SIM Cards in the SIM server and 'packages' that number along with the original call for transmission over the internet." (Am. Cmplt., ¶ 89.) "The packaged SIM information and telephone call are delivered via the internet to a local Receiver in Haiti which then directs that call back into the local network as a local call using the identifying information transmitted from the SIM card to trick the network into thinking the call was originated from that 'local' number." (Am. Cmplt., ¶ 91.) Digicel complains that this is a "manipulation of the intended use of SIM Cards" so that "Defendants intentionally manipulate the SIM card data to misrepresent the international call to Digicel's Haitian network as a domestic call made in Haiti, and only the domestic calling fees are charged." (Am. Cmplt., ¶¶ 93, 98.)

Once again, Digicel's allegations fail for lack of specificity and plausibility. There is no misrepresentation of the source of UPM's VoIP calls because, at the moment the call enters Digicel's Haiti network, it is, in fact a local call. That is because UPM uses its own

Page 11 – MOTION TO DISMISS AMENDED COMPLAINT

internet network to transmit the call to Haiti.[6] When the call reaches Haiti's local network, it uses a local switch rather than the international one because UPM's SIM server uses Digicel SIM cards that are all local Haitian telephone numbers. Digicel's allegation that "the international calls misrepresent themselves as domestic calls," (Am. Cmplt., ¶ 165), is implausible on its face because the calls are—at the moment they enter Digicel's network—in fact domestic calls. As the Court noted at the hearing on the first motion to dismiss, UPM's VoIP scenario is the same as if someone in the United States placed a Skype call over the internet to someone at a computer in Haiti, the recipient in Haiti then uses his cell phone to make a local call in Haiti, and then holds the phone up to the computer speaker so that the phone call recipient can hear the Skype transmission. As the Court observed, in that scenario—as in all of UPM's calls that reach Haiti via VoIP—there is no misrepresentation because that call actually originated as a local call in Haiti. Nor is there any intent "to fraudulently avoid compensating Digicel for the calls terminated on Digicel's network." (Am. Cmplt., ¶ 164.) Digicel has already alleged that Defendants *purchased* Digicel SIM cards to use in UPM's SIM servers; on the face of the Amended Complaint, Digicel has therefore already been compensated for the use of its local network; when UPM's VoIP calls arrive at the Digicel local switch, they are simply being routed as local calls because that is what they are. Digicel's real complaint—that UPM's use of Digicel's SIM technology (for which Digicel was paid) allows UPM to avoid being gouged by Digicel's rate for international traffic—is not the result of any misrepresentation by Defendants.

In short, Digicel has failed to allege sufficiently plausible and specific facts to state a claim for fraud.. With respect to "non-technological misrepresentations" that Defendants purportedly made, Digicel has alleged only what its own corporate policies are or how it intended its technology to be used. It has failed to allege that any of that information was ever

---

[6] That is why Digicel's protestations that UPM is using Digicel's network without compensation are not plausible: because the entire cost of bringing the call to Haiti over the internet is borne by UPM. Digicel is fully compensated for the only portion of its network that is used to terminate the call—the local network—by Defendants' previous purchase of those local minutes through having bought Digicel SIM cards.

Page 12 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

communicated to Defendants, or that Defendants made any misrepresentation to Digicel about their intended use of the technology. With respect to "electronic misrepresentations" that UPM's VoIP calls allegedly make to "trick" Digicel into recognizing them as local calls, Digicel has failed there as well. All that Digicel has alleged is that its local switches route VoIP calls because the SIM cards (which bear local numbers that were programmed by Digicel) route those calls in accordance with their programming. Digicel has failed to allege that Defendants did anything other than purchase Digicel technology and use it to access the local tariff. That Digicel may not have "intended" for its SIM cards to be used that way does not make Defendants' conduct fraudulent. Digicel has tried to correct the flaws in its original complaint and has still failed to state specific, plausible allegations that Defendants acted fraudulently. For that reason, Digicel's fraud claims should be dismissed with prejudice. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 926 (9th Cir. 2012) (leave to amend should not be granted if court determines that the pleading could not be cured by the allegation of other facts). And, without a specific, plausible claim of fraud, all of Digicel's other claims—which depend on the same theory—should be dismissed as well.

## C.    Digicel's RICO Claims Should Be Dismissed.

Digicel alleges three claims under RICO, for violations of 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d). As *Iqbal* requires, the court should first examine the elements that a plaintiff must plead to state a RICO violation. *See Iqbal*, 556 U.S. at 675, 129 S. Ct. at 1947-48. For § 1962(b), a plaintiff must allege that (1) a person (2) through a pattern (3) of racketeering activity (4) acquires or maintains an interest in or control of (5) an enterprise that affects interstate or foreign commerce. 18 U.S.C. § 1962(b).

For § 1962(c), the RICO statute sets out four elements: (1) the conduct of (2) an enterprise that affects interstate or foreign commerce (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962(c); *see also Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

Page 13 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

To plead a violation of § 1962(d), the plaintiff needs to allege that the defendants conspired to violate sections 1962(a), (b), or (c). 18 U.S.C. § 1962(d).

"Racketeering activity"—which is common to all of Digicel's RICO claims—requires predicate acts which, as relevant to Digicel's Amended Complaint, include "any act which is indictable under any of the following provisions of title 18, United States Code: … section 1029 (relating to fraud and related activity in connection with access devices), … section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). All of Digicel's RICO allegations concern predicate acts of mail fraud, wire fraud, or fraud related to access devices. (Am. Cmplt., ¶¶ 99 – 149.)

Digicel's RICO claims are all deficiently pleaded with respect to the "racketeering activity" that the Amended Complaint alleges, and must be dismissed for that reason. Defendants will first examine the flaws related to Digicel's allegations of mail and wire fraud, and then explain why Digicel's allegations of predicate acts related to access devices are also insufficient.

1.    **Because Digicel cannot demonstrate Defendants' specific intent to defraud, its RICO claims based on predicate acts of mail and wire fraud should be dismissed.**

The mail and wire fraud statutes, 18 U.S.C. § 1341 and § 1343, "are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Properties*, 751 F.3d at 997 (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1399 (9th Cir. 1986)).

"In order to prove a violation of [the mail or wire fraud statutes], there must be a showing of a specific intent to defraud. The intent to defraud may be inferred from a defendant's statement and conduct." *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992). If there is no direct evidence of intent, the plaintiff must first prove "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension," after which, "by examining the scheme itself," the court may infer the defendant's specific intent to defraud.

Page 14 – MOTION TO DISMISS AMENDED COMPLAINT

*United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984), *cert. denied*, 474 U.S. 925, 106 S. Ct. 259, 88 L. Ed. 2d 266 (1985) (quoting *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S. Ct. 3026, 65 L. Ed. 2d 1122 (1980)).

For all of the reasons enumerated in Section II(B), *supra*, Digicel has failed to allege plausible allegations that Defendants entered into a scheme "to defraud," a phrase that this court has noted means, in the context of the mail fraud statute, "the deprivation of something of value by trick, deceit, chicane or overreaching." *Walchli v. Community Bank*, 2010 WL 2105163 at *1 (D. Or. May 25, 2010) (noting that what could be considered "a poor business strategy that might ultimately lead to an action at common law" does not alone evidence a scheme or intent to defraud) (quoting *Carpenter v. United States*, 484 U.S. 19, 27, 108 S. Ct. 316, 321, 98 L. Ed. 2d 275 (1987)).

There was no "trick, deceit, chicane or overreaching" in Defendants' conduct; they purchased the Digicel SIM cards directly from licensed retailers and then used them to provide international cellular calls to Haiti at a lower price than the monopoly price Digicel enjoys.[7] *Cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 482 – 83, 126 S. Ct. 1991, 2011, 164 L. Ed. 2d 720 (2006) (Breyer, J., concurring) ("RICO does not permit private action based solely upon this competitive type of harm, *i.e.*, harm a plaintiff suffers only because the defendant was able to attract customers through normal competitive methods, such as lower prices, better products, better methods of production, or better systems of distribution."). It is clear that Digicel is unhappy with the fact that Defendants used the Digicel SIM cards they purchased to build a better mousetrap, but that—in and of itself—is not enough to "nudge" its mail and wire fraud allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. The "obvious alternative explanation" to Defendants' purported intent to defraud is that they instead intended to compete with Digicel in the Haitian telecom market. *Id.* at 567, 127 S. Ct. at 1972. Digicel's RICO claims based on mail and wire

---

[7] As already discussed, Digicel's insinuations that Defendants used a "false pretext" to obtain the SIM cards is insufficient under Rule 9(b). (Am. Cmplt., ¶¶ 32 – 34.)

Page 15 – MOTION TO DISMISS AMENDED COMPLAINT

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

fraud should therefore be dismissed. *See Eclectic Properties*, 751 F.3d at 1000 (dismissing plaintiffs' RICO § 1962(c) and (d) claims because they did not "allege facts sufficient to show 'the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension'") (citation and quotation omitted); *Walchli*, 2010 WL 2105153 at *2 (dismissing RICO mail fraud claims because there was "nothing to suggest or infer that defendants' initial effort to obtain plaintiffs' business were made pursuant to a scheme to defraud them"). Because Digicel's (Amended Complaint does not plausibly allege that Defendants had a specific intent to defraud, the RICO claims based on mail and wire fraud should be dismissed with prejudice.

### 2. Digicel's RICO claims based on alleged violations of 18 U.S.C. § 1029 should be dismissed because Digicel cannot establish Defendants' intent to defraud.

For reasons very similar to those just discussed—Defendants' actions reveal competition with, rather than an attempt to defraud, Digicel—the Amended Complaint's allegations related to predicate acts that violate 18 U.S.C. § 1029 should also be dismissed. Section 1029 deals with the improper use of an "access device," which is defined as "any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds ... ." 18 U.S.C. § 1029(e)(1). The statute prohibits a variety of conduct, but requires in almost all instances[8] that the defendant act "with intent to defraud."

---

[8] The only section that does not require an intent to defraud is section 1029(a)(10), which penalizes one who "knowingly uses, produces, traffics in, has control or custody of, or possesses hardware or software, knowing it has been configured to insert or modify telecommunication identifying information associated with or contained in a telecommunications instrument so that such instrument may be used to obtain telecommunications service without authorization." 18 U.S.C. § 1029(a)(10). Because Defendants bought the SIM cards—and the right to use their accumulated minutes—they neither "insert[ed] or modif[ied]" any telecommunications information nor used the SIM card minutes "without authorization." Because Defendants purchased the SIM cards from Digicel retailers, they acquired the "authorization" to use them and therefore did not violate section 1029(a)(10).

---

Page 16 – MOTION TO DISMISS AMENDED COMPLAINT

18 U.S.C. § 1029(a)(1) – (8); *see also United States v. Bailey*, 41 F.3d 413, 418 (9th Cir. 1994) (noting that "intent to defraud is an element, along with the involvement of an 'access device,' of any violation of 18 U.S.C. § 1029"). As discussed in section II(C)(1) of this memorandum, Digicel has not plausibly pleaded that Defendants' actions were consistent with an intent to defraud. Defendants did not falsely obtain the SIM cards, but instead bought them as would any consumer who desired to purchase additional minutes. Digicel received its compensation at the time of the SIM card purchases. Digicel is simply angry that UPM used those minutes to sell a competing service to third-party carriers, thus preventing Digicel from protecting its monopoly.

That is not what section 1029 prohibits. Its purpose is to prevent "the user of the access device [to] be able to obtain goods or services from which he would otherwise be excluded." *Bailey*, 41 F.3d at 418. But UPM was not "excluded" from using the minutes on the Digicel SIM cards which Defendants legally purchased. *Bailey*, in contrast, concerned a defendant who rewrote the programming in the hardware of cell phones to "fool the local [cellular] network into permitting calls placed by those phones to be completed in roaming mode," even though there was no distant carrier to bill for the call. *Id.* at 415. Digicel does not allege that Defendants did anything similar.[9] Instead, Defendants used (unaltered) Digicel SIM cards, which they lawfully purchased, to construct a server that would use the internet to route the call to Haiti and to receive incoming calls to Haiti. International callers with third-party carriers who contract with Digicel still have their calls placed through Digicel; only those callers who use a third-party carrier that has contracted with UPM have their calls routed through VoIP based on the requirement of the market (price, quality, service, competition, etc.) UPM's VoIP server does not "pick off" or "strip" incoming international calls from Digicel's network. The calls Digicel "loses" do not result from nefarious activities, but from UPM's competitive pricing for the same service.

---

[9] As already discussed, Digicel's "cloning" allegations are implausible on the face of the Amended Complaint and not entitled to a presumption of truth.

*TOMASI SALYER BAROWAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel's allegations do not adequately demonstrate that Defendants' conduct is evidence of a specific intent to defraud. Nor are they plausible in light of the "obvious alternative explanation" that UPM intended to compete with Digicel for the same third-party international carriers. *Twombly*, 550 U.S. at 567, 127 S. Ct at 1972. For those reasons, Digicel's RICO claims based on predicate acts of violating 18 U.S.C. § 1029 must be dismissed with prejudice. Because Digicel has no other bases for predicate acts, all of its RICO claims should therefore be dismissed.

**D.     Digicel's Civil Conspiracy Claim Should Be Dismissed.**

Because Digicel has failed to adequately plead that Defendants engaged in fraudulent conduct, its claim for civil conspiracy must also be dismissed. "In general, to constitute a civil conspiracy there must be: (1) Two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Bonds v. Landers*, 279 Or. 169, 174, 566 P.2d 513 (1977) (quoting 15A *C.J.S.* 599 Conspiracy § 1(2).); *see also Morasch v. Hood*, 232 Or. App. 392, 402, 222 P.3d 1125 (2009). A civil conspiracy is not an independent tort, absent a statute making it so, but is rather "a way in which a person may become jointly liable for another's tortious conduct." *Morasch*, 232 Or. App. at 402.

As already explained, Digicel cannot plausibly allege that Defendants' conduct was fraudulent. For that reason, none of Defendants' actions can be considered "unlawful overt acts" that would subject any or all of them to liability based on civil conspiracy. Therefore, the claim should be dismissed with prejudice.

**E.     Digicel's Conversion Claim Should Be Dismissed.**

"Conversion is a civil tort." *In re Conduct of Martin*, 328 Or. 177, 184, 970 P.2d 638 (1998). Oregon has long recognized an action for conversion. *See, e.g., Salem Light & Traction Co. v. Anson*, 41 Or. 562, 69 P. 675 (1902); *Craven v. Wright*, 114 Or. 692, 236 P. 1043

Page 18 – MOTION TO DISMISS AMENDED COMPLAINT

(1925). In 1969, the Oregon Supreme Court adopted the definition of conversion from the Restatement (Second) of Torts § 222A:

> (1)     Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.
>
> (2)     In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
>     (a)     The extent and duration of the actor's exercise of dominion or control;
>
>     (b)     the actor's intent to assert a right in fact inconsistent with the other's right of control
>
>     (c)     the actor's good faith;
>
>     (d)     the extent and duration of the resulting interference with the other's right of control;
>
>     (e)     the harm done to the chattel;
>
>     (f)     the inconvenience and expense caused to the other.

*Mustola v. Toddy*, 253 Or. 658, 663-64, 456 P.2d 1004 (1969). "The gravamen of the tort is the defendant's intent to exercise control over the chattel *inconsistently* with the plaintiff's rights." *Naas v. Lucas*, 86 Or. App. 406, 409, 739 P.2d 1051, *rev. denied*, 304 Or. 680, 748 P.2d 142 (1987) (emphasis added).

Again, because Digicel has failed to adequately allege that Defendants engaged in fraudulent conduct, it cannot establish that Defendants control over Digicel's SIM cards was "inconsistent" with Digicel's rights. Defendants paid Digicel for the SIM cards, and then used them to access Digicel's local Haitian network, which the SIM cards' programming allowed. Digicel's conversion claim should therefore be dismissed with prejudice.

## F.     Digicel's Unjust Enrichment Claim Should Be Dismissed.

Digicel alleges that Defendants purchased Digicel SIM cards. Defendants then used those SIM cards to access Digicel's local network, as those SIM cards' programming

Page 19 – MOTION TO DISMISS AMENDED COMPLAINT

TOMASI SALYER BAROWAY
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

permitted. Digicel received compensation for the use of its local network through Defendants' purchase of the SIM cards. Digicel has failed to sufficiently allege that any of Defendants' conduct was fraudulent or illegal. Therefore, its unjust enrichment claim must also be dismissed with prejudice.

**G.    Digicel's Claim for Injunction Should Be Dismissed.**

Finally, because Digicel has failed to specifically and plausibly allege that Defendants have engaged in fraudulent conduct, it cannot state the basis for injunctive relief. Digicel's claim for injunction should therefore be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss Digicel's Amended Complaint with prejudice.

Dated: September 28, 2015.

TOMASI SALYER BAROWAY

By: /s/ Eleanor A. DuBay
     Kathryn P. Salyer, OSB #883017
     ksalyer@tsbnlaw.com
     Eleanor A. DuBay, OSB #073755
     edubay@tsbnlaw.com
     Telephone: (503) 894-9900

Of Attorneys for Defendants

Page 20 – MOTION TO DISMISS AMENDED COMPLAINT

**Richard K. Hansen**, OSB #832231
Email:
rhansen@schwabe.com
Anne M. Talcott, OSB #965325
Email: atalcott@schwabe.com  Schwabe, Williamson & Wyatt, P.C.  Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Telephone:  503.796.2958
Facsimile:  503.796.2900

Attorneys for Plaintiff, Unigestion HoldingHoldings, S.A.

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDINGHOLDINGS, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**, *Plaintiff,* <br><br> vs. | No. 3:15-cv-00185-SI <br><br> **AMENDED** COMPLAINT <br><br> RICO (18 U.S.C. §§ 1962(b), (c) and (d)), |

Exhibit 1 Page 1 of 42

vs.UPM TECHNOLOGY, INC. d/b/a UPM TELECOM, INC, and UPM
MARKETING, INC., an Oregon corporation;
UPM TELECOM, INC., an Oregon a/b/n;
UPM MARKETING, INC., an Oregon
a/b/n; BENJAMINBEN SANCHEZ a/k/a BENJAMINBEN SANCHEZ MURILLO,
an Oregon residenta foreign individual; BALTAZAR RUIZ, an Oregon residenta
foreign individual, and TYLER ALLEN, an Oregon residenta foreign individual,

Defendants.

Exhibit 1 Page 2 of 42

COMPLAINT

RICO (18 U.S.C. §§ 1962(b), (c) and (d)),Fraud, Conspiracy, Conversion, and Unjust Enrichment and Permanent Injunction

**DEMAND FOR JURY TRIAL**

**COMPLAINT**

Plaintiff, UNIGESTION HOLDING, S.A., d/b/a Digicel Haiti, ("Digicel"), sues Defendants, UPM TECHNOLOGY, INC. ("UPM TECHNOLOGY"), UPM TELECOM INC., ("UPM TELECOM"); UPM MARKETING, INC.("UPM MARKETING") (collectively the companies together shall be referred to as "UPM"), BENJAMIN SANCHEZ a/k/a BEN SANCHEZ MURILLO ("Sanchez"), BALTAZAR RUIZ ("Ruiz") and TYLER ALLEN ("Allen") for damages and injunctive relief, and alleges as follows:

**PARTIES AND JURISDICTION**

1.    1. Plaintiff Digicel is a corporation organized under the laws of Haiti. Its headquarters and principal place of business is located in Port-Au-Prince, Haiti. Digicel owns mobile telecommunications switches located in Haiti through which all voice calls to and from its subscribers must pass. Digicel operates throughout the Caribbean and several other regions and is one of the largest mobile communications networks in Haiti.

2.    Defendant UPM Technology is a corporation organized under the laws of the state of Oregon with its principal place of business in Hillsboro, Oregon.

3.    Defendant UPM Telecom is a corporation organized under the laws of the state of Oregon with its principal place of business in Hillsboro, Oregon.

4.    Defendant UPM Marketing is a corporation organized under the laws of the state of Oregon with its principal place of business in Hillsboro, Oregon.

Exhibit 1 Page 3 of 42

5.    UPM Telecom and UPM Marketing are both assumed business names of UPM Technology.

6.    According to the Oregon Secretary of State, Corporate Division's business

6.    According to the Oregon Secretary of State, Corporate Division's business registry, UPM Technology, UPM Telecom, and UPM Marketing are all located at 3000 NW Stucki Place, Suite 100, Hillsboro, OR, 97124.

7.    Upon information and belief, Defendant Benjamin Sanchez is a citizen and resident of Oregon. Sanchez holds himself out as the Owner of UPM Marketing and the President of UPM Telecom. Sanchez is also the authorized representative of UPM Marketing according to the Oregon Secretary of State, Corporate Division's business registry.

8.    Upon information and belief, Defendant Baltazar Ruiz is a citizen and resident of Oregon. Ruiz holds himself out as the Project Manager for UPM Telecom.

9.    Upon information and belief, Defendant Tyler Allen is a citizen and resident of Oregon.

10.    This Court has jurisdiction over the parties pursuant to 18 U.S.C. § 1964 and 28

10.    This Court has jurisdiction over the parties pursuant to 18 U.S.C. § 1964 and 28 U.S.C. §1332(a). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens or subjects of foreign states.

11.    Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §1391(b). §1391(b).

12.    All conditions precedent to the filing of this action has occurred, been performed, excused or waived.

Exhibit 1 Page 4 of 42

## BACKGROUND

**Digicel's Operations in Haiti**

13. Plaintiff Digicel is a leading provider of telecommunications services in Haiti, with over 4 million customers.

14. Digicel has well over 900 employees and over eight regional offices in the Haitian ~~market.~~ market.

15. To facilitate the provision of mobile telecommunication services in Haiti, Digicel uses telephone switching systems ("Switches") located in Miami, Florida and New York City, New York in the USA. The purpose of the Switches is to route all voice calls that originate from customers of third party telecommunications networks located outside of Haiti to Digicel customers or subscribers located in Haiti.

16. Digicel uses a Private Branch Exchange ("PBX"), a Switch system that uses multiple telephone lines to route calls. The Switch uses an international gateway that allows Digicel to efficiently manage the routing of these calls and to manage and account for any billing and associated regulatory charges.

17. In order to properly route international calls to its customers and subscribers, Digicel has established commercial agreements with a number of third party international telecommunication carriers and charges those carriers a 'floor' rate of ~~at least~~ 23 cents per minute—the lowest rate established by the Government of Haiti for incoming international telephone calls with an end-user in Haiti—to route such traffic through its ~~switches~~Switches and other proprietary equipment in the USA and Haiti to Digicel's customers and subscribers in Haiti.

18. All United States telecommunications traffic to Digicel (Haiti) is routed

Exhibit 1 Page 5 of 42

through Digicel's international switching centers in Miami and New York. Network links are established between these switching centers and various third-party international wholesale carriers so that telecom traffic originating with these third party carriers can be legitimately routed to the Digicel network in Haiti where it is terminated. [1]

---

[1] "Terminating" essentially means where a call is shown to be received for the purposes of a cellular companies tracking and billing records.

19. ~~International Carriers who do not have a direct (authorized) link by way of agreement to one of Digicel's international switching centers must direct their traffic through a third party who has this contractual access with Digicel in order for the call to legitimately~~ For a call to pass through the proper Switches and reach its end-user on the Digicel cellular network in Haiti, a carrier must have a contractual relationship with Digicel. If a carrier does not have a contract with Digicel it must direct its traffic through a third-party with whom Digicel contracts in order for the call to pass through legitimate channels.

20. Digicel receives payment of a minimum of 23 cents per minute from the various contracting third parties for calls received under these telecommunications termination ~~arrangements~~agreements depending upon several factors including the amount of traffic they terminate ~~to~~in Haiti.

21. For every international call minute terminated on its Haiti network, Digicel is obligated to pay 5 cents per minute to the Government of Haiti from its total revenue received.

---

[1] ~~Terminating essentially means where a call is shown to be received for the purposes of a cellular companies tracking and billing records.~~

Exhibit 1 Page 6 of 42

22.    ~~21.~~ ~~Digicel retains 18 cents per minute as revenue and pays 5 cents per minute to the Government of Haiti as a levy which is used to support the National Education Fund.~~ Digicel has not authorized international or domestic telephone traffic to enter its ~~switch~~Switch in Haiti by any other route or under any other agreement.

**Switch Systems and Bypass Fraud**

23.    ~~22.~~ Telephone switching systems such as the one utilized by Digicel, are susceptible to what is ~~called~~in the telecom industry, sometimes referred to as bypass fraud. Bypass fraud occurs when individuals illegally route calls around the ~~international gateway~~Digicel International Gateway using a combination of the internet and/or certain specialized telecommunications devices called Subscriber Identity Module ("SIM") Boxes and/or SIM Servers. The SIM Boxes and SIM ~~Servers~~servers communicate with individual cellular devices through a SIM Card.

24.    ~~23.~~ A SIM Card is essentially a small circuit board which is placed inside a cellular device in order to, among other things, identify the ~~phone~~device to a specific cellular carrier as associated with a unique telephone number and customer account.

25.    The commercial purpose of these types of SIM Cards is to operate and identify one cellular device to an individual consumer, allowing that consumer access to the Digicel network and allowing Digicel to account for and invoice the calls or communications made from a cellular device containing that specific SIM Card.

26.    ~~24. These~~Instead of performing pursuant to the commercial expectations, individuals engaging in bypass fraud use various combinations and configurations of the SIM Boxes, SIM Servers and SIM Cards to set up bypass gateways, or illicit 'mini-telephone exchanges.'

Exhibit 1 Page 7 of 42

27.    ~~25.~~ This type of bypass scheme allows inbound international calls to avoid the established legitimate routing mechanisms and thereby avoid payment of termination fees to legitimate cellular carriers or indirectly, to any affected regulatory agencies.

28.    Essentially, the bypass scheme causes international calls to misrepresent the origin of the call or communication to the cellular carrier by masquerading it as a domestic call. When an international call is directed through the Defendants' SIM Boxes or SIM Servers, the call is associated to a domestic number, and the call is then subsequently made to interface with the local cellular network as a domestic call. The termination of the international call as a local call after this misrepresentation is the final act in the bypass fraud.

29.    ~~26.~~ Significant profits are generated by the illicit operators exploiting the margin between the local call rates and the international termination rates.

30.    ~~27.~~ SIM Cards used in bypass fraud are ~~usually~~ sometimes purchased using false or altered identification documents procured by local co-conspirators at the instruction and direction of the head of the fraudulent enterprise.

31.    Where the local identification infrastructure is less robust, locals are "recruited" to purchase SIM cards on behalf of the conspirators and at their instructions. The local recruits are provided with the funds to make these purchases and compensated for their efforts in furtherance of the conspiracy.

32.    The SIM Cards are purchased under the false pretext that they will be used by an individual for that individual's personal calls in a unique cellular device, when in fact they are being purchased for use in a SIM Server to re-direct international

Exhibit 1 Page 8 of 42

calls. It is beyond the contractual and commercial expectations of Digicel and its authorized retailers that an individual SIM Card would be used for anything other than an individual's personal cellular calls and communications.

33.    To protect and further the commercial expectations that a SIM Card will only be used for retail consumer purposes, Digicel SIM cards in Haiti, are only sold by Digicel's authorized retailers and representatives.    SIM Cards can be purchased at various locations including grocery and convenience stores.

34.    In order to purchase a Digicel SIM Card in Haiti an individual is required to complete and file a Customer Registration Card using their government issued identification card. A true and correct copy of a Customer Registration Card is attached to the Amended Complaint as Exhibit A. This mechanism was designed to prevent the acquisition and use of SIM cards for improper or illegal purposes.

35.    Further, the sale of SIM Cards is regulated by law and dealers are cautioned through communications from Digicel, Dealer Circulars, not to sell SIM Cards to anyone that the dealer may think is going to resell the SIM Card. A true and correct copy of an applicable regulation and two Dealer Circulars are attached to the Amended Complaint as Composite Exhibit B.[2]

36.    Digicel does not allow for the unauthorized bulk purchase of SIM Cards. This is to avoid the use of the SIM Cards in a manner inconsistent with the commercial expectation that an individual will be using the SIM Card solely for personal calls and communications.

Exhibit 1 Page 9 of 42

37. 28. TheUsing a combination of the internet and, highly specialized software, SIM Boxes andor SIM Servers allowand/or "Receivers" allows the participants in the bypass fraud to use Digicel's infrastructure to sell international call minutes to third parties for termination on Digicel's network, while avoiding payment for the use of this infrastructure.

38. 29. A SIM Box is a computer that can be used in orderdevice that stores a large number of SIM cards. Its purpose in this instance is to receive incoming international calls from third parties and terminate them through SIM Cards. These devices can hold hundreds of SIM Cards which can simultaneously terminate incoming telephone traffic at the same timethese SIM cards to Digicel subscribers. The SIM Cards are manipulated to connect to the nearest available cell tower. Each SIM Card has a separate International Mobile Equipment Identity (IMEI), making it look to the network like it is registered within a unique handset or cellular device.

39. A SIM Server is a computer with specialized, Human Behavior Software ("HBS") installed. Its purpose is to receive incoming calls international calls and terminate them through the SIM Cards to Digicel subscribers. The specialist HBS controls:

(a) Registration and movement of SIM Card's within Digicel's network;

(b) SIM Card selection for the termination of call;

(c) SIM Card profile, to disguise as a regular subscriber;

(d) SIM Card credit balance and recharge;

(e) Alarms indicating SIM Cards which are blocked;

---

[2] Plaintiff will provide a certified translation of the attached Exhibits A and B through a notice of filing as soon as the certified translations are available.

Exhibit 1 Page 10 of 42

(f)  Service whitelists (confirmed customers) and blacklists (test numbers used for identifying bypass services).

40.    30. A SIM Server is, in lay terms, a device that can be used to remotely register SIM Cards on a mobile telephone network. Using specialized software, this server device can monitor and control several connected SIM Boxes. The use of SIM Servers is typical of a large and sophisticated operation due to the volume and cost of the equipment required to construct SIM Servers.

41.    31. TheDefendants' use of SIM Servers further indicates the existence of a sophisticated operation due to the technological expertise required to construct the SIM Servers and keep them properly maintained and operational.

32.    Bypass fraud generates significant profits for illicit operators by exploiting the margin between the local call rates and the international termination rates.

42.    After a SIM Server routes the call around the Switch and international gateways, the call is directed to a "Receiver" constructed and operated in Haiti by the company or individuals assisting with the bypass operation.

43.    The Receiver receives the call from the SIM Server and directs the call to the appropriate domestic cellular tower in Haiti.

44.    At the time the Receiver delivers an international call to the local Digicel cellular tower, the Receiver furthers the digital misrepresentation that the international call is instead a local domestic call.

45.    33. Bypass fraud occursand the underlying misrepresentations occur every time a call is re- routed from a legitimate international gateway or switch to the bypass fraud gatewaySIM boxes or SIM servers and into the local network.

Exhibit 1 Page 11 of 42

46.    Defendants have engaged in the above-detailed bypass fraud through the use of

SIM Servers and SIM Boxes constructed and located in Oregon.

## FACTS

47.    ~~34.~~ In early 2014, Digicel ~~discovered~~ uncovered evidence of possible fraudulent activity using bypass techniques and discovered equipment during routine monitoring and investigation designed to detect and deter bypass fraud.

48.    ~~35.~~ Further investigation and monitoring was conducted by Digicel to confirm its initial suspicions regarding possible fraudulent bypass activity.

49.    ~~36.~~ Digicel determined that international calls were being terminated on local Haitian numbers (local Digicel SIM Cards) ~~which,~~ and these local SIM Cards were then subsequently making further outbound connections on the same calls.

50.    ~~37.~~ Digicel was able to identify specific SIM Cards that were being used in the bypass fraud by evaluating the "Bypass Profile" of the SIM Cards and their related information from Digicel's charging and billing systems.

51.    ~~38.~~ Digicel employs several proprietary strategies to regularly scan the network for indicators of anomalous call patterns that suggest ~~bypass fraud~~ Bypass Fraud.

52.    ~~39.~~ With the assistance of the local Haitian Police ("PNH"), operations were commenced to identify the ~~location~~ possible locations or ~~base~~ bases of the fraudulent activities.

53.    ~~40.~~ Contemporaneous with the PNH operations, Digicel continued its own internal investigation of the suspected bypass fraud by engaging the services of Shields Crime & Security Consultants ("Shields CSC"), in Kingston, Jamaica.

Exhibit 1 Page 12 of 42

54.    41. The combined investigations of Shields CSC (on behalf of Digicel) and the PNH, revealed a systematic and ongoing bypass fraud operation coordinated, funded, and conducted by UPM and the other Defendants.

55.    42. The fraudulent bypass operation by all indicators, is ongoing.

## MISREPRESENTATIONS MADE BY DEFENDANTS

### Misrepresentations through purchase and use of SIM Cards

56.    In Haiti, Digicel SIM Cards are only sold by Digicel's authorized representatives.

57.    Upon information and belief, Defendants employed the assistance of numerous Haitian individuals to act as their agents in the purchase and acquisition of numerous Digicel SIM Cards.

58.    Based upon demand, Digicel places an order for SIM Cards with an approved manufacturer. Digicel provides the basic information for this process including SIM Card specifications (2G, 3G, standard, micro, mini), along with the range of International Mobile Subscriber Identity (IMSI) to be used during the process. The manufacturer then produces the SIM Cards which are shipped to Digicel offices.

59.    Data regarding the SIM Cards and corresponding IMEIs is transmitted to and from the manufacturer in an encrypted format in order to maintain confidentiality of sensitive data.

60.    Upon receipt of the SIM Cards, Digicel assigns each SIM Card with a Mobile Station International Subscriber Directory Number (MSISDN). The SIM Card's details including the MSISDN are registered in Digicel's internal systems in a pre-active state.

61.    The SIM Card only becomes active on the network when they are placed

Exhibit 1 Page 13 of 42

into a handset and a transaction such as a personal call or recharge takes place.

62.    By default all SIM Cards can be used for voice, data and messaging services in the Digicel network.

63.    If a customer so requires, special parameters for specialist services can be added

to the SIM Card's function, such as vehicle tracking. These parameters are only available at the

specific request of the customer and with the approval of Digicel's commercial team.

64.    Credits, in the form of minutes, are added to the phone through recharges. This can be done using a number of methods including vouchers and on-line "top-ups." The balance associated to each service is maintained and updated by Digicel based upon transactions and recharges.

65.    To obtain Digicel SIM Cards, the Defendants' Haitian agents go to a Digicel authorized retailer and purchase SIM Cards under the false premise that those SIM Cards are for their own individual, retail use in cellular handset devices.

66.    Instead, the Haitian agent would then deliver the SIM Cards to the Defendants or their designees who then ship those cards to Defendants in Oregon.

67.    Defendants then assemble the SIM Cards into SIM Boxes and SIM Servers, all located in Oregon, to intentionally misrepresent incoming international calls to the Digicel network as local (domestic) calls placed within Haiti.

68.    In order to complete the bypass, the SIM Card is typically cloned—meaning the SIM Card data is retrieved from the SIM Card and transmitted over the internet to the local Receiver in Haiti—following which the cloned data is then used by the local Receiver to complete the call in Haiti.

Exhibit 1 Page 14 of 42

69. The SIM Cards housed in Oregon, are manipulated or cloned to retrieve and then transmit the unique identifying information off each SIM Card, so that the information can be sent to Haiti. This allows UPM to pretend to initiate a call in Haiti when the call was in fact initiated in the USA. Using the "cloned" SIM Card, the Receiver located in Haiti completes the call to the ultimate recipient using Digicel's telecom network.

70. Currently, there are at least two known methods that Defendants have employed to commit bypass fraud through the illicit use of SIM Cards.

71. First, Defendants are using Internet Protocol ("IP") technology in conjunction with traditional cellular infrastructure to cause international calls to completely bypass Digicel's international Switch and then subsequently terminate in Haiti as a local rather than an international call.

72. Second, Defendants purport to be using Digicel's Roam Like You Are Home ("RLYH") service plan to cause international calls to be manipulated in these SIM servers, re- transmitted, terminated, and accounted for as "regular" local calls.

73. Both of these bypass methods culminate in international calls being misrepresented to Digicel as regular local or domestic calls, and accordingly, invoiced and billed as such.

74. These multiple misrepresentations by the Defendants and their agents and Digicel's subsequent reliance thereon create a significant loss of revenue for Digicel, and an additional unaccounted for stress on Digicel's cellular network and infrastructure and good-will in Haiti.

**Misrepresentations made through purchase and use of RLYH Plan**

Exhibit 1 Page 15 of 42

75.    Digicel's RLYH Plan allows an individual based in Haiti, with a Haitian based telephone number, to call Haiti while traveling abroad. An individual can sign up for this service and pay an additional fee for use of this service on a weekly or monthly cycle. Having agreed to the terms of service and having paid a one-time advanced access charge, the RLYH Plan allows this individual to make international calls back to Haiti at rates similar to the domestic rate (therefore roaming like they were home) during the period they are signed up for the plan.

76.    Generally, an individual can sign up for the RLYH Plan by paying an additional access fee of approximately $20 – $25 US at the time they sign up for the RLYH plan. This service can also be added to an existing SIM Card through the use of an Unstructured Supplementary Service Data ("USSD") Code that can be entered into the phone at any time.

77.    The RLYH Plan is intended to be used by an individual customer for a finite period of time while they are roaming outside of their "home" network in Haiti.

78.    Upon information and belief, Defendants have sold large blocks of wholesale cellular minutes for calls to be terminated in Haiti to large third-party telecommunications carriers whose customers make telephone calls to Haiti.

79.    If a customer of one of the third-party carriers who purchased wholesale minutes from Defendants places a call to Haiti, the call is routed using sophisticated telecommunications software to Defendants' SIM Servers in Oregon and possibly elsewhere.

80.    Upon information and belief, UPM and its agents, subsidiaries, and

Exhibit 1 Page 16 of 42

representatives may have also created direct commercial relationships with retail customers through the retail sale of digital plans or international calling cards.

81.    The SIM Server, containing SIM Cards allegedly registered for the RLYH Plan, then directs the call to its ultimate recipient. At that time, the call represents itself to towers in the United States and ultimately in Haiti as coming from a RLYH subscriber when the call is actually from an individual that is subscribed to a third-party carrier and has no relationship with Digicel and is **not** registered on the plan.

82.    The call is then misrepresented to the Digicel's network in Haiti as a call made by an individual subscribed to the RLYH Plan and is not charged international calling rates. **Misrepresentations Made Through Use of IP Technology**

83.    Defendants are also using IP technology to illegally bypass calls around Digicel Switches.

84.    In basic terms, Defendants have SIM Servers and SIM Boxes into which they have loaded Digicel SIM Cards. These SIM Servers receive calls made to Haiti by individuals outside of Haiti.

85.    Defendants have either sold minutes (wholesale) to third-parties or sold minutes directly to consumers through phone cards or retail sales of cellular plans and devices.

86.    Once a call is made by a customer of the third-party carrier, a Digicel retail customer, or a customer who has purchased a UPM related phone card, the call is then routed directly to UPM's SIM Servers in Oregon.

87.    The call is then routed via the internet to a Receiver that has been installed in Haiti which contains the cloned SIM Card information, bypassing

Exhibit 1 Page 17 of 42

Digicel's International Switches.

88.    UPM's technology intentionally causes the call to avoid Digicel's Switches in the United States.

89.    Through the use of sophisticated software that works to evade detection of the SIM Servers and bypass operations, the SIM Servers in Oregon select a Haitian telephone number associated with one of the SIM Cards in the SIM Server and "packages" that number along with the original call for transmission over the internet.

90.    Once a SIM Card and associated telephone number is selected by the software, the telephone number is transmitted via IP technology to a Receiver located in Haiti.

91.    The packaged SIM information and telephone call are delivered via theinternet to a local Receiver in Haiti which then directs that call back into the local network as a local call using the identifying information transmitted from the SIM card to trick the network into thinking the call was originated from that "local" number.

92.    Defendants have numerous Receivers located throughout Haiti, and each Receiver can be moved to a different location on short notice. Again, this is to evade detection.

93.    This is a manipulation of the intended use of SIM Cards. Here, Defendants use the software to evade detection by misrepresenting the true identity and origin of the initial call and altering the SIM Card's normal usage patterns.

94.    Through the use of software, Defendants in Oregon can choose to

Exhibit 1 Page 18 of 42

spread calls to different Receivers. This strategy is intended to mimic the calling patterns of real people.

95.    For example, if all calls went to—and then from—a single Receiver in a static location, the abnormal call volumes to the particular tower in the area of the Receiver could be flagged as a sign of bypass fraud.

96.    To avoid easy detection, Defendants use multiple, portable Receivers in various locations. The software manipulates calling patterns by directing calls to be spread among various Receivers.

97.    The Receiver, also operated by Defendants, then routes the call to the closest Digicel tower in Haiti and ultimately, on to the recipient's cellular telephone. When the call is terminated through the Receiver the Caller Line Identification (CLI) is blocked so that the calling number is manipulated to display on the Digicel subscriber's phone as "unknown" or with a blank value. Defendants do this by inserting a special code in front of the subscriber number when the call is routed.

98.    By using SIM Servers in Oregon and sophisticated IP technology in conjunction with the local Receiver, Defendants intentionally manipulate the SIM card data to misrepresent the international call to Digicel's Haitian network as a domestic call made in Haiti, and only the domestic calling fees are charged.

**DEFENDANTS' MAIL AND WIRE FRAUD ACTIVITIES**

99.    43. Money was sent by international wire from UPM Marketing to known and unknown co- conspirators in Haiti to facilitate the illicit sourcing and purchase of Digicel SIM Cards.

100.    44. Plaintiff has knowledge of several separate Capital Bank transaction

Exhibit 1 Page 19 of 42

slips transferring money frombetween UPM Marketing toand the Haitian co-conspirators. These transactions slips are in the custody of the PNH.

101. 45. MoneyIn certain instances, money remaining from the purchases, was then sent from the Haitian co- conspirators by international wire transfer to Victor Manuel Moscoso Ruiz ("Moscoso Ruiz"), the President of UPM Marketing Guatemala, S.A. Wire transfer receipts evidencing some of these transfers are similarly in the possession of the PNH. True and correct copies of some of these receipts are attached to the Complaint as Composite Exhibit AC.

102. 46. Plaintiff knows of an additional two Sogebank financial transaction slips that evidence wire transfers of money used to further the bypass fraud. TheseEvidence of these transactions slips are similarly in the custody of the PNH.

103. 47. Several DHL shipping documents evidencing the shipment of illicitly acquired SIM Cardscards used to commit the bypass fraud, from the Haitian co-conspirators to Sanchez and Allen at 2373 NW 185th Avenue Hillsboro, OR, 97124, listing a phone number of 503.334.8522, were recovered by the PNH.
were recovered by the PNH.

104. 48. Additional documents evidencing the shipment of computer equipment to the Haitian co-conspirators by Ruiz were also discovered. These documents evidence at least ten separate international shipments between the co-conspirators. The original shipping documents are in the custody of the PNH.

105. 49. On May 13, 2014, a Haitian co-conspirator, nowformerly in the custody of the PNH, shipped SIM Cards to Sanchez in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the

Exhibit 1 Page 20 of 42

Complaint as Exhibit B̶D.

106.    5̶0̶.̶ On May 20, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Sanchez in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit C̶E.

107.    5̶1̶.̶ On May 27, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Sanchez in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit D̶F.

108.    5̶2̶.̶ On June 4, 2014, Defendant Ruiz shipped computer equipment to the Haitian co- conspirator. A true and correct copy of the customs form evidencing this shipment is attached as Exhibit E̶G.

109.    5̶3̶.̶ On June 5, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Sanchez in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit F̶H.

110.    5̶4̶.̶ On June 30, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Defendant Allen in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit G̶I.

111.    On July 3, 2014, Defendant Ruiz made an additional shipment of computer

5̶5̶.̶    O̶n̶ ̶J̶u̶l̶y̶ ̶3̶,̶ ̶2̶0̶1̶4̶,̶ ̶D̶e̶f̶e̶n̶d̶a̶n̶t̶ ̶R̶u̶i̶z̶ ̶m̶a̶d̶e̶ ̶a̶n̶ ̶a̶d̶d̶i̶t̶i̶o̶n̶a̶l̶ ̶s̶h̶i̶p̶m̶e̶n̶t̶ ̶o̶f̶ ̶c̶o̶m̶p̶u̶t̶e̶r̶ equipment to the Haitian co-conspirator.  A true and correct copy of the customs form

Exhibit 1 Page 21 of 42

evidencing this shipment is attached as Exhibit H. InterestinglyJ. Notably, the export invoice associated with this shipment was signed by Allen, although the shipment form indicates that it was made from Ruiz.

112. 56. On July 8, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Allen in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit IK.

113. 57. On July 15, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Allen in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit JL.

114. 58. On July 21, 2014, the same Haitian co-conspirator made an additional shipment of SIM Cards to Allen in Oregon by DHL. True and correct copies of the shipping documents evidencing this transaction are attached to the Complaint as Exhibit K.M.

115. 59. Money was also transferred into Haiti by UPM Marketing and the Defendants to fund and facilitate the setup and operation of the illicit bypass locations and Receivers at different secret locations in Haiti.

116. 60. Upon information and belief, UPM Telecom, through Defendants Sanchez, Ruiz, and UPM Marketing, funded and directly provided, through mail and wire, access devices, including SIM Banks (groups of SIM Servers), laptops, internet routers, and generators to their co-conspirators in Haiti, which were then usedwith the intent and sole purpose to facilitate bypass operations for the termination of

Exhibit 1 Page 22 of 42

international telephone traffic into Haiti.

117.    61. To date, Digicel estimates that as a result of Defendants' fraudulent bypass activity, in excess of 3.2 million minutes of calling time has been dive-lieddiverted away from Digicel's switches and international gateway, for which Digicel was not compensated. Defendants' Defendants' intentional misrepresentations constituting fraudulent bypass activity is continuous and on-going to this date.are continuous and on- going.

118.    62. Defendants' ongoing unlawful activity is not isolated but rather is persistent and poses a continuing threat.

119.    63. Each telephone call that is stolen from Digicel's transmission systems by Defendants' illegal bypass gateways constitutes a separate act of bypass fraud performed with the specific intent of defrauding Digicel.

120.    64. UPM Telecom has also been implicated in other fraudulent bypass operations in other regions with high international termination rates and has been implicated in fraudulent traffic into the wholesale market servicing those areas.

121.    65. In addition to suffering financial injury, Digicel also has suffered irreparable harm through disruption of its business operations and damage to its goodwill, commercial and government reputation and customer relationships.

122.    66. Digicel's investigation of the ongoing fraudulent activity is ongoing.

## COUNT I: RICO SECTION 1962(c)

123.    67. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66122 above as if fully set forth herein.

124.    68. This Count is against Defendants UPM Telecom, UPM Marketing,

Exhibit 1 Page 23 of 42

Sanchez, Ruiz, and Allen (collectively "the Count I Defendants").

125. 69. UPM Telecom is an enterprise engaged in and whose activities affect interstate commerce through the systematic re-routing of international cellular telephone calls through a sophisticated bypass network that allows cellular phone companies to avoid routine charges for ~~international cellular telephone calls. The Count I Defendants are employed or associated with the enterprise.~~

international cellular telephone calls. The Count I Defendants are employed or associated with the enterprise.

126. 70. The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs ~~through a pattern of racketeering activity and for the~~with specific intent and unlawful purpose of ~~intentionally~~ defrauding Plaintiff through a pattern of racketeering activity. Specifically, and without limitation,

(a) UPM Marketing provided funds by wire to individuals in Haiti for the purchase and use of SIM Cards to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(b) Sanchez knowingly received hundreds of Digicel SIM Cards from Haiti for use in SIM Boxes in Oregon which were used to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(c) ~~(c)~~ Ruiz for, with and on behalf of Sanchez and UPM Telecom knowingly caused computer and internet equipment to be sent to Haiti for the commission of bypass fraud in violation of 18 U.S.C.

Exhibit 1 Page 24 of 42

§ 1341, 18 U.S.C. § 1343, and 18 ~~U.S.C. § 1029;~~

U.S.C. § 1029;

(d) ~~(d)~~ Allen for, with and on behalf of Sanchez and UPM Telecom, knowingly received a large quantity of SIM Cards from Haiti for use in SIM Boxes in Oregon which were used to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(e) ~~(e)~~ Allen for, with and on behalf of Sanchez and UPM Telecom, knowingly received a large quantity of SIM Cards from Haiti for use in SIM Servers in Oregon which were used to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(f) Allen knowingly caused computer and internet equipment to be sent to Haiti

~~(f) Allen knowingly caused computer and internet equipment to be sent to Haiti~~ for the commission of bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(g) Defendants, individually and in concert, all knowingly participated in programing SIM Cards and constructing SIM Boxes and Servers to carry out the bypass fraud.

(h) Defendants continue their racketeering activity to this day as each international call that bypasses Digicel's switch, and is then subsequently transmitted using Digicel's towers and infrastructure, is a predicate act of racketeering activity.

Exhibit 1 Page 25 of 42

(i) (i) Defendants racketeering activity is on-going as millions of cellular minutes continue to be stolen by the fraudulent bypass operations that Defendants funded, constructed, and operated for this purpose.

127. 71. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts under 18 U.S.C. § 1341 related to mail fraud.

128. 72. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts under 18 U.S.C. §1343 related to wire fraud.

129. 73. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts under 18 U.S.C. § 1029 prohibiting fraud and related activity in connection with access devices.

130. 74. Defendants' racketeering activity includes directly or indirectly participating in the wiring of funds to purchase and ship equipment each Defendant knew would be used to commit bypass fraud, the purchase equipment and SIM Cards to commit bypass fraud, and the bypass fraud committed when every single such call is illegally diverted from the Digicel network. This activity is on-going and poses a continued threat.and possession of access devices in order to commit bypass fraud, the programing of the equipment, software, and SIM Cards to commit bypass fraud, and intentionally causing international calls to misrepresent themselves to Digicel's network as domestic calls through the manipulation and unintended use of SIM Cards. Bypass fraud is committed when every single such call is illegally diverted from the Digicel network. This activity is on-going and poses a continued threat.

131. 75. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. 1961(5).

Exhibit 1 Page 26 of 42

U.S.C. 1961(5).

132.    76. The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

133.    77. As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs havePlaintiff has been injured in theirits business and property in that Plaintiffs are losing revenue on an average of 1440 minutes of international cellular telephone usage per day which translates to approximately US$2,592.00 per day of lost revenue for an aggregate amount believed to be approximately, or in excess of one million dollars.

134.    78. From the time the scheme was detected in March 2014 up to and until the date of this Complaint, Plaintiff has lost significant revenue with much of this revenue believedbelieve to be attributed to ongoing and concealed fraudulent activity. These losses are continuous and on- going as Count I Defendants conduct is open-ended and continues to this day.

135.    79. WHEREFORE, Plaintiff requests that this CourtCourt enter judgment against the Count I Defendants as follows:

> (a) Actual damages min the amount of revenue stolen by Count I Defendants scheme;
>
> (b) Treble damages;
>
> (c) Attorneys' fees;
>
> (d) Injunctive relief ordering Count I Defendants to temporarily and permanently enjoin the use of or access to any assets located in the

Exhibit 1 Page 27 of 42

United States;

(e) Injunctive relief ordering Count I Defendants to cease any contact by Defendants with any party in the United States; for the purpose of further facilitating Defendants' unlawful conduct as described herein; and

(f) Any further relief this Court deems just and proper.

### COUNT II: RICO SECTION 1962(b)

136. 80. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66122 above as if fully set forth herein.

137. 81. This Count Isis against Defendants UPM Marketing, Sanchez, Ruiz, and Allen (collectively "the Count II Defendants").

138. 82. UPM Telecom is an enterprise engaged in and whose activities affect interstate commerce.

139. 83. The Count II Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically the Count II Defendants knowingly and willing maintained an interest in the enterprise through the funding and supporting the fraudulent bypass operations through the purchase and maintenance of the access devices required to perpetuate the bypass fraud, the shipping of equipment to Haiti to be used in the bypass fraud, the illicit programmingmanipulation and unintended use of SIM Cards and illicit assembly of SIM Boxes and SIM Servers to commit the bypass fraud, and the commission of individual acts of bypass fraud every time a call is diverted from Digicel's network. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).intentionally causing international

Exhibit 1 Page 28 of 42

calls to misrepresent themselves to Digicel's network as domestic calls through the manipulation and unintended use of SIM Cards, and the commission of individual acts of bypass fraud every time a

call is diverted from Digicel's network. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

140. 84. The Count II Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

141. 85. As a direct and proximate result of the Count II Defendants racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property in that:

(a) (g) Plaintiff has suffered a Loss of Plaintiff 's goodwill;

(b) (h) There has been a disruption of Plaintiff 's business operations;

(c) (i) There has been damage to Plaintiff 's commercial reputation; and

(d) (j) There has been Damage to Plaintiff 's reputation and standing with the Haitian Government.

142. 86. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count II Defendants for an award to include the following:

(a) (k) Actual damages;

(b) (l) Treble damages;

(c) (m) ———Attorneys' fees; and

(d) (n) Any further relief this Court deems just and proper.

**COUNT III: RICO SECTION 1962(d)**
**CONSPIRACY**

Exhibit 1 Page 29 of 42

143.    87. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66, 67122, 124 through 78134 and 80137 through 85141 above as if fully set forth herein.

144.    88. This Count is against Defendants UPM Telecom, UPM Marketing, Sanchez, Ruiz, and Allen (collectively "the Count III Defendants").

145.    89. As set forth above, the Count III Defendants agreed and conspired to violate 18 U.S.C. § 1962(b) and (c). Specifically,

U.S.C. § 1962(b) and (c). Specifically,

(a) UPM provided funds by wire to individuals in Haiti for the purchase and use of SIM Cards to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(b) Sanchez knowingly received a large quantity of SIM Cards from Haiti for use in SIM Boxes in Oregon which were used to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(c) Ruiz knowingly caused computer and internet equipment to be sent to Haiti for the commission of bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(d) (d) Allen knowingly received a large quantity of SIM Cards from Haiti for use in SIM Boxes in Oregon which were used to commit bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(e) (e) Allen knowingly caused computer and internet equipment to be sent

Exhibit 1 Page 30 of 42

to Haiti for the commission of bypass fraud in violation of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 1029;

(f) (f) Defendants all knowingly and willingly participated in programing or arranging for the programming of SIM Cards and constructing SIM Boxes and Servers or arranging for their construction to carry out the bypass fraud;

(g) Defendants knowingly and willingly continue their racketeering activity as

(g) Defendants knowingly and willingly continue their racketeering activity as millions of cellular minutes have been stolen by the fraudulent bypass mechanism that Defendants funded, constructed, housed and operated for this purpose.

146. 89. The Count III Defendants have intentionally conspired and agreed to acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

147. 91. The Count III Defendants knew that these predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C §§ 1962(b) and (c), in violation 18 U.S.C. § 1962(d).

148. 92. As a direct and proximate result of the Count III Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business and property in that it has suffered:

Exhibit 1 Page 31 of 42

(a) Loss of revenue from millions of minutes of international airtime;

(b) Loss of funds used to implement and execute the investigative operations which lead to the discovery of Defendants racketeering activity;

(c) Loss or diminution of Plaintiff's business and customer goodwill;

(d) Disruption of Plaintiff's business operations;

(e) Damages to Plaintiff's commercial reputation; and

(f) Damages to Plaintiff's reputation and standing with the Haitian Government.

149. 93. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count III Defendants for the following:

(a) Actual damages;

(b) (b) Treble damages;

(c) (e) Attorneys' fees;

(d) (d) Injunctive relief ordering Count III Defendants to temporarily and permanently enjoin the use of or access to any illicit assets located in the United States;

(e) (e) Injunctive relief ordering Count III Defendants to cease and desist from any contact by Defendants with any party in the United States for the purpose of further facilitating Defendants' unlawful conduct as described herein; and

(f) (f) Any further relief this Court Comi deems just and proper.

### COUNT IV:  FRAUD (RLYH Plan)

150. 94. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66122 above as if fully set forth herein.

151. 95. Defendants intended to engage, and did engage, in bypass fraud by

Exhibit 1 Page 32 of 42

improperly using the acquired SIM cards and other unauthorized equipment to permit calls to be made on Digicel's network and to be fraudulently compensated for the calls made by third parties.

152.    Defendants furthered this fraud by signing up for Digicel's "Roam Like You Are Home" plan ("RLYH Plan") with the specific intent of using the Plain for unauthorized, commercial purposes.

153.    The RLYH Plan is intended to provide individuals traveling outside of Haiti to make calls home at the going-rate for domestic calls. Instead of signing up for its intended purpose, Defendants signed up for the RLYH Plan with the specific, fraudulent intent of using SIM Cards associated with the RLYH Plan as a means of trafficking international cellular calls to

Haiti at domestic rates through the improper and unauthorized use of Digicel's cellular network

and infrastructure.

154.    96. Defendants intended to engage, and did engage, in bypass fraud by improperly using the acquired SIM cardsCards and other unauthorized equipment to permit calls to be made on Digicel's network and to fraudulently avoid compensating Digicel for the calls terminated on Digicel's network.

155.    By directing calls to avert Digicel's international Switch, Defendants are intentionally causing a fraudulent omission to take place.

156.    By causing international calls to represent themselves as domestic calls, Defendants made specific misrepresentations to Digicel. These misrepresentations caused the calls to be improperly accounted for and to be billed at a lesser domestic rate.

157.    97. Defendants knew that their acts were unlawful and intentionally

Exhibit 1 Page 33 of 42

committed ~~them~~these  acts for their own benefit.

158.    ~~98.~~As a direct, foreseeable, and proximate result of the fraudulent conduct of Defendants, Plaintiff has suffered damages.

159.    ~~99.~~The acts by Defendants were committed maliciously and with an improper motive, and in conscious disregard of the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, interest and costs, and for such other relief as this Court deems just and proper.

## COUNT V: ~~CIVIL CONSPIRACY~~ FRAUD (IP Calls)

160.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 122 above as if fully set forth herein.

161.    Defendants intended to engage, and did engage, in bypass fraud by improperly using the acquired SIM Cards, other unauthorized equipment, and specialized software to permit calls to be made on Digicel's network and to be fraudulently compensated for the calls made by third parties.

162.    Defendants furthered this fraud by using IP technology to cause international calls made to Haiti to bypass Digicel's international Switches by use of SIM Servers.

163.    By using SIM Servers and IP technology in conjunction with Receivers located in Haiti, Defendants intentionally misrepresent the international call to Digicel's Haitian network as a domestic call made in Haiti.

164.    Defendants intended to engage, and did engage, in bypass fraud by this improper use of the acquired SIM Cards and other unauthorized equipment and software to permit calls to be made on Digicel's network and to fraudulently avoid compensating

Exhibit 1 Page 34 of 42

Digicel for the calls terminated on Digicel's network.

165.    By causing international calls to represent themselves as domestic calls, Defendants made specific misrepresentations to Digicel. These misrepresentations caused the calls to be improperly accounted for and to be billed at a lesser domestic rate.

166.    Defendants knew that their acts were unlawful and intentionally committed them for their own benefit.

167.    As a direct, foreseeable, and proximate result of the fraudulent conduct of Defendants, Plaintiff has suffered damages, including but not limited to a loss of charged rates, costs of infrastructure, and loss of brand good-will.

168.    The acts by Defendants were committed maliciously and with an improper motive, and in conscious disregard of the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, interest and costs, and for such other relief as this Court deems just and proper.

## COUNT VI: CIVIL CONSPIRACY

169.    ~~100.~~ Plaintiff re-alleges and incorporates by reference paragraphs 1 through ~~66~~122 above as if fully set forth herein.

170.    ~~101.~~ Defendants, together with one or more other ~~coconspirators~~co-conspirators, agreed to undertake certain acts to accomplish various unlawful objectives.

171.    ~~102.~~ Defendants, together with one or more other co-conspirators, each accomplished some overt act in furtherance of this agreement, and said conduct resulted in substantial damages to Plaintiff.

172.    ~~103.~~ Specifically, Defendants, together with one or more other

Exhibit 1 Page 35 of 42

coconspirators, diverted international telephone calls around Digicel's international telephone network to further their own fraudulent activities, their own use and benefit with the intent of permanently depriving Plaintiff of its revenue and interests owed for use of its telecommunications infrastructure.

173.    In addition to any corporate responsibilities, individual Defendants Sanchez, Ruiz, and Allen acted in their individual capacities to act in furtherance of the conspiracy.

174.    104. As a result of the foregoing unlawful actions by Defendants, Plaintiff has suffered damages.

175.    105. The acts of Defendants were committed maliciously and with an improper motive, and in conscious disregard of the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment against the Defendants for damages, interest and costs, and for such other relief as this Court deems just and proper.

## COUNT VI: VII: CONVERSION

176.    106. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66122 above as if fully set forth herein.

177.    107. As alleged herein, Defendants have wrongfully retained possession and/or secreted away revenues of Plaintiff with the intent to permanently deprive Plaintiff of such revenues.

178.    108. Defendants have improperly kept these revenues for themselves or have used such revenues for their own benefit.

179.    109. The acts of Defendants were committed maliciously and with an improper motive, and in conscious disregard of the rights of Plaintiff.

Exhibit 1 Page 36 of 42

WHEREFORE, Plaintiff demands judgment against the Defendants for damages, interest and costs, and for such other relief as this Court deems just and proper.

### COUNT ~~VII:~~ VIII: UNJUST ENRICHMENT

180.    ~~110.~~ Plaintiff re-alleges and incorporates by reference paragraphs 1 through ~~66~~ 122 above  as if fully set forth herein.

181.    ~~111.~~ As set forth above, Defendants are in receipt of a significant benefit for which there was no entitlement.

182.    ~~112.~~ Specifically, Defendants received  a stream of revenue resulting from calls  diverted from Plaintiff 's network for which they paid no compensation to Plaintiff Digicel.

183.    ~~113.~~ Defendants have retained current possession of the profits received from the calls  diverted from Plaintiff.

184.    ~~114.~~ Under the circumstances it would be inequitable for Defendants to retain the ~~profits without paying the fair value thereof.~~ profits without paying the fair value thereof.

185.    ~~115.~~ Despite the fact that there is no basis for Defendants to retain such benefit, they  have failed to return such benefit to Plaintiff in conscious disregard of Plaintiff's rights.

186.    ~~116.~~ The acts of Defendants were committed maliciously and with an improper motive,  and in conscious disregard of the rights of Plaintiff.

WHEREFORE, Plaintiff demands judgment against the Defendants for damages, interest and costs, and for such other relief as this Court deems just and proper.

### COUNT ~~VIII:~~ IX: INJUNCTION

187.    ~~117.~~ Plaintiff re-alleges and incorporates by reference paragraphs 1

Exhibit 1 Page 37 of 42

through ~~66~~122 above  as if fully set forth herein.

188.    ~~118.~~ This is a count for temporary and permanent injunction and for equitable relief.

189.    ~~119.~~ Plaintiff has a substantial likelihood of success on the merits in its claims against Defendants.

190.    ~~120.~~ Without injunctive relief, Plaintiff will be irreparably harmed by the continuing acts of Defendants.

191.    ~~121.~~ Plaintiff has no adequate remedy at law for the injury caused by Defendants.

192.    ~~122.~~ The Defendants' unlawful and malicious conduct has been facilitated through assets—including bank accounts and other holdings—and contacts, in the United States.

193.    ~~123.~~ The threatened injury to Plaintiff outweighs whatever damage the injunction may cause to Defendants.

194.    ~~124.~~ The injunction will not be adverse to the public interest.

WHEREFORE, Plaintiff demands an order temporarily and permanently enjoining the use of or access to any illicit or illegal assets located in the United States, enjoining any contact by Defendants with any party in the United States for the purpose of further facilitating

Defendants' unlawful and fraudulent conduct as described herein, and for such other relief as this  Court deems just and proper.

### TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Exhibit 1 Page 38 of 42

**VERIFICATION**

I, ~~Daragh O'Neill~~ U L  _t\.\_          _Ot.J'I_ kANf\IIA          , declare

under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and have personal knowledge of the

facts and matters contained therein, and that the facts and matters contained therein are true and correct.

By: _____

Name: _____

Dated: ~~February 2,~~ August 26, 2015          Respectfully submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.
~~By:          ls/Richard K. Hansen~~
~~Richard K. Hansen, OSB~~
~~#832231          Telephone:~~
~~503.796-2958~~
~~Facsimile:  503.796.2900~~
~~Of Attorneys for Plaintiff~~

33394 Telephone: ~~{~~ (954) 527-1115
Facsimile:          (954) 527-1116
E-mail: ~~rvaughan@kvllaw.com~~ rvaughan@kvllaw. com

Robert C. L. Vaughan *(Pro Hae Vice* ~~Pending)~~*)*
Cherine Smith
Valbrun Leah B.
Storie
Kim Vaughan Lerner LLP
*Attorneys for  Plaintiff*
One Financial Plaza, Suite 2001 Fort Lauderdale, FL

Exhibit 1 Page 39 of 42

By:___ ls/Richard K. Hansen
        Richard K. Hansen, OSB #832231 Telephone:
        503.796-2958
        Facsimile: 503.796.2900 Of Attorneys for Plaintiff

Exhibit 1 Page 40 of 42

Document comparison by Workshare Compare on Thursday, August 27, 2015 12:10:26 PM

| Input: | |
|---|---|
| Document 1 ID | file://F:\STORAGE\LSSe64DOCS\00000192\00183541.000.DOCX |
| Description | 00183541.000 |
| Document 2 ID | F:\STORAGE\LSSe64DOCS\00000192\00183542.000.DOCX |
| Description | F:\STORAGE\LSSe64DOCS\00000192\00183542.000.DOCX |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 777 |
| Deletions | 242 |

Exhibit 1 Page 41 of 42

| Moved from | 28 |
|---|---|
| Moved to | 28 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1075 |

Exhibit 1 Page 42 of 42