IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**, | Case No. 3:15-cv-00185-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC**, and **UPM MARKETING, INC.**, an Oregon corporation; **UPM TELECOM, INC.**, an Oregon a/b/n; **UPM MARKETING, INC.**, an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident, and **TYLER ALLEN**, an Oregon resident, | |
| Defendants. | |

Richard K. Hansen and Anne M. Talcott, SCHWABE WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1800, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394. Of Attorneys for Plaintiff.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER BAROWAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

PAGE 1 – OPINION AND ORDER

Plaintiff Unigestion Holding, S.A., doing business as "Digicel Haiti" ("Digicel"), asserts claims against Defendants, alleging common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(b)-(d), conversion, and unjust enrichment.[1] Defendants move to dismiss Digicel's claims in its Amended Complaint.[2] Defendants argue that the amended allegations of fraud continue to lack clarity and specificity as to the nature and substance of any alleged misrepresentation. For the reasons that follow, Defendants' motion is denied.

**STANDARDS**

**A.  Rules 12(b)(6) and 8(a) of the Federal Rules of Civil Procedure**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the

---

[1] Plaintiff also alleges as separate counts "civil conspiracy" (Count VI) and "injunction" (Count IX). Civil conspiracy, however, is not cognizable as a separate claim under Oregon law. *See Granewich v. Harding*, 329 Or. 47, 53 (1999) ("neither 'conspiracy' nor 'aid and assist' is a separate theory of recovery"). Similarly, an injunction, whether temporary, preliminary, or permanent, is a form of relief, not a separate theory of recovery.

[2] Defendants previously moved to dismiss Plaintiff's original Complaint. The Court granted Defendants' motion with leave to replead, and Plaintiff filed its Amended Complaint, which is the subject of the pending motion.

elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Establishing the plausibility of a complaint's allegations is a two-step process." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014). At the first step, "a court should 'identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* at 996 (quoting *Iqbal*, 556 U.S. at 679) (alteration in original). At the second step, "a court should 'assume the[ ] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679) (alteration in original).

Additionally, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)

(quoting *Iqbal*, 556 U.S. at 678). Plaintiffs must offer "[s]omething more . . . such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* A complaint will survive a motion to dismiss where a plaintiff "offer[s] facts that tend[] to exclude the defendant's innocuous alternative explanation." *Eclectic Props.*, 751 F.3d at 997. Moreover, if two alternative explanations exist, "one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." *Id.* (quoting *Starr*, 652 F.3d at 1216).

## B.  Rule 9(b) of the Federal Rules of Civil Procedure

Plaintiffs alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To state a claim under this standard, a plaintiff "must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quotation marks and alteration omitted). The plaintiff's allegations must provide "notice of the particular misconduct which is alleged to constitute the fraud charged," in enough detail to permit the defendant to "defend against the charge and not just deny that [it has] done anything wrong." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010) (quotation marks omitted).

Both the plausibility requirement of Rule 8(a) and the particularity requirement of Rule 9(b) apply to allegations of fraud. *Cafasso*, 637 F.3d at 1055. Allegations of scienter may be pled generally, Fed. R. Civ. P. 9(b), but must still include sufficient factual material to be

plausible. *Eclectic Props.*, 751 F.3d at 995 n.5. The heightened standard of Rule 9(b) also applies to RICO claims alleging predicate acts involving fraud. *See, e.g.*, *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991) (mail fraud); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392-93 (9th Cir. 1988) (mail and wire fraud); *Best Deals on TV, Inc. v. Naveed*, 2007 WL 2825652, at *11 (N.D. Cal. Sept. 26, 2007) (access-device fraud).

## BACKGROUND

As alleged in the Amended Complaint (Dkt. 34), Digicel provides mobile telecommunications services to customers in Haiti. Digicel operates telephone switching systems in Miami, Florida, and New York City, New York, that route international calls from third-party providers (such as AT&T and Verizon) to Digicel customers in Haiti. The switching systems use an international gateway that allows Digicel to manage call routing and account for any billing and associated regulatory charges. Under Haitian law, international telephone carriers must charge at least 23 cents per minute for international calls terminating in Haiti. Accordingly, Digicel charges third-party providers at least 23 cents per minute to route international calls to Digicel customers in Haiti.

UPM is an Oregon corporation[3] that offers to route international calls to Haiti at lower rates than Digicel. UPM does so by purchasing large quantities of pre-paid Digicel Subscriber Identity Module ("SIM") cards[4] in Haiti, shipping the cards to UPM's operations in Oregon, and

---

[3] UPM Technology, UPM Telecom, and UPM Marketing are all aliases of the same business, collectively referred to here as "UPM."

[4] According to Digicel, a SIM card acts as a small circuit board that is placed inside a cellular phone in order to identify the cellular device associated with an individual customer's unique telephone number and account. SIM cards allow customers to access Digicel's cellular network and, in turn, allow Digicel to account for and invoice communications made from cellular devices containing specific SIM cards. Digicel customers can use SIM cards for voice,

incorporating the cards into a system connected to the internet. Digicel alleges that UPM sends money by international wire to its agents in Haiti for the purchase of Digicel SIM cards. According to Digicel, shipping documents show that agents shipped Digicel SIM cards from Haiti to Oregon, addressed to Defendant Benjamin Sanchez ("Sanchez"), Owner of UPM Marketing and President of UPM Telecom, and Defendant Tyler Allen ("Allen"), who is also affiliated with UPM. Customer forms also show that Defendant Baltazar Ruiz ("Ruiz"), Project Manager of UPM Telecom, shipped computer equipment to Haiti. Digicel asserts that Ruiz provided laptops, internet routers, and generators to co-conspirators in Haiti to facilitate UPM's operations.[5]

UPM's system includes "SIM Boxes" or "SIM Servers," located in Oregon, into which SIM cards are loaded. UPM uses the information on the SIM cards to assist in transmitting calls to Haiti in ways that indicate that the calls have originated from Haitian telephone numbers associated with Digicel SIM cards. Accordingly, the Digicel telecommunications system charges local, or non-international, rates for the calls. Digicel refers to UPM's activities as "bypass fraud." Digicel alleges that UPM engages in two categories of fraudulent activities: non-technological fraud and technological fraud.

## A.  Non-Technological Fraud

According to Digicel, the non-technological fraud occurs at the point of sale of Digicel's SIM cards. Digicel alleges that UPM sends "agents" to Digicel's authorized retailers in Haiti, including grocery and convenience stores, to purchase SIM cards under the "false premise" that

data, and messaging services on the Digicel network. Customers can add credits, in the form of minutes, to SIM cards by using, among other methods, vouchers and online "top-ups."

[5] Digicel obtained copies of receipts and shipping documents evincing these transactions from the Haitian Police. Digicel attached the copies to its Amended Complaint as Exhibits C-M. The original documents remain in the custody of the Haitian Police.

those SIM cards are for the agents' own personal use in cellular handset devices. Dkt. 34 ¶ 65.

UPM must obtain Digicel SIM cards in this manner because Digicel does not allow for the

unauthorized bulk purchase of SIM cards. Digicel cautions its authorized retailers not to sell SIM

cards to anyone who the retailers suspect will resell the SIM cards. Retailers must document all

SIM card purchases.

In order to purchase a Digicel SIM card in Haiti, an individual must complete and file a

Customer Registration Card form using his or her government-issued identification card. Digicel

alleges that UPM's agents sometimes purchase SIM cards "using false or altered identification

documents procured by local co-conspirators at the instruction and direction of the head of the

fraudulent enterprise." *Id.* ¶ 30. With its Amended Complaint, Digicel submitted a sample copy

of a Customer Registration Card form.[6] The form asks the customer for identifying information,

including the customer's name, birth date, occupation, and government-issued identification

number. The form also asks for the customer's cellular device information, including the

device's International Mobile Equipment Identity ("IMEI"). Finally, the form asks for

information about the retailer and agent who sold the SIM card to the customer.

The Customer Registration Card does not ask the customer for any information about

how the customer intends to use the SIM card. Further, at no point does the form require a

written affirmation that the customer will only use the SIM card in the cellular device

corresponding to the IMEI specified on the form. Nor does the form require an express, written

affirmation that the customer will refrain from reselling the SIM card.

---

[6] Digicel filed a certified translation of the Customer Registration Card form (Dkt. 52-1), which Digicel originally submitted in French as Exhibit A to Digicel's Amended Complaint (Dkt. 34-1). UPM does not object to the translation. The Court therefore assumes that the translated copy of Exhibit A is true and accurate.

Digicel also does not allege that its retailers ask customers for oral representations that the customers are purchasing SIM cards for exclusively personal use. Other than the assertion that UPM's agents used false or altered identification documents, Digicel provides no details regarding how UPM's agents "purchase SIM Cards under the false premise that those SIM Cards are for their own individual, retail use in cellular handset devices." Dkt. 34 ¶ 65.

## B. Technological Fraud

According to Digicel, technological fraud occurs after UPM sells minutes either wholesale to third parties or directly to consumers through phone cards or retail sales of cellular plans and devices. Then, asserts Digicel, the technological fraud occurs in one of two ways.

First, UPM purchases Digicel SIM cards and registers the cards for Digicel's Roam-Like-You're-Home ("RLYH") plan. For an access fee of approximately $25, the RLYH plan allows registered Digicel customers to make international calls to Haiti at rates similar to the domestic, or local, rate during the pre-paid period. When a UPM customer places a call, the call is routed to UPM's SIM Servers in Oregon. The SIM Servers, containing SIM cards purchased from Digicel's dealers and registered for Digicel's RLYH plan, direct the call to a third-party carrier's cellular tower in the United States, which then directs the call to Digicel's network as a call coming from a RLYH subscriber eligible for the lower calling rate. Digicel alleges that UPM uses the RLYH plan "to cause international calls to be manipulated in these SIM servers, retransmitted, terminated, and accounted for as 'regular' local calls." *Id.* ¶ 72.

Second, when a call is made by a UPM customer outside of Haiti, the call is routed to UPM's SIM Servers in Oregon. The SIM Servers then "clone" Digicel's SIM cards, meaning the Servers "manipulate[]" the SIM cards to retrieve and then transmit the unique identifying information contained in a SIM card. *Id.* ¶ 69. The identifying information from the SIM card is "packaged" with the call into Haiti, and then the "package" is routed via the internet to a local

"Receiver" in Haiti. *Id.* ¶¶ 68, 89-91. The local Receiver, allegedly operated by agents of UPM

in Haiti, uses the "cloned" SIM card data to complete the call to the ultimate recipient in Haiti

through Digicel's telecommunications network in that country. *Id.* ¶¶ 87, 91. This process allows

UPM to "pretend" to initiate a local call in Haiti when the call was in fact initiated outside of

Haiti, thus "bypassing" Digicel's international switches and international charges. *Id.* ¶ 69. In

this way, UPM "intentionally manipulate[s] the SIM card data to misrepresent the international

call to Digicel's Haitian network as a domestic call made in Haiti, and only the domestic calling

fees are charged." *Id.* ¶ 98.

Additionally, alleges Digicel, "[t]o avoid easy detection, [UPM] use[s] multiple, portable

Receivers in various locations. The software [on the SIM Servers] manipulates calling patterns

by directing calls to be spread among various Receivers." *Id.* ¶ 96. Spreading the calls among

multiple receivers "is intended to mimic the calling patterns of real people." *Id.* ¶ 94. According

to Digicel, "if all calls went to—and then from—a single Receiver in a static location, the

abnormal call volumes to the particular tower in the area of the Receiver could be flagged as a

sign of bypass fraud." *Id.* ¶ 95.

UPM refers to the second routing method as Voice over Internet Protocol ("VoIP"). UPM

argues that the method has never involved "cloning" or copying SIM cards because UPM

lawfully purchases the SIM cards and simply uses the pre-paid minutes on the cards to enable

customers to make local calls in Haiti using the Digicel local network as any local caller would.[7]

UPM further argues that because it pays for both the RLYH plans and the minutes purchased on

---

[7] UPM offers the following definition of "cloning" SIM cards: "Cloning a SIM card
would enable more than one handset to be operated from the same identifying information
contained on the original SIM card. Cloning is illegal because it would allow the cloner to
operate a cell phone for free, while the holder of the original SIM card would be billed both for
her own and the cloner's calls." Dkt. 46 at 13.

the SIM cards, UPM and its customers legitimately acquire access to Digicel's local network.

According to UPM, its activities do not involve "misrepresentations" of any kind.

# DISCUSSION

## A.  Common Law Fraud

In Oregon, a plaintiff must allege the following elements to state a claim for fraud:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the
> speaker's knowledge of its falsity or ignorance of its truth; (5) his
> intent that it should be acted on by the person and in the manner
> reasonably contemplated; (6) the hearer's ignorance of its falsity;
> (7) his reliance on its truth; (8) his right to rely thereon; (9) and his
> consequent and proximate injury.

*Or. Pub. Emps.' Ret. Bd. ex rel. Or. Pub. Emps.' Ret. Fund v. Simat, Helliesen & Eichner*, 191

Or. App. 408, 424 (2004) (quotation marks omitted).

In addition to affirmative misrepresentations, a fraud claim can be based on the omission

of a material fact, at least under certain circumstances. When fraud is based on silence or

nondisclosure of a material fact, a party first must "demonstrate that the defendant either (1)

remained silent when the defendant had a duty to speak,[8] or (2) assumed the obligation to make a

full and fair disclosure of the whole truth by making a representation in the nature of a 'half-

truth.'" *Smith v. U.S. Bank, N.A.*, 2011 WL 7628515 at *6 (D. Or. Oct. 26, 2011) (footnote

---

[8] A duty to speak or disclose information exists when there is a special relationship
between a plaintiff and a defendant. *Gardner v. First Escrow Corp.*, 72 Or. App. 715, 720
(1985). When a special relationship exists, the defendant has a duty to disclose to the plaintiff all
material matters of which the defendant had knowledge. *See Gebrayel v. Transamerica Title Ins.
Co.*, 132 Or. App. 271, 281 (1995) (citing *Restatement (Second) of Torts* § 551 (1976)). A
special relationship exists when the plaintiff has authorized the defendant to exercise
independent judgment on the plaintiff's behalf and the defendant has accepted this responsibility.
*Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 160-62 (2001). A special relationship does not
exist if the parties were merely in an "arm's-length" commercial or business relationship where
they were acting in their own economic interest. *See Conway v. Pac. Univ.*, 324 Or. 231, 239-41
(1996); *A.T. Kearney, Inc. v. Int' Bus. Mach. Corp.*, 73 F.3d 238, 243-44 (9th Cir. 1995).

added), *report and recommendation adopted* 2012 WL 1029364 (D. Or. Mar. 26, 2012); *see also*

*Benson Tower Condo. Owners Ass'n. v. Victaulic Co.*, 22 F.Supp.3d 1126, 1132-33; *Gregory v.*

*Novak*, 121 Or. App. 651, 655 (1993) (holding that "one who makes a representation that is

misleading because it is in the nature of a 'half-truth' assumes the obligation to make a full and

fair disclosure of the whole truth").

In addition to fraud by affirmative misrepresentation or omission, there is a third category

of fraud recognized under Oregon law, actual concealment. Further, where "fraud is based on

actual concealment, as opposed to simple nondisclosure, a duty to speak is not required."

*Caldwell v. Pop's Homes, Inc.*, 54 Or. App. 104, 113 (1981); *see also Wieber v. FedEx Ground*

*Package Sys., Inc.*, 231 Or. App. 469, 484 (2009) ("Moreover, even in the absence of a duty to

speak, actions by a defendant to actively conceal the truth can constitute fraud."). As explained

by the Oregon Court of Appeals:

> The distinction  [between active concealment and nondisclosure] is
> made clearer by Prosser's classification of active concealment with
> affirmative statements as follows: "* * * Any words or acts which
> create a false impression covering up the truth, * * * or which
> remove an opportunity that might otherwise have led to the
> discovery of a material fact as by floating a ship to conceal the
> defects in her bottom, * * * sending one who is in search of
> information in a direction where it cannot be obtained, * * * or
> even a false denial of knowledge by one in possession of the facts
> * * * are classed as misrepresentations, no less than a verbal
> assurance that the fact is not true."

*Paul v. Kelley*, 42 Or. App. 61, 65-66 (1979) (quoting Prosser, *Law of Torts*, § 106, at 695

(4th ed. 1971)); *see Caldwell*, 54 Or. App. at 113 (same); *see also* 10 Stuart M. Speiser, Charles

F. Krause & Alfred Gans, *The American Law of Torts* §32:73 (Monique C.M. Leahy ed., 2012)

("It is a basic principle in the law of fraud in respect to the effect of nondisclosure that the

proposition that, in the absence of a duty to speak, nondisclosure is not fraudulent presupposes

mere silence and is not applicable where, by words or conduct, a false representation is intimated or any deceit practiced.") (footnote omitted).

In addition, the *Restatement (Second) of Torts* (1977) states: "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." § 550. A comment to this section explains that this rule applies "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." *Id.* § 550 cmt. b; *see also Caldwell*, 54 Or. App. at 113 ("*Restatement (Second) of Torts* §§ 550, 551 (1977) states that nondisclosure is actionable where there is a duty to speak, but notes no such duty requirement where there has been an active concealment.").

Further, the U.S. Court of Appeals for the Fourth Circuit has explained in a thorough decision:

> [T]he common law clearly distinguishes between concealment and nondisclosure. The former is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. The latter is characterized by mere silence. Although silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does.
>
> ***
>
> In short, at common law, no fiduciary relationship, no statute, no other independent legal duty to disclose is necessary to make active concealment actionable fraud—simple "good faith" imposes an obligation not to purposefully conceal material facts with intent to deceive.

*United States v. Colton*, 231 F.3d 890, 899-900 (4th Cir. 2000).

### 1.        Non-Technological Fraud

Digicel alleges that UPM sends its agents to "purchase SIM Cards under the false

premise that those SIM Cards are for their own individual, retail use in their cellular handset

devices." Dkt. 34 ¶ 65. Digicel, however, pleads no specific facts regarding the nature of this

"false premise." In its Amended Complaint, Digicel does not specify whether the "false premise"

is oral or written, what questions—if any—Digicel's retailers ask customers regarding the

intended use of the SIM cards, or whether customers are in any way made aware of Digicel's

expectations regarding use of the SIM cards.[9]

These conclusory allegations fall short of sufficiently pleading fraud. Digicel alleges no

facts showing that UPM's agents made any false, material representations (or even half-truths)

regarding the intended use of the SIM cards or that Digicel relied on any such representations.

The only possible false, material representation alleged is UPM agents' use of false or altered

identification documents. Digicel does not, however, allege any facts concerning how this

alleged misrepresentation is material or induced Digicel's reliance. Digicel does not allege that it

would have declined to sell SIM cards to the agents if the agents had used their true names or

their actual government-issued identification cards. If non-technological fraud constituted

Digicel's only theory of how UPM defrauded Digicel, the Court would dismiss the claim.

---

[9] At oral argument, Digicel's counsel asserted that Digicel's retailers ask customers, either orally or on the Customer Registration Card form, whether they intend to use the SIM cards "legally." The Court could locate no such assertion in Digicel's amended complaint or in the text of the form (Dkt. 52-1) and does not consider this assertion a well-pleaded fact. Even if Digicel had made this assertion in its amended complaint, however, the ambiguous assertion that the customer will use the card "legally" would not suffice to show that UPM's agents committed fraud by reselling the SIM cards to UPM or mailing the cards to UPM for use in UPM's Servers.

### 2. Technological Fraud

Digicel also asserts a theory of technological fraud. According to Digicel, UPM intentionally manipulates the data on Digicel's SIM cards to represent either that an individual RLYH subscriber is calling Haiti or that an international call has originated from a single cellular device located in Haiti. According to Digicel, UPM assigns the international calls bound for Haiti to a local number at the SIM Servers in Oregon, and from this moment forward, UPM fraudulently misrepresents the true origination of the calls. Additionally, Digicel alleges that UPM's software manipulates the calls routed to UPM's Receivers to mimic the local calling patterns of individual Digicel customers. Digicel argues that these transactions constitute both affirmative misrepresentations and active concealment.

### a. Affirmative Misrepresentations

UPM responds that it makes no affirmative misrepresentations to Digicel. According to UPM, the fact that it pays for the RLYH plans makes its use of those plans indistinguishable from an individual Hatian subscriber using a RLYH plan while abroad. Additionally, argues UPM, the VoIP works essentially the same way as a Skype call coming over the internet to someone in Haiti while the person in Haiti holds his or her cellphone up to the receiving computer's speaker so that a recipient of the telephone call can hear the Skype transmission. UPM uses its own infrastructure to pipe the call over the internet and then, by buying Digicel's SIM cards, pays for access to Digicel's local network to complete the call. Thus, concludes UPM, no affirmative misrepresentation has taken place.

The Court agrees with UPM that Digicel has not alleged sufficient facts showing that UPM has made an affirmative misrepresentation. Digicel alleges no facts showing that Digicel's telecommunications network requires any express verification that the calls associated with Digicel SIM cards or RLYH plans come from personal, or individual, cellular handset devices.

PAGE 14 – OPINION AND ORDER

Although the calls that UPM connects to Digicel's network come from Servers in Oregon rather than individual Digicel customers, Digicel has not pled facts showing that UPM affirmatively misrepresents the nature of the calls.

### b. Active Concealment

Regarding active concealment, UPM argues that Oregon courts recognize active concealment only in the context of a negotiated relationship or transaction between a plaintiff and a defendant in which the defendant either makes an outright misrepresentation, states a half-truth, or remains silent in the face of a duty to speak. According to UPM, its activities cannot constitute active concealment because it has never engaged in any negotiated relationship or transaction with Digicel, made an outright misrepresentation, stated any half-truth, or become subject to a duty to speak.

Digicel responds that, among other things, it has alleged that UPM engages in a "transaction" with Digicel. According to Digicel, UPM buys Digicel SIM cards through UPM's agents in Haiti and also purchases RLYH plans from Digicel. Thus, as a customer of Digicel, UPM uses the minutes purchased on the SIM cards and the RLYH plans to place calls, thereby accessing Digicel's telecommunications network. Thus, UPM has engaged in transactions with Digicel.

In addition, UPM misunderstands the requirements for active concealment under the Oregon common law. As previously noted, in Oregon, active concealment occurs—even in the absence of a duty to speak—when a defendant engages in "acts which create a false impression covering up the truth." *Paul*, 42 Or. App. at 66 (quoting *Prosser*); *see also* Speiser, Krause & Gans, *The American Law of Torts* § 32:73 (when there is no duty to speak, nondisclosure can become fraudulent "where, by words or conduct, a false representation is intimated or any deceit practiced"). Applying Oregon law, the Ninth Circuit reversed a decision granting summary

judgment to a defendant on a claim of fraudulent misrepresentation based, in part, on the

proposition that "no duty to disclose is required when fraud is based upon active concealment."

*Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1222 (9th Cir. 1999).

In *Salem Sand & Gravel Co. v. City of Salem*, 260 Or. 630 (1971), an allegation that the

defendants suppressed material information sufficed to state a claim for fraud. In that case, the

plaintiffs had successfully bid on a project to construct a sewer line for the City of Salem.

Included among the defendants were engineers hired by the city to prepare plans and

specifications for the sewer project and to supervise the project's construction. The plaintiffs

sued the engineers for fraud, alleging that the engineers withheld the results of subsurface tests

conducted before the preparation of the plans and specifications and the calling of bids.

According to the plaintiffs, the engineers possessed records and photographs of subsurface

conditions substantially less favorable than the conditions described in the data given to the

plaintiffs to use in preparing their bids. Finding that the plaintiffs had alleged sufficient facts to

withstand the defendants' demurrer, motion to strike, and motion for judgment on the pleadings,

the Oregon Supreme Court noted, "Defendants overlook the established law that fraud may be

committed by concealment of material facts as well as by affirmative and positive

misrepresentation." *Id.* at 638. At no point did the court articulate a requirement for a negotiated

relationship, an outright misstatement, a half-truth,[10] or a duty to speak.

---

[10] The Court notes that the plaintiffs in *Salem Sand & Gravel* alleged that the engineers "include[ed] only the favorable data" regarding the subsurface conditions and thereby "represented that the subsurface conditions were more favorable than 'they were in fact.'" 260 Or. at 633. The representations in the data submitted to the plaintiffs thus could be construed as half-truths, but the Oregon Supreme Court described the allegations not as representations in the nature of half-truths but as "*withholding* the results of certain subsurface tests," *id.* at 632 (emphasis added), "fraudulent withholding," *id.* at 637, and the "concealment or suppression of any data," *id.* at 638.

In this case, Digicel alleges that when UPM transmits a call to Digicel's network, UPM conceals both the original telephone number associated with the non-Digicel subscriber and the fact that the call comes from UPM's Servers rather than an individual cellular handset device. According to Digicel's Amended Complaint, UPM accomplishes the concealment both by manipulating the SIM card data to "package" the data with the non-Digicel customer's call and by using software to replicate the calling patterns of Digicel's local Haitian subscribers. This replication avoids any abnormal call volume to any particular Digicel cellular tower, which Digicel could detect, or flag, as a sign of "bypass" operations. Digicel further alleges that UPM uses portable, easy-to-move Receivers in various locations to prevent detection by Digicel. Digicel thus alleges "contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter," amounting to active concealment under the common law. *Colton*, 231 F.3d at 899.

UPM's response that Digicel's allegations are "implausible" in light of other innocent, innocuous explanations is unavailing. UPM first asserts that there is no plausible reason for UPM to "clone" or copy Digicel's SIM cards because UPM has purchased the cards. UPM's argument regarding cloning, however, does not render Digicel's description of the SIM-card copying implausible because UPM acknowledges that the SIM cards are physically located in Oregon and that the information on the SIM cards must somehow be transmitted to Haiti.[11]

UPM also responds that Digicel's allegations that UPM manipulates data to conceal the nature of incoming calls is implausible because Digicel's own programming of the SIM cards— rather than any concealment or misrepresentation—enables the calls transmitted through UPM's Servers to enter the Digicel network at discounted rates. UPM's alternative explanation does not

---

[11] The Court recognizes that a more precise definition of "cloning" may have to wait until a later stage of the litigation.

address Digicel's allegation that even when UPM uses RLYH plans to direct calls, UPM still

must manipulate data to disguise the fact that the calls are not coming from personal or

individual cellular handset devices. Nor does UPM's explanation address Digicel's allegation

that UPM packages a non-Digicel customer's information with the SIM card information to

disguise the true origin of the call coming through VoIP.

UPM also argues that any alleged acts of concealment are more plausibly viewed merely

as steps taken to protect UPM's business activities from competitors' examination. UPM's

explanation does not, however, refute Digicel's argument that active concealment has occurred.

Digicel alleges that in order to serve UPM's customers, UPM must perpetuate Digicel's mistaken

beliefs about the nature of the incoming calls. According to Digicel, it attempts to "detect and

deter bypass fraud" and has worked with the Haitian Police to stop bypass operations. Dkt. 34 ¶¶

47-55. This leads to the reasonable inference that Digicel would not connect the calls coming

from UPM's Receivers if Digicel knew that UPM routed the calls from SIM Servers in Oregon.

UPM must thus mimic calling patterns of Digicel's subscribers to avoid detection and lead

Digicel to connect the calls coming from UPM's Receivers. This alleged activity constitutes

more than ordinary business strategies undertaken by a competitor.

UPM further argues that what Digicel asserts is concealment by UPM in routing calls to

multiple receivers in Haiti in order to thwart detection is merely an innocent act by UPM to

attempt to find the best reception in Haiti or to avoid overloading the carrying capacity of any of

Digicel's towers in Haiti. UPM thus offers a plausible explanation for its actions. Where a

defendant, however, offers a plausible innocent explanation for its actions and there is also a

plausible wrongful explanation for the same actions, a court may not dismiss a complaint unless

the "defendant's plausible alternative explanation is so convincing that plaintiff's explanation is

implausible." *Eclectic Props.*, 751 F.3d at 996 (quoting *Starr*, 652 F.3d at 1216). That is not the case here. Moreover, whether the actual facts support either UPM's or Digicel's explanations is a matter more appropriately determined at summary judgment or trial.

In addition to asserting that UPM has engaged in active concealment of material facts, Digicel alleges that the information concealed is "crucial" to Digicel's decision to connect incoming calls through its telecommunications network. This is sufficient to allege materiality. *See generally Caldwell*, 54 Or. App. at 113. Digicel further alleges that UPM has diverted millions of minutes of calling time away from Digicel's international switches, for which UPM has not compensated Digicel. Digicel's allegations satisfy the elements of common law fraud in Oregon.

## B.  RICO Claims

Digicel pleads three federal RICO claims, under 18 U.S.C. § 1962(b), (c), and (d), each of which requires a "pattern of racketeering activity," comprised of predicate acts set forth in § 1961(1). Digicel alleges three predicate acts: mail fraud under § 1341; wire fraud under § 1343; and access-device fraud under § 1029.

### 1.  Mail and Wire Fraud

Mail and wire fraud are "identical except for the particular method used to disseminate the fraud" and may therefore be analyzed together. *Eclectic Props.*, 751 F.3d at 997. The elements of mail or wire fraud are "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Id.* A scheme to defraud is a scheme that is "reasonably calculated to deceive persons of ordinary prudence and comprehension;" a scheme to defraud pled with sufficient factual specificity may give rise to a reasonable inference of specific intent to defraud. *See id.* (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984)) (quotation marks omitted); *In re Galena*

*Biopharma, Inc. Derivative Litig.*, 83 F. Supp. 3d 1047, 1064-65 (D. Or. Feb. 4, 2015) ("When a complaint alleges with particularity the circumstances constituting fraud . . . then generally it will also have set forth facts from which an inference of scienter could be drawn." (alterations and quotation marks omitted)). It is not, however, necessary to plead that the scheme succeeded, or that anyone suffered a loss or secured a gain. *Schreiber*, 806 F.2d at 1400.

Digicel alleges that UPM, through Sanchez, Ruiz, and Allen, uses the mails and wires to fund and directly provide money and computer equipment to Haitian co-conspirators. Digicel has thus pled sufficient facts to satisfy the second element of mail and wire fraud. The first and third elements are closer calls, and for the reasons discussed above, Digicel cannot satisfy these elements based only on allegations of a non-technological scheme to defraud.

Digicel also alleges that UPM processes calls through its SIM Servers with the sole purpose of facilitating international telephone traffic into Haiti without Digicel's knowledge that the calls do not originate on individual cellular handset devices. According to Digicel, UPM facilitates this international traffic into Haiti by manipulating information on Digicel SIM cards and using software to mimic the calling patterns of Digicel's Haitian subscribers. UPM also uses portable, easy-to-move Receivers to avoid detection by Digicel. These specific allegations of the circumstances constituting fraud allow for a reasonable inference of intent to defraud. *Galena Biopharma*, 83 F. Supp. 3d at 1065. Digicel thus has pled sufficient facts of mail and wire fraud.

### 2. Access Device Fraud

The federal access device fraud statute, 18 U.S.C. § 1029(a), prohibits a number of related offenses related to the improper use of "unauthorized" and "counterfeit" "access device[s]." Digicel correctly argues that the SIM cards bought by UPM are "access devices." *See* § 1029(e)(1) (defining an "access device" as any "means of account access that can be used . . . to obtain money, goods, services, or any other thing of value"). Indeed, UPM does not

dispute that SIM cards are access devices. Dkt. 51 at 27 ("UPM does not take issue with the fact that § 1029 could theoretically cover the use of the internet in cellular telecommunications and/or an unaltered SIM card.").

Digicel, however, does not specify which of the ten enumerated offenses UPM has allegedly violated. One of the offenses that appears to be most applicable to Digicel's allegations is § 1029(a)(3), which prohibits anyone from "knowingly and with intent to defraud possess[ing] fifteen or more devices which are counterfeit or unauthorized access devices." Digicel alleges that UPM, through Sanchez, has knowingly received "hundreds of Digicel SIM Cards from Haiti for use in SIM Boxes in Oregon." Dkt. 34 § 126(b). For the reasons discussed above, Digicel has alleged sufficient facts allowing for an inference of intent to defraud. The question remains, however, whether UPM has possessed "unauthorized access devices."

Under the statute, an "unauthorized access device" is defined as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." § 1029(e)(3). The SIM cards are not lost, stolen, expired, revoked, or canceled; therefore, the only issue is whether UPM obtained the cards with intent to defraud. Digicel alleges that UPM obtained the SIM cards with the intent of inserting the cards into the SIM Servers in Oregon and actively concealing the fact that the telephone calls UPM transmits to Digicel's telecommunications network do not come directly from individual cellular handset devices. These allegations are sufficient to state a claim that UPM knowingly and with the intent to defraud possesses more than fifteen unauthorized access devices. Digicel has pled sufficient facts to satisfy the elements of access device fraud.

## C.  Conversion

The Oregon Supreme Court has adopted the definition of conversion from the

*Restatement (Second) of Torts* § 222A: "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663 (1969). In assessing the seriousness of the interference with the right of another to control the chattel, Oregon courts look to, among other factors, "the actor's intent to assert a right in fact inconsistent with the other's right of control." *Id.* at 664 (quoting *Restatement (Second) of Torts* § 222A). The interference must be "so great that the actor can justly be required to pay its full value." *Morrow v. First Interstate Bank of Or., N.A.*, 118 Or. App. 164, 168 (1993). The taking or diverting of money may constitute conversion. *Waggoner v. Haralampus*, 277 Or. 601, 604 (1977) ("The general rule is that conversion will lie when the money was wrongfully received by the party charged with conversion, or an agent is obligated to return specific money to the party claiming it.").

Digicel alleges that UPM has "wrongfully retained possession and/or secreted away revenues" to which Digicel was entitled, permanently depriving Digicel of that revenue. Dkt. 34 ¶ 177. Digicel further asserts that UPM acted "maliciously and with an improper motive, and in conscious disregard of the rights of [Digicel]." *Id.* ¶ 179. According to Digicel, for every international phone call that UPM connected, Digicel was entitled to at least 23 cents per minute minus the amount that UPM paid for RLYH plans or local minutes on the SIM cards. Finding that Digicel has stated a claim that UPM commits fraud to divert international telecommunications traffic away from Digicel, the Court also finds that Digicel has sufficiently alleged conversion.

**D.  Unjust Enrichment**

To state a claim for unjust enrichment, a party must establish: "(1) a benefit conferred, (2) awareness by the recipient that he or she has received the benefit, and (3) that it would be

PAGE 22 – OPINION AND ORDER

unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Wilson v. Gutierrez*, 261 Or. App. 410, 414 (2014) (quoting *Cron v. Zimmer*, 255 Or. App. 114, 130 (2013)) (quotation marks omitted).

Digicel alleges that UPM receives a benefit in the form of use of Digicel's local telecommunications network in Haiti to connect international calls. According to Digicel, although UPM purchased access to the network for individual cellular handset devices, UPM never received authorization to use the network for calls coming through UPM's Servers in Oregon. UPM has "retained current possession of the profits received from the calls diverted from [Digicel] and "it would be inequitable for [UPM] to retain the profits without paying the fair value thereof," asserts Digicel. In light of the Court's findings regarding fraud and RICO violations, these allegations state a claim for unjust enrichment.

**E. Summary**

Digicel has stated a claim for common law fraud, RICO violations, conversion, and unjust enrichment, all based on UPM's use of technology to actively conceal the origin of the telephone calls that UPM transmits to Digicel's telecommunications network. Digicel has not separately and adequately stated claims for non-technological fraud or technological fraud based on affirmative misrepresentations. That is not fatal, however, to Plaintiff's Amended Complaint. Under Fed. R. Civ. P. 8(d)(2), "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *See MB Fin. Grp., Inc. v. U.S. Postal Serv.*, 545 F.3d 814, 819 (9th Cir. 2008) ("The district court correctly noted that a plaintiff is generally entitled to plead alternative or multiple theories of recovery on the basis of the same conduct on the part of the defendant."). Because the Court finds that some, although not all, of Plaintiff's theories of recovery are sufficiently plausible to state the alleged claims (other than civil conspiracy and

injunction, which are not independent torts) the Court denies UPM's motion to dismiss the

Amended Complaint.

## CONCLUSION

Defendants' Motion to Dismiss (Dkt. 46) is DENIED.

**IT IS SO ORDERED**.

DATED this 3rd day of February, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge