IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNIGESTION HOLDING, S.A., | ) | 3:15-cv-00185-SI |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | January 27, 2016 |
| | ) | |
| UPM TECHNOLOGY, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | Portland, Oregon |

(Motion Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

                              APPEARANCES

FOR THE PLAINTIFF:    Robert C.L. Vaughan
                      Kim Vaughan Lerner LLP
                      One Financial Plaza, Suite 2001
                      Fort Lauderdale, Florida  33394

                      Richard K. Hansen
                      Schwabe Williamson & Wyatt, PC
                      1211 SW Fifth Avenue, Suite 1900
                      Portland, Oregon  97201


FOR THE DEFENDANTS:   Kathryn P. Salyer
                      Eleanor A. DuBay
                      Tomasi Salyer Baroway
                      121 SW Morrison Street, Suite 1850
                      Portland, Oregon  97204

                      Elizabeth Schwartz
                      Attorney at Law
                      6312 SW Capitol Highway, Suite 175
                      Portland, Oregon  97239


COURT REPORTER:       Dennis W. Apodaca, RDR, RMR, FCRR, CRR
                      United States District Courthouse
                      1000 SW Third Avenue, Room 301
                      Portland, OR  97204
                      (503) 326-8182

(January 27, 2016)

P R O C E E D I N G S

(Open court:)

THE CLERK:  Your Honor, this is the time set for oral argument in civil case 15-185-SI, Unigestion Holding, S.A. versus UPM Technology, Inc., et al.

Could I have counsel in court, beginning with plaintiff, please identify yourselves for the record.

MR. HANSEN:  Richard Hansen for the plaintiff.

MR. VAUGHAN:  Robert Vaughan representing Unigestion, AKA Digicel Haiti.

Your Honor, if I might introduce our other colleagues in the courtroom.

THE COURT:  You may, and welcome back.

MR. VAUGHAN:  Thank you.  Mr. David Geary with Digicel, Conor Clarke with Digicel, Mark Shield, and Paul Flanagan also representing Digicel.

MS. SALYER:  Welcome.

THE COURT:  Ms. Salyer, welcome back.

MS. SALYER:  Good morning, Your Honor. Kathryn Salyer on behalf of defendant.  I have my colleague, Eleanor DuBay, with me as well, and Libby Schwartz.

THE COURT:  Ms. Schwartz, welcome back.

MS. SCHWARTZ:  Thank you, Your Honor.

THE COURT:  All right.  I have read everything that

you have provided, at least the English versions of what was provided to me.  This is a very interesting case.

All right.  We have defendants' motion before us. Defendant may argue.

MS. SALYER:  Thank you, Your Honor.

Your Honor, plaintiff's fraud-based claims are implausible under the standards that the Ninth Circuit articulated in the Eclectic Properties case.  The heart of any fraud claim is a false representation.  Plaintiff's amended complaint does not contain a single allegation of an actual statement that was made by the defendants that is false. Instead, the amended complaint is replete with conclusionary statements such as under false pretenses, clone, manipulated and tricked.

Before I talk about the specific allegations, I want to address how the Eclectic Properties case applies to this dispute.  Defendants have continuously cited that case.  We cited it in the motion that was filed last spring.  We cited it in our motion we filed.  Plaintiff finally filed a copy of that case as a statement of additional authority.  I think what plaintiff means is that now they agree that the standards set forth in Eclectic Properties govern the pleadings in this case.

I think that plaintiff cites that case -- it is not briefed, so we don't know for sure -- but I think they are citing it for the proposition that if there is a tie in terms

of plausibility, the tie goes to the plaintiff.  Your Honor, we think that the problem with that theory is that Eclectic Properties tells us what the plaintiff has to do to even get to a tie so that you can decide that a tie goes to plaintiff.

The reason why plaintiff's claim must be dismissed as implausible is because they don't do what they need to do to show plausibility, and that really revolves around this issue of an alternative innocent explanation.  Now, if you've read Eclectic Properties, that case was about the recession.  The plaintiffs there purchased properties, which they believed had $30 million in value.  They allege that the properties had fallen to 11 million.  The Court actually disregarded even that factual allegation, because they said that plaintiffs didn't allege enough facts about how they got there.  But the Court also said that there was an alternative, reasonable innocent explanation founded in the economy and the general recession, and the plaintiffs didn't sort of nudge their claim past explaining why that innocent explanation didn't excuse their behavior.  Because of that, the Court dismissed the claim.  So the actual discussion of the standard, as well as the ultimate result in that case, both favor the defendants here.

So I want to then talk about what the plaintiff does, because I think their complaint implicitly acknowledges that there is no fraudulent misrepresentation.  So then they want to

skip over and argue, well, because there is not an actual representation, we want to talk about concealment.  I think even then the allegations of concealment fall far short of what the law requires.

But I want to go back and talk about the point of sale, because we addressed that at the last hearing.  At that hearing I told you that I thought these cards were sold in kiosks, and that was true.  They are sometimes sold in kiosks, but it turns out that that is a bit of an overstatement.  Where that overstatement is best memorialized is in the allegation of the complaint that talks about the less robust infrastructure that exists in Haiti.

We actually have some pictures, if Your Honor is interested in seeing them.  Pictures are worth a thousand words.  These are actually pictures of the dealers and how they exist in Haiti.  What they show is that these cards are sold out of the back of pickup trucks.  There is a cornucopia of cards and telephones and SIM cards and the like that are being sold basically at markets where fruit and vegetables are sold or on street corners at the side of the road.

So the network infrastructure of dealers here, as the plaintiff concedes, is less robust.  That's important, because I think that goes to this innocent alternative explanation that is so important to the standards by which this case must be judged.

Your Honor, may I approach?

THE COURT: Of course.

MS. SALYER: So you will see the first picture is a number of cell phones. In the back, there is a number of SIM cards that are bound with rubber bands. The next is just rows and rows of cards. Again, they are pictured similar. The fourth picture is more of a storefront. So it just shows the variety of ways in which these cards and phones and access to the Digicel network can be acquired in this less robust infrastructure in Haiti.

I want to focus on what the plaintiff didn't say, because you gave them some hints last time about what you thought it might take to state a fraud claim here. You talked about sort of these promissory estoppel or these contractual-type obligations, and then you talked about the technological representations.

One of the things that you told me to do was talk slower.

THE COURT: And you are doing a good job.

MS. SALYER: The plaintiff alleges, not that there is a contractual representation. There is no allegation whatsoever about contractual representations. Instead they put it off on these dealers that I've shown you the pictures of, and they say, "We caution our dealers not to make bulk sales, and we caution them to require purchasers to register their SIM

cards."

But, you know, there is a really easy answer to this, Your Honor. If the plaintiff didn't want unregistered SIM cards to be used, all they would have to do with their own computer system is to tell that SIM card don't allow access until we've got this registered on the network. Nowhere in their complaint do they explain why they didn't block these SIM cards until the registration data was returned, and that says something about sort of the plaintiff's position with respect to these SIM cards. They want to ignore it when it favors them and push this position forward when it doesn't.

Plaintiff also doesn't discuss why they haven't attached a single filled-out registration card to their complaint that they can attach to UPM or to any of the UPM agents that they say were used in Haiti. Now, this is important because I think it again reflects the less robust infrastructure, and it is a concession that they don't have those cards and that the dealers were not, in fact, requiring that these cards be completed.

So plaintiff actually stopped short, if you really parse through the allegations in their complaint. They never specifically allege that the dealers inform defendants about any restrictions on the use of these cards, and they don't say that there is a contract or shrink wrap or some sort of pop-up when you go into the computer to load up your Roam Like You're

Home plan that warns about restrictions in the use of these cards. None of that is in the allegations of the complaint.

They admit that the less-than-robust infrastructure meant that compliance was uncertain. They go that far in their complaint, and I think that admission is fatal to the plausibility analysis.

And if the dealers didn't do what plaintiffs told them to do, assuming that plaintiffs actually told them to do that, that's on the plaintiffs. That's not on the defendants. The bottom line here, Your Honor, with respect to the contractual or oral sort of representation is that it is Digicel's own failings that make it impossible for them to allege a plausible claim of fraud. There is no misrepresentation at the point of sale, and there is no reasonable reliance on anything that they say occurred.

Instead, plaintiffs want to throw in a few conclusory allegations about "under false premises," but those conclusions are unwarranted by the specific factual allegations that are in the complaint. As a result, those conclusory allegations need not be accepted as true. It is not reasonable for plaintiff to hold my client to some sort of false-pretense standard when they never informed my client of their expectations or intentions and when my clients did not agree to those.

So the plaintiff wants to get around this lack of an actual misrepresentation by saying, "Well, we have concealment,

Your Honor," and they cite to the Court a number of cases that deal with concealment. So I want to talk about those cases.

First of all, the interesting thing is we're not dealing with a seller. Every single case that plaintiff cites is a seller who made a fraudulent statement or concealed something that would have been material in connection with the sales transaction.

THE COURT: Doesn't plaintiff here sell access to its telecommunications network to provide telephone calls that terminated in Haiti?

MS. SALYER: The seller does. But it's the buyer -- we are the buyer. These are cases where the buyer was -- the cases they cite -- where the buyer was saying that the seller made a fraudulent statement to induce the sale, not that the buyer made a fraudulent statement to induce the sale.

THE COURT: What difference does it make? If either party makes a misrepresentation, does some type of active concealment, what difference does it make whether it is the buyer or the seller other than, well, if the buyer makes it, the seller can sue, and if the seller makes it, the buyer can sue?

MS. SALYER: Well, I think it goes in part to reliance. The seller would have to show that the buyer actually concealed something, and it relied on that concealment, and that's where my second point is important,

Your Honor, and that's in terms of timing.

THE COURT: Maybe we should take a step back and let me ask you to define this concept of concealment or active concealment and make sure we're all on the same page.

MS. SALYER: Okay.

THE COURT: What is concealment or actual concealment or active concealment, as recognized either under Oregon common law fraud or the law that might be applicable to a federal RICO wire fraud or mail fraud. But what is the essence and elements of concealment? Let's make sure we're all on the same page on that.

MS. SALYER: I think, in Oregon, concealment requires a number of things. One, it can require a duty to speak. A duty to speak typically arises if there has been an omission or there is a material fact that somebody is preventing the other person from having access to. I think it is Paul v. Kelley case, the swimming pool case that they cite. There is a trailer park case that they cite. In both instances the seller concealed something or didn't disclose it. In the trailer park case, they didn't tell the Realtor to put it on the listing form that this trailer park was being sold and the mobile home would have to be moved. So there was a concealment in the face of a duty to speak.

THE COURT: Although in Wieber v. FedEx Ground Package, and that's the 2009 decision from the Oregon

Court of Appeals, it says at 231 Or. App. at page 484, "Moreover, even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud."

So I think the Oregon law is clear that there doesn't have to be a duty to speak, but what I'm trying to figure out is what is an action to actively conceal?

MS. SALYER:  That's why I think the timing of where this concealment comes in, because certainly we know that at the point of sale there is no allegation that we were actively concealing anything.

THE COURT:  By the way, I don't want to too quickly come to any tentative conclusions, but as long as I use the word "tentatively," I guess I can.  I tentatively agree with you that there are no misrepresentations at the point of sale. I will hear from Mr. Vaughan or Mr. Hansen, and maybe they will talk me out of it, but I tentatively agree that there is no misrepresentations at the point of sale or what I have been internally thinking of as essentially classic misrepresentation or non-technological misrepresentation.

What I'm really concerned though about, and I may tentatively be on the other side on this one, is that in the area of technological misrepresentation, beyond the point of sale, at least it appears to me that what is alleged in the complaint is that the defendants manipulate the data they receive or the information contained on the SIM card to

misrepresent, technologically speaking, to the Digicel system either that calls are coming from an individual cellular handset or -- no, I'll stop there -- that calls are coming from an individual cellular handset, and they do that in several ways.

One of the more interesting ways is the idea having these calls routed through different cell towers in Haiti to avoid having all of the calls come into and processed by a specific location in Haiti, which would create some suspicions that, huh, why are we getting all of this traffic from this particular static location, which Digicel could either turn off, disable, investigate further.

So they are trying to create -- this is the way I read the complaint.  They are trying to create the false impression that these calls are coming from individual cell phone users as opposed to coming through a centralized, if you will, switch -- I may not be technologically precise on this -- in order to misrepresent and mislead Digicel where these calls are coming from.

I think, based upon what we talked about at our first hearing, that that's not a classic misrepresentation or even a material omission when there is a duty to speak created by half-truth.  But I think they may have adequately alleged something in the area of active concealment because the way defendant allegedly is disguising the way the calls are coming

in in order to mislead the plaintiff.  Then we only have to ask is it material, and I think there is enough pled in there as to materiality that they wouldn't be serving these calls if they knew how they were coming in and where they were coming from.

So that's the part of the complaint that I think it might behoove defendant best to address, because I'm tentatively thinking that it adequately alleged active concealment in that technological sense.

By the way, one later point, and I will speak to you and also your colleague so you can all think about how you want to respond to this.  If I'm right, or even if I'm not, if that's the conclusion that I reach in this hearing, that there is no misrepresentations at the point of the sale, which is a good portion of their complaint, but there are adequately alleged allegations of technological fraud through active concealment, which is also a good part of their complaint, then it seems to me that the complaint goes forward to the next phase, and the motion to dismiss should be denied.  And is there anything that I can or should or need to do with respect to my conclusions, I mean, if it is more than tentatively eventually that there are no misrepresentations at the point of sale?

Do you follow what I'm saying on that last point?

MS. SALYER:  Yes, I do.

THE COURT:  So I'm not quite sure what I should do

with that if that's the direction that I end up going.

MS. SALYER:  Okay.  I will address all of those things.  I think I was saying that a lot this is really context-based.  So I want to sort of parse this out and talk about the two different kinds of calls at issue.

THE COURT:  Yes.

MS. SALYER:  Because I think there is a significant difference here between the Roam Like You're Home calls and the VoIP calls.  Then at the end, when we ask you for whatever your ruling is going to be, we may want you to make a finding that there is no contractual misrepresentation, there is no Roam Like You're Home problem, and that we are really specifically looking at the VoIP calls, if that's the way we go.

But we think we've got good reason that those claims are also not plausible, and it really goes to the notion of what the SIM technology is and what it does in this context.  When I came to the hearing last time, I didn't know enough about SIM technology.  I think you recognized neither party could adequately inform you about how this technology worked.  I have done my homework, and now I think I can explain how the SIM technology works.

THE COURT:  And you're definitely welcome to do that, although keep in mind that I have to look at a 12(b)(6) standard where I look at what is alleged in the complaint and

give all reasonable inferences to the plaintiff, except all non-conclusory allegations, as true.  By the way, I do kind of think, and I will talk to Mr. Vaughan about it later, but I do think such statements as pretext and false premises, that falls in the line of conclusory.  That doesn't give me enough facts.  But on the technological side, I have to accept what the complaint says.

Now, if you tell me with some extra complaint facts, and, by the way, I'm going to let you talk about things outside of the complaint just so we can all advance our learning.  But if you tell me some things about extra-complaint facts, and if the plaintiff responds by saying, "No, that's not the way it is, here is the way it is," and if plaintiff's version would support a claim of active concealment for technological fraud, I am going to have to say, "Okay, motion to dismiss denied," and I don't know who is right on the technology, but it will be a very interesting summary judgment argument.

With that said, say whatever you want.

MS. SALYER:  Okay.  So I want to start with those Roam Like You're Home calls.

THE COURT:  Okay.

MS. SALYER:  Actually I brought some more diagrams.  This time I think they have more detail.

THE COURT:  If you have two copies to hand to the bench, that would be wonderful.

MS. SALYER:  I do.  And here is a copy for Mr. Vaughan.

So the first part of my chart simply shows that two calls that operate the way that we think Digicel would have in their perfect world, that's how they would operate.  What it shows is basically that when the call is with the originating carrier in the United States, that the call is basically -- the tariff for that charge is being borne by the originating carrier, and the tariff changes when the call hits the Digicel switch.

In the Roam Like You're Home plan, that happens in Miami or New York.  That's where Digicel has a switch.  So by industry custom and usage, and the plaintiff won't disagree with this, the carrier gets to charge for the call for that portion that they are transmitting it or transporting it.  So when these calls hit the Digicel switch in New York or Miami, Digicel has a SIM card that authenticates the call to its network and it says, "Yes, we have this call, we are going to carry it, and we're going to charge 23 cents."  The difference is, though, when a person has a Roam Like You're Home card, then Digicel's SIM card says, "No, we're only going to charge you nine cents, because that's what we have agreed to do."

So if you turn the page over, I want to show you how sort of the UPM thing changes that.  But before I get there, I am going to talk about some things that are outside of the

complaint, but if you look Iqbal, Twombly, and even Eclectic Properties, they tell us a couple of things. They say, one, you can take judicial notice of certain things. They also say, more importantly, that judges have judicial experience and common sense.

THE COURT: By the way, this judge has no judicial experience in the area of alleged bypass fraud. By the way, have any federal cases addressed allegations of bypass fraud? We couldn't find any.

MS. SALYER: There are none; no reported cases.

THE COURT: Then I really have no judicial experience.

MS. SALYER: Not with bypass fraud. But I think you have experience with SIM technology and the information that is passed along with carriers. I am going to explain why you have that experience.

THE COURT: That's fine, although not according to my kids.

MS. SALYER: I want to answer your question about bypass fraud because I think that is important. There isn't a single reported case. In fact, when you put the term "bypass fraud" in Lexis, Westlaw, it doesn't come up. Where you can find that term interestingly is just Google it. There is all kinds of industry representatives, and we might even have one in the courtroom today that are engaged in businesses that are

designed to seek out and stop this sort of activity. So it is an industry created or coined term that is designed to prevent these calls from being made, and it is active in this case. Digicel employs that technology.

But I want to go back and talk about the Roam Like You're Home call. It originates with the consumer. UPM now has this card, and they didn't make any contractual representations that, "Oh, we live in Haiti; we're only going to use it in Haiti." In fact, what Digicel doesn't tell us when they tell us about their plan, they don't tell us what happens if somebody from Haiti buys that card and sends it to their Aunt Sally in New York. Do they prohibit that? It appears not. It appears the real problem here is that we are doing this commercially. Why is that a distinction?

THE COURT: Although the way I understand it, if someone in Haiti buys a card and mails it to their Aunt Sally in Oregon, and Aunt Sally puts it in her cell phone to use it. Digicel processes the call, and as far as I can tell, has no complaint. The way I understand it, why do they have no complaint? Because the card is being used as intended; namely, in a singular cellular handset.

By the way, Mr. Vaughan, that's a little distracting. Don't do that.

MR. VAUGHAN: You're seeing me past this?

THE COURT: I'm seeing you signal, yes, I've got it

right.

MR. VAUGHAN:  I'm so sorry.  I hear you.

THE COURT:  You can say it when it is your turn to speak.

MR. VAUGHAN:  It was not for the Court to see.  I'm so sorry, Your Honor.

THE COURT:  That's fine.  Thank you.

MS. SALYER:  I agree that Digicel wants this to be used in a singular handset.  The problem is they never told us: You can't use these in something other than a Digicel handset. And that's the problem with part of their complaint.

THE COURT:  And I get that.  And I don't disagree with you.  That's why I think there is no classic non-technological fraud.  However, and this is the part that is still only tentative in my mind:  If your client knows that Digicel is trying to use technology that would prevent the use of a SIM card in something other than a singular handset, they'll stop it -- if you know that Digicel is trying to stop it.  Thus, if your clients' technology tries to create a false technological impression to the Digicel technology; namely, this really is coming from a singular cell handset, when it is not, why doesn't that fit within the classical category of active concealment, because technologically speaking your client's technology is misrepresenting to Digicel's technology that it is coming from either an individual handset or that it

is coming from human beings, which is part of the explanation of the dispersal to the multiple towers within Haiti, and why isn't that a fraudulent representation through active concealment or deception in that technological sense?  That's what I'm struggling with.

MS. SALYER:  I'm getting there.  Unfortunately, there are three or four layers that you have to peel off the onion until you can answer the last question.

THE COURT:  But you don't have to repeat the contract stuff.  Unless plaintiff convinces me otherwise, and you will have an opportunity to rebut, I don't see point-of-sale misrepresentations or things like that, what I've been calling non-technological fraud.

MS. SALYER:  Okay.  So let's start then where this switch is located in Miami and New York.  What that switch does, it communicates back to this SIM card.  What it wants to know is:  Will I authorize you to enter my system?  Now, when I told you that I think you do have experience with SIM technology, where you get that experience is your Visa card.  Say you have a Visa card that has been issued by CitiBank, and you take it to Nordstrom's, and you want to access your CitiBank account because you want to buy your wife a lovely sweater, you take that card, and put it into the SIM card reader.  That's what the gateway does.  It is simply reading the information off the SIM card, and it is passing it on to

CitiBank that says, "Joe Smith is here; he wants to enter your network."

Note that Nordstrom doesn't know the terms of your calling plan. It doesn't know your interest rate. It doesn't even necessarily know your name. A lot of times they don't even ask anymore. It simply wants to know if this SIM card is going to contact Digicel and say, "Let me in or not."

What that SIM chip does -- and as you know, Congress just enacted new legislation that required credit card issuers to use SIM chips. They did because this is technology that is safer and more secure. NASA (sic.) hasn't been able to break it. Spyware organizations haven't been able to break it. If my client had really managed to break SIM technology, they would be probably be working for NASA, not focusing on Digicel's operations in Haiti.

THE COURT: You mean NASA or NSA?

MS. SALYER: NSA.

So we go back to what is happening at Nordstrom. Nordstrom basically sends authorization to CitiBank and says, "Can this user access your network?" CitiBank -- actually the SIM technology is a little -- it is like it asks a question, and the computer at CitiBank says, "You have the right code." There is like an algorithm that changes each time. So each time there is a question and answer process, do we allow entry, or do we not. In fact, that's how Digicel blocks these calls.

When they have done their work at the front end, and they know that they are unhappy about who is using the card, they can block it.  Or if they notice that calling patterns aren't as they deem appropriate, they block it.  But they don't block these calls here.

Instead, the SIM technology has been programmed to do exactly what Digicel wanted it to do, which is to allow these calls to enter the network.  In the case of the Roam Like You're Home plan, it is at the nine-cent rate.

THE COURT:  Although paragraph 96 of the amended complaint alleges, "To avoid easy detection, defendants use multiple portable receivers in various locations.  The software" -- I'll substitute "'on the SIM servers' manipulates the calling patterns by directing calls to be spread among various receivers."  Paragraph 96.

Paragraph 94, "Spreading these calls among multiple receivers is intended to mimic the calling patterns of real people."

Paragraph 95, according to Digicel, "If all calls went to and then from a single receiver in a static location, the abnormal call volumes to the particular tower in the area of the receiver could be flagged as a sign of bypass fraud," and then presumably shut down.  When I use my SIM card in my credit card to go to Nordstrom's and go shopping, I don't do stuff like that.

MS. SALYER:  So let me explain the alternative innocent explanation there.  Now, you are not talking about the Roam Like You're Home plan; you are talking more about the VoIP plan.  So on the VoIP plan, first of all, they want to say that we're hiding these gateways and we are moving them around to avoid detection.  You have experience with that as well, because your cell phone, my cell phone sitting over there on the desk is actually a gateway.  They want to use fancy terms like "probe" and "receiver," but "a gateway" simply means the converter.  It takes something that is VoIP, which is data, and converts it to cell, which is not.

The reason why these things can ostensibly be moved around so easily is because they are incredibly small.  So we're not moving our receivers or making them small because we are trying to avoid detection.  It is not like our receiver has to be like their tower, you know, a great, big conspicuous site at a high location.  These can be sitting in normal use on a desk, in a closet.  They are small equipment.

But this notion that it can be moved around very quickly is also very implausible, and this is why:  Because it is VoIP, we know that requires some sort of data connection, either WiFi or a landline.  And because we know we're handling a volume of calls -- they allege that -- you have to have pretty secure location.  So you can't be moving your gateway every 15 minutes to avoid detection if, in fact, you have to

maintain a stable landline or WiFi connection to handle the call volume.

One of the things I didn't say earlier, but I think Digicel wouldn't disagree with, the whole way that a carrier decides to use UPM, carriers like Verizon and the others, right when a call starts, their computers are out there scanning. They are looking for cheap minutes and quality minutes. It is a combination of the two. If they can't find a quality connection, they don't go there. So in order for us to even handle this, we need a stable WiFi or landline connection, and that's why these aren't moved around in the way that defendants say.

The other alternative explanation is, what competitor or innovator has to describe to the person they are competing with, "This is how we do business"? There is some level of secrecy that is, by its very nature, involved in innovation.

THE COURT: Although I don't remember whether we have a protective order in place in this case. Do we?

MR. VAUGHAN: I think we do, Your Honor.

THE COURT: I don't remember if it is a single tier or a double tier, one tier or two tier to protect competitive information from going to a competitor. If it is two tier, fine. You can already deal with it. If you need additional protection through a two tier that might only go to plaintiff's counsel and plaintiff's outside experts with further directions

not to go to any competitive decision-makers or even within the plaintiff itself, I understand that may result in a little bit of an inconvenience. We will cross that bridge if and when we come to it. I won't make any rulings right now. I will let the parties see if they can work things out themselves. But there are ways to protect having one competitor reveal its sensitive proprietary technology to another competitor, yet still let both sides protect their rights in litigation.

MS. SALYER: We have a two-tier protective order in this case already.

THE COURT: Okay.

MS. SALYER: I don't think that answers the question, though, that we want to protect it in the litigation, because we do. I don't think it answers the question why, in the ordinary course of our business, we're not out there telling the plaintiff and telling everyone else, "This is how we figured out to do this." That's the innovation part of it. We figured out to do this and then --

THE COURT: I don't think they are complaining that you didn't tell them how you do it. What they are complaining about is that you are doing something that misrepresents, from a technological perspective, where the call is coming from or from what type of transmitter, if you will; that you are misrepresenting that it is coming from an individual cellular handset using a SIM card. I think that's the allegation of the

technological misrepresentation that they are making.

MS. SALYER:  Okay.  So I want to get to that, because I read several sort of different aspects of that in the complaint; that we were trying to evade detection by having these receivers that can be moved around quickly in Haiti.

THE COURT:  Yes.  And the way I read that, and I could be misreading it, the way I read that, that is more to mimic the pattern of what would likely happen if individual users with SIM cards, with the Digicel SIM cards and individual handsets were to call their friends or family in Haiti as opposed to, if you will, an aggregator, like plaintiff allegedly is -- or is -- making calls all to a particular receiving station in Haiti, then dispersing the calls from there, and is trying to deceive defendants' system into thinking that it's the former rather than the latter.

MR. VAUGHAN:  Sorry to interrupt.  It is the other way around.

THE COURT:  Straighten me out then when it is your turn.

MR. VAUGHAN:  I apologize.

MS. SALYER:  What we're trying to say is that it is implausible to believe that that's way the technology is working in Haiti.  The reason is, because this isn't as global as it suggests.  It has to be the receiver.  They are calling it a receiver; we call it a gateway.  It has to have a solid

WiFi connection that Verizon and others know that is there.  So we're not moving around.  It is sitting in one spot.

To the extent that something is moving around, and we will talk about this next, it is the SIM cards, the use of the SIM cards back in the SIM server.  But the actual gateways are stationary, and they might get moved every once in a while.

THE COURT:  When you say the SIM cards or the server, are those in Oregon?

MS. SALYER:  They are in Oregon.  I will get to that next and talk about how the SIM cards work, because they work differently in the Roam Like You're Home plan.  At least if they are not working differently, they are entering the picture at a different place.  The reason they enter the picture in a different place is the first time the SIM card sort of becomes an issue is when you want to enter the Digicel network.

In the Roam Like You're Home calls, we are entering the Digicel network in Miami or New York, and that's when the SIM card is first asked for authentication.  It does two things:  It first authenticates your phone to the tower or the device to the tower, in this case the gateway to the tower. The second thing it does, it allows the call to go through.

So in the case of your cell phone, when you go home tonight, right now you are connected to towers, but as you move, it is going to connect you to a new tower the whole way home.  That's the way that technology works.

THE COURT:  That, I understand.

MS. SALYER:  Okay.  So in the VoIP call -- so what happens is the call comes in -- most of the time, even the cell phones that are used by all of us, are turning these calls into VoIP.  That's just where the technology is.  So if a call isn't VoIP by the time it hits UPM, they convert it to VoIP.  But most of the time it is VoIP already.  UPM carries that call clear to Haiti.  They carry it across the Internet.

Now, Digicel's expectation is that it is going to be paid, because this is what the industry does -- it pays you for that part of the call that you carry.  If you carry it from within Haiti from point A to point B, you get paid for that.  So UPM -- it is UPM's expense to get that call to Haiti.

Then when the call gets to Haiti, it attaches to -- it hits the gateway, which is the converter.  It then becomes a cell call.  So it transfers back from VoIP to cell.  That's the first time it is a cell call.  Then the SIM card has one attached to the tower, so we know we're communicating with the tower.  It then sends a signal onto the Digicel network, saying:  "This is our secret code; are you going to let us in?"  The Digicel network reads what it has pre-programmed into its own SIM card and says, "You can come in, use our system, complete the call," and the call gets completed.

THE COURT:  Right.

MS. SALYER:  Go ahead.

THE COURT:  I don't want to get cartoonish here, but here is the cartoon that's in my head that I'm thinking about. So I visualize this call that comes in from the United States over the Internet and lands at the receiver in Haiti and then does exactly what you say.  I'm visualizing a cartoon character as representative of that call that comes in over the Internet, and it lands in Haiti.  If that call were to say -- and now I'm going to get a little silly; but I'm visualizing a little bubble over the call, anthropomorphized, that says, "By the way, I came in through UPM's use of Internet technology, and we have purchased legally, without misrepresentations, SIM cards and put them in our servers in Oregon, and that's how I now have this number.  But here is my number; here is my authentication number I'm showing you.  That's how I came in. Will you let me in?"

Maybe that cartoon character is met by another cartoon character for Digicel saying, "Well, let me clarify this.  You are not coming in via SIM card that went into an individual handset but into, rather, a server arrangement; am I correct?"  The first little cartoon character wants to be totally honest and says, "Yes."

My reading of the complaint says that that second character, the Digicel character, will say, "Sorry, we won't take you.  Even though you have given us the right authenticating number and even though you have shown us your

card and you've purchased the right to come in, we're not taking you," which may or may not be within their regulatory or legal rights or contract rights.  I don't know.

But it is alleged that they would not take that call; they would stop it.  Therefore, because defendant knows that, defendant changes its answer, and the little cartoon character comes into Haiti and says, "Hello, I have come here via single individual handset that uses the SIM card that was purchased legally in Haiti.  Here is my identification.  May I now come in?"  And that's a misrepresentation.  That's fooling that little gatekeeper in Haiti, and Haiti says, "Oh, in that case, you may come in."

That's how I read the allegations in the amended complaint.  Am I misreading it?

MS. SALYER:  I think there is an element of that in the amended complaint, but I think the difference is, in your cartoon story, you have Digicel asking -- the little man from Digicel asking UPM, "Are you from a handset, or are you from a receiver?"  And that's what Digicel -- when we talk about the robust infrastructure, that's what they didn't do here.  They didn't ask us.

THE COURT:  And that's a fair point.  I will hear plaintiff's response in a few minutes.  But then to modify that example a little bit, it does look like what's alleged is that my UPM cartoon character that comes into Haiti is putting on a

disguise.  It is making it look like it is coming in from an individual handset.  That's the allegation when they talk about the software manipulation.

MS. SALYER:  We don't believe that to be true, but we recognize that we have got a Rule 12, what you have to consider and what you have to accept as true.  I think there is an element of the complaint that fairly states that.  I again think that's implausible, because it is not something that they're asking and -- one, it is not something they are relying on, because they already have a system in place to block the calls.  That's the whole point of shield security and this bypass fraud detection system.

THE COURT:  I have a hard time understanding your plausibility argument because it seems to me that's how this business model works.  It is a really interesting question whether it is legal or illegal, fraudulent or non-fraudulent.  But it seems that's how that business model works rather than taking a SIM card obtained in Haiti from Digicel and putting it into a single handset.  Your client puts it into the servers in Oregon, at least according to the allegations, through software, and then sends the call into Haiti and makes it look like it is coming from an individual handset when, in fact, we know it's not.  That's not how your client does business.

And if it makes it look like it is coming through an individual handset, and that's what is needed to either avoid

detection and stoppage or to allow it to come in, then it is not implausible -- whether it is fraudulent or not, we will still struggle with -- but it is not implausible.

MS. SALYER: Well, we go back to it is not illegal. They haven't alleged any law that is being broken in terms of illegal or not. It is not a contractual problem. There are no allegations of that. So the only way they get there is to show that we have some sort of scheme that we were intending to defraud them.

THE COURT: Right.

MS. SALYER: Again, they are not showing -- the Eclectic Properties case even talks about this. You have got to show that they were taking reasonable steps and that they were being precautionary themselves. They don't ask that question. What the SIM technology is asking -- the SIM technology is asking, "Do you have the access code? Did we sell you that?" We said, "You sold us the access code." If they wanted to ask that question, we would have a duty to answer it appropriately. They don't ask the question.

THE COURT: Okay.

MS. SALYER: So in closing, Your Honor, I think from our perspective, this all comes back to the robust infrastructure. Part of that is sort of what exists in Haiti. It also, though, depends on the choices that Digicel made in terms of how it was going to protect itself in this

environment.  Digicel is sort of the victim of the infrastructure in Haiti, and it is the victim of its own choices with respect to having distributed these products into the stream of commerce with no restrictions on their use and cannot now be asking the federal court to imply that there is some sort of fraudulent conduct here.

THE COURT:  Thank you, Ms. Salyer.  You will definitely have an opportunity to respond to what plaintiff says.

Mr. Vaughan or Mr. Hansen.

MR. VAUGHAN:  With the Court's permission, may I just set up quickly, Judge?

THE COURT:  Wherever you wish and take whatever time you want.

MR. VAUGHAN:  You don't want to tell me that.

THE COURT:  That's fine.

MR. VAUGHAN:  Your Honor, while I am setting up.  I thought I had one apology for the Court; it turns I have two. I have apologized to the Court for my extra motions, which I thought were behind this screen here.  But it also occurs to me that while I was motioning I may have been distracting counsel, and I apologize.  I didn't think I was being seen.  Exuberance of youth, I hear.

The other one, Judge, I think counsel and I both share some increasing knowledge as the case evolves, and I

distinctly remember in July I said to the Court, "There are SIM cards in Oregon and in Haiti." I was spanked by my clients when I went back, because that is not correct. There are no SIM cards in Haiti. I think the Court has already gathered that --

THE COURT: All the SIM cards are purchased in Haiti and then used and inserted into servers or elsewhere in Oregon.

MR. VAUGHAN: That's correct.

THE COURT: That's the allegation.

MR. VAUGHAN: That's correct. While I am tempted, Judge, to go point by point with counsel, I don't think that would be helpful, and I don't think it would be a cohesive telling of the story.

There are two things, however, that I must note. The Court asked whether or not there was a misrepresentation at the point of sale. I will say two things with respect to that before I go into our presentation in full swing. First, "bypass fraud," whether you want to call it a term of art or a term used by the industry, is fraudulent conduct that is recognized and rendered illegal in Haiti. Bypass is illegal in Haiti.

THE COURT: Is that from a regulation or from a national law or a provincial law? What specifically is the source of the rule of law in Haiti that renders that illegal, preferably with a citation?

MR. VAUGHAN:  I can't give you a citation, Judge.

THE COURT:  Okay.  Then I will take the answer now and take the citation later.

MR. VAUGHAN:  Perfect.  The reason I hesitated when the Court raised it, I had to respond is because the allegations with respect to the conduct at the point of sale are within the totality of the circumstances of what we have alleged is a scheme, a conspiracy to steal revenue from Digicel for the use of the telecom infrastructure to terminate international phone calls in Haiti.  I think that's a sum articulation of what's at issue in this case.

THE COURT:  Are there any reported decisions from Haiti that confirm, yes, that is either a violation of a private right in Haiti or a criminal violation?

MR. VAUGHAN:  Since I've already used one mulligan, I am going to tell you this with a caveat.  There have been prosecutions in Haiti against individuals who have been caught involved in bypass fraud and prosecuted as a result.  For example, the gateways and switches, those mobile stations that you have heard described so eloquently from counsel, where you've heard they cannot be moved because there has to be some element of stability, what has actually occurred -- and if the Court would grant me a little bit of permission to go outside the four corners of the complaint -- these devices are disguised as DVR players, as base computer units, and there is

an actual small antenna connected to that device and literally sticking out of the window of somebody's house and then directing the phone call to the nearest cell phone tower.

When the authorities are alerted to potential bypass in an area and a raid is commenced, those small disguised gateways or switches are then quickly bagged up, hidden away or removed, and then involved to the next innocent house down the road to facilitate the bypass.

So as we go through with the presentation, Judge, I will tell you exactly where those gateways are represented.

THE COURT:  I understand, but one more thing.  Since you have mentioned that there have been prosecutions and this goes back to what I was asking.  If at some point, and I'll ask you how long it will take you to do this in a moment, but if at some point you can give me the legal citation for what is either the Haitian law, the ordinance, the provincial regulation, something under which those prosecutions take place?  Maybe if you could provide me a copy of that, preferably in English.  And are there any other appellate decisions affirming prosecutions for that type of conduct under that law?  Do you follow what I'm asking?

MR. VAUGHAN:  Yes, sir.

THE COURT:  What's your best estimate of how long it would take to file that?  I'm not rushing you.  Whatever you think is reasonable.

MR. VAUGHAN:  It would be under two weeks, Judge, and I will be shooting for less than that.

THE COURT:  All right.  Let me say I would like you to do that within two weeks.

MR. VAUGHAN:  Yes, sir.  The only reason I am a little tentative, obviously I'm going to have to get certified translations.

THE COURT:  That's fine.

MR. VAUGHAN:  Your Honor, I think we can skip past or go through fairly quickly the standards for evaluating a motion to dismiss.  I don't think that there is much difference between the two sides, with the sole exception that my friends on the other side took great pleasure in pointing out that we did not focus on Iqbal or Twombly, but rather we focused on, for example, Cahill v. Liberty Mutual, Balistreri v. Pacifica Police Department, and Wool v. Tandem Computers.

THE COURT:  We don't need to worry about that.  But the interesting civil procedure question that I have, since you don't allege multiple counts, but instead alternative theories of fraud, the point-of-sale fraud, the technological fraud, what should I do, if anything, if I find that you have adequately stated a claim for the technological fraud, but not for the point of sale fraud?  I know you think you have.  But what if I disagree, what should I do, if anything?

MR. VAUGHAN:  Yes, sir.  The short answer to that

question, Judge, is nothing, because what you have surmised may have been our intent. What I will confirm is that what we have done is attempted to allege the totality of the conduct that we believe contributes to this bypass activity.

The Court preliminarily, or the jury ultimately, may decide to give less weight to one part of the alleged conspiracy as opposed to another. But to tell this story omitting bits and pieces of exactly how it plays out would lead to a rather disjointed and boring tale.

THE COURT: I think you're probably right at this stage, at the motion to dismiss stage. The answer is I do not know. However, I do think that it is not inappropriate at the summary judgment stage, where a court can grant summary judgment, not only on a claim, but a portion of a claim, including an issue. If the defendant were to make a motion for partial summary judgment along the lines that there was no fraud committed at the point of sale, then it would be incumbent upon the responding party, the plaintiff, to present evidence, and I don't know how I would rule. We haven't even gotten to the evidence yet. But if I were to agree with the defendant that there was no fraud committed at the point of sale, then that would be both appropriate to rule out on summary judgment and appropriate to factor in as we instruct the jury.

Do you disagree?

MR. VAUGHAN:  Yes and no.  I disagree to the extent that -- well, let me start with agreement.  I agree, to the extent that were we to make a claim for damages for fraud executed or completed at the point of sale and limit our request with those specific damage to that allegation, were we not to be able to provide a more fulsome line of proof in that regard, yes, absolutely, I agree, and summary judgment may be warranted at that juncture.

To the extent, however, that our allegations with respect to their conduct at the point of sale are important, to the extent that we have to explain how the SIM cards are acquired, how they are able to avoid any kind of detection by the robust methodologies employed by Digicel to stamp out bypass fraud, and what we're alleging is nobody walks up to a kiosk and goes, "Hi, I would like to buy some SIM cards for purposes of bypass fraud."  No.  Somebody in a school uniform, a fine, outstanding young student goes up and purchases a SIM card.  They then go around the corner to the aggregator, who pays them -- and this has been admitted -- who pays them for having purchased that SIM card.  They are collected and sent up to UPM.  In large part, the explanation of that whole section is to explain how UPM acquires these hundreds of SIM cards in Oregon.

THE COURT:  We can have this discussion as the case progresses, and I'm sure we probably will if the case

progresses. But keep in mind, and this is the question that I asked several months ago at the first oral argument, and that is: Couldn't Digicel require, in the forms that you gave me that have to be filled out with the name and the Government ID number, couldn't they simply require an affirmation, a signature that "I affirm that I will not resell this card" or "I will use this card only in an individual cellular handset device"? Then if someone signs that, knowing that that is not a true representation and that is not their intention, that's good old-fashioned fraud.

But that's not what is alleged here. That's not what the documents show, and I'm trying to figure out the implication of that.

MR. VAUGHAN: Yes, sir. You may be right, Judge, and there are a couple of answers to that question, not the least of which is, as we indicated in our pleadings, that -- how do I put this? The demographic infrastructure in Haiti is not as robust as other territories. For example, Jamaica, St. Lucia, et cetera. It is funny, because if you were to look at the contract --

THE COURT: It really is not a contract so much as a form.

MR. VAUGHAN: When I say "contract," it's the documentation that goes along with the purchase of a SIM card in Jamaica.

THE COURT:  Is that attached?  Have I seen that yet?

MR. VAUGHAN:  No, sir.  That's Jamaica.

THE COURT:  Someday I would like to see it.

MR. VAUGHAN:  It is significantly different, because the ability to track individuals, the individual identification scheme, the national identification scheme in some territories is vastly more robust than it is in other territories.

So to have somebody take a SIM card in Haiti and sign, saying, "This is my name," but they don't have an ID. There is no driver's license.  There is no national ID.  It is a futile endeavor.

THE COURT:  Here is why I am not convinced that it is futile, but I don't know what to do about it or how it is even relevant.  They may give you a false name.  You may not know how it is done.  But if the representation is -- on that thing they've signed -- that this will only be used in an individual cellular handset, and "I will not resell this card," if there is any way -- maybe this is what you are telling me there is no way to track.  If there is any way to track that that particular card that was sold ended up in Oregon in defendants' server, then you would have an inference that it was defendant who obtained that SIM card under false pretenses from the agent.  You may never find that particular agent in Haiti for the reasons you've described, but you would have a classic fraud claim against defendant.

MR. VAUGHAN:  Maybe that is what -- not maybe -- but that is what we have probably been inarticulate in trying to describe, because at the end of the day the documentation does require that you represent that you are going to use this SIM card legally.  That's the only thing.

With respect to tracking that this purchaser is John Pierre St. Paul, there is absolutely no way to do that. So when that SIM card gets to Oregon, we cannot trace who owned it, because John Pierre St. Paul may just have been a name given at the time the card was acquired.

THE COURT:  I'm not following you.  Let's say the signature on the purchased card is John Pierre, and John Pierre purchases card identifier ABC.  Well, we now know, we can see card ABC has landed in Oregon in defendants' server.

MR. VAUGHAN:  Yes.

THE COURT:  Now, we trace it back, and you say, "Ah-ha, that was sold three weeks ago to a man named John Pierre, which may very well be a false name, and we will never find John Pierre, but we have found that that particular card was sold to John Pierre.  So how did it get to plaintiff? Well, one potential inference is he purchased it directly from or through John Pierre, whoever that may be, as an agent of defendant.

MR. VAUGHAN:  All of that is absolutely correct except the last part.  It is not an inference.  It is an

allegation in the complaint.  It has been admitted to by the defendants.

THE COURT:  Ah, then that just goes to, but then there is nothing in that form that John Pierre has signed that is false, and that's my point.  It is so easy to say in that form that John Pierre signs that -- that this card -- "I will not resell."  I know your limitations on your vendors, but when John Pierre signs that form, it doesn't say, "I will not resell this card."  It doesn't say, "I will only use it in an individual handset," does it?

MR. VAUGHAN:  It says, "We will use it legally."

THE COURT:  And that is the ambiguity here.  We are trying to figure out if this is a legal use or not.  Your allegation is that it is a fraudulent use.  I'm trying with a great deal of precision to find:  Where is the fraud?  When John Pierre signs and says, "I will use it legally," it very well may be right.  However, if he would have said, "I will not resell it, I will use it only in an individual handset, and I will use it legally," oh, maybe now he is not using it legally, because there is the fraud.

MR. VAUGHAN:  And maybe -- maybe -- just maybe I may answer the Court's question as I've described -- the totality of the fraud -- maybe.  This is not to bypass the Court's question, but I think it is going to be answered.

THE COURT:  That's fine.

MR. VAUGHAN: So, Your Honor, it is going to be important for us to kind of understand contextually what we're talking about and what we're dealing with here, pursuant to the allegations in our complaint.

You have had one version of how calls are supposed to work and how bypass is alleged to work. This is what we have alleged: We allege that the normal routing of a cell phone call is as follows and is going to be as I demonstrate here. There are going to be switches and towers eliminated from this for purposes of simplicity, but the general scheme is as follows. "So Johnny's cell phone has a cell phone in Oregon."

THE COURT: Do you happen to have a hard copy of this for us, please?

MR. VAUGHAN: I have one.

THE COURT: Mary can copy it while you speak. Mary, will you copy one for me, Meg, defense counsel, and if Mr. Vaughan would like another set.

MR. VAUGHAN: I would appreciate that, Judge. My apologies for that.

So Johnny's cell phone makes a telephone from the U.S. That call eventually goes to a U.S. telecom tower. Now, that could be AT&T, Verizon, T-Mobile. It doesn't matter. It goes to the telecom tower, eventually the same company that provides cell phone service to Johnny making his phone call.

That call is then directed eventually to one of any

number of wholesale providers who sell termination into different locations.  For purposes of simplicity we have been describing that termination as "selling minutes."  The experts will tell you technology that's not correct, but just as you say:  Cartoon character, we're just talking about a bucket of minutes that are being sold to go into this location.

In the context of cell phone international phone calls being terminated in Haiti on the Digicel switch, this is what is supposed to happen next:  That wholesale provider has a relationship, a contractual relationship with Digicel.  That contractual relationship says you then direct your cell phone calls for termination on our network in Haiti to one of these two switches -- New York or Miami -- by the contractual relationship that exists there.

So afterwards, the call is directed from that switch, and it goes into a Digicel switch in Haiti for ultimate passage onto a cell phone tower in Haiti.  That cell phone tower is a Digicel tower in the Digicel network.

The only reason that the call has to go through that switch is if the call is intended for termination on a Digicel network.  It is important that we pay attention to that, because if, for example, a call was to be terminated on a Natcom -- that's another telecom phone company.

THE COURT:  I assume there are other telecom companies that can receive calls in Haiti besides Digicel.

MR. VAUGHAN:  I just did it again.  Yes, sir.  I'm sorry.  Yes, sir, that is correct.  If it were for termination on a Natcom tower or in the Natcom network, it would not go through the Digicel switch.

That phone call then goes from the tower, the Digicel tower in Haiti, and it ultimately ends with John Pierre on John Pierre's cell phone in Haiti, and the call is terminated.

Let me take a step back.  What's important to see here is the comparison with what we have alleged again in the complaint as bypass.  First, the first step in executing this bypass mission is the Digicel SIM cards have to be acquired and then shipped up to Oregon, and it is important that we know why.  Eventually you are going to see that there is one reason to have these SIM cards here in Haiti, and that's going to become clear in a second.

So just as before, Johnny's cell phone originates a phone call, and he is calling his buddy, John Pierre, in Haiti.  The call, as normal, goes to a U.S. telecom tower, just as before.  That call, as it did in the normal legitimate call, then goes to what they believe is a wholesale provider terminating minutes in Haiti.  In this instance, in this allegation of bypass, it goes to UPM.

At this point, Judge, UPM has several legitimate options:  One, if UPM has a contract with Digicel for purposes of terminating cell phone international calls on Digicel's

network, they would legitimately send it to that switch for termination in Haiti.  If UPM does not have a contractual relationship with Digicel, UPM can send it to any third-party provider that has a relationship with Digicel

THE COURT:  Does UPM have a contractual relationship with Digicel or has it?

MR. VAUGHAN:  No contractual relationship with Digicel.  There is absolutely no authority extended from Digicel to UPM directly and, as far as we know, indirectly to terminate its minutes in Haiti.

THE COURT:  Okay.

MR. VAUGHAN:  So those are the legitimate options available to UPM.  UPM utilizes none of those.

What UPM does is it bypasses -- hence, the name -- its legitimate and indirect options, and it sends these calls to a probe in Haiti -- a probe or call or a gateway, or as my friend on the other side described it, a switch.  As you will learn as the evidence progress, these switches are as we described, pieces of equipment disguised as computers or disguised as DVR players that are actually these probes, which replicates the digital information on the SIM, and with an antenna literally they send these calls onto the Haitian tower.

Now, there is something to note, Judge, because you will see, when that call goes from the U.S. telecom tower, the SIM is white.  It is white to represent the original phone call

from Johnny, wherever Johnny is.  When it gets to the UPM server, something important happens.  It is joined with that Digicel SIM.  There are two calls that are traveling at that point in time.  That is significant, because what is happening is the only reason they have these Digicel SIMS in Oregon is so that they can package the original call from Johnny, piggyback it onto that Digicel SIM, to effect the misrepresentation when it crosses the border into Haiti.

THE COURT:  That's what I loosely meant in my cartoon analogy by the call puts on a disguise.

MR. VAUGHAN:  Yes, sir.

When that call leaves that probe, it is the Digicel digital information that is being represented to the Digicel tower.  If you look closely in our depiction here, that phone call from Johnny in Oregon is still hidden underneath it.  It is still hidden underneath it when it is transmitted to John Pierre's cell phone for termination.

Now, those are the allegations in our complaint, and those are the allegations with which we must accept as true for purposes of this motion.

There are two other things that we have put here.  In our allegation, we have shown the reverse, because what gets lost in this conversation over and over is the notion that what is going on is a simultaneous ongoing conversation.  Johnny, in Oregon, "Hey, John Pierre, how are you?"

John Pierre, "I'm doing well.  What's going on?

"Oh, I'm fine.  What's the weather like in Haiti?"

But in reality this is not a one-time transaction that gets transmitted into Haiti and then lo and behold it is a "Haitian phone call."  That's absolutely false.  What's going on throughout the entirety of this transaction is the transmission of a telephone call from Johnny to John Pierre and back and forth.

The plaintiffs have in their motion indicated there is no misrepresentation as to the source of UPM's VoIP calls because at the moment -- and note carefully -- at the moment the call enters Digicel's Haiti network, it is in fact a local call.  They then go on to say that is because UPM uses its "own Internet network to transmit the call to Haiti."

When "the call" reaches Haiti's local network, it uses a local switch rather than the international one because UPM's SIM server uses Digicel SIM cards that are all local Haitian telephone numbers.  There are several things that are significant in that argument from the defendants.  First, "the call" refers to one phone call, and they say "the call" is local.  The only thing that is implausible that we've heard argued thus far is the notion that "the call" is local.

The call from Johnny's cell phone in the United States is under no circumstances, no set of facts to be described as a local Haitian phone call.  It is impossible to

describe that call from Johnny as a local call.  It is Johnny, whatever his residence or location is and his cell phone carrier and his telephone number -- impossible

THE COURT:  Let me ask this, because I want to make sure we are on the same terminology.  I think I gave you this example at our first argument.  If Johnny in Oregon wants to call Haiti, and they use Voice over Internet Protocol to somebody in Haiti that provides the service in Haiti and that person receives it on their computer over the Internet, and they have attached to their computer a nice, high-quality speaker, and they hold up a local cell phone with a Digicel SIM card to their speaker and says, "Johnny, who did you want to call?"  And he says the number in Haiti that he wanted to call.  And the person in Haiti, using the Digicel SIM card, calls the number in Haiti.  "Hello, I have a call from your friend, Johnny, in Oregon," and then holds it up to the speaker.  Johnny speaks; the caller hears.  The caller speaks; Johnny hears.  We then finish the call.  That is a local call in Haiti, correct, and there is nothing fraudulent about that under plaintiff's allegations; am I correct?

MR. VAUGHAN:  With the Court's permission to explain, I am going to say that is correct.  And this is the academic issue that I have been grappling with to answer that question. At that point the question becomes who owns the phone call when it is terminated on that computer and is floating through the

air to the cell phone that is being held up to it?

THE COURT:  Right.

MR. VAUGHAN:  Can Digicel legally, contractually, or through any other theory claim ownership of that phone call or a right to charge for that phone call between the time when it is in the air, leaves the computer, and then hits the phone? Secondly, at that point, Judge, what we're talking about is at this juncture two different telephone calls, because what the Court has indicated is there is a cell phone that would be right there.  What the Court has indicated is this call from Johnny to the gateway is one transaction, and it ends.  Then this phone call from the cell phone to John Pierre is a separate transaction, and that transaction is what is using the infrastructure.  And that's a local call, and it's being paid and charged at the local tariff.  At that point I would have a long conversation with my clients about just how far we are going to be able to take this train.

THE COURT:  Then the next step to that conversation would be the following:  If one posits, if one assumes that there is nothing illegal about my example, then instead of the voice of Johnny and the voice of the friend in Haiti being communicated over the air between the local Haitian cell phone and the speaker, if I were to connect a wire that would make it go seamlessly, easily, automatically, without background interference, what has changed?

MR. VAUGHAN:  So what has changed, Judge, is what we have represented here, because what would have changed is -- and I'll take this distraction off the screen.  What would have changed, Your Honor, is at this juncture the question becomes, as the Digicel and Johnny SIM information are transmitted between here and here, is it the same phone call?

THE COURT:  And I think to tell you what I think has changed and why it is not the same phone call, or at least what I think is different, is that when I'm sitting in Haiti using this phone holding to the speaker, either through the air or with a wire, I've used the SIM card that I bought from Digicel precisely as Digicel expected me to use it, and I have made no representations to Digicel to the contrary.  I have not in any way technologically or non-technologically fooled Digicel.  You didn't say contractually or otherwise that I can't do this.  And if this is what was going on, including with a wire connection in Haiti, we would have a very different case.

But what I see the allegations in this case is, no, here, you allege that the SIM card was mailed to Oregon, was put into a server in Oregon, and through software and/or other technological devices when this call ends up in Haiti, it makes the Haitian or the Digicel network think that the other end of the call is a single handset using a Digicel-purchased SIM card.

By making it think that, if it does, and this is what

I know Ms. Salyer was talking about, that she doesn't think it is plausible that's what it does, but if when we get into the facts there have been changes either in the directions of the software or something else technological that makes Digicel erroneously think this call is coming from a single handset with a SIM card.  That is active concealment.  It might not be classic misrepresentation or even classic half-truth in the sense of a verbal or written misrepresentation, but I'm beginning to think, at least still tentatively, but I'm beginning to think that fits within the category of fraud known as active concealment if defendant does do some manipulation to that call to make plaintiff think that it is coming actually from a single cell phone, and I think that's what you have alleged in the amended complaint.

MR. VAUGHAN:  Exactly correct, and no changes, but an addition.  It is only that it is coming from a single handset. It is that it is coming from a single handset that is located in Haiti.

THE COURT:  Okay.

MR. VAUGHAN:  That's the reason why this cloning takes place.

THE COURT:  Although now take us back to the Roam Like You're Home because with Roam Like You're Home there is no thinking by the Digicel network that it is coming from a handset in Haiti.

MR. VAUGHAN:  The Roam Like You're Home scenario presents an entirely different challenge, and the Court might recall all of our heads turned sharply to the left when Ms. Salyer was arguing and raised Roam Like You're Home last go-around.  It was something, frankly, that had slipped past us.  So we amended our complaint to add Roam Like You're Home because if they are doing that -- I know our complaint says the defendant purports to be using the Roam Like You're Home as follows, and then we allege could be also bypass fraud.

There are two options:  One, if the defendants are using the Roam Like You're Home SIMs, and they are allowing these SIMS to, A, bypass the international gateway, then it is the exact same fraudulent conduct we allege, because it is still an international call that's not being routed through the gateway.  It is not being represented as an international call, but at this level, in Haiti, it is being suggested that the call originated in Haiti.  That's option No. 1.

THE COURT:  Understood.

MR. VAUGHAN:  If what they are doing is routing this Roam Like You're Home properly, this is an RLYH SIM, and it is going to a U.S. telecom tower, then theoretically what's supposed to happen is that U.S. telecom tower is then supposed to send it onto a wholesale provider, which is then supposed to send it to the gateway, which is then supposed to send it into Haiti as normal.  Their allegations that that call properly

routed would only be a nine-cent charge is incorrect, and that is the danger of having the factual allegations being put forward on a motion to dismiss before the facts are pled by the defendant and tested by discovery.

THE COURT:  Well, explain to me, based on your amended complaint, what is the alleged fraud with respect to the Roam Like You're Home plan?

MR. VAUGHAN:  As we understand it and as we have alleged -- and to be clear -- this may be subject to correction later down the road.  We were told that the Roam Like You're Home SIM cards are programmed in such a way that when someone purchases a Roam Like You're Home SIM, they travel to the U.S. The subscription that they have to purchase is they pay an upfront $20 fee, and for a limited period of time they have a certain amount of minutes that they can use, which will be charged as if they were making a local phone call in Haiti even though they're abroad.

With that premise, counsel then proceeded to argue that, as a result, using the Digicel SIM cards that were Roam Like You're Home subscribers in any fashion that results in the exact same local tariff being charged is using the SIM cards exactly as it was programmed.  What's the problem?  You are not losing anything, because you're only charging exactly what the SIM card was programmed to charge.  No harm; no foul.

We allege that's incorrect and that's improper,

because what should happen is what I've just described.  It should go to the U.S. telecom tower.  It should go to the wholesale provider, instead of Roam Like You're Home.  But when it hits the Digicel international gateway, at that point it is identified as a Roam Like You're Home.  The interconnection charges between the telephone companies, because, remember, at this juncture when that RLYH hits a U.S. telecom tower, that U.S. telecom tower recognizes it as a roaming SIM, and then there are charges that are associated with it.

When it moves from that telecom tower and eventually makes its way to the Digicel switch, there is a whole bunch of stuff going on in the background, not the least of which is technically.  There is an AT&T call coming into the switch, but it is really not.  It is a Digicel number.  So AT&T is paying Digicel to terminate this phone call in Haiti, but there are setoffs.  There is back and forth.  So AT&T is paying Digicel. The user is paying Digicel.  Digicel is paying AT&T for the facility provided to its roaming customers, et cetera, et cetera.  UPM simply bypassing all of that works a fraud on Digicel because there is no payment being recorded anywhere along the line.

THE COURT:  I have got to tell you, I do see the alleged fraud as I have described the technological fraud outside of the Roam Like You're Home.  I think I see that.  I think on that basis I am going to be denying the motion to

dismiss, although I'm going to give defendant an opportunity to rebut, but that's my tentative view.

I don't see any of the point-of-sale fraud yet, for the reasons I've described, and I don't yet see or understand where the technological fraud comes in in the Roam Like You're Home. But I think I agree with you that, as long as the amended complaint does allege some theory of fraud, as I've described, we get past the motion to dismiss, and we go to the next step. So I don't think I'm going to worry too hard about not yet understanding the allegations of Roam Like You're Home fraud, but I thought it would be helpful to let everybody know that I don't yet see it that way or understand it.

MR. VAUGHAN: As a second year lawyer, the most important thing I learned was when to sit down.

THE COURT: Dennis, are you doing all right?

(The court reporter requested a recess.)

THE COURT: We will take five minutes and come back for defendants' rebuttal.

(Recess.)

(Open court; proceedings resumed:)

THE COURT: All right. Rebuttal from the defendant.

MS. SALYER: Your Honor, I want to start exactly where the plaintiff started, and that's with the bypass fraud. First of all, as this Court knows, Rule 11 requires the who, how, when, what, and why. Nowhere in this complaint is there

an allegation that bypass fraud is illegal in Haiti. There is no statute. There is no case.

Let me tell you what there was in the original complaint that's not in the amended complaint, and this is telling. When Digicel filed its original complaint, it was replete with allegations about how it got its monopoly and how its monopoly required it to put money into this national education fund. So, of course, that was one of the first things I started to investigate and asked about during the discovery.

They didn't want to produce those documents, and I said, "Well, if you are not going to produce those documents" -- one of the things that I found was a Supreme Court decision from Haiti. I'm not sure that it is called the Supreme Court, but it is a high court of Haiti that declared that entire setup to be unlawful; the statute void.

I pointed that out and said, "I want your client's copy of that document translated in English and everything else about your client's monopoly." If you look at the amended complaint, there is not a single allegation about that anymore. So if they want to talk about illegality, we get to know the why of it. Their claim isn't adequately pled under Rule 9, and it should be tossed. Maybe you give them leave to amend, but it isn't stating a claim as it exists, to the extent that they are relying on any sort of illegality or contract, because we

don't have any allegations about a contract claim either.

The second issue is this notion -- I think what is really concerning Your Honor is the VoIP calls that are terminated or that are transferred via VoIP to Haiti and the plaintiff's argument that it is this gateway server; it is the server that is basically helping the gateway to disperse these calls.

There is a reasonable, innocent explanation, Your Honor, to that.  What the plaintiff says is they're doing that to confuse us.  Well, do you think UPM has 800 employees that are going to sit with each of these and use a cell phone to do this?  The purpose that you use a SIM server to manage these SIM cards is simply a human resources issue.

The SIM server could be in Haiti; it could be in Oregon.  The reason it is in Oregon, it's communicating via IP. It's in Oregon because that's where the employees are that are most effectively managed.  Now, what the SIM server is doing, it is just making sure that when Verizon comes knocking on the door and says, "We need to get in," that there isn't 800 employees standing there having to use a cell phone.  Again, it is technology that facilitates this, and that's the innocent explanation that Eclectic Properties says that they have to say is implausible.

THE COURT:  But what's the innocent explanation for why it appears in Haiti that the receivers are from multiple

locations?

MS. SALYER:  Well, that's a different issue.

THE COURT:  I know.

MS. SALYER:  So the receiver is the gateway instead of the SIM card.  So the issue about the receivers being in Haiti, it's because -- there are multiple receivers, because you have to have multiple receivers to handle volume.  The receiver, which I want to call a gateway, because all of these different terms confuse me.  The gateway has to connect to the nearest tower.  So you have got gateways around so they can connect to the tower to send the call to where it needs to go.  So, again, it is volume and stability.

Remember, we have in Haiti an infrastructure, not only with these contracts that is not robust.  Their communication infrastructure, their utilities infrastructure isn't robust.  They don't have independent power sources all around the country, and so, of course, you have got alternative locations around to handle this volume, if, in fact, you have the volume.  So those are the alternative, innocent explanations that are not even addressed in the complaint.

To the extent -- and I know there are limitations on what you can choose to believe and what you can't believe.  But to the extent that you believe plaintiff's allegations that we are using some sort of software, and that software is what is misleading them, I want that specifically alleged in a

complaint such that when we talk about Rule 11 sanctions later, that we can talk about that allegation, because we don't believe -- they don't know what we're doing at UPM. They have never been to our facility. They have never talked to our employees, and yet if they want to allege that's what we are doing, they should have some factual basis to do that. Those are not specifically alleged.

The last and final thing I want to address is this Roam Like You're Home plan. I'm not sure I entirely understood the argument, but part of this applies to the VoIP calls as well, and it's this industry issue, which is you get to charge for when you carry the call. When the call becomes a cell call for purposes of VoIP -- after it is transferred, after VoIP, is in Haiti. So Digicel's only expectation is that it gets to charge nine cents for that call. Under no scenario would it be entitled to charge more for that call because the call wasn't on its network, it wasn't its customer, and it didn't carry the call to that location.

A similar argument applies to the Roam Like You're Home calls. When the call hits the tower, it is not yet a Digicel call. It's coming off either AT&T or UPM. AT&T and UPM, it is their resources, their infrastructure that is carrying that call. When it enters the Digicel network, Digicel is being paid for what it is providing.

Do you have any further questions of me, Your Honor?

THE COURT:  I don't.

MS. SALYER:  Thank you.

THE COURT:  All right.  I am going to take this under advisement.  As I've discussed with Mr. Vaughan, I expect to see the reference with a bit more specifics as to what law is being used that's allegedly violated in Haiti and whether or not there has been any appellate decisions affirming any prosecutions or convictions under that law, but I would like to know what that law is.

I have expressed to you all my tentative assessments here.  I will think about what you all have argued further.  I will re-read your papers again, although I've read them at least twice.  But I will think about it some more in the context of what you've argued.  We will get out a written decision.  As you know, discovery is scheduled to close -- oh, discovery is closed.

All right.

MR. HANSEN:  Your Honor, we submitted a stipulated motion extending that, and it was granted on the 18th of December.

THE COURT:  Okay.  Then we have a technological question that only Mary can answer.

Oh, I see.  No, it is not a technological question.  It is human error.  I misread this.

MR. HANSEN:  Oh.

THE COURT:  I misread it.  So it is not technology; it is human error.

All right.  The original discovery deadline was December 17th, 2015.  It now is April 22nd, 2016.  I did grant that.

Am I correct, Mary?

THE CLERK:  Yes.

MS. SALYER:  Your Honor, the parties have done very little discovery.  Both parties served discovery requests; both parties have served discovery responses but have not produced any documents.  I think the plaintiff has also done some requests for admissions.

You know, in a RICO and a fraud case, discovery is enormously burdensome, especially on a small company like my own.  We had urged the plaintiff not to proceed with any further discovery pending the ruling on this motion.  They didn't tacitly agree, but they impliedly did because they haven't proceeded.  I guess we would like to continue, until we decide the pleadings are closed, to not have to engage in a burdensome discovery and then talk about a discovery schedule when that occurs.

THE COURT:  Before I say that strikes me as fair, any objection from plaintiff?

MR. HANSEN:  No.

THE COURT:  Okay.  That strikes me as fair.

All right.  So right now the deadlines are April 22nd.  You will certainly have my opinion well, well, well before then.  If the motion is denied, then I would like the parties to confer about an appropriate schedule going forward.  If the motion is granted, it would be my expectation to allow leave to file a further amended pleading.  Then we will see where we go.

Okay.  Is there anything else that either side would like to discuss at this time?  First, plaintiff.

MR. VAUGHAN:  Not from the plaintiff, Your Honor.

THE COURT:  Defendants?

MS. SALYER:  No, Your Honor.  Thank you very much for your time.

THE COURT:  Thank you.  I will take this under advisement.  I will say that while you are all here and the morning is still relatively young, you might want to get together to discuss, if the case were to go forward, what would be a fair, efficient, cost-effective way of proceeding with discovery, and you may also want to discuss whether there are alternative resolutions to going further with either a motion for summary judgment or a jury trial, but I leave that in your capable hands.

Thank you.  I will take it under advisement.

COUNSEL:  Thank you, Your Honor.

(Recess.)

--oOo--

        I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca                    February 16, 2016
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter