# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**UNIGESTION HOLDING, S.A.**, a foreign
corporation, d/b/a **DIGICEL HAITI**,

        Plaintiff,

    v.

**UPM TECHNOLOGY, INC.** d/b/a **UPM
TELECOM, INC**, and **UPM
MARKETING, INC.**, an Oregon
corporation; **UPM TELECOM, INC.**, an
Oregon a/b/n; **UPM MARKETING, INC.**, an
Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a
**BENJAMIN SANCHEZ MURILLO**, an
Oregon resident; **BALTAZAR RUIZ**, an
Oregon resident, and **TYLER ALLEN**, an
Oregon resident,

        Defendants.

Case No. 3:15-cv-185-SI

**OPINION AND ORDER**

Richard K. Hansen and Anne M. Talcott, SCHWABE, WILLIAMSON & WYATT, 1211 SW Fifth
Ave, Suite 1600, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah
B. Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL
33394. Of Attorneys for Plaintiff.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER BAROWAY, 121 SW Morrison Street,
Suite 1850, Portland, OR 97204; Christopher W. Savage, DAVIS WRIGHT TREMAINE, LLP, 1919
Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006. Of Attorneys for Defendants.

PAGE 1 – OPINION AND ORDER

**Michael H. Simon, District Judge.**

Plaintiff Unigestion Holding, S.A., doing business as "Digicel Haiti," ("Digicel Haiti" or "Plaintiff")[1] provides mobile telecommunication services to Haiti for profit. Defendants also provide mobile telecommunication services to Haiti for profit. Digicel Haiti alleges that Defendants provide these services by using certain technologies that fraudulently access Digicel Haiti's telecommunications network. Based on this characterization of Defendants' business activities, Digicel Haiti asserts claims against Defendants, alleging common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(b)-(d), common law conversion, and common law unjust enrichment.

On February 3, 2016, the Court denied Defendants' motion to dismiss, ruling that, among other things, Digicel Haiti's allegations of technological fraud through active concealment satisfy, at this stage of the litigation, the pleading elements of common law fraud in Oregon. After the Court's ruling, Defendants filed their answer, asserting affirmative defenses and counterclaims. Defendants' counterclaims include allegations that Digicel Haiti violates 47 U.S.C. § 214 by operating in the United States as an international common carrier without formal authorization.

Digicel Haiti now moves to dismiss Defendants' counterclaims. Digicel Haiti also asks the Court to take judicial notice of a public record that was filed with the Federal Communications Commission ("FCC"). According to Digicel Haiti, this document is relevant to whether Digicel Haiti confines its operations to Haiti. Digicel Haiti cites this document in

---

[1] In the Court's Opinion and Order dated February 3, 2016 (ECF 58), the Court referred to Plaintiff as "Digicel," the name that Plaintiff uses in its amended complaint. ECF 34 at 2. In Plaintiff's most recent filings, however, Plaintiff differentiates between its operations as "Digicel Haiti" and the operations of other non-party entities such as "Digicel USA." For clarity, the Court refers to Plaintiff in this Opinion and Order as "Digicel Haiti."

support of its assertion that it does not operate in the United States and, therefore, does not violate 47 U.S.C. § 214 and other relevant statutory provisions. In response to the assertion that Digicel Haiti does not operate outside of Haiti, Defendants filed their own motion to dismiss. Defendants argue that Digicel Haiti cannot show harm if it does not carry international calls to Haiti. Defendants, therefore, move to dismiss the amended complaint based on lack of subject matter jurisdiction or, in the alternative, for reconsideration of the Court's earlier denial (ECF 58) of Defendants' motion to dismiss. For the following reasons, Digicel Haiti's motion for judicial notice is granted in part and denied in part; Digicel Haiti's motion to dismiss Defendants' counterclaims is denied; and Defendants' motion to dismiss or, in the alternative, to reconsider also is denied.

## STANDARDS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2

(9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Establishing the plausibility of a complaint's allegations is a two-step process." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014). At the first step, "a court should 'identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* at 996 (quoting *Iqbal*, 556 U.S. at 679) (alteration in original). At the second step, "a court should 'assume the[ ] veracity' of 'well pleaded factual allegations' and 'determine whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679) (alteration in original).

Additionally, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Plaintiffs must offer "[s]omething more . . . such as facts tending to exclude the possibility that the alternative explanation is true, . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* A complaint will survive a motion to dismiss where a plaintiff "offer[s] facts that tend[] to exclude the defendant's

innocuous alternative explanation." *Eclectic Props.*, 751 F.3d at 997. Moreover, if two alternative explanations exist, "one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." *Id.* at 996 (quoting *Starr*, 652 F.3d at 1216).

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). According to the Ninth Circuit, "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* In the case of a facial attack on the allegations in a complaint, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003).

These standards apply equally to a defendant's counterclaims when a plaintiff brings a motion to dismiss a counterclaim. *See Willson v. Bank of Am., N.A.*, 2004 WL 1811148, at *2 (N.D. Cal. Aug. 12, 2004) (stating that on a motion to dismiss, allegations of the counterclaim were required to be taken as true); *Safeco Ins. Co. of Am. v. Mirczak*, 662 F. Supp. 1155, 1160 (D. Nev. 1987) (same).

# BACKGROUND

For purposes of Digicel Haiti's motion to dismiss counterclaims, the Court accepts as true the following facts alleged in those counterclaims. Certain allegations from Plaintiff's amended complaint also are included as background, but in deciding Digicel Haiti's motion to dismiss, the Court gives no presumption of truth to Plaintiff's allegations in the amended complaint. The Court separately addresses the effect of Digicel Haiti's motion for judicial notice and Defendants' motion to dismiss or reconsider.

## A. Digicel Haiti's Operations

Digicel Haiti is the largest local telephone company in Haiti, with a market share in excess of 75 percent. When someone from outside of Haiti calls one of Digicel Haiti's customers in Haiti, the call must pass through Digicel Haiti's switching system in Haiti. The switching system allows Digicel Haiti to manage call routing, account for any billing and associated regulatory charges, and maintain monopoly control over access to its customers in Haiti. Digicel Haiti also uses telephone switches in Miami and New York for the purpose of routing calls that originate on third-party telecommunication networks outside of Haiti to Digicel Haiti customers located in Haiti. Use of these switches allows Digicel Haiti to maximize its monopoly over the delivery of telecommunications traffic along the United States-Haiti route. Digicel Haiti charges third-party carriers outside of Haiti a minimum of $0.23 per minute to route international calls to Digicel Haiti's customers in Haiti.

Digicel Haiti tracks and charges its local customers in Haiti through the use of pre-paid Subscriber Identity Module ("SIM") cards. A SIM card acts as a small circuit board: when the card is placed inside a cellular telephone, the card identifies the device as associated with an individual customer's unique telephone number and account. SIM cards allow customers to access Digicel Haiti's cellular network and, in turn, allow Digicel Haiti to account for and

invoice communications made from cellular devices containing specific SIM cards. Digicel

Haiti's customers can use SIM cards for voice, data, and messaging services on the Digicel Haiti

network. Customers can add credits, in the form of minutes, to SIM cards by using, among other

methods, vouchers and online "top-ups."

When a user of a Digicel Haiti SIM card makes a local call within Haiti, that user incurs

charges of approximately $0.09 (nine cents) per minute of wireless service. If a Digicel Haiti

customer travels to the United States and uses his or her Digicel Haiti SIM card to make calls

back to Haiti, the user of that SIM card incurs charges of at least $1.99 for each minute of

wireless service used. To allow its customers to save money when they travel abroad, Digicel

Haiti offers a Roam-Like-You're-Home ("RLYH") plan. For an access fee of approximately $20

to $25, the RLYH plan allows registered Digicel Haiti customers to make international calls to

Haiti at rates similar to the domestic (or local) rate during the pre-paid (or authorized) period.

**B.  UPM's Operations**

Defendant UPM is an Oregon corporation[2] that facilitated international calls to people in

Haiti at lower rates than Digicel Haiti. UPM asserts that it essentially resold Digicel Haiti's

services within the United States at a discount from approximately April 2014 to

November 2014. Due to Digicel Haiti's effective efforts to prevent UPM from reselling Digicel

Haiti's services, as described below, UPM no longer facilitates calls to Haiti.

UPM's business operations began with UPM buying large quantities of Digicel Haiti SIM

cards in Haiti, at four dollars each, from authorized Digicel-Haiti dealers. UPM's agents paid the

full retail price for the SIM cards and shipped these cards to UPM's facilities in Oregon. No

---

[2] Plaintiff alleges that Defendants UPM Technology, Inc., UPM Telecom, Inc., and UPM Marketing, Inc. are all aliases of the same business. The Court will collectively refer to these entities as "UPM."

written or oral agreements restricted the use of Digicel Haiti's SIM cards. After UPM's Oregon facilities received the SIM cards, UPM purchased an additional $111,209 of minutes for the cards and incorporated the cards into a SIM server. UPM used SIM servers to facilitate international calls to Haiti in two ways.

The first and most common way that UPM facilitated calls to Haiti was to enroll its Digicel Haiti SIM cards in the RLYH plan for the full retail price. UPM would then assemble the RLYH-enrolled SIM cards into a SIM server. The SIM server was connected to the internet and capable of accessing the wireless networks of third-party telecommunications carriers, such as AT&T and T-Mobile. Ordinarily, when one of the third-party carrier's customers called Haiti, the third-party carrier would have to pay the standard amount for Digicel Haiti to connect the call. UPM offered the third-party carriers a cheaper way to connect the calls. When a third-party carrier's customer called Haiti, instead of immediately routing the call to Digicel Haiti's switches in Miami or New York, the carrier's switch would select UPM. The carrier's switch would convert the call into an Internet-based protocol packet that represented the call (including the destination number in Haiti) and send the packet over the internet to one of UPM's SIM servers in Oregon. The SIM server would then initiate the call to Haiti on the carrier's wireless network. Simultaneously, the SIM server would convert the call into the appropriate format for wireless transmission and essentially program the call to appear to come from a telephone number associated with one of the RLYH-enrolled Digicel Haiti SIM cards. The third-party carrier would then route the newly-formatted call to one of Digicel Haiti's switches, and Digicel Haiti would carry the call to Haiti at the discounted RLYH rate.

A second, although less common, way in which UPM facilitated international calls to Haiti was by transporting the calls to Digicel Haiti's local Haitian network through Voice-over-

Internet-Protocol ("VoIP"). Again, the customer of a third-party carrier would call Haiti, and the third-party carrier's switch would select UPM to handle the call. The call would be sent to a UPM SIM server in Oregon in the same manner as described above. Instead of initiating a wireless call to Haiti and converting the call for wireless transmission, however, UPM would leave the call as an Internet-based protocol packet (VoIP format). UPM then used the internet to transmit the call to a receiver in Haiti, known as a Global System for Mobile communications ("GSM") Gateway. The GSM Gateway would format the call for wireless transmission and initiate a wireless call on Digicel Haiti's network in Haiti using the account information associated with a SIM card located in Oregon. Digicel Haiti would then complete the call on its network as a local call.

Digicel Haiti undertook an investigation into the international "resale" of its services. During the investigation, Digicel Haiti discovered that the calling and usage patterns of particular SIM cards were inconsistent with use by individual customers. Digicel Haiti "de-authorized" these SIM cards so that calls associated with these cards could no longer be completed. Because Digicel Haiti de-authorized many of the SIM cards that UPM used to conduct its business, UPM is no longer able to facilitate international calls to Haiti through either RLYH plans or VoIP.

## DISCUSSION

Defendants allege six counterclaims, one based on a federal statute and five based on Oregon common law. Digicel Haiti moves to dismiss all six counterclaims. Digicel Haiti bases its motion to dismiss, in part, on facts contained in the FCC document of which Digicel Haiti asks the Court to take judicial notice. Defendants argue that Digicel Haiti's motions urge an interpretation of the amended complaint that undermines Digicel Haiti's claim that *it* has been

injured by Defendants' conduct. Defendants, therefore, again move to dismiss Digicel Haiti's

claims. The Court addresses each motion in turn.[3]

## A.  Digicel Haiti's Request for Judicial Notice

Digicel Haiti moves for judicial notice of a Transfer of Control Application (the

"Application") that was filed with the FCC on December 19, 2013. Digicel Haiti also asks that

the Court consider the contents of the Application when deciding Digicel Haiti's motion to

dismiss. Digicel Haiti argues that the document is relevant to whether Digicel Haiti operates

solely as a foreign carrier outside the United States or within the United States as an international

common carrier. In this document, two entities, Global Caribbean Fiber SAS ("GCF") and Fibre

Investments Holdings Limited IBC ("FIHL") seek to transfer control of a cable landing license

held by Antilles Crossing – St. Croix Inc. ("ACSC") to FIHL. Before a cable landing license can

be transferred, 47 C.F.R. § 1.767(a)(8) requires disclosure of all foreign carriers affiliated with

the entities that seek to assume the license. To meet this requirement, the Application lists,

among others, "Digicel Unigestion Holdings, S.A., (t/a Digicel Haiti)" as an affiliated foreign

carrier. ECF 87-1 at 8.

Defendants oppose Digicel Haiti's motion and ask the Court to decline to consider the

contents of the Application when deciding Digicel Haiti's motion to dismiss. Defendants base

---

[3] In their response to Digicel Haiti's motion to dismiss counterclaims, Defendants note
that Digicel Haiti's motion failed to include a certification of conferral pursuant to Local
Rule 7-1. Local Rule 7-1(a)(3) allows a district court to deny a party's motion because of the
party's failure to include a certification of conferral. Defendants further note that Digicel Haiti's
failure to include this certification was not mere oversight: Digicel Haiti filed its motion without
attempting to confer with Defendants on any issues raised in the motion to dismiss. In its reply
brief, Digicel Haiti admits that it failed to confer before filing its motion. Digicel Haiti asserts
that it remedied this situation by conferring with Defendants' counsel before filing a reply.
Although the Court declines to deny Digicel Haiti's motion on the basis of its failure to confer,
the Court cautions Digicel Haiti against any further failures to comply with the Local Rules of
this District.

their opposition to Digicel Haiti's motion on several arguments. Defendants first argue that the authenticity of the Application is in question because the Application does not contain a case or proceeding number or other information that identifies when or if the Application was actually filed. Second, Defendants argue that it is unclear whether "Digicel Unigestion Holdings, S.A., (t/a Digicel Haiti)" is the same entity as the plaintiff in this action. Third, Defendants argue that because the Application is two-and-a-half years old, it has no bearing on whether Digicel Haiti currently is an international common carrier or was so during the relevant time periods in 2014 and 2015. Fourth, Defendants argue that even if "Digicel Unigestion Holdings, S.A., (t/a Digicel Haiti)" is the same entity as Digicel Haiti and even if Digicel Haiti has continuously been a foreign carrier since 2013, the Application still does not establish that Digicel Haiti is not *also* an international common carrier in the United States. According to Defendants, the designations of foreign carrier and international common carrier are not mutually exclusive.

A court "may take judicial notice of court filings and other matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). Taking notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment so long as the facts are noticed in accordance with the Federal Rules of Evidence. *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). Under the Federal Rules of Evidence, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Documents of which courts routinely take judicial notice include filings with government agencies, such as the FCC. *See, e.g.*, *N.W. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1026-27 (9th Cir. 2008) (taking judicial notice of the contents of EPA's

request for public comment); *Telesaurus VPC, LLC v. Power*, 2009 WL 273295, at *1 (D. Ariz. Feb. 5, 2009), *aff'd in part, rev'd in part on other grounds*, 623 F.3d 998 (9th Cir. 2010) (taking judicial notice of, among other things, an application for an FCC license).

A court may take judicial notice of the contents of a document submitted to a government agency without ruling on the truth of the contents. *See Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008). It is improper for a court to take judicial notice of the veracity and validity of a public document's contents when the parties dispute the meaning and truth of the contents. *See, e.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001) (reversing a district court's grant of a motion to dismiss where the court not only took judicial notice of undisputed matters of public record but also took judicial notice of "disputed facts stated in public records" and relied on the validity of those facts in deciding the motion to dismiss); *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004) ("While the court may take judicial notice of the general meaning of words, phrases, and legal expressions, documents are judicially noticeable only for the purpose of determining what statements are contained therein, not to prove the truth of the contents or any party's assertion of what the contents mean.").

The FCC International Bureau's Database (the "Database") confirms that the Application was first filed on December 19, 2013, by ACSC, and the Application can be accessed through this public Database. The Application was granted on September 10, 2014.[4] Therefore, it is beyond dispute that the Application was filed with the FCC. Accordingly, the Court takes judicial notice of the Application because it is a public record, the authenticity of which can be

---

[4] *See* FCC, Public Notice, Report No. SCL-00154 (Sept. 10, 2014), http://licensing.fcc.gov/ibfsweb/ib.page.FetchPN?report_key=1060582 (last visited July 8, 2016).

accurately and readily determined from a source whose accuracy cannot reasonably be questioned.

The truth of the content, and the inferences properly drawn from them, however, are not a proper subject of judicial notice under Rule 201(b). The parties continue to dispute whether Digicel Haiti operates *only* as a foreign carrier in Haiti, as Digicel Haiti asserts, or *also* as an international common carrier within the United States, as UPM asserts. Further, the Application sheds little light on this dispute because it was filed before the events that gave rise to this lawsuit occurred. Digicel Haiti—even if it is precisely the same entity listed in the Application, which is unconfirmed—could have altered its business practices between December 2013 and April 2014, when UPM began its relevant operations. Therefore, at this stage of litigation, the Court expresses no opinion on and takes no judicial notice of whether Digicel Haiti is, in fact, a foreign carrier, an international common carrier, or both. The Court declines to consider the contents of the Application for the purpose of ruling on Digicel Haiti's motion to dismiss counterclaims or, for that matter, Defendants' motion to dismiss.

## B.  Digicel Haiti's Motion to Dismiss Counterclaims

Digicel Haiti first makes the broad argument that Defendants' counterclaims should be dismissed in their entirety because the counterclaims are alleged in a "confusing manner." ECF 80 at 3, 6. The Court, however, finds Defendants' counterclaims sufficiently clear to meet the basic requirement of Federal Rule of Civil Procedure 8(a) that the counterclaims give "fair notice and enable the opposing party to defend itself effectively." *Starr*, 652 F.3d at 1216. The Court therefore turns to Digicel Haiti's more substantive arguments.

### 1.  Individual Defendants' Standing to Sue

Digicel Haiti argues that the individual defendants—Benjamin Sanchez ("Sanchez"), Baltazar Ruiz ("Ruiz"), and Tyler Allen ("Allen") (collectively the "individual defendants")—

lack standing to sue. Standing to sue requires, among other things, "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). According to Digicel Haiti, although the counterclaims state that all the defendants are bringing compulsory counterclaims, Defendants do not allege that the individual defendants suffered any injury. Therefore, Digicel Haiti asks that the Court dismiss the counterclaims to the extent that the counterclaims are brought on behalf of Sanchez, Ruiz, or Allen.

Defendants respond that any suggestion in its pleading that Sanchez, Ruiz, or Allen are asserting counterclaims is unintentional. Although Defendants state that "Defendants' compulsory counterclaims" are set forth in Defendants' pleading (EFC 73 ¶ 238), the prayer for relief clarifies that UPM (and not Sanchez, Ruiz, or Allen) is bringing counterclaims against Digicel Haiti. *See id.* at 42 ("WHEREFORE, UPM further prays that the Court enter an order, as to ***UPM's Counterclaims*** against Digicel-Haiti") (emphasis added). Nowhere in the prayer for relief do Defendants state that Sanchez, Ruiz, or Allen seeks damages or any other relief. Further, none of the counterclaims expressly refer to Sanchez, Ruiz, or Allen, and they do not allege any counterclaims against Digicel Haiti. Thus, there are no counterclaims asserted by the individual defendants to dismiss.

### 2. UPM's Counterclaim Under the Communications Act of 1934

UPM's first counterclaim alleges several violations of the Communications Act of 1934 (the "Act"), codified at 47 U.S.C. §§ 151, *et seq.* Digicel Haiti argues that the plain text of the Act does not apply to Digicel Haiti because Digicel Haiti does not operate as an international common carrier in the United States. Defendants respond that Digicel Haiti's own amended complaint contains allegations that Digicel Haiti—and not some other non-party entity—operates telecommunications equipment in the United States for the purpose of providing international telecommunication services to callers located in the United States.

### a.  Statutory and Regulatory Framework for Telecommunications

The Court begins its analysis of this issue by examining the relevant statutory and regulatory framework. Under the Act, an entity is a "common carrier" or a "telecommunications carrier" when it engages in interstate or foreign communications by offering to transmit information for a fee between points designated by its customers. *See* 47 U.S.C. §§ 153(11), (50), (51), (53) (defining, respectively, "common carrier," "telecommunications," "telecommunications carrier," and "telecommunications service"); *see also AT&T Corp. v. City of Portland*, 216 F.3d 871, 877 (9th Cir. 2000) ("A provider of telecommunications services is a 'telecommunications carrier,' which the Act treats as a common carrier to the extent that it provides telecommunications to the public, 'regardless of the facilities used.'"). To qualify as a common carrier, a provider of telecommunication services must offer its services to all customers on an equal basis. *Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 275 (D.C. Cir. 2009) (finding that certain entities were common carriers because, among other things, the entities certified that they would "serve[] all similarly situated customers equally"); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1004 (9th Cir. 2010) (stating that to be a "common carrier" under the FCA, a service provider must be engaged in the provision of services that are "for profit" and "available to the public or other specified users"); *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (discussing the essential requirement that a common carrier hold itself out to the clientele it is suited to serve).

Under the Act, a "foreign communication" is a "communication or transmission from or to any place in the United States to or from a foreign country." 47 U.S.C. § 153(21). FCC regulations refer to a common carrier involved in providing foreign communications as an "international common carrier." *See* 47 C.F.R. § 63.18. A "foreign carrier" is "any entity that is authorized within a foreign country to engage in the provision of international

telecommunications services offered to the public in that country." 47 C.F.R. § 63.09. The Act

does not apply to telecommunications providers that operate only as foreign carriers. *Cable &*

*Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1229 (D.C. Cir. 1999) ("The Communications Act

authorizes the Commission to regulate 'foreign telecommunications.' The Commission claims no

authority to directly regulate foreign carriers." (citation omitted)).

Subject to exemptions not relevant here, any entity that operates as a common carrier

within the United States, including international common carriers, is required to obtain formal

authorization. 47 U.S.C. § 214; 47 C.F.R. §§ 63.09-63.23. Such authorizations are known as

"Section 214" authorizations. Operating as an international common carrier without a

Section 214 authorization violates the Act. *See, e.g.*, *In re PTT Phone Cards, Inc.*,

29 F.C.C.R. 11531 (2014). An international common carrier, operating pursuant to a Section 214

authorization, may not charge "unjust or unreasonable" rates for the provision of foreign

communications. 47 U.S.C. § 201(b). Nor may common carriers of any kind

> make any unjust or unreasonable discrimination in charges,
> practices, classifications, regulations, facilities, or services for or in
> connection with like communication service, directly or indirectly,
> by any means or device, or to make or give any undue or
> unreasonable preference or advantage to any particular person,
> class of persons, or locality, or to subject any particular person,
> class of persons, or locality to any undue or unreasonable prejudice
> or disadvantage.

47 U.S.C. § 202(a). The Act applies to "all interstate and foreign communication . . . which

originates and/or is received within the United States, and to all persons engaged within the

United States in such communication." 47 U.S.C. § 152(a).

Any person damaged by a common carrier's acts or omissions that violate the terms of

the Act may recover damages in federal court. 47 U.S.C. §§ 206-207. Under § 206, if "any

common carrier shall do, or cause or permit to be done, any act, matter, or thing" prohibited by

the Act, or "shall omit to do any act, matter, or thing" required by the Act, then "such common

carrier shall be liable to the person or persons injured thereby for the full amount of damages

sustained in consequence of any such violation," including attorney's fees. 47 U.S.C. § 206.

Under § 207, claims for damages against carriers for violating the Act may be brought in any

federal district court with jurisdiction. 47 U.S.C. § 207.

### b.  Digicel Haiti's Amended Complaint

For purposes of Digicel Haiti's motion to dismiss counterclaims, no presumption of truth

attaches to the allegations contained in the amended complaint. Nonetheless, the Court analyzes

the plausibility of Defendants' allegations in light of the text and context of the amended

complaint, on which Defendants are entitled to rely. *See, e.g.*, *Ruivo v. Wells Fargo Bank, N.A.*,

766 F.3d 87, 91 (1st Cir. 2014) ("The court, and the defendants, are entitled to rely on the plain

language and the structure of the complaint in determining what claims are present there.").

In its motion to dismiss counterclaims, Digicel Haiti argues that it does not own

equipment in the United States and only offers telecommunication services within Haiti.

Therefore, argues Digicel Haiti, it is not an international common carrier operating in the United

States and is not subject to the Act. According to Digicel Haiti, Digicel USA, an entity that

Defendants admit has a Section 214 authorization, is the relevant Digicel entity that operates

within the United States.

In the amended complaint, however, the only "Digicel" entity identified or discussed in

any way is Plaintiff Unigestion Holding, S.A., doing business as Digicel Haiti. The first sentence

of the document states that Plaintiff will use "Digicel" as its short-form name. Plaintiff (Digicel

Haiti also known as "Digicel") then describes "Digicel's international switching centers in

Miami and New York" (ECF 34  ¶ 18), "the Digicel International Gateway" (*id.* ¶ 23), "Digicel's

international Switch" (*id.* ¶¶ 71, 155), and "Digicel's switches and international gateway" (*id.*

PAGE 17 – OPINION AND ORDER

¶ 117).[5] Moreover, according to Digicel Haiti, "In order to properly route international calls to its customers and subscribers, Digicel . . . charges [third-party international telecommunications carriers] a 'floor' rate of 23 cents per minute . . . to route such traffic *through its Switches and other proprietary equipment in the USA and Haiti* . . . ." *Id.* ¶ 17 (emphasis added). The allegations that contain these references to "Digicel's" equipment in the United States make no distinction between Plaintiff in this case and any other entity called "Digicel" or any entity affiliated with Digicel.

Moreover, Digicel Haiti makes allegations of what it calls "bypass fraud." In its amended complaint, Digicel Haiti refers to "bypass fraud" no fewer than 43 times. According to Digicel Haiti, bypass fraud occurs when "individuals illegally route calls around the Digicel International Gateway using a combination of the internet and/or certain specialized telecommunications devices called [SIM] Boxes and/or SIM Servers." *Id.* ¶ 23. In this manner, telephone calls are allegedly "stolen from Digicel's transmission systems by Defendants' illegal bypass gateways." *Id.* ¶ 119. Through bypass fraud, millions of minutes of telephone calls are allegedly "diverted away from Digicel's switches and international gateway." *Id.* ¶ 117. If Digicel Haiti does not operate switches in the United States or does not route calls from the United States to Haiti, then UPM would not be "bypassing" any of Digicel Haiti's international gateways, "stealing" any telephone calls from Digicel Haiti's "transmission systems," or "diverting" minutes away from Digicel Haiti's international telecommunication services. The very nature of Digicel Haiti's

---

[5] Digicel Haiti's "international switch" does not appear to be one of Digicel Haiti's switches in Haiti, which Digicel separately refers to as "mobile telecommunications switches located in Haiti" (ECF 34 ¶ 1).

allegation of bypass fraud suggests that Digicel Haiti operates a telecommunications network that routes communications from the United States to Haiti.[6]

### c. UPM's Allegations

UPM's well-pleaded allegations, which the Court must take as true for purposes of considering Plaintiff's motion to dismiss counterclaims, support UPM's counterclaim under the Act. UPM specifically alleges that "based on [Digicel Haiti's] representations to this Court," Digicel Haiti

> owns and operates two "Gateway" switches, one in Miami, Florida, and one in New York, New York. By means of these devices, [Digicel Haiti] offers to carry telephone calls from the United States to Haiti, using either [Digicel Haiti's] own facilities, the facilities of affiliates acting in concert with [Digicel Haiti], or the facilities of third-party carriers.

ECF 73 ¶ 209. According to UPM, when a third-party carrier's customer calls Haiti, "the call path would normally involve the United States wireless carrier delivering the call to one of [Digicel Haiti's] gateway switches in New York or Miami, at which point [Digicel Haiti] itself would carry the call to Haiti and deliver it to the called party." *Id.* ¶ 226. These allegations and UPM's other descriptions of Digicel Haiti's operations characterize Digicel Haiti as holding

---

[6] Digicel Haiti acknowledges that "[i]n hindsight, the allegations [in its amended complaint] could have more specifically identified Digicel USA, Inc., as the 'subsidiary' or related company ***owner*** of the switches and equipment." ECF 86 at 3 (emphasis in original). Digicel Haiti's complaint, however, not only fails to specifically identify Digicel USA as the owner of the switches and equipment, but fails to make any reference to the existence of separate Digicel entities, affiliates, or subsidiaries. Digicel Haiti now asserts that there is a "Digicel Group" that includes several related companies and subsidiaries. But according to Digicel Haiti, "[t]he fact is . . . that none of this level of detail and specificity was necessary or germane to the core allegations in the underlying pleading." *Id.* Digicel Haiti cannot use its own imprecise pleading to avoid UPM's counterclaim and raise new facts either in its motion to dismiss counterclaims or its reply brief. At oral argument on July 22, 2016, in light of the Court's concerns, Digicel Haiti requested leave again to amend its complaint. As discussed more fully below, the Court finds that amendment is proper, and leave is granted as specified on the record. Fed. R. Civ. P. 15(a)(2).

itself out to its customer base as able to transmit foreign communications for a floor of $0.23 per minute. *See id.* ¶¶ 75, 212-231.[7]

As the case proceeds, it may become clear that the factual assertions made by both Digicel Haiti and Defendants in their pleadings are imprecise and even incorrect. At this stage, however, UPM sufficiently alleges that Digicel Haiti offers its services on an equal basis to all similarly-situated customers, including third-party carriers such as AT&T and T-Mobile, located in the United States. These services include transmitting foreign communications from the United States to Haiti for profit. UPM's allegations are sufficient to show for purposes of surviving Plaintiff's motion to dismiss counterclaims that Digicel Haiti operates as an international common carrier in the United States. Digicel Haiti does not challenge UPM's allegations under the Act on any other basis. Accordingly, because UPM sufficiently alleges that Digicel Haiti is an international common carrier in the United States, UPM has stated a claim under Title 47 of the United States Code.

### 3.  UPM's Counterclaim for Intentional Interference with Economic Relations

UPM also alleges that Digicel Haiti intentionally interfered with UPM's economic relations by de-authorizing the SIM cards that UPM lawfully purchased and used to conduct its business operations. Digicel Haiti argues that UPM's allegations fall short of stating a claim. Under Oregon law, to state a claim for intentional interference with economic relations, a plaintiff must allege:

---

[7] Defendants acknowledge that an entity known as "Digicel Haiti" operates as an international common carrier in the United States pursuant to a Section 214 authorization. That another Digicel entity lawfully operates as an international common carrier does not, however, mean that Plaintiff (Digicel Haiti) also is not an international common carrier in the United States. Plaintiff's argument that UPM makes no allegations that Plaintiff holds itself out to customers in the United States is belied by the plain text of UPM's answer, affirmative defenses, and counterclaims.

> (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). According to Digicel Haiti, UPM fails to properly plead any of the required elements of this tort. UPM responds that Digicel Haiti is attempting to hold UPM to a higher standard of factual specificity than the Federal Rules of Civil Procedure require.

### a. Prospective Economic Advantage

Digicel Haiti first argues that UPM has failed to allege prospective economic advantage. UPM, however, specifically alleges that it is a reseller of telecommunication services and that it provided telecommunication services between the United States and Haiti to wholesale providers from April 2014 to November 2014. As described above, UPM provides extensive details about its business model. This model involves agreements between UPM and carriers such as T-Mobile that UPM will convert calls bound for Haiti into a GSM format that incorporates a telephone number associated with Digicel Haiti SIM cards. Based on these allegations, UPM has sufficiently alleged the existence of prospective economic advantage.

### b. Intent

Digicel Haiti next argues that UPM has not alleged the requisite intent on the part of Digicel Haiti to interfere with any economic relationship. Digicel Haiti characterizes its conduct as simply exercising its legal authority to block SIM cards being used to commit bypass fraud. UPM alleges, however, that Digicel Haiti intended to interfere with UPM's ability to provide telecommunication services on the United States-Haiti route. According to UPM, Digicel Haiti either knew that it would prevent UPM from competing with Digicel Haiti by de-authorizing the

SIM cards or acted with a conscious indifference to this result. *See Straube v. Larson*,

287 Or. 357, 361 (1979) ("[E]ven if [a defendant] does not act for the purpose of interfering or

does not desire it but knows that the interference is substantially certain to occur from his action

and is a necessary consequence thereof, his interference is intentional as contemplated by the

rule."). Based on these allegations, UPM has sufficiently alleged intent.

### c.  Third-Party Status

Digicel Haiti also argues that UPM has not sufficiently alleged that Digicel Haiti was a

"third-party." UPM's alleged business relationships with carriers required the use of Digicel

Haiti's SIM cards. According to Digicel Haiti, this requirement made Digicel Haiti a party to the

relationships. Claims for intentional interference with economic relations "serve[] as a means of

protecting contracting parties against interference in their contracts from ***outside*** parties."

*McGanty*, 321 Or. at 536 (emphasis in original). An entity is a party to a business relationship—

rather than an outside party—when it has "a direct interest or involvement" in the relationship.

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001)

(interpreting California law regarding when an entity is a third-party stranger to an economic

relationship). An entity does not necessarily have a direct interest or involvement in a contract

simply because the contract is for the resale of that entity's products. *See, e.g.*, *Integrated*

*Storage Consulting Servs., Inc. v. NetApp, Inc.*, 2014 WL 3372583, at *11 (N.D. Cal. July 9,

2014) (holding that a reseller sufficiently alleged intentional interference with economic relations

by the seller when the seller "did not have significant control or oversight over transactions").

Under Oregon law, even an employee of a business can be a third-party to the employer's

contract if the employee "acts against the best interests of the employer or ***solely*** for her own

benefit." *Mannex Corp. v. Bruns*, 250 Or. App. 50, 55 (2012) (emphasis in original).

Here, Digicel Haiti was not expressly made a party to any contract between UPM and third-party carriers. Further, although Digicel Haiti may have had an indirect interest in the end-uses of its products, Digicel Haiti had no ***direct*** interest or involvement in the relationships that UPM had with wholesale providers of telecommunication services. Digicel Haiti did not supervise or in any other way exercise control over UPM's transactions with wholesale providers. In addition, although UPM alleges that it facilitated international calls by using Digicel Haiti's telecommunications infrastructure in several ways, UPM never alleges that Digicel Haiti knowingly participated in UPM's business operations. Analogizing this situation to the context of an employee-employer relationship, Digicel Haiti's decision to de-authorize SIM cards was against the best interests of UPM and for Digicel Haiti's own benefit. Therefore, it cannot reasonably be said that Digicel Haiti was a party to UPM's alleged business relationships. UPM has sufficiently alleged that Digicel Haiti was a third-party.[8]

### d.  Improper Means or Improper Purpose

Digicel Haiti further argues that UPM has not sufficiently alleged that Digicel Haiti's asserted interference was done through improper means or for an improper purpose. A party is not "liable for intentional interference with economic relations if that party simply has a malevolent reason for enforcing its written contract." *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 651 (1995). A claim for intentional interference with business relations may "go to a jury only 'when interference resulting in injury to another is wrongful by

---

[8] Digicel Haiti also argues that UPM's claim under Title 47 is inconsistent with the claim that Digicel Haiti was a third-party to UPM's business relationships with wholesale providers. This argument is unavailing because UPM's claim under Title 47 rests on allegations that Digicel Haiti ***competes*** with UPM as an international common carrier in the United States, not on allegations that Digicel Haiti is a party to UPM's business relationships.

some measure beyond the fact of the interference itself.'" *Straube*, 287 Or. at 361 (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978)).

Digicel Haiti argues that it only did what it was entitled to do—prevent UPM from wrongfully using SIM cards. UPM, however, alleges that it paid the full retail price for the SIM cards and lawfully used the cards in its business operations with wholesale providers. According to UPM, Digicel Haiti could not properly de-authorize SIM cards for which UPM paid in full. By de-authorizing these SIM cards, argues UPM, Digicel Haiti breached an implied-in-fact contract to allow a purchaser to use the full value of the SIM cards. UPM also argues that Digicel Haiti de-authorized the SIM cards to create an unlawful restraint of trade. These actions were allegedly done with "intentional malice." ECF 73 ¶ 285. Based on these allegations, UPM has sufficiently alleged that Digicel Haiti's asserted interference was done through improper means or for an improper purpose.

### e.  Causal Effect and Damages

Finally, Digicel Haiti argues that UPM has failed properly to allege causation and damage. According to Digicel Haiti, UPM's allegations that Digicel Haiti caused damages to UPM's economic relations are merely conclusory. UPM, however, specifically alleges that Digicel Haiti's actions foreclosed UPM from engaging in profitable business in the United States in competition with Digicel Haiti or Digicel USA. According to UPM, "As a direct result of that foreclosure of competition, as of February 2016, UPM has lost substantial revenues and profits . . . ." ECF 73 ¶ 243. UPM asserts that it "or its agents purchased a total of approximately 10,705 Digicel SIM Cards, at the rate of approximately $4.00 per card, for a total purchase payment of $42,836.00. UPM also paid $111,209.00 for credits in the form of minutes to be added to the Digicel SIM Cards." *Id.* ¶ 262. Factoring in other costs, UPM argues that, at a minimum, Digicel Haiti has allegedly deprived UPM of $156,735.42. Based on these allegations,

PAGE 24 – OPINION AND ORDER

UPM has sufficiently alleged causal effect and damage. Accordingly, the Court denies Digicel Haiti's motion to dismiss UPM's claim for intentional interference with economic relations.

### 4.  UPM's Counterclaim for Breach of Implied-in-Fact Contract

Digicel Haiti also argues that UPM fails to state a claim for an implied-in-fact contract. An implied contract arises "where the natural and just interpretation of the actions of the parties warrants such conclusion." *Owen v. Bradley*, 231 Or. 94, 103 (1962). Like an express contract, an implied contract "is based on mutual expressions of assent. That assent and the terms of the parties' agreement may be inferred from the parties' conduct." *Jaqua v. Nike, Inc.*, 125 Or. App. 294, 297 (1993); *see also Staley v. Taylor*, 165 Or. App. 256, 262 n.6 (2000) ("Frequently, implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement."). To determine if a contract existed, courts will look only to "the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578 (2005), *adhered to as modified on reconsideration*, 203 Or. App. 768 (2006). Courts will not consider the parties' "uncommunicated subjective understanding." *Newton/Boldt v. Newton*, 192 Or. App. 386, 392 (2004).

UPM argues that Digicel Haiti's conduct in selling SIM cards gives rise to an implied-in-fact contract. According to UPM, at the point of sale, Digicel Haiti does not ask customers for any information about how the customers intend to use the SIM cards. Digicel Haiti does not require that customers represent in any way that they will not resell the SIM cards. Therefore, argues UPM, in selling the SIM cards, Digicel Haiti implies that it will honor the SIM cards and any minutes that customers purchase for use with those SIM cards. These allegations are sufficient to state a claim that the conduct of Digicel Haiti and UPM, through its agents,

manifested mutual assent to an implied contract. The terms of this contract were that in return for $4 per SIM card, the customer could use the SIM cards and any minutes purchased for use with the cards in any way the customer chose, including resale. Digicel's subjective desire that customers not resell the SIM cards or minutes on the SIM cards does not alter the terms of the implied contract. Digicel Haiti allegedly breached this contract by de-authorizing SIM cards and thereby preventing UPM from using the SIM cards and minutes that UPM lawfully purchased. The Court therefore denies Digicel Hait's motion to dismiss UPM's counterclaim for breach of an implied-in-fact contract.

### 5.   UPM's Counterclaim for Conversion

Digicel Haiti also argues that UPM fails to state a claim for conversion. The Oregon Supreme Court has adopted the definition of conversion found in the *Restatement (Second) of Torts* § 222A: "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663 (1969). In assessing the seriousness of the interference, Oregon courts look to:

> (a) The extent and duration of the actor's exercise of dominion or control; (b) the actor's intent to assert a right in fact inconsistent with the other's right of control; (c) the actor's good faith; (d) the extent and duration of the resulting interference with the other's right of control; (e) the harm done to the chattel; (f) the inconvenience and expense caused to the other.

*Id.* at 664 (quotation marks omitted) (quoting *Restatement (Second) of Torts* § 222A). The interference must be "so great that the actor can justly be required to pay its full value." *Morrow v. First Interstate Bank of Or., N.A.*, 118 Or. App. 164, 168 (1993). The taking or diverting of money may constitute conversion. *Waggoner v. Haralampus*, 277 Or. 601, 604 (1977) ("The general rule is that conversion will lie when the money was wrongfully received by the party

charged with conversion, or an agent is obligated to return specific money to the party claiming it.").

UPM alleges that Digicel Haiti "has wrongfully exercised dominion and control over the use of the Digicel SIM Cards by blocking their use with an intent to permanently deprive UPM of the use of those cards." ECF 73 ¶ 271. UPM argues that by de-authorizing SIM cards for which UPM paid in full, Digicel has completely and permanently deprived UPM of the use of these SIM cards and hundreds of minutes of call time that UPM bought for use with the cards. According to UPM, at a minimum, Digicel Haiti's actions have deprived UPM of $156,735.42. UPM further argues that Digicel Haiti cannot claim good faith because Digicel Haiti initially authorized the SIM cards and allowed the cards to access Digicel Haiti's network with no stated restrictions. Digicel Haiti has allegedly failed to compensate UPM for the loss of the SIM cards and the associated minutes.

Digicel Haiti's responds that UPM never had the right to use the SIM cards for UPM's bypass operations. Digicel Haiti's argument, however, goes to the merits of UPM's underlying claims, not to whether UPM has stated a claim that Digicel Haiti exercised control over the SIM cards in a matter inconsistent with the access for which UPM paid. Moreover, by de-authorizing the SIM cards, Digicel Haiti prevented UPM from making *any* use of the cards. Based on these allegations, UPM has sufficiently alleged conversion. The Court therefore denies Digicel Haiti's motion to dismiss this counterclaim.

### 6.  UPM's Counterclaim for Money Had and Received

Digicel Haiti also argues that UPM fails to state a claim for money had and received. Under Oregon law, "[a] claim of money had and received is appropriate when a contract has been fully performed by the plaintiff, and nothing remains to be done but the payment of money." *C.A.M. Concepts, Inc. v. Gwyn*, 206 Or. App. 122, 128 (2006). Although "[t]he claim is

PAGE 27 – OPINION AND ORDER

an action at law," recovery "is based on a promise implied by law and on the equitable principle that one who has been unjustly enriched at the expense of another is required to make restitution." *Id.* According to Digicel, UPM does not allege that it performed under a contract or that Digicel Haiti owes UPM money in return for performance.

UPM responds that Oregon courts allow claims for money had and received in a wide variety of circumstances. Indeed, Oregon courts recognize that "[t]he action for money had and received is 'liberal in form and greatly favored by the courts.'" *Davis v. Tyee Indus., Inc.*, 58 Or. App. 292, 295-96 (1982) (quoting *Albino v. Albino*, 279 Or. 537, 553 (1977)), *aff'd*, 295 Or. 467 (1983). "The test is whether a defendant, in equity and good conscience, is entitled to keep money to which a plaintiff makes a claim." *Id.* at 296. An action for money had and received "may be maintained 'whenever one has money in his hands belonging to another, which, in equity and good conscience, he ought to pay over to that other.'" *Briggs v. Lamvik*, 242 Or. App. 132, 143 (2011) (quoting *C.A.M. Concepts*, 206 Or. App. at 129).

Here, UPM alleges that Digicel Haiti received payment for the purchase of SIM cards and calling time. Nonetheless, asserts UPM, Digicel Haiti has refused to honor the unrestricted terms of sale and should be required, in equity and good conscience, to repay UPM for the unused minutes that UPM purchased. Under the liberal standard articulated by Oregon courts, these allegations suffice to state a claim for money had and received. The Court therefore denies Digicel Haiti's motion to dismiss this counterclaim.

### 7.    UPM's Counterclaim for Unjust Enrichment

Finally, Digicel Haiti argues that UPM fails to state a claim for unjust enrichment. To state a claim for unjust enrichment, a party must establish: "(1) a benefit conferred, (2) awareness by the recipient that he or she has received the benefit, and (3) that it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Wilson v.*

*Gutierrez*, 261 Or. App. 410, 414 (2014) (quotation marks omitted) (quoting *Cron v. Zimmer*, 255 Or. App. 114, 130 (2013)). "Benefit" is defined "broadly." *Id.* Thus, a "benefit" is conferred any time a person conveys to another "possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." *Id.* at 415 (quotation marks omitted) (quoting *Restatement of Restitution* § 1 cmt. b (1937)). A recipient of a known benefit acts unjustly if one of three things is true: "(1) the plaintiff had a reasonable expectation of payment; (2) the defendant should reasonably have expected to pay; or (3) society's reasonable expectations of security of person and property would be defeated by non-payment." *Cron*, 255 Or. App. at 130 (quoting *Jaqua*, 125 Or. App. at 298).

Digicel Haiti argues that UPM has not conferred any benefit on Digicel Haiti that Digicel Haiti has unjustly retained. UPM responds that it conferred on Digicel Haiti the benefit of the full monetary value of the purchased SIM cards and the additional minutes of calling time. UPM adds that Digicel Haiti has unjustifiably refused to allow UPM to use the full amount of calling time that UPM purchased, meaning that UPM paid Digicel Haiti for services that Digicel Haiti failed to provide. UPM further argues that Digicel Haiti's refusal to repay UPM for the unused minutes of calling time would violate society's reasonable expectations of security of property. These allegations are sufficient to state a claim for unjust enrichment. The Court denies Digicel Haiti's motion to dismiss this counterclaim.

## C.  Defendants' Motion to Dismiss or for Reconsideration

Defendants argue that the Court should dismiss Digicel Haiti's amended complaint because Digicel Haiti's recent filings show that *it* has not suffered any injury caused by Defendants, which means Digicel Haiti lacks standing to sue and the Court lacks subject-matter jurisdiction. In the alternative, Defendants argue that, in light of the same recent filings, the

Court should reconsider its Opinion and Order dated February 3, 2016 (ECF 58), denying

Defendants' motion to dismiss the amended complaint. Although unusual in its form,

Defendants' motion is a facial attack because they assert that on the face of the allegations in the

amended complaint, when interpreted as Digicel Haiti would now have the Court interpret them,

the allegations are insufficient to invoke federal jurisdiction. In this facial attack, the Court must

accept all the factual allegations in the amended complaint as true. *Lacano Invs., LLC v. Balash*,

765 F.3d 1068, 1071 (9th Cir. 2014).[9]

Digicel Haiti's amended complaint alleges that Digicel Haiti owns and operates

international gateway switches in Miami and New York, carries international calls from the

United States to Haiti at a minimum rate of $0.23 per minute, and is harmed when UPM routes

calls to Haiti by "bypassing" Digicel Haiti's international gateways because Digicel Haiti is

unable to charge its minimum rates for connecting calls from the United States to Haiti. In its

motion to dismiss and reply brief, however, Digicel Haiti asserts that it does not actually own or

---

[9] In Defendants' reply in support of their motion to dismiss or reconsider (ECF 93), Defendants argue that they are bringing a ***factual*** attack on the amended complaint, rather than a ***facial*** attack. Defendants urge the Court to look beyond the pleadings to the facts alleged in Digicel Haiti's motion to dismiss and assess whether Digicel Haiti can meet its burden of showing—with factual evidence and without relying on its pleading—that it has standing to proceed. In Defendants' opening brief, however, it was unclear whether Defendants were bringing a facial or factual attack on the amended complaint. Digicel Haiti interpreted the motion to dismiss as a facial attack and did not submit evidence in support of subject matter jurisdiction along with its briefing. In the absence of clarity in Defendants' opening brief, the Court also interprets Defendants' motion to dismiss as a facial attack on the amended complaint. Further, in its briefing, Digicel Haiti continues to allege that UPM deprived Digicel Haiti of revenue for international telephone calls that ***it*** connected in Haiti. *See* ECF 92 at 7 (asserting that Digicel Haiti "loses revenue as a result of Defendants' activities used to illegally connect calls originating outside of Haiti and terminated in Haiti using fraudulent bypass operations"). Additionally, as discussed below, even in light of the new facts that Digicel Haiti asserts in its briefing, the amended complaint still supports a theory of damages based on lost charges for RLYH plans. Although discovery may ultimately disprove Digicel Haiti's theory of damages (or otherwise prove that the Court is mistaken in its understanding of Digicel Haiti's allegations), such matters are more appropriately dealt with at a later stage of litigation, including summary judgment or trial.

PAGE 30 – OPINION AND ORDER

operate the international gateway switches in the United States. Digicel Haiti further asserts that it does not route calls from the United States to Haiti. According to Digicel Haiti, it merely connects calls locally in Haiti after another non-party (but, presumably, affiliated) carrier, known as "Digicel USA," routes the calls to Haiti.

Digicel Haiti now acknowledges that its amended complaint is imprecise and unclear. Plaintiff adds that both the Court and opposing counsel have "misunderstood" Plaintiff's allegations about which Digicel entity operates in the United States. The Court's Opinion and Order dated February 3, 2016, however, relied on ***Digicel Haiti's*** representations that ***Plaintiff***— and not any non-party carrier—operates in the United States. The Court expressly stated in its Opinion and Order that Digicel Haiti (identified as "Digicel" in that Opinion and Order)

> provides mobile telecommunications services to customers in Haiti. Digicel operates telephone switching systems in Miami, Florida, and New York City, New York, that route international calls from third-party providers (such as AT&T and Verizon) to Digicel customers in Haiti. The switching systems use an international gateway that allows Digicel to manage call routing and account for any billing and associated regulatory charges. Under Haitian law, international telephone carriers must charge at least 23 cents per minute for international calls terminating in Haiti. Accordingly, Digicel charges third-party providers at least 23 cents per minute to route international calls to Digicel customers in Haiti.

ECF 58 at 5.

Despite knowing that the Court interpreted its amended complaint in this way, Digicel Haiti waited until after Defendants filed their answer, affirmative defenses, and counterclaims to "clarify" its allegations. As discussed above, the Court does not attribute any presumption of truth to the allegations made in Digicel Haiti's motion to dismiss or reply brief. Nor does the Court accept as true the contents of the Application submitted by Digicel Haiti. Thus, Digicel Haiti currently is bound by its express representations as contained in its amended complaint.

Because, as discussed above, the Court concludes that the amended complaint currently governs the claims in this case, the Court denies Defendants' motion to dismiss.[10]

Even if the Court, however, were to rely upon Digicel Haiti's belated representations that it does not operate within the United States, the Court would still deny Defendants' motion to dismiss and reconsider. In its counterclaims, UPM alleges that the primary way in which it facilitated calls from the United States to Haiti was through use of RLYH plans. UPM enrolled the Digicel Haiti SIM cards that it purchased in RLYH plans for an access fee of $20 to $25. UPM then formatted telephone calls from third-party carriers' customers to appear to come from telephone numbers associated with RLYH-enrolled Digicel Haiti SIM cards. Whether Digicel Haiti or a non-party carrier actually carried the calls to Haiti, Digicel Haiti connected the calls in Haiti at domestic rates. As alleged in Digicel Haiti's amended complaint, Digicel Haiti would have ordinarily charged a minimum of $0.23 per minute for international calls entering its switch in Haiti and terminating on its Haitian cellular network. ECF 34 ¶¶ 19-22.

As a result of UPM's business operations, Digicel Haiti alleges the following harms regardless of who operates the international switches or routes calls to Haiti. Although UPM paid the RLYH access fees for the cards, UPM enabled multiple people to use the same RLYH plan without paying separate access fees. Therefore, UPM deprived Digicel Haiti of one of two fees:

---

[10] At oral argument on June 22, 2016, Digicel Haiti requested leave to amend its complaint. Defendants initially objected, arguing that they would be prejudiced unless Digicel Haiti includes in its second amended complaint additional details about its operations that will allow Defendants more fully to understand the nature of Digicel Haiti's allegations. Defendants did not object to Digicel Haiti amending the complaint if the Court requires these additional details. The Court finds that requiring additional details in Digicel Haiti's complaint is appropriate in light of the history of this case, in which the nature of the harm suffered by Digicel Haiti has been unclear at times and Digicel Haiti has argued that opposing counsel and the Court have misunderstood the allegations. Therefore, the Court grants Digicel Haiti leave to file a second amended complaint.

either (1) the $20 to $25 access fee that every individual caller would have had to pay for an

RLYH plan; or (2) at least $0.23 per minute (minus the price UPM paid for local minutes on the

SIM cards) for completing international calls in Haiti made by callers without a RLYH plan. *See

id.* ¶¶ 20-22, 75-82. Similarly, for every call that UPM connected to Haiti using VoIP, Digicel

Haiti was deprived of at least $0.23 (minus the price UPM paid for local minutes on the SIM

cards) for completing international calls terminating in Haiti. *See id.* ¶¶ 73-74, 98, 151, 153, 154,

156.

The Court's Opinion and Order dated February 3, 2016 primarily relied on these alleged

harms and associated alleged technological fraud in denying Defendants' motion to dismiss. The

Court now may have a more accurate understanding of how Digicel Haiti invoices and charges

for international calls. It appears that Digicel Haiti invoices and charges for calls when the calls

terminate on its Haitian network, rather than when the calls pass through international switches

located in the United States. Therefore, if a non-party entity operates the international switches

and carries the calls from the United States to Haiti, Digicel Haiti still would allegedly suffer

harm from having international calls enter its network appearing to be local calls, and the core of

the Court's previous analysis remains the same. Therefore, Defendants' motion to dismiss or, in

the alternative, for reconsideration is denied.

Finally, Digicel Haiti asks that the Court order Defendants to pay for Digicel Haiti's fees

and costs associated with responding to Defendant's motion to dismiss or reconsider. Similarly,

UPM "notes that it may formally seek redress in the future" for its costs and fees incurred in

bringing the motion. ECF 89 at 15. Under 28 U.S.C. § 1927, a court may require an attorney "to

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" by the

opposing party when that attorney "multiplies the proceedings in any case unreasonably and

vexatiously." The Court is concerned by Digicel Haiti's delay in alerting the Court and opposing counsel to possible factual "misunderstandings" about the true nature of Digicel Haiti's business operations and related allegations. The Court, however, does not yet find that either party (or its counsel) has unreasonably or vexatiously multiplied proceedings. Therefore, the Court declines at this time to award costs or fees to any party.

## CONCLUSION

Digicel Haiti's Motion to Dismiss Counterclaims (ECF 80) is DENIED. Digicel Haiti's Request for Judicial Notice (ECF 87) is GRANTED IN PART AND DENIED IN PART. Defendants' Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, to Reconsider (ECF 89) is DENIED. The Court also grants Digicel Haiti leave to file a second amended complaint within 45 days of the entry of this Opinion and Order with the additional details specified on the record.

**IT IS SO ORDERED**.

DATED this 26th day of July, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 34 – OPINION AND ORDER