**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
ksalyer@tomasilegal.com
edubay@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
(admitted *pro hac vice*)
chrissavage@dwt.com
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNIGESTION HOLDING, S.A., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>Plaintiff,<br><br>v.<br><br>UPM TECHNOLOGY, INC. d/b/a **UPM TELECOM, INC.**, and **UPM MARKETING, INC.**, an Oregon corporation; **UPM TELECOM, INC.**, an Oregon a/b/n; **UPM MARKETING, INC.**, an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; and **TYLER ALLEN**, an Oregon resident; and **DUY "BRUCE" TRAN**, an Oregon resident,<br><br>Defendants. | Case No. 3:15-CV-00185-SI<br><br>**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>**REQUEST FOR ORAL ARGUMENT** |

## TABLE OF CONTENTS

CERTIFICATION ................................................................................................................. 1

MOTION............................................................................................................................... 1

LEGAL MEMORANDUM ................................................................................................... 1

I.      ARGUMENT............................................................................................................. 4

      *A.*      Digicel-Haiti's Core Allegations Are Insufficient Under The Pleading Standards Established In *Twombly* And *Iqbal.* ....................................................... 4

            1.      The Allegations Regarding The Nature, Origin And Scope Of The Supposed $0.23/Minute Rate Are Insufficient Under Both *Twombly/Iqbal* And Fed. R. Civ. P. 44.1..................................................... 4

            2.      Digicel-Haiti Has Not Adequately Pled Fraud Under *Twombly* And *Iqbal.* ....................................................................................................... 7

            3.      Digicel-Haiti's Claims Of Non-Monetary Harm Are Also Insufficient Under *Twombly/Iqbal.* ............................................................ 11

      B.      The Supposedly Wrongful Conduct Digicel-Haiti Has Alleged Is Not Actionable Under Oregon Tort Law. ............................................................... 12

            1.      Oregon Tort Law Does Not Oblige UPM To Pay $0.23/Minute For Calls To Haiti.......................................................................................... 12

            2.      The Haitian Regulatory Materials Provided By Digicel-Haiti Do Not Support Imposing Liability On UPM. ............................................... 18

            3.      Oregon Tort Law Does Not Require Digicel-Haiti To Send Call Identifying Information That It Is Technically Unable To Send. ............. 19

            4.      Oregon Tort Law Does Not Require Digicel-Haiti To Route Calls To Haiti By Means Of One Of Digicel-Haiti's Gateway Switches. ......... 20

      C.      All Claims Regarding The Roam-Like-You're-Home Service Should Be Dismissed Because Digicel-Haiti Has Not Pled Any Cognizable Legal Claims With Respect To Those Services........................................................ 21

      D.      The Conversion And Unjust Enrichment Claims Should Also Be Dismissed Because They Depend On Digicel-Haiti Having A Legally Recognized Right To Monopolize Getting Calls From The United States To Its Customers In Haiti – Which It Plainly Does Not Have........................... 22

      E.      The SAC Should Be Dismissed Because The Oregon Tort Law On Which Digicel-Haiti Relies Is Preempted By The Communications Act. ....................... 23

      F.      Digicel-Haiti's Complaint Should Also Be Dismissed On Grounds Of Primary Jurisdiction. ......................................................................................... 29

II.     CONCLUSION.......................................................................................................... 31

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Court Cases*

*Abdullah v. International Lease Finance Corporation,* 2015 U.S. Dist. LEXIS 38727 (C.D. Cal. 2015) ... 5, 7

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ... 2, *passim*

*Bacerra v. Enterprise Rent-A-Car Company of Los Angeles,* 528 Fed. Appx. 770 (9th Cir. 2013) ... 5, 7

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007 ... 2, *passim*

*Bell Atlantic Tel. Cos. v. FCC,* 206 F.3d 1 (D.C. Cir. 2000) ... 6

*Boomer v. AT&T Corp.,* 309 F.3d 404 (7th Cir. 2002) ... 28, 29

*Broyte v. Gotham Towers, Inc.,* 13 F.3d 994 (6th Cir. 1994). ... 28

*Clark v. Time Warner Cable,* 523 F.3d 1110 (9th Cir. 2008) ... 4, 29, 30

*Davel Commc'ns, Inc. v. Quest Corp.,* 460 F.3d 1075 (9th Cir. 2006) ... 29

*Doyle v. City of Medford,* 356 Ore. 336 (2014) ... 12, 13

*In re Century Aluminum Co. Securities Litigation,* 729 F.3d 1104 (9th Cir. 2013) ... 8

*Joe Hand Promotions, Inc. v. Jacobson,* 874 F. Supp. 2d 1010 (D. Ore. 2012) ... 22

*Musgrave v. Lucas,* 193 Ore. 401 (1951) ... 18

*North Carolina Utilities Commission v. FCC,* 537 F.2d 787 (4th Cir. 1976) ... 24

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.,* 768 F.3d 938 (9th Cir. 2014) ... 24

*Sullivan v. Am. Airlines, Inc.,* 424 F.3d 267, 272 (2d Cir. 2005). ... 24

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.,* 307 F.3d 775 (9th Cir. 2002) ... 29

*Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426 (1907) ... 29

*United States v. Gen. Dynamics Corp.,* 828 F.2d 1356 (9th Cir. 1987) ... 29, 30

*United States v. Western Pac. R.R. Co.,* 352 U.S. 59 (1956) ... 29

*Webb v Clark,* 274 Ore 387 (1976) ... 18

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Administrative Decisions*

*1998 Biennial Regulatory Review; Reform of the International Settlements
Policy and Associated Filing Requirements,* Report and Order and Order on
Reconsideration, 14 FCC Rcd 7963 (1998) ("*1998 Biennial Regulatory
Review*") ....... 6, 7, 13, 15

*Application of General Electric Capital Corporation, Transferors, and SES
Global, S.A. Transferees, for Consent to Transfer Control of Licenses and
Authorizations Pursuant to Sections 214(a) and 310(d) of the
Communications Act and Petition for Declaratory Ruling Pursuant to Section
310(b)(4) of the Communications Act,* Order and Authorization, 16 FCC Rcd
17575 (Chief, Int'l Bur. & Chief, Wireless Telecommunications Bur. 2001) ....... 14

*Amendment of the Commission's Regulatory Policies to Allow Non-U.S.-
Licensed Space Stations to Provide Domestic and International Satellite
Service in the United States and Amendment of Section 25.131 of the
Commission's Rules and Regulations to Eliminate the Licensing Requirement
for Certain International Receive-Only Earth Stations and Communications
Satellite Corporation Request for Waiver of Section 25.131(j)(1) of the
Commission's Rules As It Applies to Services Provided via the Intelsat K
Satellite,* Notice of Proposed Rulemaking, 11 FCC Rcd 18178 (1996) ....... 14

*Application of General Electric Capital Corporation, Transferors, and SES
Global, S.A. Transferees, for Consent to Transfer Control of Licenses and
Authorizations Pursuant to Sections 214(a) and 310(d) of the
Communications Act and Petition for Declaratory Ruling Pursuant to Section
310(b)(4) of the Communications Act,* Order and Authorization, 16 FCC Rcd
17575 (Chief, Int'l Bur. & Chief, Wireless Telecommunications Bur. 2001) ....... 14

*Australia-Japan Cable (Guam) Limited; Application for License to Land and
Operate in the United States a Private Submarine Fiber Optic Cable
Extending Between Australia, Guam, and Japan,* Cable Landing License, 15
FCC Rcd 24057 (Associate Chief, Telecommunications Div. 2000) ....... 14

*Bell System Tariff Offerings Of Local Distribution Facilities For Use By
Other Common Carriers; And Letter of Chief, Common Carrier Bureau,
Dated October 19, 1973, to Laurence E. Harris, Vice President, MCI
Telecommunications Corp.,* Decision, 46 F.C.C.2d 413 (1974 ....... 25

*Commercial Communications, Inc., et al.; Petition For Declaratory Ruling
Alleging Inconsistency Between Federal "Interconnection" Decisions And An
Oklahoma Corporation Commission Rule Regulating Use and Supply Of
Customer-Provided Telephone Equipment,* Memorandum Opinion and Order,
81 F.C.C.2d 106 (1980) ....... 25

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service,* Order, 18 FCC Rcd 6077 (2003) ("*International Call-back Order*") .......................... 17, 28

*Establishment of Interstate Toll Settlements and Jurisdictional Separations Requiring the Use of Seven Calendar Day Studies by the Florida Public Service Commission,* Memorandum Opinion and Order, 93 F.C.C.2d 1287 (1983) .......................... 25

*Federal-State Joint Board on Universal Service,* Report & Order, 12 FCC Rcd 8776 (1997) .......................... 24

*GE American Communications, Inc., et al., Application for Consent to Transfer of Earth Station License of Columbia Communications Corporation,* Order and Authorization, 15 FCC Rcd 11590 (Chief, Int'l Bur. 2000) .......................... 14

*International Settlements Policy Reform, International Settlement Rates,* First Report and Order, 19 FCC Rcd 5709 (2004) ("*ISP Reform Order*") .......................... 3, 13, 16

*International Settlements Policy Reform,* Report and Order, 27 FCC Rcd 15521 (2012) ("*International Settlements Reform Order*") .......................... 26, 29

*International Settlement Rates,* Notice of Proposed Rulemaking, 12 FCC Rcd 6184 (1997) .......................... 7

*International Settlement Rates,* Report and Order, 12 FCC Rcd 19806 (1997) .......................... 14, 19

*MTS and WATS Market Structure; Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board,* Memorandum Opinion and Order, 1986 FCC LEXIS 4053; 59 Rad. Reg. 2d (P & F) 1127 (1986) .......................... 24, 25

*MTS and WATS Market Structure, Phase III; Establishment of Physical Connections and Through Routes Among Carriers; Establishment of Physical Connections by Carriers With Non-carrier Communications Facilities; Planning among Carriers For Provision of Interconnected Services, and in Connection with National Defense and Emergency Communications Services; and Regulations for and in Connection with the Foregoing,* Notice of Proposed Rulemaking, 94 F.C.C.2d 292 (1983) .......................... 25

*Policy Statement on International Accounting Rates,* Policy Statement, 11 FCC Rcd 3146 (1996) .......................... 14

*Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, as Amended,* Second Report & Order, 28 FCC Rcd 5741 (2012) .......................... 13, 14

*Telerent Leasing Corp. et al. Petition for Declaratory Rulings on Questions of Federal Preemption on Regulation of Interconnection of Subscriber-Furnished Equipment to the Nationwide Switched Public Telephone Network,* Memorandum Opinion and Order, 45 F.C.C.2d 204 (1974) .......................... 25

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**TABLE OF AUTHORITIES**

|  | Page(s) |
|---|---|
| *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission,* Memorandum Opinion and Order, 19 F.C.C. Rcd. 22404 (2004) | 24 |

*Statutes*

| | |
|---|---|
| 47 U.S.C.§ 151 | 24 |
| 47 U.S.C. § 152(a) | 24 |
| 47 U.S.C. § 153(21) | 24 |
| 47 U.S.C. § 157(a) | 16 |
| 47 U.S.C. § 201 | 26, 28 |
| 47 U.S.C. § 201(b) | 26 |
| 47 U.S.C. § 202 | 26, 28 |
| 47 U.S.C. § 202(a) | 26 |
| 47 U.S.C. § 251(a) | 27 |
| 57 ORS § 759.015 | 16 |
| Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq* | 1, *passim* |
| Racketeer Influenced Corrupt Organization ("RICO") Act | 2, 12, 29 |

*Rules/Regulations*

| | |
|---|---|
| Fed. R. Civ. P. Rule 12(b)(1) | 1 |
| Fed. R. Civ. P. Rule 12(b)(6) | 1 |
| Fed. R. Civ. P. Rule 44.1 | 2, 4, 5, 7 |
| 47 C.F.R. § 0.51 | 26 |

*Other Authorities*

| | |
|---|---|
| FCC, News Release, "FCC ANNOUNCES WIRELESS WORLD TRAVEL WEEK, FCC and Wireless Providers Offer Money-Saving Calling Tips for Foreign Travel," 2010 FCC LEXIS 3782 (2010) | 15 |

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

TABLE OF AUTHORITIES

|                                                                        | Page(s) |
|------------------------------------------------------------------------|---------|
| O.W. Holmes, THE COMMON LAW (1881)                                     | 13      |
| Remarks of FCC Chairman Genachowski, 2012 FCC LEXIS 4692 (2012)        | 14      |
| Restatement (Second) of Torts, Section 222A                           | 22      |

DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# CERTIFICATION

Pursuant to Local Rule 7.1, the undersigned attorney hereby certifies that Defendants' counsel conferred with Plaintiff's counsel by telephone in an attempt to resolve the dispute presented by the Motion set forth below.

# MOTION

Defendants UPM Technology, Inc. d/b/a UPM Telecom, Inc., UPM Marketing, Inc., UPM Telecom, Inc., UPM Marketing, Inc., Benjamin Sanchez a/k/a Benjamin Sanchez Murillo, Baltazar Ruiz, Tyler Allen, and Duy "Bruce" Tran (collectively "UPM") hereby move, pursuant to Federal Rules of Civil Procedure Rules 12(b)(1) and 12(b)(6), to dismiss Plaintiff's Second Amended Complaint ("SAC"). The SAC fails to state a claim upon which relief can be granted; any claims it properly alleges are preempted by the Communications Act of 1934, as amended; and even if it states some claims that are not preempted, the Federal Communications Commission ("FCC") has primary jurisdiction over any disputes between the parties.

# LEGAL MEMORANDUM

The heart of the SAC is the claim that UPM had a legally enforceable duty, arising under the tort law of the State of Oregon, to pay Unigestion Holdings S.A. dba Digicel Haiti ("Digicel-Haiti") $0.23 for each minute of telecommunications traffic sent from the United States to Digicel-Haiti's network in Haiti.[1] In support of this claim, the SAC makes repeated but vague allegations suggesting that Digicel-Haiti had some legally enforceable right to insist that all calls from the United States to its customers in Haiti had to be carried via its own network, through gateway switches in New York and Miami.[2] UPM got some calls to Haiti without paying $0.23/minute and without using Digicel-Haiti's gateways, and Digicel-Haiti claims that

---

[1]     The tort-based claims in the SAC are Counts IV and V, alleging fraud (SAC ¶¶ 200-09 and SAC ¶¶ 210-19), Count VI, alleging conversion (SAC ¶¶ 220-23), and Count VII, alleging unjust enrichment (SAC ¶¶ 224-30). In this Motion, we refer to all of these claims collectively as fraud claims, except where it is necessary to specifically discuss aspects of a particular tort.

[2]     *See, e.g.,* SAC at ¶¶ 22-24, 28, 38, 40, 41, 52,70.

Page 1 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

in doing so UPM committed fraud.[3]    It then tries to leverage these fraud claims into treble damages and more by asserting them as the factual basis for a set of Racketeer Influenced Corrupt Organization ("RICO") Act claims.[4]

The SAC suffers from several fundamental and insurmountable problems:

**First,** Digicel-Haiti has not adequately alleged why UPM had a legal obligation to pay $0.23/minute for traffic sent to Haiti. The stated basis of this claim is that the "Government of Haiti" has "set" that rate. SAC at ¶ 38.  UPM's supposed duty to pay, therefore, arises out of foreign law.  The SAC's bare, vague allegation on this point is insufficient under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), as well as under Fed. R. Civ. P. 44.1 regarding pleading foreign law. Because these inadequate allegations fail to establish UPM's obligation to pay the $0.23/minute rate, all claims are based on UPM's failure to do so – that is, the entire SAC – must be dismissed.[5]

**Second,** the allegations regarding UPM's supposed "misrepresentations" also fail under *Twombly* and *Iqbal.*  The essence of Digicel-Haiti's claim is that UPM "misrepresented" relevant facts to Digicel-Haiti by not providing network signaling information showing that the calls in question originated with end users in the United States.  *See* SAC at ¶¶ 22-29, 41-58. Digicel-Haiti, however, was obliged to specifically allege what UPM supposedly should have done.  This obligation arises because *Twombly* and *Iqbal* require a plaintiff to identify and "plead around" plausible innocent explanations for a defendant's conduct.  *See Twombly,* 550 U.S. at 565-67; *Iqbal,* 556 U.S. at 678-80. Here the obvious innocent explanation for UPM not transmitting the signaling data that Digicel-Haiti wants is that there is no technical means by

---

[3]    For purposes of this Motion, UPM treats Digicel-Haiti's well-pled allegations regarding UPM's actions as true. UPM reserves the right to deny, clarify, and otherwise respond to any and all of the SAC's allegations, should the Court choose not to grant this Motion to Dismiss.

[4]    The RICO-based claims are Counts I, II, and III (SAC ¶¶ 173-99).

[5]    All claims relating to "Roam Like You're Home" ("RLYH") calls should be dismissed because the SAC admits that Digicel-Haiti received $0.23/minute for RLYH calls. SAC at ¶ 136.

Page 2 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

which UPM could transmit it. It obviously cannot constitute misrepresentation for UPM to fail to do something it is not possible to do. Because the SAC's allegations on this key point are not enough under *Twombly* and *Iqbal,* this provides an independent reason to dismiss the SAC.

**Third,** even if some Haitian regulation called for Digicel-Haiti to charge $0.23/minute, and for UPM to pay it, that would not mean that UPM committed a tort by not doing so. Tort liability in Oregon does not arise from failure to meet the requirements of a foreign sovereign, and there is no public policy reason to extend Oregon tort law to cover such matters. In fact, the $0.23/minute rate is designed to extract excessive rates from United States consumers. It thus flies in the face of United States public policy, which seeks to encourage competition and to reduce international call termination rates to cost – which the FCC has estimated to be well below half that amount. *International Settlements Policy Reform, International Settlement Rates,* First Report and Order, 19 FCC Rcd 5709 (2004) ("*ISP Reform Order*") at ¶¶ 83, 91 ("where rates for foreign mobile termination applied to U.S.-international traffic are excessively high, they should move towards cost"); *id.* at ¶ 83 ("actual cost of terminating international traffic in 1997 was approximately $0.06 - $0.09 per minute"). Oregon would not impose tort liability for conduct that violates a foreign law whose purpose is to harm United States consumers. For similar reasons, Oregon tort law would not impose liability for not sending the signaling information that Digicel-Haiti wants, or for not using Digicel-Haiti's gateway switches. The entire SAC should be dismissed for this reason as well.

**Fourth,** the SAC should be dismissed because even if the SAC properly stated claims under Oregon tort law, that law is preempted by federal law. Digicel-Haiti's claims are founded on: (a) the technical means by which a United States carrier, UPM, arranged to send traffic to a foreign carrier, Digicel-Haiti; (b) the nature and content of the signaling information UPM sent and Digicel-Haiti received in connection with that international traffic; and (c) the amount Digicel-Haiti was paid to terminate it. These matters are governed entirely and exclusively by the Communications Act as interpreted and administered by the FCC. This is yet another reason that the SAC should be dismissed in its entirety.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**Fifth,** even if some modicum of some claim is deemed to survive the issues noted above, this Court should still dismiss this case under the doctrine of primary jurisdiction, because it is clear that: (a) the Communications Act and the FCC's regulatory authority govern the conduct underlying the claims in the SAC; (b) the agency's technical expertise is required to adequately address those claims; and (c) potentially inconsistent rulings could result from having disputes of this sort decided by a multiplicity of federal courts, without the benefit of the agency's nationwide perspective on how to handle both technical and economic arrangements for international communications. *See Clark v. Time Warner Cable,* 523 F.3d 1110 (9th Cir. 2008). To the extent that any viable claims might exist within the SAC, therefore, it should still be dismissed, with Digicel-Haiti invited to seek relief at the FCC.

## I.    ARGUMENT

### A.    Digicel-Haiti's Core Allegations Are Insufficient Under The Pleading Standards Established In *Twombly* And *Iqbal.*

The SAC should be dismissed because it fails to plead certain critical points with the specificity required by the Supreme Court in *Twombly* and *Iqbal.* At this late stage in the proceedings, this is a fully sufficient reason to bring this case to an end.[6]

#### 1.    The Allegations Regarding The Nature, Origin And Scope Of The Supposed $0.23/Minute Rate Are Insufficient Under Both *Twombly/Iqbal* And Fed. R. Civ. P. 44.1.

The heart of Digicel-Haiti's claim is that it has a right, enforceable against UPM, to receive a minimum of $0.23/minute for calls sent to Haiti from the United States. If it has no right to receive that amount from UPM, none of its other allegations have any legal

---

[6]    Following the hearing held on July 22, 2016, and in accordance with the Court's order, the parties conferred regarding improving the specificity of certain aspects of Digicel-Haiti's claims – particularly, the specification of what entities are involved in getting calls from the United States to Haiti, how much each entity is paid, and by whom. The SAC addresses those concerns, *see* SAC at ¶¶ 14-39, 134-36. This Motion to Dismiss addresses other, independent defects in the SAC.

Page 4 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

significance.[7]

Notwithstanding the essential nature of this point, Digicel-Haiti says virtually nothing to establish that it has any such right. Its sole explanation of the rate appears at Paragraph 38 of the SAC, where it asserts, without citation to any authority, that it "must charge those carriers [sending calls to Haiti] a minimum rate of 23 cents per minute—the 'floor' or lowest rate set by the Government of Haiti for terminating incoming international cellular telephone calls into Haiti." Under *Twombly* and *Iqbal,* a plaintiff must plead foreign law with sufficient specificity to allow the defendant (and the Court) to understand the source of the supposed foreign-originated legal obligation. *See Bacerra v. Enterprise Rent-A-Car Company of Los Angeles,* 528 Fed. Appx. 770 (9th Cir. 2013) (dismissing complaint for failure to adequately plead foreign law, citing *Iqbal*); *Abdullah v. International Lease Finance Corporation,* 2015 U.S. Dist. LEXIS 38727, [*83]-[*92] (C.D. Cal. 2015) (dismissing claim under Cormoran law as insufficiently pled under Fed. R. Civ. P. 44.1 and insufficiently specific under *Twombly/Iqbal*). Digicel-Haiti's bare, unsupported assertion about the source of the $0.23/minute rate is not sufficient under *Twombly* and *Iqbal,* and the SAC should therefore be dismissed.

UPM notes that earlier in this case, Digicel-Haiti, in purported compliance with Fed. R. Civ. P. 44.1, filed certain Haitian legal documents on which it evidently planned or plans to rely. *See* Plaintiff's Notice of Filing Authority on Haitian Law, Doc. Nos. 59, 60, & 61 (filed Feb. 10, 2016). The import of these materials is discussed below. As relevant here, however, nothing in those documents says anything about Digicel-Haiti having the right to charge UPM, or any other United States carrier, $0.23/minute for calls from the United States. As a result, nothing Digicel-Haiti has provided supports its central claim to be entitled to receive $0.23/minute from UPM.

---

[7]    For example, Digicel-Haiti complains that UPM imported certain equipment into Haiti without properly declaring its nature to Haitian authorities. *See, e.g.,* SAC at ¶¶ 148, 151, 154-66. Even if true, that allegation does not establish any liability as between UPM and Digicel-Haiti.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

The inadequacy of the SAC's allegations can be seen by considering the numerous important points that the SAC does *not* address. Among other things, Digicel-Haiti does not allege when or in what context the Government of Haiti supposedly said that Digicel had to charge $0.23/minute, or what sort of legal document (statute, regulation, license to operate, spectrum license, etc.) supposedly embodies that requirement. Digicel-Haiti neither provides nor cites to the text of the supposed Haitian legal requirement. These are not mere details. To the contrary, they matter greatly, because large legal consequences flow from seemingly minor potential differences in language. For example, a statement that Digicel-Haiti "is authorized" to charge $0.23/minute would be different from a statement that Digicel-Haiti "is required" to charge that amount, and different still from a statement that it is authorized or required to "collect" that amount. And all of those formulations would differ critically from language (were it to exist) that stated that carriers handing off traffic to Digicel-Haiti are "required to *pay*" that amount – something that Digicel-Haiti does not even allege.[8]

It would also matter how the supposed Haitian legal document defines the scope of the $0.23/minute obligation, such as whether it says that the rate applies to "telephone calls," to "telecommunications traffic," or to some other defined or undefined class of communications. This issue matters because packet-switched traffic traversing the Internet – one of the ways that UPM allegedly got calls to Haiti – is not traditionally regarded as a form of "telephone call." *See, e.g., Bell Atlantic Tel. Cos. v. FCC,* 206 F.3d 1, 5 (D.C. Cir. 2000) (noting that a "call" to a dial-up ISP does not "clearly fit" within the category of either a "local" or "long-distance" call). To the contrary, in the international calling context, the FCC has encouraged carriers to use Internet-based communication as a way to *avoid paying* call termination rates applicable to traditional telephone calls. *1998 Biennial Regulatory Review; Reform of the International*

---

[8]    Indeed, this is an entirely sufficient and independent basis for dismissing the entire SAC – Digicel-Haiti does not even allege, much less support with references to any governing law, that *UPM has any legal obligation to pay* the $0.23/minute rate that forms the essential core of Digicel-Haiti's case. This failure is also independently fatal to Digicel-Haiti's fraud theory.

Page 6 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 FCC Rcd 7963 (1998) ("*1998 Biennial Regulatory Review*") at ¶ 63 & n.119. That is, as far as United States law is concerned, traditional international call termination rates do not apply to calls handled via the Internet. *See International Settlement Rates,* Notice of Proposed Rulemaking, 12 FCC Rcd 6184 (1997) at ¶ 13 (While "internet traffic and switched voice traffic are carried over virtually identical facilities, the price for internet service is far cheaper because *switched traffic is subject to international settlement rates, while internet traffic is exchanged outside of the traditional accounting rate system*") (emphasis added).

Given this, Digicel-Haiti needed to plead something more than the vague and unsupported assertion that the "Government of Haiti" has "set" the $0.23/minute rate to properly plead claims that depend on its entitlement to receive that rate. Plainly however, Digicel-Haiti has failed to do so. As a result, under *Twombly* and *Iqbal,* the SAC should be dismissed in its entirety. *Bacerra, supra.* In this regard, the SAC also fails to meet the requirements of Fed. R. Civ. P. 44.1, which obliges a plaintiff seeking to rely on foreign law to give adequate notice of the law being relied upon. As noted above, while Digicel-Haiti has previously filed some Haitian law purportedly in compliance with Rule 44.1, nothing in those earlier filings mentions a right to impose any specific rate. That earlier filing, therefore, does not support the assertions in the SAC that Haitian law requires charging the $0.23/minute rate. When the specifics of foreign law govern whether or not a defendant is liable, courts do not hesitate to apply *Twombly* and *Iqbal* to dismiss the case when the allegations regarding that law are insufficient. *Bacerra, supra; Abdullah, supra.* That is what the Court should do here.

### 2. Digicel-Haiti Has Not Adequately Pled Fraud Under *Twombly* And *Iqbal.*

The SAC should also be dismissed because it fails to adequately plead the tort of fraud under the standard of *Twombly* and *Iqbal.* Digicel-Haiti asserts that it constitutes actionable "misrepresentation" for UPM to send a call to Digicel-Haiti's network in Haiti without also sending call signaling data that would identify the call as having originated with an

Page 7 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

end user customer in the United States. *See* SAC at ¶¶ 22-29, 41-58. But the SAC never hints at how UPM could have included that data with the calls it sent to Haiti. This matters because, under *Twombly* and *Iqbal*, a plaintiff is obliged to address and negate innocent explanations for the conduct complained of. *See Twombly*, 550 U.S. at 565-67; *Iqbal*, 556 U.S. at 678-80. Since it obviously cannot be a wrongful affirmative misrepresentation for UPM to fail to do something it is technically incapable of doing, the SAC's failure to address what UPM supposedly should have done means that the fraud claims should be dismissed.

*Iqbal* establishes a two-part test for whether allegations of wrongdoing are sufficiently plausible to survive a motion to dismiss. First, the Court must distinguish between legal conclusions and factual allegations, noting that legal conclusions are not entitled to any presumption of truth. Second, the factual allegations of the complaint must be scrutinized to ensure they present a plausible claim. The Supreme Court emphasized that allegations that are merely consistent with wrongful conduct are not sufficient. *Iqbal*, 556 U.S. at 678-80. This analysis will vary depending on the context of a particular case, and requires a court "to draw on its judicial experience and common sense." *Id.* at 679. *See also In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1107 (9th Cir. 2013) ("The level of factual specificity needed to satisfy this pleading requirement will vary depending on the context").

*Twombly* illustrates this point. There, the antitrust plaintiff alleged that defendants had conspired to divide markets geographically and had avoided competing with each other based on that conspiracy. The Supreme Court found those allegations to be insufficient, not because they were not well-pled in the abstract, but because the factual allegations of the complaint, taken as a whole, did not negate the prospect that the defendants had decided independently not to compete with each other – something that does not violate the antitrust laws. *Twombly*, 550 U.S. at 553-57. *See also Iqbal*, 556 U.S. at 679-80 (discussing *Twombly*).

Applying this test to the SAC shows that Digicel-Haiti has failed to adequately plead its fraud claim. At the outset, the SAC's numerous statements that this or that activity by UPM constituted a "misrepresentation" are simply legal conclusions that must be disregarded in

Page 8 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

assessing the sufficiency and plausibility of the factual allegations in the complaint. *See, e.g.,* SAC at ¶¶ 28, 54, 56, 58, 70, 84, 119, 121, 127, 167, 180, 189, 206, 213, 215. The question is what the SAC alleges that UPM actually did, considering the overall context of the case.

Judging from the SAC, what Digicel-Haiti is concerned about is the fact that UPM sent traffic to Haiti that was accompanied by call signaling data that did not identify the ultimate end user in the United States that was originating the call. Instead, the calls were transmitted with identifying information associated with the SIM cards that UPM had purchased to complete calls on Digicel-Haiti's network. In this regard, as the SAC describes things, UPM obtained SIM cards that work on Digicel-Haiti's network in Haiti, used those SIM cards to initiate calls onto Digicel-Haiti's network (or, in the case of RLYH calls, a United States wireless carrier's network for transmittal to Digicel-Haiti's network). In each case, UPM transmitted – accurately – the identifying information associated with the SIM cards that UPM had purchased. *See* SAC at ¶ 43 (a SIM card identifies itself as associated with a unique telephone number and customer account); *id.* at ¶¶ 87-92 (describing unique data associated with each SIM card). This *accurate* transmittal of information about the SIM cards that were actually being used is what Digicel-Haiti is complaining about.

Digicel-Haiti concocts its claim of "misrepresentation" by assuming (but never justifying) that it has an inherent entitlement to receive call signaling information that identifies the ultimate end user originating a call, irrespective of the path the call has taken to get to Haiti. If Digicel-Haiti has no legal right to get that information, it can hardly constitute "misrepresentation" for UPM to fail to supply it. But the SAC cites nothing – no contract, no statute, no regulation, no industry standard, no FCC (or other) regulatory order – nothing – to support that foundational assumption. This lack of support does not arise from Digicel-Haiti failing to understand what is going on from a technical perspective; the SAC is replete with technical explanations of how calls are handled. *See* SAC at ¶¶ 81-84, 89-90, 100-104 (Internet-based calls); *id.* at ¶¶ 132, 134-35 (RLYH calls). Instead, the lack of support reflects the fact that there is no basis for Digicel-Haiti's implicit assumption that it is technically possible to send it

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

the information it wants, and that UPM was doing something wrongful by not sending it.

In fact, the idea that UPM has anything to do with the signaling information that Digicel-Haiti receives is contradicted by the SAC itself. As the SAC explains, "electronic signaling information transmitted from the sending switch as part of the technical process of handing off the call from one switch to another." SAC at ¶ 26. At no point does the SAC allege that any UPM switch was ever is directly connected to any Digicel-Haiti switch, so even under the facts as pled by the SAC, there is no point at which UPM could hand off the data that Digicel-Haiti wants. Digicel-Haiti objects to the entire technical set-up UPM used, in part because that technical set-up does not transit that data, but using a technical arrangement in which it is impossible to transmit the data is not "affirmatively misrepresenting" anything.

The SAC's failure to establish any sort of legal entitlement to the information Digicel-Haiti seeks is sufficient, by itself, to doom the SAC's allegations of misrepresentation. But for purposes of applying the test from *Twombly* and *Iqbal,* the reason that SAC cites nothing, and the reason that there *is* nothing, is that as a simple technical matter, once a call is re-originated (from wherever it began) using a SIM card on a wireless network, the only signaling information that can be transmitted is the information associated with that SIM card. It is technically impossible to do what Digicel-Haiti blithely assumes UPM has a legal obligation to do. That technical impossibility provides the entirely innocent, non-wrongful explanation for why Digicel-Haiti did not do what Digicel-Haiti wants.

In essence, what UPM did was buy equipment (SIM cards) and services (minutes of use) from Digicel-Haiti, and then resell them to third parties. Digicel-Haiti does not allege that resale of wireless telecommunications services is a tort under Oregon law, or that Digicel-Haiti had somehow barred resale in a contract binding on UPM. In the absence of such allegations, UPM's resale activities – which as a technical matter necessarily include its transmission of SIM card identifying data – are entirely "innocent" as well.

Because Digicel-Haiti has not alleged facts to negate an entirely plausible and entirely innocent explanation for UPM's not sending the call signaling data Digicel-Haiti wants,

Page 10 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

all of the fraud claims in the SAC – and thus the entire SAC – should be dismissed.

### 3. Digicel-Haiti's Claims Of Non-Monetary Harm Are Also Insufficient Under *Twombly/Iqbal.*

The conclusion that the SAC should be dismissed due to insufficient pleading applies as well to Digicel-Haiti allegations of non-monetary harm. Those claims are vague, conclusory, and formulaic, and under the standards of *Twombly* and *Iqbal* cannot support any liability on the part of UPM.

First, Digicel-Haiti suggests that UPM's activities somehow harm, stress, or impose costs on Digicel-Haiti's infrastructure. *See* SAC at ¶ 104 (UPM's actions supposedly created "additional unaccounted for stress on Digicel-Haiti's cellular network infrastructure"); *id.* at ¶ 218 (referring to its alleged damages as including "costs of infrastructure"). This claim is facially absurd. By getting calls to Haiti by means of the Internet rather than by means of Digicel-Haiti's facilities, UPM *reduced* demand on/use of Digicel-Haiti's infrastructure. And once the calls got to Haiti and onto Digicel-Haiti's local wireless network, the use of/stress on that network is unaffected by how, exactly, the calls got to Haiti in the first place. Note that Digicel-Haiti is not complaining that the total volume of calls that UPM sent to Haiti was somehow excessive or caused any problems. To the contrary, the essence of Digicel-Haiti's claims is that the Haiti-bound calls that UPM sent through the Internet actually should have gone through the gateway switches instead – so "stress" on Digicel-Haiti's network is not at issue, because Digicel-Haiti's infrastructure would have handled the same volume of calls either way. As a result, the SAC's vague, conclusory boilerplate allegation regarding harm to infrastructure is clearly insufficient to support any claim that Digicel-Haiti has actually been harmed, as required by *Twombly* and *Iqbal.*

Second, Digicel-Haiti also vaguely suggests that UPM's activities harmed Digicel-Haiti's goodwill. *See* SAC at ¶¶ 104, 171, 191(a), 198(c), 218. It does not, however, allege a single fact that suggests that any customer, any vendor, any regulator, or, indeed, anyone at all in any context, would think less of Digicel-Haiti by virtue of UPM's activities. Instead, the

Page 11 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

unsupported and unexplained suggestion that UPM has harmed Digicel-Haiti's "goodwill" is mouthed without explanation or elaboration. This is precisely the kind of formulaic, conclusory allegation that *Twombly* and *Iqbal* have deemed to be insufficient to support a complaint.

**B.    The Supposedly Wrongful Conduct Digicel-Haiti Has Alleged Is Not Actionable Under Oregon Tort Law.**

Digicel-Haiti does not claim that UPM violated any contract between the parties; indeed, it disclaims that any contractual relationship existed. SAC at ¶40. Digicel-Haiti does not claim that UPM violated any Oregon or other United States statute that creates a private right of action.[9]  Instead, it asks this Court to extend Oregon tort law to create liability for actions that disappoint Digicel-Haiti's "expectations," *see* SAC at ¶¶ 48-49 51, 61-63, 67, or its "intentions," *see* SAC at ¶¶ 48, 121, 130, 180, 189, 203. In support of converting its "expectations" and "intentions" into liability for UPM, Digicel-Haiti appears to rely on the claim that UPM's actions may violate some ***Haitian*** legal or regulatory requirements. As described below, there is no basis for this Court to rule that Oregon tort law would impose liability for anything UPM is alleged to have done, whether or not those actions violate Haitian laws or regulations. This is an independent reason to dismiss the SAC.

**1.  Oregon Tort Law Does Not Oblige UPM To Pay $0.23/Minute For Calls To Haiti.**

Even if Digicel-Haiti had adequately pled some foreign-law basis for the $0.23/minute rate, UPM has not committed any tort by not paying it. Violations of ***a state's own*** statues and regulations may, in some circumstances, provide a basis for common law tort liability. *Doyle v. City of Medford*, 356 Ore. 336, 346-66 (2014) (discussing when Oregon courts will create tort cause of action based on violation of an Oregon statute). However, no Oregon law (or law from any jurisdiction) of which Defendants are aware suggests that tort liability would or could arise from violation of a ***foreign sovereign's*** law or regulation.

---

[9]    Digicel-Haiti's RICO claims are premised on there being something wrongful with UPM's underlying actions.

Page 12 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

The scope and reach of a state's tort law is and always has been based on considerations of sound public policy. *See, e.g.,* O.W. Holmes, Jr., THE COMMON LAW (1881) at 35 ("Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy"). Here, the Oregon Supreme Court has made clear that any new tort cause of action created based on a statute must have a sound public policy basis. *Doyle, supra,* 356 Ore. at 339, *passim.*

In this case, there is no public policy rationale for extending Oregon tort law to cover any failure by UPM to pay the $0.23/minute rate. On its face, the purpose of this high rate is to extract money from United States consumers calling Haiti. The Government of Haiti may have an interest in enforcing the payment of this fee, but no public policy of either the State of Oregon or the United States of America is served by doing so.[10] In fact, the public policy of the United States is to encourage competition in telecommunications markets in general and in international calling markets in particular. For example, as early as 1998, the FCC stated that it "has sought to *foster an increasingly competitive international telecommunications market* by adopting policies that *promote* the shift away from regulated monopolies and toward *private sector competition.*" *1998 Biennial Regulatory Review, supra,* at ¶ 1 (emphasis added, footnote omitted). The FCC has noted that it has *"longstanding policy goals of greater competition in the U.S.-international market and more cost-based rates for U.S. customers." ISP Reform Order* at ¶ 2 (emphasis added). This policy is extremely well-established; several additional illustrative FCC rulings are set out in the footnote.[11] That policy would be defeated by imposing

---

[10]    The Haitian regulatory materials that Digicel-Haiti submitted show that the government of Haiti views inbound international calling as a cash cow to help fund its overall operations, including, evidently, its schools. *See, e.g.,* Doc. No. 61 at 12 (bypass decreases general tax revenues and amounts in a "National Education Fund"). The desire of the Government of Haiti for revenues is obviously of no concern to the State of Oregon – nor could it be under the Supremacy Clause. Whether and to what extent the United States chooses to respect the desires of foreign nations is entirely a matter for the federal government.

[11]    In the quotations below, any footnotes are omitted and all emphasis is added. *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees under Section*

(note continued)...

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

liability for failing to pay inflated, monopolistic rates by virtue of using innovative technology to deliver calls to Haiti from United States (and Oregon) consumers.

Focusing on the $0.23/minute rate, it is a specific policy objective of the United States to *lower* the fees that United States consumers pay to make overseas calls. To that end, the

---

...(note continued)

*310(b)(4) of the Communications Act of 1934, as Amended,* Second Report & Order, 28 FCC Rcd 5741 (2012) at ¶ 22 (goals include "promoting competition in the U.S. telecommunications service market [and] opening foreign markets to U.S. investors" and to *"promote effective competition in the global market for communications services* and to encourage foreign market opportunities for U.S. carriers"); Remarks of FCC Chairman Genachowski, 2012 FCC LEXIS 4692 (2012) at [*10] ("The U.S. supports ... *continued growth and expansion of a vibrant, competitive international communications and Internet sector"); International Settlement Rates,* Report and Order, 12 FCC Rcd 19806 (1997) at ¶ 128 (*"the most effective way to ensure that consumers pay economically efficient, cost-based rates is through the development of effectively competitive markets"*); *Policy Statement on International Accounting Rates,* Policy Statement, 11 FCC Rcd 3146 (1996) at ¶ 2 ("Our policies should enable us to *embrace and encourage competition as it emerges.* They should not impede innovations that would lower prices and create new ways of organizing the supply and distribution of international communications services. This Policy Statement realigns our policies *to encourage competition and technological innovation"*); *Amendment of the Commission's Regulatory Policies to Allow Non-U.S.-Licensed Space Stations to Provide Domestic and International Satellite Service in the United States and Amendment of Section 25.131 of the Commission's Rules and Regulations to Eliminate the Licensing Requirement for Certain International Receive-Only Earth Stations and Communications Satellite Corporation Request for Waiver of Section 25.131(j)(1) of the Commission's Rules As It Applies to Services Provided via the Intelsat K Satellite,* Notice of Proposed Rulemaking, 11 FCC Rcd 18178 (1996) at Appendix A, ¶ B ("The Commission seeks to establish standard rules and procedures to regulate foreign entry into the U.S. satellite services market *in order to promote competition, prevent anti-competitive conduct in the market for international communications services, and open foreign communications markets"*); *Application of General Electric Capital Corporation, Transferors, and SES Global, S.A. Transferees, for Consent to Transfer Control of Licenses and Authorizations Pursuant to Sections 214(a) and 310(d) of the Communications Act and Petition for Declaratory Ruling Pursuant to Section 310(b)(4) of the Communications Act,* Order and Authorization, 16 FCC Rcd 17575 (Chief, Int'l Bur. & Chief, Wireless Telecommunications Bur. 2001) at ¶ 2 (approving merger with "potential to create economies of scale and scope that will *enhance competition in both the U.S. domestic and international communications services markets and thereby encourage lower prices and expanded service offerings"*); *Australia-Japan Cable (Guam) Limited; Application for License to Land and Operate in the United States a Private Submarine Fiber Optic Cable Extending Between Australia, Guam, and Japan,* Cable Landing License, 15 FCC Rcd 24057 (Associate Chief, Telecommunications Div. 2000) at ¶ 19 (FCC has "noted the *importance of promoting the expansion of capacity and facilities-based competition, which will result in innovation and lower prices for U.S. consumers of international communications services"); GE American Communications, Inc., et al., Application for Consent to Transfer of Earth Station License of Columbia Communications Corporation,* Order and Authorization, 15 FCC Rcd 11590 (Chief, Int'l Bur. 2000) at ¶ 1 (granting approval of merger that will allow the merged entity *"to compete more effectively in the global telecommunications market. The resulting competition will lead to wide service offerings and lower prices for consumers"*).

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

FCC has taken any number of steps to create an environment where such rates can be bypassed. As noted above, almost 20 years ago the FCC expressly recognized that using the Internet to get calls to foreign countries can help avoid high rates (like the one Digicel-Haiti is trying to uphold in this case). As the FCC stated in 1998:

> We are aware ... that "services and technologies that bypass the settlements regime" ... are available for carriers seeking *to avoid the legal monopoly ... in some countries that are legally closed to competition. We find it encouraging* that such activity is putting pressure on settlement rates in those countries. Such methods of termination may not be a realistic alternative, however, for the termination of large amounts of traffic, *particularly where termination of traffic in such a manner is illegal in the foreign country.*[note 119]
>
> [note 119] Internet telephony is a promising means of bypassing the traditional settlements system. At present, however, such services remain cumbersome for the average user and account for a minimal amount of international voice traffic.

*1998 Biennial Regulatory Review* at ¶ 63 (emphasis added; footnotes omitted except as shown).

The point bears emphasis: the FCC was "encourage[ed]" by the use of Internet telephony to "avoid the legal monopoly" in countries – like Haiti – where such competition is banned. The FCC pointedly does not chastise United States entities for violating the laws of those monopolistic countries. Quite the contrary: it bemoans the fact that the illegality will likely make Internet-based competition less effective.

The earlier FCC statement was no fluke. As recently as 2010, the FCC was actively encouraging United States citizens traveling abroad to use the Internet to avoid high charges imposed by foreign wireless carriers. News Release, "FCC ANNOUNCES WIRELESS WORLD TRAVEL WEEK, FCC and Wireless Providers Offer Money-Saving Calling Tips for Foreign Travel," 2010 FCC LEXIS 3782 (2010) ("*Internet calling is a cheap (sometimes free) way of making calls*. Calling over the Internet with Voice over Internet Protocol (VoIP) is a good option where there is access to high-speed Internet or a Wi-Fi hotspot. VoIP calls are cheaper than traditional calls ... Also, ... it's important to *make sure that the phone does not automatically connect to an international mobile network, which can be more expensive*") (second emphasis added). Again, the FCC is encouraging US consumers to avoid high prices

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

charged by foreign wireless carriers – like Digicel Haiti.

In these circumstances, even if Digicel-Haiti had alleged that Haitian law required UPM to pay $0.23/minute, the correct response by a court applying Oregon law would be to direct Digicel-Haiti to Haitian courts to try to enforce that right. It has no place in United States courts, where our nation's policies favor open competition, new technology, and lower rates for consumers – even in foreign countries where wireless providers want to charge high rates.[12]

As discussed below, the State of Oregon, ultimately, has no cognizable legal interest in the rates applicable to (or technical arrangements regarding) international telephone calling; such matters are preempted by federal law. But there is no need to reach the preemption issue because, to the extent that Oregon might have an interest, it would be fully aligned with that of the United States itself – the promotion of competition and low rates for consumers.[13] From this perspective, doubtless some Oregon consumers from time to time make calls to Haiti and, as with the policy of the United States, the public policy of Oregon would support driving rates for those calls down towards the actual economic cost of the service being provided – not giving high fees to monopolistic providers.

The FCC has had occasion to consider when and whether domestic resources

---

[12]    In this regard, 47 U.S.C. § 157(a) states that "It shall be the policy of the United States to encourage the provision of new technologies and services to the public. Any person or party ... who opposes a new technology or service proposed to be permitted under this Act shall have the burden to demonstrate that such proposal is inconsistent with the public interest." Here, Digicel-Haiti is essentially arguing that UPM's innovative technologies, that enable less expensive calling from the United States to Haiti, should be banned and suppressed. If Digicel-Haiti believes that it can make that case to the FCC, it is free to try to do so, *see* Section II.F., *infra*. But this Court should not lightly entertain such anticompetitive, anti-innovation claims in the context of this case.

[13]    For example, with regard to intra-Oregon telephone services subject to the authority of the state, 57 ORS § 759.015 states that "it is the goal of the State of Oregon to secure and maintain high-quality universal telecommunications service at just and reasonable rates for all classes of customers and to encourage innovation within the industry by a balanced program of regulation and competition." According to FCC estimates, a rate of $0.23/minute is more than twice the actual cost that a carrier like Digicel incurs in terminating traffic. *ISP Reform Order, supra* at ¶ 83 (estimated cost of terminating a minute of traffic overseas estimated in 1997 to be $0.06 - $0.09 per minute). Given this, the $0.23/minute rate is clearly not "just and reasonable." In addition, permitting Digicel-Haiti to punish UPM for trying to compete by getting calls to Haiti at a lower rate is clearly contrary to this policy as well.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

should be expended to enforce anticompetitive laws and regulations of foreign nations. In rejecting the idea that the United States should do so, it stated:

> Congress directed the Commission "to provide for a pro-competitive, deregulatory national policy framework," and mandated, that with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services. We believe that the Congressional mandate to foster competitive telecommunications markets is instructive in the current context when assessing the international regulatory environment. *We find that the benefits of supporting clear and consistent policies that promote all forms of competition outweigh any benefits derived from recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.*
>
> By no longer enforcing prohibitions against [a particular competitive calling method] in foreign countries, we are not rejecting the sovereign rights of any foreign government or limiting the ability of a foreign government to adopt and enforce policies to prohibit [that method] within its jurisdiction. *Rather, we are re-emphasizing our standing policy to encourage competition in all markets, both developed and developing.* We will continue to work in various fora to promote network expansion and universal access. *We encourage a pro-competitive ... policy that extends to the international marketplace, embraces free and open competition, and benefits U.S. consumers as well as the global community by ensuring lower prices, new and better products and services, and greater consumer choice.* Indeed, we believe that eliminating [foreign country] prohibitions [on the competitive calling method] enhance competition throughout the global marketplace.

*Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service,* Order, 18 FCC Rcd 6077 (2003) ("*International Call-back Order*") (emphasis added, footnotes omitted).

This logic eviscerates the SAC's tort claims. The fraud claim is based on the notion that Digicel-Haiti has a legitimate interest in receiving the $0.23/minute rate. *See* SAC at ¶ 218. But that is precisely the interest that United States (and Oregon) public policy seeks not to protect, but to defeat. Similarly, the conversion claim is based on the idea that by not paying the full $0.23/minute rate to Digicel-Haiti, UPM has "wrongfully retained possession and/or secreted away revenues of" Digicel-Haiti. SAC at ¶ 221. Again, the only "revenues" at issue here are those attributable to the $0.23/minute rate. Finally, Digicel-Haiti's unjust enrichment claim is entirely based on the notion that UPM "retained" revenues and profits supposedly

Page 17 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

"justly" belonging to Digicel-Haiti, a claim that derives entirely from the $0.23/minute rate. In each case, to the extent that Digicel-Haiti is arguably "damaged" by virtue of not collecting the full $0.23/minute rate on some calls, that "damage" is something that it is the policy of the United States (and, to the extent it has an interest, Oregon) to *encourage*. The tort law of Oregon, therefore, should not be construed to provide a remedy for that sort of "damage." And because it is not legally cognizable "damage," Digicel-Haiti has not adequately pled any tort claims. *See, e.g., Musgrave v. Lucas,* 193 Ore. 401, 410, 238 P.2d 780 (1951); *Webb v Clark,* 274 Ore. 387, 391, 546 P.2d 1078 (1976) ("damage" is a required element of the tort of fraud).

### 2.   The Haitian Regulatory Materials Provided By Digicel-Haiti Do Not Support Imposing Liability On UPM.

Even if Oregon tort liability could, in theory, be founded on Haitian regulations, the materials Digicel-Haiti provided do not support liability for UPM. Those materials do show that CONATEL (the Haitian regulator) was concerned about "bypass" which includes sending international calls to Haiti that look like local calls. But they do not authorize charging entities in UPM's position for such calls. Instead, they authorize certain specific actions within Haiti that CONATEL or Haitian carriers can take to deal with such traffic.

First, Haitian carriers may disconnect local numbers used to deliver international calls. Doc. 59-1 at 4. Second, CONATEL established monitoring devices on the premises of Haitian Internet Service Providers ("ISPs") to evaluate how much inbound Voice-over-Internet-Protocol ("VoIP") traffic each ISP was handling. Doc. 59-2 at 14-15. Third, CONATEL blocks Internet Protocol (IP) addresses used by Haitian ISPs to receive inbound international VoIP calls. Doc. 60 at 8; Doc. 61 at 16. Finally, CONATEL identified different classes of VoIP traffic and indicated that for certain types of traffic, a "termination agreement" is required, Doc. 60 at 14-15. The document does not directly specify who the parties to such an agreement should be, but it does say ISPs "are responsible for the use made of their networks," *id.* at 16. This means that to the extent that Digicel-Haiti believes it is entitled to payment for international calls that UPM sent via the Internet, its remedy is to pursue recovery, not from UPM, but, from the Haitian ISPs

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

from whose networks the calls were introduced into the Haitian telephone system. Moreover, while UPM's Internet-based service does not appear to neatly fit into any of the categories of VoIP calls identified in the document, it appears most closely to fit the description in Section 2.4 on page 15 of Doc. No. 61. In that case, CONATEL requires the parties to establish a "termination agreement." It does not authorize Digicel-Haiti to impose any particular charges on UPM in the absence of such an agreement. In this regard, note that the SAC specifically denies that there is any contractual relationship between UPM and Digicel-Haiti. *See* SAC at ¶ 40.

Given that CONATEL is trying to stifle competition, the overall approach in these regulatory documents makes sense.[14] But this approach is limited to actions that Haitian carriers may take within Haiti, and that CONATEL may take against entities in Haiti. Nothing in these materials suggests that CONATEL has authorized Haitian carriers to seek payment directly from non-Haitian entities like UPM. In other words, CONATEL – unlike Digicel-Haiti – understands that the territorial reach of its regulatory policies is limited to Haiti itself. Given this, nothing in these documents suggests that CONATEL would expect its Haiti-specific regulatory requirements to be embodied in the tort law of the State of Oregon.[15] As a result, even if Oregon could or should embed Haitian regulations into its tort law, that would not result in liability for UPM in this case. This is yet another reason that the SAC should be dismissed.

### 3. Oregon Tort Law Does Not Require Digicel-Haiti To Send Call Identifying Information That It Is Technically Unable To Send.

As discussed above, the key thing that UPM supposedly did wrong was to

---

[14]    The FCC has noted that high call termination rates create incentives for those who benefit from them to try to stifle competition, including, specifically, competition from Internet-based services. *See International Settlement Rates,* Report and Order, 12 FCC Rcd 19806 (1997) at ¶ 7 n.8 ("the current system of inflated settlement rates has created incentives for monopoly IMTS providers to restrict or prohibit the provision of other services, such as Internet …, which could potentially undermine their settlement payments"). This is obviously what has occurred in Haiti.

[15]    Note that the SAC alleges that Digicel-Haiti operates entirely and exclusively in Haiti. SAC at ¶ 15. This confirms that questions of whether Digicel-Haiti is getting paid the right amount (in Haiti) or is receiving the signaling information it wants (in Haiti) are questions to be resolved in Haiti.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

"misrepresent" the origin of calls it sent to Haiti by failing to send signaling information that would identify the end users originating the calls. Nothing in the SAC, however, supports the conclusion that UPM had any legal duty under Oregon tort law to send that information. As noted above, there is no statute, regulation, contract, industry standard, or any other source of authority that might suggest that UPM had a duty to send the signaling information that Digicel-Haiti wants. Because UPM had no such legal duty, and because the SAC does not allege one, Digicel-Haiti's tort claims should be dismissed for failure to state a claim.

### 4. Oregon Tort Law Does Not Require Digicel-Haiti To Route Calls To Haiti By Means Of One Of Digicel-Haiti's Gateway Switches.

To the extent that Digicel-Haiti's real claim is that UPM acted wrongfully by failing to route Haiti-bound calls through one of Digicel-Haiti's gateway switches, that claim also fails. The SAC vaguely alleges that "legitimately" routed calls will traverse its gateway switches, *see* SAC at ¶¶ 22-29, 52, 70, but that innuendo does not even rise to the level of a conclusory legal assertion. Oregon tort law has no concern for or interest in how international telecommunications traffic is or is not routed, but this aspect of Digicel-Haiti's claims fails on its own terms. In order for Digicel-Haiti to properly allege that UPM committed a tort by not routing calls to a gateway switch, Digicel-Haiti would need to have alleged some basis for finding that UPM had a legal duty under Oregon tort law to do so. It has not alleged any case law, statute, contractual, or regulatory basis for such a duty.

As described above, to the extent that Oregon law is relevant at all, the public policy of Oregon, like that of the United States, is to promote competition, the delivery of telecommunications services using innovative technology, and lower costs of service for Oregon consumers. All of those policies would be defeated by finding that Oregon law somehow compelled UPM to use one of Digicel-Haiti's gateways to get calls to Haiti. All of the SAC's tort claims should be dismissed for this reason as well.

Page 20 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**C.    All Claims Regarding The Roam-Like-You're-Home Service Should Be Dismissed Because Digicel-Haiti Has Not Pled Any Cognizable Legal Claims With Respect To Those Services.**

Independent of any of the problems discussed above, Digicel-Haiti's claims regarding resale of the RLYH service should be dismissed because the SAC does not allege that UPM violated any legal duty with respect to that traffic.

At the outset, Digicel-Haiti does not allege that UPM's actions with respect to the RLYH service violated any contractual duty UPM owed to Digicel-Haiti. This is significant because the SAC alleges that it is necessary to pay a separate fee to Digicel-Haiti in order to activate a SIM card as part of the RLYH service, and to agree to the terms of service that Digicel-Haiti establishes for RLYH. SAC at ¶ 128. If Digicel-Haiti had wanted to ban resale of RLYH service it would have been a simple matter to state, in its terms of service, that RLYH service may not be resold. Since there is nothing inherently unlawful or wrongful about reselling a telephone service purchased at retail, the fact that the SAC does not allege any legal basis for forbidding resale means that UPM had no obligation, in the United States, not to do so.

Digicel-Haiti tries to blur this point by using vague, suggestive language without any legal significance. For example, it claims that the "intended" use of RLYH is by an individual traveling to the United States. *See* SAC at ¶ 130. It does not, however, allege that this "intent" (presumably, Digicel-Haiti's) is embodied in any legally binding document or any other source of a legal obligation. Similarly, it claims that UPM used the RLYH service for "unauthorized, commercial purposes." SAC at ¶ 202. This language implies that there is some contractual (or other) obligation on UPM to use the RLYH service only in certain specified, "authorized" ways. But Digicel-Haiti makes no allegation that would identify what legally binding document (or other source of legal obligations) contains such a provision. In the absence of a legally binding restriction on UPM that would bar it from reselling the RLYH service in the

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

United States, Digicel-Haiti has failed to state a claim for relief with respect to that service.[16]

Moreover, Digicel-Haiti forthrightly admits that with respect to UPM's resale of RLYH service, Digicel-Haiti indeed received its desired $0.23/minute rate for each minute of service that UPM resold: the SAC states that for RLYH calls, "the US wireless carrier" – the entity that picks up the RLYH call from UPM and takes it to a Digicel-Haiti gateway – "is billed on behalf of Digicel-Haiti, and pays, a minimum of $0.23/minute." SAC at ¶ 136. As a result, whether or not Digicel-Haiti approves of, or has "authorized," or "intended," UPM's resale of the RLYH service, Digicel-Haiti has not been damaged by UPM's actions. For this reason as well, all claims related to the RLYH service must be dismissed.

D.    **The Conversion And Unjust Enrichment Claims Should Also Be Dismissed Because They Depend On Digicel-Haiti Having A Legally Recognized Right To Monopolize Getting Calls From The United States To Its Customers In Haiti – Which It Plainly Does Not Have.**

The SAC claims that UPM's actions in delivering calls to Haiti amount to the tort of conversion by virtue of having "retained possession and/or secreted away revenues of Plaintiff with the intent to permanently deprive Plaintiff of such revenues" and having "improperly kept these revenues for themselves or have used such revenues for their own benefit." SAC at ¶¶ 221-22. The allegations in the SAC do not properly plead a tort of conversion.

The basic tort of conversion in Oregon follows the Restatement (Second) of Torts, Section 222A: "Conversion is an intentional exercise of dominion or control over personal property which so seriously interferes with *the right of another to control it* that the actor may be justly required to pay the full value of the personal property" (emphasis added). *See Joe Hand Promotions, Inc. v. Jacobson,* 874 F. Supp. 2d 1010 (D. Ore. 2012). Digicel-Haiti does not allege that UPM literally pilfered money ("revenues") from Digicel-Haiti's coffers. Instead, Digicel-Haiti claims, in effect, that the money that third parties paid to UPM for getting calls to

---

[16]    As a general matter, United States telecommunications law frowns on limitations on the resale of services. *See, e.g.,* 47 U.S.C. § 251(b)(1) (local carriers may not impose unreasonable restrictions on resale).

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Haiti is money that in some sense "belonged" to Digicel-Haiti in the first place.

This claim is problematic, in that Digicel-Haiti obviously had no free-standing, independent right to the money that the third-parties may have possessed. And there is no obvious reason (and certainly no alleged reason) that Digicel-Haiti should be viewed as having a right to get paid for work that was actually done by UPM – that is, the work of getting calls from the United State to Haiti. The only theory on which Digicel-Haiti could be entitled to money that UPM received for work that UPM did is that Digicel-Haiti itself is entitled to any money that anyone else receives for getting calls from the United States to Haiti. In other words, the predicate of Digicel-Haiti's conversion claim is that it has an enforceable right to a monopoly on the transport of calls from the United States to Haiti. In terms of the definition of conversion, Digicel-Haiti may have alleged that UPM has "exercise[d] ... dominion or control over" the revenue in question, but it has not alleged why or how Digicel-Haiti itself supposedly has "the right ... to control it." Any claim by Digicel-Haiti that it actually *has* an enforceable right to a monopoly on carrying calls between the United States and Haiti would obviously be absurd. The conversion claim must, therefore, be dismissed.

This same logic applies to Digicel-Haiti's unjust enrichment claim. None of the allegations in the SAC suggest that UPM took money from Digicel-Haiti that it should not have taken. The claim is simply that UPM got paid for performing a service – getting calls from the United States to Haiti – on which Digicel-Haiti is (implicitly) claiming a monopoly. That is, UPM's activities were only "unjust" if Digicel-Haiti is entitled to 100% of the market for getting calls from the United States to its customers in Haiti. The SAC does not allege any such right, and no such right exists, so the unjust enrichment claim must be dismissed as well.

### E.    The SAC Should Be Dismissed Because The Oregon Tort Law On Which Digicel-Haiti Relies Is Preempted By The Communications Act.

All of Digicel-Haiti's complaints about UPM's alleged actions are entirely governed by the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* The laws of the State of Oregon – including its common law of torts such as fraud – have no role to play in

resolving any disputes that might exist between these parties with respect to compensation for, or interconnection arrangements with respect to, calls between the United States and Haiti.

As the Ninth Circuit has observed, "'[m]any federal statutes ... will support a defendant's argument that because federal law preempts state law, the defendant cannot be held liable under state law.'" *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938 (9th Cir. 2014), *quoting Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005). That is precisely the situation here. The Communications Act grants full and complete authority over international communications to the FCC, and fully occupies the field of carrier-to-carrier technical and financial arrangements for handling international traffic.

The purpose of the Communications Act is "regulating interstate and foreign commerce by wire and radio." 47 U.S.C. § 151. It applies "to *all* interstate and *foreign communication* by wire or radio." 47 U.S.C. § 152(a) (emphasis added). "Foreign communication" means "any communication ... from or to any place in the United States to or from a foreign country." 47 U.S.C. § 153(21). Under these provisions, the FCC has "exclusive jurisdiction" over foreign communications and entities engaged in providing foreign communications. *See, e.g., Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, Memorandum Opinion and Order, 19 F.C.C. Rcd. 22404 (2004) at ¶ 17 ("When a service's end points are in different states *or between a state and a point outside the United States*, the service is deemed a purely interstate service *subject to the Commission's exclusive jurisdiction*") (emphasis added). This point is extremely well-established, as shown by the materials cited in the footnote.[17]

---

[17] The courts and the FCC itself have long recognized the agency's plenary and exclusive jurisdiction over international communications. We provide illustrative citations below. In all quotations, footnotes and citations are omitted and emphasis is supplied. *North Carolina Utilities Commission v. FCC*, 537 F.2d 787, 793 (4th Cir. 1976) (referring to "*plenary jurisdiction over the rendition* of interstate and *foreign communication services* that the Act has conferred upon" the FCC); *Federal-State Joint Board on Universal Service*, Report & Order, 12 FCC Rcd 8776 (1997) at ¶ 836 (47 U.S.C. § 152(a) "grants the [FCC] *sole jurisdiction over interstate and foreign communications*"); *MTS and WATS Market Structure; Amendment of Part 67 of the Commission's Rules and Establishment of a*
(note continued)...

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

There are certainly aspects of the operations of carriers such as UPM and Digicel-Haiti that would not fall under the FCC's authority. Compliance with environmental laws, for example, is not within the purview of the FCC. The entire subject matter of this case, however, relates to how traffic from the United States to Haiti should be routed, how much UPM should

---

…(note continued)

*Joint Board,* Memorandum Opinion and Order, 1986 FCC LEXIS 4053; 59 Rad. Reg. 2d (P & F) 1127 (1986) at ¶ 23 ("In enacting the Communications Act of 1934, ***Congress clearly intended to give this Commission sole jurisdiction over 'interstate and foreign communication by wire or radio'***"); *MTS and WATS Market Structure, Phase III; Establishment of Physical Connections and Through Routes Among Carriers; Establishment of Physical Connections by Carriers With Non-carrier Communications Facilities; Planning among Carriers For Provision of Interconnected Services, and in Connection with National Defense and Emergency Communications Services; and Regulations for and in Connection with the Foregoing,* Notice of Proposed Rulemaking, 94 F.C.C.2d 292 (1983) at ¶ 22 ("Under the Act, ***the FCC is granted jurisdiction over interstate and foreign communications by wire and radio generally***, but jurisdiction is reserved to the states over intrastate and exchange communications. …[O]ften the same facilities are employed both for provision of interstate and foreign communications subject to our direct jurisdiction, and for the intrastate and exchange services over which state authority is reserved. In such circumstances, under developed case law ***the FCC has plenary jurisdiction over interconnection even to [local] facilities, where such interconnection is required for interstate and foreign communications to proceed***"); *Establishment of Interstate Toll Settlements and Jurisdictional Separations Requiring the Use of Seven Calendar Day Studies by the Florida Public Service Commission,* Memorandum Opinion and Order, 93 F.C.C.2d 1287 (1983) at ¶ 14 ("Congress has imparted to the Commission ***broad, plenary authority for the regulation and administration of interstate and foreign communications***"); *Commercial Communications, Inc., et al.; Petition For Declaratory Ruling Alleging Inconsistency Between Federal "Interconnection" Decisions And An Oklahoma Corporation Commission Rule Regulating Use and Supply Of Customer-Provided Telephone Equipment,* Memorandum Opinion and Order, 81 F.C.C.2d 106 (1980) at ¶ 26 ("It is well established that '***the Commission has plenary and comprehensive regulatory jurisdiction over interstate and foreign communication services and facilities of common carriers and all of the terms and conditions upon which such services and facilities are offered to the public***'"); *Bell System Tariff Offerings Of Local Distribution Facilities For Use By Other Common Carriers; And Letter of Chief, Common Carrier Bureau, Dated October 19, 1973, to Laurence E. Harris, Vice President, MCI Telecommunications Corp.,* Decision, 46 F.C.C.2d 413 (1974) at ¶ 6 (interconnection of equipment and private lines used in connection with foreign communications services "***are within the exclusive jurisdiction*** of the Commission"); *Telerent Leasing Corp. et al. Petition for Declaratory Rulings on Questions of Federal Preemption on Regulation of Interconnection of Subscriber-Furnished Equipment to the Nationwide Switched Public Telephone Network,* Memorandum Opinion and Order, 45 F.C.C.2d 204 (1974) at ¶ 27 ("That ***the Commission has plenary and comprehensive regulatory jurisdiction over interstate and foreign communications services and facilities of common carriers*** and all of the terms and conditions upon which such services and facilities are offered to the public is evident from the provisions of the Communications Act. It appears equally evident from those provisions that in those instances ***where the rendition of interstate and foreign service is dependent upon plant facilities which are also used for [local] or other intrastate services, the Federal role must be controlling***").

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

pay Digicel-Haiti to terminate that traffic, calls, and what signaling information should accompany it.   Such matters are governed by 47 U.S.C. §§ 201-202: "charges, practices, classifications, and regulations for and in connection with [foreign] communication service, shall be just and reasonable," 47 U.S.C. § 201(b); "unreasonable discrimination in charges, practices, classification, regulations, facilities or services for or in connection with like [foreign] communications service" is deemed unlawful. 47 U.S.C. § 202(a).

Moreover, the FCC has an entire bureau – the International Bureau – devoted to developing and implementing the FCC's policies regarding international telecommunications. *See* 47 C.F.R. § 0.51.   While the FCC's specific policies regarding foreign communications have evolved over time, there is no question that the agency retains full authority with respect to such matters and will intervene to deal with complaints regarding international calling upon the request of an affected carrier. *See International Settlements Policy Reform,* Report and Order, 27 FCC Rcd 15521 (2012) ("*International Settlements Reform Order*) at ¶¶ 30-70.

It is also clear that Digicel-Haiti's claims fall within the scope of the FCC's exclusive jurisdiction.   First, Digicel-Haiti is at bottom complaining about an asserted right to get paid $0.23/minute for calls that UPM routes from the United States to Haiti.   That complaint is clearly about a "charge … in connection with" a foreign communication service, under the FCC's authority under Section 201(a).   In this regard, the FCC has plenary authority regarding the amounts that carriers pay to send each other traffic, whether domestically or internationally. For example, where more than one carrier is involved in getting a call from the calling party to the called party, the FCC has the authority to establish the division of charges among the affected carriers.   *See* 47 U.S.C. § 201(a) (FCC, after a hearing, may "establish through routes and charges applicable thereto and the division of such charges").   Moreover, while the FCC has chosen not to directly regulate the amounts that a United States carrier must or may pay to a foreign carrier, it expressly retains authority to consider disputes between United States and foreign carriers regarding the delivery of, and charges for, calls originating in the United States and bound for a foreign country. *International Settlements Reform Order, supra.*

Page 26 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

Second, Digicel-Haiti is also complaining about the physical routing of calls from UPM to Haiti, asserting that such calls must go through one of Digicel-Haiti's gateways in Miami or New York. UPM never directly interconnected its own network equipment with that of Digicel-Haiti; it has either used the Internet (a publicly available network physically provided by any number of entities) to send traffic to an ISP or similar entity in Haiti, or (for RLYH calls) it connected via SIM cards to domestic United States wireless carriers. The FCC has plenary authority over arrangements between carriers to interconnect their networks and exchange traffic. Section 251(a) of the Communications Act obliges all telecommunications carrier to interconnect their respective networks "directly or indirectly." 47 U.S.C. § 251(a). UPM connected indirectly. If Digicel-Haiti wants to demand direct interconnection (at its Miami and/or New York switches), it is free to ask the FCC to require such an arrangement under Section 201(a), which empowers the FCC to order direct physical interconnection, after a hearing, where "such action [is] necessary or desirable in the public interest." The relevant question will be whether it is "just and reasonable" and "not unreasonably discriminatory" to require UPM to interconnect at one of those locations or, from Digicel-Haiti's perspective, whether UPM has acted in an "unjust" or "unreasonable" or somehow "discriminatory" manner by instead getting calls to Haiti via the Internet.[18]

Third, Digicel-Haiti was dissatisfied with the call signaling information it got with respect to calls that UPM handled. As noted, UPM and Digicel-Haiti are not directly interconnected, so it is not at all clear that UPM is in a position to affect what signaling data Digicel-Haiti gets from the entities with which it *is* directly connected. But assuming that UPM has some role to play, provision of signaling information is a "practice … in connection with" foreign communications." The question of whether UPM's "practices" in this regard are just,

---

[18]    Given that the FCC has the exclusive authority to require direct physical interconnections between carriers, Digicel-Haiti's allegations regarding an "established" or "expected" arrangement to route of calls via its gateways have no legal significance. Again, if Digicel-Haiti thinks that UPM should route traffic to a specific Digicel-Haiti location it is free to seek an FCC order directing UPM to do so.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

reasonable, and not unreasonably discriminatory is embraced by 47 U.S.C. §§ 201-202.

These matters clearly fall within the FCC's exclusive jurisdiction over foreign communications. The common the law of Oregon has nothing to contribute to them, and no role to play with respect to them. To the contrary, any matter that involves that questions of whether and to what extent the United States should respect, ignore, or oppose the telecommunications policies of other nations, that is a matter for the FCC – not for the courts, and not for any state. *See International Call-back Order, passim* (concluding that international comity did not require acceptance or enforcement of other nations' anticompetitive laws and regulations).

The preemption issue here is similar to that in *Broyte v. Gotham Towers, Inc.,* 13 F.3d 994 (6th Cir. 1994). There, plaintiffs sought to invoke tort law (the law of nuisance) to object to claimed negative impacts arising from wireless telephone service broadcasts from a tower near their properties. The Sixth Circuit upheld the district court's dismissal of the case on preemption grounds. The court reasoned that because Congress had given the FCC exclusive jurisdiction with regard to authorizing wireless transmissions, there was no role for state tort law to play in resolving the dispute. 13 F.3d at 997-98. The same result applies here: Congress has fully occupied the field of international communications by passing the Communications Act and empowering the FCC to implement it, and Oregon tort law has nothing to add.

This case is also similar to *Boomer v. AT&T Corp.,* 309 F.3d 404 (7th Cir. 2002). In that case, the court dismissed state-law claims challenging some of the terms and conditions included in AT&T's consumer contracts governing interstate long distance service. Even though the FCC had detariffed those services, so that the terms and conditions were embodied in contracts rather than tariffs, the relevant standard for reviewing those terms and conditions remained Sections 201 and 202 of the Communications Act, so state-law challenges to those terms and conditions were preempted. Again, the same result applies here. The FCC does not formally prescribe the specific terms (including price) on which United States and foreign carriers must interconnect to handle traffic outbound from the United States, but the agency's jurisdiction over such arrangements remains exclusive and plenary. Indeed, the FCC has made

Page 28 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

clear that it is available as a forum for resolving disputes that may arise with respect to such arrangements. *See International Settlements Reform Order, supra.* So, as in *Boomer,* all state-law consideration of the financial and technical arrangements between UPM and Digicel-Haiti regarding calling from the United States to Haiti are preempted.

The application of Oregon common law torts such as fraud, conversion, etc., is entirely preempted in the circumstances of this case. As a result, those claims, along with the RICO claims that derive from them – that is, the entire SAC – must be dismissed.

**F.    Digicel-Haiti's Complaint Should Also Be Dismissed On Grounds Of Primary Jurisdiction.**

Even if some elements of Digicel-Haiti's claims could be deemed to survive, the Court should still dismiss this entire action under the doctrine of primary jurisdiction. When a claim requires "resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," the doctrine of primary jurisdiction mandates suspension of judicial proceedings "pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63-64 (1956). The 9th Circuit has identified the following factors to consider in applying the doctrine of primary jurisdiction:

> Primary jurisdiction applies … if a claim "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency," *id.* (*citing Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 442, 27 S. Ct. 350, 51 L. Ed. 553 (1907)), and if "'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme,'" *id.* (*quoting United States v. Gen. Dynamics Corp.,* 828 F.2d 1356, 1362 (9th Cir. 1987)).

> …

> Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *Davel Commc'ns, Inc. v. Quest Corp.,* 460 F.3d 1075, 1086 (9th Cir. 2006) (internal quotation marks and citation omitted), we have traditionally examined the factors set forth in *General Dynamics,* and held that the doctrine applies in cases where there is: "(1) [a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration," *Syntek,* 307 F.3d at 781 (*citing Gen. Dynamics,* 828 F.2d at 1362). In considering these factors, we have previously explained that the primary

Page 29 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

> jurisdiction doctrine is designed to protect agencies possessing "quasi-legislative powers" and that are "actively involved in the administration of regulatory statutes." *Gen. Dynamics,* 828 F.2d at 1365. Charged with the administration of the Telecommunications and Federal Communications Acts, the FCC is such an agency. See 47 U.S.C. §§ 151, 154.

*Clark v. Time Warner Cable,* 523 F.3d 1110, 1114-15 (9th Cir. 2008).

The matters raised in Digicel-Haiti's complaint plainly meet this test. Resolving the case requires a determination of whether and when Digicel-Haiti was entitled to $0.23/minute for terminating calls from the United States and, if so, whether UPM acted unreasonably by using the Internet to get calls to Haiti, rather than interconnecting with Digicel-Haiti at its New York and Miami locations. These are clearly issues that Congress, via the Communications Act – "a statute that subjects an industry or activity to a comprehensive regulatory authority" – has committed to the FCC. Moreover, administering the Communications Act – both in general and in the specific areas of charges for international calling, use of the Internet to facilitate such calling, etc. – requires both "expertise" and "uniformity in administration."

This latter point bears emphasis. There are any number of entities that, like UPM, facilitate international calling by means of the Internet and other arrangements, such as resale of foreign carrier services, and any number of countries where such carriers directly or indirectly operate. The policy of the United States regarding what practices are or are not considered reasonable or permissible in connection with such calling arrangements should not be decided on an *ad hoc* basis by federal district courts spread across the country. To the contrary, these are matters that should be decided on an integrated, uniform basis by the federal agency charged with regulating – indeed, with exclusive jurisdiction with respect to – foreign communications.

For all the reasons discussed above, Digicel-Haiti's complaint should be dismissed, with prejudice, in its entirety. But if the Court were to conclude that Digicel-Haiti has managed to adequately plead one or more claims, the case should still be dismissed on primary jurisdiction grounds, with Digicel-Haiti invited to bring its concerns about UPM to the FCC. If it does so, and if that agency concludes that any UPM actions were inappropriate under the Communications Act, Digicel-Haiti will have its remedy under that statute. But if (as UPM is

Page 30 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

confident is the case) its actions are entirely just and reasonable under the Communications Act, then it would be anomalous, to put it mildly, to nonetheless permit Digicel-Haiti to recover damages for those same actions under the common law of the State of Oregon.

## II.    CONCLUSION

Digicel-Haiti has alleged, at most, that it would like to receive $0.23/minute for calls from the United States, and that the Haitian government empowers it to seek such compensation. It has not, however, remotely established that it has a legal right to such compensation enforceable in the United States.

Digicel-Haiti has also failed to properly allege that UPM engaged in fraud. Under *Twombly* and *Iqbal,* a plaintiff cannot ignore innocent explanations for the conduct it claims to be actionable. Here, UPM did not sent Digicel-Haiti signaling information indicating the telephone number of United States originating callers because there is no technical means to do so when a new wireless call is initiated on Digicel-Haiti's network (or, for RLYH calls, initiated in Oregon). In the absence of specific allegations explaining what UPM could or should have done to deliver the information Digicel-Haiti says it wants, its claims of fraud fail.

Furthermore, Digicel-Haiti has not explained why Oregon tort law should be construed to cover this matter at all, but even if it could be so construed, that law is entirely preempted by the Communications Act with respect to the matters addressed in the SAC.

Page 31 of 32 - DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT
UPM-L1\00211467.003

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Finally, the FCC, not this Court, is the proper forum for any disputes about the technical means by which UPM got calls to Digicel-Haiti or the compensation (if any) due to Digicel-Haiti for completing those calls.

Dated: December 9, 2016.

TOMASI SALYER MARTIN

By:     /s/ Kathryn P. Salyer
        Kathryn P. Salyer, OSB #883017
        Eleanor A. DuBay, OSB #073755
        ksalyer@tomasilegal.com
        edubay@tomasilegal.com
        Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By:     /s/ Christopher W. Saage
        Christopher W. Savage
        D.C. Bar #362657
        chrissavage@dwt.com
        Telephone: (202) 973-4200
        *Admitted Pro Hac Vice*

        Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236