IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNIGESTION HOLDING, S.A., | ) | 3:15-cv-00185-SI |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
|        vs. | ) | March 15, 2017 |
| | ) | |
| UPM TECHNOLOGY, INC., | ) | |
| et al., | ) | |
| | ) | |
|    Defendants. | ) | Portland, Oregon |

(Motion Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

<pre>
                             APPEARANCES

FOR THE PLAINTIFF:    Robert C.L. Vaughan
                      Kim Vaughan Lerner LLP
                      100 SE Third Avenue
                      One Financial Plaza, Suite 2001
                      Fort Lauderdale, Florida  33394

                      Richard K. Hansen
                      Schwabe Williamson & Wyatt, PC
                      1211 SW Fifth Avenue, Suite 1900
                      Portland, Oregon  97201


FOR THE DEFENDANTS:   Eleanor A. Dubay
                      Tomasi Salyer Martin
                      121 SW Morrison Street, Suite 1850
                      Portland, Oregon  97204

                      Christopher W. Savage
                      Davis Wright Tremaine LLP
                      1919 Pennsylvania Avenue, NW, Suite 800
                      Washington, D.C.  20006
</pre>

COURT REPORTER:    Dennis W. Apodaca, RDR, RMR, FCRR, CRR
                   United States District Courthouse
                   1000 SW Third Avenue, Room 301
                   Portland, OR  97204
                   (503) 326-8182

(March 15, 2017)

P R O C E E D I N G S

(Open court:)

THE CLERK:  Your Honor, this is the time set for oral argument on defendants' motion to dismiss for failure to state a claim regarding the second amended case.  That's ECF 113.  In civil case 15-185-SI, Unigestion Holding, S.A. versus UPM Technology, Inc., et al.

Could I have counsel in court, beginning with plaintiff, please identify yourselves for the record.

MR. VAUGHAN:  Absolutely.  Good morning, Your Honor.  Robert Vaughan, Kim Vaughan Lerner, representing Digicel.

To my right --

MR. HANSEN:  Richard Hansen with Schwabe.

THE COURT:  Good morning and welcome.

MR. VAUGHAN:  And we have two guests in the courtroom, Your Honor, also representing Digicel, Mr. Tristan Gilbertson and Mr. David Geary, who you've met in the past.

THE COURT:  Welcome.

MS. DuBAY:  Good morning, Your Honor.  Eleanor DuBay and Christopher Savage for defendants.

THE COURT:  Welcome.

MR. SAVAGE:  Thank you.

THE COURT:  We are here on defendants' motion to

dismiss the second amended complaint, Docket 113.  I've read all of your papers -- the motion, the response, and the reply. I have re-read some of my prior opinions.  If there is further argument, I would be delighted to hear it.  It is defendants' motion.

MR. SAVAGE:  Yes, Your Honor.  Thank you.

There is a lot in the papers obviously.  What I would like to emphasize today, subject to whatever questions you have, is that there are four completely independent and independently sufficient reasons to dismiss this case.

No. 1, and probably most glaring, what we spent some time on, is the complete failure to provide any justification for the 23-cent rate, which is the linchpin of their case.

THE COURT:  When you say it is the linchpin, I don't really follow that, because they are not saying that they have a right to receive 23 cents and you've deprived them of that right.  They are saying that your clients have committed fraud, either by misrepresentation or by active concealment and that, as a result of that fraud, they have been damaged, and part of their measure of damages might be measured by, but for the fraud, they say they would have gotten 23 cents per minute. But that's how I read their complaint.

MR. SAVAGE:  I think that's fair enough, but I also think that's missing a couple of critical points.

THE COURT:  Okay.

MR. SAVAGE: No. 1, and I think first and foremost, the tort of fraud in Oregon requires an allegation of damages, and they have not alleged -- if the 23 cents goes away, and I don't think there is any serious claim that they have justified the 23 cents, read that complaint without a claim that they're entitled to 23 cents, and they allege no harm -- none. "We bought these things at retail, we paid them at retail, and the service was used for a while before they cut us off." That's not harm. That's not damage.

So the problem isn't that we supposedly did all of these terrible things. I was trying to think of a good analogy. Suppose I'm a pirate: I start off in Miami, I kill seven people, I steal their boat, and I take the boat to Haiti. I pollute along the way, and I kill baby dolphins. Then I sneak in by the dark of night, go into the grocery store and buy some sodas, and then I resell the sodas on the street. I may have done a lot of bad, terrible things, but I have not damaged the grocery store.

THE COURT: All right. Let's follow that through.

MR. SAVAGE: Okay.

THE COURT: I own a grocery store. I'm going to try to do this in a way that doesn't have any racial, ethnic, gender, orientation, or any other types of discrimination -- leave that alone. But I put up a big sign "Pirates not welcome."

MR. SAVAGE:  Okay.

THE COURT:  I don't want to sell to pirates.

MR. SAVAGE:  Okay.

THE COURT:  Someone comes to my store, and I say, "Are you a pirate?"  And that person is a pirate and intentionally lies and says, "No, I'm not."  I say, "Fine, come on in," and that person buys from me.

MR. SAVAGE:  Correct.

THE COURT:  You're saying that I cannot sue that person for fraud?

MR. SAVAGE:  Correct.  Because I may have a right on some level.  If I have a right not to sell to pirates --

THE COURT:  And assume you do.

MR. SAVAGE:  If there is a right not to sell to pirates, then, sure, I have violated your right not to sell to pirates, but I haven't caused you any economic damage by doing it.

I don't know if you are including privacy cases, where like, sure, somebody violated the privacy, but there is no actual harm resulting from it.  Here, the reason that the tort law of Oregon and the tort law in most states requires actual damage as an element of the claim, not merely something you have to prove eventually, is people are disappointed and confused and unhappy about things all the time.

On our hypothetical, I might have violated their

deeply felt desire not to sell to pirates, but that's not fraud because it hasn't harmed them in any way. It has made them feel bad.

THE COURT: Well, if I can show the jury at trial that I get a lot of business because I have a reputation of not selling to pirates -- boy, I could think of a lot of substitutions right now for "pirates," but I'm not going there.

So I get a lot of business that I think comes in because I don't sell to pirates. Now, it gets out that I do sell to pirates, and I'm pretty easily deceived, and people may imply that I look the other way when pirates come in, and maybe that costs me some business. Well, obviously that would be something that could go.

MR. SAVAGE: Possibly, except they haven't actually alleged that in any meaningful fashion. And I address that in the papers. The stress on their network is just complete fluff. I mean, the calls come through one way or another. There is no differential stress on the network.

Goodwill? They say, "Oh, it hurts our goodwill." But they allege exactly zero facts -- none -- that suggest any actual harm to goodwill. That is the classic conclusory allegation of something that doesn't have actual fact.

THE COURT: You may be right on summary judgment, but where, on a motion to dismiss standard, do they have to allege the harm that you're describing?

MR. SAVAGE:  That's the Twombly and Iqbal point.

THE COURT:  Well, I know Twombly and Iqbal.  They are not damage claims.

MR. SAVAGE:  I know.  But the point is, given that damage is an element of the claim, you have to look at what they've actually pled through a pragmatic light and say, "Have they pled enough that there is something here?"  I would submit to you, with respect to the damage element of the cause of action of fraud, they have failed to plead enough.

THE COURT:  Under Oregon fraud law, can someone make a claim, like my grocery store owner, make a claim and say this:  "If I can't prove actual damages at trial, so be it, but I will ask for one dollar in" -- I am drawing a blank.

MR. SAVAGE:  Exemplary damages.

THE COURT:  Exemplary damages, I guess.

MR. SAVAGE:  Nominal damages.

THE COURT:  Nominal damages, yes.  Nominal damages and punitives, because Oregon does allow punitives for misrepresentation.  Can I ask the jury under Oregon common law fraud for nominal damages and punitives?  I think the answer is yes.

MR. SAVAGE:  That's possibly true, but I still don't think it solves the underlying problem, and then we move into my second point --

THE COURT:  Okay.

MR. SAVAGE:  -- which is -- it is not often that I quote Oliver Wendell Holmes in a brief.

THE COURT:  You're welcome to do it more if you want.

MR. SAVAGE:  But the point of tort law is to affect public policy.  One of the things that is a fatal flaw in their claims is that they have not provided any basis to believe -- let's go back to the pirate example.  Why would the tort law of Oregon care that a grocery store in Haiti doesn't want to serve pirates?  That may be an issue for Haitian law.  It may be perfectly fine under Haitian law, and judging from the materials they've submitted, I think it is probably true that the regulators in Haiti wouldn't be very happy with the things that my client is alleged to have done.  But the proper response of Oregon tort law to that is:  So what?

THE COURT:  Doesn't Oregon have an interest in having companies and individuals within its borders not engage in misrepresentation, even if the harm is caused out of state?

MR. SAVAGE:  I would submit to you that depends on a consideration of the nature of the misrepresentation, the nature of the circumstances, and the nature of the service allegedly involved.  I would submit to you that -- what is it? "Extremism in defense of liberty is no vice."  Taking steps to avoid blatantly anticompetitive, antitechnology policies of foreign nations that have the purpose and effect of increasing the amount of money that American consumers pay to make calls

overseas -- I mean, we will get to the preemption point in a minute -- that's not of concern of Oregon at all. But to the extent Oregon is involved in that, Oregon can say, "Yeah, I'm in favor of new technology. I'm in favor of competition. I'm in favor of getting around restrictions," the purpose of which is to do this.

Frankly, from what I've been able to tell from Oregon law -- and I am not an expert. I know a little bit. I have appeared before the Oregon PUC certainly. But to the extent Oregon has a policy about this stuff -- about telecommunications, about bypass, about competition -- they are as in favor of it as the federal government is.

So I would submit to you actually, no. I mean, sure, as a general proposition, of course, the state of Oregon doesn't like misrepresentation, but when you get beyond the generalities and focus on what actually happened here, what actually happened here, my client was trying to find a way to make calling Haiti cheaper. To the extent people in Oregon do that, that's a benefit.

THE COURT: I get that. If and when we ever get to a jury trial, it will be an interesting question whether you do get to make that argument to the jury, and if so, what their reaction is. But before we get there, I want to start unpacking it in sort of seeing the legal framework, and I am going to work up to it this way: If we have an Oregon person

who flies to New York City, and in a business transaction flat out lies to someone in New York, causes economic harm in New York, but nowhere else, just causing that person harm in New York, comes back, and then the New York person decides, "I don't want to fuss around with personal jurisdiction problems; I am just going to sue them in Oregon."

He sues them in Oregon, even though the only harm that was caused was to this person in New York.  There is no doubt that that is cognizable in an Oregon court, right?  I don't think there is, is there?

MR. SAVAGE:  Let's put aside -- I am thinking like a defendant now and personal jurisdiction.  But putting aside all the obvious things that I assume you will -- sure, if there is personal jurisdiction, blah, blah, blah, of course, you can sue in Oregon court or you can sue federal court in Oregon.

THE COURT:  Okay.  Now, instead of that person being in New York, let's say that person is in Haiti or China or Russia or wherever, and part of that defense by the Oregon defendant is:  Well, yeah, maybe I did lie to him, but either everybody else does that in that country, or that's what you have to do to do business, or the other side is such a mean, evil monopolist that I'm balancing the scales of equity.  That may or may not be something that one can say to an Oregon jury in that case, but it doesn't mean you don't state a claim, does it?

MR. SAVAGE:  I would submit to you that the first answer to your question is the Foreign Corrupt Practices Act. Congress had to pass a statute to make it illegal in the United States to do that stuff you just said.  Prior to the Foreign Corrupt Practices Act, I could go to X/Y/Z little country, bribe the country to give me a contract or deny whatever, and that was not actionable under United States law, even if it was legal or illegal in the other country.

THE COURT:  I'm talking about basic fraud.

MR. SAVAGE:  I understand that.

THE COURT:  You don't need the FCPA to go after basic fraud, do you?  If you cheat someone -- if you go to China and you cheat them, you lie to them, you get them to buy stuff, and what they got was not what you said, and we're not talking breach of contract --

MR. SAVAGE:  I understand.

THE COURT:  -- real fraud.  They could come to Oregon, if they wanted to, and couldn't they sue you for fraud? And as long as they state the elements of a fraud claim, you know, you made an intentional misrepresentation, intended to induce reliance, it did reasonably induce reliance, it did cause them damage -- that's the other point.  It did cause them damage.  They could sue you here even if your response might be, "Well, they deserved it.  Who cares?"  So what?  The plaintiff still stated a claim here.

MR. SAVAGE:  Well, yes and no.  I think your New York example is probably a good one, because we have the Full Faith and Credit Clause.  We are an integrated nation.  Yes, we have sovereign states, but there are several hundred years of figuring out the ways in which different things and different states can, nonetheless, be addressed by the state or federal courts.

I would submit to you that once you move overseas, it becomes a very, very different question.  I think it is a true statement that the public policy of Oregon has exactly zero interest in the laws of Haiti, the laws of China, and in particular also the laws of the relationship between the United States and those countries.  That's simply not a matter for their concern.

So my contention here on this point is, it is a matter of law that I'm arguing, not a matter of fact. Obviously when we get the facts, we will have to get there. But the matter of law I'm arguing is, if they want to establish that the courts of Oregon have an interest in something bad that supposedly happened in Haiti, they can't just say, "Something happened in Haiti that if it happened in Oregon, it would be illegal here."  They have to explain what it is bad that happened, and we will get to that failure in a minute -- what it is bad that happened.  But they also have to explain why the courts of Oregon would care that something bad happened

in Haiti.

I submit to you that you can read that complaint and you can read their response, and they never make that justification. They cite zero cases -- none -- in which any state court in any United States jurisdiction has ever imposed fraud or similar tort liability in any analogous circumstance. That's not an accident

THE COURT: I just don't remember off the top of my head right now. Do you offer any cases to the contrary that would show that a common law claim of fraud under these circumstances in a state court that causes no harm in the state and only allegedly possibly causes some harm in a foreign country is not actionable under the common law of that state? You can go back to Holmes if you want.

MR. SAVAGE: Well, the short answer is: First of all, Holmes. Second of all, I don't offer you a state court case saying, "We hereby reject that claim." I didn't find one. Frankly, I think this kind of claim is unprecedented, and there may be a reason for that. I know my arguments now are going to slightly smash together, but in my discussion -- and I might have even put this in the fraud section -- but I quoted extensively from an FCC ruling saying, "Essentially we are the body charged by Congress with dealing with international telecommunications questions, and we hereby reverse our former stance and affirmatively say we're not going to expend any of

our resources trying to enforce foreign anticompetitive activities."

I would submit to you that that logic is just as strong in the context of a tort claim, particularly a state level tort claim -- frankly, a state tort claim as it is in the matter of federal policy.

THE COURT:  The two cases that I'm thinking of, when you talk about that are Ting and Marcus.  You mentioned Ting, which is from the Ninth Circuit; Marcus from the Second Circuit, I think.  Both of them say that the Federal Communications Act was not intended to preempt state law on such things as misrepresentation, business fraud, things like that.  And as we do think about it, I'm trying to think about what would be the State of Oregon's interest here.  State of Oregon doesn't want to get a reputation of housing businessmen and businesswomen and businesses that commit fraud.  Therefore, maybe it does have an interest in, "Hey, if you have committed fraud somewhere and you've hurt someone, and it was done by an Oregon citizen, you come to Oregon, and you can bring a lawsuit, if you can otherwise satisfy our common law claim elements."

MR. SAVAGE:  I will respond to that in a minute, but I want to go back to the point that I made, which is putting aside primary jurisdiction/preemption, the body with the most knowledge in the United States of America about these kinds of

issues has stated as a matter of policy, acting under its authority that Congress gave it, to say the United States should not be expending its resources trying to enforce anticompetitive restrictions and rules and requirements imposed by foreign governments, much less imposed by foreign private entities.

I would submit to you that is -- whether you look at Holmes -- we will get to Ting in a second -- we're well past the stage, I think, where it makes sense to talk about fraud in the abstract or misrepresentation in the abstract.  This isn't about fraud in the abstract.  This is about a claim that we bought their stuff at retail and sold it to people in a way to get those people cheaper calls to Haiti.

Now, I would submit to you that's not fraud at all, and I will get to that in a second.  But in terms of Ting and the other cases, if you look at the context of Ting, what was going on there is this:  For decades -- those of us with gray hair might remember -- the FCC very tightly regulated interstate long-distance rates.  They went up to the Supreme Court trying to deregulate them and failed.  Then in '96, Congress finally gave them the authority to deregulate them, which they promptly did.

They then had the question before them, okay, so if these rates aren't governed by tariffs, what are they governed by?  They said, "Well, okay then.  They are going to be

governed by state contract law."

It is not a shock in that context that when someone brings a state contract law claim against AT&T in that case, saying your rates, your terms, and your conditions aren't right, that a court would say, "The FCC having said states can get involved in this, we're not going to say the states are preempted."

There is no such case with regard to international calling. There simply isn't, because the FCC has never said, "We want states to be involved in this," because states have nothing to do with international calling. This is not a subject matter that the State of Oregon should have any concern with. That's sort of a preemption argument. But in the context of the tort of fraud, I'm saying, given that the State of Oregon is not legitimately concerned with the terms and conditions surrounding international calling, why would the courts in Oregon extend their tort law to cover things around it?

But let me move on to the key point. It isn't fraud, it isn't misrepresentation, and they haven't pled it properly. With all due respect to your earlier ruling, think about how cell phones work. What the cell phone transmits to the network, as common experience shows, is its number. It does not transmit to the network some other number that might be lurking in the background. They have not alleged how it could

happen; how a cell phone could transmit the data they want. They have not alleged that any cell phone ever does that. They have not alleged anything to support the notion that what they say we did was a fraud was anything other than the natural operation of equipment that they sold us.

THE COURT: I read that, I think about it, and I go back to my February 3rd opinion from last year --

MR. SAVAGE: Right.

THE COURT: -- and then I try to like overlay a little bit of Twombly and Iqbal to try to understand how this works. What I said back in February of 2016 was: No. 1, I didn't think they adequately stated a claim based on the non-technological fraud. And by that, I meant the SIM card stuff.

MR. SAVAGE: Correct.

THE COURT: And I still don't. I will give them one more opportunity here to talk about it, but I don't see any fraud alleged with the purchase of SIM cards that has been alleged there. I did say back in February, for the reasons I put in my opinion, that they've adequately alleged misrepresentations relating to their technological fraud, which you are saying now, and the active concealment, which I think is somewhat related to the technological fraud.

What I'm hearing you tell me is that they are just wrong. "We didn't commit that fraud. That's not the way it

works.  There is nothing that we could have done differently." I'm not going to judge that necessarily right now.  I'm saying that's really interesting.  I look forward to reading summary judgment.

MR. SAVAGE:  Your Honor, I hear you, but the point of a motion to dismiss, the point of Twombly and Iqbal, is to cut cases off at the knees that do not deserve to go forward.

With due respect to your earlier ruling, it probably shouldn't have gone forward then, but it certainly should not go forward now.  And this is clear from the face of the complaint.  They themselves explain how networks exchange this data.  Networks exchange the data they want when two switches are interconnected with each other.  They talk about in paragraph 26 how the data flows from switch to switch when a call is handed off from one to another.  That's great.  That's more or less accurate.

They do not allege that there is any way that a normal cell phone or even one modified, as we modified it to do this thing, could possibly send the data that they want.  They don't even allege that their network would have been capable of receiving it.  I mean, if we had come up with some magic thing to send that, in addition to everything else, their network couldn't have processed it, and they don't allege it.

This is my point about allegations.  Sure, if we have to prove it, I have experts lined up.  I have been in this

business for 30 years.  I know who I can get to testify, but that's not the point.  The point is they have not actually alleged any standard of conduct that we violated.

THE COURT:  Here is what I think they have alleged, and here is what I thought a year ago in the February opinion. Tell me how I'm looking at it incorrectly.  They have alleged, from a technological perspective, your client has made the communication that ultimately is received by their technology look like it has originated as a local call in Haiti when, in fact, it originates in the United States.  And that's the technological misrepresentation that they allege.

Now, if you're going to tell me that's not what the technology does, I look forward to summary judgment.  And by the way, we are going to do it not just on paper, but we are going to have an evidentiary hearing.  I am going to want to hear from your experts, and I am going to want to have you teach me this stuff, because I'm not really that good at it.

But that's what they allege, don't they?

MR. SAVAGE:  Suppose I allege in a complaint that plaintiff breached some duty to me because what plaintiff failed to do was get in their car and fly to Honolulu.

THE COURT:  I'm not tracking you.  Start again.

MR. SAVAGE:  If I allege in a complaint that the defendant breached the duty to me and that what their duty was was to get in their car and fly to Honolulu.

THE COURT:  Sure.

MR. SAVAGE:  That does not state a claim.

THE COURT:  Agree.  Because they would say they have no such duty.

MR. SAVAGE:  Not because we have no such duty.  Yes, that's true, but also because cars don't fly to Honolulu.

THE COURT:  Okay.  I forgot about that part.

MR. SAVAGE:  That part -- cars don't fly to Honolulu.

THE COURT:  Okay.

MR. SAVAGE:  What they are alleging when they say if "Oh, we hid this," what they fail to allege, what they want to rely is, there's no way to do what it is they say.

THE COURT:  Right.

MR. SAVAGE:  And I would submit to you that that is evident, both from their complaint, where they explained that this data is exchanged on a switch-to-switch basis and, again, common practices.

So what they are really saying, and I think this is true as to what they are saying, what they are saying is, "Our entire resale-based business model is a fraud," because the entire retail-based business model is designed to avoid their 23-cent rate.

THE COURT:  Getting back to flying to Hawaii, I get your point now.  Now, that would be obvious that one can't do that.

What you are saying right now is that it is obvious from their complaint that you can't do what they are accusing you of doing, and I will say from a generalist judge/layman's perspective, no, it is not obvious from the complaint that you can't do it.  That said, it is my obligation to learn this stuff.  And when you all bring in evidence outside the pleadings, I will do my best to try to understand this stuff.  And if you are right, you will win summary judgment, I think.

MR. SAVAGE:  This seems like a great time perhaps to segue to the primary jurisdiction argument.

THE COURT:  Okay.

MR. SAVAGE:  I have no doubt that if this case goes forward, my learned experts will testify and explain and blah, blah, blah.  I will represent to you as a regular practitioner before the FCC and a 30-year member of the communications bar, with all due respect, no such explanation would be necessary at the FCC.  This is common knowledge within the expertise of the regulatory body that Congress has charged with worrying about these things.

That is an independent reason why this case shouldn't be here.  On the primary jurisdiction argument, putting aside preemption for a second, on the primary jurisdiction argument, it's not that you don't have jurisdiction in the abstract sense of jurisdiction.  It's that all of these matters -- all of the underlying actual things that they are griping about -- are

matters within the unique expertise of an agency that Congress has plainly and exclusively given this job.

I would submit to you that, much as I would look forward to educating you and the jury and whoever about all of this stuff if the case were to proceed, that's really not the right way to move forward here.  If the case is not going to be dismissed in its entirety, because after all, maybe they did allege this shouldn't have happened or maybe there could be some type of damages, it still shouldn't be here because this case is just infused with, dripping with, inseparably entangled with many complicated matters of international telecommunications technology, cellular technology.  IP technology, international relations, all those kinds of things, which Congress has committed to the FCC to do.

In that regard one of the prongs of the primary jurisdiction argument is the potential for multiplicity of decisions.  Even if I were to be completely convinced, and, of course I am, that you would get it exactly right --

THE COURT:  I'm not convinced, but okay.

MR. SAVAGE:  -- but commit no errors, that it would come out exactly the way it should be, the problem is, if this case is allowed go forward here, the implication is any foreign entity trying to enforce anticompetitive restrictions on resale -- anywhere -- could pick any District Court where they can find the relevant parties and take their luck and see what

happens.  This is manifestly, however, the kind of thing that if any body in the United States is going to say anything about it, we ought to at least see first what the FCC thinks.

Even if it is possible to go forward here -- the standard, I don't think, is controversial.  It involves matters committed in the agency, it is expertise, so on and so on.  This shouldn't be here even if it is technically a matter within your jurisdiction.

THE COURT:  Would you talk to me how that would work practicably?  If I were to agree with you, and I believe that primary jurisdiction is discretionary.  But if I agree for many of the reasons that you've argued orally and in your papers that I should exercise my jurisdiction and defer to the primary jurisdiction of the FCC, how would that work?  What would happen next?  What happens to this case?  What happens next?

I'm really not fully up to speed on primary jurisdiction.  I think I handled one or two cases on it in my life, and I just don't remember very much about it.  How does it work?

MR. SAVAGE:  At a high level, it is this:  The first decision you need to make, assuming you are going to go with primary jurisdiction is, what you do with the case here?  Two choices:  No. 1, which, of course, I prefer, is dismiss it and see what they do.  No. 2 is stay all proceedings and invite them to go to the FCC and say, "Raise this question.  Feel free

to raise the question; come back to me when you have an answer from the FCC."

THE COURT:  And what's the question?  I know that you're an advocate here, and you have got to advocate for your clients' position.  But my question is, what is the question that they should raise with the FCC if I were to stay this case pending FCC's exercise of primary jurisdiction?

MR. SAVAGE:  I would say, first question, is -- I would frame it -- I am making this up on the fly.  But I would frame it something like:  Is the conduct alleged that UPM supposedly did, is that conduct consistent with or inconsistent with United States international communications obligations? No. 2:  As a matter of fact finding, FCC, is this the kind of thing that you had in mind when you said you wanted to encourage bypass, when you wanted to encourage these sorts of things?

I submit to you if they say, "Oh, yes, this is exactly what we had in mind; go for it, UPM," when they come back here, that would inform your decision in a different way than if the FCC said, "What?  We're shocked.  We never wanted anything like this.  This is an outrage."

Obviously I think I know which way that would come out.  But that decision would allow you to proceed more effectively here.

THE COURT:  And is it also a fair question that they

could raise the FCC on primary jurisdiction -- if I were to stay the case:  FCC, you know more about how this technology works than the district judge in Oregon.  If the plaintiffs can prove what they have alleged, is that something that a state court should take cognizance of and send to a jury, or a federal court sitting in diversity or with supplemental jurisdiction under a federal claim of RICO -- it doesn't matter -- that the Court should send to the jury on the question of, "Is this fraud?"

Is that an appropriate question under a primary jurisdiction rubric for a company such as plaintiff in their position to ask the FCC?

MR. SAVAGE:  Yes.  Let me use that to segue to the preemption argument.

THE COURT:  Sure.

MR. SAVAGE:  I think there is no question that if the FCC were to say, "These matters of how United States entities and Haitian entities deal with each other with respect to potential resale are entirely within our jurisdiction over international communications, and we hereby preempt any state taking any action with respect to them," there is no question that they could do that.  In effect, that's what your question boils down to.

My preemption claim is, under any reasonable reading of what they have said, based on what they have alleged, it's

fair to conclude they've already done that.

THE COURT:  And here is the problem you are having with me on that:  From the case law I've read, it says that there is no preemption, if you will, for garden-variety business misrepresentation and fraud claims.  Now you are telling me this is no garden-variety business misrepresentation or fraud claim, but I'm not convinced of that yet, because what I'm seeing the allegation being is that through some technological mechanism the defendant is misrepresenting to the technology of the plaintiffs in Haiti where this call originates.

MR. SAVAGE:  I would submit, Your Honor, exactly what you just said explains why preemption is appropriate.

THE COURT:  Well, you know what, if you would have said "primary jurisdiction," you would have had me very, very close.  Why preemption though?

MR. SAVAGE:  Preemption in a second.  Don't get me wrong.  I'm not waiving primary jurisdiction.

THE COURT:  And you're getting closer on that.

MR. SAVAGE:  But with respect to preemption, as you yourself have described it both today and in your earlier opinion, this is not a garden-variety business representation. This is not me walking into a store and saying, "Ha-ha, I am not a pirate, ignore the patch," and all that sort of stuff.

This is, as you frame it, technological

misrepresentation. The essence of the claimed misrepresentation is how telecommunications technology works or does not work. I think there are exactly zero cases in which a highly technical telecommunications technology argument has been accepted as a basis for a fraud claim. It hasn't happened.

THE COURT: I've looked for it too.

MR. SAVAGE: Yes. Defendants have been unable to find any case -- we have also looked.

So what that tells you -- what that should tell you is this isn't the kind of thing that Ting had in mind that if AT&T or Verizon or somebody who is out there selling retail long-distance service and makes a misrepresentation or violates a state consumer protection law, that somehow 201 and 202 magically protect them. That's not what this case is.

Their claim -- I'm an advocate for the defendant. Let me put their claim in the light most favorable to them. There are ways that telephone technology works that, that if cleverly used by a defendant, can fail to provide information to a receiving network that the receiving network thinks it is entitled to receive, and that can constitute fraud.

THE COURT: You know what, to be fair to plaintiff, I would even add a little more to that --

MR. SAVAGE: Okay.

THE COURT: -- because this is what they allege. You

say it can't be done, but I'm not there yet.  That it presents information to the other network that makes the other network treat the call as if it originated locally when, in fact, it didn't.

MR. SAVAGE:  Right.  Yes.  And I want to come back to that because -- I will come back that in a second.  On this point, my point is simply that technological detail, the reason their case doesn't make it there is, they haven't actually alleged any source of any legal duty to provide them the information that they say they are entitled to.

THE COURT:  But now you're turning it into an omission case.  Normally in a pure omission case, a standard defense is we have no duty to speak.  But what they have alleged is affirmative misrepresentation case, which is what we are presenting -- what you are presenting, what your client is presenting to their network, misrepresents the origin.  Therefore, they don't need a duty if your client is, in fact, making a misrepresentation to them technologically.  And if you tell me that's not what your client is doing, I'm saying that's not a 12(b)(6).

MR. SAVAGE:  I would submit that they are actually saying something slightly different.  They don't contest, as far as I can tell, that the numbers and the identification information and all of that that we send them accurately corresponds to the devices that we bought.  What they are

saying is -- and the misrepresentation is somehow we didn't do that.  What they are saying is -- I think whatever they are claiming, it is an omission case, because what they are saying is, "We were also entitled to other information that you didn't give me."

You have got to look at what they are really saying as compared to the mere words.  What they are really saying is that there's information that you had, that you had a duty to give me, that if I knew you were a pirate, I wouldn't have done this.  If I knew it, I would have acted differently.  And you didn't give it to me.  That is not a misrepresentation case, in the absence of some allegation, some explanation as to how it could have happened.

THE COURT:  Well, I think they do.  I talked about it in my February 2016 opinion under active concealment, the analogy I put in, although we are getting a little silly with the analogy, but I kind of like it.

MR. SAVAGE:  I am good with pirates.

THE COURT:  "You had the pirate patch on, and you put on big sunglasses, so you couldn't see my pirate patch.  I had a pirate's hat on, and you put on a great, big scarf so I couldn't see that."  They are claiming -- and this is more an omissions case.  They are claiming that you manipulated the technology such that it would not be perceived accurately by their network, and that's active concealment.  It may be

misrepresentation.  But it is more than mere omission.

MR. SAVAGE:  Your Honor, rather than me trying to do this, I would urge you to ask Mr. Vaughan, or whoever, the following question:  What should they have done that would have cured the misrepresentation?  I submit to you that there are only two possible answers, only one of which is plausible.  The plausible answer, which is what this case is really about is, they shouldn't have resold our stuff at all.  They should have directed the traffic on a switch-to-switch basis to Miami and New York.

THE COURT:  I am going to ask that question, what should they have done technologically?

MR. SAVAGE:  Exactly.  That's one.

Then No. 2, they may say, "Well, they should have found some way to transmit the actual originating number," blah, blah, blah.  And I submit to you that that boils down to, "I should get in my car and fly to Hawaii."

THE COURT:  If that's their answer, I agree with you, and I will ask them that.

MR. SAVAGE:  Okay.  That's great.

THE COURT:  By the way, I agree with you, unless they talk me out of it.

MR. SAVAGE:  Of course.

So with respect to preemption, I think the fact that there are no cases anywhere outside of the FCC dealing with

international call arrangements of this sort is an indication -- now, it is sort of the dog that didn't bark problem, right. Why are there no cases? Are there no cases because nobody else resells telecommunications services anywhere in the world?

THE COURT: Or it is a relatively new technology and a relatively new phenomenon that's being detected.

MR. SAVAGE: It is possible.

On the other hand, what you have is decades of FCC rulings saying, "We encourage this. We want this bypass to happen. We want prices to be driven down. We want American entities to find ways to get around these restrictions."

Then when someone does that, you say, "Well, doing that technological thing constitutes fraud?" In this sense, if you take a look at the materials that they supply from CONATEL, it is actually kind of instructive, because the CONATEL description of how it works is actually not bad. A call comes in over the Internet. It hits a Haitian ISP, a Haitian Internet Service Provider, which then sends the call out into the Haitian network.

Now, CONATEL doesn't like that, for all the reasons we've discussed. But what happens is it comes in via the Internet and then a call is originated in Haiti, taking the data from the Internet as the content of the call.

THE COURT: Right.

MR. SAVAGE:  Not to get too metaphysical here, that's a call that originated in Haiti.  There was a bunch of --

THE COURT:  In a sense and in a sense it doesn't.  I get your point.

MR. SAVAGE:  Right.  I submit to you that their entire claim that really this other call and the call didn't really originate in Haiti is arm waving.  As a technological matter, what happened is a radio in Haiti said, "Hey, I want to make a call."  The fact is that it was linked to something further back up the stream, that's fine, but that doesn't mean the call wasn't originated there.

THE COURT:  Let me remind you, because you weren't here in the February argument.

MR. SAVAGE:  I was not.

THE COURT:  One of the discussions I had with Mr. Vaughan and I think with Ms. Salyer was as follows: Looking at Voice over Internet Protocol.

MR. SAVAGE:  Right.

THE COURT:  If someone in the United States -- if their business model was as follows:  Come to our home, sit at our desk, use our microphone, and over the Internet we will patch into our colleague, our associate in Haiti, and we will be at his home or her home.  They've got a screen, a microphone, a camera, and you can invite the person you want to call -- your cousin, your mother, whoever it is -- they will

come to that person's phone.  I said, "Does everybody agree that would not be actionable fraud?"  Everybody said yes.

I then said, "All right.  Now, what if instead of having that person come to defendants' associate's home, the call came in to defendants' associates over the Internet, defendant held up the telephone to the speaker of the computer, and dialed a local number.  Would that legitimately be a local call?"

I think Mr. Vaughan said yes, and that's not actionable.  He conceded, if I recall correctly.  But then he said, "But that's not what happened here."  Then he started describing to me the technological fraud, and that's how we got to where we are.

MR. SAVAGE:  So let's go back to that example.  There is no question that in the dial up and hold up the phone example, there is no question that the person at the receiving end, the information that they would receive is the information associated with the phone being held up to the computer, not anything coming out of the computer.

THE COURT:  Correct.

MR. SAVAGE:  All that is different here, as the CONATEL materials show, instead of physically dialing and holding up -- the magic of software:  The dialing is done by a machine and it is held up.

THE COURT:  And that's what Mr. Vaughan explained to

me before, and as I read in the complaint, he disagrees with. I don't yet have an opinion, nor is it the right procedural context for me say who is right/who is wrong on that point, your point or what was previously explained to me.  That's why I said then, and but your primary jurisdiction argument, I'm still thinking we deal with it on summary judgment.

MR. SAVAGE:  Let's go back to primary jurisdiction. The FCC has had 15 years of proceedings about voice over Internet and how it works.

THE COURT:  Right.

MR. SAVAGE:  It first made its appearance in a document known as The Report to Congress.  It is a 1998 discussion of voice over Internet and how that works for certain regulatory purposes.  The next big deal came in the early aughts, with a company called Vonnage.

THE COURT:  I remember.

MR. SAVAGE:  And there was a big fight as to whether Vonnage's service, which did the linking together, where you start on the Internet, but you can then call a regular phone number, what do you do about that?  The FCC has actually defined a difference between pure VoIP, which is two computers talking to each other, and interconnected VoIP.  This is in 47 C.F.R. Part 9.

THE COURT:  I don't want to read it if I don't have to.

MR. SAVAGE:  You don't have to read it.

The reason I'm citing it is, the FCC has very detailed proceedings about this and has had for decades.  So to the extent, as is apparently true, that this may depend on how VoIP works and that sort of thing, it's all the more reason to send it to the FCC.

THE COURT:  You are making a lot of progress.  I think it is probably a good time to hear from the plaintiff.  This is where I need to hear from plaintiff.  No. 1, first of all, I want them to begin by answering the question:  What do they contend that defendant should have done technologically that would have cured or avoided the misrepresentation?

Secondly, where I think you're making progress, but where I would like to hear from them, I recognize the way I've described the fraud, which is the way I think they allege the fraud, is not a garden-variety fraud.  That's what I say in my opinion last year, when I refer to it as "technological fraud," and it may make sense for me to stay this case in favor of primary jurisdiction and let's hear from the FCC on whether or not they view this conduct, if it occurred as alleged, as fraudulent and, if appropriate, then for resolution under either state fraud law or ultimately RICO.

I think that I would be more inclined to stay rather than dismiss, because if they are right on this point, and if the FCC says no, this is not garden-variety fraud, but it is

21st century fraud, then I think they would have a right to a jury trial in a local jurisdiction where they have personal jurisdiction over a defendant.  And I think that's why a stay is better than a dismissal, and I also think that's why primary jurisdiction is more persuasive to me than preemption.  If it turns out to be 21st century fraud by a local business, that's not preempted under Ting and Marcus and the like.

Let's hear what they have to say, and I will give you an opportunity for rebuttal.

MR. SAVAGE:  Thank you.

THE COURT:  Mr. Vaughan, what should the defendants have done technologically speaking that would have cured or avoided the misrepresentation.

MR. VAUGHAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. VAUGHAN:  Put simply, Judge:  They should not have stolen access to Digicel's network infrastructure and telecommunications infrastructure.

THE COURT:  Be a bit more precise in what they should have done.

MR. VAUGHAN:  I shall.

THE COURT:  That's a good conclusion, but now give me a bit more specificity.

MR. VAUGHAN:  So I have been saying throughout my preparation for this hearing that I am internally conflicted,

because, to be clear -- I am going to answer your question -- but to be clear, what we have done with this discussion is move this outside of the realm of a 12(b)(6) discussion.  We are now having a summary judgment conversation.  I do not want to not answer your question, so let me answer your question.

THE COURT:  What we are really doing, you're explaining to me why your theory is plausible --

MR. VAUGHAN:  Correct.

THE COURT:  -- which is still within the ambit of a 12(b)(6), given Twombly and Iqbal.

MR. VAUGHAN:  The answer to your question about technologically what should have been done is the defendants should not have manipulated the SIM information so as to have the SIM cards represent to Digicel, as it was entering its network, that "I am merely a local phone call being originated in Port-au-Prince, Haiti from Jean Pierre to Jean Louis, when, in fact, what it is is a phone call from Johnny Oregon that is being smuggled into the Digicel-Haiti telecommunications infrastructure.  That is the transaction that has taken place.

THE COURT:  What they have done, technologically speaking, you allege, is that they have --

MR. VAUGHAN:  Used the software and the technology to hide the Oregon phone call, and they have used the technology and the software to represent to the network, "Oh, I'm a local phone call.  This is the rate that I ought to be charged at.

I'm not actually coming from the UPM servers in Oregon, and I don't have any baggage," which, in fact, happens be a completely separate phone call that's being completed.

THE COURT:  Now, what's wrong with their primary jurisdiction argument, especially given that I'm not inclined to dismiss the case, but would stay the case so that you can ask the FCC whether or not if your allegations are correct, have you stated a claim for fraud that is beyond the regulatory jurisdiction of the FCC or, really, more appropriately, within the ordinary jurisdiction of a federal or state court in Oregon against the defendant.  If the FCC says that what you've stated, if you can prove is fraud, you're welcome to go prosecute that in state court.  You come back to me with that letter, and we are getting a jury trial.  We will get a jury together.

MR. VAUGHAN:  This is why I hate going second, because what has happened is, we have been framed and put into this cubbyhole that, with all due respect, is absolutely incorrect and wrong.

It is a garden-variety fraud case.  I am going to stand up in front of that jury, and I am going to say, "Ladies and gentlemen of the jury, UPM has stolen from Digicel.  They have stolen money from Digicel using fraud, misrepresentation, and deceit."

The mechanics of how that fraud has taken place, the

vehicle through which they've effected that fraud may be sophisticated and novel and new and exciting and interesting for wonks like you and I and Mr. Savage, but it is pure theft. What they did was they went through the back door, accessed the Digicel network, and didn't pay for it.  That's it.

Now, Mr. Savage says that this case is about an anticompetitive restriction on a resale.  No, it is not.  This has absolutely nothing to do with whether or not UPM can compete in Haiti or wherever.

THE COURT:  I agree with that.  Really the only thing I'm interested in this case is whether or not this is a misrepresentation or active concealment case.  Frankly, I don't think you have satisfied any type of half-truth or duty, so we're not going to worry about omissions.

Is there an affirmative misrepresentation or affirmative active concealment?  If so, the case goes forward. If not, it doesn't.

MR. VAUGHAN:  There absolutely is.  And it is funny, Judge, one of the things that I try not to do is ignore -- I have your February 3rd, 2016 order, and these green labels are where you meticulously went through and concluded that we have met the elements of the claims that we have pled.  I have them all here, and I'm not going to repeat them unless you want me to.

THE COURT:  No, because I think you have for

technological fraud. I think it is improved in the second amended complaint for the non-technological fraud of the SIM card. But now what I'm hearing and now what I would like hear your response to is, well, it is not technological fraud because that technology doesn't work the way plaintiff has alleged; and therefore, I can do one of two things: Either I can say, "Talk to me about that at summary judgment," which I know is your position. But I know defendants' back-up position is, "And the FCC will explain that to all of us if you just defer and let them deal with it on primary jurisdiction and stay the case until we at least get their guidance on that point."

MR. VAUGHAN: So what is the first problem with what they have articulated to you? The first problem is exactly what you initially said.

You know, Mr. Savage, that is fascinating, and that's an interesting position, but, frankly, you are not testifying, one. Two, they have alleged, under the rules, a short and plain statement of the claim, which is plausible on its face and which meets the elements that they need to meet at this stage in order to proceed.

What you are providing to me is additional testimony, which ought to come from the mouth of your expert, which says, while they may have alleged that we did not provide them with this information, their allegation is impossible. Judge, that

is the quintessential definition of an "affirmative defense." Yes, we failed to give them this information, but it was impossible for the following reasons. That's what an affirmative defense is for.

So the temptation that I'm trying to avoid, and we have been through this now four times, is to engage with Mr. Savage in this academic 30,000-foot conversation about the what-ifs and wherefores flowing from a well-pled pleading.

THE COURT: And if we didn't have a federal agency with expertise in the field of communications technology, including international communications, we wouldn't be talking about it here. The motion would be denied.

MR. VAUGHAN: So let's address that point, because what Mr. Savage also does in his papers is a very interesting tactic, which, frankly, gave me a little bit of whiplash as I was going through it, because he says the FCC applies, because this is a matter that deals with anticompetitive restrictions, rates, and interconnection agreements, and these two companies have this dispute between them.

Then later on he says, "And our FCC allegation and claim would fail, because there is no interconnection agreement and no relationship between these parties," which begs the question. We are not alleging any kind of contractual relationship between these parties. This is not about rates. This is not about anticompetitive activity. It is about theft,

plain and simple.

What UPM did was, let's give them the benefit of the doubt. Let's give them the benefit of the doubt and say that they looked at Haiti as a potential market and determined, "We would like go into Haiti, but, my goodness, those international rates are high. It is expensive to go into Haiti using the traditional interconnection rates. So let's just go through the back door and steal it." That's giving them the benefit of the doubt, and that's the fraud and theft and misrepresentation, which we have pled.

How would we have avoided this? We could have avoided this because -- I promised myself I wouldn't do this, but I am going to answer his question: How could we have avoided this? One, UPM could have gone in, just like Digicel, and set up its own network and paid its own capital expenditure and set up its network and competed. No problem.

Digicel could have gone to the other telecommunications company in Haiti and said, look, "Digicel is mopping the floor with you guys. We can increase your business. Why don't we enter into an arrangement where we can have the hybrid inter-connectivity. We will bring it down through VoIP. You can complete it on your network, we will split the costs, and we will go after Digicel in the market." They could have done that. No problem here either.

They could have set up their VoIP network, which

every time I stand here, I forget the name of the company that had an Internet handset in the U.S., and they sold Internet handsets to their receiving subscribers. And they do a complete VoIP. They didn't do that.

They could have come to Digicel and said, "Hey, look. We would like to participate in this market, and we don't think that the 23 cents that you charge to everybody else -- AT&T and the rest -- is an appropriate fare, because we are using a different technology. So we will pay you a lower rate. We can negotiate that rate, and we can enter into some kind of contract that way."

You know what, let's see how that shook out. No, they didn't do that. What they did was, they -- through fraud, deceit and misrepresentation -- set up their VoIP here, which was for purposes of bypassing that switch. We had this discussion a million times, and Your Honor has gotten it, because you have articulated it in your orders.

They then used clandestine means -- and I'm not going to use the conclusion. I am going to tell you. They have appliances -- equipment disguised as VCRs/radios -- in old ladies' homes in Haiti.

THE COURT: I thought you were going to say microwaves and refrigerators.

MR. VAUGHN: This is not a microwave conversation.

MR. SAVAGE: With cameras, Your Honor.

MR. VAUGHAN:  So they have these appliances, which are actually probes.  They are actually repeaters, mini-switches that they put in people's homes, and they pay them to host these switches.  Then they use those switches to direct these phone calls in a clandestine fashion onto the Digicel network so that they don't have to pay Digicel for doing it.  I have no problem if their allegation is that Digicel charges too much for its network.  Great.  Use somebody else.

I would like to segue now to the analogy, because the first thing I saw when I saw Mr. Savage's policy argument was: My goodness, this reminds me of the old piracy days -- I was not going to use it, but it came up.  It reminds me of the old piracy days when you had the competing empires of Spain and England.  They would have their pirate merchants that they would fund secretly attack the other empire's ships, and here we are talking about piracy.

But I think the piracy analogy that we have was incomplete, and it was incorrect.  I will tweak it.  Since you like the pirates, I will stay with the pirates, but tweak it. It is not a grocery store.

Let's say that there was a private train that ran from Oregon to south Florida.  That train had two rates:  One, an internal Oregon rate.  You're on the train within Oregon; you paid the local rate.  Then there were different rates if

you went to Dallas and if you went to do Florida.

UPM comes on in their pirate outfit, and they go, "No, we are not real pirates. It is a costume. I am going to a party here in Oregon." We go, "Come on in, because we don't serve pirates." That's as far as their piracy analogy goes.

This is the rest of it: They pay that local rate to get on the train here, and then they hide in the bathroom. When the train crosses the border for Oregon, and it is going to Dallas, they're hidden. They don't tell anybody that they're actually going to Dallas, and they don't tell anybody, "Oh, we're actually going to Florida."

This is the problem with that. When they're caught, they come in before this Honorable Court, and they tell the Court, "Judge, I don't see why we should be paying the Florida rate."

THE COURT: But before they come into court, when your train company client sues them and alleges they have made a misrepresentation, what is the misrepresentation, or is it active concealment by hiding in the bathroom?

MR. VAUGHAN: Well, two things -- active concealment and you preempted me. See, I'm circling.

There are two misrepresentations, because, yes, they are sued, and they come in. And what do they say? Their first defense is, "The charge that you imposed for Dallas and Florida, it's ridiculous. It is too expensive."

THE COURT:  That's not my problem.

MR. VAUGHAN:  That's not your problem.

THE COURT:  I'm saying to them, "That's not my problem.  That's not a cognizable defense."

MR. VAUGHAN:  Thank you.  No. 1.

No. 2, we come to find out that when they came onto that train in their pirate outfit, they were also pulling behind them a pirate chest.  Lo and behold, in that pirate chest, is their friend.  They have a buddy in that chest who they have brought onto my train.

THE COURT:  Okay.  That's active concealment.

MR. VAUGHAN:  And they are not paying for this person.  They are telling me, "Why do I have to pay you?"  In fact, Mr. Savage completely ignores his friend in the chest.

THE COURT:  He'll win that case.

MR. VAUGHAN:  I thought so too, Judge.

Your Honor, as much as I have said in the past, this is novel and sophisticated and challenging, it is only so with respect to when we need to start explaining to the jury the modus operandi, the mechanics of the fraud.  The bottom line is, UPM went in, they identified markets where there is low infrastructure, there is high demand, and there is difficulty with respect to accountability and monitoring.  They figured out how to steal the service.  They steal it, they resell it, and now Mr. Savage wants us to go to the FCC to determine a

rate violation?  That's not what this is about.  Absolutely not.

And the FCC has zero jurisdiction -- primary, preemptive, or otherwise -- with respect to conversion, unjust enrichment, fraud, RICO.  There is nothing the FCC is going to do in that regard.

THE COURT:  Let's assume you are right on that point. What would happen?  Let's assume that I erroneously agree with the primary jurisdiction argument, I stay the case, and I say, "Let's see what the FCC says."  Presumably you would then take it to the FCC and ask for them to give some type of ruling that says what?  "Hey, this isn't our problem.  We don't have jurisdiction over it.  We decline to exercise any jurisdiction. You go back to Oregon."

That's what would happen, right?

MR. VAUGHAN:  Yes, sir.

THE COURT:  How long would that take?

MR. VAUGHAN:  If it takes three months, it would be three months on top of the two years that we have spent discussing this.

THE COURT:  I know.

MR. VAUGHAN:  We thought about that.  What it means is that the prejudice visited upon Digicel would be enormous and insurmountable.  Every time a lawyer says "with all due respect," you know what's coming, right?  It's going to be

reversed, because at the end of the day the FCC is going to go, "This has nothing to do with inter-connectivity. This has nothing to do with rates. And it has nothing to do with competition." So it is going to come back here. Even if the FCC were to deal with something, whatever Mr. Savage can conjure up, they still can't deal with the RICO, the fraud, the unjust enrichment. So it literally would be hitting the pause button.

The other thing we need to be aware of is, in this realm, this type of fraud, there is natural, built-in horizon. Why? Because as technology changes, the way you used to commit, this fraud becomes obsolete. So back in the day, they used to have the actual handset docked in a bunch of cradles, and that was how the technology was done. So literally the phone call would come in, it would be connected to a handset, and it would be patched through. Those days are gone.

Now we have a SIM, and it used to be in a SIM bank in the location. Those days are gone. Now we have a SIM server that's here in Oregon. You know what? In short order, that's going to go too, and it is all going to be in the cloud somewhere.

That horizon is important, because the reality is, by the time we are done figuring out exactly what we're going to do and what happens, we will have moved onto the next evolution of this technology. They would have completely realized

whatever ill-gotten gains they need to, and Digicel is the only one holding the bag.

THE COURT: Although your complaint -- let me double-check. Your complaint seeks money damages -- by the way, I do have a question for you on -- not injunctive relief. So if you are entitled, if you are right on money damages, you will get your money damages award, even if the technology has moved on. Okay, so what?

MR. VAUGHAN: Well, I wouldn't say "so what," but I would say that's true; one of the reasons why we didn't seek injunctive relief is exactly what you just articulated, because at the end of the day, you're entitled to money damages.

THE COURT: I'm sympathetic to the concept of justice delayed is justice denied, and I don't want to incorrectly send you off to the FCC for three months, only to come back here. On the other hand, it really isn't a garden-variety fraud for all the reasons I articulated in February 2016 when I talked about the technological fraud. It is relatively unique, and I kind of want to get it right.

MR. VAUGHAN: You know, Judge, on both occasions I would have been a little bit more magnanimous. On prior occasions, I would have been more magnanimous, and I would have said, "Well, that's an interesting academic concept. Let's look at it and see where we land and come back."

Judge, we have done that for two years. You have --

again, going back your very well thought-out articulation of the 12(b)(6) analysis, we have pled properly all of the elements and all of the allegations needed.  Not only did we do that, but on a second round the Court asked, "Well, I was a little bit off reading your complaint with respect to who owned this switch."  Remember, that's why we are here.  Who owned the switch in Miami and New York?

THE COURT:  That was your fault, not mine.

MR. VAUGHAN:  Exactly, Judge.  I own it.

THE COURT:  Yes.

MR. VAUGHAN:  With all due respect, you said, "I actually can see how they came to that conclusion."  But then what happened, Judge?  As you articulated that ambiguity and as I fell on my sword, you said, "There are one of two things that this could mean:  It could mean that the revenue is realized here in Miami and New York, and it could be from Digicel USA; or it could mean that, as they have been saying, the revenue is realized in Haiti, and it is Digicel-Haiti."

Why do I bring that up, not to throw it back in your face?

THE COURT:  It's because of the counterclaim.

MR. VAUGHAN:  Exactly.

No. 2, there is nothing in this new iteration of the motion to dismiss that deals with what was this fatal error and flaw, which we are here to fix, which we did fix.

Thirdly, you took an unprecedented step that last time around. And you said, "You know what, Mr. Vaughan, so we don't do this again, I want you to have Mr. Savage pre-vet your complaint before you come back in here."

My initial reaction was, "Judge, I think that this complaint is being held to a standard well beyond anything required in the pleadings and probably a standard that is well beyond anything required anywhere. I have never seen a complaint this vetted."

In a refreshing exchange, Judge, you said, "You may be right, but two things I will say to you, which is why I'm ruling this way: He just indicated" -- Mr. Savage, for the record -- "just indicated that he is going to file an interrogatory request immediately after you file your complaint, and he is going to want this answer. And if you can't answer it, then I would have wasted my time. So let's just get that done." Reason No. 1.

Reason No. 2, and after all, this was your fault, this is your complaint. Do you know what I said, Judge, if you remember? "You're absolutely right. If I am going to have to answer that interrogatory, you know what, let me get that done. We can crystalize the issues and move on."

Nobody expected that we were going to have another round, arguing the exact same things. Now, to be fair, I know what Mr. Savage is going to say. Mr. Savage is going to say,

"Uh, uh, uh.  That doesn't preclude me from filing my new motion?"  And you said, "Not at all."  You don't have to be a mind-reader to read between the lines there.  I don't think you were inviting him to violate 12(g)(2).  I don't think you were violating him to rehash --

THE COURT:  I think their reply is right on 12(g).  I think rather than a 12(g) waiver argument, your argument is law of the case, and that's not a bad argument.  And I'll accept law of the case on that.

MR. VAUGHAN:  You beat me to it.

THE COURT:  Let me ask you this:  Back on damages, he does make the argument, and I know we have already talked about this a little bit last year, but Mr. Savage wasn't here.  He didn't make this argument.  What's your response to defendants' argument that fraud requires as an element damages, and you haven't pled damages?

MR. VAUGHAN:  I have pled damages.

THE COURT:  How?

MR. VAUGHAN:  And your initial articulation was exactly on point.  What they have pled is, at a minimum, had you not stolen this service, they would have been entitled to a minimum of 23 cents per minute, and they get that 23 cents, not from some random choice of putting two numbers together.  But this is what the Haitian government says, "If you want to disprove it, if you want to challenge it, that's fine."

THE COURT:  It does strike me as very similar to your friend who was hidden in the trunk when they got on the train. It didn't cost the train company any extra money.  I think it would be de minimis, the extra weight for that train.  But had he paid a ticket, they would have gotten the money.

MR. VAUGHAN:  Thank you.

THE COURT:  He could have said, "Well, I didn't cause you damage, because had I had to pay for a ticket, I wouldn't have gotten on the train."

MR. VAUGHAN:  The irony, Judge, this is where we suffer more is less.  Why?  Because I could have simply said that Digicel has been damaged, because for every minute stolen by UPM, Digicel has lost the equivalent per rate minute revenue.

And had I said that, all we would be talking about is, "Well, clearly, Judge, they are going to have to establish what this per minute revenue is, and that's going to have to be proven in order to establish their liquidated damages."

THE COURT:  Let me ask you a different question.  I'm not going to rule from the bench.  I do want to study primary jurisdiction a little bit further.  I really don't know right now what I'm going to do.  I might very well not go with primary jurisdiction and say that the case goes forward.  Let's schedule a deadline for the close of discovery, for summary judgment, and for trial.

I may go, however, with primary jurisdiction.  I honestly don't know right now.  If I do decide to go with primary jurisdiction, does plaintiff want me to stay the case or dismiss it?  Here are the consequences that I can think of:  If I stay the case, and you get your problem solved at the FCC, problem solved, let me know, and dismiss the case.

If you are right, and the FCC three months from now says, "No, this doesn't belong with us, it belongs in court," when you come back in three months, I maybe/maybe not will apologize to you for making you delay three months.  But then we will schedule a trial date, close of discovery, and the like.

If I go the route of primary jurisdiction, if you want me to dismiss it under the doctrine of primary jurisdiction, that, you can immediately take up on appeal, because we then have a final judgment.  I don't think you can take up a stay under primary jurisdiction unless you ask me to certify it for a 1292(b), in which case confer with opposing counsel, and we will see where we go.

I know your preference.  Your first choice is deny the primary jurisdiction argument.  I get it, and I'm going to give that very serious consideration.  If I decide to go primary jurisdiction, do you want me to stay or dismiss?

MR. VAUGHAN:  So, again, Judge, just saying this for the record.  Understanding that we fully -- fully object to any

kind of dismissal --

THE COURT:  I get it.  I'm not sure I'm going to go with primary jurisdiction.  If I do, which one do you want?

MR. VAUGHAN:  So that being the case, our preference would be that the Court rule on the motion, finalize, and close the pleadings --

THE COURT:  Right.

MR. VAUGHAN:  -- and then enter that which shall not be spoken --

THE COURT:  Got it.

MR. VAUGHAN:  -- with a certification we can 1292 it, upon consultation, and with some order that it be expedited before the FCC.  I think it is a simple --

THE COURT:  Wait.  1292 is to the Ninth Circuit; primary jurisdiction is to the FCC.  You'd want both?

MR. VAUGHAN:  At this point, Judge, I think the days of being genteel and exploring these options are --

THE COURT:  So if I do decide to go the primary jurisdiction route, what I will do is this:  I will write an opinion where I deal with all of the 12(b)(6) issues. Frankly, what I anticipate doing is denying it with respect to technological misrepresentation, active concealment, granting it with respect to the non-technological SIM matters, denying it with respect to conversion and unjust enrichment for the same reasons that I said back in February, and then addressing

the preemption issue.  I think I am going to find it not preempted for reasons that I've already tentatively thought about.

Then if I do decide that it should be primary jurisdiction, and we will see what the FCC has to say, then what I'll do is I'll stay the case and then invite the parties -- frankly, I think it should be your motion to move for a 1292(b) certification.  Tell me whether it is or is not opposed.  Move quickly on this.  If it is opposed, we will get on the telephone.  We will talk our way through it.  Then I'll make a ruling very, very promptly.  So that will really only delay things by a week or two at most.

MR. VAUGHAN:  Since I'm standing here, and I have learned to not let anything slide -- I know Mr. Savage wasn't here, so I kind of leave it up to him to remind you of this.  When we discussed the issue of the misrepresentation with respect to the SIM, the problem we -- the royal "we" -- had back then as well, remember, Judge, there was no claim for misrepresentation under re-SIM.  There were allegations.

What you had, again, quite meticulously set forth, was, if your only allegations as to misrepresentation were these SIM sale allegations, you'd have a difficulty.  But those are aren't the only misrepresentations that you did.  You had asked both sides, "So if I'm not buying the SIM purchase allegations, what do I get rid of?  We are not striking

anything."

THE COURT:  You're right.  You have stated a claim for fraud, for technological fraud, and for active concealment, if and when we get to a summary judgment stage where they want to move for partial summary judgment on the issue of there's no fraud by misrepresentations related to the SIM cards, then we may end up going in that direction.  I see your point.  You're right.  There is no motion to strike allegations right now as irrelevant.  If those are just an alternative theory of fraud, and they are not successful, so be it.  You still have stated other theories.  You're right.

All right.  Does anybody want to say any final words on primary jurisdiction, because that's what I'm struggling with?

MR. SAVAGE:  Your Honor, if I may, I would like to say a couple of things beyond that.

THE COURT:  You may.

MR. SAVAGE:  First, I think if you go back and review the transcript or just review your memory at this point, he never actually answered the question, the question of what should we have done to avoid doing the great misrepresentation that supposedly is happening.  He never said you should have sent this signaling.  He didn't say that.  He never said you should have interconnected over here.  What he said was is you can go to another network; you should have negotiated an

arrangement.  We certainly could have done all those things.  But I submit to you, on the Twombly/Iqbal plausibility of the pleading, there is nothing in the complaint and nothing in what he has said that addresses what standard of conduct he is actually trying to hold us to.  I think that is a fundamental flaw in this case.

THE COURT:  It is a little bit inconsistent, I think.  When you say that this is of enough of technical complexity that I should defer under the doctrine of primary jurisdiction to the FCC, but, by the way, if I don't do that, it is just so darn obvious that they haven't stated a plausible complaint.  There's some tension in those two statements.

MR. SAVAGE:  Here is the way I think of it:  If I can persuade you how obvious it is, you will dismiss it, and you don't have to send it to the FCC.  But if it is not obvious to you, then you should obviously be the one.

THE COURT:  Okay.

MR. SAVAGE:  But more seriously, putting aside the primary jurisdiction argument, there is a fundamental flaw in this pleading, which is you cannot tell from the pleading, you cannot tell from their papers, you cannot tell from any explanation that is given what is the standard of conduct that they think we should have followed -- I'll get to the other analogies in a minute -- but that is a flawed pleading.  A proper pleading says, "The defendant should have X; instead,

they have Y," right.  To say, "Defendant didn't X" --

THE COURT:  But in a misrepresentation case, the allegation is the defendant shouldn't have misrepresented.  And you say here, "What should they not have misrepresented?"  Where the call came from.

MR. SAVAGE:  This is why we get into the slight technical slide of it all.  I think it is obvious in common experience.  It is not a misrepresentation for a cell phone to send the number that is assigned to that cell phone.  Calling it a misrepresentation, with all due respect, it's playing a semantic game.  It did what it is supposed to do.  They wanted us to do something else.  They wanted us to do something different or something more.

THE COURT:  But the allegation that I'm hearing, and I don't know if it is technologically right, and you're saying it is impossible for your client to do, is the misrepresentation was that this call originated or began in Haiti, not the United States.

MR. SAVAGE:  Let me parse this out a little bit.  All of this is, again, evidence from the publicly cited FCC materials I cited, although they're long and complicated, so I am not testifying.  I'm summarizing things.

But if you stop and think about it, when we are talking about where the call is coming from, no telephone network ever knows where the call is coming from.  All that it

knows is in the signaling stream is a series of 10 digits or 13 if you have international.

THE COURT: I remember seeing telephone bills, certainly on my old land lines -- I don't know about my cell phone -- but on my old land lines that said that I made a call from Oregon to New York.

MR. SAVAGE: Yes. And let me tell you how it did that. What gets transferred to the network is simply the number of the phone. If the phone is assigned a 503 number --

THE COURT: Sure.

MR. SAVAGE: They are the CDRs. I can find you citations for this. This is why, I'd argue to the FCC, if you want to get into it. The CDRs go through a process called mediation, which runs through a bunch of computers. It says, okay, if it is a 503 number here and a 202 number there, that means it was a call between Oregon and Washington, D.C.

THE COURT: Correct.

MR. SAVAGE: So when he is talking about misrepresenting where it is coming from, all he is really saying is the number that is being sent to the network is a number that is a local Haitian number and not some other number.

Now, what he has not explained and cannot explain is how it would be possible for a resold cell phone service -- you used to put the handsets in the cradles. I believe, if I

recall the discussion and the analogy earlier, that wouldn't be fraud, right, because that's just connecting to a phone, right. But if it is just a handset in a cradle, of course, it is going to send out its number.

Again, we can get into this at the FCC. We can get into this if the case isn't dismissed, but I submit to you that it is a fundamental flaw in the pleading that they haven't explained what it is they actually wanted us to do, and he didn't explain it here. That's 1.

2. You and I had an exchange about the kinds of damage that might be relevant -- the blah, the blah, the blah, the blah-dah. When he gets up and talks about his case, it is about theft. It is about you didn't get paid. That's all about the 23 cents, and the 23 cents -- if he had said, as they were hypothesizing, "Well, they didn't pay the established rate," my objection to that would be the same. There is no United States established rate, and they haven't pled it. They are saying there's an established rate by the government of Haiti, but they haven't explained it.

A foreign legal requirement is essentially a fact that must be pled with specificity under Twombly and Iqbal. They have utterly failed to do that, and I submit to you that he can't even talk about his case without the money. The money comes back to the 23 cents, and the 23 cents is simply not adequately pled. It is dismissible. If any part of this case

survives, you should, nonetheless, dismiss claims based on an entitlement to 23 cents, because they haven't pled it.  They can't plead it.  I submit it doesn't exist, but that's a different problem.

Third, what I was waiting for someone to say, when we were talking about the train going and blah, blah.  Well, once you get beyond Oregon, well, then it becomes a matter of the Interstate Commerce Commission.  You have rate proceedings, and you have rate complaints and all those sorts of things.  He is describing a classic regulatory rate problem.  He is saying that the rate that ought to apply, because it started in New York and made its way through Oregon to Haiti is a different rate than the rate that would apply if it started in Haiti.

THE COURT:  Are you saying that if the train rate for traveling within Oregon is $1, the train rate, as regulated by the ICC to go to New York is $5, and if somebody brings in their friend hidden in a trunk, and that gets caught, the train company can't sue is that person in the trunk in Oregon for fraud?

MR. SAVAGE:  I lost "trunks" and "state lines" here. The way it works, both in telecom and in the old days for transportation, in fact, there are intrastate regulators, the Oregon PUC for telecom, and there are interstate regulators. If the guy hiding in the trunk goes from Salem to Portland,

that's a problem for the Oregon regulators.

THE COURT:  No.  The Oregon regulators set the fare. It is a problem for the transportation provider who's not getting paid.

MR. SAVAGE:  Why is there primary jurisdiction? There is actually a lot of statutory law about that.  Some regulatory statutes permits suits to recover fares against customers in court; others require/resort to the agency.

THE COURT:  Really?

MR. SAVAGE:  Yeah.  In the FCC's case, the FCC will entertain complaints by customers that they have not been charged the current rate.  They will not entertain complaints by carriers that they didn't get paid.

Now, tariff law says that an approved tariff by the FCC has the force of law and is enforceable in a suit of court, whether it's federal court or state court.  That's great. That's why we get back to the inadequacy of the 23 cents pleading.  If they had wanted to plead that there was some established rate and that they were suing on that, whatever objections I might have to that, it wouldn't be dismissable as improperly pled, but they don't plead an FCC rate or a contract or a tariff rate or anything else.

They say that the government of Haiti requires this. I understand the exchange we had about, well, there might be some damages -- blah, blah, blah.  But at the end of the day,

they can't describe their case without saying it is about the money, right. If we could agree on an accounting for the number of calls that went through and said, "Fine, here is your 23 cents for those calls," we'd be done, right. They would have no damages.

So I think it is actually an error to say that the 23 cents is not essential, and I would urge you to think about that when you are re-thinking this, because when they describe their case, that's what it's about. It's about money. We're not doing this for fun.

THE COURT: Of course not.

MR. SAVAGE: So with respect to what happens if you go with the primary jurisdiction argument, I'm not sure whether we have a strong preference. What we've requested in our papers was dismissal. Part of the reason for that, for what it is worth, was those kind of considerations, which is the case is done. They can decide whether they want to appeal it. If they do, we can fight out the legal question in the Ninth Circuit and move on. The advantage to not dismissing it is what? I mean --

THE COURT: The advantage to not dismissing it, if I'm wrong and if the FCC were to say, "This isn't properly before us, we just look at other things, not these sorts of issues, this is properly in state court," then they would have to refile a new a case or move to reopen perhaps, and that's

difficult.  The easiest thing to do is to stay it for a few months.

MR. SAVAGE:  Right.  Exactly.

For that matter I think my preference, as stated, would be dismissal and then move with the consequences of that. But if Mr. Vaughan has some very different view, we can confer about that.

THE COURT:  What I am hearing from Mr. Vaughan, although he opposes any primary jurisdiction dismissal and/or stay, if I were to invoke primary jurisdiction, he would prefer that I, No. 1, stay it; and No. 2, if he were to file a 1292(b), interlocutory certification, that I'd grant it.  If we get there, I would ask him first to confer with you.  And if you were going to file that motion, if we do get there, just let me know whether it is opposed or unopposed.

MR. SAVAGE:  I apologize.  I'm not, right now, familiar enough with the standards that apply to that motion to have an opinion.

THE COURT:  I'm not asking for your opinion now on that.

MR. SAVAGE:  Okay.  So beyond all that, I'm trying to see if there is anything else that is critical.  The key thing, I would just come back to is, there is no standard of behavior that he is trying to hold us to that he has alleged. Notwithstanding the earlier argument about technological

misrepresentation or your earlier ruling, for that matter, their own complaint, particularly in paragraph 26, explains how this data gets exchanged, and it gets exchanged switch to switch.

THE COURT:  One second.  Let me turn to page 26.

MR. SAVAGE:  They're describing the creation of the CDRs, the Call Detail Records that they want.

THE COURT:  Yes.

MR. SAVAGE:  It says, "The information in the CDR regarding the calling and called telephone numbers is contained in the electronic signaling information transmitted from the sending switch as part of the technical process from handing off the call from one switch to another."  That's basically correct.  I mean, there is a bunch of industry standards on how that's done.

That's not the situation he is describing as what we did.  That's not what he is alleging we did.  He is not alleging that we have a switch that connected to their switch and somehow we messed with the data and misrepresented it.  The very process he is describing for sending this data doesn't match the technique arrangement that he is alleging we did.

Again, I would submit to you that it is not misrepresentation not to be able to fly the car to Hawaii, and that's what he is talking about.  A switch-to-switch is a plane to Hawaii, but a cell phone or a SIM card reaching out to the

network is trying to fly a car to Hawaii, and it just doesn't happen.

Again, we can get there on summary judgment.  The FCC already understands this if it goes to the FCC.  But I would submit to you that you really have a sufficient basis to say that they have failed to prove both money damages or technological fraud.  I would urge you, in your consideration, to reach that conclusion.

THE COURT:  Thank you, Mr. Savage.  I appreciate it.

Mr. Vaughan, briefly, but not quickly.

MR. VAUGHAN:  Briefly, but not quickly.

The reason why Mr. Savage is urging you to find some other basis is because the FCC basis fails.  The Court, when you are reviewing this primary jurisdiction argument, you're going to see, one, it is the Court's discretion as to whether or not we even consider this.

But beyond that, two, Mr. Savage just said that the FCC will not entertain claims by carriers that they did not get paid, yet we are being send over to the FCC to complain that we did not get paid from UPM.  He said, "They don't plead" -- that's us -- "that there was an FCC rate, that there was a contract, or there was a tariff," yet we are being sent over to the FCC by his suggestion --

THE COURT:  I understand.

MR. VAUGHAN:  -- to go and have the FCC rule on what?

Then we are talking about the pleading, and there are a couple of problems that I have with the pleading. This is where I will end my brief comments.

One, you were just directed to paragraph 26. Paragraph 26 falls squarely within the description of how a legitimate call is terminated. That subheading is right before paragraph 22.

THE COURT: Right.

MR. VAUGHAN: Why did we do that? Because, as we were trying to, not only plead the short and plain statement of the facts, we wanted to and were ordered/invited to provide context: Tell me how this is supposed to work. Where did it deviate?

That's what this was about. Those allegations, while they provide the context, and that's the purpose they serve, really don't go to the underlying claim: They stole services from Digicel.

THE COURT: I read that section about how it is legitimately provided as giving me the context --

(The Court consulted with counsel on another case.)

(Proceedings resumed:)

MR. VAUGHAN: I'll wrap up, Judge. Before we close, I think that it is important that we do one thing here that we have overlooked/skipped/decided not to do every time we have done this, and that is what Your Honor said at the very

beginning of this hearing. We are here on a motion to dismiss. We are here to poke and prod at this complaint to determine whether or not it plausibly sets forth an allegation or a set of allegations supporting claims upon which relief can be granted. You have made that determination already. It is law of the case.

What we have now is Mr. Savage going outside the four corners of the complaint, with all due respect, to testify about what the FCC would have done and how it will treat this and how the FCC would handle this.

THE COURT: Well, it is in the context that he is explaining to me why your allegations are not plausible, and that's fair to consider on a 12(b)(6).

MR. VAUGHAN: It is fair to consider on a 12(b)(6), except Your Honor has already ruled on this. Now, why is that important? I'm not throwing that out to throw egg in anybody's face, but what does that mean? It means in February you had enough on this paper to say they have met the plausibility requirement, which means you may have an alternative explanation. But if I have two competing explanations, and the case law is crystal clear, and your explanation as the defendant doesn't on its face render mine totally and completely implausible -- not improbable -- implausible, then, Mr. Savage, they win on a motion to dismiss.

And one more time, Judge, we are going to take

literally the last remaining thing stuck to the wall, and we are considering pushing this off again.  That's all I'm going to say, Your Honor.

THE COURT:  Very good.

Thank you, Counsel, for your excellent written advocacy and oral advocacy.

I also thank our court reporter.  I think he deserves combat pay for today.

I will take it under advisement.

Thank you, Dennis.

(Court adjourned.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca                    March 21, 2017
DENNIS W. APODACA, RDR, RMR, FCRR, CRR            DATE
Official Court Reporter

MR. HANSEN: [1] 3/13
MR. SAVAGE: [86]
MR. VAUGHAN: [43] 3/10 3/15 37/13
37/15 37/20 37/23 38/7 38/10 38/21
39/15 40/17 41/12 42/12 44/25 46/19
47/1 47/4 47/11 47/15 48/15 48/17
48/21 50/8 50/19 51/8 51/10 51/21
53/9 53/16 53/18 54/5 54/9 55/23 56/3
56/7 56/10 56/15 57/12 68/10 68/24
69/8 69/21 70/13
MR. VAUGHN: [1] 44/23
MS. DuBAY: [1] 3/20
THE CLERK: [1] 3/3
THE COURT: [129]

**$**

$1 [1] 63/16
$5 [1] 63/17

**'**

'96 [1] 16/21

**-**

--oOo [1] 72/2

**/**

/s [1] 72/9

**1**

10 [1] 61/1
100 [1] 2/3
1000 [1] 2/24
113 [2] 3/6 4/1
12 [10] 29/20 38/3 38/10 51/2 53/4
53/6 53/7 56/20 70/13 70/14
121 [1] 2/9
1211 [1] 2/6
1292 [5] 55/18 56/11 56/14 57/8 66/12
13 [1] 61/1
15 [3] 1/5 3/1 35/8
15-185-SI [1] 3/7
1850 [1] 2/9
1900 [1] 2/6
1919 [1] 2/11
1998 [1] 35/12

**2**

20006 [1] 2/12
2001 [1] 2/3
201 [1] 28/14
2016 [4] 18/11 30/15 40/20 50/17
2017 [3] 1/5 3/1 72/9
202 [2] 28/14 61/15
21 [1] 72/9
21st [2] 37/1 37/6
22 [1] 69/7
23 [16] 4/16 4/21 5/3 5/5 5/6 44/7
53/22 53/22 62/14 62/14 62/24 62/24
63/2 64/17 65/4 65/6
23-cent [2] 4/13 21/22
26 [5] 19/14 67/2 67/5 69/4 69/5

**3**

30 [1] 20/1
30,000-foot [1] 42/7
30-year [1] 22/15
301 [1] 2/24
326-8182 [1] 2/25
33394 [1] 2/4

**3:15-cv-00185-SI [1] 1/3**

3rd [1] 40/20

**4**

47 [1] 35/22

**5**

503 [3] 2/25 61/9 61/15

**8**

800 [1] 2/11
8182 [1] 2/25

**9**

97201 [1] 2/6
97204 [2] 2/9 2/24

**A**

able [2] 10/7 67/23
about [70] 6/24 10/10 10/10 10/11
10/11 12/9 15/8 15/13 15/13 15/25
16/9 16/11 16/11 17/21 18/6 18/17
19/13 19/24 21/7 22/18 22/25 23/4
24/2 24/18 26/2 30/14 31/7 35/8 35/20
36/3 38/11 40/6 40/14 41/7 42/7 42/12
42/24 42/25 42/25 45/17 48/1 48/22
50/18 53/12 54/15 57/3 60/23 60/24
61/4 61/18 62/10 62/12 62/13 62/13
62/14 62/23 63/6 64/6 64/24 65/1 65/7
65/9 65/9 66/7 66/25 67/24 69/1 69/14
69/18 70/9
above [1] 72/6
above-entitled [1] 72/6
absence [1] 30/12
absolutely [6] 3/11 39/18 40/8 40/18
48/1 52/20
abstract [4] 16/10 16/10 16/11 22/23
academic [2] 42/7 50/23
accept [1] 53/8
accepted [1] 28/5
access [1] 37/17
accessed [1] 40/4
accident [1] 14/7
accountability [1] 47/23
accounting [1] 65/2
accurate [1] 19/16
accurately [2] 29/24 30/24
accusing [1] 22/2
Act [3] 12/2 12/5 15/11
acted [1] 30/10
acting [1] 16/1
action [2] 8/9 26/21
actionable [4] 12/7 14/13 34/2 34/10
active [11] 4/18 18/22 30/15 30/25
40/12 40/16 46/19 46/20 47/11 56/22
58/3
activities [1] 15/2
activity [1] 42/25
actual [8] 6/20 6/22 7/21 7/22 8/12
22/25 31/15 49/13
actually [22] 7/14 8/6 10/13 10/16
10/17 20/2 29/8 29/21 32/16 32/17
35/20 39/1 45/2 45/2 46/10 46/11
51/12 58/20 59/5 62/8 64/6 65/6
add [1] 28/23
addition [1] 19/22
additional [1] 41/22
address [2] 7/15 42/13
addressed [1] 13/6
addresses [1] 59/4

addressing [1] 56/25
adequately [3] 18/12 18/20 62/25
adjourned [1] 71/11
advantage [2] 65/19 65/21
advisement [1] 71/9
advocacy [2] 71/6 71/6
advocate [3] 25/4 25/4 28/16
affect [1] 9/4
affirmative [5] 29/14 40/15 40/16 42/1
42/4
affirmatively [1] 14/25
after [5] 12/11 23/7 43/23 52/14 52/18
again [11] 20/22 21/16 51/1 52/3 55/24
57/20 60/20 62/5 67/22 68/3 71/2
against [3] 17/3 39/11 64/7
agency [4] 23/1 24/6 42/9 64/8
ago [1] 20/5
agree [9] 21/3 24/10 24/11 31/18 31/21
34/1 40/10 48/8 65/2
agreement [1] 42/21
agreements [1] 42/18
al [2] 1/7 3/8
all [51] 4/2 5/10 5/19 6/24 10/2 11/12
14/16 14/16 16/14 17/21 22/6 22/16
22/24 22/24 23/4 23/7 23/13 24/24
27/24 29/24 31/8 32/21 34/3 34/21
36/5 36/10 39/18 40/23 41/9 48/24
49/20 50/17 51/2 51/3 51/11 52/18
53/2 54/15 56/20 58/12 59/1 60/7
60/10 60/19 60/25 61/19 62/13 63/9
66/21 70/8 71/2
allegation [10] 5/2 7/22 27/8 30/12
41/25 42/20 45/7 60/3 60/14 70/3
allegations [11] 19/24 39/7 51/3 57/19
57/21 57/22 57/25 58/8 69/14 70/4
70/12
allege [15] 5/6 7/20 7/24 19/17 19/20
19/23 20/11 20/18 20/19 20/23 21/11
23/8 28/25 36/15 38/21
alleged [22] 5/3 7/15 9/13 17/25 18/2
18/3 18/18 18/19 18/20 20/3 20/4 20/6
25/10 26/4 26/25 29/9 29/14 36/20
41/6 41/18 41/24 66/24
allegedly [2] 9/21 14/12
alleges [1] 46/17
alleging [5] 21/10 42/23 67/17 67/18
67/21
allow [2] 8/18 25/23
allowed [1] 23/22
alone [1] 5/24
along [1] 5/14
already [6] 27/1 53/12 57/2 68/4 70/5
70/15
also [12] 3/17 4/23 13/12 13/24 21/6
25/25 28/9 30/4 37/4 42/14 47/7 71/7
alternative [2] 58/9 70/19
although [4] 30/16 50/3 60/21 66/9
am [24] 8/13 10/8 10/24 11/6 11/11
20/15 20/16 23/18 25/9 27/23 30/18
31/11 37/25 38/1 38/15 39/20 39/21
43/13 44/19 46/3 52/20 57/1 60/22
66/8
ambiguity [1] 51/13
ambit [1] 38/9
amended [3] 3/6 4/1 41/2
America [1] 15/25
American [2] 9/25 32/11
amount [1] 9/25
analogies [1] 59/24
analogous [1] 14/6

## A

analogy [7]  5/12 30/16 30/17 45/10 45/18 46/5 62/1
analysis [1]  51/2
and blah [1]  22/13
and/or [1]  66/9
another [6]  7/17 19/15 52/23 58/25 67/13 69/20
answer [14]  8/20 12/2 14/15 25/1 31/7 31/18 38/1 38/5 38/5 38/11 43/13 52/15 52/16 52/21
answered [1]  58/20
answering [1]  36/10
answers [1]  31/6
anticipate [1]  56/21
anticompetitive [7]  9/23 15/1 16/4 23/23 40/7 42/17 42/25
antitechnology [1]  9/23
any [38]  4/12 5/4 5/22 5/23 6/16 7/2 7/15 7/20 9/6 14/4 14/5 14/6 14/9 14/25 17/12 18/2 18/17 19/17 20/3 23/22 23/24 24/2 26/20 26/21 26/24 28/9 29/9 29/9 39/2 40/13 42/23 48/13 54/3 55/25 58/12 59/21 62/25 66/9
anybody [3]  46/9 46/10 58/12
anybody's [1]  70/16
anything [11]  18/3 18/4 24/2 25/21 34/19 52/6 52/8 57/14 58/1 64/22 66/22
anywhere [4]  23/24 31/25 32/5 52/8
Apodaca [3]  2/23 72/9 72/10
apologize [2]  55/10 66/16
apparently [1]  36/4
appeal [2]  55/15 65/17
appearance [1]  35/11
APPEARANCES [1]  2/1
appeared [1]  10/9
appliances [2]  44/20 45/1
applies [1]  42/16
apply [3]  63/11 63/13 66/17
appreciate [1]  68/9
appropriate [4]  26/10 27/13 36/21 44/8
appropriately [1]  39/9
approved [1]  64/14
are [109]
aren't [3]  16/24 17/4 57/23
argue [1]  61/12
argued [1]  24/12
arguing [3]  13/16 13/18 52/24
argument [26]  3/5 4/4 10/22 17/13 22/10 22/21 22/22 23/16 26/14 28/4 33/13 35/5 39/5 45/11 48/9 53/7 53/7 53/8 53/12 53/14 53/15 55/21 59/19 65/13 66/25 68/14
arguments [1]  14/19
arm [1]  33/7
around [5]  10/5 11/5 17/17 32/12 52/2
arrangement [3]  43/20 59/1 67/21
arrangements [1]  32/1
articulated [5]  41/14 44/17 50/11 50/17 51/13
articulation [2]  51/1 53/19
as [68]  4/19 6/22 10/12 10/12 10/14 12/19 12/19 15/3 15/5 15/12 15/13 16/1 17/23 19/18 20/9 21/19 22/14 23/3 25/13 26/11 27/20 27/25 28/5 29/3 29/22 29/23 30/7 30/12 32/24 33/7 33/16 33/20 34/21 35/1 35/12 35/17 36/4 36/17 36/20 36/20 38/13 38/14 42/15 43/4 44/20 46/5 46/5

47/17 47/17 49/11 51/13 51/13 51/17 53/15 54/1 57/18 57/21 58/8 62/14 63/16 64/20 66/4 67/12 67/16 68/15 69/9 69/19 70/1
aside [5]  11/11 11/12 15/24 22/21 59/18
ask [12]  8/13 8/19 26/12 31/3 31/11 31/19 39/7 48/11 53/11 54/19 55/17 66/13
asked [2]  51/4 57/24
asking [1]  66/19
assigned [2]  60/9 61/9
associate [1]  33/22
associate's [1]  34/4
associated [1]  34/18
associates [1]  34/5
assume [4]  6/13 11/13 48/7 48/8
assuming [1]  24/21
attack [1]  45/16
au [1]  38/16
aughts [1]  35/15
authority [2]  16/2 16/21
Avenue [4]  2/3 2/6 2/11 2/24
avoid [4]  9/23 21/21 42/5 58/21
avoided [5]  36/12 37/13 43/11 43/12 43/14
award [1]  50/7
aware [1]  49/9
away [1]  5/3

## B

baby [1]  5/14
back [35]  9/7 11/4 14/14 15/23 18/7 18/11 18/19 21/23 25/1 25/19 29/5 29/6 33/10 34/14 35/7 39/13 40/4 41/8 43/8 48/14 49/4 49/12 50/15 50/24 51/1 51/19 52/4 53/11 55/9 56/25 57/18 58/18 62/24 64/17 66/23
back-up [1]  41/8
background [1]  17/25
bad [8]  5/17 7/3 13/19 13/22 13/24 13/25 32/17 53/8
bag [1]  50/2
baggage [1]  39/2
balancing [1]  11/22
bank [1]  49/17
bar [1]  22/15
bark [1]  32/2
based [5]  18/12 21/20 21/21 26/25 63/1
basic [2]  12/9 12/11
basically [1]  67/13
basis [7]  9/6 21/16 28/5 31/9 68/5 68/13 68/13
bathroom [2]  46/7 46/19
be [81]
beat [1]  53/10
because [55]  4/15 6/11 7/2 7/5 7/9 8/18 13/2 17/9 17/10 20/17 20/20 21/3 21/5 21/6 21/20 23/7 23/9 27/7 28/25 29/6 30/3 32/4 32/16 33/12 36/24 38/1 39/17 40/25 41/5 42/13 42/16 42/16 42/21 43/12 44/8 44/17 45/10 46/4 46/22 49/1 49/11 49/22 50/11 51/21 54/8 54/11 54/12 55/16 58/13 62/2 63/2 63/11 65/8 68/13 69/9
becomes [3]  13/9 49/12 63/7
been [17]  4/19 10/7 18/18 19/20 19/25 28/5 28/8 37/24 38/12 39/17 42/6 50/21 50/22 51/17 53/21 54/12 64/11
before [14]  1/15 5/8 10/9 10/23 16/23

22/15 35/1 46/13 46/16 52/4 56/13 65/23 69/8 69/22
began [1]  60/17
begin [1]  36/10
beginning [2]  3/9 70/1
begs [1]  42/22
behavior [1]  66/23
behind [1]  47/8
behold [1]  47/8
being [13]  11/16 27/8 32/7 34/18 38/15 38/18 39/3 52/6 56/4 56/17 61/20 68/19 68/22
believe [3]  9/6 24/10 61/25
belong [1]  55/8
belongs [1]  55/8
below [1]  72/4
bench [1]  54/20
benefit [4]  10/19 43/2 43/3 43/8
best [1]  22/7
better [1]  37/4
between [7]  13/12 35/21 42/19 42/22 42/24 53/3 61/16
beyond [8]  10/15 39/8 52/6 52/8 58/16 63/7 66/21 68/17
big [5]  5/24 30/20 30/21 35/14 35/17
bills [1]  61/3
bit [11]  10/8 18/10 37/19 37/23 42/15 50/21 51/5 53/13 54/21 59/7 60/19
blah [18]  11/14 11/14 11/14 22/13 22/14 22/14 31/16 31/16 31/16 62/11 62/11 62/11 62/12 63/6 63/6 64/25 64/25
blah-dah [1]  62/12
blank [1]  8/13
blatantly [1]  9/23
boat [2]  5/13 5/13
body [4]  14/23 15/24 22/18 24/2
boils [2]  26/23 31/16
border [1]  46/8
borders [1]  9/16
both [8]  15/10 21/15 27/21 50/20 56/15 57/24 63/22 68/6
bottom [1]  47/20
bought [3]  5/7 16/12 29/25
boy [1]  7/6
breach [1]  12/15
breached [2]  20/20 20/24
bribe [1]  12/6
brief [2]  9/2 69/3
briefly [2]  68/10 68/11
bring [4]  15/19 22/6 43/21 51/19
brings [2]  17/3 63/17
brought [1]  47/10
buddy [1]  47/9
built [1]  49/10
built-in [1]  49/10
bunch [4]  33/2 49/13 61/14 67/14
bunch of [1]  33/2
business [15]  7/5 7/8 7/12 11/1 11/21 15/12 20/1 21/20 21/21 27/5 27/6 27/22 33/20 37/6 43/20
businesses [1]  15/16
businessmen [1]  15/15
businesswomen [1]  15/16
button [1]  49/8
buy [2]  5/16 12/13
buying [1]  57/24
buys [1]  6/7
bypass [3]  10/11 25/15 32/10
bypassing [1]  44/15

**C**

C.F.R [1]  35/23
C.L [1]  2/2
call [33]  19/15 20/9 27/10 29/3 32/1
 32/17 32/19 32/23 32/24 33/2 33/6
 33/6 33/9 33/11 33/25 34/5 34/8 35/19
 38/15 38/17 38/23 38/25 39/3 49/15
 60/5 60/17 60/24 60/25 61/5 61/16
 67/7 67/13 69/6
called [3]  35/15 61/13 67/10
calling [6]  10/18 17/9 17/11 17/16 60/9
 67/10
calls [6]  7/17 9/25 16/13 45/5 65/3 65/4
came [6]  34/5 35/14 45/13 47/6 51/12
 60/5
camera [1]  33/24
cameras [1]  44/25
can [49]  7/4 8/10 8/19 10/3 11/14
 11/15 11/23 13/6 14/2 14/3 14/14
 15/19 15/20 17/5 20/1 23/25 26/3
 28/19 28/21 29/23 33/24 35/19 39/6
 39/12 40/8 41/6 41/7 43/19 43/20
 43/22 44/9 44/10 49/5 51/12 52/22
 55/4 55/15 55/16 56/11 58/25 59/13
 61/11 62/5 62/5 65/17 65/18 66/6 68/3
 70/4
can't [12]  8/12 13/20 21/24 22/2 22/5
 29/1 49/6 52/16 62/23 63/3 63/19 65/1
cannot [5]  6/9 59/20 59/21 59/21 61/23
capable [1]  19/20
capital [1]  43/15
car [5]  20/21 20/25 31/17 67/23 68/1
card [3]  18/13 41/3 67/25
cards [3]  18/18 38/14 58/6
care [2]  9/8 13/25
cares [1]  12/24
carriers [2]  64/13 68/18
cars [2]  21/6 21/8
case [63]  3/6 3/7 4/10 4/13 11/24 14/17
 17/3 17/8 22/12 22/20 23/5 23/6 23/10
 23/22 24/15 24/22 25/6 26/2 27/3 28/9
 28/15 29/8 29/12 29/12 29/14 30/3
 30/11 30/23 31/7 36/18 39/6 39/6
 39/20 40/6 40/11 40/12 40/16 41/11
 47/15 48/9 53/8 53/9 54/23 55/3 55/5
 55/6 55/18 56/4 57/6 59/6 60/2 62/6
 62/12 62/23 62/25 64/10 65/1 65/9
 65/16 65/25 69/20 70/6 70/21
cases [11]  6/18 14/4 14/9 15/7 16/16
 19/7 24/17 28/3 31/25 32/3 32/3
caught [2]  46/12 63/18
cause [5]  8/8 12/22 12/22 54/7 72/6
caused [3]  6/16 9/17 11/8
causes [3]  11/2 14/11 14/12
causing [1]  11/3
CDR [1]  67/9
CDRs [3]  61/11 61/13 67/7
cell [10]  17/22 17/22 18/1 18/2 19/18
 60/8 60/9 61/4 61/24 67/25
cellular [1]  23/12
cent [2]  4/13 21/22
cents [16]  4/16 4/21 5/3 5/5 5/6 44/7
 53/22 53/22 62/14 62/14 62/24 62/24
 63/2 64/17 65/4 65/7
century [2]  37/1 37/6
certain [1]  35/14
certainly [4]  10/9 19/9 59/1 61/4
certification [3]  56/11 57/8 66/12
certified [1]  72/8
certify [2]  55/18 72/4

challenge [1]  53/25
challenging [1]  47/18
changes [1]  49/11
charge [2]  44/7 46/24
charged [4]  14/23 22/18 38/25 64/12
charges [1]  45/8
cheaper [2]  10/18 16/13
cheat [2]  12/12 12/13
check [1]  50/4
chest [4]  47/8 47/9 47/9 47/14
China [3]  11/17 12/12 13/11
choice [2]  53/23 55/20
choices [1]  24/23
Christopher [2]  2/10 3/22
circling [1]  46/21
Circuit [4]  15/9 15/10 56/14 65/19
circumstance [1]  14/6
circumstances [2]  9/20 14/11
citations [1]  61/12
cite [1]  14/4
cited [2]  60/20 60/21
citing [1]  36/2
citizen [1]  15/19
City [1]  11/1
civil [1]  3/7
claim [34]  3/6 5/4 5/5 6/22 8/5 8/11
 8/11 11/24 12/19 12/25 14/10 14/17
 14/18 15/4 15/5 15/5 15/20 16/11 17/3
 18/12 21/2 26/7 26/24 27/7 28/5 28/16
 28/17 33/6 39/8 41/19 42/21 57/18
 58/2 69/16
claimed [1]  28/1
claiming [3]  30/3 30/22 30/23
claims [7]  8/3 9/6 27/5 40/22 63/1
 68/18 70/4
clandestine [2]  44/18 45/5
classic [2]  7/21 63/10
Clause [1]  13/3
clear [4]  19/10 38/1 38/2 70/21
clearly [1]  54/16
cleverly [1]  28/19
client [8]  9/13 10/17 20/7 29/15 29/17
 29/19 46/17 60/16
clients [1]  4/17
clients' [1]  25/5
close [5]  27/16 54/24 55/11 56/5 69/22
closer [1]  27/19
cloud [1]  49/20
cognizable [2]  11/9 47/4
cognizance [1]  26/5
colleague [1]  33/22
combat [1]  71/8
come [30]  6/6 7/11 7/17 12/17 15/19
 19/21 23/21 25/1 25/18 25/22 29/5
 29/6 33/20 34/1 34/4 39/13 41/23 44/5
 46/4 46/13 46/16 46/23 47/6 49/4
 49/15 50/15 50/24 52/4 55/9 66/23
comes [7]  6/4 7/8 11/4 32/17 32/22
 46/2 62/24
coming [6]  34/19 39/1 48/25 60/24
 60/25 61/19
comments [1]  69/3
Commerce [1]  63/8
Commission [1]  63/8
commit [4]  15/16 18/25 23/20 49/12
committed [4]  4/17 15/17 23/14 24/6
common [8]  8/19 14/10 14/13 15/20
 17/23 21/17 22/17 60/7
communication [1]  20/8
communications [6]  15/11 22/15 25/12

26/20 42/10 42/11
companies [2]  9/18 42/18
company [7]  26/11 35/15 43/18 44/1
 46/17 54/3 63/19
compared [1]  30/7
compete [1]  40/9
competed [1]  43/16
competing [2]  45/14 70/20
competition [3]  10/4 10/11 49/4
complain [1]  68/19
complaint [25]  4/1 4/22 5/5 14/2 19/11
 20/19 20/23 21/15 22/2 22/4 35/1 41/2
 50/3 50/4 51/5 52/4 52/6 52/9 52/15
 52/19 59/3 59/11 67/2 70/2 70/8
complaints [3]  63/9 64/11 64/12
complete [4]  4/12 7/16 43/22 44/4
completed [1]  39/3
completely [6]  4/9 23/17 39/3 47/14
 49/25 70/23
complexity [1]  59/8
complicated [2]  23/11 60/21
computer [3]  34/6 34/18 34/19
computers [2]  35/21 61/14
CONATEL [4]  32/15 32/16 32/21 34/22
concealment [11]  4/18 18/22 30/15
 30/25 40/12 40/16 46/19 46/20 47/11
 56/22 58/3
conceded [1]  34/10
concept [2]  50/13 50/23
concern [3]  10/2 13/14 17/12
concerned [1]  17/15
conclude [1]  27/1
concluded [1]  40/21
conclusion [4]  37/22 44/19 51/12 68/8
conclusory [1]  7/21
conditions [2]  17/4 17/16
conduct [6]  20/3 25/10 25/11 36/20
 59/4 59/22
confer [3]  55/18 66/6 66/13
conflicted [1]  37/25
conformed [1]  72/7
confused [1]  6/24
Congress [8]  12/3 14/23 16/2 16/21
 22/18 23/1 23/14 35/12
conjure [1]  49/6
connected [2]  49/15 67/18
connecting [1]  62/2
connectivity [2]  43/21 49/2
consequences [2]  55/4 66/5
consider [3]  68/16 70/13 70/14
consideration [3]  9/19 55/22 68/7
considerations [1]  65/16
considering [1]  71/2
consistent [1]  25/11
constitute [1]  28/21
constitutes [1]  32/14
consultation [1]  56/12
consulted [1]  69/20
consumer [1]  28/14
consumers [1]  9/25
contained [1]  67/10
contend [1]  36/11
content [1]  32/24
contention [1]  13/15
contest [1]  29/22
context [9]  15/4 16/16 17/2 17/14 35/3
 69/12 69/15 69/19 70/11
contract [7]  12/6 12/15 17/1 17/3 44/11
 64/21 68/22
contractual [1]  42/23

**C**

contrary [1]  14/9
controversial [1]  24/5
conversation [3]  38/4 42/7 44/24
conversion [2]  48/4 56/24
convinced [3]  23/17 23/19 27/7
corners [1]  70/8
correct [9]  6/8 6/11 18/15 34/20 38/8
 39/7 61/17 67/14 72/5
correctly [1]  34/10
corresponds [1]  29/25
Corrupt [2]  12/2 12/5
cost [1]  54/3
costs [2]  7/12 43/23
costume [1]  46/3
could [30]  3/9 7/6 7/13 12/5 12/17
 12/23 17/25 18/1 19/1 19/19 23/8
 23/24 26/1 26/22 30/13 43/11 43/13
 43/14 43/17 43/24 43/25 44/5 51/15
 51/15 51/16 51/17 54/7 54/11 59/1
 65/2
couldn't [4]  12/18 19/23 30/20 30/22
counsel [4]  3/9 55/19 69/20 71/5
counterclaim [1]  51/21
countries [1]  13/13
country [5]  11/20 12/6 12/6 12/8 14/13
couple [3]  4/24 58/16 69/2
course [7]  10/14 11/14 23/18 24/23
 31/23 62/3 65/11
court [35]  1/1 1/16 2/23 3/3 3/9 11/9
 11/15 11/15 14/5 14/11 14/16 16/20
 17/5 23/24 26/5 26/6 26/8 39/10 39/13
 46/13 46/14 46/16 51/4 55/8 56/5 64/8
 64/15 64/16 64/16 65/24 68/13 69/20
 71/7 71/11 72/10
Court's [1]  68/15
Courthouse [1]  2/23
courtroom [1]  3/17
courts [4]  13/7 13/19 13/25 17/17
cousin [1]  33/25
cover [1]  17/17
cradle [1]  62/3
cradles [2]  49/13 61/25
creation [1]  67/6
Credit [1]  13/3
critical [2]  4/24 66/22
crosses [1]  46/8
CRR [2]  2/23 72/10
crystal [1]  70/21
crystalize [1]  52/22
cubbyhole [1]  39/18
cured [3]  31/5 36/12 37/12
current [1]  64/12
customers [2]  64/8 64/11
cut [2]  5/8 19/6
cv [1]  1/3

**D**

D.C [2]  2/12 61/16
dah [1]  62/12
Dallas [4]  46/1 46/9 46/10 46/24
damage [10]  5/9 6/16 6/22 8/3 8/5 8/8
 12/22 12/23 54/8 62/11
damaged [3]  4/19 5/18 54/12
damages [22]  4/20 5/2 8/12 8/14 8/15
 8/16 8/17 8/17 8/20 23/9 50/4 50/6
 50/7 50/12 53/11 53/15 53/16 53/17
 54/18 64/25 65/5 68/6
dark [1]  5/15
darn [1]  59/11

data [10]  18/1 19/12 19/12 19/14 19/19
 21/16 32/24 67/3 67/19 67/20
date [2]  55/11 72/10
David [1]  3/18
Davis [1]  2/11
day [4]  49/1 49/12 50/12 64/25
days [6]  45/12 45/14 49/16 49/18 56/16
 63/22
de [1]  54/4
de minimis [1]  54/4
deadline [1]  54/24
deal [7]  26/18 35/6 35/14 41/10 49/5
 49/6 56/20
dealing [2]  14/23 31/25
deals [2]  42/17 51/24
decades [3]  16/17 32/9 36/3
deceit [2]  39/24 44/14
deceived [1]  7/10
decide [5]  55/2 55/22 56/18 57/4 65/17
decided [1]  69/24
decides [1]  11/4
decision [3]  24/21 25/19 25/23
decisions [1]  23/17
decline [1]  48/13
deeply [1]  7/1
defendant [14]  11/12 11/19 20/24 27/9
 28/16 28/19 34/6 36/11 37/3 39/11
 59/25 60/1 60/3 70/22
defendants [6]  1/8 2/8 3/22 28/8 37/11
 38/12
defendants' [7]  3/5 3/25 4/4 34/4 34/5
 41/8 53/14
defense [7]  9/22 11/18 29/13 42/1 42/4
 46/24 47/4
defer [3]  24/13 41/10 59/9
defined [1]  35/21
definition [1]  42/1
delay [2]  55/10 57/12
delayed [1]  50/14
delighted [1]  4/4
demand [1]  47/22
denied [2]  42/12 50/14
Dennis [4]  2/23 71/10 72/9 72/10
deny [2]  12/6 55/20
denying [2]  56/21 56/23
depend [1]  36/4
depends [1]  9/18
deprived [1]  4/16
deregulate [2]  16/20 16/21
describe [2]  65/1 65/8
described [2]  27/21 36/15
describing [6]  7/25 34/12 63/10 67/6
 67/16 67/20
description [2]  32/17 69/5
deserve [1]  19/7
deserved [1]  12/24
deserves [1]  71/7
designed [1]  21/21
desire [1]  7/1
desk [1]  33/21
detail [2]  29/7 67/7
detailed [1]  36/3
detected [1]  32/7
determination [1]  70/5
determine [2]  47/25 70/2
determined [1]  43/4
deviate [1]  69/13
devices [1]  29/25
dial [1]  34/15
dialed [1]  34/7

dialing [2]  34/22 34/23
did [27]  5/10 11/19 12/21 12/21 12/22
 16/22 18/4 18/19 23/7 25/11 35/18
 40/4 41/24 43/2 44/13 51/3 51/25
 57/23 60/11 61/7 67/17 67/17 67/21
 68/18 68/20 69/9 69/12
didn't [23]  14/17 18/12 18/25 29/4 30/1
 30/4 30/11 32/2 33/6 40/5 42/9 44/4
 44/13 50/10 53/14 54/3 54/7 58/23
 60/1 62/9 62/13 62/15 64/13
difference [1]  35/21
different [13]  13/5 13/5 13/9 25/19
 29/22 34/21 44/9 45/25 54/19 60/13
 63/4 63/13 66/6
differential [1]  7/18
differently [2]  19/1 30/10
difficult [1]  66/1
difficulty [2]  47/22 57/22
Digicel [22]  3/12 3/17 38/14 38/18
 39/22 39/23 40/5 43/14 43/17 43/18
 43/23 44/5 45/6 45/6 45/8 48/23 50/1
 51/16 51/18 54/12 54/13 69/17
Digicel's [1]  37/17
Digicel-Haiti [2]  38/18 51/18
digitally [1]  72/7
digits [1]  61/1
direct [1]  45/5
directed [2]  31/9 69/4
direction [1]  58/7
disagrees [1]  35/1
disappointed [1]  6/23
discovery [2]  54/24 55/11
discretion [1]  68/15
discretionary [1]  24/11
discrimination [1]  5/23
discussed [2]  32/22 57/16
discussing [1]  48/20
discussion [6]  14/20 35/13 38/2 38/3
 44/16 62/1
discussions [1]  33/15
disguised [1]  44/20
dismiss [17]  3/5 4/1 4/10 7/24 19/6
 24/23 36/24 39/6 51/24 55/4 55/6
 55/14 55/23 59/14 63/1 70/1 70/24
dismissable [1]  64/20
dismissal [5]  37/4 56/1 65/15 66/5 66/9
dismissed [2]  23/7 62/6
dismissible [1]  62/25
dismissing [2]  65/19 65/21
disprove [1]  53/25
dispute [1]  42/19
distance [2]  16/19 28/13
district [6]  1/1 1/2 1/16 2/23 23/24 26/3
diversity [1]  26/6
do [80]
docked [1]  49/13
Docket [1]  4/1
doctrine [2]  55/14 59/9
document [1]  35/12
does [18]  8/18 11/20 11/24 15/17 17/23
 18/2 20/13 21/2 24/18 28/3 32/13 34/1
 42/14 53/12 54/1 55/3 58/12 70/17
doesn't [20]  5/22 7/22 9/8 9/15 10/15
 11/24 15/15 26/7 29/8 32/21 33/3
 33/10 40/17 41/5 53/1 55/8 63/3 67/20
 68/1 70/22
dog [1]  32/2
doing [9]  6/16 22/3 29/19 32/13 38/6
 45/7 56/21 58/21 65/10
dollar [1]  8/13

**D**

dolphins [1] 5/14
don't [54] 4/14 5/4 6/2 6/18 7/9 8/22 11/5 11/10 11/24 12/11 14/8 14/16 18/16 18/17 19/20 19/23 20/18 21/6 21/8 22/23 24/5 24/18 27/17 29/17 29/22 35/2 35/24 35/24 36/1 39/2 40/12 43/20 44/6 45/6 46/4 46/9 46/10 46/14 48/12 50/14 52/3 53/2 53/3 53/4 54/21 55/2 55/16 59/10 59/15 60/15 61/4 64/21 68/20 69/16
done [29] 5/17 9/13 15/18 19/1 27/1 29/1 30/9 31/4 31/12 34/23 36/11 37/12 37/20 38/2 38/12 38/20 43/24 49/14 49/23 50/25 52/17 52/21 58/21 59/1 65/4 65/17 67/15 69/25 70/9
door [2] 40/4 43/8
double [1] 50/4
double-check [1] 50/4
doubt [5] 11/9 22/12 43/3 43/3 43/9
down [4] 26/23 31/16 32/11 43/21
drawing [1] 8/13
dripping [1] 23/10
driven [1] 32/11
Dubay [2] 2/8 3/21
due [8] 17/21 19/8 22/16 39/18 48/24 51/11 60/10 70/8
duty [10] 20/20 20/24 20/24 21/4 21/5 29/9 29/13 29/17 30/8 40/13

**E**

each [3] 19/13 26/18 35/22
earlier [6] 17/21 19/8 27/21 62/1 66/25 67/1
early [1] 35/15
easiest [1] 66/1
easily [1] 7/10
ECF [1] 3/6
economic [2] 6/16 11/2
educating [1] 23/4
effect [2] 9/24 26/22
effected [1] 40/1
effectively [1] 25/24
egg [1] 70/16
either [5] 4/18 11/19 36/22 41/6 43/24
Eleanor [2] 2/8 3/21
electronic [1] 67/11
element [4] 6/22 8/5 8/8 53/15
elements [5] 12/19 15/21 40/22 41/20 51/3
else [9] 11/3 11/20 19/22 32/4 44/7 45/9 60/12 64/22 66/22
emphasize [1] 4/8
empire's [1] 45/16
empires [1] 45/14
encourage [3] 25/15 25/15 32/10
end [6] 34/17 49/1 50/12 58/7 64/25 69/3
enforce [3] 15/1 16/3 23/23
enforceable [1] 64/15
engage [2] 9/16 42/6
England [1] 45/15
enormous [1] 48/23
enough [6] 4/23 8/7 8/9 59/8 66/17 70/18
enrichment [3] 48/5 49/7 56/24
entangled [1] 23/10
enter [3] 43/20 44/10 56/8
entering [1] 38/14
entertain [3] 64/11 64/12 68/18

entire [3] 21/20 21/21 33/6
entirely [1] 26/19
entirety [1] 23/7
entities [4] 16/6 26/17 26/18 32/12
entitled [8] 5/6 28/21 29/10 30/4 50/6 50/12 53/21 72/6
entitlement [1] 63/2
entity [1] 23/23
equipment [2] 18/5 44/20
equity [1] 11/22
equivalent [1] 54/13
erroneously [1] 48/8
error [2] 51/24 65/6
errors [1] 23/20
especially [1] 39/5
essence [1] 28/1
essential [1] 65/7
essentially [2] 14/22 62/20
establish [3] 13/18 54/16 54/18
established [4] 62/15 62/17 62/18 64/19
et [2] 1/7 3/8
ethnic [1] 5/22
even [15] 9/17 11/7 12/8 12/23 14/21 19/18 19/20 23/17 24/4 24/7 28/23 49/4 50/7 62/23 68/16
eventually [1] 6/23
ever [4] 10/20 14/5 18/2 60/25
every [4] 44/1 48/24 54/12 69/24
everybody [4] 11/20 34/1 34/2 44/7
everything [1] 19/22
evidence [2] 22/6 60/20
evident [1] 21/15
evidentiary [1] 20/15
evil [1] 11/22
evolution [1] 49/24
exact [1] 52/24
exactly [15] 7/20 13/10 23/18 23/21 25/18 27/12 28/3 31/13 41/14 49/23 50/11 51/9 51/22 53/20 66/3
example [4] 9/7 13/2 34/14 34/16
excellent [1] 71/5
except [2] 7/14 70/15
exchange [5] 19/11 19/12 52/10 62/10 64/24
exchanged [3] 21/16 67/3 67/3
exciting [1] 40/2
exclusively [1] 23/2
Exemplary [2] 8/14 8/15
exercise [3] 24/13 25/7 48/13
exist [1] 63/3
expected [1] 52/23
expedited [1] 56/12
expend [1] 14/25
expending [1] 16/3
expenditure [1] 43/15
expensive [2] 43/6 46/25
experience [2] 17/23 60/8
expert [2] 10/8 41/23
expertise [4] 22/17 23/1 24/6 42/10
experts [3] 19/25 20/16 22/13
explain [7] 13/22 13/24 19/11 22/13 41/9 61/23 62/9
explained [6] 21/15 34/25 35/4 61/23 62/8 62/19
explaining [3] 38/7 47/19 70/12
explains [2] 27/13 67/2
explanation [5] 22/16 30/12 59/22 70/20 70/21
explanations [1] 70/20

exploring [1] 56/17
extend [1] 17/17
extensively [1] 14/22
extent [4] 10/3 10/9 10/18 36/4
extra [2] 54/3 54/4
Extremism [1] 9/22

**F**

face [5] 19/10 41/19 51/20 70/17 70/22
fact [13] 7/22 13/16 20/10 25/13 29/3 29/17 31/24 33/9 38/17 39/2 47/14 62/20 63/23
facts [3] 7/20 13/17 69/11
fail [3] 21/11 28/19 42/21
failed [6] 8/9 16/20 20/21 42/2 62/22 68/6
fails [1] 68/13
failure [3] 3/5 4/12 13/23
fair [7] 4/23 25/25 27/1 28/22 52/24 70/13 70/14
Faith [1] 13/2
falls [1] 69/5
familiar [1] 66/17
far [2] 29/23 46/5
fare [2] 44/8 64/2
fares [1] 64/7
fascinating [1] 41/16
fashion [2] 7/15 45/5
fatal [2] 9/5 51/24
fault [2] 51/8 52/18
favor [5] 10/4 10/4 10/5 10/12 36/18
favorable [1] 28/17
FCC [64] 14/22 16/18 17/5 17/9 22/15 22/17 23/14 24/3 24/14 24/25 25/2 25/6 25/13 25/20 26/1 26/2 26/12 26/17 31/25 32/9 35/8 35/20 36/2 36/6 36/19 36/25 39/7 39/9 39/11 41/9 42/16 42/20 47/25 48/3 48/5 48/10 48/11 49/1 49/5 50/15 55/5 55/7 56/13 56/15 57/5 59/10 59/15 60/20 61/12 62/5 64/10 64/15 64/21 65/22 68/3 68/4 68/13 68/18 68/19 68/21 68/23 68/25 70/9 70/10
FCC's [2] 25/7 64/10
FCPA [1] 12/11
FCRR [2] 2/23 72/10
February [10] 18/7 18/11 18/19 20/5 30/15 33/13 40/20 50/17 56/25 70/17
February 2016 [2] 30/15 50/17
February 3rd [1] 40/20
February 3rd opinion [1] 18/7
federal [10] 10/12 11/15 13/6 15/6 15/10 26/6 26/7 39/10 42/9 64/16
feel [2] 7/3 24/25
fell [1] 51/14
felt [1] 7/1
few [1] 66/1
field [1] 42/10
Fifth [1] 2/6
fight [2] 35/17 65/18
figured [1] 47/23
figuring [2] 13/5 49/23
file [4] 52/13 52/14 66/11 66/14
filing [1] 53/1
final [2] 55/16 58/12
finalize [1] 56/5
finally [1] 16/21
Financial [1] 2/3
find [9] 10/17 14/17 23/25 28/9 32/12 47/6 57/1 61/11 68/12

**F**

finding [1] 25/13
fine [5] 6/6 9/10 33/10 53/25 65/3
first [15] 5/1 12/1 14/15 24/3 24/20 25/8 35/11 36/9 41/13 41/14 45/11 46/23 55/20 58/18 66/13
fix [2] 51/25 51/25
flat [1] 11/2
flat out [1] 11/2
flaw [5] 9/5 51/25 59/6 59/19 62/7
flawed [1] 59/24
flies [1] 11/1
floor [1] 43/19
Florida [6] 2/4 45/23 46/1 46/11 46/15 46/25
flowing [1] 42/8
flows [1] 19/14
fluff [1] 7/17
fly [8] 20/21 20/25 21/6 21/8 25/9 31/17 67/23 68/1
flying [1] 21/23
focus [1] 10/16
follow [2] 4/15 5/19
followed [1] 59/23
following [2] 31/4 42/3
follows [2] 33/16 33/20
foot [1] 42/7
force [1] 64/15
foregoing [1] 72/4
foreign [9] 9/24 12/2 12/5 14/12 15/1 16/5 16/5 23/22 62/20
foremost [1] 5/1
forget [1] 44/1
forgot [1] 21/7
former [1] 14/24
Fort [1] 2/4
forth [2] 57/20 70/3
forward [12] 19/3 19/7 19/9 19/10 20/13 22/13 23/4 23/6 23/22 24/4 40/16 54/23
found [1] 31/15
four [3] 4/9 42/6 70/7
frame [3] 25/9 25/10 27/25
framed [1] 39/17
framework [1] 10/24
frankly [8] 10/7 14/18 15/5 40/12 41/17 42/15 56/21 57/7
fraud [74]
fraudulent [1] 36/21
free [1] 24/25
friend [4] 47/9 47/14 54/2 63/18
front [1] 39/21
Full [1] 13/2
fully [3] 24/16 55/25 55/25
fun [1] 65/10
fund [1] 45/16
fundamental [3] 59/5 59/19 62/7
funny [1] 40/18
further [3] 4/3 33/10 54/21
fuss [1] 11/5

**G**

gains [1] 50/1
game [1] 60/11
garden [7] 27/4 27/6 27/22 36/16 36/25 39/20 50/16
garden-variety [7] 27/4 27/6 27/22 36/16 36/25 39/20 50/16
gave [3] 16/2 16/21 42/15
Geary [1] 3/18

gender [1] 5/23
general [1] 10/14
generalist [1] 22/3
generalities [1] 10/16
genteel [1] 56/17
gentlemen [1] 39/22
get [55] 7/5 7/8 10/1 10/15 10/20 10/20 10/22 10/23 12/13 13/17 13/17 13/23 15/15 16/8 16/13 16/15 17/6 20/1 20/21 20/25 21/23 23/18 27/17 31/17 32/12 33/1 33/4 39/14 41/11 46/7 50/7 50/19 52/17 52/21 53/22 55/5 55/21 56/2 57/9 57/25 58/4 59/23 60/6 61/13 62/5 62/5 62/13 63/7 64/13 64/17 66/13 66/14 68/3 68/18 68/20
gets [6] 7/9 61/8 62/12 63/18 67/3 67/3
getting [6] 10/5 21/23 27/19 30/16 39/14 64/4
Gilbertson [1] 3/18
give [12] 12/6 18/16 30/5 30/9 30/11 37/8 37/22 42/2 43/2 43/3 48/11 55/22
given [6] 8/4 17/14 23/2 38/10 39/5 59/22
giving [2] 43/8 69/19
glaring [1] 4/11
go [44] 5/15 7/13 9/7 12/5 12/11 12/12 14/14 15/23 18/6 19/7 19/10 23/22 24/4 24/21 24/25 25/18 34/14 35/7 39/12 43/5 43/6 43/7 43/23 46/2 46/4 47/25 48/14 49/1 49/20 54/22 55/1 55/2 55/13 55/19 55/22 56/2 56/18 58/18 58/25 61/13 63/17 65/13 68/25 69/16
goes [7] 5/3 22/12 40/16 46/5 54/23 63/25 68/4
going [64] 5/21 7/7 10/25 11/6 14/19 14/25 16/17 16/25 17/6 19/2 20/12 20/14 20/15 20/15 20/16 23/6 24/2 24/21 31/11 38/1 39/16 39/20 39/21 40/14 40/23 42/16 43/13 44/18 44/19 44/22 45/13 46/3 46/8 46/10 46/11 48/5 48/25 49/1 49/4 49/20 49/20 49/23 51/1 52/13 52/15 52/20 52/23 52/25 52/25 54/16 54/17 54/20 54/22 55/21 56/2 57/1 58/7 62/3 63/6 66/14 68/15 70/7 70/25 71/2
gone [5] 19/9 43/14 43/17 49/16 49/18
good [12] 3/11 3/15 3/21 5/11 13/2 20/17 30/18 36/8 37/14 37/15 37/22 71/4
goodness [2] 43/5 45/12
goodwill [3] 7/19 7/19 7/21
got [7] 12/14 25/4 30/6 33/23 34/12 54/2 56/10
gotten [5] 4/21 44/16 50/1 54/5 54/9
governed [3] 16/24 16/24 17/1
government [4] 10/12 53/24 62/18 64/23
governments [1] 16/5
grant [1] 66/12
granted [1] 70/5
granting [1] 56/22
gray [1] 16/17
great [7] 19/15 22/9 30/21 31/20 45/8 58/21 64/16
green [1] 40/20
griping [1] 22/25
grocery [6] 5/15 5/18 5/21 8/11 9/8 45/21
guess [1] 8/15

guests [1] 3/16
guidance [1] 41/11
guy [1] 63/25
guys [1] 43/19

**H**

ha [2] 27/23 27/23
Ha-ha [1] 27/23
had [31] 12/3 16/23 19/21 25/14 25/18 27/15 28/11 30/8 30/8 30/19 30/20 33/15 35/8 36/3 44/2 44/15 45/14 45/23 53/20 54/4 54/8 54/8 54/15 57/17 57/20 57/23 62/10 62/14 64/18 64/24 70/17
hair [1] 16/18
Haiti [32] 5/13 9/8 9/12 10/18 11/17 13/11 13/20 13/21 14/1 16/13 20/9 27/10 32/23 33/2 33/7 33/8 33/22 38/16 38/18 40/9 43/4 43/5 43/6 43/18 44/21 51/18 51/18 60/18 62/19 63/12 63/14 64/23
Haitian [8] 9/9 9/10 26/18 32/18 32/18 32/20 53/24 61/21
half [1] 40/13
half-truth [1] 40/13
hand [2] 32/9 50/16
handed [1] 19/15
handing [1] 67/12
handle [1] 70/10
handled [1] 24/17
handset [4] 44/2 49/13 49/15 62/3
handsets [2] 44/3 61/25
Hansen [2] 2/5 3/14
happen [6] 18/1 24/15 32/11 48/8 48/15 68/2
happened [15] 10/16 10/17 13/20 13/21 13/21 13/23 13/24 13/25 23/8 28/6 30/13 33/8 34/11 39/17 51/13
happening [1] 58/22
happens [7] 24/1 24/15 24/15 32/22 39/2 49/24 65/12
happy [1] 9/12
harm [11] 5/6 5/9 6/20 7/21 7/25 9/17 11/2 11/3 11/7 14/11 14/12
harmed [1] 7/2
has [38] 7/2 10/10 13/10 14/5 16/1 17/9 18/18 20/7 20/9 22/18 23/2 23/14 28/4 35/8 35/20 36/2 36/3 38/19 39/17 39/22 39/25 40/8 41/5 44/16 48/3 49/2 49/2 49/3 50/7 54/12 54/13 57/5 59/4 61/23 64/15 66/6 66/24 70/15
hasn't [2] 7/2 28/5
hat [1] 30/21
hate [1] 39/16
have [213]
haven't [10] 6/16 7/14 17/20 29/8 53/16 59/11 62/7 62/17 62/19 63/2
having [5] 9/15 17/5 27/2 34/4 38/4
Hawaii [5] 21/23 31/17 67/23 67/25 68/1
he [44] 11/7 34/10 34/10 34/11 35/1 42/16 42/20 52/12 52/13 52/15 53/11 53/13 54/5 54/7 58/19 58/22 58/23 58/23 58/24 59/4 59/4 61/18 61/19 61/23 62/8 62/12 62/14 62/23 63/9 63/10 66/9 66/10 66/11 66/24 66/24 67/16 67/17 67/17 67/20 67/21 67/24 68/20 70/11 71/7
He'll [1] 47/15
head [1] 14/9

## H

hear [9]  4/4 19/5 20/16 36/8 36/9 36/14 36/19 37/8 41/3
hearing [8]  1/13 18/24 20/15 37/25 41/3 60/14 66/8 70/1
held [4]  34/6 34/18 34/24 52/6
her [1]  33/23
here [57]  3/25 6/20 8/7 10/16 10/17 12/23 12/25 13/15 13/22 15/14 18/17 20/4 20/5 22/21 23/6 23/9 23/22 24/4 24/7 24/22 25/4 25/19 25/24 27/2 33/1 33/13 34/11 34/21 40/23 42/12 43/24 44/1 44/14 45/16 46/4 46/7 49/4 49/19 50/15 51/6 51/16 51/25 52/4 53/13 55/4 57/13 57/15 58/24 59/13 60/4 61/15 62/9 63/21 65/3 69/23 70/1 70/2
hereby [3]  14/17 14/24 26/20
Hey [4]  15/17 33/8 44/5 48/12
hid [1]  21/11
hidden [3]  46/9 54/2 63/18
hide [2]  38/23 46/7
hiding [2]  46/19 63/25
high [3]  24/20 43/6 47/22
highly [1]  28/4
him [5]  11/19 53/4 53/5 57/15 66/13
his [7]  33/23 42/14 43/13 47/14 62/12 62/23 68/23
hits [1]  32/18
hitting [1]  49/7
hold [3]  34/15 59/5 66/24
holding [4]  1/3 3/7 34/23 50/2
Holmes [4]  9/2 14/14 14/16 16/8
home [4]  33/20 33/23 33/23 34/4
homes [2]  44/21 45/3
honestly [1]  55/2
Honolulu [4]  20/21 20/25 21/6 21/8
Honor [16]  3/4 3/11 3/17 3/21 4/6 19/5 27/12 31/2 37/14 44/16 44/25 47/17 58/15 69/25 70/15 71/3
HONORABLE [2]  1/15 46/13
horizon [2]  49/10 49/22
host [1]  45/4
housing [1]  15/15
how [39]  4/22 17/21 17/25 18/1 18/10 19/11 19/14 20/6 24/9 24/14 24/18 26/2 26/17 28/2 30/12 32/17 34/12 35/9 35/13 36/4 39/25 43/11 43/13 44/12 47/24 48/17 49/14 51/12 53/18 59/14 61/7 61/24 67/2 67/14 69/5 69/12 69/18 70/9 70/10
however [2]  24/1 55/1
hundred [1]  13/4
hurt [1]  15/18
hurts [1]  7/19
hybrid [1]  43/21
hypothesizing [1]  62/15
hypothetical [1]  6/25

## I

I'd [2]  61/12 66/12
I'll [6]  53/8 57/6 57/6 57/10 59/23 69/22
I'm [60]  5/12 5/21 6/6 7/7 7/10 10/3 10/4 10/4 11/22 12/9 13/16 13/18 15/7 15/13 17/14 18/24 19/2 19/2 20/6 20/17 20/22 23/19 24/16 27/7 27/8 27/18 28/16 29/1 29/19 35/5 36/2 38/24 39/1 39/5 40/11 40/23 41/3 42/5 44/18 46/21 47/3 50/13 52/11 54/19 54/22 55/21 56/2 56/2 57/13 57/24 58/13 60/14 60/22 65/13 65/22 66/16

66/19 66/21 70/16 71/2
I've [6]  4/1 10/7 27/3 28/7 36/14 37/2
ICC [1]  63/17
identification [1]  29/23
identified [1]  47/21
identify [1]  3/10
ifs [1]  42/8
ignore [2]  27/24 40/19
ignores [1]  47/14
ill [1]  50/1
ill-gotten [1]  50/1
illegal [3]  12/3 12/8 13/22
immediately [2]  52/14 55/15
implausible [2]  70/23 70/23
implication [1]  23/22
imply [1]  7/11
important [3]  49/22 69/23 70/16
imposed [4]  14/5 16/4 16/5 46/24
impossible [3]  41/25 42/3 60/16
improbable [1]  70/23
improperly [1]  64/21
improved [1]  41/1
In fact [1]  47/14
inadequacy [1]  64/17
INC [2]  1/6 3/8
inclined [2]  36/23 39/5
including [2]  6/18 42/11
incomplete [1]  45/19
inconsistent [2]  25/11 59/7
incorrect [2]  39/19 45/19
incorrectly [2]  20/6 50/14
increase [1]  43/19
increasing [1]  9/24
independent [2]  4/9 22/20
independently [1]  4/10
indicated [2]  52/12 52/13
indication [1]  32/2
individuals [1]  9/16
induce [2]  12/21 12/21
industry [1]  67/14
inform [1]  25/19
information [13]  28/19 29/2 29/10 29/24 30/4 30/8 34/17 34/17 38/13 41/25 42/2 67/9 67/11
infrastructure [4]  37/17 37/18 38/19 47/22
infused [1]  23/10
initial [2]  52/5 53/19
initially [1]  41/15
injunctive [2]  50/5 50/11
inseparably [1]  23/10
instead [4]  11/16 34/3 34/22 59/25
instructive [1]  32/16
insurmountable [1]  48/24
integrated [1]  13/3
intended [2]  12/20 15/11
intentional [1]  12/20
intentionally [1]  6/6
inter [2]  43/21 49/2
inter-connectivity [2]  43/21 49/2
interconnected [3]  19/13 35/22 58/24
interconnection [3]  42/18 42/21 43/7
interest [5]  9/15 13/11 13/19 15/14 15/17
interested [1]  40/11
interesting [6]  10/21 19/3 40/2 41/17 42/14 50/23
interlocutory [1]  66/12
internal [1]  45/24
internally [1]  37/25

international [12]  14/23 17/8 17/11 17/16 23/9 23/13 25/12 26/20 32/1 42/11 43/5 61/2
Internet [12]  32/18 32/19 32/23 32/24 33/17 33/21 34/5 35/9 35/13 35/19 44/2 44/2
interrogatory [2]  52/14 52/21
interstate [3]  16/19 63/8 63/24
intrastate [1]  63/23
invite [3]  24/24 33/24 57/6
invited [1]  69/11
inviting [1]  53/4
invoke [1]  66/10
involved [4]  9/21 10/3 17/6 17/10
involves [1]  24/5
IP [1]  23/12
Iqbal [7]  8/1 8/2 18/10 19/6 38/10 59/2 62/21
irony [1]  54/10
irrelevant [1]  58/9
is [415]
isn't [10]  5/10 16/10 17/9 17/19 17/20 28/11 48/12 50/16 62/6 65/22
ISP [1]  32/18
issue [4]  9/9 57/1 57/16 58/5
issues [4]  16/1 52/22 56/20 65/24
it [295]
it's [11]  22/23 22/24 26/25 36/5 46/25 48/25 51/21 60/10 64/16 65/9 65/9
iteration [1]  51/23
its [15]  9/16 16/1 16/3 17/23 23/7 35/11 38/14 41/19 43/15 43/15 43/16 45/8 62/4 63/12 70/22

## J

Jean [2]  38/16 38/16
job [1]  23/2
Johnny [1]  38/17
judge [23]  1/16 19/2 22/3 26/3 37/16 40/19 41/25 46/14 47/16 50/20 50/25 51/9 51/13 52/5 52/10 52/19 54/10 54/16 55/24 56/16 57/18 69/22 70/25
judge/layman's [1]  22/3
judging [1]  9/10
judgment [12]  7/23 19/4 20/13 22/8 35/6 38/4 41/7 54/25 55/16 58/4 58/5 68/3
jurisdiction [59]  11/5 11/12 11/14 14/5 15/24 22/10 22/21 22/22 22/23 22/24 23/16 24/8 24/11 24/13 24/14 24/17 24/22 25/7 26/1 26/7 26/11 26/19 27/15 27/18 35/5 35/7 36/19 37/2 37/3 37/5 39/5 39/9 39/10 41/10 48/3 48/9 48/13 48/13 54/21 54/23 55/1 55/3 55/13 55/15 55/17 55/21 55/23 56/3 56/15 56/19 57/5 58/13 59/9 59/19 64/5 65/13 66/9 66/10 68/14
jurisdiction/preemption [1]  15/24
jury [14]  7/4 8/19 10/21 10/22 11/23 23/4 26/5 26/8 37/2 39/14 39/14 39/21 39/22 47/19
just [31]  7/16 11/3 11/6 12/4 13/20 14/8 15/3 18/24 20/14 23/10 24/18 27/13 41/9 43/7 43/14 50/11 52/12 52/13 52/17 55/24 58/9 58/19 59/10 62/2 62/3 65/23 66/14 66/23 68/1 68/17 69/4
justice [2]  50/13 50/14
justification [2]  4/12 14/4
justified [1]  5/4

**K**

key [2]  17/19 66/22
kill [2]  5/12 5/14
Kim [2]  2/2 3/12
kind [12]  14/18 24/1 25/13 28/11 30/17 32/16 42/23 44/10 50/19 56/1 57/15 65/16
kinds [3]  15/25 23/13 62/10
knees [1]  19/7
knew [2]  30/9 30/10
know [33]  6/18 8/2 8/4 10/8 12/20 14/19 20/1 25/3 25/22 26/2 27/14 28/22 41/8 41/8 41/16 44/12 48/21 48/25 49/19 50/20 52/2 52/19 52/21 52/24 53/12 54/21 55/2 55/6 55/20 57/14 60/15 61/4 66/15
knowledge [2]  15/25 22/17
known [1]  35/12
knows [2]  60/25 61/1

**L**

labels [1]  40/20
Ladies [1]  39/21
ladies' [1]  44/21
land [3]  50/24 61/4 61/5
last [5]  18/7 36/17 52/1 53/13 71/1
later [1]  42/20
Lauderdale [1]  2/4
law [30]  6/21 6/21 8/10 8/19 9/4 9/7 9/9 9/10 9/14 10/8 12/7 13/16 13/18 14/10 14/13 15/11 15/20 17/1 17/3 17/17 27/3 28/14 36/22 53/7 53/9 64/6 64/14 64/15 70/5 70/21
laws [3]  13/11 13/11 13/12
lawsuit [1]  15/20
lawyer [1]  48/24
layman's [1]  22/3
learn [1]  22/5
learned [2]  22/13 57/14
least [2]  24/3 41/11
leave [2]  5/24 57/15
legal [5]  10/24 12/8 29/9 62/20 65/18
legitimate [1]  69/6
legitimately [3]  17/15 34/7 69/19
Lerner [2]  2/2 3/12
less [3]  16/5 19/16 54/11
let [16]  17/19 26/13 28/17 33/12 38/5 41/10 50/3 52/21 53/11 54/19 55/6 57/14 60/19 61/7 66/15 67/5
let's [20]  5/19 9/7 11/11 11/17 34/14 35/7 36/19 37/8 42/13 43/2 43/3 43/7 44/12 45/22 48/7 48/8 48/10 50/23 52/16 54/23
letter [1]  39/14
level [3]  6/12 15/5 24/20
liability [1]  14/6
liberty [1]  9/22
lie [2]  11/19 12/13
lies [2]  6/6 11/2
life [1]  24/18
light [2]  8/6 28/17
like [24]  4/8 6/19 8/11 10/15 11/11 15/12 18/9 20/9 22/9 25/10 25/21 30/17 32/21 36/14 37/7 40/3 41/3 43/5 43/14 44/6 45/10 45/20 55/12 58/15
linchpin [2]  4/13 4/14
line [1]  47/20
lined [1]  19/25
lines [4]  53/3 61/4 61/5 63/21
linked [1]  33/9

linking [1]  35/18
liquidated [1]  54/18
literally [3]  49/7 49/14 71/1
little [12]  10/8 12/5 18/10 28/23 30/16 42/15 50/21 51/5 53/13 54/21 59/7 60/19
LLP [2]  2/2 2/11
Lo [1]  47/8
local [10]  20/9 34/7 34/7 37/2 37/6 38/15 38/24 45/25 46/6 61/21
locally [1]  29/3
location [1]  49/18
logic [1]  15/3
long [5]  12/19 16/19 28/13 48/17 60/21
long-distance [2]  16/19 28/13
look [14]  7/11 8/5 16/7 16/16 19/3 20/9 20/13 23/3 30/6 32/15 43/18 44/5 50/24 65/23
looked [3]  28/7 28/9 43/4
looking [2]  20/6 33/17
lost [2]  54/13 63/21
lot [7]  4/7 5/17 7/5 7/6 7/8 36/7 64/6
Louis [1]  38/16
low [1]  47/21
lower [1]  44/9
luck [1]  23/25
lurking [1]  17/25

**M**

machine [1]  34/24
made [9]  7/2 12/20 15/23 20/7 35/11 46/17 61/5 63/12 70/5
magic [2]  19/21 34/23
magically [1]  28/15
magnanimous [2]  50/21 50/22
make [14]  8/10 8/11 9/25 10/18 10/22 12/3 14/3 24/21 29/8 33/9 36/18 53/12 53/14 57/11
makes [3]  16/9 28/13 29/2
making [5]  25/9 29/18 36/7 36/13 55/10
manifestly [1]  24/1
manipulated [2]  30/23 38/13
many [2]  23/11 24/11
March [3]  1/5 3/1 72/9
Marcus [3]  15/8 15/9 37/7
market [3]  43/4 43/23 44/6
markets [1]  47/21
Martin [1]  2/8
match [1]  67/21
materials [4]  9/11 32/15 34/22 60/21
matter [15]  13/13 13/16 13/16 13/18 15/6 16/1 17/12 24/7 25/13 26/8 33/8 42/17 63/7 66/4 67/1
matters [6]  22/24 23/1 23/11 24/5 26/17 56/23
may [21]  5/17 6/11 7/10 7/23 9/9 9/9 11/23 11/23 14/19 30/25 31/14 36/4 36/18 40/1 41/24 52/10 55/1 58/7 58/15 58/17 70/19
maybe [7]  7/11 11/19 15/17 23/7 23/8 55/9 55/9
maybe/maybe [1]  55/9
me [64]  6/7 7/12 12/6 17/19 18/24 20/6 20/12 20/17 20/20 20/24 24/9 25/1 26/13 27/3 27/6 27/15 27/17 27/23 28/17 29/19 30/5 30/9 30/11 31/2 31/22 33/12 34/12 35/1 35/3 35/4 36/18 37/5 37/22 38/5 38/7 39/13 40/23 41/7 41/22 42/15 45/12 45/13 46/21 47/13 50/3 52/21 53/1 53/10

53/11 54/1 54/19 55/3 55/6 55/14 55/17 55/23 57/8 60/19 61/7 66/15 67/5 69/12 69/19 70/12
mean [13]  7/17 10/1 10/13 11/21 11/24 19/21 33/10 51/15 51/15 51/17 65/20 67/14 70/17
meaningful [1]  7/15
means [5]  44/18 48/22 61/16 70/17 70/19
meant [1]  18/13
measure [1]  4/20
measured [1]  4/20
mechanics [2]  39/25 47/20
mechanism [1]  27/9
mediation [1]  61/14
meet [1]  41/20
meets [1]  41/20
member [1]  22/15
memory [1]  58/19
mentioned [1]  15/8
merchants [1]  45/15
mere [2]  30/7 31/1
merely [2]  6/22 38/15
messed [1]  67/19
met [3]  3/18 40/22 70/18
metaphysical [1]  33/1
meticulously [2]  40/21 57/20
Miami [4]  5/12 31/9 51/7 51/16
MICHAEL [1]  1/15
microphone [2]  33/21 33/24
microwave [1]  44/24
microwaves [1]  44/23
might [10]  4/20 6/25 12/23 14/20 16/18 17/24 54/22 62/11 64/20 64/24
million [1]  44/16
mind [4]  25/14 25/18 28/11 53/3
mind-reader [1]  53/3
mine [2]  51/8 70/22
mini [1]  45/3
mini-switches [1]  45/3
minimis [1]  54/4
minimum [2]  53/20 53/22
minute [9]  4/21 10/2 13/23 15/22 53/22 54/12 54/13 54/17 59/24
misrepresentation [41]  4/18 8/19 9/17 9/19 10/15 12/20 15/12 16/10 17/20 20/11 27/5 27/6 28/1 28/2 28/13 29/14 29/18 30/1 30/11 31/1 31/5 36/12 37/13 39/23 40/12 40/15 43/10 44/14 46/18 46/18 56/22 57/16 57/19 57/21 58/21 60/2 60/8 60/10 60/17 67/1 67/23
misrepresentations [4]  18/21 46/22 57/23 58/6
misrepresented [3]  60/3 60/4 67/19
misrepresenting [2]  27/9 61/19
misrepresents [1]  29/16
missing [1]  4/24
model [3]  21/20 21/21 33/20
modified [2]  19/18 19/18
modus [1]  47/20
money [13]  9/25 39/23 50/4 50/6 50/7 50/12 54/3 54/5 62/23 62/23 65/2 65/9 68/6
monitoring [1]  47/23
monopolist [1]  11/22
months [7]  48/18 48/19 50/15 55/7 55/9 55/10 66/2
mopping [1]  43/19
more [20]  9/3 18/17 19/16 25/23 26/2

**M**

more... [15] 28/23 30/22 31/1 36/5 36/23 37/5 37/19 37/23 39/9 50/21 50/22 54/11 59/18 60/13 70/25
morning [5] 3/11 3/15 3/21 37/14 37/15
Morrison [1] 2/9
most [5] 4/11 6/21 15/24 28/17 57/12
mother [1] 33/25
motion [17] 1/13 3/5 3/25 4/2 4/5 7/24 19/6 42/12 51/24 53/2 56/5 57/7 58/8 66/14 66/17 70/1 70/24
mouth [1] 41/23
move [12] 8/23 13/8 17/19 23/6 38/2 52/22 57/7 57/9 58/5 65/19 65/25 66/5
moved [2] 49/24 50/8
Mr [3] 37/11 40/3 68/10
Mr. [28] 3/18 3/18 31/3 33/16 34/9 34/25 40/6 41/16 42/7 42/14 45/11 47/14 47/25 49/5 52/2 52/3 52/12 52/25 52/25 53/13 57/14 66/6 66/8 68/9 68/12 68/17 70/7 70/24
Mr. David [1] 3/18
Mr. Savage [18] 40/6 41/16 42/7 42/14 47/14 47/25 49/5 52/3 52/12 52/25 52/25 53/13 57/14 68/9 68/12 68/17 70/7 70/24
Mr. Savage's [1] 45/11
Mr. Tristan Gilbertson [1] 3/18
Mr. Vaughan [7] 31/3 33/16 34/9 34/25 52/2 66/6 66/8
Ms [1] 33/16
much [5] 16/5 23/3 24/18 45/8 47/17
multiplicity [1] 23/16
must [1] 62/21
my [42] 3/13 4/3 6/4 8/11 8/24 9/13 10/17 13/15 14/8 14/19 14/20 18/7 18/20 19/24 22/5 22/7 22/13 24/13 24/17 25/5 26/24 29/7 30/15 30/20 31/17 36/16 37/24 43/5 45/12 47/1 47/3 47/10 51/14 52/5 52/16 53/1 61/4 61/4 61/5 62/16 66/4 69/3
myself [1] 43/12

**N**

name [1] 44/1
nation [1] 13/3
nations [1] 9/24
natural [2] 18/4 49/10
nature [3] 9/19 9/20 9/20
necessarily [1] 19/2
necessary [1] 22/16
need [8] 12/11 24/21 29/17 36/9 41/20 47/19 49/9 50/1
needed [1] 51/3
negotiate [1] 44/10
negotiated [1] 58/25
network [28] 7/16 7/18 17/23 17/24 19/20 19/22 28/20 28/20 29/2 29/2 29/16 30/25 32/20 37/17 38/15 38/24 40/5 43/15 43/16 43/22 43/25 45/6 45/8 58/25 60/25 61/8 61/20 68/1
networks [2] 19/11 19/12
never [7] 14/3 17/9 25/20 52/8 58/20 58/22 58/23
new [21] 10/4 11/1 11/2 11/3 11/4 11/4 11/8 11/17 13/1 31/10 32/6 32/7 40/2 51/7 51/16 51/23 53/1 61/6 63/12 63/17 65/25
New York [11] 11/3 11/4 11/8 11/17 13/1 31/10 51/7 51/16 61/6 63/12

63/17
next [4] 24/15 24/15 35/14 49/24
night [1] 5/15
Ninth [3] 15/9 56/14 65/19
Ninth Circuit [3] 15/9 56/14 65/19
no [50] 5/6 6/6 6/20 7/18 9/22 10/13 11/8 13/1 14/11 17/8 21/4 21/5 21/12 22/4 22/12 22/16 23/20 24/23 26/16 26/21 27/4 27/6 29/13 31/25 32/3 32/3 34/15 34/16 36/9 36/25 40/7 40/25 42/21 42/22 43/16 43/24 44/12 45/7 46/3 55/8 57/18 58/5 58/8 60/24 62/16 64/2 65/5 66/11 66/11 66/23
No. [11] 4/11 5/1 18/11 24/24 25/13 31/14 47/5 47/6 51/23 52/17 52/18
No. 1 [5] 4/11 5/1 18/11 47/5 52/17
No. 2 [6] 24/24 25/13 31/14 47/6 51/23 52/18
nobody [2] 32/4 52/23
nominal [4] 8/16 8/17 8/17 8/20
non [3] 18/13 41/2 56/23
non-technological [3] 18/13 41/2 56/23
none [3] 5/6 7/20 14/4
nonetheless [2] 13/6 63/1
normal [1] 19/18
Normally [1] 29/12
not [172]
nothing [10] 17/11 19/1 40/8 48/5 49/2 49/3 49/3 51/23 59/3 59/3
notion [1] 18/3
Notwithstanding [1] 66/25
novel [2] 40/2 47/18
now [41] 7/7 7/9 11/12 11/16 14/9 14/19 16/14 18/22 19/2 19/10 20/12 21/24 21/24 22/1 27/5 29/11 32/2 32/21 34/3 37/22 38/3 39/4 40/6 41/3 41/3 42/6 45/10 47/25 49/17 49/18 52/24 54/22 55/2 55/7 58/8 61/23 64/14 66/16 66/19 70/7 70/15
nowhere [1] 11/3
number [16] 17/23 17/24 31/15 34/7 35/20 60/9 61/9 61/9 61/15 61/15 61/20 61/21 61/21 61/22 62/4 65/3
numbers [3] 29/23 53/23 67/10
NW [1] 2/11

**O**

object [1] 55/25
objection [1] 62/16
objections [1] 64/20
obligation [1] 22/5
obligations [1] 25/12
obsolete [1] 49/12
obvious [8] 11/13 21/24 22/1 22/4 59/11 59/14 59/15 60/7
obviously [5] 4/7 7/12 13/17 25/22 59/16
occasions [2] 50/20 50/22
occurred [1] 36/20
off [9] 5/8 5/12 14/8 19/7 19/15 50/15 51/5 67/13 71/2
offer [2] 14/9 14/16
Official [1] 72/10
often [1] 9/1
Oh [5] 7/19 21/11 25/17 38/24 46/11
okay [19] 4/25 5/20 6/1 6/3 8/25 11/16 16/23 16/25 21/7 21/9 22/11 23/19 28/24 31/20 47/11 50/8 59/17 61/15 66/21
old [6] 44/20 45/12 45/13 61/4 61/5

63/22
Oliver [1] 9/2
omission [4] 29/12 29/12 30/3 31/1
omissions [2] 30/23 40/14
once [2] 13/8 63/6
one [32] 2/3 7/17 8/13 9/5 11/23 13/2 14/17 18/16 19/15 19/18 21/24 23/15 24/17 31/6 31/13 33/15 40/19 41/6 41/18 43/14 45/23 50/2 50/10 51/14 56/3 59/16 67/5 67/13 68/15 69/4 69/23 70/25
only [13] 11/7 14/12 31/6 31/6 40/10 47/18 50/1 50/15 51/3 57/11 57/21 57/23 69/10
oOo [1] 72/2
Open [1] 3/3
operandi [1] 47/20
operation [1] 18/5
opinion [10] 18/7 18/20 20/5 27/22 30/15 35/2 36/17 56/20 66/18 66/19
opinions [1] 4/3
opportunity [2] 18/17 37/9
opposed [3] 57/9 57/9 66/15
opposes [1] 66/9
opposing [1] 55/18
options [1] 56/17
oral [2] 3/4 71/6
orally [1] 24/12
order [5] 40/20 41/21 49/19 54/18 56/12
ordered [1] 69/11
ordered/invited [1] 69/11
orders [1] 44/17
ordinary [1] 39/10
OREGON [60] 1/2 1/8 2/6 2/9 5/2 6/21 8/10 8/18 8/19 9/8 9/14 9/15 10/2 10/3 10/3 10/7 10/9 10/10 10/14 10/18 10/25 11/6 11/7 11/9 11/15 11/15 11/18 11/23 12/18 13/10 13/19 13/21 13/25 15/15 15/19 15/19 17/12 17/15 17/17 26/3 38/17 38/23 39/1 39/10 45/23 45/24 45/24 46/4 46/8 48/14 49/19 61/6 61/16 63/7 63/12 63/16 63/19 63/24 64/1 64/2
Oregon's [1] 15/14
orientation [1] 5/23
origin [1] 29/16
original [1] 72/6
originate [1] 33/7
originated [7] 20/9 29/3 32/23 33/2 33/11 38/15 60/17
originates [2] 20/10 27/11
originating [1] 31/15
other [25] 5/23 7/11 11/21 12/8 12/22 16/16 17/24 18/4 19/13 26/18 29/2 29/2 30/4 32/9 33/6 35/22 43/17 45/16 49/9 50/16 58/11 59/23 61/21 65/23 68/13
others [1] 64/8
otherwise [2] 15/20 48/4
ought [4] 24/3 38/25 41/23 63/11
our [19] 6/25 7/19 14/24 15/1 15/20 21/19 26/19 31/8 33/20 33/21 33/21 33/22 33/22 42/20 48/12 56/4 57/10 65/14 71/7
out [21] 7/9 9/17 11/2 13/5 23/21 25/23 28/12 31/22 32/19 34/19 37/6 44/12 47/6 47/24 49/23 51/1 60/19 62/4 65/18 67/25 70/16
outfit [2] 46/2 47/7

outrage [1] 25/21
outside [4] 22/6 31/25 38/3 70/7
over [12] 26/19 32/18 33/17 33/21 34/5 35/8 35/13 37/3 48/13 58/24 68/19 68/22
overlay [1] 18/9
overlooked [1] 69/24
overlooked/skipped/decided [1] 69/24
overseas [2] 10/1 13/8
own [5] 5/21 43/15 43/15 51/9 67/2
owned [2] 51/5 51/6
owner [1] 8/11

**P**

page [1] 67/5
paid [9] 5/7 43/15 45/25 54/5 62/13 64/4 64/13 68/19 68/20
paper [2] 20/14 70/18
papers [7] 4/2 4/7 7/16 24/12 42/14 59/21 65/15
paragraph [5] 19/14 67/2 69/4 69/5 69/7
parse [1] 60/19
part [8] 4/19 11/18 21/7 21/8 35/23 62/25 65/15 67/12
partial [1] 58/5
participate [1] 44/6
particular [1] 13/12
particularly [2] 15/4 67/2
parties [4] 23/25 42/22 42/24 57/7
party [1] 46/4
pass [1] 12/3
past [3] 3/19 16/8 47/17
patch [4] 27/24 30/19 30/20 33/22
patched [1] 49/16
pause [1] 49/7
pay [10] 9/25 40/5 44/9 45/3 45/6 46/6 47/13 54/8 62/15 71/8
paying [2] 46/14 47/12
PC [1] 2/5
pending [1] 25/7
Pennsylvania [1] 2/11
people [6] 5/13 6/23 7/10 10/18 16/12 16/13
people's [1] 45/3
per [4] 4/21 53/22 54/13 54/17
perceived [1] 30/24
perfectly [1] 9/10
perhaps [2] 22/9 65/25
permits [1] 64/7
person [14] 6/5 6/7 6/10 10/25 11/3 11/4 11/8 11/16 11/17 33/24 34/4 34/16 47/13 63/19
person's [1] 34/1
personal [4] 11/5 11/12 11/14 37/2
perspective [2] 20/7 22/4
persuade [1] 59/14
persuasive [1] 37/5
phenomenon [1] 32/7
phone [23] 17/22 18/1 18/2 19/18 34/1 34/15 34/18 35/19 38/15 38/17 38/23 38/25 39/3 45/5 49/15 60/8 60/9 61/5 61/9 61/9 61/24 62/2 67/25
phones [1] 17/22
physically [1] 34/22
pick [1] 23/24
Pierre [1] 38/16
piracy [5] 45/12 45/14 45/17 45/18 46/5
pirate [13] 5/12 6/5 6/5 9/7 27/24 30/9

30/19 30/20 45/15 46/2 47/7 47/8 47/8
pirate's [1] 30/24
pirates [17] 5/24 6/2 6/12 6/15 6/16 7/1 7/6 7/7 7/9 7/10 7/11 9/9 30/18 45/20 45/20 46/3 46/5
place [2] 38/19 39/25
plain [3] 41/19 43/1 69/10
plainly [1] 23/2
plaintiff [12] 1/4 2/2 3/10 12/25 20/20 20/20 26/11 28/22 36/8 36/9 41/5 55/3
plaintiffs [2] 26/3 27/10
plane [1] 67/24
plausibility [2] 59/2 70/18
plausible [6] 31/6 31/7 38/7 41/19 59/11 70/12
plausibly [1] 70/3
playing [1] 60/10
Plaza [1] 2/3
plead [6] 8/9 63/3 64/18 64/21 68/20 69/10
pleading [10] 42/8 59/3 59/20 59/20 59/24 59/25 62/7 64/18 69/1 69/2
pleadings [3] 22/7 52/7 56/6
please [1] 3/10
pled [15] 8/6 8/7 17/20 40/22 42/8 43/10 51/2 53/16 53/17 53/20 62/17 62/21 62/25 63/2 64/21
point [28] 8/1 8/4 8/24 9/4 10/1 12/22 13/15 15/23 17/19 19/5 19/6 19/24 20/2 20/2 21/24 29/7 29/7 33/4 35/3 35/4 36/24 41/12 42/13 48/7 53/20 56/16 58/7 58/19
points [1] 4/24
poke [1] 70/2
policies [1] 9/23
policy [6] 9/5 10/10 13/10 15/6 16/1 45/11
pollute [1] 5/14
Port [1] 38/16
Port-au-Prince [1] 38/16
Portland [5] 1/8 2/6 2/9 2/24 63/25
position [5] 25/5 26/12 41/8 41/8 41/17
possible [4] 24/4 31/6 32/8 61/24
possibly [4] 7/14 8/22 14/12 19/19
potential [3] 23/16 26/19 43/4
practicably [1] 24/10
practices [3] 12/2 12/5 21/17
practitioner [1] 22/14
pragmatic [1] 8/6
pre [1] 52/3
pre-vet [1] 52/3
precise [1] 37/19
preclude [1] 53/1
preempt [2] 15/11 26/20
preempted [4] 17/7 37/7 46/21 57/2
preemption [14] 10/1 15/24 17/13 22/22 26/14 26/24 27/4 27/13 27/16 27/17 27/20 31/24 37/5 57/1
preemptive [1] 48/4
prefer [2] 24/23 66/10
preference [4] 55/20 56/4 65/14 66/4
prejudice [1] 48/23
preparation [1] 37/25
presenting [3] 29/15 29/15 29/16
presents [1] 29/1
Presumably [1] 48/10
pretty [1] 7/10
previously [1] 35/4
prices [1] 32/11
primary [43] 15/24 22/10 22/21 22/22

23/15 24/11 24/13 24/16 24/22 25/7 26/1 26/19 27/15 27/18 35/5 35/7 36/19 37/4 39/4 41/10 48/3 48/9 54/20 54/23 55/1 55/3 55/13 55/14 55/17 55/21 55/23 56/3 56/15 56/18 57/4 58/13 59/9 59/19 64/5 65/13 66/9 66/10 68/14
Prince [1] 38/16
prior [3] 4/3 12/4 50/21
privacy [2] 6/18 6/19
private [2] 16/5 45/22
probably [6] 4/11 9/11 13/2 19/8 36/8 52/7
probes [1] 45/2
problem [22] 5/10 8/23 23/21 27/2 32/3 41/13 41/14 43/16 43/24 45/7 46/12 47/1 47/2 47/4 48/12 55/5 55/6 57/17 63/4 63/10 64/1 64/3
problems [2] 11/5 69/2
procedural [1] 35/2
proceed [3] 23/5 25/23 41/21
proceedings [7] 1/14 24/24 35/8 36/3 63/8 69/21 72/5
process [3] 61/13 67/12 67/20
processed [1] 19/23
prod [1] 70/2
progress [2] 36/7 36/13
promised [1] 43/12
promptly [2] 16/22 57/11
prongs [1] 23/15
proper [2] 9/13 59/25
properly [4] 17/20 51/2 65/22 65/24
proposition [1] 10/14
prosecute [1] 39/13
protect [1] 28/15
protection [1] 28/14
Protocol [1] 33/17
prove [6] 6/23 8/12 19/25 26/4 39/12 68/6
proven [1] 54/18
provide [6] 4/12 28/19 29/9 41/24 69/11 69/15
provided [2] 9/6 69/19
provider [2] 32/19 64/3
providing [1] 41/22
public [2] 9/5 13/10
publicly [1] 60/20
PUC [2] 10/9 63/24
pulling [1] 47/7
punitives [3] 8/18 8/18 8/20
purchase [2] 18/18 57/24
pure [3] 29/12 35/21 40/3
purpose [3] 9/24 10/5 69/15
purposes [2] 35/14 44/15
pushing [1] 71/2
put [12] 5/24 11/11 14/21 18/20 28/17 30/16 30/19 30/21 37/16 39/17 45/3 61/25
putting [5] 11/12 15/23 22/21 53/23 59/18

**Q**

question [32] 10/21 12/2 13/9 16/23 24/25 25/1 25/3 25/5 25/5 25/8 25/25 26/9 26/10 26/16 26/21 26/22 31/4 31/11 34/15 34/16 36/10 38/1 38/5 38/5 38/11 42/23 43/13 50/5 54/19 58/20 58/20 65/18
questions [2] 4/8 14/24
quickly [3] 57/9 68/10 68/11

**Q**

quintessential [1] 42/1
quite [1] 57/20
quote [1] 9/2
quoted [1] 14/21

**R**

racial [1] 5/22
radio [1] 33/8
radios [1] 44/20
raise [4] 24/25 25/1 25/6 26/1
ran [1] 45/22
random [1] 53/23
rate [27] 4/13 21/22 38/25 44/9 44/10
 45/24 45/25 46/6 46/15 48/1 54/13
 62/16 62/17 62/18 63/8 63/9 63/10
 63/11 63/13 63/13 63/15 63/16 64/12
 64/19 64/21 64/22 68/21
rates [10] 16/19 16/24 17/4 42/18
 42/24 43/6 43/7 45/23 45/25 49/3
rather [3] 31/2 36/23 53/7
RDR [2] 2/23 72/10
re [3] 4/3 57/19 65/8
re-read [1] 4/3
re-SIM [1] 57/19
re-thinking [1] 65/8
reach [1] 68/8
reaching [1] 67/25
reaction [2] 10/23 52/5
read [13] 4/1 4/3 4/22 5/5 14/2 14/3
 18/6 27/3 35/1 35/24 36/1 53/3 69/18
reader [1] 53/3
reading [3] 19/3 26/24 51/5
real [2] 12/17 46/3
reality [1] 49/22
realized [3] 49/25 51/15 51/18
really [21] 4/15 19/3 20/17 21/18 23/5
 24/16 30/6 30/7 31/7 33/6 33/7 38/6
 39/9 40/10 50/16 54/21 57/11 61/19
 64/9 68/5 69/16
realm [2] 38/3 49/10
reason [10] 6/20 14/19 22/20 29/7 36/2
 36/5 52/17 52/18 65/15 68/12
reasonable [1] 26/24
reasonably [1] 12/21
reasons [9] 4/10 18/19 24/12 32/21
 42/3 50/10 50/17 56/25 57/2
rebuttal [1] 37/9
recall [2] 34/10 62/1
receive [3] 4/16 28/21 34/17
received [1] 20/8
receiving [5] 19/21 28/20 28/20 34/16
 44/3
recognize [1] 36/14
record [4] 3/10 52/13 55/25 72/5
Records [1] 67/7
recover [1] 64/7
refer [1] 36/17
refile [1] 65/25
refreshing [1] 52/10
refrigerators [1] 44/23
regard [3] 17/8 23/15 48/6
regarding [2] 3/6 67/10
regular [2] 22/14 35/19
regulated [2] 16/18 63/16
regulators [5] 9/12 63/23 63/24 64/1
 64/2
regulatory [5] 22/18 35/14 39/8 63/10
 64/7
rehash [1] 53/5

reject [1] 14/17
related [2] 18/23 58/6
relating [1] 18/21
relations [1] 23/13
relationship [3] 13/12 42/22 42/24
relatively [3] 32/6 32/7 50/18
relevant [2] 23/25 62/11
reliance [2] 12/21 12/21
relief [3] 50/5 50/11 70/4
rely [1] 21/12
remaining [1] 71/1
remember [8] 14/8 16/18 24/18 35/16
 51/6 52/20 57/18 61/3
remind [2] 33/12 57/15
reminds [2] 45/12 45/13
render [1] 70/22
reopen [1] 65/25
repeat [1] 40/23
repeaters [1] 45/2
reply [2] 4/2 53/6
Report [1] 35/12
reporter [3] 2/23 71/7 72/10
represent [3] 22/14 38/14 38/24
representation [1] 27/22
representing [2] 3/12 3/17
reputation [2] 7/5 15/15
request [1] 52/14
requested [1] 65/14
require [1] 64/8
require/resort [1] 64/8
required [2] 52/7 52/8
requirement [2] 62/20 70/19
requirements [1] 16/4
requires [4] 5/2 6/21 53/15 64/23
resale [4] 21/20 23/24 26/19 40/7
resale-based [1] 21/20
resell [2] 5/16 47/24
resells [1] 32/4
resold [2] 31/8 61/24
resolution [1] 36/21
resort [1] 64/8
resources [2] 15/1 16/3
respect [22] 8/8 17/21 19/8 22/16
 26/18 26/21 27/20 31/24 39/18 47/19
 47/23 48/4 48/25 51/5 51/11 56/21
 56/23 56/24 57/17 60/10 65/12 70/8
respond [1] 15/22
response [6] 4/2 9/14 12/23 14/3 41/4
 53/14
rest [2] 44/8 46/6
restriction [1] 40/7
restrictions [5] 10/5 16/4 23/23 32/12
 42/17
result [1] 4/19
resulting [1] 6/20
resumed [1] 69/21
retail [5] 5/7 5/7 16/12 21/21 28/12
retail-based [1] 21/21
revenue [4] 51/15 51/17 54/14 54/17
reverse [1] 14/24
reversed [1] 49/1
review [2] 58/18 58/19
reviewing [1] 68/14
Richard [2] 2/5 3/14
RICO [4] 26/7 36/22 48/5 49/6
rid [1] 57/25
ridiculous [1] 46/25
right [58] 3/13 4/16 4/17 5/19 6/11 6/12
 6/14 6/15 7/7 7/23 11/9 14/9 17/5 18/8
 19/2 21/13 22/1 22/8 23/6 23/18 29/5

32/3 32/25 33/5 33/18 34/3 35/2 35/3
35/10 36/24 37/1 48/7 48/15 48/25
50/6 50/19 52/11 52/20 53/6 54/21
55/2 55/7 56/7 58/2 58/8 58/8 58/11
58/12 60/1 60/15 62/2 62/2 65/2 65/4
66/3 66/16 69/6 69/8
right/who [1] 35/3
RMR [2] 2/23 72/10
Robert [2] 2/2 3/12
Room [1] 2/24
round [2] 51/4 52/24
route [2] 55/13 56/19
royal [1] 57/17
rubric [1] 26/11
rule [3] 54/20 56/5 68/25
ruled [1] 70/15
rules [2] 16/4 41/18
ruling [7] 14/22 17/21 19/8 48/11 52/12
 57/11 67/1
rulings [1] 32/10
runs [1] 61/14
Russia [1] 11/18

**S**

S.A [2] 1/3 3/7
said [44] 12/4 12/14 16/25 17/5 17/9
 18/11 22/5 25/14 25/20 26/25 27/13
 27/15 33/8 34/1 34/2 34/3 34/9 34/11
 35/5 41/15 43/18 44/5 47/17 50/23
 51/11 51/14 52/2 52/10 52/19 53/2
 54/7 54/11 54/15 56/25 58/22 58/23
 58/24 59/4 61/5 62/14 65/3 68/17
 68/20 69/25
sale [1] 57/22
Salem [1] 63/25
Salyer [2] 2/8 33/16
same [3] 52/24 56/25 62/16
satisfied [1] 40/13
satisfy [1] 15/20
Savage [21] 2/10 3/22 40/3 40/6 41/16
 42/7 42/14 47/14 47/25 49/5 52/3
 52/12 52/25 52/25 53/13 57/14 68/9
 68/12 68/17 70/7 70/24
Savage's [1] 45/11
saw [2] 45/11 45/11
say [61] 4/14 4/21 6/4 6/6 7/19 8/6 8/11
 10/3 11/17 11/23 13/20 14/25 15/10
 16/2 17/5 17/6 18/4 18/19 21/3 21/10
 21/12 22/3 24/2 24/25 25/8 25/17
 26/17 29/1 29/10 31/14 32/13 35/3
 36/16 37/8 39/21 41/7 43/3 44/22
 45/22 46/23 48/9 50/9 50/10 52/11
 52/25 52/25 54/23 57/5 58/12 58/16
 58/23 59/8 60/1 60/4 63/5 64/23 65/6
 65/22 68/5 70/18 71/3
saying [32] 4/15 4/17 6/9 14/17 14/22
 17/4 17/14 18/22 19/2 21/18 21/19
 21/19 22/1 27/23 29/19 29/22 30/1
 30/2 30/3 30/6 30/7 32/10 37/24 47/3
 51/17 55/24 60/15 61/20 62/18 63/10
 63/15 65/1
says [17] 6/6 27/3 36/25 39/11 40/6
 41/23 42/16 42/20 48/10 48/12 48/24
 53/24 55/8 59/25 61/14 64/14 67/9
scales [1] 11/22
scarf [1] 30/21
schedule [2] 54/24 55/11
Schwabe [2] 2/5 3/14
screen [1] 33/23
SE [1] 2/3

second [14]  3/6 4/1 8/24 14/16 15/9 16/8 16/15 22/22 27/17 29/6 39/16 41/1 51/4 67/5
Secondly [1]  36/13
secretly [1]  45/16
section [2]  14/21 69/18
see [17]  18/17 23/25 24/3 24/24 30/20 30/22 44/12 46/14 46/21 48/10 50/24 51/12 55/19 57/5 58/7 66/22 68/15
seeing [3]  10/24 27/8 61/3
seek [1]  50/10
seeks [1]  50/4
seems [1]  22/9
seen [1]  52/8
segue [3]  22/10 26/13 45/10
sell [7]  6/2 6/12 6/14 6/15 7/1 7/9 7/10
selling [2]  7/6 28/12
semantic [1]  60/11
send [11]  19/19 19/22 26/5 26/8 29/24 36/6 50/14 59/15 60/9 62/4 68/19
sending [2]  67/12 67/20
sends [1]  32/19
sense [6]  16/9 22/23 32/14 33/3 33/3 36/18
sent [3]  58/23 61/20 68/22
separate [1]  39/3
series [1]  61/1
serious [2]  5/4 55/22
seriously [1]  59/18
serve [3]  9/8 46/5 69/15
server [1]  49/18
servers [1]  39/1
service [8]  5/8 9/20 28/13 32/19 35/18 47/24 53/21 61/24
services [2]  32/4 69/16
set [8]  3/4 43/15 43/16 43/25 44/14 57/20 64/2 70/3
sets [1]  70/3
seven [1]  5/13
several [1]  13/4
shall [2]  37/21 56/8
ships [1]  45/16
shock [1]  17/2
shocked [1]  25/20
shook [1]  44/12
short [4]  14/15 41/18 49/19 69/10
should [33]  16/3 17/12 19/9 23/21 24/13 25/6 26/5 26/8 28/10 31/4 31/8 31/12 31/14 31/17 36/11 37/11 37/16 37/19 38/12 38/13 46/14 57/4 57/7 58/21 58/22 58/24 58/25 59/9 59/16 59/23 59/25 60/4 63/1
shouldn't [7]  19/9 22/20 23/8 23/9 24/7 31/8 60/3
show [3]  7/4 14/10 34/22
shows [1]  17/23
SI [2]  1/3 3/7
side [1]  11/21
sides [1]  57/24
sign [1]  5/24
signaling [3]  58/23 61/1 67/11
signature [3]  72/7 72/7 72/7
signed [1]  72/7
signing [1]  72/4
silly [1]  30/16
SIM [15]  18/13 18/18 38/13 38/14 41/2 49/17 49/17 49/18 56/23 57/17 57/19 57/22 57/24 58/6 67/25
similar [2]  14/6 54/1

SIMON [1]  1/15
simple [2]  43/1 56/13
simply [7]  13/13 17/9 29/7 37/16 54/11 61/8 62/24
Since [2]  45/19 57/13
sir [1]  48/16
sit [1]  33/20
sitting [1]  26/6
situation [1]  67/16
skipped [1]  69/24
slide [2]  57/14 60/7
slight [1]  60/6
slightly [2]  14/20 29/22
smash [1]  14/20
smuggled [1]  38/18
sneak [1]  5/15
so [55]  5/10 7/8 8/12 9/14 10/13 10/22 12/24 13/15 16/23 21/18 24/6 24/6 28/10 30/20 30/21 31/24 34/14 36/3 37/24 38/5 38/13 39/6 40/13 40/16 41/13 42/5 42/13 43/7 44/9 45/1 45/6 47/16 47/18 49/4 49/7 49/12 49/14 50/6 50/8 50/9 52/2 52/16 55/24 56/4 56/18 57/11 57/15 57/24 58/10 59/10 60/21 61/18 65/6 65/12 66/21
sodas [2]  5/16 5/16
software [3]  34/23 38/22 38/24
sold [3]  16/12 18/5 44/2
solved [2]  55/5 55/6
solves [1]  8/23
some [25]  4/3 4/11 5/16 6/12 7/12 14/12 17/24 19/21 20/20 23/9 27/8 30/12 30/12 31/15 44/10 48/11 53/23 56/12 59/12 61/21 64/6 64/18 64/25 66/6 68/12
somebody [4]  6/19 28/12 45/8 63/17
somehow [3]  28/14 30/1 67/19
someone [9]  6/4 8/10 11/2 12/12 15/18 17/2 32/13 33/19 63/5
something [16]  6/22 7/13 7/22 8/7 11/23 13/19 13/21 13/25 25/10 26/4 29/22 33/9 49/5 60/12 60/12 60/13
somewhat [1]  18/23
somewhere [2]  15/18 49/21
sophisticated [2]  40/2 47/18
sort [6]  10/24 17/13 27/24 32/1 32/2 36/5
sorts [3]  25/15 63/9 65/23
source [1]  29/9
south [1]  45/23
sovereign [1]  13/4
Spain [1]  45/14
speak [1]  29/13
speaker [1]  34/6
speaking [2]  37/12 38/21
specificity [2]  37/23 62/21
speed [1]  24/16
spent [2]  4/11 48/19
split [1]  43/23
spoken [1]  56/9
squarely [1]  69/5
stage [3]  16/9 41/21 58/4
stance [1]  14/25
stand [2]  39/21 44/1
standard [9]  7/24 20/3 24/5 29/12 52/6 52/7 59/4 59/22 66/23
standards [2]  66/17 67/14
standing [1]  57/13
start [5]  5/12 10/23 20/22 35/19 47/19
started [3]  34/11 63/11 63/13

state [30]  3/5 9/17 10/14 11/24 12/19 13/6 14/3 14/4 14/14 14/13 14/16 15/4 15/5 15/11 15/14 15/14 15/14 17/1 17/3 17/12 17/14 21/2 26/4 26/20 28/14 36/22 39/10 39/13 63/21 64/16 65/24
stated [9]  12/25 16/1 18/12 39/8 39/12 58/2 58/10 59/11 66/4
statement [3]  13/10 41/19 69/10
statements [1]  59/12
states [23]  1/1 1/16 2/23 6/21 12/4 12/7 13/4 13/6 13/13 14/5 15/25 16/2 17/5 17/6 17/10 17/10 20/10 24/2 25/12 26/17 33/19 60/18 62/17
statute [1]  12/3
statutes [1]  64/7
statutory [1]  64/6
stay [18]  24/24 25/6 26/2 36/18 36/23 37/3 39/6 41/11 45/20 48/9 55/3 55/5 55/17 55/23 57/6 66/1 66/10 66/11
steal [4]  5/13 43/8 47/24 47/24
step [1]  52/1
steps [1]  9/22
still [8]  8/22 12/25 18/16 23/9 35/6 38/9 49/6 58/10
stole [1]  69/16
stolen [5]  37/17 39/22 39/23 53/21 54/12
stop [1]  60/23
store [8]  5/15 5/18 5/21 6/4 8/11 9/8 27/23 45/21
stream [2]  33/10 61/1
street [2]  2/9 5/16
stress [2]  7/16 7/18
strike [2]  54/1 58/8
striking [1]  57/25
strong [2]  15/4 65/14
struggling [1]  58/13
stuck [1]  71/1
study [1]  54/20
stuff [11]  10/10 12/4 12/13 16/12 18/14 20/17 22/6 22/7 23/5 27/24 31/8
subheading [1]  69/6
subject [2]  4/8 17/12
submit [24]  8/7 9/18 9/21 10/13 12/1 13/8 14/2 15/3 16/7 16/14 21/14 23/3 25/17 27/12 29/21 31/5 31/16 33/5 59/2 62/6 62/22 63/3 67/22 68/5
submitted [1]  9/11
subscribers [1]  44/3
substitutions [1]  7/7
successful [1]  58/10
such [8]  11/21 15/12 17/8 21/4 21/5 22/16 26/11 30/24
sue [7]  6/9 11/6 11/14 11/15 12/18 12/23 63/19
sued [1]  46/23
sues [2]  11/7 46/17
suffer [1]  54/11
sufficient [2]  4/10 68/5
suggest [1]  7/20
suggestion [1]  68/23
suing [1]  64/19
suit [1]  64/15
Suite [4]  2/3 2/6 2/9 2/11
suits [1]  64/7
summarizing [1]  60/22
summary [11]  7/23 19/3 20/13 22/8 35/6 38/4 41/7 54/24 58/4 58/5 68/3
sunglasses [1]  30/20
supplemental [1]  26/6

**S**

supply [1] 32/15
support [1] 18/3
supporting [1] 70/4
Suppose [2] 5/12 20/19
supposed [2] 60/11 69/12
supposedly [4] 5/10 13/20 25/11 58/22
Supreme [1] 16/20
Supreme Court [1] 16/20
sure [10] 6/15 6/19 10/13 11/13 19/24 21/1 26/15 56/2 61/10 65/13
surrounding [1] 17/16
survives [1] 63/1
SW [3] 2/6 2/9 2/24
switch [17] 19/14 19/14 21/16 21/16 31/9 31/9 44/15 51/6 51/7 67/3 67/4 67/12 67/13 67/18 67/18 67/24 67/24
switch-to-switch [3] 21/16 31/9 67/24
switches [4] 19/12 45/3 45/4 45/4
sword [1] 51/14
sympathetic [1] 50/13

**T**

tactic [1] 42/15
take [10] 5/13 23/25 26/5 32/15 48/10 48/17 55/15 55/17 70/25 71/9
taken [2] 38/19 39/25
takes [1] 48/18
taking [3] 9/22 26/21 32/23
talk [9] 15/8 16/9 18/17 19/13 24/9 31/22 41/7 57/10 62/23
talked [3] 30/14 50/17 53/12
talking [11] 12/9 12/14 35/22 42/11 45/17 54/15 60/24 61/18 63/6 67/24 69/1
talks [1] 62/12
tariff [4] 64/14 64/14 64/22 68/22
tariffs [1] 16/24
teach [1] 20/17
technical [4] 28/4 59/8 60/7 67/12
technically [1] 24/7
technique [1] 67/21
technological [21] 18/13 18/21 18/23 20/7 20/11 27/9 27/25 29/7 32/14 33/7 34/12 36/17 41/1 41/2 41/4 50/18 56/22 56/23 58/3 66/25 68/7
technologically [7] 29/18 31/12 36/11 37/12 38/12 38/20 60/15
technology [24] 1/6 3/8 10/4 20/8 20/13 23/12 23/12 23/13 26/2 27/10 28/2 28/4 28/18 30/24 32/6 38/22 38/23 41/5 42/10 44/9 49/11 49/14 49/25 50/7
telecom [2] 63/22 63/24
telecommunications [9] 10/11 14/24 23/12 28/2 28/4 32/4 37/18 38/18 43/18
telephone [6] 28/18 34/6 57/10 60/24 61/3 67/10
tell [17] 10/7 18/24 20/6 20/12 28/10 29/19 29/23 44/19 46/9 46/10 46/13 57/8 59/20 59/21 59/21 61/7 69/12
telling [2] 27/6 47/13
tells [1] 28/10
temptation [1] 42/5
tension [1] 59/12
tentatively [1] 57/2
terminated [1] 69/6
terms [3] 16/15 17/4 17/15
terrible [2] 5/11 5/17

testify [3] 20/1 22/13 70/8
testifying [2] 41/17 60/22
testimony [1] 41/22
than [10] 18/4 25/20 26/3 31/1 31/2 36/24 37/4 37/5 53/7 63/13
thank [9] 3/24 4/6 37/10 47/5 54/6 68/9 71/5 71/7 71/10
that [456]
that's [90]
the Court [1] 46/14
theft [4] 40/3 42/25 43/9 62/13
their [53] 4/13 4/20 4/22 5/13 6/25 7/16 9/5 10/22 13/14 14/3 16/12 17/17 18/21 19/20 19/22 20/8 20/21 20/24 20/25 21/15 21/21 22/2 23/25 26/11 28/16 28/17 29/8 29/16 30/25 31/18 33/5 33/20 39/4 41/11 41/25 43/25 44/3 44/14 45/7 45/15 46/2 46/5 46/23 47/7 47/9 53/6 54/18 59/21 63/18 65/1 65/9 67/2 67/18
them [41] 4/16 5/7 7/2 7/2 11/6 11/7 12/13 12/13 12/13 12/22 12/22 15/10 16/20 16/21 16/22 16/23 18/16 24/25 26/21 28/15 28/17 29/9 29/18 29/24 31/19 36/10 36/14 40/22 40/23 41/10 41/24 42/2 42/19 43/2 43/3 43/8 45/4 46/17 47/3 47/8 48/11
themselves [1] 19/11
then [45] 5/14 5/16 6/15 8/23 11/4 16/20 16/23 16/25 18/9 19/9 31/14 32/13 32/19 32/23 34/3 34/10 34/11 35/5 35/19 36/21 37/1 42/20 44/18 45/4 45/25 46/7 48/10 51/12 52/16 55/10 55/16 56/8 56/25 57/4 57/5 57/6 57/10 57/18 58/6 59/16 63/7 65/24 66/5 69/1 70/23
theories [1] 58/11
theory [2] 38/7 58/9
there [78]
there's [5] 21/12 30/8 58/5 59/12 62/18
therefore [3] 15/16 29/17 41/6
these [20] 5/7 5/11 14/10 15/25 16/24 22/19 22/24 25/15 26/17 32/12 40/20 42/18 42/22 42/24 45/1 45/4 45/5 56/17 57/22 65/23
they [226]
they're [6] 5/5 46/9 46/10 46/12 60/21 67/6
they've [6] 8/6 9/11 18/20 27/1 33/23 40/1
thing [14] 19/19 19/21 24/1 25/14 28/11 32/14 36/5 40/10 45/11 49/9 66/1 66/22 69/23 71/1
things [27] 5/7 5/11 5/17 6/24 9/5 9/12 11/13 13/5 15/12 15/12 17/17 22/19 22/25 23/13 25/16 40/19 41/6 46/20 51/14 52/11 52/24 57/12 58/16 59/1 60/22 63/9 65/23
think [71] 4/23 4/24 5/1 5/4 5/11 7/6 7/8 8/20 8/23 9/11 11/10 13/1 13/9 14/18 15/10 15/13 15/13 16/9 17/21 18/6 18/12 18/22 20/4 21/18 22/8 24/5 24/17 25/22 26/16 28/3 30/2 30/14 31/24 33/16 34/9 36/8 36/13 36/15 36/23 37/1 37/3 37/4 40/13 40/25 41/1 44/6 45/18 52/5 53/3 53/4 53/6 53/7 54/3 55/4 55/16 56/13 56/16 57/1 57/7 58/18 59/5 59/7 59/13 59/23 60/7 60/23 65/6 65/7 66/4 69/23 71/7
thinking [4] 11/11 15/7 35/6 65/8

thinks [2] 24/3 28/20
Third [3] 2/3 2/24 63/5
Thirdly [1] 52/1
this [177]
those [16] 13/13 16/13 16/17 23/13 43/5 45/4 49/16 49/18 57/22 58/9 59/1 59/12 63/9 65/4 65/16 69/14
though [2] 11/7 27/16
thought [6] 20/5 44/22 47/16 48/22 51/1 57/2
thought-out [1] 51/1
three [6] 48/18 48/19 50/15 55/7 55/9 55/10
through [18] 5/19 7/17 8/6 27/8 40/1 40/4 40/21 42/6 42/16 43/7 43/22 44/13 49/16 57/10 61/13 61/14 63/12 65/3
throughout [1] 37/24
throw [2] 51/19 70/16
throwing [1] 70/16
ticket [2] 54/5 54/8
tightly [1] 16/18
time [12] 3/4 4/12 6/24 22/9 36/8 44/1 48/24 49/23 52/2 52/16 69/24 70/25
times [2] 42/6 44/16
Ting [7] 15/8 15/8 16/8 16/15 16/16 28/11 37/7
today [3] 4/8 27/21 71/8
together [4] 14/20 35/18 39/15 53/23
Tomasi [1] 2/8
too [6] 28/7 33/1 45/8 46/25 47/16 49/20
took [1] 52/1
top [2] 14/8 48/19
tort [12] 5/2 6/21 6/21 9/4 9/7 9/14 14/6 15/4 15/5 15/5 17/14 17/17
totally [1] 70/22
tracking [1] 20/22
traditional [1] 43/7
traffic [1] 31/9
train [16] 45/22 45/23 45/24 46/7 46/8 46/17 47/7 47/10 54/2 54/3 54/4 54/9 63/6 63/15 63/16 63/18
transaction [2] 11/1 38/19
transcript [4] 1/14 58/19 72/5 72/6
transferred [1] 61/8
transmit [3] 17/24 18/1 31/15
transmits [1] 17/22
transmitted [1] 67/11
transportation [2] 63/23 64/3
traveling [1] 63/16
treat [2] 29/3 70/9
Tremaine [1] 2/11
trial [7] 7/4 8/12 10/21 37/2 39/14 54/25 55/11
Tristan [1] 3/18
true [7] 8/22 9/11 13/9 21/6 21/19 36/4 50/10
trunk [4] 54/2 63/18 63/19 63/25
trunks [1] 63/21
truth [1] 40/13
try [5] 5/21 18/9 18/10 22/7 40/19
trying [14] 5/11 10/17 15/1 15/13 16/3 16/20 23/23 31/2 42/5 59/5 66/21 66/24 68/1 69/10
turn [1] 67/5
turning [1] 29/11
turns [1] 37/6
tweak [2] 45/19 45/20
two [22] 3/16 15/7 19/12 24/17 24/22

**T**

two... [17]  31/6 35/21 41/6 41/18 42/18 45/23 46/20 46/22 48/19 50/25 51/14 52/11 53/23 57/12 59/12 68/17 70/20
Twombly [7]  8/1 8/2 18/10 19/6 38/10 59/2 62/21
Twombly/Iqbal [1]  59/2
type [4]  23/9 40/13 48/11 49/10
types [1]  5/23

**U**

U.S [1]  44/2
uh [3]  53/1 53/1 53/1
ultimately [2]  20/8 36/22
unable [1]  28/8
under [20]  8/10 8/19 9/10 12/7 14/10 14/13 16/1 26/7 26/10 26/24 30/15 36/21 37/7 41/18 55/14 55/17 57/19 59/9 62/21 71/9
underlying [3]  8/23 22/25 69/16
understand [6]  12/10 12/16 18/10 22/7 64/24 68/24
Understanding [1]  55/25
understands [1]  68/4
unhappy [1]  6/24
UNIGESTION [2]  1/3 3/7
unique [2]  23/1 50/18
UNITED [16]  1/1 1/16 2/23 12/4 12/7 13/13 14/5 15/25 16/2 20/10 24/2 25/12 26/17 33/19 60/18 62/17
United States [12]  12/4 13/13 14/5 15/25 16/2 20/10 24/2 25/12 26/17 33/19 60/18 62/17
unjust [3]  48/4 49/7 56/24
unless [3]  31/21 40/23 55/17
unopposed [1]  66/15
unpacking [1]  10/24
unprecedented [2]  14/18 52/1
until [1]  41/11
up [29]  5/24 10/25 16/19 19/21 19/25 24/16 25/9 33/10 34/6 34/15 34/15 34/18 34/23 34/24 39/21 41/8 43/15 43/16 43/25 44/14 45/13 49/6 51/19 55/15 55/17 57/15 58/7 62/12 69/22
UPM [13]  1/6 3/8 25/10 25/18 39/1 39/22 40/8 43/2 43/14 46/2 47/21 54/13 68/20
UPM Technology [1]  3/8
upon [3]  48/23 56/12 70/4
urge [3]  31/3 65/7 68/7
urging [1]  68/12
us [13]  5/8 16/17 18/5 41/9 47/25 55/8 59/5 60/12 60/12 62/8 65/23 66/24 68/21
USA [1]  51/16
use [6]  26/13 33/21 44/19 45/4 45/8 45/13
used [9]  5/8 28/19 38/22 38/23 44/18 49/11 49/13 49/17 61/25
using [3]  39/23 43/6 44/8
utterly [1]  62/22

**V**

variety [7]  27/4 27/6 27/22 36/16 36/25 39/20 50/16
Vaughan [13]  2/2 2/2 3/12 3/12 31/3 33/16 34/9 34/25 37/11 52/2 66/6 66/8 68/10
VCRs [1]  44/20
VCRs/radios [1]  44/20

vehicle [1]  40/1
Verizon [1]  28/12
versus [1]  3/7
very [19]  9/12 13/9 13/9 16/18 24/18 27/15 27/15 36/2 42/14 51/1 54/1 54/22 55/22 57/11 57/11 66/6 67/20 69/25 71/4
vet [1]  52/3
vetted [1]  52/9
via [1]  32/22
vice [1]  9/22
view [2]  36/20 66/6
violate [1]  53/4
violated [4]  6/15 6/19 6/25 20/3
violates [1]  28/13
violating [1]  53/5
violation [1]  48/1
visited [1]  48/23
voice [3]  33/17 35/8 35/13
VoIP [7]  35/21 35/22 36/5 43/22 43/25 44/4 44/14
Vonnage [1]  35/15
Vonnage's [1]  35/18

**W**

Wait [1]  56/14
waiting [1]  63/5
waiver [1]  53/7
waiving [1]  27/18
walking [1]  27/23
wall [1]  71/1
want [43]  6/2 9/3 9/8 10/23 11/5 13/18 14/14 15/15 15/23 17/10 18/1 19/12 19/19 20/15 20/16 21/11 29/5 32/10 32/11 32/11 33/8 33/24 35/24 36/10 38/4 40/23 50/14 50/19 52/3 52/15 53/24 53/25 54/20 55/3 55/14 55/23 56/3 56/15 58/4 58/12 61/13 65/17 67/7
wanted [9]  12/18 25/14 25/15 25/20 60/11 60/12 62/8 64/18 69/11
wants [1]  47/25
was [58]  5/8 5/11 10/17 11/8 11/8 12/7 12/8 12/14 15/11 15/18 16/16 18/4 18/4 18/11 20/21 20/24 20/25 33/2 33/9 33/14 33/16 33/20 35/4 35/17 38/14 40/4 42/2 42/16 43/2 44/13 44/15 45/11 45/12 45/18 45/19 45/22 49/14 49/14 51/4 51/8 51/24 52/5 52/18 53/19 54/2 57/18 57/21 58/24 60/17 61/16 63/5 64/18 65/15 65/16 68/21 68/21 68/22 69/14
Washington [2]  2/12 61/16
wasn't [3]  33/11 53/13 57/14
wasted [1]  52/16
waving [1]  33/7
way [30]  5/14 5/22 7/2 7/11 7/17 10/17 10/25 16/12 18/25 19/17 20/14 21/12 23/6 23/21 25/19 25/22 31/15 31/21 36/14 36/15 41/5 44/11 49/11 50/5 52/12 57/10 59/10 59/13 63/12 63/22
ways [3]  13/5 28/18 32/12
we [175]
we'd [1]  65/4
we're [9]  12/14 14/25 16/8 17/6 25/20 40/14 46/11 49/23 65/9
we've [2]  32/22 65/14
week [1]  57/12
weight [1]  54/4
welcome [6]  3/15 3/20 3/23 5/25 9/3

39/12
well [31]  4/7 7/12 8/2 11/19 12/24 13/1 14/15 16/8 16/25 27/14 30/14 31/14 32/13 41/4 42/8 46/20 50/9 50/23 51/1 51/4 52/6 52/7 54/7 54/16 54/22 57/18 62/15 63/6 63/7 64/24 70/11
well-pled [1]  42/8
Wendell [1]  9/2
went [7]  16/19 40/4 40/21 46/1 46/1 47/21 65/3
were [27]  23/5 23/17 24/10 25/6 26/1 26/17 30/4 30/9 44/22 45/25 47/7 49/5 52/23 53/4 53/4 57/19 57/21 62/15 63/6 64/19 65/22 66/10 66/11 66/14 69/4 69/10 69/11
weren't [1]  33/12
what [162]
what's [4]  25/3 39/4 48/25 53/14
what-ifs [1]  42/8
whatever [6]  4/8 12/7 30/2 49/5 50/1 64/19
when [40]  4/14 7/11 10/15 10/20 13/17 15/7 17/2 19/12 19/14 20/9 21/10 22/6 25/1 25/14 25/15 25/18 29/3 32/13 36/17 38/16 45/11 45/14 46/8 46/12 46/16 47/6 47/19 50/17 54/2 55/9 57/16 58/4 59/8 60/23 61/18 62/12 63/5 65/8 65/8 68/13
where [26]  6/19 7/24 16/9 21/15 23/24 27/10 34/13 35/18 36/9 36/13 36/14 37/2 40/21 43/20 47/21 50/24 54/10 55/19 56/20 58/4 60/5 60/24 60/25 61/19 69/3 69/12
wherefores [1]  42/8
wherever [2]  11/18 40/9
whether [14]  10/21 16/7 35/17 36/19 39/7 40/8 40/11 57/8 64/16 65/13 65/17 66/15 68/15 70/3
which [46]  4/13 9/1 10/5 13/5 14/4 15/9 15/23 16/22 18/21 18/22 23/14 24/23 25/22 28/3 29/14 31/6 31/7 32/19 35/18 35/21 36/15 38/9 39/2 40/1 41/7 41/19 41/20 41/23 41/23 42/15 42/22 43/10 43/25 44/14 45/1 51/25 51/25 52/11 55/18 56/3 56/8 59/20 61/14 65/16 70/4 70/19
while [3]  5/8 41/24 69/14
whiplash [1]  42/15
who [11]  3/18 11/1 12/24 20/1 28/12 35/3 35/3 47/9 51/5 51/6 54/2
who's [1]  64/3
whoever [3]  23/4 31/3 33/25
why [29]  9/7 13/25 17/16 22/20 27/13 27/16 32/3 35/4 37/3 37/4 38/7 39/16 43/20 46/14 47/13 49/11 50/10 51/6 51/19 52/11 54/11 60/6 61/12 64/5 64/17 68/12 69/9 70/12 70/15
will [49]  8/13 10/1 10/21 11/13 13/17 13/23 15/22 16/8 16/15 18/16 22/3 22/7 22/8 22/13 22/14 27/4 29/6 31/19 33/21 33/22 33/25 37/8 39/14 41/9 43/21 43/22 43/23 44/9 45/19 45/20 49/24 50/7 52/11 55/9 55/11 55/19 56/19 56/19 57/5 57/9 57/10 57/11 59/14 64/10 64/12 68/18 69/3 70/9 71/9
Williamson [1]  2/5
win [3]  22/8 47/15 70/24
within [10]  9/16 22/17 23/1 24/8 26/19 38/9 39/9 45/24 63/16 69/5



**W**

without [4]  5/5 62/23 65/1 72/6
wonks [1]  40/3
words [2]  30/7 58/12
work [8]  10/25 17/22 24/9 24/14 24/19
 28/3 41/5 69/12
works [10]  18/11 19/1 26/3 28/2 28/18
 32/17 35/9 35/13 36/5 63/22
world [1]  32/5
worry [1]  40/14
worrying [1]  22/18
worth [1]  65/16
would [103]
wouldn't [8]  9/12 30/9 42/11 43/12 50/9
 54/8 62/1 64/20
wrap [1]  69/22
Wright [1]  2/11
write [1]  56/19
written [1]  71/5
wrong [6]  18/25 27/18 35/3 39/4 39/19
 65/22
Wyatt [1]  2/5

**X**

X/Y/Z [1]  12/5

**Y**

yeah [3]  10/3 11/19 64/10
year [5]  18/7 20/5 22/15 36/17 53/13
years [5]  13/4 20/1 35/8 48/19 50/25
yes [18]  4/6 8/17 8/21 13/1 13/3 21/5
 25/17 26/13 28/8 29/5 34/2 34/9 42/2
 46/22 48/16 51/10 61/7 67/8
yet [5]  27/7 29/1 35/2 68/19 68/22
York [14]  11/1 11/2 11/3 11/4 11/4 11/8
 11/17 13/1 31/10 51/7 51/16 61/6
 63/12 63/17
you [278]
you'd [2]  56/15 57/22
you're [18]  6/9 7/25 9/3 20/12 25/4
 27/19 29/11 36/13 38/6 39/12 45/24
 50/12 52/20 58/2 58/7 58/11 60/15
 68/14
you've [5]  3/18 4/16 15/18 24/12 39/11
your [89]
Your Honor [15]  3/4 3/11 3/17 4/6 19/5
 27/12 31/2 37/14 44/16 44/25 47/17
 58/15 69/25 70/15 71/3
yourself [1]  27/21
yourselves [1]  3/10

**Z**

zero [5]  7/20 13/10 14/4 28/3 48/3