# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>       Plaintiff,<br><br>       v.<br><br>**UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC.** and **UPM MARKETING, INC.**, an Oregon corporation; **UPM TELECOM, INC.**, an Oregon a/b/n; **UPM MARKETING, INC.**, an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; **TYLER ALLEN**, an Oregon resident; and **DUY TRAN** a/k/a **BRUCE TRAN**,<br><br>       Defendants. | Case No. 3:15-cv-185-SI<br><br>**OPINION AND ORDER** |

Richard K. Hansen and Anne M. Talcott, SCHWABE, WILLIAMSON & WYATT, PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah B. Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394. Of Attorneys for Plaintiff.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER MARTIN, 121 SW Morrison Street, Suite 1850, Portland, OR 97204; Christopher W. Savage, DAVIS WRIGHT TREMAINE, LLP, 1919 Pennsylvania Avenue NW, Suite 800, Washington, DC 20006. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff, Unigestion Holdings, S.A., doing business as Digicel Haiti ("Digicel Haiti" or "Plaintiff"), asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and for common law fraud, conversion, and unjust enrichment against Defendants UPM Technology, Inc.; UPM Marketing, Inc.; UPM Telecom, Inc.; Benjamin Sanchez; Baltazar Ruiz; Tyler Allen; and Duy Tran (collectively, "Defendants"). Plaintiff and Defendants each provide mobile telecommunication services to Haiti. Plaintiff alleges that Defendants provide these services by fraudulently accessing Digicel Haiti's telecommunications network through the use of certain technologies and practices. Before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint ("SAC"). For the following reasons, Defendants' motion to dismiss is denied.

## STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. *Gunn v. Minton*, --- U.S. ---, 133 S. Ct. 1059, 1064 (2013) (citation omitted). As such, a court is to presume "that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). An objection that a particular court lacks subject matter jurisdiction may be raised by any party, or by the court on its own initiative, at any time. *Arbaugh v. Y&H Corp.*, 546

U.S. 500, 506 (2006); Fed. R. Civ. P. 12(b)(1). The Court must dismiss any case over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone*, 373 F.3d at 1039. A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where 'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039)). When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Robinson*, 586 F.3d at 685; *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (citation and quotation marks omitted).

**B. Motion to Dismiss Under Rule 12(b)(6)**

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint

"may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND

Digicel Haiti alleges that it operates a mobile telecommunications network in Haiti. Digicel Haiti is part of the "Digicel Group" of companies, which includes Digicel USA, Inc. ("Digicel USA") and Digicel Jamaica Limited ("Digicel Jamaica"). When an individual in the United States places a call to one of Digicel Haiti's subscribers in Haiti, that call is routed through a switch operated by Digicel USA, located in either Miami, Florida or New York, New York. The switch creates a Call Detail Record ("CDR"), which contains various information about the call, including the initiating caller's telephone number. Digicel USA's switch then transmits the call to a Digicel Haiti switch in Haiti, which routes the call to one of Digicel Haiti's cellsites in Haiti. That cellsite then connects the call to the subscriber's cellular telephone. Digicel Haiti's switch also creates a CDR when the call reaches Haiti.

Digicel Haiti only authorizes international telecommunications traffic to enter its Haitian network through this switching system, not through any other means. This is because when a call does not enter Digicel Haiti's network through the switching system, Digicel Haiti cannot obtain the identifying information that it needs to classify the call as originating internationally. When Digicel Haiti cannot classify a call as international, it cannot charge the rate that it ordinarily charges for such calls, which is a minimum of 23 cents per minute, as set by the government of Haiti.

Digicel Haiti also offers a program called the "Roam Like You're Home" ("RLYH") Plan. In exchange for paying certain fees and agreeing to the applicable terms of service, Digicel Haiti's customers on the RLYH Plan pay lower, domestic Haitian rates on international calls made to Haiti while they are abroad.

As alleged by Digicel Haiti, Defendants engaged in, and continue to engage in, what Digicel Haiti calls "bypass fraud." Defendants allegedly have created a telecommunications network consisting of the internet, specialized software, SIM[1] boxes or servers, "receivers," and "false gateways." Defendants allegedly use this network to route calls around, or "bypass," Digicel USA's and Digicel Haiti's international switches, thereby "disguising" international calls destined for Digicel Haiti's network as domestic Haitian calls. By "disguising" international calls as domestic, Defendants can place, or terminate, international calls on Digicel Haiti's network at lower, domestic rates, thereby depriving Digicel Haiti from receiving revenue that would come from imposing higher, international charges. Defendants allegedly sell to third parties minutes for calling Haiti from the United States at lower rates than those parties would otherwise have to pay if the calls were routed through Plaintiff's international switching system. Plaintiff also

---

[1] In the telecommunications context, "SIM" means "Subscriber Identity Module."

alleges that Defendants disguise ordinary international calls as international calls placed by Plaintiff's RLYH Plan subscribers.

## DISCUSSION

Defendants assert three independent arguments in support of their motion to dismiss. First, Defendants argue, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, that Plaintiff's SAC fails to state a claim. Second, Defendants argue, under Rule 12(b)(1), that the Communications Act of 1934 (the "Federal Communications Act" or the "FCA"), 47 U.S.C. § 151 *et seq.*, preempts the claims asserted by Plaintiff. Third, Defendants argue, under the doctrine of primary jurisdiction, that Plaintiff's claims should be dismissed or stayed while the Federal Communications Commission ("FCC") decides certain threshold issues. As discussed more fully below, the parties, in essence, disagree over: (a) what Defendants actually did; and (b) whether what Plaintiff alleges Defendants actually did properly can be considered fraudulent. The first question cannot be resolved at this stage of the litigation, but must await either summary judgment or trial. The second question already has been answered by the Court in the affirmative.

### A. The Sufficiency of Digicel Haiti's Allegations

This is not the first time that Defendants have moved to dismiss Digicel Haiti's claims under Rule 12(b)(6). *See* ECF 46 at 10-18. The Court previously denied Defendants' earlier motion to dismiss, holding that

> Digicel has stated a claim for common law fraud, RICO violations, conversion, and unjust enrichment, all based on UPM's use of technology to actively conceal the origin of the telephone calls that UPM transmits to Digicel's telecommunications network.

ECF 58 at 23.

Plaintiff alleges that when Defendants transmit calls to Digicel Haiti's network, they manipulate the calls to make them appear as if they have originated from a cellular telephone located in Haiti or from an RLYH Plan subscriber abroad, when in fact the calls originate in the United States by someone who is not contractually entitled to use the RLYH Plan. According to Plaintiff, Defendants engage in the allegedly deceptive practices to avoid detection by Digicel Haiti, which allegedly would not connect the calls transmitted by Defendants if Plaintiff's system recognized the calls as actually originating in the United States or from someone other than an RLYH Plan subscriber. Plaintiff's allegations that Defendants engaged in "active contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter," sufficiently state a claim of active concealment under the common law. *See United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000). In addition, Plaintiff sufficiently alleges damages by claiming that Defendants diverted calls from Plaintiff's switches, thereby preventing Plaintiff from charging its higher international rates.

As the Court previously ruled in connection with Plaintiff's First Amended Complaint, Plaintiff sufficiently pleads the elements of common law fraud in Oregon. ECF 58 at 19. Plaintiff's allegations also sufficiently state the RICO predicate acts of wire fraud, mail fraud, and access device fraud, based in part on Defendants' alleged use of the wires and mails to fund and provide equipment to their Haitian co-conspirators and Defendants' alleged unauthorized use of Digicel Haiti's SIM cards. *Id*. at 20-21. Plaintiff also sufficiently states claims for conversion and unjust enrichment. *Id*. at 22-23.

Defendants' additional arguments raised in their most recent motion to dismiss also are unavailing. First, Defendants argue that Plaintiff's claims fail because Plaintiff has not shown that Defendants have an obligation under the law of Haiti to pay Plaintiff a rate of 23 cents per

minute on all international calls from the United States to Haiti.[2] The essence of Plaintiff's case is that Plaintiff charges 23 cents per minute for international calls from the United States to Haiti, except for RLYH Plan subscribers. Plaintiff asserts that if Defendants (or their customers) want to use Plaintiff's network to make international calls from the United States to Haiti, then Defendants (or their customers) must pay the rate that Plaintiff charges. Defendants, however, allegedly through active concealment or other fraud, avoid paying those charges, which causes a loss of revenue to Plaintiff. It does not matter whether Plaintiff is legally obligated to charge any particular rate to international callers; Plaintiff has chosen to do so. That is enough. According to Plaintiff, Defendants (or their customers) must either pay Plaintiff's international charges or else use a means other than Plaintiff's network to communicate with people in Haiti.

Second, Defendants argue that even if the government of Haiti required Plaintiff to charge 23 cents per minute on international calls, Defendants would commit no tort by refusing to pay a rate that harms consumers. The Court rejects this argument for similar reasons. The issue is whether Defendants fraudulently induced Digicel Haiti to charge Defendants (or their customers) the lower, domestic rate, not whether Digicel Haiti should be charging the lower rate in the first place.

Third, Defendants argue that Plaintiff's allegation that Defendants' failure to provide Digicel Haiti with information identifying calls as originating in the United States is legally insufficient to state a claim of misrepresentation because it is technologically impossible for Defendants to provide such information. This, however, is a factual issue that cannot be resolved at this stage of the litigation. Relatedly, Defendants assert that they accurately provide Digicel

---

[2] Defendants also argue that the SAC does not give sufficient "notice by a pleading or other writing" of Plaintiff's intent to "raise an issue about a foreign country's law." Fed. R. Civ. P. 44.1. This case, however, does not implicate a foreign country's law. Plaintiff may charge any rate that is lawful, and its motivation for selecting a particular rate is irrelevant.

Haiti with the identifying information associated with the SIM cards purchased from Digicel Haiti or its agents and that Digicel Haiti has no further entitlement to receive information identifying the actual originating location of a caller. Plaintiff, however, does not allege that Defendants should have provided information different from that contained on the SIM cards coming from Digicel Haiti. Rather, Plaintiff alleges that Defendants should have connected to its network through an authorized means and not in an allegedly deceptive manner, using the SIM cards that Defendants or their agents obtained from Digicel Haiti or its agents.

Fourth, Defendants argue that Plaintiff does not adequately allege that Defendants' conduct has caused harm to Plaintiff in the form of added "stress" to Plaintiff's network. Plaintiff alleges that Defendants' conduct created "an additional unaccounted for stress on Digicel Haiti's cellular network and infrastructure." SAC ¶ 104. Defendants respond that, by using the internet to route calls to Digicel Haiti's subscribers and bypassing Plaintiff's switches, Defendants actually reduced the use of, and related stress on, Digicel Haiti's infrastructure. Again, this factual issue cannot be resolved at this stage of the lawsuit. Further, Defendants assert that Plaintiff does not adequately allege harm to its goodwill, but the Court finds that, at this stage, Plaintiff sufficiently alleges damage to its "goodwill, commercial and government reputation and customer relationships." SAC ¶ 171. More detailed allegations are not needed, and whether Plaintiff's evidence is sufficient to permit trial is a question that must wait until later.

Finally, Defendants argue that Plaintiff's claims involving the RLYH Plan should be dismissed because Defendants used the RLYH service legitimately in accordance with its terms of service, and in any case, Plaintiff received the full 23 cents per minute international rate for each minute of RLYH service that Defendants obtained and resold. This is not what Plaintiff alleges, however, In the SAC, Plaintiff asserts that Defendants obtained RLYH SIM cards,

installed them in Defendants' servers in Oregon, and used them to "disguise" international calls as RLYH-qualified calls, thereby inducing Digicel Haiti to charge a lower rate. For these reasons and for the reasons previously stated in the Court's Opinion and Order (ECF 58) denying Defendants' motion to dismiss Plaintiff's First Amended Complaint, the Court holds that Plaintiff has sufficiently stated claims for common law fraud, RICO violations, conversion, and unjust enrichment.[3]

## B. Preemption

Defendants argue that the FCA preempts Digicel Haiti's Oregon common law claims for fraud, conversion, and unjust enrichment. Federal law may preempt state law under the Supremacy Clause in three ways: "(1) express preemption; (2) field preemption (sometimes referred to as complete preemption); and (3) conflict preemption." *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003); *see* U.S. Const. art. VI, cl. 2. In any preemption analysis, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103 (1963). Defendants argue that both field preemption and conflict preemption apply.[4]

### 1. Field Preemption

"Field preemption exists 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary

---

[3] In their reply, Defendants add that the Court should dismiss Digicel Haiti's conversion and unjust enrichment claims because Plaintiff's response to the motion to dismiss Plaintiff's Second Amended Complaint did not address Defendants' arguments against those claims. The Court, however, previously rejected those arguments when Defendants asserted them against Plaintiff's First Amended Complaint. ECF 58 at 21-23. Plaintiff need not repeat its earlier responses that the Court has already accepted.

[4] Defendants do not argue that express preemption applies. Defendants' preemption claims are based on Sections 201 and 202 of the FCA, 47 U.S.C. §§ 201-02. As the Ninth Circuit has found, "Section 201(b) and 202(a) [of the FCA] do not contain preemptive text." *Ting*, 319 F.3d at 1136. Nor does the remainder of these sections contain preemptive text.

state regulation.'" *Ting*, 319 F.3d at 1136 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Defendants argue that Sections 201 and 202 of the FCA, 47 U.S.C. §§ 201-02, "field preempt" Digicel Haiti's common law claims. The relevant portion of Section 201 of the FCA is subsection (b), which states:

> All charges, practices, classifications, and regulations for and in connection with [interstate or foreign communication service by wire or radio], shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.

47 U.S.C. § 201(b). The relevant portion of Section 202 is subsection (a), which reads:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).

The Ninth Circuit previously examined the preemptive effect of Sections 201(b) and 202(a) of the FCA in *Ting*. In that case, a consumer challenged the provisions of a long distance carrier's contract barring customers from pursuing class action claims against the carrier. 319 F.3d at 1130. Citing with approval the Second Circuit's decision in *Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998), the Ninth Circuit held that field preemption was not "at issue because state law unquestionably plays a role in the regulation of long-distance contracts." *Ting*, 319 F.3d at 1136. In *Marcus*, customers brought common law claims against a long distance carrier, alleging that the carrier deceived them by failing to disclose its practice of billing customers per minute rounded up to the next higher full minute. 138 F.3d at 51-52. The Second Circuit held that "the FCA not only does not manifest a clear Congressional intent to preempt state law

actions prohibiting deceptive business practices, false advertisement, or common law fraud, it evidences Congress's intent to allow such claims to proceed under state law," based on the FCA's savings clause. *Marcus*, 138 F.3d at 54; *see* 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."). The Second Circuit distinguished the Seventh Circuit's decision in *Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir. 1998), observing that although the complaint in *Cahnmann* "purported to raise only state law claims," it was actually "a suit to invalidate a filed tariff." *Marcus*, 138 F.3d at 55.

Defendants argue that Plaintiff's lawsuit essentially is a dispute about how international telecommunications traffic from the United States to Haiti should be routed, how much Defendants should have to pay Digicel-Haiti to terminate that traffic in Haiti, and what signaling information must accompany the calls. As previously discussed, however, Plaintiff primarily alleges that Defendants committed fraud through active concealment. Plaintiff raises no issues about whether Defendants' alleged conduct complies with or violates any filed tariff. Further, Congress has manifested no clear intent to preempt Plaintiff's claim of fraud.

Defendants also argue that this dispute falls within the FCC's exclusive jurisdiction.[5] In *Vonage Holdings Corp.*, the FCC preempted a state public utility commission's regulations requiring a provider of voice over internet protocol (VoIP) services to "obtain operating authority, file tariffs, and provide and fund 911 emergency services," 19 F.C.C. Rcd. 22404,

_____

[5] Defendants rely on *Broyte v. Gotham Towers, Inc.*, 13 F.3d 994, 996-97 (6th Cir. 1994). In that case, the Sixth Circuit held that the FCC had exclusive jurisdiction over residents' nuisance claims that a radio station's signals interfered with the residents' household appliances. *Broyte* is inapposite because it hinges, in part, on Congress's stated "inten[t] to clarify the reservation of exclusive jurisdiction to the Federal Communications Commission over matter involving RFI [radio frequency interference]." *Id.* (alteration in original) (quoting H.R. Conf. Rep. 97-765, at 33 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2261, 2277)). Congress has stated no intent that is relevant to this lawsuit.

22408 (2004), holding that "[w]hen a service's end points are in different states or between a state and a point outside the United States, the service is deemed a purely interstate service subject to the Commission's exclusive jurisdiction." *Id.* at 22413. *Vonage* is distinguishable because it applies to regulations issued by state public utility commissions, not to "general laws governing entities conducting business within the state, such as laws concerning . . . fraud." *Id.* at 22405.[6] Thus, the FCA does not field preempt Digicel Haiti's claims.

### 2. Conflict Preemption

Conflict preemption is found either where "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The obstruction prong of conflict preemption "focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation." *Ting*, 319 F.3d at 1137.

Defendants refer the Court to FCC rulings in which the FCC makes statements suggesting support for Defendants' alleged conduct, without expressly finding Defendants' alleged conduct "just and reasonable" under Section 201(b) of the FCA. 47 U.S.C. § 201(b). First, in the FCC's 1997 order setting benchmark rates for international message telephone service (IMTS), the FCC stated: "Use of the Internet . . . has emerged as an alternative to higher priced IMTS. Though internet traffic and switched voice traffic are carried over virtually identical facilities, the price for internet service is far cheaper because switched traffic is subject

---

[6] Defendants' additional support for their exclusive jurisdiction argument either predates de-tariffing and the advent of Congress's and the FCC's "market-based approach" to regulation, *Ting*, 319 F.3d at 1142, or refers to regulations by state public utility commissions, not states' general laws governing entities conducting business within the state. ECF 113 at 31 n.17.

to international settlement rates, while internet traffic is exchanged outside of the traditional accounting rate system." *Int'l Settlement Rates*, 12 F.C.C. Rcd. 6184, 6189 (1997). The fact that the FCC acknowledges "internet traffic" as an "alternative" to "switched voice traffic" does not mean that the FCC has found the specific conduct that Plaintiff alleges Defendants committed to be "just and reasonable."

Second, in the FCC's 1999 order removing the International Settlements Policy ("ISP") on certain settlement arrangements between carriers, some commenters suggested "remov[ing] the ISP completely on all routes between the United States and WTO Member countries."[7] *1988 Biennial Regulatory Review Reform of the Int'l Settlements Policy & Assoc. Filing Reqs.*, 14 F.C.C. Rcd. 7963, 7965, 7977 (1999). The FCC disagreed with this proposal because it "would open U.S. carriers and consumers to potential abuse from foreign monopoly carriers," especially because "some markets of WTO Member countries remain closed to competition." *Id.* The FCC explained:

---

[7] The ISP was a policy designed to prevent "whipsawing," which is when "a foreign carrier or a combination a [sic] carriers within a foreign market . . . play[s] U.S. carriers against one another in order to gain unduly favorable terms and benefits in arrangements for exchange of traffic." *International Settlements Policy and U.S. International Accounting Rates*, https://www.fcc.gov/general/international-settlements-policy-and-us-international-accounting-rates. The ISP contained three elements:

> 1. U.S. carriers must all be offered the same effective rate and same effective date (nondiscrimination).
>
> 2. U.S. carriers are entitled to a proportionate share of return U.S.-inbound traffic based upon their proportion of U.S.-outbound traffic.
>
> 3. Settlement rates for U.S. inbound and outbound traffic are symmetrical (*i.e.*, the accounting rate is divided 50-50 between the U.S. carrier and the foreign carrier).

*Id.*

> We are aware . . . that "services and technologies that bypass the
> settlements regime," such as refile, are available for carriers
> seeking to avoid the legal monopoly of a foreign incumbent carrier
> in some countries that are legally closed to competition. We find it
> encouraging that such activity is putting pressure on settlement
> rates in those countries. Such methods of termination may not be a
> realistic alternative, however, for the termination of large amounts
> of traffic, particularly where termination of traffic in such a
> manner is illegal in the foreign country.

*1988 Biennial Regulatory Review Reform of the Int'l Settlements Policy & Assoc. Filing Reqs.*,
14 F.C.C. Rcd. 7963, 7965, 7987 (1999) (footnotes omitted). The FCC also observed that
"[i]nternet telephony is a promising means of bypassing the traditional settlements system. At
present, however, such services remain cumbersome for the average user and account for a
minimal amount of international voice traffic." *Id.* at n.119. The fact that the FCC found internet
telephony "promising" and "encouraging," but ultimately "cumbersome" and potentially
unrealistic because it could be illegal in certain countries, is not tantamount to a finding that
Defendants' alleged conduct is "just and reasonable."

Third, in its 2012 order "remov[ing] the ISP from the international routes to which it
continues to apply, with one exception related to Cuba" the FCC found that the ISP "has become
unnecessarily burdensome on U.S. carriers attempting to negotiate agreements to achieve lower
rates" and that "[e]liminating the ISP will enable more market-based arrangements between U.S.
and foreign carriers on all U.S.-international routes." *Int'l Settlements Policy Reform Joint Pet'n
for Rulemaking of AT&T Inc.*, 27 F.C.C. Rcd. 15521, 15522 (2012). The FCC did not state,
however, that conduct like what Plaintiff alleges Defendants committed would constitute an
appropriate "market-based arrangement[]."

The Court holds, therefore, that these statements by the FCC do not "provide enough
textual support independently to preempt state law." *Ting*, 319 F.3d at 1141. "A finding of
obstruction . . . depends on more than a mere identification of favorable text." *Id.* Although the

FCC may understand the benefits of internet telephony, it has not found to be "just and reasonable" the specific type of allegedly deceptive conduct that Plaintiff contends Defendants committed.

Moreover, even if the FCC found Defendants' alleged conduct to be "just and reasonable," Oregon law might still prohibit this conduct without violating Section 202(a)'s prohibition on discriminatory practices, unless application of Oregon law resulted in "unjust and unreasonable discrimination or preferences." *Ting*, 319 F.3d at 1140. In *Ting*, the Ninth Circuit acknowledged that a successful challenge, under California law, to a long distance carrier's contractual ban on consumer class actions would result in a "'preference' afforded California customers." *Id.* at 1145. The Ninth Circuit found, however, that "[s]tate contract and consumer protection laws . . . form part of the competitive framework to which the FCC defers" unless those laws "make an otherwise competitive market non-competitive."[8] *Id.* at 1145-46. Thus, the FCA does not conflict preempt Digicel Haiti's claims.

## C. Primary Jurisdiction

Defendants alternatively argue that the Court should dismiss or stay this case under the doctrine of primary jurisdiction to allow the FCC to resolve certain threshold issues that Defendants contend should be answered before the lawsuit may proceed. "Primary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim

---

[8] Defendants rely on *Boomer v. AT&T Corp.* In that case, the Seventh Circuit held that the FCA preempted a state law challenge to an arbitration clause in a consumer's agreement with a long distance carrier. 309 F.3d 404, 424 (7th Cir. 2002). The Seventh Circuit found that allowing the suit to proceed "would result in the application of fifty bodies of law," "patchwork contracts," and inconsistent rates throughout the country. *Id.* at 418-19. The Ninth Circuit disagrees with the Seventh Circuit's decision in *Boomer*, explaining that "the court in *Boomer* fail[s] to recognize that "§§ 201 and 202 contain substantive standards" that are no longer enforceable following de-tariffing and the advent of Congress's and the FCC's "market-based approach" to regulation. *Ting*, 319 F.3d at 1142.

implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)). Under this doctrine, district courts may either "stay[] proceedings" or "dismiss[] the case without prejudice," *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 782, 782 n.3 (9th Cir. 2002), and "route the threshold decision as to certain issues to the agency." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970).

In deciding whether to apply the doctrine of primary jurisdiction, "the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). The doctrine's purpose is "not to secure expert advice for courts." *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1365 (9th Cir. 1987). "There are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration."[9] *Id.* at 1362. "[C]ourts must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) ("'[E]fficiency' is the 'deciding factor' in whether to invoke primary jurisdiction."

---

[9] "[T]he primary jurisdiction doctrine is designed to protect agencies possessing 'quasi-legislative powers' and that are 'actively involved in the administration of regulatory statutes.'" *Clark*, 523 F.3d at 1115 (quoting *Gen. Dynamics*, 828 F.2d at 1365). "Charged with the administration of the Telecommunications and Federal Communications Acts, the FCC is such an agency." *Id.*

(quoting *See Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir. 2007))). On a motion to dismiss, courts determine "whether any set of facts could be proved which would avoid application of the doctrine." *Davel Commcn's, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006) (holding that "where . . . the allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss").

Defendants present two questions that they assert the FCC should decide before the Court allows this case to move forward. First, was Digicel Haiti "entitled to $0.23/minute for terminating calls from the United States?" ECF 113 at 37. Second, did Defendants act "reasonably by using the Internet to get calls to Haiti, rather than interconnecting with Digicel Haiti at its New York and Miami locations?"[10] ECF 113 at 37. At oral argument, the Court also solicited the parties' views on whether to ask the FCC if Defendants' alleged conduct constitutes fraud. ECF 121 at 26:9.[11]

As the Court has already found, whether Digicel Haiti is entitled to receive a rate of 23 cents per minute does not bear on Plaintiff's allegation that Defendants fraudulently avoided paying that rate. Thus, the Court need not address this question before resolving the motion to dismiss.

---

[10] Defendants alternatively pose this question as whether Defendants' alleged conduct is the type of bypass that the FCC wants to encourage. ECF 121 at 25:13-16. The Court addresses these two variants together.

[11] At oral argument, Defendants also proposed asking the FCC whether Defendants' alleged conduct is consistent with the United States's "international communications obligations." ECF 121 at 25:10-12. Defendants have not directed the Court to any international communications obligations that may be either consistent or inconsistent with their alleged conduct. Thus, the Court finds that this question is inappropriate to refer to the FCC at this time.

Defendants argue that the Court should ask the FCC whether Defendants acted reasonably in using the internet to connect calls to Haiti, rather than interconnecting with Digicel Haiti through its New York or Miami switches. *See* 47 U.S.C. § 201(b). Defendants refer the Court to the previously discussed statements contained in FCC rulings, arguing that if these statements do not "conflict preempt" Plaintiff's claims, the Court should at least ask the FCC what it meant when it stated that it wanted to encourage bypass. The Court concludes, however, that it does not need to ask the FCC about its views on bypass before the Court can decide the pending motion to dismiss and, specifically, whether Plaintiff states a claim that Defendants have engaged in common law fraud by active concealment.

Moreover, Plaintiff's claims do not require the Court to determine the reasonableness of Defendants' alleged conduct. In *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290 (1976), a case decided before de-tariffing and the advent of the "market based approach" to regulation, *Ting*, 319 F.3d at 1142, the plaintiff sued an airline that had denied him boarding, claiming that the airline's failure to inform him of its deliberate overbooking practices constituted fraudulent misrepresentation in violation of the common law and that the airline's overbooking practice violated the Federal Aviation Act of 1958. 426 U.S. at 295. The D.C Circuit "held that the [Civil Aeronautics] Board must be allowed to determine in the first instance whether" the airline's practice of failing to inform the plaintiff of its deliberate overbooking practices was a "deceptive practice" under the Federal Aviation Act before the district court could consider the plaintiff's common law fraudulent misrepresentation claim. *Id.* at 296-97. The D.C. Circuit observed that "a challenge to the carriers' overbooking practices had been raised" in a current proceeding before the Civil Aeronautics Board. *Id.* at 297.

The Supreme Court reversed, explaining:

The action brought by petitioner does not turn on a determination of the reasonableness of a challenged practice a determination that could be facilitated by an informed evaluation of the economics or technology of the regulated industry. The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of this case.

*Id*. at 305-306.

By contrast, the Sixth Circuit found that the FCC had primary jurisdiction over a claim that a carrier's practice of failing to inform customers that it "charg[ed] for uncompleted calls, ring time, and holding time" violated 47 U.S.C. § 201(b). *In re Long Distance Telecomm. Litig.*, 831 F.2d 627, 628-29 (6th Cir. 1987). Distinguishing *Nader*, the Sixth Circuit observed that the claim under 47 U.S.C. § 201(b) "did call on the district court to determine the reasonableness of defendants' practices." *Id.* at 632.

Plaintiff's claims are more similar to the clams at issue in *Nader*. Plaintiff has not brought a claim under Section 201(b), challenging Defendants' conduct as not "just and reasonable." 47 U.S.C. § 201(b). Thus, Digicel Haiti's claims do not turn on the reasonableness of a challenged practice or a determination that could be facilitated by an informed evaluation of the economics or technology of the telecommunications industry. Rather, they turn on whether Defendants committed fraud through active concealment. An informed evaluation of the industry's technology would not assist the Court in interpreting the allegations because, at this stage of the lawsuit, Plaintiff's allegations of fraud are presumed to be true. Similarly, the judgment of a technically expert body, such as the FCC, would not be helpful in the application of the standards of common law fraud to these allegations.

Finally, at oral argument, the Court solicited the parties' views on whether to ask the FCC if Defendants' alleged conduct constitutes fraud. ECF 121 at 26:9. As discussed above, the

Court finds that the allegations, which must be accepted as true at this stage, are sufficient to state a claim for fraud. Thus, the Court need not refer any questions to the FCC at this time. *See Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (holding that the doctrine of primary jurisdiction did not apply to the question of whether a defendant violated a tariff because that question "must necessarily be resolved in favor of" the plaintiff on a motion to dismiss).

Even if this question arose at a later stage in the litigation, the Court likely would not refer it to the FCC because the parties cite no authority that Congress has "by statute, given authority over" common law fraud claims to the FCC.[12] *See S. Utah Wilderness All. v. BLM*, 425 F.3d 735, (10th Cir. 2005) (concluding that the BLM lacked primary jurisdiction over whether particular routes fell within valid R.S. 2477 rights of way because "nothing in the terms of R.S. 2477 gives the BLM authority to make binding determinations on the validity of the rights of way granted thereunder, and we decline to infer such authority from silence when the statute creates no executive role for the BLM"); *see also Gen. Dynamics Corp.*, 828 F.2d at 1362

---

[12] The parties have not cited any case in which a federal court has referred a common law claim to the FCC, and the Court is aware of no such case. *Sprint Spectrum L.P. v. AT&T Corp.*, 168 F. Supp. 2d 1095 (W.D. Mo. 2001), is not to the contrary. In *Sprint Spectrum*, Sprint brought claims for "breach of contract, quantum meruit, and action on account" against AT&T, alleging that AT&T used Sprint's network to terminate and originate calls without paying Sprint access charges. *Id.* at 1096-97. Sprint did not seek to enforce a written agreement, but rather to recover on a theory of implied contract and quantum meruit. *Id.* at 1099. AT&T argued that "(1) whether a wireless carrier should be permitted to charge a long-distance carrier for terminating calls from (or delivering calls to) the long-distance carrier, and (2) if so, at what rate" should be referred to the FCC under the doctrine of primary jurisdiction. *Id.* The court agreed with AT&T, finding that it could "perhaps" decide whether an "implied contract exists," but that Sprint could obtain no relief "without a determination as to the reasonableness of the rates for Sprint's services." *Id.* at 1099. In contrast, Plaintiff here does not allege the existence of a contract with Defendants and has not asserted a claim of either implied contract or quantum meruit. Moreover, this case does not require the factfinder to determine the reasonableness of Plaintiff's international rates. Plaintiff's fraud claim requires only a determination as to whether Defendants' alleged conduct constitutes fraud.

(requiring the issue to have "been placed by Congress within the jurisdiction of an administrative body having regulatory authority").

The FCC may resolve formal complaints, "contain[ing] facts which, if true, are sufficient to constitute a violation of the Act or Commission order or regulation, or a defense to such alleged violation." 47 C.F.R. § 1.720(b). Neither the FCC's regulations nor the FCA, however, provide a mechanism for resolving claims of a violation of the common law. Indeed, the FCA contains a savings clause, stating that "[n]othing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies." 47 U.S.C. § 414. The FCC has observed that this savings clause "preserves the availability against interstate carriers of such preexisting state remedies as tort, breach of contract, negligence, fraud, and misrepresentation." *Operator Servs. Providers of Am. Pet'n for Expedited Declaratory Ruling*, 6 F.C.C. Rcd. 4475, 4477 (1991). Thus, based on Plaintiff's allegations, the Court declines to refer any questions to the FCC at this time.

## CONCLUSION

Defendants' Motion to Dismiss (ECF 113) is DENIED.

**IT IS SO ORDERED**.

DATED this 16th day of May, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge