**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
ksalyer@tomasilegal.com
edubay@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

     Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>    Plaintiff,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**. d/b/a **UPM TELECOM, INC**., and **UPM MARKETING, INC**., an Oregon corporation; **UPM TELECOM, INC**., an Oregon a/b/n; **UPM MARKETING, INC**., an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; and **TYLER ALLEN**, an Oregon resident; and **DUY "BRUCE" TRAN,** an Oregon resident,<br><br>    Defendants | Case No. 3:15-CV-00185-SI<br><br><br>**DEFENDANTS' OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS** |

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC.,** and **UPM MARKETING, INC.,** an Oregon corporation; **UPM TELECOM, INC.,** an Oregon a/b/n; **UPM MARKETING, INC.,** an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO,** an Oregon resident; **BALTAZAR RUIZ,** an Oregon resident; **TYLER ALLEN,** an Oregon resident; and **DUY TRAN** a/k/a **BRUCE TRAN**, a foreign individual,

       Defendants and Counterclaim-Plaintiffs,

       v.

**UNIGESTION HOLDING, S.A.,** a foreign corporation, d/b/a **DIGICEL HAITI;** and **DIGICEL USA, INC.,** a Delaware corporation,

       Counterclaim-Defendants.

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS
UPM-L1\00367587.000

**TABLE OF CONTENTS**

I.     STANDARD OF REVIEW .......................................................................................... 1

       A.     Overall Standard ........................................................................................... 1

       B.     A Note Regarding Payment For And Use Of Digicel Services ............................. 2

II.    UPM HAS PROPERLY PLED VIOLATIONS OF 15 U.S.C. § 2 ................................... 2

       A.     Summary Of Antitrust Claims ........................................................................ 2

       B.     Digicel-USA and Digicel-Haiti Are Not "The Same Company," But They
              Must Be Treated As A Single Economic Entity For Purposes Of
              Determining Liability Under The Sherman Act. ............................................... 4

       C.     UPM's Monopolization Claim Does Not Seek Improper Extraterritorial
              Application of United States Antitrust Laws. ................................................... 7

       D.     UPM Has Antitrust Standing ........................................................................ 10

       E.     UPM Has Properly Pled All Required Elements of Its Section 2 Claims ............ 15

              1.     Monopoly Power.................................................................................. 15

              2.     Maintenance of Monopoly Power Through Anticompetitive
                     Conduct ............................................................................................. 17

              3.     Antitrust Injury.................................................................................. 20

III.   UPM HAS PROPERLY PLED CLAIMS UNDER THE COMMUNICATIONS
       ACT.................................................................................................................... 23

IV.    CONCLUSION.................................................................................................... 27

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Court Cases*

*Airline Service Providers Ass'n v. LA World Airports,* 2017 U.S. App. LEXIS 16110 (9th Cir. Aug. 23, 2017) ........... 15

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,* 592 F.3d 991 (9th Cir. 2010) ........... 3,22

*Am. Family Ass'n, Inc., v. City & County of San Francisco,* 277 F.3d 1114 (9th Cir. 2002) ........... 1

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........... 1

*AT&T Corp. v. PAB, Inc.,* 935 F. Supp. 584 (E.D. Pa. 1996) ........... 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........... 1

*Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467 (9th Cir. 1985) ........... 11

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096 (9th Cir. 1999) ........... 15

*California Computer Products., Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir. 1979) ........... 3

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993) ........... 22

*CollegeNET, Inc. v. Common Application, Inc.,* 104 F. Supp. 3d 1137 (D. Or. 2015) ........... 20,21

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 753 (1984) ........... 4,5,6,7

*Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997), *aff'd sub nom. Humana Inc. v. Forsyth,* 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012) ........... 16

*Flying J Inc. v. Sprint Communications Co., L.L.P.,* 2006 U.S. Dist. LEXIS 698 (D. Utah 2006) ........... 13

*Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133 (9th Cir. 2003) ........... 5

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 343 F.3d 1000 (9th Cir. 2003) ........... 11, 14

*Intellectual Ventures I LLC v. Capital One Financial Corp.,* Civ. Action No. 1:13-cv-0074-(AJT/TRJ), 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18, 2013) ........... 19

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.,* 2017 U.S. App. LEXIS 13271 (9th Cir. July 24, 2017) ........... 15

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS
UPM-L1\00367587.000

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Jack Russell Terrier Network v. Am. Kennel Club, Inc.,* 407 F.3d 1027 (9th Cir. 2005) ... 5

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,* 847 F.3d 1221 (10th Cir. 2017) ... 5,6,7

*Marsoner v. United States (In re Grand Jury Proceedings),* 40 F.3d 959 (9th Cir. 1994) ... 10

*NetworkIP, LLC v. FCC,* 548 F.3d 116 (D.C. Cir. 2008) ... 13

*Pool Water Products v. Olin Corp.,* 258 F.3d 1024 (9th Cir. 2001 ... 22

*Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421 (9th 1995) ... 22

*Rodriguez v. Steck,* 795 F.3d 1187 (9th Cir. 2015) ... 15

*Somers v. Apple, Inc.,* 729 F.3d 953 (9th Cir. 2013) ... 10, 20

*Spectrum Sports v. McQuillan* 506 U.S. 447 (1993) ... 17

*Sprint Communs. Co. v. Nebraska PSC,* 2007 U.S. Dist. LEXIS 66902  (D. Neb. Sept. 7, 2007) ... 24

*Thomsen v. W. Elec. Co.,* 680 F.2d 1263 (9th Cir. 1982) ... 5

*Timberlane Lumber Co. v. Bank of America, N.T. & S.A.* 549 F.2d 597 (9th Cir. 1976) ... 7,8

*United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966) ... 3

*United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) ... 22

*Villa v. Maricopa County,* 865 F.3d 1224 (9th Cir. 2017) ... 1

*Vollrath Co. v. Sammi Corp.,* 9 F.3d 1455 (9th Cir. 1993) ... 6


*Administrative Decisions*


*Access Charge Reform, et al.,* Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C.R. 9923 (2001) ... 16

*Bright House Networks, LLC et al. v. Verizon California, et al.,* Memorandum Opinion and Order, 23 F.C.C.R. 10704 (2008), *affirmed, Verizon California, et al. v. FCC,* 555 F.3d 270 (D.C. Cir. 2009) ... 24

*Eastlink International (USA) Inc.; Petition to Modify Regulatory Classification from Dominant to Non-Dominant on the U.S.-Bermuda Route,* Memorandum Opinion and Order, 28 F.C.C.R. 8364 (Int'l Bur. 2012) ... 13

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

# TABLE OF AUTHORITIES

**Page(s)**

*Regulatory Policies Concerning Resale and Shared Use of Common Carrier
Services and Facilities,* 60 F.C.C.2d 261 (1976) *aff'd sub nom AT&T v. FCC,*
572 F.2d 17 (2d Cir. 1978) ......... 24

**Statutes**

| | |
|---|---|
| 15 U.S.C. § 1 | 6 |
| 15 U.S.C. § 2 | 3, *passim* |
| Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* | 4, *passim* |
| 47 U.S.C. § 153(50) | 23 |
| 47 U.S.C. § 153(51) | 23, 24 |
| 47 U.S.C. § 153(53) | 23,25 |
| 47 U.S.C. § 201 | 12 |
| 47 U.S.C. § 202 | 12 |
| 47 U.S.C. §§ 206-207 | 27 |

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
COUNTERCLAIMS
UPM-L1\00367587.000

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Defendants UPM Technology, Inc. d/b/a UPM Telecom, Inc., UPM Marketing, Inc., UPM Telecom, Inc., UPM Marketing, Inc., Benjamin Sanchez a/k/a Benjamin Sanchez Murillo, Baltazar Ruiz, Tyler Allen, and Duy "Bruce" Tran (collectively "UPM"), hereby oppose Counterclaim Defendants', Unigestion Holding S.A. and Digicel-USA's Motion to Dismiss Counterclaim Plaintiff's Counterclaims and Legal Memorandum in Support (ECF #133) ("MTD"). In its Answer and Counterclaims, UPM has alleged facts that, read in UPM's favor, and taken in conjunction with the allegations made by Unigestion Holding S.A. ("Digicel-Haiti") in its Second Amended Complaint ("SAC"), lay out legally sufficient antitrust, Communications Act, and other claims against Digicel-Haiti and Digicel-USA, Inc. ("Digicel-USA") (collectively, "Digicel").[1]

## I.    STANDARD OF REVIEW

### A.  Overall Standard

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."' *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))." *Villa v. Maricopa County,* 865 F.3d 1224 (9th Cir. 2017). "All allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Am. Family Ass'n, Inc., v. City & County of San Francisco,* 277 F.3d 1114, 1120 (9th Cir. 2002). UPM's counterclaims plainly meet this standard, and the MTD should be denied.

---

[1]    Digicel-Haiti seeks to "renew" arguments it made in an earlier-filed motion to dismiss UPM's five state-law counterclaims. *See* MTD at 20. The Court should not consider this effort at summary advocacy. The Court's previous order rejecting Digicel's earlier motion to dismiss these counterclaims, *see* ECF #95, constitutes *res judicata* (or, at least, law of the case) with respect to those issues. Alternatively, if Digicel-Haiti's incorporation by reference again puts the state-law counterclaims at issue, UPM hereby incorporates by reference its earlier opposition to Digicel-Haiti's motion to dismiss those claims. *See* Defendants' Response to Plaintiff Unigestion Holding S.A.'s Motion to Dismiss Defendants' Counterclaims (ECF # 81) at pages 12-20. For the reasons stated there, and in the Court's earlier order, the Court should again deny Digicel's motion to dismiss UPM's state-law counterclaims.

Page 1 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

### B.  A Note Regarding Payment For And Use Of Digicel Services

Digicel characterizes UPM as having tried to "steal" Digicel's services, as having tried to use those services "without paying," and as having engaged in "theft" or "fraud."  *See* MTD at 1-2, 7, 15, 17.  However, UPM has alleged that it paid the full applicable retail prices for both SIM cards and minutes of use.  UPM has also alleged that no applicable contractual or other terms barred UPM from using the SIM cards and services in the ways that that UPM in fact used them.  Answer at ¶¶ 83, 135; Counterclaims at ¶¶ 262, 266, 268, 297-319.

Taking these allegations as true and construing them in the light most favorable to UPM, UPM fully paid for the Digicel services that it used.  Moreover, in using them as it did, UPM did not violate any applicable contractual or other restrictions.  As a result, everything Digicel allegedly (or admittedly) did to disable UPM's ability to terminate calls on Digicel's network, and everything Digicel allegedly (or admittedly) did to ensure its domination of the relevant markets, must be construed as actions taken against an entity (UPM) that had paid for the services and that was entitled to make use of them as it did.  The parties disagree about these issues, but in considering Digicel's MTD, the Court should give no weight to Digicel's rhetoric regarding fraud, theft, etc., and should disregard any Digicel arguments based on that rhetoric.

## II.    UPM HAS PROPERLY PLED VIOLATIONS OF 15 U.S.C. § 2

### A.  Summary Of Antitrust Claims

UPM has alleged that Digicel acquired a monopoly (or near-monopoly) on telephone service in Haiti; that Digicel extended that monopoly to the market for carrying calls from the United States to Haiti (and to Digicel's customers in Haiti); and that Digicel has maintained that monopoly by means of anticompetitive acts directly affecting, and in many cases committed in, the United States.  These acts include: (1) purporting to require all calls bound for Digicel-Haiti to be routed through Digicel-USA switches in New York and Miami; (2) charging the same rate ($0.23/minute) whether traffic is delivered in the United States or in Haiti; (3) refusing to permit calls UPM delivered to Haiti via the internet to be completed on its network;

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

(4) refusing to permit fully paid "Roam Like You're Home" plans to be resold in the United States; and (5) failing to advise the Federal Communications Commission ("FCC") of Digicel-Haiti's status as a dominant carrier in Haiti (which would have provided avenues for stymying Digicel's anticompetitive conduct).  UPM has also alleged that Digicel's actions in extending and maintaining its monopoly have harmed UPM by preventing UPM from earning profits that it would have earned by competing in the relevant markets, which clearly constitutes "antitrust injury."  *See* Counterclaims at ¶¶ 327-43.

These claims are fully sufficient to survive a motion to dismiss.  Digicel's attacks on UPM's allegations are addressed in detail below.  By way of overview, however, there are "three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,* 592 F.3d 991 (9th Cir. 2010), *quoting California Computer Products., Inc. v. International Business Machines Corp.,* 613 F.2d 727, 735 (9th Cir. 1979).  *See also United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966).  UPM's allegations meet all three elements.[2]  The relevant product market is transporting calls from the United States to Haiti.  Counterclaims, ¶¶ 332-33.  UPM alleged that Digicel monopolized that market, having achieved a share of at least 75%.  *See* Counterclaims at ¶¶ 248, 250; *see also* Answer at ¶ 14. UPM identified five different actions by Digicel that constitute "willful acquisition or maintenance" of monopoly power.  Counterclaims at ¶¶ 335-41.  And being entirely driven from the competitive market as a result of Digicel's actions undertaken to establish and maintain its monopoly – depriving customers of a lower-priced and technically innovative alternative source of supply – is as clear and direct an "antitrust injury" as one can imagine in a monopolization case.  UPM's allegations, therefore, are fully sufficient to survive a motion to dismiss.

---

[2]    UPM, in the alternative, has alleged that Digicel violated Section 2 by attempting to monopolize the relevant markets identified above.  Counterclaims at ¶¶ 327-43.  *See* note 22, *infra.*

Page 3 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**B. Digicel-USA and Digicel-Haiti Are Not "The Same Company," But They Must Be Treated As A Single Economic Entity For Purposes Of Determining Liability Under The Sherman Act.**

Digicel argues that neither Digicel-USA nor Digicel-Haiti can be liable under the Sherman Act except to the extent that each of them has individually engaged in conduct that would make them individually liable. MTD at 3-6. Because UPM's claims are supposedly "bottomed on a known falsehood" – that is, that "Digicel-USA and Digicel-Haiti are one and the same company" – and because the companies "observe separate corporate formalities," MTD at 3-4, Digicel argues that neither one can be liable for actions undertaken by the two of them in coordination. Instead, according to Digicel, each company's actions must be separately evaluated under Section 2. MTD at 4-5.

At the outset, Digicel misconstrues UPM allegation:

> Digicel-Haiti and Digicel-USA are wholly-owned subsidiaries of Digicel Holdings, Ltd., and ***are thus considered to be a single entity for purposes of the antitrust laws***. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 753 (1984). In addition, as alleged above, with respect to calls from the United States to Haiti, Digicel-Haiti and Digicel-USA ***operate in tandem*** in order to prevent competition on the United States-Haiti route. For purposes of this counterclaim, the two entities are referred to collectively and individually as "Digicel."

Counterclaims at ¶ 329 (emphasis added). UPM accepts, at this stage of the case, the separate corporate existence of Digicel-Haiti and Digicel-USA. UPM's allegation is that the two companies constitute a single entity for ***purposes of antitrust analysis***, not that the two companies have acted in a way that warrants "piercing the corporate veil,"[3] or that for antitrust purposes Digicel-USA acts as Digicel-Haiti's "agent."[4] Similarly, precisely because the two companies constitute a single entity for antitrust purposes, UPM has not alleged any

---

[3]     UPM notes that it has not yet conducted discovery regarding the corporate operations of Digicel-USA and Digicel-Haiti, so it may well be that the facts will support veil-piercing. But veil-piercing is not a necessary part of UPM's monopolization claim.

[4]     UPM does allege that Digicel-USA can reasonably be viewed as Digicel-Haiti's "agent" for purposes of UPM's ***Communications Act*** claims. *See* MTD at 4 n.3; Counterclaims at ¶ 247. *See* Section III, *infra.*

"conspiracy" between them.  *See* MTD at 4.  Such conspiracy claims are exactly what *Copperweld* forecloses.

The logic of *Copperweld* is that entities in the same corporate family cannot conspire with each for purposes of the Sherman Act because antitrust conspiracies inherently involve a combination of distinct economic interests.  *See Jack Russell Terrier Network v. Am. Kennel Club, Inc.,* 407 F.3d 1027, 1033-34 (9th Cir. 2005), *quoting Copperweld,* 467 U.S. at 769-71.  By that same logic, however, a corporate family as a whole is viewed as a single entity for purposes of determining whether it has engaged in unlawful ***unilateral*** conduct under Section 2.  *Copperweld* made clear that, while claims based on intra-enterprise conspiracies were invalid, "anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine," because "***the enterprise is fully subject to § 2 of the Sherman Act.***"  *Copperweld,* 467 U.S. at 777 (emphasis added).  The fact that the combined enterprise remains subject to Section 2 was critical to the Court's conclusion that banning liability for intra-enterprise conspiracies would not leave a "gap" in the Sherman Act's proscription of anticompetitive conduct.  *Id.* at 776-77.  The Court, therefore, both expected and intended that Section 2 would apply to a corporate family viewed as a whole – notwithstanding the legally separate existence of the various family members.[5]  The *Copperweld* single-entity rule is a shield for commonly-owned defendants facing conspiracy claims.  *See* MTD at 4-5.  But for plaintiffs alleging unilateral violations under Section 2, it is a sword.

The most thorough discussion of this point is the Tenth Circuit's recent decision in *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.,* 847 F.3d 1221 (10th Cir. 2017).  That

---

[5]    While *Copperweld* involved entities in a parent-subsidiary relationship, its doctrine has been extended to "a broader variety of economic relationships."  *Jack Russell Terrier Network,* 407 F.3d at 1034. As relevant here, the Ninth Circuit has specifically held that the single-entity rule "applies to subsidiaries controlled by a common parent."  *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1147 (9th Cir. 2003), *citing Thomsen v. W. Elec. Co.,* 680 F.2d 1263, 1265-66 (9th Cir. 1982).  Digicel-Haiti and Digicel-USA are thus embraced by the single entity rule.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

court observed that "every court to address the question has held that affiliated entities which must be treated as a single enterprise for purposes of § 1 also must be treated as a single enterprise for purposes of § 2." *Lenox MacLaren,* 847 F.3d at 1235 *citing, inter alia, Vollrath Co. v. Sammi Corp.,* 9 F.3d 1455, 1463 (9th Cir. 1993).  There is thus no basis for Digicel's claim that *Copperweld* is limited to Section 1 cases, MTD at 4, or that the single entity rule is limited to the "narrow purpose" of addressing conspiracy claims, *id.* at 5.  To the contrary, after a painstaking review of precedent under *Copperweld,* the *Lenox MacLaren* court concluded that a plaintiff is "permitted … to assert § 2 monopolization and attempted monopolization claims" against commonly owned companies, considered at a whole.  It found that "while a single corporate enterprise is unable to engage in the concerted action necessary for conspiracy liability, **its unitary action 'remains fully subject to § 2 of the Sherman Act.'"** *Lenox MacLaren,* 847 F.3d at 1235, *quoting Copperweld,* 467 U.S. at 777 (emphasis added).

Digicel suggests that when dealing with sister corporations, a Section 2 claim can proceed only if each of the elements of a Section 2 violation can be separately made out against each of the subsidiaries.  *See* MTD at 5 (claiming that UPM had an "obligation to make sufficient allegations to substantiate claims against both Digicel-USA and Digicel-Haiti as counterclaim defendants, respectively, in this claim").  But this argument, too, is inconsistent with *Copperweld's* single-entity rule.  The Tenth Circuit explained why:

> *Copperweld's* reasoning necessarily denounces Defendants' belief that [plaintiff] could … establish its non-conspiracy § 2 claims only by proving that "***specific*** Defendants" independently satisfied each necessary element of the claims. … Rather, in a single-enterprise situation, it is the affiliated corporations' collective conduct—*i.e.,* the conduct of the enterprise they jointly compose—that matters; it is the enterprise which must be shown to satisfy the elements of a monopolization or attempted monopolization claim. … Stated another way, the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized under § 2.
>
> To hold otherwise—to require that each affiliated defendant independently satisfy every element in order to be held liable—would be difficult to justify in light of [*Copperweld*]. And it would all but eviscerate the statute with respect to sophisticated competitors. So long as a corporation spread its anticompetitive

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability, it could unlawfully monopolize with impunity. We think *Copperweld* forecloses this result.

*Lenox MacLaren,* 847 F.3d at 1236 (alterations and ellipses added, emphasis in original).

For these reasons, the fact that UPM's Section 2 claims were alleged against Digicel-USA and Digicel-Haiti as a single entity under *Copperweld* is not a "fatal defect."  MTD at 5.  To the contrary, alleging monopolization against those two companies as a single economic unit is precisely the kind of claim expressly anticipated by the Supreme Court in *Copperweld* – "the [single] enterprise is fully subject to Section 2" – and precisely the kind of claim recently approved, after exhaustive analysis, by the Tenth Circuit in *Lenox MacLaren.*   UPM's monopolization claim, therefore, is not subject to dismissal for treating Digicel-USA and Digicel-Haiti as a single economic entity.[6]

### C. UPM's Monopolization Claim Does Not Seek Improper Extraterritorial Application of United States Antitrust Laws.

Digicel argues that UPM's Section 2 claims should be dismissed because pursuing them would be an "impermissible extraterritorial application" of United States antitrust laws.  MTD at 6-7.  Digicel correctly notes that *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.* 549 F.2d 597 (9th Cir. 1976), states the applicable standard.[7] But its extraterritoriality argument fails.

---

[6]    Digicel also suggests that UPM should not be able to allege that Digicel-USA and Digicel-Haiti are a single entity for antitrust purposes because of Digicel's repleading to clarify the economic and technical roles of different Digicel entities.  *See* MTD at 5 (corporate relationships "clarified – at Defendants' insistence – in earlier pleadings").  That clarification, however, does not insulate Digicel from any otherwise applicable legal doctrines.  *See also* Section III, *infra.*

[7]    MTD at 6.  The *Timberlane* factors include:

[T]he degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business or corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the

(note continued)…

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

First, Digicel's argument is premature. Evaluation of the *Timberlane* factors will require evidence, which Digicel will be free to introduce as the case proceeds, and UPM will be free to contest. For example (as UPM understands it), Digicel-Haiti is a Haitian entity, Digicel-USA is a United States (Delaware) entity, and both are ultimately controlled by Digicel Group Ltd., an Irish concern.[8] The "nationality or allegiance of the parties" will thus require some fact-based review. As another example, Digicel continues to rely on its claim that the Government of Haiti "has established a mandatory floor of 23 cents per minute" for calls from the United States to Haiti. *See* MTD at 6. UPM, however, has denied that any such mandatory rate exists. *See* Answer at ¶ 38.[9] And it is hard to imagine how the Court could assess the "relative significance of effects on the United States as compared to those elsewhere" without cognizable material regarding what those effects are. On that score, UPM has provided materials from the FCC that explain the plain and direct anticompetitive effects in the United States, on United States consumers, of the kinds of actions that Digicel has taken in this case. *See* Counterclaims at ¶¶ 234-37, 240-42. Those materials show that the United States has a significant and well-articulated interest in preventing such impacts in the United States. Digicel, by contrast, provided no allegations or evidence indicating the actual or likely effects in Haiti of applying United States antitrust laws to its conduct. Digicel will be free to raise its extraterritoriality claims later in the case, based on whatever evidence it can adduce in support of its view of the *Timberlane* factors. But now is not the time to consider those claims.

---

…(note continued)

> foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Timberlane,* 549 F.2d at 614.

[8]    Digicel claims that it has "established" that "Digicel-Haiti is a foreign entity that only operates in Haiti." MTD at 6. Digicel has **alleged** that to be true, but that has not been "established."

[9]    Digicel has filed certain Haitian regulatory material to support its claimed right to refuse to terminate calls from UPM on its network, *see* ECF #59, but has never provided evidence to support its claimed obligation to charge the $0.23 rate.

Page 8 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS COUNTERCLAIMS
UPM-L1\00367587.000

Second, to the extent that Digicel has tried to sketch arguments applying the *Timberlane* factors without an evidentiary record, its effort fails. Essentially, Digicel argues that its anticompetitive actions were either compelled by ("as a result of"), or "in compliance with," Haitian law. MTD at 6-7. Those are quite different arguments, however, because a foreign nation presumably has a greater interest in ensuring that companies under its jurisdiction do what it commands, as compared to what it permits. Specifically, Digicel does not assert that it was **compelled** to prevent UPM from completing calls (or to prevent UPM from competing to carry calls from the United States to Haiti), but only that it was permitted ("encouraged") to do so. MTD at 6. Before a United States court should countenance such blatantly anticompetitive actions, at a minimum, it should be convinced based on reliable evidence that a foreign sovereign flatly required them.[10] The only regulatory compulsion that Digicel has alleged is the supposed obligation to charge $0.23 per minute, which, as noted above, it has not established and which UPM has contested.[11]

The remainder of Digicel's argument on extraterritoriality amounts to a discussion of why Haiti might want to adopt a policy that has the effect of permitting private mobile telephone companies like Digicel to extract monopoly profits at the expense of United States consumers, *viz.,* that such entities need the money because developing telecommunications infrastructure "is a risky and time-consuming investment." MTD at 7. Digicel, however, provides no evidence that those policy concerns actually motivated the Haitian government to impose whatever regulations it may have imposed, and certainly not that they were "necessary to

---

[10] A review of the Haitian regulatory materials provided by Digicel shows that UPM's particular service configuration does not appear to fit within the categories of traffic for which a cut-off was authorized. *See* Defendants' MTD Second Amended Counterclaim (ECF # 113) at 18-19. The meaning and scope of any alleged Haitian regulatory materials – which will need to be authenticated and admitted into evidence – can be debated as the case proceeds.

[11] In this regard, even if Digicel-Haiti is obliged to charge $0.23/minute for calls it terminates from overseas, that is different from Digicel-USA charging **the same** $0.23/minute for calls to Haiti handed off in New York or Miami. As alleged in the Counterclaims, this amounts to Digicel giving away United States-Haiti transport for free, which is clearly predatory and anticompetitive. Counterclaims at ¶ 337.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

maintain Haiti's unique sovereignty interests." *Id.* Again, this kind of claim cannot be considered in the abstract; evidence regarding the considerations motivating any particular (allegedly) relevant Haitian policy will need to be presented and evaluated.

Finally, Digicel claims that "comity" requires dismissal of UPM's antitrust claims. *Id.* Comity entails balancing the interests of the two affected nations. *See, e.g., Marsoner v. United States (In re Grand Jury Proceedings),* 40 F.3d 959, 965 (9th Cir. 1994). UPM has provided materials from the FCC showing that the United States does not respect anticompetitive telecommunications policies adopted by foreign nations, and that the United States will not and should not expend its resources in support of such anticompetitive polices. *See* Counterclaims at ¶¶ 234-37, 240-42. So, to the extent that the Court considers "comity" issues at this stage of the case, the materials in the record indicate that Digicel is, and should be, fully subject to United States antitrust law with respect to anticompetitive actions that affect United States telecommunications markets and consumers.[12]

For these reasons, the Court should reject Digicel's extraterritoriality argument.

### D. UPM Has Antitrust Standing

An antitrust plaintiff must allege "antitrust injury," a concept that includes "antitrust standing," which, in turn, requires that "the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.,* 729 F.3d 953, 963 (9th Cir. 2013) (internal quotations and citations omitted). Digicel claims that UPM lacks antitrust standing. MTD at 7-10. In fact, UPM's allegations clearly meet the standing requirement.[13]

---

[12] UPM notes the irony of Digicel-Haiti invoking the power of United States courts to seek redress for harms it allegedly *suffered* in Haiti, but then objecting on comity grounds to being held to account in those same courts for harms it allegedly *caused* in the United States.

[13] UPM responds to Digicel's arguments regarding the other elements of "antitrust injury" in Section II.E.3, *infra.*

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Digicel's specific claim is that UPM has not alleged that it is "a participant in the same market" as Digicel-USA and Digicel-Haiti.  MTD at 7-8, *citing Bhan v. NME Hospitals, Inc.,* 772 F.2d 1467 (9th Cir. 1985).  This is absurd.  UPM alleged that it (like Digicel-USA) is an international carrier competing with other carriers for the right to handle calls from the United States to other countries, including Haiti.  Counterclaims at ¶ 244.  The more technically specific allegations in both the Complaint and the Counterclaims also demonstrate that UPM and Digicel-USA were direct competitors.  Digicel alleges that when it handles a call from the United States to Haiti, the call is delivered by a wholesale entity to a Digicel switch in Miami or New York, and is then delivered via "contracted capacity" (non-Digicel facilities) to Digicel-Haiti, which terminates the call.  SAC at ¶¶ 22-24.  UPM explains that when *it* handled such a call, the call was delivered from a wholesale entity via the internet to UPM's facilities in Oregon, and was then delivered via the internet (non-UPM facilities) to Digicel-Haiti, which (prior to its anticompetitive actions) terminated the call.  Counterclaims at ¶ 268.  The technology was slightly different, but the functional effect – getting calls from a wholesale carrier in the United States to Haiti – was identical, as UPM expressly alleged: "UPM's services … involved UPM using innovative technology to resell Digicel-Haiti's services within the United States to provide the functional equivalent of traditional telephone calls from the United States to Haiti." Counterclaims at ¶ 259.[14]

The point at which market competition occurred between UPM and Digicel was vying for the business of wholesalers in the United States who had calls to get to Haiti.  *See Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 343 F.3d 1000, 1005 (9th Cir. 2003) (identifying "the point of competition" between rivals to assess antitrust standing).  Those wholesalers could

---

[14]     UPM agrees with Digicel that information regarding cross-elasticity of demand may be relevant in determining whether two businesses compete.  *See* MTD at 9.  But here, UPM has alleged direct competition between itself and Digicel, and a comparison of its detailed allegations regarding its business and those of Digicel regarding its business reveal direct, head-to-head competition.  This is more than sufficient to survive a motion to dismiss without a detailed cross-elasticity analyses.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

choose to direct their business to Digicel in New York or Miami, or to UPM in Oregon. UPM permitted the wholesalers to get the calls to Oregon using the internet; Digicel-USA apparently required more traditional telecommunications facilities. Once the calls reached the competitors' respective locations, they each arranged to get the calls to Haiti for termination – Digicel-USA using whatever "contracted capacity" it had arranged, and UPM using the internet.

This same competition occurred with "Roam Like You're Home" ("RLYH") calls. In that case, UPM performed the same functions in the United States as in the case of internet-delivered calls. That is, it had to compete with Digicel-USA to attract the business of wholesalers, it had to invest in the equipment needed to receive inbound traffic from those wholesalers, and it had to invest in the equipment needed to route those calls onward to Haiti. The difference was that rather than using the internet for transport to Haiti, UPM routed the calls to United States wireless carriers. *See* Counterclaims at ¶¶ 262-64. Those carriers got the calls back to Digicel-USA, which arranged to get them physically to Haiti. In this scenario, UPM was still competing head-to-head with Digicel-USA, and made essentially identical use of its own facilities as in the case of calls carried via the internet. The fact that UPM "resold" the RLYH service does not mean that it was not a participant in the market for wholesalers' business. To the contrary, while UPM's technical arrangements were different in the two situations, it was still directly competing with Digicel-USA in both scenarios.[15]

In arguing that UPM operated in a different market, Digicel reveals a deep confusion over UPM's characterization of itself as a "reseller." *See* MTD at 8-9. The underlying technical arrangements differed as between UPM's efforts to compete by getting calls to Haiti

---

[15] Note that UPM's RLYH arrangement also provided a backup if its available capacity on the internet, and/or its radio facilities in Haiti (*see* Counterclaims at ¶ 268) were unavailable. Moreover, blocking UPM's ability to use the RLYH service in the United States also violated the Communications Act. *See* Counterclaims at ¶¶ 262-67, 280-82 (violation of 47 U.S.C. § 202); 286-88 (violation of 47 U.S.C. § 201). *See* Section III, *infra.* So, even if UPM's direct participation in the market is viewed as limited to its internet-based service, Digicel's cutting off of UPM's ability to resell the RLYH service was a wrongful act in support of Digicel's monopolization of the market.

via the internet and terminating calls onto Digicel's network, and UPM's efforts to compete using the RLYH service. *See* Counterclaims at ¶¶ 262-67 (describing UPM resale of RLYH plans); *id.* at ¶¶ 268-69 (describing UPM resale of local Digicel-Haiti service). But in both cases UPM was competing directly against Digicel.[16]

Where UPM used the internet to get calls to Haiti, both UPM and Digicel-USA competed directly, head-to-head, for wholesale carriers' business. Once either of them got a call to carry, they each got it to Haiti. And then each of them had to terminate it on Digicel-Haiti's network. In order to accomplish that termination function, UPM used – that is, it resold – Digicel's "local" mobile service. UPM explained this situation by quoting an FCC ruling:

> In order to complete a U.S. international call, a U.S. carrier must obtain as inputs *various call termination services* from foreign carriers in the destination country of the U.S. call, including international transport services, inter-city services within the destination country, and *terminating access services within the local exchange of the called party*. A foreign carrier with market power in these input markets could favor one U.S. international carrier at the expense of its rivals by *denying rivals access to these crucial termination services* … The ultimate effect of such discrimination would be to affect adversely competition in the U.S. international services market and harm U.S. consumers.

Counterclaims at ¶ 240, *quoting Eastlink International (USA) Inc.; Petition to Modify Regulatory Classification from Dominant to Non-Dominant on the U.S.-Bermuda Route,* Memorandum Opinion and Order, 28 F.C.C.R. 8364 (Int'l Bur. 2012) at ¶ 2 (emphasis added, footnotes omitted). For calls UPM delivered via the internet, then, UPM "resold" Digicel's Haitian mobile service in Haiti as an input to the service it was selling to wholesale carriers. But the relevant antitrust market – which Digicel has monopolized – is the market for getting calls to Haiti for

---

[16]    In the communications industry, the distinction has long been made between "switchless resellers," who merely sell, and re-bill for, an underlying carrier's preexisting services with no facilities or investments of their own, and "switch-based" resellers, who invest in their own equipment, which they then use to switch traffic to other carriers' networks. *See, e.g., Flying J Inc. v. Sprint Communications Co., L.L.P.,* 2006 U.S. Dist. LEXIS 698 (D. Utah 2006) at [*19] – [*21]; *AT&T Corp. v. PAB, Inc.,* 935 F. Supp. 584, 587 (E.D. Pa. 1996) (noting that "switchless resellers … do not have physical facilities"); *NetworkIP, LLC v. FCC,* 548 F.3d 116, 118-19 (D.C. Cir. 2008). As relevant to UPM's antitrust claim, UPM was, in effect, a switch-based reseller.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

termination there.[17]   As just described, that entails performing certain functions in the United States, then arranging for physical transport between the United States and Haiti.  Both UPM and Digicel performed these functions, using somewhat different technology.

The situation is the same with respect to RLYH calls.   UPM and Digicel competed directly, head-to-head, for the wholesale carriers' business.  In the RLYH scenario, UPM routed the calls to United States wireless carriers rather than the internet, and thus "resold" the RLYH service.  But UPM and Digicel were still competing head to head for wholesalers' business, as UPM has alleged.  Counterclaims at ¶¶ 244, 259.

In this regard, as discussed *infra,* UPM has also alleged that it violates the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.,* for a carrier to impose unreasonable restrictions on the resale of its services.  Counterclaims at ¶¶ 280-91.  The scope of that Communications-Act-based obligation, however, does not necessarily track the "direct competitor" analysis relevant to antitrust standing.  There is, therefore, nothing inconsistent in characterizing Digicel's violation of its Communications Act duties (correctly) as interfering with UPM's ability to resell Digicel's services while alleging (also correctly) that UPM and Digicel competed in the market for carrying calls from the United States to Haiti.  The different legal characterization of what is wrongful about Digicel's conduct does not imply that the facts UPM has alleged are insufficient not demonstrate the direct competition which establishes antitrust standing.[18]

---

[17]    Digicel-Haiti has also monopolized the local service market in Haiti, but UPM has not alleged that monopolization of that market violated United States antitrust laws.

[18]    Digicel appears concerned about UPM's characterization of the competition described above as the market for "transporting" calls from the United States to Haiti.  *See* Counterclaims at ¶¶ 332-33; MTD at 9, 13-14.  As the descriptions above show, what the wholesaler carriers (the direct customers in the relevant market) were looking for was someone to get their calls to Haiti.  It was immaterial what physical medium was used for the actual transport function; fighting for the wholesale carriers' business was "the point of competition" between them.  *Glen Holly, supra,* 343 F.3d at 1005.  Reading the Counterclaims in the light most favorable to UPM, summarizing that competitive market as the market for "transporting" calls to Haiti is fully sufficient to survive a motion to dismiss.

### E.  UPM Has Properly Pled All Required Elements of Its Section 2 Claims

Digicel raises various arguments contending that UPM has failed to adequately allege the required elements of a Section 2 claim.  MTD at 10-17.  As described below, read in the light most favorable to UPM, UPM's allegations are sufficient to survive a motion to dismiss.[19]

#### 1.  Monopoly Power

Digicel claims that UPM has not alleged that Digicel has monopoly power in the relevant market.  MTD at 11-12.  This is absurd.  UPM has alleged that Digicel has a monopoly (or near-monopoly) with respect to local service in Haiti and that it has unlawfully extended that monopoly "to the separate lines of commerce/product markets alleged above."  Counterclaims at ¶ 335, referring to *id.* at ¶¶ 332-33.  UPM also alleged that by requiring that all calls bound for Digicel-Haiti customers be directed to Digicel-USA, Digicel "has eliminated competition for transporting calls to Haiti from the United States."  *Id.* at 336.  On this point, Digicel itself has provided adequate allegations of its monopoly power: "***All*** authorized telecommunications traffic from the United States to the Digicel-Haiti cellular network is routed through the Digicel-USA operated international switching centers in Miami and New York."  SAC at ¶ 22 (emphasis added).[20]  When a wholesaler has a call bound for Haiti, Digicel explains that the carrier "sends

---

[19]      In the event that the Court concludes that UPM's allegations with respect to any of its counterclaims are insufficient, UPM respectfully requests the opportunity to replead, which should be routinely granted.  "Leave to amend should be liberally granted, particularly when defects in the complaint could be cured by supplemental allegations."  *Airline Service Providers Ass'n v. LA World Airports,* 2017 U.S. App. LEXIS 16110 (9th Cir. Aug. 23, 2017) at [*25], *citing Rodriguez v. Steck,* 795 F.3d 1187, 1188 (9th Cir. 2015); *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.,* 2017 U.S. App. LEXIS 13271 at [*11] n.5 (9th Cir. July 24, 2017), *quoting Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1101 (9th Cir. 1999).

[20]      Calls from the United States bound for Digicel-Haiti's end users constitute a relevant submarket.  *See* Counterclaims at ¶ 333.  Digicel itself has alleged that it monopolizes this submarket: "***All*** authorized telecommunications traffic from the United States to the Digicel-Haiti cellular network is routed through Digicel-USA…".  SAC at ¶ 22 (emphasis added). With regard to calls to its own subscribers, Digicel-Haiti inherently enjoys what is known as a "terminating access monopoly," *i.e.,* the only way to reach a Digicel-Haiti subscriber is to send the call to Digicel-Haiti.  This situation, which gives Digicel-Haiti
(note continued)…

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

the call to a Digicel-USA switch." *Id.* at ¶ 24. Moreover, many of Digicel's claims against UPM (such as conversion and unjust enrichment) are premised on Digicel's asserted right to *be* a monopolist on the United States-Haiti route – at least for calls to Digicel-Haiti customers who, as UPM has alleged, comprise at least 75% of the entire Haitian market. *See* Counterclaims at ¶ 250; *see also* SAC at ¶ 14 (Digicel-Haiti a "leading" provider of telephone service in Haiti); Answer at ¶ 14 (minimum 75% market share).[21]

As Digicel notes, monopoly power is generally understood to entail "the power to control prices or exclude competition." *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997) (*citing United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966)), *aff'd sub nom. Humana Inc. v. Forsyth,* 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012). UPM's Counterclaims, and Digicel's own allegations in the SAC, establish that it controls the price of getting calls to Haiti from the United States by imposing its $0.23/minute minimum, and that it has the power to exclude competition, evidenced by its actual exclusion of UPM. There can be no question that UPM has adequately alleged monopoly power.[22]

---

…(note continued)

market power with respect to incoming calls, is well-recognized in the telecommunications industry. *See, e.g., Access Charge Reform, et al.,* Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 F.C.C.R. 9923 (2001) at ¶ 38 (carriers seeking to deliver calls to a local carrier "are subject to the monopoly power that the [local carriers] wield over access to their end users").

[21] Digicel claims that UPM's allegation regarding Digicel's market share in Haiti is provided "with no supporting factual allegation." MTD at 12. While UPM is under no obligation at the pleading stage to provide such evidence, UPM represents to the Court that the figure was derived from documents obtained from the Haitian regulator's website. *See* Counterclaims at ¶ 248. Discovery from Digicel, and other sources of information, will doubtless provide more specific figures as the case proceeds. To the extent that Digicel is objecting to the use of the word "transporting" to describe the relevant market, as described above, the substantive allegations of both the SAC and the Counterclaims make clear what physical functions are involved. *See* Section II.D, *supra.*

[22] UPM notes that it included its allegations of attempted monopolization as an alternative claim in the event that the Court were to conclude that a 75% market share was not sufficient to establish monopolization *per se.* UPM submits that an allegation of having already achieved a 75% market share of the relevant market and a 100% share of the relevant submarket is clearly sufficient to meet the
(note continued)…

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

### 2.  Maintenance of Monopoly Power Through Anticompetitive Conduct

Digicel argues that UPM has not alleged "anticompetitive conduct" by Digicel to maintain its monopoly power. MTD at 12-15. But UPM identified five separate anticompetitive actions Digicel has taken to maintain and extend its monopoly. *See* Counterclaims at ¶¶ 335-41. There is nothing "speculative" or "conclusory" about UPM's allegation of anticompetitive conduct. *See* MTD at 13.

First, Digicel itself alleges that "***all*** authorized telecommunications traffic from the United States to the Digicel-Haiti cellular network ***is routed through*** the Digicel-USA operated international switching centers in Miami and New York." SAC at ¶ 22 (emphasis added). UPM paraphrases this assertion by referring to Digicel's actions as amounting to "requiring or purporting to require that calls to its own subscribers be switched through Digicel-USA." Counterclaims at ¶ 336. Digicel claims this is "false and purposefully misleading." MTD at 13-14. Evidently the correct phrasing is to say that "Digicel-Haiti ***requires*** that international calls destined to be terminated on the Digicel-Haiti network ***be switched*** through the Digicel-USA gateway." *Id.* at 14 (emphasis added). UPM is at a loss to see what Digicel thinks is "false and misleading" about UPM's phrasing. Be that as it may, this conduct – extending the monopoly for local service in Haiti to include international service between the United States and Haiti – is clearly anticompetitive.

Digicel argues that demanding that all calls from the United States bound for Digicel-Haiti must go through Digicel-USA is not anticompetitive, on the theory that Digicel-USA will take traffic from anybody. *Id.* UPM is baffled by this claim as well. The markets that Digicel has monopolized are those for getting calls from the United States to Haiti – either to

---

…(note continued)

"dangerous probability of success" and "specific intent" elements of an attempted monopolization claim. *See* MTD at 12 n.7, *citing Spectrum Sports v. McQuillan* 506 U.S. 447, 455 (1993). If the Court disagrees, then UPM respectfully requests leave to replead. *See* cases cited in note 19, *supra.*

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Haitian telephone users generally, or to Digicel-Haiti's own customers (the submarket).  By its statements above, Digicel has ***admitted*** that it requires all traffic in the relevant submarket to go through its switches.  This is anticompetitive on its face.

Recognizing this problem, Digicel asserts, in an effort at justification, that this monopolistic practice is "necessary to properly route and bill calls."  MTD at 14.  The extent to which Digicel "needs" to monopolize the market to accomplish these purposes will be a subject for evidentiary dispute, and so should be resolved in UPM's favor at this juncture.  That said, and without unduly anticipating the evidence, the fact that it is not "necessary" to use Digicel-USA to properly "route" calls to Haiti is shown by the fact that UPM got calls to Haiti without using Digicel-USA at all.  As to billing, UPM asserts that the amounts it paid to Digicel for the wireless service in Haiti that UPM used to terminate calls was itself the "proper billing" for such calls.  *See* Section I.B, *supra.*  Moreover, given that Digicel could identify the SIM cards/services being used by UPM, there is no reason that it could not have charged higher per-minute rates for calls made using those services.  Its claims that its monopolistic arrangements were "necessary," therefore, ring hollow.

Digicel next takes issue with UPM's allegation that Digicel's imposition of the $0.23 rate is anticompetitive. *Id.* at 14-15.  Here it appears that Digicel has missed the point.  As noted above, UPM disputes the claim that the Haitian government requires the $0.23 rate.[23]  But UPM's allegation (Counterclaims at ¶ 337) does not go to the $0.23 rate *per se.*  It goes to the fact that Digicel evidently charges the ***same*** $0.23 rate whether a carrier delivers traffic in New York or Miami, or directly to Digicel in Haiti.  *See* SAC at ¶¶ 22-41 (describing charges of $0.23/minute from Digicel-Haiti to originating wholesale carriers, and payments from Digicel-Haiti to Digicel-USA, but no payments from wholesale carriers to Digicel-USA).  Digicel

---

[23]    For this reason, at this stage, Digicel's discussion of sovereign compulsion, *id.* at 14 & note 9, is beside the point.  UPM will respond at an appropriate time to the evidence (if any) Digicel may adduce regarding the provenance of the $0.23 rate.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

evidently disputes this allegation, *see* MTD at 14-15, but taking it as true, it amounts to Digicel providing transport between the United States and Haiti for free.  It does not take an advanced degree in economics to see that this would tend to maintain Digicel's monopoly on such transport.

Digicel tries to avoid this problem by pointing out that ***Digicel-Haiti*** compensates Digicel-USA via intracompany transfers.  *Id.* at 15; SAC at ¶36.  But this simply emphasizes the anticompetitive nature of the arrangement.  Under Digicel's regime, a wholesale carrier seeking to get a call from the United States to Haiti would never choose any provider other than Digicel-USA.  Any other provider would demand some non-zero price for that function, and then, when the call gets to Haiti, Digicel-Haiti would collect $0.23 – which the provider would add to its price.  Alternatively, the wholesale carrier could simply deliver the calls to Digicel-USA, in the United States, for $0.23.  This pricing scheme amounts to Digicel extending its monopoly control of access to end users in Haiti to the function of getting calls from the United States to Haiti.[24]

UPM also alleged that Digicel's refusal to complete calls was anticompetitive.  Digicel does not deny that it prevented UPM from completing calls to Digicel-Haiti's wireless network, either via resale of the RLYH service in the United States or via "local" resale in Haiti (for internet-delivered calls).  It argues that it was justified in doing so, however, because it was entitled to prevent UPM from "stealing access" to its network.  MTD at 15, *citing Intellectual Ventures I LLC v. Capital One Financial Corp.,* Civ. Action No. 1:13-cv-0074- (AJT/TRJ), 2013 U.S. Dist. LEXIS 177836 (E.D. Va. Dec. 18, 2013).  *Intellectual Ventures* indicates that a patent holder – a legal monopolist – does not violate the antitrust laws by seeking royalties; it has nothing to do with "stealing."  In any event, UPM has alleged that it paid the full retail price for

---

[24]    Even if it turns out that the Haitian government somehow does meaningfully "compel" Digicel-Haiti to charge $0.23 for calls coming in from overseas, that is not at all the same thing as compelling Digicel-USA to get calls to Haiti for free.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

the RLYH service it used in the United States, and the mobile service it used in Haiti. *See* Counterclaims at ¶¶ 262, 272-73, 295, 298, 301-02; Answer at ¶ 83. *See also* Section I.B, *supra.* UPM also alleged that there were no contractual or other restrictions imposed when it purchased SIM cards and minutes of use. *Id.* This is not "stealing access." Digicel may contest UPM's allegations on these issues, but at this stage of the case, it cannot avoid litigation of the claim that its actions were unlawful – and thus part of an illegal effort to extend and maintain its monopoly – by grandly asserting that UPM was "stealing."

Finally, Digicel did not address UPM's allegation that, as part of its effort to maintain its illegal monopoly on United States-to-Haiti transport, Digicel wrongfully failed to apprise the FCC that Digicel-USA was a "dominant" carrier under the agency's rules. *See* Counterclaims at ¶ 340. Digicel may not believe that it had that obligation, but UPM has clearly pled a reasonable basis for concluding that Digicel did have it. This confirms that UPM has properly pled its Section 2 claims.

### 3. Antitrust Injury

The Ninth Circuit has summarized the requirements for "antitrust injury" as consisting of "four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent, [along with] a fifth element—that the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers,* 729 F.3d at 963 (internal quotations and citations omitted). Digicel claims that UPM's allegations do not meet these requirements. MTD at 15-17. In fact, UPM's allegations, read in the light most favorable to UPM, are fully sufficient to do so.[25]

---

[25]    The fifth element – antitrust standing arising from participating in the relevant market – is discussed above in Section II.C.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

UPM has alleged that Digicel has unlawfully extended its monopoly on local service in Haiti to include the market for carrying calls between the United States and Haiti, and has alleged five separate unlawful acts in which Digicel has engaged to maintain that illegal monopoly. Counterclaims at ¶¶ 331-42. These allegations satisfy the "unlawful conduct" requirement. UPM has also alleged that Digicel's exclusionary conduct – purporting to require all wholesale carriers to route Haiti-bound calls via Digicel-USA's switches, refusing to complete calls after UPM paid full retail price for SIM cards and service plans, etc. – forced UPM out of the market and thereby damaged UPM by depriving it of the profits it would have been able to earn had it been allowed to operate. *Id.* at ¶ 343. These allegations satisfy the "injury to plaintiff" requirement.[26]

These same allegations show that the injury to UPM – its lost profits from being driven from the market – "flow from that which makes the conduct unlawful." *Somers,* 729 F.3d at 963. When Digicel answers the Counterclaims, it may dispute that it has a monopoly, or it may assert that the actions it has taken to protect and extend that monopoly are lawful. But in considering whether to dismiss UPM's counterclaims, there can be no doubt that UPM has alleged that it has been injured by virtue the exclusionary, monopolistic, illegal conduct by Digicel.

Similarly, there can be no serious debate that excluding otherwise viable competitors from a monopolized market, not by competition on price or quality, but instead via exclusionary conduct, is *precisely* the type of injury that Section 2's ban on monopolization was intended to prevent, *i.e.,* "injury to competition in the market as a whole, not merely injury to itself as a competitor." *CollegeNET, Inc. v. Common Application, Inc.,* 104 F. Supp. 3d 1137,

---

[26]    Digicel claims that UPM's allegation of lost profits is "entirely unsupportable." MTD at 17. UPM is not required at this stage to prove the level of its damages. That said, UPM represents that its damage allegation is based on its preliminary estimates of the profits it would have made delivering calls to Haiti for the period from November 2014 (when it was forced form the market) through the date of filing of its Counterclaims.

1147 (D. Or. 2015). "Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare." *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433 (9th 1995). The purpose of the antitrust laws is to protect the competitive process so that consumers can enjoy lower prices and broader choices among providers. *See, e.g., id.* at 1433-34. It follows that forcing competitors out of the market so that consumers (in this case, international call wholesalers) have only one practical choice for getting calls to Haiti (Digicel-USA), and have to pay Digicel's inflated rate rather than the lower rates that UPM was offering, constitutes an injury to competition and the competitive process. *See* Counterclaims at ¶ 343. Here, consumers were harmed because an innovative, lower-priced competitor was driven from the market by exclusionary actions, not competition on the merits.

The situation here, therefore, stands in contrast to cases finding no antitrust injury when a plaintiff was harmed by virtue of the defendant charging lower prices or introducing new technical innovations. For example, "'[a]s a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's produce design changes.'" *Allied Orthopedic Appliances,* 592 F.3d at 998, *quoting United States v. Microsoft Corp.,* 253 F.3d 34, 65 (D.C. Cir. 2001); *Pool Water Products v. Olin Corp.,* 258 F.3d 1024, 1035 (9th Cir. 2001) (competitor's lost profits due to alleged monopolist's price decreases are not antitrust injury as long as prices not predatory), *citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 223-24 (1993). Here, Digicel is charging monopolistic prices, and UPM was excluded from the market by Digicel's own brute exclusionary actions, not driven out by the operation of competitive forces, *i.e.,* by customers freely choosing Digicel due to better prices, more innovative technology, or some similar pro-consumer factor.

The discussion above shows that, reading UPM's allegations in the most favorable light, UPM has clearly alleged "antitrust injury" as required by Ninth Circuit precedent. Digicel's motion to dismiss on this ground should therefore be denied.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

### III.  UPM HAS PROPERLY PLED CLAIMS UNDER THE COMMUNICATIONS ACT

Digicel argues that UPM has not sufficiently alleged facts to support the conclusion that Digicel-Haiti itself, as opposed to Digicel-USA, is a telecommunications carrier under the Communications Act.  Its basic contention is that, since UPM has not alleged that Digicel-Haiti itself owns or operates facilities in the United States, there is no basis for concluding that it, itself, is a carrier.  MTD at 17-18.  This basic contention, however, completely misconceives how "telecommunications carrier" is defined under the Communications Act and, specifically, what activities are and are not required to be a carrier.  As described below, not only has UPM adequately alleged that Digicel-Haiti is a carrier, Digicel-Haiti's own affirmative allegations in the SAC confirm that it is, indeed, a carrier.[27]

Under the Communications Act, a "telecommunications carrier" is an entity that offers telecommunications to the public for a fee.  *See* 47 U.S.C. §§ 153(50), (51) and (53).  The three definitions contained in the cited provisions work together to define a telecommunications carrier.  First, 47 U.S.C. § 153(50) defines "telecommunications" as transmitting a user's information between locations directed by the user.  As relevant here, this refers to getting a call from the United States to Haiti.  Then, 47 U.S.C. § 153 (53)  defines "telecommunications service" as providing "telecommunications" for a fee, either "directly to the public or to such classes of users as to be effectively available directly to the public, ***regardless of the facilities used***" (emphasis added).  The emphasized phrase indicates that what matters in determining carrier status is which entity is selling the service; who owns or operates the underlying facilities is simply irrelevant.  Indeed, for more than forty years – even predating the enactment of these

---

[27]    Digicel-Haiti takes umbrage at the fact that UPM still claims that Digicel-Haiti violated the Communications Act even after it filed its SAC containing a more detailed explanation of which Digicel entities performed which functions in connection with getting calls from the United States to Haiti.  MTD at 17-18.  But Digicel-Haiti should not be surprised: at oral argument on Digicel's motion to dismiss UPM's earlier counterclaims, counsel for UPM explained that depending on the specific new allegations

(note continued)…

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

specific definitional terms – the FCC has held, and the courts have affirmed, that pure resellers, who own no facilities at all, are "carriers" subject to the FCC's jurisdiction.[28]  Finally, 47 U.S.C. § 153(51) defines a "telecommunications carrier" as any provider of telecommunications services.

Applying these definitions to Digicel-Haiti's own allegations shows that it is a carrier.  First, as Digicel-Haiti describes things, Digicel-USA does not charge its supposed "customers" at all.  Instead, as Digicel-Haiti describes it, when a wholesale carrier hands a call off to Digicel-USA's physical facilities in Miami or New York, the customer is billed by Digicel-Haiti:

> after collecting and reviewing the inbound and outbound call reports, generated from information provided by the CDRs, ***if Digicel-Haiti is owed money from a United States based Telecom carrier***, Digicel Jamaica will invoice the carrier and the carrier will pay the funds to Digicel Jamaica ***on behalf of and for the benefit of Digicel-Haiti.*** Digicel Jamaica then pays those funds directly to Digicel-Haiti. Digicel Jamaica does not retain any portion of these funds for its own benefit.. Specifically, Digicel Jamaica makes an intercompany transfer payment to Digicel-Haiti for the amount of the funds collected—net of any payments Digicel Jamaica makes on Digicel-Haiti's behalf. Payments made on Digicel-Haiti's behalf would include payments to USA carriers for outbound international calls that such carriers terminated for Digicel-Haiti.

SAC at ¶¶ 33-34.  So, the only charges to customers are from ("on behalf of and for the benefit of") ***Digicel-Haiti,*** not from Digicel-USA.  Clearly, then, Digicel-Haiti, not Digicel-USA, is the

---

…(note continued)

Digicel presented, UPM's Communications Act claims could well remain.  Transcript of Proceedings of July 22, 2016 at 13-14.

[28]    *See Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* 60 F.C.C.2d 261 (1976) *aff'd sub nom AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978).  This doctrine is embodied in the "regardless of the facilities used" language.  The FCC has also made clear that an entity does not lose its carrier status if it sells to wholesalers, rather than directly to the public at large.  *See, e.g., Bright House Networks, LLC et al. v. Verizon California, et al.,* Memorandum Opinion and Order, 23 F.C.C.R. 10704 (2008), *affirmed, Verizon California, et al. v. FCC,* 555 F.3d 270 (D.C. Cir. 2009); *Sprint Communs. Co. v. Nebraska PSC,* 2007 U.S. Dist. LEXIS 66902, [*37] -[*44]  (D. Neb. Sept. 7, 2007) . Finally, as noted above, communications law distinguishes between switched-based resale and switchless resale.  *See* note  16, *supra.*  Either kind of reseller, however, is a telecommunications carrier, subject to the obligations in the Communications Act.

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

entity that is selling the relevant telecommunications service to the public. This is confirmed by Digicel-Haiti's explanation of how Digicel-USA gest paid. As Digicel-Haiti explains it, Digicel-USA receives intercompany transfers that "are not directly tied to or determined by the amount of call revenue or the call volume that each market generates or collects but rather, reflects Digicel-Haiti's charges for shared services including shared capacity, provided to the members of the group." *Id.* at ¶ 36. In other words, Digicel-USA is compensated for its costs via intra-enterprise transfers; it does not charge any customers for providing telecommunications services.[29]

Given this description, Digicel-USA may well *not* be a "carrier," at least with regard to calls going to Haiti, because although it is physically involved in getting calls to Haiti, it does not charge for that function. Providing service "for a fee," however, is a prerequisite for being a telecommunications carrier. 47 U.S.C. § 153(53).[30] On the other hand, as Digicel describes things, ***Digicel-Haiti*** charges for that activity (with the billing, on its behalf, done by Digicel-Jamaica). This means that Digicel-Haiti is a telecommunications carrier in the United States. While it is true that Digicel-Haiti claims that it, itself, does not own the underlying facilities used to get the calls to Haiti, as described above, that is irrelevant under the Communications Act: an entity that charges for telecommunications is providing "telecommunications service," and thus is a "telecommunications carrier," "***regardless of the facilities used***" to do so. 47 U.S.C. § 153(53) (emphasis added). As described in the SAC, then, Digicel-Haiti is the entity that offers the service to the public and gets paid for it. Digicel-USA,

---

[29]    Digicel gamely suggests that this arrangement – compensation via intra-enterprise transfers based on costs, and without regard to traffic volumes or revenues charged to customers – constitutes an "arms-length relationship." MTD at 19. This argument is absurd on its face.

[30]    Indeed, not only does Digicel-Haiti's description contain no suggestion that Digicel-USA charges anything to the entities handing off calls for delivery to Haiti, it contains no suggestion that Digicel-USA has any contractual relationship with any such entity. *See* SAC at ¶¶ 22-40. The contractual relationships and the payments are all described as between the wholesale carriers on the one hand, and Digicel-Haiti on the other.

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

by contrast, is, in economic terms, merely a behind-the-scenes contractor who does the underlying actual work.

In addition to the legal implications of Digicel-Haiti's own specific allegations, UPM's counterclaims make clear that the real party in interest when Digicel gest calls from the United States to Haiti is Digicel-Haiti, not Digicel-USA. As UPM alleged, Digicel-USA acts, in effect, as an agent under the control of, and doing the bidding of, Digicel-Haiti with respect to that function. *See* Counterclaims at ¶ 247. Even if Digicel-Haiti had not alleged facts showing that it is a carrier, therefore, UPM's allegations on that point are clearly sufficient to survive a motion to dismiss. Indeed, the analysis above explaining why Digicel-USA and Digicel-Haiti are treated as a single entity for antitrust purposes applies, in principle, to the carrier status question as well. It would serve no public purpose, and would defeat the goals of the regulatory scheme imposed by the Communications Act, if a multi-entity corporate family could escape its carrier obligations by artfully parsing out activities and responsibilities among different entities to ensure that none of them performs all of the functions of a carrier, even though in coordination as a group, those functions are performed by a unified entity with common economic interests.

Finally, UPM is not proposing any "extraterritorial" application of the Communications Act. *See* MTD at 19. UPM's claim is that Digicel-Haiti's own actions in the market, as alleged by Digicel-Haiti itself, show that Digicel-Haiti is a "telecommunications carrier" and thus subject to the obligations imposed on carriers by the Act. Stating it simply, the allegations in the SAC – on which UPM is relying, at this point, in making its own allegations about how the various Digicel entities operate – describe economic relationships under which Digicel-Haiti sells telecommunications services to wholesale carriers (and wireless carriers) in the United States, using an affiliate (Digicel-USA) behind the scene to arrange for the physical provision of those services, and another affiliate (Digicel-Jamaica) to render bills in its name and on its behalf. As alleged in the Counterclaims and as described above, that activity makes Digicel-Haiti a carrier subject to the Communications Act whether it, itself, literally owns or operates equipment in the United States or not.

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

In these circumstances, it would plainly be inappropriate to dismiss UPM's Communications Act claims against Digicel-Haiti.  Even taking as true its assertions that it does not own or operate any facilities in the United States (and, of course, discovery may prove those assertions to be false), its own description of the economic arrangements surrounding getting calls from the United States to Haiti show that it – that is, the Digicel-Haiti legal entity – meets the definition of a "telecommunications carrier" under the Communications Act.  To the extent that it has undertaken actions that violate that Act and that harmed UPM – and UPM has clearly alleged that it has – it is liable to UPM in accordance with 47 U.S.C. §§ 206-07.  *See* Counterclaims at ¶¶ 280-96.

## IV.    CONCLUSION

For the reasons stated herein, this Court should deny all aspects of Digicel's MTD UPM's counterclaims. However, if and to the extent that the Court finds UPM's counterclaims in any way deficient, UPM respectfully requests leave to replead to cure any such deficiencies.

Dated: September 8, 2017.

TOMASI SALYER MARTIN


By: /s/ Eleanor A. DuBay
     Kathryn P. Salyer, OSB #883017
     Eleanor A. DuBay, OSB #073755
     ksalyer@tomasilegal.com
     edubay@tomasilegal.com
     Telephone: (503) 894-9900


DAVIS WRIGHT TREMAINE LLP


By: /s/ Christopher W. Savage
     Christopher W. Savage, D.C. Bar #362657
     chrissavage@dwt.com
     Telephone: (202) 973-4200
     *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 8, 2017, I served the foregoing

**DEFENDANTS' OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS** on the

following individuals by electronic service to said individuals:

| | |
|---|---|
| Robert C.L. Vaughan | Richard K. Hansen |
| Cherine Smith Valbrun | Anne M. Talcott |
| Leah Storie | Schwabe, Williamson & Wyatt, PC |
| Kim Vaughan Lerner LLP | Pacwest Center |
| One Financial Plaza | 1211 SW 5th Ave., Suite 1900 |
| 100 SE Third Avenue • Suite 2001 | Portland, OR  97204 |
| Fort Lauderdale, FL 33394 | Email: rhansen@schwabe.com |
| Email: rvaughan@kvllaw.com | Email: atalcott@schwabe.com |
| Email: cvalbrun@kvllaw.com | |
| Email: lstorie@kvllaw.com | |

Dated: September 8, 2017.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
Kathryn P. Salyer, OSB #883017
Eleanor A. DuBay, OSB #073755
ksalyer@tomasilegal.com
edubay@tomasilegal.com
Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
Christopher W. Savage, D.C. Bar #362657
chrissavage@dwt.com
Telephone: (202) 973-4200
*(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236