# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**, | Case No. 3:15-cv-185-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC**, and **UPM MARKETING, INC.**, an Oregon corporation; **UPM TELECOM, INC.**, an Oregon a/b/n; **UPM MARKETING, INC.**, an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident, and **TYLER ALLEN**, an Oregon resident; and **DUY "BRUCE" TRAN**, an Oregon resident, | |
| Defendants. | |

Richard K. Hansen, SCHWABE, WILLIAMSON & WYATT, 1211 SW Fifth Ave, Suite 1600, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah B. Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394. Of Attorneys for Plaintiff.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER BAROWAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204; Christopher W. Savage, DAVIS WRIGHT TREMAINE, LLP, 1919 Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Unigestion Holding, S.A., dba "Digicel Haiti," provides mobile telecommunication services in Haiti for profit. Defendants (collectively, "UPM") formerly provided mobile telecommunication services to Haiti for profit. Digicel Haiti alleges that UPM provided these services by using certain practices and technologies to fraudulently access Digicel Haiti's telecommunications network. Digicel Haiti asserts claims against UPM alleging common law fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(b)-(d), common law conversion, and common law unjust enrichment. Digicel Haiti filed a complaint against UPM on February 2, 2015. Since that time, Digicel Haiti has amended its complaint several times, UPM has answered and asserted counterclaims, and each party has moved to dismiss the other's claims. On October 18, 2016, Digicel Haiti filed its second amended complaint ("the Complaint" or "SAC"). On September 11, 2017, UPM filed an amended answer to the SAC, asserting seven affirmative defenses and seven counterclaims. UPM's first and seventh counterclaims include allegations that Digicel Haiti is in violation of the Communications Act of 1934 and § 2 of the Sherman Act, respectively. Digicel Haiti now moves to strike UPM's first, second, fifth, sixth and seventh affirmative defenses and dismiss UPM's first and seventh counterclaims. For the following reasons, Digicel Haiti's motion to strike and motion to dismiss are each granted in part and denied in part.

## STANDARDS

### A. Motion to Strike

An answer must "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1). Such defenses must be stated "in short and plain terms." Fed. R. Civ. P. 8(b)(1)(a). A court may strike an affirmative defense under Federal Rule of Procedure 12(f) if it presents an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

Civ. P. 12(f). The purpose of a Rule 12(f) motion is to avoid spending time and money litigating spurious issues. *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *see also Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). The disposition of a motion to strike is within the discretion of the district court. *See Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990). "Motions to strike are disfavored and infrequently granted." *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 561 F. Supp. 2d 1187, 1189 (D. Or. 2008); *see also Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014) ("Motions to strike are regarded with disfavor because of the limited importance of pleadings in federal practice and because they are often used solely to delay proceedings." (quotation marks and alterations omitted)).

An affirmative defense may be struck if it is insufficient. "'The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense.'" *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1023 (9th Cir. 2010) (quoting *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979)). "[T]he 'fair notice' required by the pleadings standards only requires describing the defense in 'general terms.'" *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019 (9th Cir. 2015) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1274 (3d ed. 1998)).

Rule 12(f) also provides that pleadings that are "immaterial" or "impertinent" may be struck by a court. An "immaterial" matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc.*, 984 F.2d at 1527 (quoting C. Wright, A. Miller, et al., 5C Fed. Prac. & Proc. Civ. § 1382 (3d ed. 2013)). "Impertinent" matters are those "that do not pertain, and are not necessary, to the issues in question." *Id.* Such pleadings are legally insufficient because they clearly lack merit "under any

set of facts the defendant might allege." *Polk v. Legal Recovery Law Offices*, 291 F.R.D. 485, 489 (S.D. Cal. 2013) (citation and quotation marks omitted).

## B. Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

**BACKGROUND**

For purposes of Digicel Haiti's motion to dismiss counterclaims, the Court accepts as true the following facts alleged in UPM's counterclaims. Certain allegations from Plaintiff's amended complaint also are included as background. In deciding Digicel Haiti's motion to dismiss, the Court gives no presumption of truth to Digicel Haiti's allegations in the amended complaint, except where UPM's argument or counterclaims endorse or rely on Digicel Haiti's allegations.

**A. Digicel Haiti's Operations**

Digicel Haiti is a wholly owned subsidiary of Digicel Holdings, Ltd., which also owns Digicel USA, Inc. ("Digicel USA") and Digicel Jamaica, Ltd. ("Digicel Jamaica"). Digicel Haiti is the leading provider of telecommunications services in Haiti, where it solely operates and has an estimated 75% market share of local telephone services. Digicel USA operates a set of international telephone switching systems—equipment with the capacity to transmit a call from the United States to an overseas telecommunications network—located in Miami, Florida and New York City, New York.

Digicel Haiti tracks and charges its local customers in Haiti through the use of pre-paid Subscriber Identity Module ("SIM") cards. A SIM card acts as a small circuit board: when the card is placed inside a cellular telephone, the card identifies the device as associated with an individual customer's unique telephone number and account. SIM cards allow customers to access Digicel Haiti's cellular network and, in turn, allow Digicel to charge for communications made from cellular devices containing specific SIM cards. Digicel Haiti's customers can use SIM cards for voice, data, and messaging services on the Digicel Haiti network. Customers can add credits, in the form of minutes, to SIM cards by using, among other methods, vouchers and online "top-ups."

When a user of a Digicel Haiti SIM card makes a local call within Haiti, that user incurs charges of approximately $0.09 per minute of wireless service. If a Digicel Haiti customer travels to the United States and uses his or her Digicel Haiti SIM card to make calls back to Haiti, the user of that SIM card incurs charges of at least $1.99 for each minute of wireless service used. Digicel also offers a Roam-Like-You're-Home ("RLYH") plan. For an access fee of approximately $20 to $25, the RLYH plan allows registered Digicel Haiti customers to call back to Haiti while traveling in the United States at rates similar to the local rate during the authorized and pre-paid period.

When someone in the United States originates a call to one of Digicel Haiti's subscribers in Haiti, the "third-party carrier"—a United States telecommunications carrier, which does not have the internal capacity to transport a call to Haiti, also sometimes referred to as a "wholesaler"—picks up that phone call from the United States-based originating caller and transports it to one of the Digicel USA switching gateways. From that switching gateway, Digicel USA further transports the call to Haiti, where Digicel Haiti "terminates" the call on its network. The terminating end of a call is the party being called by the party originating the call. On Digicel Haiti's behalf, Digicel Jamaica bills the third-party carrier a rate of $0.23 per minute for all international calls that terminate on Digicel Haiti's network. That fee includes the cost of terminating the call on Digicel Haiti's network and the cost of switching services performed by Digicel USA. Digicel Haiti then pays Digicel USA a fee for its services through intercompany transfer. Digicel Haiti does not authorize international or domestic telephone traffic to enter its telecommunications network in Haiti by any other route or under any other form of agreement.

## B. UPM's Operations

UPM is an Oregon corporation that facilitated international calls from the United States to people in Haiti on behalf of third-party carriers, at rates lower than what Digicel Haiti charged.

UPM asserts that it essentially resold Digicel Haiti's local and RLYH services within the United States at a discount from approximately April 2014 to November 2014. Due to Digicel Haiti's effective efforts to prevent UPM from reselling Digicel Haiti's services, as described below, UPM no longer facilitates calls to Haiti. UPM business operations involved paying full retail price to acquire large quantities of Digicel Haiti SIM cards from authorized dealers, and then using those cards to facilitate calls to Haiti through two technically distinct platforms: the resale of the RLYH plan and the resale of Digicel Haiti's local wireless services.

The first and most common way that UPM facilitated calls to Haiti was to enroll its Digicel Haiti SIM cards in the RLYH plan for the full retail price. UPM would then assemble the RLYH-enrolled SIM cards into a SIM server. The SIM server was connected to the internet and capable of accessing the wireless networks of AT&T and T-Mobile, the third-party carriers that have roaming arrangements with Digicel Haiti in the United States. Ordinarily, when a third-party carrier's customers called Haiti, the third-party carrier, and ultimately the customer, would have to pay the standard amount—a minimum of $0.23 per minute—for Digicel Haiti to connect the international call to its local network. UPM offered a cheaper way to connect the calls to third-party carriers on the open wholesale "spot" market in the United States. A third-party carrier that elected to use UPM's services would switch a call bound for a Digicel Haiti customer to UPM instead of through Digicel USA's gateway. The third-party carrier's switch would convert the call into an Internet-based protocol packet that carries the call (including the destination number in Haiti) over the internet to one of UPM's SIM servers located in Oregon. UPM's SIM server would then initiate the call to Haiti on the third-party carrier's wireless network. Simultaneously, UPM's SIM server would convert the call into the appropriate format for wireless transmission and essentially program the call to appear to come from a telephone

number associated with one of the RLYH-enrolled Digicel Haiti SIM cards. After the call was made to look like a call on the RLYH plan, it would follow the typical route for calls switched directly to Digicel Haiti: the third-party carrier would route the newly-reformatted call to one of Digicel USA's switches in New York or Miami, Digicel USA would carry the call to Haiti, and Digicel Haiti would terminate the call on its network, charging the associated SIM card at the discounted RLYH rate.

A second, although less common, way in which UPM facilitated international calls to Haiti was by transporting the calls to Digicel Haiti's local Haitian network through Voice-over-Internet-Protocol ("VoIP"). Again, the customer of a third-party carrier would call Haiti, and the third-party carrier's switch would select UPM to handle the call. The call would be sent to a UPM SIM server in Oregon in the same manner described above. Instead of initiating a wireless call to Haiti and converting the call for wireless transmission, however, UPM would leave the call as an Internet-based protocol packet (VoIP format). UPM would use the internet to transmit the call to a receiver in Haiti, known as a Global System for Mobile communications ("GSM") Gateway. The GSM Gateway would format the call for wireless transmission and initiate a wireless call on Digicel Haiti's network in Haiti using the account information associated with a SIM card located in Oregon. Digicel Haiti would then terminate (or complete) the call on its network as a local call, charging the associated SIM card at the local rate.

Digicel Haiti undertook an investigation into the international "resale" of its services. During the investigation, Digicel Haiti discovered that the calling and usage patterns of particular SIM cards were inconsistent with use by individual customers. Digicel Haiti "de-authorized" these SIM cards so that calls associated with these cards could no longer be completed. Because

Digicel Haiti de-authorized many of the SIM cards that UPM used to conduct its business, UPM is no longer able to facilitate international calls to Haiti through either RLYH plans or VoIP.

**DISCUSSION**

## A. Motion to Strike

### 1. Failure to State a Claim and Standing

Digicel Haiti moves to strike UPM's first affirmative defense, failure to state a claim, and second affirmative defense, lack of standing, on the basis that such defenses merely resurrect disputes that this Court has already decided. After full briefing by the parties, this Court previously ruled that Digicel Haiti has standing to bring the claims alleged in the Second Amended Complaint, and that Digicel Haiti has sufficiently stated those claims. Those rulings, however, were in response to UPM's motion to dismiss, which required this Court to accept all allegations in Digicel Haiti's pleading as true. As the case proceeds, however, it may become clear that those factual allegations were imprecise or incorrect. Thus, the fact that the same arguments did not prevail on an earlier motion under a different standard is not a sufficient basis to justify striking them.

A defense that does no more than point out a defect in a plaintiff's prima facie case, however, is a "negative defense" that can be set up by a denial, not an affirmative defense. *Zivkovic v. Southern Calif. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). "Failure to state a claim" is a negative defense that merely argues that plaintiff has not met its burden in establishing one or more elements of a claim, whatever that burden may be at a given stage of litigation. Similarly, because plaintiffs must establish standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at successive stages of the litigation," *Lujan v. Dep't of Wildlife*, 504 U.S. 555 at 561 (1992), UPM's argument that Digicel Haiti lacks standing is also a negative defense.

Because UPM's first and second affirmative defenses are in fact negative defenses, rather than affirmative defenses, it is proper to strike them.

### 2. Unclean Hands, Restraint on Trade, and Illegality

Digicel Haiti argues that UPM's fifth, sixth and seventh affirmative defenses should be stricken because UPM characterizes as affirmative defenses what should be brought as statutory antitrust counterclaims. In support of its argument, Digicel Haiti cites *Frost v. Shipowners & Merchants Towboat Co.*, in which a district court struck an antitrust defendant's affirmative defense of "unclean hands" that was predicated on the plaintiff's own anticompetitive activity, 1974 WL 888, at *4 (N.D. Cal. May 10, 1974).

*Frost*, however, does not stand for the proposition that a party bringing an antitrust claim cannot raise an affirmative defense of unclean hands or illegality based on the same facts that form the basis of the antitrust claim. Rather, it stands for the proposition that a defendant *accused of an antitrust violation* cannot raise as an affirmative defense the plaintiff's own anticompetitive activity—whether that activity is characterized as a defense of "unclean hands" or "illegality." *See also Berner v. Lazzaro*, 730 F.2d 1319, 1322 (9th Cir. 1984), *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ("[I]n private antitrust actions, it is the law of this circuit that the doctrine of *in pari delicto* does not apply where the facts show that the plaintiff is less than co-equally responsible for his injury.") Instead, the defendant must bring a separate antitrust claim against the plaintiff. In such a case, each party has an antitrust claim against the other, but neither will have a defense.

This is not the case here. Digicel Haiti accuses UPM of fraud, not an antitrust violation. Fraud is traditionally subject to the affirmative defenses raised by UPM, and Digicel Haiti cites no case law indicating otherwise.

**B. Motion to Dismiss Antitrust Claim**

UPM alleges that Digicel Haiti has a monopoly in the market for local telephone services in Haiti and it is unlawfully extending that monopoly into the market for transporting calls from the United States to Haiti through anticompetitive conduct, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. UPM alleges five different forms of anticompetitive conduct, most of which consist of Digicel Haiti's exclusion of entities like UPM from terminating calls on Digicel Haiti's local network. Digicel Haiti moves to dismiss UPM's antitrust claim on the basis that it is not subject to the extraterritorial application of the Sherman Act, Digicel Haiti is not a common entity with Digicel USA and is thus not an international carrier, UPM has no standing to bring an antitrust claim, and UPM has otherwise failed to allege the elements of a § 2 monopoly claim.

**1. Extraterritorial application of the Sherman Act**

The Foreign Trade Antitrust Improvements Act ("FTAIA") generally bars application of the Sherman Act to conduct involving trade or commerce with foreign nations, unless

> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>
> > (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> >
> > (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a. *See also McGlinchy v. Shell Chem. Co*., 845 F.2d 802, 813 n.8 (9th Cir. 1988) (noting that enactment of 15 U.S.C. § 6a preempted the previous extraterritoriality test of *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9th Cir. 1976), but that the statute "did not change the ability of the courts to exercise principles of international

comity."). UPM must thus demonstrate a "direct, substantial, and reasonably foreseeable effect" on domestic United States commerce, and that "such effect gives rise" to a Sherman Act § 2 claim.

The scope of the market that UPM alleges Digicel Haiti is improperly monopolizing, or attempting to monopolize, is not precisely alleged. UPM's allegations are, however, sufficient at this stage to support a conclusion that extraterritorial application of the Sherman Act is appropriate in this case. That market can be approximately described as the market for transporting calls from the United States to Haiti. This market necessarily implicates domestic United States commerce and consumers—whether defined as individuals placing calls to Haiti or third-party carriers seeking call transportation services to Haiti. UPM has alleged that the geographic market affected by Digicel's alleged anticompetitive activities is the entire United States. The RLYH program specifically provides discounted roaming rates for Digicel Haiti customers in the United States placing calls to Haiti, and is thus targeted at United States-based consumers. Digicel's alleged improper monopolization of the United States-Haiti international telecommunications routes has a direct, substantial, and reasonably foreseeable effect on United States consumers.

This Court may still apply the principles of international comity expressed in the *Timberlane* decision. *Id.* Whether Digicel's actions are consistent with or compelled by Haitian law or public policy involves a disputed question of fact, however, and is best resolved at a later stage of litigation. For purposes of the present motion, the FTAIA does not bar the application of the Sherman Act to the entities and commercial activities described in UPM's amended complaint, which is sufficient for this Court to consider Digicel's motion on the merits.

### 2.  Digicel Haiti and Digicel USA are a common entity under the antitrust laws

UPM argues that Digicel Haiti and Digicel USA should be considered a single entity for purposes of antitrust laws because they are wholly-owned subsidiaries of Digicel Holdings, Ltd. As a common enterprise, UPM argues, they have acted jointly to monopolize the market for the transportation of calls from the United States to Haiti. Digicel Haiti objects that it is a wholly distinct company from Digicel USA, and its operations are limited to the provision of local telephone service in Haiti.

In *Copperweld Corp. v. Independent Tube Corp.*, the Supreme Court held that a parent corporation and its wholly-owned subsidiary cannot be held liable for conspiracy with each other under § 1 of the Sherman Act. 467 U.S. 752, 759 (1984). The Tenth Circuit has extended the reasoning in *Copperweld* to hold that, when two entities "must be treated as a single enterprise for purposes of § 1, [they] must also be treated as a single enterprise for purposes of § 2." *Lenox MacLaren Surgical Corp v. Medtronic, Inc.*, 847 F.3d 1221, 1235 (10th Cir. 2017). The *Lenox* court specifically rejected the notion that individual, specific defendants must independently satisfy each element of a § 2 claim. "Rather," the court held, "in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim." *Id.* at 1236. Although the Ninth Circuit has not expressly adopted this extension of *Copperweld*, in practice it has analyzed sister and parent companies as "part of an integrated entity" whose behavior was jointly subject to a § 2 inquiry. *See Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1461 (1993). The Court is satisfied that the Ninth Circuit would join the Tenth Circuit in holding that "the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized under § 2." *Lenox*, 847 F.3d at 1236.

Digicel attempts to distinguish *Copperweld* and *Lenox* on the basis that Digicel Haiti and Digicel USA are sister-subsidiaries, while the corporate relationships in *Copperweld* and *Lenox* were parent-subsidiaries. Because there is no allegation of involvement by a common corporate parent, Digicel argues, the sister-subsidiaries should not be considered a single enterprise for the purposes of antitrust laws. The Ninth Circuit, however, has described *Copperweld* as holding that "companies under common ownership and control cannot initiate Sherman Act conspiracy violations among themselves," indicating that *Copperweld*'s reasoning is not limited to parent-subsidiary corporate relationships. *Vollrath Co.*, 9 F.3d at 1463.

Applied here, UPM has sufficiently alleged that Digicel USA and Digicel Haiti have engaged in coordinated conduct constituting a single enterprise. UPM alleges that Digicel USA and Digicel Haiti are commonly owned and "operate in tandem" to suppress competition on the United States to Haiti route. Digicel Haiti itself alleges that Digicel Haiti and Digicel USA work closely together in the common enterprise of connecting calls from the United States to Digicel Haiti's network in Haiti. Digicel Haiti bills United States-based third-party carriers a flat rate of $0.23 per minute for every international call that terminates on Digicel Haiti's network. That rate includes the cost of transmitting the call from the United States to Haiti through Digicel USA's gateway. Digicel USA does not bill the third-party carrier for this service. Rather, Digicel Haiti pays Digicel USA a fee for its service through an intercompany transfer. Thus, Digicel Haiti and Digicel USA are not only commonly owned, but engaged in a common enterprise.[1]

---

[1] Going forward, this opinion uses the term "Digicel" to refer to the common enterprise, and "Digicel USA" and "Digicel Haiti" when necessary or appropriate to refer to the distinct corporate bodies.

### 3. Standing

To state a claim for monopolization or attempted monopolization, a plaintiff must be "a participant in the same market as the alleged malefactors." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985).[2] When analyzing whether two enterprises "participate in the same market, the focus is upon the reasonable interchangeability of use or the cross-elasticity of demand between the services provided by" the enterprises. *Id.* at 1470-71. In certain cases, courts determine whether two enterprises compete in the same market by identifying "the point of competition" between the two enterprises. *See Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1005 (9th Cir. 2003) *opinion amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003) (identifying a market for a product that included manufacturers and rental services where the "point of competition" was the consumer's decision to rent or purchase the product).

Digicel Haiti argues that UPM, by merely reselling telecommunications services offered by Digicel USA and Digicel Haiti, does not participate in the same market as Digicel Haiti, which is in the local telephone services market in Haiti, or Digicel USA, which is in the "switching market." UPM alleges that it, like Digicel, is an international carrier competing with other carriers for the right to transport calls from the United States to other countries, including Haiti. As discussed above, Digicel operates as a single enterprise. As a single enterprise Digicel USA and Digicel Haiti's functions combine to offer a single product that includes the transportation of calls from the United States to Haiti and the termination of those calls on Digicel Haiti's network. UPM has not clearly alleged, however, that it offers a product that is interchangeable with a product offered by Digicel.

---

[2] The question of antitrust standing, and the requirement that an antitrust plaintiff participate in the same market as the defendant, is an outgrowth of the requirement that the plaintiff experienced antitrust injury. The remaining elements of antitrust injury are discussed later in this opinion.

As a preliminary matter, UPM does not compete with Digicel to the extent that it resells Digicel's RLYH program, in which it is only a reseller and provides no service that is an interchangeable alternate to that of Digicel. The RLYH resale "market" looks like the "market" of a person who purchases a season pass to a ski resort, and then rents that season pass out to customers for daily use at a rate below the daily rate charged by a ski resort. No matter what technological innovations the reseller innovated to facilitate his resale model, the person who rents out the season pass cannot be said to be competing in the same market as the ski resort, even though both sell daily ski passes. In reselling the RLYH plan, UPM essentially functions as a distributor, and cancelled distributors do not have antitrust standing. *Glen.*, 343 F.3d at 1010 (discussing the rule that canceled distributors do not have antitrust standing, but finding that the plaintiff at issue was not a distributor).

The other service that UPM offers—using the internet to get calls to Haiti—does appear to be interchangeable with Digicel USA's international switching service as an alternate means to conduct "international transport services." As an FCC opinion illustrates, international transport services are one "input" among others necessary to complete an international call:

> In order to complete a U.S. international call, a U.S. carrier must obtain as inputs various call termination services from foreign carriers in the destination country of the U.S. call, including *international transport services*, inter-city services within the destination country, and *terminating access services within the local exchange of the called party*.

*Eastlink international (USA) Inc.; Petition to Modify Regulatory Classification from Dominant to Non-Dominant on the U.S.-Bermuda Route*, Memorandum Opinion and Order, 28 F.C.C.R. 8364 (Int'l Bur. 2012) at ¶2 (emphasis added, footnotes omitted). Thus, the completion of an international call requires, at least, both transportation "inputs" and termination "inputs." UPM argues that it "competed directly, head-to-head, for wholesale carriers' business" when it used

the internet to get calls to Haiti. UPM defines this market as "the market for getting calls to Haiti for termination there." UPM thus argues that it competed with Digicel in providing only *international transport services* to third-party carriers.

UPM has not clearly alleged, however, that Digicel actually offers that service to third-party carriers, or that a market for "international transport services" from the U.S. to Haiti as a standalone service actually exists. Digicel's complaint alleges, and UPM seems to accept, that Digicel charges U.S. wholesalers who need to get a call to Haiti a flat rate of $0.23 per minute for calls that terminate on its network, and that flat rate includes the cost of the international transport service that was performed by Digicel USA and the cost of termination on Digicel Haiti's local network. Thus, Digicel offers to third-party carriers all of the inputs necessary to complete an international call as a single, bundled product for which it charges a flat fee. UPM, on the other hand, only competes with Digicel to the extent that it offers an international transport service, which is only one input required to complete an international call. It is not clear from UPM's allegations that there is a market for this single input. More importantly for standing purposes, UPM's standalone transportation service is not interchangeable with Digicel's transportation-termination service, because its transportation service would only partially meet a third-party carrier's needs.

### 4. Elements of an Antitrust Claim

Digicel also argues that UPM has not sufficiently pleaded an antitrust claim. In order to state an antitrust claim under § 2 of the Sherman Act, a plaintiff must show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Somers v. Apple, Inc*, 729 F.3d 953, 963 (9th Cir. 2013). To state a plausible claim for an attempted monopoly, a plaintiff must show: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish

the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury."

*CollegeNET, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1145 (D. Or. 2015).

### a. Monopoly Power in the Relevant Market

Digicel argues that UPM's Sherman Act claim fails because UPM has not alleged that Digicel has monopoly power the relevant market. A plaintiff must generally allege monopoly power in both the relevant product market and the relevant geographic market in which the trade was unreasonably restrained or monopolized. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Monopoly power, for the purpose of Section 2 of the Sherman Act, is "the power to control prices or exclude competition." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 ((9th Cir. 1997), *aff'd sub nom. Humana Inc. v. Forsyth*, 525 U.S. 299, (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012). A common way to establish monopoly power is by "(1) defin[ing] the relevant market, (2) show[ing] that the defendant owns a dominant share of that market, and (3) show[ing] that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* at 1476.

### i. Relevant Market

UPM alleges that the relevant geographic market is the entire United States. UPM does not, however, allege the precise scope of the relevant product market. "[W]ithout a definition of [the relevant product] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).

It is not clear from UPM's allegations whether the relevant product market that UPM alleges Digicel to have monopolized is limited to the international transportation service or includes both the transportation service and the local termination service. UPM appears to assert

a leveraging theory of monopolization, by which Digicel is using its monopoly in the first market, local telephone services in Haiti, to illegally extend its monopoly into a second market, the transportation of calls from the United States to Haiti. Such a theory of monopolization suggests that the second market—the market being unlawfully monopolized—is the market for only transportation, and not termination. In its response brief, UPM reinforced the conclusion that its alleged product market is limited to transportation services when it wrote that Digicel has monopolized "the market for getting calls to Haiti for termination there." This phrasing indicates that the market is for the service of "getting calls to Haiti" and not for the service of "termination there." In its complaint, however, UPM defines the primary relevant product market as the market for transporting all calls from the United States to all telephones in Haiti and the secondary product market as the market for transporting all calls from the United States to all Digicel subscribers in Haiti. By defining the market as including the transportation of calls from the United States "to telephones" or "to all Digicel subscribers," UPM indicates that the product market includes termination services. Thus, the first substantive flaw in UPM's antitrust claim is its failure clearly to define the scope of the relevant product market.

To the extent that UPM alleges that the relevant product market is only the transportation service, UPM has not sufficiently alleged that there is a market for that service. If a hotdog stand includes free condiments and garnishes for any customer who purchased a hotdog, and an entrepreneur set up a condiment and garnish stand across the street, the entrepreneur could not claim to be competing with the hotdog stand in the condiment and garnish market. UPM appears to be attempting something similar here. Digicel includes the cost of transportation, which for purposes of antitrust analysis it performs in-house, in the flat fee that it charges wholesalers that terminate calls on its network in Haiti. UPM does not allege that Digicel offers the switching

services performed by Digicel USA on a standalone basis—for example, to transport a third-party carrier's to Haiti for termination on a non-Digicel local Haitian network. Moreover, UPM does not allege that there are customers interested in transportation services alone, or what the cost of such a service is or should be. UPM alleges neither what Digicel nor UPM itself charges to customers just for the transportation service.[3] Based on UPM's counterclaims, and the portions of Digicel's complaint that UPM endorses, the appropriate customers for pure transportation services might be enterprises like Digicel itself, which can pay for the transportation service provided by UPM or a similar service provider, and then pass that cost along to the third-party carrier paying to terminate on Digicel's local network.[4]

---

[3] To the extent that UPM alleges that Digicel charges $0.23 per minute just for the transportation function—it is not clear from UPM's complaint what services UPM alleges the $0.23 to include—that allegation appears to be based on Digicel's allegations in its own complaint. Digicel alleges, however, that the $0.23 per minute fee is a flat fee charged to wholesalers that is considered to *include* the cost of the transportation function that Digicel provides, in addition to the fee for terminating a call on Digicel's network. Neither Digicel nor UPM allege what amount Digicel Haiti pays to Digicel USA for performing the transportation function.

[4] Seen this way, the market for pure international transportation services may resemble a two-sided market. A two-sided platform is one that acts as an intermediary that "caters to two or more distinct 'sides' of users that derive value from interacting with one another; but the firm's service will not attract one side unless there are participating users on the other." Erik Hovenkamp, *Antitrust Policy for Two-Sided Markets* (February 9, 2018), available at SSRN: https://ssrn.com/abstract=3121481. A firm that offers only the international transportation function of international telecommunications requires the participation of two sets of customers: wholesalers with a need to get their calls to a different country, and local service providers who charge the wholesalers to terminate that call in the local country. A new area of antitrust law appears to be emerging for two-sided markets. This new area, however, does not appear to be applicable here because Digicel is *not* a two-sided platform. It performs its transportation function in-house, for purposes of antitrust law. Because it offers both transportation and termination, it needs only one set of customers—the wholesalers. That UPM appears to offer a two-sided platform, while Digicel offers a single-sided platform reinforces the inference that UPM and Digicel do not compete in the same market.

### ii. Monopoly Power

Even if UPM had sufficiently defined the relevant product market, UPM has not

sufficiently alleged that Digicel has monopoly power in that market. To state a claim for a

Sherman Act § 2 violation, UPM must allege monopoly power *in the relevant product market*.

UPM alleges that "Digicel has acted to illegally extend its local service monopoly to the" market

for transporting calls from the United States to Haiti. UPM thus pleads a § 2 claim under a

"monopoly leveraging" theory, by which a company that has a monopoly in one product

market—which may be legitimately obtained—uses its monopoly power in the first market to

secure an unlawful monopoly in a second, distinct market. In order to state a claim under a

leveraging theory, a plaintiff must sufficiently allege that the defendant either has obtained

monopoly power in the second market or, in the case of an attempted monopoly claim, has a

"dangerous probability of success" in monopolizing a second market. *Verizon Commc'ns Inc. v.

Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n. 4 (2004).

UPM alleges that "Digicel Haiti has a market share of more than 75% in the provision of

local telephone service in Haiti," which is sufficient to allege monopoly power in that market.

*See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (holding that a market

share between seventy-five percent and eighty percent of sales is "more than adequate to

establish a prima facie case of power"). UPM has thus sufficiently alleged that Digicel has

monopoly power in the local telephone service market in Haiti, the legitimacy of which UPM

does not challenge. UPM makes no allegations, however, about Digicel's market power in the

United States-to-Haiti call transportation market. Digicel's market share in local network

services does not necessarily translate into an equivalent market share in international

transportation services. A mere unfair advantage combined with the use of upstream monopoly

power is not sufficient to state a claim for a monopoly or attempted monopoly of the second

market under a leveraging theory. *Trinko*, 540 U.S. at 415 n. 4 (clarifying that a leveraging theory presumes anticompetitive conduct and, at least, a dangerous probability of monopolization of the second market). Because UPM makes no allegations about Digicel's monopoly power in the market for transporting calls from the United States to Haiti, it has not sufficiently alleged monopoly power in the relevant market.

**b.  Maintenance of Monopoly Power Through Anticompetitive Conduct**

In addition to showing monopoly power in the relevant market, plaintiffs must demonstrate "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" *Trinko*, 540 U.S. at 407. To be considered anticompetitive, the act must "harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original). UPM alleges five ways in which Digicel Haiti has engaged in anticompetitive conduct to protect and extend its local service monopoly and monopoly of the transporting of calls from the United States to Haiti. First, Digicel requires that all international calls destined for a Digicel Haiti subscriber in Haiti be switched though the Digicel USA gateway. Second, Digicel charges $0.23 per minute for calls terminated on its network Haiti, regardless of whether they switched through Digicel USA. Third, Digicel prevents internet-based telephone services from terminating on its wireless network. Fourth, Digicel prevents the resale of Digicel Haiti's RLYH service. Fifth, Digicel failed to report its status as the dominant local carrier in Haiti to the FCC.

UPM's first allegation of anticompetitive behavior, that Digicel requires that all international calls terminated on its local network be switched through its own gateway might constitute an improper tying arrangement. UPM essentially alleges that Digicel will not sell its termination services unless a wholesaler also purchases its transportation services. As explained

above, however, UPM has not sufficiently alleged that there is independent consumer demand for international call transportation services as a standalone product. "[N]o tying arrangement can exist unless there is sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product.]" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) *accord Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 462 (1992). In this case, the tied product is the switching through Digicel USA's gateway, and the tying product is Digicel's local Haiti network service. Because UPM has not alleged that there is a distinct product market for international call transportation services such that transportation services can be efficiently offered separately from call termination services, Digicel's requirement that calls terminating on its network be switched through its own gateway is not anticompetitive.

UPM's second allegation of anticompetitive conduct falls short for similar reasons. Because Digicel charges $0.23 per minute to all U.S. wholesale carriers, regardless of whether they use the Digicel USA switches to transport the call to Haiti or a transport service like UPM's, UPM argues, no wholesale carrier will elect to use a different transport service because the carrier would then be charged twice for the transport function—once in Digicel's bundled price and once by the independent transport service. Thus, Digicel argues, those who use Digicel's transport service receive it "for free" while those who use alternative transport services are charged. Like UPM's first allegation of anticompetitive conduct, this billing scheme could be seen as unlawful tying or bundling. "Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Predatory bundling occurs when, "after allocating the

discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them." *Id* at 910. Thus, as with a theory of anticompetitive tying, a plaintiff must sufficiently allege that a defendant is offering two distinct goods for a single price in order to state an antitrust claim under a theory of anticompetitive bundling. UPM has not sufficiently alleged that there is a market for standalone international call transportation services for Digicel's billing scheme to be considered improper bundling. Moreover, UPM has made no allegation that Digicel sold the transportation service—the competitive product—below the cost of performing or delivering that service.

UPM's third and fourth allegations of anticompetitive conduct can be considered together. A firm's refusal to deal with a competitor is not anticompetitive unless it involves "[t]he unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggest[ing] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (emphasis in original). In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, the Supreme Court held that a defendant ski resort's refusal to sell daily ski pass tickets, even at the market retail rate, to a competitor ski resort was exclusionary where the defendant had previously engaged in a similar course of dealing with the competitor. 472 U.S. 585, 610-11 (1985). Because the defendant ski resort would presumably make a profit by selling tickets at the market rate to its competitor ski resort, the only rational reason for its refusal to deal was to drive its competitor out of business. *Id.* at 609. In *Trinko*, the Supreme Court declared that *Aspen Skiing* was "at or near the outer boundary of § 2 liability" when the conduct at issue is the refusal to cooperate with a rival. 540 U.S. at 409. "[T]here is no duty to deal under the terms and conditions preferred by [a competitor's] rivals, . . . there is only a duty not to refrain from dealing

where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (citations omitted).

Digicel's course of dealing with UPM is not presumably profitable, either with regard to the resale of the RLYH service or with regard to UPM's internet-based telephone service terminating on its network, and Digicel had no prior voluntary dealing with UPM or any other internet-based telephone service. Digicel might expect, for example, that an average individual who purchases a RLYH SIM card will make ten calls per week to Haiti, and sells it at a price that reflects that anticipated use. When in the hands of an organization with a business model like UPM's, however, the RLYH card may be used to make hundreds or even thousands of calls to Haiti per week. Such a resale scheme does not resemble the market-value dealing denied to the plaintiff in *Aspen Skiing*, which was attempting to buy a single-use product—a daily ski pass—at the price fixed by the defendant to reflect the value of that single-use product. Rather, the scheme is more akin to the would-be competitor who buys an unlimited season pass for a ski resort, and then rents that pass out to customers for daily use at less than the cost of a day pass. If the ski resort refused to honor the rented out season passes, such action would be a rational attempt to protect itself from lost profits and hardly anticompetitive.

By refusing to honor its RLYH program with UPM, and thus preventing UPM's resale of the RLYH benefits, Digicel is acting competitively by forsaking an unprofitable deal. Whether the RLYH contract explicitly forbids this form of resale is disputed, and Digicel's refusal to honor UPM's resold RLYH calls may well be in violation of its contract if there were no restrictions on resale. Not all breaches of contract are anticompetitive, however, and when a breach is efficient, meaning that a party chooses to breach to avoid economic loss, it is

particularly unlikely that the breach is anticompetitive. For similar reasons, Digicel's refusal to permit UPM or any other internet-based telephone service terminate on its network by reselling access to Digicel's network at the local rate for what is in fact an international call is a competitive business decision. By refusing to deal with UPM, or any other internet-based telephone service, Digicel is not forsaking near-term profits, but rather protecting itself from an unprofitable deal. UPM implicitly concedes as much in its response brief when it argues that, because Digicel was ultimately able to identify the SIM card being used by UPM, "there is no reason that it could not have charged higher per-minute rates for calls made using those services." Perhaps Digicel could have, but it was under no obligation to do so.[5]

Digicel raises no argument that UPM's fifth allegation of anticompetitive conduct—that Digicel Haiti concealed its status as a dominant carrier on the U.S.-Haiti route from the FCC in violation of § 214 of the Communications Act of 1934—is not anticompetitive. Rather, Digicel argues that all of UPM's claims against Digicel under the Communications Act do not apply to Digicel Haiti because Digicel Haiti is not an international common carrier. For reasons explained below, UPM has sufficiently alleged that Digicel Haiti is an international common carrier, and thus subject to the requirements of the Communications Act. Because Digicel raises no argument that this allegedly exclusionary conduct is not anticompetitive, and because UPM's § 2 claim fails on other grounds explained above, the Court declines to address whether Digicel's failure to register as an international common carrier is anticompetitive.

---

[5] UPM's allegations resemble a claim brought under the essential facilities doctrine. *See MCI Commc'ns v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983) (finding antitrust liability where the following elements exist: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility"). During oral argument, however, counsel for UPM expressly stated that UPM is not pleading its case under the essential facilities doctrine. ECF 150 at 31. The Court thus does not analyze UPM's claims of anticompetitive activity under the essential facilities doctrine.

### c. Antitrust Injury

There are four elements of antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Somers*, 729 F.3d at 963 (9th Cir. 2013). "[A] plaintiff must demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor." *CollegeNET, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d at 1147. As explained above, UPM has not alleged anticompetitive conduct. Thus, any injury that UPM alleges that is has suffered does not "flow from that which makes the conduct unlawful." Moreover, because UPM has not sufficiently defined the relevant market—and has specifically failed to identify other participants and consumers in that market—it has alleged injury only to itself, and not competition in that market.

## C. Motion to Dismiss Title 47 Claims

UPM's first counterclaim alleges several violations of the Communications Act of 1934 (the "Act"), codified at 47 U.S.C. §§ 151, *et seq.* Digicel Haiti argues that the plain text of the Act does not apply to Digicel Haiti because Digicel Haiti does not operate as an international common carrier in the United States. UPM argues that, regardless of any corporate formalities distinguishing Digicel USA from Digicel Haiti, Digicel Haiti offers international telecommunications services and should thus be treated as an international common carrier for the purposes of the Act.

### a. Statutory and Regulatory Framework for Telecommunications

The Court begins its analysis of this issue by examining the relevant statutory and regulatory framework. Under the Act, an entity is a "common carrier" or a "telecommunications carrier" when it engages in interstate or foreign communications by offering to transmit information for a fee between points designated by its customers. *See* 47 U.S.C. §§ 153(11),

(50), (51), (53) (defining, respectively, "common carrier," "telecommunications," "telecommunications carrier," and "telecommunications service"); *see also AT&T Corp. v. City of Portland*, 216 F.3d 871, 877 (9th Cir. 2000) ("A provider of telecommunications services is a 'telecommunications carrier,' which the Act treats as a common carrier to the extent that it provides telecommunications to the public, 'regardless of the facilities used.'").

To qualify as a common carrier, a provider of telecommunication services must offer its services to all customers on an equal basis. *Verizon Cal., Inc. v. F.C.C.*, 555 F.3d 270, 275 (D.C. Cir. 2009) (finding that certain entities were common carriers because, among other things, the entities certified that they would "serve[] all similarly situated customers equally"); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1004 (9th Cir. 2010) (stating that to be a "common carrier" under the FCA, a service provider must be engaged in the provision of services that are "for profit" and "available to the public or other specified users"); *Nat'l Ass'n of Regulatory Util. Comm'rs v. F.C.C.*, 525 F.2d 630, 641 (D.C. Cir. 1976) (discussing the essential requirement that a common carrier hold itself out to the clientele it is suited to serve).

Under the Act, a "foreign communication" is a "communication or transmission from or to any place in the United States to or from a foreign country." 47 U.S.C. § 153(21). FCC regulations refer to a common carrier involved in providing foreign communications as an "international common carrier." *See* 47 C.F.R. § 63.18. A "foreign carrier" is "any entity that is authorized within a foreign country to engage in the provision of international telecommunications services offered to the public in that country." 47 C.F.R. § 63.09. The Act does not apply to telecommunications providers that operate only as foreign carriers. *Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1229 (D.C. Cir. 1999) ("The Communications Act

authorizes the Commission to regulate 'foreign telecommunications.' The Commission claims no authority to directly regulate foreign carriers." (citation omitted)).

Subject to exemptions not relevant here, any entity that operates as a common carrier within the United States, including international common carriers, is required to obtain formal authorization. 47 U.S.C. § 214; 47 C.F.R. §§ 63.09-63.23. Such authorizations are known as "Section 214" authorizations. Operating as an international common carrier without a Section 214 authorization violates the Act. *See, e.g.*, *In re PTT Phone Cards, Inc.*, 29 F.C.C.R. 11531 at ¶7 (2014). An international common carrier, operating pursuant to a Section 214 authorization, may not charge "unjust or unreasonable" rates for the provision of foreign communications. 47 U.S.C. § 201(b). Nor may common carriers of any kind

> make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a). The Act applies to "all interstate and foreign communication . . . which originates and/or is received within the United States, and to all persons engaged within the United States in such communication." 47 U.S.C. § 152(a).

Any person damaged by a common carrier's acts or omissions that violate the terms of the Act may recover damages in federal court. 47 U.S.C. §§ 206-207. Under § 206, if "any common carrier shall do, or cause or permit to be done, any act, matter, or thing" prohibited by the Act, or "shall omit to do any act, matter, or thing" required by the Act, then "such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation," including attorney's fees. 47 U.S.C. § 206.

Under § 207, claims for damages against carriers for violating the Act may be brought in any federal district court with jurisdiction. 47 U.S.C. § 207.

### b. Application

Ruling on the same issue in an earlier motion to dismiss in this case, this Court held that Digicel's own allegations indicated that Digicel Haiti owned and operated the switches in New York and Miami, and was thus properly considered an international carrier. Plaintiff has since amended its complaint to distinguish between the Digicel USA entity, which Digicel Haiti agrees is an international carrier and which has a Section 214 authorization, and Digicel Haiti itself, which Digicel Haiti maintains operates only in Haiti. Digicel argues that, because Digicel USA and not Digicel Haiti performs the transmission of calls from the United States to Haiti, it is not required to hold a Section 214 license and is therefore not an international common carrier. Digicel Haiti's own allegations nevertheless indicate that it provides international "telecommunications for a fee . . . to the public." The definition of telecommunications service in the Act does not limit that definition to include only those entities that *perform the transmission* of calls, as Digicel argues. Rather, the Act defines telecommunications services as "the *offering* of telecommunications . . . *regardless of the facilities used*." 47 U.S.C. § 153(53) (emphasis added).

Digicel Haiti's own allegations continue to show that Digicel Haiti offers the service of transmitting calls from the United States to Haiti. Digicel Haiti charges third-party carriers in the United States $0.23 per minute for calls from the United States that terminate on Digicel Haiti's network in Haiti. Digicel Haiti alleges that "[t]here is no separate charge to third-party carriers for the use of the Digicel Group's telecommunications capacity between the United States and Haiti, the minimum 23 cents per minute charge for terminating calls on the Digicel Haiti network is considered to cover that transport function as well." Thus, Digicel Haiti offers what can be

described as a package of services that includes the transmission of the call data from the United States to Haiti and the termination of the call on Digicel Haiti's network. That Digicel Haiti appears to sub-contract the transmission function to its sister corporation, which it then pays through intercompany transfer, does not change the fact that Digicel Haiti offers the transmission for a fee. Indeed, to the extent that Digicel USA offers a service at all, as alleged in Digicel Haiti's complaint, it offers that service to Digicel Haiti. The inclusion of the phrase "regardless of the facilities used" in the definition of telecommunications service emphasizes that a telecommunications carrier is defined as such by the transmission service it offers, and not how or by whom the transmission is performed. Moreover, Digicel Haiti's RLYH program is specifically designed for customers in the United States to place calls to Haiti at a discounted rate. Regardless of how the transmission function is performed, in offering the RLYH program, Digicel Haiti offers the transmission of a call from the United States to Haiti for a fee and, as such, is an international telecommunications carrier. Digicel Haiti is therefore subject to the Communications Act.

## CONCLUSION

Digicel Haiti's Motion to Strike Affirmative Defenses (ECF 132) is GRANTED IN PART and DENIED IN PART. UPM's first and second affirmative defenses are stricken and the motion is denied in all other respects. Digicel Haiti's Motion to Dismiss Counterclaims (ECF 133) is GRANTED IN PART and DENIED IN PART. UPM's seventh counterclaim is dismissed and the motion is denied in all other respects. The Court grants UPM leave to file a second amended answer within 21 days of the entry of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 30th day of March, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge
