**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
ksalyer@tomasilegal.com
edubay@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

     Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>    Plaintiff,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**. d/b/a **UPM TELECOM, INC**., and **UPM MARKETING, INC**., an Oregon corporation; **UPM TELECOM, INC**., an Oregon a/b/n; **UPM MARKETING, INC**., an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; and **TYLER ALLEN**, an Oregon resident; and **DUY "BRUCE" TRAN,** an Oregon resident,<br><br>    Defendants | Case No. 3:15-CV-00185-SI<br><br><br>**DEFENDANTS' OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS** |

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

**UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC.,** and **UPM MARKETING, INC.,** an Oregon corporation; **UPM TELECOM, INC.,** an Oregon a/b/n; **UPM MARKETING, INC.,** an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO,** an Oregon resident; **BALTAZAR RUIZ,** an Oregon resident; **TYLER ALLEN,** an Oregon resident; and **DUY TRAN** a/k/a **BRUCE TRAN**, a foreign individual,

   Defendants and Counterclaim-Plaintiffs,

   v.

**UNIGESTION HOLDING, S.A.,** a foreign corporation, d/b/a **DIGICEL HAITI;** and **DIGICEL USA, INC.,** a Delaware corporation,

   Counterclaim-Defendants.

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

**TABLE OF CONTENTS**

I.    STANDARD OF REVIEW ............................................................................... 1

II.    UPM HAS PROPERLY PLED A CLAIM UNDER THE ESSENTIAL FACILITIES DOCTRINE. .......................................................................... 1

    A.    Overview ................................................................................................ 1

    B.    Digicel's Attacks on the Essential Facilities Doctrine Do Not Undermine the Sufficiency of UPM's Allegations. .................................. 4

        1.    General Objections to the Essential Facilities Doctrine Are Irrelevant. ...... 4

        2.    The Essential Facilities Doctrine Only Applies to Single-Firm Conduct ................................................................................ 5

        3.    Relevant Markets under the Essential Facilities Doctrine ......................... 6

        4.    Comity and Extraterritoriality. ................................................... 11

    C.    Digicel's Attacks on the Adequacy of UPM's Allegations Are Unfounded ........ 13

        1.    UPM Alleged That Digicel Is A Monopolist ........................................... 13

        2.    UPM Alleged That Access to Digicel's Local Network in Haiti Is Essential ............................................................................. 14

        3.    UPM Alleged That It Can't Duplicate The Essential Facility ................. 15

        4.    UPM Alleged UPM's Refusal To Provide Access to the Essential Facility .............................................................................. 16

        5.    UPM Alleged That Interconnection Was Feasible. ................................ 18

    D.    Digicel's Other Attacks on UPM's Sherman Act Claim Are Without Merit. ............................................................................................. 19

        1.    UPM Has Antitrust Standing. ................................................................ 20

        2.    UPM Alleged that Digicel Has Monopoly Power in the Relevant Market. ................................................................................. 23

        3.    UPM Alleged That Digicel Willfully Maintained its Monopoly Power in the Relevant Market Through Anticompetitive Conduct ..................... 25

        4.    UPM Alleged Antitrust Injury. ............................................................. 26

III.    CONCLUSION .......................................................................................... 28

CERTIFICATE OF SERVICE ...................................................................... 1

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

## TABLE OF AUTHORITIES

**Page(s)**

*Court Cases*

*Abdullah v. International Lease Finance Corporation,* 2015 U.S. Dist. LEXIS 38727 (C.D. Cal. 2015) ............ 18

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171 (9th Cir. 2016) ............ 3, *passim*

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985) ............ 11, 12

*Bacerra v. Enterprise Rent-A-Car Company of Los Angeles,* 528 Fed. Appx. 770 (9th Cir. 2013) ............ 18

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096 (9th Cir. 1999) ............ 1

*DeFontbrune v. Wofsy,* 838 F.3d 992 (9th Cir. 2016) ............ 19

*Forsyth v. Humana, Inc.,* 114 F.3d 1467 (9th Cir. 1997), *aff'd sub nom. Humana Inc. v. Forsyth,* 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012) ............ 2

*Ferguson v. Greater Pocatella Chamber of Commerce, Inc.,* 848 F.2d 976 (9th Cir. 1988) ............ 7

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 343 F.3d 1000 (9th Cir. 2003) ............ 21

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.,* 863 F. 3 1178 (9th Cir. 2017) ............ 1

*MCI Commc'ns Corp. v. AT&T Co.,* 708 F.2d 1081 (7th Cir. 1983), *cert. denied,* 464 U.S. 891 (1983) ............ 2, *passim*

*Rodriguez v. Steck,* 795 F.3d 1187 (9th Cir. 2015) ............ 1

*Somers v. Apple, Inc.,* 729 F.3d 953 (9th Cir. 2013) ............ 20, 26

*United States v. American Tel. & Tel.,* 524 F. Supp. 1136 (D.D.C. 1981) ............ 2, *passim*

*United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) ............ 17, 27

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko,* 540 U.S. 398 (2004) ............ 5, 11

*Administrative Decisions*

*Eastlink International (USA) Inc.; Petition to Modify Regulatory Classification from Dominant to Non-Dominant on the U.S.-Bermuda Route,* Memorandum Opinion and Order, 28 F.C.C.R. 8364 (Int'l Bur. 2012) ............ 8, 9

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

**Page(s)**

*Statutes*

15 U.S.C. § 1 — 6

15 U.S.C. § 2 — 3, *passim*

Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* — 1, *passim*

47 U.S.C. § 201 — 1, 2, 11

47 U.S.C. § 202 — 1, 2

47 U.S.C. §§ 251(a), 251(c) — 11

*Rules*

Fed. R. Civ. P. 44.1 — 18, 19

*Other Authorities*

Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities,* 75 Antitrust ABA 1 (2008) — 5, 13

Marina Lao, *Networks, Access, and "Essential Facilities": From Terminal Railroad to Microsoft,* 62 S.M.U.L. Rev. 557 (Spring 2009) — 4, 5

DEFENDANTS' OPPOSITION TO MOTION TO DISMISS
SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

***TOMASI SALYER MARTIN***
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Defendants UPM Technology, Inc. d/b/a UPM Telecom, Inc., UPM Marketing, Inc., UPM Telecom, Inc., UPM Marketing, Inc., Benjamin Sanchez a/k/a Benjamin Sanchez Murillo, Baltazar Ruiz, Tyler Allen, and Duy "Bruce" Tran (collectively "UPM"), hereby oppose Counterclaim Defendants', Unigestion Holding S.A. and Digicel-USA's Motion to Dismiss Counterclaim Plaintiff's Second Amended Counterclaims and Legal Memorandum in Support (ECF #162) ("MTD").

## I.     STANDARD OF REVIEW

Like Digicel,[1] MTD at 2 n. 1, UPM incorporates the standard of review as stated by the Court in its order on Digicel's earlier motion to dismiss.  *See* ECF #154 at 4.[2]

## II.     UPM HAS PROPERLY PLED A CLAIM UNDER THE ESSENTIAL FACILITIES DOCTRINE.

### A.  Overview

In this case, UPM alleges (broadly speaking) that Digicel engaged in two types of anticompetitive conduct.  First, Digicel de-authorized fully paid-up SIM cards that UPM was using with radio devices located in Oregon to resell Digicel's "Roam Like You're Home" ("RLYH") service. UPM alleges that this constitutes unjust, unreasonable, and/or unreasonably discriminatory conduct in violation of sections 201 and 202 of the Communications Act, 47 U.S.C. §§ 201-202.   Second Amended Answer and Counterclaims (ECF #158) ("Counterclaims") at ¶¶ 305-307, 311-313.  Second, Digicel de-authorized fully paid-up SIM cards that UPM was using with radio devices located in Haiti to connect to Digicel's wireless network there, in order to terminate calls that UPM had gotten to Haiti by means of the internet.

---

[1]     The counterclaim defendants are Unigestion Holding S.A. ("Digicel-Haiti") and Digicel-USA, Inc. ("Digicel-USA") (collectively, "Digicel").

[2]     If the Court concludes UPM's allegations are insufficient, UPM respectfully requests the opportunity to replead, which should be routinely granted.  *Rodriguez v. Steck,* 795 F.3d 1187, 1188 (9th Cir. 2015); *Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.,* 863 F.3d 1178, 1187 n. 5 (9th Cir. 2017), *quoting Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1101 (9th Cir. 1999).

Page 1 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

UPM alleges that that conduct, too, constitutes unjust, unreasonable, and/or unreasonably discriminatory conduct in violation of sections 201-202.  Counterclaims at ¶¶ 308-310, 314-316. UPM *also* alleges that that same conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2, under the essential facilities doctrine.  Counterclaims at ¶¶ 352-275.  The chart below maps Digicel's conduct onto UPM's different competition-based legal claims:[3]

|  | **Communications Act Claim?** | **Antitrust Claim?** |
|---|---|---|
| **Denial of RLYH Resale** | Yes | No |
| **Cut-off of service in Haiti** | Yes | Yes |

Digicel's present motion, and this opposition, is addressed solely to UPM's antitrust claim.

UPM has properly pled a violation of Section 2 under the essential facilities doctrine.  At the outset, Digicel notes that UPM disclaimed reliance on the essential facilities doctrine in connection with its earlier counterclaims.  *See* MTD at 2.  This is true but irrelevant; an amended pleading supersedes earlier pleadings.  *See Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir. 1997), *aff'd sub nom. Humana Inc. v. Forsyth,* 525 U.S. 299 (1999), *and overruled on other grounds by Lacey v. Maricopa Cnty.,* 693 F.3d 896 (9th Cir. 2012).  To the extent the Court is concerned about the evolution of UPM's argument, note that in UPM's earlier pleading, the antitrust claim attempted to embrace a range of Digicel conduct, including both its actions regarding RLYH resale and its service cut-off in Haiti.  The revised antitrust claim, by contrast, addresses only the latter conduct. Limiting the antitrust claim to a narrower aspect of Digicel's conduct – its refusal to interconnect in Haiti – clarified the applicability of the essential facilities doctrine.

UPM's essential facilities claim parallels those raised against the old Bell System by the United States and by MCI.  *See United States v. American Tel. & Tel.,* 524 F. Supp. 1136, 1352-57 (D.D.C. 1981) ("*US v. AT&T*"); *MCI Commc'ns Corp. v. AT&T Co.,* 708 F.2d 1081,

---

[3]    UPM has a variety of other claims against Digicel that are not directly based on the anticompetitive nature of Digicel's conduct. *See* Counterclaims at ¶¶ 317-351.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

1132-41 (7th Cir. 1983), *cert. denied,* 464 U.S. 891 (1983) ("*MCI*"). In those cases, AT&T had a legal monopoly on local telephone service, but intercity (long distance) service was potentially competitive. MCI wanted to compete in that market, but to win customers, it couldn't just offer to get calls from its own location in Chicago to its own location in St. Louis.[4] It had to be able to interconnect with AT&T's facilities in St. Louis, so that the calls it had gotten to that city could reach the person being called (that is, so that the calls could be terminated). AT&T denied interconnection in St. Louis, which kept customers from using MCI back in Chicago, which forced them to continue using AT&T for their long distance service. This violated Section 2 under the essential facilities doctrine. *Id.*

UPM's claim here is directly parallel. Just like MCI could get traffic from Chicago to St. Louis without relying on AT&T – but couldn't win any customers in Chicago without interconnection in St. Louis – so too UPM could get calls from the United States to Haiti without relying on Digicel, but couldn't win customers in the United States without interconnection. In other words, by denying access to its essential facility in Haiti, Digicel has destroyed competition in the United States market for carrying calls to Haiti. Digicel's local network in Haiti – just like AT&T's local monopoly in St. Louis – is an essential facility, denial of access to which is a Section 2 violation.

As the Ninth Circuit has observed, "[t]he essential facilities doctrine is one of the circumstances in which plain English and antitrust lingo converge." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171, 1184 (9th Cir. 2016) ("*Aerotec*"). The very simplicity of the claim can be deceiving. Unlike many subtle and complex antitrust doctrines, it's not that hard to understand: "I need [x] to compete with you. You control [x]. Your denying me access to [x] therefore destroys my ability to compete with you." The factual elements of the claim are

---

[4]     MCI's original route was between Chicago and St. Louis, *MCI,* 708 F.2d at 1094, so we use those two cities as examples for historical verisimilitude. As a matter of antitrust law, the relevant geographic market in those cases was nationwide. *MCI,* 708 F.2d at 1174; *US v. AT&T,* 524 F. Supp. at 1346 & n. 22, 1352-57.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

obviously subject to potential dispute – Do I really need [x] to compete?  Did you really deny access to it? – but factual disputes are resolved by evidence, not on the pleadings.  Similarly, there are possible defenses to an essential facilities claim – for example, that regulations required denial of access – but those, too, are to be resolved based on evidence, not at the pleading stage.

From this perspective, Digicel's attacks on UPM's essential facilities claim boil down to efforts make a set of simple and straightforward allegations unnecessarily confusing and complex.  To sort it out, we first address Digicel's broad-brush attacks on the essential facilities doctrine.  We then address its arguments that UPM has failed to adequately allege the specific elements of an essential facilities claim laid out by the Ninth Circuit in *Aerotec.*  Finally, we address Digicel's claims that UPM has failed to adequately allege other purported requirements in a Section 2 case.[5]

### B. Digicel's Attacks on the Essential Facilities Doctrine Do Not Undermine the Sufficiency of UPM's Allegations.

#### 1. General Objections to the Essential Facilities Doctrine Are Irrelevant.

Digicel introduces its attacks on UPM's essential facilities claim by attacking the doctrine itself.  MTD at 14-16.  Concerns of commentators about the essential facilities doctrine, however, cannot contradict the fact that the Ninth Circuit recognizes it as a viable Section 2 claim.  *Aerotec,* 836 F.3d at 1184-85.  More recent commentary, moreover, has clarified how the doctrine should be understood and applied.  *See, e.g.,* Marina Lao, *Networks, Access, and "Essential Facilities": From Terminal Railroad to Microsoft,* 62 S.M.U.L. Rev. 557 571-72 (Spring 2009) (relying on *MCI* and explaining that denial of access to networks is a core

---

[5]    Digicel argues that the Court should not even reach UPM's essential facilities claim because (according to Digicel) UPM lacks antitrust standing.  MTD at 14.  In fact, the elements of an essential facilities claim inherently reflect the requirements of antitrust pleading, such as antitrust standing and antitrust injury.  For example, a plaintiff asserting an essential facilities claim must allege that it is a competitor of the entity controlling the essential facility (which UPM has done here), which establishes standing.  Similarly, denial of access to an essential facility generates exactly the kind of harm that the antitrust laws are intended to prevent – a distortion or destruction of the very process of competition. An essential facilities violation thus inherently creates antitrust injury. *See* Section II.D., *infra.*

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

situation for applying the doctrine); Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities,* 75 Antitrust ABA 1, 11-21 (2008) (explaining that what distinguishes a valid from a questionable essential facilities case is whether the underlying facility constitutes a form of infrastructure, like a telephone network). The essential facility at issue here – Digicel's monopoly wireless network in Haiti – fits squarely within the network-based, infrastructure-based class of facilities that modern commentators recognize as sitting at the core of the sound application of the doctrine.

For this same reason, Digicel's recitation of the Supreme Court's *dictum* from *Trinko* casting doubt on the doctrine has no bearing here. MTD at 15, *citing Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko,* 540 U.S. 398, 414 (2004). Whatever the Supreme Court may have meant in 2004, the fact remains that in 2017, in *Aerotec,* the Ninth Circuit made clear that the doctrine remains viable in this circuit. Moreover, this is not a case where a plaintiff is trying to stretch the doctrine to cover some arguably, potentially, tangentially relevant conduct. *See* MTD at 17 n. 8 (suggesting that UPM is arguing for a "wholesale expansion of the essential facilities doctrine"). UPM is alleging that Digicel denied access to a physical telephone network facility needed for UPM to compete in an adjacent communications market – allegations that parallel the iconic essential facilities cases addressing the domestic United States long distance market, *US v. AT&T* and *MCI.* As far as the economic and public policy rationale for the essential facilities doctrine is concerned, this case arises where the doctrine is clearest, strongest, and best established.

### 2. The Essential Facilities Doctrine Only Applies to Single-Firm Conduct

Continuing its generic objections, Digicel argues that claims that a single firm has violated the essential facilities doctrine "must be considered more carefully than concerted multi-firm conduct." MTD at 17. Fair enough, but UPM is not suggesting that this Court fail to consider the issues carefully. Digicel will have a full opportunity to prove (if it can) that its decision to shut down UPM's competing service by cutting off its access to Digicel's local

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

monopoly in Haiti was just another "daily business decision." *Id.* More fundamentally, under *Aerotec* (and *US v. AT&T* and *MCI*), the essential facilities doctrine arises under Section 2, not Section 1, and therefore is necessarily limited to single-firm conduct. Digicel's argument that we have to be careful applying the doctrine in a Section 2 case, therefore, just means that we have to be careful applying the doctrine.

At this point, though, Digicel's argument goes off the rails. Picking up on its claim that the essential facilities doctrine might be mistakenly applied to condemn appropriate single-firm conduct, Digicel revives its theme that in cutting off UPM's use of fully-paid, contractually unrestricted SIM cards in Haiti, Digicel was "acting to prevent theft and fraud." MTD at 17. That argument is somewhere between pure spin and a stab at an affirmative defense. UPM was using fully-paid, unrestricted Digicel wireless service in Haiti to complete calls from the United States, and thereby to compete with Digicel. *E.g.,* Counterclaims at ¶¶ 266, 366. Characterizing UPM's use of fully-paid, unrestricted service as "theft" or "fraud" doesn't make it so, and certainly doesn't suggest that Digicel was unaware that it was affirmatively suppressing competition in the United States when it did what it did. Moreover, at this point in the case, Digicel's claims as to its motivation are nothing more than that – unsupported claims. Digicel will have a full opportunity to try to prove that its destruction of UPM's competitive business was undertaken with a pure heart. On the other hand, as discovery proceeds UPM expects to receive and review emails and other internal communications within Digicel about its efforts to crush UPM. Those contemporaneous documents, perhaps augmented by testimony on cross-examination of Digicel personnel, will reveal – to the extent relevant – what Digicel's motivation really was. *Cf. MCI, supra,* 708 F.2d at 1134-41 (discussing AT&T's claimed "good faith" defense); 1146-47 (documentary evidence of intent).

### 3. Relevant Markets under the Essential Facilities Doctrine

Digicel questions whether UPM and Digicel were "competitors in the same market." MTD at 18; MTD at 3-5. This claim – directed towards UPM's standing – is absurd. UPM has plainly alleged that it competed with Digicel for the business of wholesale carriers who

Page 6 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

had calls to get to Haiti.  *E.g.,* Counterclaims at ¶¶ 244, 247, 262-263, 269, 310, 313, 358. Digicel has monopolized that market by virtue of its denial of access to the relevant essential facility – its local network in Haiti.  *E.g.,* Counterclaims at ¶¶ 362-363.

The case Digicel cites for the proposition that an essential facilities plaintiff has to be a competitor with the defendant, *see* MTD at 18, illustrates the point.  In *Ferguson v. Greater Pocatella Chamber of Commerce, Inc.,* 848 F.2d 976 (9th Cir. 1988), the claimed essential facility was a stadium used to put on trade shows.  The owner of the stadium did not itself put on shows; it merely leased out its stadium to entities that did, such as the plaintiff.  So, the stadium owner did not compete with the plaintiff, and was not a proper essential facilities defendant.  On the other hand, the other defendant – an entity that put on trade shows in competition with the plaintiff – didn't own the stadium; it just got the exclusive right to use the stadium after a bidding process.  So, it was not a proper essential facilities defendant either.  The essential facilities claims against both the owner of the facility and its competitor were thus properly dismissed.

The situation here is entirely different.  UPM has alleged that Digicel and UPM competed directly in the market for getting calls to Haiti, and that Digicel – UPM's competitor – controlled a critical, essential facility for competing in that market, viz., the local wireless network in Haiti.  A parallel to *Ferguson* would exist if, for example, Digicel-USA had won an exclusive contract from an unaffiliated monopoly wireless carrier in Haiti for the right to deliver calls to that otherwise unaffiliated carrier.  As *Ferguson* shows, the antitrust laws do not generally frown on exclusive contracts entered into between non-affiliated customers and suppliers.[6]

---

[6]    Such an exclusive dealing arrangement, of course, would raise serious problems under the Communications Act, under which the FCC forbids such exclusivity because it permits monopolization of the market for international transport.  *See* Counterclaims at ¶ 240.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Ignoring UPM's allegations on this point, Digicel tries to convert the sow's ear of its anticompetitive actions into the silk purse of a product market argument, asserting that "UPM does not terminate international calls," whereas Digicel does.  MTD at 18.  Digicel states:

> Termination of international calling through a traditional network infrastructure is a critical aspect of Digicel's business that separates it from UPM and other internet-based call transporters, particularly where the essential facility in question is the infrastructure required to terminate the calls. Where there is no competition between UPM and Digicel in the same market, an essential facilities analysis is unwarranted and cannot stand.

MTD at 18.  This doesn't defeat UPM's essential facilities claim; it confirms its validity.  Imagine AT&T arguing that:

> Termination of [intercity] calling through a traditional [local telephone] network infrastructure is a critical aspect of [AT&T's] business that separates it from [MCI] and other [microwave-based] call transporters, particularly where the essential facility in question is the [local telephone network] infrastructure required to terminate the calls. Where there is no competition between [MCI] and [AT&T] in the same market, an essential facilities analysis is unwarranted and cannot stand.

The fact that AT&T controlled the local network and used it to complete calls, and that its competitors didn't have parallel local networks, didn't *excuse* AT&T from liability under the essential facilities doctrine. To the contrary, those facts helped *establish* its liability.  So here.

Call termination functionality is an input to the market for transporting calls between the United States and Haiti.  Whether that market is construed as merely transporting the calls, or transporting them and then arranging for termination, the two markets are linked in such a way that the same anticompetitive act – denial of access to the essential facility – destroys competition in both.  As the FCC explained:

> "In order to complete a U.S. international call, a U.S. carrier must obtain as inputs various call termination services from foreign carriers in the destination country …including … terminating access services within the local exchange of the called party. A foreign carrier with market power in these input markets could favor one U.S. international carrier [here, Digicel-USA] at the expense of its rivals [here, UPM] by denying rivals access to these crucial termination services … . The ultimate effect of such discrimination would be to affect adversely competition in the U.S. international services market and harm U.S. consumers." *Eastlink International (USA) Inc.; Petition to Modify Regulatory Classification from*

*Dominant to Non-Dominant on the U.S.-Bermuda Route,* Memorandum Opinion and Order, 28 F.C.C.R. 8364 (Int'l Bur. 2012) at ¶ 2 (emphasis added, footnote omitted).

Counterclaims at ¶ 240. Similarly, the court in *US v. AT&T* stated:

[M]eaningful competition in the provision of intercity services is precluded unless the non-Bell carriers are able to obtain interconnection with the Bell local distribution facilities under non-discriminatory terms and conditions. Long distance and other intercity lines are essentially useless unless they can be connected to the local switches from which both business and residential customers may be reached.

*US v. AT&T, supra,* 524 F. Supp. at 1352.

Because an essential facility is, inherently, an input into the production of some other service – that other service is what the essential facility is essential *for* – there is an inherent duality in considering the markets affected by denial of access. Consider MCI and AT&T. MCI was trying to compete in the long distance market, not the local telephone service market. But nobody would buy from MCI if it could only get calls from an MCI location in Chicago to an MCI location in St. Louis. Customers would only buy from MCI if MCI would pick up calls from customer locations in Chicago and get them all the way to customer locations in St. Louis. From this (customer) perspective, the market was end-to-end calling (including call termination services), and AT&T's denial of access to the essential facility prevented MCI from being *physically* able to offer the service.

At the same time, MCI wasn't trying to directly compete, on a one-for-one facilities basis, in the end-to-end service market. That is, it wasn't trying to compete by building *both* intercity long distance facilities between Chicago and St. Louis, *and* local phone networks in Chicago and in St. Louis. It was trying to compete in the intercity long distance market by building facilities connecting cities to each other. From this perspective, AT&T's denial of access to its local telephone networks didn't physically prevent MCI from building its intercity network and selling transport services on that network. Instead, AT&T's refusal to interconnect meant that MCI wouldn't be able to get any customers for the business it, itself, was in (intercity

Page 9 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

transport). That is, AT&T's denial of access to the essential facility prevented MCI from being *economically or commercially* able to offer the service.

In situations of this sort, there is no practical or doctrinal difference in how the market is formally characterized. One could say that MCI was trying to compete with AT&T in the market for delivering customer traffic from the customer's premises in Chicago to the customer's premises in St. Louis; from that perspective, the essential facility (AT&T's local networks) was a necessary input to the product being sold, and denial of access kept MCI out of the market. Or one could say that MCI was trying to compete with AT&T in the market for carrying traffic between Chicago and St. Louis; from that perspective, MCI could physically build, and theoretically provide, its transport service. But denial of access made it impossible for MCI to win any customers. So, in *US v. AT&T* and *MCI*, the courts and the parties characterized the market as involving "intercity" communications. *See, e.g., MCI, supra,* 708 F.2d at 1093, 1147-48; *US v. AT&T, supra,* 524 F. Supp. at 1341-46, 1352-57. This would suggest a focus on the transport function alone. But the discussion of the merits focused on MCI's inability to complete calls or sell service without access to the essential facility, which would suggest a focus on the market for the finished product. *See, e.g., US v. AT&T, supra,* 524 F. Supp. at 1352 (quoted above). In any event, the distinction is irrelevant to antitrust and economic analysis in the context of an essential facilities claim. From this perspective, Digicel's argument that UPM doesn't compete in the call termination market in Haiti is simply sleight-of-hand.

From another perspective, Digicel's argument is just a disguised factual dispute, not suitable for resolution on the pleadings. Digicel's argument assumes that UPM *could* compete in the call termination market in Haiti, and that its failure to do so means it has chosen to operate in a different market than Digicel. But to say that UPM could compete in that market is really just denying that Digicel's local wireless network in Haiti is "essential" in the first place. Digicel is free to try to prove that at trial, but – to the extent that its claim is plausible at all – it is a factual assertion that does not defeat the adequacy of UPM's pleading. On the other hand, if (as UPM alleges) access to Digicel's network in Haiti *is* essential, then UPM can't, as a

practical matter, compete, and Digicel's assertion is wrong. Again, this is a matter for resolution based on evidence, not based on the pleadings.

Finally, and taking Digicel's claim more broadly, it seems to argue – whether as a matter of standing, or market definition, or general unease with the essential facilities doctrine – that only plaintiffs who already compete across the full range of functions at issue – including the claimed essential facility – can bring essential facilities claims. But this would read the doctrine out of the law, because if a plaintiff can compete on a full, end-to-end basis, then whatever facilities the defendant may have likely aren't "essential." This entire Digicel argument, therefore, must be rejected.[7]

### 4. Comity and Extraterritoriality.

Digicel notes that UPM's essential facilities claim raises concerns about international comity, while acknowledging and accepting that issues of comity are appropriately considered at "another stage of the litigation." MTD at 22. UPM agrees – both that comity will play a role in adjudicating its Section 2 claims, and that this is not the time for delving into those issues in any great detail. The key point regarding comity is that Digicel's anticompetitive actions foreclosed competition in the United States, harming United States consumers. As a result, the United States has an interest in this conduct. This is so even though the key anticompetitive action – cutting off UPM's access to Digicel's wireless network – occurred in

---

[7]    In order to facilitate network-to-network competition under Digicel's approach, networks would need to be obliged to interconnect with each other so that their customers can call each other. It is unclear when antitrust principles require competing end-to-end networks to interconnect. Under United States law, that obligation is now handled by the Communications Act. *See* 47 U.S.C. §§ 251(a)(1) & 251(c)(1) (requiring interconnection); 47 U.S.C. § 201(a) (permitting the FCC to require carriers to establish "through routes," a form of interconnection). The holding of *Trinko, supra* (as opposed to its *dictum*) is that these statutory requirements, and associated regulatory obligations, eliminate antitrust claims seeking interconnection and related network access from carriers subject to those requirements and obligations. Because Digicel is not subject to these obligations – certainly not with regard to its operations in Haiti – *Trinko* does not apply, and application of the antitrust laws – including the essential facilities doctrine – is undiminished.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

Haiti.   Without unduly anticipating comity issues, therefore, UPM notes that at least the following points will need to be considered:

        1.    *Scope of Haitian Regulation.*  Digicel evidently believes that UPM's use of the internet to get calls to Haiti, and then the purchase and use of Digicel's retail wireless service in Haiti to terminate calls, somehow ran afoul of Haitian regulatory requirements, with the result that, even if Digicel otherwise violated Section 2 by denying UPM access to its Haitian wireless network, it should not be held liable.  *See* MTD at 22.  To prove this claim, Digicel will need to show what the Haitian regulations covered (they may not have reached UPM's serving arrangement at all), as well as what they permitted and/or required.[8]  From a comity perspective, there is a substantial difference between Haitian regulations that require Digicel to cut off UPM's services and regulations that might permit, but do not require it.  In the latter case, Digicel could have complied with both legal regimes by taking action other than cutting off UPM.

        2.    *Scope of United States Interests*.  The fact that there might be a conflict between Haitian and United States legal, policy, and regulatory objectives doesn't mean that Digicel can do whatever the Haitian government wants it to do, free from any consequences when those actions have direct, negative effects on United States consumers.  The court will need to consider the strong United States interest in promoting competition in telecommunications markets to benefit American consumers.

---

[8]    *See* Section II.C.5, *infra* (discussing handling of foreign law).  Digicel has submitted some purported translations of foreign law, and claims that "the Government of Haiti" has "set" $0.23 per minute as "a minimum rate" for the termination of "incoming international cellular telephone calls into Haiti."  SAC at ¶ 38.  Digicel, however, has not submitted any Haitian materials purporting to establish that rate, and UPM has denied that allegation.  *See* Counterclaims at ¶ 38.  Digicel now asserts that the $0.23 rate originated with CONATEL, the Haitian telecommunications regulator, MTD at 11, but it still cites nothing to back up that assertion.  Obviously if Digicel's allegation proves false, its entire affirmative case – not just its defense against UPM – crumbles. In a peculiar passage, Digicel objects to UPM calling the $0.23 a "termination fee," saying that it is a "rate for an international call terminated in Haiti."  MTD at 11.  As the case proceeds, perhaps Digicel will explain the difference between those two terms.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

3.    *Nature of remedy.* Even if there is a substantial Haitian interest in encouraging conduct that harms United States consumers, that doesn't mean that Digicel should be totally relieved of liability under United States law for its actions; it just means that the Court should take the interests of Haiti into account in deciding what to do about it, *i.e.,* in fashioning a remedy. Digicel is particularly concerned about the prospect of the enforceability of an order from this court mandating that UPM have access to Digicel's network in Haiti. *See* MTD at 23-24. But other than a general request for "such other and further relief as justice may require" (which encompasses the possibility of an injunction) UPM has only sought damages. *See* Counterclaims, Prayer for Relief at ¶¶ 8, 11. As a general matter, damages claims in essential facilities cases do not raise the concerns that can arise with a remedy of mandated access. *See* Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities,* 75 Antitrust ABA 1, 43 (Spring 2008) ("*MCI* and *Aspen* were also routine damages cases, albeit treble damage ones because of the antitrust claims involved"). This same logic applies to Digicel's comity-based concerns. If UPM prevails on its essential facilities claim, the parties and the Court can address whether – in addition to a damages remedy – some carefully crafted injunctive relief might also be appropriate.

### C.    Digicel's Attacks on the Adequacy of UPM's Allegations Are Unfounded

Digicel raises several attacks on UPM's specific allegations under the essential facilities doctrine. None of these attacks has merit, and none suggests that UPM has failed to allege a valid essential facilities claim.

### 1.    UPM Alleged That Digicel Is A Monopolist

Digicel claims that UPM "failed to allege that Digicel is a monopolist in the relevant market." MTD at 18-19. This is absurd. UPM has alleged that Digicel is a monopolist in the local telephone market in Haiti. Counterclaims at ¶¶ 248, 250, 360, 370. UPM has also alleged that Digicel is a monopolist with respect to the international transport of calls from the United States to Haiti. *E.g.,* Counterclaims at ¶ 247 ("Digicel requires that inbound international calls from the United States be routed via Digicel-USA"); ¶ 360 (Digicel states that the only

legitimate way to get traffic to Haiti is via Digicel-USA); Second Amended Complaint (ECF #104) ("SAC") at ¶ 22 (same). Indeed, ***Digicel*** has alleged that Digicel is a monopolist in that market – there is no other coherent way to understand its repeated claims that all "authorized" and "legitimate" traffic between the United States and its network in Haiti is routed via Digicel-USA's facilities in New York and Miami. SAC at ¶¶ 22, 40; Counterclaims at ¶ 360.

### 2. UPM Alleged That Access to Digicel's Local Network in Haiti Is Essential

Digicel claims that UPM has failed to allege that Digicel's local network in Haiti is essential. MTD at 18-20. UPM alleged exactly that. *E.g.,* Counterclaims at ¶ 240 (U.S. carriers "must obtain" call termination services); ¶¶ 359-60, 363-364, 366. UPM alleged that Digicel controls essentially all telephone service in Haiti. *E.g.,* Counterclaims at ¶¶ 248, 250, 360, 370. UPM also explained why access to that network is an essential input to competing in the United States for international calls from the United States to Haiti. *E.g.,* Counterclaims at ¶¶ 240, 359-60, 363-364, 366. UPM's allegations on this point are clearly sufficient.

Digicel's argument seems to be based on some factual claims that it is free to try to prove at trial, but which do not go to the adequacy of UPM's allegations. For example, Digicel claims that "the termination services that UPM [claims to be] essential, are also otherwise available and can be replicated." MTD at 19-20. UPM denies that assertion. It is, in any event, clearly factual in nature, and therefore cannot form the basis for rejecting UPM's claims at the pleading stage.

With regard to Digicel's specific claim that there are other cellular networks in Haiti to which UPM could connect, and without delving too much into factual disputes, UPM asserts that this Digicel claim is also false. The fact is that UPM tried to interconnect indirectly with Digicel (that is, by connecting to another entity and letting that entity send calls to Digicel, to reach Digicel's customers). Digicel, however – perhaps using the same call-pattern-monitoring software it used when UPM directly connected with Digicel SIM cards (*see* SAC at ¶¶ 75-76; Counterclaims at ¶¶ 268-69) – identified the telephone numbers that were making the

calls, and blocked those calls as well. Again, to the extent that Digicel wants to assert (as an affirmative defense) that other means of access were reasonably available, it is free to make and try to prove that assertion, but the fact that it might do so does not make UPM's allegations insufficient.[9]

### 3.   UPM Alleged That It Can't Duplicate The Essential Facility

Digicel also assets that the (purported) fact that UPM could connect to other wireless carriers in Haiti counts as a form of "duplicating" Digicel's own wireless network. MTD at 20. This misses the point. Digicel's exclusionary conduct was preventing calls that UPM got to Haiti from connecting to, and terminating on, Digicel's own network. To "duplicate" that facility for purposes of the essential facilities doctrine means UPM building its own network to reach all of the same customers that Digicel serves. Connecting to another network – which, as just explained, didn't work in any event – is not duplicating Digicel's essential facility.

Digicel also claims that UPM could literally build its own cellular network in Haiti, suggesting that UPM's initial damages claim suggests that such a course would be economically viable. MTD at 21. This, too, is a factual claim, which is contrary to UPM's allegations: "UPM, Digicel's competitor, is unable reasonably or practically to duplicate that facility. Duplicating Digicel's network in Haiti would take many years and dozens if not

---

[9]   Digicel darkly suggests that there is "a distinct possibility that UPM already has bypass operations" using SIM cards on other carriers' networks. MTD at page 20 n. 10. This innuendo, however, is directly contrary to UPM's affirmative allegations. In Counterclaims ¶ 260 (emphasis added), UPM alleges: "Due to Digicel-Haiti's successful efforts to foreclose UPM from providing services on the United States-Haiti route, as described below, UPM ceased offering or providing its services *on that route* after November 2014." *See also* Counterclaims ¶ 234 (explaining "route" terminology); ¶ 261 (UPM would have continued to offer service to Haiti but for Digicel's actions); ¶ 269 (Digicel's actions "had the direct and intended effect of preventing UPM from completing calls on the United States-Haiti route in competition with Digicel-Haiti and with Digicel-Haiti's affiliate, Digicel-USA"). Digicel's innuendo thus amounts to a factual dispute – it is, essentially, saying that UPM is lying when it says it exited the market in November 2014 after being driven out by Digicel's anticompetitive conduct. Digicel is entitled to challenge UPM's factual assertions, but that hardly provides a basis for dismissing UPM's essential facilities claim.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

hundreds of millions of dollars, even if spectrum licenses were available." Counterclaims at ¶ 364.  Digicel is free to try to show that UPM could have obtained the required financing, spectrum licenses, etc., to build its own wireless network in Haiti, but UPM has alleged that doing so was not feasible.

On that point, Digicel's argument based on UPM's damages claim is incoherent. UPM's damages claim reflects its preliminary estimate of how much it *would have* made had Digicel *not excluded it* from the market.  UPM obviously does not and did not have access to those funds – either directly, or as a basis for obtaining third-party financing – and so could not have duplicated Digicel's facility (even assuming that the dollar amounts it would have earned would have permitted it to do so).  Digicel is essentially saying that if Digicel had not acted anticompetitively, UPM would have been able to finance itself as a direct competitor in Haiti. But Digicel *did* act anticompetitively, so UPM was, obviously, not in a position to get financing to build a replacement wireless network (again, even if regulatory approvals and spectrum assets were readily available).  The plain meaning of UPM's allegation on this point – and an eminently plausible one – is that there was no practical way for UPM to duplicate Digicel's wireless network.  To the extent that Digicel seriously wants to claim that UPM could have done so, it is free to present evidence on that point as the case proceeds.  But that (somewhat outlandish) claim does not suggest that UPM's allegations are insufficient.

### 4. UPM Alleged UPM's Refusal To Provide Access to the Essential Facility

Digicel also argues that UPM cannot bring an essential facilities claim because it did not "approach[] Digicel Haiti to initiate a legitimate business arrangement."  MTD at 21.  But this assumes that Digicel's version of the facts and the law are what will prevail.  UPM's view is that its use of fully-paid Digicel SIM cards to initiate calls on Digicel's network at full retail

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

rates *was* (and remains) an entirely "legitimate business arrangement."[10] Moreover, Digicel does not contest that when UPM tried to interconnect, Digicel cut UPM off. *See* Counterclaims at ¶¶ 269, 358. 364(c). To the contrary, it admits that it did so, but claims that this conduct was justifiable. MTD at 10 (admitting that it deactivated UPM SIM cards); *see* SAC at ¶¶ 75-80 (discussing efforts to identify UPM's SIM cards). Combined with Digicel's repeated assertions that "all" legitimate traffic between the United States and its network in Haiti is carried by Digicel-USA via Miami and New York, SAC at ¶¶ 22, Digicel's antitrust violation is practically hiding in plain sight. From this perspective, the question isn't whether Digicel violated the antitrust laws. It clearly did, at least on a *prima facie* basis. The question is the strength of whatever pro-competitive defense or justification Digicel might raise to justify its facially and obviously anticompetitive conduct. *See United States v. Microsoft Corp.,* 253 F.3d 34, 59 (D.C. Cir. 2001) (Section 2 defendant may offer pro-competitive justifications for its exclusionary conduct).

Moreover, Digicel has been utterly consistent in its assertion that the only "legitimate" way to get calls from the United States to its customers in Haiti is to direct those calls, in the United States, to Digicel's own facilities in Miami and New York. *See, e.g.,* SAC at ¶¶ 22, 40; Counterclaims at ¶ 360; MTD at 11. Digicel's argument that UPM could have "legitimately" connected with Digicel, then, amounts to claiming that UPM could have delivered Haiti-bound calls to Digicel in the United States. In other words, according to Digicel, UPM was not harmed because Digicel was willing to continue its monopolization of the United States-Haiti route. This is like AT&T saying that competition in the long distance market wasn't damaged

---

[10] For this reason, UPM's use of the SIM cards – until Digicel cut them off – constituted a "course of consensual dealing." *See* MTD at 21. UPM notes that the "course of dealing" concept arose in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 603-04 (1985). In that case, while the court of appeals relied in part on the essential facilities doctrine, *see* 472 U.S. at 599, the Supreme Court did not. It is therefore far from clear that prior dealings are relevant to an essential facilities claim. In this regard, in *Aerotec,* the Ninth Circuit addressed the issue of prior dealings (and *Aspen Skiing*) in its discussion of
(note continued)…

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

when AT&T refused to interconnect, because MCI could have handed its calls off to AT&T in Chicago, and paid AT&T to get them to St. Louis.

### 5.    UPM Alleged That Interconnection Was Feasible.

Finally, in an effort to rebut the claim that it was feasible to provide access to UPM, Digicel claims that UPM's activities were illegal in Haiti.  MTD at 22.  Taking this as a purely legal claim, Digicel has not shown it to be accurate, and UPM denies that using Digicel's wireless service as it did was illegal in Haiti.  In this regard, the content of foreign law may (and often should) be established by testimony or other "evidence," even though it is ultimately a legal question.  Among other reasons, this is why foreign law must be pled with specificity under Rule 44.1 by the party that seeks to rely on it.  See *Bacerra v. Enterprise Rent-A-Car Company of Los Angeles,* 528 Fed. Appx. 770 (9th Cir. 2013) (dismissing complaint for failure to adequately plead foreign law); *Abdullah v. International Lease Finance Corporation,* 2015 U.S. Dist. LEXIS 38727, [*83]-[*92] (C.D. Cal. 2015) (dismissing claim under Cormoran law as insufficiently pled under Fed. R. Civ. P. 44.1).  If Digicel can prove that Haitian law not merely permitted, but compelled it to cut off UPM's service, that would be relevant to the proper analysis of UPM's claims.  But at this stage of the case, Digicel has not made that showing, which is in the nature of a quasi-factual ***defense*** against UPM's essential facilities claim.  Dismissing UPM's claims based on Digicel's bare assertions is entirely unwarranted.

To support this argument, Digicel refers to a filing it made back in 2016 containing what purports to be a translation of certain Haitian legal documents.  MTD at 22, *citing* ECF #59.  UPM, however, has not yet had an opportunity on the record to challenge the accuracy of Digicel's translation or the completeness of its selection of law to translate; or to present information regarding how the law has been interpreted by Haitian authorities or how it

…(note continued)

"refusal to deal," 836 F.3d at 1183-84, but not in its discussion of essential facilities.  836 F.3d at 1184-85.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

should or might apply to any activity in which UPM engaged.  While the Court has wide discretion under Fed. R. Civ. P. 44.1 as to how it will determine the content of foreign law, *see, e.g., DeFontbrune v. Wofsy,* 838 F.3d 992 (9ᵗʰ Cir. 2016), it would clearly be inappropriate for the Court to dismiss UPM's essential facilities claim in reliance on Digicel's as-yet-unchallenged, as-yet-unexamined assertions regarding Haitian law.[11]  In this regard, in antitrust cases involving an interplay between profit-oriented business motivations and regulatory authorizations or obligations, testimony regarding the nature, scope, operation and effect of applicable regulatory scheme is typically appropriate and necessary.  *See, e.g., MCI, supra*, 708 F.2d at 1134-41 (discussing AT&T's claimed "good faith" defense).  When the regulatory regime at issue is one administered by a foreign nation, testimony and cross-examination is all the more important in order to properly assess the impact of the foreign regulatory regime on the proper antitrust analysis of the defendant's conduct.

### D.  Digicel's Other Attacks on UPM's Sherman Act Claim Are Without Merit.

As part of its denigration of the essential facilities doctrine, Digicel's brief puts the cart before the horse, initially ignoring that doctrine entirely and addressing generic antitrust pleading requirements.  *See* MTD at 3-13.  This framing of the issues permits Digicel to ignore the deceptive simplicity – and the analytical power – of an essential facilities claim.  In fact, an essential facilities claim inherently addresses the issues of antitrust standing, monopoly power, willful acquisition and maintenance of that power, and antitrust injury.  Consider the elements of an essential facilities claim, as stated by the Ninth Circuit in *Aerotec*:

> To establish a violation of the essential facilities doctrine, [the plaintiff] must show (1) that [the defendant] is a monopolist in control of an essential facility, (2) that [the plaintiff], as [the defendant's] competitor, is unable reasonably or practically to duplicate the facility, (3) that [the defendant] has refused to provide [the plaintiff] access to the facility, and (4) that it is feasible for [the defendant] to

---

[11]    UPM notes that it made some preliminary arguments based on a review Digicel's submission of foreign law at an earlier stage of this proceeding, *see* ECF #113 at 25-26, but those arguments assumed the validity of Digicel's material.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

provide such access.

*Aerotec, supra,* 836 F.2d at 1185.  The first element directly addresses monopoly power.  The second element addresses the parties' status as competitors, and thus addresses standing.  The third and fourth elements identify the specific act – denial of access – that constitutes willful acquisition and maintenance of monopoly power.  And, because denial of access to a facility that is essential to competition inherently destroys competition, the requirement, in the first element, that the facility at issue be essential, shows that the harm caused by an essential facilities violation is indeed the type of harm the antitrust laws are intended to address, *i.e.,* it addresses antitrust injury.

Digicel's framing of the issues, therefore, profoundly misconstrues the operation of the essential facilities doctrine.  That doctrine is not a separate, additional claim that might be bolted on to the standard, separate elements of an otherwise stand-alone antitrust case.   To the contrary, the elements of the essential facilities doctrine constitute a means by which the standard elements of an antitrust case can be demonstrated.  For this reason, the responses to Digicel's artificially separate attacks on UPM's standing, and its allegations of monopoly power, maintenance of monopoly power, and antitrust injury will parallel the discussion above regarding the elements of UPM's essential facilities allegations.  UPM supplements that discussion as needed to address Digicel's specific points.

### 1.  UPM Has Antitrust Standing.

To have standing, an antitrust plaintiff must be a "participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers v. Apple, Inc.,* 729 F.3d 953, 963 (9th Cir. 2013) (internal quotations and citations omitted).  Digicel claims that UPM has failed to plead this aspect of its case.  MTD at 3-5.  UPM's allegations, however, clearly meet the standing requirement, repeatedly explaining that, and how, UPM and Digicel competed with each other.  *See, e.g.,* Counterclaims at ¶ 244 ("By virtue of its FCC authorization, UPM is in competition with other providers of international

communications services for calls from the United States to other countries, including calls to Haiti"); ¶ 247 ("Digicel-USA, like UPM, holds an international Section 214 authorization from the FCC [and] acts as Digicel-Haiti's agent with respect to offering to carry telephone calls from the United States to Haiti"); ¶¶ 262-263 (describing "spot" markets where competition for getting calls to Haiti occurs);[12] ¶ 267 (Digicel's actions "had the direct and intended effect of preventing UPM from delivering calls on the United States-Haiti route and terminating them in Haiti, in competition with Digicel-Haiti and with Digicel-Haiti's affiliate, Digicel-USA"); ¶ 269 (same); ¶ 310 ("Digicel-Haiti's actions foreclosed UPM from engaging in profitable business in the United States in competition with Digicel-Haiti and/or its affiliate Digicel-USA"); ¶ 313 (same); ¶358 ("UPM participated in the relevant markets in direct competition with Digicel, until Digicel's anticompetitive acts drove it from the market. … [UPM's] service is interchangeable with Digicel's service").

Digicel relies on the Court's earlier observation that the market for transporting calls from the United States to Haiti is not the same as the market for transporting calls from the United States to Haiti and terminating them there. MTD at 3, *quoting* ECF #154 at 17. This is a key point where Digicel's failure to consider and address how an essential facilities claim works fatally undermines its argument that UPM has not adequately alleged its claim. As discussed above, an essential facilities claim is inherently agnostic between two different characterizations of the market. *See* Section II.B.3., *supra.* First, one can view the market as the end-to-end calling service, including call termination. In that case, denial of access to the essential facility makes it impossible for the plaintiff to provide the service at all. Or, one can view the market as merely the transport function. In that case, denial of access to the essential facility makes it impossible for the plaintiff to get any customers. Either way, the defendant has violated the

---

[12]     These "spot markets" were the point at which market competition occurred between UPM and Digicel.. *See Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 343 F.3d 1000, 1005 (9th Cir. 2003) (identifying "the point of competition" between rivals to assess antitrust standing).

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

antitrust laws.

For this reason, accepting Digicel's argument on this point would mean that no essential facilities plaintiff would ever have standing. UPM believes that this aspect of the essential facilities doctrine is part of what the Court was alluding to when it noted the similarities between UPM's earlier claims and an essential facilities claim, *See* ECF #154 at 26 n. 5. As discussed above, *see* Section II.A, *supra,* UPM has pruned back the range of Digicel conduct that it is bringing within the scope of its antitrust (as opposed to its Communications Act) claims, and (obviously) is inviting the Court to consider its revised allegations and legal theory in that light.

In this regard, Digicel's argument itself shows why, in the essential facilities context, the claim that UPM and Digicel do not compete cannot be valid. Digicel states that:

> UPM's amended allegations confirm that it is not in the business of providing termination services. UPM does not allege anywhere in its Amended Counterclaim that it terminates calls. … UPM has only highlighted the fact that it and Digicel do not participate in the same market or offer interchangeable services.

MTD at 4. Now consider how that argument would have played out in *MCI* or in *US v. AT&T:*

> [MCI's] amended allegations confirm that it is not in the business of providing termination services. [MCI] does not allege anywhere in its Amended Counterclaim that it terminates calls. … [MCI] has only highlighted the fact that it and [AT&T] do not participate in the same market or offer interchangeable services.

MCI certainly was not in the business of providing termination services. But for the reasons described above, that does not mean that MCI and AT&T did not "participate in the same market." Instead, it meant that by denying interconnection, AT&T had foreclosed competition in two overlapping markets: both the pure transport market (as to which MCI could get no customers without access to AT&T's termination services) and the end-to-end service market (in which MCI could not even participate without access to AT&T's termination services).

Digicel also argues that the additional detail regarding VoIP arrangements that

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

UPM provided somehow undercuts UPM's standing. MTD at 4-5.[13] Those allegations speak for themselves, but clearly do not suggest that UPM did not compete with Digicel. The point of including them (other than to provide relevant technical background regarding how internet-based competition with Digicel actually worked) was to draw a parallel between UPM's situation with Digicel (UPM using a new and different technology than Digicel used – the internet – to provide the call transport function) and MCI's situation with AT&T (MCI using a new and different technology than AT&T – microwave transmission – to provide that function).

Whatever the specific pleading requirements that might apply in another type of case, UPM submits that in the context of an essential facilities claim, its allegations regarding its participation in the same market as Digicel – that is, its allegations that UPM and Digicel were in competition – are fully adequate to survive a motion to dismiss on the issue of antitrust standing.

### 2. UPM Alleged that Digicel Has Monopoly Power in the Relevant Market.

Digicel claims that UPM did not allege that Digicel has monopoly power in the relevant market. MTD at 6-9. In fact, as noted above, *see* Section II.C.1, *supra,* UPM clearly and repeatedly alleged that Digicel had used its monopoly on local wireless service in Haiti to obtain and (via its exclusionary conduct) maintain a monopoly on the market for delivering calls from the United States to Haiti. *See* Counterclaims at ¶¶ 248, 250, 360, 363-364, 370 (Digicel's monopoly power in Haiti); Counterclaims at ¶¶ 247, 360, 363-364; SAC at ¶ 22 (Digicel monopolizes calling on the United States-Haiti route). Digicel tries to avoid the plain import of UPM's allegations, not by contesting that it utterly dominates the market for getting calls from the United States to Haiti, but by focusing on the duality of market definition in an essential facilities case. But, as discussed above, whether one characterizes the market as pure transport,

---

[13]     Digicel may just be using these allegations as a foil for restating its argument that UPM's operations in Haiti were somehow "illegal," not "legitimate," and based on "conceal[ment]." MTD at 4. As noted above, UPM denies these allegations, which, in any event, are in the nature of defenses that Digicel might raise to UPM's antitrust claims, not attacks on the sufficiency of those claims.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

or as transport plus call termination, the allegations – and the scope of Digicel's market dominance – are the same.

In this regard, Digicel is free (if it believes the facts support it) to contest UPM's allegations and explain some other set of facts that it believes reflects reality.  One could imagine, for example, a scenario in which any number of carriers in the United States bring Haiti-bound calls to Haiti, and interconnect with Digicel there.  In that scenario, Digicel would be alleging that, whatever its market share in the local Haitian market, the (supposedly unrelated) market for transporting calls to Haiti is competitive.  While theoretically possible, however, such an allegation would fly in the face of Digicel's position that that all "authorized" and "legitimate" traffic between the United States and its network in Haiti is routed via Digicel-USA's facilities in New York and Miami.  SAC at ¶¶ 22, 40; Counterclaims at ¶ 360.  Indeed, Digicel specifically disclaims that it "would or can even accept that type of connection for an international call."  MTD at 11.  Instead, it digs in on its monopoly position, restating that "the only authorized way to transport an international call from the US to Digicel Haiti's network is through the Digicel USA switch."  *Id.*    Again, key elements of Digicel's unlawful, anticompetitive conduct are hiding in plain sight.

At bottom, Digicel fully understands that UPM has alleged that Digicel dominates the market, not just within Haiti, but also for getting calls from the United States to Haiti.  UPM suspects that Digicel is eager to have this aspect of UPM's claims dismissed precisely so that it will not be faced with the obligation to admit or deny those allegations, because an honest response will concede a key aspect of UPM's antitrust claim.

Digicel also questions UPM's allegation of a nationwide geographic market in this case.  MTD at 8-9.  UPM has alleged that wholesale entities from anywhere in the country can and do reach "spot" markets for the delivery of international calls.  Counterclaims at ¶¶262-263, 358.  The line of business affected by Digicel's anticompetitive activities is nationwide: calls can originate anywhere in the United States, and be delivered to a competitor (like UPM) anywhere in the United States.  This is shown, in fact, by Digicel's own allegations about its own

operations.  Digicel explains that "[a]ll authorized telecommunications traffic *from the United States* to the Digicel Haiti cellular network is routed through" Digicel's New York and Miami facilities.  SAC at ¶ 22 (emphasis added). *See also* SAC at ¶¶ 20-27, 37, 39.  There is not the slightest suggestion in Digicel's description of how it operates that it matters where in the United States a call originates, or where in the United States a call might be handed off to an intermediary network for onward delivery to Digicel. In its view of the market, carriers with calls bound for Haiti simply get those calls to Digicel in Miami or New York, either via a direct connection to Digicel or via an intermediary network.  SAC at ¶ 39.  This describes a national geographic market for such calls, which is exactly what UPM has alleged.

### 3. UPM Alleged That Digicel Willfully Maintained its Monopoly Power in the Relevant Market Through Anticompetitive Conduct

Digicel argues that UPM has not alleged "anticompetitive conduct" by Digicel to maintain its monopoly power. MTD at 9-12.  Here again, Digicel's argument illustrates Jonathan Swift's maxim, "there are none so blind as those who won't see."  In an essential facilities case, denial of access to the essential facility is, itself, the anticompetitive conduct that maintains monopoly power.  UPM has clearly alleged that Digicel denied access to its essential facility in Haiti.  Counterclaims at ¶¶ 267, 269, 366 (de-authorizing SIM cards); SAC at ¶¶ 22, 40 (all "authorized" traffic to Digicel in Haiti goes through its own facilities in New York or Miami). That allegation alone is sufficient to survive a motion to dismiss. *See also* Counterclaims at ¶¶ 366-370 (noting other anticompetitive actions by Digicel: charging nothing for transport between the United States and Haiti, and failing to register as a dominant carrier with the FCC).

In this regard, UPM notes again that UPM has alleged that it paid full retail prices not only for each SIM card it purchased, but also for each minute of wireless traffic it sent to Digicel's network in Haiti.  Counterclaims at ¶¶ 262, 268, 358, 364, 367.  UPM has also alleged that the cost to Digicel of terminating a minute of traffic on its wireless network in Haiti is effectively zero.  Counterclaims at ¶¶ 235, 256, 366.  There is thus no economic basis – other than suppressing competition – for Digicel to de-authorize UPM's SIM cards.  In economic

Page 25 of 27 - DEFENDANTS' OPPOSITION TO
MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS
UPM-L1\00367587.000

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

terms, Digicel's refusal to accept wildly profitable per-minute revenues on the same terms it offers per-minute services to any retail customer in Haiti is plainly anticompetitive. With due respect to the Court, this refusal to deal was without question "forsaking near-term profits." MTD at 10, *quoting* ECF #154 at 26.[14]

Finally, Digicel continues to asset that it was merely trying to block "fraud and theft," MTD at 10, as well as trying to avoid "economic loss and possible damage to the functionality of its infrastructure. *Id.* Digicel is free to allege those points in defense of UPM's claims. But those allegations are just that – factual claims by Digicel about its own motivations. UPM disputes those assertions, and obviously, Digicel's version of the facts cannot be used to support dismissing UPM's claims.

### 4. UPM Alleged Antitrust Injury.

Finally, Digicel fails to appreciate that an essential facilities claim necessarily carries within it an allegation of antitrust injury. MTD at 12-13. The Ninth Circuit has summarized the requirements for "antitrust injury" as consisting of "four elements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Somers,* 729 F.3d at 963 (internal quotations and citations omitted). In an essential facilities case, the denial of access to the essential facility is the unlawful conduct. That denial causes injury to the plaintiff by making it impossible for the plaintiff to compete at all. The injury obviously flows from that which makes the conduct unlawful; in an essential facilities case, the injury to the plaintiff "flows" directly and inevitably from the unlawful denial of access.

---

[14]    In fact, Digicel is mis-citing the Court's ruling. The Court was addressing resale of the RLYH service – no longer a part of UPM's antitrust claims – not the use of Digicel's retail wireless service in Haiti, at prevailing retail rates. *See* ECF #154 at 25-26. To the extent that the Court meant to assert, as a factual conclusion, that UPM's use of Digicel's service in Haiti (with no involvement by Digicel in getting the calls to Haiti) was not profitable to Digicel, with due respect, UPM has directly denied that state of affairs and asserted that every minute of the in-Haiti calls were profitable. UPM is entitled to the opportunity to prove those assertions at trial.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

And, finally, denial of access to an essential facility isn't competition on the merits. It doesn't involve offering consumers lower prices, or a wider array of features, or higher quality. It is exclusionary and anticompetitive. It deprives consumers of options in the market, for no legitimate economic or business reason. It obviously harms the excluded competitors, but it equally obviously harms consumers, who receive no benefits from the behavior (no lower prices, no improved quality, etc.). *See United States v. Microsoft Corp.* 253 F.3d 34, 58 (D.C. Cir. 2001). Denial of access to an essential facility, therefore, causes injury of the precise sort that the antitrust laws were intended to prevent.[15]

In a particularly brazen argument for an accused monopolist, Digicel takes UPM to task for failing to allege any other competitors in the market, suggesting, presumably, that UPM has only alleged harm to itself. MTD at 13. This is as close to a child who has murdered his parents, throwing himself on the mercy of the court as an orphan, as one is likely to encounter in an antitrust case. UPM has alleged that Digicel has effectively monopolized the market for getting calls to Haiti from the United States. The absence of a bevy of other competitors in UPM's pleading does not indicate that UPM has failed to allege that Digicel has harmed competition; it indicates that Digicel has been relentlessly effective in keeping competition from gaining a foothold. In this regard, UPM alleged that Digicel's conduct has the effect of preventing competition and thereby raising prices. *See* Counterclaims at ¶¶240-241 (referencing FCC discussion of impact of exclusionary practices); ¶ 364(b) (explaining that incumbents resisting interconnection charge supracompetitive prices); ¶369 (noting that foreign carriers try to extract high prices by denying interconnection to rivals); ¶ 373(d) referring to itself as an

---

[15]    Of course, an essential facilities defendant will try to show that its exclusion of the plaintiff was actually effectuated for some legitimate purpose (such as Digicel's claims here about protecting itself from fraud, etc.). Similarly, just as UPM has alleged (and will endeavor to prove) that Digicel's exclusionary conduct had anticompetitive effects, Digicel is entitled to allege (and endeavor to prove) that on balance its conduct actually had pro-competitive effects. *United States v. Microsoft, supra,* 253 F.3d at 59. But any such claims by Digicel are matters to address at trial; they cannot properly form a basis for dismissal of the essential facilities claim in the first place.

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236

"innovative competitor using new technology to offer useful services at lower prices than the monopolist [that] was frozen out of the market"); ¶ 374 (UPM's losses from being excluded reflect "competition that would benefit consumers by means of new service alternatives and lower prices"). Even beyond the harm to competition inherent in an essential facilities claim, there can be no question that UPM has properly alleged harm to competition, not merely harm to itself.

## III.    CONCLUSION

For the reasons stated herein, this Court should deny Digicel's Motion to Dismiss. However, if and to the extent that the Court finds UPM's allegations in any way deficient, UPM respectfully requests leave to replead to cure any such deficiencies.

Dated: July 3, 2018.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 3, 2018, I served the foregoing **DEFENDANTS'**

**OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS** on

the following individuals by electronic service to said individuals:

| | |
|---|---|
| Robert C.L. Vaughan | Richard K. Hansen |
| Cherine Smith Valbrun | Anne M. Talcott |
| Leah Storie | Schwabe, Williamson & Wyatt, PC |
| Kim Vaughan Lerner LLP | Pacwest Center |
| One Financial Plaza | 1211 SW 5th Ave., Suite 1900 |
| 100 SE Third Avenue • Suite 2001 | Portland, OR 97204 |
| Fort Lauderdale, FL 33394 | Email: rhansen@schwabe.com |
| Email: rvaughan@kvllaw.com | Email: atalcott@schwabe.com |
| Email: cvalbrun@kvllaw.com | |
| Email: lstorie@kvllaw.com | |

Dated: July 3, 2018.

TOMASI SALYER MARTIN


By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP


By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW MORRISON STREET, SUITE 1850
PORTLAND, OREGON 97204
TELEPHONE: (503) 894-9900
FACSIMILE: (971) 544-7236