IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| UNIGESTION HOLDING, SA, a foreign corporation, d/b/a DIGICEL HAITI, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 3:15-cv-00185-SI |
| vs. | ) ) | August 6, 2018 |
| UPM TECHNOLOGY, INC, d/b/a UPM TELECOM, INC, et al, | ) ) ) | Portland, Oregon |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS

(Oral Argument)

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

Court Reporter:          Ryan White, RMR, CRR, CSR/CCR
                         United States District Courthouse
                         1000 SW 3rd Avenue, Room 301
                         Portland, Oregon 97204
                         (503) 326-8184

APPEARANCES


For the Plaintiff:        KIM VAUGHAN LERNER LLP
                          By:  ROBERT C.L. VAUGHAN
                          rvaughan@kvllaw.com
                          One Financial Plaza, Suite 2001
                          Fort Lauderdale, Florida 33394
                          (954) 527-1115

                          SCHWABE, WILLIAMSON & WYATT
                          By:  RICHARD K. HANSEN
                          rhansen@schwabe.com
                          1211 SW 5th Avenue, Suite 1600
                          Portland, Oregon 97204
                          (503) 222-9981


For the Defendants:       DAVIS WRIGHT TREMAINE LLP
                          By:  CHRISTOPHER W. SAVAGE
                          chrissavage@dwt.com
                          1919 Pennsylvania Avenue NW, Suite 200
                          Washington, DC 20006
                          (202) 973-4200

                          TOMASI SALYER BAROWAY
                          By:  ELEANOR A. DUBAY
                          edubay@tomasilegal.com
                          121 SW Morrison Street, Suite 1850
                          Portland, Oregon 97204
                          (503) 894-9900

(August 6, 2018; 9:33 a.m.)


P R O C E E D I N G S


THE CLERK:  Your Honor, this is the time set for oral argument in civil case 18-185-SI, Unigestion Holding S.A. versus UPM Technology Inc., et al.

And can I have counsel in court beginning with plaintiff please identify yourself for the record.

MR. VAUGHAN:  Good morning, Your Honor.  Good to see you again.  Robert Vaughan, Kim Vaughan Lerner, appearing on behalf of Unigestion Holding, aka Digicel Haiti and Digicel USA.

THE COURT:  Good morning.  Welcome back.

MR. VAUGHAN:  Thank you.

MR. HANSEN:  Richard Hansen for the same plaintiffs.

MR. SAVAGE:  Christopher Savage with Davis Wright Tremaine for UPM and all the defendants.

MS. DuBAY:  Eleanor DuBay, Tomasi Salyer Martin for defendants.

THE COURT:  Good morning, and welcome back to you.

MS. DuBAY:  Thank you.

THE COURT:  All right.  We are here on Plaintiff Unigestion Holding's motion to dismiss plaintiff's second amended counterclaims.  I think we're right down just to the essential facilities question that we talked a little bit about

last time.

I have read all of the pleadings, but if there's anything further that either side would like to argue, Mr. Vaughan, you're welcome to proceed.

MR. VAUGHAN:  I get the feeling that the Court is asking this question when we show up with the hopes that one day, one day we will get up and say "Nothing further, Judge."  And from both Mr. Savage's responses and mine, I would put my last dollar on this.

THE COURT:  It is always a pleasure to see you all.

MR. VAUGHAN:  Ever the scholar and the gentleman. Thank you, sir.

Judge, I'm glad you started that way because I will take the Court up on focusing my comments and trying to be very brief on that essential facilities question to the extent you have a question.

I would, however, with your indulgence, like to re-contextualize our discussion, remind us as to where we are. Sometimes I try to force myself to take stock as to why are you here and how did you get here because I think it's important to the discussion.

You will remember, you've gone through the papers, that this started as a claim by Digicel Haiti -- I almost said UPM -- Digicel Haiti alleging that UPM, along with certain individual members, principals and employees, committed fraud

and theft with respect to the utilization of telecom services and the use of telecom infrastructure in Haiti.  That's where we started.

I like to analogize it, Your Honor, to cable theft.  Why?  Because I think we've had much discussion about the -- around the academic fringes of that single issue.  And I know that for most of us, it has been a very interesting academic discussion.  But sometimes -- I'll speak for myself -- we get lost with respect to the core issue and what was at stake and what was being alleged.

Imagine for a moment, Judge -- and I know we've had so many different analogies and hypotheticals and examples being used to contextualize this argument, and I'll add one more.

If we had someone who subscribed to the local cable company, Comcast, and that individual just got basic service -- and as we all now know with digital cable, even to get the basic channels, the network TV, you have to have that one basic box.  But if some enterprising individual got that basic box and went home and, through their own ingenuity and a screwdriver and a computer, they were unable to unlock that basic device and were able to secure for themselves the HBOs, the Showtime, the Starz of the world, and by paying that single basic access fee they were nonetheless able to get all the premium channels that their heart desired, there would be no question in anybody's mind in this room that they were

committing cable theft.

Imagine for a second that that individual went to their friends, their neighbors, and said, "You're paying how much?  Shame on you.  I'll solve that for you.  Just give me your basic box from some unused room in the house and I'll hook you up."  And they are able to provide to their friends, neighbors, and relatives, for some smaller fee than what the cable company was charged, expanded cable service.  There would be no doubt in anybody's mind that it would be cable theft.

Even if their argument were I am building a better mousetrap, I'm giving you premium cable for much less than the cable service is providing it, no question.

What if that individual turned around and said, "Whoa. What do you mean, cable company, I'm stealing?  I paid you for the basic box.  How dare you accuse me of theft.  I paid for the basic -- in fact, here's my statement.  I paid for the basic box months ago."  Still, no question in our mind that it would be, with respect to that premium service, theft.  Yes, you're using the box, yes, you're using the same cable line, but you're not paying for the premium service.

What if they came and they then said, "Wait a minute. You have cut off all of my friends and neighbors and family who have paid me to provide them this expanded service?  How dare you.  You are now limiting competition.  You big cable company, you're being the big, bad bully and you're shutting off the

entrepreneurial little guy who is building a better mousetrap." I think we would laugh them out of court especially if they're not only providing the service to their friends and families after -- let's just call a spade a spade -- stealing it from the cable company, but they acquired those basic boxes through God knows what means and are reselling them. There would be no question in anybody's mind in this courtroom exactly what was occurring and what the consequences would be.

I have tried hard, and I know my friend on the other side, Mr. Savage, is going to come up with some explanation that pokes a hole in my analogy. But I've really tried hard to figure out why that analogy is not on all fours with exactly what we're dealing with.

THE COURT: And I look forward to hearing that analogy being presented to the jury in closing argument, not opening statement, but in closing argument, at the jury that we will -- jury trial that we'll have in a few months, and I'm looking forward to hearing Mr. Savage's or Ms. DuBay's response in their closing argument to why that analogy is flawed. But that's not what we have before us today.

MR. VAUGHAN: And I will take the Court's direction because what I just heard you say is, but, Mr. Vaughan, it sounds like they get past pleading.

THE COURT: No, it doesn't.

MR. VAUGHAN: Okay.

THE COURT:  No, it doesn't.  You've already gotten past pleading.  We need to get you a trial date.

MR. VAUGHAN:  Absolutely.  Because at this juncture, going right back to now having contextualized our concern, where we are today with pleading and why we believe that this antitrust claim --

THE COURT:  Counterclaim.

MR. VAUGHAN:  -- counterclaim should not go forward is they have failed to meet the basic pleading requirements under section 2 of the Sherman Act, on their -- the essential facilities claim, and I'm going to focus my comments to what you asked.  I think we're here talking about essential facilities.  So let me just go directly to that.

Mr. Savage has very articulately and quite cleverly conflated an essential facilities conversation with, first, the basic requirements, the basic pleading requirements of a Sherman Act, Section 2 claim.

He has skipped over the requirement that, first, they must plead standing because UPM has failed to plead, as we discussed before and hopefully will not have to discuss again, failed to plead a relevant market in which it competes with Digicel.  UPM has failed to plead that Digicel has a monopoly in that relevant market, whatever that relevant market is determined or described to be.

And I'm going through just those elements because I

know we've had the conversation before and, surprise, surprise, I do not want to be redundant.

Finally, UPM has failed to allege that there is anticompetitive conduct, impermissible competition.  They have failed to plead that, or they -- and they have failed to plead a proper antitrust injury, injury to competition or to consumers. They have attempted to allege, and even if we're to give them the benefit of the doubt, they have attempted to allege that there is some injury to UPM.

What is that injury?  The injury is that UPM has acquired SIM cards.  They have paid for these SIM cards and paid full value for these SIM cards and they were shut off mid-service.  That's the injury alleged.

Your Honor, I thought about this long and hard, and it literally hit me at 2:30 in the morning.  No, they haven't.  UPM has absolutely no commercial relationship with any Digicel entity.  I assure you UPM cannot stand up here and tell you they have ever purchased a SIM card ever.

Let's think about it.  When this all began, I was held to task to demonstrate to this Court how it was that these SIM cards were acquired by whom, through whom, and which entity, which individual, am I claiming agency, how did they get the SIM cards.  We all got to a point of uncomfortable comfort where it was clear that they were acquired through -- all in sundry on the street.  People were asked to buy these SIM cards and they

made their way to the UPM servers in Oregon.

UPM has never purchased a SIM card ever. None of the defendants listed here has purchased a SIM card, or at least we have never been told that they have. It is not pled anywhere in this complaint that any individual or any UPM entity has ever purchased a SIM card.

What's the significance of that? Must they have privity, contractual privity in order to bring this antitrust claim? I'm not going to go so far, but what I'm going to ask is, if they have never purchased a SIM card, what standing do they have to allege injury?

THE COURT: Let me ask, if they have never purchased a SIM card, how do Digicel Haiti's SIM cards find their way into UPM's servers?

MR. VAUGHAN: Perfect question, because that is something that I can certainly try and guess at.

THE COURT: Well, I mean in terms of a reasonable inference, isn't it a reasonable inference that agents of UPM have purchased the SIM cards, provided it to UPM, and then the UPM folks put it in their servers?

MR. VAUGHAN: That is a reasonable inference.

But let's go with that reasonable inference. Assuming that they are allowed to get by with a reasonable inference, they must at least plead it. They must at least articulate with some amount of detail what that process is. Whom are these

agents?  What is the nature of that agency?  What is the flow of cash?  Who represents whom?  When were they bought?  What were the details of the purchase?

Why is that important?  Because at the end of the day the question then becomes, if what they're alleging is correct and we shut off these cards which were acquired for value, what was the nature of the underlying transaction?  When these were purchased, were they purchased for purposes of domestic use?  Were they purchased for purposes of international use?

When they come to court and they say to you that we have paid full value and we were denied the usage of the cards, full value for what?  Because without question, everybody knows it's our position that even if cards were acquired they were acquired for domestic rate usage, not international.

THE COURT:  Although, I recall asking you --

MR. VAUGHAN:  Yes, sir.

THE COURT:  -- darn near three years ago --

MR. VAUGHAN:  By my count, that's correct.

THE COURT:  -- whether or not there is some statement of conditions in the package for the UPM cards that say these UPM cards are available only for domestic use and may not be used for international calls.  And if I recall correctly, which I may not, I think you may have either said I don't know or not that I know of.

MR. VAUGHAN:  You're absolutely right.  And not only

did I say that, we also, I think, agreed that there may not have been anything in that language, the package, that arguably limited their eventual use.

But this question goes beyond that because this question is, having acquired that card, in whom does that right that is now being pursued by Mr. Savage on behalf of his clients, in whom does that right lay?  Because when Digicel allegedly shuts off those cards, is it John Pierre who purchased it, regardless of the terms of that purchase, who has been wronged?  Or is it some subsequent later acquired individuals, a later possessed individual, I should say, who now gets to walk into -- yes, sir?

THE COURT:  And there's a third possibility, too, because John Pierre could have purchased it as agent for some third person, UPM, in which case you're now back to more directly UPM.

MR. VAUGHAN:  In which case we are entitled to know that as well.  Neither you nor I should be forced to guess -- and forced to -- and I should not be forced to infer that before the Court because I may have defenses if that is the case.

THE COURT:  Well, let me ask you this because we've been in this litigation for three years.  I'm confident that both sides have taken a great deal of discovery.  We already have plaintiff's claims that are going forward against

defendant.

So what has defendant answered when plaintiff has served either an interrogatory or a 30(b)(6) deposition that asks who purchased these SIM cards that found their way into UPM's servers, what was their relationship to UPM, were they your agents, what evidence do you have of that agency relationship, how are they compensated, and things like that? So what did you learn when you asked those questions either in interrogatory or 30(b)(6) depositions to UPM?

MR. VAUGHAN:  I'm going to rely on Mr. Savage's humanity to not leave me hanging here by myself because this is the reality, Judge.  We have not done that.

THE COURT:  Because you do have until September 28th to complete discovery.

MR. VAUGHAN:  I am going to be as candid with the Court as I know how.

We have not done this discovery yet because, frankly, Judge, when you said you need to get this discovery done and, folks, I want this case to be ready to try in December, I was ecstatic.  I walked out of here and I frankly did not know which foot to put forward next because the reality is I could ask for discovery, but if I were sitting in Mr. Savage's chair, I wouldn't be proceeding with just Digicel's discovery when UPM's discovery is there to be done.

And the reality, Judge, is that the discovery in the

case, that was the case we brought, and the discovery in the case should it go forward as Mr. Savage wishes, are night and day.

THE COURT: You are correct. And I assume you've -- I assumed, walking onto the bench, that you had done discovery on the night part of -- the day part of it, and were hoping you wouldn't ever have to do discovery on the night part of it, and that may very well be the case. We'll hear from Mr. Savage in a few minutes, but --

MR. VAUGHAN: Unfortunately I stand alone. But somebody is going to get a tongue-lashing today and I may be the only one.

THE COURT: Oh, there will be no tongue-lashing. I'm just going to say discovery closes September 28th, do what you need to do.

MR. VAUGHAN: Sir, understood.

Your Honor, with respect to just closing up on that essential facilities issue, we strongly believe that under *Trinco* -- and some people -- some observers have determined that or have described *Trinco* as limiting the *Aspen* case, which we discussed, and narrowing it to scenarios where there were prior dealings. But post *Aspen*, post *Trinco*, it seems fairly obvious that with respect to essential facilities, first, if there's no denial of access, there is no essential facilities issue.

That discussion we just had about whether or not UPM

or any of these defendants actually had any kind of right to access because they never purchased SIM cards I don't believe is -- though it may sound, you know, too cute by half, I think it's a real problem.  It is a real problem that may be solved, may be solved by amended pleading, but it may not, because this inferential agency relationship needs to be fleshed out if it is going to hold water.

With respect to the continued essential facilities argument, I think that the pleadings, as they now stand, from UPM make significant other inferential leaps, other inferential leaps with respect to assuming monopoly, other inferential leaps with respect to the impermissible alleged monopolistic action.

And under *Trinco*, it's clear that a party, an alleged monopolist, that creates an infrastructure to enhance efficiency cannot be held liable under an essential facilities doctrine, and I think that's exactly what's being put forward by UPM in this pleading, which I'll say it one more time, we feel is entirely and wholly deficient.

THE COURT:  Thank you very much, Mr. Vaughan.  I appreciate that, and I'll give you an opportunity to respond.

MR. VAUGHAN:  Thank you, sir.

THE COURT:  Good morning, Mr. Savage.

MR. SAVAGE:  Good morning.

We hear you about the cutoff of discovery.

THE COURT:  And then we'll talk about a trial date.

MR. SAVAGE:  Yes.

I was fascinated by his analogy of cable theft for several reasons.  One is my firm represents all kinds of cable companies and we've done this.

But inherent in the claim of cable theft, if you stop to think about it, what underlies all of that?  What underlies all of that is a legally established indeed serving a public policy monopoly right to control the use of the content.  And in the absence of a legally established under United States law recognized monopoly right to control the content, there is no theft.

The essence of our claim here is whatever may be going on in Haiti, as a matter of United States law, they have no right to exclude us from using call termination services in Haiti to terminate these calls.  And we can get into the details, but that's where his analogy blows up because of the underlying assumption in the cable case is that there's a legitimate indeed government protected monopoly to control the access.  There is no such right here.  Never has been, never will be, as a matter of United States law.  Well, has been post -- pre, you know, *AT&T* and divestiture, there probably was.

THE COURT:  By the way, on that point, I don't know whether or not Mr. Vaughan's point and your response are appropriate for closing argument, assuming that the evidence is prevalent on this, on the basic claim, if you want to brief this

issue in a motion in limine, you're welcome to.  But I'll tell you my inclination is that it is appropriate.  And so if you conclude that it's not appropriate for closing argument, for Mr. Vaughan to make that analogy, I'd like to see some pretty good specific case law on analogy on that.

MR. SAVAGE:  Okay.

THE COURT:  But I find it intriguing, because as I was listening to Mr. Vaughan's closing argument and now your responsive closing argument, the thought crossed my mind is that an appropriate argument for the jury or not?  And I'm inclined to think that both sides should be given leeway in arguing analogies to their case, but I'll let you decide.  If you don't oppose it, then fine.

MR. SAVAGE:  I mean think about it.  But the -- my touchstone for how this plays out at trial is actually the *Microsoft* case.  Right?  The DC circuit's opinion in *Microsoft* sort of laid it out.  Right?

The plaintiff makes a prima facia case of exclusionary conduct -- you know, essential facilities in our case -- showing this happened, it had these anticompetitive effects, therefore then the burden shifts to the defendant -- in this case the counterclaim defendant -- saying, well, yes, but there are also procompetitive effects that make it worthwhile, or, anticompetitive or not, I have a justification, whether it's regulation, whether it's whatever right it is, and those are all

matters for evidence in trial, not matters for what have you.

But sure.  They are going to have a justification for their anticompetitive conduct which boils down to -- as I see it now, we may learn more -- somehow under Haitian law we had no right to do what we were doing.

And then we get into all the comity discussions of, well, maybe that's a Haitian law problem, but that doesn't necessarily authorize them, since they are also subject to US law, to take the most anticompetitive step possible.

And so yeah.  Without waiving my right to think more about it, I think what he's saying boils down to an attempt at justification of the anticompetitive content.

THE COURT:  And then to the extent that either side wants to introduce evidence at trial of Haitian law, under normal circumstances, as you know, only the judge instructs the jury on American law, but it may be appropriate to have expert testimony on Haitian law.  Interesting.

Although you mentioned the *Microsoft* case.  On essential facilities, I was looking at Judge Greene's opinion from 1981 in *US v. AT&T*.  He does say that that is an essential facility.  Basically the language that struck me from Judge Greene was that long distance and intercity lines are essentially useless unless they can be connected to the local switches from which both business and residential customers may be reached.  That's in section 4.

He then goes on to discuss essential facilities and concludes that, on some motion to dismiss, the court finds as of now sufficient evidence has been adduced to dictate the conclusion that AT&T has monopolized the intercity services market, and that's the end of his essential facilities argument.

But then I was sort of reflecting on the fact this was an injunctive action brought by the United States against AT&T, and one of the other things that Judge Greene said in his essential facilities discussion is that access to an essential facility, quote, "must be afforded upon such just and reasonable terms and regulations as will, in respect of use, character and cost of services, place every such company upon as nearly as equal plane as may be."

How are we going to do that in a private antitrust counterclaim for damages?

MR. SAVAGE:  The short answer is, as I think I tried to address in the pleading, two things.  One is I don't think we have to; but then the other is sufficient unto the day the evil thereof.

THE COURT:  I didn't get the last part of the sentence.

MR. SAVAGE:  Sufficient unto the day the evil thereof, which is to say what we have sought, like the *MCI* case -- now, yes, the legal document's the same.  But in the *MCI* case, MCI was not seeking an injunction, MCI was seeking money, and got a

lot of it, in fact.

THE COURT: Right.

MR. SAVAGE: And I aspire to that in this case.

But I take the point -- and I mean the reason it's intellectually interesting, right, and we have interplay here of the communications act that was devised in 1996, *Trinco*, regulations, so on and so on.

If this occurred -- if what Digicel did in Haiti -- you know, if Haiti wasn't Haiti, it was the city of Haiti within the state of X, it never would have happened. Right? If the 19- -- or never since 1996.

If the 1996 act applied, we would have an absolute right to interconnect with their network at any technically feasible location at cost-based rates.

THE COURT: And that is a right conferred to you by statute --

MR. SAVAGE: Correct.

THE COURT: -- with the rates being monitored by an appropriate independent agency.

MR. SAVAGE: All correct. And that's why -- the holding, as compared to sort of the negative dictum of *Trinco*, the holding is when you have that kind of US law obligation in place, antitrust claims don't lie.

Here, I think obviously, the 1996 act, the communications act, does not directly impose any obligations on

Digicel Haiti about what it does with regard to interconnection in Haiti.

And so the thing that made the -- I mean, you know, honestly, the antitrust claim in *Trinco* had problems beyond the fact that there was a regular agency. But clearly if there had been no '96 act, the court would have had to go forward and say, okay, is this an antitrust violation, why would it be, why wouldn't it be, rather than simply saying we don't have to deal with it.

In this case, we do have to deal with it because what we have is a direct negative effect in the United States on consumers, on competition, by exclusionary conduct that would be illegal if the '96 act applied. But we're back to basics, by which I mean *AT&T* and *MCI*, because the '96 act does not apply.

Now, if you have another question I'll --

THE COURT: Well, I mean it's not a question in response to that. I mean at some point I know you are going to talk about standing as well and what the relevant market is.

But just staying on essential facility, I'm now looking at the Ninth Circuit opinion in *Aerotec*, Judge McKeown's most recent opinion. And although she does say that essential facility doctrine, you know, I believe is still on some last breaths, it hasn't been fully killed, she rejects it in that case, as she puts it on page 1185, for the obvious reason that a facility is only essential where it is otherwise unavailable.

And I think that Mr. Vaughan did a pretty persuasive job in his briefing of showing that you can have other ways of connecting to or terminating a call with folks in Haiti. What's wrong with that? Therefore it's not essential.

MR. SAVAGE: Well, there's several things wrong.

One is it's not true. But to a higher -- but more broadly, we say it's not true, it's a factual assertion. He is asserting as a fact that these other arrangements are available. We don't -- I would love to see that in response to our claim and then we would deny it and we will fight about it.

THE COURT: Well, in which paragraph in the second amended complaint do you allege that they are not available?

MR. SAVAGE: What we have -- I'm not sure that we specifically said they're not available.

THE COURT: I don't think you did either, and I looked for that.

MR. SAVAGE: But -- because it didn't occur to us that they would say -- now, the fact of the matter is, as we say -- and I'm happy to -- you know, if this is what it hangs on, I will represent to you and will happily, you know, speaking -- on a speaking basis amend the pleading.

The fact of the matter is UPM tried that. Okay? They said, well, if the problem is that Digicel itself, which controls the vast array of the market in Haiti -- we have to be able to get to Digicel either directly or indirectly to have our

business work.  Why don't we try to get there indirectly?  Well, whatever magic software they used to identify calling patterns to say this isn't a retail service, this is something we don't -- something we don't like and cut it off, they did that to us as well when we connected through someone else.

Now, the interesting thing to me is on the one hand they're saying -- well, put that aside.

That's simply true.  It didn't -- it didn't seem to me that an element -- what we said in our brief -- in our pleading was we are unable to duplicate the facility to which we need access and they have denied us access to it.

Now, what we said is they denied us access to it by cutting off the SIM card, the Digicel SIM cards that we were using, but we said generally they denied us access to it.  And that is what they did.  They did it when we were using Digicel SIM cards.  They also did it when we were trying to get at it independently, which is why -- we've got a footnote about the why -- we just -- we gave up, we left.  The notion, the implication that somehow we're still doing this somehow is just wrong.  But again, that's a factual matter.

But that's the answer to your question.

A fair reading of our complaint is they wouldn't give us access to their network.  And they say, well, but you didn't specifically allege that you couldn't get access by indirectly connecting to our network.

The first thing I would say is we don't actually have to allege that under the essential facilities doctrine, and I'm going to get to that in a minute.

But the second thing I would say is any fair reading of we were denied access to their network includes we were denied access through any reasonable means because we were.

THE COURT:  But where is it that -- where is it alleged that access to their network is essential to terminating a call with someone in Haiti including someone who may be using a different cellular network?

MR. SAVAGE:  Let's take this a step at a time.

We have alleged that they control the overwhelming majority of phone calls in Haiti, of residents, of customers in Haiti.  The only way that those customers can be reached is by getting access to their network.

THE COURT:  So for those customers.

MR. SAVAGE:  Correct.

THE COURT:  Even if there were some 10 percent or so of other customers, you're still saying that --

MR. SAVAGE:  Right.

THE COURT:  -- they control a monopoly share in Haiti and the only why you can reach those customers is through their network.

MR. SAVAGE:  Correct.  And what that monopoly share is, it depends on the source.  I mean again, more discovery

needs to happen.

Their SEC filings, the most recent one I've seen, say they have 70 percent of the market. You know, I've seen other things. It could be as high as 80 or 90 percent.

But with that foreclosed, even if we could get to the stragglers and dogs and cats who have the 10 or 15 percent left, you know, that doesn't matter. And so for that reason, I don't think we have any problem with the allegation of foreclosure of access to the market.

Now, for antitrust purposes, the -- you know, sort of the *Brown Shoe* submarket kind of thing, the 70 to 90 percent of the market that they control is certainly a reasonable submarket within the entire market.

THE COURT: I think you're right. I think you're right.

MR. SAVAGE: So I don't think -- I don't think that -- I understand the point. And all this is, you know, to what level of excruciating detail do we need to anticipate the things they might say in defense of the essential facilities claim because, again, that argument isn't a defense. Their argument is you say you didn't get access but you really did get access or you really could.

If they think they can prove that, let them try. You know, I am sitting here supremely confident that that's -- you know, when you look at the facts, when the jury looks at the

facts, there's not going to be much debate about that.

But for purposes now, it's just a pleading issue.

THE COURT:  Okay.  So talk to me about standing, please.

MR. SAVAGE:  Okay.  So I tried to address this in my brief, and I think it's actually true, which is that when courts look at the essential facilities doctrine, it is a self-contained little thing that by alleging and ultimately proving the elements of an essential facilities claim you actually tick off all the boxes that a generic monopolization claim would do.

For example, if you look at either *Aerotec* or the *MetroNet* case that -- you know, in both those the court says, okay, let's look at essential facilities.  And, you know, they don't make it as a factual matter.  They say, okay, since they don't make essential facilities, now let's look at the monopolization claim.

And so standing -- antitrust standing means I'm a participant in the market and I've been foreclosed.  That's what the essential facilities claim is, you are a participant in this market.

THE COURT:  Right.  But what's the market here from which your client has been foreclosed?

MR. SAVAGE:  Well, there's sort of a Schrodinger's cat aspect to it.

THE COURT: A what?

MR. SAVAGE: A Schrodinger's cat aspect to it. Right?

THE COURT: Okay.

MR. SAVAGE: You can pick.

THE COURT: No. I want you to pick.

MR. SAVAGE: Well, probably the right way to frame it is the market at issue is the market for transporting calls between the United States and Haiti. But it is impossible to participate in that market without access at the far end to the essential facility of call termination.

Just as MCI was in the business of getting calls from Chicago to St. Louis, but, you know, they didn't want to build a local network in St. Louis, but they couldn't sell anything in that first market without access to the termination in the second.

THE COURT: Right. And so by the market of transporting calls from the US to Haiti, you mean a call that would originate with a person on a telephone in the US and it would terminate with a person on a telephone in Haiti.

MR. SAVAGE: Correct.

And, again, using the old style AT&T analogy, AT&T in Chicago was providing local telephone service to some business, and that business wanted to call, you know, their branch office or whatever in St. Louis.

In the monopoly days, AT&T takes the call from the

physical premises, its network, off of its intercity network, down to St. Louis, back to its local network and to the customer being called in Chicago.

That's the market as perceived by the customer. Right? The market as perceived by MCI is the intercity piece. I want to get it from Chicago to St. Louis, and I want to use you, AT&T, to get it from the customer in Chicago to my network in Chicago, and from my network in St. Louis to the customer in St. Louis.

So we are -- in this analogy, we are MCI. We aren't trying to rebuild a new cellular network in Haiti but -- anymore than we're trying to build a local network in the United States. We have connection in the United States. Everybody wants to get to us or these spot markets have clearly gotten to us. But at the far end, their connection, their local network, is the essential facility.

THE COURT: I'm drawing a blank because I reread before this hearing Judge Greene's opinion in *US v. AT&T*. I did not read -- I have not read in a long time anything from *MCI v. AT&T*, although I do remember reading many decades ago an absolutely brilliant closing argument by MCI's lawyer. What was his name? Robert Hamry? Robert something.

MR. SAVAGE: I don't --

THE COURT: Anyway, superb closing argument.

But what I can't remember right now, and I was

wondering if you remember, was one of the causes of action that MCI alleged in the damages action against AT&T essential facilities?

MR. SAVAGE:  Yes.

THE COURT:  Okay.

MR. SAVAGE:  Absolutely.

THE COURT:  I can see that, but I just didn't remember.

MR. SAVAGE:  And the -- so the iconic statement of the elements of -- let me back up for a second.

I was a big fan of Judge Greene.  Judge Greene explained it was an essential facility but didn't go through a lot of analysis.

To the contrary, the Seventh Circuit, in its affirming of the trial court -- in effect affirming the trial court judge, but on this point of what the district court had done, that's the first place I think that you see the 1983-case that I cite, we have laid out here are the elements of an essential facilities claim.

And it's that basic formulation that made its way to the Ninth Circuit through, I think, the *City of Anaheim* case and some of the other earlier cases and then is simply restated in *Aerotec*.

THE COURT:  Yeah.  Okay.

MR. SAVAGE:  And so they absolutely allege essential

facilities.  One on essential facilities got affirmed on essential facilities, and that's why, when the case went back, it settled for nontrivial amounts of money.

And the Seventh Circuit is one of the circuits that still has not given up on the essential facilities.

THE COURT:  And from *Aerotec*, neither has the Ninth Circuit.

MR. SAVAGE:  Correct.

And what I would submit is -- what I would submit is, to cut through some of this stuff, the case that we have here that we are alleging is about as core an essential facilities case as you can get.

THE COURT:  With a really weird comity twist.  If this was purely in the United States, it would be a little bit cleaner.

MR. SAVAGE:  Yes.  Yes.  And frankly, assuming that you do not dismiss our antitrust claim and assuming that they then respond to the antitrust claim, I think that there is a not-trivial chance that we could file a 12(c) motion for partial judgment on the pleadings with respect to it because the issue is really going to be their justification for what they did, not whether what they did had anticompetitive effects.

There is no question -- I don't think it's possible to see -- they cut us off.  We were in this business, we were doing this, and they killed that business.

They may think they have good reasons for doing it. That's going to be interesting. It's going to be Haitian law, it's going to be their claims about fraud, all this interesting stuff. But my -- you know, not meaning to tip my hand for Mr. Vaughan, but, you know --

THE COURT: It's been three years. Let's all do the tipping.

MR. SAVAGE: Yeah. Right. All the tipping.

But frankly I think -- I don't think there's a lot of question once you get the facts out there that it happened and that it was anticompetitive. The question is whether there were justifications, whether regulatory or otherwise.

And so weirdly I'm -- if we get past this stage, it's just a question of how strong are their defenses, from my perspective.

But going back to your point about standing and about injury and all of that. If you look at the way the Ninth Circuit cases address essential facilities, it is not, as I think I put in the brief, something you bolt on to a normal monopolization case. It is another way of establishing the things you need to establish in order to have a valid antitrust claim. Because if the facility is essential, then denial of access to it almost inherently destroys competition. Not just hurts us, but destroys competition.

THE COURT: And viewed this way, an essential

facilities claim is not the same as an *Aspen Skiing* claim; right?

MR. SAVAGE:  Correct.  And the commentators are pretty clear that under -- that although the Tenth Circuit, in affirming the trial judgment in *Aspen Skiing* said this is an essential facilities case, the Supreme Court didn't.  You know, the claim that dare not speak its name didn't come up in the Supreme Court's *Aspen Skiing* decision.

Now, interestingly -- I mean this is -- I mean all this stuff about agency and standing and how do we get the SIM cards, I mean in a way that goes to the *Aspen Skiing* argument, which, you know, as the case evolves we may address *Aspen Skiing*, which is our claim would be the fact that they routinely, regularly without restriction sold SIM cards to terminate calls on their network for nine cents a minute, more or less, in Haiti is a profitable course of dealing in which they engage that they refuse to do with us.

And if you look at the *Trinco* discussion, right, when *Trinco* was trying to distinguish -- I think it was *Otter Tail*, right, they say the defendant was already in the business of providing service to certain customers and refused to provide the same service to customers in -- you know, to the plaintiffs in that case.

And our argument, again, subject to their defense, is exactly that.  They were happily and profitably in the business

of selling minutes of use for calls that first showed up on their network in Haiti for nine cents a minute, and they said we're not going to do that.  And, again, I understand why, but I don't think that cuts it as an antitrust matter.

THE COURT:  By the way, one of the things that you just said triggered my thinking on this, and let me share it with you and get your response.  Because when you start talking about 12(c), you caught my attention, because I would like to move this case along.  But here's my response.

I think their primary defense, as Mr. Vaughan argued in his briefs, as he argued just now, is that Digicel Haiti's complaint against UPM is that UPM committed fraud.

Now, I have allowed that claim to move forward.  We haven't gotten to summary judgment yet, but I've allowed that claim to go forward.  If that claim goes forward to the jury, then why isn't it a defense to an essential facilities or Section 2 claim that, hey, all we did is take steps to reduce the likelihood that we will be defrauded?

MR. SAVAGE:  So a couple of responses.

Assuming for purposes of discussion that the facts and a much more granular grinding down of the case law supports the notion that this could be fraud, the thing that comes to mind standing here as I'm steeped in antitrust and not tort law at the moment is AT&T at various points in the -- its decades-long battle with MCI filed tariffs that made what MCI was doing

illegal as a matter of state law.  And, you know, whether it was a civil crime -- you know, in some cases it's a crime.  And I've had to look all this up with the '96 act.

I would submit that part -- you know, I'm trying to imagine saying, you know, ladies and gentlemen of the jury, it doesn't matter if it was fraud, it doesn't matter if it was fraud because, just as we have an obligation not to commit fraud, they have an obligation not to violate the antitrust laws.

And they're -- if they are worried about fraud, what they do in response to that fraud has to be tempered by and framed in accordance with their independent obligations under the antitrust laws.  And so if we grant that they had a right to do certain things to prevent fraud within the range of things that a completely unconstrained entity might do to prevent fraud, they don't have that full range of motion.  They have to pick things to prevent fraud that are consistent with their obligations under the antitrust laws, for example -- I'm not quite sure what comes there.  But by the time we get to closing argument, I'll have something to say.

But that's the answer, is just as MCI violated all kinds of state laws in doing what it was doing to compete with AT&T, even if we committed fraud, even if we violated Haitian criminal statutes, even if we violated the International Convention on Human Rights, I mean that's great.  That doesn't

mean that the antitrust laws of the United States don't constrain them to act in what I would say is the minimally anticompetitive way consistent with their obligations.

THE COURT:  So to condense that down, what I'm hearing is, ladies and gentlemen, we committed fraud because we had to because that was the only way we would be able to compete with them.

MR. SAVAGE:  I wouldn't phrase it that way.  Slightly. I would say, ladies and gentlemen of the jury, we did not commit fraud.  What we have at most here is a rate dispute where they want to make instead of an insanely profitable nine cents per minute for these minutes, they want to make an obscenely profitable 23 cents per minute for these minutes, and the rate dispute is to whether they can only make insane profits as compared to obscene profits.  And to say that we didn't let them get obscene profits on some number of minutes isn't fraud.  But if somehow you think it is, ladies and gentlemen of the jury, nonetheless -- but yeah.  That's --

THE COURT:  All right.

MR. SAVAGE:  So at the end of the day, I think -- we laid out in our brief lots of little citations to our things as to how we plead the various elements.  But the critical thing is, again, if you look at *Aerotec,* if you look at *MetroNet*, if you look at -- even going further back than that, when the Ninth Circuit has looked at essential facilities claims, it has

36

created them as separate than all the intricacies of a sort of freestanding monopolization claim, and that makes sense because it's kind of a separate thing.

THE COURT:  Okay.  Thank you.

Mr. Vaughan?

MR. VAUGHAN:  I have to keep my glasses on for this one because at some point I hope I develop in my practice enough I can make the argument that I just heard which is we may have committed fraud, we may have violated any number of other laws, but we were required to do so because this private company wanted, in our humble opinion, to exact obscene profits for the sale and delivery of its services through its network in a foreign country.

THE COURT:  Sounds a little bit like a Robin Hood defense, doesn't it?  Yes, we stole, but we stole from the rich and gave it to the poor and let's go home.

MR. SAVAGE:  I was making it up as I went along, Your Honor.

MR. VAUGHAN:  The sad thing is that argument was made, you might recall, in one of the very first --

THE COURT:  I do remember.

MR. VAUGHAN:  Yes.  And I haven't quite gotten to that stage yet where I'm going to stand before the Court and make such an argument.  I don't think I can get away with it.

With respect to -- just briefly, with respect to AT&T

and MCI, my friend on the other side is correct that the essential facilities argument was an almost foregone conclusion in that case. Do you know why? Because it was proceeding under a regulatory scheme where AT&T, prior to the case, was already determined to have been in violation, was already fined, and MCI was seeking damages pursuant to that predetermined violation of the essential facility that the regulatory scheme has determined was in existence.

THE COURT: And that regulatory scheme set forth the parameters, didn't it, of how much AT&T could charge in order to give the access and so we didn't have to worry about proving that reasonable rate aspect of essential facility.

MR. VAUGHAN: Exactly. And not only -- and the Court just hit the nail on the head because in that case the regulatory scheme had determined the rate structure, the terms, everything that Your Honor just pointed out and asked.

So, Mr. Savage, how am I supposed to regulate what you're asking me to do in Haiti if for some -- you know, through some path we get to the solution you want? And what Mr. Savage said was, no, I aspire to damages. But in that case, they could aspire to damages because of what we just discussed. The violation was already determined. MCI was coming in to say because of that violation I was harmed and this is how.

Skipping over the essential facilities determination and analysis, as my friend wants to do, has not been allowed

anywhere in any case.  And we stole from this website www.justice.gov an analysis that determined that a review of essential facilities cases for a five-year period from '98 to 2003 found that of the 90 essential facilities cases that had been brought during that time period, the vast majority of them were dismissed on the pleadings and not even one final judgment in the plaintiff's favor on that theory.

Why?  Because of exactly what you were discussing before with respect to that facility being almost on its death knell.  You were quite correct, both of you.  To the extent that even on the *Aerotec*, Ninth Circuit, it was not repudiated or rescinded.

THE COURT:  But there is some merit in theory -- to the theory of essential facilities.

MR. VAUGHAN:  Correct.

THE COURT:  It's just proven to be incredibly difficult, if not impossible, to apply.

MR. VAUGHAN:  And as much as I told myself, and I spoke to my colleague earlier and I said I'm not going to do it, I'm not going to do it, I'm not going to do it, do you know why, Judge?

THE COURT:  No.  Why?

MR. VAUGHAN:  It is antithetical to the very nature of an antitrust construct.  What you are doing is essentially advocating a position where a private entity, through ingenuity,

through investment, and through its own creativity and development for efficiency, for profit, for whatever purpose, creates and develops a more efficient means of delivering a service, and then lo and behold here comes Robin Hood who now determines that, ah, through use of your service I can deliver a better product and I can generate more profit and I can be more competitive.

It does the very reverse.  It has the very reverse effect to the extent that it chills desire to invest, it chills investment.  It is exactly the type of situation, especially telecom, that we're looking at today.

All of the commentators, even -- I have his name.  There was a Mr. Pate -- or Pate, you tell me.  Which is it?  I know you know the name.  Works at Hogan, used to be at the Department of Justice.

THE COURT:  I've always heard it as Pate.

MR. VAUGHAN:  It's Pate?

THE COURT:  I don't know.  But that's how I've heard other people refer to him.

MR. VAUGHAN:  R. Hewitt Pate.

THE COURT:  Yeah.

MR. VAUGHAN:  And Pate had given testimony before Congress, pointed out the actual -- the -- what's the word I'm looking for -- the reverse effect of this type of doctrine, the essential facilities doctrine, because what it does is it kills

competition because it kills the desire to invest in this type of new technology.

THE COURT:  And that's why if we have an essential facility that's in the public interest to open up, let the process of law open it up through the regulatory process maybe to declare it a public utility and then regulate it.

MR. VAUGHAN:  Exactly.

There are a couple of things I feel compelled to touch upon very briefly.

One, the conversation about the essential facility that Mr. Savage discussed with you -- I had my page marked and I moved it away, but I'll find it -- where we talked about the notion that the Digicel network is an essential facility in Haiti because it is necessary because of their market share and any number of other reasons for UPM to have access to it is absolutely incorrect.

An essential facility is not an essential facility as the be all, end all to the analysis meaning their argument that the Digicel network is an essential facility because it's the best one out there is not the point.  It has to be an essential facility because without that facility you cannot enter the market.

In their own briefing at page 20, UPM points out under the subheading UPM alleged that it can't duplicate the essential facility.  Digicel also asserts that the purported fact that UPM

41

could connect to other wireless carriers in Haiti counts as a form of duplicating, in quotes, Digicel's own wireless network. Motion to dismiss at 20.

This misses the point. Digicel's exclusionary conduct was preventing calls that UPM got to Haiti from connecting to and terminating on Digicel's own network. To duplicate that facility for purposes of the essential facilities doctrine means UPM building its own network to reach all the same customers that Digicel serves. Connecting to another network which, as just explained, didn't work in any event, is not duplicating Digicel's essential facility.

Two points. There is no question that if they determined they wanted to make that investment they could go ahead and do it themselves. Two, Mr. Savage even told you that they have connected to other networks in Haiti. I was --

THE COURT: Are those cellphone networks as opposed to landline networks?

MR. VAUGHAN: Cellphone.

THE COURT: Okay.

MR. VAUGHAN: I was struck because I thought at the beginning I heard Mr. Savage say that it's not possible, they have never done it, but I misheard because then he went on to say we have done it and it didn't work out for them as a business model because they weren't able to connect to the vast majority of Digicel's customers. And the Court picked up on

that and asked, well, why do you need to connect to Digicel's customers?  Build your own customer base.  The answer was because obviously there's the broader customer base there that they want to get to immediately.  That's not an essential facilities argument.

THE COURT:  And let me ask this.  Because unlike the MCI situation which is back in the days when the terminating user received their call on a landline and it was not economically feasible for two companies to build landlines connecting to every house, here are the Digicel customers that we're talking about cellphone customers?

MR. VAUGHAN:  Yes.

THE COURT:  Okay.  Then isn't that a problem and distinguishing feature from the *MCI* case?  Because whereas MCI could not be expected economically in every locale that it wanted to provide terminating service to to connect to landlines, and back in the early '80s that's the only way that one could connect to a terminating user, here the only thing that inhibits UPM, either on its own or working with other providers in Haiti, from connecting to a Digicel user is persuading that Digicel user to stop using Digicel and start using either UPM or UPM/other Haitian cellular provider, and that doesn't seem to be prohibitively expensive, unless I don't see in the language of *Aerotec* why that's essential, why the Digicel is essential.

Let me go to Mr. Vaughan and then Mr. Savage and then back to Mr. Vaughan.

Mr. Vaughan?

MR. VAUGHAN:  Yes, you're absolutely correct.  And it's even worse.  That was the second-to-last point I think I wanted to make because the distinction between *MCI*, the *Otter* case with respect to power, the railroad case, which I cannot remember -- it was those railway lines going into this one.

THE COURT:  *Otter Tail*.

MR. SAVAGE:  *Otter Tail* was --

THE COURT:  *Terminal* --

(Indistinguishable crosstalk.)

MR. VAUGHAN:  *Terminal Railway*.

THE COURT:  *Terminal Railway*.  And *Otter Tail* was electricity.

MR. VAUGHAN:  Correct.

THE COURT:  *Terminal Railway* was the railroad lines and the hubs.

MR. VAUGHAN:  And the distinguishing feature is exactly what you just said.  The infeasibility of having 16 different railway lines or 16 different power lines or 16 different telephone lines.

I think in the discussion you heard earlier that to connect to a Digicel customer in Haiti you must go terminate through Digicel is not correct because that call can come in

through Natcel, and then locally, after it's terminated in Haiti or lands in Haiti, it can then, through the interconnection, get to whomever.

Imagine calling the US from -- pick any country, wherever you want.  If you're on an AT&T cellphone and I'm on T-Mobile, it doesn't matter which provider we use.  The call comes in on AT&T or it comes in on T-Mobile, and then it gets over to whichever customer.

So the notion that in order to get to a Digicel customer the call must first enter the country on a Digicel network is not correct.

THE COURT:  I did want to give Mr. Savage an opportunity to respond to that point.  Do you want to do it now or when Mr. Vaughan is done?

MR. SAVAGE:  I'm accumulating a list of things.

THE COURT:  Mr. Vaughan, why don't you complete your comments.  Then we'll go back to Mr. Savage and come back to you.  And as long as nobody repeats themselves, we'll let you each keep making responsive remarks within the scope.

MR. SAVAGE:  This is prepping us for trial; cross, recross.

THE COURT:  I'm trying to get you to trial, folks.

MR. VAUGHAN:  He just tricked you into saying you're going to allow recross.

THE COURT:  I normally do allow recross.

MR. VAUGHAN:  What?

THE COURT:  Yes.  It's the Oregon way.

MR. VAUGHAN:  It's the Oregon way.

The final point -- I will stick to my promise.  The final point I wanted to touch on before I have to respond to Mr. Savage is with respect to the market.

I don't think, Your Honor, we got a clear answer as to what the market --

THE COURT:  Well, the answer that I'm hearing is it's the market for providing telecommunication service from a call that may originate in the United States and terminates in Haiti, and they have the ability to do that provided that they can get access to, I guess, Digicel's customers.  They say they are being denied that access at least on fair and reasonable terms, and that's the market that they are being denied the opportunity to compete with Digicel with.

MR. VAUGHAN:  Which means the question the Court raised at the last hearing then has reared its head once more.  Because if that's the case, then the question becomes where has UPM pled that it is in the market for terminating calls anywhere?  I thought I was hearing back and forth on that, but I also heard an analogy to the *MCI/AT&T* case where essentially the argument is we're not trying to terminate that last mile, what we're saying is we need access to that last mile in order to provide the services that we need to provide, but we're not

necessarily in the market for that last mile.

So they're not in the market for termination, but they need to have access to termination in order to provide.

THE COURT:  Or that they are desirous of being in that market and they would be in that market but for being denied access to the last mile, and that's an antitrust violation against a potential competitor.

MR. VAUGHAN:  It's also a pleading violation because nowhere in this pleading have we heard that they are a Haitian entity, they are authorized to do business in Haiti, they have been granted a regulatory license to terminate calls in Haiti. Who is this entity that is now saying it's prohibited from -- I will stop.

Thank you, Your Honor.

THE COURT:  Mr. Savage?

And by the way, you can stand there, stand wherever you want, or sit, you can remain seated.  Whatever you wish to do.

MR. SAVAGE:  Force of habit.

THE COURT:  Fair enough.

MR. SAVAGE:  So first, tying up a loose end.

In response to paragraph 50 of the complaint --

THE COURT:  One second.  Let me get to it.

MR. SAVAGE:  Okay.  In response to paragraph 50 --

THE COURT:  Let me pull up paragraph 50.

Okay. I'm there.

MR. SAVAGE: Our answer was, answering paragraph 50, defendants admit that persons acting on behalf of UPM purchased Digicel SIM cards that were shipped to Oregon and otherwise deny the allegation.

THE COURT: That takes care of that.

MR. SAVAGE: Yeah.

THE COURT: Unless Mr. Vaughan has a response, which I'll give him the opportunity to do.

MR. SAVAGE: But as a pleading factual matter it's very clear that we acquired these things for our use through use of agency.

THE COURT: Understand.

MR. SAVAGE: We didn't randomly find them floating in the Caribbean and start using them.

Two, historical point that I think you'll appreciate, the claim was made that the *MCI* court, of course they found an essential facility because at the time of the decision Judge Greene had already ruled it was an essential facility and decides there was all this regulatory stuff. That's actually not right.

Okay. First of all, the whole point of Judge Greene's ruling was not that it was an essential facility. The way that case played out, as you recall, AT&T presented its evidence and then moved for dismiss -- rather the government presented its

evidence, AT&T moved for dismissal at the close of the government's case.  Judge Greene did not say it's an essential facility.  Judge Greene said, based on the evidence before me so far, it sure looked like an essential facility, but let's wait and see what AT&T has to say.  AT&T instead decided to settle.

And so although Judge Greene's analysis, I think, is correct, it isn't a final judgment that it was an essential facility.

I believe the first and maybe the only final judgment was the 1983 decision, or it was earlier than that, but then it became a Court of Appeals decision in the Seventh Circuit saying, yes, indeed it was.

THE COURT:  Okay.

MR. SAVAGE:  And so there's that.

THE COURT:  By the way, did I tell you about the transcript I saw from *US v. AT&T* before Judge Greene?  It was a bench trial, as you know, and I saw a page of the transcript probably 35 years ago that said the government moves in evidence Exhibits 7203 through 42,912.  AT&T:  No objection.  Judge Greene:  Received.  This is before the days of computers.

MR. SAVAGE:  It was quite a case.  It was quite a case.

In my earlier days, part of my dark past involves starting in '85 I was an inhouse regulatory attorney for Bell Atlantic, one of the domestic Bells.  I did that for eight years

including some proceedings before Judge Greene administering the decree. And so I was more familiar with that than I care to admit.

THE COURT: I think we talked about this, but you worked with my former colleague from antitrust Allan Silverstein; right?

MR. SAVAGE: Yes.

THE COURT: I joined antitrust in September of '81, and by then so many people were already working on the AT&T case, they said, Michael, we don't want you working on the AT&T case, here, we're going to give you lots of other cases.

MR. SAVAGE: You got lucky.

THE COURT: Yeah. I loved it.

MR. SAVAGE: On the other hand, a career in telecom hasn't been bad.

So paragraph 50 to this, just as Mr. Vaughan couldn't resist the temptation to talk about the problems with the essential facilities doctrine, I now have to respond about the versions of the doctrine.

But the short version of it is this. Whether something is an essential facility, at the pleading stage, you plead it, it kind of seems plausible, or not, as the case may be. But in reality, it is something that is fact specific and determined by the technology of the time.

Okay. You're absolutely correct that back in the

early '80s the issue was MCI obviously could not rebuild an entire local exchange network.  Now we know in 2018 that it is at least theoretically possible to have some number of competing wireless networks.  That does not mean that it is in any way economically feasible for a new entrant to come in and build yet another one.

Depending on how this all plays out -- I mean we have clearly pled -- in fact, somewhere in here we have clearly pled that it is impractical for us to duplicate this market.  What did we say?  It would take, you know, dozens, if not hundreds of millions of dollars, many years, even assuming the spectrum license were available.  I mean we have clearly alleged that we can't do it.

THE COURT:  But now we're moving beyond a classic theoretical essential facility doctrine if we said, well, we're not talking about one essential facility, but basically saying we need to be part of some delivery mechanism for that last mile of service.  We can do it through Digicel Haiti, we can do it through any one of the other three or four digital providers in Haiti, but it's not economically feasible for us to build a fifth competing entity.

Well, now that moves us away from we can't be part of Digicel Haiti, but we could be part of one of the other cellular companies, but we weren't able to do it on economically advantageous terms, and we don't want to build our own.  We are

moving further and further afield from a classic essential facility construct.

MR. SAVAGE:  With respect, that's not right.

THE COURT:  Why not?  Why not?

MR. SAVAGE:  Let's go back to the days of AT&T. Everyone says that the Bell system was the monopoly and provided all local service.  That's actually not true.  From time out of mind and facts since 1917, there have been several thousand small local exchange carriers that were not part of the Bell system.

And if you dig deep into the history, there's a whole -- one of the original -- what the Bell system was doing in the 19-teens was refusing to interconnect its long lines with non-Bell local companies in order to squeeze them into bankruptcy and then buy them.

And the Justice Department, newly invigorated with the then recently passed Clayton Act, said, you know, we're not happy about that, and a deal was reached known in the trade as the Kingsbury Commitment which says AT&T will interconnect with other people but will also stop buying them up and essentially froze in time that arrangement.

Now, what that means is, in practical terms, in 1970s, 1980s, today, in Oregon, sure, there's -- who is it now, CenturyLink -- whoever the -- there's the big guy who serves Oregon, but there are lots of little phone companies.

52

THE COURT:  Right.  But, frankly, about 20 years ago, back when I was in private practice, I represented Canby Telephone in an antitrust claim.

MR. SAVAGE:  Right.  Lots and lots of little companies, and the way they get reached as a physical matter is they have their little area and they have their switch and that switch connects to what's called a tandem switch of the big guy.  And MCI couldn't get at those guys either.  It's just that wasn't -- that wasn't the sexy part of the case and that wasn't talked about.  But that was always there.

So the fact that there are other entities that I can connect here, maybe hit there, that's actually not new.  Okay?  That's been a feature of the phone business since forever.  One.

Two, to say, well, maybe we could pair up with Natcom, maybe if we pair up Natcom -- Natcom is the other -- the second cellular company, second sized one, maybe.  If we pair up with Natcom, then we could offer a service to try to call people in Haiti by having Natcom win customers from Digicel so that eventually a more open, you know, open mind -- I have no idea if that's actually opened-minded, but a more open-minded procompetitive entity will take over the market --

THE COURT:  Although, on that point, though, if I want to reach a Digicel user in Haiti and I'm a Natcom customer, and I have -- and I call through my Natcom service, then doesn't Natcom just connect through to the Digicel Haiti customer?  And

so why couldn't that be done here?

MR. SAVAGE:  Let me get to that to make sure we physically understand what's happening.

Every wireless customer has a phone, and that phone is linked to a particular wireless network.  So if a Natcom customer dials a Digicel customer's number and hits send, it goes up the wireless system to a Natcom switch and then they're direct -- I assume -- typical arrangement, there would be direct switch-to-switch connection between Natcom and Digicel in order to make Digicel make his guy's phone ring.

THE COURT:  Right.

MR. SAVAGE:  They said in their response how come you didn't do that?  And we had an exchange earlier.  I'm trying to skirt the don't-repeat-yourself rule.

THE COURT:  That's okay.  The don't repeat yourself has an exception for what a judge doesn't remember.

MR. SAVAGE:  Okay.  But we had an exchange earlier this morning on exactly that point, which is to say, as I laid out in the brief, we did try that and it didn't work.  The same -- by "didn't work," what I mean is the very same cutting off of access that they did to us when we were calling them, they then blocked calls coming in from Natcom from the SIM cards that we had with Natcom, and we believe they did that, as we explained, based on the -- you know, they have -- you know, discovery is going to be interesting on this.  They have a

variety of cool software algorithms that look at calling patterns and say, hey, this doesn't look right, I'm going to cut it off. And they did that to the incoming calls from Natcom as well.

So when they have 70 or 90 or whatever percent of the market, in practical terms, you can't offer a viable I'm going to get calls from United States to Haiti except I'm only going to offer calls to the United States to Haiti to Natcom customers. You've got to be able to address the bulk of the bargain as a practical matter.

THE COURT: I understand.

MR. SAVAGE: And they've made that impossible.

So whatever our intuitions about how hard or easy it is to build another cellular network to win customers, bla, bla, bla, that's summary judgment stuff, that's trial stuff, because I can sit here and say I've been in this business for 35 years and it's not as easy as it sounds. He can say, oh, come on, anybody can build a wireless network. That's why we'll have testimony about how hard it actually is to build a wireless network and how much money it costs and what you -- and the regulatory barriers.

And, you know, again, not -- I mean the analogy is a lot of fun, but even if MCI had wanted to duplicate local exchange networks, it wasn't legally allowed to. Even if it had the money at that time, your typical state law said you can't do

it without authorization and we won't give you authorization.

One of the -- that's all buried in our -- even if we could get the required spectrum licenses.  Without the spectrum license, we're out of business, and we are prepared to prove that our chance of getting that approved is zero.

So I think, you know, to summarize, this actually is one of those cases where it's an essential facility, and there will be factual disputes and we'll sort it out.  But it's not -- as a pleading matter, I don't know what -- if the doctrine remains viable in the Ninth Circuit, this case should go forward.

THE COURT:  Understand.  Thank you.

Anything further, Mr. Vaughan?  And then we'll take a ten-minute recess.

MR. VAUGHAN:  The plaintiff rests.

THE COURT:  See you in ten minutes.

(Recess taken from 10:50 to 11:02.)

THE COURT:  All right.  Good morning again.

This is both interesting and difficult.  I don't think that I can add anything more at this time with writing another opinion, so I'm not going to.  I'm going to rule from the bench.

And I just am skeptical that the essential facilities doctrine is the right tool here to deal with the problem that UPM complains about is occurring in Haiti.  The right tools might be some type of regulatory legislature reform in Haiti,

56

maybe even some regulatory reform in this country at the FCC. And I know that I've denied already a primary jurisdiction argument on plaintiff's main claim. I may be right in having denied it, but I may be wrong. But I don't want to compound the problem by adding an essential facilities claim here that just doesn't seem to be right.

You know, one of the elements of an essential facilities defense is whether or not there's a legitimate business reason for the denial of the requested interconnection. In the *MCI* case, Seventh Circuit said that there was no legitimate business or technical reason shown for AT&T's denial of the requested interconnections.

But here we have the plaintiff, Unigestion, saying, well, under Haitian law, I'm required to charge the 23 cents, 29 cents, whatever it is, for calls coming from an international caller, nine cents is what I charge for local calls, I don't want to either, one, violate Haitian law, or, two, deprive myself of that additional profit from that international -- from that higher fee for international calls, and that strikes me as a legitimate business reason.

Now, it's on the same par, to some extent, as a monopolist saying, well, I want to keep my monopoly because I want to continue to earn monopoly profits, but that's under a classic Section 2 analysis. Essential facilities is a different animal and it's never been fleshed out by the Supreme Court.

They have occasionally expressed skepticism. The Ninth Circuit and the Seventh Circuit say we're not ready to bury the essential facilities doctrine. But I don't feel comfortable expanding it in a situation where I just don't think it fits or is plausible. And so I'm going to grant defendant's opposition to dismiss the second amended counterclaims regarding antitrust.

But I do recognize that I'm doing this at a Rule 12 motion, not a rule 56 motion. That, by the way, does give me pause and gives me heartburn. That probably is not a good enough response to defendant but --

MR. SAVAGE: Your Honor, may I be heard for a moment?

THE COURT: Yeah. Of course. But at some point I do think that this is something that you can take up on appeal at the end of this case, that I've denied your counterclaim.

MR. SAVAGE: Well, let me -- let me take on a challenging task, which is to cause you to reconsider what you just said. If you were a witness, I would say read back the transcript; right?

But what you just said is they have a legitimate business reason, and with due respect, that is clear error.

THE COURT: Why?

MR. SAVAGE: The situation is they have asserted a clear business reason, just as AT&T asserted a whole bunch of totally legitimate business reasons, and then there was discovery and then there was trial, and the jury didn't buy it.

The jury said that's not what you were doing. Yeah, yeah, you're trying to preserve the integrity of the -- yeah. No. What you were doing is you were closing out the competitors.

THE COURT: Right. If they were to say --

MR. SAVAGE: But, Your Honor, but trepidation there of the judge --

THE COURT: Okay.

MR. SAVAGE: You're saying that what they're alleging to be true is true and therefore our counter-allegations can't go forward. And I understand it is interesting. It is difficult. I've spent a lot of -- you know, a lot of brain cycles trying to think this through.

There's one thing, really only -- well, there's two things that are really peculiar about this. Number one, the exclusionary conduct occurred in Haiti.

THE COURT: Correct.

MR. SAVAGE: And, okay, it occurred in Haiti. It still plainly had an effect in the United States. We'll have to assert our comity.

Number two is do they have a business justification. They say the regulator made me do it, they say I'm trying to protect against fraud, bla, bla, bla. We don't think that's true.

And what you're -- to deny us the right to go forward is to say we don't find out until, you know, five years from now

when we say, Judge Simon, the honorable trial judge, clearly made a factual determination on conflicting claims on a Rule 12(b)(6) motion which was just wrong and we had -- we should have had an opportunity to bla, bla, bla.

Now, you may be right, okay, I may be wrong.  It may be that when we get the discovery as to why they did what they did and we read through it it will say we're deeply concerned about all this stuff.  But what you're saying is I don't even get to ask?

THE COURT:  I don't think -- we're not communicating -- I haven't expressed myself fully.  I'm not saying I accept as a factual matter their defense that we're trying to stop fraud.  I'm not saying even that the government of Haiti made me do it.  I'm saying they wanted to charge the higher price.

MR. SAVAGE:  And the way they did that is by saying you have to deliver it to us in Miami thereby monopolizing the market.

THE COURT:  Right.  Right.  I'm accepting that.  So if you are alleging -- if you are alleging that they denied you the opportunity to do what it is that plaintiff wants to do in order to deprive you from paying only nine cents and requiring you to pay 23 cents, I'm accepting that.

But I don't see why that fits within the framework of an essential facility because my understanding is, in an

essential facility issue, the party is being denied the access to that bridge, to that railroad yard, to that spiral of electrical service, and you're not being denied that. You're being told if you want to do it, you come in the way everybody else does it, internationally, and you pay the 23 cents per minute. Then you can fight over whether that's a reasonable or an unreasonable charge. And that's probably going to be fought, my guess is, in Haiti, or at least with the FCC.

MR. SAVAGE: Well, I think I addressed this to some extent in my responsive brief. But what you're saying was true of MCI and AT&T.

Starting in 1977 -- I mean going back to the old days. 1977, if I'm not mistaken, is when the FCC first declared that restrictions on resale of interstate telecom services were prohibited.

What that meant was, as of 1977, and certainly as of 1981 and 1983, which were the essential facility case dates, MCI was entirely free to buy AT&T's retail long-distance service between Chicago and St. Louis and resell it as its own. In order to do that, they would have to pay AT&T's retail price for that service.

We are entirely free to buy 23-sent-a-minute carriage, effectively, from New York or Miami down to Haiti. But the fact that we have to pay that is affirming the value and the legitimacy of the monopoly foreclosure. Paying -- it's true

that they want the 23 cents a minute, and putting aside all -- they may have some, you know, great economic or great business or regulatory reason why they have a right to do it.

But on the face of it, what you're saying is, no, we have to go to Miami or New York, we have to let them monopolize carriage from the United States to Haiti, and that is a core essential facilities violation.

It's not -- this isn't -- this isn't stadiums for trade shows or -- you know, or repair services for airplane parts.  This is we can't get there -- we can't offer our service that doesn't use them from Miami or New York to Haiti unless we have access at the far end.

And so the way you're looking at this is conceding the legitimacy of their monopoly on US-to-Haitian carriage, and that's the issue.

They may be able to come up with some, again, regulatory reason why they're entitled to that monopoly.  I don't think they can do it.  All the FCC stuff we cited says that's directly contrary to United States policy.  So then --

THE COURT:  Then why isn't the remedy through the FCC, as you originally argued back in primary jurisdiction?

MR. SAVAGE:  Well, if you want to reverse your ruling on that, Your Honor, we're good to go.

THE COURT:  No, I know.  But --

MR. SAVAGE:  But the answer is -- the short answer is

this.

Number one, the reach of -- the FCC also has comity issues and the FCC has a range of things that they might be able to do eventually to put pressure on Digicel Haiti to stop doing what they're doing here.  The most extreme case is they can issue what's called a stop payment order which says to all US carriers you may not pay anything to this foreign entity because they're behaving so badly.  That's as far as it goes.  Now, that -- and then other ways are found to get the calls there, but it's -- that's fairly draconian.

A Digicel Haiti affiliate that serves the island of Tonga is, I believe, still subject to such an order.  I mean as we go forward, this -- this get a little island, control it, make money on limiting it, is actually a business model of Digicel.  It's not limited to Haiti.  And that's part of what we get into if we actually move forward.

But the FCC can do some things and can produce some results.  But what they can't do is order direct damages for a violation of an interconnection duty that arises under antitrust laws.  The FCC can't actually redress the harm that we've been subject to.

We may be able in the great by and by convince the FCC to do something to solve the problem so that future generations don't have to deal with this.  And that's great, and I've done a lot of regulatory work with that kind of motivation.  But that

doesn't get this client his damages.

And so I would urge you to reflect on what you just said and ask yourself but doesn't that just boil down to, yeah, they can have a monopoly, that's okay, under US antitrust law?

You may be right after we have the evidence, after we've fully briefed, after all that.  But to say now they have a right under the antitrust laws to have that monopoly seems a tad extreme.

THE COURT:  So if we were to go forward with discovery and deal with this on summary judgment, what would be the questions on this point I would have to resolve on summary judgment?

MR. SAVAGE:  Okay.  Well, so there's the basic essential facilities claim.  Number one, is it essential?  And we'll have experts saying of course we can't reproduce a cellular network and they have to have access to those customers and bla, bla, bla.  They'll have whatever they have.

Number two, do we have alternatives to reach those customers?  No.

All it's going to come down to -- I think when I was making my 12(c) analogy earlier, what it's going to come down to is their justification.

THE COURT:  And what if their justification is, as they now, I think, admitted is and you contend it is, that by running our switches this way, it preserves our ability to

charge 23 cents per minute for calls that begin internationally?

MR. SAVAGE:  Right.  And to the extent --

THE COURT:  Is that the right number, by the way?  Is it 23?

MR. SAVAGE:  Yeah.  That's --

(Simultaneous crosstalk.)

MR. SAVAGE:  We're using that as shorthand.  I mean it will vary, but that's essentially it.

THE COURT:  Okay.

MR. SAVAGE:  They will say, I believe, not only do we have an absolute right to get 23 cents a minute, we have an affirmative regulatory obligation to get that 23 cents a minute.

THE COURT:  But that may be subject to factual dispute.

MR. SAVAGE:  Correct.  So --

THE COURT:  Put that --

(Simultaneous crosstalk.)

THE COURT:  How do I then decide that, no, they don't?  What do I look to to decide, no, they don't?

MR. SAVAGE:  Well, this --

THE COURT:  In other words, we have a right to charge what we want to charge.

MR. SAVAGE:  And the answer to that is -- I mean you'll look to antitrust law.  Right?  They have -- as we pled it, we assume that they have a legal monopoly in Haiti.  Right?

The fact that they have their monopoly in Haiti is not as a result of terrible things they have it.

THE COURT:  Yeah.  They have monopoly power in terminating calls --

MR. SAVAGE:  Right.  In terminating calls in Haiti.

And what they are doing by saying all legitimate traffic to Haiti from the United States has to come through New York or Miami is saying we're going to destroy the potential of actual competition in getting calls to Haiti by saying you have to use our network to do that.

And if you're saying they're entitled to get that 23 cents, what you're saying is they're entitled to not be subject to competition on the United States-Haiti route, and that's wrong.

I mean that's -- A, that's contrary to the -- you said that regulation in the US is going to be relevant.  A lot of stuff I've already cited -- I mean, the US isn't down with that.  The US wants there to be competition on all of these routes, first of all.

THE COURT:  Well, then, the US can change their behavior.  I mean they're entitled -- why aren't they entitled --

MR. SAVAGE:  Maybe it can.  But as I said earlier, it can't really because it can do things to put pressure on them to try to change their behavior in the future.

THE COURT: No. I get that. But I'm trying to see how this fits within essential facilities. Because one of the elements I think of an essential facility is that you have no legitimate business reason to do what you're doing, and their claimed legitimate business reason is we want to keep our monopoly price on US-to-Haiti calls. That's their purported legitimate business reason, and unless and until the US or Haiti says, no, you can't do that, it seems to be a legitimate business reason.

MR. SAVAGE: That logic destroys the essential facilities doctrine because everyone in possession of an essential facility wants to make monopoly profits off of it. And to say it is a legitimate business reason for a holder of an essential facility to make the monopoly profits that come from it being an essential facility is to say there's nothing illegal about having an essential facility. And so that logic -- let me step back for a second.

In the grand scheme of US antitrust law, as you doubtless know, there is this debate about, you know, are we trying to maximize low prices for -- minimum prices for consumers, are we trying to bla, bla, bla, and the whole one monopoly profit doctrine, if you have one monopoly, you know, all that kind of stuff. You know what I'm referring to, that whole --

THE COURT: Yeah. Yeah.

MR. SAVAGE:  And so to Mr. Vaughan's point about, you know, you have to carefully apply the doctrine, right, and his briefing made that argument, it's true, you have to carefully apply it, but you do have to apply it.  And to say it's a legitimate business reason for a monopolist to keep his monopoly profits is saying there is no essential facilities doctrine.

THE COURT:  Here's my --

MR. SAVAGE:  To say that -- the circuits that don't like the essential facilities doctrine probably would say that's right.

THE COURT:  Here's why I don't see it that way. Because if you've got your essential facility, call it a bridge or call it a coliseum, if you simply say you may not come in, then we've got a big serious problem, you're being blocked from that essential facility.

If you say to anybody, as Digicel Haiti says here, you may come in, we welcome everyone to send calls over our bridge in Florida or New York, and the price is 23 cents per minute, then the issue then becomes not are you being denied access to an essential facility but are you being charged more than a just and reasonable term and regulation for that transit over the air.  And as we've talked about in the *MCI/AT&T* case for damages, those charges and determinations and rights were already determined.

MR. SAVAGE:  Actually, they were not, I mean to be

very clear about that.  But let's -- let me take that apart.

Two things.  Number one, MCI could have paid AT&T's long-distance rates and simply handed traffic to AT&T to carry from Chicago to St. Louis.  Right?  It's just that if that's what they had to do, then they couldn't compete in the intercity business.

And so on some level, that's what you're saying. Well, we can just pay them to get it from Miami and so what's the problem.

So the fact that what AT&T did to MCI is the quintessential essential facilities doctrine violation -- of course MCI could have bought retail service from AT&T and delivered it that way.  And so the fact that we could buy 23-cent-a-minute service doesn't defeat the essential facilities doctrine.  That's just the way it is.

Now, again, I guess -- you know, who knew that all this background I have in my earlier career would be relevant. But the FCC's rules about costs for interconnecting and regulated rates for interconnecting, that was established in an order in late 1983 to take effect with divestiture in 1984.

Now, prior to that, there was a bunch of anguishing and pain that came up with something that was called ENFIA, believe it or not, Exchange Network Facilities for Interstate Access, that was a negotiated rate to let something go on essentially while the antitrust cases were going on.  AT&T

agreed to that essentially in order to mitigate its damages because they just folded their arms and said, no, I'm not going to let anything go through. Then AT&T would have been -- MCI would have been out of business and they didn't want to do that.

But there was no general -- there was this negotiated thing in that -- in that case, and we would be happy to negotiate something -- in an alternative universe, what would have happened is this. They would have said, hey, you're sending calls that look like international calls and you're reselling our service. Why are you doing that?

We would have said, well, we think the internet -- calls on the internet are not actually subject to this international settlements rate that is the 23 cents. And I have all kinds of precedent for that.

They say, well, we think it is. Well, why don't we cut a deal? Why instead of paying 23 -- that could have happened.

THE COURT: But in the absence of that, if you get to go to the jury on damages on an essential facilities case, how are you going to prove what the just and reasonable terms would have been and should have been?

MR. SAVAGE: Well, I don't have my expert's answer on that yet, but what I think it will be is something akin to the following. Well, and, again, there's all kinds of factual issues in here which is why we need to go to trial.

We don't think that the 23 cents is a regulatory obligation.  They have never proved -- they've said it, but they have never proved it.  There is no piece of paper that they have ever produced that says you must charge 23 cents.  And they exist.  I just haven't seen it.  Right?  If they haven't --

THE COURT:  So when you asked for discovery from them to prove that, what did they say back in response to you?  You didn't ask for that; right?

MR. SAVAGE:  We'll --

THE COURT:  It's a perfectly fine interrogatory --

MR. SAVAGE:  No.  And it will be for the --

THE COURT:  -- and request for production.

MR. SAVAGE:  Yes.

And, indeed, that will be forthcoming shortly.

But -- but as regards the essential facilities claim, the damages, my first argument is going to be that they had no lawful bases to expect more than the nine cents, and so that our damage -- so the rate that we were entitled to under the law as it existed in the time we were operating was the rate we actually paid.

And to the extent that they deprived us of profits between the rate we paid then and the rate we were able to charge, that's our damages.

Now, it's fair, it's reasonable, it survives a market test which is to say they -- they offer it unrestricted in the

market for termination of calls on their network.  Now --

THE COURT:  But only for calls originating locally in Haiti.

MR. SAVAGE:  Right.  Yes.

But the argument -- but the economic argument, the damages argument is not only is it not more expensive for them to terminate our calls on a normal cellular basis, it's actually cheaper for them because it uses their normal preexisting retail billing arrangements and doesn't require all the complicated stuff that they've got.

And so assuming that we are able to undercut their claimed entitlement to 23 cents -- and obviously if we lose that, we lose a lot of things.  But if we're able to undercut that point, then I think damages are pretty clear.  We were entitled to do it at nine cents.

And they will come back with a whole bunch of stuff.  No, you're not, it's just like a regular call, 23 cents did apply, bla, bla, bla, bla, bla, and the jury will decide something.

But my first damages argument is the retail rate they charge for the service we used which is terminating calls on their network where the first time they see the call is from a wireless device in their country.

So I'm not -- I mean that may not fly.  And again, my expert hasn't -- we're not done with that process.  But to a

first approximation, yeah, that's the damages.

Again, no need for regulation because they've already set a price in the market.

THE COURT:  Mr. Vaughan, what's wrong with what he just said?

MR. VAUGHAN:  Everything.

THE COURT:  Well, I know.  Be a little more specific.

And I will share with you two things.  And I'll share with you both.  I've already started one, but I didn't finish the other.

I am incredibly skeptical that this is an essential facilities claim.  On the other hand, I am really reluctant to dismiss something like this on a 12(b)(6) as opposed to a 56 without giving an opportunity for both sides to present facts.

MR. SAVAGE:  I'll take that.

THE COURT:  I know.

On the third hand, *Twombly* and *Iqbal* teach me to use the plausibility standard.  And on the fourth hand, that's generally overstated.  And on the fifth hand, *Twombly* says the one place where it really is appropriate might be in antitrust cases.  But on the sixth hand, it does -- *Twombly* was a situation involving nationwide alleged conspiracy with hundreds of millions of potential documents and potentially billions in defense costs.

So that's my six hands.

MR. VAUGHAN:  I think I was happy up until the sixth hand.  But I think the sixth hand is still consistent because what I was going to say very briefly, very, very briefly, is that I think the Court has already gone through and weeded through all of what we just heard another argument on.

And the irony is what we just heard is exactly what took place in the response to the motion to dismiss where we have a tremendous amount of argument, a lot of which is instructed by and fed by, of course, Mr. Savage's wealth of historical knowledge, but not facts that satisfy the pleading requirements on their -- you saw me move from the podium.  You said *Iqbal* and *Twombly*, and I promised that I was not going to be repetitive up here, so I was going to sit.

We also talked about -- and you heard what I believe was a response to the very basic question you have not established a denial of access to what you have asserted is an essential facility.  What you have argued, quite forcefully, quite repetitively, quite fervently is that they're overcharging.  That is a regulatory issue.  I've never said that before.  I'm taking that from you because I agree that there may be an appropriate place to deal with that and it is not through an antitrust claim where you are asserting that you have been denied unreasonably access to an essential facility.

And then Mr. Savage put the cherry on top when he argued and repeated and reminded us that there was a solution to

this issue.  It never had to be an issue because even if this arose midstream for them -- midstream for them, very new for us -- with respect to their relationship, quote/unquote, with Digicel, it could have been a conversation where, hey, we believe that you can charge us something less and we can negotiate that term -- again, not an unreasonable denial of access -- or they could have done it the right way to begin with which was we would like to start terminating calls in Haiti, we would like to bring calls in to Haiti and we would like to negotiate with you, and we don't think -- everything that Mr. Savage has said -- we don't think that it is necessary for you to charge us the amount that you charge to someone who is using all of your services.

And this is me taking everything they have said as correct.  And even when you do that, what would have happened would have been either a creation of a course of conduct that would have at some point terminated which would give the Court the hook, which is the prior relationship that the cases look to, or a current course of conduct which would give the Court the same hook to determine and do the hook analysis to determine that short-term profitability analysis where we cut off our legs to spite our face, we have terminated even though it is a denial of short-term profits because we're looking to some vision of monopolistic heaven.

None of that is here.  Why?  Because they never once

created a relationship, a course of conduct, anything.  There is no denial of access.  He's not pled it.  The Court got it right the first time.  The Court just got it right again.

I'll stop there.

MR. SAVAGE:  And, Your Honor, I'll grant that you got it right the first time, and there really was a benefit in rethinking our claim and focusing on this, focusing on the essential facilities.

But something I alluded to in the briefing that I bring back to you is that this is a deceptively simple claim to bring.  It is deceptively simple -- the deception is there's a lot of factual stuff in it that has to be sorted out.  Is it really essential, bla, bla, bla.

But if you look at what we pled, we pled that it was essential, we pled that we had legitimate access to it by buying the SIM cards, we pled that they cut us off, and that by virtue of cutting us off, they damaged us and they damaged competition.

And the things that are troubling you and the things that he is arguing at -- you know, effectively, and the things that I keep coming back to drawing on my alleged vast expertise are the factual predicates that will have to be thrashed out by the time we get to a 56(c) motion that -- you know, did we need -- you know, legally do we need a course of dealing.  Or is that *Aspen Skiing* and not really essential facilities?  If we do need a course of dealing, is buying SIM cards at retail and

being able to use them a course of dealing?  You know, those are legal things and I think they are.

Your point of, well, couldn't we just pay to get it from Miami, that's not denial of access.  The answer is, well, MCI could have paid AT&T too and that was denial of access then.

And so, again, I think if you look at what we pled and what *Aerotec* and *MCI* and the cases in between say are the elements to be pled, we actually pled them.

I get that you're skeptical that we may not be able to prove our case.  But frankly, to get a -- all right, I won't stop myself -- to get an actually fair and just evaluation and determination of what happened here, I think this -- the anti -- the raw anticompetitive I'm going to protect my monopoly aspect of this is a critical part of this case.  In my mock argument to the jury, it's even kind of part of a defense maybe to fraud maybe.  Not necessarily, but there's a -- if what we were doing was procompetitive and presumptively legal but had some aspects that they didn't like, that leads to a different kind of fraud result, I think, that -- if we can't get into it.

And so it's not -- this isn't something that is completely unrelated to the rest of the case.  It's part and parcel to the overall circumstances.  Which gets back to, you know, what are we going to save -- you know, motions in limine, I'm going to ask a lot of the same questions in defense of the fraud claim in terms of discovery and in terms of what we're

going to present that we're going to get into in the antitrust claim.  So it's not like there's this vast set of facts that we're going to get into that we wouldn't otherwise get into. There will be some.

But I -- I get the reluctance, I get the skepticism. I wish I could say I am 100 percent confident that every factual allegation we have made in our complaint will be proven.  You know, I like to believe that, and we'll see where we are in 5(c).  But I think I've got a pretty good shot at a lot of it.

And again, I just don't -- I get the reluctance, but I don't think it's consistent with a motion to dismiss on the pleadings to say I don't even get a shot.

THE COURT:  Well, then what does *Twombly* teach us?

And by the way, I've been very critical of *Twombly* and applying it only when I think it's appropriate to apply.  But it might be appropriate here if I'm skeptical of the plausibility of this claim.

MR. SAVAGE:  Well, the -- if only I could reach inside your head and see what was making you skeptical but --

MR. VAUGHAN:  That would be unfair to me.

MR. SAVAGE:  But what I would say is this:  Is it really implausible that a company with a 90 percent market share and a relationship with a government that lets them claim that they can charge 23 cents for something that costs a tenth of a penny would say I'm going to take anticompetitive actions to

preserve those monopoly profits?

THE COURT:  Well, that begs the question.  They've taken the actions they have taken, they have said we are going to charge 23 cents per minute for calls coming in from international to terminate in Haiti.  You don't like it, talk to our regulators or our legislature, or the FCC, but that's what we're doing.  And is that anticompetitive action?

MR. SAVAGE:  It is.  And this -- you know, everything old is new again.

I commend to you, although it's long and boring, reading through the Seventh Circuit's decision in the *MCI* case because one of the key questions there was essentially why was AT&T doing what it was doing, what were their motivations?  They were trying to do this, they were trying to do that.

Those are matters to be decided based on what the evidence shows they were trying to do.  And one of AT&T's defenses for a while is, well, the states made me do it.  Right?  This is illegal under state law and therefore bla, bla, bla, to which, you know, Judge Greene and the Seventh Circuit both said, well, that's great, but, you know, federal law trumps this.

Here, one of the interesting aspects of the case is going to be the comity.  Right?

THE COURT:  The what?

MR. SAVAGE:  The comity.  Well, comedy, also.  But the --

THE COURT: Right.

MR. SAVAGE: -- the comity issues of, well, Haitian law says we have to do this. Well, that's great, but if you do things under Haitian law that have an effect in the United States that's anticompetitive, you don't get a free pass. Right?

And, again, I've alluded to this, but it's one thing if Haitian law says you are permitted to terminate service to people who are violating this. It is another thing if Haitian law says you are required to terminate service to people who are doing this because if it was not a -- if their cutting us off was not an affirmative regulatory obligation on them, from Haitian law, then they had an obligation to take United States' antitrust considerations into effect when they decided what to do, and they didn't do that. They said we can terminate and so we did.

But again, all these are the kinds of factual things that if you -- and I would submit to you if you look at the *MetroNet* case, even *Aerotec*. If you look at these other cases, these weren't pleading cases. These weren't dismissed on the pleadings. These were dismissed on summary judgment.

MR. VAUGHAN: No.

MR. SAVAGE: Many of them were dismissed on summary judgment.

MR. VAUGHAN: I wouldn't say that.

MR. SAVAGE:  At least one of them was --

THE COURT:  *Aerotec* was summary judgment.

MR. SAVAGE:  *Aerotec* was summary judgment.

MR. VAUGHAN:  *Trinco* was pleadings.

THE COURT:  *Trinco* is distinguishable.

MR. SAVAGE:  *Trinco* was completely -- yeah. *Trinco* --

THE COURT:  *Trinco* is distinguishable.  *Aerotec*, summary judgment.

MR. SAVAGE:  *Aerotec* was summary judgment.  Anaheim, the *City of Anaheim*, going back to the '90s, was after a trial on the merits.

THE COURT:  And I will say this because I'm thinking about *Twombly* as we both have been talking, and I'll give Mr. Vaughan an opportunity to respond to this.

If this case had started with UPM asserting a multi-hundred-million dollar antitrust claim based on essential facilities against Unigestion where Unigestion would be forced to incur very significant discovery expenses or otherwise submit to a settlement.  And I was as skeptical as I am right now of the essential facilities claim.  *Twombly* might dictate that I would grant Unigestion's motion to dismiss on 12(b)(6).

However, that's not how we got here.  We got here because Unigestion brought a multimillion dollar lawsuit including RICO claims and fraud claims against UPM, and UPM is

asserting a counterclaim for antitrust. And *Twombly* might have a different effect under this circumstance and it might not be that unfair to say, well, Unigestion, you brought this lawsuit, you participate in discovery, and if there's no basis in law and fact to what plaintiff has to say, present it to me on summary judgment.

Response?

MR. VAUGHAN: Yes.

I would respond as strenuously and as respectfully as I know how that --

THE COURT: You've always been respectful and you've almost always been strenuous. Go right ahead.

MR. VAUGHAN: I still grew up on the school of thought that your amount of strenuousness is significantly restrained when you walk through those double doors.

THE COURT: Good.

MR. VAUGHAN: This ain't traffic court.

Your Honor, I respectfully and strenuously would argue that the plausibility analysis that you would apply ab initio is exactly the same plausibility analysis, if not more that you would apply to the counterclaim, and I'll tell you why.

Because if it were -- I do not mean this in a diminutive or disrespectful way. But if it were an issue, a problem that legitimately lay with UPM prior to our claim being brought, and it were of the magnanimity that has been described

to Your Honor, you would expect that it would have been.

If it arises after and in the midst of what we have brought and we have decided is a legitimate claim and we have come all the way to Oregon to bring it, then the question, I think, with respect to a plausibility analysis becomes even stronger. How legitimate is the claim now? Is it, as the Court just indicated, one brought for leverage? Is it one brought for something other than and is it brought to bring us to heel and to the settlement table?

It's not an issue I would have raised spontaneously. It's not an issue I would have raised without this question being distinctly asked. But I think that the analysis, the plausibility analysis under *Twombly* is even stronger now.

And the fairness, the discovery that goes along with such a claim, the costs inherent to this claim in addition to our fraud claim is tenfold and --

THE COURT: Let's flesh that out.

MR. VAUGHAN: Yes.

THE COURT: I'll hear from both of you.

Let's assume I allow the antitrust essential facilities claim to go forward, and only an essential facilities claim under antitrust. What sort of discovery are you all going to need on this?

MR. SAVAGE: Well, what I would do, is -- if I can?

THE COURT: Yeah.

83

MR. SAVAGE:  So I'm talking to experts.  Right?  We will have -- so we will have an expert who will say it is an essential facility, this does constitute a denial, there is no practical way to do it.  They'll obviously need to talk to our expert.  Presumably they will have someone who says it's not.  So there'll be a little spatting of experts around that.

THE COURT:  You'll probably want to find out from them what is their basis for saying that the Haitian law requires this price.  That cannot be burdensome.  That's not --

MR. SAVAGE:  It can't be burdensome; and, B, we're going to ask that anyway.

THE COURT:  Right.  That's not -- right.

MR. SAVAGE:  We're going to ask:  Provide every document that you claim shows the Haitian law requires 23 cents.

THE COURT:  And whether it is or is not, a small set of documents will show that.

MR. SAVAGE:  Right.  But whatever it is.  Right?

You know, independent of the antitrust claim, we were going to ask them, identify every individual who was involved in the decision to terminate these things, describe the procedures by which you decided to do it, and give me all the documents that surrounded it.

And then we're going to say give us all the documents that constitute any conversation, written or oral, between anybody from Digicel and anybody from the Haitian regulator

talking about this issue.

Now, that's all going to -- we're going to ask all those things irrespective of the antitrust claim, which, where I keep coming back to is it is simple.  It's not -- the issue is going to be their justification and their justification is all the stuff that's going to be involved in the fraud and the 23 cent and stuff anyway.

So it's not that it's zero.  I wouldn't want to say that if this goes forward there is no additional burden, but it's not significant.

And I don't -- I guess I've got to say something in response.

Our view of the world contextually, we try to enter the Haitian market, they shut us down, we left, we walk away. We were done.  Were we treated unfairly?  Sure.  Was it wrong? Sure.  Does it cost Americans more money to call Haiti than it should?  Sure.  But there are other things to do.  We walk away.

I think you're exactly right.  They then come in and say I want to put in issue what happened in Haiti and what happened with Roam Like You're Home in the United States back in 2014.  It was, like, okay, let's put it in issue.  And it involves communications act issues and it involves antitrust issues.  They're complicated, they're a little messy legally about comity and all that kind of stuff.

But factually they're not going to dispute they cut us

off.  They did cut us off.  They're not going to dispute that they did it because they thought they were entitled to 23 cents. That's why they did it.

It's going to be a question of whether legally that's sufficient and whether when we get into the communications, as I suspect we will discover, just being a cynical person who's worked for corporations, there's going to be plenty of stuff there that is going to undercut the notion that it was done with a pure heart.

THE COURT:  That it was what?

MR. SAVAGE:  That it was done with a pure heart.

And I expect it will be things -- I expect we will discover things about a general business strategy involving monopolization of isolated markets on islands.

MR. VAUGHAN:  You're --

MR. SAVAGE:  But I may be wrong about that.  But asking those questions isn't that hard.

THE COURT:  Mr. Vaughan?

MR. VAUGHAN:  This is -- I'm sitting here because I'm absolutely in shock and this is completely inappropriate and I'll tell you why I think so.  Because if we're going to revisit this issue, which I need not say --

THE COURT:  Revisit what issue?

MR. VAUGHAN:  The essential facilities.

THE COURT:  We haven't stopped visiting it for the

first time.

MR. VAUGHAN: We haven't stopped visiting it. Then the question becomes -- I thought we had.

The question becomes have they sufficiently pled it. And the conversation about an essential facilities claim going forward without them having met the pleadings standards which we discussed -- even on the *Aerotec*, it is clear in *Aerotec,* the court said that the novel framing of an *Aerotec* Section 2 claim is an effort to sidestep the reality that there was no refusal to deal, the same kind of issue we're facing here where the essential facilities is being pled in lieu of making a clearly well-pled plausible Section 2 claim.

And Mr. Savage has literally argued that he's gone through his checklist and he believes it's right that he can articulate the essential facilities claim and skip over everything else because if I meet that I meet everything.

But that was a roundabout way of saying I don't need to plead and articulate the requirements for monopoly for pleading and proving anticompetitive conduct, pleading -- well, not proving -- pleading antitrust injury to competition and/or to consumers properly, pleading standing, skipping all of -- all over that to then go to essential facilities without establishing that there was an essential facility to begin with.

We know based upon their own concession and what we've always been pleading there are other facilities and networks in

Haiti.  We know that there is access, access which they could have obtained on the same terms as everybody else, but which they determined they were going to forego.

THE COURT:  Those same terms being the 23 cents; right?

MR. VAUGHAN:  Or thereabouts.  I know the 23 cents is being thrown out as -- for purposes of conversation, but understand it's a 23 cent floor.  You may have someone with -- sorry?

MR. SAVAGE:  I agree with you.  It could be even more.

MR. VAUGHAN:  You may have someone who has a tremendous amount of volume and they come in at the floor.  You may have someone with much less volume and it's higher.

THE COURT:  I understand.

MR. VAUGHAN:  Okay.  We have heard in support of this argument -- by my count today it was the sixth time the assertion that the United States government encourages and supports bypass.  That is incorrect.  And I was flabbergasted the first two times I heard it, so of course I had to go research it.

What does the US government policy say?  It says that in developing countries where the cost of terminating traditional telecom is traditionally high or typically high, the US government does encourage and support efforts to find means of bypassing traditional telecom.  It doesn't say it supports

bypass fraud.  And we just heard it again today.  There's --

THE COURT:  We have to wait and find out if the jury thinks that this is fraud before we call it bypass fraud.

MR. VAUGHAN:  By the same way we have to wait to and determine whether the jury thinks that this is a monopoly before -- or it's monopolistic conduct.

THE COURT:  That's fine.  We can -- if you're telling me you want to put this question to the jury, that's okay.

MR. VAUGHAN:  I am certainly not.

What I'm saying is, you know, you haven't made -- you have not articulated a final position yet.  So I'm determining and I'm directing my comments to those points -- yes.

THE COURT:  If we could bring this to a close.  Let me ask this.  And I just want a yes or no answer, please, because I do not want to intrude upon anything that's confidential and that's none of my business.

So yes or no, have the parties already had a mediation with a third-party mediator?

MR. VAUGHAN:  No.

MR. SAVAGE:  No.

THE COURT:  Okay.  I generally do not order parties to mediation.  I generally figure you all are -- and by the way, you two are among -- you four are among the best counsel I've seen in quite a long time and my -- it's always a pleasure to see you again.

So I normally assume that experienced talented counsel know how to settle a case if they want to. But sometimes it helps for a lawyer to go back and tell the client the judge has ordered us to participate in mediation, and the client says, well, I don't want to settle. And the lawyer can then say, well, we at least have to go in good faith and try because the judge has ordered, we don't have to settle, but we have to go in good faith to at least a one-day mediation and try.

So what I'm going to do is order both sides to a one-day mediation session and then you can report back to me just simply yes or no by email or by filing an ADR report. Don't give me the details, just did it settle or did it not settle.

And I'd like to schedule now a -- I don't want to make you spend the money of your clients to come back here. But let's get on the telephone for a telephone conference where if the case has settled, you tell me it's settled, if the case is not settled -- tell me whether before or after this conference, tell me before the conference, but if it's not settled at this conference I will give you my ruling on the pending motion.

MR. VAUGHAN: Thank you, sir.

MR. SAVAGE: Thank you.

THE COURT: So it wouldn't be the right time -- I want to schedule a conference, I'm thinking maybe 30 days from now, if that gives you enough time. If that doesn't give you enough

time, I'll postpone it.

Do you think scheduling a conference 30 days from now will give both sides an opportunity to participate in a one-day mediation session?

MR. VAUGHAN:  At a minimum I believe we should have it scheduled.  The only reason why I hesitate is I don't know where my clients are in --

THE COURT:  Okay.  Tell you what.  Let's schedule it now for 30 days.  And if for whatever reason it can't -- you know, you come back and you tell me, well, the earliest day we could schedule the mediation was for day 40 and therefore we jointly request our telephone conference will be on day 45 or day 50 --

MR. VAUGHAN:  Yes, sir.

THE COURT:  -- I'll grant that.  That will be fine.

So Mary, approximately 30 days from now, what's a good time for a telephone conference?

THE CLERK:  September 6th at 11:00 a.m.

THE COURT:  September 6th, will that work, at 11 a.m. Pacific time.  Since you're not going to be coming back, will that work for you with a telephone call?

MR. VAUGHAN:  I'm sorry.  Say again.

THE COURT:  Would September 6th -- what day of the week is that, Mary?

THE CLERK:  That's a Thursday.

91

THE COURT:  Thursday, September 6, 11:00 a.m. Pacific time, work for a telephone call?

MR. SAVAGE:  As far as I know now, yes.

THE COURT:  Okay.

MR. SAVAGE:  Subject to a right to say, oh, my gosh, I forgot something.  But yes.

THE COURT:  Absolutely.

Mr. Vaughan?

MR. VAUGHAN:  When I grow up, I want to be that guy.

One second, your Honor.

THE COURT:  And 11:00 a.m. Pacific, so 2:00 p.m. east coast.

MR. SAVAGE:  I know I am not in trial, but I need to confirm one other thing.

THE COURT:  I may be in trial, but I'll take a break to talk to you all.

MR. VAUGHAN:  At 11:00, I think that is --

THE COURT:  11:00 Pacific.  2:00 p.m. eastern.

MR. VAUGHAN:  Yes, sir.

THE COURT:  That works?

MR. VAUGHAN:  That's fine.

THE COURT:  Okay.  Mary, will you say that this hearing is continued to resume on September 6th at 11:00 a.m. by telephone.

And then Mary will provide you with a toll-free

calling number.  There's something ironic about us giving you a toll-free number on this, but I'm not going to explore that any further.

MR. SAVAGE:  If you use the internet, Your Honor, it's really cheap.

THE COURT:  And so we'll continue it then.  And sometime before then, just let me know, whether you want to do it by formal filing or by email to Mary to me, I don't care, just it settled or it didn't settle, or if you need more time. And if you need more time, just tell me when you'd like me to postpone the call until.

MR. VAUGHAN:  Yes, sir.

THE COURT:  All right.  Thank you, as always, for giving me a lot of interesting things to think about.

Safe travels to you all.

MR. VAUGHAN:  Thank you, Judge.

MS. DuBAY:  Thank you, Your Honor.


     (The proceedings concluded at 11:56 a.m.)

C E R T I F I C A T E

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-titled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 30th day of August, 2018.

_____
RYAN WHITE
Registered Merit Reporter
Certified Realtime Reporter
Expires 9/30/2019
Washington CCR No. 3220
Expires 10/25/2018
Oregon CSR No. 10-0419
Expires 12/31/2020

1

**'**

**'80s** [2] - 42:17, 50:1
**'81** [1] - 49:8
**'85** [1] - 48:24
**'90s** [1] - 80:11
**'96** [4] - 21:6, 21:13, 21:14, 34:3
**'98** [1] - 38:3

**1**

**10** [2] - 24:18, 25:6
**10-0419** [1] - 93:15
**10/25/2018** [1] - 93:15
**100** [1] - 77:6
**1000** [1] - 1:24
**10:50** [1] - 55:17
**11** [1] - 90:19
**1185** [1] - 21:24
**11:00** [6] - 90:18, 91:1, 91:11, 91:17, 91:18, 91:23
**11:02** [1] - 55:17
**11:56** [1] - 92:19
**12** [1] - 57:7
**12(b)(6** [2] - 59:3, 72:13
**12(b)(6)** [1] - 80:22
**12(c** [3] - 30:19, 33:8, 63:21
**12/31/2020** [1] - 93:16
**121** [1] - 2:15
**1211** [1] - 2:8
**15** [1] - 25:6
**16** [3] - 43:20, 43:21
**1600** [1] - 2:8
**18-185-SI** [1] - 3:6
**1850** [1] - 2:15
**19** [1] - 20:11
**19-teens** [1] - 51:13
**1917** [1] - 51:8
**1919** [1] - 2:12
**1970s** [1] - 51:22
**1977** [3] - 60:12, 60:13, 60:16
**1980s** [1] - 51:23
**1981** [2] - 18:20, 60:17
**1983** [3] - 48:10, 60:17, 68:20
**1983-case** [1] - 29:17
**1984** [1] - 68:20
**1996** [4] - 20:6, 20:11, 20:12, 20:24

**2**

**2** [6] - 8:10, 8:17, 33:17, 56:24, 86:8, 86:12
**20** [3] - 40:23, 41:3, 52:1
**200** [1] - 2:12
**20006** [1] - 2:12

**2001** [1] - 2:4
**2003** [1] - 38:4
**2014** [1] - 84:21
**2018** [4] - 1:8, 3:1, 50:2, 93:9
**202** [1] - 2:13
**222-9981** [1] - 2:9
**23** [25] - 35:13, 56:14, 59:23, 60:5, 61:1, 64:1, 64:4, 64:11, 64:12, 65:12, 67:18, 69:13, 69:16, 70:1, 70:4, 71:12, 71:17, 77:24, 78:4, 83:14, 84:7, 85:2, 87:4, 87:6, 87:8
**23-cent-a-minute** [1] - 68:14
**23-sent-a-minute** [1] - 60:22
**28th** [2] - 13:13, 14:14
**29** [1] - 56:15
**2:00** [2] - 91:11, 91:18
**2:30** [1] - 9:15

**3**

**30** [4] - 89:24, 90:2, 90:9, 90:16
**30(b)(6** [2] - 13:3, 13:9
**301** [1] - 1:24
**30th** [1] - 93:9
**3220** [1] - 93:14
**326-8184** [1] - 1:25
**33394** [1] - 2:5
**35** [2] - 48:18, 54:16
**3:15-cv-00185-SI** [1] - 1:7
**3rd** [1] - 1:24

**4**

**4** [1] - 18:25
**40** [1] - 90:11
**42,912** [1] - 48:19
**45** [1] - 90:12

**5**

**5(c)** [1] - 77:9
**50** [6] - 46:22, 46:24, 46:25, 47:2, 49:16, 90:13
**503** [3] - 1:25, 2:9, 2:16
**527-1115** [1] - 2:5
**56** [2] - 57:8, 72:13
**56(c** [1] - 75:22
**5th** [1] - 2:8

**6**

**6** [3] - 1:8, 3:1, 91:1
**6th** [4] - 90:18, 90:19, 90:23, 91:23

**7**

**70** [3] - 25:3, 25:11, 54:5
**7203** [1] - 48:19

**8**

**80** [1] - 25:4
**894-9900** [1] - 2:16

**9**

**9/30/2019** [1] - 93:14
**90** [5] - 25:4, 25:11, 38:4, 54:5, 77:22
**954** [1] - 2:5
**97204** [3] - 1:24, 2:8, 2:16
**973-4200** [1] - 2:13
**9:33** [1] - 3:1

**A**

**a.m** [7] - 3:1, 90:18, 90:19, 91:1, 91:11, 91:23, 92:19
**ab** [1] - 81:19
**ability** [2] - 45:12, 63:25
**able** [16] - 5:21, 5:23, 6:6, 22:25, 35:6, 41:24, 50:24, 54:9, 61:16, 62:3, 62:22, 70:22, 71:11, 71:13, 76:1, 76:9
**above-titled** [1] - 93:5
**absence** [2] - 16:9, 69:18
**absolute** [2] - 20:12, 64:11
**absolutely** [11] - 8:3, 9:16, 11:25, 28:21, 29:6, 29:25, 40:16, 43:4, 49:25, 85:20, 91:7
**academic** [2] - 5:6, 5:8
**accept** [1] - 59:12
**accepting** [2] - 59:19, 59:23
**access** [42] - 5:23, 14:24, 15:2, 16:19, 19:9, 23:11, 23:12, 23:14, 23:23, 23:24, 24:5, 24:6, 24:8, 24:15, 25:9, 25:21, 25:22, 27:9, 27:14, 31:23, 37:11, 40:15, 45:13, 45:14, 45:24, 46:3, 46:6, 53:21, 60:1, 61:12, 63:16, 67:19, 73:16, 73:23, 74:7, 75:2, 75:15, 76:4, 76:5, 87:1
**Access** [1] - 68:24

**accordance** [1] - 34:12
**accumulating** [1] - 44:15
**accuse** [1] - 6:15
**acquired** [10] - 7:5, 9:11, 9:21, 9:24, 11:6, 11:13, 11:14, 12:5, 12:10, 47:11
**act** [10] - 20:6, 20:12, 20:24, 20:25, 21:6, 21:13, 21:14, 34:3, 35:2, 84:22
**Act** [3] - 8:10, 8:17, 51:17
**acting** [1] - 47:3
**action** [5] - 15:12, 19:7, 29:1, 29:2, 78:7
**actions** [2] - 77:25, 78:3
**actual** [2] - 39:23, 65:9
**add** [2] - 5:13, 55:20
**adding** [1] - 56:5
**addition** [1] - 82:15
**additional** [2] - 56:18, 84:9
**address** [5] - 19:17, 26:5, 31:18, 32:12, 54:9
**addressed** [1] - 60:9
**adduced** [1] - 19:3
**administering** [1] - 49:1
**admit** [2] - 47:3, 49:3
**admitted** [1] - 63:24
**ADR** [1] - 89:11
**advantageous** [1] - 50:25
**advocating** [1] - 38:25
**Aerotec** [16] - 21:20, 26:12, 29:23, 30:6, 35:23, 38:11, 42:24, 76:7, 79:19, 80:2, 80:3, 80:8, 80:10, 86:7, 86:8
**affiliate** [1] - 62:11
**affirmed** [1] - 30:1
**affirming** [4] - 29:14, 29:15, 32:5, 60:24
**afforded** [1] - 19:10
**afield** [1] - 51:1
**agency** [8] - 9:22, 11:1, 13:6, 15:6, 20:19, 21:5, 32:10, 47:12
**agent** [1] - 12:14
**agents** [3] - 10:18, 11:1, 13:6
**ago** [5] - 6:17, 11:17, 28:20, 48:18, 52:1
**agree** [2] - 73:20, 87:10

**agreed** [2] - 12:1, 69:1
**ahead** [2] - 41:14, 81:12
**ain't** [1] - 81:17
**air** [1] - 67:22
**airplane** [1] - 61:9
**aka** [1] - 3:12
**akin** [1] - 69:23
**al** [2] - 1:9, 3:7
**algorithms** [1] - 54:1
**Allan** [1] - 49:5
**allegation** [3] - 25:8, 47:5, 77:7
**allegations** [1] - 58:9
**allege** [8] - 9:3, 9:7, 9:8, 10:11, 22:12, 23:24, 24:2, 29:25
**alleged** [11] - 5:10, 9:13, 15:12, 15:13, 24:8, 24:12, 29:2, 40:24, 50:12, 72:22, 75:20
**allegedly** [1] - 12:8
**alleging** [7] - 4:24, 11:5, 26:8, 30:11, 58:8, 59:20
**allow** [3] - 44:24, 44:25, 82:20
**allowed** [5] - 10:23, 33:13, 33:14, 37:25, 54:24
**alluded** [2] - 75:9, 79:7
**almost** [5] - 4:23, 31:23, 37:2, 38:9, 81:12
**alone** [1] - 14:10
**alternative** [1] - 69:7
**alternatives** [1] - 63:18
**amend** [1] - 22:21
**amended** [4] - 3:24, 15:5, 22:12, 57:6
**American** [1] - 18:16
**Americans** [1] - 84:16
**amount** [5] - 10:25, 73:8, 74:12, 81:14, 87:12
**amounts** [1] - 30:3
**Anaheim** [3] - 29:21, 80:10, 80:11
**analogies** [2] - 5:12, 17:12
**analogize** [1] - 5:4
**analogy** [13] - 7:11, 7:12, 7:14, 7:19, 16:2, 16:16, 17:4, 17:5, 27:21, 28:10, 45:22, 54:22, 63:21
**analysis** [13] - 29:13, 37:25, 38:2, 40:18, 48:6, 56:24, 74:20, 74:21, 81:19, 81:20, 82:5, 82:12, 82:13

**anguishing** [1] - 68:21
**animal** [1] - 56:25
**answer** [13] - 19:16, 23:21, 34:21, 42:2, 45:7, 45:9, 47:2, 61:25, 64:23, 69:22, 76:4, 88:14
**answered** [1] - 13:2
**answering** [1] - 47:2
**anti** [1] - 76:13
**anticipate** [1] - 25:18
**anticompetitive** [14] - 9:4, 17:20, 17:24, 18:3, 18:9, 18:12, 30:22, 31:11, 35:3, 76:13, 77:25, 78:7, 79:5, 86:19
**antithetical** [1] - 38:23
**antitrust** [42] - 8:6, 9:6, 10:8, 19:14, 20:23, 21:4, 21:7, 25:10, 26:18, 30:17, 30:18, 31:21, 33:4, 33:23, 34:8, 34:13, 34:18, 35:1, 38:24, 46:6, 49:5, 49:8, 52:3, 57:6, 62:19, 63:4, 63:7, 64:24, 66:18, 68:25, 72:20, 73:22, 77:1, 79:14, 80:17, 81:1, 82:20, 82:22, 83:18, 84:3, 84:22, 86:20
**anyway** [3] - 28:24, 83:11, 84:7
**apart** [1] - 68:1
**appeal** [1] - 57:13
**Appeals** [1] - 48:11
**APPEARANCES** [1] - 2:1
**appearing** [1] - 3:11
**applied** [2] - 20:12, 21:13
**apply** [9] - 21:14, 38:17, 67:2, 67:4, 71:18, 77:15, 81:19, 81:21
**applying** [1] - 77:15
**appreciate** [2] - 15:20, 47:16
**appropriate** [10] - 16:24, 17:2, 17:3, 17:10, 18:16, 20:19, 72:20, 73:21, 77:15, 77:16
**approved** [1] - 55:5
**approximation** [1] - 72:1
**area** [1] - 52:6
**arguably** [1] - 12:2
**argue** [2] - 4:3, 81:18
**argued** [6] - 33:10, 33:11, 61:21, 73:17,

73:25, 86:13
**arguing** [2] - 17:11, 75:19
**argument** [38] - 3:6, 5:13, 6:10, 7:15, 7:16, 7:19, 15:9, 16:24, 17:3, 17:8, 17:9, 17:10, 19:5, 25:20, 25:21, 28:21, 28:24, 32:11, 32:24, 34:20, 36:8, 36:19, 36:24, 37:2, 40:18, 42:5, 45:23, 56:3, 67:3, 70:16, 71:5, 71:6, 71:20, 73:5, 73:8, 76:15, 87:16
**Argument** [1] - 1:15
**arises** [2] - 62:19, 82:2
**arms** [1] - 69:2
**arose** [1] - 74:2
**arrangement** [2] - 51:21, 53:8
**arrangements** [2] - 22:8, 71:9
**array** [1] - 22:24
**articulate** [3] - 10:24, 86:15, 86:18
**articulated** [1] - 88:11
**articulately** [1] - 8:14
**aside** [2] - 23:7, 61:1
**aspect** [4] - 26:25, 27:2, 37:12, 76:14
**aspects** [2] - 76:18, 78:21
**Aspen** [8] - 14:20, 14:22, 32:1, 32:5, 32:8, 32:11, 32:12, 75:24
**aspire** [3] - 20:3, 37:20, 37:21
**assert** [1] - 58:19
**asserted** [3] - 57:22, 57:23, 73:16
**asserting** [4] - 22:8, 73:22, 80:16, 81:1
**assertion** [2] - 22:7, 87:17
**asserts** [1] - 40:25
**assume** [5] - 14:4, 53:8, 64:25, 82:20, 89:1
**assumed** [1] - 14:5
**assuming** [8] - 10:22, 15:11, 16:24, 30:16, 30:17, 33:20, 50:11, 71:11
**assumption** [1] - 16:17
**assure** [1] - 9:17
**AT&T** [38] - 16:21, 18:20, 19:4, 19:7, 21:14, 27:21, 27:25, 28:7, 28:18, 28:20,

29:2, 33:24, 34:23, 36:25, 37:4, 37:10, 44:5, 44:7, 47:24, 48:1, 48:5, 48:16, 48:19, 49:9, 49:10, 51:5, 51:19, 57:23, 60:11, 68:3, 68:10, 68:12, 68:25, 69:3, 76:5, 78:13
**AT&T's** [5] - 56:11, 60:18, 60:20, 68:2, 78:16
**Atlantic** [1] - 48:25
**attempt** [1] - 18:11
**attempted** [2] - 9:7, 9:8
**attention** [1] - 33:8
**attorney** [1] - 48:24
**August** [3] - 1:8, 3:1, 93:9
**authorization** [2] - 55:1
**authorize** [1] - 18:8
**authorized** [1] - 46:10
**available** [5] - 11:21, 22:8, 22:12, 22:14, 50:12
**Avenue** [3] - 1:24, 2:8, 2:12

### B

**background** [1] - 68:17
**bad** [2] - 6:25, 49:15
**badly** [1] - 62:8
**bankruptcy** [1] - 51:15
**bargain** [1] - 54:10
**BAROWAY** [1] - 2:14
**barriers** [1] - 54:21
**base** [2] - 42:2, 42:3
**based** [6] - 20:14, 48:3, 53:24, 78:15, 80:17, 86:24
**bases** [1] - 70:17
**basic** [18] - 5:15, 5:17, 5:18, 5:19, 5:21, 5:23, 6:5, 6:15, 6:16, 7:5, 8:9, 8:16, 16:25, 29:20, 63:13, 73:15
**basics** [1] - 21:13
**basis** [4] - 22:21, 71:7, 81:4, 83:8
**battle** [1] - 33:25
**became** [1] - 48:11
**becomes** [6] - 11:5, 45:19, 67:19, 82:5, 86:3, 86:4
**BEFORE** [1] - 1:17
**began** [1] - 9:19
**begin** [3] - 64:1, 74:7, 86:23
**beginning** [2] - 3:8, 41:21

**begs** [1] - 78:2
**behalf** [3] - 3:12, 12:6, 47:3
**behaving** [1] - 62:8
**behavior** [2] - 65:21, 65:25
**behold** [1] - 39:4
**believes** [1] - 86:14
**Bell** [5] - 48:24, 51:6, 51:9, 51:12, 51:14
**Bells** [1] - 48:25
**below** [1] - 93:3
**bench** [3] - 14:5, 48:17, 55:21
**benefit** [2] - 9:8, 75:6
**best** [2] - 40:20, 88:23
**better** [3] - 6:10, 7:1, 39:6
**between** [7] - 27:8, 43:6, 53:9, 60:19, 70:22, 76:7, 83:24
**beyond** [3] - 12:4, 21:4, 50:14
**big** [6] - 6:24, 6:25, 29:11, 51:24, 52:7, 67:14
**billing** [1] - 71:9
**billions** [1] - 72:23
**bit** [3] - 3:25, 30:14, 36:14
**bla** [26] - 54:14, 54:15, 58:22, 59:4, 63:17, 66:21, 71:18, 75:13, 78:18
**blank** [1] - 28:17
**blocked** [2] - 53:22, 67:14
**blows** [1] - 16:16
**boil** [1] - 63:3
**boils** [2] - 18:3, 18:11
**bolt** [1] - 31:19
**boring** [1] - 78:10
**bought** [2] - 11:2, 68:12
**box** [6] - 5:18, 5:19, 6:5, 6:15, 6:16, 6:19
**boxes** [2] - 7:5, 26:10
**brain** [1] - 58:11
**branch** [1] - 27:23
**break** [1] - 91:15
**breaths** [1] - 21:23
**bridge** [3] - 60:2, 67:12, 67:17
**brief** [8] - 4:15, 16:25, 23:9, 26:6, 31:19, 35:21, 53:19, 60:10
**briefed** [1] - 63:6
**briefing** [4] - 22:2, 40:23, 67:3, 75:9
**briefly** [4] - 36:25, 40:9, 73:3
**briefs** [1] - 33:11
**brilliant** [1] - 28:21

**bring** [7] - 10:8, 74:9, 75:10, 75:11, 82:4, 82:8, 88:13
**broader** [1] - 42:3
**broadly** [1] - 22:7
**brought** [10] - 14:1, 19:7, 38:5, 80:24, 81:3, 81:25, 82:3, 82:7, 82:8
**Brown** [1] - 25:11
**build** [10] - 27:12, 28:12, 42:2, 42:9, 50:5, 50:20, 50:25, 54:14, 54:18, 54:19
**building** [3] - 6:10, 7:1, 41:8
**bulk** [1] - 54:9
**bully** [1] - 6:25
**bunch** [3] - 57:23, 68:21, 71:16
**burden** [2] - 17:21, 84:9
**burdensome** [2] - 83:9, 83:10
**buried** [1] - 55:2
**bury** [1] - 57:2
**business** [33] - 18:24, 23:1, 27:11, 27:22, 27:23, 30:24, 30:25, 32:20, 32:25, 41:24, 46:10, 52:13, 54:16, 55:4, 56:9, 56:11, 56:20, 57:20, 57:23, 57:24, 58:20, 61:3, 62:14, 66:4, 66:5, 66:7, 66:9, 66:13, 67:5, 68:6, 69:4, 85:13, 88:16
**buy** [6] - 9:25, 51:15, 57:25, 60:18, 60:22, 68:13
**buying** [3] - 51:20, 75:15, 75:25
**bypass** [3] - 87:18, 88:1, 88:3
**bypassing** [1] - 87:25

### C

**C.L** [1] - 2:3
**cable** [17] - 5:4, 5:14, 5:16, 6:1, 6:8, 6:9, 6:11, 6:12, 6:14, 6:19, 6:24, 7:5, 16:2, 16:3, 16:5, 16:17
**caller** [1] - 56:16
**Canby** [1] - 52:2
**candid** [1] - 13:15
**cannot** [5] - 9:17, 15:15, 40:21, 43:7, 83:9
**card** [8] - 9:18, 10:2, 10:3, 10:6, 10:10, 10:13, 12:5, 23:13

**cards** [24] - 9:11, 9:12, 9:21, 9:23, 9:25, 10:13, 10:19, 11:6, 11:11, 11:13, 11:20, 11:21, 12:8, 13:4, 15:2, 23:13, 23:16, 32:11, 32:14, 47:4, 53:22, 75:16, 75:25
**care** [3] - 47:6, 49:2, 92:8
**career** [2] - 49:14, 68:17
**carefully** [2] - 67:2, 67:3
**Caribbean** [1] - 47:15
**carriage** [3] - 60:22, 61:6, 61:14
**carriers** [3] - 41:1, 51:9, 62:7
**carry** [1] - 68:3
**case** [70] - 3:6, 12:15, 12:17, 12:21, 13:19, 14:1, 14:2, 14:8, 14:20, 16:17, 17:5, 17:12, 17:16, 17:18, 17:19, 17:21, 18:18, 19:23, 19:24, 20:3, 21:10, 21:24, 26:13, 29:21, 30:2, 30:10, 30:12, 31:20, 32:6, 32:12, 32:23, 33:9, 33:21, 37:3, 37:4, 37:14, 37:20, 38:1, 42:14, 43:7, 45:19, 45:22, 47:24, 48:2, 48:21, 48:22, 49:10, 49:11, 49:22, 52:9, 55:10, 56:10, 57:14, 60:17, 62:5, 67:22, 69:6, 69:19, 76:10, 76:14, 76:21, 78:11, 78:21, 79:19, 80:16, 89:2, 89:17
**cases** [13] - 29:22, 31:18, 34:2, 38:3, 38:4, 49:11, 55:7, 68:25, 72:21, 74:18, 76:7, 79:19, 79:20
**cash** [1] - 11:2
**cat** [2] - 26:24, 27:2
**cats** [1] - 25:6
**caught** [1] - 33:8
**causes** [1] - 29:1
**CCR** [1] - 93:14
**cellphone** [4] - 41:16, 41:18, 42:11, 44:5
**cellular** [8] - 24:10, 28:11, 42:22, 50:23, 52:16, 54:14, 63:16, 71:7
**cent** [2] - 84:7, 87:8
**cents** [29] - 32:15, 33:2, 35:11, 35:13,

56:14, 56:15, 56:16, 59:22, 59:23, 60:5, 61:1, 64:1, 64:11, 64:12, 65:12, 67:18, 69:13, 70:1, 70:4, 70:17, 71:12, 71:15, 71:17, 77:24, 78:4, 83:14, 85:2, 87:4, 87:6
**CenturyLink** [1] - 51:24
**certain** [3] - 4:24, 32:21, 34:14
**certainly** [4] - 10:16, 25:12, 60:16, 88:9
**certified** [1] - 93:7
**Certified** [1] - 93:13
**certify** [1] - 93:3
**chair** [1] - 13:22
**challenging** [1] - 57:16
**chance** [2] - 30:19, 55:5
**change** [2] - 65:20, 65:25
**channels** [2] - 5:17, 5:24
**character** [1] - 19:11
**charge** [16] - 37:10, 56:14, 56:16, 59:14, 60:7, 64:1, 64:21, 64:22, 70:4, 70:23, 71:21, 74:5, 74:12, 77:24, 78:4
**charged** [2] - 6:8, 67:20
**charges** [1] - 67:23
**cheap** [1] - 92:5
**cheaper** [1] - 71:8
**checklist** [1] - 86:14
**cherry** [1] - 73:24
**Chicago** [8] - 27:12, 27:22, 28:3, 28:6, 28:7, 28:8, 60:19, 68:4
**chills** [2] - 39:9
**chrissavage@dwt.com** [1] - 2:11
**Christopher** [1] - 3:16
**CHRISTOPHER** [1] - 2:11
**Circuit** [15] - 21:20, 29:14, 29:21, 30:4, 30:7, 31:18, 32:4, 35:25, 38:11, 48:11, 55:10, 56:10, 57:1, 57:2, 78:19
**circuit's** [1] - 17:16
**Circuit's** [1] - 78:11
**circuits** [2] - 30:4, 67:8
**circumstance** [1] - 81:2
**circumstances** [2] -

18:15, 76:22
**citations** [1] - 35:21
**cite** [1] - 29:17
**cited** [2] - 61:18, 65:17
**city** [1] - 20:9
**City** [2] - 29:21, 80:11
**civil** [2] - 3:6, 34:2
**claim** [59] - 4:23, 8:6, 8:11, 8:17, 10:9, 16:5, 16:12, 16:25, 21:4, 22:9, 25:20, 26:9, 26:11, 26:17, 26:20, 29:19, 30:17, 30:18, 31:22, 32:1, 32:7, 32:13, 33:13, 33:15, 33:17, 36:2, 47:17, 52:3, 56:3, 56:5, 63:14, 70:15, 72:12, 73:22, 75:7, 75:10, 76:25, 77:2, 77:17, 77:23, 80:17, 80:21, 81:24, 82:3, 82:6, 82:15, 82:16, 82:21, 82:22, 83:14, 83:18, 84:3, 86:5, 86:8, 86:12, 86:15
**claimed** [2] - 66:5, 71:12
**claiming** [1] - 9:22
**claims** [7] - 12:25, 20:23, 31:3, 35:25, 59:2, 80:25
**classic** [3] - 50:14, 51:1, 56:24
**Clayton** [1] - 51:17
**cleaner** [1] - 30:15
**clear** [10] - 9:24, 15:13, 32:4, 45:7, 47:11, 57:20, 57:23, 68:1, 71:14, 86:7
**clearly** [7] - 21:5, 28:14, 50:8, 50:12, 59:1, 86:11
**CLERK** [3] - 3:5, 90:18, 90:25
**cleverly** [1] - 8:14
**client** [4] - 26:23, 63:1, 89:3, 89:4
**clients** [3] - 12:7, 89:15, 90:7
**close** [2] - 48:1, 88:13
**closes** [1] - 14:14
**closing** [12] - 7:15, 7:16, 7:19, 14:17, 16:24, 17:3, 17:8, 17:9, 28:21, 28:24, 34:19, 58:3
**coast** [1] - 91:12
**coliseum** [1] - 67:13
**colleague** [2] - 38:19, 49:5
**Comcast** [1] - 5:15
**comedy** [1] - 78:24

**comfort** [1] - 9:23
**comfortable** [1] - 57:3
**coming** [7] - 37:22, 53:22, 56:15, 75:20, 78:4, 84:4, 90:20
**comity** [8] - 18:6, 30:13, 58:19, 62:2, 78:22, 78:24, 79:2, 84:24
**commend** [1] - 78:10
**commentators** [2] - 32:3, 39:12
**comments** [4] - 4:14, 8:11, 44:17, 88:12
**commercial** [1] - 9:16
**commit** [2] - 34:7, 35:9
**Commitment** [1] - 51:19
**committed** [5] - 4:25, 33:12, 34:23, 35:5, 36:9
**committing** [1] - 6:1
**communicating** [1] - 59:11
**communications** [4] - 20:6, 20:25, 84:22, 85:5
**companies** [6] - 16:4, 42:9, 50:24, 51:14, 51:25, 52:5
**company** [9] - 5:15, 6:8, 6:14, 6:24, 7:5, 19:12, 36:10, 52:16, 77:22
**compared** [2] - 20:21, 35:15
**compelled** [1] - 40:8
**compensated** [1] - 13:7
**compete** [4] - 34:22, 35:6, 45:16, 68:5
**competes** [1] - 8:21
**competing** [2] - 50:3, 50:21
**competition** [12] - 6:24, 9:4, 9:6, 21:12, 31:23, 31:24, 40:1, 65:9, 65:13, 65:18, 75:17, 86:20
**competitive** [1] - 39:7
**competitor** [1] - 46:7
**competitors** [1] - 58:3
**complains** [1] - 55:24
**complaint** [6] - 10:5, 22:12, 23:22, 33:12, 46:22, 77:7
**complete** [2] - 13:14, 44:16
**completely** [4] - 34:15, 76:21, 80:6, 85:20
**complicated** [2] - 71:9, 84:23
**compound** [1] - 56:4

**computer** [1] - 5:20
**computers** [1] - 48:20
**conceding** [1] - 61:13
**concern** [1] - 8:4
**concerned** [1] - 59:7
**concession** [1] - 86:24
**conclude** [1] - 17:3
**concluded** [1] - 92:19
**concludes** [1] - 19:2
**conclusion** [2] - 19:4, 37:2
**condense** [1] - 35:4
**conditions** [1] - 11:20
**conduct** [11] - 9:4, 17:19, 18:3, 21:12, 41:4, 58:15, 74:16, 74:19, 75:1, 86:19, 88:6
**conference** [8] - 89:16, 89:18, 89:19, 89:20, 89:24, 90:2, 90:12, 90:17
**conferred** [1] - 20:15
**confident** [3] - 12:23, 25:24, 77:6
**confidential** [1] - 88:15
**confirm** [1] - 91:14
**conflated** [1] - 8:15
**conflicting** [1] - 59:2
**conformed** [1] - 93:6
**Congress** [1] - 39:23
**connect** [8] - 41:1, 41:24, 42:1, 42:16, 42:18, 43:24, 52:12, 52:25
**connected** [3] - 18:23, 23:5, 41:15
**connecting** [6] - 22:3, 23:25, 41:5, 41:9, 42:10, 42:20
**connection** [3] - 28:13, 28:15, 53:9
**connects** [1] - 52:7
**consequences** [1] - 7:8
**considerations** [1] - 79:14
**consistent** [4] - 34:17, 35:3, 73:2, 77:11
**conspiracy** [1] - 72:22
**constitute** [2] - 83:3, 83:24
**constrain** [1] - 35:2
**construct** [2] - 38:24, 51:2
**consumers** [4] - 9:6, 21:12, 66:21, 86:21
**contained** [1] - 26:8
**contend** [1] - 63:24
**content** [3] - 16:8, 16:10, 18:12
**contextualize** [2] -

4:18, 5:13
**contextualized** [1] - 8:4
**contextually** [1] - 84:13
**continue** [2] - 56:23, 92:6
**continued** [2] - 15:8, 91:23
**contractual** [1] - 10:8
**contrary** [3] - 29:14, 61:19, 65:15
**control** [7] - 16:8, 16:10, 16:18, 24:12, 24:21, 25:12, 62:13
**controls** [1] - 22:24
**Convention** [1] - 34:25
**conversation** [7] - 8:15, 9:1, 40:10, 74:4, 83:24, 86:5, 87:7
**convince** [1] - 62:22
**cool** [1] - 54:1
**core** [3] - 5:9, 30:11, 61:6
**corporation** [1] - 1:5
**corporations** [1] - 85:7
**correct** [23] - 11:5, 11:18, 14:4, 20:17, 20:20, 24:17, 24:24, 27:20, 30:8, 32:3, 37:1, 38:10, 38:15, 43:4, 43:16, 43:25, 44:11, 48:7, 49:25, 58:16, 64:15, 74:15, 93:4
**correctly** [1] - 11:22
**cost** [4] - 19:12, 20:14, 84:16, 87:22
**cost-based** [1] - 20:14
**costs** [5] - 54:20, 68:18, 72:24, 77:24, 82:15
**counsel** [3] - 3:8, 88:23, 89:1
**count** [2] - 11:18, 87:16
**counter** [1] - 58:9
**counter-allegations** [1] - 58:9
**counterclaim** [7] - 8:7, 8:8, 17:22, 19:15, 57:14, 81:1, 81:21
**counterclaims** [2] - 3:24, 57:6
**countries** [1] - 87:22
**country** [5] - 36:13, 44:4, 44:10, 56:1, 71:23
**counts** [1] - 41:1
**couple** [2] - 33:19,

40:8
**course** [13] - 32:16, 47:17, 57:12, 63:15, 68:12, 73:9, 74:16, 74:19, 75:1, 75:23, 75:25, 76:1, 87:19
**court** [12] - 3:8, 7:2, 11:10, 19:2, 21:6, 26:13, 29:15, 29:16, 47:17, 81:17, 86:8
**COURT** [176] - 1:1, 1:18, 3:13, 3:20, 3:22, 4:10, 7:14, 7:24, 8:1, 8:7, 10:12, 10:17, 11:15, 11:17, 11:19, 12:13, 12:22, 13:13, 14:4, 14:13, 15:19, 15:22, 15:25, 16:22, 17:7, 18:13, 19:20, 20:2, 20:15, 20:18, 21:16, 22:11, 22:15, 24:7, 24:16, 24:18, 24:21, 25:14, 26:3, 26:22, 27:1, 27:3, 27:5, 27:16, 28:17, 28:24, 29:5, 29:7, 29:24, 30:6, 30:13, 31:6, 31:25, 33:5, 35:4, 35:19, 36:4, 36:14, 36:21, 37:9, 38:13, 38:16, 38:22, 39:16, 39:18, 39:21, 40:3, 41:16, 41:19, 42:6, 42:13, 43:9, 43:11, 43:14, 43:17, 44:12, 44:16, 44:22, 44:25, 45:2, 45:9, 46:4, 46:15, 46:20, 46:23, 46:25, 47:6, 47:8, 47:13, 48:13, 48:15, 49:4, 49:8, 49:13, 50:14, 51:4, 52:1, 52:22, 53:11, 53:15, 54:11, 55:12, 55:16, 55:18, 57:12, 57:21, 58:4, 58:7, 58:16, 59:10, 59:19, 61:20, 61:24, 63:9, 63:23, 64:3, 64:9, 64:13, 64:16, 64:18, 64:21, 65:3, 65:20, 66:1, 66:25, 67:7, 67:11, 69:18, 70:6, 70:10, 70:12, 71:2, 72:4, 72:7, 72:16, 77:13, 78:2, 78:23, 79:1, 80:2, 80:5, 80:8, 80:13, 81:11, 81:16, 82:17, 82:19, 82:25, 83:7, 83:12, 83:15, 85:10, 85:18, 85:23, 85:25, 87:4, 87:14, 88:2, 88:7, 88:13, 88:21,

89:23, 90:8, 90:15, 90:19, 90:23, 91:1, 91:4, 91:7, 91:11, 91:15, 91:18, 91:20, 91:22, 92:6, 92:13
**Court** [19] - 1:23, 4:5, 4:14, 9:20, 12:20, 13:16, 32:6, 36:23, 37:13, 41:25, 45:17, 48:11, 56:25, 73:4, 74:17, 74:19, 75:2, 75:3, 82:6
**Court's** [2] - 7:21, 32:8
**Courthouse** [1] - 1:23
**courtroom** [1] - 7:7
**courts** [1] - 26:6
**created** [2] - 36:1, 75:1
**creates** [2] - 15:14, 39:3
**creation** [1] - 74:16
**creativity** [1] - 39:1
**crime** [2] - 34:2
**criminal** [1] - 34:24
**critical** [3] - 35:22, 76:14, 77:14
**cross** [1] - 44:20
**crossed** [1] - 17:9
**crosstalk** [3] - 43:12, 64:6, 64:17
**CRR** [1] - 1:23
**CSR** [1] - 93:15
**CSR/CCR** [1] - 1:23
**current** [1] - 74:19
**customer** [13] - 28:2, 28:4, 28:7, 28:8, 42:2, 42:3, 43:24, 44:8, 44:10, 52:23, 52:25, 53:4, 53:6
**customer's** [1] - 53:6
**customers** [19] - 18:24, 24:13, 24:14, 24:16, 24:19, 24:22, 32:21, 32:22, 41:8, 41:25, 42:2, 42:10, 42:11, 45:13, 52:18, 54:9, 54:14, 63:16, 63:19
**cut** [10] - 6:22, 23:4, 30:10, 30:24, 54:2, 69:16, 74:21, 75:16, 84:25, 85:1
**cute** [1] - 15:3
**cutoff** [1] - 15:24
**cuts** [1] - 33:4
**cutting** [4] - 23:13, 53:20, 75:17, 79:11
**cycles** [1] - 58:12
**cynical** [1] - 85:6

## D

**d/b/a** [2] - 1:5, 1:9
**damage** [1] - 70:18
**damaged** [2] - 75:17

**damages** [16] - 19:15, 29:2, 37:6, 37:20, 37:21, 62:18, 63:1, 67:23, 69:1, 69:19, 70:16, 70:23, 71:6, 71:14, 71:20, 72:1
**dare** [3] - 6:15, 6:23, 32:7
**dark** [1] - 48:23
**darn** [1] - 11:17
**date** [2] - 8:2, 15:25
**DATED** [1] - 93:9
**dates** [1] - 60:17
**DAVIS** [1] - 2:10
**Davis** [1] - 3:16
**days** [10] - 27:25, 42:7, 48:20, 48:23, 51:5, 60:12, 89:24, 90:2, 90:9, 90:16
**DC** [2] - 2:12, 17:16
**deal** [10] - 12:24, 21:8, 21:10, 51:18, 55:23, 62:24, 63:10, 69:16, 73:21, 86:10
**dealing** [5] - 7:13, 32:16, 75:23, 75:25, 76:1
**dealings** [1] - 14:22
**death** [1] - 38:9
**debate** [2] - 26:1, 66:19
**decades** [2] - 28:20, 33:24
**decades-long** [1] - 33:24
**December** [1] - 13:19
**deception** [1] - 75:11
**deceptively** [2] - 75:10, 75:11
**decide** [4] - 17:12, 64:18, 64:19, 71:18
**decided** [5] - 48:5, 78:15, 79:14, 82:3, 83:21
**decides** [1] - 47:20
**decision** [6] - 32:8, 47:18, 48:10, 48:11, 78:11, 83:20
**declare** [1] - 40:6
**declared** [1] - 60:13
**decree** [1] - 49:2
**deep** [1] - 51:11
**deeply** [1] - 59:7
**defeat** [1] - 68:14
**Defendant** [1] - 1:10
**defendant** [6] - 13:1, 13:2, 17:21, 17:22, 32:20, 57:10
**defendant's** [1] - 57:5
**defendants** [5] - 3:17, 3:19, 10:3, 15:1, 47:3
**Defendants** [1] - 2:10

**defense** [11] - 25:19, 25:20, 32:24, 33:10, 33:16, 36:15, 56:8, 59:12, 72:24, 76:15, 76:24
**defenses** [3] - 12:20, 31:14, 78:17
**deficient** [1] - 15:18
**defrauded** [1] - 33:18
**deliver** [2] - 39:5, 59:17
**delivered** [1] - 68:13
**delivering** [1] - 39:3
**delivery** [2] - 36:12, 50:17
**demonstrate** [1] - 9:20
**denial** [11] - 14:24, 31:22, 56:9, 56:11, 73:16, 74:6, 74:22, 75:2, 76:4, 76:5, 83:3
**denied** [17] - 11:11, 23:11, 23:12, 23:14, 24:5, 24:6, 45:14, 45:15, 46:5, 56:2, 56:4, 57:14, 59:20, 60:1, 60:3, 67:19, 73:23
**deny** [3] - 22:10, 47:4, 58:24
**Department** [2] - 39:15, 51:16
**deposition** [1] - 13:3
**depositions** [1] - 13:9
**deprive** [2] - 56:17, 59:22
**deprived** [1] - 70:21
**describe** [1] - 83:20
**described** [3] - 8:24, 14:20, 81:25
**desire** [2] - 39:9, 40:1
**desired** [1] - 5:24
**desirous** [1] - 46:4
**destroy** [1] - 65:8
**destroys** [3] - 31:23, 31:24, 66:10
**detail** [2] - 10:25, 25:18
**details** [3] - 11:3, 16:16, 89:12
**determination** [3] - 37:24, 59:2, 76:12
**determinations** [1] - 67:23
**determine** [3] - 74:20, 88:5
**determined** [11] - 8:24, 14:19, 37:5, 37:7, 37:15, 37:22, 38:2, 41:13, 49:24, 67:24, 87:3
**determines** [1] - 39:5
**determining** [1] -

88:11
**develop** [1] - 36:7
**developing** [1] - 87:22
**development** [1] - 39:2
**develops** [1] - 39:3
**device** [2] - 5:21, 71:23
**devised** [1] - 20:6
**dials** [1] - 53:6
**dictate** [2] - 19:3, 80:21
**dictum** [1] - 20:21
**different** [8] - 5:12, 24:10, 43:21, 43:22, 56:24, 76:18, 81:2
**difficult** [3] - 38:17, 55:19, 58:11
**dig** [1] - 51:11
**DIGICEL** [1] - 1:6
**Digicel** [45] - 3:12, 4:23, 4:24, 8:22, 9:16, 10:13, 12:7, 20:8, 21:1, 22:23, 22:25, 23:13, 23:15, 33:11, 40:13, 40:19, 40:25, 41:9, 42:10, 42:20, 42:21, 42:25, 43:24, 43:25, 44:9, 44:10, 45:16, 47:4, 50:18, 50:23, 52:18, 52:23, 52:25, 53:6, 53:9, 53:10, 62:4, 62:11, 62:15, 67:16, 74:4, 83:25
**Digicel's** [8] - 13:23, 41:2, 41:4, 41:6, 41:11, 41:25, 42:1, 45:13
**digital** [2] - 5:16, 50:19
**digitally** [1] - 93:7
**diminutive** [1] - 81:23
**direct** [4] - 21:11, 53:8, 62:18
**directing** [1] - 88:12
**direction** [1] - 7:21
**directly** [5] - 8:13, 12:16, 20:25, 22:25, 61:19
**discover** [2] - 85:6, 85:13
**discovery** [24] - 12:24, 13:14, 13:17, 13:18, 13:22, 13:23, 13:24, 13:25, 14:1, 14:5, 14:7, 14:14, 15:24, 24:25, 53:25, 57:25, 59:6, 63:9, 70:6, 76:25, 80:19, 81:4, 82:14, 82:22
**discuss** [2] - 8:20, 19:1
**discussed** [5] - 8:20,

14:21, 37:21, 40:11, 86:7
**discussing** [1] - 38:8
**discussion** [9] - 4:18, 4:21, 5:5, 5:8, 14:25, 19:9, 32:18, 33:20, 43:23
**discussions** [1] - 18:6
**dismiss** [10] - 3:23, 19:2, 30:17, 41:3, 47:25, 57:6, 72:13, 73:7, 77:11, 80:22
**dismissal** [1] - 48:1
**dismissed** [4] - 38:6, 79:20, 79:21, 79:23
**dispute** [5] - 35:10, 35:14, 64:14, 84:25, 85:1
**disputes** [1] - 55:8
**disrespectful** [1] - 81:23
**distance** [3] - 18:22, 60:18, 68:3
**distinction** [1] - 43:6
**distinctly** [1] - 82:12
**distinguish** [1] - 32:19
**distinguishable** [2] - 80:5, 80:8
**distinguishing** [2] - 42:14, 43:19
**DISTRICT** [3] - 1:1, 1:2, 1:18
**district** [1] - 29:16
**District** [1] - 1:23
**divestiture** [2] - 16:21, 68:20
**DIVISION** [1] - 1:3
**doctrine** [20] - 15:15, 21:22, 24:2, 26:7, 39:24, 39:25, 41:7, 49:18, 49:19, 50:15, 55:10, 55:23, 57:3, 66:11, 66:22, 67:2, 67:6, 67:9, 68:11, 68:15
**document** [1] - 83:14
**document's** [1] - 19:24
**documents** [4] - 72:23, 83:16, 83:21, 83:23
**dogs** [1] - 25:6
**dollar** [3] - 4:9, 80:17, 80:24
**dollars** [1] - 50:11
**domestic** [4] - 11:8, 11:14, 11:21, 48:25
**don't-repeat-yourself** [1] - 53:14
**done** [17] - 13:12, 13:17, 13:18, 13:24, 14:5, 16:4, 29:16, 41:22, 41:23, 44:14,

53:1, 62:24, 71:25, 74:7, 84:15, 85:8, 85:11
**doors** [1] - 81:15
**double** [1] - 81:15
**doubt** [2] - 6:9, 9:8
**doubtless** [1] - 66:19
**down** [12] - 3:24, 18:3, 18:11, 28:2, 33:21, 35:4, 60:23, 63:3, 63:20, 63:21, 65:17, 84:14
**dozens** [1] - 50:10
**draconian** [1] - 62:10
**drawing** [2] - 28:17, 75:20
**DUBAY** [1] - 2:14
**DuBay** [4] - 3:18, 3:21, 92:17
**DuBay's** [1] - 7:18
**due** [1] - 57:20
**duplicate** [5] - 23:10, 40:24, 41:6, 50:9, 54:23
**duplicating** [2] - 41:2, 41:10
**during** [1] - 38:5
**duty** [1] - 62:19

## E

**earliest** [1] - 90:10
**early** [2] - 42:17, 50:1
**earn** [1] - 56:23
**east** [1] - 91:11
**eastern** [1] - 91:18
**easy** [2] - 54:13, 54:17
**economic** [2] - 61:2, 71:5
**economically** [5] - 42:9, 42:15, 50:5, 50:20, 50:24
**ecstatic** [1] - 13:20
**edubay@ tomasilegal.com** [1] - 2:15
**effect** [9] - 21:11, 29:15, 39:9, 39:24, 58:18, 68:20, 79:4, 79:14, 81:2
**effectively** [2] - 60:23, 75:19
**effects** [3] - 17:20, 17:23, 30:22
**efficiency** [2] - 15:14, 39:2
**efficient** [1] - 39:3
**effort** [1] - 86:9
**efforts** [1] - 87:24
**eight** [1] - 48:25
**either** [13] - 4:3, 11:23, 13:3, 13:8, 18:13, 22:15, 22:25, 26:12, 42:19, 42:22, 52:8,

56:17, 74:16
**ELEANOR** [1] - 2:14
**Eleanor** [1] - 3:18
**electrical** [1] - 60:3
**electricity** [1] - 43:15
**element** [1] - 23:9
**elements** [8] - 8:25, 26:9, 29:10, 29:18, 35:22, 56:7, 66:3, 76:8
**email** [2] - 89:11, 92:8
**employees** [1] - 4:25
**encourage** [1] - 87:24
**encourages** [1] - 87:17
**end** [9] - 11:4, 19:5, 27:9, 28:15, 35:20, 40:18, 46:21, 57:14, 61:12
**ENFIA** [1] - 68:22
**engage** [1] - 32:17
**enhance** [1] - 15:14
**enter** [3] - 40:21, 44:10, 84:13
**enterprising** [1] - 5:18
**entire** [2] - 25:13, 50:2
**entirely** [3] - 15:18, 60:18, 60:22
**entities** [1] - 52:11
**entitled** [9] - 12:17, 61:17, 65:11, 65:12, 65:21, 65:22, 70:18, 71:15, 85:2
**entitlement** [1] - 71:12
**entity** [10] - 9:17, 9:21, 10:5, 34:15, 38:25, 46:10, 46:12, 50:21, 52:21, 62:7
**entrant** [1] - 50:5
**entrepreneurial** [1] - 7:1
**equal** [1] - 19:13
**error** [1] - 57:20
**especially** [2] - 7:2, 39:10
**essence** [1] - 16:12
**essential** [123] - 3:25, 4:15, 8:10, 8:12, 8:15, 14:18, 14:23, 14:24, 15:8, 15:15, 17:19, 18:19, 18:20, 19:1, 19:5, 19:9, 21:19, 21:21, 21:25, 22:4, 24:2, 24:8, 25:19, 26:7, 26:9, 26:14, 26:16, 26:20, 27:10, 28:16, 29:2, 29:12, 29:18, 29:25, 30:1, 30:2, 30:5, 30:11, 31:18, 31:22, 31:25, 32:6, 33:16, 35:25, 37:2, 37:7, 37:12, 37:24, 38:3,

38:4, 38:14, 39:25, 40:3, 40:10, 40:13, 40:17, 40:19, 40:20, 40:24, 41:7, 41:11, 42:4, 42:24, 42:25, 47:18, 47:19, 47:23, 48:2, 48:4, 48:7, 49:18, 49:21, 50:15, 50:16, 51:1, 55:7, 55:22, 56:5, 56:7, 56:24, 57:3, 59:25, 60:1, 60:17, 61:7, 63:14, 66:2, 66:3, 66:10, 66:12, 66:14, 66:15, 66:16, 67:6, 67:9, 67:12, 67:15, 67:20, 68:11, 68:14, 69:19, 70:15, 72:11, 73:17, 73:23, 75:8, 75:13, 75:15, 75:24, 80:17, 80:21, 82:20, 82:21, 83:3, 85:24, 86:5, 86:11, 86:15, 86:22, 86:23
**essentially** [8] - 18:23, 38:24, 45:22, 51:20, 64:8, 68:25, 69:1, 78:12
**establish** [1] - 31:21
**established** [4] - 16:7, 16:9, 68:19, 73:16
**establishing** [2] - 31:20, 86:23
**et** [2] - 1:9, 3:7
**evaluation** [1] - 76:11
**event** [1] - 41:10
**eventual** [1] - 12:3
**eventually** [2] - 52:19, 62:4
**evidence** [11] - 13:6, 16:24, 18:1, 18:14, 19:3, 47:24, 48:1, 48:3, 48:18, 63:5, 78:16
**evil** [2] - 19:18, 19:22
**evolves** [1] - 32:12
**exact** [1] - 36:11
**exactly** [13] - 7:7, 7:12, 15:16, 32:25, 37:13, 38:8, 39:10, 40:7, 43:20, 53:18, 73:6, 81:20, 84:18
**example** [2] - 26:12, 34:18
**examples** [1] - 5:12
**except** [1] - 54:7
**exception** [1] - 53:16
**exchange** [5] - 50:2, 51:9, 53:13, 53:17, 54:24
**Exchange** [1] - 68:23
**exclude** [1] - 16:14
**exclusionary** [4] -

6

17:18, 21:12, 41:4, 58:15
**excruciating** [1] - 25:18
**Exhibits** [1] - 48:19
**exist** [1] - 70:5
**existed** [1] - 70:19
**existence** [1] - 37:8
**expanded** [2] - 6:8, 6:23
**expanding** [1] - 57:4
**expect** [4] - 70:17, 82:1, 85:12
**expected** [1] - 42:15
**expenses** [1] - 80:19
**expensive** [2] - 42:23, 71:6
**experienced** [1] - 89:1
**expert** [4] - 18:16, 71:25, 83:2, 83:5
**expert's** [1] - 69:22
**expertise** [1] - 75:20
**experts** [3] - 63:15, 83:1, 83:6
**Expires** [3] - 93:14, 93:15, 93:16
**explained** [3] - 29:12, 41:10, 53:24
**explanation** [1] - 7:10
**explore** [1] - 92:2
**expressed** [2] - 57:1, 59:11
**extent** [8] - 4:15, 18:13, 38:10, 39:9, 56:21, 60:10, 64:2, 70:21
**extreme** [2] - 62:5, 63:8

## F

**face** [2] - 61:4, 74:22
**facia** [1] - 17:18
**facilities** [71] - 3:25, 4:15, 8:11, 8:12, 8:15, 14:18, 14:23, 14:24, 15:8, 15:15, 17:19, 18:19, 19:1, 19:5, 19:9, 24:2, 25:19, 26:7, 26:9, 26:14, 26:16, 26:20, 29:3, 29:19, 30:1, 30:2, 30:5, 30:11, 31:18, 32:1, 32:6, 33:16, 35:25, 37:2, 37:24, 38:3, 38:4, 38:14, 39:25, 41:7, 42:5, 49:18, 55:22, 56:5, 56:8, 56:24, 57:3, 61:7, 63:14, 66:2, 66:11, 67:6, 67:9, 68:11, 68:14, 69:19, 70:15, 72:12, 75:8, 75:24, 80:18,

80:21, 82:21, 85:24, 86:5, 86:11, 86:15, 86:22, 86:25
**Facilities** [1] - 68:23
**facility** [50] - 18:21, 19:10, 21:19, 21:22, 21:25, 23:10, 27:10, 28:16, 29:12, 31:22, 37:7, 37:12, 38:9, 40:4, 40:10, 40:13, 40:17, 40:19, 40:21, 40:25, 41:7, 41:11, 47:18, 47:19, 47:23, 48:3, 48:4, 48:8, 49:21, 50:15, 50:16, 51:2, 55:7, 59:25, 60:1, 60:17, 66:3, 66:12, 66:14, 66:15, 66:16, 67:12, 67:15, 67:20, 73:17, 73:23, 83:3, 86:23
**facing** [1] - 86:10
**fact** [17] - 6:16, 19:6, 20:1, 21:5, 22:8, 22:18, 22:22, 32:13, 40:25, 49:23, 50:8, 52:11, 60:23, 65:1, 68:10, 68:13, 81:5
**facts** [8] - 25:25, 26:1, 31:10, 33:20, 51:8, 72:14, 73:10, 77:2
**factual** [13] - 22:7, 23:20, 26:15, 47:10, 55:8, 59:2, 59:12, 64:13, 69:24, 75:12, 75:21, 77:6, 79:17
**factually** [1] - 84:25
**failed** [7] - 8:9, 8:19, 8:21, 8:22, 9:3, 9:5
**fair** [6] - 23:22, 24:4, 45:14, 46:20, 70:24, 76:11
**fairly** [2] - 14:22, 62:10
**fairness** [1] - 82:14
**faith** [2] - 89:6, 89:8
**familiar** [1] - 49:2
**families** [1] - 7:3
**family** [1] - 6:22
**fan** [1] - 29:11
**far** [7] - 10:9, 27:9, 28:15, 48:4, 61:12, 62:8, 91:3
**fascinated** [1] - 16:2
**favor** [1] - 38:7
**FCC** [11] - 56:1, 60:8, 60:13, 61:18, 61:20, 62:2, 62:3, 62:17, 62:20, 62:22, 78:6
**FCC's** [1] - 68:18
**feasible** [4] - 20:14, 42:9, 50:5, 50:20
**feature** [3] - 42:14, 43:19, 52:13

**fed** [1] - 73:9
**federal** [1] - 78:20
**fee** [3] - 5:23, 6:7, 56:19
**fervently** [1] - 73:18
**few** [2] - 7:17, 14:9
**fifth** [2] - 50:21, 72:19
**fight** [2] - 22:10, 60:6
**figure** [2] - 7:12, 88:22
**file** [1] - 30:19
**filed** [1] - 33:25
**filing** [2] - 89:11, 92:8
**filings** [1] - 25:2
**final** [6] - 38:6, 45:4, 45:5, 48:7, 48:9, 88:11
**finally** [1] - 9:3
**Financial** [1] - 2:4
**fine** [5] - 17:13, 70:10, 88:7, 90:15, 91:21
**fined** [1] - 37:5
**finish** [1] - 72:9
**firm** [1] - 16:3
**first** [22] - 8:15, 8:18, 14:23, 24:1, 27:14, 29:17, 33:1, 36:20, 44:10, 46:21, 47:22, 48:9, 60:13, 65:19, 70:16, 71:20, 71:22, 72:1, 75:3, 75:6, 86:1, 87:19
**fits** [3] - 57:4, 59:24, 66:2
**five** [2] - 38:3, 58:25
**five-year** [1] - 38:3
**flabbergasted** [1] - 87:18
**flawed** [1] - 7:19
**flesh** [1] - 82:17
**fleshed** [2] - 15:6, 56:25
**floating** [1] - 47:14
**floor** [2] - 87:8, 87:12
**Florida** [2] - 2:5, 67:18
**flow** [1] - 11:1
**fly** [1] - 71:24
**focus** [1] - 8:11
**focusing** [3] - 4:14, 75:7
**folded** [1] - 69:2
**folks** [4] - 10:20, 13:19, 22:3, 44:22
**following** [1] - 69:24
**foot** [1] - 13:21
**footnote** [1] - 23:17
**FOR** [1] - 1:2
**force** [2] - 4:19, 46:19
**forced** [4] - 12:18, 12:19, 80:18
**forcefully** [1] - 73:17
**foreclosed** [3] - 25:5, 26:19, 26:23
**foreclosure** [2] - 25:8,

60:25
**forego** [1] - 87:3
**foregoing** [1] - 93:3
**foregone** [1] - 37:2
**foreign** [3] - 1:5, 36:13, 62:7
**forever** [1] - 52:13
**forgot** [1] - 91:6
**form** [1] - 41:2
**formal** [1] - 92:8
**former** [1] - 49:5
**formulation** [1] - 29:20
**Fort** [1] - 2:5
**forth** [2] - 37:9, 45:21
**forthcoming** [1] - 70:14
**forward** [20] - 7:14, 7:18, 8:8, 12:25, 13:21, 14:2, 15:16, 21:6, 33:13, 33:15, 55:11, 58:10, 58:24, 62:13, 62:16, 63:9, 82:21, 84:9, 86:6
**fought** [1] - 60:7
**four** [2] - 50:19, 88:23
**fours** [1] - 7:12
**fourth** [1] - 72:18
**frame** [1] - 27:6
**framed** [1] - 34:12
**framework** [1] - 59:24
**framing** [1] - 86:8
**frankly** [6] - 13:17, 13:20, 30:16, 31:9, 52:1, 76:10
**fraud** [28] - 4:25, 31:3, 33:12, 33:22, 34:6, 34:7, 34:8, 34:10, 34:11, 34:14, 34:16, 34:17, 34:23, 35:5, 35:10, 35:16, 36:9, 58:22, 59:13, 76:16, 76:19, 76:25, 80:25, 82:16, 84:6, 88:1, 88:3
**free** [5] - 60:18, 60:22, 79:5, 91:25, 92:2
**freestanding** [1] - 36:2
**friend** [3] - 7:9, 37:1, 37:25
**friends** [4] - 6:3, 6:6, 6:22, 7:3
**fringes** [1] - 5:6
**froze** [1] - 51:21
**full** [4] - 9:12, 11:11, 11:12, 34:16
**fully** [3] - 21:23, 59:11, 63:6
**fun** [1] - 54:23
**future** [2] - 62:23, 65:25

## G

**general** [2] - 69:5, 85:13
**generally** [4] - 23:14, 72:19, 88:21, 88:22
**generate** [1] - 39:6
**generations** [1] - 62:23
**generic** [1] - 26:10
**gentleman** [1] - 4:11
**gentlemen** [4] - 34:5, 35:5, 35:9, 35:17
**given** [3] - 17:11, 30:5, 39:22
**glad** [1] - 4:13
**glasses** [1] - 36:6
**God** [1] - 7:5
**gosh** [1] - 91:5
**government** [8] - 16:18, 47:25, 48:18, 59:13, 77:23, 87:17, 87:21, 87:24
**government's** [1] - 48:2
**grand** [1] - 66:18
**grant** [5] - 34:13, 57:5, 75:5, 80:22, 90:15
**granted** [1] - 46:11
**granular** [1] - 33:21
**great** [8] - 12:24, 34:25, 61:2, 62:22, 62:24, 78:20, 79:3
**Greene** [11] - 18:22, 19:8, 29:11, 47:19, 48:2, 48:3, 48:16, 48:20, 49:1, 78:19
**Greene's** [4] - 18:19, 28:18, 47:22, 48:6
**grew** [1] - 81:13
**grinding** [1] - 33:21
**grow** [1] - 91:9
**guess** [6] - 10:16, 12:19, 45:13, 60:8, 68:16, 84:11
**guy** [4] - 7:1, 51:24, 52:7, 91:9
**guys** [1] - 52:8

## H

**habit** [1] - 46:19
**HAITI** [1] - 1:6
**Haiti** [72] - 3:12, 4:23, 4:24, 5:2, 16:13, 16:15, 20:9, 20:10, 21:1, 21:2, 22:3, 22:24, 24:9, 24:13, 24:14, 24:21, 27:8, 27:17, 27:19, 28:11, 32:16, 33:2, 37:18, 40:14, 41:1, 41:5, 41:15, 42:20, 43:24, 44:1, 44:2, 45:11,

46:10, 46:11, 50:18, 50:20, 50:23, 52:18, 52:23, 52:25, 54:7, 54:8, 55:24, 55:25, 58:15, 58:17, 59:14, 60:8, 60:23, 61:6, 61:11, 62:4, 62:11, 62:15, 64:25, 65:1, 65:5, 65:7, 65:9, 65:13, 66:6, 66:7, 67:16, 71:3, 74:8, 74:9, 78:5, 84:16, 84:19, 87:1

**Haiti's** [2] - 10:13, 33:11

**Haitian** [20] - 18:4, 18:7, 18:14, 18:17, 31:2, 34:23, 42:22, 46:9, 56:14, 56:17, 61:14, 79:2, 79:4, 79:8, 79:9, 79:13, 83:8, 83:14, 83:25, 84:14

**half** [1] - 15:3

**Hamry** [1] - 28:22

**hand** [10] - 23:6, 31:4, 49:14, 72:12, 72:17, 72:18, 72:19, 72:21, 73:2

**handed** [1] - 68:3

**hands** [1] - 72:25

**hanging** [1] - 13:11

**hangs** [1] - 22:19

**Hansen** [1] - 3:15

**HANSEN** [2] - 2:7, 3:15

**happily** [2] - 22:20, 32:25

**happy** [4] - 22:19, 51:18, 69:6, 73:1

**hard** [6] - 7:9, 7:11, 9:14, 54:13, 54:19, 85:17

**harm** [1] - 62:20

**harmed** [1] - 37:23

**HBOs** [1] - 5:21

**head** [3] - 37:14, 45:18, 77:19

**hear** [3] - 14:8, 15:24, 82:19

**heard** [15] - 7:22, 36:8, 39:16, 39:18, 41:21, 43:23, 45:22, 46:9, 57:11, 73:5, 73:6, 73:14, 87:15, 87:19, 88:1

**hearing** [8] - 7:14, 7:18, 28:18, 35:4, 45:9, 45:18, 45:21, 91:23

**heart** [3] - 5:24, 85:9, 85:11

**heartburn** [1] - 57:9

**heaven** [1] - 74:24

**heel** [1] - 82:8

**held** [2] - 9:19, 15:15

**helps** [1] - 89:3

**hesitate** [1] - 90:6

**Hewitt** [1] - 39:20

**high** [3] - 25:4, 87:23

**higher** [4] - 22:6, 56:19, 59:15, 87:13

**historical** [2] - 47:16, 73:10

**history** [1] - 51:11

**hit** [3] - 9:15, 37:14, 52:12

**hits** [1] - 53:6

**Hogan** [1] - 39:14

**hold** [1] - 15:7

**holder** [1] - 66:13

**holding** [2] - 20:21, 20:22

**HOLDING** [1] - 1:5

**Holding** [2] - 3:6, 3:12

**Holding's** [1] - 3:23

**hole** [1] - 7:11

**home** [2] - 5:19, 36:16

**Home** [1] - 84:20

**honestly** [1] - 21:4

**Honor** [18] - 3:5, 3:10, 5:4, 9:14, 14:17, 36:18, 37:16, 45:7, 46:14, 57:11, 58:5, 61:23, 75:5, 81:18, 82:1, 91:10, 92:4, 92:17

**honorable** [1] - 59:1

**HONORABLE** [1] - 1:17

**Hood** [2] - 36:14, 39:4

**hook** [4] - 6:5, 74:18, 74:20

**hope** [1] - 36:7

**hopefully** [1] - 8:20

**hopes** [1] - 4:6

**hoping** [1] - 14:6

**house** [2] - 6:5, 42:10

**hubs** [1] - 43:18

**Human** [1] - 34:25

**humanity** [1] - 13:11

**humble** [1] - 36:11

**hundred** [1] - 80:17

**hundreds** [2] - 50:10, 72:22

**hurts** [1] - 31:24

**hypotheticals** [1] - 5:12

### I

**iconic** [1] - 29:9

**idea** [1] - 52:19

**identify** [3] - 3:9, 23:2, 83:19

**illegal** [4] - 21:13,

34:1, 66:15, 78:18

**imagine** [4] - 5:11, 6:2, 34:5, 44:4

**immediately** [1] - 42:4

**impermissible** [2] - 9:4, 15:12

**implausible** [1] - 77:22

**implication** [1] - 23:19

**important** [2] - 4:20, 11:4

**impose** [1] - 20:25

**impossible** [3] - 27:8, 38:17, 54:12

**impractical** [1] - 50:9

**IN** [1] - 1:1

**inappropriate** [1] - 85:20

**Inc** [1] - 3:7

**INC** [2] - 1:9, 1:9

**inclination** [1] - 17:2

**inclined** [1] - 17:10

**includes** [1] - 24:5

**including** [3] - 24:9, 49:1, 80:25

**incoming** [1] - 54:3

**incorrect** [2] - 40:16, 87:18

**incredibly** [2] - 38:16, 72:11

**incur** [1] - 80:19

**indeed** [4] - 16:7, 16:18, 48:12, 70:14

**independent** [3] - 20:19, 34:12, 83:18

**independently** [1] - 23:17

**indicated** [1] - 82:7

**indirectly** [3] - 22:25, 23:1, 23:24

**Indistinguishable** [1] - 43:12

**individual** [9] - 4:25, 5:15, 5:18, 6:2, 6:13, 9:22, 10:5, 12:11, 83:19

**individuals** [1] - 12:10

**indulgence** [1] - 4:17

**infeasibility** [1] - 43:20

**infer** [1] - 12:19

**inference** [5] - 10:18, 10:21, 10:22, 10:23

**inferential** [4] - 15:6, 15:10, 15:11

**infrastructure** [2] - 5:2, 15:14

**ingenuity** [2] - 5:19, 38:25

**inherent** [2] - 16:5, 82:15

**inherently** [1] - 31:23

**inhibits** [1] - 42:19

**inhouse** [1] - 48:24

**initio** [1] - 81:19

**injunction** [1] - 19:25

**injunctive** [1] - 19:7

**injury** [9] - 9:6, 9:9, 9:10, 9:13, 10:11, 31:17, 86:20

**insane** [1] - 35:14

**insanely** [1] - 35:11

**inside** [1] - 77:18

**instead** [3] - 35:11, 48:5, 69:16

**instructed** [1] - 73:9

**instructs** [1] - 18:15

**integrity** [1] - 58:2

**intellectually** [1] - 20:5

**intercity** [5] - 18:22, 19:4, 28:1, 28:5, 68:5

**interconnect** [3] - 20:13, 51:13, 51:19

**interconnecting** [2] - 68:18, 68:19

**interconnection** [4] - 21:1, 44:2, 56:9, 62:19

**interconnections** [1] - 56:12

**interest** [1] - 40:4

**interesting** [11] - 5:7, 18:17, 20:5, 23:6, 31:2, 31:3, 53:25, 55:19, 58:10, 78:21, 92:14

**interestingly** [1] - 32:9

**International** [1] - 34:24

**international** [9] - 11:9, 11:14, 11:22, 56:15, 56:18, 56:19, 69:9, 69:13, 78:5

**internationally** [2] - 60:5, 64:1

**internet** [3] - 69:12, 92:4

**interplay** [1] - 20:5

**interrogatory** [3] - 13:3, 13:9, 70:10

**Interstate** [1] - 68:23

**interstate** [1] - 60:14

**intricacies** [1] - 36:1

**intriguing** [1] - 17:7

**introduce** [1] - 18:14

**intrude** [1] - 88:15

**intuitions** [1] - 54:13

**invest** [2] - 39:9, 40:1

**investment** [3] - 39:1, 39:10, 41:13

**invigorated** [1] - 51:16

**involved** [2] - 83:19, 84:6

**involves** [3] - 48:23, 84:22

**involving** [2] - 72:22, 85:13

**Iqbal** [2] - 72:17, 73:12

**ironic** [1] - 92:1

**irony** [1] - 73:6

**irrespective** [1] - 84:3

**island** [2] - 62:11, 62:13

**islands** [1] - 85:14

**isolated** [1] - 85:14

**issue** [26] - 5:6, 5:9, 14:18, 14:24, 17:1, 26:2, 27:7, 30:20, 50:1, 60:1, 61:15, 62:6, 67:19, 73:19, 74:1, 81:23, 82:10, 82:11, 84:1, 84:4, 84:19, 84:21, 85:22, 85:23, 86:10

**issues** [5] - 62:3, 69:25, 79:2, 84:22, 84:23

**itself** [1] - 22:23

### J

**job** [1] - 22:2

**John** [2] - 12:8, 12:14

**joined** [1] - 49:8

**jointly** [1] - 90:12

**JUDGE** [1] - 1:18

**Judge** [24] - 4:8, 5:11, 13:12, 13:18, 13:25, 18:19, 18:21, 19:8, 21:20, 28:18, 29:11, 38:21, 47:18, 47:22, 48:2, 48:3, 48:6, 48:16, 48:19, 49:1, 59:1, 78:19, 92:16

**judge** [8] - 4:13, 18:15, 29:15, 53:16, 58:6, 59:1, 89:3, 89:7

**judgment** [16] - 30:20, 32:5, 33:14, 38:6, 48:7, 48:9, 54:15, 63:10, 63:12, 79:21, 79:24, 80:2, 80:3, 80:9, 80:10, 81:6

**juncture** [1] - 8:3

**jurisdiction** [2] - 56:2, 61:21

**jury** [18] - 7:15, 7:16, 7:17, 17:10, 18:16, 25:25, 33:15, 34:5, 35:9, 35:17, 57:25, 58:1, 69:19, 71:18, 76:15, 88:2, 88:5, 88:8

**Justice** [2] - 39:15, 51:16

**justification** [9] - 17:24, 18:2, 18:12, 30:21, 58:20, 63:22, 63:23, 84:5

**justifications** [1] - 31:12

## K

**keep** [7] - 36:6, 44:19, 56:22, 66:5, 67:5, 75:20, 84:4
**key** [1] - 78:12
**killed** [2] - 21:23, 30:25
**kills** [2] - 39:25, 40:1
**Kim** [1] - 3:11
**KIM** [1] - 2:3
**kind** [11] - 15:1, 20:22, 25:11, 36:3, 49:22, 62:25, 66:23, 76:15, 76:19, 84:24, 86:10
**kinds** [5] - 16:3, 34:22, 69:14, 69:24, 79:17
**Kingsbury** [1] - 51:19
**knell** [1] - 38:10
**knowledge** [1] - 73:10
**known** [1] - 51:18
**knows** [2] - 7:6, 11:12

## L

**ladies** [4] - 34:5, 35:5, 35:9, 35:17
**laid** [4] - 17:17, 29:18, 35:21, 53:18
**landline** [2] - 41:17, 42:8
**landlines** [2] - 42:9, 42:17
**lands** [1] - 44:2
**language** [3] - 12:2, 18:21, 42:24
**lashing** [2] - 14:11, 14:13
**last** [11] - 4:1, 4:9, 19:20, 21:22, 43:5, 45:18, 45:23, 45:24, 46:1, 46:6, 50:17
**late** [1] - 68:20
**Lauderdale** [1] - 2:5
**laugh** [1] - 7:2
**law** [33] - 16:9, 16:13, 16:20, 17:5, 18:4, 18:7, 18:9, 18:14, 18:16, 18:17, 20:22, 31:2, 33:21, 33:23, 34:1, 40:5, 54:25, 56:14, 56:17, 63:4, 64:24, 66:18, 70:18, 78:18, 78:20, 79:3, 79:4, 79:8, 79:10, 79:13, 81:4, 83:8, 83:14
**lawful** [1] - 70:17
**laws** [8] - 34:9, 34:13, 34:18, 34:22, 35:1, 36:9, 62:20, 63:7
**lawsuit** [2] - 80:24, 81:3
**lawyer** [3] - 28:21,

89:3, 89:5
**lay** [2] - 12:7, 81:24
**leads** [1] - 76:18
**leaps** [3] - 15:10, 15:11
**learn** [2] - 13:8, 18:4
**least** [9] - 10:3, 10:24, 45:14, 50:3, 60:8, 80:1, 89:6, 89:8
**leave** [1] - 13:11
**leeway** [1] - 17:11
**left** [3] - 23:18, 25:6, 84:14
**legal** [4] - 19:24, 64:25, 76:2, 76:17
**legally** [6] - 16:7, 16:9, 54:24, 75:23, 84:23, 85:4
**legislature** [2] - 55:25, 78:6
**legitimacy** [2] - 60:25, 61:14
**legitimate** [16] - 16:18, 56:8, 56:11, 56:20, 57:19, 57:24, 65:6, 66:4, 66:5, 66:7, 66:8, 66:13, 67:5, 75:15, 82:3, 82:6
**legitimately** [1] - 81:24
**legs** [1] - 74:21
**Lerner** [1] - 3:11
**LERNER** [1] - 2:3
**less** [4] - 6:11, 32:16, 74:5, 87:13
**level** [2] - 25:18, 68:7
**leverage** [1] - 82:7
**liable** [1] - 15:15
**license** [3] - 46:11, 50:12, 55:4
**licenses** [1] - 55:3
**lie** [1] - 20:23
**lieu** [1] - 86:11
**likelihood** [1] - 33:18
**limine** [2] - 17:1, 76:23
**limited** [2] - 12:3, 62:15
**limiting** [3] - 6:24, 14:20, 62:14
**line** [1] - 6:19
**lines** [7] - 18:22, 43:8, 43:17, 43:21, 43:22, 51:13
**linked** [1] - 53:5
**list** [1] - 44:15
**listed** [1] - 10:3
**listening** [1] - 17:8
**literally** [2] - 9:15, 86:13
**litigation** [1] - 12:23
**LLP** [2] - 2:3, 2:10
**lo** [1] - 39:4
**local** [13] - 5:14, 18:23, 27:13, 27:22, 28:2,

28:12, 28:15, 50:2, 51:7, 51:9, 51:14, 54:23, 56:16
**locale** [1] - 42:15
**locally** [2] - 44:1, 71:2
**location** [1] - 20:14
**logic** [2] - 66:10, 66:16
**long-distance** [2] - 60:18, 68:3
**look** [22] - 7:14, 25:25, 26:7, 26:12, 26:14, 26:16, 31:17, 32:18, 34:3, 35:23, 35:24, 54:1, 54:2, 64:19, 64:24, 69:9, 74:18, 75:14, 76:6, 79:18, 79:19
**looked** [3] - 22:15, 35:25, 48:4
**looking** [7] - 7:18, 18:19, 21:20, 39:11, 39:24, 61:13, 74:23
**looks** [1] - 25:25
**loose** [1] - 46:21
**lose** [2] - 71:12, 71:13
**lost** [1] - 5:9
**Louis** [9] - 27:12, 27:13, 27:24, 28:2, 28:6, 28:8, 28:9, 60:19, 68:4
**love** [1] - 22:9
**loved** [1] - 49:13
**low** [1] - 66:20
**lucky** [1] - 49:12

## M

**magic** [1] - 23:2
**magnanimity** [1] - 81:25
**main** [1] - 56:3
**majority** [3] - 24:13, 38:5, 41:25
**marked** [1] - 40:11
**market** [40] - 8:21, 8:23, 19:5, 21:18, 22:24, 25:3, 25:9, 25:12, 25:13, 26:19, 26:21, 26:22, 27:7, 27:9, 27:14, 27:16, 28:4, 28:5, 40:14, 40:22, 45:6, 45:8, 45:10, 45:15, 45:20, 46:1, 46:2, 46:5, 50:9, 52:21, 54:6, 59:18, 70:24, 71:1, 72:3, 77:22, 84:14
**markets** [2] - 28:14, 85:14
**Martin** [1] - 3:18
**Mary** [5] - 90:16, 90:24, 91:22, 91:25, 92:8
**matter** [17] - 16:13,

16:20, 22:18, 22:22, 23:20, 25:7, 26:15, 33:4, 34:1, 34:6, 44:6, 47:10, 52:5, 54:10, 55:9, 59:12
**matters** [3] - 18:1, 78:15
**maximize** [1] - 66:20
**MCI** [34] - 19:23, 19:24, 19:25, 21:14, 27:11, 28:5, 28:10, 28:19, 29:2, 33:25, 34:21, 37:1, 37:5, 37:22, 42:7, 42:14, 43:6, 47:17, 50:1, 52:8, 54:23, 56:10, 60:11, 60:17, 68:2, 68:10, 68:12, 69:3, 76:5, 76:7, 78:11
**MCI's** [1] - 28:21
**MCI/AT&T** [2] - 45:22, 67:22
**McKeown's** [1] - 21:20
**mean** [30] - 6:14, 10:17, 17:14, 20:4, 21:3, 21:14, 21:16, 21:17, 24:25, 27:17, 32:9, 32:11, 34:25, 35:1, 50:4, 50:7, 50:12, 53:20, 54:22, 60:12, 62:12, 64:7, 64:23, 65:15, 65:17, 65:21, 67:25, 71:24, 81:22
**meaning** [2] - 31:4, 40:18
**means** [9] - 7:6, 24:6, 26:18, 39:3, 41:7, 45:17, 51:22, 87:24, 93:5
**meant** [1] - 60:16
**mechanism** [1] - 50:17
**mediation** [7] - 88:17, 88:22, 89:4, 89:8, 89:10, 90:4, 90:11
**mediator** [1] - 88:18
**meet** [3] - 8:9, 86:16
**members** [1] - 4:25
**mentioned** [1] - 18:18
**Merit** [1] - 93:13
**merit** [1] - 38:13
**merits** [1] - 80:12
**messy** [1] - 84:23
**met** [1] - 86:6
**MetroNet** [3] - 26:13, 35:23, 79:19
**Miami** [7] - 59:17, 60:23, 61:5, 61:11, 65:8, 68:8, 76:4
**Michael** [1] - 49:10
**MICHAEL** [1] - 1:17
**Microsoft** [3] - 17:16, 18:18

**mid** [1] - 9:13
**mid-service** [1] - 9:13
**midst** [1] - 82:2
**midstream** [2] - 74:2
**might** [10] - 25:19, 34:15, 36:20, 55:25, 62:3, 72:20, 77:16, 80:21, 81:1, 81:2
**mile** [5] - 45:23, 45:24, 46:1, 46:6, 50:17
**million** [1] - 80:17
**millions** [2] - 50:11, 72:23
**mind** [8] - 5:25, 6:9, 6:17, 7:7, 17:9, 33:22, 51:8, 52:19
**minded** [2] - 52:20
**mine** [1] - 4:8
**minimally** [1] - 35:2
**minimum** [2] - 66:20, 90:5
**minute** [14] - 6:21, 24:3, 32:15, 33:2, 35:12, 35:13, 55:14, 60:6, 61:1, 64:1, 64:11, 64:12, 67:18, 78:4
**minutes** [6] - 14:9, 33:1, 35:12, 35:13, 35:16, 55:16
**misheard** [1] - 41:22
**misses** [1] - 41:4
**mistaken** [1] - 60:13
**mitigate** [1] - 69:1
**Mobile** [2] - 44:6, 44:7
**mock** [1] - 76:14
**model** [2] - 41:24, 62:14
**moment** [3] - 5:11, 33:24, 57:11
**money** [7] - 19:25, 30:3, 54:20, 54:25, 62:14, 84:16, 89:15
**monitored** [1] - 20:18
**monopolist** [3] - 15:14, 56:22, 67:5
**monopolistic** [3] - 15:12, 74:24, 88:6
**monopolization** [5] - 26:10, 26:17, 31:20, 36:2, 85:14
**monopolize** [1] - 61:5
**monopolized** [1] - 19:4
**monopolizing** [1] - 59:17
**monopoly** [29] - 8:22, 15:11, 16:8, 16:10, 16:18, 24:21, 24:24, 27:25, 51:6, 56:22, 56:23, 60:25, 61:14, 61:17, 63:4, 63:7, 64:25, 65:1, 65:3,

9

66:6, 66:12, 66:14, 66:22, 67:5, 76:13, 78:1, 86:18, 88:5
**months** [2] - 6:17, 7:17
**morning** [8] - 3:10, 3:13, 3:20, 9:15, 15:22, 15:23, 53:18, 55:18
**Morrison** [1] - 2:15
**most** [6] - 5:7, 18:9, 21:21, 25:2, 35:10, 62:5
**motion** [13] - 3:23, 17:1, 19:2, 30:19, 34:16, 57:8, 59:3, 73:7, 75:22, 77:11, 80:22, 89:20
**Motion** [1] - 41:3
**motions** [1] - 76:23
**motivation** [1] - 62:25
**motivations** [1] - 78:13
**mousetrap** [2] - 6:11, 7:1
**move** [4] - 33:9, 33:13, 62:16, 73:11
**moved** [3] - 40:12, 47:25, 48:1
**moves** [2] - 48:18, 50:22
**moving** [2] - 50:14, 51:1
**MR** [188] - 3:10, 3:14, 3:15, 3:16, 4:5, 4:11, 7:21, 7:25, 8:3, 8:8, 10:15, 10:21, 11:16, 11:18, 11:25, 12:17, 13:10, 13:15, 14:10, 14:16, 15:21, 15:23, 16:1, 17:6, 17:14, 19:16, 19:22, 20:3, 20:17, 20:20, 22:5, 22:13, 22:17, 24:11, 24:17, 24:20, 24:24, 25:16, 26:5, 26:24, 27:2, 27:4, 27:6, 27:20, 28:23, 29:4, 29:6, 29:9, 29:25, 30:8, 30:16, 31:8, 32:3, 33:19, 35:8, 35:20, 36:6, 36:17, 36:19, 36:22, 37:13, 38:15, 38:18, 38:23, 39:17, 39:20, 39:22, 40:7, 41:18, 41:20, 42:12, 43:4, 43:10, 43:13, 43:16, 43:19, 44:15, 44:20, 44:23, 45:1, 45:3, 45:17, 46:8, 46:19, 46:21, 46:24, 47:2, 47:7, 47:10, 47:14, 48:14, 48:21, 49:7, 49:12,

49:14, 51:3, 51:5, 52:4, 53:2, 53:12, 53:17, 54:12, 55:15, 57:11, 57:15, 57:22, 58:5, 58:8, 58:17, 59:16, 60:9, 61:22, 61:25, 63:13, 64:2, 64:5, 64:7, 64:10, 64:15, 64:20, 64:23, 65:5, 65:23, 66:10, 67:1, 67:8, 67:25, 69:22, 70:9, 70:11, 70:13, 71:4, 72:6, 72:15, 73:1, 75:5, 77:18, 77:20, 77:21, 78:8, 78:24, 79:2, 79:22, 79:23, 79:25, 80:1, 80:3, 80:4, 80:6, 80:10, 81:8, 81:13, 81:17, 82:18, 82:24, 83:1, 83:10, 83:13, 83:17, 85:11, 85:15, 85:16, 85:19, 85:24, 86:2, 87:6, 87:10, 87:11, 87:15, 88:4, 88:9, 88:19, 88:20, 89:21, 89:22, 90:5, 90:14, 90:22, 91:3, 91:5, 91:9, 91:13, 91:17, 91:19, 91:21, 92:4, 92:12, 92:16
**MS** [3] - 3:18, 3:21, 92:17
**multi** [1] - 80:17
**multi-hundred-million** [1] - 80:17
**multimillion** [1] - 80:24
**must** [8] - 8:19, 10:7, 10:24, 19:10, 43:24, 44:10, 70:4

## N

**nail** [1] - 37:14
**name** [4] - 28:22, 32:7, 39:12, 39:14
**narrowing** [1] - 14:21
**Natcel** [1] - 44:1
**Natcom** [15] - 52:14, 52:15, 52:17, 52:18, 52:23, 52:24, 52:25, 53:5, 53:7, 53:9, 53:22, 53:23, 54:3, 54:8
**nationwide** [1] - 72:22
**nature** [3] - 11:1, 11:7, 38:23
**near** [1] - 11:17
**nearly** [1] - 19:12
**necessarily** [3] - 18:8, 46:1, 76:16
**necessary** [2] - 40:14,

74:11
**need** [23] - 8:2, 13:18, 14:15, 23:10, 25:18, 31:21, 42:1, 45:24, 45:25, 46:3, 50:17, 69:25, 72:2, 75:23, 75:25, 82:23, 83:4, 85:22, 86:17, 91:13, 92:9, 92:10
**needs** [2] - 15:6, 25:1
**negative** [2] - 20:21, 21:11
**negotiate** [3] - 69:7, 74:6, 74:10
**negotiated** [2] - 68:24, 69:5
**neighbors** [3] - 6:3, 6:7, 6:22
**Network** [1] - 68:23
**network** [37] - 5:17, 20:13, 23:23, 23:25, 24:5, 24:8, 24:10, 24:15, 24:23, 27:13, 28:1, 28:2, 28:7, 28:8, 28:11, 28:12, 28:15, 32:15, 33:2, 36:12, 40:13, 40:19, 41:2, 41:6, 41:8, 41:9, 44:11, 50:2, 53:5, 54:14, 54:18, 54:20, 63:16, 65:10, 71:1, 71:22
**networks** [6] - 41:15, 41:16, 41:17, 50:4, 54:24, 86:25
**never** [16] - 10:2, 10:4, 10:10, 10:12, 15:2, 16:19, 20:10, 20:11, 41:22, 56:25, 70:2, 70:3, 73:19, 74:1, 74:25
**new** [6] - 28:11, 40:2, 50:5, 52:12, 74:2, 78:9
**New** [5] - 60:23, 61:5, 61:11, 65:7, 67:18
**newly** [1] - 51:16
**next** [1] - 13:21
**night** [3] - 14:2, 14:6, 14:7
**nine** [7] - 32:15, 33:2, 35:11, 56:16, 59:22, 70:17, 71:15
**Ninth** [8] - 21:20, 29:21, 30:6, 31:17, 35:24, 38:11, 55:10, 57:1
**nobody** [1] - 44:18
**non** [1] - 51:14
**non-Bell** [1] - 51:14
**none** [3] - 10:2, 74:25, 88:16
**nonetheless** [2] -

5:23, 35:18
**nontrivial** [1] - 30:3
**normal** [4] - 18:15, 31:19, 71:7, 71:8
**normally** [2] - 44:25, 89:1
**not-trivial** [1] - 30:19
**Nothing** [1] - 4:7
**nothing** [1] - 66:15
**notion** [5] - 23:18, 33:22, 40:13, 44:9, 85:8
**novel** [1] - 86:8
**nowhere** [1] - 46:9
**number** [14] - 35:16, 36:9, 40:15, 50:3, 53:6, 58:14, 58:20, 62:2, 63:14, 63:18, 64:3, 68:2, 92:1, 92:2
**NW** [1] - 2:12

## O

**objection** [1] - 48:19
**obligation** [7] - 20:22, 34:7, 34:8, 64:12, 70:2, 79:12, 79:13
**obligations** [4] - 20:25, 34:12, 34:18, 35:3
**obscene** [3] - 35:15, 35:16, 36:11
**obscenely** [1] - 35:12
**observers** [1] - 14:19
**obtained** [1] - 87:2
**obvious** [2] - 14:22, 21:24
**obviously** [5] - 20:24, 42:3, 50:1, 71:12, 83:4
**occasionally** [1] - 57:1
**occur** [1] - 22:17
**occurred** [3] - 20:8, 58:15, 58:17
**occurring** [2] - 7:8, 55:24
**OF** [2] - 1:2, 1:14
**offer** [5] - 52:17, 54:6, 54:8, 61:10, 70:25
**office** [1] - 27:23
**old** [3] - 27:21, 60:12, 78:9
**once** [3] - 31:10, 45:18, 74:25
**one** [58] - 4:7, 5:13, 5:18, 14:12, 15:17, 16:3, 19:8, 19:17, 22:6, 23:6, 25:2, 29:1, 30:1, 30:4, 33:5, 36:7, 36:20, 38:6, 40:10, 40:20, 42:18, 43:8, 46:23, 48:25, 50:6, 50:16,

50:19, 50:23, 51:12, 52:13, 52:16, 55:2, 55:7, 56:7, 56:17, 58:13, 58:14, 62:2, 63:14, 66:2, 66:21, 66:22, 68:2, 72:9, 72:20, 78:12, 78:16, 78:21, 79:7, 80:1, 82:7, 89:8, 89:10, 90:3, 91:10, 91:14
**One** [1] - 2:4
**one-day** [3] - 89:8, 89:10, 90:3
**open** [5] - 40:4, 40:5, 52:19, 52:20
**open-minded** [1] - 52:20
**opened** [1] - 52:20
**opened-minded** [1] - 52:20
**opening** [1] - 7:15
**operating** [1] - 70:19
**opinion** [7] - 17:16, 18:19, 21:20, 21:21, 28:18, 36:11, 55:21
**opportunity** [9] - 15:20, 44:13, 45:15, 47:9, 59:4, 59:21, 72:14, 80:15, 90:3
**oppose** [1] - 17:13
**opposed** [2] - 41:16, 72:13
**opposition** [1] - 57:5
**oral** [2] - 3:5, 83:24
**Oral** [1] - 1:15
**order** [17] - 10:8, 31:21, 37:10, 44:9, 45:24, 46:3, 51:14, 53:9, 59:21, 60:20, 62:6, 62:12, 62:18, 68:20, 69:1, 88:21, 89:9
**ordered** [2] - 89:4, 89:7
**OREGON** [1] - 1:2
**Oregon** [12] - 1:9, 1:24, 2:8, 2:16, 10:1, 45:2, 45:3, 47:4, 51:23, 51:25, 82:4, 93:15
**original** [2] - 51:12, 93:6
**originally** [1] - 61:21
**originate** [2] - 27:18, 45:11
**originating** [1] - 71:2
**otherwise** [5] - 21:25, 31:12, 47:4, 77:3, 80:19
**Otter** [4] - 32:19, 43:6, 43:10, 43:14
**otter** [1] - 43:9
**overall** [1] - 76:22

**overcharging** [1] - 73:19
**overstated** [1] - 72:19
**overwhelming** [1] - 24:12
**own** [11] - 5:19, 39:1, 40:23, 41:2, 41:6, 41:8, 42:2, 42:19, 50:25, 60:19, 86:24

**P**

**p.m** [2] - 91:11, 91:18
**Pacific** [4] - 90:20, 91:1, 91:11, 91:18
**package** [2] - 11:20, 12:2
**page** [4] - 21:24, 40:11, 40:23, 48:17
**paid** [11] - 6:14, 6:15, 6:16, 6:23, 9:11, 11:11, 68:2, 70:20, 70:22, 76:5
**pain** [1] - 68:22
**pair** [3] - 52:14, 52:15, 52:16
**paper** [1] - 70:3
**papers** [1] - 4:22
**par** [1] - 56:21
**paragraph** [6] - 22:11, 46:22, 46:24, 46:25, 47:2, 49:16
**parameters** [1] - 37:10
**parcel** [1] - 76:22
**part** [15] - 14:6, 14:7, 19:20, 34:4, 48:23, 50:17, 50:22, 50:23, 51:9, 52:9, 62:15, 76:14, 76:15, 76:21
**partial** [1] - 30:19
**participant** [2] - 26:19, 26:20
**participate** [4] - 27:9, 81:4, 89:4, 90:3
**particular** [1] - 53:5
**parties** [2] - 88:17, 88:21
**parts** [1] - 61:10
**party** [3] - 15:13, 60:1, 88:18
**pass** [1] - 79:5
**passed** [1] - 51:17
**past** [4] - 7:23, 8:2, 31:13, 48:23
**pate** [1] - 39:13
**Pate** [5] - 39:13, 39:16, 39:17, 39:20, 39:22
**path** [1] - 37:19
**patterns** [2] - 23:2, 54:2
**pause** [1] - 57:9
**pay** [7] - 59:23, 60:5, 60:20, 60:24, 62:7, 68:8, 76:3

**paying** [6] - 5:22, 6:3, 6:20, 59:22, 60:25, 69:16
**payment** [1] - 62:6
**peculiar** [1] - 58:14
**pending** [1] - 89:20
**Pennsylvania** [1] - 2:12
**penny** [1] - 77:25
**people** [8] - 9:25, 14:19, 39:19, 49:9, 51:20, 52:17, 79:9, 79:10
**per** [6] - 35:11, 35:13, 60:5, 64:1, 67:18, 78:4
**perceived** [2] - 28:4, 28:5
**percent** [8] - 24:18, 25:3, 25:4, 25:6, 25:11, 54:5, 77:6, 77:22
**perfect** [1] - 10:15
**perfectly** [1] - 70:10
**period** [2] - 38:3, 38:5
**permitted** [1] - 79:8
**person** [4] - 12:15, 27:18, 27:19, 85:6
**persons** [1] - 47:3
**perspective** [1] - 31:15
**persuading** [1] - 42:21
**persuasive** [1] - 22:1
**phone** [6] - 24:13, 51:25, 52:13, 53:4, 53:10
**phrase** [1] - 35:8
**physical** [2] - 28:1, 52:5
**physically** [1] - 53:3
**pick** [4] - 27:4, 27:5, 34:17, 44:4
**picked** [1] - 41:25
**piece** [2] - 28:5, 70:3
**Pierre** [2] - 12:8, 12:14
**place** [6] - 19:12, 20:23, 29:17, 72:20, 73:7, 73:21
**plainly** [1] - 58:18
**Plaintiff** [3] - 1:7, 2:3, 3:22
**plaintiff** [7] - 3:9, 13:2, 17:18, 55:15, 56:13, 59:21, 81:5
**plaintiff's** [4] - 3:23, 12:25, 38:7, 56:3
**plaintiffs** [2] - 3:15, 32:22
**plane** [1] - 19:13
**plausibility** [6] - 72:18, 77:16, 81:19, 81:20, 82:5, 82:13
**plausible** [3] - 49:22,

57:5, 86:12
**played** [1] - 47:24
**plays** [2] - 17:15, 50:7
**Plaza** [1] - 2:4
**plead** [10] - 8:19, 8:21, 8:22, 9:5, 10:24, 35:22, 49:22, 86:18
**pleading** [23] - 7:23, 8:2, 8:5, 8:9, 8:16, 15:5, 15:17, 19:17, 22:21, 23:9, 26:2, 46:8, 46:9, 47:10, 49:21, 55:9, 73:10, 79:20, 86:19, 86:20, 86:21, 86:25
**pleadings** [8] - 4:2, 15:9, 30:20, 38:6, 77:12, 79:21, 80:4, 86:6
**pleasure** [2] - 4:10, 88:24
**pled** [16] - 10:4, 45:20, 50:8, 64:24, 75:2, 75:14, 75:15, 75:16, 76:6, 76:8, 86:4, 86:11, 86:12
**plenty** [1] - 85:7
**podium** [1] - 73:11
**point** [25] - 9:23, 16:22, 16:23, 20:4, 21:17, 25:17, 29:16, 31:16, 36:7, 40:20, 41:4, 43:5, 44:13, 45:4, 45:5, 47:16, 47:22, 52:22, 53:18, 57:12, 63:11, 67:1, 71:14, 74:17, 76:3
**pointed** [2] - 37:16, 39:23
**points** [4] - 33:24, 40:23, 41:12, 88:12
**pokes** [1] - 7:11
**policy** [3] - 16:8, 61:19, 87:21
**poor** [1] - 36:16
**PORTLAND** [1] - 1:3
**Portland** [4] - 1:9, 1:24, 2:8, 2:16
**position** [3] - 11:13, 38:25, 88:11
**possessed** [1] - 12:11
**possession** [1] - 66:11
**possibility** [1] - 12:13
**possible** [4] - 18:9, 30:23, 41:21, 50:3
**post** [3] - 14:22, 16:21
**postpone** [2] - 90:1, 92:11
**potential** [3] - 46:7, 65:8, 72:23
**potentially** [1] - 72:23
**power** [3] - 43:7, 43:21, 65:3

**practical** [4] - 51:22, 54:6, 54:10, 83:4
**practice** [2] - 36:7, 52:2
**pre** [1] - 16:21
**precedent** [1] - 69:14
**predetermined** [1] - 37:6
**predicates** [1] - 75:21
**preexisting** [1] - 71:8
**premises** [1] - 28:1
**premium** [4] - 5:24, 6:11, 6:18, 6:20
**prepared** [1] - 55:4
**prepping** [1] - 44:20
**present** [3] - 72:14, 77:1, 81:5
**presented** [3] - 7:15, 47:24, 47:25
**preserve** [2] - 58:2, 78:1
**preserves** [1] - 63:25
**pressure** [2] - 62:4, 65:24
**presumably** [1] - 83:5
**presumptively** [1] - 76:17
**pretty** [5] - 17:4, 22:1, 32:3, 71:14, 77:9
**prevalent** [1] - 16:25
**prevent** [3] - 34:14, 34:15, 34:17
**preventing** [1] - 41:5
**price** [6] - 59:15, 60:20, 66:6, 67:18, 72:3, 83:9
**prices** [2] - 66:20
**prima** [1] - 17:18
**primary** [3] - 33:10, 56:2, 61:21
**principals** [1] - 4:25
**private** [4] - 19:14, 36:10, 38:25, 52:2
**privity** [2] - 10:8
**problem** [12] - 15:4, 18:7, 22:23, 25:8, 42:13, 55:23, 56:5, 62:23, 67:14, 68:9, 81:24
**problems** [2] - 21:4, 49:17
**procedures** [1] - 83:20
**proceed** [1] - 4:4
**proceeding** [2] - 13:23, 37:3
**proceedings** [3] - 49:1, 92:19, 93:5
**PROCEEDINGS** [1] - 1:14
**process** [4] - 10:25, 40:5, 71:25
**procompetitive** [3] - 17:23, 52:21, 76:17

**produce** [1] - 62:17
**produced** [1] - 70:4
**product** [1] - 39:6
**production** [1] - 70:12
**profit** [4] - 39:2, 39:6, 56:18, 66:22
**profitability** [1] - 74:21
**profitable** [3] - 32:16, 35:11, 35:13
**profitably** [1] - 32:25
**profits** [11] - 35:14, 35:15, 35:16, 36:11, 56:23, 66:12, 66:14, 67:6, 70:21, 74:23, 78:1
**prohibited** [2] - 46:12, 60:15
**prohibitively** [1] - 42:23
**promise** [1] - 45:4
**promised** [1] - 73:12
**proper** [1] - 9:6
**properly** [1] - 86:21
**protect** [2] - 58:22, 76:13
**protected** [1] - 16:18
**prove** [5] - 25:23, 55:4, 69:20, 70:7, 76:10
**proved** [2] - 70:2, 70:3
**proven** [2] - 38:16, 77:7
**provide** [9] - 6:6, 6:23, 32:21, 42:16, 45:25, 46:3, 83:13, 91:25
**provided** [3] - 10:19, 45:12, 51:6
**provider** [2] - 42:22, 44:6
**providers** [2] - 42:20, 50:19
**providing** [5] - 6:12, 7:3, 27:22, 32:21, 45:10
**proving** [4] - 26:9, 37:11, 86:19, 86:20
**public** [3] - 16:7, 40:4, 40:6
**pull** [1] - 46:25
**purchase** [2] - 11:3, 12:9
**purchased** [15] - 9:18, 10:2, 10:3, 10:6, 10:10, 10:12, 10:19, 11:8, 11:9, 12:8, 12:14, 13:4, 15:2, 47:3
**pure** [2] - 85:9, 85:11
**purely** [1] - 30:14
**purported** [2] - 40:25, 66:6
**purpose** [1] - 39:2
**purposes** [7] - 11:8, 11:9, 25:10, 26:2,

33:20, 41:7, 87:7
**pursuant** [1] - 37:6
**pursued** [1] - 12:6
**put** [13] - 4:9, 10:20, 13:21, 15:16, 23:7, 31:19, 62:4, 64:16, 65:24, 73:24, 84:19, 84:21, 88:8
**puts** [1] - 21:24
**putting** [1] - 61:1

## Q

**questions** [5] - 13:8, 63:11, 76:24, 78:12, 85:17
**quintessential** [1] - 68:11
**quite** [10] - 8:14, 34:19, 36:22, 38:10, 48:21, 73:17, 73:18, 88:24
**quote** [1] - 19:10
**quote/unquote** [1] - 74:3
**quotes** [1] - 41:2

## R

**railroad** [3] - 43:7, 43:17, 60:2
**railway** [2] - 43:8, 43:21
**Railway** [3] - 43:13, 43:14, 43:17
**raised** [3] - 45:18, 82:10, 82:11
**randomly** [1] - 47:14
**range** [3] - 34:14, 34:16, 62:3
**rate** [12] - 11:14, 35:10, 35:13, 37:12, 37:15, 68:24, 69:13, 70:18, 70:19, 70:22, 71:20
**rates** [4] - 20:14, 20:18, 68:3, 68:19
**rather** [2] - 21:8, 47:25
**raw** [1] - 76:13
**re** [1] - 4:18
**re-contextualize** [1] - 4:18
**reach** [6] - 24:22, 41:8, 52:23, 62:2, 63:18, 77:18
**reached** [4] - 18:25, 24:14, 51:18, 52:5
**read** [5] - 4:2, 28:19, 57:17, 59:7
**reading** [4] - 23:22, 24:4, 28:20, 78:11
**ready** [2] - 13:19, 57:2
**real** [2] - 15:4
**reality** [5] - 13:12,

13:21, 13:25, 49:23, 86:9
**really** [15] - 7:11, 25:21, 25:22, 30:13, 30:21, 58:13, 58:14, 65:24, 72:12, 72:20, 75:6, 75:13, 75:24, 77:22, 92:5
**Realtime** [1] - 93:13
**reared** [1] - 45:18
**reason** [18] - 20:4, 21:24, 25:7, 56:9, 56:11, 56:20, 57:20, 57:23, 61:3, 61:17, 66:4, 66:5, 66:7, 66:9, 66:13, 67:5, 90:6, 90:9
**reasonable** [14] - 10:17, 10:18, 10:21, 10:22, 10:23, 19:10, 24:6, 25:12, 37:12, 45:14, 60:6, 67:21, 69:20, 70:24
**reasons** [4] - 16:3, 31:1, 40:15, 57:24
**rebuild** [2] - 28:11, 50:1
**received** [2] - 42:8, 48:20
**recent** [2] - 21:21, 25:2
**recently** [1] - 51:17
**recess** [1] - 55:14
**Recess** [1] - 55:17
**recognize** [1] - 57:7
**recognized** [1] - 16:10
**reconsider** [1] - 57:16
**record** [2] - 3:9, 93:4
**recross** [3] - 44:21, 44:24, 44:25
**redress** [1] - 62:20
**reduce** [1] - 33:17
**redundant** [1] - 9:2
**refer** [1] - 39:19
**referring** [1] - 66:23
**reflect** [1] - 63:2
**reflecting** [1] - 19:6
**reform** [2] - 55:25, 56:1
**refusal** [1] - 86:9
**refuse** [1] - 32:17
**refused** [1] - 32:21
**refusing** [1] - 51:13
**regard** [1] - 21:1
**regarding** [1] - 57:6
**regardless** [1] - 12:9
**regards** [1] - 70:15
**Registered** [1] - 93:13
**regular** [2] - 21:5, 71:17
**regularly** [1] - 32:14
**regulate** [2] - 37:17, 40:6
**regulated** [1] - 68:19

**regulation** [4] - 17:25, 65:16, 67:21, 72:2
**regulations** [2] - 19:11, 20:7
**regulator** [2] - 58:21, 83:25
**regulators** [1] - 78:6
**regulatory** [19] - 31:12, 37:4, 37:7, 37:9, 37:15, 40:5, 46:11, 47:20, 48:24, 54:21, 55:25, 56:1, 61:3, 61:17, 62:25, 64:12, 70:1, 73:19, 79:12
**rejects** [1] - 21:23
**relationship** [8] - 9:16, 13:5, 13:7, 15:6, 74:3, 74:18, 75:1, 77:23
**relatives** [1] - 6:7
**relevant** [6] - 8:21, 8:23, 21:18, 65:16, 68:17
**reluctance** [2] - 77:5, 77:10
**reluctant** [1] - 72:12
**rely** [1] - 13:10
**remain** [1] - 46:17
**remains** [1] - 55:10
**remarks** [1] - 44:19
**remedy** [1] - 61:20
**remember** [8] - 4:22, 28:20, 28:25, 29:1, 29:8, 36:21, 43:8, 53:16
**remind** [1] - 4:18
**reminded** [1] - 73:25
**repair** [1] - 61:9
**repeat** [2] - 53:14, 53:15
**repeated** [1] - 73:25
**repeats** [1] - 44:18
**repetitive** [1] - 73:13
**repetitively** [1] - 73:18
**report** [2] - 89:10, 89:11
**Reporter** [3] - 1:23, 93:13, 93:13
**represent** [1] - 22:20
**represented** [1] - 52:2
**represents** [2] - 11:2, 16:3
**reproduce** [1] - 63:15
**repudiated** [1] - 38:11
**request** [2] - 70:12, 90:12
**requested** [2] - 56:9, 56:12
**require** [1] - 71:9
**required** [4] - 36:10, 55:3, 56:14, 79:10
**requirement** [1] - 8:18

**requirements** [5] - 8:9, 8:16, 73:11, 86:18
**requires** [2] - 83:8, 83:14
**requiring** [1] - 59:22
**reread** [1] - 28:17
**resale** [1] - 60:14
**rescinded** [1] - 38:12
**research** [1] - 87:20
**resell** [1] - 60:19
**reselling** [2] - 7:6, 69:10
**residential** [1] - 18:24
**residents** [1] - 24:13
**resist** [1] - 49:17
**resolve** [1] - 63:11
**respect** [19] - 5:1, 5:9, 6:18, 14:17, 14:23, 15:8, 15:11, 15:12, 19:11, 30:20, 36:25, 38:9, 43:7, 45:6, 51:3, 57:20, 74:3, 82:5
**respectful** [1] - 81:11
**respectfully** [2] - 81:9, 81:18
**respond** [7] - 15:20, 30:18, 44:13, 45:5, 49:18, 80:15, 81:9
**response** [17] - 7:18, 16:23, 21:17, 22:9, 33:7, 33:9, 34:11, 46:22, 46:24, 47:8, 53:12, 57:10, 70:7, 73:7, 73:15, 81:7, 84:12
**responses** [2] - 4:8, 33:19
**responsive** [3] - 17:9, 44:19, 60:10
**rest** [1] - 76:21
**restated** [1] - 29:22
**restrained** [1] - 81:14
**restriction** [1] - 32:14
**restrictions** [1] - 60:14
**rests** [1] - 55:15
**result** [2] - 65:2, 76:19
**results** [1] - 62:18
**resume** [1] - 91:23
**retail** [7] - 23:3, 60:18, 60:20, 68:12, 71:8, 71:20, 75:25
**rethinking** [1] - 75:7
**reverse** [4] - 39:8, 39:24, 61:22
**review** [1] - 38:2
**revisit** [2] - 85:21, 85:23
**rhansen@schwabe. com** [1] - 2:7
**rich** [1] - 36:15
**Richard** [1] - 3:15

**RICHARD** [1] - 2:7
**RICO** [1] - 80:25
**rights** [1] - 67:23
**Rights** [1] - 34:25
**ring** [1] - 53:10
**RMR** [1] - 1:23
**Roam** [1] - 84:20
**ROBERT** [1] - 2:3
**Robert** [3] - 3:11, 28:22
**Robin** [2] - 36:14, 39:4
**room** [2] - 5:25, 6:5
**Room** [1] - 1:24
**roundabout** [1] - 86:17
**route** [1] - 65:13
**routes** [1] - 65:18
**routinely** [1] - 32:14
**Rule** [2] - 57:7, 59:3
**rule** [3] - 53:14, 55:21, 57:8
**ruled** [1] - 47:19
**rules** [1] - 68:18
**ruling** [3] - 47:23, 61:22, 89:20
**running** [1] - 63:25
**rvaughan@kvllaw. com** [1] - 2:4
**RYAN** [1] - 93:12
**Ryan** [1] - 1:23

## S

**S.A** [1] - 3:6
**SA** [1] - 1:5
**sad** [1] - 36:19
**safe** [1] - 92:15
**sale** [1] - 36:12
**SALYER** [1] - 2:14
**Salyer** [1] - 3:18
**satisfy** [1] - 73:10
**Savage** [3] - 3:16, 14:8, 44:17
**savage** [17] - 7:10, 8:14, 12:6, 14:2, 15:22, 37:17, 37:19, 40:11, 41:14, 41:21, 43:1, 44:12, 45:6, 46:15, 73:24, 74:11, 86:13
**SAVAGE** [115] - 2:11, 3:16, 15:23, 16:1, 17:6, 17:14, 19:16, 19:22, 20:3, 20:17, 20:20, 22:5, 22:13, 22:17, 24:11, 24:17, 24:20, 24:24, 25:16, 26:5, 26:24, 27:2, 27:4, 27:6, 27:20, 28:23, 29:4, 29:6, 29:9, 29:25, 30:8, 30:16, 31:8, 32:3, 33:19, 35:8, 35:20, 36:17, 43:10, 44:15,

44:20, 46:19, 46:21, 46:24, 47:2, 47:7, 47:10, 47:14, 48:14, 48:21, 49:7, 49:12, 49:14, 51:3, 51:5, 52:4, 53:2, 53:12, 53:17, 54:12, 57:11, 57:15, 57:22, 58:5, 58:8, 58:17, 59:16, 60:9, 61:22, 61:25, 63:13, 64:2, 64:5, 64:7, 64:10, 64:15, 64:20, 64:23, 65:5, 65:23, 66:10, 67:1, 67:8, 67:25, 69:22, 70:9, 70:11, 70:13, 71:4, 72:15, 75:5, 77:18, 77:21, 78:8, 78:24, 79:2, 79:23, 80:1, 80:3, 80:6, 80:10, 82:24, 83:1, 83:10, 83:13, 83:17, 85:11, 85:16, 87:10, 88:20, 89:22, 91:3, 91:5, 91:13, 92:4

**savage's** [3] - 4:8, 7:18, 73:9

**Savage's** [2] - 13:10, 13:22

**save** [1] - 76:23

**saw** [3] - 48:16, 48:17, 73:11

**scenarios** [1] - 14:21

**schedule** [4] - 89:14, 89:24, 90:8, 90:11

**scheduled** [1] - 90:6

**scheduling** [1] - 90:2

**scheme** [5] - 37:4, 37:7, 37:9, 37:15, 66:18

**scholar** [1] - 4:11

**school** [1] - 81:13

**Schrodinger's** [2] - 26:24, 27:2

**SCHWABE** [1] - 2:6

**scope** [1] - 44:19

**screwdriver** [1] - 5:20

**seated** [1] - 46:17

**SEC** [1] - 25:2

**second** [13] - 3:23, 6:2, 22:11, 24:4, 27:15, 29:10, 43:5, 46:23, 52:15, 52:16, 57:6, 66:17, 91:10

**second-to-last** [1] - 43:5

**section** [2] - 8:10, 18:25

**Section** [5] - 8:17, 33:17, 56:24, 86:8, 86:12

**secure** [1] - 5:21

**see** [18] - 3:10, 4:10,

17:4, 18:3, 22:9, 29:7, 29:17, 30:24, 42:24, 48:5, 55:16, 59:24, 66:1, 67:11, 71:22, 77:8, 77:19, 88:25

**seeking** [3] - 19:25, 37:6

**seem** [3] - 23:8, 42:23, 56:6

**self** [1] - 26:8

**self-contained** [1] - 26:8

**sell** [1] - 27:13

**selling** [1] - 33:1

**send** [2] - 53:6, 67:17

**sending** [1] - 69:9

**sense** [1] - 36:2

**sentence** [1] - 19:21

**separate** [2] - 36:1, 36:3

**September** [8] - 13:13, 14:14, 49:8, 90:18, 90:19, 90:23, 91:1, 91:23

**serious** [1] - 67:14

**served** [1] - 13:3

**servers** [4] - 10:1, 10:14, 10:20, 13:5

**serves** [3] - 41:9, 51:24, 62:11

**service** [30] - 5:16, 6:8, 6:12, 6:18, 6:20, 6:23, 7:3, 9:13, 23:3, 27:22, 32:21, 32:22, 39:4, 39:5, 42:16, 45:10, 50:18, 51:7, 52:17, 52:24, 60:3, 60:18, 60:21, 61:10, 68:12, 68:14, 69:10, 71:21, 79:8, 79:10

**services** [9] - 5:1, 16:14, 19:4, 19:12, 36:12, 45:25, 60:14, 61:9, 74:13

**serving** [1] - 16:7

**session** [2] - 89:10, 90:4

**set** [5] - 3:5, 37:9, 72:3, 77:2, 83:15

**settle** [7] - 48:5, 89:2, 89:5, 89:7, 89:12, 89:13, 92:9

**settled** [6] - 30:3, 89:17, 89:18, 89:19, 92:9

**settlement** [2] - 80:20, 82:9

**settlements** [1] - 69:13

**Seventh** [7] - 29:14, 30:4, 48:11, 56:10, 57:2, 78:11, 78:19

**several** [3] - 16:3, 22:5, 51:8

**sexy** [1] - 52:9

**shame** [1] - 6:4

**share** [7] - 24:21, 24:24, 33:6, 40:14, 72:8, 77:22

**Sherman** [2] - 8:10, 8:16

**shifts** [1] - 17:21

**shipped** [1] - 47:4

**shock** [1] - 85:20

**Shoe** [1] - 25:11

**short** [5] - 19:16, 49:20, 61:25, 74:21, 74:23

**short-term** [2] - 74:21, 74:23

**shorthand** [1] - 64:7

**shortly** [1] - 70:14

**shot** [2] - 77:9, 77:12

**show** [2] - 4:6, 83:16

**showed** [1] - 33:1

**showing** [2] - 17:19, 22:2

**shown** [1] - 56:11

**shows** [3] - 61:9, 78:16, 83:14

**Showtime** [1] - 5:22

**shut** [3] - 9:12, 11:6, 84:14

**shuts** [1] - 12:8

**shutting** [1] - 6:25

**side** [4] - 4:3, 7:10, 18:13, 37:1

**sides** [5] - 12:24, 17:11, 72:14, 89:9, 90:3

**sidestep** [1] - 86:9

**signature** [3] - 93:6, 93:7

**signed** [1] - 93:7

**significance** [1] - 10:7

**significant** [3] - 15:10, 80:19, 84:10

**significantly** [1] - 81:14

**signing** [1] - 93:3

**Silverstein** [1] - 49:6

**SIM** [25] - 9:11, 9:12, 9:18, 9:20, 9:22, 9:25, 10:2, 10:3, 10:6, 10:10, 10:13, 10:19, 13:4, 15:2, 23:13, 23:16, 32:10, 32:14, 47:4, 53:22, 75:16, 75:25

**SIMON** [1] - 1:17

**Simon** [1] - 59:1

**simple** [3] - 75:10, 75:11, 84:4

**simply** [6] - 21:8, 23:8, 29:22, 67:13, 68:3,

89:11

**Simultaneous** [2] - 64:6, 64:17

**single** [2] - 5:6, 5:22

**sit** [3] - 46:17, 54:16, 73:13

**sitting** [3] - 13:22, 25:24, 85:19

**situation** [5] - 39:10, 42:7, 57:4, 57:22, 72:22

**six** [1] - 72:25

**sixth** [4] - 72:21, 73:1, 73:2, 87:16

**sized** [1] - 52:16

**skeptical** [6] - 55:22, 72:11, 76:9, 77:16, 77:19, 80:20

**skepticism** [2] - 57:1, 77:5

**Skiing** [6] - 32:1, 32:5, 32:8, 32:11, 32:13, 75:24

**skip** [1] - 86:15

**skipped** [1] - 8:18

**skipping** [2] - 37:24, 86:21

**skirt** [1] - 53:14

**slightly** [1] - 35:8

**small** [2] - 51:9, 83:15

**smaller** [1] - 6:7

**software** [2] - 23:2, 54:1

**sold** [1] - 32:14

**solution** [2] - 37:19, 73:25

**solve** [2] - 6:4, 62:23

**solved** [2] - 15:4, 15:5

**someone** [9] - 5:14, 23:5, 24:9, 74:12, 83:5, 87:8, 87:11, 87:13

**sometime** [1] - 92:7

**sometimes** [3] - 4:19, 5:8, 89:2

**somewhere** [1] - 50:8

**sorry** [2] - 87:9, 90:22

**sort** [8] - 17:17, 19:6, 20:21, 25:10, 26:24, 36:1, 55:8, 82:22

**sorted** [1] - 75:12

**sought** [1] - 19:23

**sound** [1] - 15:3

**sounds** [3] - 7:23, 36:14, 54:17

**source** [1] - 24:25

**spade** [2] - 7:4

**spatting** [1] - 83:6

**speaking** [2] - 22:21

**specific** [3] - 17:5, 49:23, 72:7

**specifically** [2] - 22:14, 23:24

**spectrum** [3] - 50:11, 55:3

**spend** [1] - 89:15

**spent** [1] - 58:11

**spiral** [1] - 60:2

**spite** [1] - 74:22

**spontaneously** [1] - 82:10

**spot** [1] - 28:14

**squeeze** [1] - 51:14

**St** [9] - 27:12, 27:13, 27:24, 28:2, 28:6, 28:8, 28:9, 60:19, 68:4

**stadiums** [1] - 61:8

**stage** [3] - 31:13, 36:23, 49:21

**stake** [1] - 5:10

**stand** [6] - 9:17, 14:10, 15:9, 36:23, 46:16

**standard** [1] - 72:18

**standards** [1] - 86:6

**standing** [10] - 8:19, 10:10, 21:18, 26:3, 26:18, 31:16, 32:10, 33:23, 86:21

**start** [4] - 33:7, 42:21, 47:15, 74:8

**started** [5] - 4:13, 4:23, 5:3, 72:9, 80:16

**starting** [2] - 48:24, 60:12

**Starz** [1] - 5:22

**state** [5] - 20:10, 34:1, 34:22, 54:25, 78:18

**statement** [4] - 6:16, 7:16, 11:19, 29:9

**states** [1] - 78:17

**STATES** [2] - 1:1, 1:18

**States** [22] - 1:23, 16:9, 16:13, 16:20, 19:7, 21:11, 27:8, 28:12, 28:13, 30:14, 35:1, 45:11, 54:7, 54:8, 58:18, 61:6, 61:19, 65:7, 65:13, 79:5, 84:20, 87:17

**States'** [1] - 79:13

**States-Haiti** [1] - 65:13

**statute** [1] - 20:16

**statutes** [1] - 34:24

**staying** [1] - 21:19

**stealing** [2] - 6:14, 7:4

**steeped** [1] - 33:23

**stenographic** [1] - 93:4

**step** [3] - 18:9, 24:11, 66:17

**steps** [1] - 33:17

**stick** [1] - 45:4

**still** [9] - 6:17, 21:22, 23:19, 24:19, 30:5,

58:18, 62:12, 73:2, 81:13

**stock** [1] - 4:19

**stole** [3] - 36:15, 38:1

**stop** [9] - 16:5, 42:21, 46:13, 51:20, 59:13, 62:4, 62:6, 75:4, 76:11

**stopped** [2] - 85:25, 86:2

**stragglers** [1] - 25:6

**strategy** [1] - 85:13

**street** [1] - 9:25

**Street** [1] - 2:15

**strenuous** [1] - 81:12

**strenuously** [2] - 81:9, 81:18

**strenuousness** [1] - 81:14

**strikes** [1] - 56:19

**strong** [1] - 31:14

**stronger** [2] - 82:6, 82:13

**strongly** [1] - 14:18

**struck** [2] - 18:21, 41:20

**structure** [1] - 37:15

**stuff** [17] - 30:10, 31:4, 32:10, 47:20, 54:15, 59:8, 61:18, 65:17, 66:23, 71:10, 71:16, 75:12, 84:6, 84:7, 84:24, 85:7

**style** [1] - 27:21

**subheading** [1] - 40:24

**subject** [8] - 18:8, 32:24, 62:12, 62:21, 64:13, 65:13, 69:12, 91:5

**submarket** [2] - 25:11, 25:12

**submit** [5] - 30:9, 34:4, 79:18, 80:19

**subscribed** [1] - 5:14

**subsequent** [1] - 12:10

**sufficient** [4] - 19:3, 19:18, 19:22, 85:5

**sufficiently** [1] - 86:4

**Suite** [4] - 2:4, 2:8, 2:12, 2:15

**summarize** [1] - 55:6

**summary** [11] - 33:14, 54:15, 63:10, 63:11, 79:21, 79:23, 80:2, 80:3, 80:9, 80:10, 81:5

**sundry** [1] - 9:24

**superb** [1] - 28:24

**support** [2] - 87:15, 87:24

**supports** [3] - 33:21,

87:18, 87:25

**supposed** [1] - 37:17

**Supreme** [3] - 32:6, 32:8, 56:25

**supremely** [1] - 25:24

**surprise** [2] - 9:1

**surrounded** [1] - 83:22

**survives** [1] - 70:24

**suspect** [1] - 85:6

**SW** [3] - 1:24, 2:8, 2:15

**switch** [6] - 52:6, 52:7, 53:7, 53:9

**switch-to-switch** [1] - 53:9

**switches** [2] - 18:24, 63:25

**system** [4] - 51:6, 51:10, 51:12, 53:7

## T

**T-Mobile** [2] - 44:6, 44:7

**table** [1] - 82:9

**tad** [1] - 63:7

**Tail** [4] - 32:19, 43:9, 43:10, 43:14

**talented** [1] - 89:1

**tandem** [1] - 52:7

**tariffs** [1] - 33:25

**task** [2] - 9:20, 57:16

**teach** [2] - 72:17, 77:13

**technical** [1] - 56:11

**technically** [1] - 20:13

**TECHNOLOGY** [1] - 1:9

**Technology** [1] - 3:7

**technology** [2] - 40:2, 49:24

**TELECOM** [1] - 1:9

**telecom** [7] - 5:1, 5:2, 39:11, 49:14, 60:14, 87:23, 87:25

**telecommunication** [1] - 45:10

**telephone** [11] - 27:18, 27:19, 27:22, 43:22, 89:16, 90:12, 90:17, 90:21, 91:2, 91:24

**Telephone** [1] - 52:3

**tempered** [1] - 34:11

**temptation** [1] - 49:17

**ten** [2] - 55:14, 55:16

**ten-minute** [1] - 55:14

**tenfold** [1] - 82:16

**Tenth** [1] - 32:4

**tenth** [1] - 77:24

**term** [4] - 67:21, 74:6, 74:21, 74:23

**terminal** [1] - 43:11

**Terminal** [3] - 43:13,

43:14, 43:17

**terminate** [12] - 16:15, 27:19, 32:15, 43:24, 45:23, 46:11, 71:7, 78:5, 79:8, 79:10, 79:15, 83:20

**terminated** [3] - 44:1, 74:17, 74:22

**terminates** [1] - 45:11

**terminating** [12] - 22:3, 24:8, 41:6, 42:7, 42:16, 42:18, 45:20, 65:4, 65:5, 71:21, 74:8, 87:22

**termination** [6] - 16:14, 27:10, 27:14, 46:2, 46:3, 71:1

**terms** [13] - 10:17, 12:9, 19:11, 37:15, 45:14, 50:25, 51:22, 54:6, 69:20, 76:25, 87:2, 87:4

**terrible** [1] - 65:2

**test** [1] - 70:25

**testimony** [3] - 18:17, 39:22, 54:19

**THE** [180] - 1:1, 1:2, 1:17, 3:5, 3:13, 3:20, 3:22, 4:10, 7:14, 7:24, 8:1, 8:7, 10:12, 10:17, 11:15, 11:17, 11:19, 12:13, 12:22, 13:13, 14:4, 14:13, 15:19, 15:22, 15:25, 16:22, 17:7, 18:13, 19:20, 20:2, 20:15, 20:18, 21:16, 22:11, 22:15, 24:7, 24:16, 24:18, 24:21, 25:14, 26:3, 26:22, 27:1, 27:3, 27:5, 27:16, 28:17, 28:24, 29:5, 29:7, 29:24, 30:6, 30:13, 31:6, 31:25, 33:5, 35:4, 35:19, 36:4, 36:14, 36:21, 37:9, 38:13, 38:16, 38:22, 39:16, 39:18, 39:21, 40:3, 41:16, 41:19, 42:6, 42:13, 43:9, 43:11, 43:14, 43:17, 44:12, 44:16, 44:22, 44:25, 45:2, 45:9, 46:4, 46:15, 46:20, 46:23, 46:25, 47:6, 47:8, 47:13, 48:13, 48:15, 49:4, 49:8, 49:13, 50:14, 51:4, 52:1, 52:22, 53:11, 53:15, 54:11, 55:12, 55:16, 55:18, 57:12, 57:21, 58:4, 58:7, 58:16, 59:10, 59:19, 61:20, 61:24,

63:9, 63:23, 64:3, 64:9, 64:13, 64:16, 64:18, 64:21, 65:3, 65:20, 66:1, 66:25, 67:7, 67:11, 69:18, 70:6, 70:10, 70:12, 71:2, 72:4, 72:7, 72:16, 77:13, 78:2, 78:23, 79:1, 80:2, 80:5, 80:8, 80:13, 81:11, 81:16, 82:17, 82:19, 82:25, 83:7, 83:12, 83:15, 85:10, 85:18, 85:23, 85:25, 87:4, 87:14, 88:2, 88:7, 88:13, 88:21, 89:23, 90:8, 90:15, 90:18, 90:19, 90:23, 90:25, 91:1, 91:4, 91:7, 91:11, 91:15, 91:18, 91:20, 91:22, 92:6, 92:13

**theft** [9] - 5:1, 5:4, 6:1, 6:9, 6:15, 6:18, 16:2, 16:5, 16:11

**themselves** [3] - 5:21, 41:14, 44:18

**theoretical** [1] - 50:15

**theoretically** [1] - 50:3

**theory** [3] - 38:7, 38:13, 38:14

**there'll** [1] - 83:6

**thereabouts** [1] - 87:6

**thereby** [1] - 59:17

**therefore** [5] - 17:20, 22:4, 58:9, 78:18, 90:11

**thereof** [2] - 19:19, 19:22

**they've** [5] - 54:12, 70:2, 71:10, 72:2, 78:2

**thinking** [3] - 33:6, 80:13, 89:24

**thinks** [2] - 88:3, 88:5

**third** [4] - 12:13, 12:15, 72:17, 88:18

**third-party** [1] - 88:18

**thousand** [1] - 51:8

**thrashed** [1] - 75:21

**three** [4] - 11:17, 12:23, 31:6, 50:19

**thrown** [1] - 87:7

**Thursday** [2] - 90:25, 91:1

**tick** [1] - 26:10

**tip** [1] - 31:4

**tipping** [2] - 31:7, 31:8

**titled** [1] - 93:5

**today** [7] - 7:20, 8:5, 14:11, 39:11, 51:23, 87:16, 88:1

**toll** [2] - 91:25, 92:2

**toll-free** [2] - 91:25, 92:2

**TOMASI** [1] - 2:14

**Tomasi** [1] - 3:18

**Tonga** [1] - 62:12

**tongue** [2] - 14:11, 14:13

**tongue-lashing** [2] - 14:11, 14:13

**took** [1] - 73:7

**tool** [1] - 55:23

**tools** [1] - 55:24

**top** [1] - 73:24

**tort** [1] - 33:23

**totally** [1] - 57:24

**touch** [2] - 40:8, 45:5

**touchstone** [1] - 17:15

**trade** [2] - 51:18, 61:9

**traditional** [2] - 87:23, 87:25

**traditionally** [1] - 87:23

**traffic** [3] - 65:7, 68:3, 81:17

**transaction** [1] - 11:7

**TRANSCRIPT** [1] - 1:14

**transcript** [5] - 48:16, 48:17, 57:18, 93:4, 93:6

**transit** [1] - 67:21

**transporting** [2] - 27:7, 27:17

**travels** [1] - 92:15

**treated** [1] - 84:15

**Tremaine** [1] - 3:17

**TREMAINE** [1] - 2:10

**tremendous** [2] - 73:8, 87:12

**trepidation** [1] - 58:5

**trial** [19] - 7:17, 8:2, 15:25, 17:15, 18:1, 18:14, 29:15, 32:5, 44:20, 44:22, 48:17, 54:15, 57:25, 59:1, 69:25, 80:11, 91:13, 91:15

**tricked** [1] - 44:23

**tried** [5] - 7:9, 7:11, 19:16, 22:22, 26:5

**triggered** [1] - 33:6

**Trinco** [14] - 14:19, 14:20, 14:22, 15:13, 20:6, 20:21, 21:4, 32:18, 32:19, 80:4, 80:5, 80:6, 80:7, 80:8

**trivial** [1] - 30:19

**troubling** [1] - 75:18

**true** [12] - 22:6, 22:7, 23:8, 26:6, 51:7, 58:9, 58:23, 60:10, 60:25, 67:3, 93:4

trumps [1] - 78:20
try [11] - 4:19, 10:16, 13:19, 23:1, 25:23, 52:17, 53:19, 65:25, 84:13, 89:6, 89:8
trying [19] - 4:14, 23:16, 28:11, 28:12, 32:19, 34:4, 44:22, 45:23, 53:13, 58:2, 58:12, 58:21, 59:13, 66:1, 66:20, 66:21, 78:14, 78:16
turned [1] - 6:13
TV [1] - 5:17
twist [1] - 30:13
two [14] - 19:17, 41:12, 41:14, 42:9, 47:16, 52:14, 56:17, 58:13, 58:20, 63:18, 68:2, 72:8, 87:19, 88:23
Twombly [10] - 72:17, 72:19, 72:21, 73:12, 77:13, 77:14, 80:14, 80:21, 81:1, 82:13
tying [1] - 46:21
type [4] - 39:10, 39:24, 40:1, 55:25
typical [2] - 53:8, 54:25
typically [1] - 87:23

**U**

ultimately [1] - 26:8
unable [2] - 5:20, 23:10
unavailable [1] - 21:25
uncomfortable [1] - 9:23
unconstrained [1] - 34:15
under [24] - 8:9, 14:18, 15:13, 15:15, 16:9, 18:4, 18:14, 24:2, 32:4, 34:12, 34:18, 37:3, 40:23, 56:14, 56:23, 62:19, 63:4, 63:7, 70:18, 78:18, 79:4, 81:2, 82:13, 82:22
undercut [3] - 71:11, 71:13, 85:8
underlies [2] - 16:6
underlying [2] - 11:7, 16:17
understood [1] - 14:16
unfair [2] - 77:20, 81:3
unfairly [1] - 84:15
unfortunately [1] - 14:10
UNIGESTION [1] - 1:5
Unigestion [8] - 3:6, 3:12, 3:23, 56:13,

80:18, 80:24, 81:3
Unigestion's [1] - 80:22
UNITED [2] - 1:1, 1:18
United [23] - 1:23, 16:9, 16:13, 16:20, 19:7, 21:11, 27:8, 28:12, 28:13, 30:14, 35:1, 45:11, 54:7, 54:8, 58:18, 61:6, 61:19, 65:7, 65:13, 79:4, 79:13, 84:20, 87:17
universe [1] - 69:7
unless [5] - 18:23, 42:23, 47:8, 61:11, 66:7
unlike [1] - 42:6
unlock [1] - 5:20
unreasonable [2] - 60:7, 74:6
unreasonably [1] - 73:23
unrelated [1] - 76:21
unrestricted [1] - 70:25
unto [2] - 19:18, 19:22
unused [1] - 6:5
up [32] - 4:6, 4:7, 4:14, 6:6, 7:10, 9:17, 14:17, 16:16, 23:18, 29:10, 30:5, 32:7, 33:1, 34:3, 36:17, 40:4, 40:5, 41:25, 46:21, 46:25, 51:20, 52:14, 52:15, 52:16, 53:7, 57:13, 61:16, 68:22, 73:1, 73:13, 81:13, 91:9
UPM [46] - 1:9, 3:7, 3:17, 4:24, 8:19, 8:22, 9:3, 9:9, 9:10, 9:15, 9:17, 10:1, 10:2, 10:5, 10:18, 10:19, 10:20, 11:20, 11:21, 12:15, 12:16, 13:5, 13:9, 14:25, 15:10, 15:16, 22:22, 33:12, 40:15, 40:23, 40:24, 40:25, 41:5, 41:8, 42:19, 42:22, 45:20, 47:3, 55:24, 80:16, 80:25, 81:24
UPM's [3] - 10:14, 13:5, 13:23
UPM/other [1] - 42:22
urge [1] - 63:2
US [20] - 18:8, 18:20, 20:22, 27:17, 27:18, 28:18, 44:4, 48:16, 61:14, 62:6, 63:4, 65:16, 65:17, 65:18, 65:20, 66:6, 66:7,

66:18, 87:21, 87:24
US-to-Haiti [1] - 66:6
US-to-Haitian [1] - 61:14
USA [1] - 3:12
usage [2] - 11:11, 11:14
useless [1] - 18:23
user [5] - 42:8, 42:18, 42:20, 42:21, 52:23
uses [1] - 71:8
utility [1] - 40:6
utilization [1] - 5:1

**V**

valid [1] - 31:21
value [5] - 9:12, 11:6, 11:11, 11:12, 60:24
variety [1] - 54:1
various [2] - 33:24, 35:22
vary [1] - 64:8
vast [5] - 22:24, 38:5, 41:24, 75:20, 77:2
VAUGHAN [75] - 2:3, 2:3, 3:10, 3:14, 4:5, 4:11, 7:21, 7:25, 8:3, 8:8, 10:15, 10:21, 11:16, 11:18, 11:25, 12:17, 13:10, 13:15, 14:10, 14:16, 15:21, 36:6, 36:19, 36:22, 37:13, 38:15, 38:18, 38:23, 39:17, 39:20, 39:22, 40:7, 41:18, 41:20, 42:12, 43:4, 43:13, 43:16, 43:19, 44:23, 45:1, 45:3, 45:17, 46:8, 55:15, 72:6, 73:1, 77:20, 79:22, 79:25, 80:4, 81:8, 81:13, 81:17, 82:18, 85:15, 85:19, 85:24, 86:2, 87:6, 87:11, 87:15, 88:4, 88:9, 88:19, 89:21, 90:5, 90:14, 90:22, 91:9, 91:17, 91:19, 91:21, 92:12, 92:16
Vaughan [22] - 3:11, 4:4, 7:22, 15:19, 17:4, 22:1, 31:5, 33:10, 36:5, 43:1, 43:2, 43:3, 44:14, 44:16, 47:8, 49:16, 55:13, 72:4, 80:15, 85:18, 91:8
Vaughan's [3] - 16:23, 17:8, 67:1
version [1] - 49:20
versions [1] - 49:19
versus [1] - 3:7
viable [2] - 54:6, 55:10

view [1] - 84:13
viewed [1] - 31:25
violate [2] - 34:8, 56:17
violated [4] - 34:21, 34:23, 34:24, 36:9
violating [1] - 79:9
violation [10] - 21:7, 37:5, 37:6, 37:22, 37:23, 46:6, 46:8, 61:7, 62:19, 68:11
virtue [1] - 75:16
vision [1] - 74:23
visiting [2] - 85:25, 86:2
volume [2] - 87:12, 87:13
vs [1] - 1:8

**W**

Wait [1] - 6:21
wait [3] - 48:4, 88:2, 88:4
waiving [1] - 18:10
walk [4] - 12:11, 81:15, 84:14, 84:17
walked [1] - 13:20
walking [1] - 14:5
wants [6] - 18:14, 28:13, 37:25, 59:21, 65:18, 66:12
Washington [2] - 2:12, 93:14
water [1] - 15:7
ways [2] - 22:2, 62:9
wealth [1] - 73:9
website [1] - 38:1
weeded [1] - 73:4
week [1] - 90:24
weird [1] - 30:13
weirdly [1] - 31:13
welcome [5] - 3:13, 3:20, 4:4, 17:1, 67:17
well-pled [1] - 86:12
whereas [1] - 42:14
whichever [1] - 44:8
White [1] - 1:23
WHITE [1] - 93:12
Whoa [1] - 6:13
whole [6] - 47:22, 51:12, 57:23, 66:21, 66:24, 71:16
wholly [1] - 15:18
WILLIAMSON [1] - 2:6
win [2] - 52:18, 54:14
wireless [9] - 41:1, 41:2, 50:4, 53:4, 53:5, 53:7, 54:18, 54:19, 71:23
wish [2] - 46:17, 77:6
wishes [1] - 14:2

witness [1] - 57:17
wondering [1] - 29:1
word [1] - 39:23
words [1] - 64:21
works [2] - 39:14, 91:20
world [2] - 5:22, 84:13
worried [1] - 34:10
worry [1] - 37:11
worse [1] - 43:5
worthwhile [1] - 17:23
WRIGHT [1] - 2:10
Wright [1] - 3:16
writing [1] - 55:20
written [1] - 83:24
wronged [1] - 12:10
www.justice.gov [1] - 38:2
WYATT [1] - 2:6

**Y**

yard [1] - 60:2
year [1] - 38:3
years [9] - 11:17, 12:23, 31:6, 48:18, 48:25, 50:11, 52:1, 54:16, 58:25
York [5] - 60:23, 61:5, 61:11, 65:8, 67:18
yourself [4] - 3:9, 53:14, 53:15, 63:3

**Z**

zero [2] - 55:5, 84:8