**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**UNIGESTION HOLDINGS, S.A.** d/b/a **DIGICEL HAITI**,

        Plaintiff and Counterclaim-Defendant,

        v.

**UPM TECHNOLOGY, INC.** d/b/a **UPM TELECOM, INC.** and **UPM MARKETING, INC.**; **UPM TELECOM, INC.**; **UPM MARKETING, INC.**; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**; **BALTAZAR RUIZ**; **TYLER ALLEN**; and **DUY "BRUCE" TRAN**,

        Defendants and Counterclaim-Plaintiffs,

        v.

**DIGICEL USA, INC.**,

        Additional Counterclaim Defendant.

Case No. 3:15-cv-185-SI

**OPINION AND ORDER**

Richard K. Hansen and Anne M. Talcott, SCHWABE, WILLIAMSON & WYATT, 1211 SW Fifth Ave, Suite 1600, Portland, OR 97204; Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah B. Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394. Of Attorneys for Plaintiff, Counterclaim-Defendant, and Additional Counterclaim-Defendant.

Kathryn P. Salyer and Eleanor A. DuBay, TOMASI SALYER BAROWAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204; Christopher W. Savage, DAVIS WRIGHT TREMAINE, LLP, 1919 Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006. Of Attorneys for Defendants and Counterclaim-Plaintiffs.

**Michael H. Simon, District Judge.**

Plaintiff Unigestion Holding, S.A. dba "Digicel Haiti" ("Digicel Haiti") provides mobile telecommunication services *in* Haiti. Defendants (collectively, "UPM") formerly provided mobile telecommunication services *to* Haiti. Digicel Haiti alleges that UPM provided these services by using certain practices and technologies fraudulently to access Digicel Haiti's telecommunications network in Haiti. In its Second Amended Complaint ("SAC"), Digicel Haiti alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. §§ 1962(b)-(d), common law fraud, conversion, and unjust enrichment. ECF 104. In UPM's Second Amended Answer ("SAA"), UPM asserts counterclaims, alleging violations of §§ 201 and 202 of the Communications Act of 1934 under 47 U.S.C. § 151 *et seq*., breach of implied-in-fact contract, money had and received, conversion, unjust enrichment, intentional interference with prospective advantage, and monopolization and attempted monopolization in violation of § 2 of the Sherman Act under 15 U.S.C. § 2. ECF 158. Two motions are pending before the Court. The first is Digicel Haiti's motion to dismiss UPM's antitrust counterclaim. ECF 162. The second is UPM's motion to dismiss Digicel Haiti's RICO claims. ECF 178. For the following reasons, both motions are granted.

## STANDARDS

### A. Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-*

*Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## B. Motion for Judgment on the Pleadings Under Rule 12(c)

"Analysis under Rule 12(c) is 'substantially identical' to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (quoting *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012)). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)). In addition, "to

survive a motion to dismiss, a complaint must contain sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (*Iqbal* standard applies to review of Rule 12(c) motions).

## BACKGROUND

For purposes of Digicel Haiti's motion to dismiss UPM's antitrust counterclaim, the Court accepts as true the well pleaded facts alleged by UPM in its counterclaim. In addition, certain allegations from Plaintiff's SAC are included as background. In deciding Digicel Haiti's motion to dismiss, the Court gives no presumption of truth to Digicel Haiti's allegations in the SAC, except where UPM's antitrust counterclaim endorses or relies upon Digicel Haiti's allegations. For purposes of UPM's motion to dismiss Digicel Haiti's RICO claims, the Court accepts as true the well-pleaded facts alleged by Digicel Haiti in its SAC.

### A. Digicel Haiti

Digicel Haiti is a wholly owned subsidiary of Digicel Holdings, Ltd., which also owns Additional Counterclaim Defendant Digicel USA, Inc. ("Digicel USA") and Digicel Jamaica, Ltd. ("Digicel Jamaica"). Digicel Haiti is the leading provider of telecommunications services *in* Haiti, where it solely operates and has an estimated market share of between 75 and 90 percent of local telephone service in Haiti. SAA, ¶ 250 (ECF 158 at 29). Digicel USA operates a set of international telephone switching systems—equipment with the capacity to transmit a call from the United States to an overseas telecommunications network—located in Miami, Florida and New York City, New York.

Digicel Haiti tracks and charges its local customers in Haiti through the use of pre-paid Subscriber Identity Module ("SIM") cards. A SIM card acts as a small circuit board. When the

card is placed inside a cellular telephone, the card identifies the device as associated with an individual customer's unique telephone number and account. SIM cards allow customers to access Digicel Haiti's cellular network and, in turn, allow Digicel Haiti to charge for communications made from cellular devices containing specific SIM cards. Digicel Haiti's customers use these SIM cards for voice, data, and messaging services on the Digicel Haiti network. Digicel Haiti's customers can add credits, in the form of minutes, to their SIM cards by using, among other methods, vouchers and online "top-ups."

When a user of a Digicel Haiti SIM card makes a local call within Haiti, that user incurs charges of approximately $0.09 per minute of wireless service. If a Digicel Haiti customer travels to the United States and uses his or her Digicel Haiti SIM card to make calls back to Haiti, the user of that SIM card generally incurs charges of at least $1.99 for each minute of wireless service used. Digicel Haiti also offers a Roam-Like-You're-Home ("RLYH") pricing plan. For a monthly access fee of approximately $20 to $25, the RLYH plan allows registered Digicel Haiti customers to call back to Haiti while traveling in the United States at rates similar to the local rate in Haiti during the authorized, pre-paid period.

When someone in the United States not registered on a Digicel Haiti RLYH plan originates a call to one of Digicel Haiti's subscribers in Haiti, a "third-party carrier"—typically, a United States telecommunications carrier, which does not have the internal capacity to transport a call to Haiti, also sometimes referred to as a "wholesaler"—picks up that telephone call from the United States-based originating caller and transports it to one of the Digicel USA switching gateways. From that switching gateway, Digicel USA picks up the call and transports it to Haiti, where Digicel Haiti "terminates" the call on its local network in Haiti. The terminating end of a call is the party being called by the party originating the call. On Digicel Haiti's behalf, Digicel

Jamaica bills the third-party carrier at the rate of $0.23 per minute for international calls that terminate on Digicel Haiti's network. That fee includes the cost of terminating the call on Digicel Haiti's network and the cost of switching services performed by Digicel USA. Digicel Haiti then pays Digicel USA a fee for its services through an intercompany transfer. Digicel Haiti does not authorize international or domestic telephone traffic to enter its telecommunications network in Haiti by any other route or under any other form of agreement.

## B.  UPM

UPM is an Oregon corporation that facilitated international calls from the United States to people in Haiti on behalf of third-party carriers, at rates lower than what Digicel Haiti charged. UPM asserts that from April 2014 through November 2014 it essentially resold Digicel Haiti's local and RLYH services within the United States at a discount. Due to Digicel Haiti's effective efforts to prevent UPM from reselling Digicel Haiti's services, as described below, UPM no longer facilitates calls to Haiti. UPM's business operations involved paying full retail price to acquire large quantities of Digicel Haiti's SIM cards from authorized dealers and then using those cards in UPM servers to facilitate calls to Haiti through two distinct platforms: (1) the resale of the RLYH plan; and (2) the resale of Digicel Haiti's local wireless services.

The first and most common way that UPM facilitated calls to Haiti began with UPM enrolling or registering in the RLYH plan the Digicel Haiti SIM cards that UPM purchased at full retail price. UPM would then place or assemble the RLYH-enrolled SIM cards into one or more SIM servers owned and maintained by UPM. These UPM servers were then connected to the internet and capable of accessing the wireless networks of AT&T and T-Mobile, the third-party carriers that have roaming arrangements in the United States with Digicel Haiti. Ordinarily, when a third-party carrier's customers called Haiti, the third-party carrier, and ultimately the customer, would have to pay the standard amount—a minimum of $0.23 per minute—for Digicel

Haiti to connect the international call to its local network in Haiti. UPM offered to the third-party carriers a less expensive way to connect the calls based on the open wholesale "spot" market in the United States. A third-party carrier that elected to use UPM's services would switch a call bound for a Digicel Haiti customer in Haiti to UPM, instead of through Digicel USA's gateway. The third-party carrier's switch would convert or reformat the call into an internet-based protocol packet that carries the call (including the destination number in Haiti) over the internet to one of UPM's SIM servers located in Oregon. UPM's SIM server would then initiate the call to Haiti on the third-party carrier's wireless network. UPM's SIM server also would convert the call into the appropriate format for wireless transmission and essentially program or reformat the call to make it appear to come from a mobile telephone number already associated with one of the RLYH-enrolled Digicel Haiti SIM cards. After the call was made to look like a call registered on the RLYH plan, it would follow the typical route for calls switched directly to Digicel Haiti: the third-party carrier would route the newly-reformatted call to one of Digicel USA's switches in New York or Miami, Digicel USA would then carry the call to Haiti, and lastly Digicel Haiti would terminate the call on its local network in Haiti, charging the associated SIM card at the discounted RLYH rate.

A second, although less common, way in which UPM facilitated international calls to Haiti was by transporting the calls to Digicel Haiti's local network in Haiti through a Voice-over-Internet-Protocol ("VoIP"). Similar to the first process, the customer of a third-party carrier would initiate a call to someone in Haiti, and the third-party carrier's switch would then select UPM to handle the call. The call would be sent to a UPM SIM server in Oregon in the same manner described above. Instead of initiating a wireless call to Haiti and converting the call for wireless transmission, however, UPM would leave the call in an Internet-based protocol packet

(*i.e.*, in VoIP format). UPM would use the internet to transmit the call to a receiver in Haiti, known as a Global System for Mobile communications ("GSM") Gateway. The GSM Gateway would then format the call for wireless transmission and initiate a wireless call on Digicel Haiti's local network in Haiti using the account information associated with the UPM SIM card in Oregon. Digicel Haiti would then terminate (or complete) the call on its local network in Haiti, treating the call as a local call and charging the associated SIM card at the lower rate applicable to local calls.

Digicel Haiti undertook an investigation into the international "resale" of its services. During the investigation, Digicel Haiti discovered that the calling and usage patterns of particular SIM cards were inconsistent with use by individual customers. Digicel Haiti then "de-authorized" those SIM cards so that calls associated with those cards could no longer be completed. Because Digicel Haiti de-authorized many of the SIM cards that UPM used to conduct its business, UPM was no longer able to facilitate international calls to Haiti through either RLYH plans or VoIP.

## DISCUSSION

### A. UPM's Amended Antitrust Counterclaim

UPM alleges that Digicel Haiti has monopolized or attempted to monopolize two distinct product markets. The first is the product market for delivering calls from the United States to Haiti for calls terminating in Haiti (the "Haiti market"). SAA, ¶ 356 (ECF 158 at 54). The second is the product market for delivering calls from the United States to Haiti for calls terminating with a Digicel Haiti subscriber (the "Digicel Haiti submarket"). *Id*. For both product markets, UPM alleges a geographic market of the United States. SAA, ¶ 357 (ECF 158 at 55).

In an earlier pleading, UPM alleged several different forms of anticompetitive conduct. *See* ECF 127, at 45-46, ¶¶335-340. Plaintiff moved to dismiss UPM's earlier antitrust

counterclaim. During oral argument on that motion, UPM expressly stated that it was not relying upon the "essential facilities" doctrine as a theory of anticompetitive conduct. *See* ECF 154 at 26 n.5. The Court dismissed UPM's antitrust counterclaim but allowed UPM to replead. *Id.* at 31. In its amended antitrust counterclaim, UPM now bases its counterclaim almost exclusively on the essential facilities doctrine. UPM alleges:

> As described more fully below, Digicel has violated Section 2 of the Sherman Act by denying UPM access to Digicel Haiti's local wireless network in Haiti, which is an "essential facility" in competing with Digicel within the United States for the business of carriers who seek the service of delivering calls to, and terminating those calls in, Haiti. In addition, Digicel has violated Section 2 by pricing the function of transporting and terminating calls from the United States to Haiti at the exact same level as the function of terminating calls in Haiti alone, in other words, by pricing the transport function at the undeniably predatory price of zero. The result has been that Digicel has monopolized the market for delivering and terminating calls from the United States to Haiti. In the alternative, Digicel's actions constitute an unlawful attempt to monopolize that market, in that those action create a dangerous probability of such monopolization.

SAA, ¶ 359 (ECF 158 at 56). Digicel Haiti moves to dismiss UPM's amended antitrust counterclaim, arguing: (1) UPM lacks antitrust standing; (2) UPM fails to plead the elements required under Section 2 of the Sherman Act; (3) the "essential facilities" doctrine is inapplicable; (4) UPM fails to allege antitrust injury; and (5) international comity requires dismissal. ECF 162.

## 1. Standing

To state a claim for monopolization or attempted monopolization, a plaintiff must be "a participant in the same market as the alleged malefactors." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985). When analyzing whether two enterprises "participate in the same market, the focus is upon the reasonable interchangeability of use or the cross-elasticity of demand between the services provided by" the two enterprises. *Id.* at 1470-71. In certain cases,

courts determine whether two enterprises compete in the same market by identifying "the point

of competition" between the two enterprises. *See Glen Holly Entertainment, Inc. v. Tektronix,*

*Inc.*, 343 F.3d 1000, 1005 (9th Cir. 2003), *opinion amended on denial of reh'g*, 352 F.3d 367

(9th Cir. 2003) (identifying a market for a product that included manufacturers and rental

services where the "point of competition" was the consumer's decision to rent or purchase the

product).

In its SAA, UPM asserts:

> This UPM service is interchangeable with Digicel's service. UPM,
> therefore, has "antitrust standing" to challenge Digicel's
> anticompetitive actions.

SAA, ¶ 358 (ECF 158 at 55-56). Notwithstanding this conclusory assertion, UPM lacks antitrust

standing. By simply reselling telecommunications services offered by Digicel USA and Digicel

Haiti, UPM does not participate in the same market as either Digicel Haiti, which is in the local

telephone services market in Haiti, or Digicel USA, which is in the "switching market." UPM

alleges that it is an international carrier competing with other carriers for the right to transport

calls from the United States to other countries, including Haiti. As discussed above, however, the

services provided by Digicel USA and Digicel Haiti combine to offer a single product that

includes the transportation of calls from the United States to Haiti, including the termination of

those calls in Haiti on Digicel Haiti's local network.

To the extent that UPM merely resells Digicel's RLYH program, UPM does not compete

with Digicel. UPM is only a reseller and provides no service that is an interchangeable

alternative to what is provided by Plaintiff. The RLYH resale "market" is analogous to the

market in which a person who purchases a season pass to a ski resort and then rents that season

pass out to customers for daily use at a rate below the daily rate charged by the ski resort. No

matter what technological innovations the reseller may have created to facilitate this resale

model, the person who rents out the season pass on a daily basis cannot be said to be

"competing" in the *same* market as the ski resort, even though both sell daily ski passes. In

simply reselling Digicel Haiti's RLYH plan, UPM essentially functions as a distributor, and

cancelled or terminated distributors do not generally have antitrust standing. *Glen.*, 343 F.3d

at 1010 (discussing the rule that canceled or terminated distributors do not have antitrust standing

but finding that the plaintiff was not a distributor).

     The other service that UPM offers—using the internet to transport calls to Haiti by

VoIP—does appear to be interchangeable with Digicel USA's international switching service as

an alternative means to conduct international transport services. As an FCC opinion illustrates,

however, international transport services are only one "input" among others necessary to

complete an international call:

> In order to complete a U.S. international call, a U.S. carrier must
> obtain as inputs various call termination services from foreign
> carriers in the destination country of the U.S. call, including
> *international transport services*, inter-city services within the
> destination country, and *terminating access services within the
> local exchange of the called party*.

*Eastlink international (USA) Inc.; Petition to Modify Regulatory Classification from Dominant*

*to Non-Dominant on the U.S.-Bermuda Route*, Memorandum Opinion and Order, 28 F.C.C.R.

8364 (Int'l Bur. 2012) at ¶2 (emphasis added, footnotes omitted). Thus, the completion of an

international call requires, at least, both transportation "inputs" and termination "inputs." UPM

argues that it "competed directly, head-to-head, for wholesale carriers' business" when it used

the internet to get calls to Haiti. UPM defines this market as the market for getting calls to Haiti

for termination there. Thus, UPM argues, it competed with Plaintiff in providing *international*

*transport services* to third-party carriers.

UPM, however, has not sufficiently alleged that Digicel Haiti (including in combination with Digicel USA) offers that specific service to third-party carriers or even that a market for international transport services from the United States to Haiti as a standalone service actually exists. Plaintiff alleges, and UPM seems to accept, that Plaintiff charges U.S. wholesalers seeking to get a call to Haiti a flat rate of $0.23 per minute for calls that terminate on Digicel Haiti's local network and that flat rate includes the cost of the international transport service that was performed by Digicel USA and the cost of termination on Digicel Haiti's local network. Thus, Plaintiff offers to third-party carriers all the inputs necessary to complete an international call as a single, bundled product for which it charges a flat fee. UPM, on the other hand, only competes with Digicel Haiti (including in combination with Digicel USA) to the extent that UPM offers an international transport service, which is only one input required to complete an international call. It does not appear from UPM's allegations, however, that there is a market for this single input. More importantly for standing purposes, UPM's standalone transportation service is not interchangeable with Digicel Haiti's transportation-termination service because UPM's transportation service would only partially meet a third-party carrier's needs. Thus, UPM lacks standing to assert its monopolization and attempted monopolization counterclaim.

## 2. Elements of Sherman Act Act § 2 Offense

Digicel Haiti also argues that UPM has not sufficiently pleaded the elements of its antitrust claim. To state an antitrust claim of monopolization under § 2 of the Sherman Act, a plaintiff must show: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Somers v. Apple, Inc*, 729 F.3d 953, 963 (9th Cir. 2013). To state a claim for attempted monopoly under § 2, a plaintiff must show: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous

probability of success; and (4) causal antitrust injury." *CollegeNET, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1145 (D. Or. 2015).[1]

### a. Monopoly Power in a Relevant Market

Digicel Haiti argues that UPM's § 2 monopolization claim fails because UPM has not alleged that Digicel Haiti has monopoly power a relevant market. A plaintiff must allege monopoly power and describe both a relevant product market and a relevant geographic market. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011). Monopoly power, for the purpose of § 2 of the Sherman Act, is "the power to control prices or exclude competition." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 ((9th Cir. 1997), *aff'd sub nom. Humana Inc. v. Forsyth*, 525 U.S. 299, (1999), *and overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012). A common way to establish monopoly power is by "(1) defin[ing] the relevant market, (2) show[ing] that the defendant owns a dominant share of that market, and (3) show[ing] that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* at 1476.

### i. Relevant Market

UPM alleges that the relevant geographic market is the entire United States. UPM does not, however, allege the precise scope of the relevant product market. "[W]ithout a definition of [the relevant product] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).

It is not clear from UPM's amended allegations whether the relevant product market that UPM alleges Digicel Haiti to have monopolized is limited to international transportation service

---

[1] UPM has not alleged a conspiracy to monopolize, which also is actionable under § 2.

or includes both transportation service and local termination service. Although UPM implies the latter, UPM does not allege that it actually terminates any calls in Haiti or has the ability to do so without Digicel Haiti.

UPM previously asserted, and still appears to assert, a leveraging theory of monopolization, by which Digicel Haiti is using its monopoly power in the market for local telephone service in Haiti (the first market) illegally to extend its monopoly into a second market, which is the transportation of calls from the United States to Haiti. Such a theory of monopolization, however, suggests that the second market—the market being unlawfully monopolized—is the market for only transportation, and not termination. UPM reinforces the conclusion that its alleged product market is limited to transportation services when it states that Digicel has monopolized the market for getting calls to Haiti for termination there. This phrasing indicates that the market is for the service of "getting calls to Haiti" and not for the service of "termination there."

In its SAA, UPM defines the primary relevant product market as the market for "delivering calls from the United States to Haiti and terminating such calls to called parties in Haiti." SAA, ¶356 (ECF 158 at 54). UPM also defines a relevant submarket as the market for "delivering calls from the United States to Haiti and terminating such calls to Digicel Haiti subscribers in Haiti." *Id*. By defining the market as including the transportation of calls from the United States "to called parties in Haiti" or "to Digicel Haiti subscribers in Haiti," UPM appears to imply that the product market includes termination services. As previously stated, however, UPM never alleges that it does, or even can, by itself, terminate a call in Haiti. Thus, the first substantive flaw in UPM's amended antitrust claim is its continued failure clearly and precisely to define the scope of the alleged relevant product market.

To the extent that UPM alleges that the relevant product market is only transportation service, UPM has not sufficiently alleged that there is a market for that service. If a hotdog stand includes *free* condiments and garnishes for any customer who purchased a hotdog, and an entrepreneur set up a condiment and garnish stand across the street, the entrepreneur could not claim to be competing with the hotdog stand in the condiment and garnish market. UPM appears to be attempting something similar here. Digicel Haiti includes the cost of transportation, which for purposes of antitrust analysis it performs in-house, in the flat fee that it charges wholesalers that terminate calls on its network in Haiti. UPM does not allege that Digicel Haiti offers the switching services performed by Digicel USA on a standalone basis—for example, to transport a third-party carrier's calls to Haiti for termination on a non-Digicel local network in Haiti. Moreover, UPM does not allege that there are customers interested in such standalone transportation services or what the cost of such a service is or should be. UPM also alleges neither what Digicel Haiti nor UPM itself charges to customers for just the transportation service.

### ii. Power

Even if UPM had sufficiently defined the relevant product market, UPM has not sufficiently alleged that Digicel Haiti has monopoly power in that market. To state a claim for a Sherman Act § 2 violation, UPM must allege monopoly power *in the relevant product market*. UPM alleges that Digicel Haiti has acted to illegally extend its local service monopoly to the market for transporting calls from the United States to Haiti. UPM thus pleads a § 2 claim under a "monopoly leveraging" theory, under which a company that has a monopoly in one product market—which may be legitimately obtained—uses its monopoly power in the first market to secure an unlawful monopoly in a second, distinct market. In order to state a claim under a leveraging theory, a plaintiff must sufficiently allege that the defendant either has obtained

monopoly power in the second market or, in the case of an attempted monopoly claim, has a "dangerous probability of success" in monopolizing a second market. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004).

UPM alleges that Digicel Haiti has a market share of more than 75 percent in the provision of local telephone service in Haiti, which is sufficient to allege monopoly power in that market. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (holding that a market share between 75 percent and 80 percent of sales is "more than adequate to establish a prima facie case of power"). UPM has thus sufficiently alleged that Digicel Haiti has monopoly power in the local telephone service market in Haiti, the legitimacy of which UPM does not challenge.

UPM makes no allegations, however, about Digicel Haiti's market power in the United States-to-Haiti call transportation market. Digicel's market share in local network services does not necessarily translate into an equivalent market share in international transportation services. A mere unfair advantage combined with the use of upstream monopoly power is not sufficient to state a claim for a monopoly or attempted monopoly of the second market under a leveraging theory. *Trinko*, 540 U.S. at 415 n.4 (clarifying that a leveraging theory presumes anticompetitive conduct and, at least, a dangerous probability of monopolization of the second market). Because UPM makes no allegations about Digicel's monopoly power in the market for transporting calls from the United States to Haiti, it has not sufficiently alleged monopoly power in the relevant market.

### b. Anticompetitive Conduct

In addition to showing monopoly power in the relevant market, an antitrust plaintiff alleging monopolization must demonstrate "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident," *Trinko*, 540 U.S. at 407. To be considered anticompetitive, the act must "harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (emphasis in original).

UPM previously alleged five ways in which Digicel Haiti has engaged in anticompetitive conduct to protect and extend its local service monopoly and monopoly of the transporting of calls from the United States to Haiti. First, Digicel Haiti requires that all international calls destined for a Digicel Haiti subscriber in Haiti be switched though the Digicel USA gateway. Second, Digicel Haiti charges $0.23 per minute for calls terminated on its network in Haiti, regardless of whether they switched through Digicel USA. Third, Digicel Haiti prevents internet-based telephone services (*i.e.*, VoIP) from terminating on its wireless network. Fourth, Digicel Haiti prevents the resale of Digicel Haiti's RLYH service. Fifth, Digicel Haiti failed to report its status as the dominant local carrier in Haiti to the FCC.

In its SAA, UPM appears to have reduced its theories of anticompetitive conduct to three. First, UPM alleges that Digicel's deauthorization of its SIM cards is anticompetitive because it constitutes a forsaking of "immediate and substantial short-term profits in order to achieve its anticompetitive end." SAA, ¶366 (ECF 158 at 61). Digicel, however, has had no prior dealing with UPM or any other internet-based telephone service. Instead, Digicel's deactivation of SIM cards is employed to prevent fraud and theft. That is not anticompetitive.

Second, UPM alleges that Digicel Haiti's pricing practices are predatory. SAA, ¶368 (ECF 158 at 62). At bottom, it appear that UPM is complaining that Digicel Haiti does not provide connection services to internet-based call providers. As previously discussed, the only way authorized by Digicel Haiti to transport an international call from the United States to

Digicel Haiti's local network in Haiti is through the Digicel USA switch. Digicel requires that all international calls terminated on its local network be switched through its own gateway. This might constitute an improper tying arrangement. UPM essentially alleges that Digicel will not sell its termination services unless a wholesaler also purchases its transportation services. As previously explained, however, UPM has not sufficiently alleged that there is independent consumer demand for international call transportation services as a standalone product. "[N]o tying arrangement can exist unless there is sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market in which it is efficient to offer [the tied product] separately from [the tying product.]" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) *accord Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 462 (1992). In this case, the tied product is the switching through Digicel USA's gateway, and the tying product is Digicel Haiti's local network service in Haiti. Because UPM has not alleged that there is a distinct product market for international call transportation services such that transportation services can be efficiently offered separately from call termination services, Digicel Haiti's requirement that calls terminating on its network in Haiti be switched through Digicel USA's gateway is not anticompetitive.

Relatedly, because Digicel charges $0.23 per minute to all U.S. wholesale carriers, regardless of whether they use the Digicel USA switches to transport the call to Haiti or a transport service like UPM's, UPM argues, no wholesale carrier will elect to use a different transport service because the carrier would then be charged twice for the transport function—once in Digicel's bundled price and then again by the independent transport service. Thus, Digicel argues, those who use Digicel's transport service receive it "for free," while those who use alternative transport services are charged. Like UPM's first allegation of anticompetitive

conduct, this billing scheme could be seen as unlawful tying or bundling. "Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Predatory bundling occurs when, "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them." *Id.* at 910. Thus, as with a theory of anticompetitive tying, a plaintiff must sufficiently allege that a defendant is offering two distinct goods for a single price in order to state an antitrust claim under a theory of anticompetitive bundling. UPM has not sufficiently alleged that there is a market for standalone international call transportation services for Digicel's billing scheme to be considered improper bundling. Moreover, UPM has made no allegation that Digicel Haiti sold the transportation service—the competitive product—below the cost of performing or delivering that service.

Third, UPM alleges that Digicel Haiti's failure to register in the United States as a dominant local carrier constitutes anticompetitive conduct. SAA, ¶369 (ECF 158 at 62-63). UPM does not explain how this conduct is anticompetitive—either Digicel Haiti must register with Federal Communications Commission under § 214 of the Communications Act of 1934, or it need not register. If it must register but has failed to do so, there likely would be regulatory consequences, but not necessarily market consequences. Digicel Haiti argues that all of UPM's claims under the Communications Act fail because that statute does not apply to Digicel Haiti based on the fact that Digicel Haiti is not an "international common carrier." Because UPM's antitrust counterclaim fails on other grounds, the Court declines to address whether Digicel Haiti's failure to register as an international common carrier is anticompetitive.

### 3. Essential Facilities Doctrine

The primary addition to UPM's amended antirust counterclaim is its addition of a claim under the essential facilities doctrine. As described by the Seventh Circuit, in *MCI Commc'ns v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983), antitrust liability may be found when the following elements exist: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.

The Supreme Court has never expressly recognized the doctrine, and the most recent cases from the Supreme Court have been less than enthusiastic in considering that doctrine. *See Trinko*, 540 U.S. 398 (2004) (refusing to employ essential facilities doctrine when regulatory framework provided necessary context to determine § 2 liability); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585, n. 44 (1985) (refusing to employ essential facilities analysis in finding § 2 liability). Indeed, many scholars believe that due to its unworkable nature the essential facilities doctrine should be entirely abandoned. *See* Philip Areeda & H. Hovencamp, *Antitrust Law* § 772 (2d ed. 2004 supp.) ("one is hard-pressed to see any separate vitality remaining in the essential facility doctrine").

The doctrine, however, appears to continue to survive in the Ninth Circuit. In a recent decision, the Ninth Circuit summarized the doctrine as follows:

> The essential facilities doctrine is one of the circumstances in which plain English and antitrust lingo converge. This theory is a variation on a refusal to deal claim. It imposes liability where competitors are denied access to an input that is deemed essential, or critical, to competition. Although the Supreme Court has never recognized the doctrine, *see Trinko*, 540 U.S. at 411, we have continued to treat it as having a basis in § 2 of the Sherman Act.

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184-85 (9th Cir. 2016). Thus, to establish a violation of the essential facilities doctrine, UPM must show: (1) that Digicel Haiti is

a monopolist in control of an essential facility, (2) that UPM, as Digicel Haiti's competitor, is unable reasonably or practically to duplicate the facility, (3) that Digicel Haiti has refused to provide UPM access to the facility, and (4) that it is feasible for Digicel Haiti to provide such access.

The termination services that UPM is claiming are essential are also available and can be replicated. Digicel Haiti is not the only cellular telephone provider in Haiti. Its network cannot be an essential facility when there are other networks UPM could use to terminate international calls in Haiti. UPM could just as easily buy SIM cards from any of Digicel Haiti's competitors, for example, and piggyback onto their local networks in Haiti. Digicel Haiti's infrastructure, thus, is not essential; it is just convenient. Thus, UPM's essential facilities argument fails because UPM does not allege facts sufficient to determine that Digicel Haiti is in possession of an essential facility.

Further, in *Aerotec Int'l.* the Ninth Circuit also noted that "there is no duty to deal under the terms and conditions preferred by [a competitor's] rivals, . . . there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition." *Aerotec Int'l, Inc.*, 836 F.3d at 1184. Digicel Haiti's course of dealing with UPM is not presumably profitable, either with regard to the resale of the RLYH service or with regard to UPM's internet-based telephone service (VoIP) terminating on Digicel Haiti's local network in Haiti, and Digicel Haiti had no prior voluntary dealing with UPM or any other internet-based telephone service. Digicel Haiti might expect, for example, that a typical individual customer who purchases a RLYH SIM card will make a certain, limited number of calls per week to Haiti, and thus will sell it at a price that reflects that anticipated level of use. When in the hands of an

organization with a business model like UPM's, however, the RLYH card may be used to make hundreds or even thousands of calls to Haiti per week. Such a resale scheme does not resemble the market-value dealing denied to the plaintiff in *Aspen Skiing*, which was attempting to buy a single-use product—a daily ski pass—at the price fixed by the defendant to reflect the value of that single-use product. Rather, the scheme is more akin to the would-be competitor who buys an unlimited season pass for a ski resort, and then rents that pass out to customers for daily use at less than the cost of a day pass. If the ski resort refused to honor the rented-out season passes, such an action would be a rational attempt to protect itself from lost profits and not anticompetitive.

By refusing to honor its RLYH program with UPM, and thus preventing UPM's resale of the RLYH benefits, Digicel Haiti is acting competitively by forsaking an unprofitable deal. Whether the RLYH contract explicitly forbids this form of resale is disputed, and Digicel Haiti's refusal to honor UPM's resold RLYH calls may well be in violation of its contract if there were no restrictions on resale. Not all breaches of contract are anticompetitive, however, and when a breach is efficient, meaning that a party chooses to breach to avoid economic loss, it is particularly unlikely that the breach is anticompetitive.

For similar reasons, Digicel Haiti's refusal to permit UPM or any other internet-based telephone service terminate calls on Digicel Haiti's local network by reselling access to that network at local rates for what is in fact an international call is a competitive business decision. By refusing to deal with UPM, or any other internet-based telephone service, Digicel Haiti is not forsaking near-term profits, but rather protecting itself from an unprofitable deal. UPM implicitly concedes as much when it argued that because Digicel Haiti was ultimately able to identify the SIMs card being used by UPM, there is no reason that it could not have charged higher per-

minute rates for calls made using those services. Perhaps Digicel Haiti could have done so, but it was under no obligation to do that.

### 4. Conclusion

UPM has failed adequately to plead a plausible antitrust counterclaim under § 2 of the Sherman Act against Digicel Haiti (either alone or in combination with Digicel USA). Accordingly, UPM's antitrust counterclaim is dismissed.[2]

## B. Digicel Haiti's RICO Claims

Among other claims, Digicel Haiti asserts in its SAC three federal RICO counts against UPM, alleging violations of 18 U.S.C. §§ 1962(b), (c), and (d). Although § 1962 proscribes certain actions, the civil remedy for those violations is provided in § 1964, which states, in relevant part: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c). In *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), the Supreme Court considered whether a private civil RICO claim brought under § 1964 could reach injuries to "business or property" suffered outside the United States. Relying on the presumption against extraterritorial application of federal statutes, the Supreme Court concluded that RICO's private right of action addresses only "domestic injuries" to a plaintiff's business or property, *i.e.,* injuries to business or property located in the United States. *Id.* at 2106-11.

As UPM argues, lower courts have begun to flesh out this requirement of a domestic injury. Although a single rule has not yet emerged, there is "a general consensus among the

---

[2] Based on the Court's conclusions above, the Court declines to reach Plaintiff's arguments regarding antitrust injury and international comity.

courts that . . . the location of a RICO injury depends on where the plaintiff 'suffered the injury'—not where the injurious conduct took place." *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 702 (3d Cir. 2018). For injury allegedly caused to intangible property, such as lost profits or other intangible harm to an ongoing business, courts look to the nature of the injury to determine where it occurred. The Seventh Circuit has adopted a test that provides that injury to a business occurs where the business resides. *See Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094–95 (7th Cir. 2018) ("It is well understood that a party experiences or sustains injuries to its intangible property at its residence, which for a corporation . . . is its principal place of business;" dismissing RICO claim by business in Singapore).

The Third Circuit, however, takes a somewhat different view, applying a multi-factor test to determine where a RICO plaintiff suffered injury to a business. The Third Circuit holds that this question requires

> consideration of multiple factors, [including] where the injury itself arose; the location of the plaintiff's residence or principal place of business; where any alleged services were provided; where the plaintiff received or expected to receive the benefits associated with providing such services; where any relevant business agreements were entered into and the laws binding such agreements; and the location of the activities giving rise to the underlying dispute.

*Humphrey*, 905 F.3d at 707.

Although the Ninth Circuit has not yet addressed the "domestic injury" requirement, several district courts within the circuit have done so.[3] *See, e.g., Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1078 (N.D. Cal. 2018) (no domestic injury based on plaintiff's "protestations in this case that it has no presence in California and did no business in

---

[3] The Ninth Circuit recently discussed *RJR Nabisco* in *Doe v. Nestle, S.A.*, 929 F.3d 623, 639-41 (9th Cir. 2018), albeit in a different context.

California"); *Korea Trade Ins. Corp. v. ActiveON, Inc.*, 2018 WL 1281800, at *4-5 (S.D. Cal. Mar. 9, 2018) (injury occurred in Korea, where U.S.-based defendants fraudulently induced Korean plaintiff to lend money that was not repaid, forcing plaintiff to pay $137 million to other Korean companies in Korea); *Xiaomei Li v. Hanqing Sun*, 2016 WL 8377667, at *2, (N.D. Cal. Dec. 12, 2016) (where plaintiffs were defrauded in China while living there, the fact that defendants moved to the United States and brought the funds from the fraud here does not establish a domestic injury); *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1156 (C.D. Cal. 2016) (where plaintiff "maintains a 'hub' in the United States," "extended credit and delivered goods … in the United States[, and when] not paid … pursued arbitration in the United States pursuant to a binding arbitration agreement that required arbitration . . . in Los Angeles," domestic injury has occurred); *Gusevs v. AS Citadele Banka*, 2016 WL 9086931, at *7 (C.D. Cal. Sept. 8, 2016) (no domestic injury because, even though plaintiff lived in California, the injuries "were suffered by his businesses and properties located in Latvia, and he does not allege that any businesses or properties located within the United States were injured."); *Uthe Tech. Corp. v. Harry Allen & Aetrium, Inc.*, 2016 WL 4492580, at *3 (N.D. Cal. Aug. 26, 2016), *aff'd on other grounds*, 739 F. Appx. 903 (9th Cir. July 2, 2018) (U.S. shareholder not injured in U.S. by diminution in value of Singapore company) (unpublished).

Digicel Haiti has alleged it was harmed in several ways. Primarily, Digicel Haiti alleges that is was deceived into terminating international calls on its local network in Haiti, leading it to charge only $0.09 per minute when it would have charged $0.23 had it known the calls were really international in nature. *See, e.g.,* SAC at ¶¶ 183-184 (alleging lost revenue). Digicel Haiti also alleges that UPM's actions "disrupted its business operations," SAC at ¶¶ 191, 198, and injured its "goodwill," its "commercial reputation," and its "reputation and standing with the

Haitian Government." *Id*. Digicel Haiti further asserts that it incurred costs investigating UPM's conduct. SAC at ¶¶ 77-79, 198. Finally, and perhaps most importantly, Digicel Haiti alleges: "Digicel Haiti operates *solely within Haiti*. It does not have any operations within the United States." SAC at ¶ 15 (emphasis added); *see also* SAC at ¶ 1 (Digicel Haiti is organized under Haitian law, has its headquarters and principal place of business in Haiti, and operates its network in Haiti). Thus, whatever it reasonably may mean for an injury to be "domestic," Digicel Haiti's alleged injuries were all suffered in Haiti, not in the United States, and thus not actionable under § 1964(c).

Plaintiff's first response to UPM's argument is that UPM failed to bring this motion in a timely fashion. Plaintiff correctly argues that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure must be made before pleading if a responsive pleading is required. Fed. R. Civ. P 12(b). Here, a responsive pleading to Plaintiff's complaint was required, and UPM answered. Thus, as Plaintiff observes, UPM has waived all defenses listed in Rule 12(b)(2)-(5) that were not timely asserted. In reply, however, UPM asks the Court to treat its RICO argument as a motion for judgment on the pleadings, under Rule 12(c). Because no unfair prejudice to Plaintiff would result, the Court will do so.

For Plaintiff's second argument, Plaintiff contends that UPM's conduct did cause Plaintiff to suffer domestic injury. For the reasons explained above, however, Plaintiff's argument is not persuasive. As Plaintiff itself alleges, it "operates solely within Haiti" and "does not have any operations within the United States." SAC at ¶ 15. Thus, it is not plausible that Plaintiff suffered any domestic injury.

Finally, Plaintiff argues both that "insulating domestic defendants" from liability for international fraudulent schemes, such as is alleged in this case, is a dangerous approach that this

court should not take, and that Plaintiff's only remedy is with this court. The Court is in general agreement with both propositions. The Court notes, however, as stated by UPM, that UPM's motion is focused only on Digicel Haiti's statutory claim under RICO, and UPM does not seek to dismiss Plaintiff's common law fraud and other claims. The remedies of a civil RICO statutory claim are particularly powerful, including mandatory treble damages and attorney's fees. The entire point of the Supreme Court's holding in *RJR Nabisco* is that Congress did not intend to provide the special and powerful remedies of civil RICO in situations where the plaintiff's injuries were entirely foreign rather than domestic. Digicel Haiti is not left without a remedy in this case, although the remedies that remain may be less desirable to Plaintiff that a remedy under civil RICO. Accordingly, Plaintiff's civil RICO claims are dismissed.

## CONCLUSION

Plaintiff's motion to dismiss Defendants' amended antitrust counterclaim (ECF 162) is granted. Defendants' motion to dismiss Plaintiff's RICO claims (ECF 178) also is granted.

**IT IS SO ORDERED**.

DATED this 3rd day of September, 2019.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge