**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
*(Admitted Pro Hac Vice)*
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

        Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>        Plaintiff,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**. d/b/a **UPM TELECOM, INC**., and **UPM MARKETING, INC**., an Oregon corporation; **UPM TELECOM, INC**., an Oregon a/b/n; **UPM MARKETING, INC**., an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; **TYLER ALLEN**, an Oregon resident; and **DUY TRAN a/k/a** | Case No. 3:15-CV-00185-SI<br><br>**DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

**BRUCE TRAN,** a foreign individual,

      Defendants.

**UPM TECHNOLOGY, INC**. d/b/a **UPM TELECOM, INC**., and **UPM MARKETING, INC**., an Oregon corporation; **UPM TELECOM, INC**., an Oregon a/b/n; **UPM MARKETING, INC**., an Oregon a/b/n; **BENJAMIN SANCHEZ** a/k/a **BENJAMIN SANCHEZ MURILLO**, an Oregon resident; **BALTAZAR RUIZ**, an Oregon resident; **TYLER ALLEN**, an Oregon resident; and **DUY TRAN a/k/a BRUCE TRAN,** a foreign individual,

      Defendants and Counterclaim-Plaintiffs,

    v.

**UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI;** and **DIGICEL-USA, INC.**, a Delaware corporation,

      Counterclaim-Defendants.

Defendants UPM Technology, Inc. (UPM) d/b/a UPM Telecom, Inc., UPM Marketing, Inc., UPM Telecom, Inc., UPM Marketing, Inc., Benjamin Sanchez a/k/a Benjamin Sanchez Murillo, Baltazar Ruiz, Tyler Allen, and Duy Tran (collectively "Defendants") hereby responds to Plaintiff's Third Amended Complaint (TAC) as follows:

## ANSWER

1.    Answering Paragraph 1, Defendants are without sufficient knowledge to admit or deny the first sentence of Paragraph 1. Defendants admit the allegations of the second sentence of Paragraph 1.

2.    Answering Paragraph 2, Defendants admit.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

3.     Answering Paragraph 3, Defendants deny. In further response to Paragraph 3, Defendants admit that UPM conducts business as UPM Telecom, Inc. (UPM Telecom) which, at all relevant times, was an assumed business name of UPM Technology.

4.     Answering Paragraph 4, Defendants deny.  In further response to Paragraph 4, Defendants admit that UPM conducts business as UPM Marketing, Inc. (UPM Marketing) which is an assumed business name of UPM Technology.

5.     Answering Paragraph 5, Defendants admit.

6.     Answering Paragraph 6, Defendants are without sufficient knowledge to admit or deny the allegations in Paragraph 6 regarding the contents of the business registry of the Oregon Secretary of State.  Defendants admit that UPM's address is as alleged in Paragraph 6.

7.     Answering Paragraph 7, Defendants deny that Benjamin Sanchez (Sanchez) is a citizen and resident of the state of Oregon, further deny that Sanchez holds himself out as the owner of UPM Marketing or President of UPM Telecom; but admit that Sanchez is listed as an authorized representative of UPM Marketing in the business registry for the Oregon Secretary of State Corporation Division.

8.     Answering Paragraph 8, Defendants admit that Balthazar Ruiz (Ruiz) is a citizen and resident of the state of Oregon but deny that Ruiz holds himself out as a Project Manager for UPM Telecom.

9.     Answering Paragraph 9, Defendants admit that Tyler Allen (Allen) is a resident and citizen of the state of Oregon.

10.     Answering Paragraph 10, Defendants admit that during the period relevant to this lawsuit, Mr. Tran was a citizen and resident of Oregon and admit that Mr. Tran is the Chief Executive Officer of UPM, and otherwise deny.

11.     Answering Paragraph 11, Defendants state that this paragraph contains legal conclusions to which no response is required.

12.     Answering Paragraph 12, Defendants state that this paragraph contains legal conclusions to which no response is required.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

13.     Answering Paragraph 13, Defendants state that this paragraph contains legal conclusions to which no response is required; to the extent a response is required Defendants deny the allegations contained therein.

14.     Answering Paragraph 14, Defendants admit that Plaintiff is a leading provider of telecommunications services in Haiti, and assert that Digicel-Haiti is the leading provider of telecommunications services in Haiti, with a market share in excess of 75%. Defendants lack sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in Paragraph 14 and on that basis deny the same.

15.     Answering Paragraph 15, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 15 therein and on that basis deny the same.

16.     Answering Paragraph 16, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 16 and on that basis deny the same.

17.     Answering Paragraph 17, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 17 and on that basis deny the same.

18.     Answering Paragraph 18, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the first sentence of Paragraph 18 and on that basis deny the same. Defendants admit the allegations contained in the second sentence of Paragraph 18.  Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the first sentence of Paragraph 18 and on that basis deny the same.

19.     Answering Paragraph 19, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 19 and on that basis deny the same.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

20.    Answering Paragraph 20, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 20 and on that basis deny the same.

21.    Answering Paragraph 21, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 21 and on that basis deny the same.

22.    Answering Paragraph 22, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 22 and on that basis deny the same.

23.    Answering Paragraph 23, Defendants admit.

24.    Answering Paragraph 24, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the first sentence of Paragraph 24 and on that basis deny the same.  With respect to the second sentence of Paragraph 24, Defendants admit that calls bound for a Digicel-Haiti subscriber that are delivered to a Digicel-USA switch are transmitted to Digicel-Haiti's network in Haiti, and otherwise deny the allegations of the second sentence of Paragraph 24.  Defendants admit the allegations in the third and fourth sentences of Paragraph 24.  Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the footnote to the final sentence of Paragraph 24 and on that basis deny the same.

25.    Answering Paragraph 25, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 25 and on that basis deny the same.

26.    Answering Paragraph 26, Defendants admit that the allegations contained in the first two sentences of Paragraph 26 are a reasonable general description of how Call Detail Records (CDRs) are generated.  With respect to the third sentence of Paragraph 26, Defendants are unsure what the phrase "In this instance" refers to, but admit that Digicel-Haiti's switches

Page 5 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

would normally record the time a call starts and ends and thereby implicitly record the duration of a call.

27.    Answering Paragraph 27, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 27 and on that basis deny the same.

28.    Answering Paragraph 28, Defendants admit that Digicel-USA switches will not generate a CDR with respect to a call that does not traverse those switches, but otherwise deny the allegations of Paragraph 28.

29.    Answering Paragraph 29, Defendants deny.

30.    Answering Paragraph 30, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 30 and on that basis deny the same.

31.    Answering Paragraph 31, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 31 and on that basis deny the same.

32.    Answering Paragraph 32, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 32 and on that basis deny the same.

33.    Answering Paragraph 33, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 33 and on that basis deny the same.

34.    Answering Paragraph 34, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 34 and on that basis deny the same.

35.    Answering Paragraph 35, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 35 and on that basis deny the same.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

36.    Answering Paragraph 36, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 36 and on that basis deny the same.

37.    Answering Paragraph 37, Defendants deny.

38.    Answering Paragraph 38, Defendants deny.

39.    Answering Paragraph 39, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 39 and on that basis deny the same.

40.    Answering Paragraph 40, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 40 and on that basis deny the same.

41.    Answering Paragraph 41, Defendants deny.

42.    Answering Paragraph 42, Defendants admit that devices exist that can store and control SIM cards and that such devices can monitor and control several SIM cards, admit that there is no technical requirement for a SIM card to be in the same location as a radio with which it is associated, and otherwise deny that allegations of Paragraph 42.

43.    Answering Paragraph 43, Defendants admit.

44.    Answering Paragraph 44, Defendants admit that devices can be loaded with multiple SIM cards, that it is possible to communicate with such devices via the internet, and that calls can be routed to such devices, including international calls, via the internet. Defendants otherwise deny that allegations of Paragraph 44.

45.    Answering Paragraph 45, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 45 and on that basis deny the same.

46.    Answering Paragraph 46, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 46 and on that basis deny the same.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

47. Answering Paragraph 47, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 47 and on that basis deny the same.

48. Answering Paragraph 48, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 48 and on that basis deny the same.

49. Answering Paragraph 49, Defendants deny.

50. Answering Paragraph 50, Defendants admit that persons acting on behalf of UPM purchased Digicel-Haiti SIM Cards that were shipped back to Oregon, and otherwise deny the allegations of this Paragraph.

51. Answering Paragraph 51, Defendants deny.

52. Answering Paragraph 52, Defendants deny.

53. Answering Paragraph 53, Defendants admit that for a time UPM made use of equipment in Haiti to initiate calls on Digicel-Haiti's network, and otherwise deny the allegations of this Paragraph.

54. Answering Paragraph 54, Defendants admit that for a time UPM made use of equipment in Haiti that received data via internet access service obtained from local Haitian internet service providers (ISPs) and used that data to initiate calls onto Digicel-Haiti's network, and otherwise deny the allegations of this Paragraph.

55. Answering Paragraph 55, Defendants deny.

56. Answering Paragraph 56, Defendants deny.

57. Answering Paragraph 57, Defendants admit that calls initiated via equipment in Haiti on Digicel-Haiti's network would be digitally associated to a domestic number associated with a Digicel Haiti SIM Card, and otherwise deny the allegations contained of this Paragraph.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

58.    Answering Paragraph 58, Defendants admit that calls initiated via equipment in Haiti on Digicel Haiti's network do not pass through switches in New York or Miami, and otherwise deny the allegations contained in this Paragraph.

59.    Answering Paragraph 59, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 59 and on that basis deny the same. To the extent that the allegations of this Paragraph are intended to suggest that Defendants generated "significant profits" in connection with sending calls to Haiti, Defendants deny that allegation.

60.    Answering Paragraph 60, Defendants deny.

61.    Answering Paragraph 61, Defendants deny.

62.    Answering Paragraph 62, Defendants deny.

63.    Answering Paragraph 63, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the first sentence of Paragraph 63 and on that basis deny those allegations. Defendants admit the allegations of the second sentence of Paragraph 63, but deny any implied allegation in that sentence that grocery or convenience stores are the only authorized channels for retail distribution of SIM Cards.

64.    Answering Paragraph 64, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 64 and on that basis deny the same.

65.    Answering Paragraph 65, Defendants admit that UPM obtained, through third parties, multiple Digicel Haiti SIM Cards, and otherwise deny the allegations of that paragraph.

66.    Answering Paragraph 66, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 66 and on that basis deny the same.

Page 9 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

67. Answering Paragraph 67, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 67 and on that basis deny the same.

68. Answering Paragraph 68, Defendants admit that it is possible to transmit voice communications via the internet that can be linked to local calls in Haiti, and otherwise deny that allegations of this Paragraph.

69. Answering Paragraph 69, Defendants deny.

70. Answering Paragraph 70, Defendants deny.

71. Answering Paragraph 71, Defendants admit that they own and operate equipment in Oregon, and otherwise deny the allegations of this Paragraph.

72. Answering Paragraph 72, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 72 and on that basis deny the same.

73. Answering Paragraph 73, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 73 and on that basis deny the same.

74. Answering Paragraph 74, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 74 and on that basis deny the same.

75. Answering Paragraph 75, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 75 and on that basis deny the same.

76. Answering Paragraph 76, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 76 and on that basis deny the same.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

77.     Answering Paragraph 77, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 77 and on that basis deny the same.

78.     Answering Paragraph 78, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 78 and on that basis deny the same.

79.     Answering Paragraph 79, Defendants deny.

80.     Answering Paragraph 80, Defendants deny.

81.     Answering Paragraph 81, Defendants deny.

82.     Answering the first sentence of Paragraph 82, Defendants admit that in the past UPM sold wholesale minutes to Haiti that got the communications to Haiti via the internet, following by initiating a local call in Haiti linked to the internet.  Defendants deny that are now engaged in such activities. Defendants deny the allegations of the second sentence of Paragraph 82.

83.     Answering Paragraph 83, Defendants admit that UPM paid full retail price for Roam Like You Are Home (RLYH) service on certain SIM cards for which UPM also paid full retail price, and that UPM initiated calls to Haiti using those SIM cards on the network of or more domestic United States wireless carriers.  Defendants otherwise deny the allegations of Paragraph 83.

84.     Answering Paragraph 84, Defendants deny.

85.     Answering Paragraph 85, Defendants deny.

86.     Answering Paragraph 86, Defendants admit that they obtained numerous Digicel Haiti SIM Cards from third parties who acquired them in Haiti, and otherwise deny the allegations of Paragraph 86.

87.     Answering Paragraph 87, Defendants admit.

88.     Answering Paragraph 88, Defendants admit.

89.     Answering Paragraph 89, Defendants admit.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

90. Answering Paragraph 90, Defendants admit that a SIM card purchased from Digicel-Haiti will become active when it is used to make a call or a recharge (adding money to the account associated with the SIM card) occurs, and otherwise deny that allegations of Paragraph 90.

91. Answering Paragraph 91, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 91 regarding Digicel-Haiti's "defaults." In further response to Paragraph 91, Defendants admit that Digicel-Haiti SIM Cards can be used to transmit voice and messaging services into Digicel-Haiti's network.

92. Answering Paragraph 92, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 92 and on that basis deny the same.

93. Answering Paragraph 93, Defendants admit.

94. Answering Paragraph 94, Defendants deny.

95. Answering Paragraph 95, Defendants deny.

96. Answering Paragraph 96, Defendants deny.

97. Answering Paragraph 97, Defendants admit that UPM was shipped Digicel Haiti SIM Cards to its location in in Oregon, and otherwise deny the allegations of Paragraph 97.

98. Answering Paragraph 98, Defendants deny.

99. Answering Paragraph 99, Defendants deny.

100. Answering Paragraph 100, Defendants admit that during the period in the past that it operated in Haiti, it placed SIM Cards shipped from Haiti into devices in Oregon.

101. Answering Paragraph 101, Defendants admit that when a local call in Haiti is initiated on Digicel-Haiti's network via radio equipment in Haiti, that equipment transmits information associated with a Digicel Haiti SIM Card; that the SIM Card itself may not be physically located in Haiti; and that the internet may be used to transmit that information.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Defendants otherwise deny the allegations of Paragraph 101, and specifically deny that they "cloned" any SIM Cards, as that term is normally used in the telecommunications industry.

102.    Answering the first sentence of Paragraph 102, Defendants admit that when a local call in Haiti is initiated on Digicel-Haiti's network via radio equipment in Haiti, that equipment transmits information associated with a Digicel Haiti SIM Card; that the SIM Card itself may not be physically located in Haiti; and that the internet may be used to transmit that information; but otherwise deny the allegations of the first sentence of Paragraph 102. Defendants deny the allegations of the second sentence of Paragraph 102. Answering the third sentence of Paragraph 102, Defendants admit that Digicel-Haiti's network will complete calls using its network irrespective of where the SIM Card associated with the number making the call is physically located, but otherwise deny the allegations of that sentence.

103.    Answering Paragraph 103, Defendants deny.

104.    Answering Paragraph 104, Defendants deny.

105.    Answering Paragraph 105, Defendants deny.

106.    Answering the first sentence of Paragraph 106, Defendants admit that they have placed Digicel-Haiti SIM cards into devices in Oregon, but otherwise deny the allegations of that sentence. Answering the second sentence of Paragraph 106, Defendants admit that during the time they operated in Haiti they shipped radio devices to Haiti, but otherwise deny the allegations of that sentence. Defendants deny the remaining allegations of Paragraph 106.

107.    Answering Paragraph 107, Defendants admit that for a period of time in the past, UPM sold wholesale minutes of use to carriers for calls from the United States to Haiti, but otherwise deny that allegations of Paragraph 107.

108.    Answering Paragraph 108, Defendants deny.

109.    Answering Paragraph 109, Defendants admit the allegations of the first two sentences of Paragraph 109. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the third sentence of Paragraph 109, and on that basis deny the same.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

110.    Answering Paragraph 110, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 110 and on that basis deny the same.

111.    Answering Paragraph 111, Defendants deny.

112.    Answering Paragraph 112, Defendants deny.

113.    Answering Paragraph 113, Defendants deny.

114.    Answering Paragraph 114, Defendants admit that for a period of time in the past, it converted calls received in Oregon into internet data and transmitted that data to local Haitian ISPs and that those local Haitian ISPs transmitted information to equipment in Haiti that initiated local calls on Digicel-Haiti's network.  Defendants deny the remaining allegations of Paragraph 114.

115.    Answering Paragraph 115, Defendants deny.

116.    Answering Paragraph 116, Defendants deny.

117.    Answering Paragraph 117, Defendants deny.

118.    Answering Paragraph 118, Defendants admit that information from SIM cards located in Oregon was used to authenticate wireless users on Digicel-Haiti's network in Haiti, originated by UPM equipment in Haiti, but otherwise deny the allegations of this Paragraph 118.

119.    Answering Paragraph 119, Defendants deny.

120.    Answering Paragraph 120, Defendants deny.

121.    Answering Paragraph 121, Defendants deny.

122.    Answering Paragraph 122, Defendants deny.

123.    Answering Paragraph 123, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 123 and on that basis deny the same.

124.    Answering Paragraph 124, Defendants deny.

125.    Answering Paragraph 125, Defendants deny.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

126.    Answering Paragraph 126, Defendants deny.

127.    Answering Paragraph 127, Defendants deny.

128.    Answering Paragraph 128, Defendants admit that Digicel-Haiti's RLYH plan operates generally as described, but denies that during the time that UPM purchased that service, there was any contractual or other limitation or requirement that only individual subscribers could purchase RLYH plans.

129.    Answering Paragraph 129, Defendants admit that Digicel-Haiti's RLYH plan operates generally as described, but denies that during the time that UPM purchased that service, there was any contractual or other limitation or requirement that only individual subscribers could purchase RLYH plans.

130.    Answering Paragraph 130, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 130 and on that basis deny the same.  In further response to Paragraph 130, Defendants deny that there were any contractual or other restrictions on the use of RLYH plans that reflected the "intention" referred to in that paragraph.

131.    Answering Paragraph 131, Defendants admit that during the time UPM was operating in Haiti, it sold a number of wholesale minutes for calls bound to Haiti to third-party carriers, but otherwise deny the allegations of Paragraph 131.

132.    Answering Paragraph 132, Defendants admit that during the time UPM as operating in Haiti, calls from its wholesale customers were routed to its location in Oregon, but otherwise deny the allegations of Paragraph 132.

133.    Answering Paragraph 133, Defendants deny.

134.    Answering Paragraph 134, Defendants deny.

135.    Answering Paragraph 135, Defendants deny the allegations of the first sentence of Paragraph 135.  Defendants admit the allegations of the second sentence of Paragraph 135.  Defendants do not understand the meaning of the claim that UPM "combines" a call with "digital information" from a SIM card and therefore denies the allegations of the third

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

sentence of Paragraph 135. With respect to the fourth sentence of Paragraph 135, Defendants admit that during the time that it was operational in Haiti it would initiate calls to United States wireless carriers using SIM Cards that it had registered for (and paid for) the RLYH plan and admits that those carriers had roaming agreements with Digicel-Haiti, but otherwise deny the allegations of that sentence. Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in the final sentence of Paragraph 135, and on that basis deny the same, except that Defendants admit that some of the calls that it initiated using SIM Cards on the RLYH plan were completed to called parties in Haiti.

136.    Answering Paragraph 136, Defendants admit.

137.    Answering Paragraph 137, Defendants admit that during the time that UPM operated in Haiti, it sent funds to persons in Haiti to purchase Digicel Haiti SIM Cards, but deny all remaining allegations of Paragraph 137.

138.    Answering Paragraph 138, Defendants admit that during the time that UPM operated in Haiti, it sent funds to persons in Haiti to cover certain costs of associated with operating UPM equipment in Haiti, but deny all remaining allegations of Paragraph 138.

139.    Answering Paragraph 139, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 139 and on that basis deny the same.

140.    Answering Paragraph 140, Defendants deny.

141.    Answering Paragraph 141, Defendants admit that certain funds that UPM had sent to persons in Haiti were later sent to Victor Manuel Moscoso Ruiz, but deny the remaining allegations of Paragraph 141.

142.    Answering Paragraph 142, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 142 and on that basis deny the same.

143.    Answering Paragraph 143, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 143 and on

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that basis deny the same. In further response to Paragraph 143, Defendants deny that Defendants acquired any SIM Cards illegally and deny that any SIM Cards it acquired were used to commit fraud.

144. Answering Paragraph 144, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 144 and on that basis deny the same.

145. Answering Paragraph 145, Defendants admit that during 2014 a number of SIM Cards were shipped from Haiti to Sanchez in Oregon, but otherwise deny the allegations of Paragraph 145.

146. Answering Paragraph 146, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Sanchez in Oregon, but otherwise deny the allegations of Paragraph 146.

147. Answering Paragraph 147, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Sanchez in Oregon, but otherwise deny the allegations of Paragraph 147.

148. Answering Paragraph 148, Defendants admit that during 2014 UPM shipped certain equipment to Haiti for use in providing its services in Haiti, but otherwise deny the allegations of Paragraph 148.

149. Answering Paragraph 149, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Sanchez in Oregon, but otherwise deny the allegations of Paragraph 149.

150. Answering Paragraph 150, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Sanchez in Oregon, but otherwise deny the allegations of Paragraph 150.

151. Answering Paragraph 151, Defendants admit that during 2014 UPM shipped certain equipment to Haiti for use in providing its services in Haiti, but otherwise deny the allegations of Paragraph 151.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

152.    Answering Paragraph 152, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Allen in Oregon, but otherwise deny the allegations of Paragraph 152.

153.    Answering Paragraph 153, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Allen in Oregon, but otherwise deny the allegations of Paragraph 153.

154.    Answering Paragraph 154, Defendants admit that during 2014 a number of SIM cards were shipped from Haiti to Allen in Oregon, but otherwise deny the allegations of Paragraph 154.

155.    Answering Paragraph 155, Defendants admit that during the time that UPM operated in Haiti, it sent funds to persons in Haiti to cover certain costs of associated with operating UPM equipment in Haiti, but deny all remaining allegations of Paragraph 155.

156.    Answering Paragraph 156, Defendants admit that during the time UPM operated in Haiti, UPM shipped certain equipment to Haiti for use in providing its services in Haiti, but otherwise deny the allegations of Paragraph 156.

157.    Answering Paragraph 157, Defendants are unclear what Digicel-Haiti means by "standard operating procedures" and by "sophisticated telecommunications equipment" and so deny the allegations of Paragraph 157.

158.    Answering Paragraph 158, Defendants are unclear what Digicel-Haiti means by "invoice templates" and by "telecommunications equipment" and so deny the allegations of Paragraph 158.

159.    Answering Paragraph 159, Defendants are unclear what Digicel-Haiti means by "shipping procedures" and so deny the allegations of Paragraph 159.

160.    Answering Paragraph 160, Defendants are unclear what Digicel-Haiti means by "shipping procedures" and so deny the allegations of Paragraph 160.

161.    Answering Paragraph 161, Defendants deny.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

162.    Answering Paragraph 162, Defendants deny.  In further response to Paragraph 162, Defendants deny that they at any time sent any equipment to Haiti that meets the definition of "False Gateway" established by Plaintiff in the Third Amended Complaint.

163.    Answering Paragraph 163, Defendants deny.

164.    Answering Paragraph 164, Defendants deny.

165.    Answering Paragraph 165, Defendants deny.

166.    Answering Paragraph 166, Defendants deny.

167.    In response to the first sentence of Paragraph 167, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in that sentence, and on that basis deny the same.  Defendants deny the allegations of the second sentence of Paragraph 167.  In further response to the second sentence of Paragraph 167, Defendants state that UPM ceased its operations in Haiti during 2014.

168.    Answering Paragraph 168, Defendants deny.  In further response to the allegations of the first sentence of Paragraph 168, Defendants admit that UPM undertook certain activities to explore operation in Haiti during 2011 but did not continue those activities in any substantial way thereafter until it operated in Haiti briefly during 2014.

169.    Answering Paragraph 169, Defendants deny.

170.    Answering Paragraph 170, Defendants deny.

171.    Answering Paragraph 171, Defendants deny.

172.    Answering Paragraph 172, Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations contained in Paragraph 172 and on that basis deny the same.

173.    Answering Paragraph 173, Defendants re-allege and re-incorporate by reference Paragraphs 1 through 172 above as if fully set forth herein.

174.    Answering Paragraph 174, this paragraph consists of legal arguments or conclusions and therefore no response to it is required.  To the extent that a response is required, Defendants deny the allegations of this paragraph.

Page 19 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

175. Answering Paragraph 175, Defendants deny.

176. Answering Paragraph 176, Defendants deny.

177. Answering Paragraph 177, Defendants deny.

178. Answering Paragraph 178, Defendants deny.

179. Answering Paragraph 179, Defendants deny.

180. Answering Paragraph 180, Defendants deny.

181. Answering Paragraph 181, Defendants deny.

182. Answering Paragraph 182, Defendants deny, and, with respect to the unnumbered paragraph following paragraph 182 beginning with "WHEREFORE", Defendants deny that Plaintiff is entitled to the relief prayed for.

183. Answering Paragraph 183, Defendants re-allege and re-incorporate by reference Paragraphs 1 through 172 above as if fully set forth herein.

184. Answering Paragraph 184, Defendants deny.

185. Answering Paragraph 185, Defendants deny.

186. Answering Paragraph 186, Defendants deny.

187. Answering Paragraph 187, Defendants deny.

188. Answering Paragraph 188, Defendants deny.

189. Answering Paragraph 189, Defendants deny.

190. Answering Paragraph 190, Defendants deny.

191. Answering Paragraph 191, Defendants deny.

192. Answering Paragraph 192, Defendants deny, and, with respect to the unnumbered paragraph following paragraph 192 beginning with "WHEREFORE", Defendants deny that Plaintiff is entitled to the relief prayed for.

193. Answering Paragraph 193, Defendants re-allege and re-incorporate by reference Paragraphs 1 through 172 above as if fully set forth herein.

194. Answering Paragraph 194, Defendants deny.

195. Answering Paragraph 195, Defendants deny.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

196. Answering Paragraph 196, Defendants deny, and, with respect to the unnumbered paragraph following paragraph 196 beginning with "WHEREFORE", Defendants deny that Plaintiff is entitled to the relief prayed for.

197. Answering Paragraph 197, Defendants re-allege and re-incorporate by reference Paragraphs 1 through 172 above as if fully set forth herein.

198. Answering Paragraph 198, Defendants deny.

199. Answering Paragraph 199, Defendants deny.

200. Answering Paragraph 200, Defendants deny.

201. Answering Paragraph 201, Defendants deny.

202. Answering Paragraph 202, Defendants deny.

203. Answering Paragraph 203, Defendants deny. and, with respect to the unnumbered paragraph following paragraph 203 beginning with "WHEREFORE", Defendants deny that Plaintiff is entitled to the relief prayed for.

204. Except as expressly admitted or otherwise controverted herein, Defendants deny any and all remaining allegations of the Third Amended Complaint.

## ALLEGATIONS RELATED TO AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

### General Background

205. Under the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* (the "Act"), an entity is a "telecommunications carrier" and a "common carrier" when it offers to transmit information for a fee between points designated by its customer. *See* 47 U.S.C. §§ 151(11), (50), (51), & (53) (defining, respectively, "common carrier," "telecommunications," "telecommunications carrier," and "telecommunications service"). (For purposes of the Act, the terms "common carrier" and "telecommunications carrier" are generally interchangeable. *See Virgin Islands Telephone Corp. v. FCC,* 198 F.3d 921, 926-27 (D.C. Cir. 1999).) A "foreign communication" under the Act is a communication with one end in the United States and the other end in a foreign country. 47 U.S.C. § 153(21). A common carrier involved in providing

Page 21 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

foreign communications is referred to in the FCC's rules as an "international carrier" or an "international common carrier," and the services such entities provide are referred to as "international services." *See, e.g.,* 47 C.F.R. §§ 63.09-63.23.

206.    FCC rules require that an entity seeking to operate in the United States as an international carrier, *i.e.*, as an entity offering to deliver traffic between the United States and a foreign country, must obtain formal authorization to do so. *See id.*  These authorizations are required under 47 U.S.C. § 214.  They are referred to in the industry as "Section 214" authorizations.  Operating as an international common carrier without a Section 214 authorization constitutes a violation of the Act. *See, e.g., PTT Phone Cards, Inc.,* Notice of Apparent Liability for Forfeiture, 29 F.C.C.R. 11531 (2014); *PTT Phone Cards, Inc.,* Forfeiture Order, 2015 FCC LEXIS 3727 (FCC Dec. 7, 2015).

207.    Terminating a call on a modern wireless network, such as the network that Digicel-Haiti operates in Haiti, costs the network operator less than $0.02 per minute.  This includes both the variable (per-minute) costs of terminating the call (such as any incremental power consumption), as well as provision for a share of the network's fixed and overhead costs (such as the cost of investments in cell towers).

208.    If a foreign wireless network operator imposes termination fees (sometimes called "settlement rates") on United States-originated calls that are significantly in excess of the costs of terminating the calls, including fees that are above the rate for terminating calls in the local market, that harms United States consumers.

209.    The FCC has taken regulatory actions designed and intended to put economic pressure on foreign carriers to lower foreign termination fees.  For example, in 1998 the FCC stated that it "has sought to foster an increasingly competitive international telecommunications market by adopting policies that promote the shift away from regulated monopolies and toward private sector competition." *1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 F.C.C.R. 7963 (1998) at ¶ 1 (footnote omitted).

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

210.     The FCC has long been aware of the use of technology by United States entities to avoid (or "bypass") high settlement rates.  Such activities put marketplace pressure on foreign carriers and governments to lower such fees.

211.     For example, in the order quoted above, the FCC stated:

We are aware … that "services and technologies that bypass the settlements regime" … are available for carriers seeking to avoid the legal monopoly of a foreign incumbent carrier in some countries that are legally closed to competition. *We find it encouraging that such activity is putting pressure on settlement rates in those countries*. Such methods of termination may not be a realistic alternative, however, for the termination of large amounts of traffic, particularly where termination of traffic in such a manner is illegal in the foreign country.[fn 119]

[fn 119] *Internet telephony is a promising means of bypassing the traditional settlements system.* At present, however [that is, in 1998], such services remain cumbersome for the average user and account for a minimal amount of international voice traffic.

*Id.* at ¶ 63 (emphasis added, footnotes omitted except as shown above).

212.     International common carriers are subject to the terms of 47 U.S.C. § 201(b), which requires that the "charges, practices, classifications, and regulations for and in connection with" the provision of "foreign communications" must not be "unjust or unreasonable."  Section 201(b) states that "any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful."

213.     International common carriers are also subject to the terms of 47 U.S.C. § 202(a), which states that "[it] shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue preference or disadvantage."

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

214.    One way in which an international carrier can impede competition in the United States is by interfering with other carriers' ability to complete calls from the United States to the carrier's home (foreign) market.

215.    To complete a call from the United States to a foreign country, a United States carrier must obtain, as inputs, various call termination services from foreign carriers in the destination country.  These inputs include international transport services (getting the call to the foreign country), transport within the destination country to the network serving the called party, and call termination services from the carrier serving the called party.

216.    One way in which a foreign carrier can interfere with the ability of a United States carrier to complete calls is to refuse to permit the resale, within the United States, of the foreign carrier's services, to the extent that such services are available in the United States.

217.    By forbidding resale, a carrier can offer services at one price or under one set of conditions to a preferred set of customers, but then refuse to offer services at those same prices, terms and conditions to other customers.  Resale of the carrier's services avoids this result.  For example, if a carrier offers a low price to some customers but not others, competitors may purchase the low-priced service for resale, and offer it to customers not in the favored group.  This prevents the carrier charging higher prices to customers not in the favored group.

## UPM and Digicel Entities

218.    UPM provides various communications services.  Among other things, UPM is an international common carrier within the meaning of 47 U.S.C. §§ 201-202 and associated regulations of the FCC.  UPM holds a Section 214 authorization to provide its services by means of resale of the facilities and services of other entities, by means of UPM's own facilities where such facilities exist and have appropriate capacity, or by a combination of resale and the use of UPM's own facilities.  *See* Public Notice, "International Authorizations Granted," ITC-214-20081120-00511, 24 F.C.C.R. 5376 (May 7, 2009).

219.    Digicel-Haiti is a 100%-owned indirect subsidiary of Digicel Holdings, Ltd.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

220. Digicel-USA Incorporated (Digicel-USA) is also a 100%-owned indirect subsidiary of Digicel Holdings, Ltd.

221. Digicel-USA owns and operates two "Gateway" switches, one in Miami, Florida, and one in New York, New York. Digicel-USA, is an international carrier on the United States-Haiti route. Digicel-USA holds an international Section 214 authorization from the FCC.

222. Digicel-USA acts as Digicel-Haiti's agent with respect to offering to carry telephone calls from the United States to Haiti, such that Digicel-USA and Digicel-Haiti are both common carriers within the meaning of the Act. Specifically:

a. Digicel-Haiti takes steps to ensure, and purports to require, that inbound international calls from the United States be routed via Digicel-USA.

b. Digicel-Haiti dictates the price to be charged to third party carriers for calls that Digicel-USA carries from the United States to Haiti.

c. Digicel-Haiti ultimately receives the entirety of the charge to third party carriers for delivering calls to Haiti, with small cost-allocation-based compensation to Digicel-USA, such that the economic substance of the transaction is that Digicel-Haiti is paid the demanded rate for the service.

### Digicel-Haiti's Market Position in Haiti

223. There is little if any traditional "landline" telephone service in Haiti. According to one source, more than 99.9% of local telephone service in Haiti is provided by means of wireless telephone service. *See* https://www.cia.gov/library/publications/the-world-factbook/geos/ha.html (more than 6.5 million wireless subscriptions, versus less than 6,000 landline subscriptions).

224. Digicel-Haiti provides 75% or more, perhaps as much as 90%, of the local telephone service in Haiti. *See, e.g.,* http://www.haitilibre.com/en/news-19625-haiti-technology-telephony-the-competition-in-figures-2016.html (calculations based on figures from CONATEL, the Haitian regulator suggest a Digicel-Haiti market share of approximately 89%). As a result of

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

this dominant market share and for other reasons, Digicel-Haiti exercises significant market power in the local telephone service market in Haiti.

## Technical Aspects of Wireless Telephone Service

225.    Digicel-Haiti's wireless network in Haiti is a "GSM" system. GSM is a technical standard for wireless networks developed by the worldwide wireless industry.  "GSM" is an acronym meaning (in its English version) "Global System for Mobile Communications."

226.    The GSM standard sets out parameters and requirements for the operation of a wireless telephone system.

227.    Among other things, the GSM standard sets out the format for exchanging information between the network and a customer's radio device, such as a wireless phone, as well as the specific information that must be exchanged between the network and a customer's radio device in order to set up, maintain, and end a call.

228.    In a GSM system, a customer's radio device, such as a wireless phone, laptop computer, notebook computer, or other device, is physically and technically distinct from the Subscriber Identity Module, or SIM card.

229.    A SIM card is an integrated circuit that stores an International Mobile Subscriber Identity (IMSI) number and associated authorization key, which is used (among other things) to identify and authenticate subscribers to a given mobile network as associated with a unique telephone number (assigned by the wireless carrier, as described below) and customer account.  The SIM card stores network state information, which is received from the Location Area Identity (LAI) number, provided by the wireless network operator. GSM networks are divided into Location Areas, each having a unique LAI number. When the device changes locations, it stores the new LAI to the SIM and sends it back to the network with its new location

230.    Wireless network operators, such as Digicel-Haiti, obtain SIM cards from manufacturers.  The manufacturer assigns each SIM card a unique IMSI number, from within a range of IMSI numbers provided by the wireless network operator.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

231. The IMSI numbers embodied in Digicel-Haiti SIM cards are provided by Digicel-Haiti.

232. The wireless network operator, such as Digicel-Haiti, assigns each SIM card a Mobile Station International Subscriber Directory Number (MSISDN). The MSISDN includes the standard 10-digit telephone number (along with the country code and, sometimes, other information) associated with the SIM card and its ISMI number.

233. A SIM card is not, itself, capable of making telephone calls.

234. It is the radio device, not the SIM card, that sends signals to, and receives signals from, the wireless network. The SIM card contains information (the ISMI number and the authorization key) that the radio device transmits. To perform its functions, a SIM card must be directly or indirectly connected to a radio device, such as a wireless phone, laptop computer, notebook computer, or other device with a radio configured to send and receive signals in the format set by the GSM standard. There is no technical requirement, in the GSM standard or otherwise, for a SIM card to be physically embedded in a radio device with which it is associated.

235. A GSM-compatible radio device may be associated with different SIM cards at different times.

236. For example, a customer may use different SIM cards in the same wireless phone. A customer traveling to a foreign country can, upon arrival, remove the SIM card from the customer's home wireless network and replace it with a SIM card issued by a wireless network in the country being visited. The customer's wireless phone is then temporarily associated with the telephone number and account information from the SIM card issued by the foreign network operator. The SIM card from the customer's home network can be re-inserted into the wireless phone upon return home, at which point the wireless phone is again associated with the telephone number and account from the SIM card issued by the home wireless network operator.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

237.     A SIM card may be used to provide the information needed to make wireless calls from more than one GSM-compatible radio device.

238.     For example, a customer can remove a SIM card from an old wireless phone and place it into a new one.  The new wireless phone will then be associated with the same telephone number and account information as the old one.

239.     A SIM card may be used to provide the information needed to make wireless calls from more than one radio device because:

a.     The SIM card, not any particular radio device, contains the IMSI and authorization key; and

b.     The IMSI and authorization key are the information that, under the GSM standard, are used to authenticate a subscriber on the network and keep track of the status of the subscriber's account.

240.     A SIM card that has not yet been used is registered in the system of the wireless network operator in a pre-active state.  The SIM card and the associated account becomes activated when its information (the ISMI number and the authorization key) is transmitted to the network in connection with a use of the network's services (such as placing a wireless call), or when a customer adds money to the account associated with the SIM card via a "recharge" or "top-up."

241.     During 2014 and continuing through the present, Digicel-Haiti allows recharges/top-ups to be made using credit cards online via third-party Internet websites.  The customer enters the Digicel-Haiti telephone number and credit card information; the third-party charges the customer's credit card; and the recharge/top-up amounts are credited to the account associated with the SIM card with the telephone number the customer entered.

242.     During 2014 and continuing through the present, Digicel-Haiti also allows customers to enroll in the "Roam Like You're Home" program, described below, using similar online transactions.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Roaming Arrangements**

243. "Roaming" refers to an arrangement under which the subscribers of one wireless network provider (the "home" network) can send and receive wireless calls while they are physically within the service area of a different wireless network provider (the "host" network).

244. In order for roaming to work, the home network and the host network must be technically compatible. Digicel-Haiti has (and since 2014 has had) roaming arrangements in the United States with AT&T Wireless and T-Mobile. Both of those carriers have GSM wireless networks which are compatible with the mobile phones used on Digicel-Haiti's network in Haiti.

245. Roaming arrangements are generally reciprocal, *i.e.,* each carrier agrees that the other's customers may make calls on its network. So, for example, when a Digicel-Haiti customer is in the United States and in AT&T's service area, the Digicel-Haiti customer can make and receive calls through AT&T's network, and when an AT&T customer is in Haiti, the AT&T customer can make and receive calls through Digicel-Haiti's network.

246. When a roaming device appears on a host network, the host network obtains authentication information (such as the IMSI number and MSISDN from the device's SIM card). The host network sends an electronic query to the home network to confirm that the information corresponds to a valid account on the home network's system. The host network will not permit the roaming device to send or receive calls (except, in some cases, calls to emergency services such as "911") unless the host network receives confirmation from the home network that the SIM card information is associated with a valid, active account on the home network. As a result, it is the home network, not the host network, that determines whether the roaming device will receive service from the host network.

247. In a roaming arrangement, the roaming customer has no contractual relationship with the host carrier. Instead, the roaming agreement between the home carrier and the host carrier permits the home carrier to offer to its customers the ability to make and receive

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

calls while on the host network, and the home carrier agrees to pay the host carrier an agreed rate for the services the home carrier's customers use.

248.    In practice, rather than billing each other for each roaming minute, carriers typically net out the roaming minutes on each network, with payment made only for the net minutes.  For example, if Carrier A's customers use 1,000 minutes of roaming on Carrier B's network, and Carrier B's customers use 1,500 minutes of roaming on Carrier A's network, Carrier A would not bill for 1,500 minutes, and Carrier B would not bill for 1,000 minutes. Instead, Carrier B would pay Carrier A their agreed rate for the net 500 minutes of roaming that Carrier B's customers incurred.

249.    The home carrier's customer has no role in determining how much the home carrier will pay the host carrier for the customer's use of the host carrier's network.  That rate is determined by negotiations between the two carriers.

250.    The host carrier has no role in determining how much the home carrier will charge the customer for using the host carrier's network.  That rate is determined by the home carrier.

251.    The host carrier is entitled to be paid by the home carrier for the usage of the host carrier's network by the home carrier's customers, irrespective of whether those customers pay the home carrier for their roaming usage.  The host carrier has no contractual relationship with the home carrier's customers.

252.    Roaming arrangements, therefore, are a form of resale, in which the home carrier resells the host carrier's services to the home carrier's customers. The home carrier offers to provide telecommunications, for a fee, on the host carrier's system.  For roaming within the United States, therefore, the home carrier – such as Digicel-Haiti here – is a telecommunications carrier subject to the Communications Act.

253.    In the case of Digicel-Haiti's roaming arrangements with AT&T Wireless and T-Mobile, when a Digicel-Haiti customer roaming on one of those networks makes a call to

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

a Digicel-Haiti customer in Haiti, in addition to any other applicable financial arrangements, the United States wireless carrier pays Digicel-Haiti $0.23 per minute for those calls.

**Routing Calls from the United States to Haiti**

254.     Telephone calls from the United States to Haiti are routed, generally, as follows:

a.     A landline or wireless telephone initiates a call by signaling the network to which it is connected that a call is about to start.  For a landline phone, this happens when the telephone goes "off-hook" and the network sends a dial tone to the telephone indicating that it is ready to receive dialed digits.  For a wireless phone, the digits are entered into the phone first, and then transmitted to the network when the "send" function is invoked, typically by pushing a physical or virtual button on the phone.

b.     In United States telephone networks, calls are established and routed by means of a protocol known as "Signaling System 7," or "SS7."  Switches in telephone networks (both wired and wireless) use the SS7 protocol to exchange the information needed to set up and end each individual telephone call.

c.     The network automatically "knows" the telephone number of the device making the call.  For a landline device, that number is determined by the physical line to which the phone is attached.  For a wireless device, that number is determined by the MSISDN (which contains a standard telephone number) assigned by the wireless network to the SIM card associated with the call.

d.     The dialed telephone number identifies the number being called.

e.     This information – the calling number, the called number, and other information – is formulated into an SS7 message that will direct the call through the Public Switched Telephone Network (PSTN).  The PSTN is the set of all networks, worldwide, serving landline and wireless telephones that can be reached by means of a standard telephone number.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

f.      The switch serving the device originating the call examines the dialed digits, which tell the switch where the call ultimately needs to go.

g.      In some cases, the originating switch will have a direct connection to the network serving the party being called.  In such cases the originating switch will transmit a message in the SS7 format to the network where the call will be terminated.  That network will either accept the call (assuming the called number is valid, the called party is not already on the phone, etc.), or reject it.

h.      If the originating network does not have a direct connection to the network serving the calling party, it will have programming for selecting an intermediate network to get the call set-up signaling (and, later, the call itself) delivered.  In that case, it sends the SS7 signaling for the call to the intermediate network, which eventually (perhaps through still other networks) gets the signaling data to the network serving the called party.  That network then accepts or rejects the call, as just described.

i.      Once the call set-up message has reached, and been accepted by, the network serving the called party, that network sends signals back to the originating network indicating that the call can start, and at the same time signals the telephone of the called party that there is an incoming call.  When the called party answers, the call begins.

j.      When the call ends (by one party hanging up), similar signaling is sent from the network whose subscriber hung up, indicating that the call is over, and that resources used for the call are no longer needed and can be devoted to other calls.

255.    The scenario above describes a typical call from a telephone in the United States to a telephone on Digicel-Haiti's network in Haiti.  The United States caller dials the number of a Digicel-Haiti subscriber.  The caller's network typically will not have any direct connection to Digicel-Haiti, and so hands the call off to one or more intermediate networks.  Digicel-Haiti prefers that calls from the United States to Haiti be routed via Digicel-USA.  In that scenario, the Digicel-USA switch receives the SS7 messages associated with the call and

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

forwards them to Digicel-Haiti, which then causes the recipient's telephone to ring.  The call is "terminated" when the recipient's telephone answers.

## Voice-Over-Internet Protocol Calls

256.    The Internet is not part of the PSTN.

257.    End points on the PSTN are identified by standard telephone numbers.

258.    End points on the Internet are identified by Internet Protocol (IP) addresses.

259.    Calls and other information are generally routed through the PSTN using a "circuit switched" format.

260.    Calls and other information are routed through the Internet using a "packet switched" format.

261.    Services provided on the Internet are not "telecommunications services" within the meaning of the Communications Act.  *Restoring Internet Freedom,* Declaratory Ruling, Report and Order, and Order, 33 F.C.C.R. 311 (January 4, 2018) at ¶¶ 20-161**.**  Instead, Internet communications, including voice calls, are "information services," generally not subject to regulation by the FCC under the Communications Act.  *Id.*

262.    It is technically possible (and increasingly common) to send voice calls over the Internet, in whole or in part, as described below.

263.    The Internet uses entirely different signaling protocols and data formats from those used on the PSTN.

264.    The PSTN is sometimes called a "circuit switched" network.  This term is used because years ago, a telephone call established an actual end-to-end electrical circuit between the calling party's and the called party's telephones.

265.    The Internet is known as a "packet switched" network.  Information transmitted via the Internet is broken up into "packets" (formatted according to industry-standard protocols) which are sent separately and individually across the network to their destination.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

266.    On the PSTN the destination of a call is determined by the dialed telephone number.  On the Internet, the destination of a packet is determined by the IP address of the device to which the packet has been sent.  IP addresses are conceptually similar to telephone numbers – in each case what is being represented is a particular "location" on the Internet or the PSTN, respectively.  However, their format is entirely different.

267.    Essentially any kind of data can be broken into packets and transmitted over the Internet.  This includes live human voices.

268.    This capability has enabled Voice-over-Internet Protocol telephone service, or "VoIP."  With VoIP, the human voices involved in a call are converted to packets in real time and sent between the calling and called parties via the Internet.

269.    In order for a call being carried via the Internet to reach a telephone subscriber on the PSTN (such as a subscriber to Digicel-Haiti's wireless service), the call must be taken off the Internet and linked to a traditional PSTN circuit-switched call.

270.    One way to accomplish this is to use equipment (sometimes called a "gateway") to convert between the two formats (VoIP/packet switched and PSTN/circuit switched).  To perform its function, the gateway will be connected both to the Internet and to the PSTN.  It will accept an incoming call from the Internet in VoIP format, and then use its connection to the PSTN to initiate a PSTN call to the party being called.

271.    The gateway is only able to initiate a PSTN call if it is connected to an active, valid telephone service (landline or wireless) on the PSTN.  When such a call is initiated, the carrier providing the PSTN connection to the gateway automatically views the calling number associated with the call to be the number that it has itself assigned to the service it is providing to the gateway.  For example, Digicel-Haiti's network will automatically view a call linked from the Internet to a Digicel-Haiti wireless service as having the telephone number associated with the SIM card whose information was used to establish the call.

272.    Under United States law, VoIP calls are considered "information services," and not "telecommunications services." For this reason, they are not subject to the

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

rules regarding settlement payments that apply between carriers for international traffic on the PSTN. *See International Settlements Policy Reform,* First Report and Order, 19 F.C.C.R. 5709 (2004) at ¶ 12 & n. 26 (when the FCC established its "international settlements program," it "chose not to apply" that program to "enhanced services," now known as "information services"); *International Settlements Policy Reform; Joint Petition for Rulemaking of AT&T Inc., Sprint Nextel Corporation and Verizon; Modifying the Commission's Process to Avert Harm to U.S. Competition and U.S. Customers Caused by Anticompetitive Conduct; Petition of AT&T for Settlements Stop Payment Order on the U.S.-Tonga Route,* Notice of Proposed Rulemaking, 26 F.C.C.R. 7233 (2011) at ¶ 3 n. 5 (same).

## Purchasing Digicel-Haiti SIM Cards and Services

273. During 2014, Digicel-Haiti sold SIM cards through various distribution channels in Haiti. These include sales at convenience stores and sales from individuals who obtain SIM cards directly or indirectly from Digicel-Haiti and then sell them to individuals on street corners, out of the back of pick-up trucks, and other similar means.

274. During 2014 and thereafter, some vendors in Haiti sold Digicel-Haiti SIM cards to the public in return for cash payment. The retail price for a Digicel-Haiti SIM card purchased from such vendors was approximately $4.00 per SIM card (in United States currency).

275. Vendors who sold Digicel-Haiti SIM cards for cash, in 2014 and thereafter, obtained those SIM cards by purchasing them directly from Digicel-Haiti, from an entity authorized by Digicel-Haiti to sell them, or from another vendor, who had purchased them, directly or indirectly, from Digicel-Haiti or from an entity authorized by Digicel-Haiti to sell them.

276. Some of the vendors who sold Digicel-Haiti SIM cards to the public for cash, in 2014 and thereafter, did not require purchasers to provide any identification, fill out any forms, or sign any documents as a condition of purchasing Digicel-Haiti SIM cards.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

277.    Some of those vendors did not provide purchasers with any documents containing any prices or other terms or conditions applicable to the use of the SIM cards or the use of Digicel-Haiti's wireless services.

278.    With respect to the terms and conditions applicable to Digicel-Haiti's wireless voice services:

a.    At no time during 2014 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

b.    At no time during 2015 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

c.    At no time during 2016 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

d.    At no time during 2017 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

e.    At no time during 2018 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

f.    At no time during 2019 did Digicel-Haiti have publicly available tariffs on file with Haitian authorities, or any other governmental authority, establishing any prices or other terms or conditions for the use of Digicel-Haiti's wireless services.

279.    With respect to information provided on Digicel-Haiti's Internet website regarding Digicel-Haiti's wireless services:

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

a. At no time during 2014 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

b. At no time during 2015 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

c. At no time during 2016 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

d. At no time during 2017 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

e. At no time during 2018 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

f. At no time during 2019 did Digicel-Haiti state on its Internet website any terms or conditions for the use of its wireless services, other than the prices it charged for its SIM cards and its pricing options for usage of its services.

280. With respect to the use of Digicel-Haiti's services in Haiti to handle calls that were transported to Haiti via the Internet:

a. At no time during 2014 did Digicel-Haiti provide its customers with any document stating, and at no time during 2014 did Digicel-Haiti's Internet website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

b. At no time during 2015 did Digicel-Haiti provide its customers with any document stating, and at no time during 2015 did Digicel-Haiti's Internet

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

c.      At no time during 2016 did Digicel-Haiti provide its customers with any document stating, and at no time during 2016 did Digicel-Haiti's Internet website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

d.      At no time during 2017 did Digicel-Haiti provide its customers with any document stating, and at no time during 2017 did Digicel-Haiti's Internet website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

e.      At no time during 2018 did Digicel-Haiti provide its customers with any document stating, and at no time during 2018 did Digicel-Haiti's Internet website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

f.      At no time during 2019 did Digicel-Haiti provide its customers with any document stating, and at no time during 2019 did Digicel-Haiti's Internet website state, that Digicel-Haiti's wireless service could not be used to deliver, to Digicel-Haiti's wireless network, calls that had reached Haiti via the Internet.

281.    With respect to the resale of Digicel-Haiti's voice services in Haiti:

a.      At no time during 2014 did Digicel-Haiti provide its customers with any document stating, and at no time during 2014 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

b.      At no time during 2015 did Digicel-Haiti provide its customers with any document stating, and at no time during 2015 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

c.    At no time during 2016 did Digicel-Haiti provide its customers with any document stating, and at no time during 2016 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

d.    At no time during 2017 did Digicel-Haiti provide its customers with any document stating, and at no time during 2017 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

e.    At no time during 2018 did Digicel-Haiti provide its customers with any document stating, and at no time during 2018 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

f.    At no time during 2019 did Digicel-Haiti provide its customers with any document stating, and at no time during 2019 did Digicel-Haiti's Internet website state, that a Digicel-Haiti wireless service purchased by one customer could not be used to deliver, to Digicel-Haiti's wireless network, calls that had originated on another network, by someone other than the Digicel-Haiti customer.

282.    At no time from 2014 to the present has Digicel-Haiti expressed in any writing (including its Internet website) a requirement that a purchaser of a SIM card use that SIM card in any one wireless device, or to use the SIM card at all.

283.    Instead, the choice of wireless device or devices with which to use a SIM card is entirely up to the purchaser of the SIM card.

Page 39 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE
DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED
COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

284.    At no time from 2014 to the present has Digicel-Haiti expressed in any writing (including on its Internet website) any terms and conditions, other than price and payment terms, on purchasers of its SIM cards and users of its network.

285.    From 2014 through the present, a Digicel-Haiti account would incur charges of approximately $0.09 per minute (depending on exchange rates) for each minute of wireless service used in Haiti. As indicated above, the cost to Digicel of handling a minute of traffic on its wireless network is below $0.02.  The $0.09/minute rate, therefore, is profitable for Digicel-Haiti.

286.    From 2014 through the present, when a Digicel-Haiti SIM card was used in connection with a wireless network in the United States via roaming arrangements (described below) the per-minute rate charged to customers for such calls would normally be $1.99 per minute or more.

287.    From 2014 through the present, under Digicel-Haiti's "Roam Like You're Home" (RLYH) rate plan, if a customer paid a flat rate of approximately $20 to $25 (depending on the exchange rate), a SIM card enrolled in the plan would permit calls from the United States to Haiti to be made for the same rate applicable to calls within Haiti (approximately $0.09 per minute).

288.    UPM provided calling to Haiti to wholesale providers in the United States market, using the means described in Paragraphs 297-320 below, during the period from approximately March 2014 through approximately December 2014.

289.    Also during 2014, UPM provided wholesale calling to Haiti using pure arbitrage arrangements.  Under those arrangements, UPM would purchase call termination in Haiti from unaffiliated, third party entities at one price, and then sell call termination in Haiti to different, unaffiliated third party entities at a slightly higher price.

290.    These arbitrage arrangements did not entail UPM purchasing any SIM cards or services from Digicel-Haiti, and did not entail UPM initiating any calls using Digicel-Haiti SIM cards or services, whether in the United States or in Haiti. Instead, these arrangements

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

involved receiving incoming Haiti-bound traffic from third party entities and switching that traffic outbound to different third party entities. These latter entities arranged, directly or indirectly, to send that traffic to Haiti. UPM ceased these arbitrage arrangements by the end of 2014 as well.

291. In addition, UPM engaged in certain activities in Haiti in 2011, in the nature of market exploration. Those activities were terminated in 2011 shortly after they began.

292. Overall, during 2014 UPM sold, on the wholesale market, approximately 3.9 million minutes of call termination into Haiti before abandoning the market for United-States-to-Haiti calling late that year. The vast majority of those minutes – more than 90% – were provided by means of arbitrage arrangements, as described in Paragraphs 289-290 above. That is, for those minutes, UPM was simply a middleman, making no use of any Digicel-Haiti services.

293. UPM provided the vast majority of the remaining Haiti-bound minutes – that is, most of the roughly 10% that were not provided via arbitrage – by means of resale of RLYH service within the United States, as described in Paragraphs 297-313, below.

294. UPM provided the small number of remaining minutes – that is, a small fraction of the 10% – by means of placing radio devices in Haiti, getting calls to Haiti via the Internet, and initiating wireless calls directly onto Digicel-Haiti's network in Haiti, as described in Paragraphs 314-320, below.

295. Due to Digicel-Haiti's successful efforts to foreclose UPM from providing calling to Haiti, as described below, UPM no longer offered or provided such services after December 2014.

296. But for the conduct of Digicel-Haiti, as described below, UPM would have continued to provide calling between the United States and Haiti, including through the present.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Resale of RLYH Arrangements – Calls Initiated in the United States**

297.    In 2014, UPM, through agents in Haiti, acquired approximately 10,705 Digicel-Haiti SIM cards by purchasing those SIM cards on the open market and paying full retail price for them.  When UPM purchased those SIM cards, it was not provided (directly or through its agents) any documentation containing any terms or conditions associated with their use; no such terms or conditions were presented on Digicel-Haiti's website; and no such terms or conditions were contained in any publicly filed tariffs.  UPM then had its agents ship those SIM cards to UPM's location in Oregon.

298.    In 2014, UPM activated some of those SIM cards by paying Digicel-Haiti the full retail price ($24.44 based on the exchange rate in effect at the time of purchase) to enroll those SIM cards in Digicel-Haiti's RLYH program.  UPM also added money to the Digicel-Haiti accounts associated with the SIM cards by means of online recharges/top-ups.

299.    In 2014, UPM assembled a number of those SIM cards into radio devices in Oregon, capable of accessing the United States wireless networks of AT&T Wireless and T-Mobile, the two carriers that have roaming arrangements with Digicel-Haiti in the United States.

300.    In 2014, UPM offered, on the open wholesale market in the United States, to transport calls from the United States to Haiti.

301.    Some carriers responded favorably to UPM's offer and began to send calls to UPM for further delivery to Haiti.

302.    The path of such a RLYH call through the network would be as follows:

a.    An end user originating the call dials a telephone number that indicates a call to Haiti.

b.    The call then reaches the switch of the carrier serving the end user.

c.    That switch then decides (based on its internal programming) how to route the call onward to Haiti.

d.    Where UPM was selected to handle calls to Haiti, the third-party carrier's switch would convert the call into an IP format and send the Internet packets

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

representing the call (including the number in Haiti for which the call was destined), by means of the public Internet, to UPM's equipment located in Oregon.

e.    UPM's equipment would then direct its radio device (using information from a SIM card purchased from Digicel-Haiti and duly enrolled in the RLYH plan) to initiate a wireless call in the United States to the called number in Haiti, while simultaneously translating the Internet packets representing the call into the format used for wireless transmission to the United States wireless carrier.

f.    Once the call with the wireless carrier in Oregon was established, that carrier would route the call from Oregon to Haiti by forwarding the call (directly or indirectly) to one of Digicel-Haiti's gateway switches in New York or Miami, at which point Digicel-Haiti itself would carry the call to Haiti and deliver it to the called party.

303.    There was and is no way for UPM to include the telephone number of the original calling party in the information that the Digicel-Haiti SIM card sends to the network of the United States wireless carrier on which UPM initiates the wireless call.

304.    Instead, the telephone number associated with the call will be the MSISDN assigned by Digicel-Haiti, associated with the SIM card being used to authenticate the call.

305.    Such a call will be completed only when the information in the SIM card being used to authenticate the call is associated with a valid account within Digicel-Haiti's system.  For the account to be valid:

a.    The SIM card itself must have been paid for and appropriately activated on Digicel-Haiti's system; and

b.    Sufficient payments must have been made to Digicel-Haiti to cover the cost of the call under the applicable rate plan – in this case, including payment of the fee to enroll the SIM card in the RLYH plan.

306.    As a result, Digicel-Haiti only completed calls for which it has been fully paid.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

307. The payment arrangements associated with such RLYH calls carried by UPM were as follows:

a. Digicel-Haiti received (from UPM) the subscription amount (as indicated above, approximately $24.44) for the RLYH service.

b. Digicel-Haiti received (from UPM) $0.09 per minute, by debiting the account associated with the SIM card being used to authorize the call.

c. Digicel-Haiti received (from the United States wireless carrier that picked up the call from UPM's radio device) $0.23 per minute for terminating the call in Haiti.

d. Digicel-Haiti paid the United States wireless carrier a per-minute roaming fee specified in the roaming agreement between Digicel-Haiti and that carrier.

e. On information and belief, the roaming fee that Digicel-Haiti paid to the United States wireless carrier was less than $0.09 per minute.

308. By contrast, compare the payment arrangements associated with a call from the United States to Digicel-Haiti that is handled without the involvement of UPM reselling an RLYH call:

a. Digicel-Haiti did not receive the subscription amount for a RLYH service.

b. Digicel-Haiti did not receive the $0.09 per minute RLYH roaming fee.

c. Digicel-Haiti received the $0.23 per minute call termination fee.

d. Digicel-Haiti did not pay a roaming fee to a United States wireless carrier.

309. The differences between the two situations are that (a) Digicel-Haiti does not receive the RLYH subscription fee or the $0.09 per minute RLYH roaming charge, but (b) Digicel-Haiti does not pay a roaming fee to the United States wireless carrier.

Page 44 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

310.    However, because (on information and belief) the roaming fee that Digicel-Haiti pays to the United States wireless carrier was less than the $0.09 per minute RLYH fee received from UPM, it was more profitable for Digicel-Haiti to receive a call routed through UPM's resold RLYH service than for Digicel-Haiti to receive a stand-alone call from a United States caller routed to Digicel-USA without any involvement by UPM.

311.    If – contrary to UPM's understanding – the roaming fee Digicel-Haiti paid to the Unites States wireless carrier is higher than $0.09, such that the revenue to Digicel-Haiti for calls routed via UPM resale of RLYH service is lower than Digicel-Haiti's revenue for calls routed from United States carriers without UPM involvement, Digicel-Haiti still makes a substantial profit on resold RLYH service calls.

312.    In order to prevent UPM from reselling Digicel-Haiti's services, Digicel-Haiti used various technical means to analyze the calling and usage patterns associated with particular SIM cards, and, when it concluded that the calling and usage patterns were consistent with a resale use, rather than use by an individual customer, it de-authorized the affected SIM cards in its own system, so that calls associated with those SIM cards would no longer be completed.

313.    This had the direct and intended effect of preventing UPM from delivering calls from the United States-Haiti for termination on Digicel-Haiti's network in Haiti.

## Use of Local Calls (Calls Initiated in Haiti).

314.    Most of the calls at issue in this case were made by means of UPM's resale, within the United States, of Digicel-Haiti's RLYH plan, as described above. Some, however, involved the use of UPM equipment in Haiti to initiate a wireless call.

315.    In those cases, a call originating with a third-party carrier made its way from the calling party to UPM's facilities in Oregon in the manner described above. For these calls, however, UPM would not convert the call to GSM format and initiate a wireless call in Oregon with equipment in Oregon. Instead, for these calls, UPM would leave the call in Internet

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

format and route the packets representing the call, via the Internet, to its radio equipment in Haiti.

316.   The equipment in Haiti would convert the call to GSM format and initiate a wireless call on Digicel-Haiti's network in Haiti, using the account information associated with a SIM card located in Oregon.  That is, in this arrangement the radio device involved in making the relevant wireless connections was located in Haiti, while the SIM card with the relevant account information was still located in Oregon.  In this situation, UPM had fully paid for all the Digicel-Haiti services that it used.

317.   There was and is no way for UPM to include the telephone number of the original calling party in the information that the Digicel-Haiti SIM card sends to Digicel-Haiti's network when UPM initiated a wireless call in Haiti.

318.   In this situation, Digicel-Haiti would receive $0.09 per minute for the call, but would not receive the $0.23 per minute fee for international call termination.  The $0.09 per minute fully covers the costs of the service that Digicel-Haiti itself provided – termination in Haiti of a wireless call that was initiated in Haiti.

319.   Moreover, as indicated above, under United States law, international call termination fees do not apply to calls carried via the Internet, because such calls are classified as "information services" rather than "telecommunications services."  In this arrangement, therefore, Digicel-Haiti has no legitimate claim to the $0.23 per minute rate in the first place. (Note also that UPM denies that Digicel-Haiti has any legal entitlement to the $0.23 per minute rate at all.)

320.   Digicel-Haiti used various technical means to identify SIM cards that were being used in SIM servers to resell its local wireless services and de-authorized those SIM cards. This had the direct and intended effect of preventing UPM from completing calls on the United States-Haiti route in competition with Digicel-Haiti and with Digicel-Haiti's affiliate, Digicel-USA.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## FIRST AFFIRMATIVE DEFENSE

### (Payment)

321.    As set forth above, UPM acquired the right to terminate calls to customers in Haiti when it purchased the Digicel-Haiti SIM Cards and purchased recharges/top-ups, and purchased access to Digicel-Haiti's RLYH plan. Digicel-Haiti has thus received all payment to which it is entitled for the services and functions it provided to UPM.

## SECOND AFFIRMATIVE DEFENSE

### (Justification)

322.    As set forth above, UPM's use of Digicel-Haiti SIM cards to authenticate calls in the United States, using Digicel-Haiti's RLYH Plan, and to authenticate calls in Haiti using UPM's radio devices in Haiti, was justified, because UPM acquired the right to terminate calls to customers in Haiti when it purchased the SIM cards, the RLYH plan, and recharges/top-ups.

## THIRD AFFIRMATIVE DEFENSE

### (Unclean Hands)

323.    Digicel-Haiti has participated, directly and by means of its affiliate and agent, Digicel-USA, in activities that violate the Communications Act of 1934, as amended, and that constitute unfair and unreasonable business practices, restraint of trade, and acts that stifle competition for calls from the United States to Haiti, in direct violation of the pro-competitive telecommunications policies of the United States.  As a result, Digicel-Haiti is not entitled to the assistance of courts of the United States to continue to perpetuate its unlawful conduct.

## FOURTH AFFIRMATIVE DEFENSE

### (Illegality)

324.    Digicel-Haiti's arrangements with its agent, Digicel-USA, pursuant to which Digicel-Haiti will not accept inbound international calls from the United States other than through Digicel-USA, as well as Digicel-Haiti's actions in de-authenticating the Digicel-Haiti SIM cards that UPM had purchased and was using as described above, constitute a violation of

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the Act and FCC decisions and policies under the Act favoring the resale of telecommunications services, and Digicel-Haiti cannot recover any damages based on claims that it is entitled to maintain those illegal arrangements and actions.

## FIFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

325.    Digicel-Haiti's claims against UPM are barred by the applicable Statute of Limitations.

## JURISDICTION AND VENUE

326.    This Court has jurisdiction over Defendants' compulsory counterclaims, set out below, pursuant to 28 U.S.C. § 1367(a), because all such counterclaims are so related to Digicel-Haiti's claims that they form part of the same case or controversy under Article III of the United States Constitution.  This Court also has jurisdiction over Defendants' compulsory counterclaims arising out of the Act under 28 U.S.C. § 1331, because such counterclaims arise under the laws of the United States.

327.    This Court has personal jurisdiction over Digicel-Haiti because Digicel-Haiti has filed suit in this Court, thereby consenting to such jurisdiction.

328.    Venue in proper in this district pursuant to 28 U.S.C. § 1391(b).

## FIRST COUNTERCLAIM

### Count I – Violation of Section 202 of the Act – Resale of "Roam Like You're Home"

329.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

330.    Digicel-Haiti is a telecommunications carrier under the Act and is subject to the terms of Section 202 of the Act.

331.    Digicel-Haiti's actions in blocking the use by UPM of SIM cards associated with the RLYH plan, when permitting other owners of SIM cards associated with that plan to complete such calls, constitutes "unreasonable discrimination" against UPM within the meaning of 47 U.S.C. § 202(a) and associated FCC rules and rulings.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

332. Digicel-Haiti's actions foreclosed UPM from engaging in lawful and profitable business in the United States. As a direct result of that foreclosure, as of November 2019, UPM has lost substantial revenues and profits, for which Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, in an amount to be proven at trial but estimated to be in excess of $50,000,000, and will continue to lose at least $1 million per month until such time as Digicel-Haiti discontinues its unreasonable discrimination.

### Count II – Violation of Section 202 of the Act – Calls Initiated in Haiti

333. UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

334. Digicel-Haiti is a telecommunications carrier under the Act and is subject to the terms of Section 202 of the Act.

335. Digicel-Haiti's actions in blocking the use by UPM of SIM cards associated with its equipment located in Haiti to complete calls from the United States by means of initiating wireless calls within Haiti, when permitting other owners of SIM cards to initiate wireless calls within Haiti, constitutes "unreasonable discrimination" against UPM within the meaning of 47 U.S.C. § 202(a) and associated FCC rules and rulings.

336. Digicel-Haiti's actions foreclosed UPM from engaging in lawful and profitable business in the United States. As a direct result of that foreclosure, as of November 2019, UPM has lost substantial revenues and profits, for which Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, in an amount to be proven at trial but estimated to be in excess of $50,000,000, and will continue to lose at least $1 million per month until such time as Digicel-Haiti discontinues its unreasonable discrimination.

### Count III – Violation of Section 201 of the Act – Resale of "Roam Like You're Home"

337. UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

338. Digicel-Haiti is a telecommunications carrier under the Act and is subject to the terms of Section 201 of the Act.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

339.    Digicel-Haiti's actions in blocking the use by UPM of SIM cards associated with the RLYH plan to complete calls from the United States to Haiti, when permitting other owners of SIM cards associated with the plan to complete such calls, constitutes an "unjust or unreasonable" "charge, practice, classification or regulation" within the meaning of 47 U.S.C. § 201(b) and associated FCC rules and rulings.

340.    Digicel-Haiti's actions foreclosed UPM from engaging in lawful and profitable business in the United States.  As a direct result of that foreclosure, as of November 2019, UPM lost substantial revenues and profits, for which Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, in an amount to be proven at trial but estimated to be in excess of $50,000,000, and will continue to lose at least $1 million per month until such time as Digicel-Haiti discontinues its unjust and unreasonable practice.

## Count IV – Violation of Section 201 of the Act – Calls Initiated in Haiti

341.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

342.    Digicel-Haiti is a telecommunications carrier under the Act and is subject to the terms of Section 201 of the Act.

343.    Digicel-Haiti's actions in blocking the use by UPM of SIM cards associated with its equipment located in Haiti to complete calls from the United States by means of initiating wireless calls within Haiti, when permitting other owners of SIM cards to initiate wireless calls within Haiti, constitutes an "unjust or unreasonable" "charge, practice, classification or regulation" within the meaning of 47 U.S.C. § 201(b) and associated FCC rules and rulings.

344.    Digicel-Haiti's actions foreclosed UPM from engaging in lawful and profitable business in the United States.  As a direct result of that foreclosure, as of November 2019, UPM lost substantial revenues and profits, for which Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, in an amount to be proven at trial but estimated to be in excess of

Page 50 of 59 - DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
UPM-L1\00595327.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

$50,000,000, and will continue to lose at least $1 million per month until such time as Digicel-Haiti discontinues its unjust and unreasonable practice.

## Count V – Violation of 47 U.S.C. § 214

345.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

346.    Digicel-Haiti is a telecommunications carrier under the Act and is subject to the terms of Section 214 of the Act.

347.    Digicel-Haiti's arrangements with its affiliate, Digicel-USA so involve Digicel-Haiti in the operation and business decisions of Digicel-USA with respect to the US-Haiti route that Digicel-Haiti is, for all intents and purposes, a telecommunications carrier and an international common carrier on that route.  Moreover, Digicel-Haiti's offering of RLYH within the United States constitutes Digicel-Haiti as a telecommunications carrier for both domestic and international calling.

348.    In order to operate as an international common carrier, Section 214 of the Act and associated FCC rules require that Digicel-Haiti obtain an appropriate Section 214 authorization from the FCC.

349.    Digicel-Haiti has never received any Section 214 authorization from the FCC to operate on the US-Haiti route.  Had it attempted to obtain such authorization, it would have had to disclose to the FCC that it is a dominant carrier in Haiti and thus would have been classified as a dominant carrier on the US-Haiti route.  Such an application would have permitted UPM, prior to Digicel-Haiti beginning operations in the United States, to request the FCC to forbid Digicel-Haiti from engaging in unjust, unreasonable, and discriminatory practices against UPM, such as those in which Digicel-Haiti has engaged.  As a result, Digicel-Haiti's ability to foreclose competition from UPM on the US-Haiti route by means of blocking calls originating with SIM cards owned by UPM, during the time that UPM sought to provide its services, as alleged above, is a direct result of Digicel-Haiti's failure to seek and obtain Section 214 authorization from the FCC.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

350.    Digicel-Haiti's actions foreclosed UPM from engaging in lawful and profitable business in the United States.  As a direct result of that foreclosure, as of November 2019, UPM lost substantial revenues and profits, for which Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, in an amount to be proven at trial but estimated to be in excess of $50,000,000, and will continue to lose at least $1 million per month until such time as Digicel-Haiti discontinues its unjust and unreasonable practice.

## SECOND COUNTERCLAIM

## (Breach of Implied-in-Fact Contract)

351.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

352.    UPM's agents purchased Digicel-Haiti SIM cards at full retail prices from authorized Digicel-Haiti dealers.  The sales transactions through which the Digicel-Haiti SIM cards were purchased were no different from those in which an individual Digicel-Haiti customer purchases one or more Digicel-Haiti SIM cards for use in his or her cell phones.

353.    Digicel-Haiti's purpose in selling Digicel-Haiti SIM cards is to allow purchasers to access the Digicel-Haiti network for at least the number of minutes that are associated with each Digicel-Haiti SIM card.  When those minutes are used up, the purchaser must either buy a new card or pay Digicel-Haiti to recharge/top-up the card, refreshing it with additional credits that reflect a set number of minutes at Digicel-Haiti's specified per-minute rate.  In other words, in each transaction – whether SIM card purchase or recharge/top-up – the purchaser reasonably expects to receive, and Digicel-Haiti intends to sell, not merely a physical SIM card, but also access to the Digicel-Haiti network for the amount of time specified on or associated with that SIM card.

354.    There was no language on or contained in the packaging surrounding the SIM cards purchased by UPM's agents that imposed any restrictions or limits on how the SIM card or its minutes can be used, nor were such restrictions imposed by any other materials that

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti or its vendors provided to UPM in connection with the purchase of SIM cards, recharges/top-ups, or RLYH plans.

355. UPM or its agents purchased a total of approximately 10,705 Digicel-Haiti SIM cards, at the rate of approximately $4.00 per card, for a total purchase payment of approximately $42,836.00. UPM also paid approximately $111,209.00 for recharges/top-ups and RLYH plans to be added to the Digicel-Haiti SIM cards.

356. Digicel-Haiti's conduct regarding the sale and use of its SIM cards, both in its transactions with UPM's agents and in its general SIM card transactions with its other customers, manifested its intent that Digicel-Haiti would provide access to its Haiti network for the specified number of minutes in exchange for the purchase of its SIM cards, recharges/top-ups, and RLYH plans.

357. UPM reasonably understood that, by buying the Digicel-Haiti SIM cards, recharges/top-ups, and RLYH plans, it would be able to access the Digicel-Haiti's network for the number of minutes that it had purchased at the applicable per-minute rate (approximately $0.09 per minute). Digicel-Haiti's and UPM's conduct established an implied-in-fact contract that Digicel-Haiti would provide access to its Haitian network in exchange for the purchase of its SIM cards, RLYH plans, and recharges/top-ups

358. Digicel-Haiti's conduct in blocking UPM's ability to use the Digicel-Haiti SIM cards was a breach of Digicel-Haiti's manifested intent to provide UPM access to the Digicel-Haiti network in exchange for purchase of the SIM cards.

359. UPM has performed all conditions precedent to Digicel-Haiti's performance, which has not been excused.

360. As a direct and proximate result of Digicel-Haiti's breach of its implied-in-fact contract to allow UPM, a purchaser of Digicel-Haiti SIM cards, recharges/top-ups, and RLYH plans, access to Digicel-Haiti's network, UPM has suffered damages in an amount to be proved at trial, as alleged above.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## THIRD COUNTERCLAIM

(Money Had and Received)

361.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

362.    Digicel-Haiti received money from UPM for the purchase of Digicel-Haiti SIM cards, RLYH plans, and recharges/top-ups.  Digicel-Haiti blocked the use of Digicel-Haiti SIM cards, RLYH plans, and recharges/top-ups, and should not be allowed to keep the money it received.

363.    Digicel-Haiti should be required to return $156,735.42 to UPM on account of the funds it received for Digicel-Haiti SIM cards, RLYH plans, and recharges/top-ups that UPM was not allowed to use.

## FOURTH COUNTERCLAIM

(Conversion)

364.    UPM reasserts and realleges all of the allegations of paragraphs 205 through 320 above as though such allegations were set forth fully herein.

365.    As set forth above, Digicel-Haiti has wrongfully exercised dominion and control over the use of the Digicel-Haiti SIM cards that UPM purchased by blocking their use, with an intent to permanently deprive UPM of the use of those cards.  This conduct constitutes conversion.

366.    Digicel-Haiti's conduct involved repeated actions to convert UPM's property for its own benefit.  The harm to UPM caused by Digicel-Haiti's repeated actions is the result of intentional malice, trickery or deceit.

367.    Digicel-Haiti should be required to pay $156,735.42 to UPM representing the value of the Digicel-Haiti SIM Cards and credits that it converted from UPM.

368.    Digicel-Haiti has acted with a conscious indifference to the harm suffered by UPM.  Digicel-Haiti's conduct is so reprehensible as to warrant the imposition of punitive damages to achieve punishment or deterrence.  It has acted with malice or has shown a

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others, within the meaning of O.R.S. § 31.730. Digicel-Haiti, therefore, should be required to pay UPM punitive damages in an amount to be proved at trial.

## FIFTH COUNTERCLAIM

(Unjust Enrichment)

369.    UPM reasserts and realleges all of the allegations of paragraphs 232 through 296 above as though such allegations were set forth fully herein.

370.    As set forth above, Digicel-Haiti has received funds from UPM for the purchase of the Digicel-Haiti SIM Cards, RLYH plans, and recharges/top-ups, but Digicel-Haiti has blocked UPM from receiving the economic benefit of those purchases.

371.    Digicel-Haiti has not reimbursed UPM for the value it paid for the Digicel-Haiti SIM cards, RLYH plans, and recharges/top-ups.

372.    Digicel-Haiti's conduct involved repeated actions to receive a benefit from UPM without reimbursement for the proceeds thereof. The harm to UPM caused by Digicel-Haiti's repeated actions is the result of intentional malice, trickery or deceit.

373.    Under the circumstances, it is inequitable to allow Plaintiff to retain the funds received from the purchase when it has failed to allow UPM to use the Digicel-Haiti SIM Cards and credits to access Digicel-Haiti's network. Digicel-Haiti should be required to repay UPM for the unused value of the Digicel-Haiti SIM Cards purchased by UPM, which amount is $156,735.42.

374.    Digicel-Haiti has acted with a conscious indifference to the harm suffered by UPM. Digicel-Haiti's conduct is so reprehensible as to warrant the imposition of punitive damages to achieve punishment or deterrence. It has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others, within the meaning of O.R.S. § 31.730.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti, therefore, should be required to pay UPM punitive damages in an amount to be proved at trial.

## SIXTH COUNTERCLAIM

(Intentional Interference with Prospective Economic Advantage)

375.    UPM reasserts and realleges all of the allegations of paragraphs 232 through 296 above as though such allegations were set forth fully herein.

376.    UPM has a variety of business relationships with telecommunications wholesalers and carriers in which UPM offers to sell "minutes" that those carriers then use to complete telephone calls (including cellular telephone calls) made by their customers.  Some of the minutes UPM offered were to place telephone calls to Haiti.

377.    Digicel-Haiti is not a party to the business relationships in which UPM sells services on the wholesale market.

378.    Digicel-Haiti intentionally interfered with UPM's ability to market its telephone minutes that would complete calls to Haiti through the improper means of:

        a.    breaching its implied-in-fact contractual agreement to provide the minutes associated with the SIM cards that UPM purchased from Digicel-Haiti or its agents;

        b.    creating or continuing an unlawful restraint of trade; and/or

        c.    violating the aforementioned statutes, regulations, and FCC rulings; and

        d.    making defamatory statements about UPM to others, including UPM's customers.

379.    Digicel-Haiti's conduct involved repeated actions to intentionally interfere with UPM's ability to market its telephone minutes.  The harm to UPM caused by Digicel-Haiti's repeated actions is the result of intentional malice, trickery or deceit.

380.    As a direct and proximate result of Digicel-Haiti's intentional interference with UPM's relationships with wholesalers for the sale of cellular telephone services for

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

international calls terminating in Haiti, UPM has suffered damages in an amount to be proven at trial.

381.    Digicel-Haiti has acted with a conscious indifference to the harm suffered by UPM.  Digicel-Haiti's conduct is so reprehensible as to warrant the imposition of punitive damages to achieve punishment or deterrence.  It has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others, within the meaning of O.R.S. § 31.730. Digicel-Haiti, therefore, should be required to pay UPM punitive damages in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray that the Court enter an order, as to Digicel-Haiti's claims against Defendants:

1.    Dismissing the Third Amended Complaint, and each and every count, with prejudice;

2.    Providing that Digicel-Haiti take nothing on its claims, and entering judgment on all of Digicel-Haiti's claims in favor of Defendants;

3.    Awarding Defendants their costs in defending this action, including reasonable attorneys' fees; and

4.    Awarding Defendants such other and further relief as justice may require.

WHEREFORE, UPM further prays that the Court enter an order, as to UPM's Counterclaims against Digicel-Haiti and Digicel-USA:

5.    Awarding monetary judgment against Digicel-Haiti for damages UPM incurred as a result of Digicel-Haiti's and Digicel-USA's violations of the Communications Act of 1934, as amended, in an amount to be proven at trial;

6.    Awarding UPM damages on its contractual and quasi-contractual claims against Digicel-Haiti, in an amount to be proved at trial;

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

7.    Awarding UPM damages on its tort claims against Digicel-Haiti in an amount to be proved at trial;

8.    Awarding UPM punitive damages in an amount to be proved at trial;

9.    Awarding UPM its costs in defending this action, including reasonable attorneys' fees; and

10.    Awarding UPM such other and further relief as justice may require.

## **TRIAL BY JURY**

Defendants demand trial by jury on all issues so triable.

Dated: September 7, 2021.


TOMASI SALYER MARTIN


By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

    DAVIS WRIGHT TREMAINE LLP

    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*

    Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2021, I served the foregoing **DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: September 7, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236