**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

     Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>    Plaintiff & Counterclaim-Defendant,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>    Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DEFENDANT UPM TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Oral Argument Requested**<br>**Hearing: January 14, 2022 at 10:00 AM** |

Page 1 - DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1(a), Defendant UPM Technology, Inc. ("UPM") states that its counsel conferred in good faith with counsel for Plaintiff, Digicel-Haiti, to resolve the disputed issues and were unable to do so.

## MOTION

Pursuant to Fed. R. Civ. P. 56, UPM moves this Court for an order granting summary judgment in its favor on all of Digicel-Haiti's claims.[1] There are no genuine disputes of material fact as to those claims, so UPM is entitled to judgment as a matter of law. If Digicel-Haiti's claims are not dismissed in their entirety, UPM seeks partial summary judgment on several specific issues indicated below.

UPM also seeks partial summary judgment with respect to certain aspects of its Communications Act counterclaim. Specifically, UPM seeks summary judgment that Digicel-Haiti's roaming arrangements with United States carriers made it a "telecommunications carrier" subject to the Communications Act and that its deauthentication (blocking) of the SIM cards UPM used with Digicel-Haiti's roaming service constituted a restriction on the resale of that service.[2]

This Motion is supported by:

1.    The Declaration of Bruce Tran, as CEO of UPM ("Tran UPM Dec."); and

2.    The Declaration of Christopher W. Savage ("Savage Dec.").

---

[1] The formal caption of the case lists three separate UPM entities, but, as the Court has noted, there is only one UPM entity. ECF #58 (ruling on motion to dismiss Amended Complaint, Feb. 3, 2016) at p. 5 n.3. That entity is UPM Technology, Inc. *See* UPM's Rule 30(b)(6) deposition transcript ("UPM Depo.") attached as Exhibit 4 to Savage Dec., 23:21-24:23.

[2] "SIM" stands for "subscriber identity module." *See* Third Amended Complaint (ECF #200) ("TAC"), ¶ 41. Digicel-Haiti sold SIM cards to enable subscribers to use its network. Deposition Transcript of Digicel-Haiti's Rule 30(b)(6) corporate representative Maarten Boute ("Digicel(I) Depo.") attached as Exhibit 1 to Savage Dec., 63:6-19. As described below, each SIM card contains a unique identification number and other information that is used to "authenticate" the card on Digicel-Haiti's network, which enables it to make calls. Deauthenticating, or blocking, a SIM card prevents it from doing so.

Page 2 - DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF CONTENTS

LOCAL RULE 7-1 CERTIFICATION ...................................................................... 2

MOTION ................................................................................................................... 2

TABLE OF AUTHORITIES ................................................................................. III

LEGAL MEMORANDUM ...................................................................................... 3

I.     FACTUAL BACKGROUND ......................................................................... 3

       A.     Bypass on Digicel-Haiti's Network ................................................... 3

       B.     How UPM Got Calls to Digicel-Haiti's Network .............................. 4

II.    SUMMARY JUDGMENT STANDARD ....................................................... 8

III.   DIGICEL-HAITI'S CLAIMS MUST BE DISMISSED ............................... 10

       A.     Overview of UPM's Motion ............................................................ 11

       B.     UPM Made No Representations to Digicel-Haiti ............................ 12

              1.     There Was No Human Contact Between UPM and Digicel-Haiti
                     ........................................................................................... 12

              2.     UPM Obtained SIM Cards and Top-Ups from Independent
                     Dealers ............................................................................... 12

              3.     UPM Made No Representations When Authenticating SIM
                     Cards .................................................................................. 13

              4.     UPM Made No Representations When Making Calls ........... 16

              5.     UPM Made No Representations when Subscribing to RLYH ... 17

              6.     Because UPM Made No Representations to Digicel-Haiti, It Is
                     Entitled to Summary Judgment on Digicel-Haiti's Fraud Claim ... 18

       C.     Any Representations UPM Made to Digicel-Haiti Were True ........... 19

              1.     UPM Did Not Lie ................................................................ 20

              2.     UPM Did Not Omit Any Material Information. ..................... 21

              3.     UPM Did Not Engage In Concealment. ............................... 23

       D.     Any Digicel-Haiti Reliance On UPM's "Representations" Was
              Unjustified ...................................................................................... 25

       E.     UPM Is Entitled to Summary Judgment on Digicel-Haiti's Claims ... 27

IV.    AT A MINIMUM, UPM IS ENTITLED TO PARTIAL SUMMARY
       JUDGMENT ON CERTAIN ASPECTS OF DIGICEL-HAITI'S FRAUD
       CLAIM ............................................................................................................ 28

       A.     UPM Is Entitled to Summary Judgment that RLYH Resale Was Not
              Fraud ............................................................................................... 28

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

1. All RLYH Resale Calls Were Routed And Rated As International Calls .................................................................................. 28

2. Digicel-Haiti Was Not Damaged by RLYH Resale ................................. 28

B. UPM Is Entitled to Summary Judgment with Respect to The Number of Minutes of Bypass Traffic It Sent to Digicel-Haiti ................................................ 29

1. UPM Is the Sole Source of Records Regarding How Many Minutes of Traffic it Terminated to Digicel-Habit's Network. ................. 29

2. UPM's In-Country Bypass and RLYH Activities .................................... 30

C. UPM Is Entitled to Summary Judgment With Respect How to Calculate Damages .................................................................................................... 31

D. UPM Is Entitled to Summary Judgment With Respect to Digicel-Haiti's Other Damages Claims ............................................................................. 32

V. UPM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON TWO ASPECTS OF ITS COUNTERCLAIM ............................................................................. 34

VI. CONCLUSION ............................................................................................. 35

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

**CASES**

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) .......................................................... 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ................................................................................................................................ 9, 29

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001) ................................ 9

*Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278 (9th Cir. 1982) ..................................... 9, 29

*Carpenter v. United States,* __ U.S. __, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) ............. 15, 16

*Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)* ......................... 9

*Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 297 P.3d 1277 (2013) ....................................... 25

*Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or. 332, 225 P.2d 757 (1950) ............................... 11

*Coy v. Starling*, 53 Or. App. 76, 630 P.2d 1323 (1981) .............................................................. 11

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) .................................................. 10, 19

*Dizick v. Umpqua Cmty. Coll.*, 287 Or. 303, 599 P.2d 444 (1979) ....................................... 11, 31

*Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099 (D. Or. Sep. 12, 2020) .......................................................................................................... 9, 29

*Google, LLC, v. Oracle Am. Inc.,* __ U.S. __, 141 S. Ct. 1183, 209 L. Ed. 2d 311 (2021) .................................................................................................................................. 14

*Green v. United States,* 392 F. Supp. 3d 68 (D.D.C. 2019) .......................................................... 14

*Martell v. GM LLC,* 492 F. Supp. 3d 1131 (D. Or. 2020) ........................................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ........................................................................................................ 9, 11

*Morasch v. Hood,* 232 Or. App. 392, 222 P.3d 1125 (2009) ....................................................... 31

*Naas v. Lucas*, 86 Or. App. 406, 739 P.2d 1051, *rev. denied*, 304 Or. 680, 748 P.2d 142 (1987) .................................................................................................................... 27

*Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner,* 191 Or. App. 408, 83 P.3d 350 (2004) ................................................................................................. 12, 25, 26

*Sega Enters. v. Accolade, Inc.,* 977 F.2d 1510 (9th Cir. 1992) .................................................... 14

*Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253 (D. Or. August 6, 2014) .................................................................................................................... 19

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*Strawn v. Farmers Ins. Co.,* 350 Or. 336, 258 P.3d 1199 (2011) .................................. 5, 12, 20, 28

*United States v. Clayton,* 108 F.3d 1114 (9th Cir. 1997)............................................... 20

*United States v. Nosal,* 676 F. 3d 854 (9th Cir. 2012).................................................. 19

*Universal Studios v. Corley,* 273 F.3d 429  (2nd Cir. 2001) ......................................... 14

*Van Buren v. United States,* __ U.S. __, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021) .................... 19

*Webb v. Clark*, 274 Or. 387, 546 P.2d 1078 (1976) .................................................... 11

*Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 220 P.3d 68 (2009).......... 11, 20, 28

## STATUTES

18 U.S.C. § 1030................................................................................................. 19

18 U.S.C. §§ 1029.............................................................................................. 16

47 U.S.C. §§ 201............................................................................................... 34

47 U.SC. §§ 153................................................................................................ 34

## RULES

Fed. R. Civ. P. 56(a) ............................................................................................ 9

Fed. R. Civ. P. 56(c) ......................................................................................... 9, 29

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**LEGAL MEMORANDUM**

## I.    FACTUAL BACKGROUND

### A. Bypass on Digicel-Haiti's Network

Digicel-Haiti's fraud claim attacks UPM's efforts to deliver calls from third party carriers to Digicel-Haiti's subscribers. The economic basis for these efforts was the fact that Digicel-Haiti charged $0.23 per minute for calls routed to its network through its international gateway switch,[3] but charged only about $0.10 per minute (the "local rate") for calls that entered its network as wireless calls in Haiti.[4]

The vast price disparity between calls routed via the international gateway switch and calls that first appear on Digicel-Haiti's network in Haiti created a strong economic incentive to reach the network without using the international gateway. Some Digicel-Haiti subscribers responded to this incentive by getting international calls to Haiti on their own (typically via the Internet). Digicel-Haiti refers to this activity as "bypass."[5] Digicel-Haiti estimates that since 2010, its network has handled ████████████████ bypass minutes per year, representing ██████ ████ of the total traffic on its network.[6]

Digicel-Haiti did not want its subscribers to use its network in this way, *i.e.,* it did not want them to connect international calls by initiating a wireless call in Haiti.  However, it did not impose any contractual obligations on its subscribers to bar them from doing so. To the

---

[3] TAC, ¶¶ 38-39.

[4] Digicel(I) Depo., 94:15-95-8. Digicel-Haiti's prices for its services in Haiti were expressed in Haitian gourdes rather than United States dollars, so in dollar terms those prices varied with the relevant exchange rate. *Id*., 94:15-95-8. In addition, from time to time Digicel-Haiti offered discounts on its local rate. *Id.*., 74:22-75:12. Its $0.23 per minute price for calls routed via its international gateway switch was expressed in United States currency and thus was not affected by the exchange rate. The precise value of the local rate is not relevant to this motion.

[5] TAC, ¶ 41.

[6] Digicel(I) Depo., 29:9-32:9.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

contrary, subscribers were not required to sign any contract, to assent to any terms of service, or indeed to have any direct dealings with Digicel-Haiti at all, in order to become a paying customer and receive service from Digicel-Haiti.[7] In the absence of contractual remedies, Digicel-Haiti engaged in self-help, using various techniques to identify which subscribers were using their SIM cards to engage in bypass.[8] Once it concluded that a SIM card was being used for this purpose, it deauthenticated the SIM card, blocking it from being used to make any calls.[9] Digicel-Haiti devoted considerable resources ███████████████████████████ to these self-help efforts.[10]

### B. How UPM Got Calls to Digicel-Haiti's Network

UPM got calls to Digicel-Haiti's network in three ways: arbitrage, in-country-bypass, and Roam Like You're Home ("RLYH") resale.[11] Only one involved bypass.

*Arbitrage.* Over the period at issue in this case – from 2011 through 2014 – the main way UPM got calls to Digicel-Haiti's network was arbitrage of other carriers' services.[12] In total, minutes sent via arbitrage (4,528,886 minutes) amounted to more than three times as many minutes as were sent by in-country bypass and RLYH resale combined (1,427,255 minutes).[13]

In the arbitrage arrangement, UPM would identify a third party carrier offering termination on that network at one price – say, $0.10 per minute – and then resell those services

---

[7] Digicel(I) Depo., 25:22-26:7, 48:3-7; Deposition Transcript of Paul Flanagan ("Flanagan Depo.") attached as Exhibit 3 to Savage Dec., 51:10-52:25; Tran UPM Dec., ¶¶ 20, 29-30.

[8] Digicel(I) Depo., 20:6-19.

[9] *Id.*, 37:6-14.

[10] *Id.*, 32:21-34:14.

[11] UPM Depo., 584:14-585:3, 586:15-19, 615:13-21.

[12] *Id.*, 586:24-588:10.

[13] Tran UPM Dec., ¶¶ 33-34 and Exhibit 1.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

to others at a higher price – say, $0.105 per minute.[14] Under this arrangement (and, indeed, for in-country bypass and RLYH resale as well), calls would come into UPM's softswitch[15] via the Internet, which would route them, again via the Internet, to the third-party carrier UPM was buying from.[16] With arbitrage, UPM simply acted as a middle-man, entirely within the United States, between carriers with calls to get to Digicel-Haiti's network and carriers offering to get them there.[17]

As noted, over the relevant period arbitrage represented the overwhelming majority of UPM's sales of minutes terminating to Digicel-Haiti.[18] With arbitrage, UPM had no contacts, communications, or other dealings with Digicel-Haiti; it purchased no SIM cards or top-ups from Digicel-Haiti;[19] it exchanged no information with Digicel-Haiti; it established no physical connections or links with Digicel-Haiti's network, and it used no Digicel-Haiti services.[20] For these reasons, UPM's arbitrage activity cannot conceivably be subject to Digicel-Haiti's fraud claim. *Strawn v. Farmers Ins. Co.,* 350 Or. 336, 351-52, 258 P.3d 1199 (2011) (first element of fraud is a representation from the tortfeasor to the victim).

*In-country bypass.* Between August 2011 and March 2012, and then again between April and October 2014, UPM used the Internet to get calls to Haiti and, once there, terminated

---

[14] UPM Depo., 50:4-14.

[15] A "softswitch" is a software program, running on a server connected to the Internet, that performs call routing functions for calls in Voice-over-Internet Protocol ("VoIP") format. *See* UPM Depo. 573:24-574:7.

[16] *Id.*, 587:17-23.

[17] *Id.*

[18] *Id.*, 587:24-588:10.

[19] "Topping up" or "recharging" refers to adding money to the account associated with a SIM card. *See Id.*, 607:1-609:8.

[20] *Id.*, 587:17-23.

them on Digicel-Haiti's network.[21] UPM's agents in Haiti purchased SIM cards from independent

dealers.[22] The SIM cards were manufactured for Digicel-Haiti and contain identifying information,

including an International Mobile Subscriber Information ("IMSI") number, supplied by Digicel-

Haiti.[23] UPM's SIM cards were shipped to Oregon,[24] and mounted into a "SIM unit" that could

read the information on the cards.[25] A call bound for Digicel-Haiti's network would come into

UPM's softswitch via the Internet, as above, and UPM routed it, again via the Internet, to one of

the "Gateway" devices it had located in Haiti.[26] UPM then transmitted authentication data from

one of its SIM cards to the Gateway.[27] The Gateway, in turn, initiated a wireless call on Digicel-

---

[21] Tran UPM Dec., ¶¶ 3, 32-34 and Exhibit 1. Prior to UPM's Rule 30(b)(6) deposition (held over three days in October 2021), UPM had understood that its in-country bypass activities during the 2011-2012 period occurred entirely between November 2011 and March 2012. *See* UPM Depo., 585:6-586:14. At the deposition, UPM was shown some emails indicating an earlier initiation of that activity, in August 2011. *See Id.*, 182:11-184:0. In part for that reason, UPM subsequently conducted a detailed review of UPM's "call detail records," or CDRs, that reflect detailed, contemporaneously-recorded information about every call that UPM ever sent to Digicel-Haiti. That review showed that UPM completed a total of 1,070,379 to Digicel-Haiti via in-country bypass at any time between January 2011 and December 2012. A small fraction – 79,743 minutes, or less than 7.5% of the total – occurred in September and October 2011, with an additional 616 minutes at the very end of August 2011. Tran UPM Dec., ¶¶ 32-34 and Exhibit 1. The detailed CDR-based review confirmed that all UPM in-country bypass activity during the 2011-2012 period ended in March 2012, as UPM had understood. It also confirmed that all UPM in-country bypass during 2014 began in April of that year, as UPM had understood, but actually ended in October 2014 rather than in November. *Id.*

[22] UPM Depo., 64:7-9, 98:2-8, 103:2-12, 104:5-21. The parties may dispute the legal relationship between UPM and the in-country personnel who purchased SIM cards, but that dispute has no bearing on this motion. Without prejudice to how the issue may be addressed later in the case, UPM will refer to these personnel here as "agents."

[23] Digicel(I) Depo., 47:13-48:7, 63:6-19; Deposition Transcript of Digicel-Haiti's Rule 30(b)(6) corporate representative Gerard Pierre Laborde ("Digicel(II) Depo.") attached as Exhibit 2 to Savage Dec., 14:7-12; Flanagan Depo., 59:8-16.

[24] UPM Depo. 108:23-109:9, 627:12-14.

[25] *Id.*, 430:9-12, 576:8-13, 581:14-23.

[26] Digicel(I) Depo., 123:11-24; UPM Depo. 574:20-576:2.

[27] UPM Depo 575:18-576:20.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Haiti's network to the party being called, and connected the Internet-delivered call to that wireless call.[28] Digicel-Haiti deducted the local rate from the SIM card's account as these calls were in progress.[29]

UPM used in-country bypass to get calls to Digicel-Haiti's network during the 2011-2012 period. During 2014, however, UPM used in-country bypass for only a tiny fraction of the calls it delivered to Digicel-Haiti's network.[30] Indeed, UPM's detailed records reveal only **nineteen (19)** minutes of in-country bypass traffic during all of 2014.[31] A small number of minutes cannot be affirmatively confirmed as either in-country bypass or RLYH resale; treating those as in-country bypass minutes, the total rises to 950 minutes – still less than three one-hundredths of 1% (less than 0.03%) of the total minutes UPM sent to Digicel-Haiti during 2014 (including arbitrage), and less than one-half of 1% (less than 0.5%) of the non-arbitrage minutes (that is, of in-country bypass and RLYH resale minutes combined).[32] Instead, during 2014, other than arbitrage, UPM mainly got calls to Digicel-Haiti's network by reselling RLYH service.[33]

*RLYH resale.* RLYH resale is the third way UPM got calls to Digicel-Haiti's network, beginning in mid-2014 and ending in November 2014.[34] UPM sent Digicel-Haiti a total of 279,669 RLYH resale minutes, all during 2014.[35] To buy RLYH service, UPM would first activate and top-up a SIM card. UPM then caused the SIM card to exchange some data with

---

[28] UPM Depo 575:21-24; Digicel(II) Depo., 15:14-21.

[29] Digicel(I) Depo., 75:13-76:9.

[30] UPM Depo., 613:25-614:8, 625:8-15.

[31] *Id.*, 635:25-636:4.

[32] Tran UPM Dec., ¶¶ 33-34 and Exhibit 1.

[33] UPM Depo., 625:2-11.

[34] *Id.*, 614:13-21.

[35] Tran UPM Dec., ¶ 34.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti's network to enroll in the RLYH service.[36] This caused Digicel-Haiti to deduct the subscription fee from the roaming SIM card's account.[37] With RLYH service, wireless calls to Digicel-Haiti's network were charged at the local rate. The fact that Digicel-Haiti charged the local rate, rather than the default roaming rate, is why the service is called "Roam Like You're Home."[38]

RLYH resale was in some ways similar to in-country bypass, but there were several important differences. Calls bound for Digicel-Haiti's network reached UPM in Oregon via the Internet, as above, and were sent via the Internet to UPM's Gateways, as above. With RLYH resale, however, the Gateways were in Oregon, not in Haiti.[39] As a result, RLYH Gateways never initiated any calls on Digicel-Haiti's network; instead, they initiated calls on the host network in the United States (that is, the network of one of Digicel-Haiti's roaming partners).[40] The roaming partner then routed the calls back to Haiti using Digicel-Haiti's international gateway switch.[41] As a result – crucially – RLYH resale did not "bypass" Digicel-Haiti's international gateway switch.[42] Instead, RLYH resale calls were routed and charged as inbound international calls. Furthermore – also crucially – for all RLYH resale calls, Digicel-Haiti received $0.23 per minute, while *also* receiving the local rate from UPM.[43]

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[36] Digicel-Haiti Answer to Interrogatory ("Digicel Int.") No. 15, attached as Exhibit 5 to Savage Dec. *See* UPM Depo., 436:13-21, 449:25-451:1.

[37] Digicel(I) Depo., 79:4-19; UPM Depo. 435:25-436:9.

[38] Digicel(I) Depo., 93:24-94:20.

[39] UPM Depo., 437:10-17.

[40] Digicel(I) Depo., 76:10-78:6.

[41] *Id*., 90:10-93:21.

[42] *Id.*

[43] *Id.*, 93:11-21.

Page 8 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986) (internal quotations omitted). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212-13 (1986) (internal quotations omitted).

"The court must view the evidence in the light most favorable to the nonmoving party. … However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence." *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099, at *17 (D. Or. Sep. 12, 2020), citing *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982) and Fed. R. Civ. P. 56(c).

"The underlying substantive law governing the claims determines whether or not [a fact] is material." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). "Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001), citing *Anderson*, 477 U.S. at 248. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. … In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a ***genuine issue for trial***.' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986) (internal citations omitted).

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## III.     DIGICEL-HAITI'S CLAIMS MUST BE DISMISSED

This not really a fraud case; it is, in fact, a contract case. And Digicel-Haiti's complaint is not really that it was deceived by UPM; its complaint is that UPM used Digicel-Haiti's service in a way of which Digicel-Haiti disapproved – but that did not violate any of the service's terms and conditions.

That is the fatal flaw in Digicel-Haiti's contract case: it never imposed any limitations on the use of its service. To obtain service, a subscriber did not have to say anything, sign anything, or click "I agree" on some website. A subscriber did not have to deal with Digicel-Haiti at all. All a subscriber had to do was buy a SIM card from a third party, buy a top-up from a third party, and – bingo! – the subscriber can make calls on Digicel-Haiti's network.[44]

Digicel-Haiti's business model thus created a simple, implied-in-fact contract: "If you have a valid SIM card with money in the account, you can make calls until you're out of money."[45] Nothing in this contract barred the subscriber from reselling the service – including by linking it to calls from outside of Haiti, sent via the Internet. Whatever its subjective desires for how its service would be used, Digicel-Haiti cannot create obligations on third parties by magic. *See, e.g., Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62-64 (1st Cir. 2018) (customers must have conspicuous notice of terms for them to be binding).

Digicel-Haiti thus knew a breach of contract claim had no chance of prevailing, so it had to come up with another way to address bypass. It could have just charged $0.23 per minute for calls made using SIMs cards identified as being used for bypass.[46] Instead, it decided to make an ideological point: Digicel-Haiti – along with similarly-situated carriers, their regulators, and

---

[44] Digicel(I) Depo., 25:22-26:7, 48:3-7; Flanagan Depo., 51:10-52:25; *see* UPM Depo., 130:11-17.

[45] *Id.*

[46] Digicel(I) Depo., 145:18-146:2; Flanagan Depo.,106:17-107:1.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

their consultants – informally label as "fraud" anything that looks like bypass.[47] This means that there was propaganda value in attacking bypass as "fraud."  So, fraud is what Digicel-Haiti pled.

Digicel-Haiti's fraud claim, though, is just as flawed as its underlying breach of contract claim, and mainly for the same reason. Having structured its business so that someone became a subscriber without ever dealing with Digicel-Haiti, the *sine qua non* of fraud – a misleading ***representation*** from one person to another – is missing.

Because Digicel-Haiti has pled fraud, UPM explains below why the undisputed evidence shows that that claim fails. As will be seen, applying common-law fraud concepts to a situation where UPM made no representations to Digicel-Haiti can be a bit strained. Ultimately, though, the undisputed evidence shows that no "rational trier of fact" could "find for [Digicel-Haiti]" on its fraud claim. *Matsushita Elec. Indus. Co., supra,* 475 U.S. at 586-587. UPM, therefore, is entitled to summary judgment in its favor on that claim.

## A.  Overview of UPM's Motion

To prevail on its fraud claim, Digicel-Haiti must prove, by "clear and convincing evidence," each element of common-law fraud. *Dizick v. Umpqua Cmty. Coll*., 287 Or. 303, 311, 599 P.2d 444, 448 (1979) (citing *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078 (1976); *Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 480, 220 P.3d 68, 77 (2009), *citing Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or. 332, 350, 225 P.2d 757 (1950). "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Coy v. Starling*, 53 Or. App. 76, 80, 630 P.2d 1323 (1981) (citations omitted). The Oregon Supreme Court has stated those elements as:

> the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance.

---

[47] Digicel(I) Depo., 16:18-24.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*Strawn, supra,* 350 Or. at 351-52.[48] The fraud claim fails because the undisputed facts show that:

- UPM did not make any "representations" to Digicel-Haiti.
- If the functional electronic exchanges between UPM and Digicel-Haiti were "representations," they were true.
- If UPM's "representations" were false, Digicel-Haiti was not justified in relying on them.

Digicel-Haiti, therefore, has no chance of prevailing on its fraud claim. Its conversion and unjust enrichment claims necessarily fail as well.

### B. UPM Made No Representations to Digicel-Haiti

UPM did not make any "representations" to Digicel-Haiti at all. This alone is a sufficient reason to grant UPM summary judgment on Digicel-Haiti's fraud claim.

#### 1. There Was No Human Contact Between UPM and Digicel-Haiti

UPM did not have any human contact with Digicel-Haiti – no calls, emails, letters, meetings, texts – nothing.[49] The normal "representations" in a fraud case simply did not happen here. As a result, nothing UPM said or did – in the normal meaning of those terms – constituted or could constitute "representations" to Digicel-Haiti.

#### 2. UPM Obtained SIM Cards and Top-Ups from Independent Dealers

UPM acquired SIM cards without any interaction with Digicel-Haiti. Digicel-Haiti distributed SIM cards by selling them to independent dealers, who then re-sold them to the public.[50] Any interactions between UPM's agents (who obtained the SIM cards for UPM) and the independent dealers were not representations by UPM to Digicel-Haiti, any more than a comment by an Uber Eats driver to a gas station attendant would be a representation by Uber to Shell or

---

[48] This five-element statement of the elements of fraud is a condensed version of the previous nine-element statement. *See Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner,* 191 Or. App. 408, 424, 83 P.3d 350 (2004).

[49] Tran UPM Dec., ¶¶ 20, 29-30.

[50] Digicel(I) Depo., 166:11-24; Flanagan Depo., 11:2-12.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Exxon-Mobil. And, in any event, there is no evidence of anything any of those agents may have said to any distributor of SIM cards.

The situation is similar for top-ups. UPM purchased top-ups from third parties, not from Digicel-Haiti.[51] UPM told the third party (via electronic data exchange) the telephone number of a SIM card and the amount to be added to the account.[52] UPM paid the third party, which paid Digicel-Haiti. UPM then confirmed that the money was in a SIM card's account by sending Digicel-Haiti a balance-checking code.[53] None of this constitutes any "representation" by UPM to Digicel-Haiti.

### 3.   UPM Made No Representations When Authenticating SIM Cards

UPM also made no representations to Digicel-Haiti when it authenticated its SIM cards. The undisputed evidence shows that, for authentication, the only communication between UPM (that is, its SIM cards) and Digicel-Haiti (that is, its network) was – to put it charitably – technical electronic gobbledygook. The process is technically complicated, involving the exchange of several data elements over several steps, and is laid out in detail in one of Digicel-Haiti's interrogatory responses.[54] For purposes of Digicel-Haiti's fraud claim, translating the technical gobbledygook into something like a conversation would yield this:

```
SIM:       Hey Network! Here's my ID number: [sends ICCID/IMSI]

NETWORK:   OK, my list of SIMs has that ID, but to make sure it's
           you, show me you can make sense of this: [sends a
           complicated code based on a secret number]

SIM:       Got it. And to prove it's me, look at this: [sends a
           complicated code based on what it got from the network,
           along with the secret number]

NETWORK:   Welcome. While you're here, we'll use that same key to
```

---

[51] Digicel(I) Depo., 73:12-74:74:7; UPM Depo., 607:1-609:8.

[52] *Id.*

[53] UPM Depo., 607:4-22.

[54] Digicel Int. No. 12. *See also* Digicel(II) Depo., 10:9-11:14; UPM Depo., 159:5-24.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

```
                encrypt the content we exchange.
```

This is not a "representation" from UPM (or its SIM card) to Digicel-Haiti (or the network). It is simply an exchange of functional data needed to identify the SIM card.

As far as UPM's research reveals, no Oregon case has ever held that this kind of technical data exchange was, or could, constitute a "representation" for purposes of a fraud claim. One can imagine situations where a human entering a code into a computer might be a "representation" of something, but the data exchanges here occurred without human intervention or even any human choice. They were automatic, a form of "syncing up" between a SIM card and the network.[55] As a result, these data exchanges do not "represent" anything, because they do not *mean* anything. They simply performed the *function* of confirming that SIM cards were genuine.

The distinction between a functional exchange of data, on the one hand, versus a meaningful expression of information that could constitute a "representation," on the other, is directly analogous to the distinction in software copyright and First Amendment cases between "expressive" and "functional" code. Expressive code reflects the coder's creativity, and is fully protected by copyright. It *expresses* something. Functional code, however, just tells the computer to do something, and is subject to "thin" copyright protection or none at all – precisely because it does *not* meaningfully "express" anything. *See, e.g., Google, LLC, v. Oracle Am. Inc.,* __ U.S. __, 141 S. Ct. 1183, 1198, 209 L. Ed. 2d 311 (2021) (noting distinction between "expressive and functional features of computer code" for copyright purposes, with "functional" code subject to limited copyright protection); *Universal Studios v. Corley,* 273 F.3d 429, 451 (2nd Cir. 2001) (distinguishing between the "functional and expressive elements" of computer code, with "functional" elements not subject to First Amendment protection); *Green v. United States,* 392 F. Supp. 3d 68, 92-93 (D.D.C. 2019) (same); *cf. Sega Enters. v. Accolade, Inc.,* 977 F.2d 1510, 1520-28 (9th Cir. 1992) (functional aspects of code not subject to copyright protection). Here, the data

---

[55] *See* Digicel(II) Depo., 12:6-15.

Page 14 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

exchanges between UPM's SIM cards and Digicel-Haiti's network were entirely functional, not expressive, and so cannot constitute a "representation" for purposes of the tort of fraud.

Additional guidance on this point comes from the Supreme Court's landmark decision regarding cell site location information, *Carpenter v. United States,* __ U.S. __, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018). In that case, the Court had to decide if the "third-party doctrine" applied to information wireless networks routinely generate about subscribers in the course of their operations. If Carpenter "voluntarily" provided that information to the network, then law enforcement could get it without a warrant, and Carpenter would lose his case; if not, then a warrant was required and the network-derived evidence would be thrown out. The Court expressly held that a user does ***not*** "voluntarily" provide data that a wireless network automatically generates and stores:

> [A] cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up. Virtually any activity on the phone generates CSLI, including incoming calls, texts, or e-mails and countless other data connections that a phone automatically makes when checking for news, weather, or social media updates. Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data. As a result, in no meaningful sense does the user voluntarily "assume[ ] the risk" of turning over a comprehensive dossier of his physical movements.

138 S. Ct. at 2220. Just as Carpenter did not "voluntarily" provide information that wireless networks gathered as part of their normal operation, neither did UPM "represent" anything to Digicel-Haiti by virtue of its SIM cards automatically authenticating themselves.

By authenticating SIM cards on Digicel-Haiti's network, in sum, UPM was not *saying* anything, so it was not "representing" anything to Digicel-Haiti. As a result, authenticating SIM cards is an entirely functional exchange of data that cannot properly be treated as a "representation" for purposes of a fraud claim.[56]

---

[56] The situation might be different if this case involved SIM cards that UPM had stolen or "cloned" (which it assuredly does not). It would still be challenging in such a case to find a "representation"

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

#### 4.   UPM Made No Representations When Making Calls

A similar process applied when a SIM directed a Gateway radio to initiate a call. In that case the SIM card sent a signal to the Gateway indicating the number it wants to call, and the Gateway (which has the radio) sends that to the network.[57] The network confirms there is money in the account,[58] and makes the call by connecting the radio channel between the Gateway and the network to a newly-established radio channel between the network and the wireless phone of the party being called.[59] These, too, are an entirely functional communications, not expressive of anything.[60]

Digicel-Haiti claimed that UPM misrepresented the nature of the calls it was making on Digicel-Haiti's network by hiding or manipulating the telephone numbers associated with those calls.[61] (This seems to be part of Digicel-Haiti's claim of "active concealment;" *see infra.*)  Implicit in this claim is the notion that something UPM did "represented" to Digicel-Haiti what the calling telephone number was, and that UPM somehow altered or manipulated that number. But this claim is baseless: the undisputed evidence shows that ***UPM had nothing to do***

---

for purposes of fraud, but statutes barring counterfeit access devices and unauthorized network access might come into play. *See* 18 U.S.C. §§ 1029, 1030. Indeed, it is likely that one reason Congress enacted these statutes was that those situations did not readily fit within common-law tort doctrines.

[57] Digicel(II) Depo., 12:24-14:6, 15:6-18.

[58] Digicel(I) Depo., 50:9-25, 75:19-76:9. 77:15-78:6.

[59] Digicel(II) Depo., 12:24-14:6, 15:6-18; Tran UPM Dec., ¶ 23.

[60] The network has to know which cell site the Gateway radio is connected to for the call to work. The network periodically sends the SIM card information identifying that cell site. Digicel(I) Depo., 67:9-68:3; Digicel(II) Depo., 20:8-21. When making a call, the SIM card sends back that same information. Digicel(I) Depo., 67:9-68:3. This, too, is entirely functional, and entirely without human intervention. *Carpenter, supra.*

[61] *See, e.g.,* TAC, ¶ 126-127.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*with assigning calling number information, and had no control over it.*[62] The telephone number associated with a SIM card is assigned by the network operator (Digicel-Haiti), not the SIM card owner (UPM).[63] When a SIM card was used to make calls, Digicel-Haiti's network automatically looked up the phone number that it, itself, had assigned to the SIM card, and transmitted that number to the called party.[64] UPM did not, and could not, alter the number that Digicel-Haiti associated with a SIM card – and thus the telephone number Digicel-Haiti's network transmitted to called parties.[65]

### 5.   UPM Made No Representations when Subscribing to RLYH

The discussion above focused on in-country bypass, but it also applies to RLYH resale. With RLYH resale, the authentication exchange occurs between the SIM card and the host carrier's network (that is, the network of the United States carrier "hosting" the roaming SIM card).[66] The host network transmitted data to Digicel-Haiti's network to confirm the authenticity of the SIM card, and Digicel-Haiti's network sent its response back to the host network for transmission to the SIM card.[67]

The only difference with RLYH resale is the process for subscribing a SIM card to RLYH. But that process, too, involves the exchange of data, not any "representation" of anything:

> To subscribe [to RLYH]:
>
> 1. Dial * 186 # from a Digicel phone and receive a message from our system with additional instructions.
>
> 2. Confirm the subscription by dialing * 186 * 1 # or cancel the request by dialing * 186 * 9 #

---

[62] Digicel(II) Depo., 16:14-17-7; UPM Depo., 163:3-19, 164:8-19, 604:11-605-20.

[63] Digicel(I) Depo., 48:18-49:8.

[64] *Id*., 48:18-49:8; Digicel(II) Depo., 19:5-20; UPM Depo., 164:8-19.

[65] Digicel(II) Depo., 19:11-20; *see* UPM Depo., 163:3-19, 164:8-19; Tran UPM Dec., ¶ 24.

[66] *See* Digicel(II) Depo., 77:15-78:6.

[67] *Id*.,  76:10-79:3.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

3. Once the subscription is confirmed you will receive the activation confirmation message from Digicel …[68]

This is a purely functional exchange between a SIM card and the network. Just like authenticating a SIM card, signing up for RLYH involved exchanging functional, not expressive, data. So, just as UPM made no representations to Digicel-Haiti with in-country bypass, it also made no representations when signing up for RLYH.

### 6.   Because UPM Made No Representations to Digicel-Haiti, It Is Entitled to Summary Judgment on Digicel-Haiti's Fraud Claim

The undisputed evidence, summarized above, shows that UPM did not communicate anything to, or – for purposes of the tort of fraud – "represent" anything to, Digicel-Haiti. It bought SIM cards and top-ups from independent third parties, and then used the services it had purchased. This required the exchange of certain functional, technical data between UPM's SIM cards and the network, but those exchanges did not express, represent, or "mean" anything. However, the *sine qua non* of fraud is a ***representation*** by the tortfeasor to the victim. Here, because UPM never made any representations to Digicel-Haiti, Digicel-Haiti's fraud claim fails before it begins.

As discussed below, the fact that UPM made no representations to Digicel-Haiti when buying SIM cards, top-ups, and RLYH subscriptions, or when authenticating SIM cards and making calls, did not reflect UPM hiding or concealing anything. The lack of communication from UPM to Digicel-Haiti was the inevitable result of how Digicel-Haiti chose to structure its own operations. It could have required purchasers of SIM cards or top-ups to appear in person at a Digicel-Haiti-run store, to fill out forms, to show identification, and to swear to abide by any terms of service it wanted to impose. It doubtless had good reasons for not setting things up that way, but having decided not to, it cannot now invent, and claim to have relied upon, "representations" UPM did not make and was not required to make.

---

[68] Digicel Int. No. 15.

Page 18 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

This illuminates the black hole at the center of Digicel-Haiti's untenable fraud claim – the fact that it is, at its essence, an untenable a breach of contract claim. This is shown by the repeated references in the Complaint to Digicel-Haiti's "expectations" or "intentions."[69] Indeed, at one point the mask slips entirely off, and Digicel-Haiti alleges that its "***contractual*** and commercial expectations" somehow affect what UPM was allowed to do with the services it purchased. In fact, no terms of service were ever established between UPM and Digicel-Haiti. *See Cullinane, supra.*

But even if some terms were in place, it is not fraud for a subscriber to violate terms of service – otherwise every employee who uses their work computer to check their personal email is a fraudster. A good analogy is *Van Buren v. United States,* __ U.S. __, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021). There, the Supreme Court held that someone with access to a network does not "exceed authorized access" for purposes of 18 U.S.C. § 1030 – that is, someone is not engaged in "computer fraud or abuse" – if they use the system in a way that violates the rules laid down by the system owner. *See also United States v. Nosal,* 676 F. 3d 854 (9th Cir. 2012) (en banc) (same). Here, UPM bought and paid for SIM cards and usage on Digicel-Haiti's network, and authenticated its SIM cards, in exactly the manner Digicel-Haiti required. If UPM then ***used*** the service in a manner that Digicel-Haiti did not like, then UPM was ***at most*** breaching a contract. It was not, by any stretch of the legal imagination, committing fraud.[70]

## C. Any Representations UPM Made to Digicel-Haiti Were True

Digicel-Haiti's fraud claim requires showing by "clear and convincing evidence"

---

[69] *See, e.g.,* TAC, ¶¶ 48, 49, 51, 62, 63, 67, 121, 130, 176.

[70] *Cf. Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253, at *42-48 (D. Or. August 6, 2014). In that case, the Court noted the distinction between "covenants," which are merely promises, and "conditions," which must be met for contractual rights to be valid in the first place. To establish a condition requires "clear and unambiguous language." *Id.* Here, Digicel-Haiti's position essentially requires that a ***condition*** of use of its wireless service must have been that the service would not be used for bypass. While it may have wanted such a condition to be in place, Digicel-Haiti did not impose that or any other condition using "clear and unambiguous language" – or any language at all. The condition – and even the covenant – did not exist.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that UPM made false, material representations to Digicel-Haiti. *Wieber, supra; Strawn, supra,* 350 Or. at 351-52. Even if the interactions between UPM's and Digicel-Haiti's equipment could be considered "representations," Digicel-Haiti cannot make the required evidentiary showing because all of those representations were true.[71]

There are three ways a representation can be false for purposes of a fraud claim: a lie; an omission of a material fact; or active concealment of a material fact.[72] UPM did not lie about, omit, or conceal any material facts.

### 1.    UPM Did Not Lie

When authenticating themselves on Digicel-Haiti's network, the information UPM's SIM cards sent to the network was true – it accurately reflected the information on the SIM cards that UPM had purchased. Digicel-Haiti has suggested that UPM "cloned" SIM cards, evidently trying to evoke the idea that UPM created fake or counterfeit cards to gain unauthorized access to Digicel-Haiti's network.[73] *Cf. United States v. Clayton,* 108 F.3d 1114, 1115 (9th Cir. 1997) (defining "cloning" as "stealing the identification numbers of legitimate cellular phones and programming them into other cellular phones. The 'cloned phone' can then be used to make calls … charged to the owner of the legitimate phone"). But UPM never engaged in "cloning."[74] Its SIM cards had all been legitimately purchased and topped up.[75]

Digicel-Haiti has also suggested (as noted above) that when UPM used its SIM

---

[71] For this reason, Digicel-Haiti cannot show that UPM made representations knowing they were false – because they were true. This is a separate element of the tort of fraud that Digicel-Haiti cannot satisfy. *Strawn, supra,* 350 Or. at 351-52.

[72] *See* ECF #58 at 10-12 (discussing types of misstatements).

[73] *See* TAC, ¶¶ 101, 114.

[74] UPM Depo., 582:24-583:18.

[75] *Id.*, 583:22-584:4.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

cards to make a call, UPM falsified information about the telephone number making the call.[76] In fact, UPM never sent *any* information about the originating caller's telephone number, and had no opportunity to do so. All it sent to Digicel-Haiti was the SIM card's true, actual ID number and, as discussed above, *Digicel-Haiti,* not UPM, associated the SIM's ID number with a telephone number that Digicel-Haiti had, itself, assigned. It was not a misrepresentation to send accurate SIM card ID information to Digicel-Haiti.[77]

### 2.   UPM Did Not Omit Any Material Information.

One can make a misrepresentation by omitting material information. This situation arises when the tortfeasor remains silent when he has a duty to speak, or when he presents information in the form of a "half-truth" that creates such a duty.[78] Neither of these circumstances exists in connection with any of UPM's communications to Digicel-Haiti. The only way the automatic data exchanges that occurred between the parties' equipment would work at all is if the devices involved followed the prescribed protocol for exchanging information. Not only did UPM (through its devices) not have any duty to "say" anything more than it did, the prescribed protocols did not provide any opportunity for it to do so.[79]

Digicel-Haiti has suggested that UPM had an obligation to fill out (or to have its

---

[76] *See, e.g.,* TAC, ¶¶ 28, 57, 119, 126-127.

[77] UPM does not dispute that when it sent Gateways to Haiti, it labeled them as DVD players. *See* TAC, ¶¶ 157-166. This was an ill-considered effort to minimize customs duties and to avoid customs officials damaging the equipment in the course of inspecting it. *See* UPM Depo., 339:6-23, 357:18-358:2, 360:24-361:8. Be that as it may, there is no evidence that UPM ever intended Digicel-Haiti to see a physical UPM Gateway, and certainly no evidence that Digicel-Haiti relied on the labeling of UPM's Gateways to determine what services to provide to UPM or what to charge for them. The labeling of UPM's Gateways, therefore, while perhaps not UPM's finest hour, was not, and could not have been, a representation *to Digicel-Haiti*. So, it is irrelevant to Digicel-Haiti's fraud claim.

[78] *See* ECF #58 at 10-11.

[79] *See* Digicel(II) Depo., 12:6-15 (authentication occurs using steps from GSM standard); *id.* 18:3-26:1 (describing information available to the network from a call); Tran UPM Dec., ¶ 22, 24, 29.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

agents fill out) registration forms when acquiring SIM cards, and that its failure to do so could be a form of omission or concealment.[80] When acquiring SIM cards, UPM's agents did not fill out registration forms, but Digicel-Haiti did not, in fact, require subscribers to fill out the forms, and the service it provided was unaffected by whether a form was completed.[81] Indeed, one of Digicel-Haiti's witnesses, a former Haitian government official, explained that the Haitian regulator's "Circulars" – such as the one about getting registration forms[82] – were non-binding.[83] Failure to fill out a form, therefore, cannot be a misrepresentation by omission. In practice, on the ground, there was no requirement to fill out those forms, and so it does not matter whether UPM's agents did or did not do so.

The "half-truth" doctrine is particularly inapplicable in the case of purely functional, machine-to-machine communications of the sort at issue here. "Half-truth" cases involve human-to-human contact where a speaker created an inaccurate mental impression in the mind of a listener by stating some facts but leaving out others. *See, e.g., Martell v. GM LLC,* 492 F. Supp. 3d 1131, 1143-44 (D. Or. 2020) (referring to the plaintiff having "heard" a half-truth and being "put .. at ease" by hearing it). UPM's research reveals no cases applying the doctrine to machine-to-machine communications. This absence of case law makes sense because, with machine-to-machine communications, the recipient device (Digicel-Haiti's network) is incapable of forming any mental impressions at all – whether complete or incomplete, accurate or inaccurate, troubled or "at ease."

---

[80] *See* TAC, ¶ 64.

[81] Digicel(I) Depo., 40:8-25; Flanagan Depo., 52:2-25, 64:8-65:2.

[82] *See* TAC, ¶ 66.

[83] Deposition Transcript of Charles Castel ("Castel Depo.") attached as Exhibit 6 to Savage Dec., 173:9-175:21.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### 3.   UPM Did Not Engage In Concealment.

Digicel-Haiti clearly would have liked to know which calls on its network were bypass calls and which were not. But there was no way to tell in real time.[84] This is not because bypassers were taking active steps to hide anything. It is because nothing distinguishes a bypass call from a plain old local call on Digicel-Haiti's network.[85] The network had no way of knowing – and the bypassers had no way of telling the network – that the people talking on the phone were in different countries.[86] That information is inherently unavailable to the network, and there is no protocol or procedure with which to tell it.[87] UPM itself did not alter or modify the protocols or signaling used to authenticate a SIM card on the network or to make calls.[88] There was, therefore, no "concealment" of anything.

This is where the essential contractual nature of Digicel-Haiti's claim – and Digicel-Haiti's sleight-of-hand to conceal that nature – becomes most apparent. Digicel-Haiti sold its SIM cards to dealers who sold them to UPM.[89] UPM then paid third party vendors to top them up.[90] Digicel-Haiti structured its business such that there were no terms applicable to its service, and no restrictions on how it was used. Yet on Digicel-Haiti's telling, somehow UPM committed fraud – by "active concealment" no less – simply by using the service it had purchased in a manner that nothing forbade it from doing. Digicel-Haiti is trying to overcome its lack of restrictive terms of service by imposing them after the fact, *ad hoc,* by saying that it constitutes fraud for UPM to

---

[84] *See* Flanagan Depo., 110:24-111:3.

[85] Digicel(I) Depo., 146:10-24.

[86] *See* Digicel(II) Depo., 12:6-15 (authentication occurs using steps from the technical standard for wireless networks); *id.* 18:3-26:1 (describing information available to the network from a call); Tran UPM Decl., ¶¶ 22, 24, 29.

[87] *Id.*

[88] Tran UPM Dec., ¶¶ 22-24, 29.

[89] Digicel(I) Depo., 166:11-24.

[90] UPM Depo., 607:1-609:5.

Page 23 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

violate supposed restrictions ***that were never imposed in the first place.***

The essence of Digicel-Haiti's position is that when UPM made a call with a radio located in Haiti, that necessarily constituted a representation that the call was a plain old local wireless call, and so, when a call is ***not*** a plain old wireless call, that is a form of concealment. But that claim is gaslighting, an exercise in pure narcissism: it may reflect what Digicel-Haiti would like to believe, but it does not reveal anything about what UPM (or other users of Digicel-Haiti's services) thought, meant, or intended when they used those services. In fact, because there were no terms of service, Digicel-Haiti and its subscribers operate under a thin, bare-bones, implied-in-fact contract: "If you have a valid SIM card, you can make calls until you run out of money." Nothing about that contract – that is, nothing about the terms and conditions of using Digicel-Haiti's service – suggests or implies that when someone used the service, they were representing anything about the content of, or points of origin of, a call. Digicel-Haiti had the power – and, in Haiti, perhaps even the right – to unilaterally cut off subscribers who used the service in ways Digicel-Haiti did not like.[91] But the idea that Digicel-Haiti can invoke common-law fraud by active concealment to further punish those subscribers is absurd.

There is no limiting principle to Digicel-Haiti's radical expansion of the tort of fraud. Consider the following hypothetical argument, paralleling Digicel-Haiti's position:

- Undersigned counsel's commercial expectation is that anyone who wants a copy of this brief must use the legitimate, authorized brief-distribution channel to obtain one – going to undersigned counsel's website and paying the required $5,000 copying fee.

- Rather than using this legitimate, authorized channel, Digicel-Haiti's counsel surreptitiously got a copy of this brief by signing up for an email distribution system that let him bypass the authorized channel. Undersigned counsel does not intend the email system to substitute for the authorized channel.

- Undersigned counsel cannot tell who is getting copies of the brief from the email system, and Digicel-Haiti's counsel knows it. This means that when Digicel-Haiti's counsel surreptitiously got his copy from the email system, he was actively concealing his bypass of the legitimate, authorized channel.

---

[91] The core of UPM's counterclaim is that, under the Communications Act, Digicel-Haiti had no such right with respect to resale of the roaming services it offered in the United States.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

- It does not matter that undersigned counsel made the brief available via the email system and that Digicel-Haiti's counsel used that system without violating any of its terms and conditions. Because the only legitimate, authorized way to get a copy is going to the website and paying $5,000, using any other means to get a copy is fraud. Moreover, doing so using the email system, where undersigned counsel cannot tell who is getting copies, is fraud by active concealment.

- Digicel-Haiti's counsel therefore owes undersigned counsel $5,000 for each copy of this brief that he has received, made or distributed – plus punitive damages, given the surreptitious, furtive nature of his actions.

Framed this way, the two-part sleight-of-hand in Digicel-Haiti's argument is easy to see. First, where did the supposed obligation on Digicel-Haiti's counsel to use the "legitimate, authorized" service (the $5,000 brief-copying website – or Digicel-Haiti's international gateway) come from? The answer: nowhere. It was pulled out of thin air. It may be what Digicel Haiti (or undersigned counsel) *wanted*, but one party's desires are not another party's obligations. Second, where did the supposed obligation on Digicel-Haiti's counsel *not* to use the less expensive alternative (the email distribution system – or Digicel-Haiti's wireless service) come from? The same answer: nowhere. This part of Digicel-Haiti's position, in fact, is particularly egregious because, unlike in the hypothetical, Digicel-Haiti controlled the less expensive system (its Haitian wireless service) and could have arranged its business to impose restrictive terms and conditions if it wanted to.

When UPM linked inbound international calls to Digicel-Haiti's network in Haiti, it was no more committing fraud, and no more engaging in active concealment, than was Digicel-Haiti's counsel when he received his copy of this brief via the ECF system – whether undersigned counsel wants $5,000 per copy or not.

## D. Any Digicel-Haiti Reliance On UPM's "Representations" Was Unjustified

In order to prevail on its fraud claim, Digicel-Haiti will have to prove that it *reasonably* relied on UPM's "representations." *See Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 297 P.3d 1277 (2013); *Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner,* 191 Or. App. 408, 428, 83 P.3d 350, 362 (2004). The reasonableness of Digicel-Haiti's reliance is not determined in the abstract; the fact that Digicel-Haiti was a knowledgeable and sophisticated industry participant

means that it is held to a higher standard than some naïf who knew little or nothing about wireless networks, the Internet, or international calling. *Id.* No reasonable trier of fact could conclude that it was reasonable for Digicel-Haiti to rely on UPM"s "representations" to conclude that the calls UPM was making were all "local" in nature.

The essence of Digicel-Haiti's purported "reliance" is that when a UPM Gateway initiated a call on Digicel-Haiti's network, Digicel-Haiti reasonably concluded that this was a truly "local" call.[92] Testimony from Digicel-Haiti's Rule 30(B)(6) designees shows that any such reliance was entirely unjustified.

First, at a high level, Digicel-Haiti knew very well that ███████████ calls on its network were inbound international calls that had bypassed its international gateway switch. Digicel-Haiti testified that it experienced ███████████████ bypass traffic each year, representing ███████████████████ traffic on its network.[93] This ██████ bypass evidently began some time ago, but █████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████.[94] Bypass was a big enough concern to Digicel-Haiti that ██████████████████████ ████████████████████████[95] Digicel-Haiti cannot simultaneously recognize, as it plainly did, that *any* call might be a bypass call, and that ████████████ calls on its network *were* bypass calls, and then claim it can justifiably rely on the local appearance of a call to conclude that it is really local.

But Digicel-Haiti's reliance was unreasonable on a more granular level as well.

---

[92] *See* TAC, ¶¶ 104, 189.

[93] Digicel(I) Depo., 29:9-32:9.

[94] *Id.*, 159:7-161:10.

[95] *Id.*, 32:21-34:14.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Specifically, Digicel-Haiti fully understood that the fact that the *radio* connecting to Digicel-Haiti's network was in Haiti – as it had to be – did not mean that the SIM card authenticating the call, or the call itself, was actually in Haiti. Again, its Rule 30(b)(6) representative took pains to precisely explain that Digicel-Haiti only knew where the *radio* – in our case, the radio in a UPM Gateway – was located.[96] Any purported Digicel-Haiti reliance on the fact that a Gateway radio in Haiti was used to initiate a call, to conclude that the underlying call itself was originating in Haiti, was entirely unjustified.

### E.  UPM Is Entitled to Summary Judgment on Digicel-Haiti's Claims

The discussion above shows that no rational fact-finder could conclude that UPM made any representations to Digicel-Haiti; that no rational fact-finder could conclude that – treating the interactions between UPM's equipment and Digicel-Haiti's systems as "representations" – any such representations were false (or that UPM knew they were false); and that no rational fact-finder could conclude that it was reasonable for Digicel-Haiti to rely on UPM's "representations" to conclude that UPM's calls were not inbound international calls. UPM, therefore, is entitled to summary judgment on Digicel-Haiti's fraud claim.

Moreover, dismissal of the fraud claim necessarily means that Digicel-Haiti's claims for conversion and unjust enrichment must fail as well. As to conversion, the "gravamen of the tort is the defendant's intent to exercise control over the chattel *inconsistently* with the plaintiff's rights." *Naas v. Lucas*, 86 Or. App. 406, 409, 739 P.2d 1051, *rev. denied*, 304 Or. 680, 748 P.2d 142 (1987) (emphasis added). Here, Digicel-Haiti's conversion claim is entirely based upon its fraud claim; the conversion claim merely asserts that UPM wrongfully and improperly kept revenues Digicel-Haiti claims were lost because of the claimed fraud.[97] As a result, dismissal of the fraud claim necessarily requires dismissal of the conversion claim.

---

[96] Digicel(II) Depo., 20:11-21.

[97] *See* TAC, ¶¶ 193-196.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

The same logic applies to Digicel-Haiti's unjust enrichment claim.[98] Without the support of the fraud claim, Digicel-Haiti cannot show that (1) UPM retained any profits that belonged to Digicel-Haiti; (2) UPM was required to pay compensation to Digicel-Haiti; or (3) UPM acted willfully or maliciously. Accordingly, UPM is entitled to summary judgment with respect to Digicel-Haiti's conversion claim as well.

## IV.    AT A MINIMUM, UPM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON CERTAIN ASPECTS OF DIGICEL-HAITI'S FRAUD CLAIM

### A.  UPM Is Entitled to Summary Judgment that RLYH Resale Was Not Fraud

#### 1.   All RLYH Resale Calls Were Routed And Rated As International Calls

The essence of Digicel-Haiti's fraud claim is that UPM falsely represented calls made using UPM's SIM cards as "really" local calls when in fact they were inbound international calls. But every RLYH resale call *was* an inbound international call; every RLYH resale call was *routed* as an inbound international call, via Digicel-Haiti's international gateway switch; and every RLYH resale call was *charged* as an inbound international call, with the carrier delivering the call to the international gateway switch being charged $0.23 per minute.[99] Whatever concerns Digicel-Haiti might have about RLYH resale, "fraud" cannot be among them, and UPM is entitled to a ruling that Digicel-Haiti's fraud claim has no application to RLYH resale.

#### 2.   Digicel-Haiti Was Not Damaged by RLYH Resale

Digicel-Haiti must prove by "clear and convincing evidence" that it was damaged by UPM's alleged fraud. *Wieber, supra; Strawn, supra.* The undisputed evidence is that, for all RLYH resale calls, Digicel-Haiti received *both* the $0.23 per minute it claims to be entitled to

---

[98] *See* TAC, ¶¶ 197-203.

[99] Digicel(I) Depo., 79:4-19; TAC, ¶ 136. Notably, for RLYH resale calls, the host carrier in the United States pays the $0.23 per minute ████████████████████████████████████ Digicel(I) Depo., 92:18-93:21. This means that ██████████████████████████████████████████████ ████████████████████████████████████████████████

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

(from its roaming partner), *and also* the local rate (from UPM). Far from being harmed by RLYH resale, Digicel-Haiti profited from it – so much so that, ████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████[100] As a result, even if RLYH resale somehow fulfilled the other elements of a fraud case – which it does not – the fraud claim still fails when applied to RLYH resale because Digicel-Haiti was not damaged. This is an independent ground for granting UPM summary judgment on Digicel-Haiti's fraud claim as it applies to RLYH resale.

## B. UPM Is Entitled to Summary Judgment with Respect to The Number of Minutes of Bypass Traffic It Sent to Digicel-Haiti

### 1. UPM Is the Sole Source of Records Regarding How Many Minutes of Traffic it Terminated to Digicel-Habit's Network.

Summary judgment is appropriate when there are no real disputes about material facts. "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212-13 (1986) (internal quotations omitted). "A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence." *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099, at *17 (D. Or. Sep. 12, 2020), citing *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982) and Fed. R. Civ. P. 56(c).

Here, UPM has detailed, contemporaneously-generated business records that reflect how many SIM cards UPM purchased, how much UPM spent topping up those SIM cards, how many RLYH services UPM enrolled in, and how many minutes of traffic UPM terminated on Digicel-Haiti's network using each of the three methods (arbitrage, in-country bypass, and RLYH

---

[100] Digicel(I) Depo., 96:4-97:24.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

resale) identified above.[101] As discussed immediately below, however, Digicel-Haiti has literally no records of these matters. Consequently, there are and can be no cognizable disputes between the parties with respect to them.

Digicel-Haiti's practice, like UPM's, was to record CDRs for calls on its network.[102] Digicel-Haiti's systems, however, did not regularly record information about who purchased or used any particular SIM card,[103] and so Digicel-Haiti is unable, even in principle, to link the CDRs associated with a particular SIM card's usage with any particular subscriber. Theoretically, Digicel-Haiti could have used UPM's CDRs and its information about its SIM cards to cross-check Digicel-Haiti's own records. However, Digicel-Haiti's records for all periods relevant to this case have been corrupted or destroyed, or are otherwise unavailable.[104] As a result, Digicel-Haiti necessarily lacks admissible evidence that could create a genuine dispute as to these quantitative aspects of UPM's activities.

### 2. UPM's In-Country Bypass and RLYH Activities

UPM has conducted a detailed analysis of its contemporaneously-generated records of every call it ever terminated onto Digicel-Haiti's network.[105] The table below reflects that analysis:

| Period | Arbitrage Minutes | In-Country Minutes | RLYH Minutes | Recharges |
|---|---|---|---|---|
| August 2011 – March 2012 | 968,356 | 1,070,379 | 0 | $101,778 |
| April – December 2014 | 3,560,530 | 950 | 279,669 | $109,208 |
| **TOTAL** | **4,528,886** | **1,071,329** | **279,669** | **$211,056** |

---

[101] Tran UPM Dec., ¶¶ 8-15.

[102] Digicel(I) Depo., 57:19-58:24; *See* UPM Depo., 597:13-19; Digicel(II) Depo., 21:25-23:19, 25:2-26:1 (details on data captured in a CDR by Digicel-Haiti's network).

[103] Digicel(I) Depo., 40:8-25; Flanagan Depo. 56:14-57:3.

[104] Digicel(I) Depo., 57:22-58:20. Digicel-Haiti's counsel implied that Digicel-Haiti has not given up trying to recover its records, *id.*, 59:9-60:20, but they have evidently been trying for years with no success.

[105] Tran UPM Dec., ¶¶ 31-34 and Exhibit 1. Note that for 2014, the figures do not include "test" minutes. *See id.,* ¶ 35.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

If the Court does not dismiss Digicel-Haiti's fraud claim, then UPM is entitled to summary judgment that the figures above reflect the amount of in-country bypass and RLYH resale traffic that UPM sent to Digicel-Haiti's network. Digicel-Haiti's lack of records means that there cannot be any dispute about these material facts.

### C.  UPM Is Entitled to Summary Judgment With Respect How to Calculate Damages

Damages for fraud are determined using the "out-of-pocket" rule. *Morasch v. Hood,* 232 Or. App. 392, 400, 222 P.3d 1125, 1130 (2009). The rule is applied flexibly to compensate the plaintiff for losses actually incurred. *Dizick v. Umpqua Community College,* 287 Or. 303, 312; 599 P.2d 444, 448 (1979). If the Court denies UPM's motion for summary judgment on Digicel-Haiti's fraud claim, it should nonetheless grant summary judgment that any monetary damages for any given minute of bypass traffic will be calculated using the following formula:

> $0.23 per minute, ***minus***
>
> $0.05 per minute due to the Haitian government, ***minus***
>
> the local rate for calls in Haiti, ***equals***
>
> UPM's per-minute damages liability.

This formula fairly captures the out-of-pocket impact of a minute of bypass traffic.[106]

This may seem obvious: Digicel-Haiti's economic harm from getting the local rate as opposed to $0.23 for a minute of traffic is the difference between the two, minus the $0.05 tax Digicel-Haiti would have paid had it received the $0.23. Digicel-Haiti's Rule 30(b)(6) designee and one of its expert witnesses agreed to this approach to calculating damages.[107]  Moreover, consideration of damages at trial (and potential settlement discussions) could be vastly

---

[106] UPM is not seeking summary judgment as to a specific per-minute damages figure, because there may be disputes as to the precise value of the local rate. UPM *is* seeking summary judgment that the formula above is the way to calculate Digicel-Haiti's damages from bypass calls.

[107] Digicel(I) Depo., 135:14-135:2, 139:12-24; McEwen Disclosure at 5 ("Digicel makes $0.18 per minute and the Haitian Government makes $0.05…"), attached as Exhibit 7 to Savage Dec.

Page 31 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

complicated if Digicel-Haiti is permitted to pursue more elaborate, but legally unsupported, damages theories. UPM, therefore, seeks summary judgment on this point.

UPM is also entitled to summary judgment that in calculating damages, amounts that UPM *paid* to top-up SIM cards and to enroll in RLYH plans, but that Digicel-Haiti *kept* when it blocked those SIM cards, must be deducted from any damages amount. Digicel-Haiti's damages claim is that it should have received a per-minute usage charge of $0.23 per minute for bypass calls. Clearly, the amounts UPM paid Digicel-Haiti for usage need to be considered in determining how much Digicel-Haiti has been (supposedly) damaged. Indeed, Digicel-Haiti referred to the money that it kept as having been "banked."[108] Failing to deduct these amounts from Digicel-Haiti's damages would ensure that those damages would exceed Digicel-Haiti's out-of-pocket losses.

### D. UPM Is Entitled to Summary Judgment With Respect to Digicel-Haiti's Other Damages Claims

Other than not receiving its desired $0.23 per minute, Digicel-Haiti has claimed that UPM caused it several other types of damage: (1) harm due to stress on Digicel-Haiti's network;[109] (2) harm in investigating bypass;[110] and (3) harm to its good will.[111] Considering the undisputed facts as a whole, if Digicel-Haiti's fraud claim is not dismissed, UPM is entitled to summary judgment in its favor with respect to these other damages claims, because, give the undisputed facts, these claims are inherently insubstantial and speculative.

First, as noted above, during the 8-month period from August 2011 through March 2012, UPM completed 1,070,379 in-country bypass minutes. During that same period, based on

---

[108] Digicel(I) Depo., 145:18-146:2.

[109] *See* TAC, ¶ 104.

[110] Digicel Int. No. 49.

[111] TAC, ¶¶ 104, 171, 191.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the minimum estimate of how much bypass traffic Digicel-Haiti's network carried annually, Digicel-Haiti handled ████████████████████.[112] This means that ████████ ████████████████████████████████████████████████ ████████████████████████[13] No rational finder of fact could conclude that this ████ ████████ put any meaningful stress on Digicel-Haiti's network, and UPM is entitled to summary judgment that it is not liable for any damages based on that theory.

This same logic indicates that UPM cannot reasonably be held liable for Digicel-Haiti's costs of investigating bypass; Digicel-Haiti clearly had a much bigger bypass problem than anything UPM was doing, and there is no evidence to suggest that its investigation efforts would have been any different had UPM not done anything at all. This means that Digicel-Haiti's investigation costs are not out-of-pocket losses attributable to UPM. Indeed, Digicel-Haiti's Rule 30(b)(6) witness stated that the Government of Haiti had been concerned about bypass, and had been urging carriers in Haiti to identify it, for many years, and that Digicel-Haiti had been engaged in efforts to detect and suppress bypass since 2007.[114] Also, there is no evidence that Digicel-Haiti spent anything investigating UPM *before* 2014, but *in* 2014, UPM completed less than 1,000 minutes of in-country bypass.[115] No rational finder of fact could conclude that UPM's minor presence in Haiti had any material effect on Digicel-Haiti's investigation costs, and UPM is entitled to summary judgment that it is not liable for any damages based on that theory.

Finally, both UPM's tiny presence in Haiti and the Haitian regulator's pre-existing attitudes about bypass show that no rational finder of fact could conclude that UPM's activities had any material effect on Digicel-Haiti's reputation and good will, and UPM is entitled to summary

---

[112] This figure is 8/12 of the estimated annual number of bypass minutes provided by Digicel-Haiti.

[113] This figure is derived by dividing UPM's bypass minutes by the estimated total number of minutes carried by Digicel-Haiti's network.

[114] Digicel(I) Depo., 19:7-17, 27:18-22.

[115] Tran UPM Dec., ¶ 34.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

judgment that it is not liable for any damages based on that theory as well.

## V.    UPM IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON TWO ASPECTS OF ITS COUNTERCLAIM

UPM's counterclaim against Digicel-Haiti can be summarized as follows:

- Digicel-Haiti is a "telecommunications carrier" subject to the Communications Act because its sale of roaming services (including RLYH service) to subscribers in the United States constitutes "offering telecommunications for a fee" within the meaning of 47 U.SC. §§ 153(50), (51), and (53);

- FCC rulings interpreting and applying 47 U.S.C. §§ 201 and 202 hold that it is unjust, unreasonable, and/or unreasonably discriminatory, for a telecommunications carrier to block or restrict the ability of its customers to resell, to third parties, the services the customers buy from the telecommunications carrier;

- Blocking UPM's RLYH SIM cards prevented UPM from reselling that service;

- So, Digicel-Haiti violated the Communications Act by blocking those SIM cards.

UPM expects that Digicel-Haiti will argue that its blocking of UPM's RLYH SIM cards was not unlawful, and in part for this reason, UPM is not seeking summary judgment on the ultimate question of liability. However, there can be no reasonable dispute that (a) Digicel-Haiti's roaming arrangements make it a telecommunications carrier subject to the Communications Act, and (b) Digicel-Haiti's blocking of UPM's RLYH SIM cards prevented UPM from reselling RLYH service. UPM seeks partial summary judgment on those two points.

The relevant facts about Digicel-Haiti's resale arrangements are not in dispute. Digicel-Haiti obtains from its roaming partners the right for Digicel-Haiti subscribers located in the United States to use the roaming partners' services. But the roaming subscribers are not charged by, do not pay, and do not become customers of those roaming partners.[116] Instead, Digicel-Haiti is charged by, and pays, the roaming partners, and then, in turn, charges its own subscribers for their use of those services.[117] There can be no doubt – and no rational trier of fact could fail to find – that Digicel-Haiti is offering telecommunications (the underlying physical services provided by

---

[116] Digicel(I) Depo., 89:10-18.

[117] Digicel(I) Depo., 85:11-20.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

its roaming partners) for a fee (the amounts it charges its subscribers when they use those services). This clearly establishes Digicel-Haiti as a telecommunications carrier in the United States, as, indeed, this Court already found in connection with Digicel-Haiti's effort to have UPM's counterclaim dismissed.[118] UPM is entitled to summary judgment that Digicel-Haiti is and was a telecommunications carrier subject to the Communications Act.

Finally, it is entirely obvious that by blocking UPM's RLYH SIM cards, Digicel-Haiti necessarily prevented UPM from reselling the RLYH services to which those SIM cards had subscribed. UPM is therefore entitled to summary judgment that Digicel-Haiti prevented UPM from reselling that service.

With these grants of partial summary judgment, the issues left for further proceedings on liability would be whether the FCC's rulings forbidding resale restrictions permit any justification or exception that could apply to a carrier in Digicel-Haiti's position and, if so, whether Digicel-Haiti qualifies for such an exception. Clearly, though, further proceedings on UPM's counterclaim would be significantly streamlined if the Court grants UPM's motion.

## VI.    CONCLUSION

For the foregoing reasons, UPM respectfully requests that the Court grant summary judgment in its favor on Digicel-Haiti's fraud claim, and partial summary judgment, as described above, with respect to UPM's Communications Act counterclaim.

Dated: November 12, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Eleanor A. DuBay, OSB #073755
    edubay@tomasilegal.com
    Telephone: (503) 894-9900
        *Of Attorneys for Defendants*

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*
        *Of Attorneys for Defendant*

---

[118] ECF #154 at 27-31. From this perspective, no facts have emerged that would contradict the allegations in Digicel-Haiti's complaint on which the Court relied to sustain UPM's counterclaim against Digicel-Haiti's Rule12(b)(6) motion.

Page 35 – DEFENDANT UPM TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT
UPM-L1\00609751.000

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, I served the foregoing **DEFENDANT UPM TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: November 12, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants