**Kathryn P. Salyer, OSB #883017**
**Eleanor A. DuBay, OSB #073755**
**Blake Van Zile, OSB #184672**
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage, D.C. Bar #362657**
chrissavage@dwt.com
(*Admitted Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDINGS, S.A. d/b/a DIGICEL HAITI,**<br><br>        **Plaintiff and Counterclaim-Defendant,**<br><br>**v.**<br><br>**UPM TECHNOLOGY, INC.,** *et al.,*<br><br>        **Defendants and Counterclaim-Plaintiffs** | **Case No. 3:15-cv-185-SI**<br><br><br>**DECLARATION OF BRUCE TRAN AS CHIEF EXECUTIVE OFFICER OF UPM TECHNOLOGY, INC. IN SUPPORT OF UPM TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT** |

I, Bruce Tran, declare as follows:

Page 1- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

1.      I am the owner and Chief Executive Officer ("CEO") of UPM Technology, Inc. ("UPM") a defendant in this matter. I have been the owner and CEO of UPM since its founding in 2007. I make this declaration based on personal knowledge, including information available to me from UPM's records in my role as CEO of UPM, in support of UPM's Motion For Summary Judgment ("Motion").

2.      I was UPM's corporate designee for the Rule 30(b)(6) deposition of UPM, taken in this matter over the course of three days (October 25 – October 27, 2021). This declaration summarizes and supplements some of my testimony for UPM during that deposition. In addition, certain matters raised at that deposition led me to conduct a detailed review of information in UPM's records to determine with precision how many minutes of traffic UPM sent to Digicel-Haiti's network, over what specific periods of time, and using which methods of doing so, as well as how much money UPM paid to Digicel-Haiti, during different time periods, for usage on Digicel-Haiti's network.

**High-Level Description of UPM's Operations and Records**

3.      The time period relevant to this case is August 2011 through November 2014. UPM first sent calls to Digicel-Haiti's network in August 2011; ceased sending calls to Digicel-Haiti's network in March 2012; then resumed again between April and December of 2014. UPM has sent no minutes to Digicel-Haiti's network since December 2014. Terminating calls to Digicel-Haiti's network in Haiti was never a significant portion of UPM's total business.

4.      During the relevant time period, UPM's main business was to be a reseller of international telecommunications services. At a high level, UPM would participate in the spot market for international resale to identify other carriers who had traffic to terminate to different countries. UPM would then attempt to identify ways to get calls to those countries at a cost to UPM that was lower than the price the carriers were willing to pay to get their traffic delivered.

5.      As a matter of physical network configuration, UPM's resale business always entailed the following basic scenario. First, calls from our customers (the carriers we

Page 2- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

were selling call termination to) would send their traffic to UPM, via the Internet, in Voice-over-Internet Protocol ("VoIP") format. These calls would arrive, using UPM's connections to the Internet, at UPM's "softswitch." A softswitch is a specialized computer program, running on computer servers connected to the Internet.

6.     The softswitch would access a routing table that UPM would regularly update. The softswitch would use the information in the routing table to send the calls bound for a particular network in a particular destination country along a particular "route." In this context a "route" is essentially an Internet Protocol ("IP") address, either of a third party carrier from whom UPM was buying call termination services, or of a UPM "Gateway" device, typically located in the destination country, that UPM would use to initiate wireless calls on the destination network.

7.     In practical terms, the calls came from the Internet to UPM's softswitch, and the softswitch sent them back out, also via the Internet, either to another carrier or to UPM's own equipment – again, typically in a destination country. Every call that UPM sent for termination during the relevant period passed through our softswitch in the manner described above.

8.     As part of its normal operation, the softswitch records a range of information about each call that UPM handled, including its duration, the number being called, and whether it was routed to a third-party network or to UPM equipment. These records are known in the telecommunications industry as "Call Detail Records," or "CDRs."

9.     The primary function of CDRs is billing. In the international resale industry, every significant participant both buys and sells call termination to a range of destination networks. The rates carriers charge for termination to a given network in a given destination country could change daily. Also, margins (the difference between what a company can charge for call termination to a given destination network, and its costs to buy or provide that call termination) were typically very thin.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

10.     For these reasons, it was extremely rare for participants in this industry to extend credit to each other. Instead, carriers in this industry would bill each other regularly – typically weekly or even more frequently – and expect payment in cash (typically wire transfer) essentially immediately.

11.     In these circumstances, it was extremely important that a carrier have accurate systems for recording and analyzing CDRs. Each carrier would have its own set of CDRs, generated and recorded on its own equipment, reflecting every call that it sent to or received from any other carrier. These CDRs allowed each carrier to effectively "audit" any bill it received by checking the minutes being billed by the other carrier, against that carrier's own CDRs. It was common for carriers to send an electronic file containing the CDRs (essentially a large spreadsheet) along with a bill to ensure that the buyer and seller would agree on how many minutes of use had been exchanged.

12.     As part of its functioning in this industry, therefore, UPM recorded CDRs for every call that it handled, including all calls that UPM sent, via any route, to Digicel-Haiti's network in Haiti.

13.     In addition to CDRs, UPM also had other automatically-generated records, two of which are relevant here. First, when UPM itself was providing call termination on a destination network, it would need to acquire SIM ("Subscriber Identity Module") cards for use on that network, and also to "top up" or "recharge" those cards, which simply means paying for usage on the destination network. Each SIM card has a unique identification number, as well as a telephone number assigned to it by the destination network. For purposes of UPM's business, the telephone number represented an account on the destination network's system. Third-party vendors would sell recharges on a range of destination networks. This would be handled electronically. UPM would transmit to the third-party vendor the telephone number of the SIM card that UPM wanted to recharge, along with the amount to be recharged. The third-party vendor would then transfer the funds to the destination network, to be credited to the appropriate

Page 4- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

SIM card's account. UPM has records of the recharges it purchased, itemized by telephone number.

14.    Second, in addition to CDRs, at least for 2014, UPM has records reflecting the specific usage made with, and recharges applicable to, each SIM card. These records were generated using software that UPM itself developed for this purpose.

15.    In addition, UPM has normal accounting records associated with its business – the bills it sent to carriers to whom it was selling call termination, the bills it received from carriers from whom it was buying call termination, etc.

16.    I have retrieved and reviewed many of these records to develop the information about the scope of UPM's business involving call termination onto Digicel-Haiti's network, as described below.

**UPM's Operations In Haiti**

17.    UPM got calls to Digicel-Haiti's network in three ways: arbitrage, in-country-bypass, and Roam Like You're Home ("RLYH") resale.

18.    "Arbitrage" refers to UPM simply reselling the services of third party carriers. In this scenario, calls would come to UPM's softswitch from its customers, and then be sent out to the carriers from whom UPM was buying call termination onto Digicel-Haiti's network.

19.    "In-country bypass" refers to the situation in which UPM itself got the calls to Digicel-Haiti's network in Haiti. At a high level, UPM would send calls via the Internet to Haiti and, via a local Internet connection, to devices that UPM had sent to Haiti called "Gateways." The Gateways were equipped with standard wireless telephone service radios, which would make calls on Digicel-Haiti's network. Before this could happen, however, UPM had to have acquired SIM cards for Digicel-Haiti's network and recharged those SIM cards – paid money to Digicel-Haiti via third-party vendors – so that the calls would go through.

Page 5- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

20.    UPM acquired Digicel-Haiti SIM cards by paying contractors (individual people) in Haiti to buy them at retail. In Haiti it was not difficult to obtain SIM cards from a range of vendors, either in grocery or convenience stores or from booths on the street. It was not necessary to deal directly with Digicel-Haiti in any way to obtain SIM cards. UPM's contractors would charge UPM a mark-up over the retail cost of the SIM cards, effectively as part of their compensation.

21.    The contractors would ship the SIM cards back to UPM in Oregon. UPM would then mount the SIM cards into a device called a "SIM Unit." The SIM Unit is essentially a large SIM card reader, *i.e.,* it is a device that can read the information contained on a SIM card and transmit that information to other UPM equipment and send that information, as needed, to Haiti.

22.    In order to actually make a wireless call on Digicel-Haiti's network (and, in fact, any network using standard technology), it is necessary to authenticate a SIM card on the network. This is a highly technical process, every step of which is set by international standards bodies. UPM is unable to modify or vary the steps involved in the authentication process or to provide any information to Digicel-Haiti's network other than the information called for by these technical standards.

23.    At a high level, however, in order to make a call, the radio in a Gateway would transmit authentication data to Digicel-Haiti's network and, once the network has confirmed that the SIM card is valid and has money in its account, the radio sends the network the number being called. At that point, Digicel-Haiti's network would establish a connection between the Gateway, at one end, and the wireless phone of the party being called, at the other end.

24.    As noted above, the telephone number associated with a SIM card is assigned by the network operator, in this case, Digicel-Haiti. When a Gateway made a call, Digicel-Haiti's network would automatically send to the called party the telephone number that

Page 6- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti itself had assigned to the SIM card whose information was used to authenticate the call. UPM had no control over that process in any way. In the context of a call from a Gateway, there was no means, technically, by which UPM could convey to Digicel-Haiti's network that the call ultimately originated with a third party in another country, and no means, technically, by which UPM could cause Digicel-Haiti's network to send to the called party any telephone number other than the one that Digicel-Haiti itself had assigned to the SIM card.

25.    "RLYH Resale" refers to a specific service that Digicel-Haiti offered to subscribers roaming in the United States. I am not certain when Digicel-Haiti first offered RLYH service, but UPM first used it in 2014. With RLYH, a Digicel-Haiti subscriber in the United States would pay a flat fee of approximately $25, which would then enable calls using the associated SIM card to be made from the United States back to another Digicel-Haiti subscriber at the same rate that a subscriber would pay for a local wireless call in Haiti. After approximately a month, the subscription would run out and, unless the RLYH service was subscribed to again, normal roaming rates would apply for calls back to Haiti.

26.    In UPM's case, in order to subscribe to RLYH, UPM would first recharge a SIM with enough money to cover the cost of the RLYH subscription and a reasonable amount of usage, then send Digicel-Haiti's network the codes needed to activate the RLYH service.

27.    Physically, RLYH resale is similar to in-country bypass, except that the Gateways were located in Oregon, not in Haiti. A call bound for Digicel-Haiti's network would hit UPM's softswitch and be directed, via the Internet, to a Gateway in Oregon, which would initiate a wireless call on the United States network of a Digicel-Haiti roaming partner, such as AT&T. A SIM card enrolled in the RLYH program would be used to authenticate the call. The roaming partner would then get the call back to Haiti.

28.    RLYH resale was superior to in-country bypass for several reasons, notably that in Oregon, both power from the power company and Internet access were readily

Page 7- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

available and stable. RLYH resale also made it unnecessary to ship Gateways to Haiti and arrange for contractors to set them up and keep them operational there.

29.    As the summary above shows, it was never necessary for UPM or its contractors to have any direct dealings with Digicel-Haiti to obtain service on Digicel-Haiti's network. SIM cards and recharges could be, and were, obtained from third-party vendors. It was obviously necessary for UPM's equipment (its Gateways and SIM cards) to exchange data with Digicel-Haiti in order to make calls, but those were entirely technical, standards-driven data exchanges, not any sort of direct business dealing. It was necessary to send some signaling directly to Digicel-Haiti in order to subscribe to the RLYH service, but that, too, was a scripted technical exchange.

30.    In fact, at no point during the entire period relevant to this case did UPM ever have any direct contact with Digicel-Haiti. There were no meetings, no telephone calls, no exchange of letters or emails, and no text messages. UPM did not need to deal with Digicel-Haiti in order to pay for and use Digicel-Haiti's services, and at no point did UPM do so.

**Quantitative Aspects of UPM's Operations in Haiti**

31.    Some time ago in this case, as part of settlement efforts and as part of the discovery process, UPM provided Digicel-Haiti with detailed information, derived from UPM's records described above, detailing how many minutes of traffic UPM delivered to Digicel-Haiti's network during 2014, including minutes delivered in-country bypass and RLYH resale.

32.    Prior to my Rule 30(b)(6) deposition, I had understood that UPM began its in-country bypass operations in Haiti in November 2011. At my deposition, I was presented with some emails that suggested that our operations there had began slightly earlier. My immediate reaction was that any such earlier operations were likely part of our process of testing the routes before actually selling call termination services to our customers. Nonetheless, following my deposition, I performed an in-depth review of UPM's records (principally, our archived CDRs) to identify precisely how much traffic UPM sent to Digicel-Haiti, at what times.

Page 8- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

33.    The result of that review is set out in Exhibit 1 to this Declaration. In summary, UPM's softswitch sent a total of 1,427,255 minutes to UPM Gateways for termination to Digicel-Haiti's network (including both in-country bypass and RLYH resale) during the relevant period (August 2011 through December 2014), and 4,528,886 minutes to third-party carriers (arbitrage) during that period. UPM's first "bypass" minutes were sent in late August 2011. UPM sent bypass minutes to Digicel-Haiti's network from August 2011 through March 2012, and then again April 2014 through October 2014.

34.    During 2014, the overwhelming majority of UPM's non-arbitrage minutes were sent using RLYH resale. Our records show a total of nineteen (19) minutes sent to Gateways in Haiti during 2014. However, there are 931 minutes during that period that our records do not unambiguously assign to either RLYH resale or in-country bypass, so the number of in-country bypass minutes could be as high as 950 during 2014. By contrast, our RLYH resale minutes during this period were 279,669.

35.    I should note that because the total minutes discussed above are based on UPM's CDRs – that is, records from our switch – these figures include minutes that UPM sent through its switch in order to test UPM's own routes and operations.  For example, UPM might send a call authenticated using a SIM associated with one Gateway to another port on the same Gateway, authenticated using a different SIM, in order to test call quality, the stability of the Internet connection between the Haitian Internet Service Provider and UPM's gateway, etc. If it becomes necessary UPM can provide more detailed information regarding test minutes.

36.    In addition to these records, as indicated above, UPM also has records showing the amounts it paid to third-party vendors to recharge the accounts associated with the Digicel-Haiti SIM cards it had purchased. These recharge payments are amounts that UPM paid to be able to use Digicel-Haiti's network. During 2014, UPM paid $109,208 in recharges. During UPM's 2011-2012 operations, UPM paid $101,778 in recharges.  Altogether, UPM paid $211,056 in recharges for its SIM cards on Digicel-Haiti's network.

Page 9- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

37.    With regard to recharges, I note that when Digicel-Haiti blocked a SIM card that UPM was using in its resale operations, Digicel-Haiti simply kept any unused funds in the account associated with the SIM card. These unused funds, retained by Digicel-Haiti, should be considered in determining how much UPM actually paid to Digicel-Haiti for usage of its network.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Executed on November 12, 2021

_____
Bruce Tran

Page 10- DECLARATION OF BRUCE TRAN IN SUPPORT OF
UPM's MOTION FOR SUMMARY JUDGMENT
UPM-L1\00608709.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

TRAN DECLARATION
EXHIBIT 1

| Period | UPM Terminated Minutes | Arbitrage Minutes |
|---|---|---|
| Aug-11 | 616 | 33,836 |
| Sep-11 | 28,451 | 59,348 |
| Oct-11 | 51,292 | 136,087 |
| Nov-11 | 155,032 | 96,317 |
| Dec-11 | 190,596 | 47,680 |
| Jan-12 | 277,505 | 161,021 |
| Feb-12 | 294,691 | 310,249 |
| Mar-12 | 72,196 | 123,818 |
| **Subtotal 2011-2012** | **1,070,379** | **968,356** |
| Mar-14 | - | 4 |
| Apr-14 | 573 | 106 |
| May-14 | 51,297 | 297,661 |
| Jun-14 | 18,377 | 29,592 |
| Jul-14 | 119,879 | 451,056 |
| Aug-14 | 110,718 | 1,054,905 |
| Sep-14 | 53,513 | 1,074,882 |
| Oct-14 | 2,519 | 380,235 |
| Nov-14 | - | 203,299 |
| Dec-14 | - | 68,790 |
| **Subtotal 2014** | **356,876** | **3,560,530** |
| **TOTAL** | **1,427,255** | **4,528,886** |

Exhibit 1
Page 1 of 1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2021, I served the foregoing **DECLARATION OF BRUCE TRAN IN SUPPORT OF DEFENDANT UPM TECHNOLOGY, INC.'S MOTION FOR SUMMARY JUDGMENT** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: November 12, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236