**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

        Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>        Plaintiff & Counterclaim-Defendant,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>        Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)**<br><br>**Oral Argument Requested**<br>**Hearing: January 14, 2022 at 10:00 AM** |

Page 1 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................II

I.      INTRODUCTION ................................................................................................ 2

II.     DIGICEL-HAITI'S MOTION SHOULD BE DENIED BECAUSE IT HAS
        NOT PRESENTED UNDISPUTED FACTS SHOWING BY CLEAR AND
        CONVINCING EVIDENCE THAT UPM COMMITTED FRAUD ............................... 2

        A.      Overview ................................................................................................ 3

        B.      Specific Deficiencies In Digicel-Haiti's Factual Showing ..................................... 5

                1.      Buying and Using Digicel-Haiti's Services Was Not Fraud ....................... 5

                2.      UPM Did Not Falsify or Misrepresent Telephone Numbers or the Fact
                        that Other Calls Were Being Linked to Calls UPM Made ......................... 8

                3.      Shipping Gateways to Haiti Was Not Fraud .......................................... 10

                4.      Moving Gateways Around – If It Even Happened – Is Not Fraud. .......... 10

                5.      Emulating Human Behavior – If It Even Happened – Is Not Fraud......... 11

                6.      Digicel-Haiti's Motion Does Not Address Damages – Which Digicel-
                        Haiti Did Not Suffer................................................................................. 15

                7.      Digicel-Haiti Has Not Shown That UPM's "Representations" Were
                        Material or Constituted Intentional Fraud................................................... 17

                8.      Digicel-Haiti's "Reliance" on the Conclusion that UPM was not Using
                        Digicel-Haiti's Service for Bypass was not Reasonable ......................... 20

                9.      Digicel-Haiti Does Not Explain Why RLYH Resale Was Fraudulent –
                        And It Wasn't. ...................................................................................... 21

III.    FEDERAL LAW BARS HOLDING UPM LIABLE FOR FRAUD ON
        THE FACTS OF THIS CASE ................................................................................. 22

IV.     CONCLUSION.................................................................................................... 27

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**TABLE OF AUTHORITIES**

**Cases**

*Adams v. Knoth,* 102 Or. App. 238, 794 P.2d 796, *rev. denied,* 310 Or. 422, 799 P.2d 151 (1990) ................................................................................................. 15

*Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179 (9th Cir. 1988) ...................................... 13

*Cocchiara v. Lithia Motors, Inc.,* 353 Or. 282, 297 P.3d 1277 (2013) ........................................ 21

*Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or. 332, 225 P.2d 757 (1950) ................................. 2

*Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363 (2000) ...................................................... 24

*Cullinane v. Uber Techs., Inc.,* 893 F.3d 53  (1st Cir. 2018) ........................................................... 4

*Dizick v. Umpqua Cmty. Coll.*, 287 Or. 303, 599 P.2d 444, 448 (1979) ...................................... 2

*Fraser v. Goodale,* 342 F.3d 1032 (9th Cir. 2003) ....................................................................... 13

*Gerke v. Burton Enterprises, Inc.,* 80 Or. App. 714, 723 P.2d 1061, *rev. denied,* 302 Or. 299 (1986) ................................................................................................. 16

*Hurford v. Harned,* 6 Or. 362 (1877) ........................................................................................... 20

*Mead*   26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services,* 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d. 820 (2005) ................................................................... 26

*Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner,* 191 Or. App. 408, 83 P.3d 350 (2004) ................................................................................................ 21

*Orr v. Bank of Am.,* 235 F.3d 764 (9th Cir. 2002) ....................................................................... 13

*Pollack v. D.R. Horton, Inc.-Portland,* 190 Or. App. 1, 77 P.3d 1120  (Or. App. 2003) ............. 18

*Shelter Forest Int'l Acquisition, Inc. v. Cosco Shipping (USA) Inc.,* 511 F. Supp. 3d 1118 (D. Or. 2021) ................................................................................................ 14

*Sizer v. New Eng. Life Ins. Co.,* 871 F. Supp. 2d 1071, (D. Or. 2012) ........................................ 20

*Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944) ............................. 26

*Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253 (D. Or. August 6, 2014) ..................................................................................................... 4

*South Seattle Auto Auction, Inc. v. Western Casualty & Surety Co.,* 41 Or. App. 707, 598 P.2d 1269 (1979) ............................................................................................... 20

*Sprietsma v. Mercury Marine,* 537 U.S. 51 (2002) ................................................................ 24, 26

*Strawn v. Farmers Ins. Co.,* 350 Or. 336, 258 P.3d 1199 (2011) ................................................... 2

*United States v. Mead Corp.*, 533 U.S. 218,  121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) ..................................................................................................... 26

*United States v. Nosal*, 676 F.3d 854, 860 n.7 (9th Cir. 2012) .................................................... 15

*TOMASI SALYER MARTIN*<br>121 SW Morrison Street, Suite 1850<br>Portland, Oregon 97204<br>Telephone: (503) 894-9900<br>Facsimile: (971) 544-7236

*Van Buren v. United States,* __ U.S. __, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021) ................... 15

*Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 220 P.3d 68 (2009)........................ 2

**Other Authorities**

*1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 F.C.C.R. 7963 (1998)....................................................................... 26

*1998 Biennial Regulatory Review; Reform of the International Settlements Policy, supra,* 14 FCC Rcd 7963 (1998).................................................................................. 27

*Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Order, 18 FCC Rcd 6077 (2003) ............................................................................................................... 25, 26

*In the Matter of Regulation of International Accounting Rates,* First Report and Order, 7 FCC Rcd 59 (1991)................................................................................... 24, 27

*In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services,* Report and Order, 83 F.C.C.2d 167 (1980) .............................................................................................. 24, 27

*In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* Report and Order, 60 F.C.C.2d 261 (1976)............. 23, 27

**Rules**

Commission's Rules Relative to Cellular Communications Systems, Report and Order, 86 F.C.C.2d 469 (1981) ........................................................................................ 24, 27

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## I.    INTRODUCTION

Digicel-Haiti's Motion for Partial Summary Judgment (ECF #269) ("Motion") fails for two reasons. First, Digicel-Haiti has to show that the undisputed facts provide "clear and convincing" evidence of each element of a common-law fraud case – that is, clear and convincing evidence that UPM knowingly made material, false representations to Digicel-Haiti; that Digicel-Haiti justifiably relied on them; and that it was damaged as a result.[1] Digicel-Haiti has not made this showing.

Second, Digicel-Haiti's claim depends on characterizing as fraudulent UPM activities that amount to nothing more than UPM taking the steps needed to buy and resell Digicel-Haiti's services. As discussed here and in UPM's own motion for summary judgment,[2] these activities do not support liability for fraud under Oregon common law. To the extent, however, that Oregon law could be interpreted to treat such activity as fraudulent, any such interpretation is preempted by federal law, which affirmatively encourages those activities.

## II.    DIGICEL-HAITI'S MOTION SHOULD BE DENIED BECAUSE IT HAS NOT PRESENTED UNDISPUTED FACTS SHOWING BY CLEAR AND CONVINCING EVIDENCE THAT UPM COMMITTED FRAUD

A review of the facts Digicel-Haiti cites shows that it has not remotely established each element of fraud by clear and convincing evidence.

---

[1] *Strawn v. Farmers Ins. Co.,* 350 Or. 336, 351-52, 258 P.3d 1199 (2011) (elements of fraud); *Dizick v. Umpqua Cmty. Coll.*, 287 Or. 303, 311, 599 P.2d 444, 448 (1979) (requirement of "clear and convincing evidence" of each element); *Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 480, 220 P.3d 68, 77 (2009) (same), *citing Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or. 332, 350, 225 P.2d 757 (1950).

[2] Defendant UPM Technology, Inc.'s Motion for Summary Judgment (ECF #255) ("UPM Motion").

Page 2 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### A. Overview

Digicel-Haiti presents no facts suggesting that UPM did anything to Digicel-Haiti other than to use Digicel-Haiti's services. It asserts (and UPM does not deny) that UPM bought SIM cards; that it bought top-ups; that it activated the SIM cards on Digicel-Haiti's network; and that it used the local network, with the SIM cards, paid for by the top-ups.[3] Digicel-Haiti's problem is *how* UPM used the services it bought – connecting Internet-delivered traffic to those services. Digicel-Haiti's argument boils down to claiming that if someone used its services in a way it did not want, that constitutes fraud.[4]

But Digicel-Haiti's desires did not magically impose legal obligations on UPM. Digicel-Haiti was free to impose contractual restrictions on its subscribers had it wanted to. It could have sold SIM cards directly to the public and required purchasers to sign a contract that barred resale or bypass. It could have sold top-ups directly to the public, and required online top-up purchasers to click "I agree" before accepting their money. It could have required subscribers to access a website through their phones, and click "I agree" before making any calls.

Digicel-Haiti, however, did none of those things. Instead, it affirmatively chose to arrange its business to avoid directly engaging in retail transactions. Subscribers purchased SIM cards from independent dealers, not from Digicel-Haiti.[5] Subscribers purchased top-ups from

---

[3] Motion at 2-3.

[4] Motion, *passim.* Digicel-Haiti's motion is particularly untenable in its brief discussion of UPM's resale of Roam Like You're Home ("RLYH") service. While most of this brief relates to both in-country bypass (where UPM placed gateway devices in Haiti) and RLYH resale, we note where an argument applies only to in-country bypass, and we separately address RLYH resale below. *See infra.*

[5] Deposition Transcript of UPM's Rule 30(b)(6) corporate representative Bruce Tran ("UPM Depo."), 64:7-9, 98:2-8, 103:2-12, 104:5-21; Deposition Transcript of Digicel-Haiti's Rule 30(b)(6) corporate representative Maarten Boute ("Digicel(I) Depo."), 166:11-24; Deposition Transcript of Paul Flanagan ("Flanagan Depo."), 11:2-12. The UPM Depo., Digicel(I) Depo. and Flanagan Depo. are attached to the Declaration of Christopher W. Savage in Support of Defendant UPM Technology, Inc.'s Motion for Summary Judgment (filed under seal) (ECF #258) ("ECF

Page 3 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

independent dealers, not from Digicel-Haiti.[6] And the only thing Digicel-Haiti cared about when a SIM card authenticated itself on the network to make a call is whether there was money in the account.[7] As a result of these business decisions, UPM was not in any position to make, and did not make, any representations to Digicel-Haiti – there was no way for it to do so when using the service – and any "representations" it did make to Digicel-Haiti were true. UPM, therefore, did not defraud Digicel-Haiti. All that happened is that UPM used Digicel-Haiti's services in a way that Digicel-Haiti did not like, but that was not barred by any terms of service.[8]

To concoct fraud out of whole cloth, Digicel-Haiti claims – or, more accurately, unilaterally declares, after the fact – that any time a subscriber used its services, that usage somehow amounted to a "representation" that the original calling party was physically located in Haiti – even though there was no such obligation imposed on any subscriber. On this basis, it concludes that if the original calling party wasn't in Haiti, that means the subscriber lied.[9] But that is like a car dealer declaring that anyone who test-drives a new SUV is representing that they will buy it, then suing people for fraud when they buy a less expensive sedan, or like a restauranteur declaring that anyone who sits down to dinner is representing that they will buy dessert, then suing

---

#258").

[6] ECF #258, Digicel(I) Depo., 73:12-74:7; UPM Depo., 607:1-609:8.

[7] ECF #258, Digicel(I) Depo., 25:22-26:7, 48:3-7; 50:9-25, 75:19-76:9. 77:15-78:6; Flanagan Depo., 51:10-52:25; *see* UPM Depo., 130:11-17.

[8] This conclusion is not affected by Digicel-Haiti's argument that UPM had "full knowledge that Digicel-Haiti actively objected" to bypass. Motion at 9. When push came to shove, Digicel-Haiti did not take even the most obvious, basic steps to impose a "no bypass" condition on its subscribers. *See Cullinane v. Uber Techs., Inc.,* 893 F.3d 53, 62-64 (1st Cir. 2018) (customers must have conspicuous notice of terms for them to be binding). To the same effect is *Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253, at *42-48 (D. Or. August 6, 2014). That case explains the difference between contractual "covenants," which are merely promises, and "conditions," which must be met for contractual rights to be valid in the first place. If Digicel-Haiti had wanted to impose a "no bypass" condition on its subscribers, it would have had to use "clear and unambiguous language" to do so – and it obviously did not.

[9] Motion, *passim.*

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

diners for fraud when all they have after dinner is coffee. Customers are not bound by what a vendor *wants.* Customers are bound by what they *agree to in a contract.* One can imagine law-school-hypothetical scenarios where the car-buyer or the diner might have entered into a contract to buy the SUV or the apple pie and, as suggested above, one can readily imagine scenarios in which Digicel-Haiti subscribers could have been required to agree not to use its services for bypass. But in the absence of such contractual restrictions, claiming that the car buyer, or the diner, or UPM, committed fraud is pure fantasy.[10]

### B. Specific Deficiencies In Digicel-Haiti's Factual Showing

#### 1. Buying and Using Digicel-Haiti's Services Was Not Fraud

Digicel-Haiti recites facts that amount to showing that UPM bought and used Digicel-Haiti's services,[11] but UPM's simple act of buying and using Digicel-Haiti's services was not fraud. UPM used the SIM cards and usage it had bought and paid for to initiate calls in Haiti (where UPM's gateways were located) or in Oregon (for RLYH resale). That service the ability to make calls – is what Digicel-Haiti was selling.[12] As discussed in UPM's Motion, using those services was not a "representation" by UPM to Digicel-Haiti about anything, and therefore cannot

---

[10] The undisputed facts show that Digicel-Haiti will have a difficult time showing that it legitimately expected to receive the $0.23 per minute rate for bypass calls in the first place. When it determined that a SIM card was being used for bypass, it did not start charging $0.23 per minute for calls, nor did it remit the $0.05 per minute tax to the Haitian government for calls that SIM card had made. It simply "banked" the money that remained in the SIM card's account. *See* ECF #258, Digicel(I) Depo., 145:18-146:2; Flanagan Depo., 106:17-107:1. In fact, its decision to keep that money destroys its fraud case, by destroying its damages claim. *See infra*.

[11] Motion at 1-2.

[12] In this regard, one of Digicel-Haiti's expert witnesses agreed that there is no technical difference between a bypass call and a plain old local call in Haiti. Deposition Transcript of Kenneth McEwen ("McEwen Depo.") attached as Exhibit 1 to the Declaration of Christopher Savage in Support of Defendants' Oppositions to Digicel-Haiti's Motions ("Savage Opp. Dec."), 126:15-127:1.

Page 5 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

constitute fraud.[13]

As relevant here, Digicel-Haiti has failed to show that the mere use of its services was a "representation" of anything to Digicel-Haiti, or that any such "representation" was false. UPM addresses each of Digicel-Haiti's specific factual claims below. The key point here, though, is that, noting in the law of fraud permits Digicel-Haiti to unilaterally declare what a subscriber "means" when the subscriber uses Digicel-Haiti's services and then claim that the subscriber lied when they did not "mean" anything of the sort.

While not quite a factual claim, Digicel-Haiti also asserts that UPM "illegally sourced and acquired SIM cards … from third parties [rather than buying] them from an authorized dealer.[14] But – to the extent that this claim is relevant – nothing that Digicel-Haiti cites remotely supports this assertion.

First, Digicel-Haiti cites its own complaint, with no pin-cite to any particular allegation.[15] Pin-cite or no, Digicel-Haiti's bare allegations are not sufficient to support a motion for summary judgment. In any event, as UPM explained in its own summary judgment motion, Digicel-Haiti chose to structure its business such that it, itself has no role in the retail sale of SIM cards. Instead, it sells those SIM cards to distributors, who then re-sell them to the public.[16] Having divorced itself from the retail sale of SIM cards, it cannot rely on the circumstances by which subscribers acquire them to support a fraud claim.

Second, Digicel-Haiti cites several paragraphs of UPM's Answer to support its

---

[13] UPM Motion, *passim.* UPM respectfully refers the Court to that filing for more detail on this point.

[14] Motion at 7, 8-9

[15] *See, e.g.,* Motion at 1, 7.

[16] UPM Motion at 12-13, *citing* ECF #258, Digicel(I) Depo., 166:11-24; Flanagan Depo., 11:2-12. *See also Id.* at 6, *citing* ECF #258, UPM Depo., 64:7-9, 98:2-8, 103:2-12, 104:5-21.

Page 6 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

claims of "illegality."[17] In each cited paragraph, however, UPM simply admits that it acquired SIM cards in Haiti, while denying the characterizations and innuendo Digicel-Haiti tried to associate with that fact.

Third, Digicel-Haiti cites UPM's earlier motion to compel (ECF #247), which notes precisely those same admissions.[18] Nothing about these materials suggests that there was anything "illegal" about UPM's acquisition of SIM cards.[19]

Fourth, Digicel-Haiti cites certain UPM admissions from earlier in the case.[20] In those admissions, again, UPM states that it paid agents in Haiti to buy SIM cards and ship them back to Oregon, with no mention of any "illegality" associated with those actions.

Finally, Digicel-Haiti cites part of an extended discussion with UPM's Rule 30(b)(6) witness about how UPM acquired SIM cards.[21] But nothing about that discussion remotely suggests that UPM obtained SIM cards "illegally." To the contrary, it indicates that UPM instructed its agents to acquire SIM cards and ship them back to Oregon, with the assumption being that the agents would buy them "in the supermarket" or "on the streets."[22]

UPM obviously rejects the notion that it did anything illegal in acquiring SIM cards, and there is no evidence to suggest that it did. But even if it did, that has no bearing on Digicel-

---

[17] Motion at 1-2, 7, *citing* Defendants' Amended Answer, Affirmative Defenses And Counterclaims To Plaintiff's Third Amended Complaint And Demand For Jury Trial (ECF #244) ("UPM Answer") at ¶¶ 50, 57, 65, 68, 82-83, 86, 97, 129.

[18] *Id*. at 1-2, *citing* ECF #247 at 3.

[19] Digicel-Haiti also cites "section C" of that motion to compel. Motion at 3, 7. The only "section C" of that filing relates to UPM's claims regarding RLYH resale, and does not appear to have anything to do with acquiring SIM cards.

[20] Motion at 2-3, 7, *citing* Ex. 8, UPM Response to First Request for Admission.

[21] Motion at 7, *citing* UPM Dep., 106-110.

[22] Savage Opp. Dec., Ex. 2, UPM Depo., 106:23-107:11; 107:20-108:3. Because UPM was relying on in-country agents to obtain the SIM cards, UPM does not know precisely how each SIM card was acquired. *See id.* at 109:10-19. But the gap between UPM not having complete knowledge of how each and every SIM card was acquired, and the conclusion that UPM acquired them illegally, is unbridgeable.

Page 7 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Haiti's fraud claim. Suppose, hypothetically, that some UPM agent in Haiti held up a SIM card distributor at gunpoint, stole SIM cards, and shipped them to UPM. Because of the way Digicel-Haiti structured its business (selling SIM cards to independent distributors), Digicel-Haiti itself no longer owned the SIM cards, and had already been paid for them. Moreover, they would not work until UPM paid to have them topped up. So as far as Digicel-Haiti is concerned, the (hypothetical) stolen SIM cards would be just like any other SIM cards used to make calls on its network. If a thief steals someone's phone, that is obviously bad behavior. But if the thief then tops it up with the thief's own money, Digicel-Haiti is not defrauded when the thief uses the stolen phone to make calls. If someone pays a ski resort for a lift ticket, they are not defrauding the resort if they go up the lifts and down the mountains on stolen skis. Or, vary the hypothetical and assume that a distributor decided as a matter of charity (or for some totally random reason) to simply give SIM cards to one of UPM's agents. Digicel-Haiti would not be defrauded when those SIM cards were topped up and used to make calls. Ultimately, Digicel-Haiti never connects any concern about **how** UPM acquired SIM cards with any claimed fraud that UPM supposedly committed against Digicel-Haiti. In fact, there is no such connection.

### 2. UPM Did Not Falsify or Misrepresent Telephone Numbers or the Fact that Other Calls Were Being Linked to Calls UPM Made

Digicel-Haiti argues that "UPM concealed … the original telephone number[s]" of the ultimate calling parties, as well as "the fact that there was another call" being connected to the Digicel-Haiti service.[23] This is simply untrue, and nothing Digicel-Haiti cites suggests otherwise.

First, Digicel-Haiti cites the deposition of Baltazar Ruiz, a former UPM employee,[24] who said nothing about concealing telephone numbers or concealing the fact that inbound international calls transported via the Internet were being connected to Digicel-Haiti's

---

[23] Motion at 6; *Id.* at 6-8.

[24] *Id., citing* Savage Opp. Dec., Ex. 3, Deposition Transcript of Baltazar Ruiz ("Ruiz Depo.") at 50:11-20 and 234-12-18.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

network. In the first cited portion of his deposition, Mr. Ruiz simply states that UPM sent calls to Haiti via the Internet (using "VoIP," or "Voice over Internet Protocol") and converted those calls to "GSM" (which stands for "Global Standard for Mobility") in order to terminate them on Digicel-Haiti's network. In the second cited portion of his deposition, Mr. Ruiz, responding to a question as to why UPM did not contact Digicel-Haiti directly, said (in effect) that bypassing Digicel-Haiti's international gateway switch was a less expensive way to terminate calls in Haiti. There is no dispute that UPM did those things, but doing them does not constitute any sort of "concealment."

Second, Digicel-Haiti cites two paragraphs from UPM's Answer.[25] But these paragraphs point out that UPM itself had nothing to do with the telephone number that Digicel-Haiti associated with an incoming call. Instead, they state (correctly) that the telephone number associated with an incoming call was determined by the number that Digicel-Haiti, in its own systems, associated with the SIM card authenticating the call – a point amply confirmed by Digicel-Haiti's own witnesses.[26]

This was (and is) the normal operation of the service that Digicel-Haiti was selling. Nothing in Digicel-Haiti's Motion provides any justification for treating the fact that its own systems determined the telephone number associated with a SIM card as concealing anything, or as a representation by UPM that it was not linking an inbound international call to the Digicel-Haiti service for which UPM had paid. This is simply Digicel-Haiti trying to retroactively impose a contractual condition ("do not use this service for bypass; do not link other calls to a call established using the service") by contorting the mechanical and automatic operation of its own systems into a representation by UPM. This logic not only fails to support summary judgment for

---

[25] *Id., citing* UPM Answer-at ¶¶ 303-304.

[26] ECF #258, Digicel(I) Depo., 48:18-49:8; Digicel(II) Depo., 16:14-17:7; 19:5-20; 77:15-78:6. *See also* ECF #258, UPM Depo., 163:3-19, 164:8-19, 604:11-605:20; Declaration of Bruce Tran, as CEO of UPM ("Tran UPM Dec.") (ECF #256), ¶ 24.

Page 9 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti; it actually supports granting summary judgment for UPM *against* Digicel-Haiti.[27]

### 3. Shipping Gateways to Haiti Was Not Fraud

Digicel-Haiti next notes that UPM shipped gateways to Haiti.[28] UPM indeed did so, but Digicel-Haiti fails to explain how UPM shipping gateways to its agents there – not to Digicel-Haiti – did or could constitute a "representation" to Digicel-Haiti or could constitute "concealment" of anything from Digicel-Haiti. There is no evidence that Digicel-Haiti even knew about UPM's shipments to Haiti, much less that it relied on the existence of or facts surrounding those shipments in providing services to UPM. So, those facts and circumstances have no bearing on Digicel-Haiti's fraud claim. UPM mislabeling its gateways to ease their way through Haitian customs may not reflect well on UPM, but that does not convert UPM's shipments into material false representations made by UPM *to Digicel-Haiti*. By way of analogy, if someone smuggles a computer into the United States, that does not mean they are defrauding the electric company when they plug it in and charge it up. Further, if someone illegally crosses the border into the United States, that does not mean they are defrauding the hotel where they pay to spend the night or the restaurant where they pay for a meal. So even if – as Digicel-Haiti claims – UPM got its gateways into Haiti illegally, that may be a problem between UPM and Haitian customs officials, but it is not relevant to the claim that UPM defrauded Digicel-Haiti.

### 4. Moving Gateways Around – If It Even Happened – Is Not Fraud

In further pursuit of its "concealment" theme, Digicel-Haiti states that UPM's

---

[27] Digicel-Haiti's argument is not improved by characterizing the linking of an inbound international call with a call using Digicel-Haiti's service as "packaging" two calls together. *See* Motion at 7. The question for purposes of Digicel-Haiti's fraud claim is whether UPM's use of its services amounted to a "representation" of anything from UPM to Digicel-Haiti. In the absence of a contractual obligation on UPM that it would only use the services for certain specified purposes and not otherwise, there is no basis to treat that usage as "representing" anything. *See* UPM Summary Judgment Motion at 12-19.

[28] Motion at 2, 7.

Page 10 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

gateways "were also frequently re-located in-country."[29] But Digicel-Haiti cites to nothing on the record to support this claim – much less to support its further speculation that the reason for such claimed "re-locations" was "to avoid detection based on usage patterns."[30] In fact, there is no evidence that UPM's in-country agents moved gateways around.

What the available evidence does show is that UPM faced recurring problems with the operation of its gateways in Haiti, arising from unreliable power and Internet access.[31] To the extent that UPM's in-country agents moved the gateways, therefore, the key reason was likely simply achieving technical stability for them. And – though it would seem to be obvious – one of the key characteristics of a wireless service is that it enables the user to move from one place to another: a subscriber can make calls with her wireless phone at home, then at the coffeeshop on the way to work, then at the office. So here again, Digicel-Haiti is trying to convert a natural characteristic of the use of its services – UPM bought a service whose key characteristic is *mobility,* and then *moved!* – into evidence of fraud, without bothering to tether its (unsupported) factual claim to any of the elements of the tort.

### 5.    Emulating Human Behavior – If It Even Happened – Is Not Fraud

In this same vein, Digicel-Haiti asserts that UPM used "specialized human behavior software" that supposedly "creat[ed] the false impression that calls were being placed by individual … subscribers."[32] Digicel-Haiti's support for that claim is thin indeed. In fact, there is no "clear and convincing evidence" that UPM deployed human behavior software for its operations in Haiti, and no evidence that any such UPM software created any "impression" on Digicel-Haiti.

---

[29] Motion at 3.

[30] *Id.*

[31] Savage Opp. Dec., Ex. 2, UPM Depo., 578:14-18; 579:10-25. This is one reason that in 2014, UPM shifted away from placing its gateways in Haiti and instead focused its operations on resale of Roam Like You're Home ("RLYH") service, from within the United States.

[32] Motion at 3; *see id*. at 7-8.

Page 11 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

First, Digicel-Haiti cites an earlier UPM motion to compel that had nothing to do with the question of human behavior software.[33] Second, it cites a UPM response to a request for admission in which UPM admits that it used "software to select which SIM Card should be used to route a call" – which it did, but nothing about that admission suggests anything about how the software worked, much less that it selected among SIM cards with an eye towards emulating human behavior or creating false impressions on the part of Digicel-Haiti.[34] Third, it cites a portion of the UPM Rule 30(b)(6) deposition in which UPM states that it *has* proprietary software to make SIM cards "simulate normal human usage," without any context or explanation as to how UPM used that software. What the testimony actually makes clear is that the software was used "in a lab environment,"[35] and was essentially "a call generator" that "has features to make calls" and "can be used for many different purposes."[36] Indeed, at no point in the sequence of questions about this software was UPM's witness even asked whether UPM ever used that software in Haiti, and there is no indication that it did. This is hardly "clear and convincing" evidence that UPM deployed and used software in connection with its operations in Haiti designed to emulate human calling patterns in its operations with the purpose of deceiving Digicel-Haiti.

Later, Digicel-Haiti cites one of its own witnesses to support its claim that UPM "used software to replicate the calling patterns of a 'normal' human being."[37] The first problem with citing this testimony is that the witness was simply describing what "human behavior software" is, not asserting that UPM used it. But the second, more fundamental problem, is that

---

[33] Motion at 3, *citing* "Sec. C" of ECF #247, a UPM motion to compel discovery. But the only "Section C" of that filing relates to UPM's Communications Act counterclaim against Digicel-Haiti, and has nothing to do with human behavior software.

[34] *Id.* at 3, *citing* Ex. 8, UPM Response to First Request for Admission, No. 22.

[35] Savage Opp. Dec., Ex. 2, UPM Depo., 552:8-553:12.

[36] *Id.*

[37] Motion at 8, *citing* McEwen Depo., 127-128.

Page 12 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the witness made abundantly clear that his testimony was not based in any way on any specific knowledge about UPM.[38] So this testimony has no bearing on what UPM actually *did.*

Finally on this point, Mr. Ruiz (a former employee, not UPM's Rule 30(b)(6) witness), in response to some general questions about UPM's use of human behavior software, indicated that it was used with regard to Digicel-Haiti.[39] There is no evidence, however, that Mr. Ruiz had any role in UPM's operations in Haiti or that he was in a position to know what UPM did to support those operations.[40] Particularly in light of the testimony of UPM's Rule 30(b)(6) witness, this unclear recollection from a former employee who had unrelated responsibilities cannot constitutes the "clear and convincing" evidence Digicel-Haiti needs to establish this point.[41]

But even if UPM did what Digicel-Haiti says it did, that would still not support a claim of fraud. UPM knew that Digicel-Haiti had the practical, real-world power to deauthenticate SIM cards for which UPM had paid, and that Digicel-Haiti would use that power if it concluded that the SIM cards were being used for bypass. That deauthentication may or may not have been

---

[38] Savage Opp. Dec., Ex. 1, McEwen Depo., 26:25-27:5 (no direct knowledge of any "investigations" of UPM's activities); *id.,* 30:11-25 (although witness is aware of the existence of others' "investigations" into UPM, that awareness did not affect his expert report); *see also id.,* 146:12-148:22 (witness comments about UPM use of RLYH service not based on any knowledge about UPM itself).

[39] Savage Opp. Dec., Ex. 3, Ruiz Depo., 287:24-289:2.

[40] *See* Savage Opp. Dec., Ex. 3, Ruiz Depo., 35:15-36;12 (his job at UPM was Network Operations Center ("NOC") manager, later demoted to NOC engineer); 40:19-42:6 (duties were to manage Spanish-speaking NOC employees and IT infrastructure in Portland; duties did not include anything to do with UPM's gateways). Anything Mr. Ruiz may have believed about UPM's use of human behavior software would therefore appear to be inadmissible hearsay. A motion for summary judgment, however, must be supported with ***admissible*** evidence. *Fraser v. Goodale,* 342 F.3d 1032, 1036 (9th Cir. 2003), *citing Orr v. Bank of Am.,* 235 F.3d 764, 773 (9th Cir. 2002); *see also Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1181-82 (9th Cir. 1988). From this perspective, Digicel-Haiti's failure to ask UPM's Rule 30(b)(6) witness whether human behavior software was actually used in connection with UPM's activities in Haiti is telling.

[41] There are independent reasons to be skeptical of Mr. Ruiz's recollections of events that occurred many years ago. *See* Savage Opp. Dec., Ex. 3, Ruiz. Depo., 9:2-15:13.

Page 13 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

legal with respect to SIM cards being used in Haiti.[42] But nothing in any contract between UPM and Digicel-Haiti barred bypass, which suggests that *Digicel-Haiti* was breaching the implied-in-fact contract between the parties by cutting off SIM cards it concluded were being used for bypass. Moreover, nothing in any contract barred the use of human behavior software. UPM logically wanted to maximize the use of the SIM cards it had purchased and the money it had paid to top them up. Taking steps – not barred by any term of service – to conform the usage of its SIM cards to human calling patterns would tend to delay Digicel-Haiti's deauthentication. It would therefore have been an entirely reasonable and legitimate step for UPM to have taken.[43]

This again highlights the fundamental problem with Digicel-Haiti's fraud case, which is that what Digicel-Haiti is really trying to do is use the tort of fraud to retroactively impose *contractual* restrictions – essentially, terms of service – onto UPM, when in fact no such restrictions existed. No contract barred UPM from using the Internet to avoid Digicel-Haiti's international gateway switch. No contract barred UPM from using gateways in Haiti (or anywhere else). No contract barred UPM from linking inbound international calls to gateways located in Haiti. No contract barred UPM from using software to try to emulate human usage patterns. No

---

[42] It clearly *was* illegal in the United States; this is the basis for UPM's Communications Act counterclaim.

[43] From this perspective, UPM had a duty to attempt to mitigate the damages it would sustain by virtue of Digicel-Haiti's breach of the parties' implied-in-fact contract (that is, Digicel-Haiti's failure to permit UPM to use its topped-up SIM cards to make calls on Digicel-Haiti's system). *See, e.g., Shelter Forest Int'l Acquisition, Inc. v. Cosco Shipping (USA) Inc.,* 511 F. Supp. 3d 1118, 1126 (D. Or. 2021) (non-breaching party has duty to mitigate damages). UPM also notes that there is a certain tension in Digicel-Haiti's case on the issue of human behavior software. Specifically, the more that the usage pattern of a SIM card being used for bypass looked like the normal usage of an individual human subscriber, the less unusual stress or burden on Digicel-Haiti's network that SIM card would create. And, it is undisputed that any given bypass call is technically identical to a plain old local call. ECF #258, Digicel(I) Depo., 146:10-24; Savage Opp. Dec., Ex. 1, McEwen Depo., 126:15-127:1. To the extent that Digicel-Haiti was actually concerned about the impact of bypass on its network (as opposed to simply issues of the price to be charged for calls), it should have welcomed the use of human behavior software – the more effective, the better.

---

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

contract barred UPM from doing any of the things that Digicel-Haiti is complaining about. And –granting that Digicel-Haiti did not want UPM to do those things – the reason no contract existed to bar such actions was Digicel-Haiti's own business decisions to divorce itself from direct relationships with subscribers in selling SIM cards and top-ups.

UPM's research has revealed no case in any United States jurisdiction where a court found it to be fraudulent for a subscriber to pay for and use a service in a manner different than the service provider wanted but that was not barred by a contract between the subscriber and the service provider. As indicated in UPM's Motion,[44] the closest analogy is the situation under the Computer Fraud and Abuse Act,[45] where someone with access to a computer system uses it in a manner that violates applicable terms of service. The Supreme Court has expressly rejected the notion that such activity constitutes fraud or abuse for purposes of that statute,[46] and expressly rejected the government's argument that the statute covers violations of "purpose-based limits contained in contracts and workplace policies."[47] In the context of this case, UPM and Digicel-Haiti certainly disagree about what uses of Digicel-Haiti's services were or were not permitted. But that disagreement is, at most, a *contract* dispute, not a fraud case.

### 6.  Digicel-Haiti's Motion Does Not Address Damages – Which Digicel-Haiti Did Not Suffer

Under Oregon law, "[an] essential element of a fraud claim is damages." *Adams v. Knoth,* 102 Or. App. 238, 243, 794 P.2d 796, 799, *rev. denied,* 310 Or. 422, 799 P.2d 151 (1990); *Gerke v. Burton Enterprises, Inc.,* 80 Or. App. 714, 720, 723 P.2d 1061, *rev. denied,* 302 Or. 299

---

[44] *See* UPM Motion at 19.

[45] 18 U.S.C. § 1030.

[46] *Van Buren v. United States,* __ U.S. __, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021).

[47] *Id.* at 1659. *See also United States v. Nosal*, 676 F.3d 854, 860 n.7 (9th Cir. 2012) (*en banc*) (noting that violating an employer's policies for using workplace computers may justify firing an employee but does not constitute fraud under the statute).

Page 15 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

(1986). It follows that Digicel-Haiti is not entitled to summary judgment as to UPM's *liability* for fraud without showing there are no disputes as to Digicel-Haiti's alleged *damages* for fraud. In fact, there are substantial disputes regarding damages.

Digicel-Haiti argues that summary judgment is appropriate even if "the amount of damages" is still in dispute.[48] Fair enough, but "the amount of damages" is not the issue. Here, the parties dispute whether Digicel-Haiti was damaged at all. As explained in UPM's motion for summary judgment, Digicel-Haiti has no records of how many minutes of Digicel-Haiti's services UPM used or how much UPM paid Digicel-Haiti for the use of those services.[49] This means that UPM's detailed records regarding those matters are the only evidence available in this case.[50] The undisputed evidence from those records shows that (1) UPM completed 1,071,329 minutes of in-country bypass traffic; and (2) UPM paid Digicel-Haiti $211,056 in top-ups to pay for its usage.[51] While Digicel-Haiti's nominal price for inbound international calls was $0.23 per minute, $0.05 of that was simply passed through to the Haitian government. Both Digicel-Haiti's CEO (in his role as Rule 30(b)(6) witness) and one of its experts acknowledged that Digicel-Haiti only kept $0.18 per minute for inbound international calls routed through its gateway switch.[52] But dividing UPM's payments by the number of in-country bypass minutes means that Digicel-Haiti received $0.197 cents from UPM for each in-country bypass minute that UPM completed. That is, applying simple mathematics to the only available relevant information shows that ***UPM has already paid Digicel-Haiti more than it would have received absent UPM's allegedly fraudulent conduct.*** In other words, Digicel-Haiti was not damaged by UPM's actions.

At a minimum, this means that there is a very substantial material dispute as to

---

[48] Motion at 6 & n.3.

[49] UPM Motion at 29-30, *citing* ECF #258, Digicel(I) Depo., 57:22-58:20.

[50] *Id.* at 29-31, *citing* Tran UPM Dec. at ¶¶ 8-15.

[51] *Id.* at 30, *citing* Tran UPM Dec. at ¶¶ 31-34 and Exhibit 1.

[52] ECF #258, Digicel(I) Depo., 135:14-135:2, 139:12-24; McEwen Disclosure at 5 ("Digicel makes $0.18 per minute and the Haitian Government makes $0.05…").

Page 16 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

whether Digicel-Haiti was damaged; this alone bars granting summary judgment in Digicel-Haiti's favor. In fact – given that UPM's records are the only source of evidence on this point – this shows that the Court should grant summary judgment *against* Digicel-Haiti, since the undisputed facts show that Digicel-Haiti was *not* damaged, and thus show that Digicel-Haiti has not proven, and cannot prove, one of the required elements of fraud.

### 7. Digicel-Haiti Has Not Shown That UPM's "Representations" Were Material or Constituted Intentional Fraud

Digicel-Haiti tries to skate by its obligation to demonstrate that the undisputed facts show by "clear and convincing evidence" that UPM's supposed "representations" were material and that UPM intended to defraud Digicel-Haiti.[53] This entire section of the motion is very long on innuendo and arm-waving and very short on purportedly undisputed facts.

### a. UPM Did Not Make Any Material Representations to Digicel-Haiti

First, as discussed in UPM's motion for summary judgment, UPM did not make any meaningful "representations" to Digicel-Haiti at all,[54] and, to the extent that its communications with Digicel-Haiti's equipment could constitute "representations", they were all true.[55] The absence of any representations by UPM is confirmed by Digicel-Haiti's own argument: to support its claim that UPM's "representations" were "material," it refers to UPM having "shipped supplies" to, and placed "equipment" in, Haiti and having "acquired SIM cards through fraudulent or illegal means."[56] As discussed above, however (and putting aside that there was nothing illegal about acquiring SIM cards), neither shipping things to Haiti nor acquiring SIM cards involved any contact or communication between UPM and Digicel-Haiti. This means that these activities cannot

---

[53] Motion at 8-10.

[54] UPM Motion at 12-19.

[55] *Id.* at 19-25.

[56] Motion at 8-9.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

have been "representations" to Digicel-Haiti at all, much less "material" ones.

Digicel-Haiti then alludes to UPM having supposedly "transmitted calls onto Digicel-Haiti's … network in a manner that disguised the calls' true origin."[57] But as discussed above, all that actually happened was that UPM used the services it had purchased from Digicel-Haiti.[58] The fact that there is no technical distinction on Digicel-Haiti's network between a purely intra-Haiti call and a call that reached Haiti via the Internet[59] means that the network is simply incapable of knowing anything about the "true origin" of any call. As a result, a subscriber's use of the network cannot rationally be construed as any sort of representation about a call's "true origin," and thus cannot support a fraud claim.[60] This aspect of Digicel-Haiti's claim is based on the unsupported, circular, and self-serving notion that the mere use of its network somehow constitutes a representation that the calls being made are purely intra-Haiti local calls.[61]

Digicel-Haiti next alludes to UPM's supposed use of "software designed and intended to evade detection," *id.,* to human behavior software.[62] But as discussed above, there is no admissible evidence – and certainly not "clear and convincing evidence" – that UPM ever used such software in its operations in Haiti.

Given all of this, Digicel-Haiti's claim that UPM's supposed representations were "material and impacted [Digicel-Haiti's] conduct"[63] is nothing more than unsupported rhetoric.

---

[57] *Id.* at 9.

[58] *See also* UPM Motion, *passim.*

[59] ECF #258, Digicel(I) Depo., 146:10-24; Savage Opp. Dec., Ex. 1, McEwen Depo., 126:15-127:1.

[60] *See Pollack v. D.R. Horton, Inc.-Portland,* 190 Or. App. 1, 20-21, 77 P.3d 1120, 1132 (Or. App. 2003) (alleged silence and concealment do not constitute an element of fraud unless they "relate to something that constitutes a representation").

[61] *See* UPM Motion at 23-25.

[62] Motion at 9.

[63] *Id.*

Page 18 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

UPM bought and paid for service on Digicel-Haiti's network and then used that service in a manner that did not violate any conditions or terms of service that Digicel-Haiti had imposed.[64] Digicel-Haiti's entire argument depends on twisting the fact that UPM used that service into a series of supposed "representations" that UPM never made and never intended to make. Not only is this not "clear and convincing evidence" that UPM made material representations, it is not evidence at all.

### b.  There Is No Evidence That UPM Intended to Deceive Digicel-Haiti

Digicel-Haiti's claims about UPM's "intentions" are similarly unmoored from any actual evidence, as opposed to Digicel-Haiti's own heated rhetoric. For example, it claims that it "is uncontested that … [UPM] intended to cause Digicel-Haiti to connect and terminate calls sent by [UPM] under false pretenses."[65] UPM obviously does not agree that it sent calls to Digicel-Haiti "under false pretenses," and Digicel-Haiti cites nothing to support this claim.[66]

Digicel-Haiti also claims that UPM intended to complete calls "without paying the established termination rates."[67] But this assumes what Digicel-Haiti is trying to prove, which is that its $0.23 per minute rate was the proper rate to apply to calls sent to Haiti via the Internet (thus making it, presumably, the "established" rate). In fact, all that UPM owed when it used Digicel-Haiti's local network entirely in Haiti (for calls sent to Haiti via the Internet) was the local calling rate that Digicel-Haiti charged. Digicel-Haiti's claimed desire to receive $0.23 per minute for those calls was never embodied in any contractual term or condition associated with the service, and so is not binding on UPM. Moreover, as UPM has explained, Digicel-Haiti lacked the courage of its supposed convictions on this point, because it chose *not* to assess the $0.23 per minute rate on

---

[64] *See supra,* pages 2-4.

[65] Motion at 9.

[66] Digicel-Haiti also cites UPM's supposed use of human behavior software as evidence of what it "intended," *id.,* but, as noted above, it has not established that that ever actually occurred.

[67] *Id.*

Page 19 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

calls made using SIM cards it had identified as handling bypass calls.[68]

The only thing the evidence shows is that UPM intended to use the services that it had purchased from Digicel-Haiti, with the understanding that the price charged for those services would be the price for calls originated in Haiti. This is entirely consistent with the fact that the only use of Digicel-Haiti's services that UPM made was to initiate calls in Haiti (using its gateways located there). While one can make contrary claims based on the metaphysics of telecommunications (What is a "call"? When do two linked communications become one single "call"? Does transmitting a communication via the Internet continue an existing "call," or create a new one at the far end?) the undeniable physical reality is that there is no distinction on Digicel-Haiti's network between a "bypass" call and a purely "local" call.[69] The service that UPM used, and intended to use was identical to – and, in physical, as opposed to metaphysical, terms, *was* – the service that Digicel-Haiti offered at its local rate. An intent by UPM to use the service for which it had paid, without violating any terms or conditions associated with the service, cannot be the basis for a fraud claim.[70]

### 8. Digicel-Haiti's "Reliance" on the Conclusion that UPM was not Using Digicel-Haiti's Service for Bypass was not Reasonable

Digicel-Haiti argues that the mere fact that it completed calls from UPM at the local rate shows that it relied on UPM's representations.[71] To the extent that Digicel-Haiti simply means

---

[68] ECF #258, Digicel(I) Depo., 145:18-146:2; Flanagan Depo., 106:17-107:1. *See* UPM Motion at 10.

[69] ECF #258, Digicel(I) Depo., 146:10-24; Savage Opp. Dec., Ex. 1, McEwen Depo., 126:15-127:1.

[70] *See Sizer v. New Eng. Life Ins. Co.,* 871 F. Supp. 2d 1071, 1080, (D. Or. 2012) ("Because of the plaintiff's burden to present clear and convincing evidence of fraud, '[t]he Courts will not presume fraud when the transaction is equally susceptible to two explanations, one which is consistent with fraudulent intent and the other with good faith and fair dealing'"), *citing South Seattle Auto Auction, Inc. v. Western Casualty & Surety Co.,* 41 Or. App. 707, 714, 598 P.2d 1269 (1979) (*citing Hurford v. Harned,* 6 Or. 362, 365 (1877)).

[71] Motion at 10.

Page 20 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that it completed the calls that UPM made and charged the local rate for those calls, UPM agrees – while noting, again, that Digicel-Haiti was entirely able to charge the international rate had it wanted to, once it identified a SIM card as being used for bypass.

The problem, though, is that Digicel-Haiti asserts that it was reasonable for it to rely on the fact that calls were physically originating on its network in Haiti to conclude that those calls were not being used to terminate inbound international calls that had reached Haiti via the Internet. As explained in UPM's summary judgment motion, however, Digicel-Haiti's own testimony shows that any such conclusion was entirely unwarranted – not by virtue of anything that UPM did, but by virtue of Digicel-Haiti's own knowledge of the longstanding, substantial, and pervasive use of its network for bypass.[72] Digicel-Haiti's own experience and knowledge, therefore, renders unreasonable any claimed reliance on the physically "local" nature of the calls UPM was making.[73]

### 9. Digicel-Haiti Does Not Explain Why RLYH Resale Was Fraudulent – And It Wasn't

In addition to the points above, which generally apply both to in-country bypass and to RLYH resale, UPM has explained why RLYH resale itself could not have been fraudulent.[74] Briefly, the essence of Digicel-Haiti's fraud claim is that UPM misrepresented inbound international calls as "really" being local intra-Haiti calls, resulting in those calls being charged at the local rate rather than at the international rate. That obviously does not apply to RLYH resale. Each and every RLYH resale call reached Digicel-Haiti's network by means of its international gateway switch – thus being identified as an incoming international call – and for each and every RLYH resale call, Digicel-Haiti received its desired $0.23 per minute – as well as an additional

---

[72] UPM Motion at 25-27.

[73] *See Cocchiara v. Lithia Motors, Inc.,* 353 Or. 282, 297 P.3d 1277 (2013); *Or. Pub. Emples. Ret. Bd. v. Simat, Helliesen & Eichner,* 191 Or. App. 408, 428, 83 P.3d 350, 362 (2004).

[74] UPM Motion at 28-29.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

roughly $0.10 per minute.[75] Nothing about this is fraudulent.

The only conceivable "misrepresentation" with RLYH resale would be the fact that the telephone number that Digicel-Haiti would associate with the call would be the number Digicel-Haiti assigned to the SIM card being used to authenticate the call. For reasons UPM has explained, however, that is not a "misrepresentation."[76] But even crediting Digicel-Haiti's claim that knowing the original calling number might have caused it not to complete an in-country bypass call, it never explains how that knowledge would matter for RLYH resale. For RLYH resale, it received the calls at its international gateway switch and was paid the $0.23 per minute it desired.

Given this, no matter what else it rules, the Court should clearly deny Digicel-Haiti's motion for summary judgment as it relates to RLYH calls, and grant UPM's motion that its resale of RYLH service was not fraudulent.

## III.    FEDERAL LAW BARS HOLDING UPM LIABLE FOR FRAUD ON THE FACTS OF THIS CASE

Digicel-Haiti asserts that UPM's "defense" against Digicel-Haiti's fraud claim is "premise[d]" on "the false notion that [its] acts … are condoned by" the Federal Communications Commission ("FCC").[77] This is wrong. As discussed in the earlier sections of this brief, and in UPM's own summary judgment motion, UPM's "defense" is premised on the fact that its actions were not fraudulent – UPM made no representations to Digicel-Haiti; UPM did not intend to defraud Digicel-Haiti; if UPM's communications with Digicel-Haiti constitute representations, they were true; and any reliance by Digicel-Haiti on any such representations to conclude that UPM was not engaged in bypass was unjustified.[78] An additional "defense," noted above, is that Digicel-Haiti cannot prevail on its fraud claim because it was not damaged. And, Digicel-Haiti has

---

[75] *Id.*

[76] *Id.* at 16-17.

[77] Motion at 3.

[78] *See* UPM Motion, *passim.*

Page 22 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S  MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

not remotely shown by clear and convincing evidence that it was defrauded in any way at all with respect to RLYH resale. It is unnecessary to consider the impact of federal law on Digicel-Haiti's fraud claim either to deny Digicel-Haiti's motion for summary judgment or to grant UPM's.

That said, this is not, and has never been, a simple state-law tort case. Without exploring the full potential impact of federal telecommunications law and policy on this matter, at a bare minimum federal law requires that state common-law tort concepts not be expanded and interpreted to penalize competitive activities overseas that would not be illegal in the United States. Federal law thus provides an additional reason to deny Digicel-Haiti's motion for summary judgment (and, indeed, to dismiss its entire fraud claim).[79]

At the outset, there can be no question that UPM's efforts to bypass Digicel-Haiti would be entirely lawful in this country. UPM bought SIM cards on the open market, paid the full retail price for usage, and then resold the service it bought by linking it to calls delivered via the Internet. The FCC has banned restrictions on such resale.[80] To the extent that Oregon tort law

---

[79] The Court previously denied a UPM motion to dismiss Digicel-Haiti's fraud claim on grounds of federal preemption and primary jurisdiction. *See* ECF #122 at 10-22. The gist of UPM's earlier motion was that the entire spectrum of potential fraudulent conduct as between two carriers (UPM and Digicel-Haiti) was preempted by federal law, a proposition the Court rejected. UPM's argument here is much narrower. At the motion to dismiss stage, the applicable standard required the Court to accept all of Digicel-Haiti's allegations, including (for example) claims that UPM manipulated SIM card information to falsely represent the telephone number making a call and otherwise actively concealed the nature of the calls it was making. Discovery has revealed that none of this is true: UPM did not manipulate SIM card data, and made no misrepresentations to Digicel-Haiti at all, whether by concealment or otherwise. *See* UPM Motion at 12-25. Based on these facts developed in discovery, the argument here is not that federal law would preempt Oregon tort law from reaching truly fraudulent conduct. Instead, the argument here is the more modest proposition that federal law preempts state tort law to the extent that – but only to the extent that – actions UPM would necessarily undertake to compete with and bypass Digicel-Haiti (such as buying SIM cards and top-ups and using and reselling Digicel-Haiti's services) could be construed under state law to be fraudulent. If the Court accepts UPM's arguments based entirely on Oregon tort law (*see supra* and UPM Motion, *passim*), it is unnecessary to reach the preemption argument raised here.

[80] *See In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* Report and Order, 60 F.C.C.2d 261 (1976); *In the Matter of Regulatory*

Page 23 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

could be interpreted to impose liability for fraud (or any other tort) on a reseller, simply for taking the actions needed to engage in resale, such an interpretation of common-law torts would be directly preempted by federal law.[81] To the extent, therefore, that Digicel-Haiti seeks to impose state common-law tort liability on UPM for the actions UPM needed to take to resell Digicel-Haiti's services – which it plainly does – such liability is barred.[82] These actions would be lawful in the United States as a matter of federal telecommunications law and policy, and so state tort law cannot be deployed to punish them.[83]

In fact, because UPM's activities would clearly have been legal in the United States, the effect of Digicel-Haiti's fraud claim (and perhaps its true purpose) can be seen as an effort to import anti-consumer, anti-competitive **restrictions based on Haitian law** into this country and to weaponize United States courts to enforce those restrictions here. But this course is barred by federal law as well. When other nations (such as Haiti) have anti-competitive, anti-consumer telecommunications polices in place, those nations are free to enforce those polices within their

---

*Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services,* Report and Order, 83 F.C.C.2d 167 (1980); *In the Matter of Regulation of International Accounting Rates,* First Report and Order, 7 FCC Rcd 59 (1991). This ban on resale restrictions applies fully to wireless carriers. In the Matter of An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems, Report and Order, 86 F.C.C.2d 469 (1981) at ¶¶ 103-107.

[81] *See, e.g., Sprietsma v. Mercury Marine,* 537 U.S. 51, 64 (2002) (conflict preemption overrides state law "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). Alternatively, it is fair to say that the entire "field" of one carrier's resale of another carrier's services has been occupied by the FCC, acting under the Communications Act, which bars state action in that field. *See Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 n.6 (2000) (field preemption is a species of conflict preemption).

[82] At a minimum, this covers UPM's activities in buying SIM cards, buying top-ups, deploying gateways, and linking calls from the Internet to the services it was reselling.

[83] This does not mean that Digicel-Haiti would be barred by federal law from pursuing an action against UPM in Haiti, under Haitian law. It just means that United States law cannot properly be brought in as a substitute. *See infra.*

Page 24 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

own borders. But they are not free to come to the United States and have United States adjudicatory bodies do their dirty work.

The FCC has specifically addressed what the United States should do about carriers who take pro-competitive actions that violate foreign law: nothing. After flirting for some years with a policy that permitted foreign regulators and entities – on "comity" grounds – to bring complaints at the FCC against carriers violating foreign law, the FCC specifically concluded that the Communications Act should not be interpreted to countenance such complaints.[84] The FCC found that permitting foreign governments or entities to use the FCC to enforce anti-consumer restrictions is:

> inconsistent with and ***undermin[es] the Commission's goal of promoting global competition.*** We will therefore no longer devote Commission resources to analyzing and investigating allegations that a U.S. carrier is [violating a foreign nation's anti-consumer, anticompetitive restrictions].

> Congress directed the Commission "to provide for a pro-competitive, deregulatory national policy framework," and mandated, that with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services. We believe that the Congressional mandate to foster competitive telecommunications markets is instructive in the current context when assessing the international regulatory environment. ***We find that the benefits of supporting clear and consistent policies that promote all forms of competition outweigh any benefits derived from recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.***

> By no longer enforcing [anti-consumer, anticompetitive policies from] foreign countries, we are not rejecting the sovereign rights of any foreign government or limiting the ability of a foreign government to adopt and enforce policies to prohibit [carrier actions] within its jurisdiction. ***Rather, we are re-emphasizing our standing policy to encourage competition in all markets, <u>both developed and developing</u>. … We encourage a pro-competitive … policy that extends to the international marketplace, embraces free and open competition, and benefits U.S. consumers as well as the global community by ensuring lower prices, new and better products and services, and greater consumer choice.*** Indeed, we

---

[84] *See Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Order, 18 FCC Rcd 6077 (2003) at ¶¶ 10-14 ("*Foreign Restrictions Order*").

Page 25 – DEFENDANTS' OPPOSITION TO
DIGICEL-HAITI'S MOTION FOR PARTIAL
SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

believe that eliminating [anti-consumer, anticompetitive] prohibitions enhance[s] competition throughout the global marketplace.[85]

The FCC has thus found that enforcing foreign anticompetitive restrictions in the United States would "undermine" the Communications Act's goal of "promoting global competition,"[86] and that United States resources should not be used to provide "recognition and assistance in the enforcement of foreign laws intended to prohibit" competition. To the extent that state tort law could be used as an end-run around this plain federal policy, such tort law is preempted.[87]

Again, none of this is to say that federal law preempts the use of state law to punish truly wrongful tortious conduct.[88] But it *is* to say that federal law preempts interpreting and

---

[85] *Id.* at ¶¶ 10-12 (emphasis added, footnotes omitted). Note that the underlined language puts the lie to any claim by Digicel-Haiti that the status of Haiti as a relatively low-income country entitles it (or Digicel-Haiti) to any special dispensation in the form of protection from pro-competitive efforts by United States carriers.

[86] *Id. See also 1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 F.C.C.R. 7963 (1998) at ¶ 1.

[87] *Sprietsma, supra.* This Court is not free to second-guess, at Digicel-Haiti's behest, the FCC's considered determination of what policies the Communications Act embodies. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services,* 545 U.S. 967, 980-86, 125 S. Ct. 2688, 162 L. Ed. 2d. 820 (2005). *Cf. United States v. Mead Corp*., 533 U.S. 218, 227-228, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001). The *Mead* Court observed that "agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and we have long recognized that considerable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer." *Id.* (internal quotations and citations omitted).; *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). In our case, there can be no question that the FCC's determination of how to handle foreign anticompetitive restrictions being applied to United States carriers in a United States forum is the result of careful consideration of how the Communications Act should be applied. Even if not formally binding on this Court, therefore, the FCC's views should be given great deference.

[88] For example, federal law would not protect an entity that hacked into Digicel-Haiti's system to get service for free, or an entity that stole subscribers' money by cloning their SIM cards. These types of actions might constitute "telecommunications piracy," *see* Motion at 3, but resale and

---

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

expanding state law to treat as tortious those actions that a carrier necessarily and appropriately takes to engage in the kind of competition that the FCC specifically encourages – including the use of the Internet to bypass exorbitant foreign termination rates,[89] and to resell other carriers' services purchased at retail.[90] As explained above, Digicel-Haiti's fraud case fails because it has not shown, and cannot show, that UPM's activities fulfill the required elements of the tort of fraud. But, to the extent that its bypass and resale activities could, theoretically, form a basis for liability, any such interpretation or application of state tort law is preempted and must be rejected.

## IV.    CONCLUSION

For the foregoing reasons, UPM respectfully requests that the Court deny Digicel-Haiti's motion for summary judgment on Digicel-Haiti's fraud claim, and instead grant UPM's motion for summary judgment dismissing that claim.

Dated: December 3, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*
    Of Attorneys for Defendants

bypass do not.

[89] *See 1998 Biennial Regulatory Review; Reform of the International Settlements Policy, supra,* 14 FCC Rcd 7963 (1998) at ¶ 63 & n.119. *See also* UPM Answer at ¶¶ 210-211.

[90] *See* FCC authorities cited in footnote 80, *supra.*

Page 27 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)
UPM-L1\00613697.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, I served the foregoing **DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR PARTIAL SUMMARY JUDGMENT (FRAUD)** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: December 3, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

Page 1 – CERTIFICATE OF SERVICE
UPM-L1\00613339.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236