**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

        Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**, <br><br> Plaintiff & Counterclaim-Defendant, <br><br> v. <br><br> **UPM TECHNOLOGY, INC.**, *et al.,* <br><br> Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI <br><br> **DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY, INC.'S COUNTERCLAIMS** <br><br> **Oral Argument Requested** <br> **Hearing: January 14, 2022 at 10:00 AM** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. III

I.    INTRODUCTION ............................................................................... 2

II.    UPM'S COMMUNICATIONS ACT CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS ................................................................. 3

III.    DIGICEL-HAITI IS A TELECOMMUNICATIONS CARRIER WITHIN THE MEANING OF THE COMMUNICATIONS ACT ............................................ 6

    A.    The Court Correctly Determined That Digicel-Haiti Is A Carrier With Respect To RLYH Service ............................................................ 6

    B.    Digicel-Haiti's Argument That It Is Not A Carrier Is Meritless ........... 9

    C.    There Is No Basis For The Court to "Abstain" From Deciding UPM's Communications Ac Claims ................................................... 12

        1.    Digicel-Haiti Has Not Shown That The Court Should Abstain from Deciding UPM's Communications Act Claims ....................... 12

        2.    The Parties Formed An Implied-In-Fact Contract .................................. 13

    D.    The "Foreign Sovereign Compulsion" Doctrine Does Not Protect or Excuse Digicel-Haiti's Violation of the Communications Act ........................ 17

    E.    There Is No Merit to Digicel-Haiti's Claim that International Comity Forbids Holding It Accountable for Its Communications Act Violations ............ 21

IV.    UPM HAD VALID IMPLIED-IN-FACT CONTRACTS WITH DIGICEL-HAITI .......................................................................................... 25

V.    CONCLUSION .................................................................................. 29

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado, Inc. v. Mayorkas,* 2021 U.S. Dist. LEXIS 167128 (S.D. Cal. September 2, 2021) ............................................................................................... 9

*Am. Auto. Ins. Co. v. Haw. Nut & Bolt, Inc.,* 2017 U.S. Dist. LEXIS 205819 (D. Haw. September 27, 2017) ......................................................................... 9

*Animal Sci. Products v. Hebei Welcome Pharm. Co.,* 8 F.4th 136 (2d. Cir. 2021) ....................... 18

*AT&T Corp. v. City of Portland,* 216 F.3d 871 (9th Cir. 2000) ..................................................... 7

*Cable & Wireless P.L.C v. FCC,* 166 F.3d 1224 (D.C. Cir. 1999) ............................................... 11

*Communications Vending Corp. of Arizona v. FCC,* 365 F.3d 1064 (D.C. Cir. 2004) ................. 5

*Cullinane v. Uber Techs., Inc.,* 893 F.3d 53 (1st Cir. 2018) ........................................................ 28

*DCIPA, LLC v. Lucile Slater Packard Children's Hosp.,* 868 F. Supp. 2d 1042 (D. Or. 2011) ............................................................................................................................ 15

*Eichman v. Fotomat Corp.,* 880 F.2d 149 (9th Cir. 1989) .............................................................. 9

*FTC v. AT&T Mobility LLC,* 883 F.3d 848 (9th Cir. 2018) .......................................................... 11

*FTC v. Verity Int'l, Ltd.,* 443 F.3d 48 (2d Cir. 2006) ................................................................... 11

*Huynh v. Harasz,* 2016 U.S. Dist. LEXIS 63678 (N.D. Cal. May 12, 2016) ............................... 9

*In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 198 F. Supp. 3d 1183 (D. Or. 2016) ..................................................................................................................... 15

*In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 2017 U.S. Dist. LEXIS 18322 (D. Or. February 9, 2017) ............................................................................. 15

*Liberty Mutual Ins. Co. v. E.E.O.C.,* 691 F.2d 438 (9th Cir. 1982) .............................................. 9

*MCI Telecomms. Corp. v. FCC,* 59 F.3d 1407 (D.C. Cir. 1995) .................................................... 5

*Milgard Tempering v. Selas Corp. of Am.,* 902 F.2d 703 (9th Cir. 1990) ..................................... 9

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services,* 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d. 820 (2005) ................................................................... 17, 24

*Patrickson v. Dole Food Co., Inc.,* 251 F.3d 795 (9th Cir. 2001) ............................................... 25

*PDK Laboratories, Inc. v. Ashcroft,* 338 F. Supp. 2d 1 (D.D.C. 2004) ........................................ 9

*Railroad Co. v. Lockwood,* 84 U.S. 357, 21 L. Ed. 627 (1873) .................................................. 11

*Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944) ............................ 18

*Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253 (D. Or. August 6, 2014) ........................................................................................................................... 28

*Staley v. Taylor,* 165 Or. App. 256, 994 P.2d 1220, 1224 (2000) .............................................. 15

*United States v. Brodie,* 174 F. Supp. 2d 294 (E.D. Pa. 2001) .................................................... 18

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*United States v. Mead Corp.,* 533 U.S. 218,  121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) .................................................................................................. 18, 24

*Verizon v. FCC,* 740 F.3d 623 (D.C. Cir. 2014) ............................................................. 11

*Zabriskie v. Fannie Mae,* 2016 U.S. Dist. LEXIS 26124 (D. Ariz. February 24, 2016) ............... 9

**Statutes**

47 U.S.C. § 206 ................................................................................................................ 11

47 U.S.C. § 415 ......................................................................................................... 3, 4, 5

47 U.S.C. §§ 151 ................................................................................................ 2, 7, 17, 23

47 U.S.C. §152 ................................................................................................................. 10

47 U.S.C. §§ 153 ..................................................................................................... 6, 7, 11, 15

**Other Authorities**

*1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 FCC Rcd 7963 (1998) ..................................................... 23

*AirTouch Cellular v. Pacific Bell,* Memorandum Opinion and Order, 16 FCC Rcd 13502 (2001) ............................................................................................................ 5

*AT&T Services, Inc. and AT&T Corp., Complainants. v. 123.Net, Inc. (d/b/a Local Exchange Carriers of Michigan and/or Prime Circuits), Defendants,* Memorandum Opinion and Order, 35 FCC Rcd 6401 (2020) ............................................. 5

*Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Notice of Proposed Rulemaking, 17 FCC Rcd 2794 (2002) ........................................................... 21

*Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Order, 18 FCC Rcd 6077 (2003) .......................................................................................... 21, 22, 23

*Foreign Restrictions* ...................................................................................................... 22

*In the Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,* Opinion, 22 FCC Rcd 5901 (2007) ........................................... 11

*Operator Communications, Inc., Complainant, v. Contel of the South, Inc. d/b/a Verizon Mid-States, et al., Defendants,* Memorandum Opinion and Order, 20 FCC Rcd 19783 (2005) ......................................................................................... 5

*Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route,* Memorandum Opinion and Order, 29 FCC Rcd 4186 (2014) .................. 17, 21, 22, 23, 24

*Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, 60 F.C.C.2d 261 (1976) *aff'd sub nom AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978) .......................................................................................... 8, 16

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Treatises**

Restatement (Second) of Contracts § 4 (1979) .............................................................................. 15

## I.     INTRODUCTION

Digicel-Haiti's Motion for Summary Judgment (ECF #264) ("Motion (Communications Act)") seeks dismissal of UPM's Communications Act counterclaims. Although the facts surrounding this motion are largely undisputed, it should be denied because Digicel-Haiti fundamentally misreads the law – including the Communications Act of 1934 (the "Communications Act" or the "Act"), as amended, 47 U.S.C. §§ 151 *et seq.*; the law of international comity; and even the Haitian "law" on which it relies for its "foreign sovereign compulsion" argument.

The law as applied to the undisputed facts compels the conclusion that Digicel-Haiti, by virtue of its offering roaming services in the United States, is a "telecommunications carrier" under the Act. Moreover, the undisputed facts show that by blocking UPM's SIM cards, Digicel-Haiti restricted – indeed, totally barred – UPM from reselling Digicel-Haiti's services, in violation of decades of precedent of the Federal Communications Commission ("FCC") interpreting the Act. Not only should Digicel-Haiti's summary judgment motion be denied, therefore, but UPM's motion for partial summary judgment on its Communications Act claims should be granted.[1]

---

[1] UPM alleges that Digicel-Haiti's blocking of UPM's SIM cards violated the Act both with respect to UPM's in-country bypass operations and with respect to UPM's resale of Roam Like You're Home ("RLYH") service. *See* Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Third Amended Complaint and Demand for Jury Trial (ECF #244) ("Amended Answer") at ¶¶ 333-336 & 341-344 (claims regarding in-country bypass) and 329-322 & 337-340 (claims regarding RLYH resale). UPM has concluded that it will not press its Communications Act claims regarding Digicel-Haiti's blocking the SIM cards used for in-country bypass. The overwhelming majority of in-country bypass occurred during 2011 and 2012, and, as discussed *infra,* claims relating to that period are time-barred. However, the overwhelming majority of UPM's activities during 2014 – for which claims are *not* time-barred – involved RLYH resale. *See* Defendant UPM Technology, Inc.'s Motion for Summary Judgment (ECF #255) ("UPM Motion") at 7, 30-31. The monetary insignificance of the more recent in-country bypass activity counsels against expending any further resources litigating about that activity.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## II.    UPM'S COMMUNICATIONS ACT CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Digicel-Haiti argues that UPM's Communications Act claims are barred by the Statute of Limitations.[2] To the extent that UPM's claims as pled extend to Digicel-Haiti's actions during the 2011-2012 period, UPM agrees. UPM's claims relating to the 2014 period, however, are not barred.

The applicable Statute of Limitations is 47 U.S.C. § 415(b), which states that claims against carriers, not based on tariff overcharges, must be brought within two years of when the cause of action accrues. As UPM explained in its motion for summary judgment, it engaged in bypass of Digicel-Haiti, and RLYH resale, during two distinct periods: from August 2011 through March 2012, and then again from April 2014 through December 2014.[3] UPM raised its Communications Act claim in its initial Answer and Counterclaims, filed on March 1, 2016.[4] This means that UPM's claims for Communications Act violations by Digicel-Haiti committed prior to March 1, 2014 – that is, during the 2011-2012 period – are barred. By the same token, however, Section 415(b) does *not* bar Digicel-Haiti's liability for violations committed during the later period of UPM's activities – that is, from April to December 2014.[5]

Digicel-Haiti's argument that the statute bars liability for its Communications Act violations during the more recent period is based on the idea that, because UPM knew by 2011 that Digicel-Haiti would continue to block SIM cards, UPM has somehow waived the right to seek recovery for the damages it incurred by virtue of Digicel-Haiti's blocking in 2014.[6] This argument

---

[2] Motion (Communications Act) at 3-8.

[3] UPM Motion at 5-7, 30-31.

[4] Defendants' Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Amended Complaint and Demand for Jury Trial (ECF #73) at ¶¶ 241-252. The current iteration of UPM's Communications Act claim appears in its Amended Answer at ¶¶ 329-344.

[5] UPM's damages for Digicel-Haiti's violations of the Communications Act continue to this day. UPM would have continued its profitable RLYH resale activity from 2014 to the present, but for Digicel-Haiti's illegal blocking of the SIM cards UPM was using for that purpose.

[6] Motion (Communications Act) at 3-7.

Page 3 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

is meritless.

UPM agrees that it knew early on that Digicel-Haiti would try to block the SIM cards that UPM used for in-country bypass. On the other hand, UPM did not know – and could not have known until 2014 – that Digicel-Haiti would *also* block SIM cards used for RLYH resale. Prior to 2014, UPM had not engaged in RLYH resale. Even if UPM believed that Digicel-Haiti would block SIM cards being used for in-country bypass in 2014, UPM would have had no reason to suspect that Digicel-Haiti would *also* violate United States law by blocking SIM cards being used for RLYH resale. This is true both because the physical configurations of the two arrangements (in-country bypass and RLYH resale) are quite different – RLYH resale does not involve UPM placing or operating any equipment in Haiti – and because the legal and regulatory regime for telecommunications in the United States differs substantially from that in Haiti. Even if, therefore, UPM knew that Digicel-Haiti understood itself to be entitled to block SIM cards that were being used for in-country bypass, UPM would have had no reason to think that Digicel-Haiti would try to block SIM cards being used to for RLYH resale – which entailed resale of physical services provided in the United States using the network of one of Digicel-Haiti's roaming partners. The legal regimes applicable to these two distinct aspects of Digicel-Haiti's operations are quite different, and UPM had no reason to think that Digicel-Haiti would fail to grasp that fact.

More fundamentally, it does not matter what UPM knew or predicted about Digicel-Haiti's actions – a moment's consideration shows that Digicel-Haiti's theory is absurd. It basically argues that because UPM knew about Digicel-Haiti's prior blocking of SIM cards used for in-country bypass, that insulates Digicel-Haiti from liability when it later broke the law by blocking SIMs used for RLYH resale. Under Digicel-Haiti's theory, serial offenders get an automatic "get out of jail free card" simply by persisting openly and notoriously in their unlawful conduct.

Not surprisingly, Digicel-Haiti does not cite a single case, treatise, or any other authority to support its theory, which is entirely unmoored from the terms of the statute. Section 415(b) provides: "All complaints against carriers for the recovery of damages not based on overcharges shall be filed with the Commission within two years *from the time the cause of action*

Page 4 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY INC.'S COUNTERCLAIMS

UPM-L1\00613956.000

*accrues* … ."[7] Even if UPM knew that Digicel-Haiti *would* block UPM's SIM cards, UPM's "cause of action" did not "accrue" until Digicel-Haiti actually *did* block them. The case law is clear that under Section 415, a cause of action accrues when the injury occurs.[8] UPM's Communications Act claims against Digicel-Haiti, therefore, did not *accrue* until Digicel-Haiti actually blocked the SIM cards, which means that UPM's claims based on blocking that occurred in 2014 are not barred.

This conclusion is supported by the analogous situation under Section 415 of a carrier alleged to have violated the Act by overcharging its customers. In that case, each separate monthly bill reflecting the overcharge is a violation. Challenges to bills rendered more than two years prior to the complaint are barred, but challenges to bills rendered within two years of filing are not.[9] No precedent remotely suggests that a carrier is immunized from liability for ongoing overcharges if the plaintiff realized it was being overcharged more than two years before filing the complaint. What matters is when the bills containing the overcharges were rendered. And so here: UPM's cause of action against Digicel-Haiti for blocking SIM cards during 2014 arose during 2014, and is not barred by the Statute of Limitations.

---

[7] 47 U.S.C. § 415(b) (emphasis added).

[8] *Communications Vending Corp. of Arizona v. FCC,* 365 F.3d 1064, 1074 (D.C. Cir. 2004) (under Section 415, "a cause of action accrues either *when a readily discoverable injury occurs* or, if an injury is not readily discoverable, when the plaintiff should have discovered it") (emphasis added) (*citing MCI Telecomms. Corp. v. FCC,* 59 F.3d 1407, 1417 (D.C. Cir. 1995)). *See also AirTouch Cellular v. Pacific Bell,* Memorandum Opinion and Order, 16 FCC Rcd 13502, 13504, ¶ 6 (2001) (under Section 415(b), a cause of action accrues "*when the carrier does the unlawful act* or fails to do what the law requires") (emphasis added). None of these cases – and no other case – suggests that a cause of action accrues when an injured party first reasonably anticipates that an as-yet-not-occurred injury will materialize in the future.

[9] *See, e.g., AT&T Services, Inc. and AT&T Corp., Complainants. v. 123.Net, Inc. (d/b/a Local Exchange Carriers of Michigan and/or Prime Circuits), Defendants,* Memorandum Opinion and Order, 35 FCC Rcd 6401 (2020) at ¶ 36 & n.152; *Operator Communications, Inc., Complainant, v. Contel of the South, Inc. d/b/a Verizon Mid-States, et al., Defendants,* Memorandum Opinion and Order, 20 FCC Rcd 19783 (2005) at ¶ 11.

Page 5 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

For these reasons, while the Statute of Limitations *does* protect Digicel-Haiti's SIM card blocking that occurred prior to March 1, 2014 from liability, the Statute does not bar claims for Digicel-Haiti's blocking after that date. As a result, Digicel-Haiti's summary judgment motion based on the Statute of Limitations should be denied to the extent it purports to apply to blocking activity by Digicel-Haiti that occurred after March 1, 2014.

## III. DIGICEL-HAITI IS A TELECOMMUNICATIONS CARRIER WITHIN THE MEANING OF THE COMMUNICATIONS ACT

Digicel-Haiti argues that it is not a "common carrier" or "telecommunications carrier" subject to the Act.[10] Remarkably, at no point in its argument does Digicel-Haiti cite, quote, discuss, or even acknowledge: (a) the specific provisions in the Act that define which entities are or are not carriers;[11] or (b) this Court's ruling on this precise point earlier in the case.[12] Despite Digicel-Haiti's effort to push its head into the sand, its status as a carrier under the Communications Act is determined by what that Act says – and the Act says that Digicel-Haiti is a carrier, particularly with respect to its provision of RLYH service.

The Court's earlier ruling remains valid. Moreover, while the earlier ruling was in the context of a motion to dismiss, discovery has not revealed any facts relevant to this question that have changed materially (or at all) between those alleged in the parties' pleadings and what we know today. As a result, the Court's earlier ruling on this point is "law of the case" that Digicel-Haiti should not be permitted to relitigate now.

### A. The Court Correctly Determined That Digicel-Haiti Is A Carrier With Respect To RLYH Service

This Court ruled in an earlier order that Digicel-Haiti was a common carrier and

---

[10] Motion (Communications Act) at 8-12.

[11] 47 U.S.C. §§ 153(11), (50), (51) and (53).

[12] ECF #154 (Opinion and Order, March 30, 2018) at 27-31. *See also* ECF #95 (Opinion and Order, July 26, 2016) at 14-20.

Page 6 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

telecommunications carrier under the Act,[13] specifically holding that when Digicel-Haiti offers RLYH service, that activity constitutes Digicel-Haiti as a carrier.[14] The Court first laid out the requirements for carrier status under the Act:

> Under the Act, an entity is a "common carrier" or a "telecommunications carrier" when it engages in interstate or foreign communications by offering to transmit information for a fee between points designated by its customers. *See* 47 U.S.C. §§ 153(11), (50), (51), (53) (defining, respectively, "common carrier," "telecommunications," "telecommunications carrier," and "telecommunications service"); *see also AT&T Corp. v. City of Portland,* 216 F.3d 871, 877 (9th Cir. 2000) ("A provider of telecommunications services is a 'telecommunications carrier,' which the Act treats as a common carrier to the extent that it provides telecommunications to the public, 'regardless of the facilities used.'").[15]

The Court then explained that the fact that Digicel-Haiti does not, itself, own any physical facilities in the United States is immaterial because the Act specifically states that an entity's status as a carrier depends on what services the entity ***offers***, not the physical means of providing those services:

> Digicel argues that, because [another entity] and not Digicel Haiti performs the transmission of calls from the United States to Haiti, it is not … [a] common carrier. Digicel Haiti's own allegations nevertheless indicate that it provides international "telecommunications for a fee ... to the public." The definition of telecommunications service in the Act does not limit that definition to include only those entities that ***perform the transmission*** of calls, as Digicel argues. Rather, the Act defines telecommunications services as "the ***offering*** of telecommunications ... ***regardless of the facilities used.***" 47 U.S.C. § 153(53) (emphasis added).[16]

Finally, while the Court's discussion focused on Digicel-Haiti's provision of international transmission services to third-party carriers, the Court also specifically held that Digicel-Haiti's RLYH service constituted Digicel-Haiti as a carrier:

> The inclusion of the phrase "regardless of the facilities used" in the definition of telecommunications service emphasizes that a telecommunications carrier is defined

---

[13] *Id.*

[14] *Id.* at 31.

[15] *Id.* at 27-28.

[16] *Id.* at 30 (emphasis in original).

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

as such by the transmission service it offers, and not how or by whom the transmission is performed. Moreover, Digicel Haiti's RLYH program is specifically designed for customers in the United States to place calls to Haiti at a discounted rate. ***Regardless of how the transmission function is performed, in offering the RLYH program, Digicel Haiti offers the transmission of a call from the United States to Haiti for a fee and, as such, is an international telecommunications carrier. Digicel Haiti is therefore subject to the Communications Act.***[17]

The Court's analysis was correct then and is correct now. Because the Act classifies entities as carriers based on the services they offer, and expressly states that the facilities used to provide those services are immaterial, Digicel-Haiti is a carrier in the United States because it offers RLYH service to SIM card holders here.[18]

While the earlier ruling was made on the pleadings, the facts developed in discovery are entirely consistent and, indeed, have never been in dispute. As UPM explained in its summary judgment motion, Digicel-Haiti obtains from its roaming partners the right for Digicel-Haiti subscribers located in the United States to use the roaming partners' services. The roaming subscribers, however, are not charged by, do not pay, and do not become customers of the United States roaming partners.[19] Instead, Digicel-Haiti is charged by, and pays, the roaming partners, and then, in turn, charges its own subscribers for their use of those services.[20] This clearly shows that with RLYH service, Digicel-Haiti is offering telecommunications (the underlying physical

---

[17] *Id.* at 31 (emphasis added).

[18] UPM notes that while the "regardless of the facilities used" language in the statute was added in 1996, that then-new language simply confirmed and codified decades of FCC precedent holding that resellers, including resellers without their own facilities, were "common carriers" under the Act. *See, e.g., Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, 60 F.C.C.2d 261 (1976) *aff'd sub nom AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978) ("*Private Line Resale Order*").

[19] Deposition Transcript of Digicel-Haiti's Rule 30(b)(6) corporate representative Maarten Boute ("Digicel(I) Depo."), Declaration of Christopher W. Savage in Support of Defendant UPM Technology, Inc.'s Motion for Summary Judgment (filed under seal) (ECF #258) ("ECF #258"), Ex. 1, 89:10-18.

[20] ECF #258, Digicel(I) Depo., 85:11-20.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

services provided by its roaming partners) for a fee (the amounts it charges its subscribers when they use those services) within the United States. In other words, whatever else it may be (*see infra*), without question Digicel-Haiti is a telecommunications carrier in the United States.

The Court need not dwell on this issue. A new ruling that Digicel-Haiti is a telecommunications carrier in the United States by virtue of offering RLYH service would be entirely appropriate, but in light of its earlier ruling, the Court should also hold that any Digicel-Haiti argument that it is not a carrier is precluded by the "law of the case" doctrine. Under that doctrine, "a court is generally precluded from reconsidering an issue previously decided by the same court."[21] The doctrine applies when "the issue in question [has been] 'decided explicitly or by necessary implication in [the] previous disposition.' "[22] And, even though the standards governing the earlier motion to dismiss and the present motion for summary judgment are different, "if no factual issues have changed" between the motion to dismiss and the summary judgment motion, law of the case still applies.[23] Here, the factual issues have not changed at all, so the Court's earlier ruling on this point is conclusive.

### B. Digicel-Haiti's Argument That It Is Not A Carrier Is Meritless

As noted above, Digicel-Haiti's argument that it is not a carrier makes no reference to the Court's earlier ruling or to the relevant portions of the Act. This is a strong signal that its argument should not be taken seriously. Even so, the discussion below further explains why Digicel-Haiti's argument is invalid.

---

[21] *Milgard Tempering v. Selas Corp. of Am.,* 902 F.2d 703 (9th Cir. 1990).

[22] *Id., quoting Liberty Mutual Ins. Co. v. E.E.O.C.,* 691 F.2d 438, 441 (9th Cir. 1982) and *citing Eichman v. Fotomat Corp.,* 880 F.2d 149, 157 (9th Cir. 1989) (second alternation in original).

[23] *Al Otro Lado, Inc. v. Mayorkas,* 2021 U.S. Dist. LEXIS 167128, [*34] (S.D. Cal. September 2, 2021); *Am. Auto. Ins. Co. v. Haw. Nut & Bolt, Inc.,* 2017 U.S. Dist. LEXIS 205819, [*19] (D. Haw. September 27, 2017); *Zabriskie v. Fannie Mae,* 2016 U.S. Dist. LEXIS 26124, [*13] (D. Ariz. February 24, 2016), *citing PDK Laboratories, Inc. v. Ashcroft,* 338 F. Supp. 2d 1, 7 (D.D.C. 2004); *Huynh v. Harasz,* 2016 U.S. Dist. LEXIS 63678, [*64] (N.D. Cal. May 12, 2016).

Page 9 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti blithely asserts that it is not a carrier because it does not "engage [in] communications in the U.S.," which, in its view, is what creates "the necessity for its roaming agreements with U.S. carriers."[24] This is a glassy-eyed denial of the Court's earlier (correct) ruling that those roaming arrangements establish that Digicel-Haiti *is* a carrier.[25] Its argument seems to be that the fact that it has no physical facilities in the United States means that it cannot be a carrier.[26] As discussed above, however, the facilities an entity owns (if any) is irrelevant to carrier status.

In this regard, Digicel-Haiti quotes (and emphasizes) language from 47 U.S.C. §152 that states that the FCC lacks jurisdiction over carriers "engaged in interstate or foreign communications *solely through physical connections with another carrier* … ."[27] Its apparent point is that since it does not own any facilities in the United States, its only activity here is, or must be "solely through physical connections with" other carriers. The flaw in this argument is obvious: Digicel-Haiti's roaming arrangements – its resale of the services of its United States roaming partners – is one of the ways that Digicel-Haiti is "engaged in interstate or foreign communications." That is, whatever "physical connections" Digicel-Haiti may have with other carriers, that is not the "sole" means by which it is "engaged in interstate or foreign communications" within the United States.

Digicel-Haiti also seems deeply confused about how carrier regulation works under the Communications Act. An entity is not simply thrown into a bucket labeled "carrier" or "not carrier," with that status sticking with the entity for all purposes. To the contrary, an entity may be a carrier (or a particular type of carrier) with respect to some of its activities, while not being a

---

[24] *Id.* at 10.

[25] ECF # 154 at 31.

[26] *See* Motion (Communications Act) at 10-12.

[27] *Id.* at 8, *quoting* 47 U.S.C. § 152.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

carrier (or being a different type of carrier) with respect to other activities. This is apparent on the face of the statute, which provides that an entity will be regulated as a carrier "only to the extent that it is engaged in providing telecommunications services."[28] This necessarily means that an entity can be a carrier in some of its activities but not others, as courts – including the Ninth Circuit, *en banc* – have found.[29] This means that even though Digicel-Haiti is a foreign carrier with respect to its provision of wireless services in Haiti,[30] it is plainly *also* a "telecommunications carrier" engaged in "foreign communications" within the United States when it offers its RLYH service. Digicel-Haiti's practices in connection with *that* activity, therefore, are subject to the Act, and the Court should so rule – again.[31]

---

[28] 47 U.S.C. § 153(51).

[29] *FTC v. AT&T Mobility LLC,* 883 F.3d 848, 858 (9th Cir. 2018) (*en banc*) (Federal Trade Commission can regulate AT&T's non-carrier activities even though AT&T is a carrier for other purposes; "being a common carrier entity was not a unitary status for regulatory purposes. A business with common-carrier status acted in its capacity as a common carrier only when it performed activities that were "embraced within the scope of its chartered powers"), *quoting Railroad Co. v. Lockwood,* 84 U.S. 357, 377, 21 L. Ed. 627 (1873); *Verizon v. FCC,* 740 F.3d 623, 650-651 (D.C. Cir. 2014) (the FCC may not impose common carrier regulation on non-carrier activities of carriers), *citing In the Matter of Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,* Opinion, 22 FCC Rcd 5901 (2007) at ¶ 50 (a "service provider is to be treated as a common carrier for the telecommunications services it provides, but it cannot be treated as a common carrier with respect to other, non-telecommunications services it may offer").

[30] *See* Motion (Communications Act) at 2, 8-12, *citing Cable & Wireless P.L.C v. FCC,* 166 F.3d 1224 (D.C. Cir. 1999) and *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48 (2d Cir. 2006). These cases simply confirm that the FCC does not directly regulate foreign carriers. They have no bearing on the point here, which is that Digicel-Haiti, by virtue of offering its SIM card holders the ability to make calls in the United States and be charged by Digicel-Haiti, is a carrier *within the United States*.

[31] UPM notes that Digicel-Haiti mischaracterizes UPM's Communications Act claim as being based on Digicel-Haiti "*knowingly* disconnect[ing]" UPM's SIM cards. Motion (Communications Act) at 15. *See also id.* at 1 (Digicel-Haiti did not know that the SIM cards it blocked were being used by UPM). There is no basis for importing any sort of scienter requirement into UPM's Communications Act claim. That claim is based on 47 U.S.C. § 206, which states:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall

Page 11 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY INC.'S COUNTERCLAIMS

UPM-L1\00613956.000

**C. There Is No Basis For The Court to "Abstain" From Deciding UPM's Communications Ac Claims**

  **1. Digicel-Haiti Has Not Shown That The Court Should Abstain from Deciding UPM's Communications Act Claims**

In a brief discussion entirely devoid of citation or legal analysis, Digicel-Haiti argues that the Court should "abstain" from exercising its jurisdiction over UPM's Communications Act claims.[32] There is no basis for abstention.

Digicel-Haiti first focuses on factual connections with Haiti. Its argument is apparently that, because UPM obtained SIM cards in Haiti, the purchase and use of those SIM cards, as well as Digicel-Haiti's actions blocking them, are supposedly governed entirely by Haitian law.[33] This is, to put it mildly, a curious argument for Digicel-Haiti to be making, in light of its principal position in the case, which is that ***Oregon's*** common law of fraud governs UPM's activities. The UPM in-country bypass operations to which Digicel-Haiti takes such offense involved having UPM's agents buy SIM cards in Haiti, establish gateways in Haiti, and then use information from the Haitian-bought SIM cards transmitted to the Haitian-located gateways, via Haitian Internet Service Providers, to make calls on Digicel-Haiti's network in Haiti. If it is Digicel-Haiti's position that the Court, out of some sensitivity to the authority of Haitian courts, should abstain from adjudicating claims regarding activities in Haiti that are subject to Haitian

---

  be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Liability under this statute does not turn on what carriers knew or did not know. It turns on what carriers did or did not do. In the absence of statutory language establishing a requirement for intent, specific intent, or other kind of scienter, Digicel-Haiti is, effectively, arguing that its evident ignorance of its obligations under the Act should excuse its violation of the Act. There is no basis for any such argument, and the Court should reject it.

[32] Motion (Communications Act) at 12-13.

[33] *Id.*

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

law, the first thing the Court should do is dismiss Digicel-Haiti's complaint.

In any event, Digicel-Haiti's "abstention" argument could apply, at most, to UPM's Communications Act claims regarding its in-country bypass operations and, as noted above, UPM is not pressing those claims. Digicel-Haiti's argument, however, has no possible bearing on UPM's claims regarding Digicel-Haiti's blocking of SIM cards being used for RLYH resale. With RLYH resale, while the SIM cards were indeed purchased in Haiti, once they were shipped to the United States, all of the relevant activities happened here. The SIM cards were activated in the United States, via interactions with the networks of Digicel-Haiti's roaming partners; the SIM cards were topped up in the United States, via third-party online top-up services; the SIM cards were enrolled in RLYH service in the United States, again via interactions with the networks of Digicel-Haiti's roaming partners; the SIM cards were used to authenticate calls on the roaming partners' networks in the Unites States, by means of gateways located in the United States; and, when Digicel-Haiti blocked those SIM cards, what that blocking was intended to accomplish, and did accomplish, was to make it impossible for UPM to use them to make calls in the United States.[34]

For these reasons, as regards RLYH resale, Digicel-Haiti is simply wrong when it states that "UPM's counterclaims are based on actions that allegedly took place in Haiti."[35] The bald assertion – unsupported by any statute or precedent – that in these circumstances this Court should "abstain" from adjudicating UPM's Communications Act claims, in deference to the supposed primacy of issues of foreign law, is absurd.

### 2. The Parties Formed An Implied-In-Fact Contract

For reasons which are not clear, Digicel-Haiti segues from discussing abstention principles to attacking the idea that the parties formed an implied-in-fact contract.[36] Specifically,

---

[34] Declaration of Bruce Tran, as CEO of UPM ("Tran UPM Dec.") (ECF #256) at ¶¶ 25-28.

[35] Motion (Communications Act) at 12.

[36] *Id*. at 12-13.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti casts aspersions on the provenance of the SIM cards that UPM's agents bought in Haiti and shipped back to Oregon, apparently to argue that no contract could have been formed between UPM and Digicel-Haiti.[37] This argument, too, fails.

Digicel-Haiti initially argues that "UPM never purchased *any* SIM cards directly from Digicel-Haiti,"[38] and later asserts that "UPM never purchased a single SIM card from Digicel-Haiti."[39] UPM is not sure what to make of this argument, because Digicel-Haiti's own Rule 30(b)(6) witness confirmed that Digicel-Haiti distributes SIM cards in Haiti through independent dealers, rather than itself selling SIM cards directly to the public.[40] If a subscriber who does not buy a SIM card "directly from Digicel Haiti" has no "legally recognizable contractual or equitable relationship" with Digicel-Haiti,[41] then it evidently has no such relationship with the vast majority of its own subscribers.

In fact, Digicel-Haiti's focus on how UPM (or any subscriber) acquires SIM cards is beside the point. The contractual relationship between Digicel-Haiti and its subscribers does not begin when a subscriber buys a SIM card from an independent dealer, and is unaffected by how a subscriber may have acquired a SIM card. At the point in time when someone acquires a SIM card, Digicel-Haiti still regards the SIM card as being in an inactive state.[42] The contract between

---

[37] *Id.* Digicel-Haiti also engages in some unsupported innuendo, asserting that UPM's acquisition of SIM cards somehow involved "the illegal acts of UPM or its 'agents.'" *Id.* at 13. There was nothing "illegal" about UPM's acquisition of its SIM cards. To the extent that Digicel-Haiti is alluding to the fact that UPM's agents did not fill out registration cards when they bought SIM cards, UPM has already explained that there was no actual requirement to do so. *See* UPM Motion at 21-22.

[38] *Id.* at 12 (emphasis in original).

[39] *Id.* at 13.

[40] ECF #258, Digicel(I) Depo., 166:11-24; Deposition Transcript of Paul Flanagan, ECF #258, Ex. 3 ("Flanagan Depo."), 11:2-12. *See also* Deposition Transcript of UPM's Rule 30(b)(6) corporate representative Bruce Tran, ECF #258, Ex. 4 ("UPM Depo."), 64:7-9, 98:2-8, 103:2-12, 104:5-21.

[41] Motion (Communications Act) at 12.

[42] Digicel(I) Depo. attached as Exhibit 4 to the Declaration of Christopher Savage in Support of

---

Page 14 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti and the SIM card holder is formed when the subscriber activates the SIM card and tops it up. Activating the SIM card entails a series of electronic communications between the SIM card and Digicel-Haiti's network, the result of which is that Digicel-Haiti's network recognizes the SIM card as having been issued by Digicel-Haiti itself, recognizes an account for the SIM card, and recognizes that the SIM card is no longer "inactive."[43] Topping up the SIM card entails sending money to Digicel-Haiti, designated for the account of the specific SIM card that has been activated, via a third-party web site that Digicel-Haiti works with for that purpose.[44] Once Digicel-Haiti has accepted money for the account of a particular SIM card, it becomes contractually obligated to permit that SIM card to be used to authenticate and make calls, until the money runs out.

The obvious purpose – the only purpose – of providing top-up money to Digicel-Haiti is to permit the SIM card to be used to make calls. The obvious purpose – the only purpose – of Digicel-Haiti accepting the money and crediting it to the particular SIM card's account is to permit that account to be charged for calls that are authenticated using that SIM card. These actions – providing money for a specific SIM card's account, and accepting the money into that specific account – constitute a "meeting of the minds" by conduct, and thereby establish the existence of an implied-in-fact contract.[45] As UPM has explained, the simple terms of the contract are: "If you

---

Defendants' Oppositions to Digicel-Haiti's Motions ("Savage Opp. Dec."), 46:20-48:7.

[43] *Id*.; *see also* Digicel-Haiti Answer to Interrogatory ("Digicel Int.") No. 12; ECF #258, Digicel(II) Depo., 10:9-11:14; UPM Depo., 159:5-24; UPM Motion at 13-14.

[44] Savage Opp. Dec., Ex. 4, Digicel (I) Depo., 70:8-23; 73:12-74:18.

[45] "[I]mplied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement." *Staley v. Taylor,* 165 Or. App. 256, 262, 994 P.2d 1220, 1224 (2000). "In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct," *id, citing* Restatement (Second) of Contracts § 4 comment a (1979). *See also In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 2017 U.S. Dist. LEXIS 18322 (D. Or. February 9, 2017) *In re Premera Blue Cross Customer Data Sec. Breach Litig.,* 198 F. Supp. 3d 1183, 1198-1200 (D. Or. 2016); *DCIPA, LLC v. Lucile Slater Packard Children's Hosp.,* 868 F. Supp. 2d 1042,

---

Page 15 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

have a valid SIM card with money in the account, you can make calls until you're out of money."[46] This is the contract that Digicel-Haiti breached, and its validity does not depend in any way on how a SIM card was acquired – whether from an independent dealer, from Digicel-Haiti itself, as a gift, or simply found in the streets. Once Digicel-Haiti has sold its SIM cards to independent distributors, it no longer has any interest in (or even awareness of) what happens to them ***until they are activated and topped up***.[47]

While Digicel-Haiti's is wrong that there was no contract between the parties, it is not entirely clear what it would mean if Digicel-Haiti were right. Digicel-Haiti seems to be suggesting that if there was not a contract, then Digicel-Haiti's blocking of the SIM cards cannot violate the Communications Act. UPM is aware of no Communications Act precedent that would support such an argument, and Digicel-Haiti has presented none, which alone is a sufficient basis to deny Digicel-Haiti's motion for summary judgment.[48] Moreover, even if the Court were to conclude that the undisputed facts do ***not*** conclusively show that there ***was*** an implied-in-fact contract, then at the very least there is a dispute about whether such a contract was formed. So even if there were some merit to Digicel-Haiti's (apparent) claim that the absence of a contract

---

1053 (D. Or. 2011).

[46] *See* UPM Motion at 10, 24. In the case of RLYH resale, the contract is formed by the subscriber sending the appropriate electronic codes to Digicel-Haiti's network and Digicel-Haiti sending back confirmation codes. *See id.* at 13-14, 17-18. A key flaw in Digicel-Haiti's fraud claim is trying to project much more elaborate content, meaning, and expression onto the simple, functional acts described above. *See id.*

[47] Savage Opp. Dec., Ex. 4, Digicel (I) Depo., 46:20-48:7; ECF #258, Digicel Int. No. 12; ECF #258, Digicel(II) Depo., 10:9-11:14; ECF #258, UPM Depo., 159:5-24; UPM Motion at 13-14.

[48] The FCC's policies banning resale restrictions serve the pro-competitive, pro-consumer purpose of putting pressure on carriers to align their rates with the cost of providing the service being resold. *See, e.g., Private Line Resale Order, supra,* at ¶ 7. The accomplishment of that purpose is unaffected by the formal contractual status of the carrier doing the reselling vis-à-vis the carrier whose services are being resold. This is particularly true where, as here, the reselling carrier is paying the full retail price for the resold service. There is therefore no reason to conclude that UPM's Communications Act claims against Digicel-Haiti with respect to RLYH resale would be affected in any way by the contractual relationship between UPM and Digicel-Haiti.

Page 16 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

would preclude liability under the Communications Act, the dispute about the existence of such a contract would preclude granting Digicel-Haiti's summary judgment motion.[49]

### D. The "Foreign Sovereign Compulsion" Doctrine Does Not Protect or Excuse Digicel-Haiti's Violation of the Communications Act

Digicel-Haiti argues that UPM's Communications Act claims must be dismissed because its action in blocking UPM's SIM cards was compelled by Haitian law.[50] The Court should reject Digicel-Haiti's invitation to apply that doctrine here, for several reasons.

At the outset, Digicel-Haiti forthrightly admits that the "foreign sovereign compulsion" doctrine has never been applied as a defense to violations of the Communications Act.[51] Digicel-Haiti, however, was apparently unaware that the FCC has expressly declined to apply the foreign sovereign compulsion doctrine to limit entities' obligations under the Communications Act, noting, as does Digicel-Haiti, that the doctrine has only been applied in the context of antitrust cases.[52] This Court may not be required to follow this FCC (ruling under the *Brand X Internet* case[53]) but at a minimum the Court should give some appropriate deference to

---

[49] Note that UPM has not sought summary judgment on the entirety of its Communications Act claim, but instead only sought summary judgment that Digicel-Haiti is a carrier subject to the Act and that by blocking the UPM SIM cards that had subscribed to RLYH service, it prevented UPM from reselling that service. UPM Motion at 34-35. The Court can and should grant UPM's motion on these points even as it rejects Digicel-Haiti's argument about contract formation as a ground for summary judgment in Digicel-Haiti's favor.

[50] Motion (Communications Act) at 13-17.

[51] Indeed, UPM's research reveals no case in which any court in the Ninth Circuit has applied that doctrine in any context.

[52] *Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route,* Memorandum Opinion and Order, 29 FCC Rcd 4186 (2014) ("*Tonga Order*") at ¶ 13 (rejecting foreign carrier's attempt to rely on the foreign sovereign compulsion defense because the matter before the FCC did not involve antitrust liability).

[53] *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services,* 545 U.S. 967, 980-86, 125 S. Ct. 2688, 162 L. Ed. 2d. 820 (2005) (*"Brand X"*). In that case, the Supreme Court held that federal courts were obliged to defer to the FCC's reasonable interpretations of the Communications Act, even if the FCC's interpretation contradicted circuit precedent.

---

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the FCC's view that the requirements of the Communications Act are not vitiated by the foreign sovereign compulsion doctrine.[54]

In any event, for several reasons, the doctrine does not apply here, on its own terms. First, it is not enough that a potentially applicable law or regulation formally exists "on the books," in the abstract, nominally calling for or forbidding certain conduct. Instead, the doctrine only applies where conduct is "actually compelled under the threat of severe sanctions."[55] While the Haitian regulator, CONATEL, doubtless takes a dim view of in-country bypass, that does not mean that Digicel-Haiti is at any real risk of sanctions – much less "severe sanctions" – if it does not conform to those Haitian regulatory policies.

Second, as Digicel recognizes,[56] a requirement of the foreign sovereign compulsion defense is that particular conduct actually be ***compelled*** by foreign law. But the regulatory materials Digicel-Haiti cites do not establish that it was compelled to do anything. The 2008 CONATEL document Digicel-Haiti relies on[57] states that:

> ***it is requested*** that all owners of landline or mobile telephones comply with the limits specified in their subscription package. In addition, CONATEL informs all concerned that illegal telephone traffic, such as bypassing, will be resisted with the

---

[54] *See United States v. Mead Corp.,* 533 U.S. 218, 227-228, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) ("agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance, and we have long recognized that considerable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer") (internal quotations and citations omitted); *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40, 65 S. Ct. 161, 89 L. Ed. 124 (1944).

[55] *Animal Sci. Products v. Hebei Welcome Pharm. Co.,* 8 F.4th 136, 147 (2d. Cir. 2021) (later ruling in the "Vitamin C Antitrust Litigation" decision cited by Digicel-Haiti). *See also United States v. Brodie,* 174 F. Supp. 2d 294, 301 n.7 (E.D. Pa. 2001) ("Even the most ardent proponents of the defense recognize that in order for the defense to be triggered, there must be a threat of tangible sanctions") (citation omitted).

[56] *E.g.,* Motion (Communications Act) at 16 (quoting *United States v. Brodie, supra*).

[57] Motion (Communications Act) at 14, *citing* ECF #59.

utmost rigor. With the publication of this note, CONATEL *authorizes* network operators to disconnect, after notifying CONATEL, all telephone numbers used for illegal or fraudulent traffic.[58]

This language does not *require* Digicel-Haiti to block any SIM cards; it *requests* that owners of SIM cards not exceed the "limits" of whatever their "subscription package" might be, and *authorizes* operators, such as Digicel-Haiti, to block SIM cards. This establishes, at most, that it did not violate Haitian law for Digicel-Haiti to block the SIM cards UPM was using for in-country bypass; it does not in any way establish that Digicel-Haiti was obliged to do so. This regulatory material, therefore, is insufficient on its face to support a foreign sovereign compulsion defense.

On this same point, as noted in UPM's motion for summary judgment, one of Digicel-Haiti's own witnesses, a former high-level Haitian government official with experience in the Haitian telecommunications industry, testified that CONATEL "Circulars" – the kind of regulatory document upon which Digicel-Haiti relies – are advisory rather than binding.[59] Indeed, this testimony is confirmed by the language of the CONATEL document quoted above – authorizing, but not requiring action – and further compels the conclusion that a foreign sovereign compulsion defense cannot properly be invoked against UPM's Communications Act claims.

Third, even if the CONATEL Circulars are binding and enforceable against Digicel-Haiti (they are not), and even if they entailed sufficiently severe penalties to otherwise bring a foreign sovereign compulsion defense into play (they do not), Circular No. 009 (ECF #60), on which Digicel-Haiti relies, imposes no obligations on Digicel-Haiti, whether with regard to blocking SIM cards or anything else.[60]

Circular No. 009 does not address what network operators such as Digicel-Haiti can, should, or must do to deal with bypass. Instead, it addresses what *Internet Service Providers*

---

[58] ECF #59 (emphasis added).

[59] Deposition Transcript of Charles Castel ("Castel Depo. "), ECF #258, Ex. 6, 173:9-175:21.

[60] UPM notes that CONATEL Circular No. 009, upon which Digicel-Haiti relies, is dated May 8, 2013, and therefore can have no application to UPM's activities in Haiti during 2011 and 2012.

Page 19 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

are supposed to do.  The document states that CONATEL will "step up the fight against bypassing by *using the infrastructures of the Internet, by detecting IP addresses* using specialized equipment."[61] The operative paragraphs then indicate that CONATEL will identify the Internet Protocol ("IP") addresses used to send VoIP traffic to Haiti, and that, once identified, those IP addresses will be blocked. This has nothing to do with SIM Cards and wireless services.[62]

More fundamentally, Circular No. 009 confirms that the concerns of the Haitian regulators extended only to in-country bypass, and not to the RLYH resale which is the focus of UPM's Communications Act claims. This is clear from the face of the document itself, which defines "bypass" as follows:

> Bypassing: activity involving the sending of diverted traffic, i.e. sent towards a central terminal, either illegally or by concealing the true origin of the call. *In other words, the international call appears as a local call.* The transit transport of traffic received from one carrier to another operator without the latter knowing the origin is also deemed to constitute bypassing.[63]

As UPM explained in its motion for summary judgement, RLYH resale is not "bypass," for the simple reason that all resold RLYH calls *are* international calls and are *routed and rated* as international calls. At no point would a RLYH resale call ever be "diverted" from Digicel-Haiti's international gateway switches, nor would it ever "appear as a local call."[64]

The Haitian regulatory materials on which Digicel-Haiti relies, therefore, entirely fail to support interposing the foreign sovereign compulsion defense to UPM's Communications Act claims – and most emphatically forbid using that defense against UPM's Communications Act

---

[61] ECF #60 at ¶ 2 (emphasis added).

[62] ECF #60 at ¶¶ 3-5. In the context of this case, enforcing this Circular would mean that calls UPM sent to Haiti via the Internet would be blocked in the equipment of the Haitian Internet Service Provider to which UPM's gateways were linked, so that the calls would not reach the gateways – and thus never involve Digicel-Haiti at all.

[63] ECF #60 at ¶ 1.4 (emphasis added).

[64] UPM Motion at 7-8, 28-29.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

claims regarding RLYH resale. The concerns of the Haitian regulators simply did not extend to the situation of RLYH resale. As a result, the materials on which Digicel-Haiti has chosen to rely actually confirm that it had no legal justification *at all* for blocking the SIM cards UPM was using for RLYH resale.[65] Again, RLYH resale was simply not within the purview of, or of interest to, Haitian regulators. Not only did such activity take place in the United States, not in Haiti, it did not interfere with collection of the $0.05 per minute government tax on inbound international calls – which was apparently the regulators' principal concern.[66]

**E. There Is No Merit to Digicel-Haiti's Claim that International Comity Forbids Holding It Accountable for Its Communications Act Violations**

UPM is perplexed by Digicel-Haiti's "comity" argument. That argument critically depends on an FCC "Notice of Proposed Rulemaking" ("NPRM") from 2002. In that *proposal,* the agency was considering whether to continue a then-existing, comity-based policy under which the FCC would enforce anti-competitive, anti-consumer restrictions imposed on United States carriers by foreign entities or governments.[67] For reasons which are unclear, though, Digicel-Haiti fails to cite to, acknowledge, or discuss the FCC's *final decision* in the proceeding in which the *proposal* was made.[68]

---

[65] This makes sense, because it appears that the Haitian regulators' principal concern about bypass was the negative effect it seems to have had on collection of the $0.05 per minute tax on inbound international calls. *See* Digicel(I) 160:6-25. That tax is assessed on every RLYH resale call, so the regulators would have no reason to be concerned.

[66] *Id.* Because Digicel-Haiti has completely failed to meet the basic requirements of the foreign sovereign compulsion defense, the Court need not decide whether the defense could properly apply in Communications Act cases. *See* Motion (Communications Act) at 16. As noted above, however, the FCC's view is that it should not. *See Tonga Order, supra* at ¶ 13.

[67] Motion (Communications Act) at 17-18, discussing *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Notice of Proposed Rulemaking, 17 FCC Rcd 2794 (2002).

[68] *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Order, 18 FCC Rcd 6077 (2003) ("*Foreign Restrictions Order*"). UPM assumes here that Digicel-Haiti's failure to address the FCC's final action arose from ignorance of FCC processes rather than from an effort to mislead the Court. On

---

Page 21 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

This oversight is fatal to Digicel-Haiti's argument, because in the FCC's order resolving the proceeding, the agency entirely rejects any claim that principles of comity warrant subjugating the interests of United States consumers to those of foreign governments pursuing anti-competitive, anti-consumer objectives (such as, here, bans on bypass or resale). Prior to the FCC's ruling (and as indicated in the NPRM), the FCC, relying on principles of comity, permitted foreign governments and entities to use the FCC's processes to adjudicate claims that United States carriers were violating a foreign government's (anticompetitive, anti-consumer) policies and rules. Re-considering and rejecting that earlier view, the FCC found that permitting foreign governments or private entities to use the FCC to enforce anti-consumer restrictions is:

> inconsistent with and *undermin[es] the Commission's goal of promoting global competition.* We will therefore no longer devote Commission resources to analyzing and investigating allegations that a U.S. carrier is [violating a foreign nation's anti-consumer, anticompetitive restrictions].

> Congress directed the Commission "to provide for a pro-competitive, deregulatory national policy framework," and mandated, that with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services. We believe that the Congressional mandate to foster competitive telecommunications markets is instructive in the current context when assessing the international regulatory environment. *We find that the benefits of supporting clear and consistent policies that promote all forms of competition outweigh any benefits derived from recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.*

> By no longer enforcing [anti-consumer, anticompetitive policies from] foreign countries, we are not rejecting the sovereign rights of any foreign government or limiting the ability of a foreign government to adopt and enforce policies to prohibit [carrier actions] within its jurisdiction. *Rather, we are re-emphasizing our standing policy to encourage competition in all markets, <u>both developed and</u>*

---

the one hand, in the LEXIS database, the NPRM does not contain any links to the FCC's final action, so that database might not alert someone unfamiliar with researching FCC rulings that the agency had indeed taken further action. On the other hand, the FCC's ruling in the *Foreign Restrictions* matter was expressly reaffirmed and relied upon in the *Tonga Order, supra,* at ¶ 22 & n. 80, which, while focusing on a different carrier in Tonga, also involved a Digicel-Haiti affiliate. *See id.* at ¶ 4 & n.14; ¶ 7 & n.27. Given this, it seems highly unlikely that Digicel-Haiti was unaware of the *Tonga Order,* which, in turn, would have advised it of the FCC's final decision in the *Foreign Restrictions* matter.

Page 22 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*developing. … We encourage a pro-competitive … policy that extends to the international marketplace, embraces free and open competition, and benefits U.S. consumers as well as the global community by ensuring lower prices, new and better products and services, and greater consumer choice.* Indeed, we believe that eliminating [anti-consumer, anticompetitive] prohibitions enhance[s] competition throughout the global marketplace.[69]

The FCC has thus found that enforcing foreign anticompetitive restrictions in the United States would "undermine" the Communications Act's goal of "promoting global competition,"[70] and that United States resources should not be used to provide "recognition and assistance in the enforcement of foreign laws intended to prohibit" competition.

In the *Tonga Order, supra,* the FCC confirmed its view that considerations of comity neither compel nor even authorize ignoring the policies embodied in the Communications Act. In that case, carriers in Tonga, in purported compliance with a directive from the Tongan regulator, tried to impose high call termination rates on United States international carriers (AT&T and Verizon) and then blocked their ability to send calls to Tonga when the carriers would not agree to the higher rates.[71] In the course of ruling that considerations of foreign law did not prevent its taking action to respond to the foreign anticompetitive conduct, the FCC stated that its "policies to address anticompetitive conduct apply regardless of whether such conduct is undertaken solely by a foreign carrier or pursuant to the direction of a foreign government."[72] Later, the FCC stated that while it "has acknowledged that principles of international comity can play a role in

---

[69] *Id.* at ¶¶ 10-12 (emphasis added, footnotes omitted). Note that the underlined language puts the lie to any claim by Digicel-Haiti that the status of Haiti as a relatively low-income country entitles it (or Digicel-Haiti) to any special dispensation in the form of protection from pro-competitive efforts by United States carriers.

[70] *Id. See also 1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements,* Report and Order and Order on Reconsideration, 14 FCC Rcd 7963 (1998) at ¶ 1.

[71] *Tonga Order, supra,* at ¶¶ 1-7. The parallel between the anticompetitive conduct in that case (a foreign carrier blocking calls to its network) and what Digicel-Haiti did here (blocking the SIM cards UPM was using for RLYH resale) is palpable.

[72] *Id.* at ¶ 13.

---

Page 23 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

accommodating the laws of foreign governments, it has made clear that such principles do not relieve the Commission of its obligation to serve the U.S. public interest … ."[73] The FCC also observed that "there is a longstanding exception to the doctrine of international comity as applied by the U.S. courts, that no nation is required to enforce foreign interests that are fundamentally prejudicial to those of the domestic forum."[74] The FCC concludes its discussion of comity by observing that "foreign governments may not, simply by enacting domestic legal, regulatory, or procedural measures, require the United States to implement such measures as a matter of international law."[75]

Clearly, therefore, the FCC – the agency charged with implementing the Communications Act – takes a much narrower and more jaundiced view of using assertions of "comity" to excuse anticompetitive conduct than does Digicel-Haiti. Even if this fact alone does not determine how this Court should rule on Digicel-Haiti's comity claims, UPM submits that the agency's views are sensible, persuasive, and reflect a fair balancing of the directives and policies of the Communications Act against claimed sovereign interests of the Haitian government.[76] For

---

[73] *Id.* at ¶ 21 (footnotes omitted)

[74] *Id.* at ¶ 22 (footnote and internal quotations omitted).

[75] *Id.* (footnote omitted).

[76] *Brand X, supra; United States v. Mead Corp., supra.* The Ninth Circuit has also expressed skepticism about arguments that considerations of the interests of foreign governments should affect the decisions of United States courts:

> Federal judges cannot dismiss a case because a foreign government finds it irksome, ***nor can they tailor their rulings to accommodate a non-party*** … . If a foreign government finds … litigation offensive, it may lodge a protest with our government; our political branches can then respond in whatever way they deem appropriate – up to and including passing legislation. Our government may, of course, communicate its own views as to the conduct of the litigation, and the court … can take those views into account. ***But it is quite a different matter to suggest that courts … will tailor their rulings to accommodate the expressed interests of a foreign nation that is not even a party.*** …
>
> ***If courts were to take the interests of foreign governments into account, they would be conducting foreign policy by deciding whether it serves our national***

all of these reasons, therefore, the Court should reject Digicel-Haiti's claim that the Communications Act does not or should not apply to its blocking of UPM's ability to resell RLYH service on comity grounds.

## IV.    UPM HAD VALID IMPLIED-IN-FACT CONTRACTS WITH DIGICEL-HAITI

UPM has explained above that the implied-in-fact contract(s) between UPM and Digicel-Haiti were formed when UPM activated (authenticated) its SIM cards and Digicel-Haiti accepted money to top-up the accounts of the activated SIM cards.[77] The terms of this contract (consistent with its having been established by conduct rather than words) are spare: Someone with a valid, activated SIM card with money in the SIM card's account can make calls until the money runs out. The only rational way to interpret the parties' conduct (activating SIM cards, paying money to top them up, and placing that money in the accounts associated with the SIM cards) is as establishing this simple contract.

Digicel-Haiti's discussion of the implied contract issue in the final section of its motion focuses on the argument that an implied-in-fact contract could not have been established between the parties because its terms were supposedly illegal, or if it was "made for an illegal purpose."[78] As discussed below, this claim is meritless and should be rejected.

First, there is obviously nothing illegal in the simple contract that UPM contends was established by the parties' conduct. Digicel-Haiti's argument fails for this reason alone.

Second, in trying to defeat the existence of a contract, Digicel-Haiti rehashes its

---

*interests to continue with the litigation, dismiss it on some ground such as forum non conveniens, or deal with it in some other way.*

*Patrickson v. Dole Food Co., Inc.,* 251 F.3d 795, 803-05 (9th Cir. 2001) (emphasis added, footnotes and citations omitted).

[77] *See* discussion in Section III.C., *supra.*

[78] Motion (Communications Act) at 20-21.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

baseless claim that UPM obtained its SIM cards illegally.[79] As UPM explained above, given Digicel-Haiti's own business decision to distribute SIM cards to the public through independent dealers, obtaining a SIM card does not establish the implied-in-fact contract between the parties. As a result, the provenance of someone's SIM card is irrelevant to the contract established when a SIM card is activated and Digicel-Haiti accepts the money to top it up.[80] Although the circumstances under which UPM acquired its SIM cards are irrelevant to the establishment of the parties' implied-in-fact contract, it unfortunately bears notice that the materials Digicel-Haiti cites do not support the factual assertions for which it cites them, as set out in detail in the footnote.[81]

---

[79] *Id.* at 20.

[80] UPM notes that prior to discovery, it did not realize that Digicel-Haiti had chosen to sell SIM cards to independent distributors for sale to the public, rather than itself selling SIM cards directly to the public. UPM, therefore, alleged that the purchase of SIM cards might have been a part of the process of establishing an implied-in-fact contract. Because Digicel-Haiti is not involved in selling SIM cards to the public, it is now clear that the implied-in-fact contract is established by the conduct noted above rather than by anything arising from the transactions involved in buying or selling SIM cards.

[81] With apologies to the Court for the mind-numbing review occasioned by Digicel-Haiti's mis-citation of the record, set out below are the details of what the materials that Digicel-Haiti cites actually say. All of the Digicel-Haiti claims and citations here are found in the second full paragraph on page 20 of its motion.

First, Digicel-Haiti claims that UPM "did not purchase SIM cards directly from Digicel-Haiti or its licensed retailers," and cites to UPM's response to a request for admission. All that response says, however, is that "UPM admits that it does not have any receipts or invoices from the Digicel-Haiti agents selling SIM cards to UPM's agents in Haiti." *See* UPM Res. To Second Req. for Admis. No. 3 (Exhibit 13 to Digicel-Haiti's motion) (ECF #267-13). Not having receipts does not remotely support the idea that UPM obtained its SIM cards from somewhere other than a Digicel-Haiti independent distributor.

Digicel-Haiti then claims that "UPM acquired SIM cards from individuals who obtained the cards from unknown or unidentified sources," citing to a range of cited materials, none of which support that assertions:

- It cites its own complaint without any pin-cite.

- It cites to four paragraphs of UPM's Answer, where UPM states that its agents "purchased Digicel-Haiti SIM cards that were shipped back to Oregon," Answer, ¶ 50; that "UPM obtained, through third parties, multiple Digicel-Haiti SIM cards," *id.,* ¶ 65; that it "obtained numerous Digicel-Haiti SIM cards from third parties who acquired them in Haiti," *id.,* ¶ 86; and that it "was

---

Page 26 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Third, Digicel-Haiti asserts without any explanation or justification that the parties cannot have an implied-in-fact contract due to lack of privity.[82] This claim misunderstands the nature of the parties' contract. Because Digicel-Haiti sold SIM cards through independent dealers, the act of purchasing of the SIM cards was not itself part of the conduct that led to the formation of a contract. Instead, activating the SIM cards and topping them up – direct interactions between the SIM card owner and Digicel-Haiti – formed the contract, which is therefore not subject to any privity concerns.

Fourth, Digicel-Haiti asserts that its "consistent and unambiguous expression of unwillingness to allow bypass on its network" somehow vitiates formation of an implied-in-fact

shipped Digicel-Haiti SIM cards to its location in Oregon," *id.* at 97.

- It cites to page 3 of a UPM Motion to Compel (ECF #247) where UPM simply states that "UPM sent agents to Haiti to purchase Digicel-Haiti SIM cards and sent them back to UPM in Oregon."

- It cites to five UPM responses to requests for admission, which state that UPM admits: that it "instructed individuals in Haiti to purchase Digicel-Haiti SIM Cards;" that it "wired money to aid individuals in Haiti to purchase SIM Cards;" that "the individuals that purchased SIM cards for [UPM] were monetarily compensated;" that "SIM Cards purchased in Haiti were shipped to UPM;" and that it "paid the shipping costs for SIM Cards to be sent from Haiti."

- It cites (again) to the UPM admission noted above, that UPM has no receipts from the people who sold its agents the SIM cards.

None of these materials have any bearing on the point for which Digicel-Haiti cites them – where the people from whom UPM's agents bought the SIM cards themselves got the SIM cards. The cited materials simply have nothing to do with the point Digicel-Haiti cites them for.

Digicel-Haiti then states that UPM admits that "the purpose of acquiring the SIM Cards was to *[secretly]* gain access to Digicel-Haiti's network," citing ¶ 357 of UPM's Answer (ECF #344) (emphasis added by UPM, alteration *added by Digicel-Haiti*). What that paragraph actually says is this: "UPM reasonably understood that, by buying the Digicel-Haiti SIM cards, recharges/top-ups, and RLYH plans, it would be able to access the Digicel-Haiti's network for the number of minutes that it had purchased at the applicable per-minute rate (approximately $0.09 per minute). Digicel-Haiti's and UPM's conduct established an implied-in-fact contract that Digicel-Haiti would provide access to its Haitian network in exchange for the purchase of its SIM cards, RLYH plans, and recharges/top-ups." Aside from Digicel-Haiti's alteration being breathtakingly misleading, the material Digicel-Haiti quotes is plainly out of context.

[82] Motion (Communications Act) at 20.

Page 27 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

contract.[83] As UPM explained in its own summary judgment motion, however, the fact that one party to a contract may desire some term or condition to be included does not magically impose that condition on the other party.[84] Had Digicel-Haiti wanted to impose limitations or conditions on the use of its services, it would have had to make those limitations or conditions conspicuously available to UPM, such as by requiring UPM to click "I agree" or otherwise be put on reasonable, inquiry notice that the terms and conditions existed.[85] Because Digicel-Haiti failed to take any such steps, it cannot claim that its subjectively desired terms and conditions are embodied in the parties' contract. [86]

Finally, Digicel-Haiti's entire "illegality" argument requires, at a minimum, that it prove that there was something illegal about UPM's intended use of Digicel-Haiti's services. Conceivably, the Haitian regulatory materials Digicel-Haiti relies on for its "foreign sovereign compulsion" argument might support the conclusion that using its services for in-country bypass was illegal under Haitian law. But, as discussed above, those materials simply have no application to RLYH resale, because RLYH resale is not "bypass," either under a common-sense interpretation of the term or under the specific definition adopted by the Haitian regulators. As a result, Digicel-Haiti's "illegality" argument, on its own terms, cannot apply to UPM's use of Digicel-Haiti's services for RLYH resale – the only conduct addressed by UPM's Communications Act claim.

---

[83] *Id.*

[84] UPM Motion at 10, 25.

[85] *See Cullinane v. Uber Techs., Inc.,* 893 F.3d 53, 62-64 (1st Cir. 2018) (customers must have conspicuous notice of terms for them to be binding); *Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253, at *42-48 (D. Or. August 6, 2014) (to impose a contractual condition, a party must use "clear and unambiguous language").

[86] Not that for RLYH resale, essentially all of the acts involved in contract formation occurred in the United States: the SIM cards were activated here, via the networks of United States carriers; the top-up payments were sent from here; the acknowledgements of the top-ups were received here; the RLYH program was subscribed to from here; the confirmation of enrollment was received here; and, of course, the calls at issue were made from here. As a result, questions as to the formation and terms of this implied-in-fact contract can only appropriately be governed by United States law.

Page 28 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S
MOTION FOR SUMMARY JUDGMENT ON DEFENDANT
UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

## V.    CONCLUSION

For the foregoing reasons, UPM respectfully requests that the Court deny Digicel-Haiti's motion for summary judgment on Digicel-Haiti's Communications Act and implied contract claims, and instead grant UPM's motion for partial summary judgment regarding its Communications Act claims.

Dated: December 3, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900


DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

Page 29 – DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY INC.'S COUNTERCLAIMS
UPM-L1\00613956.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, I served the foregoing **DEFENDANTS' OPPOSITION TO DIGICEL-HAITI'S  MOTION FOR SUMMARY JUDGMENT ON DEFENDANT UPM TECHNOLOGY, INC.'S COUNTERCLAIMS** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: December 3, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants