**Kathryn P. Salyer,** OSB #883017
**Eleanor A. DuBay,** OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage,** D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>    Plaintiff,<br><br>    v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>    Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DECLARATION OF CHRISTOPHER W. SAVAGE IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO DIGICEL-HAITI'S MOTIONS** |

Page 1- DECLARATION OF CHRISTOPHER W. SAVAGE
IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO
DIGICEL-HAITI'S MOTIONS
UPM-L1\00613404.000

I, Christopher W. Savage, declare under penalty of perjury:

1. I am an attorney at Davis Wright Tremaine LLP. I am one of the attorneys representing the defendants in the above-captioned action. I make this declaration based on personal knowledge and my review of the records and files in this proceeding and public records referenced herein. I am competent to testify if called to do so.

2. I make this declaration in support of the following:

   a. Defendants' Opposition to Digicel-Haiti's Motion for Partial Summary Judgment (Fraud);

   b. Defendants' Opposition to Digicel-Haiti's Motion for Summary Judgment on Defendant UPM Technology, Inc.'s Counterclaims; and

   c. Defendants' Opposition to Digicel-Haiti's Daubert Motion and, in the Alternative, Motion in Limine to Exclude Testimony of Defendant's Expert, Joseph Gillan.

3. On October 13, 2021, I took the deposition of Kenneth McEwen. Attached hereto as Exhibit 1 is a true and correct copy of the following pages from the transcript of Mr. McEwen's deposition: 5, 26-28, 30, 126-127, 146-148, and 166.

4. From October 25-27, 2021, I attended the deposition of UPM Technology, Inc.'s corporate representative, Duy Tran aka Bruce Tran. Attached hereto as Exhibit 2 is a true and correct copy of the following pages from the transcript of UPM Technology, Inc.'s deposition: 6, 106-109, 246, 253, 552-553, 565-566, 570, 578-579, and 641.

5. On October 15, 2021, I attended the deposition of Baltazar Ruiz. Attached hereto as Exhibit 3 is a true and correct copy of the following pages from the transcript of Mr. Ruiz's deposition: 4, 9-15, 35-36, 40-42, 50, 234, 287-289, and 301.

6. On October 22, 2021, I took the deposition of Unigestion Holdings, S.A. d/b/a Digicel-Haiti's corporate representative Maarten Boute. Attached hereto as Exhibit 4 is a

Page 2- DECLARATION OF CHRISTOPHER W. SAVAGE
IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO
DIGICEL-HAITI'S MOTIONS
UPM-L1\00613404.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

true and correct copy of the following pages from the transcript of Mr. Boute's deposition: 5, 46-48, 70, and 168.

7.    On October 18, 2021, I attended the deposition of Joseph Gillan.  Attached hereto as Exhibit 5 is a true and correct copy of the following pages from the transcript of Mr. Gillan's deposition: 4, 12-15, 16-17, 33-34, 39-41, 249, and 250.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated: December 3, 2021.

By: _____
Christopher W. Savage
Washington, DC

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236



**Planet Depos**
We Make It *Happen*™

# Transcript of Kenneth McEwen

**Date:** October 13, 2021
**Case:** Unigestion Holdings, S.A., et al. -v- UPM Technology, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit 1
Page 1 of 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON - PORTLAND DIVISION

- - - - - - - - - - - - - - - - - x

UNIGESTION HOLDINGS, S.A.          :

d/b/a DIGICEL HAITI,               :

      Plaintiff/                   :

      Counterclaim Defendant : Case No.

  v.                               : 3:15-CV-185-SI

UPM TECHNOLOGY, INC., et al.,  :

      Defendants/                  :

      Counterclaim Plaintiffs:

- - - - - - - - - - - - - - - - - x

Deposition of KENNETH McEWEN

Conducted Virtually

Wednesday, October 13, 2021

7:01 a.m. Eastern Time

Job No. 405102

Pages:  1 - 166

Reported by:  Janet A. Hamilton, RDR

Exhibit 1
Page 2 of 13

P R O C E E D I N G S

-----

(McEwen Deposition Exhibit 1 through Exhibit 3 were pre-marked for identification.)

- - - - -

KENNETH McEWEN, a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANTS/ COUNTERCLAIM PLAINTIFFS UPM TECHNOLOGY, INC.

BY MR. SAVAGE:

Q  Good morning, Mr. McEwen.  Thank you for being with us today.

A  No problem.

Q  My name is Chris Savage.  I'm a lawyer for a company called UPM Technology.  You're here because there's a lawsuit that's been filed by Unigestion Holding, S.A., but we'll call them Digicel Haiti, against my client alleging a variety of things, some of which we're going to talk about.

Let me ask, have you ever had your deposition taken before?

A  No.

Q  And have you ever appeared in a United

Exhibit 1
Page 3 of 13

mistaken, he is -- Robert, you would probably know this. I believe the name, that's a gentleman who's in the legal department at Digicel; is that right?

MR. VAUGHAN: Legal and compliance, Gerard Laborde, yes.

Q Okay. I don't know if the court reporter -- can you spell -- could you spell the name for the court reporter? I just want to make sure the record's clean.

MR. VAUGHAN: G-E -- G-E-R-A-R-D. Laborde, L-A-B-O-R-D-E.

Q Great. Thanks. I thought I recognized the name, but I wanted to make sure the record would be clear.

So without going into details yet, there are a couple of places in your report where you refer to an investigation of UPM's activities. Well, I could point them out to you, but do you recall making a reference to investigation of UPM activities?

A Yes, because they are referenced also within the expedition -- from the documentations I've researched in crew.

Q Right. No, I get that. Other than the

Exhibit 1
Page 4 of 13

references to investigations in the documents, do you have any knowledge whatsoever of any investigations that Digicel or anyone else may have taken regarding UPM and its activities?

A  Not into UPM itself, no.

Q  Okay.  What knowledge other than into UPM itself beyond what's in the documents do you have of any investigation?

MR. VAUGHAN:  Objection.  Relevance, and please tread lightly.  Depending on where you're going, I may stop you.

Q  Yeah, and let me --

A  Mr. Vaughan, don't worry.  I am not willing to discuss that because that affects my customers' business.

Q  If, if I may, if I may interject here. This is a delicate area that Mr. Vaughan and I have spoken about in other context.  So first, A, there are rules in place that protect the confidentiality of proprietary information that may come up in this deposition.  Mr. Vaughan and I have the option to designate material as confidential, which would mean it just isn't publicly disclosed, but we can also designate things as highly confidential, which means that it

Exhibit 1
Page 5 of 13

Transcript of Kenneth McEwen
Conducted on October 13, 2021                    28

would not go beyond essentially me, Mr. Vaughan, and my experts, but it would never go to my clients or any other -- any party uninvolved in the case, and every one of us has a strict obligation to only use that kind of information for purposes of this case.

It's about as strict an NDA as you can get, and it's enforced by the power of the United States courts to hold us in contempt and put us in jail if we violate it.

So understand -- I appreciate and understand your need to protect confidential information, and I want to make sure the record is clear that that is all protected.

MR. VAUGHAN: That said --

Q Not quite done.

MR. VAUGHAN: Sorry.

Q Also understand that my view, and Mr. Vaughan may have a different view, is to the extent that information, proprietary or not, went into and affected your -- the formation of your opinion and the formation of your report, if it underlies your report in any way, then my view is that I am entitled to have access to that, perhaps under this highly confidential -- my client can't

Exhibit 1
Page 6 of 13

what -- where Mr. Vaughan will tell you not to answer, I'm confident, and we may be taking it up with the judge, is if you say you know about it and it affected your opinion, and I say, well, tell me about it, and Mr. Vaughan says, don't say a word, then we'll have something to take to the judge.

But I'm laying all this out because it is a very sensitive area, and I want to make clear where we are.

So with all that, first question:  Are you aware of any investigation that Digicel Haiti took regarding bypass of its network at all?

A  I am aware of investigations between -- that Digicel and my customer have done jointly.

Q  Okay.  One.

Two, this is again a yes or no question.

Does that knowledge that you've just described, does that knowledge affect in any way the opinions and matters you've discussed in your report?

MR. VAUGHAN:  Ob- -- does it affect in any way?  You can answer that, and that's a yes or no question.

A  No.

Exhibit 1
Page 7 of 13

technical characteristics of the signaling of the bypass call and the plain old local call are identical; aren't they?

A    On an individual's individual call in -- between the local transmission of the bypass international call versus the local initiated call, there is no real difference on that individual call basis.  In that sense you're talking from a technical aspect.

Q    Correct.

A    But the actual location from the call is where it will be originating from is the duration of the call, so the call is always from an A to a B.

Q    Right.  But again, I'm just focusing on what you're calling, I believe the local transmission, local transmission path; and now, looking at one individual call.  The technical characteristics of the local transmission path of the bypass call that may have originated in Timbuktu and the local call that's just a guy talking on his phone, those technical characteristics are identical; isn't that right?

A    In the sense of a single -- on a single call-to-call basis, yes, because they're both

Exhibit 1
Page 8 of 13

subscriber lines.

Q  Okay.  So, and when you were alluding to other things like number of calls and blah blah blah, what you were getting at there is a concern that the call distribution may be different, the length of calls may be different, that a large number of bypass calls might have an effect on the network different from an individual making a call?

A  You are correct.  Because of the way bypass operates it does have differentiation of the characteristics based on numbers.

Q  Okay.  So are you familiar with the idea of what's called human behavior software?

A  Yes.

Q  And what is that and what's it supposed to do?

A  It's supposed to be -- oh, it's used by bypass operators to attempt to get their SIMs or their systems to make their SIMs appear to be a human person.

Q  And that entails not using a SIM, you know, for 12 hours straight.  It -- moving it around, making sure the call durations are, are appropriate to a human use, that -- just to make

Exhibit 1
Page 9 of 13

All I know is there is a charge for

cross-connection and that is involved for roaming.

Q  But you don't know what it is.  Okay.

A  No.

Q  All right.  Okay.  If I could have just a moment, I know we're running short on time.  I think I've covered everything that I would like to ask you, but I'm not entirely sure.  So just let me -- let me block myself off for about a minute and I'll...

(A discussion was held off the record.)

Q  Okay.  Just one little bit more.  When I was asking you about the scenario of the, using the roaming route rather than the Internet down to Haiti route, you said you had some assumption that UPM would do that as a backup but not as a primary.  Did you talk to anybody about that assumption and why that would be logical or is that just you thinking about it?

A  That --

MR. VAUGHAN:  Objection.  Misstates testimony.  He did not say it was an assumption, but go ahead.

A  That's built on my understanding from conversation -- not with Digicel or with

Exhibit 1
Page 10 of 13

Mr. Vaughan's team.  I told about UPM scenario, but with conversations I've had with other players globally.  The re -- the usage of that route would be more, potentially more expensive than using the route via the Internet and therefore would not be the preferred route.  The preferred route would be the cheaper route.

Q  Okay, but just to be clear, which I think you said is, that part of your presentation was not based on any information about UPM or Digicel Haiti whatsoever.  It was based on your general assumptions and knowledge?

A  It's --

MR. VAUGHAN:  Objection.  Misstates testimony.

Go ahead.

A  It's based on my knowledge of how the bypass operators normally operate.

Q  Okay.  But it's not based on anything specific you know or think you know about UPM?

MR. VAUGHAN:  Third time.  Objection. Asked and answered.  And my prior objections.

Go ahead and answer, Mr. McEwen.

Q  Go ahead.

A  As mentioned, it's based on my experience

Exhibit 1
Page 11 of 13

of how bypass operators typically behave rather than anything that's been provided to me.

MR. VAUGHAN:  We're going for a fourth?

Q  Perhaps.  Is it based in any way on any knowledge you have or believe you have about UPM?

MR. VAUGHAN:  Objection.  Asked and answered thrice.  You want her to just read my objection?

Q  No, I'd like -- if we can get a direct answer to this question, I am done.

MR. VAUGHAN:  Say it again, Mr. McEwen.

Q  The question is, is this based in any way on any information specific to UPM?

MR. VAUGHAN:  Fifth time, asked and answered.  You can give him the answer again, Mr. McEwen.

A  This is based on my knowledge of how these people behave and how bypass operators typically behave rather than anything that's been typically passed to me or been passed to me in reference to the way UPM has particularly behaved during any investigation done by Digicel.

MR. VAUGHAN:  Going for a fifth or a sixth?

MR. SAVAGE:  No.  We're good.  That's what

Exhibit 1
Page 12 of 13

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of October, 2021.

Janet A. Hamilton

Registered Diplomate Reporter

My commission expires

February 4, 2023.

# Exhibit 2

# Deposition Transcript of Bruce Ngoc Quang Tran, Designated Representative (Excerpts)

# Filed Under Seal



# Transcript of Baltazar Ruiz

**Date:** October 15, 2021
**Case:** Unigestion Holdings, S.A., et al. -v- UPM Technology, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit 3
Page 1 of 21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON - PORTLAND DIVISION

- - - - - - - - - - - - - - - - - x

UNIGESTION HOLDINGS, S.A.         :

d/b/a DIGICEL HAITI,              :

      Plaintiff/                 :

      Counterclaim Defendant :  Case No.

  v.                               :  3:15-CV-185-SI

UPM TECHNOLOGY, INC., et al.,  :

      Defendants/                :

      Counterclaim Plaintiffs:

- - - - - - - - - - - - - - - - - x

Deposition of BALTAZAR RUIZ

Conducted Virtually

Friday, October 15, 2021

9:02 a.m. PST

Job No.: 406559

Pages: 1 - 301

Reported by: Burgundy B. Ryan, CSR, RPR

Certificate No. 11373

Planet Depos

888.433.3767

Exhibit 3
Page 2 of 21

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                    4

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Friday, October 15, 2021, commencing at 9:02 a.m. PST thereof, via remote video teleconference, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of

California, personally appeared

BALTAZAR RUIZ,

a witness called on behalf of PLAINTIFF, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

IT TECHNICIAN:  Thank you to everyone for attending this proceeding remotely, which we anticipate will run smoothly.

Please remember to speak slowly, and do your best not to talk over one another.

Please be aware that we are recording this proceeding for backup purposes.  Any off-the-record discussions should be had away from the computer. Please remember to mute your mic for those conversations.

Please have your video enabled to help the reporter identify who is speaking.  If you are unable to connect with video and are connecting via phone,

Exhibit 3
Page 3 of 21

# Exhibit 3

# Deposition Transcript of Baltazar Ruiz (Excerpts)

# Pages 4-10 Filed Under Seal

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                    35

clear.

COURT REPORTER:  Yes.  Thank you.

MR. VAUGHAN:  Yes.  Sorry about that.

MR. SAVAGE:  No.  It is an acronym.

By MR. VAUGHAN:

Q    What is New Voice Telecom?

A    Oh, that -- yes, that is the -- that is the same -- VoIP 1 changed the name to New Voice Telecom, and they also used the name New Voice Retail -- well, because it was another business, New Voice Retail. Thank you.  That -- that -- that jogged my memory.

Q    And that's where you worked from 2004 to 2012?

A    Correct.

Q    Okay.  Let me focus your attention and time at UPM.  When you started at UPM, what was your job title?

A    It was NOC manager.

Q    It was --

(Zoom cross-talk.)

MR. SAVAGE:  N-O-C.

THE WITNESS:  Yes.  N-O-C.

MR. SAVAGE:  N-O-C.

THE WITNESS:  Thank you.

By MR. VAUGHAN:

Exhibit 3
Page 11 of 21

Q     And what is NOC -- go ahead.

A     I'm sorry, Robert.  Was there a question?

Q     Sure.  What does NOC mean, N-O-C, what does it mean?

A     Oh, Network Operations Center.

Q     Was NOC manager the only position you ever held at UPM?

A     No.

Q     What other positions did you hold with the time frame, if you can?

A     Yeah.  I started as a NOC manager, and then I was demoted to a NOC engineer.

Q     You said you were demoted?

A     Yes.

Q     Okay.  From what time to what time?

A     This was -- let me think.  I want to say it was 2014 or 2015.

Q     Okay.  That's when you were the NOC engineer?

A     Yes; correct.

Q     So you were not manager from 2012 to -14?

A     Correct.

Q     Okay.  And then what other positions, if any, did you hold from '15 to '16?

A     Well, the titles didn't entail the

Exhibit 3
Page 12 of 21

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                    40

as you just described it for us?

A    Yeah.  I think -- yeah, I think so.  Yes.

Q    How many times?

A    I don't recall.

Q    What was the average bonus that you received?

A    I can't recall.

Q    Now, you said that it was based on the amount of minutes sold through the network.  How was that determined for bonus purposes or commission purposes?

A    I -- I don't know.  I mean, no.

Q    Who made that determination?

A    I -- I don't know.  I imagine the owner.  I don't know.

Q    Who communicated to you whether or not you had earned a bonus?

A    The paycheck.

Q    Now, you -- you started to tell me a little bit about your duties as the NOC manager and then later as the NOC engineer.  And you described it first as you were managing all of the Spanish speaking employees who worked at the NOC.  You managed the infrastructure in the data center.  What else, if any, duties or responsibilities did you have

during your time at UPM?

A     None.  None that I recall.

Q     Were you responsible for gateways?

A     No.

Q     Were you responsible for shipping?

MR. SAVAGE:  Objection.  Foundation.  I mean, feel free to ask about gateways, but I think it's useful to note that you haven't described what they are.

MR. VAUGHAN:  Okay.  I'll take that.

By MR. VAUGHAN:

Q     Do you know what a gateway is?

A     I know what it is, yes.

Q     Okay.  What's a gateway?

A     A device that converts VoIP into GSM.

Q     And what's GSM?

A     That thing to be used by -- by phones, but this day any phone could be a gateway.  But, yes, it's the ability -- gateway would basically -- yeah.  In a simplistic way, that.

Q     And -- and -- and we've already -- I think you've defined for us what VoIP is, but just tell us again, what is VoIP?

A     VoIP is the -- a set of protocols that are able to conduct speech over Internet.

Exhibit 3
Page 14 of 21

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                42

Q    You were -- I was asking you about your duties and responsibilities with respect to gateways. I'm sure you answered, but it just slipped me.  Did you have any responsibilities with respect to gateways?

A    No, no responsibilities that I recall.

Q    Did you have any responsibilities with respect to distribution?

A    Distribution?

Q    Yes.

A    Of?

Q    Distribution of UPM assets, UPM services, anything UPM distributed?

MR. SAVAGE:  Objection.  Vague.

MR. VAUGHAN:  You can answer.

THE WITNESS:  It's pretty vague.  It's pretty vague.  When you -- in the data center, the data center systems basically distribute a VoIP calls across multiple gateways, but I wouldn't -- I didn't manage that, so -- so, no, I was not -- no, in that regard, I was not managing the distribution, no.

By MR. VAUGHAN:

Q    Okay.  So you had nothing to do with the distribution of calls from that data center outward.

A    No.

Exhibit 3
Page 15 of 21

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                    50

A    Lower the cost of calls in the U.S.

Q    Its business was to lower the cost of calls in the U.S.

A    Yes.  Yeah, of the cost of international calls.

Q    How does it go about that?  So your understanding that this company was in the business of lowering the cost of international calls?  That's what happen you understood the business to be?

A    Yeah.  Yeah.

Q    Okay.  How did you understand -- let me rephrase that.  Did you have an understanding of how the company went about lowering the cost of international calls?

A    Using VoIP gateways.

Q    And explain that for me, please.  How did it use VoIP gateways to lower the cost of international calls?

A    Reaching the gateway via VoIP and then converting the call to GSM at the gateway.

Q    Did you ever come to gain an understanding of whether or not UPM is just one company or multiple different entities?

A    I never knew.

Q    Okay.  Which UPM company were you

test your routes to see if your routes were working?

A     Correct.

Q     Why didn't you just contact Digicel, and say, hey, we would like to test these routes?

A     That's a good question.  Because I don't know that we had a method for that.

Q     A phone?

A     No, no.  The numbers.

Q     A telephone, why don't you just contact Digicel to say, hey, we would like to test some termination routes with you?

A     Well, I am going to -- I am going to guess that the price -- I mean, the -- the core of the business of UPM was lower the price and the cost of doing the call that way was much lower than what you're suggesting, which is relationship with Digicel.  That was the core of the business of UPM.

Q     So the relationship with Digicel was the more expensive option than the option you chose?

A     Correct.

Q     And the option you chose was to avoid the relationship with Digicel?

MR. SAVAGE:  Objection.  There is no evidence that Mr. Ruiz --

You told me -- I heard no gasping, so I thought I was on mute.

You told me earlier that MERA was software that was used to manage and monitor a switch; correct?

A    MERA is a -- a -- a voice switch for a VoIP switch.  It's a VoIP switch.

Q    So MERA is not software.  It is a VoIP switch.

A    It is -- it is software, but it is a VoIP switch.

Q    So the switch that you're talking about is actually a Softswitch.  It's software.

A    Oh, yes.  Thank you.  You made me remember that term.  I had forgotten about that term.  Yes. It is a Softswitch.

Q    Okay.  Thank you for clarifying that.

Just to be clear, when I spoke to you, you spoke of not having any familiarity with human behavior software while you were at UPM and only developing some knowledge within the last year.  Do you remember that?

A    Correct.

Q    Now, it appears, to me -- and maybe I'm wrong -- but you described for Mr. Savage your

Exhibit 3
Page 18 of 21

Transcript of Baltazar Ruiz
Conducted on October 15, 2021                    288

understanding of human behavior software, and it sounded like you were saying while you were at UPM. Can you clarify for me?

A     No.  Yes, I can clarify.  I mean, as -- as I am -- as we are having this conversations, I am remembering bits and pieces of my work at UPM and -- and, yes, the -- the -- the -- the effort behind the human behavior, it was basically having what I described before, having two gateways communicate to each other and emulate human behavior.

And if I recall correctly, that is -- that is what evolved into the SIM robot.  And I think that's where your question came from.  That is what ended up as a SIM robot, which I recall is -- I don't know if it still exists -- a very complex tool.

Q     So I'm glad you are remembering.  So it is software -- complex software that was utilized by UPM to emulate human behavior; correct?

A     Yes.

Q     And it was to emulate human behavior to avoid bypass detection; correct?

A     Correct.

Q     And it was to emulate human behavior so that carriers in this case, Digicel in Haiti, would not be able to identify SIMs being used by UPM for

Exhibit 3
Page 19 of 21

bypass; correct?

A    Correct.

Q    And now that your memory is jogged, that's one of the things that the consultant who was training you on how to avoid bypass detection, one of the things they spoke about; right?

A    I don't recall the details of that training.  I do recall that -- that he is from Mexico, and he came over a couple of times that I recall.

Q    Okay.  All right.

MR. VAUGHAN:  Now, Austin, I apologize, man.  I should have kept the -- the -- the number written on these things.  I want 0607, and I -- I don't remember which exhibit number it is?

IT TECHNICIAN:  Stand by.

MR. SAVAGE:  The -- the Bates number 0607.

MR. VAUGHAN:  That is correct.

MR. SAVAGE:  Let me see if I can find it for you.

MR. VAUGHAN:  A rookie mistake.  I should have written the exhibit number on the document, and I didn't.

Okay.  Thank you, Austin.

Exhibit 3
Page 20 of 21

CERTIFICATE OF STENOGRAPHIC REPORTER

I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

BALTAZAR RUIZ,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED:  Friday, October 22, 2021.

_____
Burgundy B. Ryan, CSR No. 11373, RPR

Exhibit 3
Page 21 of 21

# Exhibit 4

# Deposition Transcript of Maarten Boute, Designated Representative (Excerpts)

# Filed Under Seal

Joseph Gillan
October 18, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

------------------------------
UNIGESTION HOLDINGS,S.A,  a foreign
corporation, d/b/a DIGICEL HAITI,

        Plaintiff,

VS.

                                No. 3:15-CV-00185-SI

UPM TECHNOLOGY, INC., d/b/a UPM
TELECOM, INC., and UPM MARKETING,
INC., an Oregon corporation; UPM
TELECOM, INC., an Oregon a/b/n; UPM
MARKETING, INC., an Oregon a/b/n;
BEN SANCHEZ a/k/a BEN SANCHEZ MURILLO;
a foreign individual; BALTAZAR RUIZ,
a foreign individual, TYLER ALLEN, a
foreign individual, and DUY TRAN a/k/a
BRUCE TRAN, a foreign individual,

        Defendants,

UPM TECHNOLOGY, INC.,

        Counterclaim Plaintiff,

Vs.

UNIGESTION HOLDINGS, S.A.;

        Counterclaim Defendant

------------------------------

Video Teleconference
Hollywood, Florida
October 18, 2021
10:01 A.M.

- - - - - - -

DEPOSITION

OF

JOSEPH GILLAN
- - - - - - -

Joseph Gillan
October 18, 2021

The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.  They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.  This arrangement is pursuant to the Florida Supreme Court Administrative Order No. AOSC-20-23.  The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

MR. VAUGHAN:  Robert Vaughan, Anisha Atchanah, appearing on behalf of Digicel Holdings, at Digicel Haiti Unigestion from Kim Vaughan Lerner, and we agree.

MR. SAVAGE:  Chris Savage from Davis Wright Tremaine for UBM Technology and the individual defendants, and we agree.

Thereupon,

JOSEPH GILLAN

after being duly, testified upon his oath as follows;

DIRECT EXAMINATION

Exhibit 5    4
Page 2 of 15

Joseph Gillan
October 18, 2021

from an economist perspective of those policies and those decisions.

Q.  Okay.  So to be clear, and I don't want to put words in your mouth, but in that definition, where you focused on the economic evaluation and economic analysis of the FCC's reasoning, you didn't make any mention directly or indirectly of the applicable law.

So I just need your confirmation that you are not here to testify as to the applicable law, directly or indirectly.

MR. SAVAGE:  Objection.  Argumentative.

BY MR. VAUGHAN:

Q.  You may answer.

A.  Well, without trying to split hairs, if the question is, are resale restrictions prohibited by the FCC, then I certainly am going to say, my reading of these orders and the economic analysis underlined in these, yes, those are practices found to be unjust and unreasonable by the FCC.

Now, whether or not, you know, Haitian law versus US law, or international treaty applies, that type of question, I'm certainly not going there.  But I am willing to explain the reasoning behind FCC decisions, and since those are legal documents, to that extent, I am testifying as their applicability.

Joseph Gillan
October 18, 2021

Q.  Okay.  So if I heard you correctly, to the extent that the FCC regulates any conduct that may be at issue in this case, you are here to opine as to the applicability of those FCC regulations?

MR. SAVAGE:  Objection.  Misstates the witness' testimony.

BY MR. VAUGHAN:

Q.  You may answer.

A.  I don't think I go -- I go to the issue of applicability because I am assuming that has lots of legal baggage associated with it.  All I can say is that when there is a clear FCC order that says X, because of economic factors, you know, Y through Z, I would testify to what I believe that FCC order says in those economic arguments.

Whether or not the entire framework that the FCC laid out applies or not, that's not something I'm in a position to issue a judgement on.

Q.  Okay.  So you're not here to testify as to whether or not the frame -- what you called the framework -- which I asked you about whether or not any specific FCC regulations apply, you're not here to testify about that?

A.  Not whether the -- if the question goes, does the FCC have the jurisdiction for its orders to have to be

Joseph Gillan
October 18, 2021

adhered to, that's not -- that, to me, is a legal question that I'm not testifying to.  And that's what I hear you asking about when you say the word apply.

Q.  Okay.

A.  Whether they have the underlying legal jurisdiction over a subject matter.

Q.  That's not what I asked, but, fine, we'll take jurisdiction.  Put jurisdiction aside.  You're not here to testify to jurisdiction.

My question is slightly different.  Are you here to testify about whether or not any specific FCC regulations apply to the facts and circumstances of this particular dispute, as you understand them?

A.  No.  With that clarity, I think the distinction is I am here to testify as to the economic reasoning the FCC applied in reaching --

Q.  Sir -- sir, I --

A.  -- applied that same --

MR. SAVAGE:  Let him answer, Robert.

MR. VAUGHAN:  Chris, we are not going to start off with you yelling at me.  If you want to object, object.

MR. SAVAGE:  Let him finish his answer.

MR. VAUGHAN:  Okay.  Let's just get something clear.  Chris, you're not going to yell

Joseph Gillan
October 18, 2021

at me, again.  Or we're going to -- we're just not going to go down that road today.  It's not necessary.

Number two --

MR. SAVAGE:  Well, you interrupted me -- or will you let him finish his answer?

I am not going to yell at you anymore, but I do need clarity about that.

BY MR. VAUGHAN:

Q.  Cool.  Mr. Gillan, it really helps if you let me finish.  You may be surprised at where I am.

Mr. Gillan, Mr. Gillan, I apologize for interrupting you and it won't happen again.  The -- well, I'll try not to have it happen again.  My concern is this --

MR. SAVAGE:  I said that, I'm sure that's the best.

BY MR. VAUGHAN:

Q.  If I ask you one question and answer something else, knowing myself the way I do, I won't accept it.  It will not satisfy me, which means we will keep regoing the same territory over and over and over again, which in your -- is to nobody's benefit.

So if I ask you a question about whether your testimony is about the applicability of certain

Joseph Gillan
October 18, 2021

regulations to the facts and circumstances of this case,
and you insist on talking to me about the underlying
economic analysis, I'm not going accept that as an
answer to my question.  Because it isn't.

You have given me that response three times,
which is the only reason I interrupted you.  So I'm now
going to put it back into your hands, and I'm going to
ask you my question one more time.  Sir, as an expert
witness in this case, do you see it as your role to
opine as to the applicability of specific FCC
regulations to the facts and circumstances of this case
as you now understand them?

MR. SAVAGE:  Asked and answered.  Objection
unclear and ambiguous.

You may answer.

THE WITNESS:  No, not as to their
applicability.

BY MR. VAUGHAN:

Q.  Thank you so much, sir.

You have intimated on three occasions that you do
see your role as opining about the underlying economic
rationale and the underlying economic analysis that
drives certain FCC decisions.  Did I get that right?

A.  Yes.

Q.  And will you be purporting to testify as to what

Exhibit 5
Page 7 of 15

Joseph Gillan
October 18, 2021

you believe the FCC's decisions would be vis a vis the issues in this case, based upon your understanding of those underlying economic rationales and underlying economic analyses?

MR. SAVAGE:  Objection.  Relevance.

You may answer.

THE WITNESS:  No, not as I understand your question, which, as I understood, you asked me if I was going to make a prediction about what the FCC would say under certain circumstances as opposed to simply going back and applying the analysis that they had applied previously.

BY MR. VAUGHAN:

Q.  Okay.  So you're not going to make any kind of prediction or projection as to what the FCC would do with this dispute and question if placed before them?

MR. SAVAGE:  Objection.  Incomplete hypothetical.

You may answer.

BY MR. VAUGHAN:

Q.  You can answer.

A.  Correct.

Q.  Okay.  You are, however, intending to testify regarding the economic rationale and under -- underlying economic analyses regarding the FCC's previous

Joseph Gillan
October 18, 2021

changed their corporate form and/or because I actually changed my hourly rate, requiring that a different engagement contract had to be signed between the two of us.  It would be between myself and the entity that is now known as WITS.

Q.  And what is the current hourly rate of your engagement?

A.  I bill them 400 an hour.

Q.  Now, not to repeat or rehash our earlier discussion, still talking about the scope of your retention, the scope of your work in this case, you have already described for me that -- I'm paraphrasing slightly, just because it is too long to remember, but you're addressing the economic and policy rationales for certain FCC decisions, past FCC decisions and their applicability to resale.

Are you also intending to discuss whether UPM's resale of Digicel Haiti services is consistent with FCC's economic reasoning and rationale?

A.  Yes, in the sense that if you apply that economic analysis to UPM's resale of the two termination methods, is it consistent with the type of resale arrangement that the FCC found to be publicly beneficial, yes.  And other decisions.

Q.  So you do intend to apply the rationale from past

Joseph Gillan
October 18, 2021

FCC's decisions to the determination of whether UPM's resale was consistent with FCC regulations?

A.   Well, consistent with the economic analysis that the FCC used in reaching those decisions, yes.

Q.   Do you also intend to address whether Digicel Haiti's alleged interruptions of UPM efforts was unreasonable?

A.   Yes.  It helps if that same standard is unreasonable, yes.

Q.   How do you plan to discuss whether or not Digicel Haiti's alleged interruption of UPM's efforts was unreasonable?

A.   Well, sort of the reverse.  Was UPM's use to obtain lower termination cost can -- reasonable under 201/202?  If then the analysis of the economics of why you allow resale, why you permit carriers to use alternative termination arrangements to achieve more cost based rates.

So in a sense that their behavior and use was reasonable, then denying them their use would have been unreasonable, and nothing more complicated than that. Just the mirror image.

Q.   So similarly your discussion here ends with your conclusion about the reasonableness, or lack thereof, of Digicel Haiti's conduct?

Joseph Gillan
October 18, 2021

MR. VAUGHAN:  Okay.

MR. SAVAGE:  I think that's it.

MR. VAUGHAN:  Got it.

MR. SAVAGE:  Maybe argumentative, too, but we'll let that go.

MR. VAUGHAN:  No good deed goes unpunished. Next time, I won't stop.

BY MR. VAUGHAN:

Q.  So the second -- the second thing that you're doing, in addition to what we just confirmed, is you then take what you have repeated from the FCC, and then you provide your conclusion about what the FCC would do using that analysis?

MR. SAVAGE:  Objection.  Mischaracterizes the witness' testimony.

BY MR. VAUGHAN:

Q.  You may now answer.

A.  No, as I indicated, I'm not giving a prediction as to what the FCC would do.  All right?  I'm merely saying -- and maybe it's not a merely, but if you apply the same economic reasoning that the FCC has applied over the 35 years, to the facts as I understand them, that these are the conclusions that I reach applying that same analysis.

Now, that is not really the same as saying I'm

Joseph Gillan
October 18, 2021

predicting what the FCC would do because the FCC might choose to apply a completely different analysis than they applied over the past 35 years.  So I'm not trying to argue what -- make a prediction about what they would do, I'm just saying, if you apply the analysis that they have applied consistently over this period of time to the facts at hand, you reach the conclusions that I reach.  Or at least I reach the conclusions that I reach as an economist from my economic training and their economic analysis.

But I recognize that the FCC, at times, issues decisions that are not entirely consistent with precedent, so therefor, I am not making a prediction about FCC behavior.

Q.  This is what you would?

A.  No, this is what conclusion I would reach applying the analysis that they applied.

Q.  So it is not what you think the FCC would do -- let's go at it another way.  It's not what you think the FCC would do, you're not predicting the FCC's conclusions?

MR. SAVAGE:  Objection.  Mischaracterizes testimony.

BY MR. VAUGHAN:

Q.  You may now confirm.

Joseph Gillan
October 18, 2021

A.  I am not making a prediction, other than to say that if they applied the same analysis that they applied over this period of time that that analysis applied here.  To me, as an economist, produces the same outcome.

Q.  The answer is, that's correct, what I just said is correct?

MR. SAVAGE:  Objection.  Argumentative.

BY MR. VAUGHAN:

Q.  Right?

MR. SAVAGE:  Objection.  Argumentative.

MR. VAUGHAN:  Yeah, we heard you.

MR. SAVAGE:  You asked another question.

THE WITNESS:  I would like what you said repeated to me because I believe I clarified.

BY MR. VAUGHAN:

Q.  You're not -- to be clear, you are not suggesting or predicting that that this is what the FCC would do, true?

A.  Correct because --

Q.  Okay.

A.  Because I cannot --

Q.  I don't need an explanation.

A.  -- the FCC has not made.

Q.  Okay.  Number two, you are not saying that this

Exhibit 5    41
Page 13 of 15

Joseph Gillan
October 18, 2021

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD


     I, STACIE APPEL-CLAIR Florida Professional

Reporter, State of Florida, certify that JOSEPH GILLAN,

personally appeared before me on the 18th day of

October, 2021, and was duly sworn.


     Dated this 18th day of October, 2021.



                         STACIE APPEL-CLAIR, FPR

                         Notary Public - State of Florida

Joseph Gillan
October 18, 2021

CERTIFICATE

I, Stacie Appel-Clair, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that said transcript is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, nor financially interested in the action.

Dated this 27th day of October, 2021.

Stacie Appel-Clair

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, I served the foregoing **DECLARATION OF CHRISTOPHER W. SAVAGE IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO DIGICEL-HAITI'S MOTIONS** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: December 3, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236