**Kathryn P. Salyer,** OSB #883017
**Eleanor A. DuBay,** OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage,** D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**, <br><br> Plaintiff, <br><br> v. <br><br> **UPM TECHNOLOGY, INC**., *et al.,* <br><br> Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI <br><br> **DECLARATION OF CHRISTOPHER W. SAVAGE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REPLIES** |

I, Christopher W. Savage, declare under penalty of perjury:

UPM-L1\00615619.001

1. I am an attorney at Davis Wright Tremaine LLP. I am one of the attorneys representing the defendants in the above-captioned action. I make this declaration based on personal knowledge and my review of the records and files in this proceeding and public records referenced herein. I am competent to testify if called to do so.

2. I make this declaration in support of Defendant UPM Technology, Inc.'s Reply in Support of Defendants Benjamin Sanchez A/K/A Benjamin Sanchez Murillo, Baltazar Ruiz, Tyler Allen And Duy Tran Aka Bruce Tran's Motion For Summary Judgment and Defendants' Reply In Support Of Motion For Summary Judgment (together, "Replies").

3. On October 27, 2021, I attended the deposition of Duy Tran aka Bruce Tran. Attached hereto as Exhibit 1 is a true and correct copy of the following pages from the transcript of Mr. Tran's deposition: 1, 4, 37-38, and 107.

4. On October 12, 2021, I took the deposition of Charles Castel. Attached hereto as Exhibit 2 is a true and correct copy of the following pages from the transcript of Mr. Castel's deposition: 1, 5, 75-76, 112, 121 and 193.

5. Attached hereto as Exhibit 3 is a true and correct copy of the following pages from the Expert Report of Don J. Wood, dated September 27, 2021 and produced by Defendants UPM Technology, Inc: 1-4.

6. For the convenience of the Court, attached hereto as Exhibit 4 is a true and correct copy of the FCC's Order in the FCC's proceeding regarding enforcing foreign nations' anticompetitive restrictions: *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Order, 18 FCC Rcd 6077 (2003). This order was cited in Defendants' Opposition To Digicel-Haiti's Motion For Summary Judgment On Defendant UPM Technologies, Inc.'s Counterclaims (ECF #279) ("UPM Opposition (Communications Act)"), p. 21-23, n. 68.

7. For the convenience of the Court, attached hereto as Exhibit 5 is a true and correct copy of the FCC's Notice of Proposed Rulemaking in its proceeding regarding enforcing foreign nations' anticompetitive restrictions: *Enforcement of Other Nations' Prohibitions Against*

*the Uncompleted Call Signaling Configuration of International Call-back Service et al.,* Notice of Proposed Rulemaking, 17 FCC Rcd 2794 (2002). *See* UPM Opposition (Communications Act), p. 21, n. 67. *See* UPM Opposition (Communications Act), p. 21, n.67.

8.    For the convenience of the Court, attached hereto as Exhibit 6 is a true and correct copy of the FCC's ruling regarding anticompetitive practices along the United States-Tonga route: *Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route, Memorandum Opinion and Order,* 29 FCC Rcd 4186 (2014). *See* UPM Opposition (Communications Act), p. 17, n.52.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated: December 20, 2021.

By:    _____
　　　　Christopher W. Savage
　　　　Washington, DC

UPM-L1\00615619.001



**Planet Depos**

*We Make It Happen*™

<span style="color:darkred">**Contains Attorneys' Eyes Only and Super Confidential Information**</span>

# Transcript of Bruce Ngoc Quang Tran

**Date:** October 27, 2021
**Case:** Unigestion Holdings, S.A., et al. -v- UPM Technology, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit 1
Page 1 of 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNIGESTION HOLDINGS, S.A., A   :

FOREIGN CORPORATION, D/B/A     :

DIGICEL HAITI,                 :

                    Plaintiff :

   v.                          : No. 3:15-cv-00185-SI

UPM TECHNOLOGY, INC. D/B/A     :

UPM TELECOM, INC., AND UPM     :

MARKETING, INC., AN OREGON     :

CORPORATION, ET AL.            :   Full Version

              Defendants.:

-----------

CONTAINS ATTORNEYS' EYES ONLY AND SUPER

CONFIDENTIAL TESTIMONY

Videoconference Deposition of

BRUCE NGOC QUANG TRAN

Conducted Virtually

Wednesday, October 27, 2021

4:34 p.m. EST

Job No.:  409842

Pages:  1 - 107

Reported By:  Dawn M. Hart, RPR/RMR/CRR

Exhibit 1
Page 2 of 6

Contains AEO and Super Confidential Information
Transcript of Bruce Ngoc Quang Tran
Conducted on October 27, 2021                                    4

P R O C E E D I N G S

BRUCE NGOC QUANG TRAN

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MS. VALBRUN:

Q    Good afternoon, Mr. Tran.

A    Good afternoon.

Q    Can you please go ahead and state your full name for this record?

A    My first name is Bruce, my last name is Tran, and my middle name is Ngoc Quang.

Q    And N-G-O-C Q-U-A-N-G, correct, for your middle name?

A    Yes, that is correct.

Q    You just had your deposition taken as the corporate representative for the UPM companies in this case, correct?

A    That is correct.

Q    Okay.  So I just want to give you the heads-up, you will probably anticipate, some of the questions might seem a little bit repetitive, but I assure you to the extent we're repeating any

Q    Now, I think I know the answer to this question but I'm going to ask anyway.  Is there anyone within your company structure that you have to report to?  Is there anyone that you report to that's above you?

A    Yes, my wife.  I'm just kidding.

Q    Your wife is in the company?  That's sworn testimony now.

A    I'm just kidding.  No.

Q    All right.  Just so we --

MR. SAVAGE:  Let the record reflect that doesn't mean she's not the boss.

Q    Just so that the record is clean, is there anyone within the corporate structure that's above you that you have to report to, Mr. Tran?

A    No.

Q    Now, Mr. Ben Sanchez, is that an individual that at any point in time you worked closely with?

A    Yes.

Q    Okay.  Now tell us, who is Mr. Ben Sanchez?

A    He was the President of the company.

Q    And during what period was he the President of the company?

Exhibit 1
Page 4 of 6

Contains AEO and Super Confidential Information
Transcript of Bruce Ngoc Quang Tran
Conducted on October 27, 2021                                      38

A    At the very beginning when we start, which was 2007, until his departure, which I don't remember when he departed, but I think he departed sometime around '15, '16, I think.  But he was really inactive way, way, way prior to that.

Q    Mr. Tran, have you ever been employed by any entity that you do not own?

A    Which period?

Q    Prior to the first time you owned your own company, so essentially -- just so you know, I'm looking for at any point prior to you owning UPM, did you work for any company?

A    I did.

Q    What was the name of that company?

A    It was called New World Brands.

Q    What's it called?  Sorry.

A    New, N-E-W.

Q    Uh-humh.

A    And World, that's W-O-R-L-D.

Q    Yes.

A    And then Brands, B-R-A-N-D-S.

Q    And what kind of business was that?

A    Telecom.

Q    And what did you do there?

A    I was -- I had two titles.  One I was a

Exhibit 1
Page 5 of 6

Contains AEO and Super Confidential Information
Transcript of Bruce Ngoc Quang Tran
Conducted on October 27, 2021                    107

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Dawn M. Hart, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 28th day of October, 2021.

My commission expires:

January 2, 2025

_____

NOTARY IN AND FOR THE

STATE OF MARYLAND

Exhibit 1
Page 6 of 6



**Planet Depos**
We Make It *Happen*™

# Transcript of Charles Castel

**Date:** October 12, 2021
**Case:** Unigestion Holdings, S.A., et al. -v- UPM Technology, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit 2
Page 1 of 8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON - PORTLAND DIVISION

- - - - - - - - - - - - - - - - - x

UNIGESTION HOLDINGS, S.A.         :

d/b/a DIGICEL HAITI,              :

      Plaintiff/                 :

      Counterclaim Defendant :  Case No.

  v.                              :  3:15-CV-185-SI

UPM TECHNOLOGY, INC., et al.,  :

      Defendants/                :

      Counterclaim Plaintiffs:

- - - - - - - - - - - - - - - - - x

Deposition of CHARLES CASTEL

Conducted Virtually

Tuesday, October 12, 2021

10:13 a.m. Eastern Time

Job No. 405089

Pages:  1 - 193

Reported by:  Janet A. Hamilton, RDR

Exhibit 2
Page 2 of 8

P R O C E E D I N G S

-----

(Castel Deposition Exhibit 1 through Exhibit 4 were pre-marked for identification.)

CHARLES CASTEL,

a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANTS/
COUNTERCLAIM PLAINTIFFS UPM TECHNOLOGY, INC.
BY MR. SAVAGE:

Q  Good morning, Mr. -- is your name pronounced Castel?

A  Castel, yes.

Q  Castel, okay.  Good morning.  My name is Chris Savage.  I am a lawyer with the law firm called Davis Wright Tremaine in the United States. I represent UPM Technology and the individual defendants in the litigation that we're involved in now.

Could you state your current employer, if you have one, and place of residence?

A  For the moment I'm working as an independent consultant.

Q  And you --

A  In economics and public policy and

Exhibit 2
Page 3 of 8

document that's been marked as Castel No. 2, and it's -- at the bottom it says Exhibit 1, pages -- page 4 all the way up through page 20.

Do you have a copy of that with you, Mr. Castel?

A  Yes.

Q  Okay, good.  That will just make it easier when I refer to a particular page.

A  This is a copy of my opinion.

Q  Correct.  That's exactly what we're going to be talking about.

One, a few lead-up questions to the background of this.  In preparing this opinion, did you receive any specific information from Digicel about their books and records and finances?  Did any of that kind of thing go into forming this opinion?

A  No.  I, I totally relied on publicly available information.

Q  Okay.  So then just to be clear, you did not look at any information at all regarding UPM Technologies, my client?

A  Excuse me?

Q  Did you look at any information specifically relating to my client, UPM

Exhibit 2
Page 4 of 8

Technologies, in putting together this opinion?

A  No.

MR. VAUGHAN:  Objection, vague.

Q  Okay.  Well, let's look at specific things then.  So I'm going to be referring to specific pages; and just so the record is clear, I'm referring to the numbered pages on your expert report that says at the bottom right Exhibit 1, page 1 of 20, page 2 of 20, et cetera.  So when I refer to page 1 or page 3 or what have you, that's what I'm referring to.

So with that in mind, if you could take a look at page 3.  Exhibit 1, page 3 of 20.

Do you have that in front of you?

A  Yes.  It says it is registration of normal cost operations?

Q  No, not the version that I have.  This is the one -- so page 1 is the cover page.

A  Yes.

Q  Page 2 is the table of contents.

A  Yes.

Q  And then page 3, Exhibit 1, page 3, has a heading at the top called telecom legal bypass and bypass fraud context.

If not, we can put it up on the screen

Exhibit 2
Page 5 of 8

saying that we had like X amount of equipment instead of 2X or 3X.

Q   And in addition, we have records showing, assume that we have records showing how many minutes of traffic were actually completed using that equipment.

MR. VAUGHAN:  Objection.  Incomplete hypothetical.  Assumes facts not in evidence.

Go ahead.  He wants you to make those assumptions.

A   That -- I am at a loss here.  I don't see how I would come to that kind of exercise.

Q   Well, let me give you a hypothetical.

A   And, and to begin with, trusting what UPM is saying.

Q   Well, let me give you --

A   Because this is a clear case of information asymmetry, where UPM knows and only UPM can know what it's been busy doing.

Q   Well, let me ask this --

A   So now you are asking me as a number --

Q   No, no.

A   You're asking me whether or not I would, should consider to add faith to what UPM involved in bypass operations in Haiti would come up with

Exhibit 2
Page 6 of 8

You're Home service in the United States?

A   No, but I can infer from that that everything that he is saying here in terms of market share is based on his experience, UPM's experience of the Haitian market.

And the only experience UPM have of the Haitian market is the bypass activities they were involved in.

Q   So do you have any understanding with respect to UPM's activities in 2014, what portion of bypass minutes were completed by virtue of equipment down in Haiti versus what portion were completed using equipment entirely in the United States?

MR. VAUGHAN:  Objection.

A   I don't have --

MR. VAUGHAN:  Objection.  Assumes facts not in evidence.

You can answer if you know.

A   No.

Q   So suppose with me that what Mr. Wood was saying was that if Digicel had not prevented UPM from reselling service in the United States, UPM would have had a market share of 15 percent.

Do you understand what I'm asking you to

Exhibit 2
Page 7 of 8

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

    I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

    IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of October, 2021.

_____

Registered Diplomate Reporter

My commission expires

February 4, 2023.

Expert Report of Don J. Wood, MBA, CVA, MAFF
September 27, 2021


United States District Court
For The District of Oregon
Portland Division
No. 3:15-cv-00185-SI


1. My name is Don J. Wood.  I am a principal in the firm of Wood & Wood, an economic and financial consulting firm.  My business address is 914 Stream Valley Trail, Alpharetta, Georgia 30022.  I provide financial, economic, and regulatory analysis of telecommunications and related convergence industries, with an emphasis on cost-of-service issues and financial damages.  I have over thirty years of experience in the telecommunications industry, and have conducted extensive analyses of the kinds of network facilities and services at issue in this case.

2. I received a BBA in Finance (with Distinction) from Emory University, an MBA with concentrations in Finance and Microeconomics from the College of William and Mary, and a certification in Data Analytics from Cornell University.  I have taken courses related to telecommunications networks and costing from Bell Communications Research (Bellcore, now known as iconectiv), have developed and applied cost models to identify and quantify network costs, and have taught professional courses in this area.  I am a Certified Valuation Analyst, a Master Analyst in Financial Forensics, and a member of the National Association of Certified Valuators and Analysts and National Association of Forensic Economics.

3. I was employed in the local exchange industry by BellSouth Services, Inc. in its Pricing and Economics, Service Cost Division.  My responsibilities included performing cost analyses of new and existing services, and preparing documentation for filings with state regulatory commissions and the Federal Communications Commission ("FCC").  While at

1

Exhibit 3
Page 1 of 4

BellSouth Services, I was responsible for conducting the network cost analysis required to support BellSouth's tariffed rates.

4. I was employed in the interexchange industry by MCI Telecommunications Corporation, as Manager of Regulatory Analysis for the Southern Division. In this capacity, I was responsible for the development and implementation of regulatory policy for operations in the southern U. S. I then served as a Manager in MCI's Economic Analysis and Regulatory Affairs Organization, where I participated in the development of regulatory policy for national issues. While at MCI, my responsibilities included the in-depth analysis of cost studies of the network functions provided by other carriers.

5. My industry experience includes both wireline and wireless technologies and services.

6. I have testified on telecommunications cost issues before the regulatory commissions of forty-three states, Puerto Rico, and the District of Columbia. I have presented expert testimony regarding telecommunications cost issues in state, federal, and overseas courts, before alternative dispute resolution tribunals, and at the FCC. A copy of my curriculum vitae, which includes a listing of previous testimony, is attached as Exhibit No. DJW-1.

7. I am being compensated at a rate of $525/hour for all work done on this case.

8. I have been asked by UPM Technology, Inc. ("UPM") to review the facts asserted in its counterclaim[1] and to calculate, based on the information currently available, the financial damages incurred by UPM that are causally related to the actions of Unigestion Holding S.A., d/b/a Digicel Haiti ("Digicel").

9. This report addresses the incremental financial harm to UPM caused by Digicel preventing UPM from reselling Digicel's Roam Like You're Home ("RLYH") service in the

---

[1] Defendant's Amended Answer, Affirmative Defenses and Counterclaims to Plaintiff's Third Amended Complaint and Demand for Jury Trial, filed 9/7/2021.

Exhibit 3
Page 2 of 4

United States.  That incremental financial harm for a given time period is a function of the size of the market, UPM's market share, UPM's cost to process the calls, and UPM's assumed retail price.

10. According to the FCC, the total "minutes completed on foreign mobile networks" for U.S. billed international calls to Haiti in 2014, was 246,719,004.[2]  This equates to 20,559,917 minutes per month.

11. Market growth over time can be projected based on the growth in the size of the Haitian-American population in the United States.  The United States Census Bureau, in its American Community Survey, reports a population of 813,186 in 2010 and 953,908 in 2015.[3]  These values indicate an annual growth rate of 3.24%.

12. In 2014, Digicel's retail price was $.23 per minute of use ("MOU").  At a 20% discount off Digicel's price, UPM's per-MOU price in order to compete would be $.184 per MOU. At a per-MOU cost to complete the call of $.095, UPM would realize a per-MOU margin of $.089.

13. Pursuant to UPM estimates, I have applied a market share for UPM of 15% in 2014, increasing by five percentage points each calendar year (to 50% in 2021); this equates to an average market share of 33% over the total period.

14. Based on these assumptions, the incremental financial impact on UPM of Digicel's actions are set forth in the table below:

---

[2] FCC International Bureau Report, 2014 U.S. International Telecommunications Traffic and Revenue Data, Table 5.
www.fcc.gov/reports-research/reports/international-traffic-and-revenue-reports/international-telecommunications
[3] **NATIVITY AND CITIZENSHIP STATUS IN THE UNITED STATES, Survey/Program:** American Community Survey, **TableID:** B05001.
https://data.census.gov/cedsci/table?q=haitian&tid=ACSDT5YSPT2015.B05001.

3

Exhibit 3
Page 3 of 4

| Estimate of Incremental Financial Impact on UPM from Digitel's Blockage of Resale of "Roam Like You're Home" Plans | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 |
| Digicel-Haiti Retail Price | $ | 0.230 | $ | 0.230 | $ | 0.230 | $ | 0.230 | $ | 0.230 | $ | 0.230 | $ | 0.230 | $ | 0.230 |
| UPM Retail Price | $ | 0.184 | $ | 0.184 | $ | 0.184 | $ | 0.184 | $ | 0.184 | $ | 0.184 | $ | 0.184 | $ | 0.184 |
| UPM Margin | $ | 0.089 | $ | 0.089 | $ | 0.089 | $ | 0.089 | $ | 0.089 | $ | 0.089 | $ | 0.089 | $ | 0.089 |
| Total US-Haiti Minutes/Month | | 20,559,917 | | 21,226,807 | | 21,915,329 | | 22,626,184 | | 23,360,097 | | 24,117,815 | | 24,900,111 | | 25,707,781 |
| UPM US-Haiti Minutes/Month | | 3,083,988 | | 4,245,361 | | 5,478,832 | | 6,787,855 | | 8,176,034 | | 9,647,126 | | 11,205,050 | | 12,853,891 |
| UPM RLYH SIMs Needed | | 286 | | 394 | | 508 | | 629 | | 758 | | 894 | | 1,038 | | 1,191 |
| January | $ | - | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| February | $ | - | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| March | $ | - | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| April | $ | - | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| May | $ | - | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| June | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| July | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| August | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| September | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | $ | 1,143,996 |
| October | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | | |
| November | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | | |
| December | $ | 274,475 | $ | 377,837 | $ | 487,616 | $ | 604,119 | $ | 727,667 | $ | 858,594 | $ | 997,249 | | |
| | | | | | | | | | | | | | | | |
| TOTAL | $ | 1,921,324 | $ | 4,534,046 | $ | 5,851,393 | $ | 7,249,429 | $ | 8,732,004 | $ | 10,303,130 | $ | 11,966,993 | $ | 10,295,966 |

15. For the period June 1, 2014 through September 30, 2021, the total incremental financial impact on UPM arising from Digicel's refusal to allow UPM to resell Digicel's RLYH service is $60,854,287, excluding any applicable interest.

I hereby certify that this report is an accurate statement of my opinions, to which I will testify under oath.

_____
Don J. Wood
September 27, 2021

4

Exhibit 3
Page 4 of 4

Federal Communications Commission                                    FCC 03-63

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| Enforcement of Other Nations' Prohibitions | **)** | IB Docket No. 02-18 |
| Against the Uncompleted Call Signaling | **)** | |
| Configuration of International Call-back Service | **)** | |
| | **)** | |
| Petition for Rulemaking of the | **)** | |
| Telecommunications Resellers Association | **)** | RM-9249 |
| To Eliminate Comity-Based Enforcement of | **)** | |
| Other Nations' Prohibitions Against the | **)** | |
| Uncompleted Call Signaling Configuration | **)** | |
| of International Call-back Service | **)** | |
| | **)** | |

**ORDER**

Adopted:  March 24, 2003                              Released:  March 28, 2003

By the Commission:

### I. Introduction

1.      In this Order, we eliminate the existing comity-based prohibitions on call-back and the current policy on call-back services that allows a foreign government or entity to make use of the enforcement mechanisms of the Commission to enforce foreign government prohibitions against U.S. carriers from offering uncompleted call-signaling abroad.  The record in this proceeding provides no basis upon which to continue this policy, which the Commission adopted in 1995 based upon international comity.  We will continue to maintain an ongoing public file that contains information on the legality of call-back in foreign countries so that U.S. carriers may be aware of and ensure that their actions are consistent with foreign law.  We also will continue to maintain our policies prohibiting call-back configurations that degrade the network or constitute fraudulent activity.

### II. Background

2.      International call-back arrangements allow foreign callers to take advantage of low U.S. international services rates, many of which are significantly lower than the rates available in their home countries.  The Commission policy addresses the uncompleted call signaling type of call-back.[1]  Using this type of arrangement, a foreign caller dials the call-back provider's switch in the United States, waits a predetermined number of rings, and hangs up before the switch answers.  The switch then automatically returns the call, and upon completion, provides the caller in the foreign country with a U.S. dial-tone.

---

[1]      Uncompleted call-signaling is the most prevalent form of call-back, and it is the method that the Commission addressed in the Call-back proceeding. *See VIA USA, Ltd., Telegroup, Inc., Discount Call Int'l Co.*, 9 FCC Rcd 2288 ¶ 3 (1994) (*Call-back Order*), *aff'd on reconsideration*, 10 FCC Rcd 9540 ¶ 3  (1995) (*Call-back Reconsideration*) (together *Call-back Proceeding*).

Exhibit 4
Page 1 of 8

3.      The Commission first examined international call-back arrangements in a 1994 decision granting section 214 authorizations to three applicants seeking to provide international resold switched services using the uncompleted call signaling configuration of call-back.[2]  In the *Call-back Order*, the Commission concluded that the public interest, convenience, and necessity would be served by authorizing U.S. carriers to provide such service, which "could place significant downward pressure on foreign collection rates, to the ultimate benefit of U.S. ratepayers and industry."[3]  In several subsequent proceedings, the Commission reaffirmed its support for call-back as an important alternative calling mechanism that places downward pressure on above-cost international rates for U.S. consumers.[4]  In addition, call-back traffic benefits foreign carriers by increasing the settlement rate payments made by U.S. carriers to foreign carriers under the international accounting rate regime.[5]

4.      In the 1994 *Call-back Order*, the Commission concluded that the provision of uncompleted call-signaling does not violate U.S. law or international law or regulations.[6]  The Commission did not address the legality of international call-back under the laws of foreign countries, but noted that the applicants should "provide service in a manner that is consistent with the laws of countries in which they operate."[7]

5.      The next year, in the *Call-back Reconsideration*, the Commission received comments from 21 countries and a regional commission representing six Central American countries (COMTELCA/INTEL).[8]  Notwithstanding the finding that call-back serves the public interest and does not violate U.S. or international law, in the *Call-back Reconsideration Order* the Commission concluded that the United States should, for reasons of international comity, assist in the enforcement of foreign laws that ban call-back.[9]  The Commission stated that foreign governments bear principal responsibility for

---

[2]      *See Call-back Order,* 9 FCC Rcd at 2288 ¶ 3.

[3]      *Id.* at 2290 ¶ 11.

[4]      *See, e.g., 1998 Biennial Regulatory Review - - Reform of the International Settlements Policy and Associated Filing Requirements and Regulation of International Accounting Rates,* IB Docket No. 98-148 & CC Docket No. 90-337, Notice of Proposed Rulemaking, 15 FCC Rcd 15320 ¶ 16 (1998) (*1998 ISP Reform NPRM)* ("We continue to believe that encouraging alternative means of routing traffic, such as international call-back service, Internet telephony, and switched hubbing is an effective way to lower settlement rates, as well as foreign and domestic collection rates."); *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market and Market Entry and Regulation of Foreign-Affiliated Entities,* Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23896 ¶ 7 (1997) (*Foreign Participation Order)*; Order on Reconsideration, 15 FCC Rcd 18158 (2000) ("New technologies such as call-back and Internet telephony are already putting significant pressure on international settlement rates and domestic collection rates.").

[5]      Settlement rates are the per-minute charges that carriers pay their foreign correspondents to terminate international traffic.  *See International Settlement Rates,* IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19806, 19807 ¶ 2 (1997) (*Benchmarks Order) aff'd sub nom., Cable and Wireless Plc. v. FCC,* 166 F.3d 1224 (DC Cir. 1999), Report and Order on Reconsideration and Order Lifting Stay, 14 FCC Rcd 9256 (1999)*.*  In a typical call-back arrangement, a U.S. call-back company provides a caller in a foreign country with a U.S. dial-tone and charges U.S. rates. The call is deemed to be U.S.-originated for purposes of the international accounting rate regime, and the underlying U.S. international facilities-based carrier therefore makes a settlement payment on the call to its foreign correspondent.  *See* R. Freden*,* "The Impact of Call-Back and Arbitrage on the Accounting Rate Regime," *Telecommunications Policy*, Vol.21 No. 9/10 1997 at 820.

[6]      *See Call-back Reconsideration Order,* 10 FCC Rcd at 9524-54 ¶ 6-41.

[7]      *Call-back Order,* 9 FCC Rcd at 2292 ¶ 18.

[8]      *See Call-back Reconsideration Order,* 10 FCC Rcd at 9542 n.2, 9554 ¶ 42.

[9]      The doctrine of international comity reflects the broad concept of respect among nations. It involves one nation recognizing within its territory the laws of a foreign state. *See Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 143 (1895); Restatement (Third) of the Foreign Relations Law of the United States, § 101, comment e (1986).

Exhibit 4
Page 2 of 8

enforcing their domestic laws, but noted that a foreign government could invoke the principle of international comity to seek assistance in enforcing its laws.[10]  The Commission therefore adopted a policy prohibiting U.S. carriers from offering international call-back using the uncompleted call signaling configuration to countries where it has been expressly prohibited.[11]

6.      Pursuant to this policy, the Commission enacted two methods to assist foreign governments.  First, the Commission established a mechanism for a foreign government to notify the U.S. Government that call-back using uncompleted call-signaling is illegal in its country.[12]  Since adoption of this policy, 36 countries have submitted information about the legality of call-back within their territories.[13]  Second, the Commission set forth procedures for a foreign government to notify the U.S. government if the foreign country has been unsuccessful in enforcing its prohibitions on uncompleted call signaling against U.S. carriers.  To bring an action against a carrier unlawfully providing call-back, the Commission required that the foreign government provide specific documentation of the country's legal restriction on international call-back using uncompleted call signaling, evidence of violations by particular carriers, and a description of enforcement measures attempted by that foreign government.[14] To date, foreign governments or entities have sought Commission assistance in enforcing their prohibitions on call-back only on a few occasions. In only two instances has the Commission concluded that the requirements necessary for the Commission to assist in the enforcement of foreign laws against call-back have been satisfied.[15]

7.      On March 19, 1998, the Telecommunications Resellers Association (TRA) filed a petition requesting that we adopt a notice of proposed rulemaking to review the Commission's international call-back policy.[16]  TRA asserts that much has changed since the *Call-back Proceedings*.

---

[10]     As the Commission noted, such recognition is entirely discretionary by individual nations. *See Call-back Reconsideration Order,* 10 FCC Rcd at 9557 ¶¶ 50-51.

[11]     The Commission's policy extends only to the uncompleted call signaling form of call-back because the record in the initial call-back proceeding focused on this methodology. *See id.* at 9555-56 ¶ 47.

[12]     *See id.*at 9524-54 ¶ 6-41.

[13]     The Commission maintains a public file containing the submitted material, which is available in the Commission's public reference room located at 445 Twelfth St, SW, Washington, DC 20554. The Commission's website includes a list of the countries that have submitted material to the public file as well as a list of countries that stated call-back is illegal in a 1996 ITU Survey.  *See* http://www.fcc.gov/ib/td/pf/call-back.html. We note that according to ITU Plenipotentiary 2002 Resolution 21, 106 governments have notified the ITU that call-back is prohibited in their country. *See* Final Act of the Plenipotentiary Conference (PP-02), Res. 21 (Marrakesh 2002) (Resolution 21).

[14]     *See Call-back Reconsideration Order*, 10 FCC Rcd at 9558 ¶ 52.

[15]     The International Bureau sent letters to all alleged providers of call-back in Saudi Arabia warning them that if they were to continue to provide call-back, they would face Commission enforcement action. Pursuant to Section 208 complaints filed by the Philippine Long Distance Telephone Company (PLDT), the Philippine dominant carrier, the Commission ordered three call-back providers to cease offering call-back in the Philippines. *See generally Philippine Long Distance Telephone Company v. International Telecom, Ltd., D/B/A Kallback Direct,* Memorandum Opinion and Order, 12 FCC Rcd 15001 (1997), *aff'd on reconsideration*, 15 FCC Rcd 6009 (2000); *Philippine Long Distance Telephone Company v. US Link, L.P. D/B/A USA Global Link,* Memorandum Opinion and Order, 12 FCC Rcd 12010 (Com. Car. Bur. 1997), *aff'd on reconsideration*, 15 FCC Rcd 8736 (2000); *Philippine Long Distance Telephone Company v. Dialback USA.. Inc.,* Memorandum Opinion and Order, 12 FCC Rcd 12023 (Com. Car. Bur. 1997).

[16]     *See* Petition for Rulemaking of the Telecommunications Resellers Association To Eliminate Comity-Based Enforcement of Other Nation's Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service, RM-9249 (filed Mar. 19, 1998) (*TRA Petition*).  TRA's rulemaking request is limited to the uncompleted call signaling configuration of international call-back service.

3

Exhibit 4
Page 3 of 8

**Federal Communications Commission** **FCC 03-63**

TRA argues that, given the World Trade Organization Agreement on Basic Telecommunications Services (WTO Basic Telecom Agreement)[17] and the United States' commitment to market-opening policies, "there can no longer be any policy justification for Commission recognition or enforcement of foreign laws . . . intended to restrain U.S. carriers from entering telecommunications markets."[18]

8. Nine parties filed comments and seven parties filed reply comments on the TRA petition.[19] Commenters included one foreign government (Public Service Regulatory Commission Panama) and five foreign companies (C&W PLC, Philippine Long Distance Telephone Company, CANTV, Telkom SA, and Costa Rican Institute of Energy) filed comments. Several comments supported TRA's petition.[20] Others contended that the WTO Basic Telecom Agreement does not justify changes to the current policy; they argued that eliminating the comity-based call-back policy could prompt retaliation that could hamper the development of global competition and would violate the U.S. Government's commitment under the International Telecommunication Union.[21]

9. On January 30, 2002, the Commission adopted a Notice of Proposed Rulemaking (NPRM) to review its international call-back policy.[22] In the NPRM, the Commission proposed to eliminate the existing comity-based prohibitions and policy that allows a foreign government or entity to make use of the Commission's enforcement mechanisms to prohibit U.S. carriers from offering call-back services abroad using the uncompleted call signaling configuration. Only two parties filed comments, and no reply comments were filed.[23] In their comments, both the Competitive Telecommunications Association (CompTel) and the Association of Communications Enterprises (ASCENT) support the Commission's proposal. Both Comptel and ASCENT argue that the current policy is no longer necessary in today's pro-competitive environment. No foreign governments or entities filed comments on the proposal in the NPRM to eliminate the policy allowing the use of the Commission's procedures to enforce prohibitions on call-back in foreign countries.

---

[17] The results of the WTO basic telecommunications services negotiations are incorporated into the General Agreement on Trade in Services (GATS) by the Fourth Protocol to the GATS, April 30, 1996, 36 I. L. M. 366 (1997). These results, as well as the basic obligations contained in the GATS, are referred to as the "WTO Basic Telecom Agreement."

[18] *TRA Petition* at 3.

[19] Public Notice, *Pleading Cycle Established for Comments on the Telecommunications Resellers Association Petition for Rulemaking Regarding the Commission's International Call-back Policy,* DA 98-592 (rel. Mar. 27, 1998)

[20] *See, e.g.,* Telegroup comments; USA Global Link, Inc. comments; Ursus comments.

[21] *See, e.g.,* Cable & Wireless, plc comments; Costa Rican Institute of Electricity comments; Compania Anonima Nacional Telefonos de Venezuela (CANTV) comments; Philippine Long Distance Telephone Company comments; Public Service Regulatory Commission of the Republic of Panama comments; Telkom SA Limited comments.

[22] *See Petition for Rulemaking of the Telecommunications Resellers Association To Eliminate Comity-Based Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-Back Service*, IB Docket No. 02-18, Notice of Proposed Rulemaking, 17 FCC Rcd 2794 (2002).

[23] *See* Comments of the Association of Communications Enterprises To Eliminate Comity-Based Enforcement of Other Nation's Prohibitions Against Uncompleted Call Signaling Configuration of International Call-back Service, RM-9249 (filed April 15, 2002) (ASCENT Comments); Comments of the Competitive Telecommunications Association To Eliminate Comity-Based Enforcement of Other Nation's Prohibitions Against Uncompleted Call Signaling Configuration of International Call-back Service, RM-9249 (filed April 15, 2002) (CompTel Comments).

Exhibit 4
Page 4 of 8

### III. Discussion

10.     The record in this proceeding provides no support for continuing the current comity-based prohibitions on call-back and the policy that allows foreign governments to make use of the Commission's enforcement mechanism to prohibit U.S. carriers from offering call-back services using the uncompleted call-signaling configuration.  No party filed comments urging continuation of this policy. Further, we view this policy as inconsistent with and undermining the Commission's goal of promoting global competition.[24]  We will therefore no longer devote Commission resources to analyzing and investigating allegations that a U.S. carrier is offering uncompleted call-signaling in a foreign jurisdiction.[25]

11.     Congress directed the Commission "to provide for a pro-competitive, deregulatory national policy framework," and mandated, that with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services.[26]  We believe that the Congressional mandate to foster competitive telecommunications markets is instructive in the current context when assessing the international regulatory environment.[27]  We find that the benefits of supporting clear and consistent policies that promote all forms of competition outweigh any benefits derived from recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.

12.     By no longer enforcing prohibitions against call-back in foreign countries, we are not rejecting the sovereign rights of any foreign government or limiting the ability of a foreign government to adopt and enforce policies to prohibit call-back within its jurisdiction.  Rather, we are re-emphasizing our standing policy to encourage competition in all markets, both developed and developing.  We will continue to work in various fora to promote network expansion and universal access.[28]  We encourage a

---

[24]     *See generally FCC Invites Exploitation with Softened Stance on Call-back Service*, Communications Resale Report, Sept. 15, 1997 (noting that the PLDT decisions "ultimately will frustrate global competition and invite exploitation of its policies by self-interested foreign entities").

[25]     Allowing foreign governments and entities to use Commission resources to pursue U.S. carriers providing call-back in their country requires the Commission to gauge the adequacy of the foreign government's efforts to enforce prohibitions against call-back activity.  As a result, Commission staff has to engage in resource-intensive analysis and interpretation of foreign laws.

[26]     *See* Telecommunications Act of 1996, Pub. L. No. 104-104, 11 Stat. 56, *codified at* 47 U.S.C. § 151 *et seq*; Joint Statements of Managers, S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. Preamble (1996).

[27]     47 U.S.C. § 253 (a). Subsequent to the *Call-back Proceeding*, the Commission has implemented several initiatives to promote competition on international routes.  In 1997, the Commission adopted the *Foreign Participation Order,* which set forth pro-competitive rules and policies regarding foreign participation in the U.S. telecommunications market. *See Foreign Participation Order*, 12 FCC Rcd 23891. In light of the WTO Basic Telecom Agreement and WTO members' commitments to open markets, the Commission determined in the *Foreign Participation Order* that it served the public interest to adopt rules to open further the U.S. market to competition from foreign companies. *Id.* Also in 1997, the Commission adopted the *Benchmarks Order,* which requires U.S. carriers to reduce the settlement rates they pay to foreign carriers in order to limit above-cost payments in the absence of competitive forces on the foreign end of U.S. international routes.  *See Benchmarks Order,* 12 FCC Rcd 19806. Additionally, in the *ISP Reform Order*, the Commission limited application of the international settlements policy (ISP) to encourage rate competition among U.S. international carriers. *See 1998 Biennial Regulatory Review Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order on Reconsideration, 14 FCC Rcd 7963 (1999) (*ISP Reform Order*).

[28]     The Commission is an active participant in the ITU's Development Sector, the Inter-American Telecommunications Commission (CITEL), and the Asia-Pacific Economic Cooperative (APEC).  In addition, to the extent possible, the Commission works extensively with its counterparts in developing countries to address the challenges of regulation in developing markets with a fast changing telecommunications environment.

Exhibit 4
Page 5 of 8

pro-competitive call-back policy that extends to the international marketplace, embraces free and open competition, and benefits U.S. consumers as well as the global community by ensuring lower prices, new and better products and services, and greater consumer choice. Indeed, we believe that eliminating call-back prohibitions enhance competition throughout the global marketplace.

13.    We continue to maintain that our policy allowing the uncompleted call signaling configuration of call-back services is consistent with international law.[29] Likewise our elimination of the comity-based prohibitions and the policy that allows foreign governments and entities to use Commission resources to enforce prohibitions of call-back in a foreign country is consistent with international law. This policy was adopted at the discretion of the Commission,[30] out of consideration of then expressed difficulties that some foreign governments may face in giving effect to their laws and regulations barring uncompleted call signaling.[31] As the Commission stated in the *Call-back Reconsideration Order*, foreign governments may not, simply by enacting domestic legal, regulatory, or procedural measures, require the United States to implement such measures as a matter of international law.[32] We find that at this time, given the Commission's mandate to promote competition, and the fact that no party has filed in this proceeding urging continuation of the policy, it is no longer appropriate for the Commission to maintain a policy that provides for a foreign government or entity to use the Commission's enforcement mechanisms to prohibit uncompleted call signaling.

14.    We further find that this change to our policy on call-back services is also consistent with the ITU Plenipotentiary 2002 Resolution 21 and the 1994 Kyoto Declaration.[33] Resolution 21 requests administrations "to pay due regard to the decisions of other administrations and international operators whose regulations do not permit such services."[34] The Kyoto Declaration directs that a member state should "take such actions as may be *appropriate within the constraints of its national law*" if a carrier subject to its jurisdiction offers call-back in violation of another member state's laws.[35] To that end, we will continue to maintain an ongoing public file to inform call-back providers about the legality of call-back in foreign countries. We remind U.S. carriers that it is in their best interest to act in a manner consistent with foreign laws, and to refer to the public file and note which foreign governments have notified the Commission that call-back is illegal in their countries. We also will continue to prohibit the provision of call-back using any configuration that degrades the network or that constitutes fraudulent activity.[36]

---

[29]    *Call-back Reconsideration Order,* 10 FCC Rcd at 9551-9554 ¶¶ 33-41.

[30]    In the *Call-back Reconsideration Order* we recognized that the doctrine of comity is used as a "discretionary means for U.S. Courts and agencies to take account of foreign sovereign acts, and therefore is distinct from obligations imposed under international law." *Call Back Reconsideration Order*, 10 FCC Rcd at 9555-9556 ¶ 47.

[31]    *Id.* at 9557 ¶ 50.

[32]    *Call-back Reconsideration Order*, 10 FCC Rcd at 9555-9556 ¶ 47. In its comments in support of the NPRM, ASCENT notes that the doctrine of comity "has little justifiable application in the absence of efforts by sovereign states to enforce their own laws and policies." *See* ASCENT comments.

[33]    *See* Final Act of the Plenipotentiary Conference (PP-02), Res. 21 (Marrakesh 2002) (Resolution 21); Final Act of the Plenipotentiary Conference (PP-94), Res. Com4/6 (Kyoto 1994) (Kyoto Declaration).

[34]    Resolution 21 at *resolves* ¶ 2.

[35]    Kyoto Declaration at ¶ 2 (emphasis added).

[36]    *See Call-back Reconsideration Order,* 10 FCC Rcd at 9546 ¶¶ 17-18 (supporting U.S. carrier efforts to eliminate "hot line" or "polling" methods of call-back); *see also* Public Notice, *International Bureau to Pursue Carriers Engaged in Fraudulent International Call-back,* Report No. IN 96-5 (Feb. 12, 1996) (announcing intention to sanction call-back providers that engage in suppression of answer supervision signaling).

Exhibit 4
Page 6 of 8

## IV. Conclusion

15.    Consistent with our pro-competitive policies, we remove the existing comity-based prohibitions and the policy that provides for a foreign government or entity to make use of the enforcement mechanisms of the Commission to prohibit U.S. carriers from offering the uncompleted call signaling form of call-back abroad thereby restricting global competition.  The Commission will, however, continue to maintain an ongoing public file that contains information on the illegality of call-back in foreign countries and continue to maintain our policies prohibiting call-back configurations that degrade the network or constitute fraudulent activity.

## V.  Procedural Issues

### A. Final Regulatory Flexibility Certification

16.    The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. §§ 601-612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Pub, L. No. 104-121, Title II, 110 Stat. 857, requires a final regulatory flexibility analysis in notice-and-comment proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[37]  The policy change adopted in this Order does not impose any additional compliance burden on small entities dealing with the Commission.  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[38]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[39]  Accordingly, we certify, pursuant to Section 605(b) of the RFA, that the policy change adopted in this Order does not have a significant economic impact on a substantial number of small business entities, as defined by the RFA.  The Commission's Consumer and Government Affairs Bureau, Reference Information Center, shall send a copy of this Order, including the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration in accordance with Section 605(b) of the RFA.  This certification will also be published in the Federal Register.[40]

### B. Initial Paperwork Reduction Act of 1995 Analysis

17.    This Order does not contain either a new or a modified information collection. As a result, we need not seek comment on the impact of this Order on information collections, pursuant to the Paperwork Reduction Act of 1995, Pub. L. No. 104-13.

### VI. Ordering Clauses

18.    Accordingly, IT IS ORDERED that, pursuant to Sections 1, 4 (i)-(j), 201 (b), 214, 303(r), and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154 (i)-(j), 201 (b), 214, 303 (r), and 403, this Order IS HEREBY ADOPTED.

---

[37]    5 U.S.C. § 605(b).

[38]    5 U.S.C. § 601(6).

[39]    5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[40]    5 U.S.C. § 605(b).

Exhibit 4
Page 7 of 8

19.      IT IS FURTHER ORDERED that the condition placed on international Section 214 authorizations regarding the provision of international call-back services through the use of uncompleted call-signaling, IS HEREBY REMOVED from all existing Section 214 authorizations.

20.      IT IS FURTHER ORDERED that the Commission's Consumer and Government Affairs Bureau's Reference Information Center SHALL SEND a copy of this Order, including the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.


                    FEDERAL COMMUNICATIONS COMMISSION



                    Marlene H. Dortch
                    Secretary

Exhibit 4
Page 8 of 8

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| Enforcement of Other Nations' Prohibitions | **)** | IB Docket No. 02-18 |
| Against the Uncompleted Call Signaling | **)** | |
| Configuration of International Call-back Service | **)** | |
| | **)** | |
| Petition for Rulemaking of the | **)** | |
| Telecommunications Resellers Association | **)** | RM-9249 |
| To Eliminate Comity-Based Enforcement of | **)** | |
| Other Nations' Prohibitions Against the | **)** | |
| Uncompleted Call Signaling Configuration | **)** | |
| of International Call-back Service | **)** | |
| | **)** | |

**NOTICE OF PROPOSED RULEMAKING**

**Adopted:  January 30, 2002**                      **Released:  February 13, 2002**

Comment Date:  April 15, 2002
Reply Comment Date:  May 15, 2002

By the Commission:

## I.      Introduction

        1.  We grant the petition filed by the Telecommunications Resellers Association (TRA), and adopt a notice of proposed rulemaking to review the Commission's international call-back policy.[1]  For reasons of international comity, current Commission policy prohibits U.S. carriers from offering a particular form of call-back to customers in countries where it is expressly prohibited.  We believe that the balancing of interests involved in the Commission's 1995 decision to adopt the comity-based call-back policy has shifted.  Consistent with the Commission's long-standing policies to promote competition in the international telecom market, we ask whether we should eliminate the existing policy that allows a foreign government or entity to make use of the enforcement mechanisms of the Commission to prohibit U.S. carriers from offering call-back abroad.  As a general matter, we continue to believe that it is in the interests of U.S. carriers to act in a manner consistent with foreign law. To that end, we propose to continue to maintain a public file that contains information on the legality of call-back in foreign countries. We also propose to maintain our policies prohibiting call-back configurations that degrade the network or constitute fraudulent activity.

---

[1]        *See* Petition for Rulemaking of the Telecommunications Resellers Association To Eliminate Comity-Based Enforcement of Other Nation's Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service, RM-9249 (filed Mar. 19, 1998) (*TRA Petition*).  TRA's rulemaking request is limited to the uncompleted call signaling configuration of international call-back service.  Uncompleted call signaling occurs when a U.S. call-back company provides a caller in a foreign country with a U.S. dialtone to dial a telephone number in the United States and charges U.S. rates.

Exhibit 5
Page 1 of 10

**Federal Communications Commission**                                        **FCC 02-28**

## II.    Background

2.       International call-back arrangements allow foreign callers to take advantage of low U.S. international services rates, many of which are significantly lower than the rates available in their home countries. The Commission first examined international call-back in a 1994 decision granting section 214 authorizations to three applicants seeking to provide international resold switched services using the uncompleted call signaling configuration of call-back.[2]  Uncompleted call signaling involves a foreign caller who dials the call-back provider's switch in the United States, waits a predetermined number of rings, and hangs up before the switch answers. The switch then automatically returns the call, and upon completion, provides the caller in the foreign country with a U.S. dialtone. The Commission's comity-based policy extends only to the uncompleted call signaling form of call-back because the record in the initial proceeding focused on this methodology.

3.       In the *Call-back Order*, the Commission concluded that the public interest, convenience, and necessity would be served by authorizing the U.S. carriers to provide such service, that "could place significant downward pressure on foreign collection rates, to the ultimate benefit of U.S. ratepayers and industry."[3]  In several proceedings since, the Commission has expressed steadfast support for call-back as an important alternative calling mechanism that places downward pressure on above-cost international rates for U.S. consumers.[4]  At the same time, call-back traffic benefits foreign carriers by increasing the settlement rate payments made by U.S. carriers to foreign carriers under the international accounting rate regime.[5]

4.       As part of the *Call-back Order*, the Commission concluded that the provision of call-back does not violate U.S. law or international law or regulations.[6]  The Commission explicitly did not address the legality of international call-back under foreign law, but noted that the applicants should   "provide service in a manner that is consistent with the laws of countries in which they operate."[7]   On reconsideration, however, the Commission examined the provision of call-back in light of international

---

[2]      *See VIA USA, Ltd., Telegroup, Inc., Discount Call Int'l Co.*, 9 FCC Rcd 2288 (1994) (Call-Back Order), aff'd on reconsideration, 10 FCC Rcd 9540 (1995) (Call-Back Reconsideration) (together *Call-Back Proceeding*).

[3]      *Id.* at 2290 (¶ 11).

[4]      *See, e.g., 1998 Biennial Regulatory Review - - Reform of the International Settlements Policy and Associated Filing Requirements and Regulation of International Accounting Rates,* IB Docket No. 98-148 & CC Docket No. 90-337, Notice of Proposed Rulemaking, at  16 (rel. Aug. 6, 1998) (*ISP Reform NPRM)* ("We continue to believe that encouraging alternative means of routing traffic, such as international call-back service, Internet telephony, and switched hubbing is an effective way to lower settlement rates, as well as foreign and domestic collection rates."); *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market and Market Entry and Regulation of Foreign-Affiliated Entities,* Report and Order and Order on Reconsideration, 12 FCC Rcd. 23, 891, 23,896 (¶ 7) (1997) (*Foreign Participation Order)*; Order on Reconsideration, 15 FCC Rcd 18158 (2000) ("New technologies such as call-back and Internet telephony are already putting significant pressure on international settlement rates and domestic collection rates.").

[5]      Settlement rates are the per-minute charges that carriers pay their foreign correspondents to terminate international traffic. *See International Settlement Rates,* IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19, 806, 19, 807 (¶ 2) (1997) (*Benchmarks Order*) aff'd sub nom., *Cable and Wireless Plc. v. FCC,* 166 F.3d 1224 (DC Cir. 1999), Report and Order on Reconsideration and Order Lifting Stay, 14 FCC Rcd 9256 (1999).  In a typical call-back arrangement, a U.S. call-back company provides a caller in a foreign country with a U.S. dialtone and charges U.S. rates. The call is deemed to be U.S.-originated for purposes of the international accounting rate regime, and the underlying U.S. international facilities-based carrier therefore makes a settlement payment on the call to its foreign correspondent.

[6]      *See Call-back Reconsideration Order,* 10 FCC Rcd at 9524-54 (¶ 6-41).

[7]      *Call-back Order,* 9 FCC Rcd at 2292 (¶ 18).

Exhibit 5
Page 2 of 10

comity. The doctrine of international comity reflects the broad concept of respect among nations. It involves one nation recognizing within its territory the laws of a foreign state.[8]  As the Commission noted, such recognition is entirely discretionary by individual nations. [9]

5.        Notwithstanding the finding that call-back serves the public interest and does not violate U.S. or international law, the Commission concluded that the United States should, for reasons of international comity, assist in the enforcement of foreign laws that ban call-back. The Commission declared that foreign governments bear the principal responsibility for enforcing their domestic laws, but noted that an invocation of comity in this circumstance would assist in the effective enforcement of foreign laws.  In 1995, the Commission therefore adopted a policy prohibiting U.S. carriers from offering international call-back using the uncompleted call signaling configuration to countries where it has been expressly prohibited.[10]

6.        The Commission invited foreign governments to notify the U.S. Government of the legality of call-back within their territory.  The Commission required that any notification include specific documentation of a legal restriction on international call-back using uncompleted call signaling, evidence of violations by particular carriers, and a description of enforcement measures attempted by that foreign government.[11]  Since adoption of this policy, 36 countries have submitted information about the legality of call-back within their territories.[12]  To date, the Commission has concluded that two countries, Saudi Arabia and the Philippines, have satisfied the requirements necessary for the Commission to assist in the enforcement of foreign laws against call-back.  The International Bureau sent letters to all alleged providers of call-back in Saudi Arabia warning them that if they were to continue to provide call-back, they would face Commission enforcement action. Pursuant to Section 208 complaints filed by the Philippine Long Distance Telephone Company (PLDT), the Philippine dominant carrier, the Commission ordered three call-back providers to cease offering call-back in the Philippines.[13]

7.        On March 19, 1998, TRA filed a petition requesting that we adopt a notice of proposed rulemaking to review the Commission's international call-back policy.[14]  TRA asserts that much has changed since the Commission adopted its call-back policy in 1995.  TRA argues that, given the World Trade Organization Agreement on Basic Telecommunications Services (WTO Basic Telecom Agreement)[15] and the United States' commitment to market-opening policies, "there can no longer be any

---

8        *See Hilton v. Guyot,* 159 U.S. 113, 163-64, 16S. Ct. 139, 143 (1895); Restatement (Third) of the Foreign Relations Law  of the United States, § 101, comment e (1986).

9        *See Call-back Reconsideration Order,* 10 FCC Rcd at 9557 (¶¶ 50-51).

10        *See id.* at 9555-56 (¶ 47).

11        *See id.* at 9558 (¶ 52).

12        The Commission maintains a public file containing the submitted material, which is available in the Commission's public reference room located at 445 Twelfth St, SW, Washington, DC 20554. The Commission's website includes a list of the countries that have submitted material to the public file.  *See* http://www.fcc.gov/ib/td/pf/call-back.html.

13        *See Philippine Long Distance Telephone Company v. International Telecom, Ltd., D/B/A Kallback Direct,* Memorandum Opinion and Order*, 12 FCC Rcd 15,001 (1997), aff'd on reconsideration*, 15 FCC Rcd 6009 (2000)*; Philippine Long Distance Telephone Company v. US Link, L.P. D/B/A USA Global Link,* Memorandum Opinion and Order, 12 FCC Rcd 12,010 (Com. Car. Bur. 1997), *aff'd on reconsideration*, FCC 00-109 (rel. Mar. 29, 2000)*; Philippine Long Distance Telephone Company v. Dialback USA.. Inc.,* Memorandum Opinion and Order, 12 FCC Rcd 12,023 (Com. Car. Bur. 1997).

14        *See TRA Petition.*

15        The results of the WTO basic telecommunications services negotiations are incorporated into the General Agreement on Trade in Services (GATS) by the Fourth Protocol to the GATS, April 30, 1996, 36 I. L. M. 366

(continued....)

3

Exhibit 5
Page 3 of 10

policy justification for Commission recognition or enforcement of foreign laws . . . intended to restrain U.S. carriers from entering telecommunications markets."[16]    As a result, TRA requests that the Commission reverse its comity-based call-back policy.

8.    Pursuant to Section 1.401 of our rules, we issued a public notice seeking comment on TRA's petition.[17]    Nine parties filed comments; seven parties filed reply comments. Several comments support TRA's petition.[18]    Others contend that the WTO Basic Telecom Agreement does not justify reversal of the call-back policy, that such a reversal would violate the U.S. Government's commitments under the International Telecommunication Union, and that such action could prompt retaliation that could hamper the development of global competition.[19]

## III.    Discussion

9.    Since it adopted the call-back policy in 1995, the Commission has taken significant steps to open the U.S. international market to competition and to enhance consumer benefits on U.S. international routes. During this period, moreover, the global commitment to competition policy has increased dramatically. Given these developments, we believe that it is appropriate to review the Commission's comity-based call-back policy. We therefore seek comment on whether we should eliminate the existing comity-based prohibitions and, thus, discontinue the policy that allows a foreign government or entity to make use of the enforcement mechanisms of the Commission to prohibit the U.S. carriers from offering one form of call-back abroad.

10.    As the Commission stated in the *Call-back Reconsideration Order,* the doctrine of comity "is a discretionary means for U.S. Courts and agencies to take account of foreign sovereign acts, and therefore is distinct from obligations imposed under international law."[20]    Comity involves a court or agency evaluation of the interest of the state and the interests of recognizing the laws of a foreign nation. As TRA observed in its petition, the U.S. Court of Appeals for the District of Columbia has stated that "[n]o nation is under an unremitting obligation to enforce foreign interests, which are fundamentally prejudicial to those of the domestic forum.  Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."[21]

---

(...continued from previous page)
(1997). These results, as well as the basic obligations contained in the GATS, are referred to as the "WTO Basic Telecom Agreement."

[16]    *TRA Petition* at 3.

[17]    Public Notice, *Pleading Cycle Established for Comments on the Telecommunications Resellers Association Petition for Rulemaking Regarding the Commission's International Call-back Policy,* DA 98-592 (rel. Mar. 27, 1998)

[18]    *See, e.g.,* Telegroup comments; USA Global Link, Inc. comments; Ursus comments.

[19]    *See, e.g.,* Cable & Wireless, plc comments; Costa Rican Institute of Electricity comments; Compania Anonima Nacional Telefonos de Venezuela  (CANTV) comments; Philippine Long Distance Telephone Company comments; Public Service Regulatory Commission of the Republic of Panama comments; Telkom SA Limited comments.

[20]    *Call-back Reconsideration Order,* 10 FCC Rcd at 9555-9556 (¶ 47). The Commission made clear that foreign governments may not, simply by enacting domestic legal, regulatory, or procedural measures, require the United States to implement such measures as a matter of international law. *See id.*

[21]    *TRA Petition* at 11 (quoting *Laker Airways, Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C. Cir. 1984).

Exhibit 5
Page 4 of 10

11.     As an initial matter, we note here that in the *Call-back Reconsideration Order,* the Commission declared that "foreign governments bear the principal responsibility for enforcing their domestic laws, *just as our mandate is to implement the statutory requirements of the Communications Act.*"[22]   In February 1996, the Telecommunications Act of 1996 (1996 Act) became law, amending the Communications Act.[23]   Congress directed the Commission "to provide for a pro-competitive, deregulatory national policy framework"[24] and mandated that, with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services.[25]   We believe that the congressional mandate to foster competitive telecommunications markets is instructive in the current context as we weigh our policy to promote procompetitive regulatory environments abroad[26] against the recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.   We seek comment on the impact of the 1996 Act on the Commission's comity-based call-back policy.

12.     Since the call-back policy was adopted, the Commission has implemented several initiatives to promote competition in the U.S. market for international services and enhance consumer benefits on U.S. international routes.[27]   On November 25, 1997, the Commission adopted the *Foreign Participation Order,* which set forth pro-competitive rules and policies regarding foreign participation in the U.S. telecommunications market.[28]   In light of the World Trade Organization Basic Telecom Agreement and WTO members' commitments to open markets, the Commission determined in the *Foreign Participation Order* that it served the public interest to adopt rules to open further the U.S. market to competition from foreign companies.  Also in 1997, the Commission adopted the *Benchmarks Order,* which requires U.S. carriers to reduce the settlement rates they pay to foreign carriers in order to limit above-cost payments in the absence of competitive forces on the foreign end of U.S. international routes.[29]   Additionally, in the *ISP Reform Order*, the Commission limited application of the international settlements policy (ISP) to encourage rate competition among U.S. international carriers.[30]   With these new policies, the Commission has sought to produce significant consumer benefits through lower prices for existing services and greater service innovation, as well as one-stop shopping resulting from newly-found efficiencies.[31]

13.     We also believe that the market opening commitments made by the United States as part of the WTO Basic Telecom Agreement further demonstrate the United States' dedication to an open, competitive global market for telecommunications services. The United States Government offered to

---

[22]     *Call-back Reconsideration Order,* 10 FCC Rcd at 9557 (¶ 50) (emphasis added).

[23]     Telecommunications Act of 1996, Pub. L. No. 104-104, 11 Stat. 56 *codified at* 47 U.S.C. ¶ 151 *et seq.*

[24]     *See* Joint Statement of Managers, S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. Preamble (1996).

[25]     47 U.S.C. § 253 (a) ("No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.").

[26]     *See Foreign Participation Order,* 12 FCC Rcd 23,891.

[27]     *Id.*

[28]     *Id.*

[29]     *See Benchmarks Order,* 12 FCC Rcd 19,806.

[30]     Specifically, the Commission found that the ISP is no longer necessary in two circumstances:  (1) for settlement arrangements between U.S. carriers and foreign carriers that lack market power, and (2) for settlement arrangements on routes where U.S. carriers are able to terminate at least fifty percent of their U.S. billed traffic at rates that are at least twenty-five percent below the applicable benchmark rate.

[31]     *Foreign Participation Order*, 12 FCC Rcd at 23,896-97 ¶ 10.

Exhibit 5
Page 5 of 10

open the U.S. market to telecommunications carriers from all other WTO members because of its commitment to competition, regardless of any particular member's market structure. The global commitment to competition policy, moreover, has increased dramatically since adoption of the Commission's policy on call-back.  At that time, only a handful of the world's telecommunications markets were open to competition.  During the WTO Basic Telecom Agreement negotiations which concluded in February 1997, seventy WTO members, including the United States and most of its major trading partners, took the historic step of committing to open their markets for basic telecommunications services.  Based on this agreement, more than 95 percent the global telecommunications market, measured by revenue, is currently covered by commitments that remove restrictions on competition and foreign entry.[32]   As Dr. Pekka Tarjanne, former Secretary-General of the International Telecommunications Union (ITU), said, "The landmark agreement . . . changes everything."[33]

14.     Free and open competition benefits individual consumers and the global community by ensuring lower prices, new and better products and services, and greater consumer choice than occurs under monopoly conditions.  In an open market, producers compete to win customers by lowering prices, developing new services that best meet the needs of customers.  A competitive market promotes innovation by rewarding producers that invent, develop, and introduce new and innovative products and production processes. By doing so, the wealth of the society as a whole is increased.  In a competitive environment, businesses that fail to understand and react to consumer needs face the loss of customers and declining profits.

15.     We seek comment on whether the balancing of interests involved in the decision to adopt the call-back policy has shifted.  We believe that the Commission should have a clear, consistent policy in favor of competition on U.S. international routes and foreign markets. This pro-competitive policy should extend to all forms of call-back.  The current comity-based policy may be construed as diminishing the Commission's support for competitive forces.[34]   Moreover, given the growth of alternative calling arrangements, we believe that the comity-based policy may create a dangerous precedent.  As TRA notes, "the Commission would not want  [the call-back policy] . . . to serve as a basis for schemes to block the growth of, for example, Internet services."[35]   We therefore seek comment on whether it is no longer appropriate for the Commission to maintain comity-based prohibitions and engage in enforcement actions in support of foreign laws that serve to restrict competition.

16.     In addition, we note here the difficulty of administering the current call-back policy. Commission staff has in many circumstances received incomplete information regarding the legality of call-back abroad and has experienced difficulty in determining the reliability of information submitted. As a result, Commission staff has to engage in resource-intensive analysis and interpretation of foreign laws.  The call-back policy also requires the Commission to gauge the adequacy of foreign government efforts to enforce prohibitions against call-back activity.  For these reasons, administration of the current call-back policy has proven to be extremely difficult.

---

[32]     *See id.* at 293,895 (¶ 7).

[33]     Dr. Pekka  Terjanne, Secretary–General, ITU, "The 1998 Telecommunications Revolution," at 2 (presented May 27, 1997).

[34]     *See, e.g., FCC Invites Exploitation with Softened Stance on Call-back Service,* Communications Resale Report, Sept. 15, 1997 (noting that the PLDT decisions "ultimately will frustrate global competition and invite exploitation of its policies by self-interested foreign entities").

[35]     TRA reply comments at 11. *See also* Editorial, *Whose Side Is the FCC On?,* Wall St. J., Aug. 18, 1997, at A14 ("[I]f the FCC's stated policy on telephone deregulation and its intent to keep its regulatory tentacles out of cyberspace is to have any credibility at all, it should put these state-owned telecoms on notice: The U.S. will not enforce foreign laws antithetical to world-wide competition.").

Exhibit 5
Page 6 of 10

17.    We believe that eliminating the current policy would not constitute a rejection of the sovereign rights of any foreign government.  Nor would it preclude or limit a foreign government's ability to adopt or enforce policies to prohibit call-back within its territory.  We do not propose to mandate that a foreign government adopt the Commission's pro-competitive policies.  We simply ask whether we should eliminate the use of the Commission's enforcement mechanisms to restrict competition in the international services market.

18.    We also believe that our proposal is consistent with the ITU Kyoto Declaration regarding alternative calling mechanisms.[36]  As an initial matter, we remain committed to our policies against the provision of call-back using any configuration that degrades the network[37] or that constitutes fraudulent activity.[38]  The declaration directs that a member state should "take such actions as may be *appropriate within the constraints of its national law*" if a carrier subject to its jurisdiction offers call-back in violation of another member state's laws.[39]  We emphasize here that we continue to believe that it is in the best interests of U.S. carriers to act in a manner consistent with foreign laws. Therefore we propose to continue to maintain a public file to inform call-back providers about the legality of call-back in foreign nations. We seek comment on whether, given the 1996 Act's commitment to competition and the Commission's recent policies to promote competitive markets abroad, elimination of the existing policy that allows a foreign government or entity to make use of the enforcement mechanisms of the Commission to prohibit U.S. carriers from offering call-back abroad is an appropriate response within the constraints of U.S. law and therefore is consistent with the ITU declaration.

19.    We recognize that some parties oppose TRA's request for rulemaking.[40]  One party argues that international policy changes designed to foster global competition, as reflected in the WTO Basic Telecom Agreement, should have no impact on policies purportedly based solely on the separate principle of international comity (such as the FCC's call-back rule).[41]  Others assert that a change in policy would undermine the FCC's international credibility in fostering greater global competition and could prompt retaliation.[42]  Commenters also claim that it is unfair for the Commission to change its policy with regard to nations that are not WTO members or did not make commitments to liberalize their markets.[43]  We invite comment on these positions.  We note that we will incorporate the comments received in response to the TRA petition into this rulemaking proceeding.

20.    The availability of call-back service may be particularly beneficial to residents of developing countries.  In general, the prices charged by national carriers for regular international service in developing countries tend to be higher than the prices of regular international service in developed

---

[36]    *See* Final Act of the Plenipotentiary Conference (PP-94), Res. Com4/6 (Kyoto 1994) (Kyoto Declaration).

[37]    *See Call-back Reconsideration Order,* 10 FCC Rcd at 9546 (¶¶ 17-18) (supporting U.S. carrier efforts to eliminate "hot line" or "polling" methods of call-back).

[38]    *See* Public Notice, *International Bureau to Pursue Carriers Engaged in Fraudulent International Call-back,* Report No. IN 96-5 (Feb. 12, 1996) (announcing intention to sanction call-back providers that engage in suppression of answer supervision signaling).

[39]    Kyoto Declaration at ¶ 2 (emphasis added).

[40]    *See, e. g.,* Cable & Wireless, plc comments; Costa Rican Institute of Electricity comments; Compania Anonima Nacional Telefonos de Venezuela  (CANTV) comments; Philippine Long Distance Telephone Company comments; Public Service Regulatory Commission of the Republic of Panama comments; Telkom SA Limited comments.

[41]    *See* Cable and Wireless comments at 5.

[42]    *See* PLDT reply comments at 2; CANTV comments at 5.

[43]    *See* Cable and Wireless comments at 5.

Exhibit 5
Page 7 of 10

countries. Call-back service gives consumers in developing countries access to international calling prices that are generally much lower than the prices offered by carriers in their countries. Thus, call-back service makes international calling more affordable in developing markets and encourages customers to make calls that otherwise would not have been placed. Additionally, the availability of call-back can place downward pressure on prices in developing markets because international call-back provides a more competitive environment for the provision of international service.

21.    The Public Service Regulatory Commission of the Republic of Panama suggests that call-back services severely impede the efforts of carriers in developing markets to extend and modernize their networks while reducing prices in order to introduce competition. The regulator suggests that the Commission can support liberalization efforts by maintaining the existing policy on call-back.[44] We take this opportunity to reaffirm our commitment to advancing the telecommunications sector in developing markets, and we emphasize here that our proposal should in no way be construed as a departure from this long-standing policy. We will continue to work in various fora to promote network expansion and universal access in developing markets. In this regard, the Commission is an active participant in the ITU's Development Sector, the Inter-American Telecommunications Commission (CITEL), and the Asia-Pacific Economic Cooperative (APEC). In addition, the Commission through its bilateral outreach works extensively with its counterparts in developing countries to address the challenges of regulating in a changing telecommunications environment. We therefore seek comment on what effect changing our policy would have on the provision of telecom services in developing markets. We intend for the Commission to continue to play a meaningful role to ensure that a robust telecommunications marketplace reaches all parts of the globe.

### IV. Conclusion

22.    Given developments in the international telecommunications market and consistent with our procompetitive policies, we propose to eliminate the Saudi Arabia and Philippines prohibitions and remove the policy that allows a foreign government or entity to make use of the enforcement mechanisms of the Commission to prohibit U.S. carriers from offering one form of call-back abroad.

### V. Procedural Issues

#### A. *Ex Parte* Presentations

22.    This is a non-restricted (*i.e.,* permit-but-disclose) notice-and-comment and rulemaking proceeding. *Ex parte* presentations are permitted, except during the Sunshine Agenda period, provided that they are disclosed as provided in the Commission's rules.[45]

#### B. Initial Regulatory Flexibility Certification

23.    The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. §§ 601-612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Pub, L. No. 104-121, Title II, 110 Stat. 857, requires an initial regulatory flexibility analysis in notice-and-comment proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[46] The Commission is issuing this Notice of Proposed Rulemaking to seek comment on the possible elimination of existing comity-based prohibitions and removal of the

---

[44]    Public Service Regulatory Commission of the Republic of Panama comments.

[45]    *See generally* 47 C.F.R. §§ 1.1202, 1.203, 1.1206.

[46]    5 U.S.C. § 605(b).

Exhibit 5
Page 8 of 10

policy that allows a foreign government or entity to use the enforcement mechanisms of the Commission to prohibit U.S. carriers from offering call-back abroad. The proposals do not impose any additional compliance burden on small entities dealing with the Commission. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[47] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[48] Accordingly, we certify, pursuant to Section 605(b) of the RFA, that the proposals, if promulgated, would not have a significant economic impact on a substantial number of small business entities, as defined by the RFA. The Commission's Consumer Information Bureau, Reference Information Center, shall send a copy of this Notice, including the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration in accordance with Section 605(b) of the RFA. This initial certification will also be published in the Federal Register.[49]

## C. Initial Paperwork Reduction Act of 1995 Analysis

33.      This Notice of Proposed Rulemaking does not contain either a proposed or a modified information collection. As a result, we need not seek comment on the impact of this Notice on information collections, pursuant to the Paperwork Reduction Act of 1995, Pub. L. No. 104-13.

## D. Comment Filing Procedures

34.      Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 C.F.R. §§ 1.415, 1.419, interested parties may file comments on or before April 15, 2002, and reply comments on or before May 15, 2002. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS) or by filing paper copies. *See Electronic Filing of Documents in Rulemaking Proceedings*, 13 FCC Rcd 11322, 11326 (1998).

35.      Comments filed through the ECFS can be sent as an electronic file via the Internet to <http://www.fcc.gov/e-file/ecfs.html>. Generally, only one copy of an electronic submission must be filed. If multiple docket or rulemaking numbers appear in the caption of this proceeding, however, commenters must transmit one electronic copy of the comments to each docket or rulemaking number referenced in the caption. Parties may also submit an electronic comment by Internet e-mail. To get filing instructions for e-mail comments, commenters should send an e-mail to ecfs@fcc.gov, and should include the following words in the body of the message, "get form <your e-mail address>." A sample form and directions will be sent in reply. Or you may obtain a copy of the ASCII Electronic Transmittal Form (FORM-ET) at http://www.fcc.gov/efile/email.html.

36.      Parties who choose to file by paper must file an original and four copies of each filing. If more than one docket or rulemaking number appear in the caption of this proceeding, commenters must submit two additional copies for each additional docket or rulemaking number. All filings must be sent to the Commission's Acting Secretary, William F. Caton, Office of the Secretary, Federal Communications Commission, 445 12th Street, SW, Room TW-A325, Washington, D.C. 20554. One copy of all comments should also be sent to the Commission's copy contractor, Qualex, Portals II, 445 12th St., SW, Room CY-B402, Washington, D.C. 20054. Documents filed in this proceeding will be available for public

---

[47]      5 U.S.C. § 601(6).

[48]      5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[49]      5 U.S.C. § 605(b).

Exhibit 5
Page 9 of 10

inspection during regular business hours in the FCC Reference Information Center of the Federal Communications Commission, 445 12th Street, S.W., Washington, D.C. 20554, and will be placed on the Commission's Internet site.

## VI.  Ordering Clauses

38.      Accordingly, IT IS ORDERED that, pursuant to Sections 1, 4 (i)-(j), 201 (b), 214,303(r), and 403 of the Communications Act of 1934, as amended, 47 U.S.C. § § 151, 154 (i)-(j),    201 (b), 214, 303 (r), and 403, this Notice of Proposed Rulemaking IS HEREBY ADOPTED.

39.      IT IS FURTHER ORDERED that the Commission's Consumer Information Bureau's Reference Information Center SHALL SEND a copy of this Notice of Proposed Rule Making, including the Initial Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

William F. Caton
Acting Secretary

10

Exhibit 5
Page 10 of 10

Federal Communications Commission                                    FCC 14-35

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | **)** |
| | **)** |
| Petition of AT&T Inc. for Settlements Stop | **)**     IB Docket No. 09-10 |
| Payment Order on the U.S.-Tonga Route | **)** |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  April 4, 2014**                                **Released:  April 7, 2014**

By the Commission:

## I.     INTRODUCTION

1.     In this Memorandum Opinion and Order (Order), we deny Tonga Communications Corporation's (TCC)[1] Application for Review of the International Bureau's (Bureau) 2009 *Tonga Stop Payment Order*, which directed all U.S. carriers authorized to provide facilities-based international switched voice services on the U.S.-Tonga route to suspend all U.S. carrier payments for termination services to TCC.[2]  As we discuss below, we concur with the Bureau's findings that TCC disrupted the U.S.-international networks of AT&T Inc. (AT&T) and Verizon Communications Inc. (Verizon) for the purpose of forcing those carriers to agree to higher termination rates, and we find the Bureau's decision to issue the *Tonga Stop Payment Order* consistent with Commission precedent and adequately supported by the record.

## II.     BACKGROUND

2.     TCC is a telecommunications carrier that provides voice, data, Internet, and cellular services in the Kingdom of Tonga.[3]  As noted in the *Tonga Stop Payment Order*, TCC provides service pursuant to a telecommunications license issued by the Tonga Communications Minister.[4]

---

[1] Tonga Communications Corporation (TCC), Application for Review, IB Docket No. 09-10 (filed July 15, 2009) (Application for Review).

[2] *Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route,* IB Docket No. 09-10, Order and Request for Further Comment, 24 FCC Rcd 8006 (Int'l Bur. 2009) (*Tonga Stop Payment Order*).  Specifically, the Bureau ordered that "all facilities-based carriers subject to Commission jurisdiction having a correspondent agreement with TCC for direct termination of U.S. traffic on the U.S.-Tonga route shall suspend all termination payments to TCC for switched voice service effective upon release of [the *Tonga Stop Payment Order*] until such time as the Commission issues a Public Notice that AT&T's and Verizon's circuits on the U.S.-Tonga route are fully restored." *Id.* at 8024, ¶ 59 (emphasis in original).  AT&T and Verizon continue to report that their circuits remain disrupted.  *See, e.g.*, Letter from Jacquelynn Ruff, Vice President, International Public Policy & Regulatory Affairs, Verizon to Marlene H. Dortch, Secretary, FCC (filed Jan. 13, 2014) (Jan. 13 Verizon Letter); Letter from James J.R. Talbot, General Attorney, AT&T to Marlene H. Dortch, Secretary, FCC (filed Jan. 24, 2014) (Jan. 24 AT&T Letter).

[3] TCC Opposition, IB Docket 09-10 (filed Feb. 19, 2009).  TCC is a public enterprise wholly owned and controlled by the Tongan Government.  *See Tonga Stop Payment Order*, 24 FCC Rcd at 8007, ¶ 3; *see also* http://www.tcc.to/index.php/aboutus/ (last visited Jan. 30, 2014); http://www.mic.gov.to/government/176-public-enterprises/1131-aggregate-performance-of-public-enterprises (last visited Jan. 30, 2014).

[4] TCC Opposition at 2; *see Tonga Stop Payment Order*, 24 FCC Rcd at 8007, ¶ 3.  Tonga's Ministry of Information and Communications is the "main regulating body for all communication services, and has the role of lead

(continued….)

Exhibit 6
Page 1 of 14

**Federal Communications Commission**                    **FCC 14-35**

3.        On December 3, 2008, AT&T filed a petition asking the Commission to issue an order stopping U.S. settlements payments to TCC because TCC had blocked AT&T's circuits to Tonga since November 24, 2008, in support of its demand to increase termination rates on this route to over three times the previous level (from approximately $0.09 to $0.30).[5]  Verizon filed comments in support of AT&T's petition.[6]  TCC opposed the petition, arguing, *inter alia*, that it did not engage in any anticompetitive behavior because the rate increases were mandated by the Tonga Communications Minister; the Commission lacks authority to issue a stop payment order on the U.S.-Tonga route because the increased rates were mandated by the government; the Commission does not have authority to prescribe rates that would create a conflict with the laws of a foreign country; and the $0.30 rate increase was not unreasonably high.[7]

4.        On June 15, 2009, the Bureau issued the *Tonga Stop Payment Order*, which found that TCC's disruption of the international networks of AT&T and Verizon was anticompetitive and required action to protect U.S. consumers in accordance with Commission policy and precedent.[8]  In particular, the Bureau found that TCC engaged in anticompetitive actions by demanding a substantial rate increase amounting to a rate floor without engaging in meaningful negotiations and then threatening and carrying out threats to disrupt the AT&T and Verizon networks when the carriers did not accede to the increase.[9]  In this regard, the Bureau found that TCC demanded an increase in termination rates for inbound international calls from $0.09 per minute to $0.30 per minute – a rate floor that is well over the Commission's existing benchmark rate of $0.19 per minute for U.S.-Tonga traffic – and began blocking Verizon's and AT&T's circuits in November 2008.[10]  Further, the Bureau determined that TCC had not presented persuasive arguments to rebut the presumption that its actions harm the U.S. public interest.[11]  Specifically, the Bureau stated that TCC's disruption of U.S. carrier circuits to enforce the rate increase, notwithstanding the Tonga Communications Minister's mandate to increase termination rates for inbound international telephone calls, had an anticompetitive effect on U.S. carriers and consumers.[12]  The Bureau explained that the Commission has the authority to issue a stop payment order to U.S. carriers to protect U.S. consumers from such anticompetitive behavior regardless of whether the rate increases were

(Continued from previous page) ─────────────────
communicator for government information in creating awareness of government policies, programs and activities." Tonga Government Portal: Ministry of Information and Communications, at http://www.mic.gov.to/ministrydepartment/14-govt-ministries/prime-ministers-office/information-a-communications (last visited Jan. 30, 2014).

[5] AT&T, Petition for Settlements Stop Payment Order on the U.S.-Tonga Route, IB Docket No. 09-10, at 1 (filed Dec. 3, 2008) (AT&T Petition); AT&T, Reply Comments (filed Feb. 26, 2009) (AT&T Reply Comments).

[6] Verizon, Comments, IB Docket No. 09-10 (filed Feb. 19, 2009) (Verizon Comments).  Verizon states that TCC also has blocked Verizon's circuits to Tonga since November 17, 2008, in support of its demand to increase termination rates on this route to $0.30.  *Id*. at 1.

[7] *See generally* TCC Opposition; TCC Reply (filed Feb. 26, 2009).  For a full discussion of the pleadings filed in response to the AT&T Petition, *see Tonga Stop Payment Order*, 24 FCC Rcd at 8007-10, ¶¶ 2-10.

[8] *Tonga Stop Payment Order,* 24 FCC Rcd at 8006, ¶ 1.

[9] *Id*. at 8011-15, ¶¶ 15-25, 8021, ¶ 44.

[10] *Id*. at 8011-12, ¶¶ 16-18.

[11] *Id*. at 8012, ¶ 19, 8021, ¶ 44.  *See International Settlements Policy Reform; International Settlement Rates*, IB Docket Nos. 02-324 and 96-21, First Report and Order, 19 FCC Rcd 5709, 5731, ¶ 45 (2004) (*2004 ISP Reform Order*) ("[T]here is a rebuttable presumption of harm to the public interest if U.S. carriers demonstrate in their petitions that they have suffered network disruptions by foreign carriers with market power in conjunction with their allegations of anticompetitive behavior, or 'whipsawing.'").

[12] *Tonga Stop Payment Order*, 24 FCC Rcd at 8013-14*,* ¶¶ 22-23.

Exhibit 6
Page 2 of 14

mandated by the Tonga Communications Minister.[13]  For these reasons, the Bureau granted AT&T's petition to issue the stop payment order.[14]

5.     On July 15, 2009, TCC filed its Application for Review requesting the Commission to review and overturn the Bureau's decision and lift the settlements stop payment order on the U.S.-Tonga route.[15]  TCC contends, among other things, that the Bureau's determination that TCC's actions are anticompetitive and constitute "whipsawing"[16] is erroneous and conflicts with established law[17] because the Tongan Government required TCC to increase its termination rates.[18]  TCC argues that, under these circumstances, the Commission does not have authority under the Communications Act of 1934, as amended (the Act),[19] to issue the stop payment order.[20]  Additionally, TCC argues that the Commission cannot lawfully issue an order regarding the rates charged by a foreign telecommunications carrier for providing termination services in a foreign country when such order creates a direct conflict with the duly enacted laws and regulations of the foreign country.[21]  TCC also maintains that the interests of U.S. consumers "would be better served" if the Bureau investigated AT&T's and Verizon's high rates for service on the U.S.-Tonga route.[22]

---

[13] *Id.* at 8013-16, ¶ 22-25.

[14] *Id.* at 8021, ¶ 44-45.  The Bureau, on its own motion, also sought further comment in the *Tonga Stop Payment Order* on whether the Commission should extend the stop payment order to any U.S. carrier with direct arrangements with Digicel Tonga Limited (Digicel), another carrier licensed to provide telecommunications services in Tonga, for international termination services in Tonga.  *Id.* at 8007, ¶ 3, 8021, ¶ 46.  Based upon a review of the record developed on that issue, the Bureau released a second order in November 2009 requiring all facilities-based carriers subject to Commission jurisdiction having an operating agreement with Digicel for direct termination of U.S. traffic on the U.S.-Tonga route to suspend all termination payments to Digicel for switched voice service. *Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route*, IB Docket No. 09-10, Second Order and Further Request for Comment, 24 FCC Rcd 13769 (Int'l Bur. 2009) (*Tonga Second Stop Payment Order*). Digicel did not file an application for review of the *Tonga Second Stop Payment Order*, and that order remains effective.

[15] Application for Review at 1-3, 10.

[16] *International Settlements Policy Reform et al.*, IB Docket Nos. 11-80, 05-254, 09-10 and RM-11322, Report and Order, 27 FCC Rcd 15521, 15523, n.5 (2012) (*2012 ISP Reform Order*) ("Certain forms of anticompetitive activity can be referred to as "whipsawing," generally defined as a broad range of anticompetitive behavior by foreign carriers that possess market power, in which the foreign carrier or a group of foreign carriers exploit that market power in negotiating settlement rates with competitive U.S. telecommunications carriers.  For example, the Commission has found "whipsawing" to have occurred when a foreign carrier or foreign carriers acting in concert have demanded increases in settlement rates and blocked the circuits of any U.S. carrier that refuses to agree to the demanded rate increases.") (citations omitted).

[17] Application for Review at 1-5.

[18] *Id.* at 3-5.  TCC states that it "increased its termination rate in response to an August 2008 ruling of the [Tonga Communications Minister] that raised the minimum termination rate for *all* inbound international telephone traffic – whether terminating to TCC or its competitor [Digicel Tonga Ltd], and without regard to country of origin – to US$0.30/minute effective no later than September 1, 2008."  *Id.* at 3 (emphasis in original).

[19] 47 U.S.C. § 151 *et seq.*

[20] Application for Review at 6-8.

[21] *Id*.

[22] *Id*. at 8-9.  TCC states that AT&T's and Verizon's published consumer landline rates to Tonga far exceed the termination rate to Tonga, and argues that the Commission should require AT&T and Verizon to lower their consumer landline rates for calls to Tonga and other thin routes.  *Id*.

Exhibit 6
Page 3 of 14

**Federal Communications Commission**                    **FCC 14-35**

6.        In July 2009, AT&T and Verizon filed oppositions to TCC's Application for Review, asking the Commission to affirm the Bureau's *Tonga Stop Payment Order*.[23]  AT&T contends that the Bureau properly determined that TCC's disruption of U.S. carrier circuits violated Commission policies protecting U.S. consumers against the abuse of foreign market power.  In particular, AT&T contends that the Bureau correctly applied Commission rules and policies to the facts in this matter; adopted the stop payment order to prevent "whipsaw" conduct on the U.S.-Tonga route; properly determined that the Tongan Government's order establishing a minimum termination rate does not justify TCC's actions; and did not create a conflict with foreign law by issuing the *Tonga Stop Payment Order*.  Finally, AT&T argues that the Bureau properly determined that AT&T's inbound rates are not relevant to TCC's anticompetitive conduct.[24]  Verizon argues that the Commission has authority under the Act to issue the *Tonga Stop Payment Order*; the *Tonga Stop Payment Order* creates no conflict of laws; and AT&T's and Verizon's allegedly high rates for service to Tonga are irrelevant.[25]  TCC did not respond to AT&T's and Verizon's oppositions.

7.        The Tongan Government officially rescinded its minimum termination rate effective April 1, 2010.[26]  However, to date, Tongan carriers TCC and Digicel Tonga Ltd. (Digicel)[27] continue to require above-benchmark rates for inbound traffic that include a $0.051 cent per minute tax levied by Tonga,[28] and AT&T's and Verizon's direct circuits on the U.S.-Tonga route remain disrupted.[29]  The Office of the United States Trade Representative (USTR) stated, in its 2012 Section 1377 Review on Compliance with Telecommunications Trade Agreements,[30] that TCC and Digicel continue to "insist on unreasonable above-cost rates and refuse to restore direct circuits between the United States and Tonga."[31]  In this regard, USTR has urged the Tongan Government to restore direct circuits and offer

---

[23] AT&T, Opposition to Application for Review, IB Docket No. 09-10 (filed July 30, 2009) (AT&T Opposition); Verizon, Opposition to Application for Review, IB Docket No. 09-10 (filed July 30, 2009) (Verizon Opposition).

[24] AT&T Opposition at 1-13.

[25] Verizon Opposition at 1-6.

[26] *See* Letter from Jacquelynn Ruff, Vice President, International Public Policy & Regulatory Affairs, Verizon to Marlene H. Dortch, Secretary, FCC (filed June 14, 2010) (attaching announcement from Tongan Government that it will no longer be setting a regulatory minimum access charge for all inbound international telephone calls effective April 1, 2010); *see 2012 ISP Reform Order*, 27 FCC Rcd at 15527, ¶ 9.

[27] Digicel is licensed to provide telecommunications service in Tonga.  TCC Opposition at 2-3.

[28] *See 2012 ISP Reform Order*, 27 FCC Rcd at 15527, ¶ 9.  Letter from James J.R. Talbot, General Attorney, AT&T to Marlene H. Dortch, Secretary, Federal Communications Commission (filed October 22, 2012); Letter from Jacquelynn Ruff, Vice President, International Public Policy & Regulatory Affairs, Verizon to Ms. Marlene H. Dortch, Secretary, Federal Communications Commission (dated October 12, 2012).  *See also* Office of the United States Trade Representative, 2012 Section 1377 Review on Compliance with Telecommunications Trade Agreements, *available at* http://www.ustr.gov/webfm_send/3331 (last visited Feb. 12, 2014).

[29] *See*, *e.g.*, Jan. 13 Verizon Letter; Jan. 24 AT&T Letter.

[30] Section 1377 of the Omnibus Trade and Competitiveness Act of 1988 requires USTR to review, by March 31 of each year, the operation and effectiveness of U.S. telecommunications trade agreements.  The purpose of the review is to determine whether any act, policy, or practice of a foreign country that has entered into a telecommunications-related agreement with the United States is not in compliance with the terms of the agreement or otherwise denies, within the context of the agreement, mutually advantageous market opportunities to telecommunications products and services of U.S. firms in that country.  *See* Office of the United States Trade Representative, Section 1377 Review, *at* http://www.ustr.gov/trade-topics/services-investment/telecom-e-commerce/section-1377-review (last visited Jan. 30, 2014).

[31] *See* Office of the United States Trade Representative, 2012 Section 1377 Review on Compliance with Telecommunications Trade Agreements at 11, *available at* http://www.ustr.gov/webfm_send/3331 (last visited Jan. 30, 2014).

Exhibit 6
Page 4 of 14

reasonable, cost-based rates to U.S. carriers.  Nevertheless, USTR observed in its 2013 Section 1377 Review on Compliance with Telecommunications Trade Agreements that "TCC … refuses to negotiate a cost-oriented and reasonable rate for termination for international traffic to Tonga and the [Tongan Government] has failed to take appropriate steps to ensure that TCC offers such rates."[32]

## III.    DISCUSSION

8.       In this section, we assess whether TCC has proffered a basis for overturning on review the Bureau's findings and decisions in the *Tonga Stop Payment Order*.[33]  In particular, we consider whether TCC has provided an adequate basis to rebut the Bureau's finding that TCC's actions constituted anticompetitive conduct harming U.S. consumers and so were contrary to the public interest.[34]  We also examine whether the Bureau's order created a conflict with Tongan law or otherwise amounted to an exercise in extraterritorial jurisdiction, as TCC claims.[35]  Finally, we address TCC's contention that the Commission should investigate AT&T's and Verizon's allegedly high rates for service to Tonga to protect U.S. consumers.[36]  As we discuss below, we find no basis in the record to grant TCC's Application for Review.  We also find that the Bureau's *Tonga Stop Payment Order* comports with Commission authority to act in the public interest in responding to carrier-initiated petitions and notifications seeking Commission intervention on individual international routes where there is anticompetitive conduct.

### A.    The Bureau's Finding of Anticompetitive Conduct and Issuance of the Stop Payment Order

#### 1.    Indicia of Anticompetitive Conduct

9.       *Background*.  The Commission maintains several safeguards designed to protect U.S. consumers from anticompetitive conduct by foreign carriers and other types of market failures.[37]  Included among the safeguards is a process by which the Commission may consider petitions such as that filed by AT&T alleging anticompetitive harm.[38]  The Commission has recognized that, under certain circumstances, "carriers with market power might be free to act anticompetitively, ultimately harming U.S. customers through artificially inflated costs for call termination."[39]  The Commission regards "certain actions as indicia of potential anticompetitive conduct by foreign carriers, including, but not limited to: (1) increasing settlement rates above benchmarks; (2) establishing rate floors, even if below benchmarks, that are above previously negotiated rates; or (3) threatening or carrying out circuit disruptions in order to achieve rate increases or changes to the terms and conditions of termination agreements."[40]  The Commission has concluded that each of these types of actions is a means to disrupt

---

[32] *See* Office of the United States Trade Representative, 2013 Section 1377 Review on Compliance with Telecommunications Trade Agreements at 15, *available at* http://www.ustr.gov/sites/default/files/04032013%202013%20SECTION%201377%20Review.pdf (last visited Jan. 30, 2014).

[33] *See* 47 C.F.R. § 1.115.

[34] *See Tonga Stop Payment Order*, 24 FCC Rcd at 8012-13, ¶ 19.  TCC asserts that the Bureau's finding is based on erroneous findings of fact and conflicts with prior precedents.  Application for Review at 3-5.

[35] Applications for Review at 6-8.

[36] *Id.* at 8-9.

[37] *See 2012 ISP Reform Order*, 27 FCC Rcd 15521; *2004 ISP Reform Order*, 19 FCC Rcd 5709.

[38] *See* 47 C.F.R. § 64.1002(d) (2008).  Subsequent to the time AT&T filed its petition, in 2008, the Commission moved the rule governing petitions alleging anticompetitive conduct to Section 63.22(g) of its rules.  47 C.F.R. § 63.22(g); *see 2012 ISP Reform Order*, 27 FCC Rcd at 15532, ¶ 22.

[39] *See 2004 ISP Reform Order,* 19 FCC Rcd at 5729, ¶ 40.

[40] *Id.* at 5730-31, ¶ 44.

Exhibit 6
Page 5 of 14

normal commercial negotiations in order to force U.S. carriers to accept above-cost settlement rate increases that would be passed on to U.S. customers, and may require Commission action to protect U.S. customers.[41]  The Commission has found, in particular, that blocking or disruption of U.S. carrier networks directly harms the public interest.[42]  As a result, the Commission has adopted a rebuttable presumption of anticompetitive conduct causing harm to the public interest "if U.S. carriers demonstrate in their petitions that they have suffered network disruptions by foreign carriers with market power in conjunction with their allegations of anticompetitive behavior, or 'whipsawing.'"[43]

10.    *Discussion*.  After reviewing the record in this case, we conclude that the Bureau correctly determined that TCC's actions were anticompetitive because they satisfy each of the three indicia for anticompetitive conduct recognized by the Commission.[44]  The record supports the Bureau's finding that: (1) there was a substantial increase in rates above benchmarks; (2) a rate floor was set; and (3) TCC disrupted AT&T's and Verizon's circuits when its rate demands were not met.  First, TCC demanded a substantial increase in termination rates from $0.09 to $0.30,[45] which was more than triple the rate negotiated between AT&T and TCC in July 2008[46] and is well above the Commission's established benchmark rate for the U.S.-Tonga route of $0.19 per minute.[47]  Second, the $0.30 termination rate is the minimum settlement rate for all inbound international telephone traffic to Tonga.  The $0.30 rate floor did not permit additional commercial negotiation below that level.[48]  Finally, TCC disrupted circuits when its rate demands were not met, directly harming the public interest.[49]  Thus, the Bureau correctly determined that TCC's actions to disrupt the U.S.-international networks of AT&T and Verizon, for the purpose of trying to force U.S. carriers to agree to higher termination rates, constituted anticompetitive conduct causing harm to the public interest that required Commission action to protect U.S. consumers.[50]

11.    TCC does not question the factual bases underlying the Bureau's determination that these three types of actions occurred here.  Rather, TCC in effect argues that the occurrence of the three types of actions does not warrant a conclusion in this case that TCC's conduct was anticompetitive.  For the reasons discussed below, we conclude that TCC's arguments are not persuasive, and, therefore, that the Bureau properly issued the stop payment order to U.S. carriers subject to Commission jurisdiction.

### 2.    Tongan Law Requirements

12.    *Background*.  TCC argues that, because its actions were mandated by Tongan law, TCC cannot be found to have engaged in anticompetitive conduct, citing to *Interamerican Refining Co.* for

---

[41] *Id*.

[42] *Id*. at 5731, ¶ 45.

[43]  *Id.*

[44] *See supra* ¶ 9 and accompanying notes.

[45] *See Tonga Stop Payment Order*, 24 FCC Rcd at 8011-13, ¶¶ 15-19.

[46]  *Id.*

[47]  *See Tonga Stop Payment Order*, 24 FCC Rcd at 8013-14, ¶¶ 20-22*; see also International Settlement Rates*, IB Docket No. 96-261, Report and Order, 12 FCC Rcd 19806, 19807, ¶ 1, 19815-16, ¶ 19, 19865, ¶ 120, 19965, Appendix C (1997) (*Benchmarks Order*), *aff'd sub nom. Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224 (D.C. Cir. 1999) (*Cable & Wireless*); Report and Order on Reconsideration and Order Lifting Stay, 14 FCC Rcd 9256 (1999); *see also* AT&T Reply Comments at 2-3; Verizon Comments at 2.

[48] *Tonga Stop Payment Order*, 24 FCC Rcd at 8012, ¶ 17.

[49] *See id.* at 8011-13, ¶¶ 15-20.

[50] *Id*. at 8022, ¶ 48.

Exhibit 6
Page 6 of 14

support.[51]  TCC further states that, by ordering U.S. carriers to stop settlement payments to TCC until TCC rescinds its demand that U.S. carriers pay the amount required by Tongan law and reopens AT&T's and Verizon's circuits, the Bureau, in effect, is penalizing a foreign carrier for refusing to disobey the dictates of its own domestic law.[52]

13.    *Discussion.*  We are not persuaded by these arguments.  As a preliminary matter, the involvement of the Tongan Government in this case does not change the anticompetitive nature of TCC's actions.  TCC's actions, regardless of whether they were taken pursuant to a mandate from the Tonga Communications Minister, were "no less coercive or anticompetitive than they would have been if TCC [had] acted on its own."[53]  In this regard, we note that there is nothing in the record to suggest that the Tongan Government required TCC to block U.S. carrier circuits.[54]  In any event, the Commission's policies to address anticompetitive conduct apply regardless of whether such conduct is undertaken solely by a foreign carrier or pursuant to the direction of a foreign government.  Indeed, in the *2004 ISP Reform Order*, the Commission stated that its policies regarding foreign market power abuse apply in instances where foreign carriers "are under common control or act pursuant to anticompetitive government mandates."[55]  Moreover, in its *Benchmarks Order*, the Commission, in recognizing the sovereign rights of countries to regulate their telecommunications, stated that it cannot accept the view that it must agree to allow U.S. carriers to settle their traffic at whatever rates are imposed by entities controlling the foreign end of an international route without regard to the impact on the U.S. public interest.[56]  Finally, we do not find compelling TCC's reliance on *Interamerican Refining Co.* for the general proposition that "[a] party whose actions are mandated by law cannot be found to have engaged in anticompetitive conduct."[57]  That case deals with the sovereign compulsion defense to antitrust liability, which is inapplicable here as this case neither involves antitrust liability nor an attempt to exercise Commission jurisdiction over TCC.  Accordingly, we find that TCC's argument does not provide a basis for overturning the *Tonga Stop Payment Order*.

### 3.    TCC Blockage of Circuits

14.    *Background.*  In the *Tonga Stop Payment Order*, the Bureau concluded that TCC's disruption of AT&T's and Verizon's networks for their failure to accede to its rate increases was anticompetitive.[58]  In response, TCC claims that it did not block AT&T's and Verizon's circuits for anticompetitive reasons, but rather because its contractual agreements with AT&T and Verizon had expired.[59]

15.    *Discussion*.  We concur with the Bureau's conclusion that TCC blocked AT&T's and Verizon's circuits for an anticompetitive purpose; namely, to try to force them to accept above-benchmark termination rates.[60]  This conclusion is supported by TCC itself, which acknowledged that "it

---

[51] Application for Review at 3 (citing *Interamerican Refining Co. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1296 (D. Del. 1970)).

[52] *Id.* at 2-5.

[53] *Tonga Stop Payment Order,* 24 FCC Rcd at 8014, ¶ 22.

[54] *Id.*

[55] *2004 ISP Reform Order*, 19 FCC Rcd at 5727, ¶ 35, n.92.

[56] *Benchmarks Order*, 12 FCC Rcd at 19950, ¶ 311; *see also Tonga Stop Payment Order,* 24 FCC Rcd at 8013, ¶ 22.

[57] Application for Review at 3.

[58] *Tonga Stop Payment Order,* 24 FCC Rcd at 8021, ¶ 44.

[59] Application for Review at 4.

[60] *Tonga Stop Payment Order,* 24 FCC Rcd at 8022, ¶ 48.

Exhibit 6
Page 7 of 14

stopped terminating AT&T and Verizon's calls" in part because "U.S. carriers refused to pay the termination rate that TCC was required by Tongan law to charge."[61]

16.    We also find that there is no record basis for TCC's contention that its agreements with AT&T and Verizon for terminating traffic in Tonga had expired.  As the Bureau found in the *Tonga Stop Payment Order*, AT&T's rate agreement with TCC was set forth in a schedule to the underlying operating agreement, which specifically provided that the parties should continue to provide service in the event the parties failed to agree on new rates before the expiration of the period in which agreed rates were in effect.[62]  Similarly, Verizon's agreement with TCC provides that its term is extended "indefinitely" until terminated on prior written notice.[63]  The Bureau properly observed these provisions to be consistent with industry practice, that is, to continue service pursuant to the underlying operating agreement, notwithstanding the expiration of rates contained in a separate schedule or annex.[64]

### 4.    Preventing Whipsawing

17.    *Background*.  In the *Tonga Stop Payment Order*, the Bureau noted that one purpose of a stop payment order is to require U.S. carriers to take a unified bargaining position with respect to the foreign carrier, thereby removing any opportunity that the foreign carrier might have to whipsaw, *i.e.,* "play one [U.S. carrier] off against the other" in an effort to establish a higher settlement rate.[65]  TCC denies any plans to play one U.S. carrier off against the other, and asserts on this basis that any finding of anticompetitive conduct in the *Tonga Stop Payment Order* was unwarranted.[66]

18.    *Discussion*.   TCC cannot rebut the Bureau's finding that TCC engaged in anticompetitive conduct[67] by saying that TCC lacked a plan for playing U.S. carriers against each other.  Even if TCC had no plans for whipsawing U.S. carriers, without the *Tonga Stop Payment Order* TCC would still have had the opportunity to engage in such conduct.  The Bureau properly concluded that requiring U.S. carriers to take a unified bargaining position against a non-cost-based, higher rate would remove the opportunity for TCC to play U.S. carriers against each other to the detriment of U.S. consumers.[68]

---

[61] Application for Review at 4.

[62] *See* AT&T Opposition at 4-5; *Tonga Stop Payment Order*, 24 FCC Rcd at 8020, ¶¶ 41-43.  AT&T claims that TCC's action of blocking circuits is specifically prohibited by the terms of AT&T's agreement with TCC for the nominal period of July 1 through August 31, 2008, which, according to AT&T, provided for continuation of service past this period unless specifically terminated under the terms of the agreement, and for deferral of the exchange of monthly rates and the processing of settlements pending execution of a new rate sheet.  AT&T Opposition at 2-3.

[63] Verizon Comments at 1-2 (stating that under its most recent termination agreement with TCC effective from September 1, 2007 through December 31, 2007, its term would "extend indefinitely thereafter until terminated by either party with thirty (30) days prior written notice or until amended by the parties upon mutual agreement").  Verizon received an email from TCC providing three days' notice of termination of the circuits but not thirty day notice of termination of the agreement.  *See* Verizon Comments at 2 ("On November 14, 2008, TCC sent an email informing Verizon of its decision to "turn down circuits with [Verizon]" effective November 17, 2008 to avoid being out of compliance.  TCC began blocking Verizon circuits to Tonga after the close of business on November 17, 2008.").

[64] *See Tonga Stop Payment Order,* 24 FCC Rcd at 8020-21, ¶ 43, and sources cited therein.

[65] *Tonga Stop Payment Order,* 24 FCC Rcd at 8017, ¶ 30 (citing *Cable & Wireless*, 166 F.3d at 1229-30).

[66] Application for Review at 5.

[67] *See supra* ¶ 10.

[68] *Tonga Stop Payment Order,* 24 FCC Rcd at 8017, ¶ 30.

Exhibit 6
Page 8 of 14

B.        **Conflict of Laws**

19.        *Background*.  TCC contends that the Commission cannot lawfully issue an order regarding the rates charged by a foreign telecommunications carrier for providing termination services in a foreign country when such order creates a direct conflict with the duly enacted laws and regulations of the foreign country.[69]  In addition, TCC maintains that courts have refused to construe U.S. laws in a way that would bring them in conflict with foreign laws.[70]  Further, TCC observes that the U.S. Court of Appeals for the D.C. Circuit (D.C. Circuit), in its decision upholding the Commission's *Benchmarks Order*, withheld judgment on whether the Commission has authority to issue an order that "subjects foreign carriers to conflicting obligations," making this an issue of first impression.[71]

20.        *Discussion*.  As an initial matter, we disagree with TCC that there is any conflict, let alone a "direct conflict," between Tongan law and the *Tonga Stop Payment Order*.  "[W]hat [i]s required to establish a true conflict [i]s an allegation that compliance with the regulatory laws of both countries would be impossible,"[72] which, as a corollary, requires that the entity whose compliance is at issue be subject to the regulatory requirements of both jurisdictions.[73]  As TCC is not subject to the U.S. regulatory requirements at issue here, there is no such impossibility.  Specifically, the Bureau's order does not impose any requirement on TCC with respect to settlement rates.  Rather, the order's requirements apply only to U.S. carriers.  Additionally, we note that the Tongan Government rescinded the mandated minimum termination rate in 2010.  Thus, even if there had been some sort of conflict of laws in this case, the conflict would have ended with that rescission.[74]

21.        Further, assuming for the sake of argument that there was an actual conflict in this case, we disagree with TCC that such conflict would limit the Commission's authority to carry out its statutory responsibilities in a manner that it finds will best serve the public interest, as the Bureau did in this case on behalf of the Commission under delegated authority.[75]  Indeed, while the Commission has acknowledged that principles of international comity can play a role in accommodating the laws of foreign governments,[76] it has made clear that such principles do not relieve the Commission of its obligation to serve the U.S. public interest in assessing whether to allow U.S. carriers to settle their traffic at a given rate imposed by entities controlling the foreign end of an international route.[77]

---

[69] *See* Application for Review at 6-8.

[70] *Id.* at 6 (citing TCC Opposition at 8, n.16).

[71] *See id.* (citing *Cable & Wireless*, 166 F.3d at 1230).

[72] *Filetech, S.A. v. France Telecom, S.A.*, 157 F.3d 922, 932 (2d Cir. 1998) (quoting *In re Maxwell Communications Corp.*, 93 F.3d 1036, 1050 (2d Cir. 1996)).

[73] *See, e.g.*, *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 799 (1993) (quoting Restatement (Third) Foreign Relations Law § 403, Comment *e* (No conflict exists "where a person subject to regulation by two states can comply with the laws of both.")); *Chavez v. Carranza*, 559 F.3d 486, 495 (6th Cir. 2009) (same).

[74]  *See supra* ¶ 7.

[75] *See* 47 U.S.C. § 201, 47 C.F.R. § 0.261.

[76] *See, e.g.*, *VIA USA, Ltd., Telegroup, Inc.*, Order on Reconsideration, 10 FCC Rcd 9540, 9555-56, ¶ 47 (1995) (*Call-back Reconsideration Order*) (concluding that the United States should, for reasons of international comity, assist in the enforcement of foreign laws that ban call-back).  *But see infra* note 80.

[77] *See Benchmarks Order*, 12 FCC Rcd at 19950, ¶ 311 (finding that FCC benchmark settlement rate requirements for U.S. carriers are consistent with international law and International Telecommunication Union (ITU) regulations, as such requirements constitute an exercise of the sovereign right of the United States to regulate its telecommunications; that such right 'includes the right to attach reasonable conditions to [telecommunications] authorizations to ensure that the actions of such carriers are consistent with the public interest"; and that the United

(continued….)

9

Exhibit 6
Page 9 of 14

22.     More generally, we agree with the Bureau's conclusion that there is a longstanding exception to the doctrine of international comity as applied by the U.S. courts, "that no nation is required to enforce 'foreign interests that are fundamentally prejudicial to those of the domestic forum.'"[78] Moreover, comity is a discretionary means for U.S. courts and agencies to take account of foreign sovereign acts, and therefore is distinct from obligations imposed under international law.[79]  As we have stated in previous orders, foreign governments may not, simply by enacting domestic legal, regulatory, or procedural measures, require the United States to implement such measures as a matter of international law.[80]  In the present case, for the reasons set forth herein and in the underlying Bureau decisions, we agree that the Bureau correctly concluded that the public interest would be best served by issuing the *Tonga Stop Payment Order*, despite any Tongan governmental mandates for rate increases (which, notably, have now been removed).

(Continued from previous page) ——————————
States is not constrained to "agree to allow U.S. carriers to settle their traffic at whatever rates the foreign carrier deems appropriate regardless of the impact on the U.S. public interest").

[78] *Tonga Stop Payment Order*, 24 FCC Rcd at 8017, ¶ 29.  *See also Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("[F]rom the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act."); *Treco v. Treco & Hamilton*, 240 F.3d 148, 157 (2d Cir. 2000) (*Treco*) ("It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States."); *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 75 (3d Cir. 1994) (comity "must yield to domestic policy" and "cannot compel a domestic court to uphold foreign interests at the expense of public policies of the forum state") .

[79] *Royal and Sun Alliance Insurance Company of Canada v. Century International Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (Doctrine of comity "is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency.") (internal quotations omitted); *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 854 (2d Cir. 1997) (same).  *See also Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895), *quoted in Treco*, 240 F.3d at 157-58 ("'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other").  We note that TCC indirectly cites three cases in support of the proposition that "the law is clear that the Act will be construed narrowly to avoid a conflict with foreign laws."  *See* Application for Review at 6 (providing cross-reference to TCC Opposition at 8, n.16).  Footnote 16 in the cross-referenced TCC Opposition, in turn, cites the following cases:  *Ali v. Ashcroft*, 346 F.3d 873, 885 (9th Cir. 2003); *Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 426 (2d Cir. 1987); and *CFTC v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984).  As the Bureau correctly observed in the *Tonga Stop Payment Order*, however, these cases are inapposite because they hold that U.S. statutes must be construed consistently with international law, and are not relevant to construction of U.S. statutes with respect to the domestic law or policy of a foreign government.  *See Tonga Stop Payment Order*, 24 FCC Rcd at 8016, n.89.

[80] Thus, in 2003, the Commission changed the approach it had taken in the *Call-Back Reconsideration Order* (*see supra* note 76), eliminating the existing comity-based prohibitions on call-back and the policy on call-back services that allowed a foreign government or entity to make use of the enforcement mechanisms of the Commission to enforce foreign government prohibitions against U.S. carriers from offering uncompleted call-signaling abroad. *Petition for Rulemaking of the Telecommunications Resellers Association To Eliminate Comity-Based Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service*, IB Docket No. 02-18, Order, 18 FCC Rcd 6077 (2003). The Commission eliminated the prohibitions on call-back and its policy on call-back services given the absence of record support for continuing the policy and because the Commission viewed it as "inconsistent with and undermining the Commission's goal of promoting global competition."  *Id.* at 6081, ¶¶ 10-11.  The Commission explained that "[b]y no longer enforcing prohibitions against call-back in foreign countries, [it is] not rejecting the sovereign rights of any foreign government or limiting the ability of a foreign government to adopt and enforce policies to prohibit call-back within its jurisdiction.  Rather, [it is] re-emphasizing [its] standing policy to encourage competition in all markets, both developed and developing."  *Id.* at 6081, ¶ 12 (internal citations omitted).

Exhibit 6
Page 10 of 14

## C.      Extraterritorial Jurisdiction

23.      *Background*.  TCC argues that the *Tonga Stop Payment Order* exceeds the Commission's jurisdiction by interpreting the operating agreements between the U.S. carriers and TCC.[81]  It contends that, "[w]hen the Bureau construes an agreement between a U.S. carrier and TCC, it is inherently regulating TCC in the process [because] [w]hatever contract interpretation applies to the U.S. carrier presumably applies equally to TCC."[82]  In addition, TCC asserts that the Bureau exceeded its authority by attempting to "coerce" TCC to terminate AT&T's and Verizon's traffic at rates lower than those mandated by Tongan law.[83]

24.      *Discussion*.  We reject TCC's argument that extraterritorial consequences preclude the Bureau's review and findings in the *Tonga Stop Payment Order*.  It is well settled that the exercise of our authority over U.S.-international settlement rates and practices is not an assertion of extraterritorial regulation of foreign carriers; rather, such exercise constitutes direct regulation of U.S. carriers, which the Commission employs in order to protect the public interest.[84]  In a similar context, the D.C. Circuit has upheld the Commission's international settlement rates policy, including Commission review of contracts between U.S. carriers and foreign correspondents, despite the "extraterritorial consequences" of the Commission's application of this policy to U.S. carriers.[85]  Indeed, Commission review and interpretation of contracts entered into by U.S. carriers for delivery of traffic to foreign destinations may, as here, be necessary and relevant to the Commission's policy goals of protecting U.S. ratepayers from the effects of anticompetitive actions[86] and ensuring that U.S. consumers receive telecommunications services at reasonable rates.[87]  Thus, the existence of extraterritorial consequences stemming from the Bureau's review of this case does not render the Bureau's actions impermissible.

25.      As explained previously, the Commission, or the Bureau under delegated authority,[88] has the authority to issue an order to U.S. carriers prohibiting the payment of increased rates to protect U.S. consumers from anticompetitive behavior, and the Bureau's action in this instance is consistent with similar actions taken by the Commission and the Bureau to address the consequences of a foreign carrier's anticompetitive conduct on an international route.[89]  In this case, we find that the Bureau, in

---

[81] Application for Review at 7 (stating TCC's view that the government of Tonga "effectively modified" the operating agreements when it set a rate floor on termination of international traffic).

[82] *Id*.

[83] *Id*. at 5.

[84] *Cable & Wireless*, 166 F.3d 1224.  *See also 2004 ISP Reform Order* 19 FCC Rcd at 5742, ¶ 74; *Tonga Stop Payment Order*, 24 FCC Rcd at 8014, ¶ 23.

[85] *Cable & Wireless*, 166 F.3d at 1230-31.

[86] *Id*.; *Benchmarks Order*, 12 FCC Rcd at 19948-49, ¶¶ 306-08.

[87] *See Benchmarks Order*, 12 FCC Rcd at 19817, ¶ 24.

[88] *See* 47 U.S.C. § 201; 47 C.F.R. §§ 0.261, 64.1002(d) (2008) (subsequently redesignated as 47 C.F.R. § 63.22(g)).

[89] *See e.g.*, *AT&T Corp. Proposed Extension of Accounting Rate Agreement for Switched Voice Service with Argentina*, Order, 11 FCC Rcd 18014 (Int'l Bur. 1996) (*Argentina Order*); *Petition for Protection from Anticompetitive Behavior and Stop Settlement Payment Order on the U.S.-Pakistan Route,* IB Docket No. 12-324, Memorandum Opinion and Order, 28 FCC Rcd 2127 (Int'l Bur. 2013) (*Pakistan Order*); *Sprint Communications Company, L.P.*, *Request for Modification of the International Settlements Policy to Change the Accounting Rate for Switched Voice Service with Mexico*, Memorandum Opinion and Order, 13 FCC Rcd 24998,  25000-01, ¶ 6 (1998) (*Mexico Order*) ("The Bureau has strictly enforced the Commission's regulations against whipsawing."); *AT&T Corp., Emergency Petition for Settlements Stop Payment Order and Request for Immediate Interim Relief and Petition of WorldCom, Inc. for Prevention of "Whipsawing" on the U.S.-Philippines Route*, IB Docket No. 03-38, Order, 18 FCC Rcd 3519 (Int'l Bur. 2003) (*Philippines Order*), Order on Review, 19 FCC Rcd 9993 (2004)

(continued….)

Exhibit 6
Page 11 of 14

issuing the *Tonga Stop Payment Order*, properly applied Commission policies for protecting U.S. consumers from unreasonably high termination rates demanded by TCC.[90]  We enforce those policies through the issuance of stop payment orders – that are addressed *only* to U.S. carriers (not foreign carriers) – where, as here, the Commission finds anticompetitive conduct and coordinates with the Executive Branch agencies responsible for trade and foreign relations,.

26.     Finally, TCC asserts that the Bureau's *Tonga Stop Payment Order* is an attempt to coerce TCC into terminating AT&T's and Verizon's traffic at benchmark rates, and that, therefore, the Bureau's action is inconsistent with Commission practices.[91]  We disagree.  Stop payment orders like the one at issue here are designed to prevent a foreign carrier from unfairly using its market power to play U.S. carriers off against each other in order to obtain a demanded higher rate.  The effect of the stop payment order – to unify the position of the U.S. carriers so that the bargaining power of individual U.S. carriers is not diluted vis-à-vis the foreign carrier – helps level the playing field by strengthening the bargaining position of the U.S. carriers as a whole.[92]  Accordingly, rather than creating coercive power to enable U.S. carriers to extract price concessions from the foreign carrier, as suggested by TCC, a stop payment order ameliorates an inherently coercive environment stemming from foreign carrier market power. Furthermore, the *Tonga Stop Payment Order* is substantially similar to previous stop payment orders adopted in response to anticompetitive practices employed by carriers in other countries.[93]  Thus, we find that the Bureau's order is fully consistent with Commission practice.

### D.     AT&T and Verizon Rates

27.     *Background.*  TCC argues that the interests of U.S. consumers "would be better served if the Bureau were to investigate AT&T's and Verizon's usurious collection rates on the U.S.-Tonga route and require AT&T to lower its above-benchmark settlement rate on the U.S.-Tonga route and other thin routes."[94]  TCC states that, before TCC blocked AT&T circuits, AT&T was paying $0.09 per minute to terminate traffic in Tonga and yet its published consumer rates for service to Tonga ranged from $1.57 per minute (under AT&T's Worldwide Value Calling Plan) to $3.22/minute (under AT&T's Worldwide Occasional Calling Plan).[95]  TCC also states that Verizon's published consumer landline rates for service to Tonga range from $1.56 per minute (under Verizon's International Single Rate Plan) to $7.09 per minute (under Verizon's Basic International Rates).[96]  TCC contends the Bureau "brush[ed] aside" concerns regarding AT&T's above-benchmark termination rates in certain high-cost Numbering Plan Areas (NPAs) in the United States.[97]

28.     *Discussion*.  We reach no conclusion on TCC's argument regarding AT&T's rates for terminating traffic into high-cost NPAs, because it is not relevant to our assessment of TCC's anticompetitive conduct on the U.S.-Tonga route, and thus provides no basis for granting its Application for Review of the Bureau's *Tonga Stop Payment Order*.  In the context of the ISP reform proceedings, the

---

(Continued from previous page) ─────────────────

(affirming Bureau finding of whipsawing and upholding stop payment order), *aff'd* by Order on Reconsideration, 20 FCC Rcd 14106 (2005).

[90] *See Tonga Stop Payment Order*, 24 FCC Rcd at 8016-18, ¶¶ 28-33.

[91] Application for Review at 4-5.

[92] *Tonga Stop Payment Order*, 24 FCC Rcd at 8017, ¶ 30 (citing *Cable & Wireless*, 166 F.3d at 1229-30).

[93] *See, e.g.*, *Pakistan Order*, 28 FCC Rcd 2127; *Philippines Order*, 18 FCC Rcd 3519; *Mexico Order*, 13 FCC Rcd 24998; *Argentina Order* 11 FCC Rcd 18014.

[94] Application for Review at 8-9.

[95] *Id*. at 8.

[96] *Id*.

[97] *Id*. at 9.

Exhibit 6
Page 12 of 14

Commission made it clear that the rates charged by U.S. carriers do not provide any basis for excusing anticompetitive conduct by foreign carriers.[98]  In response to allegations that U.S. carriers had failed to lower retail calling rates in proportion to decreases in international settlement rates – allegations raised both generally and specifically in connection with the U.S.-Tonga route and interactions between TCC and U.S. carriers – the Commission sought comment in the *2011 ISP Reform NPRM* on what action, if any, it should take.[99]  TCC and Digicel submitted comments arguing that U.S. carriers must make a specific showing that any benchmark savings have been passed through to U.S. consumers prior to the Commission having the ability to impose benchmarks on a particular U.S.-international route.[100]  In the *2012 ISP Reform Order*, the Commission, *inter alia*, rejected an approach that would link action on these two types of rates in the manner that TCC proposes again here – *i.e.*, addressing the allegations against the U.S. carriers before or instead of acting on claims of anticompetitive settlement rates charged by foreign carriers.[101]  The Commission determined that condoning anticompetitive practices by foreign carriers would not be an appropriate response to concerns about U.S. carrier rates, and that such a response would, in fact, not be in the public interest.[102]  Further, the Commission disagreed with the notion – asserted by TCC and Digicel – that U.S. carriers must make a specific showing that any benchmark savings have been passed through to U.S. consumers prior to the Commission being able to impose benchmarks on a particular U.S.-international route.[103]  Instead, the Commission found that it has the authority to take action in response to anticompetitive behavior on a U.S.-international route, and that authority (and the exercise thereof) is in no way dependent upon a certain pricing arrangement for U.S. consumers.[104]  TCC has provided no basis for changing our approach on this issue.  Accordingly, we reject TCC's suggestion that the Bureau should have investigated rates charged by domestic carriers to U.S. consumers in lieu of issuing the *Tonga Stop Payment Order*.[105]

### E.    Elimination of Reporting Requirement

29.    *Background.*  In the *Tonga Stop Payment Order*, the Bureau ordered AT&T and Verizon to "immediately inform the Commission when their circuits have been fully restored, and, otherwise . . . file a report every 30 days after release of this Order explaining the status of their attempts to have their circuits on the U.S.-Tonga route fully restored."[106]  Since that order was issued, AT&T and Verizon have regularly submitted reports stating that their direct circuits on the U.S.-Tonga route remain disrupted.[107]  AT&T states that it continues to seek the resumption of directly routed services to Tonga.  Verizon states that it unsuccessfully engaged in communications with TCC regarding re-opening Verizon's circuits in

---

[98] *See, e.g., 2012 ISP Reform Order,* 27 FCC Rcd at 15546-47, ¶¶ 71-73.

[99] *See International Settlements Policy Reform: International Settlement Rates*, IB Docket Nos. 11-80, 05-254 & 09-10, and RM-11322, Notice of Proposed Rulemaking, 26 FCC Rcd 7233, 7253-55, ¶¶ 59-60 (2011) (*2011 ISP Reform NPRM*).

[100] *2012 ISP Reform Order,* 27 FCC Rcd at 15547, ¶ 73, n.178.

[101] *See id.* at 15547, ¶ 73.

[102] *Id*.

[103] *Id*.

[104] *Id*.

[105] While not relevant to the issues in this proceeding, we note that the appropriate forum for reviewing concerns regarding whether U.S. carriers are passing through savings to customers is a separate request for Commission consideration of such concerns independent of this proceeding.

[106] *Tonga Stop Payment Order*, 24 FCC Rcd at 8025, ¶ 50.  The order also requires AT&T and Verizon to notify the Commission immediately when service is restored and inform the Commission at what rate service was restored.  *Id.* at 8021, ¶ 45.

[107] *See supra* note 29.

Exhibit 6
Page 13 of 14

light of the June 8, 2010, announcement that the Tongan Government will no longer be setting a regulatory minimum settlement rate or access charge for all inbound international telephone calls.[108] Verizon also states that, for the time being, it is not pursuing further negotiations with TCC.[109]

30.      *Discussion*.  We observe that the status of carriers' circuits on the U.S.-Tonga route has not changed significantly since AT&T and Verizon began filing status reports with the Commission shortly after release of the *Tonga Stop Payment Order*.  For this reason and because the requirement that AT&T and Verizon submit periodic updates on the status of their circuit restoration attempts imposes a burden on the carriers, we eliminate this reporting requirement.  We will, however, continue to require AT&T and Verizon to immediately inform the Commission when their respective circuits on the U.S.-Tonga route have been fully restored and at what rate service was restored and/or about other significant developments regarding their efforts to have their circuits on the U.S.-Tonga route fully restored.

## IV.     CONCLUSION

31.      For the reasons set forth above, we find no basis in the record to grant TCC's Application for Review.  Accordingly, we affirm the Bureau's decision to suspend U.S. carrier payments to TCC for termination services pending restoration of AT&T's and Verizon's circuits.

## V.      ORDERING CLAUSES

32.      IT IS ORDERED that Tonga Communications Corporation's Application for Review IS DENIED.

33.      IT IS FURTHER ORDERED that all facilities-based carriers subject to Commission jurisdiction having a correspondent agreement with Tonga Communication Corporation for direct termination of U.S. traffic on the U.S.-Tonga route SHALL CONTINUE TO SUSPEND all termination payments to Tonga Communications Corporation for switched voice service until such time as the Commission issues a Public Notice announcing that AT&T's and Verizon's direct circuits on the U.S.-Tonga route are fully restored.

34.      IT IS FURTHER ORDERED that AT&T and Verizon shall immediately inform the Commission when their circuits on the U.S.-Tonga route have been fully restored and at what rate service was restored and/or about other significant developments regarding their efforts to have their circuits on the U.S.-Tonga route fully restored.

35.      IT IS FURTHER ORDERED that upon release of this Memorandum Opinion and Order, AT&T and Verizon are no longer required to file a report every 30 days explaining the status of their efforts to have their circuits on the U.S.-Tonga route fully restored.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[108] *See* Letter from Jacquelynn Ruff, Vice President, International Public Policy & Regulatory Affairs, Verizon to Marlene H. Dortch, Secretary, FCC (filed June 14, 2010) (attaching announcement from Tongan Government that it will no longer be setting a regulatory minimum access charge for all inbound international telephone calls effective April 1, 2010).

[109] *See, e.g.,* Jan. 13 Verizon Letter.

Exhibit 6
Page 14 of 14

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, I served the foregoing **DECLARATION OF CHRISTOPHER W. SAVAGE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REPLIES** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: December 20, 2021.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants