# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDINGS, S.A., d/b/a DIGICEL HAITI**, | Case No. 3:15-cv-185-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **UPM TECHNOLOGY, INC., d/b/a UPM TELECOM, INC., and UPM MARKETING, INC.; BENJAMIM SANCHEZ a/k/a BENJAMIN SANCHEZ MURILLO; BALTAZAR RUIZ; TYLER ALLEN; and DUY "BRUCE" TRAN**, | |
| Defendants. | |

Robert C.L. Vaughan, Cherine Smith Valbrun, and Leah B. Storie, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394; and Anne M. Talcott and Kathryn E. Kelly, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Plaintiff.

Christopher W. Savage, DAVIS WRIGHT TREMAINE LLP, 1919 Pennsylvania Avenue NW, Suite 800, Washington, DC 20006; and Kathryn P. Salyer, Eleanor A. DuBay, and Blake Van Zile, TOMASI SALYER MARTIN, 121 SW Morrison Street, Suite 1850, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Unigestion Holdings, S.A., doing business as Digicel Haiti, Inc. (Digicel Haiti),

provides mobile telecommunications services in Haiti. In its Third Amended Complaint

(ECF 200), Digicel Haiti asserts claims of fraud, conversion, and unjust enrichment. Digicel Haiti brings these claims against UPM Technology, Inc. (UPM), Duy "Bruce" Tran, Benjamin Sanchez, Baltazar Ruiz, and Tyler Allen.[1] UPM is an Oregon corporation that, among other things, facilitated international calls from the United States to other countries.

Digicel Haiti contends that UPM defrauded Digicel Haiti. At its core, Digicel Haiti asserts that UPM linked calls from people in the United States seeking to call people in Haiti to Digicel Haiti's communications network in a manner that resulted in lower rates than what Digicel Haiti typically charged for inbound international calls. The parties agree that UPM purchased bulk quantities of Digicel Haiti's SIM cards from third-party vendors.[2] UPM would then recharge or "top off" a SIM card by paying other third-party vendors, who would remit at least a portion of that payment to Digicel Haiti, along with specific identifying information for that card. After receiving and recharging the SIM cards issued by Digicel Haiti, UPM would install multiple Digicel Haiti SIM cards in UPM's computer servers (known as "SIM Units"), which were typically in Oregon.

---

[1] The Court refers to Defendants Tran, Sanchez, Ruiz, and Allen collectively as the "Individual Defendants" and refers to UPM and the Individual Defendants collectively as "Defendants." Mr. Tran is the owner and Chief Executive Officer of UPM. ECF 256. Mr. Sanchez, who is no longer employed by UPM, previously was President of UPM. ECF 289 at 7-8 (Tr. 37-38). Mr. Ruiz, who also is no longer employed by UPM, previously was UPM's Network Operations Center Project Manager. ECF 270-3. Mr. Allen also appears to be a former employee of UPM. ECF 263.

[2] "SIM" is an acronym for "Subscriber Identity Module." Each SIM card contains a unique identification number and other information used to "authenticate" the card on a telecommunication carrier's network, enabling the card to be used to make calls. Typically, an individual cell phone user would purchase a SIM card to be used for making calls from a specific cell phone, or handset. The SIM card would often include a certain monetary value, or "prepaid" amount, but could be recharged or "topped off" with new payments. If a carrier, such as Digicel Haiti, deactivates (or de-authenticates) a SIM card, that card can no longer be used to make calls.

After this, the alleged fraud would take one of two possible forms. Digicel Haiti refers to one form as "bypass fraud," which UPM calls "in-country bypass" or simply as "bypass." For bypass, UPM would use its SIM Units to take calls that began in the United States and transmit them via the internet, in Voice-over-Internet Protocol (VoIP) format, to a Gateway device maintained and operated by UPM in Haiti. A Gateway device can contain up to sixteen radios, or radio transmitters. After being received by the UPM Gateway device in Haiti, the call (which began in the United States) would be transmitted to Digicel Haiti's communications network in Haiti, for termination in Haiti.[3] Through this operation, a call that began in the United States would appear to Digicel Haiti to be a local call that had begun in Haiti. Thus, Digicel Haiti would only charge that call as a local call (and reduce the remaining balance on the associated SIM card accordingly), rather than as a more expensive inbound international call. UPM does not deny that it engaged in this practice but denies that it constitutes fraud.[4]

Under the second form, UPM would obtain Digicel Haiti SIM cards and install multiple SIM cards in UPM's SIM Units, as described above. UPM would then register these cards with Digicel Haiti for Digicel Haiti's discounted program known as "Roam Like You're Home" (RLYH). When a call that originates in the United States intended for Haiti reached UPM's

---

[3] In this context, "termination" means the location where a call is shown to be received for purposes of a cellular company's tracking and billing records.

[4] Digicel Haiti also alleges that UPM misrepresented facts to shipping and customs officials to conceal the true nature and function of UPM's Gateway devices shipped to Haiti and that UPM shipped this equipment under the name of a fake company that does not exist. UPM does not deny this allegation but argues that it is irrelevant to Digicel Haiti's claim of fraud because these misrepresentations were not made to Digicel Haiti. Digicel Haiti has not presented evidence showing that the customs officials in Haiti to whom these alleged misrepresentations were made would have confiscated these Gateway devices had they known the truth about the shipped equipment. Whether this evidence is admissible under Rule 404(b)(2) of the Federal Rules of Evidence can be addressed at the final pretrial conference.

switches in the United States, UPM (again using its SIM Unit) would route that call ultimately to Digicel Haiti's network in Haiti, typically through a Digicel Haiti roaming partner. Digicel Haiti's network would recognize that call as having begun in the United States but would charge that call (and reduce the value remaining on the SIM card accordingly) at the lower rate under Digicel Haiti's RLYH program, rather than at the higher rate for inbound international roaming calls. Digicel Haiti contends that its RLYH program was only intended to be used by individual subscribers to that program and not for use in UPM's aggregated SIM Unit model. Thus, Digicel Haiti refers to this practice as "RLYH fraud." UPM does not deny that it engaged in this practice but denies that it constitutes fraud.

Digicel Haiti originally alleged "that when UPM transmits a call to Digicel's network, UPM conceals both the original telephone number associated with the non-Digicel subscriber and the fact that the call comes from UPM's Servers [Units] rather than an individual cellular handset device." *See Unigestion Holding, S.A. v. UPM Tech., Inc*., 160 F. Supp. 3d 1214, 1227 (D. Or. 2016). Digicel Haiti also originally alleged that "UPM accomplishes the concealment both by manipulating the SIM card data to 'package' the data with the non-Digicel customer's call and by using software to replicate the calling patterns of Digicel's local Haitian subscribers. This replication avoids any abnormal call volume to any particular Digicel cellular tower, which Digicel could detect, or flag, as a sign of 'bypass' operations." *Id*. As discussed below, Digicel Haiti has produced no evidence that UPM "manipulated" the SIM card data to "disguise" the original telephone number associated with the person in the United States who began the call to Haiti. UPM has shown that Digicel Haiti's network did not request that information and there was no place for UPM to provide it. Digicel Haiti presented no evidence to the contrary.

As also discussed below, there is a factual dispute over whether UPM used software specially designed to simulate (or replicate) the calling patterns of Digicel Haiti's local Haitian subscribers to mislead Digicel Haiti and avoid detection by Digicel Haiti (and deactivation of the associated SIM cards). UPM had this software, often called "human behavior software," but whether it used this software to mislead Digicel Haiti is disputed. Digicel Haiti has presented evidence that UPM used human behavior software to direct and vary the use of specific SIM cards (including the timing and duration of calls using a specific SIM card) to avoid detection by Digicel Haiti. If Digicel Haiti detected that a SIM card was being used in either of the two ways described above, Digicel Haiti would deactivate (or de-authenticate) that SIM card from further use.

In Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff's Third Amended Complaint (ECF 244), UPM asserts several counterclaims against Digicel Haiti. UPM alleges that Digicel Haiti violated several sections of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, *et seq.* (Communications Act). UPM contends that Digicel Haiti's "roaming" agreements with several United States telecommunications carriers made Digicel Haiti subject to the Communications Act and that Digicel Haiti's deactivating (or de-authenticating) the Digicel Haiti SIM cards that UPM bought from third parties constitutes an unlawful restriction on the "resale" of telecommunication services in violation of the Communications Act. UPM also asserts counterclaims alleging breach of implied-in-fact contract, money had and received, conversion, unjust enrichment, and intentional interference with prospective economic advantage.

The Court has set a ten-day jury trial to begin on April 4, 2022. Now before the Court are five motions filed by the parties. First, UPM, joined by the Individual Defendants, seeks

summary judgment against all claims asserted by Digicel Haiti (ECF 255). Second, the

Individual Defendants move for summary judgment, asserting that they cannot be held

personally liable, even if Digicel Haiti were to prevail against UPM (ECF 259). Third, Digicel

Haiti seeks summary judgment against all counterclaims asserted by UPM (ECF 264). Fourth,

Digicel Haiti moves for partial summary judgment to establish Defendants' liability for fraud

(ECF 269). Finally, Digicel Haiti, through a *Daubert* motion and alternative motion *in limine*,

seeks to exclude or limit the testimony of UPM's expert witness Joseph Gillan, which the parties

agree is relevant only to UPM's counterclaims (ECF 272).

## STANDARDS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that a party is entitled to

summary judgment if the "movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving

party has the burden of establishing the lack of a genuine dispute of material fact. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most

favorable to the non-movant and draw all reasonable inferences in the non-movant's favor.

*Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although

"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's

position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

The first sentence of Rule 56(a) provides: "A party may move for summary judgment, identifying each claim or defense—or *the part of each claim or defense*—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The 2010 Advisory Committee explains that this sentence was "added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment; *see also Minority Police Officers Ass'n of S. Bend v. City of S. Bend, Ind.*, 721 F.2d 197, 200 (7th Cir. 1983) ("The word 'judgment' in the term 'partial summary judgment' is a misnomer. A partial summary judgment is merely an order deciding one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment on a separate claim.").

Further, Rule 56(g) states: "If the court does not grant all the relief requested by the motion, it may enter an order stating *any material fact*—including an item of damages or other relief—that is not genuinely in dispute *and treating the fact as established* in the case." Fed. R. Civ. P. 56(g) (emphasis added). As explained by the 2010 Advisory Committee, "the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute." Fed. R. Civ. P. 56(g) advisory committee's note to 2010 amendment. If, however, "the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event." *Id*.

When parties cross-move for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

(simplified); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

Finally, in evaluating a nonmoving party's facts offered at summary judgment, the Court does "not focus on the admissibility of the evidence's form. [The Court] instead focus[es] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("[T]he evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial[.]"); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."). At summary judgment, the Court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live

testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) ("[W]hen evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence." (emphasis in original)); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence").[5]

## FACTUAL BACKGROUND

### A. Digicel Haiti[6]

Digicel Haiti provides telecommunications services in Haiti and has more than four million customers. It operates solely within Haiti and has more than 900 employees. Digicel Haiti contracts with several third-party distributors and partners. Digicel Haiti also has several affiliated entities, collectively, the "Digicel Group." Besides Digicel Haiti, the Digicel Group includes, among others, Digicel USA, Inc. (Digicel USA) and Digicel Jamaica Limited (Digicel Jamaica).

Digicel USA is a Delaware corporation and holds a license from the Federal Communications Commission that permits Digicel USA to switch international telecom traffic in

---

[5] For example, in *Fraser* the Ninth Circuit considered a diary's contents as evidence to defeat a motion of summary judgment, despite a hearsay challenge, because the contents of the diary "could be admitted into evidence at trial in a variety of ways," including having the witness "testify to all the relevant portions of the diary from her personal knowledge." *Fraser*, 342 F.3d at 1037. "Because the diary's contents could be presented in an admissible form at trial, we may consider the diary's contents in the [movant's] summary judgment motion." *Id.*

[6] The facts in this subsection are based on the allegations in the Third Amended Complaint, ECF 200, ¶¶ 14-27. In their Amended Answer, Defendants do not appear to dispute the substance of these points. In any event, this subsection merely provides helpful background information unnecessary to resolve the pending motions, unlike the subsections that follow.

the United States. Digicel USA's switching operations act as a hub for international traffic between wholesale carriers in the USA and several markets in the Caribbean, including Haiti, which is served by Digicel Haiti. Digicel Jamaica is incorporated in Jamaica and provides centralized administrative and operational services for the entities in the Digicel Group.

To facilitate the termination of incoming international call traffic on Digicel Haiti's domestic mobile telecommunication network in Haiti, Digicel Haiti typically connects telephone calls sent to it from the United States through a system of telephone switching systems operated by Digicel USA and located in Miami, Florida, and New York City, New York. Digicel USA provides centralized switching facilities that allow for the management, technical support, and quality control for the switching equipment responsible for transmission and direction of international calls to Digicel Haiti and other Digicel Group affiliates from wholesale carriers in the United States.

Digicel Haiti routes telecommunications traffic from the United States to its cellular network in Haiti through the Digicel USA international switching centers in Miami and New York. From there, a call is terminated on a Digicel Haiti subscriber's handset. Typically, a call from the United States to an individual in Haiti would be handled as follows. The caller in the United States (U.S. Caller) would place a call to a recipient in Haiti (Haitian Recipient). The call originates on a United States carrier's network, and that carrier transfers the call to a wholesale international carrier. The wholesale international carrier recognizes the call as one that is directed to Haiti and sends the call to a Digicel USA switch, in either New York or Miami. From the assigned Digicel USA switch, the call is transmitted to a switch in Haiti owned and operated by Digicel Haiti. The switch in Haiti sends the call to a cell site in Haiti, also owned and operated

by Digicel Haiti. From that cell site, the call is transmitted by Digicel Haiti to the Haitian Recipient's cellular device.

When a call is directed through Digicel USA's switch in Miami or New York, a Call Detail Record (CDR) is created at the switch. The CDR is complete when the call is completed. The CDR is a record generated by a switch that contains certain call information including the telephone number of the caller, the number of the recipient, the time the call was made, and the duration of the call. The information in the CDR about the calling and called telephone numbers is in the electronic signaling information transmitted from the sending switch as part of the technical process of handing off the call from one switch to another. The Digicel Haiti switch typically records when the call begins and the duration of the call.

For each incoming international call, a separate simultaneous CDR is created by a switch in Haiti and operated by Digicel Haiti. Digicel Jamaica uses both the CDRs from the switches in Miami and New York and the CDRs from the switch in Haiti to create reports used to reconcile the number of calls made to Haiti and the number of minutes that should be invoiced to the appropriate parties.

**B.  UPM's Operations Generally[7]**

During the period relevant to this lawsuit, UPM's main business was as a reseller of international telecommunications services. UPM would participate in the spot market for international resale to identify other carriers that had traffic that terminated in other countries. UPM would attempt to identify ways to get calls to those countries at a cost to UPM that was lower than the price the carriers would pay to get their traffic delivered.

---

[7] Except when expressly noted, the facts in this subsection are based on the Declaration of Bruce Tran (Tran Decl.). ECF 256, ¶¶ 4-16.

UPM's resale business generally begins with calls coming to UPM from UPM's customers (typically, telecommunications carriers with whom UPM has contracted to provide service) via the internet, in VoIP format. These calls would arrive, using UPM's connections to the internet, at UPM's "softswitch." UPM's softswitch is a specialized computer program, running on UPM's computer servers connected to the internet.

UPM's softswitch would access a "routing table" that UPM would regularly update. The softswitch would use the information in the routing table to send calls bound for a particular network in a particular destination country along a particular "route." In this context, a "route" is essentially an Internet Protocol (IP) address, either of a third-party carrier from whom UPM was buying call termination services, or a UPM "Gateway" device, typically in the destination country, that UPM would use to initiate wireless calls on the destination network.

The calls typically came from the internet to UPM's softswitch, and UPM's softswitch would send the calls back out, also via the internet, either to another carrier or to UPM's Gateway equipment, typically in a destination country. Every call that UPM sent for termination during the relevant period passed through UPM's softswitch in this way.

UPM's softswitch records a range of information about each call that UPM handled, including its duration, the number being called, and whether it was routed to a third-party network or to UPM's equipment. As previously noted, records of this sort are known in the telecommunications industry as "Call Detail Records" (CDRs). Also as noted, the main function of CDRs is billing. In the international resale industry, significant participants both buy and sell call termination to a range of destination networks. The rates carriers charge for termination to a given network in a destination country could change daily. Also, margins (*i.e.*, the difference between what a company can charge for call termination to a given destination network, and the

company's cost to buy or provide that call termination) were typically thin. For these reasons, it is rare for participants in this industry to extend credit to each other. Instead, carriers generally would bill each other regularly, often weekly, or even more often, and expect payment in cash (typically, by wire transfer).

It is important that a carrier have accurate systems for recording and analyzing CDRs. Each carrier would have its own set of CDRs, generated and recorded on its own equipment, reflecting every call sent to or received from any other carrier. These CDRs allowed each carrier to effectively "audit" any bill it received by checking the minutes being billed by the other carrier, against that carrier's own CDRs. It was common for carriers to send an electronic file containing the CDRs (essentially a large spreadsheet) along with a bill to ensure that the buyer and seller would agree on how many minutes of use had been exchanged. UPM recorded CDRs for every call that it handled, including all calls that UPM sent, via any route, to Digicel Haiti's network in Haiti.

When UPM was providing call termination on a destination network, it would need to acquire SIM cards for use on that specific network and to recharge or "top up" those cards, which simply means paying for usage on the destination network. Each SIM card has a unique identification number, as well as a telephone number assigned to it by the destination network. For purposes of UPM's business, the telephone number represented an account on the destination network's system. Third-party vendors would sell recharges to UPM on a range of destination networks. This would be handled electronically. UPM would transmit to the third-party vendor the telephone number of the SIM card that UPM wanted to recharge, along with the amount to be recharged. The third-party vendor would then transfer the funds to the destination network, to be

credited to the appropriate SIM card's account. UPM has records of the recharges it purchased, itemized by telephone number.

Besides CDRs, UPM has records, at least from 2014, reflecting the specific usage made with, and recharges applicable to, each SIM card. These records were generated using software that UPM developed for this purpose. UPM also has accounting records associated with its business, including the bills sent to carriers to whom it was selling call termination service and the bills it received from carriers from whom it was buying call termination service.

## C.  UPM's Operations in Haiti[8]

UPM first sent calls to Digicel Haiti's network in August 2011. UPM stopped sending calls to Digicel Haiti's network in March 2012 but then resumed sending calls between April and December 2014. UPM sent no calls to Digicel Haiti's network after December 2014. Thus, the period relevant here is August 2011 through November 2014. According to UPM, terminating calls to Digicel Haiti's network in Haiti was never a significant portion of UPM's total business.

UPM connected calls to Digicel Haiti's network in three ways: arbitrage, in-country bypass, and RLYH Resale. "Arbitrage" refers to UPM simply reselling the services of third-party carriers. In this scenario, calls would come to UPM's softswitch from its customers and then be sent to the carriers from whom UPM was buying call termination onto Digicel Haiti's network.[9]

### 1.  Bypass

"In-country bypass" refers to when UPM itself connected the calls to Digicel Haiti's network in Haiti. In general terms, UPM would send calls via the internet (using VoIP) to Haiti

---

[8] Except when expressly noted, the facts in this subsection are based on the Tran Decl. ECF 256, ¶¶ 3, 17-30.

[9] The parties agree that UPM's arbitrage business is not relevant here.

and, via a local Internet connection, to devices that UPM had sent to Haiti called "Gateways." The Gateways were equipped with standard wireless telephone service radios, which would make calls on Digicel Haiti's network.[10] Before this could happen, however, UPM needed to have acquired SIM cards for Digicel Haiti's network and recharged those SIM cards — paid money to Digicel Haiti via third-party vendors, so that the calls would go through.

UPM acquired Digicel Haiti SIM cards by paying contractors (individual people) in Haiti to buy them at retail. In Haiti, it was not hard to obtain SIM cards from a range of vendors, either in grocery or convenience stores or from booths on the street. It was unnecessary to deal directly with Digicel Haiti in any way to obtain SIM cards. UPM's contractors would charge UPM a mark-up over the retail cost of the SIM cards as part of their compensation. After UPM received the SIM cards, it would need to charge or "top off" these cards so that the calls would go through. UPM did this by paying money to Digicel Haiti via third-party vendors.[11]

---

[10] During Mr. Tran's deposition, taken as a UPM designated representative, he testified that each Gateway would have up to 16 radios installed inside but that the infrastructure in Haiti was not "fast" or "clean" enough to run the full 16 ports. ECF 282 at 35 (Tr. 578).

[11] Digicel Haiti states that written terms apply to the use of its SIM cards. According to Digicel Haiti, "[t]hese conditions provide that a SIM card may not be used for commercial purposes, nor for the purpose of modifying the routing of the telecommunications service." ECF 274 at 12. In support of this statement, Digicel Haiti attaches a certified translation of these terms to the Declaration of Cherine Smith Valbrun. ECF 275 (declaration) and ECF 275-1 (terms). According to these terms, they govern the relationship between Digicel Haiti and the "Customer," defined as the "user" of the mobile telephone service. ECF 275-1 at 7.

As noted, however, UPM represents that it bought Digicel Haiti SIM cards at retail, from a range of vendors, including grocery and convenience stores and from booths on a street. ECF 256 at 6 (Tran. Decl., ¶ 20.) UPM also represents that it paid Digicel Haiti to recharge or "top off" these cards via third-party vendors. *Id*. at 5 (Tran Decl., ¶ 19). Because Digicel Haiti presents no evidence to the contrary, the Court accepts these facts as undisputed. Digicel Haiti offers no facts or argument explaining how UPM would have become obligated to Digicel Haiti's terms, for example by "shrink wrap" terms, electronic "click" agreement, or some other means. That may explain why Digicel Haiti has not alleged breach of contract. In any event,

The contractors would ship the SIM cards back to UPM in Oregon. UPM would then mount the SIM cards into a device called a "SIM Unit." The SIM Unit is essentially a large SIM card reader — a device that can read the information contained on a SIM card and transmit that information to other UPM equipment and send that information, as needed, to Haiti.

To make a wireless call on Digicel Haiti's network (and, in fact, any network using standard technology), it is necessary to authenticate a SIM card on the network. This is a highly technical process, every step of which is set by international standards bodies. UPM cannot modify or vary the steps involved in the authentication process or to provide any information to Digicel Haiti's network other than the information called for by these technical standards. To make a call, the radio in a UPM Gateway would transmit authentication data to Digicel Haiti's network and, after the network has confirmed that the SIM card is valid and has money in its account, the radio sends the network the number being called. At that point, Digicel Haiti's network establishes a connection between the Gateway, at one end, and the wireless phone of the party being called, at the other end.

As noted, the telephone number associated with a SIM card is assigned by the network operator, in this case, Digicel Haiti. When a UPM Gateway made a call, Digicel Haiti's network would automatically send to the called party the telephone number that Digicel Haiti itself had assigned to the SIM card, whose information was used to authenticate the call. UPM had no control over that process in any way. In the context of a call from a UPM Gateway, there was no means, technically, by which UPM could convey to Digicel Haiti's network that the call ultimately began with a third party who called from another country. UPM also had no way to

---

UPM contends that it did not deal directly with Digicel Haiti or make any representations to Digicel Haiti, and Digicel Haiti offers no facts to controvert UPM's assertion.

PAGE 16 – OPINION AND ORDER

cause Digicel Haiti's network to send to the called party any telephone number other than the one that Digicel Haiti itself had assigned to the SIM card.

### 2. RLYH Resale

"RLYH Resale" refers to a specific service that Digicel Haiti offered to subscribers roaming in the United States known as "Roam Like You're Home." UPM began to "resell" Digicel Haiti's RLYH service in 2014. With RLYH, a Digicel Haiti subscriber in the United States would pay a flat fee of around $25. Digicel Haiti would then charge calls using the associated SIM card to be made from the United States back to another Digicel Haiti subscriber at the same rate that a subscriber would pay for a local wireless call in Haiti. After about a month, the subscription would run out and, unless the RLYH service was subscribed to again, normal roaming rates would apply for calls back to Haiti.

In UPM's case, to subscribe to RLYH, UPM would first recharge a SIM with enough money to cover the cost of the RLYH subscription and a reasonable amount of usage, then send Digicel Haiti's network the codes needed to activate the RLYH service. Physically, RLYH Resale is like in-country bypass, except that the Gateways were in Oregon, not Haiti.[12] A call bound for Digicel Haiti's network would hit UPM's softswitch and be directed, via the internet, to a Gateway in Oregon, which would initiate a wireless call on the United States network of a Digicel Haiti roaming partner, such as AT&T. A SIM card enrolled in the RLYH program would be used to authenticate the call. The roaming partner would then get the call back to Haiti.

For UPM's purposes, RLYH Resale was superior to in-country bypass. In Oregon, both power from the power company and Internet access were readily available and stable. RLYH

---

[12] Indeed, UPM's owner and Chief Executive Office Mr. Tran kept the Gateways used for RLYH in his home, not at UPM's business address. ECF 277-1 at 3 (Tr. 23).

Resale also made it unnecessary to ship Gateways to Haiti and arrange for contractors to set them up and keep them operational there. It was unnecessary for UPM or its contractors to have any direct dealings with Digicel Haiti to obtain service on Digicel Haiti's network. SIM cards and recharges could be, and were, obtained from third-party vendors. It was still necessary for UPM's equipment (specifically, UPM's Gateways, SIM Units, and SIM cards) to exchange data with Digicel Haiti to make calls, but those were technical, standards-driven data exchanges, not any sort of direct business dealing. It also was necessary to send some signaling directly to Digicel Haiti to subscribe to the RLYH service, but that, too, was a scripted technical exchange. At no point during the entire period relevant here did UPM ever have any direct contact with Digicel Haiti. There were no meetings, telephone calls, exchange of letters or emails, or text messages. UPM did not need to deal with Digicel Haiti to pay for and use Digicel Haiti's services, and at no point did UPM do so.[13]

**D. Additional Evidence Relating to Digicel Haiti's Fraud Claim**

As discussed, UPM sent multiple Gateway devices to Haiti, which contained up to 16 radios per unit. UPM used these radios to connect bypass calls coming to Haiti via the internet to Digicel Haiti's telecommunications network, for which Digicel Haiti charged local call rates. Digicel Haiti presents evidence that when UPM shipped these Gateway devices to Haiti, UPM did so under false pretenses to disguise the truth about the item being shipped. Digicel Haiti also

---

[13] It is unclear whether UPM communicated directly with Digicel Haiti, even electronically, when UPM subscribed to Digicel Haiti's RLYH program or whether UPM worked through third-party vendors, as is the case when UPM recharged or "topped off" its SIM cards. It is also unclear what, if any, terms Digicel Haiti tried to attach to its RLYH program or how UPM might have become bound to those terms. Digicel Haiti presents no evidence that might answer these questions, especially the latter. Moreover, even if UPM were contractually bound to these terms, Digicel Haiti presents no evidence or argument for why any breach of those terms might also be actionable as fraud.

presents evidence that UPM used sophisticated software that directed UPM's use of its multiple

SIM cards so that calls made using those cards simulated human cell phone usage to avoid

detection by Digicel Haiti. Avoiding detection is important to UPM because Digicel Haiti

deactivated SIM cards that it believed were not being used by human callers in the manner

intended by Digicel Haiti. Indeed, UPM does not dispute that Digicel Haiti deactivated (or

de-authorized) SIM cards being used by UPM as late as 2014, whenever Digicel Haiti believed

that those cards were being used for bypass or to obtain RLYH pricing by persons other than

Digicel Haiti's individual subscribers. *See* ECF 244 at 48 (UPM's Counterclaims, ¶ 331).

In 2012, Ruiz, who was then UPM's Network Operations Center Project Manager,

emailed UPM's Bruce Tran and Dean Johnson. Ruiz attached to his email a UPM document

titled "Shipping Standard Operating Procedures" (SSOP). ECF 270-3. In his email, Ruiz asked

for authorization to distribute that document. *Id.*

Under the heading "Customs Invoice," the SSOP stated:

> In case of a country where inconspicuous presence is required,
> include a "Customs Invoice Template", found in the same
> repository. (Use a different template each time)

*Id.* at 4. In addition, under the heading "Standard Checklist," the SSOP stated both:

- No branding
  > Make sure that there is no branding of any sort, for
  > example: Bags of connectors include the
  > manufacturer's website and/or telephone number.

and

- Not from UPM
  > Read THOROUGHLY all the paperwork included
  > and validate that there is nothing stating "UPM",
  > "upmtelecom.com", "upmtelecom.net",
  > "Pennydial", etc.

*Id.* at 8. Further, under the heading "Extended Checklist," the SSOP stated:

PAGE 19 – OPINION AND ORDER

- Avoid alert words
  Depending on the country, some words get full attention from the customs agent, here is a small list of words to avoid anywhere in the label, box or any component in the box:
  - Commercial
  - Telecommunications

*Id*.

Mr. Ruiz also testified at deposition. He confirmed that UPM would send Gateway devices into Haiti disguised as DVD players, that UPM did not ship any actual DVD players, and that this was done under the SSOP to "conceal these shipments from customs." ECF 270-4 at 5 (Tr. 210). Mr. Ruiz added that UPM used the business name "Video Vizion," which was not a real company, to send the Gateway devices marked as DVDs. *Id*. at 5-6 (Tr. 210-11).

Similarly, Mr. Allen explained during his deposition that UPM changed the description of the equipment from Gateway kit to DVD media player when shipping Gateway devices. ECF 271-3 at 3 (Tr. 90). Mr. Allen also stated that there was no such company as "Video Vizion." *Id*. at 4-5 (Tr. 92-93). Testifying as UPM's designee under Rule 30(b)(6) of the Federal Rules of Civil Procedure, Mr. Tran confirmed this information. ECF 271-2 at 4 (Tr. 364).

As for UPM's use of human behavior software, Digicel Haiti propounded the following Request for Admission and UPM gave the following answer:

> REQUEST FOR ADMISSION NO. 22: Please admit that you use software to select which SIM Card out of a SIM Server or SIM Box should be used to route a call.
>
> RESPONSE: Defendant objects to this Request on the grounds that it is compound and not singular; further objects that the terms "SIM Card," "SIM Server," "software" and "SIM Box" are not defined and are thus vague and ambiguous. *Without waiving these objections, Defendant admits that software is used to select which SIM Card should be used to route a call.*

PAGE 20 – OPINION AND ORDER

ECF 270-8 at 6 (emphasis added). In addition, Mr. Tran, testifying as UPM's designated

representative under Rule 30(b)(6), confirmed that UPM had proprietary software, called "Call

Simulator," which was meant to be used with the SIM cards to make them simulate normal

human call usage. ECF 271-2 at 5 (Tr. 552). The Call Simulator software was specially designed

for UPM. *Id*. According to Mr. Tran, the purpose of Call Simulator was to "identify when the

SIM [card] would get blocked in a lab environment." *Id*. at 6 (Tr. 553).

During the deposition of Digicel Haiti's expert witness Kenneth McEwen, he explained

that he is familiar with human behavior software and that it is used by bypass operators to

attempt to make their SIM cards appear to be being used by a human. ECF 270-6 at 3 (Tr. 127).

For example, this would entail not using a SIM card for 12 hours straight, moving it around, and

making sure that the call durations are appropriate for human use, so that any given SIM card

usage would look like a regular individual user using a phone. *Id*. at 3-4 (Tr. 127-28).

Digicel Haiti presented evidence that UPM used this software to mislead Digicel Haiti,

not merely in a "lab environment." UPM's former employee, Mr. Ruiz, who previously was

UPM's Network Operations Center Project Manager, testified in deposition that UPM had

complex software used by UPM to "emulate human behavior to avoid bypass detection."

ECF 282 at 56 (Tr. 288). When Mr. Ruiz was asked whether "it was to emulate human behavior

so that carrier in this case, Digicel in Haiti, would not be able to identify SIMs being used by

UPM for bypass," he answered: "Correct." *Id*. at 56-57 (Tr. 288-89). In response, UPM argues

that Mr. Ruiz would not have known about this information.

Digicel Haiti also presents circumstantial evidence of UPM's motivation to use this

software to avoid detection and blocking by UPM. The parties do not dispute that when Digicel

Haiti discovered that the calling and usage patterns of certain SIM cards differed from use by

individual customers, Digicel Haiti would "de-authorize" those SIM cards so that calls associated with them could no longer be completed. In its counterclaims, UPM asserts:

> In order to prevent UPM from reselling Digicel-Haiti's services, Digicel-Haiti used various technical means to analyze the calling and usage patterns associated with particular SIM cards, and, when it concluded that the calling and usage patterns were consistent with a resale use, rather than use by an individual customer, it deauthorized the affected SIM cards in its own system, so that calls associated with those SIM cards would no longer be completed.

ECF 244 at 45 (UPM's Counterclaims, ¶ 312).[14]

Further, as early as 2011, UPM knew Digicel Haiti was doing this. Mr. Tran, as UPM's corporate designee, testified as follows:

> Q.    Now, you can agree with me that based upon what's in this email, you can confirm you were aware of blocking of SIMs taking place in Haiti by Digicel in 2011; correct?
>
> A.    Yes.
>
> Q.    You were aware that your SIMs would run somewhere between 150 and 450 minutes before they were identified and blocked by Digicel as bypassed; correct?
>
> A.    I may have been aware in 2011, but I was not aware as of 2021 because I don't remember this email.
>
> Q.    That's why these emails are here, sir.
>
> A.    Right.

ECF 268-1 at 6-7 (Tr. 197-98).

---

[14] In its answer to this allegation by UPM, Digicel Haiti states: "Admitted that Digicel-Haiti worked to prevent the unauthorized and illicit resell of access to its network. The remaining allegations of paragraph 312 are denied." ECF 245 at 15 (Amended Answer and Affirmative Defenses to UPM's Amended Counterclaims, ¶ 312).

**DISCUSSION**

**A.  UPM's Motion for Summary Judgment**

    **1.  Digicel Haiti's Fraud Claim**

        **a.  Common Law Fraud Generally**

In Oregon, a plaintiff may show fraud by affirmative misrepresentation, omission, or actual or active concealment. To prove fraud by affirmative misrepresentation, a plaintiff must show:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the
> speaker's knowledge of its falsity or ignorance of its truth; (5) his
> intent that it should be acted on by the person and in the manner
> reasonably contemplated; (6) the hearer's ignorance of its falsity;
> (7) his reliance on its truth; (8) his right to rely thereon; (9) and his
> consequent and proximate injury.

*Or. Pub. Emps.' Ret. Bd. ex rel. Or. Pub. Emps.' Ret. Fund v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 424 (2004) (quotation marks omitted).

A fraud claim also can be established based on the omission of a material fact, at least in some cases. When fraud is based on silence or nondisclosure of a material fact, a party first must "demonstrate that the defendant either (1) remained silent when the defendant had a duty to speak,[15] or (2) assumed the obligation to make a full and fair disclosure of the whole truth by

---

[15] A duty to speak or disclose information exists when there is a special relationship between a plaintiff and a defendant. *Neel v. Lee*, 316 Or. App. 159, 177 (2021) ("Typically, a duty to speak or disclose exists when there is a special relationship between the plaintiff and the defendant."); *see also Gardner v. First Escrow Corp*., 72 Or. App. 715, 720 (1985) ("Fraud may be predicated on a failure to disclose material facts when the parties have a fiduciary relationship."). When a special relationship exists, the defendant has a duty to disclose to the plaintiff all material matters of which the defendant had knowledge. *See Gebrayel v. Transamerica Title Ins. Co*., 132 Or. App. 271, 281 (1995) (citing *Restatement (Second) of Torts* § 551 (1976)). A special relationship exists when the plaintiff has authorized the defendant to exercise independent judgment on the plaintiff's behalf and the defendant has accepted this responsibility. *Bennett v. Farmers Ins. Co. of Or*., 332 Or. 138, 160-62 (2001). A special relationship does not exist if the parties were merely in an "arm's-length" commercial or business relationship where they were acting in their own economic interest. *See Conway v. Pac.*

making a representation in the nature of a 'half-truth.'" *Smith v. U.S. Bank*, N.A., 2011 WL 7628515, at *6 (D. Or. Oct. 26, 2011) (footnote added), *report and recommendation adopted* 2012 WL 1029364 (D. Or. Mar. 26, 2012); *see also Benson Tower Condo. Owners Ass'n. v. Victaulic Co.*, 22 F. Supp. 3d 1126, 1132-33 (D. Or. 2014) (same); *Gregory v. Novak*, 121 Or. App. 651, 655 (1993) ("one who makes a representation that is misleading because it is in the nature of a 'half-truth' assumes the obligation to make a full and fair disclosure of the whole truth"). In addition, under unique circumstances, a party to a business transaction that is not in a special relationship with the other party may have a duty to disclose "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." *Neel v. Lee*, 316 Or. App. 159, 178 (2021) (emphasis omitted) (quoting *Restatement (Second) of Torts* § 551).

Along with fraud by affirmative misrepresentation or omission, there is a third category of fraud recognized under Oregon law, actual concealment. Where "fraud is based on actual concealment, as opposed to simple nondisclosure, a duty to speak is not required." *Caldwell v. Pop's Homes, Inc.*, 54 Or. App. 104, 113 (1981); *see also Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 484 (2009) ("Moreover, even in the absence of a duty to speak, actions by a defendant to actively conceal the truth can constitute fraud.").

As explained by the Oregon Court of Appeals:

> The distinction [between active concealment and nondisclosure] is made clearer by Prosser's classification of active concealment with affirmative statements as follows: ". . . Any words or acts which

---

*Univ.*, 324 Or. 231, 239-41 (1996); *A.T. Kearney, Inc. v. Int'l Bus. Mach. Corp.*, 73 F.3d 238, 243-44 (9th Cir. 1995).

> create a false impression covering up the truth, . . . or which
> remove an opportunity that might otherwise have led to the
> discovery of a material fact as by floating a ship to conceal the
> defects in her bottom, . . . sending one who is in search of
> information in a direction where it cannot be obtained, . . . or even
> a false denial of knowledge by one in possession of the facts . . .
> are classed as misrepresentations, no less than a verbal assurance
> that the fact is not true."

*Paul v. Kelley*, 42 Or. App. 61, 65-66 (1979) (quoting Prosser, *Law of Torts*, § 106, at 695 (4th ed. 1971)); *see Caldwell*, 54 Or. App. at 113 (same); *see also* 10 Stuart M. Speiser *et al.*, *American Law of Torts* § 32:73 (Monique C.M. Leahy ed., 2012) ("It is a basic principle in the law of fraud in respect to the effect of nondisclosure that the proposition that, in the absence of a duty to speak, nondisclosure is not fraudulent presupposes mere silence and is not applicable where, by words or conduct, a false representation is intimated *or any deceit practiced*." (footnote omitted) (emphasis added)). These principles were recently reaffirmed by the Oregon Court of Appeals. *See MAT, Inc. v. Am. Tower Asset Sub, LLC*, 312 Or. App. 7, 17 (2021).

Moreover, the *Restatement (Second) of Torts* § 550 (1977) states:

> One party to a transaction who by concealment or other action
> intentionally prevents the other from acquiring material
> information is subject to the same liability to the other, for
> pecuniary loss as though he had stated the nonexistence of the
> matter that the other was thus prevented from discovering.

A comment to this section explains that this rule applies "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." *Id*. § 550 cmt. b; *see also Caldwell*, 54 Or. App. at 113 ("*Restatement (Second) of Torts* §§ 550, 551 (1977) states that nondisclosure is actionable where there is a duty to speak but notes no such duty requirement where there has been an active concealment.").

Further, the Fourth Circuit has explained in a thorough decision:

> [T]he common law clearly distinguishes between concealment and
> nondisclosure. The former is characterized by deceptive acts or
> contrivances intended to hide information, mislead, avoid
> suspicion, or prevent further inquiry into a material matter. The
> latter is characterized by mere silence. Although silence as to a
> material fact (nondisclosure), without an independent disclosure
> duty, usually does not give rise to an action for fraud, suppression
> of the truth with the intent to deceive (concealment) does.
>
> . . .
>
> In short, at common law, no fiduciary relationship, no statute, no
> other independent legal duty to disclose is necessary to make
> active concealment actionable fraud—simple "good faith" imposes
> an obligation not to purposefully conceal material facts with intent
> to deceive.

*United States v. Colton*, 231 F.3d 890, 899-900 (4th Cir. 2000).

### b.  Common Law Fraud: Burden of Proof and Damages

A plaintiff must prove fraud by clear and convincing evidence. *Dizick v. Umpqua Cmty.
Coll.*, 287 Or. 303, 311 (1979). After a jury has found "that the defendant made a fraudulent
representation [or is liable for a material omission or has committed active concealment], there is
no reason why the burden of proof of damages in fraud should be different from proof of
damages caused by any other tort. We hold there is no difference, and the trial court did not err."
*Id*. Thus, even in a fraud case, damages need be proven only by a preponderance of the evidence.

In addition, the Oregon Supreme Court in *Dizick* rejected the defendant's argument that
in fraud cases there are only two measures of damages: the "benefit of the bargain" and "out of
pocket" damages. *Id*. at 312. Instead, the Oregon Supreme Court explained: "When the alleged
fraud does not involve the sale of property, the proper measure of damages must be flexible to

compensate the plaintiff for whatever loss he has suffered." *Id.*; *see also Hocks v. Hocks*, 95 Or. App. 40, 46 (1989) (same), quoting *Dizick*.[16]

### c. Application

The key facts are not in dispute. The parties agree that UPM bought Digicel Haiti SIM cards in Haiti and sent them to UPM in Oregon. They also agree that UPM activated those SIM cards and used them to initiate and authenticate two types of calls. The first type involves "bypass" calls sent to Haiti via the internet and then transmitted by radio to Digicel Haiti's network. These calls appear to Digicel Haiti to be local calls that began in Haiti. The second type involves RLYH calls sent by a United States network of a Digicel Haiti roaming partner to Digicel Haiti. The parties agree that UPM linked third-party calls bound for Digicel Haiti customers to the calls that UPM initiated. They agree that Digicel Haiti charged UPM the rate for local calls in Haiti, rather than Digicel Haiti's higher rate for inbound international calls or non-RLYH calls. Finally, they agree that Digicel Haiti, when it believed that a SIM card was being used for this purpose, deactivated (or de-authenticated) that card, thereby blocking UPM from continuing to use that SIM card.

### i. Affirmative Misrepresentation

In its Third Amended Complaint, Digicel Haiti alleged that UPM "cloned" data from the Digicel Haiti SIM cards that UPM purchased. ECF 200, ¶¶ 101, 114. Digicel Haiti, however, presents no evidence of "cloning" of data. UPM merely used the SIM cards in a manner that was

---

[16] The Oregon Supreme Court's 1979 decision in *Dizick* came after its earlier decision in *Galego v. Knudsen*, 281 Or. 43, *modified*, 282 Or. 155 (1978). Thus, the statement in *Galego* that "[i]t is well established in this state that, in an action for fraud, plaintiff's recovery is limited to that measured by the 'out-of-pocket' rule unless the actionable misrepresentation was a warranty of value, in which case plaintiff could recover under the 'benefit-of-the-bargain' rule" is no longer a correct statement of Oregon law after *Dizick*. Indeed, the holding in *Dizick* reinstating the judgment for the plaintiff is inconsistent with the earlier statement in *Galego*.

not to the advantage of Digicel Haiti. Similarly, Digicel Haiti alleged that UPM used these SIM cards to misrepresent the call's international origin. *Id.*, ¶¶ 28, 57, 119, 127. Digicel Haiti, however, presents no evidence of any affirmative misrepresentation by UPM. Indeed, Digicel Haiti expressly alleged:

> When the call is terminated through a Receiver or False Gateway, the Caller Line Identification (CLI) is blocked so that the calling number is manipulated to display on the Digicel Haiti subscriber's phone as "unknown" or with a blank value. Defendants do this by programming the SIM Servers to insert a special code in front of the subscriber number when the call is routed through bypass.

*Id.*, ¶ 126. Digicel Haiti, however, presents no evidence to support this allegation.

Digicel Haiti also alleged:

> In order to legitimately purchase a Digicel Haiti SIM Card in Haiti, an individual is required to complete and file a Customer Registration Card using their government issued identification card. A true and correct copy of a Customer Registration Card is attached to the Amended Complaint as Exhibit A. This mechanism was designed to prevent the acquisition and use of SIM Cards for improper or illegal purposes.

*Id.*, ¶ 64. According to UPM's evidence, however, when UPM's agents acquired Digicel Haiti SIM cards in Haiti, they did not fill out registration forms, Digicel Haiti did not require them to fill out forms, and the service provided by Digicel Haiti was unaffected by whether a form was completed and returned.[17] Digicel Haiti presented no evidence to the contrary or any evidence of false statements being made by UPM or its agents in Haiti, either in writing or orally.

---

[17] In the deposition testimony of Digicel Haiti's designative representative, Maarten Boute, the witness was asked: "[I]f someone buys a SIM card and either doesn't fill out a card or the dealer doesn't get you the card, you will make efforts to try to identify that person. But . . . if no identification is forthcoming, you will in fact allow the SIM card to continue to be used, of course assuming they're putting money in on the prepaid basis?" ECF 258-1 at 17 (Tr. 40). Mr. Boute answered: "So we will allow that SIM card to be used as long as it is doing authorized activity on our network, yes." *Id.* Similarly, Digicel Haiti's employee Paul Flanagan confirmed that, as a practical matter, Digicel Haiti does not always receive completed registration cards

Digicel Haiti also submitted the Declaration of Gerard Laborde. ECF 265. Mr. Laborde is the Legal and Regulatory Director of Digicel Haiti. *Id*., ¶ 2. Mr. Laborde explains that "Digicel Haiti imposes terms and conditions on retailers, subscribers, and customers." *Id*., ¶ 5. Among these terms is a provision that "the SIM Card may not be used for commercial purposes, nor for the purpose of modifying the routing of the telecommunications service." *Id*., ¶ 6(i). Mr. Laborde adds that Digicel Haiti's

> distributors are not allowed to sell directly or indirectly the
> subscriptions to persons, knowing that those persons will resell the
> product outside the Digicel store, unless Digicel provides written
> authorization for such resale. . . . Also, our dealers are not
> authorized to sell more than two (2) mobile phones or more than
> two Digicel SIM Cards to a person on the same day.

*Id*., ¶ 6(ii). Further, Mr. Laborde quotes from Digicel Haiti's Distribution Contract for Electronic Recharge, which provides, in relevant part: "The Authorized Distributor will ensure that its Resellers act within its rights and obligations under the provisions of this Agreement." *Id*., ¶ 6(iii). Finally, Mr. Laborde quotes from Digicel Haiti's Associate Partner Agreement, which "limits an associate partner's rights and prohibits the sale of more than two (2) mobile phones or more than two Digicel SIM Cards to a person on the same day." *Id*., ¶ 6(iv). UPM does not dispute these points, but correctly argues that there is no evidence that UPM and Digicel Haiti ever had an express contractual relationship between them. In short, Digicel Haiti may have claims against its retailers, subscribers, and customers, including its distributors and associate partners, but UPM does not fit into any of those categories.

Thus, Digicel Haiti has failed to show a genuine dispute on whether UPM made any affirmative misrepresentations to Digicel Haiti. Indeed, Digicel Haiti has failed to show that

---

from people who purchase its SIM cards and distributors do not always turn in registration cards to Digicel Haiti. ECF 258-3 at 6, 10-11 (Tr. 52, 64-65).

UPM made any "representations" at all to Digicel Haiti. For these reasons, the Court grants partial summary judgment against Digicel Haiti's fraud claim to the extent that it alleges an affirmative misrepresentation.

### ii. Material Omission

As discussed, when fraud is based on silence or nondisclosure of a material fact, a party first must show that: (1) the defendant remained silent while having a duty to speak; (2) the defendant made an affirmative representation that was only a "half-truth," thereby incurring an obligation to make a full and fair disclosure of the whole truth; or (3) the unique circumstances of a business transaction between the two parties required full disclosure. Digicel Haiti has failed to show that UPM had a duty to speak. Similarly, because Digicel Haiti has failed to show a genuine dispute on whether UPM made any affirmative representations to Digicel Haiti, it has failed to show that UPM made a "half-truth" requiring full disclosure. Finally, Digicel Haiti has failed to show that there was the requisite unique business transaction between it and UPM in which because of that relationship or the customs or usage of the industry, Digicel Haiti would reasonably expect disclosure of the alleged omitted facts. *See, e.g.*, *U.S. Nat. Bank of Oregon v. Fought*, 291 Or. 201, 219 (1981) (rejecting a fraud claim based on omission under this theory of duty to disclose because the plaintiff failed to allege or prove facts that the plaintiff and the defendant were parties to the requisite type of business transaction because the duty to disclose under this theory "is imposed only upon one party to a business transaction to make disclosure to another party to that transaction"). The Court therefore grants partial summary judgment against Digicel Haiti's fraud claim to the extent that it alleges a material omission.

### iii. Active Concealment

The situation is different for Digicel Haiti's fraud claim alleging fraud by active concealment. Viewing the evidence in the light most favorable to the non-moving party (Digicel

Haiti, for purposes of Defendants' motion for summary judgment) and drawing all reasonable inferences in favor of Digicel Haiti, as the Court should do at this stage of the lawsuit, Digicel Haiti has shown a genuine dispute on whether UPM engaged in active concealment to the detriment of Digicel Haiti. When Digicel Haiti believed that its SIM cards were being used in a "bypass" fashion and not by individual persons making local calls in Haiti or using RLYH as an individual subscriber, Digicel Haiti deactivated (or de-authorized) that SIM card. UPM was aware of that fact since 2011 and, viewing the evidence in the light most favorable to Digicel Haiti, UPM tried to mislead Digicel Haiti into believing that the SIM cards were being used by natural persons making individual calls, rather than being used with multiple SIM cards in UPM's SIM Units (or Gateway devices).

UPM's use of human behavior software is a deceptive act or contrivance intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. It also creates a false impression covering up the truth and makes the discovery of a material fact more difficult. If UPM did use that software to deceive Digicel Haiti or to hinder Digicel Haiti's ability to identify and block SIM cards being used by other than natural persons for individual calls and UPM did that with the requisite intent to deceive Digicel Haiti, that is enough to allow Digicel Haiti's claim of fraud by active concealment to proceed to trial. To that extent, the Court denies Defendants' motion for summary judgment against Digicel Haiti's claim of fraud by active concealment.

### 2. Digicel Haiti's Conversion Claim

The Oregon Supreme Court has adopted the following definition of "conversion" from the *Restatement (Second) of Torts* § 222A: "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 253

Or. 658, 663 (1969). "The gravamen of the tort is the defendant's intent to exercise control over the chattel inconsistently with the plaintiff's rights." *Naas v. Lucas*, 86 Or. App. 406, 409 (1987). The interference must be "so great that the actor can justly be required to pay its full value." *Morrow v. First Interstate Bank of Or., N.A.*, 118 Or. App. 164, 168 (1993). As for the taking or diverting of money from another, the Oregon Supreme Court has recognized the tort of conversion of money but only under limited circumstances. "The general rule is that conversion will lie when the *money was wrongfully received* by the party charged with conversion, or an agent is obligated to return specific money to the party claiming it." *Waggoner v. Haralampus*, 277 Or. 601, 604 (1977) (emphasis added).

Digicel Haiti has failed to present evidence that UPM wrongfully exercised dominion or control over any chattel belonging to Digicel Haiti. Digicel Haiti does not dispute that UPM purchased the SIM cards at issue from third parties; Digicel Haiti only objects to how UPM used those cards. Digicel Haiti also has failed to present evidence that UPM received specific money belonging to Digicel Haiti. To hold otherwise could lead to allowing every claim of breach of contract or fraud to serve as the basis of a claim for conversion. Thus, the Court grants partial summary judgment against Digicel Haiti's claim of conversion.

### 3. Digicel Haiti's Unjust Enrichment Claim

To prove unjust enrichment, a party must establish: "(1) a benefit conferred, (2) awareness by the recipient that he or she has received the benefit, and (3) that it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it." *Wilson v. Gutierrez*, 261 Or. App. 410, 414 (2014) (quoting *Cron v. Zimmer*, 255 Or. App. 114, 130 (2013)) (quotation marks omitted). Further, "[u]njust enrichment is an equitable doctrine." *Wilson*, 261 Or. App. at 411; *see also Specialty Risk Servs. v. Royal Indem. Co.*, 213 Or. App. 620, 625 (2007) ("Restitution for unjust enrichment is a venerable claim for relief sounding

in equity, the underlying principles of which date back to Roman law and the *Digest* of Justinian."). Federal courts, however, are precluded from awarding equitable relief when an adequate legal remedy exists. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841-42 (9th Cir. 2020). Digicel Haiti has shown an issue of fact for its claim of common law fraud by active concealment, which is a legal claim, and Digicel Haiti may present that claim to a jury. Thus, the equitable claim of unjust enrichment is no longer available to Digicel Haiti.[18] Thus, the Court grants partial summary against Digicel Haiti's claim of unjust enrichment.

### 4.  UPM's Other Motions for Partial Summary Judgment

UPM also moves for partial summary judgment on certain aspects of Digicel Haiti's fraud claim. The Court address UPM's arguments in turn.

### a.  Whether RLYH Resale Was Fraud

UPM asserts:

> The essence of Digicel-Haiti's fraud claim is that UPM falsely represented calls made using UPM's SIM cards as "really" local calls when in fact they were inbound international calls. But every RLYH resale call was an inbound international call; every RLYH resale call was routed as an inbound international call, via Digicel-Haiti's international gateway switch; and every RLYH resale call was charged as an inbound international call, with the carrier delivering the call to the international gateway switch being charged $0.23 per minute. Whatever concerns Digicel-Haiti might have about RLYH resale, "fraud" cannot be among them, and UPM is entitled to a ruling that Digicel-Haiti's fraud claim has no application to RLYH resale.

ECF 255 at 32. It is unclear to the Court whether UPM's alleged use of human behavior software also pertains to Digicel Haiti's claim relating to RLYH. UPM argues that Digicel Haiti was not

---

[18] Further, if a jury finds for Digicel Haiti on its claim of fraud, Digicel Haiti will have recovered all that it has a right to receive. If, however, a jury finds against Digicel Haiti on that claim, then Digicel Haiti would be unable to show the third element of its claim for unjust enrichment.

damaged by RLYH Resale because Digicel Haiti was paid $0.23 per minute by its roaming partner plus its local rate, which UPM paid. As the Court understands Digicel Haiti's damage theory, however, it would have received more revenue had the same calls been made using international rates and without RLYH. Until these issues have been clarified, which may have to wait until either the final pretrial conference or the close of Digicel Haiti's case-in-chief at trial, the Court denies this aspect of UPM's motion for partial summary judgment.

### b. Number of Bypass Minutes UPM Sent to Digicel Haiti and Damages

UPM contends that it has detailed business records contemporaneously generated that reflect how many SIM cards UPM purchased, how much UPM spent "topping up" those SIM cards, how many RLYH services UPM enrolled in, and how many minutes of traffic UPM terminated on Digicel-Haiti's network using each of the three methods (arbitrage, in-country bypass, and RLYH Resale). ECF 255 at 33. UPM adds that Digicel Haiti "has literally no records of these matters." *Id*. at 34. It is unclear to the Court both how to read the data that UPM provides and how Digicel Haiti intends to calculate its damages. Until these issues have been clarified, which may have to wait until either the final pretrial conference or the close of Digicel Haiti's case-in-chief at trial, the Court denies this aspect of UPM's motion for partial summary judgment. The Court notes, however, that as stated by the Oregon Supreme Court, "[w]hen the alleged fraud does not involve the sale of property, the proper measure of damages must be flexible to compensate the plaintiff for whatever loss he has suffered." *Dizick*, 287 Or. at 312.

### c. Digicel Haiti's Other Damages Claims

UPM also moves for partial judgment against other aspects of Digicel Haiti's claimed damages, specifically: (i) harm due to stress on Digicel-Haiti's network; (ii) harm to Digicel Haiti in investigating bypass; and (iii) harm to Digicel Haiti's goodwill. UPM's motion on these points may be well-taken, at least for categories (i) and (iii). Even so, the Court declines to

consider this issue further but invites UPM to raise the issue again either at the final pretrial conference or the close of Digicel Haiti's case-in-chief at trial.

### d.  UPM's Counterclaim under the Communications Act

UPM seeks partial summary judgment on two aspects of its counterclaim under the Communications Act. Because the Court is deferring further consideration of UPM's counterclaims until after the trial on Digicel Haiti's claim of fraud by active concealment, the Court defers ruling on this issue.

## B.  Individual Defendants' Motion for Summary Judgment

The Individual Defendants (Messrs. Sanchez, Ruiz, Allen, and Tran) move for summary judgment in their favor against all claims asserted against them by Digicel Haiti. Because the only claim remaining against UPM is Digicel Haiti's claim of fraud by active concealment (and the Individual Defendants joined UPM's motion), the Court need not consider Digicel Haiti's other claims.

The Individual Defendants argue that Digicel Haiti has alleged no claim against them "in their individual capacity." With one exception, the Individual Defendants are correct. The only exception is that Digicel Haiti alleges in its Third Amended Complaint that Mr. Tran, who is the owner and Chief Executive Officer of UPM, "directed" the other UPM employees. *See* ECF 200, ¶ 140. The Individual Defendants also correctly state that Digicel Haiti did not plead a theory of corporate veil piercing, let alone facts that would support such a theory.

In response, Digicel Haiti cites a decision from the Ninth Circuit stating that a "corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016), citing

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (internal quotation

marks omitted). Oregon law reaches the same result. The Oregon Supreme Court explains:

> If a lawful agent of a corporation, acting within the scope of his
> authority, makes fraudulent representations orally or by printed
> pamphlets, by which another is injured, both the company and the
> agent may be liable in an action for deceit; but, in order to maintain
> an action for deceit against an officer or agent of a corporation, it is
> necessary to allege and prove that such officer or agent in some
> manner participated in the fraudulent representations.

*McFarland v. Carlsbad Hot Springs Sanitarium Co*., 68 Or. 530, 539 (1913). Further,

> in order to hold the officer of a corporation personally liable for
> fraud by an agent or employee of the corporation it is necessary to
> show that the officer had knowledge of the fraud, either actual or
> imputed, or that he personally participated in the fraud.

*Osborne v. Hay*, 284 Or. 133, 145-46 (1978).

Digicel Haiti has presented sufficient evidence of fraud by active concealment to raise

genuine issues for trial not only against UPM but also its owner and Chief Executive Officer,

Mr. Tran. The Individual Defendants' motion for summary judgment is granted in part and

denied in part. The Court grants partial summary judgment on Digicel Haiti's claims against

Messrs. Sanchez, Ruiz, and Allen. Digicel Haiti's claim of fraud by active concealment,

however, may proceed to trial against Mr. Tran as well as UPM.[19]

---

[19] In its response, Digicel Haiti also moves under Rule 15 to amend the pleadings to add a claim for alter ego as a separate theory of recovery. ECF 276 at 2 n.1. That motion is denied. A response to summary judgment is not the time to amend pleadings or raise new claims. *See, e.g.*, *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (stating that the plaintiff "may not effectively amend its Complaint by raising a new theory of standing in its response to a motion for summary judgment."); *Navajo Nation v. U.S. Forest Serv*., 535 F.3d 1058, 1080 (9th Cir. 2008) (stating that when allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); *Wasco Prods., Inc. v. Southwall Techs., Inc*., 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (quoting *Fleming v. Lind-Waldock & Co*., 922 F.2d 20, 24 (1st Cir. 1990))).

Case 3:15-cv-00185-SI   Document 294   Filed 01/18/22   Page 37 of 40


**C.  Digicel Haiti's Motion for Summary Judgment Against UPM's Counterclaims**

For the reasons discussed below in Section (F), the Court defers ruling on Digicel Haiti's motion for summary judgment against UPM's counterclaims until after the trial of Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran.

**D.  Digicel Haiti's Motion for Partial Summary Judgment Establishing Fraud**

Digicel Haiti moves for partial summary judgment establishing that UPM and Mr. Tran committed fraud by active concealment. ECF 269.[20] Defendants deny that they used human behavior software to deceive Digicel Haiti. Digicel Haiti's evidence is enough to deny Defendants' motion for summary judgment on this point when the Court should view the facts in the light most favorable to Digicel Haiti, as the non-moving party. Digicel Haiti's evidence is insufficient, however, to grant Digicel Haiti's cross-motion for summary judgment, when the Court should view the facts in the light most favorable to UPM and Mr. Tran, as the non-moving parties. Thus, the Court denies Digicel Haiti's motion for partial summary judgment establishing fraud.

**E.  Digicel Haiti's *Daubert* Motion and Alternative Motion *in Limine***

For the reasons discussed below in Section (F), the Court defers ruling on Digicel Haiti's *Daubert* motion and alternative motion *in limine* until after the trial of Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran.

**F.  *Sua Sponte* Bifurcation of UPM's Counterclaims**

Rule 42(b) of the Federal Rules of Civil Procedure provides:

> For convenience, to avoid prejudice, or to expedite and economize,
> the court may order a separate trial of one or more separate issues,

---

[20] Based on the Court's rulings granting in part UPM and the Individual Defendants' motions for summary judgment, all that the Court need consider is Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran.

> claims, crossclaims, counterclaims, or third-party claims. When
> ordering a separate trial, the court must preserve any federal right
> to a jury trial.

Fed. R. Civ. P. 42(b).

This rule "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). "Courts may consider several factors in determining whether bifurcation is appropriate, including whether the issues are clearly separable, and whether bifurcation would increase convenience and judicial economy, reduce the risk of jury confusion, and avoid prejudice to the parties." *Ioane v. Spjute*, 2016 WL 3916966, at *1 (E.D. Cal. July 19, 2016) (quotation marks omitted); *see also Baldwin Hardware Corp. v. Franksu Enters. Corp.*, 1990 WL 357312, at *2 (C.D. Cal. Dec. 28, 1990) ("Rule 42(b) grants the Court broad discretion to order a separate trial of any claim or counterclaim to further convenience, avoid delay and prejudice, or when separate trials will be conducive to expedition and judicial economy. Interests of efficient judicial administration are controlling, rather than the wishes of the parties." (citation omitted)).

As noted, Digicel Haiti deactivated (or de-authorized) SIM cards that Digicel Haiti believed were being used contrary to Digicel Haiti's terms.[21] The parties do not appear to dispute either that UPM engaged in bypass activities or that Digicel Haiti deactivated many of the SIM cards that UPM acquired (and recharged) from third parties. Indeed, the only issue that appears

---

[21] These terms allow Digicel Haiti to suspend or terminate a SIM card (or the service provided under the agreement) of the user "bypasses" Digicel Haiti's services or otherwise violates any of the applicable statutory restrictions and regulations. ECF 275-1 at 10 (¶ 13). Haitian law governs these terms. *Id.* at 11 (¶ 15).

to be in dispute is whether UPM engaged in fraud by active concealment by using human behavior software. If UPM did engage in fraud in that way, that *might* be a defense against all or some of UPM's counterclaims.[22]

To increase judicial economy and reduce the risk of jury confusion, the Court believes that bifurcating these issues and asking a jury to determine whether UPM and Mr. Tran committed fraud by active concealment is the best action. The Court further believes that bifurcation will not unfairly prejudice any party. The Court gave the parties advance notice of the Court's intention to make this ruling and an opportunity to be heard. Neither party objected. Thus, the Court bifurcates this lawsuit and stays the trial of UPM's counterclaims until after the trial of Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART UPM's Motion for Summary Judgment (ECF 255). Digicel Haiti may proceed to trial only on its claim of fraud by active concealment; the Court grants UPM's motion against all other claims. The Court GRANTS IN PART AND DENIES IN PART the Individual Defendants' separate Motion for Summary Judgment (ECF 259). The Court grants partial summary judgment on Digicel Haiti's claims against Messrs. Sanchez, Ruiz, and Allen, but Digicel Haiti may proceed to trial against Defendants UPM and Mr. Tran. The Court DEFERS ruling on Digicel Haiti's Motion for Summary Judgment Against UPM's Counterclaims (ECF 264) until after the trial of Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran. The Court DENIES Digicel Haiti's Motion for Partial Summary Judgment Establishing Defendants' Liability for Fraud (ECF 269). The Court DEFERS ruling on Digicel Haiti's *Daubert* Motion (and Alternative

---

[22] The Court expresses no opinion on this issue for now.

Motion *in Limine*) Against UPM's Expert Witness Joseph Gillan (ECF 272) until after the trial of Digicel Haiti's claim of fraud by active concealment against UPM and Mr. Tran. Finally, the Court *sua sponte* BIFURCATES UPM's counterclaims and STAYS the trial of those counterclaims until after the trial of Digicel Haiti's sole remaining claim of fraud by active concealment against UPM and Mr. Tran.

    **IT IS SO ORDERED**.

    DATED this 18th day of January, 2022.

                                          */s/ Michael H. Simon*
                                          Michael H. Simon
                                          United States District Judge