**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

   Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>  Plaintiff & Counterclaim-Defendant,<br><br>  v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>  Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DEFENDANTS' LAY WITNESS STATEMENTS** |

Page 1 – DEFENDANTS' LAY WITNESS STATEMENTS
UPM-L1\00626851.000

Pursuant to the Court's Trial Management Order (ECF #191), Defendants UPM Technology, Inc. and Bruce Tran (collectively, "UPM") submit its expert lay witness statements.

## I.    INTRODUCTION

Digicel-Haiti bears the burden of proof in this case. As various UPM filings have shown, Digicel-Haiti plainly will not be able to meet that burden. Therefore, there is a good chance that UPM will not present any witnesses at all.

An essential element of Digicel-Haiti's case is to prove that UPM engaged in tortious conduct – its supposed use of human behavior software ("HBS") to actively conceal that its SIMs were not being used by individual subscribers. Digicel-Haiti, however, has proffered literally no evidence addressing the question of whether UPM actually used HBS. The terms "human behavior software," "HBS," and cognates are entirely absent from Digicel-Haiti's witness statements. The only potentially relevant material in its witness statements is the vague suggestion that Mr. Ruiz might testify about UPM efforts to "conceal its activities and avoid fraud detection techniques used by carriers such as Digicel." ECF #303 at 9. That is plainly not specific enough to allow UPM to meaningfully respond.[1]

Another essential element of Digicel-Haiti's case is to prove that it was damaged by UPM's tortious conduct. As narrowed by the Court's ruling on dispositive motions, the only allegedly tortious UPM conduct at issue is alleged active concealment, via HBS, of the fact that UPM's SIMs were not being used by individual subscribers. Literally nothing in any aspect of Digicel-Haiti's proffered testimony (lay or expert) addresses the question of how or whether

---

[1] UPM notes that this kind of general statement is precisely what the Court directed the parties ***not*** to present. The Court specifically admonished the parties as follows:

> For example, do not say, "The witness will testify about the accident." Instead say, "The witness will testify that the defendant ran a red light and was traveling at approximately 30 miles per hour."

ECF #191 at page 2, ¶ 2(b)(i). Digicel-Haiti's description of Mr. Ruiz's testimony boils down to saying that Mr. Ruiz "will testify about the [alleged tort]."

Page 2 – DEFENDANTS' LAY WITNESS STATEMENTS
UPM-L1\00626851.000

Digicel-Haiti was damaged by such UPM conduct. UPM will rebut whatever damages evidence Digicel-Haiti might introduce. But because UPM cannot now know what Digicel-Haiti will present regarding damages, UPM cannot now say with any certainty what it will present to rebut Digicel-Haiti's evidence.

UPM's ability to know what its witnesses will testify to is further complicated by the overall inadequacy of Digicel-Haiti's witness statements. As noted above, Digicel-Haiti's only proffered testimony that seems even to remotely bear on the one remaining issue in the case is vague to the point of uselessness. Much of the remainder of its witness statements is similarly vague or addresses entirely irrelevant matters. For example, Digicel-Haiti states that Mr. Boute will address the "general terms and conditions" applicable to Roam Like You're Home ("RLYH") service.  ECF #303 at 3. Yet this Court expressly excluded the question of such terms and conditions from the case, because Digicel-Haiti had no evidence that UPM was ever bound by them. ECF #294 at 15-16 & n.11; *id.* at 18 & n.13; *id.* at 29. If there is anything specific that Digicel-Haiti views to be relevant to the actual issues in the case, it is impossible to tell what that might be, because the description in the witness statement is so vague.[2]

Finally, Digicel-Haiti has indicated that it plans to call Mr. Tran (UPM's CEO as well as an individual defendant), Mr. Allen (a current UPM employee) and Mr. Ruiz (a former UPM employee). Yet most of what Digicel-Haiti indicates these witnesses will testify to has nothing to do with the only remaining issue in the case.  As a result, UPM cannot now assess what *relevant* testimony Digicel-Haiti might elicit from these witnesses, and, therefore, what testimony UPM might need to elicit during its own redirect examination (Mr. Tran) or cross-examination (Mr. Allen and Mr. Ruiz). And for that reason, it is not clear whether UPM will need or want to

---

[2] UPM requests that at an appropriate point reasonably in advance of trial, Digicel-Haiti be required to re-file its witness statements, both to conform to the Court's rulings on the pending motions *in limine* and to provide the level of specificity required by the Trial Management Order. *See* ECF #191 at page 2, ¶ 2(b)(i).

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

call either Mr. Allen or Mr. Ruiz as witnesses in its own case. (UPM will certainly call Mr. Tran if Digicel-Haiti's case is not dismissed.)

All of these factors combine to create a situation in which, at this point, UPM is severely impaired and prejudiced in trying to indicate to what exactly its witnesses will testify. The best that UPM can do is a good faith effort to indicate what its witnesses *may* be called upon to address. That good faith effort is set out below. In these circumstances, however, fairness requires that UPM reserve the right to modify and supplement its witness statements in light of further developments in the case, including any supplements or clarifications to Digicel-Haiti's witness statements, as well as the Court's forthcoming rulings on the parties' motions *in limine.*

## II.    UPM'S WITNESS STATEMENTS

### A. Bruce Tran

#### 1.    Background Information

Mr. Tran is CEO of UPM. His business address is 3000 NE Stucki Avenue, Suite 100, Hillsboro, Oregon 97124. He is also an individual defendant.

#### 2.    Substance of Testimony

The following statement of the substance of Mr. Tran's testimony is subject to all of the qualifications noted above. For example, Mr. Tran may not be asked to testify about some or all of the points indicated below, and may need to testify about additional matters, depending on the Court's rulings on pending motions *in limine.* In addition, UPM notes that many of the points noted below appear to UPM to be uncontroversial as between the parties, such that they can and should be addressed by stipulation in order to avoid burdening and confusing the jury.

Mr. Tran may testify as follows:

a.    UPM engaged in the business of terminating calls onto Digicel-Haiti's network from August 2011 through March 2012, and then again from April 2014 through October 2014. It got calls to Digicel-Haiti's network either by means of in-country bypass or by means of reselling RLYH service. UPM is no longer in the business of terminating voice calls onto the

Page 4 – DEFENDANTS' LAY WITNESS STATEMENTS
UPM-L1\00626851.000

network of Digicel-Haiti or any other carrier. Free Internet-based services such as Zoom, Skype, Facetime, etc. have largely destroyed the underlying economics of the international voice call termination business.

    b.  UPM's customers were third-party carriers with calls that needed to be routed to a subscriber on Digicel-Haiti's network. When those carriers chose UPM to deliver those calls to Digicel-Haiti's network, the calls were sent to UPM in Oregon via the Internet. Specifically, they arrived at a UPM server running software called a "Softswitch" that directs incoming calls, via the Internet, to other devices that are also connected to Internet.

    c.  The Softswitch sent the calls, via the Internet, to UPM "Gateway" devices. In the case of in-country bypass, UPM's Gateways were located in Haiti. Calls made through these Gateways connected directly to Digicel-Haiti's network in Haiti, which connected the calls to the Digicel-Haiti subscriber being called. In the case of RLYH, UPM's Gateways were located in the Portland, Oregon area. Calls made through the Gateways in Oregon connected to the network of a Digicel-Haiti roaming partner in the United States – that is, a wireless carrier serving the Portland area. That carrier then routed the calls to one of Digicel-Haiti's international switches, in New York or Miami, which then routed them back to Digicel-Haiti's network in Haiti, which directed the call to the Digicel-Haiti subscriber being called.

    d.  In order to function, a Gateway needs a reliable source of electric power and an operating environment that is neither too hot nor too cold. Unreliable electrical power and hot weather in Haiti significantly interfered with the reliable operation of UPM's Gateways located in Haiti. In addition, a Gateway must be connected to the Internet in order to receive the calls being sent from UPM's Softswitch. This means that each Gateway must have a stable Internet connection with enough bandwidth to handle the call or calls being sent to the Gateway. Unreliable Internet connectivity in Haiti significantly interfered with the reliable operation of UPM's Gateways located in Haiti.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

e.      A Gateway must connect to the cellular network where the Gateway is located in order to deliver calls to that network. This means that each Gateway must be located in an area with reliable wireless coverage in order to function. To make these connections, each UPM Gateway had GSM cellular radios (no more than 16 per Gateway), called "ports," that were used to initiate calls on the wireless network where the Gateway was located. Due to issues with Internet and cellular connectivity, it was very frequently the case that many of the ports on UPM's Gateways in Haiti could not be used.

f.      For each call that went through, UPM needed a valid "Subscriber Identity Module" or "SIM" card for use on Digicel-Haiti's network. UPM purchased a large number of those SIM cards via agents in Haiti. Digicel-Haiti did not sell SIM cards directly to UPM. Instead, Digicel-Haiti sold SIM cards to various distributors, and UPM's agents purchased SIM cards from those distributors and shipped them to UPM in Oregon. In Oregon, the SIMs were physically mounted into a device called a "SIM Unit." This device was connected via the Internet to a server running SIM management software, and to UPM's Softswitch. For a call to go through, the SIM card being used to authenticate the call must have been "topped up," meaning that UPM paid money to Digicel-Haiti to pay in advance for usage on that specific SIM card.

g.      For a call to go through, the Internet data packets  representing the call itself had to be associated with account information from an active SIM card that had been topped up with enough money to make at least one call. UPM used software, called "SIM management" software, to associate an incoming call with the account information from a valid, topped up SIM and a working port on a Gateway.

h.      UPM did not configure its SIM management software to mimic or simulate human behavior with regard to the selection of SIMs or the pattern of calls placed using the SIMs. To the contrary, it configured the software to randomly select a SIM and then place calls over that SIM essentially continuously until the SIM was cut off by Digicel-Haiti. UPM's intention in conducting its business terminating calls onto Digicel-Haiti's network was to purchase Digicel-

Haiti's services at generally available retail prices and to use the Internet and other technology to resell those fully-paid-for services on commercially advantageous terms. UPM's understanding was and is that these activities were consistent with and encouraged by the policies of the Federal Communications Commission, the federal body that supervises the communications industry in the United States. UPM did not intend to defraud Digicel-Haiti or to misrepresent anything to Digicel-Haiti.

i.      In the normal and ordinary course of UPM's business, UPM's equipment automatically recorded detailed information about every call that UPM completed, including every call that it completed onto Digicel-Haiti's network. These records are known in the industry as "Call Detail Records," or CDRs. These records were the basis upon which UPM billed its customers. Copies of these records were routinely provided to UPM's customers so that those customers could confirm from their own records that UPM's bills were accurate.

j.      These records are extremely voluminous. For UPM's activity completing calls onto Digicel-Haiti's network alone, the CDRs cover hundreds of thousands of separate calls, and more than a million minutes of traffic. These records are stored electronically in a standard SQL ("structured query language") database that can be queried to produce the requested information. These records permit quantification, to a high degree of accuracy, how many calls and how many minutes of traffic UPM completed onto Digicel-Haiti's network.

k.      During the entire period relevant to this case, UPM purchased in the range of 20,000 SIM cards for use on Digicel-Haiti's network. Of those, approximately 13,700 were used to complete a least one call.

l.      During the entire period relevant to this case, UPM completed slightly less than 1.1 million minutes of traffic via in-country bypass (where the Gateways were located in Haiti) and slightly less than 280,000 minutes of traffic via RLYH resale (where the Gateways were located in the Portland, Oregon area). Because of the highly unreliable nature of connectivity to Digicel-Haiti's network in Haiti, UPM also completed a substantial number of "test" calls,

typically involving one UPM SIM being used to make a call, via a Gateway, to another UPM SIM, either connected to that same Gateway or a different one. UPM was charged by Digicel-Haiti for the minutes of use associated with those test calls. The test calls did not involve an actual call from an end user onto Digicel-Haiti's network, and so the test calls should not factor into any estimation of Digicel-Haiti's damages.

m.    UPM also has business records that reflect how much money UPM paid to Digicel-Haiti to "recharge" or "top-up" its SIM cards, including payments to use the RLYH service. These records include the invoices that UPM paid third-party vendors that provided the ability to recharge Digicel-Haiti SIM cards via online transactions. UPM paid approximately $283,000 for such recharges over the period relevant to this case. This means that UPM has already paid Digicel-Haiti an average of $0.257 per minute for each in-country bypass minute that UPM completed.

n.    For the period from August 2011 to March 2012, UPM also has business records that contain detailed information regarding the usage of individual Digicel-Haiti SIM cards, on a SIM-card-by-SIM-card basis. Specifically, UPM has records of the usage associated with the approximately 12,500 different SIM cards that it used to authenticate calls on Digicel-Haiti's network during that period. These records contain information that identifies the length of the first call made with each SIM card. This information shows that the average length of the first call on these SIM cards is slightly more than five (5) minutes.

## B.  Daniel Barbosa Romero

### 1.  Background Information

Mr. Romero is a UPM employee/contractor located in Mexico. He is one of UPM's SIM Managers. His responsibilities included working with UPM's SIM management software. This included the process of assigning SIMs to active SIM pools to be used to authenticate calls, managing automatic recharges of SIMs as their recharge/top-up balances were depleted, and other related activities.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### 2.     Substance of Testimony

The following statement of the substance of Mr. Barbosa's testimony is subject to all of the qualifications noted above. For example, he may not be asked to testify at all, or he may testify about additional matters, depending on the Court's rulings on pending motions *in limine* and the status of the record at the time he is called to testify.

a.     Mr. Barbosa will testify that he has worked for UPM since at least 2010 (with a break in employment during or about 2016), and that his responsibilities have included SIM management from at least 2011 through 2014.

b.     He will testify that he was involved in the day-to-day process of SIM management in connection with UPM's operations in Haiti during the periods of time relevant to this case.

c.     He will testify that UPM did not configure its SIM management software to mimic or simulate human behavior with regard to the selection of SIMs or the pattern of calls placed using the SIMs. To the contrary, it configured the software to randomly select a SIM and then place calls over that SIM essentially continuously until the SIM was cut off by Digicel-Haiti.

d.     He will testify that UPM's objective regarding SIM management was to complete as many calls as possible using a SIM before it was cut off. He will testify that while he did not know what processes Digicel-Haiti used to identify UPM's SIMs, Digicel-Haiti was extremely efficient at identifying and cutting off the SIMs. This fact made it impractical for UPM to try to manage the calling pattern associated with any SIMs, because any delay in making use of a SIM created too much risk that the SIM would be cut off while it still had substantial funds in its account. Instead, as noted above, UPM's SIM management software was configured to send as many calls as possible, one after another, using a given SIM.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Dated: February 28, 2022.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
   Kathryn P. Salyer, OSB #883017
   Eleanor A. DuBay, OSB #073755
   Blake Van Zile, OSB #184672
   ksalyer@tomasilegal.com
   edubay@tomasilegal.com
   bvanzile@tomasilegal.com
   Telephone: (503) 894-9900


DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
   Christopher W. Savage, D.C. Bar #362657
   chrissavage@dwt.com
   Telephone: (202) 973-4200
   *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

Page 10 – DEFENDANTS' LAY WITNESS STATEMENTS
UPM-L1\00626851.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I served the foregoing **DEFENDANTS' LAY WITNESS STATEMENTS** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: February 28, 2022.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
   Kathryn P. Salyer, OSB #883017
   Eleanor A. DuBay, OSB #073755
   Blake Van Zile, OSB #184672
   ksalyer@tomasilegal.com
   edubay@tomasilegal.com
   bvanzile@tomasilegal.com
   Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
   Christopher W. Savage, D.C. Bar #362657
   chrissavage@dwt.com
   Telephone: (202) 973-4200
   *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236