**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Salyer Martin
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

    Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**, <br><br> Plaintiff & Counterclaim-Defendant, <br><br> v. <br><br> **UPM TECHNOLOGY, INC**., *et al.,* <br><br> Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI <br><br><br> **DEFENDANTS' TRIAL MEMORANDUM** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. III

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND AND THE BURDEN OF PROOF ......................... 3

    A.    What Digicel-Haiti Will Not Show ....................................................... 3

    B.    Evidence UPM May Submit ................................................................. 8

        1.    HBS and Damages ....................................................................... 9

        2.    Background and Other Evidence ................................................. 11

III.  THE ELEMENTS OF FRAUD ..................................................................... 13

    A.    Count I - RLYH ................................................................................ 14

        1.    Misrepresentation by Active Concealment: UPM Did Not Use
HBS In Connection With Its Use of RLYH And Did Not Make
Any RLYH Call Look Like It Was Being Made By An Individual
Subscriber ................................................................................. 14

        2.    UPM Did Not Know That Its Use Of SIM Management Software
In Connection With RLYH Resale Would Convey False
Information To Digicel-Haiti .......................................................... 17

        3.    Digicel-Haiti Did Not Reasonably Rely On Any False
Information Conveyed By UPM In Connection With RLYH
Resale ......................................................................................... 17

        4.    Digicel-Haiti Was Not Damaged By Any Reliance On
Information Conveyed By UPM In Connection With RLYH
Resale ......................................................................................... 18

        5.    RLYH Resale – Summary .............................................................. 20

    B.    Count II – In-Country Bypass ............................................................. 21

        1.    Misrepresentation by Active Concealment: UPM Did Not Use
HBS In Connection With In-Country Bypass And Did Not Make
Any In-Country Bypass Call Look Like It Was Being Made By
An Individual Subscriber ............................................................... 21

        2.    UPM Did Not Know That Its Use Of SIM Management Software
In Connection With In-Country Bypass Would Convey False
Information To Digicel-Haiti .......................................................... 22

        3.    Digicel-Haiti Did Not Reasonably Rely On Any False
Information Conveyed By UPM In Connection With In-Country
Bypass ......................................................................................... 22

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

4.      Digicel-Haiti Was Not Damaged By Any Reliance On Information Conveyed By UPM In Connection With In-Country Bypass ...................................................................................22

IV.    CONCLUSION .................................................................................24

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

**Cases**

*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) ........................................................................................ 3

*Conzelmann v. N. W. P. & D. Prod. Co.,* 190 Or. 332, 225 P.2d 757 (1950) ............. 1, 3, 8

*Coy v. Starling,* 53 Or. App. 76, 630 P.2d 1323 (1981) ........................................ 1

*Dizick v. Umpqua Cmty. Coll.,* 287 Or. 303, 599 P.2d 444(1979) .................................. 1, 2

*Knepper v. Brown,* 213 Or. App. 598, 162 P.3d 1026 (2007) ............................................ 3

*Schwarz v. Philip Morris Inc. (In re Estate of Schwarz)* 206 Or. App. 20, 135 P.3d 409 (2006), *aff'd*, 348 Or. 442 (2010), *adh'd to on recons,* 349 Ore. 521 (2010), *on remand sub nom. Schwarz v. Philip Morris USA, Inc.*, 272 Or. App. 268, 355 P.3d 931 (2015), *cert. denied* 578 U.S. 975 (2016) ............. 3, 20

*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003) ........................................................................ 3

*Strawn v. Farmers Ins. Co.*, 350 Or. 336,  258 P.3d 1199, *adh'd to on recons*, 350 Or. 521, 256 P.3d 100 (2011) ............................................................... 2, 5

*Webb v. Clark,* 274 Or. 387, 546 P.2d 1078 (1976) ........................................ 1, 8

*Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 220 P.3d 68 (2009) ...................................................................................................... 1

**Statutes**

ORS 31.730(1) ................................................................................................ 3

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Pursuant to the Court's Trial Management Order (ECF #191), Defendants UPM Technology, Inc. and Duy "Bruce" Tran (collectively "UPM" unless context otherwise requires) submit this Trial Memorandum.

## I.     INTRODUCTION

Count I of Digicel-Haiti's Complaint alleges that UPM committed fraud with respect to its use, within the United States, of "Roam Like You're Home" ("RLYH") service. *See* Third Amended Complaint (ECF #200) ("TAC") at ¶¶ 173-182. Count II alleges that UPM committed fraud with respect to UPM's engaging in in-country bypass within Haiti.[1] All of Digicel-Haiti's other claims have been dismissed. ECF #294 at 31-33.

With respect to each Count, Digicel-Haiti must prove each element of common-law fraud by clear and convincing evidence.[2] "Clear and convincing evidence means that the truth of the facts asserted is highly probable."[3] As to the elements of fraud, the Oregon Supreme Court has stated that a plaintiff must prove that

> the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the

---

[1] ECF #294 at 31-33. UPM does not refer to its use of RLYH to get calls to Digicel-Haiti as "bypass" because the routing of RLYH calls is quite different from the routing of in-country bypass calls and, in particular, resold RLYH calls did not "bypass" anything. These calls flowed from UPM's switch, to Digicel-Haiti's United States Roaming partner, to Digicel's international gateway switch, and on to Digicel-Haiti's network in Haiti. "Bypass" refers to getting calls to a Digicel-Haiti subscriber without going through – that is, "bypassing" – Digicel-Haiti's international gateway switch. There was, therefore, no "bypass" in connection with RLYH calls. UPM has sought a ruling *in limine* to prevent counsel or witnesses from referring to UPM's use of RLYH as "bypass."

[2] *Dizick v. Umpqua Cmty. Coll.,* 287 Or. 303, 311, 599 P.2d 444(1979) (*citing Webb v. Clark,* 274 Or. 387, 391, 546 P.2d 1078 (1976)); *Wieber v. FedEx Ground Packaging Sys.,* 231 Or. App. 469, 480, 220 P.3d 68 (2009) (*citing Conzelmann v. N. W. P. & D. Prod. Co.,* 190 Or. 332, 350, 225 P.2d 757 (1950)).

[3] *Coy v. Starling,* 53 Or. App. 76, 80, 630 P.2d 1323 (1981) (citations omitted).

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance.[4]

One way to make a material misrepresentation is by "active concealment." *See* ECF #294 at 24-26. This case is limited to the claim that UPM committed fraud by using human behavior software ("HBS") to actively conceal from Digicel-Haiti the fact that UPM was using its SIM cards to make either in-country bypass calls (Count II), or resale of RLYH calls (Count I). *Id.* at 30-31. This means that, to prevail at trial, Digicel-Haiti must show by clear and convincing evidence:

- That UPM used HBS to manage the SIMs it was using to deliver calls to Digicel-Haiti's network;

- That UPM's HBS had the effect of making some bypass/RLYH calls look like they were being made by an individual subscriber;

- That UPM used HBS knowing that it would convey that false information to Digicel-Haiti;

- That UPM intended Digicel-Haiti to rely on that false information;

- That Digicel-Haiti reasonably relied on it, *i.e.,* that Digicel-Haiti completed more bypass/RLYH calls than it would have, but for the operation of the HBS; and

- That Digicel-Haiti was damaged as a result of that reasonable reliance.

If Digicel-Haiti cannot make *all* of these showings by clear and convincing evidence, its case fails. If it can, then it must then prove, by a preponderance of the evidence, the amount it was damaged by UPM's conduct.[5] Generally speaking, damages are determined by the "out-of-pocket" rule, but that rule is to be applied flexibly to identify how much Digicel-Haiti was harmed as a result of UPM's actions.[6]

---

[4] *Strawn v. Farmers Ins. Co.*, 350 Or. 336, 351-352, 258 P.3d 1199, *adh'd to on recons*, 350 Or. 521, 256 P.3d 100 (2011).

[5] *Dizick, supra,* 287 Or. at 312.

[6] *Id. See also* ECF #294 at 26-27*; Knepper v. Brown,* 213 Or. App. 598, 608 n.5, 162 P.3d

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti also seeks punitive damages.[7] To prove that it is entitled to punitive damages, it must show that UPM acted with malice.[8] It must also show that UPM's conduct caused harm to Oregon residents, within Oregon, or that Oregon has a legitimate policy interest prohibiting the allegedly tortious conduct.[9]

## II.    FACTUAL BACKGROUND AND THE BURDEN OF PROOF

### A.    What Digicel-Haiti Will Not Show

Digicel-Haiti bears the burden of proof, and the materials it has presented indicate that it will not be able to meet that burden.[10] Nothing in Digicel-Haiti's proffered evidence shows – certainly not by clear and convincing evidence – that UPM used any form of HBS to manage its SIMs when terminating calls on Digicel-Haiti's network. UPM of course used software to manage its SIMs – it had thousands of them – but not all SIM management software is HBS. Digicel-Haiti proffers no evidence as to how UPM's SIM management software was configured, what it did, or how what it did supposedly hid the nature of the calls UPM made. It also proffers no evidence that UPM knew its software

---

1026, 1032 (2007) ("Damages are limited to those which might reasonably be expected to follow from the character of the misrepresentation itself.").

[7] TAC at ¶¶ 182, 192.

[8] ORS 31.730(1) ("Punitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice").

[9] *Schwarz v. Philip Morris Inc. (In re Estate of Schwarz)* 206 Or. App. 20, 135 P.3d 409 (2006), *aff'd*, 348 Or. 442 (2010), *adh'd to on recons,* 349 Ore. 521 (2010), *on remand sub nom. Schwarz v. Philip Morris USA, Inc.*, 272 Or. App. 268, 355 P.3d 931 (2015), *cert. denied* 578 U.S. 975 (2016) (following *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) and *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

[10] The person alleging fraud has the burden of proving it, and it must be established by evidence that is clear, satisfactory, and convincing. *Conzelmann v. Nw. Poultry & Dairy Prods. Co.*, 190 Or. 332, 350-51, 225 P.2d 757 (1950) (internal citations omitted).

---

Page 3 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

would convey false information or that UPM intended Digicel-Haiti to rely on any such false information.[11]

Assuming Digicel-Haiti can surmount those hurdles, its evidence regarding damages is particularly weak: it has no evidence that it was harmed by anything UPM did.

At the highest level of generality, Digicel-Haiti must show that it was entitled to receive more than UPM already paid; otherwise, it was not damaged by UPM's actions. This means that Digicel-Haiti must show, at a minimum, that it was entitled to a higher per-minute rate than it received. This must be shown separately for RLYH calls (Count I) and in-country bypass calls (Count II), because these calls were charged differently. At this high level, UPM notes even if Digicel-Haiti was entitled to cut off SIMs being used for bypass, that does not mean that it was entitled to charge more than the local rate for bypass calls (that is, its sole remedy may have been cutting bypass SIMs). To show that completing bypass calls harmed Digicel-Haiti, it must either show that it was entitled to impose a higher per-minute rate for bypass calls, or that the calls would have been completed via a different routing, on which a higher per-minute rate would have been paid. Its proffered evidence does not address these points.

---

[11] Perhaps recognizing its evidentiary problems, Digicel-Haiti's trial memorandum essentially ignores the Court's ruling limiting the case to the claim that UPM actively concealed the nature of its activity by using HBS. Instead, Digicel-Haiti seems to think it is entitled to argue that every aspect of UPM's activity is part of an "entire scheme [that] was devised to conceal [its] activity and the true origin of the … calls [it was] transmitting" to Digicel-Haiti. Plaintiff's Trial Memorandum, ECF #299 at 8. UPM is filing contemporaneously herewith a motion *in limine* to require Digicel-Haiti's evidence and argument to conform to the Court's ruling and focus on the claim that UPM used HBS; that UPM's use of HBS effectively concealed from Digicel-Haiti the nature of UPM's activities; that Digicel-Haiti reasonably relied on that concealment; and was damaged thereby. "Everything you did deceived us and concealed things from us" is not a remotely good-faith response to the Court's ruling.

Page 4 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

If Digicel-Haiti can nevertheless make that showing, it then has to show that the money it confiscated when it cut off UPM's SIMs does not cover any shortfall in the per-minute charges it collected in real time while the calls were being made. (This is money that UPM paid to top-up SIMs that was not used up before the SIMs were cut off and that Digicel-Haiti simply "banked."[12]) This is simple math: Suppose that the only money Digicel-Haiti received was $10.00, for 100 minutes of traffic, assessed in real time at $0.10 per minute. In that case it received $0.10 per minute ($10.00 received, divided by 100 minutes). But if, in addition to the real-time charges, it also confiscated $10.00, that means it received $20.00 for 100 minutes of traffic. In that case, its effective rate was $0.20 per minute ($20.00 received, divided by 100 minutes) and – if it has not shown that it was entitled to more than that – then it was not damaged by UPM's activities.[13]

Digicel-Haiti's proffered evidence does not address these points either, but its evidentiary problems are even deeper than that. The Court has limited this case to the claim that UPM defrauded Digicel-Haiti by active concealment via HBS. ECF #294 at 30-31. This means that Digicel-Haiti must prove that it suffered damages *as a result of* the use of HBS. *See Strawn, supra*, 350 Or. at 52. Digicel-Haiti's evidence does not address this point *at all.* In fact, as explained below, making this showing would be a bit complicated.

On the one hand, UPM can only have harmed Digicel-Haiti by using HBS to the extent that the HBS actually worked. To the extent that Digicel-Haiti saw through whatever disguises UPM's software may have created, the use of that software did not harm Digicel-Haiti.[14] Digicel-Haiti has presented no evidence on this issue. On the other hand,

---

[12] Boute Depo. at 145:18-146:2.

[13] As part of its renewed summary judgment motion, UPM is also renewing its request that the Court rule as a matter of law that Digicel-Haiti's damages must take account of the amounts of money that UPM paid and that Digicel-Haiti confiscated.

[14] In terms of the elements of fraud, ineffective HBS either would not have actually concealed anything (in which case it would not have constituted a misrepresentation), or

even a perfectly effective HBS could never hide or disguise the *first call* made using any given SIM. A SIM's first call announces to Digicel-Haiti that the SIM exists – and doubtless starts Digicel-Haiti's efforts to track and analyze the SIM's usage patterns – but nothing about that first call can be hidden or disguised in any way.[15] This means that any economic harm for Digicel-Haiti associated with completing a SIM's first call cannot have been caused by any UPM "active concealment," and therefore cannot fairly form a basis for damages in this case.

These two factors – the fact that no HBS could be perfectly effective, and the fact any harm caused by completing a SIM's first call is not harm *caused by* HBS – necessarily means that number of minutes that can properly form the basis of Digicel-Haiti's damages claim is necessarily less than the total number of minutes UPM completed. And this means – again, as a matter of simple math – that the money Digicel-Haiti confiscated plays a larger role in determining if Digicel-Haiti was damaged as a result of UPM's use of HBS.

Suppose, as above, that Digicel-Haiti received $10.00 for 100 minutes of traffic assessed in real time, and that it confiscated another $10.00. But now suppose that half the minutes got through without being attributable to the operation of any HBS. In that case, Digicel-Haiti could only have been damaged (for purposes of its fraud claim) by the half that got through because of the HBS. And to see if it was *actually* damaged, the confiscated $10.00 must be spread, not over *all* the minutes UPM completed, but rather over only the ones that got through because of the HBS. In this example, 50 minutes got through because of the HBS, and for *those* minutes, Digicel-Haiti got its real-time charge

---

would not have led Digicel-Haiti to have relied upon it (in which case it would not have caused any damages).

[15] The Court dismissed fraud claims based on misrepresentation or omission of material information. ECF #294 at 27-30. Merely making a bypass or RLYH call, therefore, cannot be fraudulent.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

of $0.10 per minute, *plus* another $0.20 per minute (the confiscated $10.00, divided by the 50 "HBS" minutes). That translates (in this example) to an effective rate of $0.30 per minute (the $5.00 received for the 50 relevant minutes, plus the confiscated $10.00, divided by the 50 minutes).

To prove that it was damaged by UPM use of HBS, therefore, Digicel-Haiti has to prove that the per-minute amount it received for the relevant minutes – the ones that only got through because of the HBS – was less than whatever per-minute amount it can show it was entitled to. If it received that amount (or more) per minute, then UPM's use of HBS did not cause Digicel-Haiti any harm, and its fraud claim fails.[16]

The damages calculation above is mandated by applying the element of fraud that requires damages to have been *caused by* the defendant's misrepresentation to the specific fraud claim at issue here – fraud by active concealment by means of HBS. Considering those points, it is clear that Digicel-Haiti's proffered damages evidence bears no relationship to what it needs to prove. Its entire damages case consists of an unreliable and speculative estimate by an unqualified witness who purports to estimate how much total bypass traffic might have been completed on Digicel-Haiti's network, and who then multiplies that number by $0.23.[17] Digicel-Haiti proffers no evidence of how much traffic UPM specifically sent to Digicel-Haiti; no evidence of how much traffic UPM completed on Digicel-Haiti's network as a result of using HBS; and no evidence that the amount it has already received from UPM does not cover whatever per-minute rate it claims to be entitled

---

[16] This discussion goes entirely to the *fact* of harm caused by fraudulent conduct, which Digicel-Haiti must prove by clear and convincing evidence. If it somehow shows that the per-minute amount it received for the relevant minutes was less than it was entitled to receive, that would go to the *amount* of harm, which it must prove by a preponderance of the evidence.

[17] One of UPM's Motions *in Limine* seeks to have this speculative and unreliable testimony excluded from trial.

Page 7 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

to. Its damages case, in short, is completely unhinged from the only surviving legal theory in this case.[18] As a result, both counts of the Complaint fail as a matter of law.

In this regard, given the somewhat complicated proof needed to first show that UPM engaged in concealment via HBS at all, and then to show fraud by active concealment, and then to identify both the fact of damages and the amount of damages, UPM is proposing to the Court a somewhat detailed jury verdict form to aid in sorting the evidence.[19] UPM urges the Court to adopt that form, or one like it, to avoid jury confusion.

## B.    Evidence UPM May Submit

It is difficult to identify what evidence UPM will submit as part of its case in chief. First, given the profound deficiencies in Digicel-Haiti's evidence, if the case goes to trial (UPM has filed a renewed motion for summary judgment), UPM may not need to present any facts at all, because the Court will find it appropriate to grant a motion for a directed verdict. Moreover, assuming that UPM does put on a case, which facts UPM will present depends on the facts Digicel-Haiti will have presented. And, because Digicel-Haiti has listed Mr. Tran as a witness, along with former defendants Mr. Allen and Mr. Ruiz, UPM's redirect and/or cross-examination of those witnesses will almost certainly establish some facts relevant to UPM's own case.[20] At a very high level, however, UPM believes it is likely that it will present evidence making a number of points, noted below.

---

[18] Indeed, it does not appear that Digicel-Haiti has made any effort to conform its evidence – either on damages or on liability – to Court's ruling defining what claims remain viable.

[19] This is necessary because if any one of the fraud "elements is not established by clear and convincing evidence, plaintiff's case must fail." *Webb v. Clark*, 274 Or. at 391 (citing *Conzelmann v. N. W. P. & D. Prod. Co., supra*).

[20] Because Mr. Tran is an adverse party, UPM will not object to Digicel-Haiti treating him as an adverse witness and cross-examining him from the get-go, even though he will have been called by Digicel-Haiti. UPM's examination of Mr. Tran at that time will be in the nature of redirect. Neither Mr. Allen nor Mr. Ruiz are adverse parties at this point, so UPM expects Digicel-Haiti to conduct direct examination of them, with UPM conducting cross-examination. UPM requests that the Court resolve this question at the pretrial conference.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### 1. HBS and Damages

Focusing on the heart of the matter, UPM's witnesses will describe what HBS is and will testify that UPM did not use HBS either with regard to in-country bypass or with regard to RLYH resale. Instead, they will testify, UPM concluded that the most effective way to get the most value out of its SIM cards before they were cut off was simply to send as many calls as possible over a SIM card once it was activated – the exact *opposite* of using HBS, which would entail trying to manage the pattern of calls made using a SIM to mimic the usage of an individual subscriber. UPM's witnesses will testify that UPM adopted this strategy in light of the extraordinary effectiveness of Digicel-Haiti's systems for identifying and cutting off UPM's SIMs. And they will testify that this very effectiveness made the entire venture (trying to terminate calls on Digicel-Haiti's network) uneconomical, leading UPM to initially abandon the Haiti market in March 2012 and then – having chosen to try again in April 2014 – to abandon it yet again, for good, in November 2014. Moreover, given technological developments that have made voice and video conversations over the Internet essentially free to everyone with a smartphone (such as Facetime, Skype, Viber, etc.), UPM some years ago abandoned the voice market entirely.

Next, on the issue of damages, UPM's witnesses will testify that because UPM never used HBS, any economic harm Digicel-Haiti may have incurred as a result of UPM's activity was not caused by active concealment via HBS. If need be, UPM's witnesses will also present a specific quantification of how much traffic it sent to Digicel-Haiti's network, by month, for the entire period it was operating in the Haiti market, along with an evidence-based estimate of how many of those minutes, in the aggregate, were attributable to the first call made with each SIM (which, as noted above, cannot have caused Digicel-Haiti any harm by virtue of any active concealment). It will also present a specific quantification of how much it paid Digicel-Haiti for usage on its network, and will show

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that Digicel-Haiti has already received more money per minute from UPM than Digicel-Haiti is entitled to.[21]

Finally regarding liability, if UPM's RLYH resale activity remains an issue (UPM's renewed summary judgment motion seeks to exclude it), then UPM expects to present the evidence of its expert, Mr. Joe Gillan, to explain that in economic terms, Digicel-Haiti's prevention of RLYH resale by blocking UPM's SIMs is precisely the type of activity that the Federal Communications Commission's ("FCC") ban on resale restrictions is designed to, and has been applied to, prevent. This testimony will only be necessary if the Court concludes that the import of the FCC's ban on resale is not clear on its face, or if it permits Digicel-Haiti to present evidence purporting to show that its cutting of UPM's RLYH SIMs was reasonable notwithstanding that ban.

With regard to punitive damages, UPM will present evidence that neither UPM nor Mr. Tran acted with malice or in a reprehensible manner towards Digicel-Haiti, and that, to the contrary, UPM and Mr. Tran intended to purchase Digicel-Haiti services at applicable retail rates and use those services in a legitimate manner to provide communications services to the public. While UPM and Mr. Tran understood that Digicel-Haiti would have liked to have received higher per-minute rates than it may have received, neither UPM nor Mr. Tran believed that Digicel-Haiti had any right to those higher rates. UPM will also present evidence that UPM is no longer in the business of terminating voice calls on third-party networks, which shows that deterrence of future conduct – a key element of a punitive damages award – is not applicable here. Moreover, UPM will present evidence that if it turns out that Digicel-Haiti did have a right to higher rates, UPM is

---

[21] *See* Declaration of Bruce Tran As Chief Executive Officer Of UPM Technology, Inc. In Support Of UPM Technology, Inc.'s Motion For Summary Judgment (ECF #256) at ¶¶ 36-37 and Exhibit 1. Depending on what information (if any) Digicel-Haiti presents regarding the amount of traffic UPM supposedly completed as a result of its use of HBS, UPM may also present, as rebuttal evidence, its own analysis of that issue.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

prepared to reimburse Digicel-Haiti for any shortfall. Moreover, as discussed *infra,* as a matter of law, this is not a case in which punitive damages can be awarded under Oregon law.[22]

### 2. Background and Other Evidence

Depending on what has already been established in the record by the time UPM puts on its case, UPM expects to present evidence of the following facts:

- UPM engaged in the business of terminating calls onto Digicel-Haiti's network from August 2011 through March 2012, and then again from April 2014 through October 2014.

- UPM got calls to Digicel-Haiti's network either by means of in-country bypass or by means of reselling RLYH service.

- UPM's customers were third-party carriers with calls to get to a subscriber on Digicel-Haiti's network.

- The calls from UPM's customers reached UPM in Oregon via the Internet. Specifically, they arrived at a UPM server running software called a "Softswitch" that directs incoming calls, via the Internet, to other devices that are also connected to Internet.

- The softswitch sent the calls at issue in this case, via the Internet, to UPM "Gateway" devices.

- In the case of in-country bypass, UPM's Gateways were located in Haiti. Calls made through these Gateways connected directly to Digicel-Haiti's network in Haiti, which connected the calls to the Digicel-Haiti subscriber being called.

- In the case of RLYH, UPM's Gateways were located in the Portland, Oregon area. Calls made through these Gateways connected to the network of a Digicel-Haiti

---

[22] *See also* Defendant's Motion *in Limine* No. 9 (Exclude Request for Punitive Damages and Any Related Evidence, Testimony and Argument), concurrently filed.

Page 11 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

roaming partner in the United States – that is, a wireless carrier serving the Portland area. That carrier then routed the calls to one of Digicel-Haiti's international switches, in New York or Miami, which then routed them back to Digicel-Haiti's network in Haiti, which directed the call to the Digicel-Haiti subscriber being called.

- In order to function, a Gateway needs a reliable source of electric power and an operating environment that is neither too hot nor too cold. Unreliable electrical power and hot weather in Haiti significantly interfered with the reliable operation of UPM's Gateways located in Haiti.

- A Gateway must be connected to the Internet in order to receive the calls being sent from UPM's Softswitch. This means that each Gateway must have a stable Internet connection with enough bandwidth to handle the call or calls being sent to the Gateway. Unreliable Internet connectivity in Haiti significantly interfered with the reliable operation of UPM's Gateways located in Haiti.

- A Gateway must connect to the cellular network where the Gateway is located in order to deliver calls to that network. This means that each Gateway must be located in an area with reliable wireless coverage in order to function.

- Each UPM Gateway had GSM cellular radios (no more than 16 per Gateway), called "ports," that were used to initiate calls on the wireless network where the Gateway was located.

- For a call to go through, UPM needed a valid SIM card for use on Digicel-Haiti's network. UPM purchased a large number of those SIM cards via agents in Haiti.

- Digicel-Haiti did not sell SIM cards directly to UPM. Instead, Digicel-Haiti sold SIM cards to various distributors. UPM's agents purchased SIM cards from those distributors and shipped them to UPM in Oregon.

- In Oregon, the SIMs were physically mounted into a device called a "SIM Unit." This device was connected via the Internet to a server running SIM management software, and to UPM's Softswitch.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

- For a call to go through, the SIM card being used to authenticate the call must have been "topped up," meaning that UPM paid money to Digicel-Haiti to pay in advance for usage on that specific SIM card.

- For a call to go through, the Internet signaling representing the call itself had to be associated with account information from an active SIM card that had been topped up with enough money to make at least one call.

- UPM used software, called "SIM management" software, to automatically associate an incoming call with the account information from a valid, topped up SIM and a working port on a Gateway.

- UPM did not configure its SIM management software to mimic or simulate human behavior with regard to the selection of SIMs or the pattern of calls placed using the SIMs. To the contrary, it configured the software to randomly select a SIM and then place calls over that SIM continuously until the SIM was cut off by Digicel-Haiti.

As noted above, UPM may present other miscellaneous points, depending on what facts Digicel-Haiti presents in its case. Also, depending on what matters Digicel-Haiti develops during cross-examination of UPM's witnesses, UPM may need to address additional facts on redirect.

## III.    THE ELEMENTS OF FRAUD

UPM does believe that Digicel-Haiti will be able to present evidence establishing that UPM committed fraud by active concealment via the use of HBS, either with respect to Count I (RLYH) or Count II (In-Country Bypass). UPM's anticipated position and arguments with respect to each element of fraud, for each Count, is presented below. UPM reserves the right to refrain from making the arguments below, and to present different or additional arguments, depending on the contours of the case following the pretrial conference and depending on the evidence and arguments that Digicel-Haiti actually presents at trial.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

As noted above, Digicel-Haiti must show each of the elements of common-law fraud by clear and convincing evidence. In the context of the Court's ruling limiting this case to the claim that UPM used HBS to actively conceal the nature of the calls it was sending to Digicel-Haiti's network, this means that Digicel-Haiti must show, by clear and convincing evidence:

(1) That UPM used HBS to manage the SIMs it was using to deliver calls to Digicel-Haiti's network; that the HBS UPM used had the effect of making some bypass/RLYH calls look like they were being made by an individual subscriber; and that this was a false representation of a material matter;

(2) That UPM used HBS knowing that it would convey that false, material information to Digicel-Haiti;

(3) That UPM intended to deceive Digicel-Haiti into relying on that false information;

(4) That Digicel-Haiti actually, reasonably relied on such false misrepresentation, *i.e.,* that Digicel-Haiti completed more bypass/RLYH calls than it would have, but for the operation of the HBS, resulting in its loss; and

(5) That Digicel-Haiti was actually damaged as a result of that reasonable reliance.

As discussed below, Digicel-Haiti will be unable to show that any of these things are true by clear and convincing evidence.

### A. Count I - RLYH

#### 1. Misrepresentation by Active Concealment: UPM Did Not Use HBS In Connection With Its Use of RLYH And Did Not Make Any RLYH Call Look Like It Was Being Made By An Individual Subscriber

The Court's ruling narrowed Digicel-Haiti's case to a single claim: that UPM used HBS to actively conceal that the RLYH calls being made using its SIMs and Gateways were not calls being made by individual subscribers. UPM's evidence will establish that this did not happen.

This is a situation in which the old quote attributed to Abraham Lincoln

applies: If you call a dog's tail a leg, how many legs does it have? The answer is four – because calling a tail a leg doesn't make it one. Here, like a dog's tail staying a tail no matter what one calls it, if someone *calls* a complicated SIM management program a form of "human behavior software," *that doesn't make it one*. A program is, in fact, HBS if it is used to manage the pattern of calls made using a SIM card so that it looks like the SIM card is being used by an individual subscriber. One can readily imagine what that might entail: be sure to interpose random delays between calls made using the SIM, because individual subscribers do not use their phones to make call after call after call without significant delays between calls; concentrate calls during times when an individual subscriber might make them (say, during lunch hour, or in the early evening); ensure that any one SIM calls a relatively small group of numbers, since most individual subscribers have a small number of friends and business associates to whom they will place calls; etc. But again: No matter what a program might be *called,* whether or not it is HBS depends on what it *does.*

Digicel-Haiti has no evidence that UPM had any software in place that *did what HBS does* in connection with calls made using RLYH service. Its active concealment claim thus fails before it begins.

UPM cannot tell how or if Digicel-Haiti will try to prove that UPM deployed and used HBS with respect to its resale of RLYH. Neither its lay nor expert witness statements mention "human behavior" or HBS.[23] The only witness on Digicel-Haiti's witness list with actual knowledge of UPM's operations in this respect is Mr. Tran, and, as noted above, Mr. Tran will testify that far from trying to mimic human behavior, UPM

---

[23] The expert report of Mr. McEwen refers to HBS a few times, but does not indicate that he is familiar with any details regarding how HBS works. As to UPM in particular, he testified in his deposition that he has no knowledge of UPM's own operations. McEwen Depo. at 147:8-148:22.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

tried to get as much usage out of each SIM as quickly as possible before the SIM was cut off by Digicel-Haiti.[24] This approach amounts to UPM openly and notoriously declaring that its SIMs were being used for bypass, not an effort to hide anything. Perhaps if UPM had used HBS, its ventures into terminating calls onto Digicel-Haiti's network would not have been the abject failures that they were. But the fact is that Digicel-Haiti cut off UPM's SIMs so quickly and effectively that UPM left the market.[25]

---

[24] Digicel-Haiti evidently plans to rely on testimony from Mr. Ruiz to show that UPM supposedly used HBS. *See* Plaintiff's Lay Witness Statements at 9. Mr. Ruiz's deposition, however, clearly shows that he was not involved in that aspect of UPM's operations:

> Q … Just quickly, are you familiar with human behavior software?
>
> A In the past year I have been more familiar with it.
>
> Q While you were at UPM?
>
> A ***Oh, no.***
>
> Q Did you have any interaction with human behavior software at all?
>
> A ***Not closely.***

Ruiz Depo. at 257:12-22. Moreover, Mr. Ruiz's memory-related issues arising from certain of his prescription medications undermine his reliability as a witness. *Id.* at 9:2-15:13. Indeed, he characterized his recollection of the time frame relevant to this case as a "blur." *Id.* at 15:10-13.

[25] Because Digicel-Haiti has ignored the Court's ruling limiting this case to claims of active concealment by means of HBS, it appears that Digicel-Haiti will argue that matters unrelated to that claim should still be presented to the jury. These might include claims that there was something nefarious about how UPM obtained its SIM cards, how it topped up its SIM cards, or even (in the case of in-country bypass, under Count II) how UPM shipped its Gateways to Haiti. None of these claims relates in any way to actively concealing anything from Digicel-Haiti, and these matters are therefore not properly part of this case, as narrowed by the Court's ruling. One of UPM's Motions *in Limine* (No. 3), asks the Court to direct that these now-extraneous issues not be allowed into the case, because they are irrelevant and would confuse and prejudice the jury. UPM does not address in this Trial Memorandum how it might address these extraneous matters if they are allowed into the case, but of course reserves the right, in that event, to counter them with evidence and argument.

***TOMASI SALYER MARTIN***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### 2. UPM Did Not Know That Its Use Of SIM Management Software In Connection With RLYH Resale Would Convey False Information To Digicel-Haiti

Because UPM did not use its SIM management software to try to mimic an individual subscriber's calling patterns, UPM was not trying, by use of its software, to convey false information to Digicel-Haiti about the fact that it was using the SIMs to resell RLYH service. As discussed in connection with Digicel-Haiti's now-dismissed claim that all bypass calls are inherently fraudulent, in making use of Digicel-Haiti's RLYH service, it wasn't trying to convey anything at all to Digicel-Haiti, much less anything false or misleading. UPM was simply trying to make efficient use of the SIMs and services for which it had paid.

### 3. Digicel-Haiti Did Not Reasonably Rely On Any False Information Conveyed By UPM In Connection With RLYH Resale

Assuming that Digicel-Haiti can show that UPM conveyed false, material information by using HBS to conceal that its SIMs were not being used by individual subscribers, Digicel-Haiti will then have to show that it actually and reasonably relied on that information, which in this context means that the false information reasonably led Digicel-Haiti to delay cutting off the SIMs UPM was using. Whether any such delay – that is, any such reliance – was reasonable will depend on (a) precisely what Digicel-Haiti shows UPM to have done, that supposedly induced the delay, and (b) precisely what systems Digicel-Haiti had in place to detect bypass, how they worked, and why they failed to identify UPM's SIMs more quickly.

At this juncture, before hearing Digicel-Haiti's actual testimony, UPM cannot state precisely what it will contend on this specific point. Again, that will depend on testimony yet to be received and yet to be subject to cross-examination. In this regard, however, Digicel-Haiti states that its witness Mr. Laborde will testify that its "system for identifying potential bypass [is] 99.9% accurate." Plaintiff's Lay Witness Statements, ECF #303 at 7. This aspect of Mr. Laborde's evidence is consistent with UPM's experience. Mr.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Tran will testify that Digicel-Haiti was murderously efficient at identifying and cutting off the SIMs that UPM was using to resell RLYH service. It also suggests that Digicel-Haiti will have a difficult time showing the UPM was ever able to actually conceal its activity – that is, in Count I, its use of SIMs to resell RLYH service – from Digicel-Haiti at all.

### 4. Digicel-Haiti Was Not Damaged By Any Reliance On Information Conveyed By UPM In Connection With RLYH Resale

UPM has outlined above the problems with Digicel-Haiti's damages case. But in the context of UPM's resale of RLYH service, those problems are particularly severe. As explained above, the presentation by Digicel-Haiti's damages "expert," Mr. Castel, is laughable in its lack of relation to anything the evidence shows that UPM might have done. It ignores the money that UPM paid to Digicel-Haiti on a per-minute basis and the money that Digicel-Haiti confiscated. It does not establish that Digicel-Haiti was entitled to receive $0.23 per minute (and indeed ignores Mr. McEwen and Mr. Boute, both of whom agree that one must remove the $0.05 tax, included in the $0.23 figure, to identify how much Digicel-Haiti itself would receive from a call coming through its international gateway). It is entirely unmoored from the only live claim in the case, which is fraud-by-active-concealment-via-HBS.[26]

But there are two other problems with Digicel-Haiti's damages case, specifically as it applies to RLYH. First, Mr. Castel's damages analysis, flawed and speculative though it is, literally says nothing at all about RLYH. To the extent that analysis is grounded in reality at all, it is wholly based on issues concerning in-country bypass, not RLYH. Second, Mr. Castel's analysis also ignores the fact that for each RLYH call, Digicel-Haiti receives the full $0.23 per minute it claims to be entitled to, *as well as* the

---

[26] None of this is meant to suggest that Mr. Castel is not an educated and intelligent man who has had a wide-ranging and interesting career. He is all of those things. But it is meant to suggest that his damages analysis in this case is worthless.

Page 18 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

local per-minute rate that UPM paid for each minute of RLYH resale that it completed.[27] For these calls, moreover, Digicel-Haiti does not incur any charges from its United States roaming partner.[28] This means that – far from being damaged by RLYH resale – Digicel-Haiti actually makes more money than it would have if the call had simply gone directly to its international gateway.[29]

Moreover, Digicel-Haiti's RLYH damages case is also fatally flawed because it does not consider the money that UPM paid to Digicel-Haiti for RLYH services – both the $25 sign-up fee and top-up fees – that Digicel-Haiti confiscated when it cut off UPM's RLYH SIMs. Even if, on some theory, Digicel-Haiti could show that it was not paid enough on a per-minute basis for the RLYH calls that UPM completed, the confiscated money is more than sufficient to cover any per-minute "damages" Digicel-Haiti might have experienced --  particularly with respect to the calls that were only completed due to UPM's supposed use of HBS. There is simply no scenario under which Digicel-Haiti can prove that it incurred any damages from UPM's resale of RLYH service.

Finally, with regard to punitive damages, as noted above, UPM will present evidence that neither UPM nor Mr. Tran acted with malice or in a reprehensible manner

---

[27] In this regard, some of Digicel-Haiti's filings suggest that a proper damages calculation must take account of the fact that UPM obtained and resold various promotional offers for in-country bypass services in Haiti, but that consideration has nothing to do with RLYH. (*See infra* for how it applies in the context of in-country bypass.) When a call was made using a RLYH SIM, the full applicable local calling rate was deducted in real time. Boute Depo. at 93:24-95:18.

[28] Boute Depo. at 91:7-93:21.

[29] Even if – contrary to its CEO's sworn testimony – Digicel-Haiti had to pay something to its domestic roaming partner for handling RLYH calls, UPM's RLYH resale activity would still have been a net gain for Digicel-Haiti, as long as the per-minute amount paid to the roaming partner was less than the local call termination rate that Digicel-Haiti received from UPM. Mr. Castel, of course, entirely ignores this, because his analysis entirely ignores RLYH.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

towards Digicel-Haiti, and that, to the contrary, UPM and Mr. Tran intended to purchase Digicel-Haiti services at applicable retail rates and use those services in a legitimate manner to provide communications services to the public. This is neither malicious nor reprehensible. Also, because UPM is no longer in the voice business, punitive damages cannot be justified on some need to deter the relevant conduct in the future. Technology has moved on, and this case is entirely about the past. Moreover, this is not a case in which punitive damages can be awarded under Oregon law, because even if Digicel-Haiti can prove it suffered some actual damages, punitive damages are only available for harm to Oregon or its residents.[30]

Here, Digicel-Haiti is not an Oregon entity, and the Court long ago held that it has not suffered any domestic injury. ECF #188 at 25-27. As a result, the State of Oregon has no legitimate policy interest in imposing punitive damages in this case.[31] UPM recognizes that the Court's ruling that Digicel-Haiti did not suffer domestic injury was made in the context of Digicel-Haiti's RICO claims. The same logic that required dismissal of those claims, however, also requires dismissal of its punitive damages claims. Just as Congress did not intend inherently punitive RICO remedies (such as treble damages and an award of attorneys' fees) to be available for out-of-country harms, *see* ECF #188 at 27, Oregon does not make punitive damages available for out-of-state harms arising from conduct which is lawful in this jurisdiction.

### 5.  RLYH Resale – Summary

Digicel-Haiti has no evidence that UPM actually used HBS with respect to any of its RLYH resale activities. Digicel-Haiti has no evidence that UPM intended any of

---

[30] *Schwarz*, 206 Or. App. at 47-52, *supra*.

[31] Punitive damages punishing a defendant for in-state conduct that causes out-of-state harm are only properly assessed if the plaintiff sufficiently demonstrates at trial that Oregon has a legitimate policy, comporting with the Due Process Clause, to punish the tortious conduct at issue. *Id*. at 49-50. Digicel-Haiti's proffered evidence does not indicate any awareness on its part of this requirement for receiving punitive damages.

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

its SIM management software (whether labeled "HBS" or not) to convey false information to Digicel-Haiti. Not only does Digicel-Haiti have no evidence that it reasonably relied on any such false information – which would manifest itself in the form of delaying identifying a SIM as being used for RLYH resale, and thus cutting it off – its own evidence confirms UPM's experience, which is that Digicel-Haiti was extremely efficient at cutting off SIMs. Digicel-Haiti has no evidence whatsoever to show that it was damaged as a result of UPM's resale of RLYH service. And Digicel-Haiti has no evidence to show that punitive damages are either appropriate or even legally available in this case. Count I of the Complaint should therefore be dismissed.

### B.    Count II – In-Country Bypass

The issues and evidence regarding Count II (in-country bypass) largely, but not exactly, parallel those regarding Count I (RLYH resale). Where appropriate below, UPM simply refers to the discussion above regarding Count I, while providing a discussion of whatever might be distinctive regarding Count II.

#### 1.    Misrepresentation by Active Concealment: UPM Did Not Use HBS In Connection With In-Country Bypass And Did Not Make Any In-Country Bypass Call Look Like It Was Being Made By An Individual Subscriber

On this element of fraud, the evidence and issues regarding Count II are largely the same as those discussed above under Count I. UPM would note that while it engaged in RLYH resale (Count I) only during part of 2014, it engaged in in-country bypass from August 2011 through March 2012, and then again during part of 2014. This means that the detailed evidence that might arise with respect to Count II will likely differ from that that will arise with respect to Count I. Digicel-Haiti's basic evidentiary problem, however – showing that UPM actually used HBS – is the same for both counts. UPM did

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

not do so either with respect to RLYH resale (Count I) or in-country bypass (Count II).[32]

### 2. UPM Did Not Know That Its Use Of SIM Management Software In Connection With In-Country Bypass Would Convey False Information To Digicel-Haiti

On this element of fraud as well, the evidence and issues regarding Count II are essentially identical to those discussed above under Count I.

### 3. Digicel-Haiti Did Not Reasonably Rely On Any False Information Conveyed By UPM In Connection With In-Country Bypass

Here too, the issues and evidence regarding the reasonableness of any Digicel-Haiti reliance on false information supposedly conveyed to Digicel-Haiti by UPM, by means of using HBS, are essentially the same as between Count I and Count II.

### 4. Digicel-Haiti Was Not Damaged By Any Reliance On Information Conveyed By UPM In Connection With In-Country Bypass

The issues and arguments regarding this element of fraud – damages – are parallel as between Count I and Count II, but there are a number of differences.

At a high level, the issues are the same. As explained above, Digicel-Haiti's damages analysis is entirely speculative and unreliable, is entirely unrelated to the number of in-country minutes that UPM might actually have completed, and makes no effort at all to identify how many of those minutes were completed as a result of UPM engaging in active concealment. Digicel-Haiti's basic failure of proof regarding damages is the same for both counts.

Moreover, the proper logic for identifying whether Digicel-Haiti was damaged is also the same for both counts: First, Digicel-Haiti has to identify how much traffic it completed on its network that it would not completed but for UPM engaging in

---

[32] As noted above, it appears that Digicel-Haiti is going to try to introduce evidence of a range of extraneous activity in support of its "everything UPM did was active concealment" approach. All of those extraneous issues should be excluded, as explained in UPM's motion *in limine.* That said, UPM notes that some of those extraneous issues – such as its policies for shipping Gateways – are only relevant to Count II.

active concealment via HBS. Second, it has to show what per-minute rate it was entitled to receive for that traffic. Multiplying the number of relevant minutes by the per-minute rate provides a baseline for estimating its damages. Third, it has to identify how much UPM already paid (including both real-time, minute-by-minute deductions while calls were in progress and the amounts that it confiscated when it cut off SIM cards). Finally, it has to divide the amount it received by the number of relevant minutes to derive an effective per-minute rate, to see if it actually received less than it was entitled to. While several steps are involved, this is nothing but basic math.

The details of the calculation, however, will differ as between the two counts. As noted above, unlike for RLYH resale (Count I), for in-county bypass (Count II), Digicel-Haiti has to show either that it was entitled to charge a rate higher than the normal local rate for in-country bypass calls, or that without UPM's bypass, those calls would have been routed through its international gateway and been charged at a higher rate. It has not proffered any evidence that would establish either of these points.

Also, some of Digicel-Haiti's proffered evidence suggests that it will want to show that in some cases of in-country bypass, UPM did not pay the full local per-minute rate, but instead paid a discounted rate (including, possibly, some "free" minutes). This may well be true, but any such issue will be merged into an accurate damages calculation along the lines outlined above. If UPM got a discounted rate for some in-country bypass minutes, that will automatically be reflected by its having paid Digicel-Haiti a lower rate per minute (using the calculation above) than if it had always paid the full local rate. If Digicel-Haiti wants to argue that particular promotions it offered – or its promotions in general – were not properly available to UPM, it is free to do so; UPM will respond to such arguments based on whatever Digicel-Haiti presents.

Furthermore, in its earlier briefing on dispositive motions, UPM showed that even if Digicel-Haiti was entitled to its full $0.18 per minute (the $0.23 per minute gross international rate, less the $0.05 tax that goes directly to the Haitian government), for every

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

minute UPM completed, UPM has still paid Digicel-Haiti more than the required $0.18 per minute when the confiscated money is taken into account. *See* ECF #255 at 35-36. Now that the case has been narrowed to a claim of active concealment via HBS, the total number of relevant minutes is necessarily less than UPM used in its earlier calculation (if for no other reason than that a SIM's first call cannot have been completed due to active concealment). This means that the money that Digicel-Haiti confiscated when it cut off UPM's SIMs must be spread over fewer relevant minutes. This means that the effective per-minute rate that UPM paid is even higher than suggested in UPM's earlier filings, making it completely certain that Digicel-Haiti was not damaged by UPM's activities. This warrants dismissing the case, as requested in UPM's Renewed Motion for Summary Judgment.

Finally, for the reasons discussed under Count I, Digicel-Haiti's claim for punitive damages fails under Count II as well.

## IV.     CONCLUSION

Digicel-Haiti has ignored the Court's ruling narrowing this case to a claim of active concealment via HBS, and the Court should confirm at the pretrial conference that Digicel-Haiti's presentation to the jury (if the case is allowed to go forward at all) will be confined to matters actually at issue in accordance with the Court's order. While Digicel-Haiti would not prevail even under its unconstrained view of its claims, as described above it surely cannot prevail under the one claim that remains live in this case.

Dated: February 28, 2022.                    TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
Kathryn P. Salyer, OSB #883017
Eleanor A. DuBay, OSB #073755
Blake Van Zile, OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Telephone: (503) 894-9900

Page 24 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

Page 25 – DEFENDANTS' TRIAL MEMORANDUM
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I served the foregoing **DEFENDANTS' TRIAL MEMORANDUM** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR  97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com

Dated: February 28, 2022.

TOMASI SALYER MARTIN

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    Telephone: (202) 973-4200
    *(Admitted Pro Hac Vice)*

Of Attorneys for Defendants

Page 1 – CERTIFICATE OF SERVICE
UPM-L1\00626674.000

*TOMASI SALYER MARTIN*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236