IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNIGESTION HOLDING, S.A., a foreign corporation doing business as Digicel Haiti, | ) ) ) ) |
| Plaintiff, | ) Case No. 3:15-cv-00185-SI ) |
| v. | ) ) |
| UPM Technology, Inc., doing business as UPM Telecom, Inc., et al., | ) January 14, 2022 ) ) |
| Defendants. | ) Portland, Oregon ) |

**Oral Argument**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES


FOR THE PLAINTIFF:     Mr. Robert C.L. Vaughan (by video)
                       Ms. Cherine Smith Valbrun (by video)
                       Kim Vaughan Lerner LLP
                       312 S.E. 17th Street, Suite 300
                       Fort Lauderdale, FL 33316



                       Ms. Anne M. Talcott
                       Schwabe, Williamson & Wyatt
                       1211 S.W. Fifth Avenue, Suite 1900
                       Portland, OR 97204



FOR THE DEFENDANTS:    Mr. Christopher W. Savage
                       Davis Wright Tremaine, LLP
                       1919 Pennsylvania Avenue, NW, Suite 200
                       Washington, D.C. 20006


                       Ms. Blake Van Zile
                       Ms. Eleanor A. DuBay
                       Tomasi Salyer Martin
                       121 S.W. Morrison Street, Suite 1850
                       Portland, OR 97204




COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                       United States District Courthouse
                       1000 S.W. Third Avenue, Room 301
                       Portland, OR 97204
                       (503)326-8188
                       bonita_shumway@ord.uscourts.gov

(P R O C E E D I N G S)

(January 14, 2022; 10:03 a.m.)

* * * * *

THE COURT:  Good morning, everyone.  We are here in the case of Unigestion Holding, S.A., doing business as Digicel-Haiti versus UPM Technology, Inc., et al., Case No. 3:15-cv-185.  This is Judge Simon.

And I will invite counsel for the plaintiff to enter appearances, and let's begin with the folks that are joining us by video conference.

MR. VAUGHAN:  Absolutely.  Good morning, Your Honor, your time, good afternoon mine.  Robert Vaughan and Cherine Smith Valbrun, appearing on behalf of Unigestion Holding, dba Digicel-Haiti.

THE COURT:  Good to see you.

Good morning, Ms. Valbrun.

MS. VALBRUN:  Good morning, Your Honor.

THE COURT:  And counsel for the plaintiff here in court?

MS. TALCOTT:  Good morning, Your Honor.  Anne Talcott, also here for Unigestion, dba Digicel-Haiti.

THE COURT:  I appreciate you rising, but because we have people on video conference, let me ask all counsel to remain seated, so that way you can speak directly into the microphone and the folks on the video conference can hear you

hopefully more clearly.

So we heard from Ms. Talcott.  Let me now invite counsel for defendants to enter an appearance.  And you all can remain seated, please.

MR. SAVAGE:  Good afternoon, Your Honor.  This is Christopher Savage for UPM Technology and the other defendants.

MS. DUBAY:  Eleanor DuBay for the defendants.

MS. VAN ZILE:  And Blake Van Zile for defendants.

THE COURT:  Good morning to you.  Good to see you all.

All right.  My understanding is that we are here for argument on five motions.  They are Defendant UPM's motion for summary judgment, Docket 255; the individual defendants' motion for summary judgment, Docket 259.  And I'll note that the individual defendants also joined UPM's motion.

Third is Plaintiff Unigestion's motion for summary judgment against Defendant UPM's counterclaims, Docket 264. Fourth is Plaintiff Unigestion's motion for partial summary judgment to establish defendants' liability for fraud, Docket 269.  And then finally, fifth, Plaintiff Unigestion's *Daubert* motion or alternative motion in limine regarding defendants' expert Joseph Gillan.  That's Docket 272.  And it's my understanding that that really relates only to the counterclaims and not to the affirmative claims by plaintiff. If I'm wrong, somebody can tell me later.

And let me tell you all that I have read everything that you all have filed, including most recently regarding the *Davel* case.  I appreciate everything that you have filed.

I also, as you know -- I hope you know I sent you a tentative opinion by email yesterday.  As I put in my cover email, it really is just tentative, and I look forward to you telling me if I've misunderstood any of your arguments, left out any of your important arguments, if I've misunderstood any important facts.  But would you just at least first confirm for me that you did receive by email yesterday my tentative opinion.

First, did plaintiff receive it?

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  Thank you.

Did defendant receive it?

MR. SAVAGE:  We did indeed, Your Honor.

THE COURT:  Thank you.

I look forward to your arguments.  If you've already discussed among yourselves and have a plan of how you all would like to proceed, and if you agree, that's fine with me.  If you haven't discussed it among yourselves and/or if you can't agree, didn't agree, then I would say the first-filed motion is defendants' motion, and I'd let defendant make the first argument, and you can talk about anything you want to talk about about any of the motions.

And generally the way I do things is there's no time limit, and so I'll make sure that both sides can respond to whatever the other side says, and we'll just keep going back and forth until either you all are exhausted or I'm exhausted.

In addition, probably after about an hour and a half, if we're still going -- or earlier, if our court reporter asks -- we'll take a break for our court reporter primarily, and if anyone else needs a break before then, don't hesitate to speak up.

So unless you all have another proposal, then I suppose the floor is going to be defendants'.

MR. VAUGHAN:  In light of your generous offer, Judge, I think I need to reintroduce Mr. Savage.  I think too much time has passed and you have forgotten who he is.

THE COURT:  No, what are you talking about?  I just looked at Mr. Savage.

MR. SAVAGE:  That's right.  I'm delighted to be here, and although Mr. Vaughan and I and Ms. Valbrun have been able to work out a lot of things, we didn't talk about the arguments.  So I'm prepared to jump in.

THE COURT:  Very good.  The floor is yours.

MR. SAVAGE:  First, it's great to be here physically.

THE COURT:  By the way, if you'd be more comfortable taking off your mask while you speak, you're welcome to do it, provided everyone here is fully vaccinated.  The court staff is

fully vaccinated and boosted.  If you want to, you're welcome.

MR. SAVAGE:  I am vaxxed, I am boosted. I had a negative PCR test a couple days ago, so I'm good to go.

Yeah, so I somewhat want to say I'm sorry we filed so much paper for you.  I hope at least some of it was entertaining.

THE COURT:  They're all interesting.

MR. SAVAGE:  There's a lot of moving parts here.  And I very much appreciate your practice of tentative opinions, because it allows me to focus on what I think the meat of our concerns are.

So jumping right in, the most critical thing -- there's basically three or four things, but the most critical thing I want to focus on for a bit is the question of damages, because as we see the situation, it is this:  Digicel-Haiti's claim is they're entitled to a gross amount of 23 cents per minute for every minute that's an international minute with, as the papers show, a 5-cent deduction for money they wouldn't get.  They're essentially a collection agent.

They have no records at all bearing on how many minutes we sent and how much money we sent them.  We, on the other hand, have call-by-call CDRs, is the industry term, call detail records of every such call and of the money that was spent.  So there is no conceivable factual dispute in this case about how much traffic we sent them and how much money we paid

them.

Those facts are sufficient to make the determination as to whether or not Digicel-Haiti was damaged by our conduct. And if they were not, the tort of fraud in Oregon isn't like your standard negligence or whatever tort, it's an element of fraud.  And so if we have shown -- as I think we have, which I'll get to in a minute -- that they have not been damaged, then all the other stuff, interesting though it may be, isn't actually material.

And before we had your tentative opinion, what I was going to start my argument by saying is there's a long, complicated, and interesting way to show that we win, but there's also a short and simple one.  And damages are the short and simple one.

In our motion, we explained that the governing law in Oregon is the out-of-pocket rule.  And because they have to pay 5 cents for every minute that comes in through their international gateway, they're only out of pocket 18 cents per minute on calls that are international calls inbound.

They didn't contest that.  We'll get to what they did say in a minute.  They didn't contest that.  And simple math, dollars we paid them divided by minutes we sent, gives you dollars, or in this case cents per minute, and the answer to that is 19.7 cents, or whatever the calculation is, something like that, which is more than what they are entitled to.

So if we assume that what we did was fraudulent and wrong otherwise, they were not damaged because the money they have from us fully compensates them for what it is they say they're entitled to.

Now, if they're wrong, and it wasn't fraud, they owe us money back, right?  But assuming -- even assuming that all the other elements of fraud are present -- which they're not, but even assuming they're all present, they've got all their money.  Therefore, under Oregon law, no fraud.  Not just liable, but we have to figure out damages.  No liability.

So that was not touched on, and I think the tentative opinion didn't go into this in the detail that, you know, at least from my perspective it deserved, but fundamentally it's an element of fraud.  And now looking at it procedurally in our motion, we said, here's the facts that are undisputed, indisputable because they have no records.  Here's what the money shows, here's what the math shows, therefore we win.  There's a motion, and it got clarified as it went along.

And so I would urge you in reaching your final decision to focus a bit more than the tentative decision did on that specific question, because it's not just, oh, they're liable for fraud, let's see how much money is involved.  Oh, they've gotten paid.  We're not liable because we paid them.  They have not been harmed.

And to that end, there are the three other sort of

vague kinds of harm that they suggested.  They suggested investigation costs, goodwill, and harm to network.  I think the -- without getting into information that Mr. Vaughan's client viewed as proprietary, I think if you compare the total number of bypassed minutes that they themselves said they are subject to, as compared to the total amount of traffic on their network, and then look at the number of minutes that we actually sent to them, it is such a tiny fraction that no rational finder of fact could possibly find that it either harmed their network, harmed their goodwill, or that there are any investigation costs that are reasonably attributable to us.

And this goes back to the Oregon rule on out-of-pocket costs.  You know, if I -- if I climb somebody's fence and defeat their clever alarm system and break into their store and steal $10, right, certainly whatever crimes I've committed, I've converted their $10.  But the fence was there. The alarm system was there.  That's not attributable to me.

And the record is clear and undisputed that they spent -- again, I don't want to get into specifics that they claim to be proprietary.  They spend a lot of money every year, and have been doing so for the better part of a decade, worrying about fraud.  And to say that our tiny little piece of that traffic somehow results in any incremental or additional investigation costs for them would be irrational.  I mean, if a jury found that, we would be entitled to JNOV.  It just

wouldn't make any sense.

So they don't have any damages, and because they don't have any damages, they don't have a case. And so I would urge you in generating your final opinion to address that and give some more thought on that.

I'm about to move on to the next thing. If you have questions on that.

THE COURT: I do have a question for you, and then I also think procedurally it might be most helpful to me, after I ask you my question, a very specific question, to turn the floor over to plaintiff just to respond to that point so I can understand their point in connection with your argument.

And here's my question. If you can turn to Mr. Tran's declaration, Docket 256.

MR. SAVAGE: I'm counting on my co-counsel to have that. Which paragraph?

THE COURT: Thirty-four. Thirty-four. Docket 256.

MR. SAVAGE: Paragraph 34.

THE COURT: It's the one that has his chart of minutes at the end as Exhibit 1. We're in no rush.

MR. SAVAGE: So I'm very familiar with it. I spent a great deal of quality time with Mr. Tran on this. But yes, okay.

THE COURT: Do you see the number at the very end of paragraph 34?

MR. SAVAGE:  Yes.

THE COURT:  By the way, is there any reason for me to worry that that is somehow a confidential or proprietary number I can't say out loud?

MR. SAVAGE:  No.  The only thing we filed under seal were in order to accommodate what I understood Digicel-Haiti's concerns about confidential information.

THE COURT:  I did a quick comparison between what was redacted and what you didn't file under seal and what you did, and it looked like it was just the Digicel-Haiti's basic numbers.  Okay.

So I cannot figure out when I look at Exhibit 1 to Tran's declaration about the UPM terminated minutes, including in 2014, because 2012 didn't involve Roam Like You're Home, when I look at the 2014 terminated minutes and I look at your comment in the last two sentences of paragraph 34.  So let's assume the in-country bypass minutes in 2014 could be as high as 950, rounded to a thousand.  By contrast, the Roam Like You're Home resale minutes during this period was -- and I'll just round -- a little bit under 280,000.

I could not figure out where that number came from when I looked at Exhibit 1.  Was I missing something?

MR. SAVAGE:  You are correct that it does not appear in Exhibit 1, and what you're missing -- and I, of course, say then we didn't say it clearly enough.  There are a large -- the

way that the industry standard for CDRs works is everything that goes through the switch gets recorded and makes a CDR, including, as relevant here, minutes that are test minutes. And the difference here is test minutes.  And I think there's a footnote to that effect in the actual brief that, particularly when it's not entirely clear, you know, isn't going to work. And as you noted, the actual operation of a gateway and the system down in Haiti was, to use the technical term, an enormous pain in the neck because the power was unreliable, the internet was unreliable, there was just a wide range of problems, and so to the extent there were operations trying to be had in Haiti, there was an awful lot of testing, it isn't working, and if it goes through the switch and hits the gateway, it will be recorded by the switch even if it never actually does anything.

And so the difference, as I understand it -- obviously, this is the company's data, not mine, but the difference, as I understand it, is there was a lot of testing going on in the world of operations in Haiti.  And obviously we would think that if you're doing a test and not impacting anything, that's not a chargeable event.  I haven't done the math.  I think the math still works.

THE COURT:  Is there anything in these documents that were filed with me or in the record that could help me find this number 279,669?  And if the answer to that is no, I'll --

MR. SAVAGE: You've not missed anything. It was -- one of the questions was, okay, well, how many Roam Like You're Home minutes were there? Well, there were 279. Okay, let's put that. It's not in the chart, but this is the evidence of it.

Again, this is all -- to the point you made in the tentative opinion, this is all admissible evidence. Right? And --

THE COURT: Right.

MR. SAVAGE: And if called upon to testify. But again, critically, they have nothing on the other side.

THE COURT: I understand. I just wanted to make sure -- I now have my answer.

MR. SAVAGE: Okay.

THE COURT: I wanted to make sure that I wasn't missing how that number, the bottom line number was derived from the record evidence. I get it. Okay.

MR. SAVAGE: This is stand-alone record evidence. That number is stand-alone record evidence.

THE COURT: I'm not worried about it. That's fine.

The other question -- and let me put this to plaintiff's counsel now -- is would you please address the substantive argument that Mr. Savage just made. And as I understand it, it's that under Oregon law of damages for fraud, a prevailing plaintiff is only entitled to out-of-pocket. And

to be candid, I have not taken a close look at that question, so I'll take your representation right now that as of out-of-pocket, there is no out-of-pocket damages that plaintiff has suffered.

I'm interested in plaintiff's response to that, please.

MR. VAUGHAN:  Thank you, Your Honor.

And this is my first time outside of the introduction to speak.  I've got to say thank you so much for the effort you put into that tentative opinion.  I think both Mr. Savage and I and all of counsel here have seen many a final opinion that pale in comparison to the obvious work you put in here, and we appreciate it because it does help to crystallize where we ought to focus our attention.  And even if we aren't ecstatic about some of the conclusions, we are very satisfied and happy with the effort.

THE COURT:  I'm positive there's information on the conclusions in the tentative opinion that both sides are dissatisfied with.

MR. VAUGHAN:  Exactly.

THE COURT:  For example, damages.

MR. VAUGHAN:  I think we just heard from Mr. Savage, that's it.

To answer your question substantively, we disagree on several different components with the methodology, with the

numbers, and with the underlying quote/unquote evidence.

First, there is no question that Digicel doesn't have the actual records.  That said, I think, as was explained by my friend on the other side, we suffered a significant server loss -- we're very candid with that -- and we have still been trying to recreate documents.  Mr. Savage has been very gracious about all of that, and we've been working through it.

But from where we stand -- from where I stand, there has been no prejudice.  And I'll tell you why.  To the extent that we're trying to determine the volume of bypass minutes actually effectuated by UPM as a part of this project, it had to be from the very beginning, without regard to what data was lost or not, it had to be based upon circumstantial evidence.

When my friend on the other side talks about everything that goes through must go through the switch and is recorded, that is incorrect.  Bypass minutes, what have been called in-country bypass, what's been called bypass -- and I'm not talking about Roam Like You're Home for the moment, which from our perspective is the tail wagging the dog.  But from our perspective, bypass is the key violator here.  Bypass is the dog.

When those minutes are transferred via VoIP to Haiti, they don't go through the switch.  CDRs are not generated for those minutes.  They are sent to the gateway in Haiti, which is a radio, as Mr. Savage describes and as the experts agree, and

from that radio to the network.

So the circumstantial evidence that we intend to put forth is a combination of the total volume of bypass, which Mr. Savage himself has acknowledged he elicited from the client, which forgive me if I have this number wrong -- I can find it -- but I think it is in excess of 40 million minutes. As Mr. Savage correctly indicates, I cannot, will not, would never attempt to attribute 40 million minutes to his client. It is a significant component, but 10 percent, I believe, of the total volume of minutes completed by the client Digicel-Haiti, and therefore it does create significant damages.  How much of that is attributable to UPM, I believe can be established -- must be established through circumstantial evidence.  That circumstantial evidence is the number of gateways and equipment that they had in Haiti, the amount of time they spent in Haiti, and there is testimony from their own employees about the level of revenue maximized or realized, I should say, by UPMs throughout this project.  There is the testimony which admittedly Mr. Tran disavowed.  We would expect nothing else.  But Mr. Tran disavowed the assertions of a Jaspaul Gosal, an employee and project manager of UPM, who referenced the number of -- the amount of money, the revenue realized by UPM, the number of minutes realized by UPM. Mr. Tran himself in a more general level described the level of revenue realized by UPM in bypass in its operations.

We believe we should be entitled before the jury, where there is admittedly no direct evidence of how many minutes were completed in bypass, we should be entitled to establish through circumstantial evidence how much, to what extent the scope of the bypass activity, and therefore what should be awarded to Digicel for UPM's bypass.

THE COURT:  Let me interrupt you for a minute there. Can I interrupt you for a minute?

MR. VAUGHAN:  Of course.

THE COURT:  Assume you're right.  Because right now I'm still hearing two ships talking past, perhaps, or I'm not understanding it.

Let's assume you're right.  Let's assume that there were 40 million total bypass minutes that came from UPM and that --

MR. SAVAGE:  He said there was no way we were up as many as 40 million.  He just thought it was more than we said.

THE COURT:  Okay.  Let's assume that there was some quantity of bypass minutes that Digicel-Haiti can show by circumstantial evidence probably or more likely than not came from UPM's bypass in a nontesting environment.  Assume there's some quantity.  For right now let's just call that quantity X.

If I'm hearing Mr. Savage correctly, then he's still saying, fine, even for those X minutes, there is no out-of-pocket loss to Digicel-Haiti because they received

enough money for each one of those X minutes to cover their out-of-pocket costs, and therefore there's no damage.  So even if you're right, Mr. Vaughan, that Digicel-Haiti can prove with circumstantial evidence that UPM passed through X number of minutes through bypass and not merely by testing, Mr. Savage is saying for each one of those minutes, Digicel-Haiti's costs were covered, and therefore at least for those minutes for that category of damages, there is no damage.

          Do I understand your argument correctly, Mr. Savage?

          MR. SAVAGE:  Yes, you do, and you've gotten to another -- you've melded together two different arguments I have.  I was going to get to the next one later.  But so far so good.

          THE COURT:  We'll get to the other three categories later.

          MR. SAVAGE:  Even within the damages category there's a --

          THE COURT:  But within the category of actual damages, Mr. Vaughan, what's your response to that?

          MR. VAUGHAN:  It goes without saying, I'll start I disagree.  First, Mr. Savage talks about the -- two different things.  One, the actual lost cost or revenue.  And in getting to that actual lost cost or revenue, he speaks to the 23 cents per minute international rate.  Assume to the extent that Digicel-Haiti has lost a minute of international revenue, they

have -- you start with the 23 cents, and then he deducts from that 23 cents the 5-cent tax that Digicel-Haiti would be obligated to pay, which he describes as Digicel-Haiti acting as a collection agent.

I completely disagree.  The bottom line is first, with respect to the 23 cents per minute, Digicel-Haiti, I believe, is entitled to the full 23 cents per minute for every minute lost that UPM did not pay to Digital Haiti a full 23 cents per minute for every terminated call.

The fact of the matter is, Your Honor, we posit that with every single terminated call, UPM packaged, they will say, or transmitted two calls:  one, the original call from the caller in the United States that initiated the call and sent it to its carrier here in the United States, which was picked up by UPM and transferred to Digicel-Haiti; but two, that local call that UPM claims it quote/unquote originated in Haiti and claims it paid the local rate for.  Every single time we hear the description of that transaction, the original international call is dropped from the discussion midway through the conversation.  And then we hear that it's a single call that has been terminated, and that single call calculation, the calculus then begins with 23 cents, less the taxes, so roughly 19.  That is incorrect.

So even if my friend on the other side were to argue that there was some payment made to Digicel-Haiti for the

completion of that local part of the call, or that local call, it completely ignores that that digital package, which is the original call originated by that individual in the United States, has been transmitted, has been completed and terminated with nary a cent being paid to Digicel-Haiti.

THE COURT:  When you say "nary a cent," ultimately for that call wasn't a gross of 23 cents per minute paid to Digicel-Haiti, minus whatever the taxes Digicel-Haiti lost?

MR. VAUGHAN:  No.

THE COURT:  Why?

MR. VAUGHAN:  And I'll tell you why.  We have to at this point separate the two things we're talking about.  We're talking about Roam Like You're Home on the one hand and --

THE COURT:  Right.  Let's just talk about bypass.

MR. VAUGHAN:  Perfect.  For in-country bypass, the only payments made to Digicel-Haiti would have been the local permanent rate for that connection from the radio to the Digicel network in Haiti.

THE COURT:  And is that 20 cents per minute?

MR. VAUGHAN:  No, sir.  That is roughly 7 to 9 cents, I believe.  Seven to 9, not 79.

THE COURT:  Yeah.

MR. VAUGHAN:  So somewhere between 7 to 9 cents, if memory serves me.

Mr. Savage would posit that Digicel-Haiti would

therefore have received somewhere from 7 to 9 cents. They would not be obligated or they should not receive the taxes which would ultimately be paid out otherwise, and therefore they get the net.

That is absolutely incorrect. One, it ignored the fact there are two calls being completed. Two, it presupposes that the tax burden incurred by Digicel-Haiti is a dollar-for-dollar, cent-for-cent tax obligation without regard for any other condition, circumstance, arrangement that may be in place, tax credits and the like, and it presupposes -- Let me do it by way of an example.

If you take just a regular theft scenario, and one were to go in and heist a TV from a store, you don't turn around and say that what you owed to the target is their net profit less overhead, less taxes that they would have paid on it. The bottom line is what is owed is the 23 cents. What is owed is the value of the good that was taken. If there is an obligation on the part of Digicel-Haiti to either infrastructure payment, taxes or anything of the like, that is inconsequential with respect to the loss for the item, the asset.

THE COURT: Are you prepared to tell me now whether you agree or disagree with the legal proposition Mr. Savage says, and that is under Oregon's law of fraud, a defendant is only entitled to out-of-pocket loss, as opposed to any type of

contractual expectation loss?  Do you agree with that?

MR. VAUGHAN:  I want to be completely candid with the Court.  I am unfamiliar with that case, with that case law at this moment, but -- and I want to make that clear because I don't want to waste your time with the --

THE COURT:  With our own research.

MR. VAUGHAN:  But I do want to posit that my immediate response is that our out-of-pocket costs in a scenario like this must be the lost 23 cents.  It must be because that would be the lost revenue which we would have otherwise gotten from every other completed international minute.

I'll stop there, Judge.

THE COURT:  Let me ask you a question about that.  At trial, assuming we get to trial on this point, how were you going to prove that a caller from the United States calling Haiti, if they could not make the call -- Let me take a step back.

How much would a caller -- and we're just talking bypass.  How much would a caller from the United States to Haiti who went through UPM's bypass pay for -- pay per minute?

MR. VAUGHAN:  That has not been established in this record.  We don't know exactly who UPM's clients were.  We understand that they sell wholesale minutes.  We don't know exactly what their client roster is.  We do have certain

contracts, we do have certain companies that purchase wholesale minutes from UPM, but I don't know the exact rates that they would pay to UPM.

THE COURT:  Now, Mr. Savage.

MR. SAVAGE:  I'm accumulating things I want to say, so whenever you want to hear from me.

THE COURT:  Let's just attribute some variable to that number.  Let's assume a caller from the United States who wants to call Haiti is X per minute.  Now, I assume from what I understand in this case, had there not been the -- what Digicel-Haiti alleges to be bypass fraud, that caller would have had to pay more, right?

MR. VAUGHAN:  No.  The analysis is from the other end, Judge.  The amount that the caller pays here is almost irrelevant to the analysis with respect to what Digicel receives there.  Why?  The Digicel rate is actually a rate set by the Haitian government.  It is 23 cents.  That rate is in conjunction with the Digicel -- I'm sorry, the Haitian government's participation and involvement with the ITU and with the international community.  That rate is actually a benchmark rate that was recommended by the FCC and adopted by the Haitian government.

So to the extent the Court is inquiring and concerned about what the upstream cost to the consumer is as it may or may not impact the damages or the revenue on the Digicel-Haiti

side, I would respectfully suggest that one doesn't impact the other.

THE COURT:  Let me explore this.  Suppose I have a cousin in Haiti.  My cousin is married.  I want to call from Oregon my cousin.  I want to do it perfectly legally, perfectly appropriately.  I know nothing about UPM and I make the call. How much am I going to pay per minute?

MR. VAUGHAN:  I don't know the answer because it depends on your relationship and your carrier.  AT&T may charge you 30 cents.  Verizon may charge you 28 cents.  You may have an international calling arrangement.

THE COURT:  I have no international calling arrangement.

MR. VAUGHAN:  So I -- and understand I am guessing now because I can go on the internet and see what it would be charged.

THE COURT:  Now suppose I hear that there's this company called UPM, and if I place my call through them, don't I -- won't I save some money on what I would otherwise pay AT&T or Verizon?

MR. VAUGHAN:  Well, you know, that was an argument that was being articulated at the beginning by UPM when they indicated that there was this what I call the Robin Hood theory, where they were benefiting the consumer here with quote/unquote lower rates.

There has been not one shred of evidence, not one shred that the consumer in the United States has benefited by a cent to the extent of realizing lower rates here in the U.S., not one shred.  And I think that argument has for the most part been abandoned because there has been nothing to suggest that UPM has lowered its charges to anybody else, as opposed to realizing the benefit of paying less in Haiti.

THE COURT:  Okay.  In a moment I'm going to invite Mr. Savage to comment, but I have one very specific question for you, Mr. Vaughan, and then I'll give you an opportunity to say anything more you want at this time about damages before going back to Mr. Savage.

But I forgot I wanted to put something out of the way.  UPM argues in their briefing that one of the ways in which they do business is what they've described as arbitrage. I think, if I read them correctly, arbitrage has nothing to do with this case.  Do you agree?

MR. VAUGHAN:  I agree.

THE COURT:  Very good.  Thank you.

Is there anything further you want to say about damages now?  Otherwise I'll go back to Mr. Savage, and you know I'll, of course, go back to you after he says what he says.

MR. VAUGHAN:  Nothing further at this point, Your Honor.  I think that to the extent your tentative opinion

indicated that there is certainly much more to be established and brought forward with respect to evidence at trial, there is not sufficient record evidence at this moment to determine as a matter of law that there are no material facts in dispute with respect to the damages amount, which must necessarily be proven by circumstantial evidence.  So I don't think there's anything else I need to say on this point.

THE COURT:  I'm going to go back to Mr. Savage in a minute, but let me share with Mr. Savage two questions that are now in my mind.  I had previously and tentatively granted summary judgment against the unjust enrichment claim by plaintiff on the grounds that unjust enrichment requires an adequate remedy at law.

Here, if there are no provable damages, and we have no fraud claim, but there may be a theory of unjust enrichment that if there was active concealment in fraud, perhaps UPM should be responsible to disgorge its profits, and maybe I shouldn't dismiss unjust enrichment.  So why should I dismiss unjust enrichment if there really are no provable damages that are actionable in fraud?

Secondly, can you help me understand if I want to call my Cousin Mary in Haiti, would I be able to save money by doing it through UPM's bypass?

MR. SAVAGE:  The short answer to those questions -- and I'll get back to that.  The short answer is yes, you'll be

able to save money by virtue of the activities of UPM, but you wouldn't directly deal with UPM.  We're in the wholesale business.  You'd save money by buying from one of UPM's customers.  And I'll get to that in more detail in a minute.

Second, with regard to unjust enrichment, I believe the tentative decision is correct to dismiss the unjust enrichment claim for a range of reasons, including this one. I'll come back to that, but I wanted to -- I'm basically making notes.

But first I think you now understand why in our papers we're repeatedly saying this is really a contract claim, right?  They're asking for contract damages, right?  The expectation is this is a 23-cent-a-minute call or whatever call and we didn't get our 23 cents a minute, so we want that, we want our 23 cents a minute.  That's a contract claim.  That's a very different notion than a fraud claim, which again, out of how much were they really hurt?

Now, there are two pieces to they weren't really hurt.  One is even if we assume that the right number is the out-of-pocket money they get for the 23 cents, which is the 18 cents, that was covered.  That's what the calculation shows.

The point you alluded to, I think, which is also there is unless we make the assumption -- which is absurd -- that their going local rate, that they lose money, that they're not covering their costs when someone in Haiti makes a local

call, then every time we paid them that local rate, we covered their costs and they're not out of pocket anything.  Right?  And again, within the realm -- in the briefing, I just made the favorable to them assumption that their out-of-pocket money was really the 18 cents, right?  But, in fact, it's true that when you drill down, they're really not out of pocket anything if they got paid for what they did.  They wanted more on a contract theory.  And as you found correctly, I think in the tentative opinion, not much in the way of contractual obligations here on either side.  I'll get to that in a minute later on.

But all of that said, there's a procedural issue here that I'm concerned about.  On the date that you set, as modified by even a couple more weeks, we filed our dispositive motion saying you have no evidence of damages, here are the evidence of damages, here's why this is it.  The way summary judgment works, as I understand it, is at that point they had an obligation to come back and either say your facts are right but your legal theory is wrong and here is why we're still entitled to the money, or to say your facts are wrong, here are the other facts.  They didn't do either of those things.  And it seems to be a bit late in the day to say, oh, we've got circumstantial evidence we'll put forward.  They, I think, were obliged to put that forward in their opposition to my motion, so that in my reply in support of my motion, I can say that's

nuts for the following reasons.

They didn't do that and, you know, if you look back on how -- at least my involvement with this case, I've always been big on the merits. Let's look at what really happened and figure it out. But this is a situation where I really think that procedurally if they wanted to say, here is our circumstantial evidence that shows the blah, blah, blah, blah, blah, that would have been the time to do it, and they missed it. And I don't think they should get a free pass on that because they have all this data. Right? They have this -- and we'll talk about Mr. Gosal in a minute. They have whatever he said. They have all -- they have piles of invoices that we sent to the carriers to whom we sold. We sent them all this stuff. It's there, and they chose not to come forward with it. I was expecting to have to have a big, long, complicated --

THE COURT: You make many, many, many arguments in your opening two motions for summary judgment.

MR. SAVAGE: Correct.

THE COURT: One of them was no damages. But that's only one among many, many, many.

MR. SAVAGE: Correct. And I'm focusing on it now not because it's necessarily the most important but because it's self-sufficient to make the case go away.

I now have a second point, again a procedural-like point rather than a substantive one. This is not a plain old

tort case.  This is not a plain old civil case.  The standard of proof is they have to prove fraud, which means they have to prove damages by clear and convincing evidence.

THE COURT:  Can I short circuit that just for a minute and tell you I made that exact same argument as a trial lawyer to a very, very good local Oregon trial judge whom I respect a lot many, many years ago.  Let me tell you what her response was to me and I've never found a response to her response.  So I'll give you that chance.

"That doesn't fit into a summary judgment analysis where all facts have to be viewed in the light most favorable to the nonmoving party and reasonable inferences drawn in light of the nonmoving party.  The burden of proof of being clear and convincing is only an instruction to the jury that jury, you have to decide this particular question, all of the elements of fraud, not by a preponderance but by clear and convincing evidence, and that there's no way that a trial judge can or should on summary judgment say, "Well, this may satisfy a preponderance standard, but it's not good enough to satisfy a clear and convincing standard," because that is something really for the fact finder to decide at trial, and if you assume all reasonable inferences in favor of the nonmoving party, something that satisfies a preponderance standard also then under that presumption would satisfy a clear and convincing standard, even though you may be able to persuade a

jury under a clear and convincing standard no, it doesn't.

What's your response to that?  I didn't have a good response when I made that similar argument.

MR. SAVAGE:  Well, I think I have an advantage in having a response that -- judging we're roughly the same age -- you didn't have as a young trial lawyer, and that advantage is the Supreme Court's case where they said if a rational trier of fact could not reach X result, then that's --

THE COURT:  And that's been the law for a long time and I understand it.  That's a dangerous thing for a judge to do on summary judgment.  If there really are disputed issues of fact -- obviously, we all agree a judge can't start weighing credibility and/or even weighing the evidence but must give the benefit of the doubt of the dispute to the nonmoving party.

So if I say right now there is evidence of that, there is evidence to show that a jury could find it by preponderance but I don't think a rational juror could find it by clear and convincing, my experience has been I'm pretty likely to be reversed on that point.

MR. SAVAGE:  So I'm tempted to say, well, go ahead and rule that.  If you're reversed, we'll take care of that. But --

THE COURT:  I want to try this case but only once, too.

MR. SAVAGE:  But substantively -- this then relates

back to the procedural point.  At this point I'm shadow boxing. I think I know what they're talking about when they say there might be some circumstantial evidence, but I have been deprived of the opportunity even to explain to you why.  The plain contemporaneous business records that we have -- and I want to take issue and clarify something Mr. Vaughan said.  He said there are no CDRs for the bypass calls.  And there are two ways in which that is wrong.  I understand why he said it, and I know what he meant, and what he meant was right but there are two ways that he's wrong.

First, the normal international CDRs that Digicel would create for a call that goes in the normal way, those CDRs do not exist for bypass calls.  I think that's what Mr. Vaughan meant.  I agree with that.

However, one, UPM, an independent carrier with its own switch, has the CDRs.

THE COURT:  I get that.

MR. SAVAGE:  But two, if you look at the points -- and I don't have the page numbers off the top of my head, but if you look at the parts of Mr. Laborde's deposition, in his role as one of Digicel-Haiti's corporate representatives, he explains what their network records with respect to every call, including local calls.  And so although the international-type CDRs that they were talking about are not generated, Digicel-Haiti's network in fact, according to their expert,

maintains records even on the local or bypass calls.

And nobody cares anymore, but think about back in the day when your wireless carrier used to give you the listing of every call. Their ability to do that is because the wireless switching infrastructure records the CDRs, as Mr. Laborde testified. And so it is true that since they don't know which SIM cards were ours independently, they would have some issues, but as I said in the papers, if they hadn't lost their records, we told them what SIM cards we have. We told them the numbers, we told them all that stuff. They say, okay, we agree.

But going back to the meat of it, we have detailed call-by-call, contemporaneously created business records of every call. They have, at most, unstated circumstantial evidence that might mean something.

THE COURT: I get that.

MR. SAVAGE: They lose on that.

Now, some points about the 23 cents versus the 18 cents. Let's take Mr. Vaughan's example of helping the thief. I break into the store -- I break into Target and I steal the TV, and retail price of that TV is $200. They say, "Give me my TV back." I say, "I sold it." They say, "Well, give me the money back," and I give them the $200. I don't give them $200 plus the sales tax, right?

And the 18 cents is what they get for the call. The fact that they charged 23 and panned off 5 to the government,

that --

THE COURT:  I understand your point.

MR. SAVAGE:  So there's that point.  I think -- What else was there?

THE COURT:  You want to get back to first of all why I should not rethink my unjust enrichment issue.  I want to get back to that.  But I also want to give you some bad news right now, and that is this:  I understand what you're saying, and I'm not sure you're wrong, but take a look at my tentative opinion at page 7.

MR. SAVAGE:  I know I have it here Your Honor, but my co-counsel -- Page 7.  I've got it.

THE COURT:  It's the second half of that first full paragraph, the one right in the middle, the Advisory Committee notes to 56(g).

I really do understand what you're saying, but this case was filed in 2015.  We've all come a long way in understanding it.  We are really close to a trial date.  It's not moving.  We're going to trial -- unless I give you summary judgment -- in April.  That's not far from now.  And I think I understand what you're saying.  I'm not sure I disagree with it, but I will feel much better when I look at, number one, everybody's pretrial submissions.  At our final pretrial conference, I'll see your evidence, I'll see plaintiff's evidence, I'll see the witness statements, I'll see the

exhibits.  Some judges in this building -- I've done it occasionally -- dismiss the case at the pretrial conference when we see all the facts and there's nothing in dispute. Sometimes we let it go to the end of the plaintiff's case and we say -- at the end of the plaintiff's case we grant a motion for judgment as a matter of law, and then that can go up on appeal.  And sometimes when we want to exercise an abundance of caution, we say, hmm, I think that motion for judgment as a matter of law is really interesting.  It may be right.  Let's see what the jury says.  And if the jury goes against the defendant, we'll take a good close, hard look at it on a renewed motion for judgment as a matter of law.  And at least in that way, whichever way the Court goes, whoever is on the losing end of it can appeal, the Ninth Circuit can sort that out, and we don't have to retry the case again.

That's the advice I'm gleaning from 56(g) Advisory Committee notes, that even if I find that a fact like damages in this case is not genuinely in dispute, if there's enough sort of uncertainty or confusion in my mind, it may be better to let's see how this sorts out at the final pretrial conference and/or motion for judgment as a matter of law and/or motion for renewed judgment as a matter of law.

MR. SAVAGE:  So, on the one hand, you absolutely have the discretion to do that.  On the other hand, I don't think that this is really the appropriate case for exercising your

judgment that way, precisely because, A, damages is an actual element of the offense, of the tort.  This is not a subsidiary point.  This is not something -- they have completely failed in their opposition to my motion to present any evidence or any cogent legal argument that addresses the evidence that we've put forward or the legal argument based on Oregon law, the out-of-pocket damages rule, explaining why it is that they have to lose.  And it seems to me that at some point -- as you say, this case has been going on for seven years.  It can't be a shock to them.  Maybe it is a shock to them, but somewhere along the line, presumably they would have noted that damage is an element and they have to prove it and it's measured by out-of-pocket loss.  And the correct presumption when they come up with nothing -- which they did -- is they have nothing.  And so I'm --

THE COURT:  One more reaction to that, and that is you know how you're winning in this tentative order on the really important point that your client didn't do anything to manipulate the technology, contrary to the allegations early, and frankly contrary to what they were alleging when I denied your motions to dismiss, you persuaded me eventually, at least tentatively, that your client didn't do anything to manipulate the data, to misrepresent the country of origin for the call.  It took me a long time to get there and to understand that, and maybe I will some day have the same reaction to the damages

argument, but I'm not there yet.

I understand what you're saying.  I'm thinking that may be right, but I don't have the confidence in that yet.

MR. SAVAGE:  So sleep on it, Your Honor.

THE COURT:  I will.  I'm not ruling from the bench.

But given that -- so it will be more useful to talk about other things than go around on this.

MR. SAVAGE:  I got the point.

Okay.  Unjust enrichment.  Either way, the arguments are parallel in the following sense:  unjust enrichment is not a contract claim.  It's a --

THE COURT:  It's an equitable claim.

MR. SAVAGE:  Yeah, it's an equitable claim.  Do we have money that we shouldn't have.  Okay?

Well, they didn't conduct any discovery about that in any particular detail that I recall -- I shouldn't say that because I don't know what they meant when they asked certain questions, but at the end of the day, we know how many minutes we sent them, and we know how much money we paid them, and as we laid out in the briefing somewhere, the way it works is, you know, we buy a SIM card from somebody on the street, we activate it, we go to the third party and say here's 10 bucks for this SIM card.  And so now there's $10 sitting in the account.  And footnote -- this matters a lot later -- at that point we have an implied-in-fact contract because there's no

possible rational way to understand us paying them money and then putting it in a particular account other than saying you now have the right to make calls using that.

So we've given them money, and then we'll make a call, 9 cents -- we'll call it 10 cents a minute, 10 cents the first minute, 10 cents the second minute, the call is over. They somehow magically figure out that SIM card is probably being used for bypass and they cut us off. There's $9.80 sitting in that account. They don't give that back to us. They've kept it.

THE COURT: I understand.

MR. SAVAGE: And as a result --

MS. VALBRUN: I'm frozen.

THE COURT: You're frozen, Ms. Valbrun?

I can hear you, Mr. Vaughan.

MR. VAUGHAN: I know, Judge.

THE COURT: And I heard Ms. Valbrun saying she's frozen.

MS. VALBRUN: Sorry. I'm connected now. Sorry for the interruption.

THE COURT: Thank you.

Back to you, Mr. Savage.

MR. SAVAGE: Now you see why we didn't want to have our internet in Oregon. Even Florida has trouble with the internet.

THE COURT:  Did you say Oregon or did you mean Haiti?

MR. SAVAGE:  I'm sorry.  We love the internet in Oregon.  It works great.

But in any event, the question of unjust enrichment has to take account not just of whatever money we got from third parties but also the money they got from us.  And --

THE COURT:  I understand that.  But I was thinking if unjust enrichment applied, a fair and not uncommon measure of unjust enrichment is how much profit was made by the party that engaged in the unjust activity.  And that's a fair measure when there's no adequate legal remedy at law.

What I'm kind of struggling with is here there appears to be an adequate legal remedy at law, an adequate legal remedy; namely, sue for fraud.  And just because someone -- the plaintiff could not prove all of the elements, including damages, doesn't necessarily mean there's not an adequate legal remedy.  And so I'm just struggling with what does it mean for there to be an adequate remedy available at law even if you don't prevail on it, because if there's not an adequate legal remedy available, they should be entitled -- someone should be entitled to bring a claim for equitable remedy -- namely, unjust enrichment -- and a very common measure of damages for unjust enrichment is, okay, how much was the other side unjustly enriched?  What was their profit from their improper activity?

Why wouldn't that apply here?

MR. SAVAGE: Okay. So my stressed prudential point about the distinction between law and equity, was that eliminated by Rule 1 in 1934 or something?

THE COURT: Yes, except the Ninth Circuit in *Sonner* brings it back.

MR. SAVAGE: Of course.

Even so, if you go back to old practice, a case in equity would be dismissed if there is an adequate remedy at law. Many times typically when the case at law had not been tried, had not been filed, cases in equity are dismissed for there being an adequate remedy at law when the law case hadn't been filed at all. What that means is, I think, that the existence of an adequate remedy at law is not at all the same as you win a case if you go to law courts.

THE COURT: I agree.

MR. SAVAGE: And so given that, I think you're correct that the fraud claim is an adequate remedy at law, and it is an adequate remedy at law whether it actually works for them or not. It can't depend -- otherwise -- otherwise there would be no cases in equity dismissing claims for inadequate remedy at law, because it would only be people who won at law who then go to equity and then be dismissed. So I get the point but I don't think --

THE COURT: I think that's probably right. We'll

give Mr. Vaughan or Ms. Valbrun an opportunity to respond to that at some point if they want to.  I think I'm probably right in dismissing the unjust enrichment claim for that reason, but I'm still struggling over that particular question, and it was just heightened by your argument that there's no damages.

MR. SAVAGE:  Right, right.  They have an adequate remedy at law, it's just not one they like.

THE COURT:  Not one they can prove.

MR. SAVAGE:  Exactly, exactly.

THE COURT:  Anything further you want to say on these damages points?

Oh, by the way.  Can I ask a technical question?

MR. SAVAGE:  Sure.

THE COURT:  As I understand it and said in the tentative opinion, UPM would go to third parties to recharge or top off the SIM cards.

MR. SAVAGE:  Right.

THE COURT:  It's totally unclear to me how UPM would go about paying the $25 fee for Roam Like You're Home.  Is that directly to Digicel-Haiti or is that also through third-party vendors?

MR. SAVAGE:  Roam Like You're Home is a combination of both.  Here's how it works.  For argument's sake, say it was 25 bucks.  I think $25 was the fee.  If UPM wants to say, I want to enroll this SIM card in Roam Like You're Home, we would

go to the third-party vendor and say, third-party vendor, put 30 bucks on this account, and then the SIM card has a balance of 30 bucks.  And then analogous to making a call, sending signals that caused the amount to decrement by minute -- it's laid out in one of the briefs -- we send a little signal to Digicel-Haiti saying, hey, enroll this in Roam Like You're Home, and bingo, they take off the 25 bucks.

THE COURT:  That actually leads to my follow-up, because I know that Digicel-Haiti in some of the declarations they've attached, including Ms. Valbrun's, gives me terms and conditions.  It's unclear to me, and I don't think it's adequately stated -- or if it was, I missed it -- how one acknowledges those terms and conditions, whether it's like a shrink-wrap when one buys a SIM card, whether the SIM card says by using this SIM card, you agree to our terms and conditions which are stated at the following website, or whether when one goes to activate, whether it be a SIM card or Roam Like You're Home, there's some type of click box where you say, I agree to your terms and conditions.  That's totally unclear to me.

But what I'm gleaning from -- but I note that Digicel-Haiti didn't allege and didn't present any evidence that it says on the SIM card by using this SIM card, you agree to our terms and conditions.  So later I'll be asking Digicel-Haiti.

MR. SAVAGE:  Well, just to be clear, what we've said

is -- in our pleadings, which we believe to be true, is there's no point in any part of this process where we buy a SIM card from a third party, where we pay the third party to top off when we go, "We'd like Roam Like You're Home," at no point in that process is there anything like the -- you know, click here to move forward, by clicking you agree.  None of that exists.

And we had some footnotes about, you know, the *Cullinane* case and I believe your case about the conditions versus covenants and that sort of thing, that there needs to be something.  It is our contention and our understanding that there was nothing.  And part of the reason we said there was nothing is, A, to show there weren't any conditions; but B, if somehow they were going to say, oh, no, no, no, look at this piece of evidence.  And, again, they didn't do that.

It's contrary to my nature to keep coming back to the procedural requirements and not the substance, but at the end of the day, the whole point of all this briefing, of all this I'm going to move for this, let's see if they oppose it, is if they don't oppose it, it narrows things down.  And they simply did not oppose it.

THE COURT:  I understand.

But on the Roam Like You're Home, you're telling me that when you do send the message directly to Digicel-Haiti, enroll this SIM card in Roam Like You're Home, there is no statement that appears by asking for this, you hereby agree to

abide by terms and conditions?

MR. SAVAGE:  That is correct.  It's in one of the briefs where it's -- I think it's in the first brief on our motion that just a -- again, it's a simple little back and forth, you know, send star 86, blah, blah, blah, but nothing else happens.

THE COURT:  But on the back and forth, I didn't know whether it said and by you agreeing by doing this -- the reason I ask, obviously, is because terms and conditions, typically we see them on contract cases, but there at least is the possibility that if you say, I'll abide by your terms and conditions without ever having any reasonable belief that you were going to, that could be a fraud.

MR. SAVAGE:  I understand the point.  As we said, at no point does that happen.

THE COURT:  Got it.  Okay.  Understood.

Anything else that you want to say now?

MR. SAVAGE:  So just a little bit of preview.  What I want to talk about next, whenever we get done with this piece, I want to focus on Roam Like You're Home.  And there is a damages element to that, but it's not the same as what we've been talking about.  It's a different look at damages.  Then I want to talk about at some length, sadly, the whole issue about the human behavioral software.

THE COURT:  Right.

MR. SAVAGE:  And that's kind of the things that were on my agenda.  But I don't know whether you want Mr. Vaughan --

THE COURT:  Well, let me invite Mr. Vaughan and Ms. Valbrun or Ms. Talcott, anything you want to say at this point about what we've covered so far?  Otherwise we'll go to Mr. Savage to talk about damages and Roam Like You're Home.

MR. VAUGHAN:  Well, I'll be very brief.  I'm trying -- as Mr. Savage said, I, too, have tried furiously to keep up with what has been discussed so far.

With respect to unjust enrichment, I read the Court's tentative opinion to indicate that there was partial summary judgment against Digicel-Haiti's claim of unjust enrichment, but it was qualified by the footnote, which indicated that if a jury finds for Digicel-Haiti on its claim for fraud -- footnote 16, page 31 -- Digicel-Haiti will have recovered all that it was entitled to receive.  However, if the jury finds that Digicel-Haiti -- finds against Digicel-Haiti on that claim, then Digicel-Haiti would be allowed to show the third element of its claim for unjust enrichment, which third element would be that it would be unjust to allow the recipient to retain the benefit without requiring -- or to pay for it, which is exactly what the Court is struggling with.

THE COURT:  Uh-oh, uh-oh.  That word "able" should have been "unable."

MR. VAUGHAN:  Which word?

THE COURT:  In the last sentence.  What I was meaning to communicate was if a jury finds for Digicel-Haiti on its claim of fraud, then Digicel-Haiti will be recovering all that it's entitled to under the law of fraud.  But if a jury finds against Digicel-Haiti -- namely, that there was no fraud -- then Digicel-Haiti would be unable to show the third element of its claim for unjust enrichment, which -- let me go back to that -- I think is that there was some unjustness.  In other words, if there is no fraud, the third element of unjust enrichment on the previous page is that it would be unjust to allow them to retain the benefit.  So my point in that footnote 16 -- and that word "able" should be "unable," and I blame myself and everybody else on my staff who proofread this.  What I was intending to communicate is if there's no fraud, there's no unjust enrichment.

Sorry about that.

MR. VAUGHAN:  I'm glad I raised this because --

THE COURT:  Me too.  Thank you.  Sorry.

MR. VAUGHAN:  You're welcome.

And an opportunity to agree with what you are now struggling with.  To the extent that there is an inability or a difficulty to establish the damages for fraud, meaning that it's not just out of pocket, it's also benefits of the bargain, of the position they should have been in, to the extent that that fails, the alternative claim of unjust enrichment would

allow for the jury to determine that UPM should not be unjustly enriched, should not get a windfall, should not essentially get an unfair benefit of this transaction, and that their profits related to the unfair transactions should be disgorged. And that is exactly what you're instinctively leaning towards. I never read this opinion -- or this tentative opinion, and I never intended that both the claim at law -- fraud -- and the claim at equity -- unjust enrichment -- were to secure a benefit for Digicel in tandem.

THE COURT: I understand.

Let me ask you -- you made an interesting comment a moment ago. Let me ask you to give me some Oregon law on that. Where in Oregon law does it say that recoverable damages for fraud can include benefit of the bargain?

MR. VAUGHAN: The case is *Schedler* -- S-c-h-e-d-l-e-r -- *v. FieldTurf USA*, a 2017 case, and it's 3:16-cv-0344-PK.

THE COURT: Okay. I'll go back and look at that. That's not in my head right now, but I'll go back and look at it.

MR. VAUGHAN: I think, if I heard the Court correctly, there are two measures of damages for fraud, out-of-pocket and benefit of the bargain. The out-of-pocket benefit restores the plaintiff to the financial position he enjoyed prior to the fraud and the transaction, awarding the

difference in actual value between what the plaintiff gave and what he received.  The benefit-of-the-bargain measure places a defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding him the difference in value between what he actually received and what he was fraudulently led to believe he --

THE COURT:  Let me ask you -- and I don't have that case in front of me.  Maybe you do.  That's a Judge Papak case.  That's what the PK stands for, Magistrate Judge Papak.  Does he cite any Oregon law for the benefit-of-the-bargain prong?

MR. VAUGHAN:  I don't have that before me, Judge.

Judge, I was just told I gave you the wrong citation.  Please allow me two minutes to get you the citation.

MR. SAVAGE:  And could it be shared with us for our benefit?

MR. VAUGHAN:  Of course, of course.  I'll announce it.

THE COURT:  That's fine.

MR. VAUGHAN:  Then, Your Honor --

THE COURT:  One moment.

(To law clerk) If you could look generally under Oregon cases for measure of damages for fraud.

MR. SAVAGE:  Your Honor, if I can jump in briefly on that.  If the fraud is of the sort of promissory fraud that we talked about in the footnote, that if I enter into a contract

with you, and that contract is fraudulent because I make --
that kind of fraud, as we cited in our brief, that kind of
fraud applies in a circumstance where there's a direct
conversation and the contract is entered into because of the
fraudulent representation.  That might be -- that might be a
species of fraud in which contract damages are appropriate.
That's not what we have here.

THE COURT:  Here's what I'm thinking of.  What I'm
thinking of applies both in civil cases and in criminal.  There
have been too many criminal fraud cases like this.  But what
I'm thinking is this.  If a defendant says, "I've got a great
investment for you.  It's foolproof.  I've got a gold mine and
the relevant assayers and experts say there's a lot of gold in
it, and I've already inspected it all, all I need from you is
$100,000, and I'll give you ten times your money in two months
or six months."  And you're defrauded.  You give them $100,000,
it turns out that was an absolute lie.  Your damages are
$100,000, not ten times $100,000.

MR. SAVAGE:  Right.  Which I think is relevant.

THE COURT:  Yeah.

MR. VAUGHAN:  Of course you would.

THE COURT:  Let Mr. Vaughan speak.

MR. SAVAGE:  I'm sorry.

MR. VAUGHAN:  Thank you, Judge.

There are important distinctions.  One, in the fraud

in the inducement context, you're absolutely correct that to the extent that there is a scenario where one is induced to enter into a contract with a promise of something that is demonstrably or later is demonstrated to be fraudulent, the appropriate measure of damages in that circumstance would be what the victim, the target would be able to demonstrate is their out-of-pocket loss, what I have lost as a result of the fraudulent act or transaction.

Here this is not a fraud in the inducement context. Here there is no contract. Here there is no outlay in terms of a cost expense based upon a representation. Here this is more akin to the acquisition of an asset, the obtaining of a benefit, each minute of service, the access to the network, and the access to that network was obtained by fraud. The access to the network was obtained by the act of concealment.

THE COURT: Let me ask you this, then. All right. So you own a building and I lie to you about my identity in order to gain access to your building. I'm in your building, I look around, I do whatever I'm going to do, maybe -- yeah, I do whatever I'm going to do and I leave.

You now have discovered that I gained access to your building with absolute fraud. I misrepresented to you who I was, what my purposes were, and I committed fraud. I made a misrepresentation to you intentionally, you reasonably relied on it in giving me access, and you reasonably relied on it to

your detriment -- I don't know about to your detriment.

That's my question.  How have you been damaged?  What's your measure of damage?

MR. VAUGHAN:  Okay.  May I please respectfully just slightly modify your hypothetical?  Slightly.

THE COURT:  Yes.

MR. VAUGHAN:  I own a train.  You access my train and you access it fraudulently.  And I'll explain --

THE COURT:  I give you a counterfeit ticket.  I did not really buy the ticket.  I made up a ticket and I handed it to you.

Go ahead.

MR. VAUGHAN:  No, no, sir.  I want to hear the rest of the question.

THE COURT:  You charge $100 for this one-way trip on your train or your airplane.  In fact, before computers, I gave you a counterfeit paper ticket.  It's pure counterfeit; I'm defrauding you.

What's your measure of damages?  Is it the full retail price of the ticket or is it your out-of-pocket cost?

MR. VAUGHAN:  My measure of damages is the price of the ticket, and in this instance, I will suggest to you something else to make this analogy more apropos.

You boarded my train with a suitcase and you went and you took a seat and you traveled a distance.  I later

determined that your ticket was fraudulent.  I also determined that in your suitcase was your buddy Fred, who got a free ride all the way down from point A to point B.  Your argument is, wait a minute, this seat cost you absolutely nothing.  If I wasn't there, it would still be a seat on the train.  You have lost nothing, ignoring the fact that you have utilized, you have completely failed to pay me my established ticket price.  Your argument is it is economically rational for me to give you a piece of paper that I've convinced you to accept because it is beneficial for me to pay less or pay nothing.  It is also no damage to you that my friend was in the trunk.  He didn't even use a seat.

THE COURT:  Right.

MR. VAUGHAN:  My damage, however, is that I've lost two tickets.  It does not matter that the seat was there.  It does not matter that Fred was comfortable in the trunk.  It does not matter, Judge, that I have to pay income tax to whichever authority required that out of that $100, I pay them something.  What I have lost is the cost of two tickets that you failed --

THE COURT:  I get you.  I want to study the law a little bit more.

By the way, I think there might be an interesting difference if there were plenty of empty seats versus no empty seats and but for this fraudulent ticket, I would have sold it

to somebody that would have given me $100.  But I get your point.

I'll get to Mr. Savage.

MR. VAUGHAN:  I absolutely agree with you that it may be a difference, yes, sir.

THE COURT:  Mr. Savage, you wanted to add something?

MR. SAVAGE:  I'd like to give a shout out to Blake Van Zile, my co-counsel, who has been busily looking and found it in the case that directly cited it, *Morasch v. Hood*, which is 232 Oregon App 392 from 2009, that in a fraud case, the benefit of the bargain is available only if the misrepresentation is a warranty of value.  Okay?

So if I say, I've got this car, it's worth 100,000 bucks and so you pay me 100,000 bucks, you know, you're entitled to get -- you're stuck with the car, you're entitled to the benefit of a $100,000 car like a Rolls --

THE COURT:  Or I get my $100,000 back.

MR. SAVAGE:  Right, exactly.

But otherwise -- otherwise it is out of pocket.  So if there's no warranty of value made in the course of the fraudulent misrepresentation, benefit of the bargain is not part of Oregon damages.

THE COURT:  We'll look into that.

By the way, it seems to me if I say to you, as you know, when we're standing on a corner in New York City near

Times Square, and I say to you, "I've got a $20,000 Rolex. Would you like to buy it for $20?"

MR. SAVAGE:  I have one of those.

THE COURT:  And you give me your $20, I easily can see that I defrauded you out of $20.  I have a harder time seeing that I made a warranty of value and I owe you $20,000.

MR. SAVAGE:  What is a warranty of value.  But it's clear that that's not what's happened here.

THE COURT:  I understand.  I understand.

I need to study -- you know, I did not really spend enough time, in hindsight now, on understanding the law of damages for fraud under Oregon law, because I came to the conclusion that I was confused about what the real facts were on damages, and I was going to wait and see what things looked like when we got to trial.  But I want to go back and study that some more.

MR. SAVAGE:  I appreciate that.  That's all we can ask.

But kind of more on damages, if we can move on to Roam Like You're Home.

THE COURT:  Okay.

MR. SAVAGE:  Drawing from the facts we've submitted and the facts even in the tentative opinion, the way UPM gets business is we go out to the world and say, hey, I can get calls to Haiti for -- and this actually comes up in the damages

in our Communications Act claim, although we haven't really talked about that, because, of course, our damages are based on how much we could have made, you know, how much we could have charged. And what's common in the telecom industry in a competitive situation is when you set a price, if there's a monopoly price out there, the competitors will price below it but not all the way below it. They get the advantage of having the competition work. And that's why over time the people who buy from UPM's customers, which have lower rates, because competition would force the price down, and then over time that would lead to lower rates in the market. That's just the way the economics of it works.

But in Roam Like You're Home, we go out into the world and we say, hey, we can get a call to Haiti.

THE COURT: A little more slowly, sir.

MR. SAVAGE: We can get a call to Haiti not for that outrageous 23 cents that Digicel-Haiti USA will charge you, we can get it to you for 22 cents, or whatever it is.

And so the calls came to us. We sent them, you know, on reliable internet in Oregon to gateways powered by reliable power in Oregon off to AT&T, who sent it off to Digicel-Haiti, who paid them the 23 cents that they want. It is an undisputed fact that for every Roam Like You're Home call, they received not only the 23 cents that they claim to be entitled to, but also the 10 cents or whatever from us. And consequently, there

is no conceivable way -- none -- that they can claim to have been damaged in any way when we made Roam Like You're Home resale.  They simply not only made their 23 cents, they made more.  It was profitable for them.

They cut us off probably instinctively.  Now, this is alluded to both in the briefing and in some depositions that is cited.  Eventually, if the amount of traffic being sent on a Roam Like You're Home service gets large enough, the U.S. carrier says, hey, I'm paying you 23 cents a minute on each of those.  Maybe we ought to do something about that.  And the testimony is, in fact, that happened.

And what you do to deal with that in the industry, which they testified that they did at some point, is they said, oh, okay, we'll just put in a restriction on the number of calls.  And that's their -- they say a normal user of this service would not make a thousand calls a day or whatever, and so we'll put in a restriction and we'll have our profit and whatever.  Segueing slightly to our Communications Act claim, just to see how it fits in, when they didn't have that restriction in place, they are required to permit us to resell it as it was.

But as it relates to the fraud claim, first of all, what's fraudulent?

THE COURT:  I want to repeat some of this back to you to make sure I'm following it.  Then we'll go to Mr. Vaughan,

and when we're done with this aspect, we'll take a break.

If under normal circumstances I'm a subscriber in Haiti, I've got a relationship with Digicel-Haiti, I know I'm going to be going to the United States and roaming, I subscribe to the card, I buy the card, and I notify them digitally that I want to subscribe to Roam Like You're Home, and they deduct my $25, whatever.  I then travel to the United States and I want to call home.  Am I charged a total of 23 cents per minute?

MR. SAVAGE:  No.  The end user -- so there are various money streams here, which is why it gets a little complicated.

THE COURT:  What I'm asking for first is not the UPM system.  I live in Haiti --

MR. SAVAGE:  The answer is what I get charged as -- forgetting UPM entirely.  I am a resident of Haiti, I get my card and come to the U.S.  I pay the 25 bucks.  I call home for a minute.  I get charged the 10 cents or 9 cents or whatever. AT&T, hypothetically, that handles the call sends it the normal way and pays them 23 cents.  Their arrangements with their roaming partners say every call you send back to me, whether it's a roaming call or any other call, I get 23 cents.

THE COURT:  Okay.  So the end user, the individual subscriber to the card, pays approximately 10 cents per call or whatever it is?

MR. SAVAGE:  Correct.

THE COURT:  Plus Digicel-Haiti would receive 23 cents per minute from their American roaming partner?

MR. SAVAGE:  Correct.  They actually admitted this in their complaint, one of their complaints long ago.  And I didn't catch it, so I spent a lot of time trying to establish it with their witnesses, who also confirmed it.

THE COURT:  Now, your argument is that that means for every minute that that card is used for Roam Like You're Home, they get 23 cents plus 10 cents, and therefore they've not been damaged?

MR. SAVAGE:  That is correct.  And the answer is they have no out-of-pocket loss, exactly.  And this is -- you know, shifting ground slightly, why are they so great on Roam Like You're Home?  It's a very profitable arrangement for them, and it is profitable on some level at the expense of the U.S. roaming partners.  And again, it gets complicated, but that's the way the market would work, is that's the interaction with competition.

THE COURT:  In a moment I'll go to Mr. Vaughan or Ms. Valbrun, but let me just get your understanding of what you think their theory of damage is.  Let me articulate it and see if I've got it right.

If we accept this basic legal point that we can also look to not only out of pocket but also expectation, they really only wanted Roam Like You're Home card -- Never mind.

Never mind.  Strike everything I just said there.

Let me go to Mr. Vaughan or Ms. Valbrun.  Okay?

How have you been damaged when UPM uses Roam Like You're Home as you've alleged, fraudulently?

MR. VAUGHAN:  Mr. Savage is entirely incorrect on several different bases.

THE COURT:  Okay.  Tell me.

MR. VAUGHAN:  First, this notion that UPM -- well, that Digicel-Haiti is paying for all of the service is incorrect.  The notion that Digicel-Haiti just went ahead and restricted the number of calls, which is all it needed to have done to have solved the problem of an overutilization is also incorrect.

Let me just explain the basics of the Roam Like You're Home arrangement.  You're correct that the Digicel-Haiti subscriber who subscribes to Roam Like You're Home gets the benefit of making an international call when they are roaming, and they are charged as if they were making a local call from right there in Haiti at the 7 to 9 cents per minute.

What Mr. Savage ignores and doesn't highlight is that when that SIM is placed in a box in Oregon and it is used to access the Digicel-Haiti network, purportedly as a traveler from Haiti simply making a call back, it makes absolutely no accommodation and conceals the fact that it is carrying with it an Oregon caller, a caller from Seattle, a caller from

California calling back to Haiti.  The relationship between Digicel-Haiti and its roaming partners certainly does not contemplate multiple calls being used, being transported back to Haiti on that one relationship.  Digicel-Haiti certainly does not contemplate that when it is negotiating roaming relationships with the AT&Ts and the Verizons of the world -- and, Judge, one important thing to keep in mind is that these roaming relationships have a significant reciprocal component, meaning Digicel-Haiti and AT&T will enter into a reciprocal roaming arrangement:  I will allow you to send to me through your network a million minutes.  In exchange, when your folks are here in Haiti, I will allow you to have your folks roam for a million minutes on my network.  Because we are both bartering, I will charge you some net of the 23 cents because you are charging me some amount for me allowing your folks to roam when they're on my network.

So this simplified notion of a 23-cent payment in exchange for allowing a Digicel-Haiti subscriber to access the U.S. carrier's network for roaming is also oversimplistic and incorrect.

THE COURT:  So can you explain to me, walk me through what is Digicel-Haiti's theory of how they have been damaged by the Roam Like You're Home as UPM has used it.

MR. VAUGHAN:  For every single Roam Like You're Home call that has been completed, Digicel-Haiti has not been paid

for that call that originated in the U.S.A.

THE COURT:  So this is your theory, if I've got this correct:  For any given call that UPM handles through this Roam Like You're Home process, had they not handled it that way, your theory is that Digicel-Haiti, had that call been made, would have been -- received greater revenues because of the higher international calling charges, right?

MR. VAUGHAN:  Yes.  It would have received the 23 cents or whatever that charge is for that international call.

THE COURT:  Go ahead.

MR. VAUGHAN:  There is no dispute that to the extent that UPM alleges that they initiated a call using that SIM card, that was paid for because it's on the SIM card.  There is no payment for John calling Jon Pierre in Haiti.

THE COURT:  So when a caller in the United States makes a call that -- let's say through their roaming partner AT&T or Verizon or whoever, and that goes through UPM, the call gets received and recognized by Digicel-Haiti as a Roam Like You're Home call, therefore they only charge the 7, 8, 9, 10 cents per minute for that call.  Does Digicel-Haiti also get any compensation from the U.S. roaming partner that processed that call?

MR. VAUGHAN:  As a part of that roaming relationship, as Mr. Savage said -- and I agree with this part -- there is a complicated exchange of benefit going back and forth.  It is

overly simplistic to say when AT&T accepts a roaming call from a Digicel-Haiti subscriber and completes that call, it is incorrect to say that AT&T pays Digicel-Haiti 23 cents.  Some amount may be paid, but it may be netted.  It may be that Digicel-Haiti does not charge for that call, to the extent that there is a reciprocal arrangement where AT&T has its roaming subscribers accessing the Digicel-Haiti network to transfer calls the other way.  So yes, there is some benefit based upon that roaming relationship.

THE COURT:  Now, from the perspective of the caller in the U.S., I want to call Haiti and I'll do it either through AT&T or through Verizon, whoever I get access to, am I going to end up being charged more or less if it goes through the UPM Roam Like You're Home process as opposed to just a normal AT&T roaming charge to Haiti?  Will the end user see any difference in the cost or the price or the charge?

MR. VAUGHAN:  The short answer to your question is no, because as Mr. Savage just pointed out, that end user, John, who is taking up his phone in Oregon and making a call to Jon Pierre, isn't selecting UPM.  John makes the call, it goes to his cell carrier, AT&T.  It so happens that AT&T has a wholesale relationship with UPM, where they direct international traffic through UPM as well as many others.  But that's a randomized, sometimes AI determined -- artificial intelligence software determined selection.  It goes to UPM,

and UPM then, Mr. Savage would say, employs the most economically rational means of getting it there, notwithstanding it may be illegal.

THE COURT:  Okay.  Understood.

How is Digicel-Haiti going to prove and quantify its damages on Roam Like You're Home in front of the jury at our trial?

MR. VAUGHAN:  That one is actually easier because Mr. Savage has indicated -- well, let me say this with a caveat.  Assuming that the jury believes -- which I don't -- that the records that we have received are the universe and the sum total of all of the transactions completed by UPM, then the measure of damages with respect to Roam Like You're Home loss is for every minute completed, Digicel-Haiti was denied 23 cents for that call because in that package that UPM combined was the Roam Like You're Home SIM and the call from John Smith in Oregon.

THE COURT:  And for any given call --

MR. VAUGHAN:  Say again.

THE COURT:  For any given call in that universe, how much did Digicel-Haiti actually receive?  I understand you're saying for any given call, had it not been done this way through UPM's Roam Like You're Home, Digicel-Haiti would have received 23 cents per minute.  How much, in fact, would or did Digicel-Haiti receive for any given call done this way?  It

couldn't be nothing.

MR. VAUGHAN:  Only the local component, the 10 cents.

THE COURT:  Pardon me?

MR. VAUGHAN:  Only the local component, the 10 cents. And then, of course, the subscription fee.  So we're not -- we're not claiming damages for that $25.  We're not claiming damages for the 10 cents.  We're saying that through the software, they combined two calls.  They paid for only one.

THE COURT:  And if John in Oregon would have called Haiti without going through this UPM Roam Like You're Home --

MR. VAUGHAN:  Digicel-Haiti would have --

THE COURT:  Would receive 23 cents per minute?

MR. VAUGHAN:  For every single minute of that call, correct.

THE COURT:  In fact, what they received was only 10 cents per minute, plus some portion of the benefit of that $25 charge.  Right?

MR. VAUGHAN:  The answer to your question, Judge, is yes.  The reason I'm hesitating is because Mr. Savage has posited, and there is one theory that the jury may accept, that to the extent that the transaction was combined, that the amount paid to Digicel-Haiti ought to be a net of what they received for that combined transaction.  So to the extent that there was 23 cents for the international call and Digicel-Haiti received 10 cents, then it should be 13 cents.

THE COURT:  Right.

MR. VAUGHAN:  And I disagree.

THE COURT:  I understand.

MR. VAUGHAN:  Okay.

THE COURT:  Under their theory, you'd also subtract whatever you received total for all of the $25 charges.  Okay.

MR. VAUGHAN:  Correct.

THE COURT:  You disagree with that theory.  Is that because you believe that one call, you should be receiving both 23 cents plus 10 cents?

MR. VAUGHAN:  Correct.

THE COURT:  Why?

MR. VAUGHAN:  You say "that one call."  What has happened is they have essentially combined two calls into one digital packet.  There are still two calls being completed, and it is undeniable, because if UPM now claims that it's a single call which was interrupted, it begs the question what did they initiate, what did they utilize their Roam Like You're Home subscription to complete?  It begs the question what did John Smith initiate?  What did he use his call and subscription to initiate and complete?  There are two calls.  Just because they have been able to utilize the technology to package them all, put their buddy Fred in the suitcase, it doesn't mean that two calls were not transmitted onto the network.

THE COURT:  Even though we only have one caller John

in Oregon calling Haiti, you're still saying that's two calls, and Digicel-Haiti should be paid for two calls?

MR. VAUGHAN:  We don't only have one caller John in Haiti.  We have John in Haiti directed to UPM.  UPM will tell you it initiated a call.  That's what UPM will say.  It initiated a call from its Oregon servers or for the in-country bypass.  Bypass, it will say the radio initiated a call from the radio in Haiti.  There are two transactions.

THE COURT:  However, if UPM would not have done what it did, and John would have just called Haiti in the normal way, there only would have been one call.

MR. VAUGHAN:  Correct.

THE COURT:  And so all that UPM -- all that Digicel-Haiti has really lost -- and then UPM Haiti would have gotten 23 cents.

MR. VAUGHAN:  Correct.

THE COURT:  So all that Digicel-Haiti really lost -- well, I guess Mr. Savage is saying they didn't lose anything, because what Digicel-Haiti got from that call was -- well, it was 10 cents.  That's what Digicel-Haiti got from that call.

MR. VAUGHAN:  Correct.

THE COURT:  Assuming that Mr. Vaughan is correct, that they didn't get anything from the roaming partner.  We'll get to that.

So what they got from that call is 10 cents.  If UPM

never existed or never committed fraud, then they would have gotten 23 cents.  Why isn't the damage under UPM -- under Digicel-Haiti's theory 13 cents?

MR. VAUGHAN:  Because there would not have been the additional utilization of the infrastructure.  Again, it is asking if, using your train analogy, Fred had never gone on to the train with the suitcase, his friend had simply bought the ticket legitimately, hadn't stowed away, just one guy on the train, it would have been the one ticket.

If you have -- if Digicel -- you have UPM initiating one call, packaging a second call, there are two calls that Digicel-Haiti is entitled to payment for.  It is inappropriate, it is frankly, I think, unsupportable to simply say it is economically rational for me to try to find the cheapest way to use your services notwithstanding what your tariff or your charge is.

THE COURT:  I'm going to ask both sides this question.  First, for Digicel-Haiti I'll ask Mr. Vaughan, and then for UPM I'll ask Mr. Savage.  Has Digicel-Haiti already provided and exchanged a damages expert report?

MR. SAVAGE:  Yes.

THE COURT:  And I take it has UPM provided and exchanged a rebuttal damages report, not on the counterclaims, but on --

MR. VAUGHAN:  No.

MR. SAVAGE:  And I can tell you why if it becomes necessary.

THE COURT:  Do you plan on having an expert witness? I mean, I don't know how you're going to do that without an expert damage report being provided.  Just through cross-examination of their witness?

MR. SAVAGE:  So not to presage too much, but --

THE COURT:  You don't have to.

MR. SAVAGE:  -- if you were to take a look at their damages expert, you would see that he says it is not based on any information about UPM specifically whatsoever.  And I'm going to move to exclude it entirely on that basis, first of all.

Second of all, we have asked for summary judgment on how one ought to calculate damages, and that is a purely legal question.  And assuming --

THE COURT:  Assuming you don't get an answer.

MR. SAVAGE:  If we don't get an answer, then we will present the evidence of the sort Mr. Tran has presented in his declaration, here are how many minutes, argue to you and the jury in trial, and to the Court of Appeals if necessary, how one calculates out-of-pocket damages in this context.

THE COURT:  Got it.

MR. SAVAGE:  I've got more things to say, but I'll wait because I'm not sure you're done.

THE COURT:  I'm done.  Do you want to say more things about damages?  Otherwise it's a good time for a break.

MR. SAVAGE:  Yes.

THE COURT:  Talk about damages.

MR. SAVAGE:  And maybe -- I'll presage it a little bit.  I don't normally do this.

Not only is Mr. Vaughan entirely wrong in his distinction, entirely wrong in his description of the money that flows from the U.S. roaming partner to Digicel-Haiti in the case of Roam Like You're Home calls, what he says is -- it directly contradicts what they alleged in their complaint and amounts to testifying by counsel about the content of these agreements which they refused to present to us, saying that they were irrelevant.  And so what I know about the way these roaming agreements work, I know because I have verbally beat it out of their -- not their expert, their 30(b)(6) representative.  So to have Mr. Vaughan going on and on about what these agreements say, I've read a lot of roaming agreements in my career and I understand what he's saying, but that's not even admissible evidence.  That is speculation, what they say.

I have to say this.  Paragraph 136 of the third amended complaint --

THE COURT:  That's what I was going to ask you.  What number?

MR. SAVAGE:  Paragraph 136.

THE COURT:  One second.

I am there.

MR. SAVAGE:  Okay.  Paragraph 135 says we're being illegal --

THE COURT:  Slowly, slowly.

MR. SAVAGE:  Okay.  135 says we're being illegal, we're being bad, and then it says the call is picked up by a U.S. wireless carrier that has a roaming agreement with Digicel-Haiti.  This is 135.  The U.S. wireless carrier then delivers the call to Digicel USA for delivery to Haiti.  "For these calls" --

THE COURT:  I said slowly.

MR. SAVAGE:  Okay.  "For these calls, the U.S. wireless carrier is billed on behalf of Digicel-Haiti, and pays a minimum of 23 cents per minute, subject to offsets or netting out."

All that means is if I owe you $100 and you owe me $110, you pay me 10 bucks.  But the payment, the charge of 23 cents per minute for every one of these Roam Like You're Home calls exists, and they allege that it exists.

MR. VAUGHAN:  Exactly what I described, Judge.

THE COURT:  One moment.

MR. SAVAGE:  And what that means is -- what that means is, yes, for every Roam Like You're Home call that UPM

made, Digicel-Haiti received both the 10 cents for us and the 23 cents from the U.S. carrier.

THE COURT:  What I'm hearing Mr. Vaughan say is had there been no fraud at all, had UPM never existed, would that call still have been made, they would have gotten 23 cents. What I'm hearing you say is, well, they got the 23 cents plus 10 cents.

MR. SAVAGE:  Correct.

THE COURT:  Therefore there's no damage.

MR. SAVAGE:  Correct.  This is a profitable business for them.  We were making them money by diverting calls away from the normal path that would just go to Digicel U.S.A. and get them 23 cents, and instead gave them 9 cents from us plus the other 23 cents.

THE COURT:  Why do you think they're complaining about it?

MR. SAVAGE:  I think they're complaining about it for several reasons:  One, it is a form of competition and they do not like it; two, even though they never imposed any contractual obligations banning resale, they don't like resale, and when they detect it to be happening, they cut off the SIM cards, which --

THE COURT:  Why?  They're getting more money this way.

MR. SAVAGE:  Honestly, I think the answer is -- the

honest answer is, as far as I can tell, they just didn't think about it.  There's a bunch of stuff in the depositions about how they had these whole AIs and algorithms that studied usage, and if it looks like it's being used this way, they'll cut it off.  And I don't think it occurred to them.  Frankly, I think -- again, shifting to the Communications Act counterclaim, Mr. Vaughan has made allusions in various pleadings to we didn't knowingly do this or knowingly do that, and I've always come back saying, knowingly has nothing to do with it.  It's not a scienter statute, it's what you do.

The reason I do that is -- without prejudice to what may happen at some trial some day -- I believe they had no clue.  I believe that they never thought about their obligations under U.S. law when they started doing what they were doing in the U.S., and as a result of never having thought about it, violated them.

THE COURT:  By the way, look at the next sentence on paragraph 136 --

MR. SAVAGE:  Yes.

THE COURT:  -- on the third amended complaint.

"The U.S. carrier also bills Digicel-Haiti a fee for handling roaming calls, including calls made under the Roam Like You're Home plan."

So to evaluate their real out-of-pocket costs --

MR. SAVAGE:  Excuse me.  I asked their 30(b)(6)

witness, who said they actually don't get charged for that.  I asked about that, and the answer was no, there wasn't such a charge.

MR. VAUGHAN:  Okay.  Where is that?

MR. SAVAGE:  That's in Mr. Laborde's deposition.  I don't know if I cited it, but it's there.

THE COURT:  I don't think you cited it.

MR. SAVAGE:  But --

THE COURT:  Okay.

MR. SAVAGE:  But in any event, yes, then the question is if the charge that they get charged is less than 10 cents a minute, which, you know, I'll testify now it surely is, the way these contracts work, but if it's less than 10 cents a minute, they're still making money, they're just making less.

THE COURT:  I understand.

MR. SAVAGE:  So all that said, I have to address this two call theory.

THE COURT:  Yes, you may.

MR. SAVAGE:  To the extent we are talking about United States communications law, the FCC has been presented with and has rejected the notion that when you link things together they're actually two calls repeatedly.  It first came up -- it comes up in a lot of ways.  It comes up when someone is call forwarding from point A to point B in the old days.  It came up in the context of back when we used to have dial-up

ISPs, there was a big fight on whether or not if the call stopped at the modem, on and on and on.  The FCC always looks at a call as an end-to-end communications path, and all this talk about digital encapsulation and Fred hiding in a suitcase, you know, A, that's not the way communications law works in the United States; B, it is technically inaccurate, because the only thing that we buy from them when we buy a -- let's say down in Haiti, in-country bypass, the only thing we buy from them is a communications path with certain technical characteristics.  You have so much bandwidth, you can put so much volume in, so much -- you know, so much frequency variation.  But what the content of that call is is up to you, the user, not them.  And the two call theory boils down to saying if you use one content, Joe or John, standing in Port-au-Prince saying something, it's 9 cents, but if you use different content, it becomes a different rate.

I can imagine a world in which that kind of regime was imposed by contract or by tariff, just as I can imagine a regime that says if a human being is on the train, they've got to buy a ticket.  But that's -- we're not in the contract world.  We're in a world of fraud, and there's nothing -- there is no provision of any binding legal authority anywhere that says we can't do that.

This is the point of my hopefully slightly humorous thing in my opening brief about Mr. Vaughan owing me 5,000

bucks for copying the brief.  I can declare he has to go to my website and pay 5,000 bucks, but the fact he gets it for free from ECF isn't fraud.

THE COURT:  Let me ask before we take a break, Mr. Vaughan, is there anything you would like to say before our break?

MR. VAUGHAN:  I'm trying to be disciplined.

THE COURT:  No need.

MR. VAUGHAN:  Okay.  One, I am desperately looking for what Mr. Savage just described as, you know, a suggestion that there is no charge to Digicel-Haiti, because I think that is incorrect.

Number two, I think the Court is mindful of and fully aware that what Mr. Savage just offered up, outside of analogies -- which we've all been freely using, and I love a good analogy just like everybody else -- is testimony.  That does not show up anywhere in the record and ought not to be considered, because there is nowhere in this record that 60 percent of what he just said outside of the analogies appears.

MR. SAVAGE:  If that's the standard, they lose on Roam Like You're Home because they did not contest a single thing that we said in our motion.

THE COURT:  Okay.

MR. VAUGHAN:  You can have the last word, Chris.

THE COURT:  No, I'm getting the last word.  But I'm going to ask you a question.  What would you all like to do?  Let me tell you our constraints.  We have a 1:30 -- I have a 1:30 call in another case, in a civil case.  What do you think?

How long do you think, Mary?  Fifteen minutes?

THE COURTROOM DEPUTY:  Yes, at most.

THE COURT:  Fifteen minutes.  That's at 1:30.  At 3:00, I have a very serious criminal matter, but I don't think that will take more than 15 minutes, notwithstanding it's serious.

Mary, do you agree?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  About 15 minutes, and that's at 3:00.

And I really have a hard stop.  I need to leave the building at 4:30.  You don't have to have all that time.  If you wanted to be much more efficient, tell me in a few minutes.  I've got to give Bonita a break, and probably all of you, too.  We can take a relatively short lunch break, like 30 minutes or something, start up at 12:30.  We can wrap everything up by 1:20, but I do have to excuse myself at 1:30 for 15 minutes.  If we come back, that's fine, but then I'll have to excuse myself again at 3:00.  You can tell me what you all want to do.

Let me tell you right now my tentative reactions to this, and although I think intellectually what Mr. Savage is saying about some procedural points on summary judgment is

probably right, when I hear both sides telling me that the factual recitations by the other are incorrect, and we're talking about damages, not liability, my instinct is to say I want to look at this again after everybody has given me their trial documents. And in all candor, I probably -- unless it's totally clear and obvious to me what to do -- will let it go to the jury. And in all candor, unless it's totally clear and obvious at the motion for directed verdict or judgment as a matter of law, I'll probably let the jury decide, and then we'll all untangle things, if need be, on a closed written record in renewed motion for judgment as a matter of law so that whoever doesn't like what I rule can take it up to the Ninth Circuit and they can untangle it again and I won't have to try the case a second time.

So that's probably where things are going to end up.

MR. SAVAGE:  The one thing I would say is liability is damages.

THE COURT:  I understand your point.

MR. SAVAGE:  But the second point is I think the discussion of the human behavioral software issue --

MR. VAUGHAN:  I'd also like to talk about that as well, Judge.

I'm sorry, Chris, for hijacking you there.

THE COURT:  We're going to come back.

MR. VAUGHAN:  Say again?

THE COURT:  We're going to come back.  I just don't want to get into the merits of that discussion now.

MR. VAUGHAN:  I'll stop.  Okay.

THE COURT:  So let's do an inventory.  What do we want to talk about when we come back?

MR. SAVAGE:  I have much to say about the human behavioral software.

THE COURT:  So does Mr. Vaughan.

MR. SAVAGE:  To presage it, I agree with you that the record is not clear, but I'm going to try to convince you that that is an immaterial fact.

THE COURT:  Okay.

MR. SAVAGE:  And then I think I may want to spend a very small amount of time on one of the issues on the individual defendants, but that will be a very brief point I'd like to suggest.

THE COURT:  On Sanchez -- Never mind.

MR. SAVAGE:  One of the individual defendants.

THE COURT:  Which one?

MR. SAVAGE:  Mr. Tran.  I want to make a point about that.

THE COURT:  So you want to talk about the human behavior software and Mr. Tran.

Mr. Vaughan, what else would you like to talk about when we come back?

MR. VAUGHAN:  I wanted to touch on the human behavior software as well, Judge, one very brief factual point which, frankly, I might not even raise because I understand the constraints on how you have to view the evidence.  I just wanted to make sure that your observation was not a finding as it was an articulation of what you must accept at this point.

THE COURT:  Yes.  My plan, at least the way the tentative opinion has been drafted, I'm not making any findings of fact that will preclude the jury on issues, I think.  Call my attention to something that you're worried about, and we'll clarify that.

MR. VAUGHAN:  Then I would probably be very brief.

THE COURT:  Call my attention to that.

Let me ask you, given that I absolutely must step aside a few minutes before -- Mary, is it 1:30 that we have that call?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  Do you want to come back at 12:30?  12:40?  12:45?  1:00?  What do you want to do?

MR. VAUGHAN:  I defer to the folks on the West Coast because I had a 20-minute snack.

THE COURT:  Thank you, Mr. Vaughan.

Bonita, how much time do you need?

THE COURT REPORTER:  A half hour.

THE COURT:  Your minimum is a half hour.  If you

really want more of a break than that, just tell me.

MR. SAVAGE:  So why don't we plan to come back at 1:00?  Do you need to break at 1:20?

Why don't we come back at, like, 10 minutes of 1:00 -- that gives us time to grab something -- and then spend whatever it is, half an hour.  I will try, subject to hopefully not elaborate questioning, I will try to make my points about human behavior software within that half hour, take your call, Mr. Vaughan -- and then I think we can wrap up.

THE COURT:  All right.  We'll come back at 12:50. Keep in mind -- and I know you know this.  Keep in mind for the human behavior software issue, it's not going to get you anywhere at summary judgment to say that Mr. Ruiz didn't know what he was talking about.

MR. SAVAGE:  Understood.  My argument is going to say let us assume for purposes of this argument that we deployed human behavioral software, that we used it to make everything look just like a normal human being.  That's not a material fact.

THE COURT:  Okay.  And obviously, just so we're on the same page, you know that I'm only looking at that issue from the perspective of Oregon law -- really it's pretty much common law -- on active concealment.  I agree it's not a misrepresentation.  There's no -- I don't view that as a half truth.

MR. SAVAGE:  Understood.

THE COURT:  What bothers me is the active concealment.

MR. SAVAGE:  Understood.  And they failed to convince you, but that's the job I'm taking on.

THE COURT:  All right.  Sounds good.  So we'll come back at 12:50 Pacific Time.

MR. VAUGHAN:  Should we log off on this or --

THE COURT:  Mary, does it matter?

THE COURTROOM DEPUTY:  No, not until 1:30.

THE COURT:  You don't need to log off if you don't want to.  I don't know how much you're being billed per minute.

(A recess is then taken.)

THE COURT:  All right.  I think the floor will be yours, Mr. Savage.

Mr. Vaughan, can you hear us?

MR. VAUGHAN:  Yes, sir.  Loud and clearly.

THE COURT:  All right.

MR. SAVAGE:  May I get started?

THE COURT:  Please.

MR. SAVAGE:  So just the briefest of brief codas on the issue of damages.

THE COURT:  All right.

MR. SAVAGE:  Both preparation for trial and presentation of facts to the jury, in our view, would be

materially enhanced if the legal questions that we posed, which is to say the theories of how you calculate damages, what are recoverable damages, could be decided on the motion, because as you can just see from the exchange, there are vastly different things that will come into play, depending on what counts as in or out.  So we moved -- our motion was for how you calculate damages, and that's -- we feel fairly strongly about that for case management, if you would see clear to do that.

THE COURT:  No, I agree, although let me add to you a little more by way of coda as well.  You cited a case in your motion for summary judgment, an Oregon case, *Dizick v. Umpqua Community College*.

MR. SAVAGE:  Yes.

THE COURT:  It's an Oregon Supreme Court decision from 1979.  You cited it on page 11, primarily for the proposition that each element of common law fraud must be proven by clear and convincing evidence, and that's correct.

You also cited it on page 31 of your brief, where you correctly cited it for the proposition that the rule is applied flexibly to compensate the plaintiff for losses actually incurred.

MR. SAVAGE:  Yes.

THE COURT:  You cite the *Morasch* case previously, in the previous sentence for the out-of-pocket rule, but that arguably is limited to certain circumstances.

When I delve into the *Dizick* case, let me share with you something that I see. And I'm not going to make any final decisions now, but I do understand and agree with you that as the parties prepare for jury instructions and/or judgments as a matter of law or even whatever arguments you want to make when the evidence is presented at our final pretrial conference, it will be helpful to know when I'm thinking about damages -- and I agree with you.

But let me share with you from this *Dizick* case something really interesting, I think, maybe confusing. Do you know what the facts of that case were? And if not, it's totally fine.

MR. SAVAGE: I did, but there's a lot of cases. Which one was this? I apologize.

THE COURT: That's fine. Here's something that I just read about that case. In *Dizick v. Umpqua Community College* -- and that's 287 Oregon 303, 1979 -- a student sued the college for fraud, alleging that the college misrepresented the training that the student was to receive. The Court -- the Supreme Court of Oregon held that the student could recover the wages that he would have earned had he worked instead of going to school.

The following quote appears from that case at jump cite 312: "When the alleged fraud does not involve the sale of property" -- which, by the way, the *Morasch* case did -- "the

proper measure of damages must be flexible to compensate the plaintiff for whatever loss the plaintiff has suffered."

And if we look at it just as a matter of out-of-pocket damages, if a student chooses to not go to work, not accept a job, and instead go to college, community college, in reliance on some misrepresentations about the type of training he'd receive and how that might benefit him in the future, if you were just to ask what were the out-of-pocket costs of that student, it might be tuition, but, frankly, for a community college, tuition is not going to be very great.  But that student gave up for one or two years or one semester -- I don't really remember right now -- gave up for some period of time the income they would have earned had they gone to a job and worked for that semester or year or two years.

Now, is that out-of-pocket damages?  No, I don't think it's out-of-pocket.  The only out-of-pocket would be the tuition, maybe the books, maybe the parking at the community college.

MR. SAVAGE:  Your Honor, I think that's exactly right, and I think that makes my point.

THE COURT:  Well, tell me how, because that means that we are more flexible than simply -- simply looking at out-of-pocket damages.

Now, even though applying what you said and what Mr. Vaughan said -- and some of these facts aren't in dispute,

at least between the two of you.  I'd have to look at the record again.  But it seems to me that I need to look at and see what is the evidence of -- essentially for any given call that was made or, you know, any quantity of calls that were made, how much did Digicel-Haiti actually receive versus how much would they have received if essentially those still originating callers would have made those calls to Haiti had UPM not existed or not committed any fraud or not used Roam Like You're Home.  And if there's a positive difference there, that difference, seems to me that it would have been the right measure of damages.

MR. SAVAGE:  And let me be clear.  If you look at our pleading, that's what we proposed.  That's exactly what we proposed.  And what we said is -- you know, what we said as well, how much were they hurt?  They were hurt by that net, whatever it might be.  And the only legal dispute that I hear, although it wasn't briefed by Mr. Vaughan, is we said you take off the taxes.  He said no, you don't, but didn't explain why, even though his witness and his expert both said you take off the taxes.  But yeah, that's what we asked for.

Now, the next step -- and this is where, frankly, the flexibility comes in.  Right?  What I think the Court was doing -- and now that you've said it and I do remember it, what the Court was saying there is -- what the Court affirmatively did not do was apply a contract expectation damages.  Well,

gee, if he'd gotten the training that he was supposed to have gotten, he would have made $50,000 a year instead of $40,000 a year, so he gets the marginal 10.  What the Court is asking is how much was he really hurt.

THE COURT:  Right.

MR. SAVAGE:  Okay?  And it's flexible.  The maximum amount that he was really hurt was the tuition, whatever it was, and I guess that was probably negligible, plus the money he didn't make because he was in school.

The maximum amount that Digicel-Haiti was hurt is a spread between the 23 minus the 5, minus what we paid them.  And irrespective of the metaphysics of multiple calls and packaging, digital pack and all that great stuff, that doesn't affect how much they were hurt.  To get that next increment of money that they seem to be asking for requires an adoption of a contract-like standard and not anything like an out-of-pocket standard.

But we quoted the point about it being flexible for precisely that reason.  Fraud being fraud, you never quite know what the right fix is, but it sure isn't contract damages.

THE COURT:  And the reason why I bring this up is I was maybe reacting maybe too aggressively to your statement that the measure is out of pocket.  And I think it's not so limited to just what did they have to spend out of pocket.

MR. SAVAGE:  I think that's fair.  I mean, don't get

me wrong.  I would be delighted for you to rule that as long as they covered their costs, they have no damages.  I think that's true, but merely -- merely ruling what we've asked you to rule here, that it can't be more than that, will go a long way to clarifying things.

THE COURT:  I think what I'm thinking is the right measure of damages is how much did they receive.

And by the way, I can't recall the case at the moment, but it looks like it's net, not gross, which may affect the taxes.  How much did they actually receive and how much would they have received had there been no fraud.

MR. SAVAGE:  Right.  And it's clear the amount they would have received had there been no fraud is the 23 cents either minus the 5 cents or not -- we think it should be -- and then whatever we paid them.

THE COURT:  And by the way, just on that tax issue, and what we may end up doing, just so we don't have to try the case twice, is give some special interrogatories to the jury about gross and net, and we'll see how that develops.

But I will share with you both that there is also an Oregon Court of Appeals case that even when they talk about lost profits being recovered under circumstances when they can be, those are limited and unambiguously limited to net profits. Among other cases, *Cruz Development* -- C-r-u-z -- *v. Yamalova* -- Y-a-m-a-l-o-v-a -- 174 Or App 494, at a jump cite

497 from 2001.  They're quoting a communications case, *Frogge* -- F-r-o-g-g-e -- v. *U.S. West Communications*, 120 Or App 619 at 620 from 1993.  I'll take a closer look at that.

I may or may not be in a position to decide what to do about taxes now, but it's becoming a little bit clearer what the right measure of damages should be, whether there is a fact dispute on that or not sufficient for summary judgment.  I may end up just simply punting on that.

MR. SAVAGE:  Understood.  And obviously we would, from our perspective, if you're going to rule for us, we don't want to go to the jury.  If you rule against us, of course we want to go to the jury, right?

But on the assumption that despite my eloquence you're probably going to let some aspects of this case go to the jury, again I would urge you under the Rule 56(a) partial summary judgment approach, to the extent that you can be persuaded or have been persuaded this is how we measure damages, this is how we look at this, those rulings would not just help the trial -- they would definitely help the trial, but they would also spare the parties a lot of angst and work going into the preparation.

THE COURT:  And the way I do it, too, I view 56 primarily as can we get rid of issues -- claims, issues, and maybe even facts.  I will also probably express some tentative views on the law.  And then the way I normally do things as we

go to trial anyway is four weeks before our pretrial conference, the plaintiff sends in a lot of their pretrial documents -- if you haven't already seen it, my civil trial management order, it's there -- and then the next week the defendant does, and then the third week -- or really two weeks before the pretrial conference, both parties send in some more things.  And among other things, besides exhibits, perpetuated depositions -- or rather depositions in lieu of testimony, exhibits, witness statements, exhibit lists, I also ask the parties to send in proposed jury instructions.

Now, here don't bother -- neither side, don't waste your time with the noncase-specific substantive instructions. You'll see well before our trial what I'm planning on doing there, and if you think I've left something important out, you know, treat all corporations fairly like people, or something like that, fine, mention it and we'll add it if it's appropriate.

But spend your time on the substantive instructions, which if all we're going to do is just fraud by active concealment and damages, that's really what you should focus your time on.  What are the elements of fraud by active concealment?  How do I explain that concept to a jury and what are the relevant damages?

So you give me your -- both sides' views on an appropriate damages instructions.  I will give you well before

trial and probably even before our final pretrial conference, like I did with this tentative opinion, my tentative jury instructions.  That's where you can tell me if there's some nonsubstantive instructions you'd like me to add or take out, fine, but that's where you're also seeing what things are going to look like.  And I will start that process in this opinion by expressing some views, but I don't expect that they will be the final word on the law of recoverable damages.  But start or at least continue the instruction.

Mr. Vaughan, did you want to say anything further on damages before we move to talking about human behavior software?

MR. VAUGHAN:  The short answer is yes, I do, but discretion is the better part of valor.  I think you understand our position.  I think you have been very patient and you've made it clear kind of where you're leaning and what you might expect from us going forward.  So I know what my task is going forward.

THE COURT:  Thank you.

All right.  The -- what is it called?  Human behavior software.

MR. SAVAGE:  Okay.  So I'm trying to think of the best way to move forward.  Probably the best way to frame it is this.  There is a purely legal issue on undisputed facts sitting in front of you that you may have already decided --

you sort of alluded to it -- that I think, depending on how you decide it, makes the human behavior software question entirely irrelevant.

And that issue is the nature of the implied-in-fact contract that we assert exists and existed between UPM and Digicel-Haiti.  I want to tell you why.  What we say is -- we laid out -- and there seems to be no dispute as to this.  The way it works is we get a SIM card, you know, from a vendor on the street, pick it out of the garbage -- whatever, we get a SIM card, it's sitting in their network in inactive status.  We activate it, and that has the practical effect of creating an account on their system, okay, this is a live thing now.  And then we do the top-up and put money in it.  We say put money in this account, you know, 202-256, blah, blah, blah.

It is our contention -- and I think it's probably undisputed when you think about it -- that creates an implied-in-fact contract, saying, okay, you can use that SIM card to make calls.  Because otherwise why would we give the money?  There's no rational explanation for that.  So there we go.

Because there was no click, I agree, there was no sign here, no blah, blah, blah, that's all there was.  And so in particular, there is nothing in that contract that says we're not allowed to bypass.  There's no restriction in any contractual term between us saying we can't bypass.

Therefore -- I mean, Haiti is in the French tradition.  What is it the Germans say?  Anything that isn't expressly permitted you can't do, and the French say anything that isn't forbidden you can.  Well, we can.

Let me shift gears and give you a hypothetical.  I'm going to put in a plug for my son.  Ryan Savage is the bassist in a band called Arlie, A-r-l-i-e.  They're a great band.  Look them up.  They appeal mostly to kids their age, 24, 25, that sort of thing.

So suppose hypothetically my son is performing at some venue in Portland tonight -- I wish he was -- and I have a ticket.  And I'm allowed to go to that concert, but suppose the doorman at the concert says, "Old guys shouldn't come in here, it messes up the vibe."

THE COURT:  It is my belief that really happens in Portland.

MR. SAVAGE:  So here's the deal.  I want to come see my son play.  I've got a ticket that gives me the right to play, but I know the doorman is at least going to hassle me and maybe not let me in if he sees me.  So what do I do?  I actively conceal my age by -- I grow hair, I put on face --

THE COURT:  You get a fake ID that says you're 16.

MR. SAVAGE:  Right, exactly.

Hypothetically, my son -- but the point being, I could be acting in a skulky, concealing way to make sure that

something bad doesn't happen in the course of doing something I'm allowed to do, and whatever fraud act of concealment is, it isn't that.

And what that means in our case is if there is nothing forbidding us, if there is no legal obligation on us from any source -- and we contend there was not -- that made bypass unlawful, then it literally doesn't matter if we skulked around doing bypass or had a big sign saying bypass, bypass, bypass. It was legal in either case.

Now flip it around. Suppose, hypothetically, that by virtue of Haitian law, by virtue of the moral rights of the universe, by virtue of some binding legal reason, we're not allowed to bypass. Okay. Then every minute that we bypass is a source of liability. If we weren't allowed to do it, we weren't allowed to do it. And whether we sculked around to do it or not, we still owe them whatever the appropriate measure of damages is in either case. It literally --

THE COURT: There would be no misrepresentation or omission, and maybe they could sue you for implied contract under your theory.

MR. SAVAGE: Sure. As I said in one of the briefs, dismissing their fraud claim doesn't mean they are legally unprepared to deal with this problem. It just means that a fraud claim is not the right way to do it. But the point is, skulking or not is totally beside the point in this case. What

matters is whether what we were doing was okay or not.

Another example.  I have a right-of-way across a field to get to my other field.  The guy who's managing the field I have to cross doesn't believe me or doesn't know about it and shoots trespassers on sight.  I need to sculk across that field, but I'm not doing anything wrong.

And so the whole issue of human behavior software goes away once you recognize that either what we were doing was legal or it wasn't.

THE COURT:  Let me ask you under your hypothetical with your son's band, would the band venue, would the music venue be allowed, even though you bought a ticket, be allowed to look at you and say, wait a minute, you're over 30, you're not welcome here.  I don't care if you have a ticket.  Would they be allowed under your hypothetical to say, fine, then you can't come in?

MR. SAVAGE:  That's a very interesting question.  Okay?  In my band hypothetical, the answer is no, I've got a ticket.

THE COURT:  In this situation, putting aside your Communications Act counterclaim --

MR. SAVAGE:  Right.

THE COURT:  Put it aside because let's assume -- Put it aside.  If in Haiti it is perfectly permissible for Digicel-Haiti to say, we are not going to honor SIM cards that

are used like in this aggregated fashion, only if they're purchased by individual users, put into individual phones.  If that is allowed, if they're allowed to block your card, if they're allowed to deauthorize -- which by the way, I don't like that word because it's not a real word, but --

MR. SAVAGE:  Deauthenticate.

THE COURT:  That's what I like.  If they're allowed to deauthenticate the cards, if that is allowed for them to do in Haiti, then fine, you can buy your cards in Oregon or get -- you can buy your cards and have them shipped to Oregon, but if they are allowed to deactivate them, then I think you violate -- I think UPM violates Oregon law, commits common law fraud by actively concealing how these cards are being used in order to, if you will, bypass their deactivation.

MR. SAVAGE:  So what you're posing is actually -- it's an interesting philosophical question but also a legal question, which is how does this notion of active concealment interrelate with the famed fallacy of the excluded middle.  Right?  If we unequivocally, completely, totally have the right to use these SIM cards for bypass, then it literally doesn't matter whether or not we skulked around.  If we absolutely had no right to do it, then it doesn't matter that we skulked around.

THE COURT:  Not necessarily.  Here's the nuance.  If they have a right -- you have a right to use it unless they

stop you, but assume that they have a right under Haitian law to deactivate it.  If that's the case, if they're within their legal rights to deactivate, and you don't want to be deactivated, are you allowed under Oregon common law fraud to engage in active concealment, basically to use a fraudulent ID card in order to get around their lawful deactivation?

And I think, at a minimum, that's going to be a jury question.  I'm not going to rule on summary judgment in plaintiff's favor on that point.  That's why in part I denied their affirmative motion for liability summary judgment on fraud.  But I think that that seems to fit within the four corners of active concealment if they are allowed to deactivate in Haiti.

MR. SAVAGE:  Well, two means of response.  One, I agree with you -- I mean, it's going to presage the testimony. I agree with you that looking at what is in the record right now, there is a dispute of fact as to whether or not we did human behavior software.  So that's there.  So I'm working on the assumption for purposes of this argument we did.  Let's just say we did.  Okay?  I'm not sure that I agree with you that -- it's definitely a jury question whether we did.  I don't know that I would agree with you that it's a jury question as to whether that constitutes active fraud by active concealment.

THE COURT:  Okay.

MR. SAVAGE:  That sounds to me like a legal question. Now, it may be that some day I'll regret those words, but if the facts are what they are, the question is is that active concealment.  I mean, let's assume -- again, let's assume for discussion we did this.  Right?  And what we did means whatever it means.  Relying on the facts, that's a -- anyway --

THE COURT:  Well, the definition that I'm working on for active concealment, of what is active concealment -- and you'll see it primarily on page 24 and a little bit on to 25 of my tentative opinion -- is the following:  Any words or acts -- and I think here we don't have words.  Any acts that create a false impression, covering up the truth.

And here where I think that looks like active concealment is the truth is that these are SIM cards being used in the aggregate in a SIM unit as opposed to by individual subscribers or individual handsets, or which somehow remove an opportunity to discover it.  I think at least viewing the facts in the light most favorable to the plaintiff here, the purpose of using the software is to make it more difficult for them to discover that these are not individual subscribers using individual SIM cards, because you know that if they did discover it, they'd deactivate the card.  So that's one way in which -- or two ways in which this is active concealment.

Relatedly, looking at the Fourth Circuit decision on *U.S. v. Colton*, discussed on page 25, obviously active

concealment is different from nondisclosure.  The former, active concealment, is characterized by deceptive acts or contrivances intended to hide information, prevent further inquiry.

So what's the information that's being hidden?  That this is not really -- this call coming in on this associated SIM card is not really from an individual subscriber having one SIM card in a handset.  And that's why, although I'm not going to go all the way and give summary judgment for the plaintiff on the question of is there active concealment, I think that's why there's enough for a jury to ask the question, is there active concealment.

MR. SAVAGE:  Fair enough.

And I think we may be just speeding past each other.  Sure, the jury can -- a factual question will be -- if we go to trial on this, there will be a factual question of -- and I want to get to this -- what is meant by human behavior software, did we use it, on how many SIM cards, for how long, in what circumstances, and in effect how many calls got through by virtue of human behavior software.  And, you know, spoiler alert, not many, but that does raise a flip-side question here, which weirdly came up in an FTC case.  I'll spare you the details, but if using human behavior software is bad for some reason and if we're allowed to use these SIMs for bypass -- if we're not allowed to use SIM for bypass, you don't have to get

there, we're done, we owe them whatever we're going to owe them, right?  But if we're not, you know --

THE COURT:  I understand that point.

MR. SAVAGE:  Let me finish my point here, which is if human behavior software is bad, what is the standard of use of SIMs for bypass that wouldn't be bad?  And I would submit there is none, and I would submit that nobody has the possible slightest clue what it would be.  Do we have to use the same SIM over and over until it runs out?  We're not allowed to spread them out one to the other?  If we spread them out one to the other, why does it look so much like a human that we've started doing things?

My point would be I don't see how it is possible to say that -- simultaneously possible to say it's okay to use this for bypass but not in this way, which again gets back to my point --

THE COURT:  Here's where I'm disagreeing -- and you can tell me where I'm wrong on this, but I think you've left something out.  Let's also assume under your hypothetical it's okay for you to use a SIM card for bypass, but it's also okay for Digicel-Haiti, if they see that being done, for them to deactivate.  Then what you're not allowed to do is misrepresent facts in order to avoid or make it more difficult for them to do what they're allowed to do; mainly, deactivate.

MR. SAVAGE:  But this is exactly the point I'm

making.  Assume for purposes of discussion that that's the ruling in this case and we appeal it up and the United States Supreme Court 9-0 says that --

THE COURT:  A little more likely 5-4.

MR. SAVAGE:  6-3 today.

In any event, we have this solid Supreme Court case that says exactly what you just said.  And so UPM says, this is a good business, I want to go back and do it again, but I don't want to get in trouble.  What is the standard of behavior that that rule establishes?  And the answer, I submit, is there is none.

THE COURT:  No, I think the response would be don't do anything that intentionally misrepresents the facts.

MR. SAVAGE:  And then the question is, therefore, but -- because there is no objective standard of how I should distribute calls among SIMs, what that boils down to is bypass with a pure heart.

THE COURT:  Okay.

MR. SAVAGE:  And then again, the human behavior software doesn't matter.  What matters is the intent.

THE COURT:  Well, the human behavior software by itself, using a piece of software is not going to be, I think, active concealment.  What is active concealment is doing some act that misrepresents the facts or hides the facts, distorts the facts or makes it more difficult to discover the true

facts, with the intent of accomplishing that result; mainly, deceiving Digicel-Haiti.

MR. SAVAGE:  But then -- and this gets back to the fallacy of the excluded middle problem.  If our intent was nothing more than to make use of the services we bought in a way we were allowed to do, notwithstanding that they're allowed to cut us off if they decide, if our intent is to do what we want to do, what we're allowed to do, how can it be fraud?  I think the answer is it can't.

And one of the cases, the *Sizer v. Eland* (ph) case on page -- footnote 70 of our reply brief, I think -- but I'll point it out -- says when you have activity that can be -- commercial activity that is susceptible of a fraudulent or nonfraudulent interpretation, the law will not presume the fraud is there.

And therefore -- again, getting back to my point, if we were allowed to use the SIMs for bypass, if that was legal, we said we want to use the SIMs for bypass and we're going to do this, I would submit it can't be fraud by active concealment.  It can't be fraud at all because the requisite intent isn't there.  You can't have fraudulent intent to do something you're allowed to do.

THE COURT:  But if the fraudulent intent is to mislead another party -- here Digicel-Haiti -- into believing a certain state of events exist in the world when those aren't

the real events.

I really do need to leave now for 15 minutes or less.

MR. SAVAGE:  Okay.

MR. VAUGHAN:  Judge, he filibustered me.

THE COURT:  No, you can come back.  You can have the floor when we come back, but I'll also tell you, too, he filibustered you but he didn't win.  All he's pointing out is this is something that both sides will need to address if they want to.  First of all, the next opportunity will be in the jury instructions, when I tell the jury what is active concealment, because I'm not going to rule that there is active concealment as a matter of law.  I'm going to give that to the jury.  I'm also going to have to then explain to the jury what is active concealment.

Now, you can tell my first starting point, it's going to be what the cases say and the Restatement and things like that.  But you'll both have an opportunity to give me input into these jury instructions even before the trial begins.  I really like to have as much of the important jury instructions finalized before you even begin your opening statements so you know what things are going to look like.  Some things we might have to adjust or some things will have to wait until the evidence comes in, but stuff like this we won't.

MR. SAVAGE:  Perfect.

THE COURT:  I don't know what the evidence will show,

but you'll know what the law is I'm going to instruct.

MR. SAVAGE:  Should we depart?

THE COURT:  No.

Mary, I'm going to do this in chambers.  We can do this in chambers.

You can hang out here.  I'm going to take this call in chambers, deal with another case, and be back in less than 15 minutes.

MR. VAUGHAN:  Thank you, sir.

(A recess is then taken.)

THE COURT:  All right.  Cloture has been invoked.

Mr. Vaughan, the floor is yours.

MR. VAUGHAN:  Thank you so much.  May it please the chair.

I will be very brief on the human behavior software. I did have some initial questions, which your exchange with Mr. Savage has answered for the most part for me.

I think, however, to put a fine point on Your Honor's analysis and the rationale behind your decision, I would just point us to the deposition testimony of Mr. Baltazar Ruiz, a member of the UPM leadership team, actively involved in the management of its IT software.

Following an exchange with Mr. Savage on redirect, I inquired of him about human behavior software, and I said, "So I'm glad you're remembering.  So it is software, complex

software that was utilized by UPM to emulate human behavior, correct?"

And that's at page 288 of Mr. Ruiz's deposition.

He answers, "Yes."

"Question:  And it was to emulate human behavior to avoid bypass detection, correct?"

He answers, "Correct."

I asked, "And it was to emulate human behavior so that carriers -- in this case Digicel-Haiti -- would not be able to identify SIMs being used by UPM for bypass, correct?"

And Mr. Ruiz answers, "Correct."

At this stage on summary judgment, it belies reason that even Mr. Savage would dare to argue that this is a point that there is no material fact in dispute upon which Your Honor can make a ruling on summary judgment.

THE COURT:  Let me just ask you for the clarification of my opinion, did you just cite or quote anything that I did not cite or quote on page 21?

MR. VAUGHAN:  No, I don't think so.  I think it just bears repeating as to why your analysis --

THE COURT:  Anytime anyone wants to tell me why I was right, you go right ahead.

MR. VAUGHAN:  But I think in everybody's interest, and to be time conscious, that was all I wanted to point out with respect to human behavior software.

I think Mr. Savage's point, which appears to be a more academic one, that human behavior software can be used in an innocent fashion, you have dealt with, or at least for purposes of our conversation, nobody is saying that ab initio just deploying the software means you're guilty of something. It is the intent behind the software. It is the intent behind what you are utilizing it to do. And it is crystal clear, as is confirmed by Mr. Ruiz and the other circumstantial evidence, that it was being used as a bypass detection avoidance mechanism. I think on summary judgment, the conversation ends.

THE COURT: Thank you, Mr. Vaughan.

Anything further on that topic, Mr. Savage? Otherwise we can move on to another topic.

MR. SAVAGE: No, no. I'd just say I agree that there is a conflict in the testimony about this, and my argument was on that assumption.

But the last point I want to make -- I'll be very brief, because there is a sense in which I honestly don't care, but the reason that I don't care is why you should rethink your ruling, and that is allowing Mr. Tran to be dismissed as an individual defendant.

The reason I don't care is the principal defendant is UPM. UPM is a functioning, solvent corporation. In the unlikely event of some gross miscarriage of justice that we are held liable for some activity down in Haiti or what have you,

there is not the slightest doubt that UPM will pay that judgment and it will be done.  So Mr. Tran's actual exposure in this case is effectively zero, which is kind of the point.  Okay?  Because the Oregon courts are extremely clear that you respect the corporate form unless you really need to set it aside, and you really need to set it aside when, you know, not just the corporation can't pay a judgment, but it can't pay a judgment because it's been looted, because it's -- bad stuff has been done.  And there's absolutely no evidence of that here.

And the problem I have -- I saw the case you cited, I understood -- I see where you're going with that.  The problem is there is actually no real limit to applying it in the absence of the other -- the statement that gee, if a CEO is actively involved in promoting some kind of fraud, you can hold him personally liable, I don't think Oregon law says, and in that case ignore everything else about piercing the corporate veil, right?  There needs to be something more.  And here there just isn't anything more.  The evidence is they said in their complaint, Mr. Tran directed these things, and he's the CEO.  Sure, in some sense he's responsible for these things.  Did they cite any evidence?  Is there any evidence that he sat around and plotted how we're going to do what we're going to do in Haiti?  No, because Haiti wasn't that big of a deal.  It wasn't taking up a lot of his time.

I'm not contesting the fact that the law says what it says, that if you have a sufficiently involved, sufficiently horrible, sufficiently fraudulent CEO, sure, you can hold him or her personally liable, but on these facts, everything -- taking everything as true, if that's enough to set aside a separate corporate existence, then most Oregon law about separate corporate existence isn't Mr. Tran.  I think you should dismiss him too.  Obviously, if they win, they get money from him.  It just seems --

THE COURT:  Fair enough.  Let me share with you what I was thinking on that.

First of all, let me make clear to everybody involved, especially Mr. Vaughan, I'm not going to let you amend the pleadings to add a separate theory of alter ego or pierce the corporate veil.  I made that clear on March 17 on page 34, that's not happening.  We're beyond amendment of pleadings.

MR. VAUGHAN:  Can I beg and plead and ask you to reconsider and think about it and sleep on it?

THE COURT:  You can, but then I will still answer no.

MR. SAVAGE:  I said that to my kids.

MR. VAUGHAN:  Understood.

THE COURT:  Okay.  And some of the cases that I cited I think were even my own.

But in response to what Mr. Savage just said, the

perspective that I'm coming from -- and frankly, this is the first case of alleged bypass fraud or telecommunications bypass that I've ever seen.  And I love working with you all, but I'd like this to be my last case of telecommunications bypass.

But what I've seen a lot of is securities fraud allegations, and there the allegations are not only against a company that's allegedly responsible for making false statements, but the individuals within the company that make the false statements.

If all we had alleged against Mr. Tran was he's the CEO -- and by the way, the fact that he's the owner I think is irrelevant.  That's moving much more towards alter ego or piercing.  And maybe I should even take out the word "owner," but that was just more background of what he is.

If the only thing was that he's the owner, that's clearly not enough.  If all that we had was that he's the CEO, then I would agree with Mr. Savage, that's not enough.  I'm not going to start presuming that a CEO of a company knows everything that everybody in the company is doing.  I agree with him.

But we do know that Mr. Tran knows about the existence of the human behavior software, and frankly, what jumped out at me as saying, well, I'm not going to judge anybody's credibility, that's a jury question, when he said we never used it out of the lab environment, and Mr. Ruiz says

yes, we did, I said, that's going to be enough.  I wanted the jury to decide whether or not they believed Mr. Tran or not. If it really -- Mr. Tran's knowledge was simply, to the best of my belief we never used it in Haiti, well, then maybe if we believe Mr. Ruiz it was used in Haiti, but Mr. Ruiz can't tie Mr. Tran to it, maybe the jury will say UPM is liable but not Mr. Tran.  That's fine.

But when I saw that inconsistency or that tension between Mr. Tran's testimony and Mr. Ruiz's testimony, I wanted to be cautious and not decide who do I believe but let the jury decide that issue.

MR. SAVAGE:  And that's totally fair enough on the question of whether it was used and whether it was used in Haiti and whether it was used in Haiti even with bad intent. What I'd still ask you to reconsider, though, is if Mr. Tran in his role as the CEO -- put aside owner now.  In his role as CEO of the company says yes, we, UPM, ought to use human behavior software down in Haiti because that will help further our fraud -- further UPM's fraud against Digicel-Haiti, in that capacity, even so, he would be acting entirely as the agent of the corporation that would be doing the bad thing.

THE COURT:  But if he authorized it or directed it, I think that would be the same thing as the person who makes the misrepresentation for the corporation.

MR. SAVAGE:  No.  And let me tell you why.  And I

think -- I think your -- you need to do more telecommunications.  I think your vast overexposure to securities fraud may be leading you astray here because securities fraud at the end the day almost always amounts to information and statements and lying and not lying and blah, blah, blah, whereas the CEO who makes the speech on behalf of the corporation but makes the speech that directly misleads the market, to the extent that Digicel-Haiti was misled by anything here, it was misled again on the assumption -- it was misled by the use of human behavior software, which is something that the corporation did, whereas in the securities fraud case, it is the very act of having the speech, lying to the Wall Street analyst, whatever it is that was bad that creates the liability.  And so while it makes sense in that context, when it is the direct acts of the agent of the corporation to the world that harms the world, here all he did at most was -- taking all the facts their way, all he did at most was say, yeah, this is a great way to defraud them -- a great way for UPM to defraud them, UPM people, go do that.

Now, I submit to you that that -- if that is enough to generate individual liability on the part of the CEO, you may not mean to be undermining the Oregon law on respecting the corporate form, but in fact there's no way to get to that answer that doesn't do that.

THE COURT:  I invite you to send me some cases either

by the time when we get to our final pretrial conference and/or judgment as a matter of law that would support the situation where a CEO knows that the corporation is committing fraud, expressly authorizes it, but is not held personally responsible. I'd like to see those cases, and then I'll reconsider it.

Mr. Vaughan.

MR. VAUGHAN: If it would help as well to short circuit this -- and to be fair, my partner is the person arguing this point, but I just wanted to interject one fact, and then I'll be quiet.

Mr. Tran also hosted in his home some of the servers.

Okay. I'll stop there.

THE COURT: Okay. Ms. Valbrun, if you're arguing it, or Ms. Talcott, do either of you have a case that responds to or rebuts what Mr. Savage just said?

MS. VALBRUN: Your Honor, I do not have a case that actually supports what Mr. Savage says because every case that we've looked at where you have an individual at the level of Mr. Tran taking direct action, they have been held liable.

THE COURT: What do you think is the most persuasive case on that point that I should take a close look at that you've already cited?

MS. VALBRUN: Your Honor, I mean, initially obviously I would direct Your Honor to the cases that Your Honor -- that

you've already cited to them on page 33 to 34 of your opinion, in those cases where they talk about when someone with control takes certain direct actions.

And then also to the extent there was the *Amfac Foods* that was cited to, and in that case, it makes it clear that when an individual has acted to create direct liability as an actor by virtue of their own participation in the conduct which gave rise to the actual cause of action, that you can bring a claim against the individual.

THE COURT:  *Amfac Foods* is the leading case in Oregon for piercing the corporate veil.

MS. VALBRUN:  Correct.  And then, Your Honor --

THE COURT:  That's not what you pled in the third amended complaint.

MS. VALBRUN:  No.  But it does have language in there that supports Your Honor's -- or the position that when you have someone who is at a certain level within a company create certain -- take certain steps, that they can have this individual liability.

Your Honor, there is *Frontier Recovery, LLC v. Lane*, which is -- which the citation I have is 2009, U.S. District, and this is a Lexis citation I have, 137010.  But in that case, it does point out and it tries to somehow distinguish *Amfac*. It says -- However, I also know that *Amfac* was a breach of contract case involving an attempt to collect a corporate debt,

and while going through the case -- and I apologize, I started pulling that up while Mr. Savage was making this argument, but there it does talk about the exposure that an individual can have and the fact that depending on the type of claim that is being sought against a corporation, the Court can determine that an adequate remedy is not always the ability to just collect from the corporation itself.  You can actually go after the individual officer or shareholder in that company.

My apologies, but those are the only two cases that I have right now regarding that, but -- and we would like the opportunity, Your Honor, that you extended to Mr. Savage, to the extent we can find any case law and I can pull the case law, that we can forward that to Your Honor as well.

THE COURT:  But I think that would be most helpful when you give me your proposed jury instructions, because I'm going to want to give very clear instructions to the jury of what will it take to find UPM liable for fraud by active concealment and what will it take to find Mr. Tran liable, and I'm going to tell the jury that they'll have to judge each defendant separately.  And to the extent that either side wants me to explain under what circumstances someone in Mr. Tran's position can or can't be held liable for what UPM as a company does, give me your proposed instruction and your legal authorities that support your view of that instruction.

MR. VAUGHAN:  Understood.

THE COURT: Look, the reality, I'm not going to rule from the bench but I am going to rule next week. So I'm not going to wait for much more authority. I'm going to think about what you all have said, think about it over the weekend, and get you my final decision next week. But assuming I don't depart too dramatically from my tentative opinion, our next round of substantive discussions will be on jury instructions.

MR. VAUGHAN: Okay.

MS. VALBRUN: Thank you, Your Honor.

And just to extend a little bit more, Mr. Vaughan had pointed out to you some of the facts that I wanted to kind of flesh out for Your Honor, because as we're dealing with Mr. Tran -- and he's correct, and we did cite that Mr. Tran was the one running approximately 20 gateways out of his own home.

THE COURT: Where is that in the record? Give me a cite. I didn't -- I don't remember seeing that he had this in his own home.

MS. VALBRUN: It's in Exhibit 1 at 23, 5 through 15.

THE COURT: One second. One more time, Ms. Valbrun. Tell me again.

MS. VALBRUN: It would be Exhibit 1, which is, I believe --

THE COURT: Deposition?

MS. VALBRUN: The deposition of him individually, at 23, lines 5 through 15.

THE COURT:  Thank you.

MS. VALBRUN:  Additionally, Your Honor, I think there's no dispute -- you said it and I think Mr. Savage will agree -- Tran testified he managed all the key people, he made all the decisions, he hired all the key employees.  And that is in Exhibit 14 at 33, lines 2 through 6.

And before I was trying to figure out the case, but we also cite to the case of *Kelly v. Ringler Associates*, and in that case, it does point out that individual liability is particularly appropriate when the individual, like a Mr. Tran in this case, was the quote/unquote guiding spirit behind the wrongful conduct and the central figure in the challenged corporate activity.  And I believe that's the same issue that we have here.

To the extent we are talking about any decisions or any conduct by the company, Mr. Tran himself basically testified that he is the individual that made all those decisions.

We understand Your Honor's rulings, but we would also ask that Your Honor take a look, for example, at the defendant Mr. Ruiz and his level of involvement in all of this transaction based on the evidence that was presented.  He was -- Mr. Vaughan spoke a bit about him, about Mr. Ruiz and his level of control, and he was the one that testified regarding the use of the software.  He drafted all the standard

operating procedures that gave detailed instructions to all of UPM employees on how to ship bypass equipment in a way that would avoid detection by government agencies.

THE COURT:  Let me ask you this question, and I don't mean to be too practical about this.  I totally get why you would want the CEO and the owner as an individual defendant, if the law supports that, to make sure that if there's a judgment against UPM, it would be satisfied.

What difference does it makes whether Mr. Ruiz is an individual defendant or not?

MR. VAUGHAN:  May I answer that?

THE COURT:  Please.

MR. VAUGHAN:  Mrs. Valbrun?

MS. VALBRUN:  Go ahead.

THE COURT:  I see you're asking her.  I'll stay out of that.

MR. VAUGHAN:  I'm trying to be respectful, and I think Ms. Valbrun will probably give you the legal answer, and she'll most likely be more correct than I will be.

The practical answer to answer your question is none. My concern with respect to Mr. Ruiz is with respect to some of the other bits of evidence, and we also have punitive damages claim.  So the practical answer, and if you are being guided by why are we dragging this individual in when ultimately he was directed by the company and Mr. Tran, you're right.

THE COURT:  Okay.  Anything further, Ms. Valbrun?

MS. VALBRUN:  No, Your Honor.

THE COURT:  Are there any other issues we should talk about?  Then I have a question or two for you, more big picture.  But anything else?

Let me confirm this.  I'm pretty confident that the motion regarding defendant's expert Joseph Gillan is related only to the counterclaims.

MR. VAUGHAN:  It is.

MR. SAVAGE:  That is correct.

THE COURT:  All right.  Go ahead.

MR. VAUGHAN:  I just had one quick point that I wanted to raise with the Court, and admittedly also being practical, it may not change any of the specific rulings that we are now facing, but I just wanted to make sure that I didn't leave the Court -- I didn't allow the Court to -- traveling under an impression that we acquiesced or agreed to this notion of the vendor relationships that UPM purportedly had with individuals in Haiti; two, that there were any relationships that we acknowledged as being appropriate or legal vendor relationships between Digicel and any of these third parties; three, that there is any record evidence to support any argument from UPM that it established some sort of legal acquisition of these SIMs.  You will notice, Judge, we never ever acquiesced to UPM purchasing SIMs.

And I'll just very quickly tell you why.  Mr. Tran in his deposition was asked these questions -- and this is the deposition transcript.  I'm sure Mrs. Valbrun will be able to help me in a couple minutes and tell me where it's exhibited in our papers.  But in Mr. Tran's deposition from October 25th, which is exhibited to the record and is a part of your summary judgment record, he was asked, "So these people were supposed to buy SIM cards, and then how does UPM get them?"

And these are the people they acquired the SIM cards from.

"Do they sell them back to UPM?  How do you get the SIM cards after they buy them?"

He answers, "They will send them to us."

He was asked, "And then UPM pays them back for the SIM cards?"

He said, "No.  We pay them in advance."

"You pay them in advance for the SIM cards?

"Correct.  It's a prepayment.

"So you prepaid them for the SIM cards?

"Correct.

"When these people go and buy the SIM cards, describe the process for me.  How do they buy the SIM cards?

"Answer:  I do not know because I'm not in country, but I do know that they will buy them on the street mostly.

"Okay.  Who do they buy the cards from?

"Answer:  From -- from people who get them from Digicel, obviously.  I don't know.  I don't know the answer."

Skipping forward to page 110, line 4.

"So when UPM would contract with these folks and ask them to get SIMs, go buy SIM cards, UPM cannot tell me under oath how they buy them, correct?

"Answer:  I cannot, because if I tell you something, I would just speculate, but I cannot.  I don't know the answer because I didn't do it.

"Question:  And you cannot tell me who buys them specifically?

"Answer:  If I can't tell you a hundred percent, I don't know.  I can speculate, but whoever.  They told us that they bought them on the streets, they sold them in the back of pickup trucks, on stands, to people on the streets.

"Okay.  Let me ask you a very tough question.  None of them have been caught so far.  Have you ever encountered scenarios where these contractors have purchased stolen SIMs?

"No, I have never.  I hope they didn't.

"What did you do to confirm these SIMs were not stolen if you hope that they weren't stolen?

"Answer:  We have no clue.  That's why trust was so important."

I'm sorry for dragging you through that entire quotation and litany, but it is important because the argument

that there was some form of acquisition of these SIMs that was the precursor to what Mr. Savage described as an implied-in-fact contract is absolutely false for two reasons: one, I think it is fairly accepted law that especially in this stream of commerce type of scenario, one cannot inherit or acquire more rights downstream than existed upstream. What Mr. Savage is arguing and what UPM would like to posit is that the proper acquisition of a SIM card, if Digicel did these correct -- and we have exhibits of the terms and conditions -- someone properly acquiring the SIM card would be limited to the terms and conditions as expressed in those terms and conditions, whether it be directed from a shrink-wrap, written on the paper that they tear the SIM card from, directing them to the terms and conditions, but the terms and conditions, it is undisputed, are there.

What Mr. Savage argues and UPM argues is UPM is not bound by those, we didn't click anything, we didn't sign it, we just acquired the SIM cards later. But what that necessarily means is they somehow have more rights and benefits and less obligations and duties than the person who legally and legitimately acquired a SIM card. That just cannot be, Judge.

THE COURT: I understand what you're saying, and that may be a useful and important discussion if we ever get to talking about your -- the merits of your motion against the counterclaim for implied-in-fact contract. But we're not

there.  I'm putting that off.

MR. VAUGHAN:  Which is why I didn't want to lead with it.  So I will go back to my initial premise.  I just didn't want to leave this hanging possibility that we acquiesced to this notion of the vendor relationship or we acquiesced to the notion of a proper purchase, and certainly not the implied contract discussion.

THE COURT:  I totally understand what you're saying, and that's fine.

MR. VAUGHAN:  Thank you.

THE COURT:  All right.  Is there anything else about any of the pending motions we should talk about now? Mr. Vaughan?  Ms. Valbrun?

MR. VAUGHAN:  At the risk of Mr. Savage being creative with something else, I'm going to tentatively, hesitantly say I think we can stop here.

THE COURT:  All right.  Do you agree, Mr. Savage?

MR. SAVAGE:  Almost, almost.

MR. VAUGHAN:  Well, I take it back.  I take it back.

MR. SAVAGE:  Discretion is the better part of valor. All of the things I would have said in response to what he was saying, I'll just let that pass.

The only thing I would ask of you in connection with your final ruling is we emphasized a lot the importance of damages as part of the elements of fraud, not just the thing

you do after you determine liability.  And when you issue your final rulings, and in conformity with what you said in the tentative order, the potential fraud liability is fraud by active concealment by virtue of using human behavior software to prevent them from cutting off SIM cards.  It would be very helpful if in connection with that and the rest of the points we've made, you articulate the theory of damages that goes along with that, because it seems logical to me that on that theory of liability, the damages would be calls that were made that would not have been made had they cut the SIMs off sooner by virtue of the -- by virtue of the alleged active concealment.

And the reason that matters is among the detailed records that we have, we -- for every SIM that we used, we know the first call that it made, the last call it made, and when it was cut off.  And again, without presaging the evidence, for a lot of them, the interval between first call and cutoff is a matter of minutes.  And so there's a very large fraction of SIMs and a very large fraction of calls which assuming for purposes of discussion we used human behavior software with evil intent and blah, blah, blah, did nonetheless -- did not affect a very large number of the SIMs that are at issue.  And so it will materially affect how we prepare for trial if in the course of your ruling you'd say, "and because this is the theory of liability I'm allowing you to go forward to trial,

this is the corresponding theory of damages that would go with it," because again, damages are an element of fraud.

THE COURT:  I hear what you're saying and I'll think about it, but that also may be a jury question.

MR. SAVAGE:  The permissible theory of damages, a legally acceptable level or calculation of damages is a legal question.  Now, within the framework of whatever it is that that legal framework is, the jury would decide it was ten calls, it was 10 million calls.  But I would implore you to be specific about that because it would really materially affect how we prepare.

THE COURT:  I'll just remind you of the evolution of our discussion on recoverable damages for fraud, and that is that I thought -- and I may have misheard you, but I thought I heard you say in Oregon fraud is limited to out of pocket, and as we got more into *Dizick* and other discussions, no, it's not strictly limited to out of pocket, and Oregon law does say -- I think this is consistent with common law fraud generally -- that when fraud has been shown, damages, although they have to be natural and foreseeable and proximate, the measure is flexible.

MR. SAVAGE:  Yes.  And there's some great quote that I can't now remember about there's some point at which flexibility becomes no standard at all.  And we're the ones who quoted you, it has to be applied flexibly, I'm not disputing

that in the slightest, but if as I -- I mean, I'll represent because I believe to be true a very large number of the SIM cards that they cut off were cut off using methods that were unaffected by human behavior software on SIMs as to which human behavior software was never implemented. They just fall out of the case.

THE COURT: But where I'm coming from on this, what I was meaning to communicate was that I may instruct the jury that if they find that there's fraud, then plaintiff can recover only those damages that were caused by the fraud. "Members of the jury, the parties may disagree about which damages or which damage evidence was or was not caused by the fraud. That's one of the reasons why we bring you in here."

And so that may end up being the direction I go, as opposed to, "Members of the jury, this is the very narrow, you know, maze that must be followed, and if they go through this maze and they touch every corner, then they will get this amount of damages."

That's generally not the way I do it.

MR. SAVAGE: I like the idea of the mouse working trying to find the cheese. Who stole my cheese? I'm working on that.

THE COURT: I didn't hear you, Mr. Vaughan.

MR. VAUGHAN: I think Mr. Savage just wants you to limit damages, just put them in a cubbyhole and then say go for

it.

THE COURT:  I understand.

MR. SAVAGE:  Whatever you can do to limit damages, Your Honor, we'd like that.

THE COURT:  Let me ask you, since we don't have the counterclaims and we have the actual claims being limited, assume we don't talk about unjust enrichment or conversion, and all we talk about is fraud by active concealment, I'm thinking that this is not going to be and should not have to be a ten-day jury trial.

MR. VAUGHAN:  I agree.

MR. SAVAGE:  I agree.

THE COURT:  Let me ask you this.  I think it probably should even be done -- could even be done in one week, five days.  We bring a jury in on Monday and we get it done by Friday.

MR. VAUGHAN:  That's exactly what I said, Judge.  I think my mic is cutting in and out, which you warned me about.  I think five days is what I was proposing.

THE COURT:  And will you put this in pencil in your own notes, because as of right now, we are scheduled to begin on April 4th and end on April 15th, those ten days.  There is a possibility -- and it's going to be very COVID dependent -- that there may be a meeting of Ninth Circuit judges out of town that I'd want to attend on April 4th, 5th, and 6th.  And I've

already said, hey, if I'm in trial, I'm not going. But I'd like to be able to go. If everything fits in place, which it probably won't, if COVID is under control and we actually do have this meeting of judges on April 4th, 5th, and 6th, we'll probably know this no later than our pretrial conference of March 21st. Probably I'll know it by early March, maybe late February. I might want to start our trial -- instead of April 4th, April 11th. And you're already holding those two weeks anyway.

Let me know and speak with your witnesses if that's going to be a gigantic problem for any of your witnesses who might be only available the first week but not the second, but try to be flexible. But we'll stay in touch on that.

MR. VAUGHAN: Judge, you had asked to hold the two weeks and you had made that clear that there was no moving, so I think that shouldn't be a problem.

THE COURT: Thank you. We'll talk about that as we get closer.

MR. SAVAGE: Your Honor, just for the record, the only witness I had scheduling issues with was actually Mr. Gillan. And so if we're putting that off to some point in the future, that's fine.

THE COURT: Remind me to make a comment about the counterclaims in a few moments.

And I do want to keep our pretrial conference date

right now of March 21st, just in case we decide we want to have a second pretrial conference.  So we'll keep March 21st.  That means under our civil case management order, four weeks before that date is the first round or first wave of documents.  I think there the burden is all on the plaintiff.  The second week the burden is all on the defendant, and then the third and fourth you each have some burdens.

Let's keep to that schedule.  Please don't ask for any extensions or postponements of that.  I want to keep to that schedule so I can be fully prepared and probably even plan on sending you draft tentative rulings on motions in limine or objections before our pretrial conference so we can talk about it at the pretrial conference.  Obviously, some things may have to wait until trial to see if an adequate foundation has been made, but most motions in limine and many trial exhibit objections or testimonial objections can wait -- sorry, need not wait until trial and can be resolved by the pretrial conference.  And that makes our trial much more efficient.

I'll also tell you more then, but I'll tell you now, typically in this district, at least pre-COVID, civil trials are six-person minimum, but we typically will bring in seven or eight, and then they'd all deliberate to a unanimous verdict.  We won't excuse any as alternates.  When you only have seven or eight, they can all deliberate or participate.

MR. VAUGHAN:  And you can go down to six in event

something goes --

THE COURT:  Yes.  I can go down to six.  I can go down below that if both sides stipulate, but I've never had that in ten years, so I'd rather not start now.  But under the law, six is good enough, absent stipulation of all parties.

I do generally allow a little bit of attorney-conducted voir dire.  We'll talk more about that at the pretrial conference.  I do put really tight limits on what you can say at them.  It really can't be case specific, like, "Let me give you a hypothetical.  If the facts in this case show such and such, how would you rule?"  We're not going to go there.  We'll talk more about that at the pretrial.

MR. SAVAGE:  We're going to want to disqualify anyone who has a phone.

THE COURT:  Speaking of disqualification, in all seriousness, the last couple of civil jury trials that I've been doing, with everybody's consent I have said only vaccinated jurors are eligible to come in.  That presents a little bit of a headache in a criminal trial if the defendant objects.  Nobody has yet objected to that in a civil case.  If you know now that you have no objection, tell me, otherwise tell me soon or I'll ask you relatively soon.  But I find that when the jurors know that some of their colleagues are not vaccinated, they get very distracted, it's uncomfortable, and at least two of my colleagues have had jurors that have come

down with COVID in the middle of a trial.  So I like the idea of only allowing vaccinated jurors to come in, and putting that basically in the up-front questionnaire.

Can you tell me now if you have any objection?

MR. SAVAGE:  None from us, Your Honor.  The defendants think that's fine.

MR. VAUGHAN:  No objection from the plaintiff.

I am academically curious, though, because I've been involved with many groups who are thinking about the impact of this type of filtering, and I wonder what it does to the jury pool.  I'd love to chat with you on what you've seen.

THE COURT:  I'll tell you right now, in my opinion, on normal civil cases like this, it has no effect at all.  It may or may not have an effect, let's say, on -- well, on a criminal case, depending upon the type of charges, depending upon the background of the defendant.  It may even have an effect in civil rights cases, maybe if you're suing the state, maybe a Bivens action, suing the federal government.  It may or may not affect how people feel about government generally, the level of government, stuff like that.  But I think for a business-to-business dispute like this, I think it will have no effect.

MR. SAVAGE:  I'll ask around when I get back home to see how the federal district courts in the District of Columbia are dealing with this issue.

THE COURT:  Well, frankly, it's a bigger problem on criminal cases, especially by protesters, frankly, of either the left or the right sort, because it may very well affect how jurors feel about their government at whatever level.  It's not going to have an effect in most civil cases.

Okay.  But as of right now, I'm hearing both sides have no objection to me limiting our jury pool only to those who have been fully vaccinated for COVID-19.

So, Mary, let our jury coordinator know that.

We'll talk more about voir dire later.

Let me also just share with you this, and we don't need to discuss it now, I don't want to discuss it now, but I'm intrigued as to whether or not there will be any disputed facts on UPM's counterclaims.  Let's assume we know at the end of this trial, the jury either finds that there was fraud by active concealment or the jury finds that there wasn't.  Once we know that -- and that's a big disputed fact.  Once we know that, I'd like to talk with you all about what do we do about these Communications Act counterclaims and the related state counterclaims, because I think they raise tough and interesting issues, but I'm not sure they raise any disputed issues of fact.  But --

MR. VAUGHAN:  Your Honor, a very brief point on this.  I understand we're not going to talk about this now.

MR. SAVAGE:  The only thing I would say, Your Honor,

is you're probably right, except for the question of damages.

THE COURT:  No, I understand.  I agree.

MR. SAVAGE:  Damages is not an element.  It's a separate thing.  Obviously, we're going to disagree about damages.

THE COURT:  I agree.  I get it.

MR. SAVAGE:  Unless Robert will stipulate to something.

THE COURT:  So we'll talk about that at a later time after we know what's going on here.

I'm also thinking I generally do not do and do not like really detailed, involved, 20-page special verdict forms, you know, things like that, but this case may not be appropriate for a very plain vanilla general verdict.  So I'm kind of visualizing a handful of questions, maybe six to ten very specific questions that will probably be spaced over three, four, five pages of a special verdict form, probably not more.

So give some thought to what you think would be the right questions that we would need to have our jury answer unanimously.  Don't waste your time or mine giving me 30 or 40 pages of a special verdict form, but I'm thinking that a general verdict form is probably not going to be right here in this case.  So give some thought to what you really want to have our jury decide.

Then, as I said, spend the time on your jury instructions.  Keep in mind, too, when you're giving me your witness statements, reread my civil trial management order, please.  I really do require a great deal of fair specificity. It doesn't have to be on every jot and tittle of the direct testimony, but it has to fairly disclose what the witness will testify to on direct, and it will not be sufficient to say, "The witness will testify consistently with his or her deposition."

So if a witness is on direct and the cross-examiner objects and says, "beyond the scope of the witness statement," I will ask you out of the presence of the jury or at sidebar, what page and line number of the witness statement should I look at.

Now, if it's pure background and it's not that important, I'm not going to let anybody play gotcha with each other.  But if it's important stuff, makes a difference to the case, it really needs -- the substance needs to be fairly disclosed or you have to have a really good explanation for why it's both not been disclosed and why it's not unfairly prejudicial to the other side.

So give some care and attention to your witness statements.  Unlike state court, this is not going to be trial by ambush.  Both sides have interesting things to say.  I'll let you both say what you want to say to the jury, but it's got

to be fairly disclosed to both sides.

Similarly, too, with impeachment exhibits.  An impeachment exhibit is not a really great document that you don't want the other side to know about until you spring it on them.  Impeachment really is just to impeach essentially the credibility or honesty, ability to recall a witness's statement, an inconsistent statement.  It's not to bring in a new fact.

I need to go in a few minutes.  Anything else?

MR. VAUGHAN:  Very quickly.  You said we have very limited voir dire.  Generally what's your inclination?

THE COURT:  Ten to 15 minutes, 10 to 15 minutes unless you're getting incredibly interesting answers that will take longer.

I will share with you very briefly, many, many years ago, I did represent the local telephone company in a federal court case.  The trial judge then said same thing, you can have limited attorney-conducted voir dire.

I said to the jury, the jury panel, I said, "Many people I think have had good experiences with our local phone company, some people have had not so good experiences.  Have any of you had a less-than-satisfactory experience with the phone company?"  Every hand went up and the judge gave me a little bit of extra time.

MR. SAVAGE:  Your Honor, if this is the company that

I'm thinking of, back in the day they broke up the Bell system into a number of --

THE COURT: US West.

MR. SAVAGE: It had a name in the industry, and the word was not "west," it was "US Worst."

THE COURT: All right. If we can go off the record, I will tell you one more thing, and then I've got to run.

Anything else we should talk about?

MS. DUBAY: I just wanted to clarify in the world of COVID for exhibits. Paper? Electronic only? Not allow any paper?

THE COURT: No, paper is fine. Frankly, send it to me double-sided hole-punched notebooks with good tabs.

And we'll talk more at the pretrial conference, but if each side -- I don't want to give the jury 500 exhibits themselves, but if each side wants to have, let's say, half a dozen or so really key exhibits that you want them to have in a notebook, and both sides can agree, I'll let you give them ten key exhibits they can keep on top of, and they'll all have written copies of the instructions. We'll talk more about that at the pretrial conference.

MS. DUBAY: Thank you, Your Honor.

THE COURT: All right. This concludes the hearing. I'll take the pending motions under advisement.

(Proceedings concluded at 2:29 p.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *April 29, 2022*
BONITA J. SHUMWAY, CSR, RMR, CRR          DATE
Official Court Reporter

**MR. SAVAGE: [155]**
**MR. VAUGHAN: [106]** 3/11 5/13 6/12 15/7 15/20 15/22 18/9 19/20 21/9 21/11 21/15 21/20 21/23 23/2 23/7 23/22 24/13 25/8 25/14 25/21 26/18 26/24 39/16 46/7 46/25 47/17 47/19 48/15 48/21 49/11 49/16 49/19 50/21 50/24 52/4 52/7 52/13 52/21 53/14 54/4 60/5 60/8 61/24 62/8 62/11 62/23 63/17 64/8 64/19 65/2 65/4 65/11 65/13 65/18 66/2 66/4 66/7 66/11 66/13 67/3 67/12 67/16 67/21 68/4 68/25 71/22 74/4 76/7 76/9 76/25 78/21 78/25 79/3 80/1 80/12 80/20 82/8 82/17 91/13 103/4 104/9 104/13 105/19 105/23 108/18 108/22 112/8 114/25 115/8 117/11 117/13 117/17 118/9 118/12 122/2 122/10 122/14 122/19 125/24 126/11 126/17 127/14 128/25 130/7 131/23 134/10
**MS. DUBAY: [3]** 4/7 135/9 135/22
**MS. TALCOTT: [1]** 3/20
**MS. VALBRUN: [14]** 3/17 39/13 39/19 112/17 112/24 113/12 113/15 115/9 115/18 115/21 115/24 116/2 117/14 118/2
**MS. VAN ZILE: [1]** 4/8
**THE COURT REPORTER: [1]** 80/24
**THE COURT: [265]**
**THE COURTROOM DEPUTY: [4]** 77/6 77/12 80/17 82/10

## $

**$10 [3]** 10/15 10/16 38/23
**$100 [4]** 52/15 53/18 54/1 71/18
**$100,000 [6]** 50/15 50/16 50/18 50/18 54/16 54/17
**$110 [1]** 71/19
**$20 [3]** 55/2 55/4 55/5
**$20,000 [2]** 55/1 55/6
**$200 [3]** 34/20 34/22 34/22
**$25 [6]** 42/19 42/24 58/7 65/6 65/16 66/6
**$40,000 [1]** 87/2

**$50,000 [1]** 87/2
**$9.80 [1]** 39/8

## -

**--o0o [1]** 136/2

## /

**/s/Bonita [1]** 136/9

## 1

**10 [25]** 38/22 39/5 39/5 39/6 56/25 58/17 58/23 59/9 62/19 65/2 65/4 65/7 65/15 65/25 66/10 67/20 67/25 71/19 72/1 72/7 74/11 74/13 81/4 87/3 134/12
**10 million [1]** 124/9
**10 percent [1]** 17/9
**100,000 [2]** 54/13 54/14
**1000 [1]** 2/22
**10:03 [1]** 3/2
**11 [1]** 83/15
**110 [1]** 120/3
**11th [1]** 127/8
**120 [1]** 89/2
**121 [1]** 2/16
**1211 [1]** 2/9
**12:30 [2]** 77/19 80/18
**12:40 [1]** 80/19
**12:45 [1]** 80/19
**12:50 [2]** 81/10 82/7
**13 [2]** 65/25 68/3
**135 [3]** 71/4 71/7 71/10
**136 [3]** 70/22 71/1 73/18
**137010 [1]** 113/22
**14 [3]** 1/7 3/2 116/6
**15 [9]** 77/9 77/13 77/20 103/2 104/8 115/18 115/25 134/12 134/12
**15th [1]** 126/22
**16 [3]** 46/15 47/12 93/22
**17 [1]** 108/15
**174 [1]** 88/25
**17th [1]** 2/5
**18 [5]** 8/18 28/20 29/5 34/17 34/24
**185 [1]** 3/7
**1850 [1]** 2/16
**19 [2]** 20/23 131/8
**19.7 [1]** 8/24
**1900 [1]** 2/9
**1919 [1]** 2/13
**1934 [1]** 41/4
**1979 [2]** 83/15 84/17
**1993 [1]** 89/3

**1:00 [3]** 80/19 81/3 81/5
**1:20 [2]** 77/20 81/3
**1:30 [5]** 77/3 77/4 77/7 80/15 82/10
**1:30 for [1]** 77/20

## 2

**20 [2]** 21/19 115/14
**20-minute [1]** 80/21
**20-page [1]** 132/12
**200 [1]** 2/13
**20006 [1]** 2/13
**2001 [1]** 89/1
**2009 [2]** 54/10 113/21
**2012 [1]** 12/14
**2014 [3]** 12/14 12/15 12/17
**2015 [1]** 35/17
**2017 [1]** 48/16
**202-256 [1]** 92/14
**2022 [3]** 1/7 3/2 136/9
**21 [1]** 105/18
**21st [3]** 127/6 128/1 128/2
**22 [1]** 56/18
**23 [48]** 7/16 19/23 20/1 20/2 20/6 20/7 20/8 20/22 21/7 22/16 23/9 24/17 28/14 28/15 28/20 34/17 34/25 56/17 56/22 56/24 57/3 57/9 58/8 58/19 58/21 59/1 59/9 61/14 62/8 63/3 64/14 64/24 65/12 65/24 66/10 67/15 68/2 71/16 71/19 72/2 72/5 72/6 72/13 72/14 87/11 88/13 115/18 115/25
**23-cent [1]** 61/17
**232 [1]** 54/10
**24 [2]** 93/8 98/9
**25 [6]** 42/24 43/7 58/16 93/8 98/9 98/25
**255 [1]** 4/13
**256 [3]** 11/14 11/17 92/14
**259 [1]** 4/14
**25th [1]** 119/5
**264 [1]** 4/17
**269 [1]** 4/20
**272 [1]** 4/22
**279 [1]** 14/3
**279,669 [1]** 13/25
**28 [1]** 25/10
**280,000 [1]** 12/20
**287 [1]** 84/17
**288 [1]** 105/3
**29 [1]** 136/9
**2:29 [1]** 135/25

**300 [1]** 2/5
**301 [1]** 2/22
**303 [1]** 84/17
**31 [2]** 46/15 83/18
**312 [2]** 2/5 84/24
**326-8188 [1]** 2/23
**33 [2]** 113/1 116/6
**33316 [1]** 2/6
**34 [5]** 11/18 11/25 12/16 108/16 113/1
**392 [1]** 54/10
**3:00 [3]** 77/8 77/13 77/22
**3:15-cv-00185-SI [1]** 1/5
**3:15-cv-185 [1]** 3/7
**3:16-cv-0344-PK [1]** 48/17

**4**

**40 [1]** 132/21
**40 million [4]** 17/6 17/8 18/14 18/17
**494 [1]** 88/25
**497 [1]** 89/1
**4:30 [1]** 77/15
**4th [4]** 126/22 126/25 127/4 127/8

**5**

**5,000 [2]** 75/25 76/2
**5-4 [1]** 101/4
**5-cent [2]** 7/18 20/2
**500 [1]** 135/15
**503 [1]** 2/23
**56 [4]** 35/15 36/16 89/15 89/22
**5th [2]** 126/25 127/4

**6**

**6-3 [1]** 101/5
**60 percent [1]** 76/19
**619 [1]** 89/3
**620 [1]** 89/3
**6th [2]** 126/25 127/4

**7**

**70 [1]** 102/11
**79 [1]** 21/21

**8**

**8188 [1]** 2/23
**86 [1]** 45/5

**9**

**9-0 [1]** 101/3
**950 [1]** 12/18
**97204 [3]** 2/9 2/17 2/22

**A**

**a.m [1]** 3/2
**ab [1]** 106/4
**abandoned [1]** 26/5
**abide [2]** 45/1 45/11
**ability [3]** 34/4 114/6 134/6
**able [11]** 6/18 27/22 28/1 31/25 46/23 47/12 51/6 66/22 105/10 119/3 127/2
**about [132]** 5/24 5/25 5/25 6/5 6/15 6/19 7/25 10/22 11/6 12/7 12/13 14/20 15/15 16/7 16/14 16/18 17/17 19/21 21/12 21/13 21/14 23/14 24/24 25/6 26/11 26/20 29/13 30/11 33/2 33/24 34/2 34/17 38/7 38/15 41/3 42/19 44/7 44/8 45/19 45/22 45/23 45/23 46/5 46/6 47/16 49/25 51/17 52/1 55/13 56/2 57/10 69/11 70/2 70/4 70/12 70/14 70/17 72/16 72/17 73/2 73/2 73/13 73/16 74/2 74/19 75/4 75/25 77/13 77/25 78/3 78/21 79/5 79/6 79/20 79/22 79/24 80/10 81/7 81/14 83/7 84/7 84/16 85/6 87/18 88/19 88/21 89/5 91/11 92/16 95/4 104/24 106/15 107/17 108/6 108/19 109/21 113/2 114/3 115/4 115/4 116/15 116/23 116/23 117/5 118/4 121/24 122/11 122/12 124/4 124/10 124/23 125/11 126/7 126/8 126/18 127/17 127/23 128/12 129/7 129/12 130/9 130/19 131/4 131/10 131/18 131/18 131/24 132/4 132/9 134/4 135/8 135/20
**above [1]** 136/6
**above-entitled [1]** 136/6
**absence [1]** 107/14
**absent [1]** 129/5
**absolute [2]** 50/17 51/22
**absolutely [11]** 3/11 22/5 36/23 51/1 53/4 54/4 60/23 80/14 96/21 107/9 121/3
**absurd [1]** 28/23
**abundance [1]** 36/7
**academic [1]** 106/2
**academically [1]** 130/8
**accept [5]** 53/9 59/23 65/20 80/6 85/5
**acceptable [1]** 124/6
**accepted [1]** 121/4

**accepts [1]** 63/1
**access [11]** 51/13 51/14 51/14 51/18 51/21 51/25 52/7 52/8 60/22 61/18 63/12
**accessing [1]** 63/7
**accommodate [1]** 12/6
**accommodation [1]** 60/24
**accomplishing [1]** 102/1
**according [1]** 33/25
**account [7]** 38/24 39/2 39/9 40/5 43/2 92/12 92/14
**accumulating [1]** 24/5
**acknowledged [2]** 17/4 118/20
**acknowledges [1]** 43/13
**acquiesced [4]** 118/17 118/25 122/4 122/5
**acquire [1]** 121/6
**acquired [3]** 119/9 121/18 121/21
**acquiring [1]** 121/10
**acquisition [4]** 51/12 118/24 121/1 121/8
**across [2]** 95/2 95/5
**act [10]** 51/8 51/15 56/1 57/18 73/6 94/2 95/21 101/24 111/12 131/19
**acted [1]** 113/6
**acting [3]** 20/3 93/25 110/20
**action [3]** 112/20 113/8 130/18
**actionable [1]** 27/20
**actions [1]** 113/3
**activate [3]** 38/22 43/17 92/11
**active [30]** 27/16 81/23 82/2 90/19 90/21 96/17 97/5 97/12 97/23 97/23 98/3 98/8 98/8 98/13 98/23 98/25 99/2 99/10 99/12 101/23 101/23 102/19 103/10 103/11 103/14 114/17 123/4 123/11 126/8 131/16
**actively [4]** 93/21 96/13 104/21 107/15
**activities [1]** 28/1
**activity [7]** 18/5 40/10 40/25 102/12 102/13 106/25 116/13
**actor [1]** 113/7
**acts [4]** 98/10 98/11 99/2 111/15
**actual [11]** 13/5 13/7 16/3 19/18 19/22 19/23 37/1 49/1 107/2 113/8 126/6
**actually [24]** 8/9 10/8 13/15 16/11 24/16 24/20 41/19 43/8 49/5 55/25 59/3 64/8 64/21 74/1 74/22 83/20 86/5 88/10 96/15 107/13 112/18 114/7

**actually... [2]** 127/3 127/20
**add [5]** 54/6 83/9 90/16 91/4 108/14
**addition [1]** 6/5
**additional [2]** 10/23 68/5
**Additionally [1]** 116/2
**address [4]** 11/4 14/22 74/16 103/8
**addresses [1]** 37/5
**adequate [15]** 27/13 40/11 40/13 40/13 40/17 40/18 40/20 41/9 41/12 41/14 41/18 41/19 42/6 114/6 128/14
**adequately [1]** 43/12
**adjust [1]** 103/22
**admissible [2]** 14/7 70/20
**admitted [1]** 59/3
**admittedly [3]** 17/19 18/2 118/13
**adopted [1]** 24/21
**adoption [1]** 87/15
**advance [2]** 119/16 119/17
**advantage [3]** 32/4 32/6 56/7
**advice [1]** 36/16
**advisement [1]** 135/24
**Advisory [2]** 35/14 36/16
**affect [7]** 87/14 88/9 123/22 123/23 124/10 130/19 131/3
**affirmative [2]** 4/24 97/10
**affirmatively [1]** 86/24
**after [8]** 6/5 11/9 26/22 78/4 114/7 119/12 123/1 132/10
**afternoon [2]** 3/12 4/5
**again [28]** 10/19 14/6 14/11 28/16 29/3 30/24 36/15 44/14 45/4 59/16 64/19 68/5 73/6 77/22 78/4 78/13 78/25 86/2 89/15 98/4 100/15 101/8 101/19 102/16 111/9 115/20 123/16 124/2
**against [14]** 4/17 27/11 36/10 46/12 46/17 47/5 89/11 109/6 109/10 110/19 113/9 114/5 117/8 121/24
**age [3]** 32/5 93/8 93/21
**agencies [1]** 117/3
**agenda [1]** 46/2
**agent [4]** 7/19 20/4 110/20 111/15
**aggregate [1]** 98/15
**aggregated [1]** 96/1
**aggressively [1]** 87/22
**ago [5]** 7/3 31/7 48/12 59/4

134/16
**agree [41]** 5/20 5/22 5/22 16/25 22/23 23/1 26/17 26/18 32/12 33/14 34/10 41/16 43/15 43/18 43/22 44/6 44/25 47/20 54/4 62/24 77/11 79/9 81/23 83/9 84/3 84/8 92/21 97/15 97/16 97/20 97/22 106/14 109/17 109/19 116/4 122/17 126/11 126/12 132/2 132/6 135/18
**agreed [1]** 118/17
**agreeing [1]** 45/8
**agreement [1]** 71/9
**agreements [4]** 70/13 70/15 70/18 70/19
**ahead [7]** 32/20 52/12 60/10 62/10 105/22 117/14 118/11
**AI [1]** 63/24
**airplane [1]** 52/16
**AIs [1]** 73/3
**akin [1]** 51/12
**al [2]** 1/8 3/6
**alarm [2]** 10/14 10/17
**alert [1]** 99/21
**algorithms [1]** 73/3
**all [115]** 3/23 4/3 4/10 4/11 5/1 5/2 5/19 6/4 6/10 7/7 7/20 8/8 9/6 9/8 9/8 14/6 14/7 15/11 16/7 29/12 30/10 30/12 30/13 31/11 31/15 31/22 32/12 34/10 35/5 35/17 36/3 40/15 41/13 41/14 44/17 44/17 46/15 47/3 50/14 50/14 51/16 53/3 55/17 56/7 57/22 60/9 60/11 64/12 66/6 66/22 67/13 67/13 67/17 69/13 69/14 71/18 72/4 74/16 75/3 76/15 77/2 77/15 77/17 77/22 78/5 78/7 78/10 81/10 82/6 82/14 82/18 82/23 87/13 90/15 90/19 91/20 92/22 99/9 102/20 103/7 103/9 104/11 105/24 108/12 109/3 109/10 109/16 111/16 111/17 111/17 115/4 116/4 116/5 116/5 116/17 116/21 116/25 117/1 118/11 122/11 122/17 122/21 124/24 126/8 128/5 128/6 128/22 128/24 129/5 129/15 130/13 131/18 135/6 135/19 135/23
**allegations [3]** 37/19 109/6 109/6
**allege [2]** 43/21 71/21
**alleged [6]** 60/4 70/11 84/24

109/2 109/10 123/11
**allegedly [1]** 109/7
**alleges [2]** 24/11 62/12
**alleging [2]** 37/20 84/18
**allow [9]** 46/20 47/11 48/1 49/13 61/10 61/12 118/16 129/6 135/10
**allowed [28]** 46/18 92/24 93/12 94/2 94/13 94/14 94/15 95/12 95/12 95/15 96/3 96/3 96/4 96/7 96/8 96/11 97/4 97/12 99/24 99/25 100/9 100/22 100/24 102/6 102/6 102/8 102/17 102/22
**allowing [5]** 61/15 61/18 106/20 123/25 130/2
**allows [1]** 7/10
**alluded [3]** 28/22 57/6 92/1
**allusions [1]** 73/7
**almost [4]** 24/14 111/4 122/18 122/18
**alone [2]** 14/18 14/19
**along [3]** 9/18 37/11 123/8
**already [9]** 5/18 50/14 68/19 90/3 91/25 112/23 113/1 127/1 127/8
**also [45]** 3/21 4/15 5/4 8/13 11/9 28/22 31/23 35/7 40/6 42/20 47/23 53/1 53/10 56/25 59/6 59/23 59/24 60/12 61/19 62/20 66/5 73/21 78/21 83/18 88/20 89/20 89/24 90/9 91/5 96/16 100/19 100/20 103/6 103/13 112/12 113/4 113/24 116/8 116/19 117/22 118/13 124/4 128/19 131/11 132/11
**alter [2]** 108/14 109/12
**alternates [1]** 128/23
**alternative [2]** 4/21 47/25
**although [8]** 6/18 33/23 56/1 77/24 83/9 86/17 99/8 124/19
**always [5]** 30/3 73/9 75/2 111/4 114/6
**am [12]** 7/2 7/2 23/3 25/7 25/14 58/8 58/15 63/12 71/3 76/9 115/2 130/8
**ambush [1]** 133/24
**amend [1]** 108/14
**amended [3]** 70/23 73/20 113/14
**amendment [1]** 108/16
**American [1]** 59/2
**Amfac [4]** 113/4 113/10 113/23 113/24
**among [7]** 5/19 5/21 30/20

**among... [4]** 88/24 90/7 101/16 123/13

**amount [16]** 7/16 10/6 17/16 17/22 24/14 27/5 43/4 57/7 61/15 63/4 65/22 79/14 87/7 87/10 88/12 125/18

**amounts [2]** 70/12 111/4

**analogies [2]** 76/15 76/19

**analogous [1]** 43/3

**analogy [3]** 52/23 68/6 76/16

**analysis [5]** 24/13 24/15 31/10 104/19 105/20

**analyst [1]** 111/13

**angst [1]** 89/20

**Anne [2]** 2/8 3/20

**announce [1]** 49/16

**another [7]** 6/10 19/11 77/4 95/2 102/24 104/7 106/13

**answer [32]** 8/23 13/25 14/13 15/24 25/8 27/24 27/25 58/14 59/11 63/17 65/18 69/17 69/18 72/25 73/1 74/2 91/13 95/18 101/10 102/9 108/20 111/24 117/11 117/18 117/20 117/20 117/23 119/23 120/2 120/8 120/22 132/20

**Answer: [3]** 120/1 120/7 120/12

**Answer: From [1]** 120/1

**Answer: I [1]** 120/7

**Answer: If [1]** 120/12

**answered [1]** 104/17

**answers [5]** 105/4 105/7 105/11 119/13 134/13

**any [65]** 5/7 5/8 5/8 5/25 10/11 10/23 11/1 11/2 11/3 12/2 22/9 22/25 37/4 37/4 38/15 38/16 40/4 43/21 44/2 44/12 45/12 49/10 57/2 58/21 62/3 62/21 63/15 64/18 64/20 64/22 64/25 69/11 72/19 74/10 75/22 80/8 84/2 86/3 86/4 86/8 92/24 94/6 98/10 98/11 101/6 107/22 107/22 114/12 116/15 116/16 118/3 118/14 118/19 118/21 118/22 118/22 122/12 127/11 128/9 128/23 130/4 131/13 131/21 134/22 135/10

**anybody [2]** 26/6 133/16

**anybody's [1]** 109/24

**anymore [1]** 34/2

**anyone [3]** 6/8 105/21 129/13

**anything [36]** 5/24 13/15 13/21

13/23 14/1 22/19 26/11 26/20 27/6 29/2 29/6 37/18 37/22 42/10 44/5 45/17 46/4 67/18 67/23 76/5 87/16 91/10 93/2 93/3 95/6 101/13 105/17 106/12 107/19 111/8 118/1 118/5 121/17 122/11 134/9 135/8

**Anytime [1]** 105/21

**anyway [3]** 90/1 98/6 127/9

**anywhere [3]** 75/22 76/17 81/13

**apologies [1]** 114/9

**apologize [2]** 84/14 114/1

**App [3]** 54/10 88/25 89/3

**appeal [4]** 36/7 36/14 93/8 101/2

**Appeals [2]** 69/21 88/21

**appear [1]** 12/23

**appearance [1]** 4/3

**appearances [2]** 2/2 3/9

**appearing [1]** 3/13

**appears [5]** 40/13 44/25 76/20 84/23 106/1

**applied [3]** 40/8 83/19 124/25

**applies [2]** 50/3 50/9

**apply [2]** 41/1 86/25

**applying [2]** 85/24 107/13

**appreciate [5]** 3/22 5/3 7/9 15/13 55/17

**approach [1]** 89/16

**appropriate [9]** 36/25 50/6 51/5 90/17 90/25 94/16 116/10 118/20 132/14

**appropriately [1]** 25/6

**approximately [2]** 58/23 115/14

**April [8]** 35/20 126/22 126/22 126/25 127/4 127/8 127/8 136/9

**April 11th [1]** 127/8

**April 15th [1]** 126/22

**April 4th [4]** 126/22 126/25 127/4 127/8

**apropos [1]** 52/23

**arbitrage [2]** 26/15 26/16

**are [108]** 3/4 3/9 4/11 4/12 6/4 6/15 7/11 8/2 8/13 8/19 8/25 9/7 9/15 9/25 10/5 10/10 10/11 12/23 12/25 13/3 15/15 15/18 16/22 16/23 16/24 22/6 22/22 27/4 27/9 27/14 27/19 27/20 28/18 29/15 29/18 29/20 29/20 32/11 33/7 33/7 33/9 33/24 35/18 38/10 41/11 43/16 47/20

48/22 50/6 50/17 50/25 56/2 57/20 58/9 59/13 60/17 60/18 61/12 61/13 61/15 64/11 66/15 66/21 67/8 68/11 69/20 74/19 78/2 78/15 83/2 83/4 85/22 88/23 90/21 90/23 91/5 94/22 95/25 96/1 96/11 96/13 97/4 97/12 98/3 98/3 98/14 98/20 103/21 106/7 106/24 107/4 109/6 114/9 116/15 117/23 117/24 118/3 118/15 119/9 121/15 123/22 124/2 126/21 128/21 129/18 129/23 130/9 130/25

**aren't [3]** 15/14 85/25 102/25

**arguably [1]** 83/25

**argue [3]** 20/24 69/20 105/13

**argues [3]** 26/14 121/16 121/16

**arguing [3]** 112/10 112/14 121/7

**argument [25]** 1/15 4/12 5/24 8/11 11/12 14/23 19/9 25/21 26/4 31/5 32/3 37/5 37/6 38/1 42/5 53/3 53/8 59/7 81/15 81/16 97/19 106/15 114/2 118/23 120/25

**argument's [1]** 42/23

**arguments [8]** 5/7 5/8 5/18 6/20 19/11 30/16 38/9 84/5

**Arlie [1]** 93/7

**around [11]** 22/14 38/7 51/19 94/8 94/10 94/15 96/21 96/23 97/6 107/23 130/23

**arrangement [7]** 22/9 25/11 25/13 59/14 60/15 61/10 63/6

**arrangements [1]** 58/19

**articulate [2]** 59/21 123/7

**articulated [1]** 25/22

**articulation [1]** 80/6

**artificial [1]** 63/24

**as [134]** 1/4 1/7 3/5 5/4 5/5 7/15 7/17 8/3 8/6 9/18 10/4 10/6 11/20 12/17 12/18 13/3 13/7 13/16 13/18 14/23 15/2 16/3 16/11 16/25 16/25 17/7 18/16 18/17 20/3 20/3 22/25 24/24 26/6 26/15 27/3 29/8 29/13 29/17 31/5 32/6 33/21 34/5 34/8 36/6 36/8 36/12 36/21 36/22 37/8 38/19 39/12 41/15 42/14 45/14 45/21 46/8 50/2 51/7 54/24 57/21 57/22 58/14 60/4 60/18 60/22 61/23 62/18 62/23 62/24 63/14 63/18

**as... [63]** 63/23 63/23 73/1 73/1 73/15 75/3 75/18 76/10 78/8 78/11 78/21 80/2 80/5 81/24 83/3 83/5 83/10 84/3 84/4 85/3 86/14 88/1 88/1 89/23 89/25 92/7 94/21 97/17 97/23 98/15 103/12 103/19 105/20 106/7 106/9 106/20 108/5 109/23 110/16 110/16 110/20 110/23 112/2 112/8 113/6 114/13 114/22 115/12 117/6 118/20 121/2 121/11 122/25 124/16 125/1 125/4 125/14 126/21 127/17 128/23 131/6 131/13 133/1

**aside [8]** 80/15 95/20 95/23 95/24 107/6 107/6 108/5 110/16

**ask [35]** 3/23 11/10 23/14 42/12 45/9 48/11 48/12 49/7 51/16 55/18 68/17 68/18 68/19 70/24 76/4 77/2 80/14 85/8 90/9 95/10 99/11 105/16 108/18 110/15 116/20 117/4 120/4 120/16 122/23 126/5 126/13 128/8 129/22 130/23 133/12

**asked [11]** 38/17 69/14 73/25 74/2 86/20 88/3 105/8 119/2 119/7 119/14 127/14

**asking [8]** 28/12 43/23 44/25 58/12 68/6 87/3 87/15 117/15

**asks [1]** 6/7

**aspect [1]** 58/1

**aspects [1]** 89/14

**assayers [1]** 50/13

**assert [1]** 92/5

**assertions [1]** 17/20

**asset [2]** 22/21 51/12

**associated [1]** 99/6

**Associates [1]** 116/8

**assume [21]** 9/1 12/17 18/10 18/13 18/13 18/18 18/21 19/24 24/8 24/9 28/19 31/22 81/16 95/23 97/1 98/4 98/4 100/19 101/1 126/7 131/14

**assuming [10]** 9/6 9/6 9/8 23/15 64/10 67/22 69/16 69/17 115/5 123/19

**assumption [6]** 28/23 29/4 89/13 97/19 106/16 111/9

**astray [1]** 111/3

**attached [1]** 43/10

**attempt [2]** 17/8 113/25

**attend [1]** 126/25

**attention [4]** 15/14 80/10 80/13 133/22

**attorney [2]** 129/7 134/18

**attorney-conducted [2]** 129/7 134/18

**attributable [3]** 10/11 10/17 17/12

**attribute [2]** 17/8 24/7

**au [1]** 75/15

**authorities [1]** 114/24

**authority [3]** 53/18 75/22 115/3

**authorized [1]** 110/22

**authorizes [1]** 112/4

**available [4]** 40/18 40/20 54/11 127/12

**Avenue [3]** 2/9 2/13 2/22

**avoid [3]** 100/23 105/6 117/3

**avoidance [1]** 106/9

**awarded [1]** 18/6

**awarding [2]** 48/25 49/4

**aware [1]** 76/14

**away [4]** 30/23 68/8 72/11 95/8

**awful [1]** 13/12

**B**

**back [64]** 6/3 9/6 10/12 23/18 26/12 26/21 26/22 27/8 27/25 28/8 29/18 30/2 33/1 34/2 34/11 34/21 34/22 35/5 35/7 39/9 39/22 41/6 41/8 44/15 45/4 45/7 47/7 48/18 48/19 54/17 55/15 57/24 58/20 60/23 61/1 61/3 62/25 73/9 74/25 77/21 78/24 79/1 79/5 79/25 80/18 81/2 81/4 81/10 82/7 100/15 101/8 102/3 102/16 103/5 103/6 104/7 119/11 119/14 120/14 122/3 122/19 122/19 130/23 135/1

**background [3]** 109/14 130/16 133/15

**bad [10]** 35/7 71/8 94/1 99/23 100/5 100/6 107/8 110/14 110/21 111/13

**balance [1]** 43/2

**Baltazar [1]** 104/20

**band [5]** 93/7 93/7 95/11 95/11 95/18

**bandwidth [1]** 75/10

**banning [1]** 72/20

**bargain [7]** 47/23 48/14 48/23 49/2 49/10 54/11 54/21

**bartering [1]** 61/14

**based [7]** 16/13 37/6 51/11 56/2 63/8 69/10 116/22

**bases [1]** 60/6

**basic [2]** 12/10 59/23

**basically [5]** 7/13 28/8 97/5 116/16 130/3

**basics [1]** 60/14

**basis [1]** 69/12

**bassist [1]** 93/6

**be [206]**

**bearing [1]** 7/20

**bears [1]** 105/20

**beat [1]** 70/15

**because [94]** 3/22 7/10 7/15 8/16 9/2 9/16 9/21 9/23 11/2 12/14 13/9 15/13 18/10 18/25 23/4 23/10 25/8 25/15 26/5 30/10 30/22 30/22 31/20 34/4 37/1 38/17 38/25 40/14 40/19 41/22 43/9 45/9 47/17 50/1 50/4 53/9 55/12 56/2 56/9 61/13 61/14 62/6 62/13 63/18 64/8 64/15 65/19 66/9 66/16 66/21 67/19 68/4 69/25 70/15 75/6 76/11 76/18 76/22 80/3 80/21 83/3 85/21 87/9 92/18 92/21 95/23 96/5 98/21 101/15 102/20 103/11 106/18 107/4 107/8 107/8 107/24 110/18 111/3 112/18 114/15 115/12 119/23 120/7 120/9 120/25 123/8 123/24 124/2 124/10 125/2 126/21 130/8 131/3 131/20

**becomes [3]** 69/1 75/16 124/24

**becoming [1]** 89/5

**been [71]** 6/18 8/7 9/24 10/21 16/5 16/6 16/7 16/9 16/16 16/17 20/21 21/4 21/4 21/16 23/22 24/10 26/1 26/5 26/5 30/4 30/8 32/9 32/18 33/3 37/9 41/10 41/11 41/13 45/22 46/9 46/24 47/24 49/4 50/10 52/2 54/8 57/2 59/9 60/3 61/22 61/25 61/25 62/5 62/6 64/22 66/22 67/11 68/4 68/9 72/4 72/5 74/20 76/15 80/8 86/10 88/11 88/13 89/17 91/15 104/11 107/8 107/9 112/20 120/17 123/10 124/19 128/14 129/17 130/8 131/8 133/20

**before [21]** 1/17 6/8 8/10 18/1 26/11 49/11 52/16 76/4 76/5 80/15 90/1 90/6 90/13 90/25

**before... [7]** 91/1 91/11 103/18 103/20 116/7 128/3 128/12
**beg [1]** 108/18
**begin [3]** 3/9 103/20 126/21
**beginning [2]** 16/12 25/22
**begins [2]** 20/22 103/18
**begs [2]** 66/17 66/19
**behalf [3]** 3/13 71/15 111/6
**behavior [30]** 79/23 80/1 81/8 81/12 91/11 91/20 92/2 95/7 97/18 99/17 99/20 99/23 100/5 101/9 101/19 101/21 104/15 104/24 105/1 105/5 105/8 105/25 106/2 109/22 110/17 111/10 123/4 123/20 125/4 125/5
**behavioral [4]** 45/24 78/20 79/7 81/17
**behind [4]** 104/19 106/6 106/6 116/11
**being [36]** 21/5 22/6 25/22 31/13 39/8 41/12 57/7 61/3 61/3 63/13 66/15 69/5 71/5 71/7 71/8 73/4 75/19 81/18 82/12 87/18 87/19 88/22 93/24 96/13 98/14 99/5 100/21 105/10 106/9 114/5 117/23 118/13 118/20 122/14 125/14 126/6
**being illegal [1]** 71/5
**belief [3]** 45/12 93/15 110/4
**belies [1]** 105/12
**believe [18]** 17/9 17/12 18/1 20/7 21/21 28/5 44/1 44/8 49/6 66/9 73/12 73/13 95/4 110/5 110/10 115/22 116/13 125/2
**believe he [1]** 49/6
**believed [1]** 110/2
**believes [1]** 64/10
**believing [1]** 102/24
**Bell [1]** 135/1
**below [4]** 56/6 56/7 129/3 136/4
**bench [2]** 38/5 115/2
**benchmark [1]** 24/21
**beneficial [1]** 53/10
**benefit [21]** 26/7 32/14 46/21 47/11 48/3 48/9 48/14 48/23 48/24 49/2 49/10 49/15 51/13 54/11 54/16 54/21 60/17 62/25 63/8 65/16 85/7
**benefited [1]** 26/2
**benefiting [1]** 25/24

**benefits [2]** 47/23 121/19
**beside [1]** 94/25
**besides [1]** 90/7
**best [3]** 91/23 91/23 110/3
**better [5]** 10/21 35/22 36/19 91/14 122/20
**between [13]** 12/8 21/23 41/3 49/1 49/5 61/1 86/1 87/11 92/5 92/25 110/9 118/21 123/17
**beyond [2]** 108/16 133/11
**big [7]** 30/4 30/15 75/1 94/8 107/24 118/4 131/17
**bigger [1]** 131/1
**billed [2]** 71/15 82/12
**bills [1]** 73/21
**binding [2]** 75/22 94/12
**bingo [1]** 43/7
**bit [14]** 7/14 9/20 12/20 29/22 45/18 53/22 70/6 89/5 98/9 115/10 116/23 129/6 129/19 134/24
**bits [1]** 117/22
**Bivens [1]** 130/18
**blah [20]** 30/7 30/7 30/7 30/7 30/8 45/5 45/5 45/5 92/14 92/14 92/14 92/22 92/22 92/22 111/5 111/6 111/6 123/21 123/21 123/21
**Blake [3]** 2/15 4/8 54/7
**blame [1]** 47/12
**block [1]** 96/3
**boarded [1]** 52/24
**boils [2]** 75/13 101/16
**bonita [6]** 2/21 2/23 77/17 80/23 136/9 136/10
**books [1]** 85/17
**boosted [2]** 7/1 7/2
**both [26]** 6/2 15/10 15/18 42/23 48/7 50/9 57/6 61/13 66/9 68/17 72/1 78/1 82/24 86/19 88/20 90/6 90/24 103/8 103/17 129/3 131/6 133/20 133/24 133/25 134/1 135/18
**bother [1]** 90/11
**bothers [1]** 82/2
**bottom [3]** 14/16 20/5 22/16
**bought [4]** 68/7 95/12 102/5 120/14
**bound [1]** 121/17
**box [2]** 43/18 60/21
**boxing [1]** 33/1
**breach [1]** 113/24
**break [13]** 6/7 6/8 10/14 34/19 34/19 58/1 70/2 76/4 76/6 77/17 77/18 81/1 81/3

**brief [15]** 13/5 45/3 46/7 50/2 75/25 76/1 79/15 80/2 80/12 82/21 83/18 102/11 104/15 106/18 131/23
**briefed [1]** 86/17
**briefest [1]** 82/21
**briefing [5]** 26/14 29/3 38/20 44/17 57/6
**briefly [2]** 49/23 134/15
**briefs [3]** 43/5 45/3 94/21
**bring [7]** 40/21 87/21 113/8 125/13 126/15 128/21 134/7
**brings [1]** 41/6
**broke [1]** 135/1
**brought [1]** 27/2
**bucks [11]** 38/22 42/24 43/2 43/3 43/7 54/14 54/14 58/16 71/19 76/1 76/2
**buddy [2]** 53/2 66/23
**building [6]** 36/1 51/17 51/18 51/18 51/22 77/15
**bunch [1]** 73/2
**burden [4]** 22/7 31/13 128/5 128/6
**burdens [1]** 128/7
**busily [1]** 54/8
**business [12]** 1/4 1/7 3/5 26/15 28/3 33/5 34/12 55/24 72/10 101/8 130/21 130/21
**buy [20]** 38/21 44/2 52/10 55/2 56/9 58/5 75/7 75/7 75/8 75/20 96/9 96/10 119/8 119/12 119/21 119/22 119/24 119/25 120/5 120/6
**buying [1]** 28/3
**buys [2]** 43/14 120/10
**bypass [55]** 12/17 16/10 16/16 16/17 16/17 16/20 16/20 17/3 17/25 18/3 18/5 18/6 18/14 18/19 18/21 19/5 21/14 21/15 23/20 23/21 24/11 27/23 33/7 33/13 34/1 39/8 67/7 67/7 75/8 92/24 92/25 94/7 94/8 94/8 94/8 94/9 94/13 94/13 96/14 96/20 99/24 99/25 100/6 100/15 100/20 101/16 102/17 102/18 105/6 105/10 106/9 109/2 109/2 109/4 117/2
**bypassed [1]** 10/5

## C

**C-r-u-z [1]** 88/24
**C.L [1]** 2/4
**calculate [3]** 69/15 83/2 83/6
**calculates [1]** 69/22

**C**

**calculation [4]** 8/24 20/21 28/21 124/6

**calculus [1]** 20/22

**California [1]** 61/1

**call [111]** 7/22 7/22 7/22 7/23 18/22 20/9 20/11 20/12 20/13 20/16 20/19 20/20 20/21 21/1 21/1 21/3 21/7 23/17 24/9 25/4 25/6 25/18 25/23 27/22 28/13 28/13 29/1 33/12 33/22 34/4 34/12 34/12 34/13 34/24 37/23 39/5 39/5 39/6 43/3 56/14 56/16 56/23 58/8 58/16 58/18 58/20 58/21 58/21 58/23 60/17 60/18 60/23 61/25 62/1 62/3 62/5 62/9 62/12 62/16 62/17 62/19 62/20 62/22 63/1 63/2 63/5 63/11 63/19 63/20 64/15 64/16 64/18 64/20 64/22 64/25 65/13 65/24 66/9 66/13 66/17 66/20 67/5 67/6 67/7 67/11 67/19 67/20 67/25 68/11 68/11 71/8 71/11 71/25 72/5 74/17 74/24 75/1 75/3 75/12 75/13 77/4 80/9 80/13 80/16 81/8 86/3 99/6 104/6 123/15 123/15 123/17

**called [8]** 14/10 16/17 16/17 25/18 65/9 67/10 91/20 93/7

**caller [14]** 20/13 23/16 23/19 23/20 24/8 24/11 24/14 60/25 60/25 60/25 62/15 63/10 66/25 67/3

**callers [1]** 86/7

**calling [7]** 23/16 25/11 25/12 61/1 62/7 62/14 67/1

**calls [41]** 8/19 8/19 22/6 33/7 33/13 33/23 34/1 39/3 55/25 56/19 57/15 57/16 60/11 61/3 63/8 65/8 66/14 66/15 66/21 66/24 67/1 67/2 68/11 70/10 71/12 71/14 71/21 72/11 73/22 73/22 74/22 86/4 86/7 87/12 92/18 99/19 101/16 123/9 123/19 124/9 124/9

**calls: [1]** 20/12

**calls:  one [1]** 20/12

**came [8]** 12/21 18/14 18/20 55/12 56/19 74/22 74/25 99/22

**can [103]** 3/24 3/25 4/3 4/25 5/24 6/2 11/11 11/13 17/5 17/13 18/8 18/19 19/3 25/15 27/21 29/25 31/4 31/17 36/6

36/14 36/14 39/15 42/8 42/12 48/14 49/23 55/4 55/17 55/19 55/24 56/14 56/16 56/18 57/1 59/23 61/21 69/1 73/1 75/10 75/17 75/18 76/1 76/25 77/18 77/19 77/22 78/12 78/13 81/9 82/16 83/4 88/22 89/16 89/23 91/3 92/17 93/4 93/4 96/9 96/10 99/15 100/18 102/8 102/12 103/5 103/5 103/15 104/4 104/6 105/15 106/2 106/13 107/15 108/3 108/18 108/20 113/8 113/18 114/3 114/5 114/7 114/12 114/12 114/13 114/22 120/13 122/16 125/9 126/3 128/10 128/12 128/16 128/17 128/24 128/25 129/2 129/2 129/9 130/4 134/17 135/6 135/18 135/19

**can't [22]** 5/21 12/4 32/12 37/9 41/20 75/23 88/4 88/8 92/25 93/3 95/16 102/9 102/19 102/20 102/21 107/7 107/7 110/5 114/22 120/12 124/23 129/9

**candid [3]** 15/1 16/5 23/2

**candor [2]** 78/5 78/7

**cannot [8]** 12/12 17/7 120/5 120/7 120/8 120/10 121/6 121/21

**capacity [1]** 110/20

**car [3]** 54/13 54/15 54/16

**card [34]** 38/21 38/23 39/7 42/25 43/2 43/14 43/14 43/15 43/17 43/22 43/22 44/2 44/24 58/5 58/5 58/16 58/23 59/8 59/25 62/13 62/13 92/8 92/10 92/18 96/3 97/6 98/22 99/7 99/8 100/20 121/8 121/10 121/13 121/21

**cards [26]** 34/7 34/9 42/16 72/22 95/25 96/8 96/9 96/10 96/13 96/20 98/14 98/21 99/18 119/8 119/9 119/12 119/15 119/17 119/19 119/21 119/22 119/25 120/5 121/18 123/5 125/3

**care [6]** 32/21 95/14 106/18 106/19 106/22 133/22

**career [1]** 70/19

**cares [1]** 34/2

**carrier [11]** 20/14 25/9 33/15 34/3 57/9 63/21 71/9 71/10 71/15 72/2 73/21

**carrier's [1]** 61/19

**carriers [2]** 30/13 105/9

**carrying [1]** 60/24

**case [99]** 1/5 3/5 3/6 5/3 7/24 8/23 11/3 23/3 23/3 24/10 26/17 30/3 30/23 31/1 31/1 32/7 32/23 35/17 36/2 36/4 36/5 36/15 36/18 36/25 37/9 41/8 41/10 41/12 41/15 44/8 44/8 48/15 48/16 49/8 49/8 54/9 54/10 70/10 77/4 77/4 78/14 83/8 83/10 83/11 83/23 84/1 84/9 84/11 84/16 84/23 84/25 88/8 88/18 88/21 89/1 89/14 94/4 94/9 94/17 94/25 97/2 99/22 101/2 101/6 102/10 104/7 105/9 107/3 107/11 107/17 109/2 109/4 111/11 112/15 112/17 112/18 112/22 113/5 113/10 113/22 113/25 114/1 114/12 114/12 116/7 116/8 116/9 116/11 125/6 128/1 128/3 129/9 129/10 129/20 130/15 132/13 132/24 133/18 134/17

**cases [20]** 41/11 41/21 45/10 49/22 50/9 50/10 84/13 88/24 102/10 103/16 108/23 111/25 112/5 112/25 113/2 114/9 130/13 130/17 131/2 131/5

**catch [1]** 59/5

**categories [1]** 19/14

**category [3]** 19/8 19/16 19/18

**caught [1]** 120/17

**cause [2]** 113/8 136/6

**caused [3]** 43/4 125/10 125/12

**caution [1]** 36/8

**cautious [1]** 110/10

**caveat [1]** 64/10

**CDR [1]** 13/2

**CDRs [9]** 7/22 13/1 16/23 33/7 33/11 33/12 33/16 33/24 34/5

**cell [1]** 63/21

**cent [9]** 7/18 20/2 21/5 21/6 22/8 22/8 26/3 28/13 61/17

**central [1]** 116/12

**cents [87]** 7/16 8/17 8/18 8/23 8/24 19/23 20/1 20/2 20/6 20/7 20/9 20/22 21/7 21/19 21/20 21/23 22/1 22/16 23/9 24/17 25/10 25/10 28/14 28/15 28/20 28/21 29/5 34/17 34/18 34/24 39/5 39/5 39/5 39/6 56/17 56/18 56/22 56/24 56/25 57/3 57/9 58/8 58/17 58/17 58/19 58/21 58/23 59/1 59/9 59/9

**C**

**cents... [37]** 60/19 61/14 62/9 62/20 63/3 64/15 64/24 65/2 65/4 65/7 65/12 65/16 65/24 65/25 65/25 66/10 66/10 67/15 67/20 67/25 68/2 68/3 71/16 71/20 72/1 72/2 72/5 72/6 72/7 72/13 72/13 72/14 74/11 74/13 75/15 88/13 88/14

**CEO [12]** 107/14 107/20 108/3 109/11 109/16 109/18 110/16 110/16 111/6 111/21 112/3 117/6

**certain [10]** 23/25 24/1 38/17 75/9 83/25 102/25 113/3 113/17 113/18 113/18

**certainly [5]** 10/15 27/1 61/2 61/4 122/6

**certified [1]** 136/7

**certify [1]** 136/4

**chair [1]** 104/14

**challenged [1]** 116/12

**chambers [3]** 104/4 104/5 104/7

**chance [1]** 31/9

**change [1]** 118/14

**characteristics [1]** 75/10

**characterized [1]** 99/2

**charge [16]** 25/9 25/10 52/15 56/17 61/14 62/9 62/19 63/5 63/15 63/16 65/17 68/16 71/19 74/3 74/11 76/11

**chargeable [1]** 13/21

**charged [10]** 25/16 34/25 56/4 58/8 58/14 58/17 60/18 63/13 74/1 74/11

**charges [4]** 26/6 62/7 66/6 130/15

**charging [1]** 61/15

**chart [2]** 11/19 14/4

**chat [1]** 130/11

**cheapest [1]** 68/14

**cheese [2]** 125/21 125/21

**Cherine [2]** 2/4 3/12

**chooses [1]** 85/4

**chose [1]** 30/14

**Chris [2]** 76/25 78/23

**Christopher [2]** 2/12 4/6

**circuit [7]** 31/4 36/14 41/5 78/13 98/24 112/9 126/24

**circumstance [3]** 22/9 50/3 51/5

**circumstances [5]** 58/2 83/25 88/22 99/19 114/21

**circumstantial [12]** 16/13 17/2 17/14 17/14 18/4 18/20 19/4 27/6 29/23 30/7 33/3 34/13 106/8

**citation [4]** 49/12 49/13 113/21 113/22

**cite [10]** 49/10 83/23 84/24 88/25 105/17 105/18 107/22 115/13 115/16 116/8

**cited [14]** 50/2 54/9 57/7 74/6 74/7 83/10 83/15 83/18 83/19 107/11 108/23 112/23 113/1 113/5

**City [1]** 54/25

**civil [12]** 31/1 50/9 77/4 90/3 128/3 128/20 129/16 129/20 130/13 130/17 131/5 133/3

**claim [33]** 7/16 10/20 27/11 27/15 28/7 28/11 28/15 28/16 38/11 38/12 38/13 40/21 41/18 42/3 46/12 46/14 46/17 46/19 47/3 47/7 47/25 48/7 48/8 56/1 56/24 57/1 57/18 57/22 94/22 94/24 113/9 114/4 117/23

**claiming [2]** 65/6 65/6

**claims [7]** 4/24 20/16 20/17 41/21 66/16 89/23 126/6

**clarification [1]** 105/16

**clarified [1]** 9/18

**clarify [3]** 33/6 80/11 135/9

**clarifying [1]** 88/5

**clear [27]** 10/18 13/6 23/4 31/3 31/13 31/16 31/20 31/24 32/1 32/18 43/25 55/8 78/6 78/7 79/10 83/8 83/17 86/12 88/12 91/16 106/7 107/4 108/12 108/15 113/5 114/16 127/15

**clearer [1]** 89/5

**clearly [4]** 4/1 12/25 82/17 109/16

**clerk [1]** 49/21

**clever [1]** 10/14

**click [4]** 43/18 44/5 92/21 121/17

**clicking [1]** 44/6

**client [7]** 10/4 17/5 17/8 17/10 23/25 37/18 37/22

**clients [1]** 23/23

**climb [1]** 10/13

**close [4]** 15/1 35/18 36/11 112/22

**closed [1]** 78/10

**closer [2]** 89/3 127/18

**Cloture [1]** 104/11

**clue [3]** 73/13 100/8 120/22

**co [3]** 11/15 35/12 54/8

**co-counsel [3]** 11/15 35/12 54/8

**Coast [1]** 80/20

**coda [1]** 83/10

**codas [1]** 82/21

**cogent [1]** 37/5

**colleagues [2]** 129/23 129/25

**collect [2]** 113/25 114/7

**collection [2]** 7/19 20/4

**college [8]** 83/12 84/17 84/18 84/18 85/5 85/5 85/10 85/18

**Colton [1]** 98/25

**Columbia [1]** 130/24

**combination [2]** 17/3 42/22

**combined [5]** 64/15 65/8 65/21 65/23 66/14

**come [26]** 28/8 29/18 30/14 35/17 37/13 58/16 73/9 77/21 78/24 79/1 79/5 79/25 80/18 81/2 81/4 81/10 82/6 83/5 93/13 93/17 95/16 103/5 103/6 129/18 129/25 130/2

**comes [6]** 8/17 55/25 74/23 74/23 86/22 103/23

**comfortable [2]** 6/23 53/16

**coming [4]** 44/15 99/6 109/1 125/7

**comment [4]** 12/16 26/9 48/11 127/23

**commerce [1]** 121/5

**commercial [1]** 102/13

**commits [1]** 96/12

**committed [4]** 10/16 51/23 68/1 86/8

**Committee [2]** 35/14 36/17

**committing [1]** 112/3

**common [7]** 40/22 56/4 81/23 83/16 96/12 97/4 124/18

**communicate [3]** 47/2 47/14 125/8

**communications [11]** 56/1 57/18 73/6 74/20 75/3 75/5 75/9 89/1 89/2 95/21 131/19

**community [6]** 24/20 83/12 84/16 85/5 85/10 85/17

**companies [1]** 24/1

**company [15]** 25/18 109/7 109/8 109/18 109/19 110/17 113/17 114/8 114/22 116/16 117/25 134/16 134/21 134/23 134/25

**company's [1]** 13/17

**compare [1]** 10/4

**compared [1]** 10/6

**comparison [2]** 12/8 15/12
**compensate [2]** 83/20 85/1
**compensates [1]** 9/3
**compensation [1]** 62/21
**competition [4]** 56/8 56/10 59/18 72/18
**competitive [1]** 56/5
**competitors [1]** 56/6
**complaining [2]** 72/15 72/17
**complaint [6]** 59/4 70/11 70/23 73/20 107/20 113/14
**complaints [1]** 59/4
**complete [2]** 66/19 66/21
**completed [9]** 17/10 18/3 21/4 22/6 23/11 61/25 64/12 64/14 66/15
**completely [6]** 20/5 21/2 23/2 37/3 53/7 96/19
**completes [1]** 63/2
**completion [1]** 21/1
**complex [1]** 104/25
**complicated [5]** 8/12 30/15 58/11 59/16 62/25
**component [4]** 17/9 61/8 65/2 65/4
**components [1]** 15/25
**computers [1]** 52/16
**conceal [1]** 93/21
**concealing [2]** 93/25 96/13
**concealment [31]** 27/16 51/15 81/23 82/3 90/20 90/22 94/2 96/17 97/5 97/12 97/24 98/4 98/8 98/8 98/14 98/23 99/1 99/2 99/10 99/12 101/23 101/23 102/20 103/11 103/12 103/14 114/18 123/4 123/12 126/8 131/16
**conceals [1]** 60/24
**conceivable [2]** 7/24 57/1
**concept [1]** 90/22
**concern [1]** 117/21
**concerned [2]** 24/23 29/13
**concerns [2]** 7/11 12/7
**concert [2]** 93/12 93/13
**concluded [1]** 135/25
**concludes [1]** 135/23
**conclusion [1]** 55/13
**conclusions [2]** 15/15 15/18
**condition [1]** 22/9
**conditions [15]** 43/11 43/13 43/15 43/19 43/23 44/8 44/12 45/1 45/9 45/12 121/10 121/11 121/12 121/14 121/15

**conduct [5]** 8/3 38/15 113/7 116/12 116/16
**conducted [2]** 129/7 134/18
**conference [20]** 3/10 3/23 3/25 35/24 36/2 36/21 84/6 90/2 90/6 91/1 112/1 127/5 127/25 128/2 128/12 128/13 128/18 129/8 135/14 135/21
**confidence [1]** 38/3
**confident [1]** 118/6
**confidential [2]** 12/3 12/7
**confirm [3]** 5/9 118/6 120/20
**confirmed [2]** 59/6 106/8
**conflict [1]** 106/15
**conformed [1]** 136/7
**conformity [1]** 123/2
**confused [1]** 55/13
**confusing [1]** 84/10
**confusion [1]** 36/19
**conjunction [1]** 24/18
**connected [1]** 39/19
**connection [4]** 11/12 21/17 122/23 123/6
**conscious [1]** 105/24
**consent [1]** 129/17
**consequently [1]** 56/25
**considered [1]** 76/18
**consistent [1]** 124/18
**consistently [1]** 133/8
**constitutes [1]** 97/23
**constraints [2]** 77/3 80/4
**consumer [3]** 24/24 25/24 26/2
**contemplate [2]** 61/3 61/5
**contemporaneous [1]** 33/5
**contemporaneously [1]** 34/12
**contend [1]** 94/6
**content [4]** 70/12 75/12 75/14 75/16
**contention [2]** 44/10 92/15
**contest [3]** 8/20 8/21 76/22
**contesting [1]** 108/1
**context [5]** 51/1 51/9 69/22 74/25 111/14
**continue [1]** 91/9
**contract [27]** 28/11 28/12 28/15 29/8 38/11 38/25 45/10 49/25 50/1 50/4 50/6 51/3 51/10 75/18 75/20 86/25 87/16 87/20 92/5 92/17 92/23 94/19 113/25 120/4 121/3 121/25 122/7
**contract-like [1]** 87/16
**contractors [1]** 120/18
**contracts [2]** 24/1 74/13
**contractual [4]** 23/1 29/9

**contradicts [1]** 70/11
**contrary [3]** 37/19 37/20 44/15
**contrast [1]** 12/18
**contrivances [1]** 99/3
**control [3]** 113/2 116/24 127/3
**conversation [4]** 20/20 50/4 106/4 106/10
**conversion [1]** 126/7
**converted [1]** 10/16
**convince [2]** 79/10 82/4
**convinced [1]** 53/9
**convincing [8]** 31/3 31/14 31/16 31/20 31/25 32/1 32/18 83/17
**coordinator [1]** 131/9
**copies [1]** 135/20
**copying [1]** 76/1
**corner [2]** 54/25 125/17
**corners [1]** 97/12
**corporate [10]** 33/21 107/5 107/17 108/6 108/7 108/15 111/23 113/11 113/25 116/13
**corporation [11]** 1/3 106/23 107/7 110/21 110/24 111/7 111/11 111/15 112/3 114/5 114/7
**corporations [1]** 90/15
**correct [37]** 12/23 28/6 30/18 30/21 37/13 41/18 45/2 51/1 58/25 59/3 59/11 60/15 62/3 65/14 66/7 66/11 67/12 67/16 67/21 67/22 72/8 72/10 83/17 105/2 105/6 105/7 105/10 105/11 113/12 115/13 117/19 118/10 119/18 119/20 120/6 121/9 136/5
**correctly [7]** 17/7 18/23 19/9 26/16 29/8 48/22 83/19
**corresponding [1]** 124/1
**cost [8]** 19/22 19/23 24/24 51/11 52/20 53/4 53/19 63/16
**costs [12]** 10/2 10/11 10/13 10/24 19/2 19/6 23/8 28/25 29/2 73/24 85/9 88/2
**could [19]** 10/9 12/17 12/21 13/24 23/17 32/8 32/16 32/17 40/15 45/13 49/14 49/21 56/3 56/3 83/3 84/20 93/25 94/19 126/14
**couldn't [1]** 65/1
**counsel [10]** 3/8 3/18 3/23 4/3 11/15 14/22 15/11 35/12 54/8 70/12
**counterclaim [3]** 73/7 95/21

**counterclaim... [1]** 121/25
**counterclaims [9]** 4/17 4/24 68/23 118/8 126/6 127/24 131/14 131/19 131/20
**counterfeit [3]** 52/9 52/17 52/17
**counting [1]** 11/15
**country [7]** 12/17 16/17 21/15 37/23 67/6 75/8 119/23
**counts [1]** 83/5
**couple [4]** 7/3 29/14 119/4 129/16
**course [13]** 12/24 18/9 26/22 41/7 49/16 49/16 50/21 54/20 56/2 65/5 89/11 94/1 123/24
**court [31]** 1/1 1/18 2/21 3/19 6/6 6/7 6/25 23/3 24/23 36/13 46/22 48/21 69/21 76/13 83/14 84/19 84/20 86/22 86/24 86/24 87/3 88/21 101/3 101/6 114/5 118/13 118/16 118/16 133/23 134/17 136/11
**Court's [2]** 32/7 46/10
**Courthouse [1]** 2/21
**courts [3]** 41/15 107/4 130/24
**cousin [4]** 25/4 25/4 25/5 27/22
**covenants [1]** 44/9
**cover [2]** 5/5 19/1
**covered [5]** 19/7 28/21 29/1 46/5 88/2
**covering [2]** 28/25 98/12
**COVID [6]** 126/23 127/3 128/20 130/1 131/8 135/10
**COVID-19 [1]** 131/8
**create [5]** 17/11 33/12 98/11 113/6 113/17
**created [1]** 34/12
**creates [2]** 92/16 111/13
**creating [1]** 92/11
**creative [1]** 122/15
**credibility [3]** 32/13 109/24 134/6
**credits [1]** 22/10
**crimes [1]** 10/15
**criminal [6]** 50/9 50/10 77/8 129/19 130/15 131/2
**critical [2]** 7/12 7/13
**critically [1]** 14/11
**cross [3]** 69/6 95/4 133/10
**cross-examination [1]** 69/6
**cross-examiner [1]** 133/10
**CRR [2]** 2/21 136/10

**Cruz [1]** 88/24
**crystal [1]** 106/7
**crystallize [1]** 15/13
**CSR [2]** 2/21 136/10
**cubbyhole [1]** 125/25
**Cullinane [1]** 44/8
**curious [1]** 130/8
**customers [2]** 28/4 56/9
**cut [9]** 39/8 57/5 72/21 73/4 102/7 123/10 123/16 125/3 125/3
**cutoff [1]** 123/17
**cutting [2]** 123/5 126/18
**cv [3]** 1/5 3/7 48/17

**D**

**D.C [1]** 2/13
**damage [11]** 19/2 19/8 37/11 52/3 53/11 53/14 59/21 68/2 69/5 72/9 125/12
**damaged [8]** 8/3 8/7 9/2 52/2 57/2 59/10 60/3 61/22
**damages [102]** 7/14 8/13 9/10 11/2 11/3 14/24 15/3 15/21 17/12 19/8 19/16 19/19 24/25 26/11 26/21 27/5 27/14 27/19 28/12 29/15 29/16 30/19 31/3 36/17 37/1 37/7 37/25 40/16 40/23 42/5 42/11 45/21 45/22 46/6 47/22 48/13 48/22 49/22 50/6 50/17 51/5 52/19 52/21 54/22 55/12 55/14 55/19 55/25 56/2 64/6 64/13 65/6 65/7 68/20 68/23 69/10 69/15 69/22 70/2 70/4 78/3 78/17 82/22 83/2 83/3 83/7 84/7 85/1 85/4 85/15 85/23 86/11 86/25 87/20 88/2 88/7 89/6 89/18 90/20 90/23 90/25 91/8 91/11 94/17 117/22 122/25 123/7 123/9 124/1 124/2 124/5 124/6 124/13 124/19 125/10 125/12 125/18 125/25 126/3 132/1 132/3 132/5
**dangerous [1]** 32/10
**dare [1]** 105/13
**data [4]** 13/17 16/12 30/10 37/23
**date [5]** 29/13 35/18 127/25 128/4 136/10
**Daubert [1]** 4/20
**Davel [1]** 5/3
**Davis [1]** 2/12
**day [11]** 29/22 34/3 37/25 38/18 44/17 57/16 73/12 98/2

111/4 126/10 135/1
**days [5]** 7/3 74/24 126/15 126/19 126/22
**dba [2]** 3/13 3/21
**deactivate [7]** 96/11 97/2 97/3 97/12 98/22 100/22 100/24
**deactivated [1]** 97/4
**deactivation [2]** 96/14 97/6
**deal [8]** 11/22 28/2 57/12 93/17 94/23 104/7 107/24 133/4
**dealing [2]** 115/12 130/25
**dealt [1]** 106/3
**deauthenticate [2]** 96/6 96/8
**deauthorize [1]** 96/4
**debt [1]** 113/25
**decade [1]** 10/21
**deceiving [1]** 102/2
**deceptive [1]** 99/2
**decide [12]** 31/15 31/21 78/9 89/4 92/2 102/7 110/2 110/10 110/11 124/8 128/1 132/25
**decided [2]** 83/3 91/25
**decision [7]** 9/20 9/20 28/6 83/14 98/24 104/19 115/5
**decisions [4]** 84/3 116/5 116/15 116/18
**declaration [3]** 11/14 12/13 69/20
**declarations [1]** 43/9
**declare [1]** 76/1
**decrement [1]** 43/4
**deduct [1]** 58/6
**deduction [1]** 7/18
**deducts [1]** 20/1
**defeat [1]** 10/14
**defendant [17]** 4/12 4/17 5/15 5/23 22/24 36/11 50/11 90/5 106/21 106/22 114/20 116/20 117/6 117/10 128/6 129/19 130/16
**defendant's [1]** 118/7
**defendants [10]** 1/9 2/12 4/3 4/6 4/7 4/8 4/15 79/15 79/18 130/6
**defendants' [5]** 4/13 4/19 4/21 5/23 6/11
**defer [1]** 80/20
**definitely [2]** 89/19 97/21
**definition [1]** 98/7
**defraud [2]** 111/18 111/19
**defrauded [3]** 49/3 50/16 55/5
**defrauding [1]** 52/18
**deliberate [2]** 128/22 128/24
**delighted [2]** 6/17 88/1
**delivers [1]** 71/11

**delivery [1]** 71/11
**delve [1]** 84/1
**demonstrably [1]** 51/4
**demonstrate [1]** 51/6
**demonstrated [1]** 51/4
**denied [3]** 37/20 64/14 97/9
**depart [2]** 104/2 115/6
**depend [1]** 41/20
**dependent [1]** 126/23
**depending [5]** 83/5 92/1 114/4 130/15 130/15
**depends [1]** 25/9
**deployed [1]** 81/16
**deploying [1]** 106/5
**deposition [10]** 33/20 74/5 104/20 105/3 115/23 115/24 119/2 119/3 119/5 133/9
**depositions [4]** 57/6 73/2 90/8 90/8
**deprived [1]** 33/3
**derived [1]** 14/16
**describe [1]** 119/21
**described [5]** 17/24 26/15 71/22 76/10 121/2
**describes [2]** 16/25 20/3
**description [2]** 20/18 70/8
**deserved [1]** 9/13
**desperately [1]** 76/9
**despite [1]** 89/13
**detail [4]** 7/23 9/12 28/4 38/16
**detailed [4]** 34/11 117/1 123/13 132/12
**details [1]** 99/23
**detect [1]** 72/21
**detection [3]** 105/6 106/9 117/3
**determination [1]** 8/2
**determine [5]** 16/10 27/3 48/1 114/5 123/1
**determined [4]** 53/1 53/1 63/24 63/25
**detriment [2]** 52/1 52/1
**Development [1]** 88/24
**develops [1]** 88/19
**dial [1]** 74/25
**dial-up [1]** 74/25
**did [57]** 5/10 5/12 5/15 5/16 8/20 9/1 9/20 12/8 12/9 20/8 29/7 37/14 40/1 40/1 44/20 52/9 55/10 57/13 64/21 64/24 66/17 66/18 66/19 66/20 67/10 76/22 84/13 84/25 86/5 86/25 87/24 88/7 88/10 91/2 91/10

97/17 97/19 97/20 97/21 98/5 98/5 98/21 99/18 104/16 105/17 105/17 107/21 110/1 111/11 111/16 111/17 115/13 120/20 121/9 123/21 123/21 134/16
**didn't [42]** 5/22 6/19 8/20 8/21 9/12 12/9 12/14 12/25 28/14 29/21 30/2 32/2 32/6 37/18 37/22 38/15 39/23 43/21 43/21 44/14 45/7 53/11 57/19 59/5 67/18 67/23 73/1 73/8 81/13 86/18 87/9 103/7 115/16 118/15 118/16 120/9 120/19 121/17 121/17 122/2 122/3 125/23
**difference [12]** 13/4 13/16 13/18 49/1 49/4 53/24 54/5 63/15 86/9 86/10 117/9 133/17
**different [10]** 15/25 19/11 19/21 28/16 45/22 60/6 75/16 75/16 83/4 99/1
**difficult [3]** 98/19 100/23 101/25
**difficulty [1]** 47/22
**Digicel [114]** 1/4 3/6 3/14 3/21 7/15 8/3 12/6 12/10 16/2 17/11 18/6 18/19 18/25 19/3 19/6 19/25 20/2 20/3 20/6 20/15 20/25 21/5 21/8 21/8 21/16 21/18 21/25 22/7 22/18 24/11 24/15 24/16 24/18 24/25 33/11 33/21 33/25 42/20 43/6 43/9 43/21 43/24 44/23 46/12 46/14 46/15 46/17 46/17 46/18 47/2 47/3 47/5 47/6 48/9 56/17 56/21 58/3 59/1 60/9 60/10 60/15 60/22 61/2 61/4 61/9 61/18 61/22 61/25 62/5 62/18 62/20 63/2 63/3 63/5 63/7 64/5 64/14 64/21 64/23 64/25 65/11 65/22 65/24 67/2 67/14 67/17 67/19 67/20 68/3 68/10 68/12 68/18 68/19 70/9 71/10 71/11 71/15 72/1 72/12 73/21 76/11 86/5 87/10 92/6 95/25 100/21 102/2 102/24 105/9 110/19 111/8 118/21 120/2 121/9
**Digicel-Haiti [90]** 3/6 3/14 3/21 8/3 17/11 18/19 18/25 19/3 19/25 20/2 20/3 20/6 20/15 20/25 21/5 21/8 21/8 21/16 21/25 22/7 22/18 24/11 24/25 42/20 43/6 43/9 43/21 43/24 44/23 46/14 46/15 46/17 46/17

46/18 47/2 47/3 47/5 47/6 56/17 56/21 58/3 59/1 60/9 60/10 60/15 60/22 61/2 61/4 61/9 61/18 61/25 62/5 62/18 62/20 63/2 63/3 63/5 63/7 64/5 64/14 64/21 64/23 64/25 65/11 65/22 65/24 67/2 67/14 67/17 67/19 67/20 68/12 68/18 68/19 70/9 71/10 71/15 72/1 73/21 76/11 86/5 87/10 92/6 95/25 100/21 102/2 102/24 105/9 110/19 111/8
**Digicel-Haiti's [8]** 12/6 12/10 19/6 33/21 33/25 46/12 61/22 68/3
**digital [5]** 20/8 21/2 66/15 75/4 87/13
**digitally [1]** 58/5
**dire [4]** 129/7 131/10 134/11 134/18
**direct [11]** 18/2 50/3 63/22 111/15 112/20 112/25 113/3 113/6 133/5 133/7 133/10
**directed [6]** 67/4 78/8 107/20 110/22 117/25 121/12
**directing [1]** 121/14
**direction [1]** 125/14
**directly [7]** 3/24 28/2 42/20 44/23 54/9 70/11 111/7
**disagree [9]** 15/24 19/21 20/5 22/23 35/21 66/2 66/8 125/11 132/4
**disagreeing [1]** 100/17
**disavowed [2]** 17/19 17/20
**disciplined [1]** 76/7
**disclose [1]** 133/6
**disclosed [3]** 133/19 133/20 134/1
**discover [4]** 98/17 98/20 98/22 101/25
**discovered [1]** 51/21
**discovery [1]** 38/15
**discretion [3]** 36/24 91/14 122/20
**discuss [2]** 131/12 131/12
**discussed [4]** 5/19 5/21 46/9 98/25
**discussion [9]** 20/19 78/20 79/2 98/5 101/1 121/23 122/7 123/20 124/13
**discussions [2]** 115/7 124/16
**disgorge [1]** 27/17
**disgorged [1]** 48/4
**dismiss [6]** 27/18 27/18 28/6 36/2 37/21 108/8

**dismissed [4]** 41/9 41/11 41/23 106/20
**dismissing [3]** 41/21 42/3 94/22
**dispositive [1]** 29/14
**dispute [14]** 7/24 27/4 32/14 36/3 36/18 62/11 85/25 86/16 89/7 92/7 97/17 105/14 116/3 130/21
**disputed [4]** 32/11 131/13 131/17 131/21
**disputing [1]** 124/25
**disqualification [1]** 129/15
**disqualify [1]** 129/13
**dissatisfied [1]** 15/19
**distance [1]** 52/25
**distinction [2]** 41/3 70/8
**distinctions [1]** 50/25
**distinguish [1]** 113/23
**distorts [1]** 101/24
**distracted [1]** 129/24
**distribute [1]** 101/16
**district [8]** 1/1 1/2 1/18 2/21 113/21 128/20 130/24 130/24
**diverting [1]** 72/11
**divided [1]** 8/22
**Dizick [5]** 83/11 84/1 84/9 84/16 124/16
**do [133]** 6/1 6/24 11/8 11/24 19/9 19/10 22/11 23/1 23/7 23/25 24/1 25/5 26/15 26/16 26/17 29/21 30/2 30/8 32/11 33/13 34/4 35/16 36/24 37/18 37/22 38/13 44/14 44/23 49/8 51/19 51/19 51/19 51/20 57/10 57/12 63/11 69/3 69/4 70/1 70/6 72/15 72/18 73/8 73/8 73/9 73/10 73/11 75/23 77/2 77/4 77/5 77/11 77/20 77/22 78/6 79/4 79/4 80/18 80/19 80/19 80/23 81/3 83/8 84/3 84/10 86/23 86/25 89/5 89/22 89/25 90/19 90/22 91/13 92/13 93/3 93/20 93/20 94/2 94/14 94/15 94/15 94/24 96/8 96/22 100/8 100/22 100/24 100/24 101/8 101/13 102/6 102/7 102/8 102/8 102/19 102/21 102/22 103/2 104/4 104/4 106/7 107/23 107/23 109/21 110/10 111/1 111/19 111/24 112/15 112/17 112/21 119/11 119/11 119/22 119/23 119/24

119/25 120/9 120/20 122/17 123/1 125/19 126/3 127/3 127/25 129/6 129/8 131/18 131/18 132/11 132/11 132/11 133/4
**Docket [7]** 4/13 4/14 4/17 4/19 4/22 11/14 11/17
**document [1]** 134/3
**documents [5]** 13/23 16/6 78/5 90/3 128/4
**does [32]** 12/23 13/15 15/13 17/11 40/18 45/15 48/13 49/9 53/15 53/16 53/17 61/2 61/5 62/20 63/5 76/17 79/8 82/9 84/24 90/5 96/17 99/21 100/11 113/15 113/23 114/3 114/23 116/9 117/9 119/8 124/17 130/10
**doesn't [19]** 16/2 25/1 31/10 32/1 40/16 60/20 66/23 78/12 87/13 94/1 94/7 94/22 95/4 95/4 96/20 96/22 101/20 111/24 133/5
**dog [2]** 16/19 16/21
**doing [22]** 1/3 1/7 3/5 10/21 13/20 27/23 45/8 73/14 73/15 86/23 88/17 90/13 94/1 94/8 95/1 95/6 95/8 100/12 101/23 109/19 110/21 129/17
**dollar [2]** 22/8 22/8
**dollars [2]** 8/22 8/23
**don't [92]** 6/8 10/19 11/2 11/3 11/3 16/23 22/13 23/5 23/23 23/24 24/2 25/8 25/18 27/6 30/9 32/17 33/19 34/6 34/22 36/15 36/24 38/3 38/17 39/9 40/19 41/24 43/11 44/19 46/2 49/7 49/11 52/1 64/10 67/3 69/4 69/8 69/17 69/18 70/6 72/20 73/5 74/1 74/6 74/7 77/8 77/15 79/1 81/2 81/4 81/24 82/11 82/11 82/12 85/12 85/15 86/18 87/25 88/17 89/10 90/11 90/11 91/7 95/14 96/4 97/3 97/22 98/11 99/25 100/13 101/8 101/12 103/25 105/19 106/18 106/19 106/22 107/16 115/5 115/16 117/4 120/2 120/2 120/8 120/13 126/5 126/7 128/8 131/11 131/12 132/21 134/4 135/15
**done [17]** 13/21 36/1 45/19 58/1 60/12 64/22 64/25 67/9 69/25 70/1 100/1 100/21 107/2 107/9 126/14 126/14 126/15

**doorman [2]** 93/13 93/19
**double [1]** 135/13
**double-sided [1]** 135/13
**doubt [2]** 32/14 107/1
**down [14]** 13/8 29/6 44/19 53/3 56/10 75/8 75/13 101/16 106/25 110/18 128/25 129/2 129/3 130/1
**downstream [1]** 121/6
**dozen [1]** 135/17
**draft [1]** 128/11
**drafted [2]** 80/8 116/25
**dragging [2]** 117/24 120/24
**dramatically [1]** 115/6
**Drawing [1]** 55/22
**drawn [1]** 31/12
**drill [1]** 29/6
**dropped [1]** 20/19
**DuBay [2]** 2/15 4/7
**during [1]** 12/19
**duties [1]** 121/20

**E**

**each [11]** 19/1 19/6 51/13 57/9 83/16 99/14 114/19 128/7 133/16 135/15 135/16
**earlier [1]** 6/6
**early [2]** 37/19 127/6
**earned [2]** 84/21 85/13
**easier [1]** 64/8
**easily [1]** 55/4
**ECF [1]** 76/3
**economically [3]** 53/8 64/2 68/14
**economics [1]** 56/12
**ecstatic [1]** 15/14
**effect [8]** 13/5 92/11 99/19 130/13 130/14 130/17 130/22 131/5
**effectively [1]** 107/3
**effectuated [1]** 16/11
**efficient [2]** 77/16 128/18
**effort [2]** 15/9 15/16
**ego [2]** 108/14 109/12
**eight [2]** 128/22 128/24
**either [17]** 6/4 10/9 22/18 29/10 29/18 29/21 38/9 63/11 88/14 94/9 94/17 95/8 111/25 112/15 114/20 131/2 131/15
**elaborate [1]** 81/7
**Eland [1]** 102/10
**Eleanor [2]** 2/15 4/7
**Electronic [1]** 135/10
**element [12]** 8/5 9/14 37/2 37/12 45/21 46/18 46/19 47/6

**element... [4]** 47/9 83/16 124/2 132/3
**elements [5]** 9/7 31/15 40/15 90/21 122/25
**elicited [1]** 17/4
**eligible [1]** 129/18
**eliminated [1]** 41/4
**eloquence [1]** 89/13
**else [17]** 6/8 17/20 26/6 27/7 35/4 45/6 45/17 47/13 52/23 76/16 79/24 107/17 118/5 122/11 122/15 134/9 135/8
**email [3]** 5/5 5/6 5/10
**emphasized [1]** 122/24
**employee [1]** 17/21
**employees [3]** 17/17 116/5 117/2
**employs [1]** 64/1
**empty [2]** 53/24 53/24
**emulate [3]** 105/1 105/5 105/8
**encapsulation [1]** 75/4
**encountered [1]** 120/17
**end [23]** 9/25 11/20 11/24 24/14 36/4 36/5 36/14 38/18 44/16 58/9 58/22 63/13 63/15 63/18 75/3 75/3 78/15 88/17 89/8 111/4 125/14 126/22 131/14
**ends [1]** 106/10
**engage [1]** 97/5
**engaged [1]** 40/10
**enhanced [1]** 83/1
**enjoyed [2]** 48/25 49/3
**enormous [1]** 13/9
**enough [16]** 12/25 19/1 31/19 36/18 55/11 57/8 99/11 99/13 108/5 108/10 109/16 109/17 110/1 110/12 111/20 129/5
**enriched [2]** 40/24 48/2
**enrichment [25]** 27/11 27/12 27/15 27/18 27/19 28/5 28/7 35/6 38/9 38/10 40/4 40/8 40/9 40/22 40/23 42/3 46/10 46/12 46/19 47/7 47/10 47/15 47/25 48/8 126/7
**enroll [3]** 42/25 43/6 44/24
**enter [5]** 3/8 4/3 49/25 51/3 61/9
**entered [1]** 50/4
**entertaining [1]** 7/6
**entire [1]** 120/24
**entirely [8]** 13/6 58/15 60/5 69/12 70/7 70/8 92/2 110/20

**entitled [19]** 7/16 8/25 9/4 10/25 14/25 18/1 18/3 20/7 22/25 29/20 40/20 40/21 46/16 47/4 54/15 54/15 56/24 68/12 136/6
**environment [2]** 18/21 109/25
**equipment [2]** 17/15 117/2
**equitable [3]** 38/12 38/13 40/21
**equity [6]** 41/3 41/9 41/11 41/21 41/23 48/8
**especially [3]** 108/13 121/5 131/2
**essentially [6]** 7/19 48/2 66/14 86/3 86/6 134/5
**establish [4]** 4/19 18/4 47/22 59/5
**established [6]** 17/13 17/13 23/22 27/1 53/7 118/23
**establishes [1]** 101/10
**et [2]** 1/8 3/6
**evaluate [1]** 73/24
**even [42]** 9/6 9/8 13/14 15/14 18/24 19/2 19/16 20/24 28/19 29/14 31/25 32/13 33/4 34/1 36/17 39/24 40/19 41/8 53/11 55/23 66/25 70/20 72/19 80/3 84/5 85/24 86/19 88/21 89/24 91/1 95/12 103/18 103/20 105/13 108/24 109/13 110/14 110/20 126/14 126/14 128/10 130/16
**even be [1]** 126/14
**event [6]** 13/21 40/4 74/10 101/6 106/24 128/25
**events [2]** 102/25 103/1
**eventually [2]** 37/21 57/7
**ever [5]** 45/12 109/3 118/25 120/17 121/23
**every [27]** 7/17 7/23 8/17 10/20 20/7 20/9 20/11 20/17 23/11 29/1 33/22 34/4 34/13 56/23 58/20 59/8 61/24 64/14 65/13 71/20 71/25 94/13 112/18 123/14 125/17 133/5 134/23
**everybody [5]** 47/13 76/16 78/4 108/12 109/19
**everybody's [3]** 35/23 105/23 129/17
**everyone [2]** 3/4 6/25
**everything [12]** 5/1 5/3 13/1 16/15 60/1 77/19 81/17 107/17 108/4 108/5 109/19 127/2
**evidence [53]** 14/4 14/7 14/17 14/18 14/19 16/1 16/13 17/2

17/14 17/14 18/2 18/4 18/20 19/4 26/1 27/2 27/3 27/6 29/15 29/16 29/23 30/7 31/3 31/17 32/13 32/15 32/16 33/3 34/14 35/24 35/25 37/4 37/5 43/21 44/14 69/19 70/20 80/4 83/17 84/6 86/3 103/23 103/25 106/8 107/9 107/19 107/22 107/22 116/22 117/22 118/22 123/16 125/12
**evil [1]** 123/21
**evolution [1]** 124/12
**exact [2]** 24/2 31/5
**exactly [16]** 15/20 23/23 23/25 42/9 42/9 46/21 48/5 54/18 59/12 71/22 85/19 86/13 93/23 100/25 101/7 126/17
**examination [1]** 69/6
**examiner [1]** 133/10
**example [5]** 15/21 22/11 34/18 95/2 116/20
**except [2]** 41/5 132/1
**excess [1]** 17/6
**exchange [6]** 61/11 61/18 62/25 83/4 104/16 104/23
**exchanged [2]** 68/20 68/23
**exclude [1]** 69/12
**excluded [2]** 96/18 102/4
**excuse [4]** 73/25 77/20 77/21 128/23
**exercise [1]** 36/7
**exercising [1]** 36/25
**exhausted [2]** 6/4 6/4
**exhibit [10]** 11/20 12/12 12/22 12/24 90/9 115/18 115/21 116/6 128/15 134/3
**Exhibit 1 [6]** 11/20 12/12 12/22 12/24 115/18 115/21
**Exhibit 14 [1]** 116/6
**exhibited [2]** 119/4 119/6
**exhibits [9]** 36/1 90/7 90/9 121/9 134/2 135/10 135/15 135/17 135/19
**exist [2]** 33/13 102/25
**existed [5]** 68/1 72/4 86/8 92/5 121/6
**existence [4]** 41/14 108/6 108/7 109/22
**exists [4]** 44/6 71/21 71/21 92/5
**expect [3]** 17/20 91/7 91/17
**expectation [4]** 23/1 28/13 59/24 86/25
**expecting [1]** 30/15
**expense [2]** 51/11 59/15

**E**

experience [2] 32/18 134/22
experiences [2] 134/20 134/21
expert [9] 4/22 33/25 68/20
 69/3 69/5 69/10 70/16 86/19
 118/7
experts [2] 16/25 50/13
explain [8] 33/4 52/8 60/14
 61/21 86/18 90/22 103/13
 114/21
explained [2] 8/15 16/3
explaining [1] 37/7
explains [1] 33/22
explanation [2] 92/19 133/19
explore [1] 25/3
exposure [2] 107/2 114/3
express [1] 89/24
expressed [1] 121/11
expressing [1] 91/7
expressly [2] 93/2 112/4
extend [1] 115/10
extended [1] 114/11
extensions [1] 128/9
extent [21] 13/11 16/9 18/5
 19/24 24/23 26/3 26/25 47/21
 47/24 51/2 62/11 63/5 65/21
 65/23 74/19 89/16 111/8 113/4
 114/12 114/20 116/15
extra [1] 134/24
extremely [1] 107/4

**F**

F-r-o-g-g-e [1] 89/2
face [1] 93/21
facing [1] 118/15
fact [37] 10/9 20/10 22/6 29/5
 31/21 32/8 32/12 33/25 34/25
 36/17 38/25 52/16 53/6 56/23
 57/11 60/24 64/24 65/15 76/2
 79/11 80/9 81/19 89/6 92/4
 92/17 97/17 105/14 108/1
 109/11 111/23 112/10 114/4
 121/3 121/25 131/17 131/22
 134/8
facts [31] 5/9 8/2 9/15 27/4
 29/18 29/20 29/21 31/11 36/3
 55/13 55/22 55/23 82/25 84/11
 85/25 89/24 91/24 98/3 98/6
 98/17 100/23 101/13 101/24
 101/24 101/25 102/1 108/4
 111/17 115/11 129/10 131/13
factual [5] 7/24 78/2 80/2
 99/15 99/16
failed [4] 37/3 53/7 53/20 82/4

fails [1] 47/25
fair [8] 40/8 40/10 87/25 99/13
 108/10 110/12 112/9 133/4
fairly [6] 83/7 90/15 121/4
 133/6 133/18 134/1
fake [1] 93/22
fall [1] 125/5
fallacy [2] 96/18 102/4
false [5] 49/4 98/12 109/7
 109/9 121/3
famed [1] 96/18
familiar [1] 11/21
far [6] 19/12 35/20 46/5 46/9
 73/1 120/17
fashion [2] 96/1 106/3
favor [2] 31/22 97/9
favorable [3] 29/4 31/11 98/18
FCC [3] 24/21 74/20 75/2
February [1] 127/7
federal [3] 130/18 130/24
 134/16
fee [4] 42/19 42/24 65/5 73/21
feel [4] 35/22 83/7 130/19
 131/4
fence [2] 10/14 10/16
few [4] 77/16 80/15 127/24
 134/9
field [4] 95/3 95/3 95/4 95/6
FieldTurf [1] 48/16
Fifteen [2] 77/5 77/7
fifth [2] 2/9 4/20
fight [1] 75/1
figure [7] 9/10 12/12 12/21
 30/5 39/7 116/7 116/12
file [1] 12/9
filed [10] 5/2 5/3 5/22 7/4 12/5
 13/24 29/14 35/17 41/11 41/13
filibustered [2] 103/4 103/7
filtering [1] 130/10
final [13] 9/19 11/4 15/11
 35/23 36/20 84/2 84/6 91/1
 91/8 112/1 115/5 122/24 123/2
finalized [1] 103/20
finally [1] 4/20
financial [1] 48/24
find [13] 10/9 13/24 17/6 32/16
 32/17 36/17 68/14 114/12
 114/17 114/18 125/9 125/21
 129/22
finder [2] 10/9 31/21
finding [1] 80/5
findings [1] 80/8
finds [7] 46/14 46/16 46/17
 47/2 47/4 131/15 131/16
fine [17] 5/20 14/20 18/24

49/18 77/21 84/12 84/15 90/16
 91/5 95/15 96/9 104/18 110/7
 122/9 127/22 130/6 135/12
finish [1] 100/4
first [30] 5/9 5/12 5/22 5/23
 6/22 15/8 16/2 19/21 20/5
 28/10 33/11 35/5 35/13 39/6
 45/3 57/22 58/12 60/8 68/18
 69/12 74/22 103/9 103/15
 108/12 109/2 123/15 123/17
 127/12 128/4 128/4
first-filed [1] 5/22
fit [2] 31/10 97/11
fits [2] 57/19 127/2
five [4] 4/12 126/14 126/19
 132/17
fix [1] 87/20
FL [1] 2/6
flesh [1] 115/12
flexibility [2] 86/22 124/24
flexible [6] 85/1 85/22 87/6
 87/18 124/21 127/13
flexibly [2] 83/20 124/25
flip [2] 94/10 99/21
flip-side [1] 99/21
floor [6] 6/11 6/21 11/11 82/14
 103/6 104/12
Florida [1] 39/24
flows [1] 70/9
focus [6] 7/10 7/14 9/20 15/14
 45/20 90/20
focusing [1] 30/21
folks [7] 3/9 3/25 61/11 61/12
 61/15 80/20 120/4
follow [1] 43/8
follow-up [1] 43/8
followed [1] 125/16
following [6] 30/1 38/10 43/16
 57/25 84/23 104/23
following: [1] 98/10
following:  Any [1] 98/10
Foods [2] 113/4 113/10
foolproof [1] 50/12
footnote [7] 13/5 38/24 46/13
 46/14 47/11 49/25 102/11
footnotes [1] 44/7
forbidden [1] 93/3
forbidding [1] 94/5
force [1] 56/10
foregoing [1] 136/4
foreign [1] 1/3
foreseeable [1] 124/20
forgetting [1] 58/15
forgive [1] 17/5
forgot [1] 26/13

**F**

**forgotten [1]** 6/14
**form [7]** 72/18 107/5 111/23 121/1 132/17 132/22 132/23
**former [1]** 99/1
**forms [1]** 132/12
**Fort [1]** 2/6
**forth [5]** 6/4 17/3 45/5 45/7 62/25
**forward [14]** 5/6 5/18 27/2 29/23 29/24 30/14 37/6 44/6 91/17 91/18 91/23 114/13 120/3 123/25
**forwarding [1]** 74/24
**found [4]** 10/25 29/8 31/8 54/8
**foundation [1]** 128/14
**four [7]** 7/13 11/17 11/17 90/1 97/11 128/3 132/17
**fourth [3]** 4/18 98/24 128/7
**fraction [3]** 10/8 123/18 123/19
**frame [1]** 91/23
**framework [2]** 124/7 124/8
**frankly [11]** 37/20 68/13 73/5 80/3 85/9 86/21 109/1 109/22 131/1 131/2 135/12
**fraud [95]** 4/19 8/4 8/6 9/5 9/7 9/9 9/14 9/22 10/22 14/24 22/24 24/11 27/15 27/16 27/20 28/16 31/2 31/16 40/14 41/18 45/13 46/14 47/3 47/4 47/5 47/9 47/14 47/22 48/7 48/14 48/22 48/25 49/22 49/24 49/24 50/2 50/3 50/6 50/10 50/25 51/9 51/14 51/22 51/23 54/10 55/12 57/22 68/1 72/4 75/21 76/3 83/16 84/18 84/24 86/8 87/19 87/19 88/11 88/13 90/19 90/21 94/2 94/22 94/24 96/13 97/4 97/11 97/23 102/8 102/15 102/19 102/20 107/15 109/2 109/5 110/19 110/19 111/3 111/4 111/11 112/3 114/17 122/25 123/3 123/3 124/2 124/13 124/15 124/18 124/19 125/9 125/10 125/13 126/8 131/15
**fraudulent [14]** 9/1 50/1 50/5 51/4 51/8 53/1 53/25 54/21 57/23 97/5 102/13 102/21 102/23 108/3
**fraudulently [3]** 49/6 52/8 60/4
**Fred [5]** 53/2 53/16 66/23 68/6 75/4
**free [3]** 30/9 53/2 76/2

**freely [1]** 76/15
**French [2]** 93/1 93/3
**French tradition [1]** 93/1
**frequency [1]** 75/11
**Friday [1]** 126/16
**friend [5]** 16/4 16/14 20/24 53/11 68/7
**Frogge [1]** 89/2
**front [4]** 49/8 64/6 91/25 130/3
**Frontier [1]** 113/20
**frozen [3]** 39/13 39/14 39/18
**FTC [1]** 99/22
**full [4]** 20/7 20/8 35/13 52/19
**fully [6]** 6/25 7/1 9/3 76/13 128/10 131/8
**functioning [1]** 106/23
**fundamentally [1]** 9/13
**furiously [1]** 46/8
**further [9]** 26/20 26/24 42/10 91/10 99/3 106/12 110/18 110/19 118/1
**future [2]** 85/8 127/22

**G**

**gain [1]** 51/18
**gained [1]** 51/21
**garbage [1]** 92/9
**gateway [4]** 8/18 13/7 13/14 16/24
**gateways [3]** 17/15 56/20 115/14
**gave [9]** 49/1 49/12 52/16 72/13 85/11 85/12 113/8 117/1 134/23
**gears [1]** 93/5
**gee [2]** 87/1 107/14
**general [3]** 17/24 132/14 132/23
**generally [8]** 6/1 49/21 124/18 125/19 129/6 130/19 132/11 134/11
**generate [1]** 111/21
**generated [2]** 16/23 33/24
**generating [1]** 11/4
**generous [1]** 6/12
**genuinely [1]** 36/18
**Germans [1]** 93/2
**get [82]** 7/19 8/7 8/20 10/19 14/17 19/12 19/14 22/4 23/15 27/25 28/4 28/14 28/20 29/10 30/9 33/17 34/15 34/24 35/5 35/6 37/24 41/23 45/19 48/2 48/2 49/13 53/21 54/1 54/3 54/15 54/17 55/24 56/7 56/14 56/16 56/18 58/14 58/15 58/17

58/21 59/9 59/20 62/20 63/12 67/23 67/24 69/17 69/18 72/13 74/1 74/11 79/2 81/12 82/19 87/14 87/25 89/23 92/8 92/9 93/22 95/3 96/9 97/6 99/17 99/25 101/9 108/8 111/23 112/1 115/5 117/5 119/8 119/11 120/1 120/5 121/23 125/17 126/15 127/18 129/24 130/23 132/6
**gets [11]** 13/2 55/23 57/8 58/10 59/16 60/16 62/18 76/2 87/3 100/15 102/3
**getting [7]** 10/3 19/22 64/2 72/23 77/1 102/16 134/13
**gigantic [1]** 127/11
**Gillan [3]** 4/22 118/7 127/21
**give [40]** 11/5 26/10 31/9 32/13 34/3 34/20 34/21 34/22 34/22 35/7 35/19 39/9 42/1 48/12 50/15 50/16 52/9 53/8 54/7 55/4 77/17 88/18 90/24 90/25 92/18 93/5 99/9 103/12 103/17 114/15 114/16 114/23 115/15 117/18 129/10 132/19 132/24 133/22 135/15 135/18
**given [12]** 38/6 39/4 41/17 54/1 62/3 64/18 64/20 64/22 64/25 78/4 80/14 86/3
**gives [4]** 8/22 43/10 81/5 93/18
**giving [3]** 51/25 132/21 133/2
**glad [2]** 47/17 104/25
**gleaning [2]** 36/16 43/20
**go [69]** 7/3 9/12 16/15 16/23 22/13 25/15 26/21 26/22 27/8 30/23 32/20 36/4 36/6 38/7 38/22 41/8 41/15 41/23 42/15 42/19 43/1 44/4 46/5 47/7 48/18 48/19 52/12 55/15 55/24 56/13 57/25 59/19 60/2 62/10 72/12 76/1 78/6 85/4 85/5 88/4 89/11 89/12 89/14 90/1 92/20 93/12 99/9 99/15 101/8 105/22 111/19 114/7 117/14 118/11 119/21 120/5 122/3 123/25 124/1 125/14 125/16 125/25 127/2 128/25 129/2 129/2 129/11 134/9 135/6
**goes [16]** 10/12 13/2 13/13 16/15 19/20 33/12 36/10 36/13 43/17 62/17 63/13 63/20 63/25 95/8 123/7 129/1
**going [96]** 6/3 6/6 6/11 8/11 13/6 13/19 19/12 23/16 25/7 26/8 26/12 27/8 28/24 34/11

**going... [82]** 35/19 37/9 44/13 44/18 45/13 51/19 51/20 55/14 58/4 58/4 62/25 63/12 64/5 65/10 68/17 69/4 69/12 70/17 70/24 77/2 78/15 78/24 79/1 79/10 81/12 81/15 84/2 84/21 85/10 89/10 89/14 89/21 90/19 91/5 91/17 91/17 93/6 93/19 95/25 97/7 97/8 97/15 99/8 100/1 101/22 102/18 103/11 103/12 103/13 103/15 103/21 104/1 104/4 104/6 107/12 107/23 107/23 108/13 109/18 109/23 110/1 114/1 114/16 114/19 115/1 115/2 115/3 115/3 122/15 126/9 126/23 127/1 127/11 129/11 129/13 131/5 131/24 132/4 132/10 132/23 133/16 133/23

**gold [2]** 50/12 50/13

**gone [2]** 68/6 85/13

**good [28]** 3/4 3/11 3/12 3/15 3/16 3/17 3/20 4/5 4/9 4/9 6/21 7/3 19/13 22/17 26/19 31/6 31/19 32/2 36/11 70/2 76/16 82/6 101/8 129/5 133/19 134/20 134/21 135/13

**goodwill [2]** 10/2 10/10

**Gosal [2]** 17/21 30/11

**got [33]** 9/8 9/18 15/9 29/7 29/22 35/12 38/8 40/5 40/6 45/16 50/11 50/12 53/2 54/13 55/1 55/15 58/3 59/22 62/2 67/19 67/20 67/25 69/23 69/24 72/6 75/19 77/17 93/18 95/18 99/19 124/16 133/25 135/7

**gotcha [1]** 133/16

**gotten [8]** 9/23 19/10 23/11 67/15 68/2 72/5 87/1 87/2

**governing [1]** 8/15

**government [8]** 24/17 24/22 34/25 117/3 130/18 130/19 130/20 131/4

**government's [1]** 24/19

**grab [1]** 81/5

**gracious [1]** 16/7

**grant [1]** 36/5

**granted [1]** 27/10

**great [13]** 6/22 11/22 40/3 50/11 59/13 85/10 87/13 93/7 111/18 111/18 124/22 133/4 134/3

**greater [1]** 62/6

**gross [5]** 7/16 21/7 88/9 88/19 106/24

**ground [1]** 59/13

**grounds [1]** 27/12

**groups [1]** 130/9

**grow [1]** 93/21

**guess [2]** 67/18 87/8

**guessing [1]** 25/14

**guided [1]** 117/23

**guiding [1]** 116/11

**guilty [1]** 106/5

**guy [2]** 68/8 95/3

**guys [1]** 93/13

# H

**had [47]** 7/2 8/10 13/12 16/11 16/13 17/15 24/10 24/12 27/10 29/17 41/10 41/11 44/7 49/3 62/4 62/5 64/22 68/6 68/7 72/3 72/4 73/3 73/12 80/21 84/21 85/13 86/7 88/11 88/13 94/8 96/21 109/10 109/16 115/10 115/16 118/12 118/18 123/10 127/14 127/15 127/20 129/3 129/25 134/20 134/21 134/22 135/4

**hadn't [3]** 34/8 41/12 68/8

**hair [1]** 93/21

**Haiti [146]**

**Haiti's [9]** 7/15 12/6 12/10 19/6 33/21 33/25 46/12 61/22 68/3

**Haitian [5]** 24/17 24/18 24/22 94/11 97/1

**half [8]** 6/5 35/13 80/24 80/25 81/6 81/8 81/24 135/16

**hand [5]** 7/22 21/13 36/23 36/24 134/23

**handed [1]** 52/10

**handful [1]** 132/15

**handled [1]** 62/4

**handles [2]** 58/18 62/3

**handling [1]** 73/22

**handset [1]** 99/8

**handsets [1]** 98/16

**hang [1]** 104/6

**hanging [1]** 122/4

**happen [3]** 45/15 73/12 94/1

**happened [4]** 30/4 55/8 57/11 66/14

**happening [2]** 72/21 108/16

**happens [3]** 45/6 63/21 93/15

**happy [1]** 15/15

**hard [2]** 36/11 77/14

**harder [1]** 55/5

**harm [2]** 10/1 10/2

**harmed [3]** 9/24 10/10 10/10

**harms [1]** 111/16

**has [59]** 6/14 11/19 15/4 16/6 16/9 17/4 19/25 20/21 21/4 21/4 23/22 26/1 26/2 26/4 26/5 26/6 26/16 32/18 33/16 37/9 39/24 40/5 43/2 46/9 54/8 61/23 61/25 61/25 63/6 63/21 64/9 65/19 66/13 67/14 68/19 68/22 69/19 71/9 73/7 73/9 74/20 74/21 76/1 78/4 80/8 85/2 92/11 100/7 104/11 104/17 107/9 113/6 124/19 124/25 128/14 129/14 129/20 130/13 133/6

**hassle [1]** 93/19

**have [268]**

**haven't [4]** 5/21 13/21 56/1 90/3

**having [7]** 32/5 45/12 56/7 69/3 73/15 99/7 111/12

**he [68]** 6/14 17/4 18/16 18/17 19/23 20/1 20/3 26/22 26/22 30/11 33/6 33/8 33/9 33/9 33/21 48/24 49/2 49/3 49/5 49/5 49/6 49/9 53/11 66/20 69/10 70/10 76/1 76/2 76/19 81/14 84/21 84/21 86/18 87/1 87/2 87/3 87/4 87/7 87/9 87/9 93/11 93/20 103/4 103/6 103/7 105/4 105/7 107/22 109/14 109/24 110/20 110/22 111/16 111/17 115/16 116/4 116/4 116/5 116/17 116/22 116/24 116/25 117/24 119/7 119/13 119/14 119/16 122/21

**he'd [2]** 85/7 87/1

**he's [11]** 18/23 33/10 70/19 103/7 107/20 107/21 109/10 109/11 109/15 109/16 115/13

**head [2]** 33/19 48/19

**headache [1]** 129/19

**hear [12]** 3/25 20/17 20/20 24/6 25/17 39/15 52/13 78/1 82/16 86/16 124/3 125/23

**heard [5]** 4/2 15/22 39/17 48/21 124/15

**hearing [6]** 18/11 18/23 72/3 72/6 131/6 135/23

**heart [1]** 101/17

**heightened [1]** 42/5

**heist [1]** 22/13

**held [5]** 84/20 106/25 112/4 112/20 114/22

**help [8]** 13/24 15/13 27/21

**help... [5]** 89/19 89/19 110/18 112/8 119/4

**helpful [4]** 11/9 84/7 114/14 123/6

**helping [1]** 34/18

**her [5]** 31/7 31/8 108/4 117/15 133/8

**here [59]** 3/4 3/18 3/21 4/11 6/17 6/22 6/25 7/8 13/3 13/4 15/11 15/12 16/20 20/14 24/14 25/24 26/3 27/14 29/10 29/12 29/15 29/19 29/20 30/6 35/11 40/12 41/1 44/5 50/7 51/9 51/10 51/10 51/11 55/8 58/10 61/12 69/20 88/4 90/11 92/22 93/13 95/14 98/11 98/13 98/18 99/21 100/4 102/24 104/6 107/10 107/18 111/3 111/9 111/16 116/14 122/16 125/13 132/10 132/23

**here's [12]** 9/15 9/16 9/17 11/13 29/16 38/22 42/23 50/8 84/15 93/17 96/24 100/17

**hereby [1]** 44/25

**hesitantly [1]** 122/16

**hesitate [1]** 6/8

**hesitating [1]** 65/19

**hey [5]** 43/6 55/24 56/14 57/9 127/1

**hidden [1]** 99/5

**hide [1]** 99/3

**hides [1]** 101/24

**hiding [1]** 75/4

**high [1]** 12/17

**higher [1]** 62/7

**highlight [1]** 60/20

**hijacking [1]** 78/23

**him [10]** 49/4 85/7 104/24 107/16 108/3 108/8 108/9 109/20 115/24 116/23

**himself [3]** 17/4 17/24 116/16

**hindsight [1]** 55/11

**hired [1]** 116/5

**his [22]** 11/19 17/8 33/20 63/19 63/21 66/20 68/7 69/19 70/7 70/8 86/19 86/19 107/25 110/16 110/16 112/12 115/14 115/17 116/21 116/24 119/2 133/8

**hits [1]** 13/13

**hmm [1]** 36/8

**hold [3]** 107/15 108/3 127/14

**holding [4]** 1/3 3/5 3/13 127/8

**hole [1]** 135/13

**hole-punched [1]** 135/13

**home [50]** 12/14 12/19 14/3 16/18 21/13 42/19 42/22 42/25 43/7 43/18 44/4 44/22 44/24 45/20 46/6 55/20 56/13 56/23 57/2 57/8 58/6 58/8 58/16 59/8 59/14 59/25 60/4 60/15 60/16 61/23 61/24 62/4 62/19 63/14 64/6 64/13 64/16 64/23 65/10 66/18 70/10 71/20 71/25 73/23 76/22 86/9 112/12 115/14 115/17 130/23

**honest [1]** 73/1

**honestly [2]** 72/25 106/18

**honesty [1]** 134/6

**honor [36]** 3/11 3/17 3/20 4/5 5/13 5/16 15/7 20/10 26/25 35/11 38/4 49/19 49/23 85/19 95/25 105/14 112/17 112/24 112/25 112/25 113/12 113/20 114/11 114/13 115/9 115/12 116/2 116/20 118/2 126/4 127/19 130/5 131/23 131/25 134/25 135/22

**Honor's [3]** 104/18 113/16 116/19

**HONORABLE [1]** 1/17

**Hood [2]** 25/23 54/9

**hope [4]** 5/4 7/5 120/19 120/21

**hopefully [3]** 4/1 75/24 81/6

**horrible [1]** 108/3

**hosted [1]** 112/12

**hour [5]** 6/5 80/24 80/25 81/6 81/8

**how [81]** 5/19 7/20 7/21 7/25 7/25 9/22 14/2 14/16 17/12 18/2 18/4 23/15 23/19 23/20 25/7 28/17 30/3 36/20 37/17 38/18 38/19 40/9 40/23 42/18 42/23 43/12 52/2 56/3 56/3 57/19 60/3 61/22 64/5 64/20 64/24 69/4 69/15 69/20 69/21 73/3 77/5 80/4 80/23 82/12 83/2 83/6 85/7 85/21 86/5 86/5 86/15 87/4 87/14 88/7 88/10 88/10 88/19 89/17 89/18 90/22 92/1 96/13 96/17 99/18 99/18 99/19 100/13 101/15 102/8 107/23 117/2 119/8 119/11 119/22 120/6 123/23 124/11 129/11 130/19 130/24 131/3

**however [6]** 33/15 46/16 53/14 67/9 104/18 113/24

**human [36]** 45/24 75/19 78/20

79/6 79/22 80/1 81/8 81/12 81/17 81/18 91/11 91/20 92/2 95/7 97/18 99/17 99/20 99/23 100/5 100/11 101/19 101/21 104/15 104/24 105/1 105/5 105/8 105/25 106/2 109/22 110/17 111/10 123/4 123/20 125/4 125/4

**humorous [1]** 75/24

**hundred [1]** 120/12

**hurt [8]** 28/17 28/19 86/15 86/15 87/4 87/7 87/10 87/14

**hypothetical [7]** 52/5 93/5 95/10 95/15 95/18 100/19 129/10

**hypothetically [4]** 58/18 93/10 93/24 94/10

**I**

**I'd [14]** 5/23 54/7 78/21 79/15 86/1 106/14 109/3 110/15 112/5 126/25 127/1 129/4 130/11 131/18

**I'll [65]** 4/14 6/2 8/7 12/19 13/25 15/2 16/9 19/20 21/11 23/13 26/10 26/21 26/22 27/25 28/4 28/8 29/10 31/9 35/24 35/24 35/25 35/25 43/23 45/11 46/7 48/18 48/19 49/16 50/15 52/8 54/3 59/19 63/11 68/18 68/19 69/24 70/5 74/12 77/21 78/9 79/3 89/3 98/2 99/22 102/11 103/6 106/17 112/5 112/11 112/13 117/15 119/1 122/22 124/3 124/12 125/1 127/6 128/19 128/19 129/22 130/12 130/23 133/24 135/18 135/24

**I'm [128]** 4/25 6/4 6/17 6/20 7/3 7/4 11/6 11/15 11/21 14/20 15/5 15/17 16/17 18/11 18/11 18/23 24/5 24/18 26/8 27/8 28/8 29/13 30/21 32/18 32/20 33/1 35/9 35/21 36/16 37/15 38/1 38/2 38/5 39/13 39/19 40/2 40/12 40/17 42/2 42/4 43/20 44/18 46/7 47/17 50/8 50/8 50/11 50/23 51/18 51/19 51/20 52/17 57/9 57/25 58/2 58/3 58/12 65/19 68/17 69/11 69/25 70/1 72/3 72/6 76/7 77/1 77/1 78/23 79/10 80/8 81/21 82/5 84/2 84/7 88/6 90/13 91/22 93/5 93/12 94/2 95/6 97/8 97/18 97/20 98/7 99/8

**I**

**I'm... [42]** 100/17 100/18 100/25 103/11 103/12 103/13 104/1 104/4 104/6 104/25 108/1 108/13 109/1 109/17 109/23 114/15 114/19 115/1 115/2 115/3 117/17 118/6 119/3 119/23 120/24 122/1 122/15 123/25 124/25 125/7 125/21 126/8 127/1 127/1 131/6 131/12 131/21 132/11 132/14 132/22 133/16 135/1

**I've [33]** 5/7 5/8 10/15 10/16 15/9 30/3 31/8 35/12 36/1 50/11 50/12 50/14 53/9 53/14 54/13 55/1 58/3 59/22 62/2 69/24 70/18 73/9 77/17 90/14 93/18 95/18 109/3 109/5 126/25 129/3 129/16 130/8 135/7

**ID [2]** 93/22 97/5
**idea [2]** 125/20 130/1
**identify [1]** 105/10
**identity [1]** 51/17
**ignore [1]** 107/17
**ignored [1]** 22/5
**ignores [2]** 21/2 60/20
**ignoring [1]** 53/6
**illegal [3]** 64/3 71/5 71/7
**imagine [2]** 75/17 75/18
**immaterial [1]** 79/11
**immediate [1]** 23/8
**impact [3]** 24/25 25/1 130/9
**impacting [1]** 13/20
**impeach [1]** 134/5
**impeachment [3]** 134/2 134/3 134/5
**implemented [1]** 125/5
**implied [7]** 38/25 92/4 92/17 94/19 121/3 121/25 122/6
**implore [1]** 124/9
**importance [1]** 122/24
**important [13]** 5/8 5/9 30/22 37/18 50/25 61/7 90/14 103/19 120/23 120/25 121/23 133/16 133/17
**imposed [2]** 72/19 75/18
**impression [2]** 98/12 118/17
**improper [1]** 40/25
**inability [1]** 47/21
**inaccurate [1]** 75/6
**inactive [1]** 92/10
**inadequate [1]** 41/21
**inappropriate [1]** 68/12

**inbound [1]** 8/19
**Inc [3]** 1/7 1/7 3/6
**inclination [1]** 134/11
**include [1]** 48/14
**including [8]** 5/2 12/13 13/3 28/7 33/23 40/16 43/10 73/22
**income [2]** 53/17 85/13
**inconsequential [1]** 22/20
**inconsistency [1]** 110/8
**inconsistent [1]** 134/7
**incorrect [10]** 16/16 20/23 22/5 60/5 60/10 60/13 61/20 63/3 76/12 78/2
**incredibly [1]** 134/13
**increment [1]** 87/14
**incremental [1]** 10/23
**incurred [2]** 22/7 83/21
**indeed [1]** 5/16
**independent [1]** 33/15
**independently [1]** 34/7
**indicate [1]** 46/11
**indicated [4]** 25/23 27/1 46/13 64/9
**indicates [1]** 17/7
**indisputable [1]** 9/16
**individual [27]** 4/13 4/15 21/3 58/22 79/15 79/18 96/2 96/2 98/15 98/16 98/20 98/21 99/7 106/21 111/21 112/19 113/6 113/9 113/19 114/3 114/8 116/9 116/10 116/17 117/6 117/10 117/24
**individually [1]** 115/24
**individuals [2]** 109/8 118/19
**induced [1]** 51/2
**inducement [2]** 51/1 51/9
**industry [5]** 7/22 13/1 56/4 57/12 135/4
**inferences [2]** 31/12 31/22
**information [7]** 10/3 12/7 15/17 69/11 99/3 99/5 111/5
**infrastructure [3]** 22/19 34/5 68/5
**inherit [1]** 121/6
**initial [2]** 104/16 122/3
**initially [1]** 112/24
**initiate [3]** 66/18 66/20 66/21
**initiated [5]** 20/13 62/12 67/5 67/6 67/7
**initiating [1]** 68/10
**initio [1]** 106/4
**innocent [1]** 106/3
**input [1]** 103/17
**inquired [1]** 104/24
**inquiring [1]** 24/23

**inquiry [1]** 99/4
**inspected [1]** 50/14
**instance [1]** 52/22
**instead [5]** 72/13 84/21 85/5 87/2 127/7
**instinct [1]** 78/3
**instinctively [2]** 48/5 57/5
**instruct [2]** 104/1 125/8
**instruction [4]** 31/14 91/9 114/23 114/24
**instructions [16]** 84/4 90/10 90/12 90/18 90/25 91/3 91/4 103/10 103/18 103/19 114/15 114/16 115/7 117/1 133/2 135/20
**intellectually [1]** 77/24
**intelligence [1]** 63/25
**intend [1]** 17/2
**intended [2]** 48/7 99/3
**intending [1]** 47/14
**intent [11]** 101/20 102/1 102/4 102/7 102/21 102/21 102/23 106/6 106/6 110/14 123/21
**intentionally [2]** 51/24 101/13
**interaction [1]** 59/17
**interest [1]** 105/23
**interested [1]** 15/5
**interesting [12]** 7/7 8/8 8/12 36/9 48/11 53/23 84/10 95/17 96/16 131/20 133/24 134/13
**interject [1]** 112/10
**international [17]** 7/17 8/18 8/19 19/24 19/25 20/18 23/11 24/20 25/11 25/12 33/11 33/23 60/17 62/7 62/9 63/23 65/24
**international-type [1]** 33/23
**internet [6]** 13/10 25/15 39/24 39/25 40/2 56/20
**interpretation [1]** 102/14
**interrelate [1]** 96/18
**interrogatories [1]** 88/18
**interrupt [2]** 18/7 18/8
**interrupted [1]** 66/17
**interruption [1]** 39/20
**interval [1]** 123/17
**intrigued [1]** 131/13
**introduction [1]** 15/8
**inventory [1]** 79/4
**investigation [3]** 10/2 10/11 10/24
**investment [1]** 50/12
**invite [5]** 3/8 4/2 26/8 46/3 111/25
**invoices [1]** 30/12
**invoked [1]** 104/11

**involve [2]** 12/14 84/24
**involved [7]** 9/22 104/21 107/15 108/2 108/13 130/9 132/12
**involvement [3]** 24/19 30/3 116/21
**involving [1]** 113/25
**irrational [1]** 10/24
**irrelevant [4]** 24/15 70/14 92/3 109/12
**irrespective [1]** 87/12
**is [541]**
**isn't [14]** 8/4 8/8 13/6 13/12 63/20 68/2 76/3 87/20 93/2 93/3 94/3 102/21 107/19 108/7
**ISPs [1]** 75/1
**issue [17]** 29/12 33/6 35/6 45/23 78/20 81/12 81/21 82/22 88/16 91/24 92/4 95/7 110/11 116/13 123/1 123/22 130/25
**issues [10]** 32/11 34/7 79/14 80/9 89/23 89/23 118/3 127/20 131/21 131/21
**it [442]**
**it's [98]** 4/22 6/22 8/5 9/13 9/21 11/19 13/6 14/4 14/24 20/20 29/5 30/14 30/22 30/22 31/19 35/13 35/18 37/12 38/11 38/12 38/13 42/7 42/18 43/4 43/11 43/11 43/13 44/15 45/2 45/3 45/3 45/4 45/21 45/22 47/4 47/23 47/23 48/16 50/12 52/17 54/13 55/7 58/21 59/14 62/13 66/16 70/2 73/4 73/10 73/10 74/6 74/13 75/15 77/9 78/5 78/7 81/12 81/22 81/23 83/14 84/11 85/16 87/6 87/23 88/9 88/12 89/5 90/4 90/16 92/10 92/15 96/5 96/16 97/15 97/21 97/22 100/14 100/19 100/20 103/15 107/8 107/8 115/18 119/4 119/18 124/16 126/23 129/24 131/1 131/4 132/3 133/15 133/15 133/17 133/20 133/20 133/25 134/7
**item [1]** 22/20
**its [14]** 17/25 20/14 26/6 27/17 33/15 46/14 46/19 47/2 47/7 61/2 63/6 64/5 67/6 104/22
**itself [2]** 101/22 114/7
**ITU [1]** 24/19

**January [2]** 1/7 3/2
**Jaspaul [1]** 17/21
**JNOV [1]** 10/25
**job [3]** 82/5 85/5 85/13
**Joe [1]** 75/14
**John [11]** 62/14 63/19 63/20 64/16 65/9 66/19 66/25 67/3 67/4 67/10 75/14
**joined [1]** 4/15
**joining [1]** 3/9
**Jon [2]** 62/14 63/20
**Joseph [2]** 4/22 118/7
**jot [1]** 133/5
**judge [30]** 1/18 3/7 6/12 23/13 24/14 31/6 31/17 32/10 32/12 39/16 49/8 49/9 49/11 49/12 50/24 53/17 61/7 65/18 71/22 78/22 80/2 103/4 109/23 114/19 118/24 121/21 126/17 127/14 134/17 134/23
**judges [3]** 36/1 126/24 127/4
**judging [1]** 32/5
**judgment [38]** 4/13 4/14 4/17 4/19 27/11 29/17 30/17 31/10 31/18 32/11 35/20 36/6 36/8 36/12 36/21 36/22 37/1 46/12 69/14 77/25 78/8 78/11 81/13 83/11 89/7 89/16 97/8 97/10 99/9 105/12 105/15 106/10 107/2 107/7 107/8 112/2 117/7 119/7
**judgments [1]** 84/4
**jump [4]** 6/20 49/23 84/23 88/25
**jumped [1]** 109/23
**jumping [1]** 7/12
**juror [1]** 32/17
**jurors [5]** 129/18 129/23 129/25 130/2 131/4
**jury [69]** 10/25 18/1 31/14 31/14 32/1 32/16 36/10 36/10 46/14 46/16 47/2 47/4 48/1 64/6 64/10 65/20 69/21 78/7 78/9 80/9 82/25 84/4 88/18 89/11 89/12 89/15 90/10 90/22 91/2 97/7 97/21 97/22 99/11 99/15 103/10 103/10 103/13 103/13 103/18 103/19 109/24 110/2 110/6 110/10 114/15 114/16 114/19 115/7 124/4 124/8 125/8 125/11 125/15 126/10 126/15 129/16 130/10 131/7 131/9 131/15 131/16

132/20 132/25 133/1 133/12 133/25 134/19 134/19 135/15
**just [107]** 5/6 5/9 6/3 6/15 9/9 9/21 10/25 11/11 12/10 12/20 13/10 14/12 14/23 15/22 18/17 18/22 21/14 22/12 23/19 24/7 29/3 31/4 40/5 40/14 40/17 42/5 42/7 43/25 45/4 45/18 47/23 49/12 52/4 56/11 57/14 57/19 59/20 60/1 60/10 60/14 63/14 63/18 66/21 67/10 68/8 69/5 72/12 73/1 74/14 75/18 76/10 76/14 76/16 76/19 79/1 80/4 81/1 81/18 81/20 82/21 83/4 84/16 85/3 85/8 87/24 88/16 88/17 89/8 89/19 90/19 94/23 97/20 99/14 101/7 104/19 105/16 105/17 105/19 106/5 106/14 107/7 107/19 108/9 108/25 109/14 112/10 112/16 114/6 115/10 118/12 118/15 119/1 120/8 121/18 121/21 122/3 122/22 122/25 124/12 125/5 125/24 125/25 127/19 128/1 131/11 134/5 135/9
**justice [1]** 106/24

**K**

**keep [12]** 6/3 44/15 46/9 61/7 81/11 81/11 127/25 128/2 128/8 128/9 133/2 135/19
**Kelly [1]** 116/8
**kept [1]** 39/10
**key [5]** 16/20 116/4 116/5 135/17 135/19
**kids [2]** 93/8 108/21
**Kim [1]** 2/5
**kind [11]** 40/12 46/1 50/2 50/2 55/19 75/17 91/16 107/3 107/15 115/11 132/15
**kinds [1]** 10/1
**know [91]** 5/4 5/4 9/12 10/13 13/6 23/23 23/24 24/2 25/6 25/8 25/21 26/22 30/2 33/2 33/9 34/6 35/11 37/17 38/17 38/18 38/19 38/21 39/16 43/9 44/5 44/7 45/5 45/7 46/2 52/1 54/14 54/25 55/10 56/3 56/19 58/3 59/12 69/4 70/14 70/15 74/6 74/12 75/5 75/11 76/10 81/11 81/11 81/13 81/21 82/12 84/7 84/11 86/4 86/14 87/19 90/15 91/17 92/8 92/14 93/19 95/4 97/22 98/21 99/20 100/2

**know... [26]** 103/21 103/25 104/1 107/6 109/21 113/24 119/23 119/24 120/2 120/2 120/8 120/13 123/14 125/16 127/5 127/6 127/10 129/21 129/23 131/9 131/14 131/17 131/17 132/10 132/13 134/4

**knowingly [3]** 73/8 73/8 73/9
**knowledge [1]** 110/3
**knows [3]** 109/18 109/21 112/3

**L**

**lab [1]** 109/25
**Laborde [1]** 34/5
**Laborde's [2]** 33/20 74/5
**laid [3]** 38/20 43/5 92/7
**Lane [1]** 113/20
**language [1]** 113/15
**large [6]** 12/25 57/8 123/18 123/19 123/22 125/2
**last [8]** 12/16 47/1 76/25 77/1 106/17 109/4 123/15 129/16
**late [2]** 29/22 127/6
**later [12]** 4/25 19/12 19/15 29/11 38/24 43/23 51/4 52/25 121/18 127/5 131/10 132/9
**Lauderdale [1]** 2/6
**law [69]** 8/15 9/9 14/24 22/24 23/3 27/4 27/13 32/9 36/6 36/9 36/12 36/21 36/22 37/6 40/11 40/13 40/19 41/3 41/10 41/10 41/12 41/12 41/14 41/15 41/18 41/19 41/22 41/22 42/7 47/4 48/7 48/12 48/13 49/10 49/21 53/21 55/11 55/12 73/14 74/20 75/5 78/9 78/11 81/22 81/23 83/16 84/5 89/25 91/8 94/11 96/12 96/12 97/1 97/4 102/14 103/12 104/1 107/16 108/1 108/6 111/22 112/2 114/12 114/13 117/7 121/4 124/17 124/18 129/5
**lawful [1]** 97/6
**lawyer [2]** 31/6 32/6
**lead [2]** 56/11 122/2
**leadership [1]** 104/21
**leading [2]** 111/3 113/10
**leads [1]** 43/8
**leaning [2]** 48/5 91/16
**least [16]** 5/9 7/5 9/13 19/7 30/3 36/12 37/21 45/10 80/7 86/1 91/9 93/19 98/17 106/3 128/20 129/25

**leave [5]** 51/20 77/14 103/2 118/16 122/4
**led [1]** 49/6
**left [4]** 5/7 90/14 100/18 131/3
**legal [29]** 22/23 29/19 37/5 37/6 40/11 40/13 40/14 40/17 40/20 59/23 69/15 75/22 83/1 86/16 91/24 94/5 94/9 94/12 95/9 96/16 97/3 98/1 102/17 114/23 117/18 118/20 118/23 124/6 124/8
**legally [4]** 25/5 94/22 121/20 124/6
**legitimately [2]** 68/8 121/21
**length [1]** 45/23
**Lerner [1]** 2/5
**less [13]** 20/22 22/15 22/15 26/7 53/10 63/13 74/11 74/13 74/14 103/2 104/7 121/19 134/22
**less-than-satisfactory [1]** 134/22
**let [60]** 3/23 4/2 5/1 5/23 14/21 18/7 22/10 23/14 23/17 25/3 27/9 31/7 36/4 46/3 47/7 48/11 48/12 49/7 50/22 51/16 59/20 59/21 60/2 60/14 64/9 76/4 77/3 77/23 78/6 78/9 80/14 81/16 83/9 84/1 84/9 86/12 89/14 93/5 93/20 95/10 100/4 105/16 108/10 108/12 108/13 110/10 110/25 117/4 118/6 120/16 122/22 126/5 126/13 127/10 129/10 131/9 131/11 133/16 133/25 135/18
**let's [28]** 3/9 9/22 12/16 14/3 18/13 18/13 18/18 18/22 21/14 24/7 24/8 30/4 34/18 36/9 36/20 44/18 62/16 75/7 79/4 95/23 97/19 98/4 98/4 100/19 128/8 130/14 131/14 135/16
**level [11]** 17/17 17/24 17/24 59/15 112/19 113/17 116/21 116/24 124/6 130/20 131/4
**Lexis [1]** 113/22
**liability [15]** 4/19 9/10 78/3 78/16 94/14 97/10 111/14 111/21 113/6 113/19 116/9 123/1 123/3 123/9 123/25
**liable [11]** 9/10 9/22 9/23 106/25 107/16 108/4 110/6 112/20 114/17 114/18 114/22
**lie [2]** 50/17 51/17
**lieu [1]** 90/8
**light [4]** 6/12 31/11 31/12

**like [109]** 5/20 8/4 8/25 12/10 12/14 12/18 14/2 16/18 21/13 22/10 22/19 23/9 30/24 36/17 42/7 42/19 42/22 42/25 43/6 43/13 43/17 44/4 44/4 44/5 44/22 44/24 45/20 46/6 50/10 54/7 54/16 55/2 55/15 55/20 56/13 56/23 57/2 57/8 58/6 59/8 59/13 59/25 60/3 60/14 60/16 61/23 61/24 62/4 62/18 63/14 64/6 64/13 64/16 64/23 65/10 66/18 70/10 71/20 71/25 72/19 72/20 73/4 73/23 76/5 76/16 76/22 77/2 77/18 78/12 78/21 79/16 79/24 81/4 81/18 86/9 87/16 87/16 88/9 90/15 90/16 91/2 91/4 91/6 96/1 96/5 96/7 98/1 98/13 100/11 103/16 103/19 103/21 103/23 109/4 112/5 114/10 116/10 121/7 125/20 126/4 127/2 129/9 130/1 130/13 130/20 130/21 131/18 132/12 132/13
**likely [4]** 18/20 32/19 101/4 117/19
**limine [3]** 4/21 128/11 128/15
**limit [4]** 6/2 107/13 125/25 126/3
**limited [10]** 83/25 87/24 88/23 88/23 121/11 124/15 124/17 126/6 134/11 134/18
**limiting [1]** 131/7
**limits [1]** 129/8
**line [6]** 14/16 20/5 22/16 37/11 120/3 133/13
**lines [2]** 115/25 116/6
**link [1]** 74/21
**listing [1]** 34/3
**lists [1]** 90/9
**litany [1]** 120/25
**literally [3]** 94/7 94/17 96/20
**little [17]** 10/22 12/20 43/5 45/4 45/18 53/22 56/15 58/10 70/5 83/10 89/5 98/9 101/4 115/10 129/6 129/19 134/24
**live [2]** 58/13 92/12
**LLC [1]** 113/20
**LLP [2]** 2/5 2/12
**local [16]** 20/15 20/17 21/1 21/1 21/16 28/24 28/25 29/1 31/6 33/23 34/1 60/18 65/2 65/4 134/16 134/20
**log [2]** 82/8 82/11
**logical [1]** 123/8

**long [10]** 8/11 30/15 32/9 35/17 37/24 59/4 77/5 88/1 88/4 99/18
**longer [1]** 134/14
**look [41]** 5/6 5/18 10/7 12/12 12/15 12/15 15/1 30/2 30/4 33/18 33/20 35/9 35/22 36/11 44/13 45/22 48/18 48/19 49/21 51/19 54/23 59/24 69/9 73/17 78/4 81/18 85/3 86/1 86/2 86/12 89/3 89/18 91/6 93/7 95/13 100/11 103/21 112/22 115/1 116/20 133/14
**looked [5]** 6/16 12/10 12/22 55/14 112/19
**looking [7]** 9/14 54/8 76/9 81/21 85/22 97/16 98/24
**looks [4]** 73/4 75/2 88/9 98/13
**looted [1]** 107/8
**lose [5]** 28/24 34/16 37/8 67/18 76/21
**losing [1]** 36/14
**loss [10]** 16/5 18/25 22/20 22/25 23/1 37/13 51/7 59/12 64/13 85/2
**losses [1]** 83/20
**lost [16]** 16/13 19/22 19/23 19/25 20/8 21/8 23/9 23/10 34/8 51/7 53/6 53/14 53/19 67/14 67/17 88/22
**lot [18]** 6/19 7/8 10/20 13/12 13/18 31/7 38/24 50/13 59/5 70/18 74/23 84/13 89/20 90/2 107/25 109/5 122/24 123/17
**loud [2]** 12/4 82/17
**love [4]** 40/2 76/15 109/3 130/11
**lower [4]** 25/25 26/3 56/9 56/11
**lowered [1]** 26/6
**lunch [1]** 77/18
**lying [3]** 111/5 111/5 111/12

**M**

**made [38]** 14/6 14/23 20/25 21/16 29/3 31/5 32/3 40/9 48/11 51/23 52/10 54/20 55/6 56/3 57/2 57/3 57/3 62/5 72/1 72/5 73/7 73/22 86/4 86/5 86/7 87/2 91/16 94/6 108/15 116/4 116/17 123/7 123/9 123/10 123/15 123/15 127/15 128/15
**magically [1]** 39/7

**Magistrate [1]** 49/9
**mainly [2]** 100/24 102/1
**maintains [1]** 34/1
**make [37]** 5/23 6/2 8/2 11/1 14/12 14/15 23/4 23/17 25/6 28/23 30/16 30/23 39/3 39/4 50/1 52/23 57/16 57/25 79/20 80/5 81/7 81/17 84/2 84/5 87/9 92/18 93/25 98/19 100/23 102/5 105/15 106/17 108/12 109/8 117/7 118/15 127/23
**makes [16]** 13/2 28/25 60/23 62/16 63/20 85/20 92/2 101/25 110/23 111/6 111/7 111/14 113/5 117/9 128/18 133/17
**making [13]** 28/8 43/3 60/17 60/18 60/23 63/19 72/11 74/14 74/14 80/8 101/1 109/7 114/2
**managed [1]** 116/4
**management [5]** 83/8 90/4 104/22 128/3 133/3
**manager [1]** 17/21
**managing [1]** 95/3
**manipulate [2]** 37/19 37/22
**many [26]** 7/20 14/2 15/11 18/2 18/17 30/16 30/16 30/16 30/20 30/20 30/20 31/7 31/7 38/18 41/10 50/10 63/23 69/20 99/18 99/19 99/21 128/15 130/9 134/15 134/15 134/19
**March [5]** 108/15 127/6 127/6 128/1 128/2
**March 21st [3]** 127/6 128/1 128/2
**marginal [1]** 87/3
**market [3]** 56/11 59/17 111/8
**married [1]** 25/4
**Martin [1]** 2/16
**Mary [7]** 27/22 77/5 77/11 80/15 82/9 104/4 131/9
**mask [1]** 6/24
**material [4]** 8/9 27/4 81/18 105/14
**materially [3]** 83/1 123/23 124/10
**math [4]** 8/21 9/17 13/22 13/22
**matter [23]** 20/10 27/4 36/6 36/9 36/12 36/21 36/22 53/15 53/16 53/17 77/8 78/9 78/11 82/9 84/5 85/3 94/7 96/21 96/22 101/20 103/12 112/2 123/18
**matters [4]** 38/24 95/1 101/20 123/13
**maximized [1]** 17/17

**maximum [2]** 87/6 87/10
**may [52]** 8/8 22/9 24/24 24/25 25/9 25/10 25/10 27/15 31/18 31/25 36/9 36/19 38/3 52/4 54/4 63/4 63/4 63/4 64/3 65/20 73/12 74/18 79/13 82/19 88/9 88/17 89/4 89/4 89/7 91/25 98/2 99/14 104/13 111/3 111/22 117/11 118/14 121/23 124/4 124/14 125/8 125/11 125/14 126/24 128/13 130/14 130/14 130/16 130/18 130/19 131/3 132/13
**maybe [22]** 27/17 37/10 37/25 49/8 51/19 57/10 70/5 84/10 85/17 85/17 87/22 87/22 89/24 93/20 94/19 109/13 110/4 110/6 127/6 130/17 130/18 132/15
**maze [2]** 125/16 125/17
**me [145]**
**mean [16]** 10/24 34/14 40/1 40/16 40/18 66/23 69/4 87/25 93/1 94/22 97/15 98/4 111/22 112/24 117/5 125/1
**meaning [4]** 47/1 47/22 61/9 125/8
**means [16]** 31/2 41/13 59/7 64/2 71/18 71/24 71/25 85/21 94/4 94/23 97/14 98/5 98/6 106/5 121/19 128/3
**meant [5]** 33/9 33/9 33/14 38/17 99/17
**measure [18]** 40/8 40/10 40/23 49/2 49/22 51/5 52/3 52/19 52/21 64/13 85/1 86/11 87/23 88/7 89/6 89/17 94/16 124/20
**measured [1]** 37/12
**measures [1]** 48/22
**meat [2]** 7/10 34/11
**mechanism [1]** 106/10
**meeting [2]** 126/24 127/4
**melded [1]** 19/11
**member [1]** 104/21
**Members [2]** 125/11 125/15
**memory [1]** 21/24
**mention [1]** 90/16
**merely [3]** 19/5 88/3 88/3
**merits [3]** 30/4 79/2 121/24
**message [1]** 44/23
**messes [1]** 93/14
**metaphysics [1]** 87/12
**methodology [1]** 15/25
**methods [1]** 125/3
**mic [1]** 126/18

**M**

**MICHAEL [1]** 1/17
**microphone [1]** 3/25
**middle [4]** 35/14 96/18 102/4 130/1
**midway [1]** 20/19
**might [14]** 11/9 33/3 34/14 50/5 50/5 53/23 80/3 85/7 85/9 86/16 91/16 103/21 127/7 127/12
**million [7]** 17/6 17/8 18/14 18/17 61/11 61/13 124/9
**mind [9]** 27/10 36/19 59/25 60/1 61/7 79/17 81/11 81/11 133/2
**mindful [1]** 76/13
**mine [4]** 3/12 13/17 50/12 132/21
**minimum [4]** 71/16 80/25 97/7 128/21
**minus [4]** 21/8 87/11 87/11 88/14
**minute [56]** 7/17 7/17 7/17 8/7 8/17 8/19 8/21 8/23 18/7 18/8 19/24 19/25 20/6 20/7 20/8 20/9 21/7 21/19 23/12 23/21 24/9 25/7 27/9 28/4 28/13 28/14 28/15 29/10 30/11 31/5 39/5 39/6 39/6 43/4 51/13 53/4 57/9 58/8 58/17 59/2 59/8 60/19 62/20 64/14 64/24 65/12 65/13 65/16 71/16 71/20 74/12 74/13 80/21 82/12 94/13 95/13
**minutes [52]** 7/21 8/22 10/5 10/7 11/20 12/13 12/15 12/17 12/19 13/3 13/3 13/4 14/3 16/10 16/16 16/22 16/24 17/6 17/8 17/10 17/23 18/3 18/14 18/19 18/24 19/1 19/5 19/6 19/7 23/24 24/2 38/18 49/13 61/11 61/13 69/20 77/5 77/7 77/9 77/13 77/16 77/18 77/20 80/15 81/4 103/2 104/8 119/4 123/18 134/9 134/12 134/12
**miscarriage [1]** 106/24
**misheard [1]** 124/14
**mislead [1]** 102/24
**misleads [1]** 111/7
**misled [3]** 111/8 111/9 111/9
**misrepresent [2]** 37/23 100/22
**misrepresentation [6]** 51/24 54/12 54/21 81/24 94/18 110/24
**misrepresentations [1]** 85/6

**misrepresented [2]** 51/22 84/18
**misrepresents [2]** 101/13 101/24
**missed [3]** 14/1 30/8 43/12
**missing [3]** 12/22 12/24 14/16
**misunderstood [2]** 5/7 5/8
**modem [1]** 75/2
**modified [1]** 29/14
**modify [1]** 52/5
**moment [9]** 16/18 23/4 26/8 27/3 48/12 49/20 59/19 71/23 88/9
**moments [1]** 127/24
**Monday [1]** 126/15
**money [39]** 7/18 7/21 7/23 7/25 9/2 9/6 9/9 9/17 9/22 10/20 17/22 19/1 25/19 27/22 28/1 28/3 28/20 28/24 29/4 29/20 34/22 38/14 38/19 39/1 39/4 40/5 40/6 50/15 58/10 70/8 72/11 72/23 74/14 87/8 87/15 92/13 92/13 92/19 108/8
**monopoly [1]** 56/6
**months [2]** 50/15 50/16
**moral [1]** 94/11
**Morasch [3]** 54/9 83/23 84/25
**more [62]** 4/1 6/23 8/25 9/20 11/5 17/24 18/17 18/20 24/12 26/11 27/1 28/4 29/7 29/14 37/16 38/6 51/11 52/23 53/22 55/16 55/19 56/15 57/4 63/13 69/24 70/1 72/23 77/9 77/16 81/1 83/10 85/22 88/4 90/6 98/19 100/23 101/4 101/25 102/5 106/2 107/18 107/19 109/12 109/14 111/1 115/3 115/10 115/19 117/19 118/4 121/6 121/19 124/16 128/18 128/19 129/7 129/12 131/10 132/18 135/7 135/14 135/20
**morning [6]** 3/4 3/11 3/16 3/17 3/20 4/9
**Morrison [1]** 2/16
**most [20]** 5/2 7/12 7/13 11/9 26/4 30/22 31/11 34/13 64/1 77/6 98/18 104/17 108/6 111/16 111/17 112/21 114/14 117/19 128/15 131/5
**mostly [2]** 93/8 119/24
**motion [31]** 4/12 4/13 4/15 4/16 4/18 4/21 4/21 5/22 5/23 8/15 9/15 9/18 29/15 29/24 29/25 36/5 36/8 36/12 36/21 36/22 37/4 45/4 76/23 78/8

78/11 83/3 83/6 83/11 97/10 118/7 121/24
**motions [8]** 4/12 5/25 30/17 37/21 122/12 128/11 128/15 135/24
**mouse [1]** 125/20
**move [8]** 11/6 44/6 44/18 55/19 69/12 91/11 91/23 106/13
**moved [1]** 83/6
**moving [4]** 7/8 35/19 109/12 127/15
**Mr [6]** 2/4 2/12 30/11 50/22 108/7 115/13
**Mr. [142]**
**Mr. Baltazar [1]** 104/20
**Mr. Gillan [1]** 127/21
**Mr. Laborde [1]** 34/5
**Mr. Laborde's [2]** 33/20 74/5
**Mr. Ruiz [10]** 81/13 105/11 106/8 109/25 110/5 110/5 116/21 116/23 117/9 117/21
**Mr. Ruiz's [2]** 105/3 110/9
**Mr. Savage [56]** 6/13 6/16 14/23 15/10 15/22 16/6 16/25 17/4 17/7 18/23 19/5 19/9 19/21 21/25 22/23 24/4 26/9 26/12 26/21 27/8 27/9 39/22 46/6 46/8 54/3 54/6 60/5 60/20 62/24 63/18 64/1 64/9 65/19 67/18 68/19 76/10 76/14 77/24 82/15 104/17 104/23 105/13 106/12 108/25 109/17 112/16 112/18 114/2 114/11 116/3 121/2 121/7 121/16 122/14 122/17 125/24
**Mr. Savage's [1]** 106/1
**Mr. Tran [23]** 11/22 17/19 17/20 17/24 69/19 79/20 79/23 106/20 107/20 109/10 109/21 110/2 110/6 110/7 110/15 112/12 112/20 114/18 115/13 116/10 116/16 117/25 119/1
**Mr. Tran's [6]** 11/14 107/2 110/3 110/9 114/21 119/5
**Mr. Vaughan [37]** 6/18 19/3 19/19 26/10 33/6 33/13 39/15 42/1 46/2 46/3 57/25 59/19 60/2 67/22 68/18 70/7 70/17 72/3 73/7 75/25 76/5 79/8 79/24 80/22 81/9 82/16 85/25 86/17 91/10 104/12 106/11 108/13 112/7 115/10 116/23 122/13 125/23
**Mr. Vaughan's [2]** 10/3 34/18
**Mrs. [2]** 117/13 119/3

**Mrs. Valbrun [2]** 117/13 119/3
**Ms [7]** 2/4 2/8 2/15 2/15 4/2 39/14 43/10
**Ms. [14]** 3/16 6/18 39/17 42/1 46/4 46/4 59/20 60/2 112/14 112/15 115/19 117/18 118/1 122/13
**Ms. Talcott [2]** 46/4 112/15
**Ms. Valbrun [12]** 3/16 6/18 39/17 42/1 46/4 59/20 60/2 112/14 115/19 117/18 118/1 122/13
**much [48]** 6/13 7/5 7/9 7/21 7/25 7/25 9/22 15/9 17/12 18/4 23/19 23/20 25/7 27/1 28/17 29/9 35/22 38/19 40/9 40/23 56/3 56/3 64/21 64/24 69/7 75/10 75/11 75/11 75/11 77/16 79/6 80/23 81/22 82/12 86/5 86/6 86/15 87/4 87/14 88/7 88/10 88/10 100/11 103/19 104/13 109/12 115/3 128/18
**multiple [2]** 61/3 87/12
**music [1]** 95/11
**must [11]** 16/15 17/13 23/9 23/9 27/5 32/13 80/6 80/14 83/16 85/1 125/16
**my [101]** 4/11 4/22 5/5 5/10 8/11 9/13 11/10 11/13 11/15 14/13 15/8 16/3 16/14 20/24 23/7 25/4 25/5 25/18 27/10 27/22 29/24 29/25 29/25 30/3 32/18 33/19 34/20 35/6 35/9 35/11 36/19 37/4 41/2 43/8 44/15 46/2 47/11 47/13 48/19 51/17 51/23 52/2 52/7 52/21 52/24 53/7 53/11 53/14 54/8 54/17 58/6 58/15 61/13 61/16 70/19 75/24 75/25 76/1 77/23 78/3 80/7 80/10 80/13 81/7 81/15 85/20 89/13 90/3 91/2 91/17 93/6 93/10 93/15 93/18 93/21 93/24 95/3 95/18 98/10 100/4 100/13 100/16 102/16 103/15 105/17 106/15 108/21 108/24 109/4 110/4 112/9 114/9 115/5 115/6 117/21 122/3 125/21 126/18 129/25 130/12 133/3
**myself [3]** 47/13 77/20 77/22

**N**

**name [1]** 135/4

**namely [3]** 40/14 40/22 47/5
**narrow [1]** 125/15
**narrows [1]** 44/19
**nary [2]** 21/5 21/6
**natural [1]** 124/20
**nature [2]** 44/15 92/4
**near [1]** 54/25
**necessarily [5]** 27/5 30/22 40/16 96/24 121/18
**necessary [2]** 69/2 69/21
**neck [1]** 13/9
**need [21]** 6/13 27/7 50/14 55/10 76/8 77/14 78/10 80/23 81/3 82/11 86/2 95/5 103/2 103/8 107/5 107/6 111/1 128/16 131/12 132/20 134/9
**needed [1]** 60/11
**needs [5]** 6/8 44/9 107/18 133/18 133/18
**negative [1]** 7/3
**negligence [1]** 8/5
**negligible [1]** 87/8
**negotiating [1]** 61/5
**neither [1]** 90/11
**net [8]** 22/4 22/14 61/14 65/22 86/15 88/9 88/19 88/23
**netted [1]** 63/4
**netting [1]** 71/16
**network [18]** 10/2 10/7 10/10 17/1 21/18 33/22 33/25 51/13 51/14 51/15 60/22 61/11 61/13 61/16 61/19 63/7 66/24 92/10
**never [22]** 13/14 17/8 31/8 48/6 48/7 59/25 60/1 68/1 68/1 68/6 72/4 72/19 73/13 73/15 79/17 87/19 109/25 110/4 118/24 120/19 125/5 129/3
**new [2]** 54/25 134/8
**news [1]** 35/7
**next [11]** 11/6 19/12 45/19 73/17 86/21 87/14 90/4 103/9 115/2 115/5 115/6
**Ninth [4]** 36/14 41/5 78/13 126/24
**no [121]** 1/5 3/6 6/1 6/15 7/20 7/24 9/9 9/10 9/16 10/8 11/20 12/5 13/25 15/3 16/2 16/9 18/2 18/16 18/24 19/2 19/8 21/9 21/20 24/13 25/12 27/4 27/14 27/15 27/19 29/15 30/19 31/17 32/1 33/7 38/25 40/11 41/21 42/5 44/2 44/4 44/13 44/13 44/13 44/24 45/15 47/5 47/9 47/14 47/15 51/10 51/10 52/13 52/13 53/10 53/24 54/20 57/1

58/9 59/12 60/23 62/11 62/14 63/18 68/25 72/4 72/9 73/12 74/2 75/22 76/8 76/11 77/1 81/24 82/10 83/9 85/15 86/18 88/2 88/11 88/13 92/7 92/19 92/21 92/21 92/22 92/24 94/5 94/18 95/18 96/22 101/12 101/15 103/5 104/3 105/14 105/19 106/14 106/14 107/9 107/13 107/24 108/20 110/25 111/23 113/15 116/3 118/2 119/16 120/19 120/22 124/16 124/24 127/5 127/15 129/21 130/7 130/13 130/21 131/7 132/2 135/12
**nobody [4]** 34/2 100/7 106/4 129/20
**noncase [1]** 90/12
**noncase-specific [1]** 90/12
**nondisclosure [1]** 99/1
**none [7]** 44/6 57/1 100/7 101/11 117/20 120/16 130/5
**nonetheless [1]** 123/21
**nonfraudulent [1]** 102/14
**nonmoving [4]** 31/12 31/13 31/22 32/14
**nonsubstantive [1]** 91/4
**nontesting [1]** 18/21
**normal [10]** 33/11 33/12 57/15 58/2 58/18 63/14 67/10 72/12 81/18 130/13
**normally [2]** 70/6 89/25
**not [258]**
**note [2]** 4/14 43/20
**notebook [1]** 135/18
**notebooks [1]** 135/13
**noted [2]** 13/7 37/11
**notes [4]** 28/9 35/15 36/17 126/21
**nothing [21]** 14/11 17/20 25/6 26/5 26/16 26/24 36/3 37/14 37/14 44/11 44/12 45/5 53/4 53/6 53/10 65/1 73/9 75/21 92/23 94/5 102/5
**notice [1]** 118/24
**notify [1]** 58/5
**notion [9]** 28/16 60/8 60/10 61/17 74/21 96/17 118/17 122/5 122/6
**notwithstanding [4]** 64/3 68/15 77/9 102/6
**now [72]** 4/2 9/5 9/14 14/13 14/22 15/2 18/10 18/22 22/22 24/4 24/9 25/15 25/17 26/21 27/10 28/10 28/18 30/21 30/24

**N**

**now... [53]** 32/15 34/17 35/8 35/20 38/23 39/3 39/19 39/23 45/17 47/20 48/19 51/21 55/11 57/5 59/7 63/10 66/16 74/12 77/23 79/2 84/3 85/12 85/15 85/24 86/21 86/23 89/5 90/11 92/12 94/10 97/17 98/2 103/2 103/15 110/16 111/20 114/10 118/15 122/12 124/7 124/23 126/21 128/1 128/19 129/4 129/21 130/4 130/12 131/6 131/12 131/12 131/24 133/15
**nowhere [1]** 76/18
**nuance [1]** 96/24
**number [25]** 10/5 10/7 11/24 12/3 12/21 13/25 14/16 14/16 14/19 17/5 17/15 17/22 17/23 19/4 24/8 28/19 35/22 57/14 60/11 70/25 76/13 123/22 125/2 133/13 135/2
**numbers [4]** 12/11 16/1 33/19 34/9
**nuts [1]** 30/1
**NW [1]** 2/13

**O**

**o0o [1]** 136/2
**oath [1]** 120/6
**objected [1]** 129/20
**objection [4]** 129/21 130/4 130/7 131/7
**objections [3]** 128/12 128/16 128/16
**objective [1]** 101/15
**objects [2]** 129/20 133/11
**obligated [2]** 20/3 22/2
**obligation [4]** 22/8 22/18 29/18 94/5
**obligations [4]** 29/10 72/20 73/14 121/20
**obliged [1]** 29/24
**observation [1]** 80/5
**obtained [2]** 51/14 51/15
**obtaining [1]** 51/12
**obvious [3]** 15/12 78/6 78/8
**obviously [12]** 13/17 13/19 32/12 45/9 81/20 89/9 98/25 108/8 112/24 120/2 128/13 132/4
**occasionally [1]** 36/2
**occurred [1]** 73/5
**October [1]** 119/5
**October 25th [1]** 119/5

**off [25]** 6/24 33/19 34/25 39/8 42/16 43/7 44/3 56/21 56/21 57/5 72/21 73/5 82/8 82/11 86/18 86/19 102/7 122/1 123/5 123/10 123/16 125/3 125/3 127/21 135/6
**offense [1]** 37/2
**offer [1]** 6/12
**offered [1]** 76/14
**officer [1]** 114/8
**Official [1]** 136/11
**offsets [1]** 71/16
**oh [8]** 9/21 9/22 29/22 42/12 44/13 46/23 46/23 57/14
**okay [58]** 11/23 12/11 14/2 14/3 14/14 14/17 18/18 26/8 34/10 38/9 38/14 40/23 41/2 45/16 48/18 52/4 54/12 55/21 57/14 58/22 60/2 60/7 64/4 66/4 66/6 71/4 71/7 71/14 74/4 74/9 76/9 76/24 79/3 79/12 81/20 87/6 91/22 92/12 92/17 94/13 95/1 95/18 97/20 97/25 100/14 100/20 100/20 101/18 103/3 107/4 108/23 112/13 112/14 115/8 118/1 119/25 120/16 131/6
**old [5]** 30/25 31/1 41/8 74/24 93/13
**omission [1]** 94/19
**once [4]** 32/23 95/8 131/16 131/17
**one [92]** 8/13 8/14 11/19 14/2 19/1 19/6 19/12 19/22 20/12 21/13 22/5 22/12 25/1 26/1 26/1 26/4 26/9 26/14 28/3 28/7 28/19 30/19 30/20 30/25 33/15 33/21 35/14 35/22 36/23 37/16 42/7 42/8 43/5 43/12 43/14 43/16 45/2 49/20 50/25 51/2 52/15 55/3 59/4 61/4 61/7 64/8 65/8 65/20 66/9 66/13 66/14 66/25 67/3 67/11 68/8 68/9 68/11 69/15 69/22 71/2 71/20 71/23 72/18 75/14 76/9 78/16 79/14 79/18 79/19 80/2 84/14 85/11 85/11 94/21 97/14 98/22 99/7 100/10 100/10 102/10 106/2 112/10 115/14 115/19 115/19 116/24 118/12 121/4 121/5 125/13 126/14 135/7
**one-way [1]** 52/15
**ones [1]** 124/24
**only [44]** 4/23 8/18 12/5 14/25 21/16 22/25 30/20 31/14 32/23

41/22 54/11 56/24 57/3 59/24 59/25 62/19 65/2 65/4 65/8 65/15 66/25 67/3 67/11 70/7 75/7 75/8 81/21 85/16 86/16 96/1 109/6 109/15 114/9 118/8 122/23 125/10 127/12 127/20 128/23 129/17 130/2 131/7 131/25 135/10
**opening [3]** 30/17 75/25 103/20
**operating [1]** 117/1
**operation [1]** 13/7
**operations [3]** 13/11 13/19 17/25
**opinion [25]** 5/5 5/11 8/10 9/12 11/4 14/7 15/10 15/11 15/18 26/25 29/9 35/10 42/15 46/11 48/6 48/6 55/23 80/8 91/2 91/6 98/10 105/17 113/1 115/6 130/12
**opinions [1]** 7/9
**opportunity [8]** 26/10 33/4 42/1 47/20 98/17 103/9 103/17 114/11
**opportunity to [1]** 103/17
**oppose [3]** 44/18 44/19 44/20
**opposed [5]** 22/25 26/6 63/14 98/15 125/15
**opposition [2]** 29/24 37/4
**Oral [1]** 1/15
**ord.uscourts.gov [1]** 2/23
**order [10]** 12/6 37/17 51/18 90/4 96/14 97/6 100/23 123/3 128/3 133/3
**OREGON [46]** 1/2 1/9 8/4 8/16 9/9 10/12 14/24 25/5 31/6 37/6 39/24 40/1 40/3 48/12 48/13 49/10 49/22 54/10 54/22 55/12 56/20 56/21 60/21 60/25 63/19 64/17 65/9 67/1 67/6 81/22 83/11 83/14 84/17 84/20 88/21 96/9 96/10 96/12 97/4 107/4 107/16 108/6 111/22 113/10 124/15 124/17
**Oregon's [1]** 22/24
**origin [1]** 37/23
**original [4]** 20/12 20/18 21/3 136/6
**originated [3]** 20/16 21/3 62/1
**originating [1]** 86/7
**other [40]** 4/6 6/3 7/22 8/8 9/7 9/25 14/11 14/21 16/4 16/14 19/14 20/24 22/9 23/11 24/13 25/2 29/21 36/24 38/7 39/2 40/24 47/8 58/21 63/8 72/14

**other... [15]** 78/2 88/24 90/7 95/3 99/14 100/10 100/11 106/8 107/14 117/22 118/3 124/16 133/17 133/21 134/4

**others [1]** 63/23

**otherwise [14]** 9/2 22/3 23/11 25/19 26/21 41/20 41/20 46/5 54/19 54/19 70/2 92/18 106/13 129/21

**ought [6]** 15/14 57/10 65/22 69/15 76/17 110/17

**our [66]** 6/6 6/7 7/10 8/3 8/15 9/14 10/22 15/14 16/19 16/19 23/6 23/8 28/10 28/14 28/15 29/14 30/6 35/23 39/24 43/15 43/23 44/1 44/10 44/10 45/3 49/14 50/2 56/1 56/2 57/17 57/18 64/6 76/5 76/23 77/3 82/25 83/6 84/6 86/12 89/10 90/1 90/13 91/1 91/15 92/15 94/4 102/4 102/7 102/11 106/4 110/18 112/1 115/6 119/5 124/13 127/5 127/7 127/25 128/3 128/12 128/18 131/7 131/9 132/20 132/25 134/20

**ours [1]** 34/7

**out [90]** 5/8 6/19 8/16 8/18 9/10 10/13 12/4 12/12 12/21 14/25 15/3 15/3 18/25 19/2 22/3 22/25 23/8 26/13 28/16 28/20 29/2 29/4 29/6 30/5 36/15 36/20 37/7 37/13 38/20 39/7 43/5 47/23 48/23 48/23 50/17 51/7 52/20 53/18 54/7 54/19 55/5 55/24 56/6 56/13 59/12 59/24 63/18 69/22 70/16 71/17 73/24 83/6 83/24 85/4 85/8 85/15 85/16 85/16 85/23 87/16 87/23 87/24 90/14 91/4 92/7 92/9 100/9 100/10 100/10 100/19 102/12 103/7 104/6 105/24 109/13 109/23 109/25 113/23 115/11 115/12 115/14 116/7 116/9 117/15 124/15 124/17 125/5 126/18 126/24 133/12

**outlay [1]** 51/10

**outrageous [1]** 56/17

**outside [3]** 15/8 76/14 76/19

**over [10]** 11/11 39/6 42/4 56/8 56/10 95/13 100/9 100/9 115/4 132/16

**overexposure [1]** 111/2

**overhead [1]** 22/15

**overly [1]** 63/1

**oversimplistic [1]** 61/19

**overutilization [1]** 60/12

**owe [7]** 9/5 55/6 71/18 71/18 94/16 100/1 100/1

**owed [3]** 22/14 22/16 22/17

**owing [1]** 75/25

**own [10]** 17/17 23/6 33/16 51/17 52/7 108/24 113/7 115/14 115/17 126/21

**owner [5]** 109/11 109/13 109/15 110/16 117/6

# P

**p.m [1]** 135/25

**Pacific [1]** 82/7

**pack [1]** 87/13

**package [3]** 21/2 64/15 66/22

**packaged [1]** 20/11

**packaging [2]** 68/11 87/13

**packet [1]** 66/15

**page [18]** 33/19 35/10 35/12 46/15 47/10 81/21 83/15 83/18 98/9 98/25 102/11 105/3 105/18 108/16 113/1 120/3 132/12 133/13

**pages [2]** 132/17 132/22

**paid [21]** 7/25 8/22 9/23 9/23 20/17 21/5 21/7 22/3 22/15 29/1 29/7 38/19 56/22 61/25 62/13 63/4 65/8 65/22 67/2 87/11 88/15

**pain [1]** 13/9

**pale [1]** 15/12

**panel [1]** 134/19

**panned [1]** 34/25

**Papak [2]** 49/8 49/9

**paper [7]** 7/5 52/17 53/9 121/13 135/10 135/11 135/12

**papers [4]** 7/18 28/11 34/8 119/5

**paragraph [9]** 11/16 11/18 11/25 12/16 35/14 70/22 71/1 71/4 73/18

**parallel [1]** 38/10

**Pardon [1]** 65/3

**parking [1]** 85/17

**part [17]** 10/21 16/11 21/1 22/18 26/4 44/2 44/11 54/22 62/23 62/24 91/14 97/9 104/17 111/21 119/6 122/20 122/25

**partial [3]** 4/18 46/11 89/15

**participate [1]** 128/24

**participation [2]** 24/19 113/7

**particular [5]** 31/15 38/16 39/2 42/4 92/23

**particularly [2]** 13/5 116/10

**parties [9]** 40/6 42/15 84/4 89/20 90/6 90/10 118/21 125/11 129/5

**partner [6]** 59/2 62/16 62/21 67/23 70/9 112/9

**partners [3]** 58/20 59/16 61/2

**parts [2]** 7/8 33/20

**party [12]** 31/12 31/13 31/23 32/14 38/22 40/9 42/20 43/1 43/1 44/3 44/3 102/24

**pass [2]** 30/9 122/22

**passed [2]** 6/14 19/4

**past [2]** 18/11 99/14

**path [3]** 72/12 75/3 75/9

**patient [1]** 91/15

**pay [25]** 8/16 20/3 20/8 23/21 23/21 24/3 24/12 25/7 25/19 44/3 46/21 53/7 53/10 53/10 53/17 53/18 54/14 58/16 71/19 76/2 107/1 107/7 107/7 119/16 119/17

**paying [5]** 26/7 39/1 42/19 57/9 60/9

**payment [6]** 20/25 22/19 61/17 62/14 68/12 71/19

**payments [1]** 21/16

**pays [6]** 24/14 58/19 58/23 63/3 71/15 119/14

**PCR [1]** 7/3

**pencil [1]** 126/20

**pending [2]** 122/12 135/24

**Pennsylvania [1]** 2/13

**people [14]** 3/23 41/22 56/8 90/15 111/19 116/4 119/7 119/9 119/21 120/1 120/15 130/19 134/20 134/21

**per [23]** 7/16 8/18 8/23 19/24 20/6 20/7 20/9 21/7 21/19 23/21 24/9 25/7 58/8 58/23 59/2 60/19 62/20 64/24 65/12 65/16 71/16 71/20 82/12

**percent [3]** 17/9 76/19 120/12

**Perfect [2]** 21/15 103/24

**perfectly [3]** 25/5 25/5 95/24

**performing [1]** 93/10

**perhaps [2]** 18/11 27/16

**period [2]** 12/19 85/12

**permanent [1]** 21/17

**permissible [2]** 95/24 124/5

**permit [1]** 57/20

**permitted [1]** 93/2

**perpetuated [1]** 90/7

**person [4]** 110/23 112/9 121/20 128/21
**personally [3]** 107/16 108/4 112/4
**perspective [7]** 9/13 16/19 16/20 63/10 81/22 89/10 109/1
**persuade [1]** 31/25
**persuaded [3]** 37/21 89/17 89/17
**persuasive [1]** 112/21
**ph [1]** 102/10
**philosophical [1]** 96/16
**phone [4]** 63/19 129/14 134/20 134/23
**phones [1]** 96/2
**physically [1]** 6/22
**pick [1]** 92/9
**picked [2]** 20/14 71/8
**pickup [1]** 120/15
**picture [1]** 118/5
**piece [5]** 10/22 44/14 45/19 53/9 101/22
**pieces [1]** 28/18
**pierce [1]** 108/15
**piercing [3]** 107/17 109/13 113/11
**Pierre [2]** 62/14 63/20
**piles [1]** 30/12
**PK [2]** 48/17 49/9
**place [4]** 22/10 25/18 57/20 127/2
**placed [1]** 60/21
**places [1]** 49/2
**plain [4]** 30/25 31/1 33/4 132/14
**plaintiff [26]** 1/5 2/4 3/8 3/18 4/16 4/18 4/20 4/24 5/12 11/11 14/25 15/3 27/12 40/15 48/24 49/1 49/3 83/20 85/2 85/2 90/2 98/18 99/9 125/9 128/5 130/7
**plaintiff's [6]** 14/22 15/5 35/24 36/4 36/5 97/9
**plan [6]** 5/19 69/3 73/23 80/7 81/2 128/10
**planning [1]** 90/13
**play [4]** 83/5 93/18 93/19 133/16
**plead [1]** 108/18
**pleading [1]** 86/13
**pleadings [4]** 44/1 73/8 108/14 108/17
**please [10]** 4/4 14/22 15/6 49/13 52/4 82/20 104/13

117/12 128/8 133/4
**pled [1]** 113/13
**plenty [1]** 53/24
**plotted [1]** 107/23
**plug [1]** 93/6
**plus [8]** 34/23 59/1 59/9 65/16 66/10 72/6 72/13 87/8
**pocket [38]** 8/16 8/18 10/13 14/25 15/3 15/3 18/25 19/2 22/25 23/8 28/20 29/2 29/4 29/6 37/7 37/13 47/23 48/23 48/23 51/7 52/20 54/19 59/12 59/24 69/22 73/24 83/24 85/4 85/8 85/15 85/16 85/16 85/23 87/16 87/23 87/24 124/15 124/17
**point [74]** 11/11 11/12 14/6 21/12 23/15 26/24 27/7 28/22 29/17 30/24 30/25 32/19 33/1 33/1 35/2 35/3 37/3 37/8 37/18 38/8 38/25 41/2 41/24 42/2 44/2 44/4 44/17 45/14 45/15 46/5 47/11 53/3 53/3 54/2 57/13 59/23 74/24 74/24 75/24 78/18 78/19 79/15 79/20 80/2 80/6 85/20 87/18 93/24 94/24 94/25 97/9 100/3 100/4 100/13 100/16 100/25 102/12 102/16 103/15 104/18 104/20 105/13 105/24 106/1 106/17 107/3 112/10 112/22 113/23 116/9 118/12 124/23 127/21 131/23
**pointed [2]** 63/18 115/11
**pointing [1]** 103/7
**points [6]** 33/18 34/17 42/11 77/25 81/7 123/6
**pool [2]** 130/11 131/7
**Port [1]** 75/15
**Port-au-Prince [1]** 75/15
**portion [1]** 65/16
**Portland [6]** 1/9 2/9 2/17 2/22 93/11 93/16
**posed [1]** 83/1
**posing [1]** 96/15
**posit [4]** 20/10 21/25 23/7 121/8
**posited [1]** 65/20
**position [7]** 47/24 48/24 49/3 89/4 91/15 113/16 114/22
**positive [2]** 15/17 86/9
**possibility [3]** 45/11 122/4 126/23
**possible [4]** 39/1 100/7 100/13 100/14
**possibly [1]** 10/9

**postponements [1]** 128/9
**potential [1]** 123/3
**power [2]** 13/9 56/21
**powered [1]** 56/20
**practical [5]** 92/11 117/5 117/20 117/23 118/14
**practice [2]** 7/9 41/8
**pre [1]** 128/20
**pre-COVID [1]** 128/20
**precisely [2]** 37/1 87/19
**preclude [1]** 80/9
**precursor [1]** 121/2
**prejudice [2]** 16/9 73/11
**prejudicial [1]** 133/21
**premise [1]** 122/3
**prepaid [1]** 119/19
**preparation [2]** 82/24 89/21
**prepare [3]** 84/4 123/23 124/11
**prepared [3]** 6/20 22/22 128/10
**prepayment [1]** 119/18
**preponderance [4]** 31/16 31/19 31/23 32/17
**presage [4]** 69/7 70/5 79/9 97/15
**presaging [1]** 123/16
**presence [1]** 133/12
**present [6]** 9/7 9/8 37/4 43/21 69/19 70/13
**presentation [1]** 82/25
**presented [4]** 69/19 74/20 84/6 116/22
**presents [1]** 129/18
**presumably [1]** 37/11
**presume [1]** 102/14
**presume the [1]** 102/14
**presuming [1]** 109/18
**presumption [2]** 31/24 37/13
**presupposes [2]** 22/6 22/10
**pretrial [20]** 35/23 35/23 36/2 36/20 84/6 90/1 90/2 90/6 91/1 112/1 127/5 127/25 128/2 128/12 128/13 128/17 129/8 129/12 135/14 135/21
**pretty [3]** 32/18 81/22 118/6
**prevail [1]** 40/19
**prevailing [1]** 14/25
**prevent [2]** 99/3 123/5
**preview [1]** 45/18
**previous [2]** 47/10 83/24
**previously [2]** 27/10 83/23
**price [9]** 34/20 52/20 52/21 53/7 56/5 56/6 56/6 56/10 63/16
**primarily [4]** 6/7 83/15 89/23 98/9

**P**

**Prince [1]** 75/15
**principal [1]** 106/22
**prior [1]** 48/25
**probably [28]** 6/5 18/20 39/7 41/25 42/2 57/5 77/17 78/1 78/5 78/9 78/15 80/12 87/8 89/14 89/24 91/1 91/23 92/15 117/18 126/13 127/3 127/5 127/6 128/10 132/1 132/16 132/17 132/23
**problem [8]** 60/12 94/23 102/4 107/11 107/12 127/11 127/16 131/1
**problems [1]** 13/11
**procedural [5]** 29/12 30/24 33/1 44/16 77/25
**procedural-like [1]** 30/24
**procedurally [3]** 9/14 11/9 30/6
**procedures [1]** 117/1
**proceed [1]** 5/20
**proceedings [3]** 1/16 135/25 136/5
**process [6]** 44/2 44/5 62/4 63/14 91/6 119/22
**processed [1]** 62/21
**profit [4]** 22/15 40/9 40/24 57/17
**profitable [4]** 57/4 59/14 59/15 72/10
**profits [4]** 27/17 48/3 88/22 88/23
**project [3]** 16/11 17/18 17/21
**promise [1]** 51/3
**promissory [1]** 49/24
**promoting [1]** 107/15
**prong [1]** 49/10
**proof [2]** 31/2 31/13
**proofread [1]** 47/13
**proper [3]** 85/1 121/8 122/6
**properly [1]** 121/10
**property [1]** 84/25
**proposal [1]** 6/10
**proposed [5]** 86/13 86/14 90/10 114/15 114/23
**proposing [1]** 126/19
**proposition [3]** 22/23 83/16 83/19
**proprietary [3]** 10/4 10/20 12/3
**protesters [1]** 131/2
**provable [2]** 27/14 27/19
**prove [8]** 19/3 23/16 31/2 31/3 37/12 40/15 42/8 64/5

**proven [2]** 27/5 83/17
**provided [4]** 6/25 68/20 68/22 69/5
**provision [1]** 75/22
**proximate [1]** 124/20
**prudential [1]** 41/2
**pull [1]** 114/12
**pulling [1]** 114/2
**punched [1]** 135/13
**punitive [1]** 117/22
**punting [1]** 89/8
**purchase [2]** 24/1 122/6
**purchased [2]** 96/2 120/18
**purchasing [1]** 118/25
**pure [3]** 52/17 101/17 133/15
**purely [2]** 69/15 91/24
**purportedly [2]** 60/22 118/18
**purpose [1]** 98/18
**purposes [6]** 51/23 81/16 97/19 101/1 106/4 123/20
**put [27]** 5/5 14/4 14/21 15/10 15/12 17/2 26/13 29/23 29/24 37/6 43/1 57/14 57/17 66/23 75/10 92/13 92/13 93/6 93/21 95/23 95/23 96/2 104/18 110/16 125/25 126/20 129/8
**putting [5]** 39/2 95/20 122/1 127/21 130/2

**Q**

**qualified [1]** 46/13
**quality [1]** 11/22
**quantify [1]** 64/5
**quantity [4]** 18/19 18/22 18/22 86/4
**question [50]** 7/14 9/21 11/8 11/10 11/10 11/13 14/21 15/1 15/24 16/2 23/14 26/9 31/15 40/4 42/4 42/12 52/2 52/14 63/17 65/18 66/17 66/19 68/18 69/16 74/10 77/2 92/2 95/17 96/16 96/17 97/8 97/21 97/23 98/1 98/3 99/10 99/11 99/15 99/16 99/21 101/14 109/24 110/13 117/4 117/20 118/4 120/16 124/4 124/7 132/1
**Question: [2]** 105/5 120/10
**Question: And [2]** 105/5 120/10
**questioning [1]** 81/7
**questionnaire [1]** 130/3
**questions [11]** 11/7 14/2 27/9 27/24 38/18 83/1 104/16 119/2 132/15 132/16 132/20
**quick [2]** 12/8 118/12

**quickly [2]** 119/1 134/10
**quiet [1]** 112/11
**quite [1]** 87/19
**quotation [1]** 120/25
**quote [8]** 16/1 20/16 25/25 84/23 105/17 105/18 116/11 124/22
**quote/unquote [4]** 16/1 20/16 25/25 116/11
**quoted [2]** 87/18 124/25
**quoting [1]** 89/1

**R**

**radio [5]** 16/25 17/1 21/17 67/7 67/8
**raise [5]** 80/3 99/21 118/13 131/20 131/21
**raised [1]** 47/17
**randomized [1]** 63/24
**range [2]** 13/10 28/7
**rate [11]** 19/24 20/17 21/17 24/16 24/16 24/17 24/20 24/21 28/24 29/1 75/16
**rates [5]** 24/2 25/25 26/3 56/9 56/11
**rather [3]** 30/25 90/8 129/4
**rational [8]** 10/9 32/7 32/17 39/1 53/8 64/2 68/14 92/19
**rationale [1]** 104/19
**reach [1]** 32/8
**reaching [1]** 9/19
**reacting [1]** 87/22
**reaction [2]** 37/16 37/25
**reactions [1]** 77/23
**read [6]** 5/1 26/16 46/10 48/6 70/18 84/16
**real [5]** 55/13 73/24 96/5 103/1 107/13
**reality [1]** 115/1
**realized [4]** 17/18 17/23 17/23 17/25
**realizing [2]** 26/3 26/7
**really [51]** 4/23 5/6 27/19 28/11 28/17 28/18 29/5 29/6 30/4 30/5 31/21 32/11 35/16 35/18 36/9 36/25 37/18 52/10 55/10 56/1 59/25 67/14 67/17 77/14 81/1 81/22 84/10 85/12 87/4 87/7 90/5 90/20 93/15 99/6 99/7 103/2 103/19 107/5 107/6 110/3 124/10 129/8 129/9 132/12 132/24 133/4 133/18 133/19 134/3 134/5 135/17
**realm [1]** 29/3
**reason [14]** 12/2 42/3 44/11

**R**

**reason... [11]** 45/8 65/19 73/11 87/19 87/21 94/12 99/24 105/12 106/19 106/22 123/13
**reasonable [3]** 31/12 31/22 45/12
**reasonably [3]** 10/11 51/24 51/25
**reasons [4]** 28/7 30/1 72/18 125/13
**reasons: [1]** 121/4
**reasons: one [1]** 121/4
**rebuts [1]** 112/16
**rebuttal [1]** 68/23
**recall [3]** 38/16 88/8 134/6
**receive [14]** 5/10 5/12 5/15 22/2 46/16 59/1 64/21 64/25 65/12 84/19 85/7 86/5 88/7 88/10
**received [18]** 18/25 22/1 49/2 49/5 56/23 62/6 62/8 62/18 64/11 64/24 65/15 65/23 65/25 66/6 72/1 86/6 88/11 88/13
**receives [1]** 24/16
**receiving [1]** 66/9
**recently [1]** 5/2
**recess [2]** 82/13 104/10
**recharge [1]** 42/15
**recipient [1]** 46/20
**reciprocal [3]** 61/8 61/9 63/6
**recitations [1]** 78/2
**recognize [1]** 95/8
**recognized [1]** 62/18
**recommended [1]** 24/21
**reconsider [3]** 108/19 110/15 112/6
**record [20]** 10/18 13/24 14/17 14/18 14/19 23/23 27/3 76/17 76/18 78/11 79/10 86/2 97/16 115/15 118/22 119/6 119/7 127/19 135/6 136/5
**recorded [3]** 13/2 13/14 16/16
**records [12]** 7/20 7/23 9/16 16/3 33/5 33/22 34/1 34/5 34/8 34/12 64/11 123/14
**recover [2]** 84/20 125/10
**recoverable [4]** 48/13 83/3 91/8 124/13
**recovered [2]** 46/15 88/22
**recovering [1]** 47/3
**Recovery [1]** 113/20
**recreate [1]** 16/6
**redacted [1]** 12/9
**redirect [1]** 104/23

**referenced [1]** 17/22
**refused [1]** 70/13
**regard [3]** 16/12 22/8 28/5
**regarding [5]** 4/21 5/2 114/10 116/25 118/7
**regime [2]** 75/17 75/19
**regret [1]** 98/2
**regular [1]** 22/12
**reintroduce [1]** 6/13
**rejected [1]** 74/21
**related [3]** 48/4 118/7 131/19
**Relatedly [1]** 98/24
**relates [3]** 4/23 32/25 57/22
**relationship [8]** 25/9 58/3 61/1 61/4 62/23 63/9 63/22 122/5
**relationships [5]** 61/6 61/8 118/18 118/19 118/21
**relatively [2]** 77/18 129/22
**relevant [4]** 13/3 50/13 50/19 90/23
**reliable [2]** 56/20 56/20
**reliance [1]** 85/6
**relied [2]** 51/24 51/25
**Relying [1]** 98/6
**remain [2]** 3/24 4/4
**remedy [16]** 27/13 40/11 40/13 40/14 40/17 40/18 40/20 40/22 41/9 41/12 41/14 41/18 41/19 41/22 42/7 114/6
**remember [4]** 85/12 86/23 115/16 124/23
**remembering [1]** 104/25
**remind [2]** 124/12 127/23
**remove [1]** 98/16
**renewed [3]** 36/12 36/22 78/11
**repeat [1]** 57/24
**repeatedly [2]** 28/11 74/22
**repeating [1]** 105/20
**reply [2]** 29/25 102/11
**report [3]** 68/20 68/23 69/5
**reporter [4]** 2/21 6/6 6/7 136/11
**represent [2]** 125/1 134/16
**representation [4]** 15/2 49/4 50/5 51/11
**representative [1]** 70/17
**representatives [1]** 33/21
**require [1]** 133/4
**required [2]** 53/18 57/20
**requirements [1]** 44/16
**requires [2]** 27/12 87/15
**requiring [1]** 46/21
**requisite [1]** 102/20
**reread [1]** 133/3
**resale [4]** 12/19 57/3 72/20

72/20
**research [1]** 23/6
**resell [1]** 57/20
**resident [1]** 58/15
**resolved [1]** 128/17
**respect [13]** 20/6 22/20 24/15 27/2 27/5 31/7 33/22 46/10 64/13 105/25 107/5 117/21 117/21
**respectful [1]** 117/17
**respectfully [2]** 25/1 52/4
**respecting [1]** 111/22
**respond [3]** 6/2 11/11 42/1
**responds [1]** 112/15
**response [13]** 15/5 19/19 23/8 31/8 31/8 31/9 32/2 32/3 32/5 97/14 101/12 108/25 122/21
**responsible [4]** 27/17 107/21 109/7 112/5
**rest [2]** 52/13 123/6
**Restatement [1]** 103/16
**restores [1]** 48/24
**restricted [1]** 60/11
**restriction [4]** 57/14 57/17 57/20 92/24
**result [5]** 32/8 39/12 51/7 73/15 102/1
**results [1]** 10/23
**retail [2]** 34/20 52/20
**retain [2]** 46/20 47/11
**rethink [2]** 35/6 106/19
**retry [1]** 36/15
**revenue [8]** 17/17 17/22 17/25 19/22 19/23 19/25 23/10 24/25
**revenues [1]** 62/6
**reversed [2]** 32/19 32/21
**rid [1]** 89/23
**ride [1]** 53/2
**right [97]** 4/11 6/17 7/12 9/6 10/15 14/7 14/9 15/2 18/10 18/10 18/13 18/22 19/3 21/14 24/12 28/12 28/12 28/19 29/2 29/5 29/18 30/10 32/15 33/9 34/23 35/7 35/14 36/9 38/3 39/3 41/25 42/2 42/6 42/6 42/17 45/25 48/19 50/19 51/16 53/13 54/18 59/22 60/19 62/7 65/17 66/1 77/23 78/1 81/10 82/6 82/14 82/18 82/23 85/12 85/20 86/10 86/22 87/5 87/20 88/6 88/12 89/6 89/12 91/20 93/18 93/23 94/24 95/2 95/22 96/19 96/19 96/22 96/25 96/25 97/1 97/16 98/5 100/2 104/11 105/22 105/22 107/18 114/10

**right... [14]** 117/25 118/11 122/11 122/17 126/21 128/1 130/12 131/3 131/6 132/1 132/20 132/23 135/6 135/23

**rights [5]** 94/11 97/3 121/6 121/19 130/17

**Ringler [1]** 116/8

**rise [1]** 113/8

**rising [1]** 3/22

**risk [1]** 122/14

**RMR [2]** 2/21 136/10

**roam [46]** 12/14 12/18 14/2 16/18 21/13 42/19 42/22 42/25 43/6 43/17 44/4 44/22 44/24 45/20 46/6 55/20 56/13 56/23 57/2 57/8 58/6 59/8 59/13 59/25 60/3 60/14 60/16 61/12 61/16 61/23 61/24 62/3 62/18 63/14 64/6 64/13 64/16 64/23 65/10 66/18 70/10 71/20 71/25 73/22 76/22 86/8

**roaming [24]** 58/4 58/20 58/21 59/2 59/16 60/17 61/2 61/5 61/8 61/10 61/19 62/16 62/21 62/23 63/1 63/6 63/9 63/15 67/23 70/9 70/15 70/18 71/9 73/22

**Robert [3]** 2/4 3/12 132/7

**Robin [1]** 25/23

**role [3]** 33/21 110/16 110/16

**Rolex [1]** 55/1

**Rolls [1]** 54/16

**Room [1]** 2/22

**roster [1]** 23/25

**roughly [3]** 20/22 21/20 32/5

**round [3]** 12/20 115/7 128/4

**rounded [1]** 12/18

**Ruiz [11]** 81/13 104/20 105/11 106/8 109/25 110/5 110/5 116/21 116/23 117/9 117/21

**Ruiz's [2]** 105/3 110/9

**rule [19]** 8/16 10/12 32/21 37/7 41/4 78/12 83/19 83/24 88/1 88/3 89/10 89/11 89/15 97/8 101/10 103/11 115/1 115/2 129/11

**ruling [7]** 38/5 88/3 101/2 105/15 106/20 122/24 123/24

**rulings [5]** 89/18 116/19 118/14 123/2 128/11

**run [1]** 135/7

**running [1]** 115/14

**runs [1]** 100/9

**rush [1]** 11/20

**Ryan [1]** 93/6

**S**

**S-c-h-e-d-l-e-r [1]** 48/16

**S.A [2]** 1/3 3/5

**S.E [1]** 2/5

**S.W [3]** 2/9 2/16 2/22

**sadly [1]** 45/23

**said [57]** 9/15 10/5 16/3 18/16 18/17 29/12 30/12 32/7 33/6 33/6 33/8 34/8 42/14 43/25 44/11 45/8 45/14 46/8 57/13 60/1 62/24 71/13 74/1 74/16 76/19 76/23 85/24 85/25 86/14 86/14 86/17 86/18 86/19 86/23 94/21 101/7 102/18 104/24 107/19 108/21 108/25 109/24 110/1 112/16 115/4 116/3 119/16 122/21 123/2 126/17 127/1 129/17 133/1 134/10 134/17 134/19 134/19

**sake [1]** 42/23

**sale [1]** 84/24

**sales [1]** 34/23

**Salyer [1]** 2/16

**same [10]** 31/5 32/5 37/25 41/14 45/21 81/21 100/8 110/23 116/13 134/17

**Sanchez [1]** 79/17

**sat [1]** 107/22

**satisfactory [1]** 134/22

**satisfied [2]** 15/15 117/8

**satisfies [1]** 31/23

**satisfy [3]** 31/18 31/19 31/24

**Savage [59]** 2/12 4/6 6/13 6/16 14/23 15/10 15/22 16/6 16/25 17/4 17/7 18/23 19/5 19/9 19/21 21/25 22/23 24/4 26/9 26/12 26/21 27/8 27/9 39/22 46/6 46/8 54/3 54/6 60/5 60/20 62/24 63/18 64/1 64/9 65/19 67/18 68/19 76/10 76/14 77/24 82/15 93/6 104/17 104/23 105/13 106/12 108/25 109/17 112/16 112/18 114/2 114/11 116/3 121/2 121/7 121/16 122/14 122/17 125/24

**Savage's [1]** 106/1

**save [4]** 25/19 27/22 28/1 28/3

**saw [2]** 107/11 110/8

**say [108]** 5/22 7/4 8/21 9/3 10/22 12/4 12/24 12/25 15/9 17/18 20/11 21/6 22/14 24/5 26/11 26/20 27/7 29/18 29/20

29/22 29/25 30/6 31/18 32/15 32/20 33/2 34/10 34/20 34/21 34/21 36/5 36/8 37/8 38/16 38/22 40/1 42/10 42/23 42/24 43/1 43/18 44/13 45/11 45/17 46/4 48/13 50/13 54/13 54/24 55/1 55/24 56/14 57/15 58/20 62/16 63/1 63/3 64/1 64/9 64/19 66/13 67/5 67/7 68/13 69/24 70/1 70/18 70/21 70/22 72/3 72/6 75/7 76/5 78/3 78/16 78/25 79/6 81/13 81/15 83/2 91/10 92/6 92/13 93/2 93/3 95/13 95/15 95/25 97/20 100/14 100/14 103/16 106/14 110/6 111/17 122/16 123/24 124/15 124/17 125/25 129/9 130/14 131/25 133/7 133/24 133/25 133/25 135/16

**saying [33]** 8/11 18/24 19/6 19/20 28/11 29/15 35/8 35/16 35/21 38/2 39/2 39/17 43/6 64/22 65/7 67/1 67/18 70/13 70/19 73/9 75/14 75/15 77/25 86/24 92/17 92/25 94/8 106/4 109/23 121/22 122/8 122/22 124/3

**says [31]** 6/3 22/24 26/22 26/23 36/10 43/14 43/22 50/11 57/9 69/10 70/10 71/4 71/7 71/8 75/19 75/23 92/23 93/13 93/22 101/3 101/7 101/7 102/12 107/16 108/1 108/2 109/25 110/17 112/18 113/24 133/11

**scenario [4]** 22/12 23/9 51/2 121/5

**scenarios [1]** 120/18

**Schedler [1]** 48/15

**schedule [2]** 128/8 128/10

**scheduled [1]** 126/21

**scheduling [1]** 127/20

**school [2]** 84/22 87/9

**Schwabe [1]** 2/8

**scienter [1]** 73/10

**scope [2]** 18/5 133/11

**sculk [1]** 95/5

**sculked [1]** 94/15

**seal [2]** 12/5 12/9

**seat [5]** 52/25 53/4 53/5 53/12 53/15

**seated [2]** 3/24 4/4

**seats [2]** 53/24 53/25

**Seattle [1]** 60/25

**second [13]** 28/5 30/24 35/13

**second... [10]** 39/6 68/11 69/14 71/2 78/14 78/19 115/19 127/12 128/2 128/5
**Secondly [1]** 27/21
**secure [1]** 48/8
**securities [4]** 109/5 111/3 111/4 111/11
**see [37]** 3/15 4/9 7/15 9/22 11/24 25/15 35/24 35/24 35/25 35/25 36/3 36/10 36/20 39/23 44/18 45/10 55/5 55/14 57/19 59/21 63/15 69/10 83/4 83/8 84/2 86/3 88/19 90/13 93/17 98/9 100/13 100/21 107/12 112/5 117/15 128/14 130/24
**seeing [3]** 55/6 91/5 115/16
**seem [1]** 87/15
**seems [9]** 29/22 37/8 54/24 86/2 86/10 92/7 97/11 108/9 123/8
**seen [5]** 15/11 90/3 109/3 109/5 130/11
**sees [1]** 93/20
**Segueing [1]** 57/18
**selecting [1]** 63/20
**selection [1]** 63/25
**self [1]** 30/23
**self-sufficient [1]** 30/23
**sell [2]** 23/24 119/11
**semester [2]** 85/11 85/14
**send [10]** 43/5 44/23 45/5 58/20 61/10 90/6 90/10 111/25 119/13 135/12
**sending [2]** 43/3 128/11
**sends [2]** 58/18 90/2
**sense [4]** 11/1 106/18 107/21 111/14
**sense: [1]** 38/10
**sense:  unjust [1]** 38/10
**sent [14]** 5/4 7/21 7/21 7/25 8/22 10/8 16/24 20/13 30/13 30/13 38/19 56/19 56/21 57/7
**sentence [3]** 47/1 73/17 83/24
**sentences [1]** 12/16
**separate [5]** 21/12 108/6 108/7 108/14 132/4
**separately [1]** 114/20
**serious [2]** 77/8 77/10
**seriousness [1]** 129/16
**server [1]** 16/4
**servers [2]** 67/6 112/12
**serves [1]** 21/24
**service [4]** 51/13 57/8 57/16

60/9
**services [2]** 68/15 102/5
**set [6]** 24/16 29/13 56/5 107/5 107/6 108/5
**seven [4]** 21/21 37/9 128/21 128/23
**several [3]** 15/25 60/6 72/18
**shadow [1]** 33/1
**share [7]** 27/9 84/1 84/9 88/20 108/10 131/11 134/15
**shared [1]** 49/14
**shareholder [1]** 114/8
**she'll [1]** 117/19
**she's [1]** 39/17
**shift [1]** 93/5
**shifting [2]** 59/13 73/6
**ship [1]** 117/2
**shipped [1]** 96/10
**ships [1]** 18/11
**shock [2]** 37/10 37/10
**shoots [1]** 95/5
**short [9]** 8/13 8/13 27/24 27/25 31/4 63/17 77/18 91/13 112/8
**should [38]** 17/18 18/1 18/3 18/6 22/2 27/17 27/18 30/9 31/18 35/6 40/20 40/21 46/23 47/12 47/24 48/1 48/2 48/2 48/4 65/25 66/9 67/2 82/8 88/14 89/6 90/20 101/15 104/2 106/19 108/8 109/13 112/22 118/3 122/12 126/9 126/14 133/13 135/8
**shouldn't [5]** 27/18 38/14 38/16 93/13 127/16
**shout [1]** 54/7
**show [10]** 7/18 8/12 18/19 32/16 44/12 46/18 47/6 76/17 103/25 129/11
**shown [2]** 8/6 124/19
**shows [4]** 9/17 9/17 28/21 30/7
**shred [3]** 26/1 26/2 26/4
**shrink [2]** 43/14 121/13
**shrink-wrap [2]** 43/14 121/13
**shumway [4]** 2/21 2/23 136/9 136/10
**SI [1]** 1/5
**side [15]** 6/3 14/11 16/4 16/14 20/24 25/1 29/10 40/24 90/11 99/21 114/20 133/21 134/4 135/15 135/16
**sidebar [1]** 133/12
**sided [1]** 135/13
**sides [10]** 6/2 15/18 68/17 78/1 103/8 129/3 131/6 133/24 134/1 135/18

**sides' [1]** 90/24
**sight [1]** 95/5
**sign [3]** 92/22 94/8 121/17
**signal [1]** 43/5
**signals [1]** 43/4
**signature [2]** 136/7 136/7
**significant [4]** 16/4 17/9 17/11 61/8
**signing [1]** 136/4
**SIM [52]** 34/7 34/9 38/21 38/23 39/7 42/16 42/25 43/2 43/14 43/14 43/15 43/17 43/22 43/22 44/2 44/24 60/21 62/12 62/13 64/16 72/21 92/8 92/10 92/17 95/25 96/20 98/14 98/15 98/21 99/7 99/8 99/18 99/25 100/9 100/20 119/8 119/9 119/12 119/15 119/17 119/19 119/21 119/22 120/5 121/8 121/10 121/13 121/18 121/21 123/5 123/14 125/2
**similar [1]** 32/3
**Similarly [1]** 134/2
**SIMON [2]** 1/17 3/7
**simple [4]** 8/13 8/14 8/21 45/4
**simplified [1]** 61/17
**simplistic [1]** 63/1
**simply [9]** 44/19 57/3 60/23 68/7 68/13 85/22 85/22 89/8 110/3
**SIMs [16]** 99/24 100/6 101/16 102/17 102/18 105/10 118/24 118/25 120/5 120/18 120/20 121/1 123/10 123/19 123/22 125/4
**simultaneously [1]** 100/14
**since [2]** 34/6 126/5
**single [8]** 20/11 20/17 20/20 20/21 61/24 65/13 66/16 76/22
**sir [6]** 21/20 52/13 54/5 56/15 82/17 104/9
**sitting [4]** 38/23 39/9 91/25 92/10
**situation [5]** 7/15 30/5 56/5 95/20 112/2
**six [6]** 50/16 128/21 128/25 129/2 129/5 132/15
**six-person [1]** 128/21
**Sizer [1]** 102/10
**Skipping [1]** 120/3
**skulked [3]** 94/7 96/21 96/22
**skulking [1]** 94/25
**skulky [1]** 93/25
**sleep [2]** 38/4 108/19
**slightest [3]** 100/8 107/1 125/1

**slightly [5]** 52/5 52/5 57/18 59/13 75/24

**slowly [4]** 56/15 71/6 71/6 71/13

**small [1]** 79/14

**Smith [4]** 2/4 3/13 64/16 66/20

**snack [1]** 80/21

**so [156]**

**software [40]** 45/24 63/25 65/8 78/20 79/7 79/23 80/2 81/8 81/12 81/17 91/12 91/21 92/2 95/7 97/18 98/19 99/18 99/20 99/23 100/5 101/20 101/21 101/22 104/15 104/22 104/24 104/25 105/1 105/25 106/2 106/5 106/6 109/22 110/18 111/10 116/25 123/4 123/20 125/4 125/5

**sold [4]** 30/13 34/21 53/25 120/14

**solid [1]** 101/6

**solved [1]** 60/12

**solvent [1]** 106/23

**some [73]** 7/5 11/5 15/15 18/18 18/22 20/25 24/7 25/19 33/3 34/7 34/17 35/7 36/1 37/8 37/25 42/2 43/9 43/18 44/7 45/23 47/8 48/12 55/16 57/6 57/13 57/24 59/15 61/14 61/15 63/3 63/8 65/16 73/12 73/12 77/25 85/6 85/12 85/25 88/18 89/14 89/24 90/6 91/3 91/7 93/11 94/12 98/2 99/23 101/23 103/21 103/22 104/16 106/24 106/25 107/15 107/21 108/23 111/25 112/12 115/11 117/21 118/23 121/1 124/22 124/23 127/21 128/7 128/13 129/23 132/19 132/24 133/22 134/21

**somebody [3]** 4/25 38/21 54/1

**somebody's [1]** 10/13

**somehow [7]** 10/23 12/3 39/7 44/13 98/16 113/23 121/19

**someone [8]** 28/25 40/15 40/21 74/23 113/2 113/17 114/21 121/10

**something [36]** 8/24 12/22 26/13 31/20 31/23 33/6 34/14 37/3 41/4 44/10 51/3 52/23 53/19 54/6 57/10 75/15 77/19 80/10 81/5 84/2 84/10 84/15 90/14 90/15 94/1 94/1 100/19 102/22 103/8 106/5 107/18

**sometimes [3]** 36/4 36/7 63/24

**somewhat [1]** 7/4

**somewhere [4]** 21/23 22/1 37/10 38/20

**son [4]** 93/6 93/10 93/18 93/24

**son's [1]** 95/11

**Sonner [1]** 41/5

**soon [2]** 129/22 129/22

**sooner [1]** 123/10

**sorry [11]** 7/4 24/18 39/19 39/19 40/2 47/16 47/18 50/23 78/23 120/24 128/16

**sort [10]** 9/25 36/14 36/19 44/9 49/24 69/19 92/1 93/9 118/23 131/3

**sorts [1]** 36/20

**sought [1]** 114/5

**sounds [2]** 82/6 98/1

**source [2]** 94/6 94/14

**spaced [1]** 132/16

**spare [2]** 89/20 99/22

**speak [6]** 3/24 6/9 6/24 15/9 50/22 127/10

**Speaking [1]** 129/15

**speaks [1]** 19/23

**special [4]** 88/18 132/12 132/17 132/22

**species [1]** 50/6

**specific [8]** 9/21 11/10 26/9 90/12 118/14 124/10 129/9 132/16

**specifically [2]** 69/11 120/11

**specificity [1]** 133/4

**specifics [1]** 10/19

**speculate [2]** 120/8 120/13

**speculation [1]** 70/20

**speech [3]** 111/6 111/7 111/12

**speeding [1]** 99/14

**spend [7]** 10/20 55/10 79/13 81/5 87/24 90/18 133/1

**spent [5]** 7/24 10/19 11/21 17/16 59/5

**spirit [1]** 116/11

**spoiler [1]** 99/20

**spoke [1]** 116/23

**spread [3]** 87/11 100/10 100/10

**spring [1]** 134/4

**Square [1]** 55/1

**staff [2]** 6/25 47/13

**stage [1]** 105/12

**stand [4]** 14/18 14/19 16/8 16/8

**stand-alone [2]** 14/18 14/19

**standard [16]** 8/5 13/1 31/1 31/19 31/20 31/23 31/25 32/1 76/21 87/16 87/17 100/5 101/9 101/15 116/25 124/24

**standing [2]** 54/25 75/14

**stands [2]** 49/9 120/15

**star [1]** 45/5

**start [10]** 8/11 19/20 20/1 32/12 77/19 91/6 91/8 109/18 127/7 129/4

**started [4]** 73/14 82/19 100/12 114/1

**starting [1]** 103/15

**state [4]** 102/25 130/17 131/19 133/23

**stated [2]** 43/12 43/16

**statement [7]** 44/25 87/22 107/14 133/11 133/13 134/7 134/7

**statements [8]** 35/25 90/9 103/20 109/8 109/9 111/5 133/3 133/23

**STATES [16]** 1/1 1/18 2/21 20/13 20/14 21/4 23/16 23/20 24/8 26/2 58/4 58/7 62/15 74/20 75/6 101/2

**status [1]** 92/10

**statute [1]** 73/10

**stay [2]** 117/15 127/13

**steal [2]** 10/15 34/19

**step [3]** 23/17 80/14 86/21

**steps [1]** 113/18

**still [16]** 6/6 13/22 16/5 18/11 18/23 29/19 42/4 53/5 66/15 67/1 72/5 74/14 86/6 94/16 108/20 110/15

**stipulate [2]** 129/3 132/7

**stipulation [1]** 129/5

**stole [1]** 125/21

**stolen [3]** 120/18 120/21 120/21

**stop [6]** 23/13 77/14 79/3 97/1 112/13 122/16

**stopped [1]** 75/2

**store [3]** 10/15 22/13 34/19

**stowed [1]** 68/8

**stream [1]** 121/5

**streams [1]** 58/10

**street [6]** 2/5 2/16 38/21 92/9 111/12 119/24

**streets [2]** 120/14 120/15

**stressed [1]** 41/2

**strictly [1]** 124/17

**Strike [1]** 60/1

**strongly [1]** 83/7
**struggling [5]** 40/12 40/17 42/4 46/22 47/21
**stuck [1]** 54/15
**student [6]** 84/17 84/19 84/20 85/4 85/9 85/11
**studied [1]** 73/3
**study [3]** 53/21 55/10 55/15
**stuff [9]** 8/8 30/14 34/10 73/2 87/13 103/23 107/8 130/20 133/17
**subject [3]** 10/6 71/16 81/6
**submissions [1]** 35/23
**submit [5]** 100/6 100/7 101/10 102/19 111/20
**submitted [1]** 55/22
**subscribe [2]** 58/4 58/6
**subscriber [6]** 58/2 58/23 60/16 61/18 63/2 99/7
**subscribers [3]** 63/7 98/16 98/20
**subscribes [1]** 60/16
**subscription [3]** 65/5 66/19 66/20
**subsidiary [1]** 37/2
**substance [2]** 44/16 133/18
**substantive [5]** 14/23 30/25 90/12 90/18 115/7
**substantively [2]** 15/24 32/25
**subtract [1]** 66/5
**such [5]** 7/23 10/8 74/2 129/11 129/11
**sue [2]** 40/14 94/19
**sued [1]** 84/17
**suffered [3]** 15/4 16/4 85/2
**sufficient [5]** 8/2 27/3 30/23 89/7 133/7
**sufficiently [3]** 108/2 108/2 108/3
**suggest [4]** 25/1 26/5 52/22 79/16
**suggested [2]** 10/1 10/1
**suggestion [1]** 76/10
**suing [2]** 130/17 130/18
**suitcase [5]** 52/24 53/2 66/23 68/7 75/4
**Suite [4]** 2/5 2/9 2/13 2/16
**sum [1]** 64/12
**summary [25]** 4/13 4/14 4/16 4/18 27/11 29/16 30/17 31/10 31/18 32/11 35/19 46/11 69/14 77/25 81/13 83/11 89/7 89/16 97/8 97/10 99/9 105/12 105/15

106/10 119/6
**support [4]** 29/25 112/2 114/24 118/22
**supports [3]** 112/18 113/16 117/7
**suppose [6]** 6/11 25/3 25/17 93/10 93/12 94/10
**supposed [2]** 87/1 119/7
**Supreme [5]** 32/7 83/14 84/20 101/3 101/6
**sure [20]** 6/2 14/13 14/15 35/9 35/21 42/13 57/25 69/25 80/5 87/20 93/25 94/21 97/20 99/15 107/21 108/3 117/7 118/15 119/3 131/21
**surely [1]** 74/12
**susceptible [1]** 102/13
**switch [6]** 13/2 13/13 13/14 16/15 16/23 33/16
**switching [1]** 34/5
**system [6]** 10/14 10/17 13/8 58/13 92/12 135/1

**T**

**tabs [1]** 135/13
**tail [1]** 16/19
**take [34]** 6/7 15/2 22/12 23/17 32/21 33/6 34/18 35/9 36/11 40/5 43/7 58/1 68/22 69/9 76/4 77/9 77/18 78/12 81/8 86/17 86/19 89/3 91/4 104/6 109/13 112/22 113/18 114/17 114/18 116/20 122/19 122/19 134/14 135/24
**taken [4]** 15/1 22/17 82/13 104/10
**takes [1]** 113/3
**taking [7]** 6/24 63/19 82/5 107/25 108/5 111/17 112/20
**Talcott [5]** 2/8 3/21 4/2 46/4 112/15
**talk [33]** 5/24 5/24 6/19 21/14 30/11 38/6 45/19 45/23 46/6 70/4 75/4 78/21 79/5 79/22 79/24 88/21 113/2 114/3 118/3 122/12 126/7 126/8 127/17 128/12 129/7 129/12 131/10 131/18 131/24 132/9 135/8 135/14 135/20
**talked [2]** 49/25 56/2
**talking [15]** 6/15 16/18 18/11 21/12 21/13 23/19 33/2 33/24 45/22 74/19 78/3 81/14 91/11 116/15 121/24
**talks [2]** 16/14 19/21

**tandem [1]** 48/9
**target [3]** 22/14 34/19 51/6
**tariff [2]** 68/15 75/18
**task [1]** 91/17
**tax [7]** 20/2 22/7 22/8 22/10 34/23 53/17 88/16
**taxes [9]** 20/22 21/8 22/2 22/15 22/19 86/18 86/20 88/10 89/5
**team [1]** 104/21
**tear [1]** 121/13
**technical [3]** 13/8 42/12 75/9
**technically [1]** 75/6
**technology [5]** 1/7 3/6 4/6 37/19 66/22
**telecom [2]** 1/7 56/4
**telecommunications [3]** 109/2 109/4 111/2
**telephone [1]** 134/16
**tell [40]** 4/25 5/1 16/9 21/11 22/22 31/5 31/7 60/7 67/4 69/1 73/1 77/3 77/16 77/22 77/23 81/1 85/21 91/3 92/6 100/18 103/6 103/10 103/15 105/21 110/25 114/19 115/20 119/1 119/4 120/5 120/7 120/10 120/12 128/19 128/19 129/21 129/22 130/4 130/12 135/7
**telling [3]** 5/7 44/22 78/1
**tempted [1]** 32/20
**ten [9]** 50/15 50/18 124/8 126/10 126/22 129/4 132/15 134/12 135/18
**ten-day [1]** 126/10
**tension [1]** 110/8
**tentative [28]** 5/5 5/6 5/10 7/9 8/10 9/11 9/20 14/7 15/10 15/18 26/25 28/6 29/9 35/9 37/17 42/15 46/11 48/6 55/23 77/23 80/8 89/24 91/2 91/2 98/10 115/6 123/3 128/11
**tentatively [3]** 27/10 37/22 122/15
**term [3]** 7/22 13/8 92/25
**terminated [6]** 12/13 12/15 20/9 20/11 20/21 21/4
**terms [14]** 43/10 43/13 43/15 43/19 43/23 45/1 45/9 45/11 51/10 121/9 121/11 121/12 121/14 121/14
**test [4]** 7/3 13/3 13/4 13/20
**testified [5]** 34/6 57/13 116/4 116/17 116/24
**testify [4]** 14/10 74/12 133/7 133/8
**testifying [1]** 70/12

**testimonial [1]** 128/16
**testimony [11]** 17/16 17/19 57/11 76/16 90/8 97/15 104/20 106/15 110/9 110/9 133/6
**testing [3]** 13/12 13/18 19/5
**than [21]** 8/25 9/20 18/17 18/20 28/16 30/25 38/7 39/2 74/11 74/13 77/9 81/1 85/22 88/4 102/5 104/7 117/19 121/6 121/20 127/5 134/22
**thank [18]** 5/14 5/17 15/7 15/9 26/19 39/21 47/18 50/24 80/22 91/19 104/9 104/13 106/11 115/9 116/1 122/10 127/17 135/22
**that [874]**
**that's [100]** 4/22 5/20 6/17 7/17 10/17 13/21 14/20 15/23 28/15 28/15 28/21 29/25 30/19 32/8 32/9 32/10 33/13 35/20 36/16 40/10 41/25 43/19 46/1 48/19 49/8 49/9 49/18 50/7 52/2 55/8 55/17 56/8 56/11 57/15 59/16 59/17 63/24 67/1 67/5 67/20 70/20 70/24 74/5 75/5 75/20 76/21 77/7 77/13 77/21 78/15 81/18 82/5 83/7 83/17 84/15 84/17 85/19 86/13 86/13 86/20 87/25 88/2 90/20 91/3 91/5 92/22 95/17 96/7 97/2 97/7 97/9 97/18 98/6 98/22 99/5 99/8 99/10 101/1 105/3 108/5 108/16 109/7 109/12 109/15 109/17 109/24 110/1 110/7 110/12 113/13 116/13 120/22 122/9 125/13 125/19 126/17 127/10 127/22 130/6 131/17
**theft [1]** 22/12
**their [66]** 8/17 9/8 10/6 10/10 10/10 10/14 10/14 10/16 11/12 17/17 19/1 22/14 23/25 26/14 28/24 28/25 29/2 29/4 29/24 33/22 33/25 34/4 34/8 37/4 40/24 40/25 48/3 51/7 57/3 57/15 58/19 58/19 59/2 59/4 59/4 59/6 59/21 62/16 66/5 66/18 66/23 69/6 69/9 70/11 70/16 70/16 70/16 73/13 73/24 73/25 78/4 88/2 90/2 92/10 92/12 93/8 94/22 96/14 97/2 97/6 97/10 107/19 111/17 113/7 129/23 131/4

**them [87]** 7/21 7/25 8/1 8/22 9/3 9/23 10/8 10/24 25/18 26/16 29/1 29/4 30/13 30/19 34/9 34/9 34/10 34/22 34/22 37/10 37/10 38/19 38/19 39/1 39/4 41/20 45/10 47/11 50/16 53/18 56/19 56/22 57/4 58/5 58/19 59/14 66/22 72/11 72/11 72/13 72/13 73/5 73/16 75/7 75/9 75/13 87/11 88/15 93/8 94/16 96/8 96/10 96/11 98/19 100/1 100/2 100/10 100/10 100/21 100/23 111/18 111/19 113/1 119/8 119/11 119/12 119/13 119/14 119/16 119/17 119/19 119/24 120/1 120/5 120/6 120/10 120/14 120/14 120/17 121/14 123/5 123/17 125/25 129/9 134/5 135/17 135/18
**themselves [2]** 10/5 135/16
**then [89]** 4/20 5/22 6/8 6/10 8/8 10/7 11/8 12/25 18/23 20/1 20/20 20/22 26/10 29/1 31/24 32/8 32/25 36/6 39/2 39/4 41/23 41/23 43/2 43/3 45/22 46/18 47/3 47/6 49/19 51/16 56/10 57/25 58/7 64/1 64/12 65/5 65/25 67/14 68/1 68/19 69/18 71/8 71/10 74/10 77/21 78/9 79/13 80/12 81/5 81/9 82/13 88/15 89/25 90/4 90/5 92/13 94/7 94/13 95/15 96/9 96/11 96/20 96/22 100/22 101/14 101/19 102/3 103/13 104/10 108/6 108/20 109/17 110/4 112/5 112/11 113/4 113/12 118/4 119/8 119/14 125/9 125/17 125/25 128/6 128/19 128/22 133/1 134/17 135/7
**theories [1]** 83/2
**theory [21]** 25/24 27/15 29/8 29/19 59/21 61/22 62/2 62/5 65/20 66/5 66/8 68/3 74/17 75/13 94/20 108/14 123/7 123/9 123/25 124/1 124/5
**there [174]**
**there's [51]** 6/1 7/8 7/13 8/11 8/13 9/18 13/4 15/17 18/21 19/2 19/16 25/17 27/6 29/12 31/17 35/3 36/3 36/18 38/23 38/25 39/8 40/11 40/16 40/19 42/5 43/18 44/1 47/14 47/14 50/3 50/13 54/20 56/5 72/9

73/2 75/21 81/24 84/13 86/9 91/3 92/19 92/24 99/11 107/9 111/23 116/3 117/7 123/18 124/22 124/23 125/9
**therefore [14]** 9/9 9/17 17/11 18/5 19/2 19/7 22/1 22/3 59/9 62/19 72/9 93/1 101/14 102/16
**these [33]** 13/23 42/10 61/7 70/12 70/14 70/18 71/12 71/14 71/20 73/3 74/13 85/25 96/13 96/20 98/14 98/20 99/24 103/18 107/20 107/21 108/4 118/21 118/24 119/2 119/7 119/9 119/21 120/4 120/18 120/20 121/1 121/9 131/19
**they [240]**
**they'd [2]** 98/22 128/22
**they'll [3]** 73/4 114/19 135/19
**they're [30]** 7/7 7/16 7/19 8/18 9/4 9/5 9/7 9/8 9/21 28/12 28/24 29/2 29/6 33/2 61/16 72/15 72/17 72/23 74/14 74/14 74/22 89/1 93/7 96/1 96/3 96/4 96/7 97/2 100/24 102/6
**they've [7]** 9/8 9/23 26/15 39/10 43/10 59/9 75/19
**thief [1]** 34/18
**thing [23]** 7/12 7/14 11/6 12/5 32/10 44/9 61/7 75/7 75/8 75/25 76/23 78/16 92/12 93/9 109/15 110/21 110/23 122/23 122/25 131/25 132/4 134/17 135/7
**things [33]** 6/1 6/19 7/13 19/22 21/12 24/5 29/21 38/7 44/19 46/1 55/14 69/24 70/1 74/21 78/10 78/15 83/5 88/5 89/25 90/7 90/7 91/5 100/12 103/16 103/21 103/21 103/22 107/20 107/21 122/21 128/13 132/13 133/24
**think [135]** 6/13 6/13 7/10 8/6 9/11 10/2 10/4 11/9 13/4 13/20 13/22 15/10 15/22 16/3 17/6 26/4 26/16 26/25 27/6 28/10 28/22 29/8 29/23 30/5 30/9 32/4 32/17 33/2 33/13 34/2 35/3 35/20 36/8 36/24 41/13 41/17 41/24 41/25 42/2 42/24 43/11 45/3 47/8 48/21 50/19 53/23 59/21 68/13 72/15 72/17 72/25 73/1 73/5 73/6 74/7 76/11 76/13 77/4 77/5 77/8 77/24 78/19 79/13 80/9 81/9 82/14 84/10 85/16 85/19 85/20

**think... [65]** 86/22 87/23 87/25 88/2 88/6 88/14 90/14 91/14 91/15 91/22 92/1 92/15 92/16 96/11 96/12 97/7 97/11 98/11 98/13 98/17 99/10 99/14 100/18 101/12 101/22 102/9 102/11 104/18 105/19 105/19 105/23 106/1 106/10 107/16 108/7 108/19 108/24 109/11 110/23 111/1 111/1 111/2 112/21 114/14 115/3 115/4 116/2 116/3 117/18 121/4 122/16 124/3 124/18 125/24 126/13 126/18 126/19 127/16 128/5 130/6 130/20 130/21 131/20 132/19 134/20

**thinking [13]** 38/2 40/7 50/8 50/9 50/11 84/7 88/6 108/11 126/8 130/9 132/11 132/22 135/1

**third [20]** 2/22 4/16 38/22 40/6 42/15 42/20 43/1 43/1 44/3 44/3 46/18 46/19 47/6 47/9 70/22 73/20 90/5 113/13 118/21 128/6

**third-party [3]** 42/20 43/1 43/1

**Thirty [2]** 11/17 11/17

**Thirty-four [2]** 11/17 11/17

**this [223]**

**this: [1]** 7/15

**this:  Digicel-Haiti's [1]** 7/15

**those [29]** 8/2 16/22 16/24 18/24 19/1 19/6 19/7 27/24 29/21 33/12 43/13 55/3 57/10 86/6 86/7 88/23 89/18 98/2 102/25 112/5 113/2 114/9 116/17 121/11 121/17 125/10 126/22 127/8 131/7

**though [9]** 8/8 31/25 66/25 72/19 85/24 86/19 95/12 110/15 130/8

**thought [8]** 11/5 18/17 73/13 73/15 124/14 124/14 132/19 132/24

**thousand [2]** 12/18 57/16

**three [5]** 7/13 9/25 19/14 118/22 132/17

**through [36]** 8/17 13/2 13/13 16/7 16/15 16/15 16/23 17/13 18/4 19/4 19/5 20/19 23/21 25/18 27/23 42/20 61/10 61/21 62/3 62/16 62/17 63/11 63/12 63/13 63/23 64/23 65/7 65/10 69/5 99/19 114/1 115/18 115/25 116/6 120/24 125/16

**throughout [1]** 17/18

**ticket [17]** 52/9 52/10 52/10 52/17 52/20 52/22 53/1 53/7 53/25 68/8 68/9 75/20 93/12 93/18 95/12 95/14 95/19

**tickets [2]** 53/15 53/19

**tie [1]** 110/5

**tight [1]** 129/8

**time [37]** 3/12 6/1 6/14 11/22 15/8 17/16 20/17 23/5 26/11 29/1 30/8 32/9 37/24 55/5 55/11 56/8 56/10 59/5 70/2 77/15 78/14 79/14 80/23 81/5 82/7 85/13 90/12 90/18 90/21 105/24 107/25 112/1 115/19 132/9 132/21 133/1 134/24

**times [4]** 41/10 50/15 50/18 55/1

**tiny [2]** 10/8 10/22

**tittle [1]** 133/5

**today [1]** 101/5

**together [2]** 19/11 74/22

**told [5]** 34/9 34/9 34/10 49/12 120/13

**Tomasi [1]** 2/16

**tonight [1]** 93/11

**too [15]** 6/13 32/24 46/8 47/18 50/10 69/7 77/17 87/22 89/22 103/6 108/8 115/6 117/5 133/2 134/2

**took [2]** 37/24 52/25

**top [5]** 33/19 42/16 44/3 92/13 135/19

**top-up [1]** 92/13

**topic [2]** 106/12 106/13

**tort [4]** 8/4 8/5 31/1 37/2

**total [8]** 10/4 10/6 17/3 17/10 18/14 58/8 64/12 66/6

**totally [10]** 42/18 43/19 78/6 78/7 84/12 94/25 96/19 110/12 117/5 122/8

**touch [3]** 80/1 125/17 127/13

**touched [1]** 9/11

**tough [2]** 120/16 131/20

**towards [2]** 48/5 109/12

**town [1]** 126/24

**tradition [1]** 93/1

**traffic [5]** 7/25 10/6 10/23 57/7 63/23

**train [9]** 52/7 52/7 52/16 52/24 53/5 68/6 68/7 68/9 75/19

**training [3]** 84/19 85/7 87/1

**Tran [26]** 11/22 17/19 17/20 17/24 69/19 79/20 79/23 106/20 107/20 108/7 109/10 109/21 110/2 110/6 110/7 110/15 112/12 112/20 114/18 115/13 115/13 116/4 116/10 116/16 117/25 119/1

**Tran's [7]** 11/14 12/13 107/2 110/3 110/9 114/21 119/5

**transaction [7]** 20/18 48/3 48/25 51/8 65/21 65/23 116/22

**transactions [3]** 48/4 64/12 67/8

**transcript [4]** 1/16 119/3 136/5 136/6

**transfer [1]** 63/7

**transferred [2]** 16/22 20/15

**transmitted [3]** 20/12 21/4 66/24

**transported [1]** 61/3

**travel [1]** 58/7

**traveled [1]** 52/25

**traveler [1]** 60/22

**traveling [1]** 118/16

**treat [1]** 90/15

**Tremaine [1]** 2/12

**trespassers [1]** 95/5

**trial [39]** 23/15 23/15 27/2 31/5 31/6 31/17 31/21 32/6 35/18 35/19 55/15 64/7 69/21 73/12 78/5 82/24 89/19 89/19 90/1 90/3 90/13 91/1 99/16 103/18 123/23 123/25 126/10 127/1 127/7 128/14 128/15 128/17 128/18 129/19 130/1 131/15 133/3 133/23 134/17

**trials [2]** 128/20 129/16

**tried [2]** 41/11 46/8

**trier [1]** 32/7

**tries [1]** 113/23

**trip [1]** 52/15

**trouble [2]** 39/24 101/9

**trucks [1]** 120/15

**true [8]** 29/5 34/6 44/1 49/4 88/3 101/25 108/5 125/2

**trunk [2]** 53/11 53/16

**trust [1]** 120/22

**truth [3]** 81/25 98/12 98/14

**try [8]** 32/23 68/14 78/14 79/10 81/6 81/7 88/17 127/13

**trying [10]** 13/11 16/6 16/10 46/8 59/5 76/7 91/22 116/7 117/17 125/21

**Ts [1]** 61/6

**tuition [4]** 85/9 85/10 85/17 87/7

**turn [3]** 11/10 11/13 22/13
**turns [1]** 50/17
**TV [4]** 22/13 34/20 34/20 34/21
**twice [1]** 88/18
**two [47]** 12/16 18/11 19/11
19/21 20/12 20/15 21/12 22/6
22/6 27/9 28/18 30/17 33/7
33/10 33/18 48/22 49/13 50/15
53/15 53/19 65/8 66/14 66/15
66/21 66/23 67/1 67/2 67/8
68/11 72/19 74/17 74/22 75/13
76/13 85/11 85/14 86/1 90/5
97/14 98/23 114/9 118/4
118/19 121/3 127/8 127/14
129/25
**type [8]** 22/25 33/23 43/18 85/6
114/4 121/5 130/10 130/15
**typically [4]** 41/10 45/9 128/20
128/21

## U

**U.S [18]** 26/3 57/8 58/16 59/15
61/19 62/21 63/11 70/9 71/9
71/10 71/14 72/2 73/14 73/15
73/21 89/2 98/25 113/21
**U.S.A [2]** 62/1 72/12
**uh [2]** 46/23 46/23
**uh-oh [2]** 46/23 46/23
**ultimately [3]** 21/6 22/3 117/24
**Umpqua [2]** 83/11 84/16
**unable [3]** 46/24 47/6 47/12
**unaffected [1]** 125/4
**unambiguously [1]** 88/23
**unanimous [1]** 128/22
**unanimously [1]** 132/21
**uncertainty [1]** 36/19
**unclear [3]** 42/18 43/11 43/19
**uncomfortable [1]** 129/24
**uncommon [1]** 40/8
**undeniable [1]** 66/16
**under [32]** 9/9 12/5 12/9 12/20
14/24 22/24 31/24 32/1 47/4
49/21 55/12 58/2 66/5 68/2
68/2 73/14 73/22 88/22 89/15
94/20 95/10 95/15 97/1 97/4
100/19 114/21 118/17 120/5
127/3 128/3 129/4 135/24
**underlying [1]** 16/1
**undermining [1]** 111/22
**understand [44]** 11/12 13/16
13/18 14/12 14/24 19/9 23/24
24/10 25/14 27/21 28/10 29/17
32/10 33/8 35/2 35/8 35/16

35/21 37/24 38/2 39/1 39/11
40/7 42/14 44/21 45/14 48/10
55/9 55/9 64/21 66/3 70/19
74/15 78/18 80/3 84/3 91/14
100/3 116/19 121/22 122/8
126/2 131/24 132/2
**understanding [7]** 4/11 4/23
18/12 35/18 44/10 55/11 59/20
**understood [10]** 12/6 45/16
64/4 81/15 82/1 82/4 89/9
107/12 108/22 114/25
**undisputed [6]** 9/15 10/18
56/22 91/24 92/16 121/15
**unequivocally [1]** 96/19
**unfair [2]** 48/3 48/4
**unfairly [1]** 133/20
**unfamiliar [1]** 23/3
**UNIGESTION [4]** 1/3 3/5 3/13
3/21
**Unigestion's [3]** 4/16 4/18
4/20
**unit [1]** 98/15
**UNITED [16]** 1/1 1/18 2/21
20/13 20/14 21/3 23/16 23/20
24/8 26/2 58/4 58/7 62/15
74/20 75/6 101/2
**universe [3]** 64/11 64/20 94/12
**unjust [28]** 27/11 27/12 27/15
27/18 27/19 28/5 28/6 35/6
38/9 38/10 40/4 40/8 40/9
40/10 40/22 40/23 42/3 46/10
46/12 46/19 46/20 47/7 47/9
47/10 47/15 47/25 48/8 126/7
**unjustly [2]** 40/24 48/1
**unjustness [1]** 47/8
**unlawful [1]** 94/7
**unless [9]** 6/10 28/23 35/19
78/5 78/7 96/25 107/5 132/7
134/13
**Unlike [1]** 133/23
**unlikely [1]** 106/24
**unprepared [1]** 94/23
**unquote [4]** 16/1 20/16 25/25
116/11
**unreliable [2]** 13/9 13/10
**unstated [1]** 34/13
**unsupportable [1]** 68/13
**untangle [2]** 78/10 78/13
**until [7]** 6/4 82/10 100/9
103/22 128/14 128/17 134/4
**up [42]** 6/9 18/16 20/14 36/6
37/14 43/8 46/9 52/10 55/25
63/13 63/19 71/8 74/23 74/23
74/23 74/25 74/25 75/12 76/14
76/17 77/19 77/19 78/12 78/15

81/9 85/11 85/12 87/21 88/17
89/8 92/13 93/8 93/14 98/12
99/22 101/2 107/25 114/2
125/14 130/3 134/23 135/1
**up-front [1]** 130/3
**UPM [94]** 1/7 1/7 3/6 4/6 12/13
16/11 17/12 17/21 17/23 17/23
17/25 18/14 19/4 20/8 20/11
20/15 20/16 24/2 24/3 25/6
25/18 25/22 26/6 26/14 27/16
28/1 28/2 33/15 42/15 42/18
42/24 48/1 55/23 58/12 58/15
60/3 60/8 61/23 62/3 62/12
62/17 63/13 63/20 63/22 63/23
63/25 64/1 64/12 64/15 65/10
66/16 67/4 67/4 67/5 67/9
67/13 67/14 67/25 68/2 68/10
68/19 68/22 69/11 71/25 72/4
86/8 92/5 96/12 101/7 104/21
105/1 105/10 106/23 106/23
107/1 110/6 110/17 111/19
111/19 114/17 114/22 117/2
117/8 118/18 118/23 118/25
119/8 119/11 119/14 120/4
120/5 121/7 121/16 121/16
**UPM's [13]** 4/12 4/15 4/17 18/6
18/21 23/21 23/23 27/23 28/3
56/9 64/23 110/19 131/14
**UPMs [1]** 17/18
**upon [7]** 14/10 16/13 51/11
63/8 105/14 130/15 130/16
**upstream [2]** 24/24 121/7
**urge [3]** 9/19 11/4 89/15
**us [32]** 3/9 9/3 9/6 10/11 39/1
39/8 39/9 40/6 49/14 56/19
56/25 57/5 57/20 70/13 72/1
72/13 81/5 81/16 82/16 89/10
89/11 91/17 92/25 94/5 94/5
102/7 104/20 119/13 120/13
130/5 135/3 135/5
**USA [3]** 48/16 56/17 71/11
**usage [1]** 73/3
**use [23]** 13/8 53/12 66/20
68/15 75/14 75/15 92/17 96/20
96/25 97/5 99/18 99/24 99/25
100/5 100/8 100/14 100/20
102/5 102/17 102/18 110/17
111/10 116/25
**used [24]** 34/3 39/8 59/8 60/21
61/3 61/23 73/4 74/25 81/17
86/8 96/1 96/13 98/14 105/10
106/2 106/9 109/25 110/4
110/5 110/13 110/13 110/14
123/14 123/20
**useful [2]** 38/6 121/23

**user [6]** 57/15 58/9 58/22 63/15 63/18 75/13
**users [1]** 96/2
**uses [1]** 60/3
**using [12]** 39/3 43/15 43/22 62/12 68/6 76/15 98/19 98/20 99/23 101/22 123/4 125/3
**utilization [1]** 68/5
**utilize [2]** 66/18 66/22
**utilized [2]** 53/6 105/1
**utilizing [1]** 106/7

**V**

**vaccinated [6]** 6/25 7/1 129/18 129/24 130/2 131/8
**vague [1]** 10/1
**Valbrun [17]** 2/4 3/13 3/16 6/18 39/14 39/17 42/1 46/4 59/20 60/2 112/14 115/19 117/13 117/18 118/1 119/3 122/13
**Valbrun's [1]** 43/10
**valor [2]** 91/14 122/20
**value [7]** 22/17 49/1 49/5 54/12 54/20 55/6 55/7
**Van [3]** 2/15 4/8 54/8
**vanilla [1]** 132/14
**variable [1]** 24/7
**variation [1]** 75/12
**various [2]** 58/10 73/7
**vast [1]** 111/2
**vastly [1]** 83/4
**Vaughan [41]** 2/4 2/5 3/12 6/18 19/3 19/19 26/10 33/6 33/13 39/15 42/1 46/2 46/3 50/22 57/25 59/19 60/2 67/22 68/18 70/7 70/17 72/3 73/7 75/25 76/5 79/8 79/24 80/22 81/9 82/16 85/25 86/17 91/10 104/12 106/11 108/13 112/7 115/10 116/23 122/13 125/23
**Vaughan's [2]** 10/3 34/18
**vaxxed [1]** 7/2
**veil [3]** 107/18 108/15 113/11
**vendor [6]** 43/1 43/1 92/8 118/18 118/20 122/5
**vendors [1]** 42/21
**venue [3]** 93/11 95/11 95/12
**verbally [1]** 70/15
**verdict [7]** 78/8 128/22 132/12 132/14 132/17 132/22 132/23
**Verizon [4]** 25/10 25/20 62/17 63/12

**Verizons [1]** 61/6
**versus [5]** 3/6 34/17 44/9 53/24 86/5
**very [46]** 6/21 7/9 11/10 11/21 11/24 15/15 16/5 16/6 16/12 26/9 26/19 28/16 31/6 31/6 40/22 46/7 59/14 77/8 79/14 79/15 80/2 80/12 85/10 91/15 95/17 104/15 106/17 111/12 114/16 119/1 120/16 123/5 123/18 123/19 123/22 125/2 125/15 126/23 129/24 131/3 131/23 132/14 132/16 134/10 134/10 134/15
**via [1]** 16/22
**vibe [1]** 93/14
**victim [1]** 51/6
**video [5]** 2/4 2/4 3/10 3/23 3/25
**view [5]** 80/4 81/24 82/25 89/22 114/24
**viewed [2]** 10/4 31/11
**viewing [1]** 98/17
**views [3]** 89/25 90/24 91/7
**violate [1]** 96/12
**violated [1]** 73/16
**violates [1]** 96/12
**violator [1]** 16/20
**virtue [9]** 28/1 94/11 94/11 94/12 99/20 113/7 123/4 123/11 123/11
**virtue of [1]** 123/11
**visualizing [1]** 132/15
**VoIP [1]** 16/22
**voir [4]** 129/7 131/10 134/11 134/18
**volume [4]** 16/10 17/3 17/10 75/11

**W**

**wages [1]** 84/21
**wagging [1]** 16/19
**wait [9]** 53/4 55/14 69/25 95/13 103/22 115/3 128/14 128/16 128/17
**walk [1]** 61/21
**Wall [1]** 111/12
**want [84]** 5/24 7/1 7/4 7/14 10/19 23/2 23/4 23/5 23/7 24/5 24/6 25/4 25/5 26/11 26/20 27/21 28/14 28/15 32/23 33/5 35/5 35/6 35/7 36/7 39/23 42/2 42/10 42/25 45/17 45/19 45/20 45/23 46/2 46/4 52/13 53/21 55/15 56/22 57/24 58/6 58/7

63/11 70/1 77/22 78/4 79/2 79/5 79/13 79/20 79/22 80/18 80/19 81/1 82/12 84/5 89/11 89/12 91/10 92/6 93/17 97/3 99/17 101/8 101/9 102/8 102/18 103/9 106/17 114/16 117/6 122/2 122/4 126/25 127/7 127/25 128/1 128/9 129/13 131/12 132/24 133/25 134/4 135/15 135/17
**wanted [19]** 14/12 14/15 26/13 28/8 29/7 30/6 54/6 59/25 77/16 80/1 80/5 105/24 110/1 110/9 112/10 115/11 118/13 118/15 135/9
**wants [6]** 24/9 42/24 105/21 114/20 125/24 135/16
**warned [1]** 126/18
**warranty [4]** 54/12 54/20 55/6 55/7
**was [174]**
**Washington [1]** 2/13
**wasn't [10]** 9/5 14/15 21/7 53/5 74/2 86/17 95/9 107/24 107/25 131/16
**waste [3]** 23/5 90/11 132/21
**wave [1]** 128/4
**way [70]** 3/24 6/1 6/23 8/12 12/2 13/1 18/16 22/11 26/14 29/9 29/16 31/17 33/12 35/17 36/13 36/13 37/1 38/9 38/20 39/1 42/12 52/15 53/3 53/23 54/24 55/23 56/7 56/11 57/1 57/2 58/19 59/17 62/4 63/8 64/22 64/25 67/11 68/14 70/14 72/24 73/4 73/17 74/12 75/5 80/7 83/10 84/25 88/4 88/8 88/16 89/22 89/25 91/23 91/23 92/8 93/25 94/24 95/2 96/4 98/22 99/9 100/15 102/6 109/11 111/17 111/18 111/18 111/23 117/2 125/19
**ways [5]** 26/14 33/7 33/10 74/23 98/23
**we [312]**
**we'd [2]** 44/4 126/4
**we'll [35]** 6/3 6/7 8/20 19/14 29/23 30/11 32/21 36/11 39/4 39/5 41/25 46/5 54/23 57/14 57/17 57/17 57/25 58/1 67/23 78/10 80/10 81/10 82/6 88/19 90/16 127/4 127/13 127/17 128/2 129/7 129/12 131/10 132/9 135/14 135/20
**we're [50]** 6/6 9/23 11/20 16/5

**we're... [46]** 16/10 21/12 21/12 23/19 28/2 28/11 29/19 32/5 35/19 54/25 58/1 65/5 65/6 65/6 65/7 71/4 71/7 71/8 75/20 75/21 78/2 78/24 79/1 81/20 90/19 92/24 94/12 99/24 99/25 100/1 100/1 100/2 100/9 102/8 102/18 107/23 107/23 108/16 115/12 121/25 124/24 127/21 129/11 129/13 131/24 132/4

**we've [14]** 16/7 29/22 35/17 37/5 39/4 43/25 45/21 46/5 55/22 76/15 88/3 100/11 112/19 123/7

**website [2]** 43/16 76/2

**week [7]** 90/4 90/5 115/2 115/5 126/14 127/12 128/6

**weekend [1]** 115/4

**weeks [6]** 29/14 90/1 90/5 127/9 127/15 128/3

**weighing [2]** 32/12 32/13

**weirdly [1]** 99/22

**welcome [4]** 6/24 7/1 47/19 95/14

**well [37]** 14/2 14/3 25/21 31/18 32/4 32/20 34/21 38/15 43/25 46/3 46/7 60/8 63/23 64/9 67/18 67/19 72/6 78/22 80/2 83/10 85/21 86/15 86/25 90/13 90/25 93/4 97/14 98/7 101/21 109/23 110/4 112/8 114/13 122/19 130/14 131/1 131/3

**went [5]** 9/18 23/21 52/24 60/10 134/23

**were [53]** 8/4 9/2 12/6 13/11 13/24 14/3 14/3 18/3 18/14 18/16 19/7 20/24 22/13 23/15 23/23 25/24 28/17 29/23 33/24 34/7 37/20 44/13 45/13 46/1 48/8 51/23 53/24 55/13 60/18 66/24 69/9 70/14 72/11 73/15 84/11 85/8 85/8 86/4 86/15 86/15 87/14 95/1 95/8 102/6 102/17 108/24 118/19 119/7 120/20 123/9 125/3 125/3 125/10

**were 279 [1]** 14/3

**weren't [5]** 28/18 44/12 94/14 94/15 120/21

**west [4]** 80/20 89/2 135/3 135/5

**what [239]**

**what's [11]** 16/17 19/19 32/2

52/3 52/19 55/8 56/4 57/23 99/5 132/10 134/11

**whatever [34]** 6/3 8/5 8/24 10/15 21/8 28/13 30/11 40/5 51/19 51/20 56/18 56/25 57/16 57/18 58/7 58/17 58/24 62/9 66/6 81/6 84/5 85/2 86/16 87/7 88/15 92/9 94/2 94/16 98/5 100/1 111/13 124/7 126/3 131/4

**whatsoever [1]** 69/11

**when [80]** 12/12 12/15 12/22 13/6 16/14 16/22 21/6 25/22 28/25 29/5 32/3 33/2 34/3 35/22 36/3 36/7 37/13 37/20 38/17 40/10 41/10 41/12 43/14 43/16 44/4 44/23 54/25 55/15 56/5 57/2 57/19 58/1 60/3 60/17 60/21 61/5 61/11 61/16 62/15 63/1 72/21 73/14 74/21 74/23 74/25 75/7 78/1 79/5 79/25 84/1 84/5 84/7 84/24 88/21 88/22 92/16 102/12 102/25 103/6 103/10 107/6 109/24 110/8 111/14 112/1 113/2 113/6 113/16 114/15 116/10 117/24 119/21 120/4 123/1 123/15 124/19 128/23 129/23 130/23 133/2

**whenever [2]** 24/6 45/19

**where [36]** 12/21 15/13 16/8 16/8 18/2 25/24 30/5 31/11 32/7 43/18 44/2 44/3 45/3 48/13 50/3 51/2 63/6 63/22 74/4 78/15 83/18 86/21 91/3 91/5 91/16 98/13 100/17 100/18 107/12 112/3 112/19 113/2 115/15 119/4 120/18 125/7

**whereas [2]** 111/6 111/11

**whether [25]** 8/3 22/22 41/19 43/13 43/14 43/16 43/17 45/8 46/2 58/20 75/1 89/6 94/15 95/1 96/21 97/17 97/21 97/23 110/2 110/13 110/13 110/14 117/9 121/12 131/13

**which [79]** 8/6 8/25 9/7 11/16 16/18 16/24 17/3 17/5 17/19 20/3 20/14 21/2 22/3 23/10 26/15 27/5 28/16 28/20 28/22 28/23 31/2 33/8 34/6 37/14 43/16 44/1 46/13 46/19 46/21 46/25 47/7 50/6 50/19 54/9 56/9 57/13 58/10 60/11 64/10 66/17 70/13 72/22 74/12 75/17

76/15 79/19 80/2 83/1 84/14 84/25 88/9 90/19 96/4 96/17 98/16 98/23 98/23 99/22 100/4 100/15 104/16 105/14 106/1 106/18 107/3 111/10 113/7 113/21 113/21 115/21 119/6 122/2 123/19 124/23 125/4 125/11 125/12 126/18 127/2

**whichever [2]** 36/13 53/18

**while [4]** 6/24 111/14 114/1 114/2

**who [32]** 6/14 17/21 23/21 23/23 24/8 41/22 41/23 47/13 51/22 53/2 54/8 56/8 56/21 56/22 59/6 60/16 63/19 74/1 110/10 110/23 111/6 113/17 119/25 120/1 120/10 121/20 124/24 125/21 127/11 129/14 130/9 131/8

**who's [1]** 95/3

**whoever [5]** 36/13 62/17 63/12 78/12 120/13

**whole [4]** 44/17 45/23 73/3 95/7

**wholesale [4]** 23/24 24/1 28/2 63/22

**whom [2]** 30/13 31/6

**why [44]** 16/9 21/10 21/11 24/16 27/18 28/10 29/16 29/19 33/4 33/8 35/5 37/7 39/23 41/1 56/8 58/10 59/13 66/12 68/2 69/1 72/15 72/23 81/2 81/4 86/18 87/21 92/6 92/18 97/9 99/8 99/11 100/11 105/20 105/21 106/19 110/25 117/5 117/24 119/1 120/22 122/2 125/13 133/19 133/20

**wide [1]** 13/10

**will [77]** 3/8 13/14 17/7 20/11 35/22 37/25 38/5 38/6 46/15 47/3 52/22 56/6 56/17 61/9 61/10 61/12 61/14 63/15 67/4 67/5 67/7 69/18 77/9 78/6 79/15 80/9 81/6 81/7 82/14 83/5 84/7 88/4 88/20 89/24 90/25 91/6 91/7 96/14 99/15 99/16 102/14 103/8 103/9 103/22 103/25 104/15 107/1 107/2 108/20 110/6 110/18 114/17 114/18 115/7 116/3 117/18 117/19 118/24 119/3 119/13 119/24 122/3 123/23 125/17 126/20 128/21 130/21 131/13 132/7 132/16 133/6 133/7 133/8 133/12 134/13

## W

**will... [2]**  134/15 135/7
**Williamson [1]**  2/8
**win [5]**  8/12 9/17 41/15 103/7 108/8
**windfall [1]**  48/2
**winning [1]**  37/17
**wireless [5]**  34/3 34/4 71/9 71/10 71/15
**wish [1]**  93/11
**within [9]**  19/16 19/18 29/3 81/8 97/2 97/11 109/8 113/17 124/7
**without [11]**  10/3 16/12 19/20 22/8 45/12 46/21 65/10 69/4 73/11 123/16 136/6
**witness [14]**  35/25 69/3 69/6 74/1 86/19 90/9 127/20 133/3 133/6 133/8 133/10 133/11 133/13 133/22
**witness's [1]**  134/6
**witnesses [3]**  59/6 127/10 127/11
**won [1]**  41/22
**won't [5]**  25/19 78/13 103/23 127/3 128/23
**wonder [1]**  130/10
**word [10]**  46/23 46/25 47/12 76/25 77/1 91/8 96/5 96/5 109/13 135/5
**words [4]**  47/9 98/2 98/10 98/11
**work [9]**  6/19 13/6 15/12 56/8 59/17 70/15 74/13 85/4 89/20
**worked [2]**  84/21 85/14
**working [7]**  13/13 16/7 97/18 98/7 109/3 125/20 125/21
**works [10]**  13/1 13/22 29/17 38/20 40/3 41/19 42/23 56/12 75/5 92/8
**world [11]**  13/19 55/24 56/14 61/6 75/17 75/21 75/21 102/25 111/16 111/16 135/9
**worried [2]**  14/20 80/10
**worry [1]**  12/3
**worrying [1]**  10/22
**Worst [1]**  135/5
**worth [1]**  54/13
**would [145]**
**wouldn't [5]**  7/18 11/1 28/2 41/1 100/6
**wrap [4]**  43/14 77/19 81/9 121/13
**Wright [1]**  2/12

**written [3]**  78/10 121/13 135/20
**wrong [15]**  4/25 9/2 9/5 17/5 29/19 29/20 33/8 33/10 35/9 49/12 70/7 70/8 88/1 95/6 100/18
**wrongful [1]**  116/12
**Wyatt [1]**  2/8

## Y

**Y-a-m-a-l-o-v-a [1]**  88/25
**Yamalova [1]**  88/25
**yeah [7]**  7/4 21/22 38/13 50/20 51/19 86/20 111/18
**year [4]**  10/20 85/14 87/2 87/3
**years [6]**  31/7 37/9 85/11 85/14 129/4 134/15
**yes [30]**  5/13 11/22 12/1 19/10 27/25 41/5 52/6 54/5 62/8 63/8 65/19 68/21 70/3 71/25 73/19 74/10 74/18 77/6 77/12 80/7 80/17 82/17 83/13 83/22 91/13 105/4 110/1 110/17 124/22 129/2
**yesterday [2]**  5/5 5/10
**yet [3]**  38/1 38/3 129/20
**York [1]**  54/25
**you [503]**
**you failed [1]**  53/20
**you'd [5]**  6/23 28/3 66/5 91/4 123/24
**you'll [5]**  27/25 90/13 98/9 103/17 104/1
**you're [99]**  6/24 7/1 12/14 12/19 12/24 13/20 14/2 16/18 18/10 18/13 19/3 21/13 32/21 35/8 35/9 35/16 35/21 37/17 38/2 39/14 41/17 42/19 42/22 42/25 43/6 43/17 44/4 44/22 44/22 44/24 45/20 46/6 47/19 48/5 50/16 51/1 54/14 54/15 54/15 55/20 56/13 56/23 57/2 57/8 58/6 59/8 59/14 59/25 60/4 60/15 60/15 60/16 61/23 61/24 62/4 62/19 63/14 64/6 64/13 64/16 64/21 64/23 65/10 66/18 67/1 69/4 69/25 70/10 71/20 71/25 73/23 76/22 80/10 82/12 86/9 89/10 89/14 91/5 91/16 93/22 95/13 95/13 96/15 100/22 102/22 104/25 106/5 107/12 112/14 117/15 117/25 121/22 122/8 124/3 127/8 130/17 132/1 133/2 134/13
**you've [11]**  5/18 14/1 19/10

19/11 60/4 86/23 91/15 100/18 112/23 113/1 130/11
**young [1]**  32/6
**your [156]**
**yours [3]**  6/21 82/15 104/12
**yourselves [2]**  5/19 5/21

## Z

**zero [1]**  107/3
**Zile [3]**  2/15 4/8 54/8