IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNIGESTION HOLDING, S.A., a )
foreign corporation doing )
business as Digicel Haiti, )
                                      )
            Plaintiff,       )    Case No. 3:15-cv-00185-SI
                                      )
      v.                     )
                                      )
UPM Technology, Inc., doing  )    March 29, 2022
business as UPM Telecom, Inc.,)
et al.,                      )
                                      )
            Defendants.      )    Portland, Oregon
_____ )

(Pretrial Conference Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES

FOR THE PLAINTIFF:        Mr. Robert C.L. Vaughan
                          Ms. Cherine Smith Valbrun
                          Ms. Anisha Carla Atchanah
                          Kim Vaughan Lerner LLP
                          312 SE 17th Street, Suite 300
                          Fort Lauderdale, FL 33316


                          Ms. Anne M. Talcott
                          Schwabe, Williamson & Wyatt
                          1211 S.W. Fifth Avenue, Suite 1900
                          Portland, OR 97204


FOR THE DEFENDANTS:       Mr. Christopher W. Savage
                          Davis Wright Tremaine, LLP
                          1919 Pennsylvania Avenue, NW, Suite 200
                          Washington, D.C. 20006


                          Ms. Blake Van Zile
                          Ms. Eleanor A. DuBay
                          Tomasi Salyer Martin
                          121 S.W. Morrison Street, Suite 1850
                          Portland, OR 97204


COURT REPORTER:           Dennis W. Apodaca, CSR, RMR, RDR
                          United States District Courthouse
                          1000 S.W. Third Avenue, Room 301
                          Portland, OR 97204
                          (503)326-8182

INDEX

Pretrial conference hearing                                        4

(March 29, 2022)

P R O C E E D I N G S

(Open court:)

THE CLERK:  Your Honor, this is the time set for a pretrial conference in 3:15-cv185-SI, Unigestion Holding, S.A., versus UPM Technology, Inc., et al.

Could I have counsel please identify yourselves for the record, beginning with plaintiff.

MS. TALCOTT:  Anne Talcott from Schwabe, Williamson & Wyatt for plaintiff.  Thank you, Your Honor.

THE COURT:  Good morning.

MR. VAUGHAN:  Good morning, Judge.

Robert Vaughan, Cherine Smith Valbrun, and Anisha Atchanah also appearing for Unigestion Holding.

THE COURT:  Good morning.  Good to see you all.

MS. VALBRUN:  Good morning.

THE COURT:  For defendant.

MR. SAVAGE:  Chris Savage for UPM Technology and Mr. Tran along with --

MS. DuBay:  Eleanor DuBay from Tomasi Salyer Martin.

MS. ZILE:  And Blake Van Zile also from Tomasi Salyer Martin for defendants.

THE COURT:  Good morning, everyone.

I trust everyone received by email this morning the agenda that I sent out.

MR. VAUGHAN:  Yes, sir.

MR. SAVAGE:  Yes.

THE COURT:  As you'll see, I have about 21 substantive points followed by anything else that you all want to discuss, if there is anything that we haven't already discussed.  I would like to begin -- following the agenda -- with defendants' motions in limine.  The first motion in limine is defendants' motion to exclude all testimony from plaintiff's expert witnesses, Mr. Castel, Mr. McEwen, and Mr. Cross.  Let's take these one at a time.

One moment.

I would like to begin really by asking plaintiff's counsel, and it could be anybody you wish, or you can even tag team, to explain to me plaintiff's theory of damages and how plaintiff calculates damages.

Who would like to address that?

MR. VAUGHAN:  That would be me, Judge.

THE COURT:  Mr. Vaughan, please.

MR. VAUGHAN:  In essence, Your Honor, putting it in its simplest form, what Mr. Castel did, he did an analysis of the number of minutes -- international minutes -- terminated, I believe, over the last two or three years by Digicel-Haiti.  He also looked at the publicly available financials for Digicel-Haiti.

He looked at the number of minutes that were

determined to be minutes that were lost through bypass.  In sum, what he then calculated was the delta of the two.

So put simply, Judge, we have the data and numbers supporting total number of minutes, which were historically what Digicel-Haiti completed.  He looked at the number of minutes lost through bypass, and the delta would have been the total number of minutes lost through bypass.

He then analyzed the information that was provided regarding UPM's capacity.  That capacity, he provided various scenarios for, scenarios which contemplated 80 percent of UPM's admitted capacity, using -- he assumed 14 hours per day for the time periods that UPM was active in Haiti doing bypass.

The analysis of all of that information gave Mr. Castel the basis for computing the amount of Digicel's loss through bypass, which was as a result of the direct and the circumstantial evidence attributable to UPM.

THE COURT:  I'm not following that very last point. Let me ask a follow-up question or two, if I may.

MR. VAUGHAN:  Sure.

THE COURT:  I understand up until that last sentence that Mr. Castel had determined the number of minutes that Digicel-Haiti lost through bypass.  Am I correct in concluding that that is all of the minutes that they lost through bypass regardless of whether the bypass was performed by UPM or any other bypass operator?

Is that correct?

MR. VAUGHAN:  I think that's fair to say, but that's not where the analysis ends.

THE COURT:  I agree.  I want to work my way up there.

MR. VAUGHAN:  Got it.

THE COURT:  How many different bypass operators were operating during this relevant time period in Haiti?

MR. VAUGHAN:  Funny you should ask that question. The evidence reveals that there are a number of individuals who were caught in the act.  There were a number of single players that were identified by virtue of targeted operations where people were nabbed.  So far the evidence has revealed only one corporate entity that was nabbed in the act, and that one corporate entity that was grabbed was UPM.  I don't have or I don't recall any evidence of any other corporate entity -- certainly nobody else at the level and at the significance of UPM being grabbed in any of these investigations and operations.

THE COURT:  Now, with respect to the number of single-player bypass operators, as distinct from the corporate entity UPM, am I correct in assuming that plaintiff does not have any evidence connecting those single-player bypass operators with UPM; am I correct?

MR. VAUGHAN:  Not quite.  Not correct.

THE COURT:  Okay.  Go ahead.

MR. VAUGHAN:  We did actually identify -- one comes to mind, and I believe there are two others.  But the name Marceas Artger (phonetic) was one individual, and there is somebody else whose name escapes me at the moment.  But they were identified, arrested, prosecuted in Haiti as a result of sting operations/investigations conducted in conjunction with the local authority.

Actually it was in one of those operations -- I believe with Mr. Artger (phonetic), who is one of the individuals who was affiliated with and associated with shipments to UPM where UPM was identified.  So, yes, sir, there are individuals; at least two.

THE COURT:  Now, I did not see any of that in the trial submissions provided by plaintiff.

Did I miss it?

MR. VAUGHAN:  It is in the -- let me make sure that I'm not being anything more than 100 accurate with you.  It is in the description of Mr. Gerard Laborde's testimony where he is going to describe the efforts and the investigations that led to the identification of UPM.  So while it was not specifically set forth that he is going to talk about the arrest of Mr. Artger, it is specifically set forth that he is going to be the witness talking about how UPM was identified, the investigations, and the bypass -- the anti-bypass operations that led to the identification of UPM.

THE COURT:  All right.  I have plaintiff's witness statement for Mr. Laborde in front of me.  That's Docket 303, beginning at page 5 at Docket 303.  I have read it quite thoroughly, quite frankly several times, and I did not see anything in that statement for Mr. Laborde explaining that some of these -- that one or more of these single-player bypass operators were connected with UPM.

Did I miss it?

MR. VAUGHAN:  Let me pull up my --

THE COURT:  And if that's not the right document, then you're welcome to tell me what document I should consult.

MR. VAUGHAN:  One second, Your Honor.

Mr. Laborde's witness statement at page 7, the subsection that talks about the nature, scope, and timing of Digicel-Haiti's efforts to identify which entities were engaged in bypass, resell of Digicel-Haiti's services.  He would describe generally the interactions and engagements with local, regulator, law enforcement, and private investigators in joint operations to identify and dismantle bypass operations, and he will describe in particular the operation that discovered UPM's bypass involvement in Haiti in July 2014.  That's at the overflow sentence, pages 7 to 8.

While Your Honor may not have the advantage of this background, none of this is a surprise to UPM.  This is all part of the case and has been part of the discovered facts for

the last seven years.

THE COURT:  All right.  Well, you're going to meed to amend that witness statement to provide more detail, because nothing in this witness statement says that Mr. Laborde will identify, let alone name, any particular bypass operators discovered in Haiti who were connected with UPM.

So not only -- it's not sufficient for you to simply say it is not a surprise to defendants.  I need to see any substantive testimony described in the witness statement.  If it's not material or if it's background, I'm not going to worry about it.  But if it is something as important as which bypass operators were affiliated with UPM and which were not, that needs to be disclosed.  We will talk a little bit later about when you can amend that.

MR. VAUGHAN:  So Your Honor would like me to --

THE COURT:  Well, let me put it this way:  If there is an objection at trial to any witness's testimony that is other than just sort of basic background material or noncontroversial, non-disputed background stuff, if there is an objection that it's beyond the scope of the witness statement, the way I handle that is I ask the propounder of the testimony to show me by page and line where that testimony is fairly disclosed.  And if it's not, in my opinion, fairly disclosed, the objection will be sustained.  Simply saying, "He will describe generally the results of the investigation" isn't

enough.

MR. VAUGHAN:  Understood.

THE COURT:  You can read more about the way I describe all of this in my trial management order.

MR. VAUGHAN:  I may be shooting myself in the foot. You have told us that.  I just want to make sure I understand now, when I'm amending, because where we have -- Mr. Laborde will describe in particular the operation that discovered UPM's bypass involvement in Haiti in July 2014.  I apologize if I missed the boat on that.  But to the extent that we talked about the fact that he's going to talk about that specific operation, the one that discovered UPM and the fact that it was in July of 2014, I don't want to miss the boat again.

THE COURT:  Sure.

MR. VAUGHAN:  I should name the individuals that were called.  How much detail should I go into, Judge?

THE COURT:  Well, when it says that he will describe in particular the operation, the way I read that is he will say, "We worked with a private investigator.  We worked with law enforcement.  We work with so and so.  This is the operation, and we did this in July 2014."  Fine.  That describes the operation.  Nothing in there says, "And we discovered two individuals who were doing bypass, and we discovered that they were in connection with UPM.  And by the way, this is not based on inadmissible hearsay, here is how I

discovered it," so we will know exactly what he is going to testify to, and we will know whether or not it is based on inadmissible hearsay.

MR. VAUGHAN:  Understood.  I think I get it now, Judge.  My apologies.

THE COURT:  No apologies needed.  That's why we are doing this.

All right.  So let me ask you this -- back to Mr. Castel.  We do know that there are a number of other bypass operators.  You told me that you'll have evidence that a couple of the single-player bypass operators, you contend are affiliated with UPM, okay.

What percentage of the total bypass minutes does Mr. Castel attribute to UPM?  We will talk more specifically in a few moments, but I'll stop there.  What percentage of the total bypass minutes in this relevant time frame does Mr. Castel attribute to UPM?

MR. VAUGHAN:  So, Judge, in Mr. Castel's report -- I'm trying to see if he says the specific percentage.

THE COURT:  He does in the rebuttal report, but I didn't see it in the opening report, and that could be okay. But I just want to understand your theory of damages.

MR. VAUGHAN:  I'm glad you reminded me of that.  So essentially the theory is, Judge, that because we did not have -- and I understand my friends on the other side believe

that they provided us with, from an ipse dixit standpoint, their say-so as to the universe of UPM's operation.  But we did not have what Digicel-Haiti believed to believe credible evidence disclosing the totality of UPM's participation.

The indirect, the circumstantial evidence that was used was, as I indicated, the total amount of minutes determined to have been lost to bypass, the total amount of UPM's capacity, and UPM's capacity was determined based upon Duy Tran's testimony, based upon Mr. Wood, the economic expert from UPM, who testified that he utilized 15 percent of the total market of termination of calls to identify UPM's capacity, which Mr. Castel confirmed in his rebuttal was actually greater than the assumption that Mr. Castel had made when he did his initial analysis to determine or estimate UPM's -- Digicel's loss from UPM's participation.

THE COURT:  Is plaintiff's damage theory going to be limited -- now, we won't talk about the nonmonetary damages yet.  We will put those aside for a little bit.  We will just talk about the minutes lost through bypass.

Is plaintiff's damage theory that these are the total minutes that were lost through bypass, and we are attributing, because of Mr. Wood's testimony, 15 percent of that to UPM, and that is what we are a seeking from UPM -- Mr. Savage, don't shake your head while I'm talking.  It is really distracting.

MR. SAVAGE:  I apologize.

THE COURT:  No need for an apology; just don't do it again.

MR. SAVAGE:  Thank you.  Yes, sir.

THE COURT:  So is that going to be plaintiff's damage theory; that they've calculated -- that Mr. Castel has calculated the total number of minutes lost through bypass, and although Mr. Castel by himself does not know what portions of those bypass operations are attributable to UPM, he is going to use UPM's testimony from Mr. Wood that 15 percent is UPM's responsibility; and therefore, the jury will be asked to award 15 percent of those total minutes lost through bypass as attributable to UPM?  Do I have that correct?

MR. VAUGHAN:  With a friendly amendment.  We were not even that aggressive.  In doing our analysis utilizing total minutes lost, utilizing UPM's capacity based upon the indirect evidence gathered, Mr. Castel's initial number was less than 15 percent of the market share.

Upon obtaining Mr. Wood's report, Mr. Castel, in his rebuttal, noted that the 15 percent identified by Mr. Wood was even greater than and provided even more confidence to Mr. Castel in his conservative assumption.

THE COURT:  Well, then take me through that.  I'm having trouble following that.  I'm looking at Mr. Castel's rebuttal report, Table 1.  That's at Docket 304-2, Table 1. Could you explain to me how to read Table 1, please.

MR. VAUGHAN:  Let me get to that report, Your Honor.  Just a second, Judge.

THE COURT:  Sure.

MR. VAUGHAN:  Table 1.  The estimates provided by Digicel using UPM's 15 percent market share --

THE COURT:  I see the title.  But like for August 2011, there is a figure there of a little more than 41 million-something.  First of all, what is MOU, and what does that 41 million figure mean or signify?

MR. VAUGHAN:  That number signifies what 15 percent of the market share would represent in terms of incoming international traffic -- minutes.  Minutes, not dollars.

THE COURT:  So MOU is minutes?

MR. SAVAGE:  Your Honor, if I may.  MOU is industry standard jargon for "minutes of use."

THE COURT:  Thank you.

MR. VAUGHAN:  Minutes of use.  I was looking for that.

THE COURT:  So does 41 million -- Mr. Vaughan, the 41 million figure for August 2011, is 41 million minutes of use, which is 15 percent of the total what?  Total bypass?

If you are talking, I can't hear you.  You may be on mute.

MR. VAUGHAN:  Total incoming international minutes.

THE COURT:  Okay.  Total incoming minutes.

MR. VAUGHAN:  Yes.

THE COURT:  Now, that's 15 percent of the total minutes?

MR. VAUGHAN:  Yes, sir.

THE COURT:  Okay.  So when we add all of that up during this relevant period at the end of Table 1, we have, it looks like, about 1.7 billion total incoming minutes.

MR. VAUGHAN:  From August 2011 to January 2015, which would be the totality of the time period, understanding that my friends on the other side suggests they're not near consistent.

THE COURT:  And that would be all of the minutes that came in to Digicel-Haiti in that time period, 1.7 billion.  Now you take 15 percent of that, you get 261 million.  Then at 261 million, if that's the number of bypass minutes, then at 23 cents a minute, that's what Digicel-Haiti values at $60 million, correct?

MR. VAUGHAN:  Using 15 percent, that's correct.

THE COURT:  Okay.  Understood.

All right.  Thank you.

Let me ask you this --

MR. VAUGHAN:  Yes, Your Honor.

THE COURT:  When I read Mr. Castel's report, I did not see any mention at all of human behavior software, either that specific title or even generically, generally.

Is it correct that if the evidence were to show -- if

the jury were to believe that UPM never used human behavior software, Mr. Castel's damage number still wouldn't change? Is that correct?

MR. VAUGHAN: That is absolutely correct.

THE COURT: Okay. So go ahead and explain to me, please, how that is consistent with my summary judgment opinion.

MR. VAUGHAN: So your summary judgment opinion, Judge, and I have had that page here that I wanted to make sure that I referenced to the Court, because there has been, I think, an extremely aggressive reading of your summary judgment opinion -- one page and one line in particular -- and I want to make sure we are all on the same page.

Your Honor ruled that we were allowed, after your order, to bring a claim that UPM engaged in active concealment to the detriment of Digicel-Haiti. This is at page 31 of 40 of Document 294.

THE COURT: Yes. I'm right there. I'm with you.

MR. VAUGHAN: Perfect.

You indicated in detailing the nature of the active concealment that when Digicel-Haiti believed that SIM cards were being used in bypass fashion, it believed that individuals were making the calls, not being aggregated either for Roam Like You're Home or calls being made through the other type of in-country bypass.

You indicate UPM tried to mislead Digicel into believing that the SIM cards were being used by natural persons rather than being used with multiple SIM cards.

You then further went on to point out that UPM's use of human behavior software, in furtherance of that deception, is a deceptive act intended to hide information, mislead, or avoid suspicion.  It also creates a false impression, covering up the truth, making discovery of the material fact more difficult.

Without regurgitating everything in your order, you conclude that that alone, if true, if proven, is enough to allow Digicel-Haiti's claim by a fraud by active concealment to proceed.  That line -- that excerpt -- has been read by my friends on the other side to limit the entire fraud by active concealment to one question:  Did Digicel-Haiti utilize human behavior software to perpetuate a fraud that UPM -- I'm sorry -- use human behavior software to perpetuate a fraud against Digicel-Haiti, which completely and totally obliterates the totality of the fraud that has been committed against Digicel-Haiti?  Because the fraud that was committed was the termination of international minutes purporting to be local calls to the detriment of Digicel-Haiti utilizing, among other things, fraud and artifice, deception, and active concealment, for example.  And the Court said, "The use of human behavior software is one example which, if that is proven, that would be

enough to allow the claim of fraud by active concealment to go forward."  It didn't say that that is the only fraud by active concealment.  It didn't say that the utilization of bypass to terminate international minutes as local minutes is scot-free.  It didn't say that the circumstances surrounding the execution and facilitation of this bypass enterprise was "get a fair game."  It didn't say that UPM essentially had a free pass to do everything else it was doing.

This order says that the use of human behavior software, for example, is active concealment and a deceptive act or contrivance intended to hide information, mislead, or avoid suspicion.

What Mr. Savage --

THE COURT:  I'm not interested in what Mr. Savage has to say right now.  Nothing personal.

MR. VAUGHAN:  Okay.  To read the order otherwise would mean -- and it's funny, because to read the order otherwise would essentially obliterate 90 percent of the case.

THE COURT:  You are correct.  So let me ask you this: Do you understand that in my summary judgment decision I expressly found that there was no genuine issue of material fact for the jury on whether UPM made any affirmative misrepresentations to Digicel-Haiti, including misrepresenting what the phone number was that was associated with the SIM card?

Do you understand that was part of my ruling?

MR. VAUGHAN:  Understood.

THE COURT:  Okay.  Do you understand that as part of my summary judgment ruling I ruled there was no dispute as to a material fact on whether or not UPM cloned any SIM cards?

Do you understand?

MR. VAUGHAN:  Understood.

THE COURT:  Okay.  Do you understand that as part of my summary judgment ruling I found -- frankly, even undisputed -- that Digicel-Haiti sold SIM cards to third-party distributors who sold them on the streets, and UPM's agents readily and lawfully purchased those SIM cards from third parties?

MR. VAUGHAN:  I'm sorry, Judge.  I'm getting an echo. Could you say that again?

THE COURT:  Yes.  Of course.  I'll start again from the beginning.

Do you understand that it was also part of my summary judgment ruling that UPM lawfully purchased SIM cards from third-party distributors and did not purchase them directly from Digicel-Haiti?

MR. VAUGHAN:  Respectfully, Judge, I'm not sure that I understood that.

THE COURT:  Then where is the evidence in the record, either the summary judgment record or even here, do you have

any evidence that UPM purchased SIM cards directly from Digicel-Haiti?

MR. VAUGHAN:  No, sir.  And we do not allege that.

THE COURT:  Good.  Agree.

MR. VAUGHAN:  As a matter of fact --

THE COURT:  Do you have any evidence and is there any evidence in the trial record or summary judgment record that when UPM purchased SIM cards from third-party distributors, they unlawfully purchased them?

MR. VAUGHAN:  No, Your Honor, because there is no evidence in the record that UPM purchased any SIM cards.  That's the problem.  There is zero evidence in the record as to how UPM "acquired" these SIM cards.

You'll remember that in Mr. Duy Tran's deposition testimony he admitted that the individuals who shipped SIM cards to them, who they compensated to acquire and send SIM cards to them, he had no idea how and where they acquired them from.  It has always been our position -- and if I was in any way, shape, or form less than 100 percent clear on this point, it has always been our position that there is zero evidence that UPM purchased a single SIM card -- none.

And it's one of the things we were talking about, Judge, when you said that the discussion about the contractual relationship or lack thereof may be a discussion for the other phase of the case, and so I held back on that discussion at our

last summary judgment hearing.  But it has consistently been our position that there is zero evidence in this case of UPM purchasing a single SIM card -- not even one.

THE COURT:  I'm hear from Mr. Savage on that point a little bit later.

But let me ask you this:  Did you understand my summary judgment ruling, because this was certainly my intention, that if there was no use of human behavior software -- and I mean that term generically.  I'm not trying to use a proprietary term, as I understand was used here.  But if there was no use of any type of software to try to fool the bypass detection systems Digicel-Haiti, if there was no use of any type of software to try to actively conceal that this was bypass, then summary judgment would be granted in full for defendant.

Did you understand my opinion to have that consequence?  Because that was my intention.

MR. VAUGHAN:  I did not understand your opinion to have that consequence and --

THE COURT:  Let me explain why I did and why I intended that, because if you remember, back originally when this case started, and we talked about this at our summary judgment argument.  When this case started, one of the key allegations that you made in one of the early versions of the complaint, which was the basis for why I denied the motion to

dismiss, was that what UPM was doing was manipulating the data that was being transmitted to Haiti through the UPM servers and computers and gateways in order to falsely represent that a call that terminated in Haiti actually was a local call originating in Haiti.  You alleged that.

And one of the things that we talked about in summary judgment oral argument, and I thought I found in my opinion, was, as it turned out in discovery, you have no evidence of that.  Maybe other people -- other bypass operators might have done things like that.  But there was no evidence presented in the summary judgment record that UPM in any way modified the data that was being transmitted and ended up on the Digicel-Haiti network.

Is that consistent with your understanding?  Because that's how I understand it.

MR. VAUGHAN:  Well, let me -- I'm always grappling with making sure I answer your question first, notwithstanding what I want to say in addition.

THE COURT:  And I appreciate that.  And you can do both, as long as you answer my question first.

MR. VAUGHAN:  Yes, sir.  That was not my understanding.

As you may be gathering from my response and from our papers, we did not understand the Court to be saying that what we considered to be the example of the utilization of human

behavior software in furtherance of this active concealment was the be-all and end-all of all of the active concealment, because there is evidence that UPM, using -- they call it the SIM server, which is software which manages the SIM cards in the SIM boxes, SIM RAs (phonetic) in Oregon, that SIM server essentially repackages the original phone call along with the data from the Digicel SIM cards in such a way that when it is sent to the Digicel network, the Digicel tower, the Digicel tower does not recognize that there is an original international call packaged along with that software.  That is not something that is by happenstance.  It is not random.  It is by design.  It is the SIM server.  I don't know if that falls under the human behavior software you said that you did not intend that term to be specific to a particular package of software, but software designed to conceal the fact that there is an international call being packaged along with the Digicel SIM data.

THE COURT:  I did not see it that way, and I was looking for the evidence of that, because what I was looking for at the time we dealt with summary judgment was what was UPM misrepresenting to Digicel-Haiti?  The way I understood --

MR. VAUGHAN:  I'm sorry.

THE COURT:  The way I understood the evidence was that they weren't misrepresenting anything.  They may have failed to disclose that there was a call that originated in the

United States, but there was no duty to disclose that, as long as there is no affirmative misrepresentation or half-truth, and half-truth was not your theory.  And I did not see any affirmative misrepresentation.

The way I understood UPM's evidence, as well as Digicel-Haiti's evidence, was they acquired the SIM cards. They put the SIM cards in their servers.  They used the SIM cards to transmit the calls.  And when Digicel-Haiti received the SIM cards -- sorry -- when Digicel-Haiti received the call on its network, the only number they associated with it was the SIM card, the correct SIM card, and I found that was not an affirmative misrepresentation.

MR. VAUGHAN:  Actually, Your Honor --

THE COURT:  Go ahead, Mr. Vaughan.

MR. VAUGHAN:  Actually, Your Honor, you are always very clear, and I'm sitting in here in shock that we missed each other, it appears, because while -- please forgive me for saying this.  While I disagreed with the fact that there wasn't active misrepresentation, while I disagreed that there wasn't omission, I thought I understood what you were saying.  You were concerned about the misrepresentation -- affirmative misrepresentation -- especially because it was more digital than human.  There were no statements being made from one to the other, and you had concerns with that.  I get it.

With respect to the active concealment, however, I

thought the Court was of the same mind and understood that with every single bypass call -- what people have been calling "bypass call" -- we have been arguing and our expert, Mr. McEwen, has also stated, there are actually two calls being completed.  There is the original international call.  That original call is sent to UPM for transmission down to Haiti. UPM then claims that it initiates a call utilizing Digicel's SIM card.  That's two calls, one of which is affirmatively actively concealed from Digicel-Haiti.  Digicel-Haiti does not have the opportunity to bill for that call, because it's hidden, and it is hidden by virtue of the operation of UPM's SIM server, this SIM management software that is there in UPM. It is further concealed by the deployment, the utilization of what's been generically called human behavior software, which is just software that is used to mimic or simulate human behavior.

THE COURT:  All right.  So let's take a look at my opinion at the bottom of page 29.  Let me know when you're there.

MR. VAUGHAN:  Let me get there.

THE COURT:  That's okay.  Take your time.  It is Docket 294.  It is my summary judgment opinion.

Mary, I don't see Ms. Valbrun or the other attorney. Did we lose them?

MR. VAUGHAN:  They are here.

The bottom of page?

THE COURT: 29.

So you see the last carry-over paragraph at the bottom of 29: "Thus, Digicel-Haiti has failed to show a genuine dispute on whether UPM made any affirmative misrepresentations to Digicel-Haiti. Indeed, Digicel Haiti has failed to show that UPM made any representations at all to Digicel-Haiti. For these reasons, the Court grants partial summary judgment against Digicel-Haiti's fraud claim to the extent it alleges an affirmative misrepresentation."

Then in the next section, when I discuss material omission, I do the same thing primarily, because I say: Digicel-Haiti -- in the middle of that paragraph -- has failed to show that UPM made a half-truth requiring full disclosure and failed to disclose that there was a requisite business relationship between Digicel-Haiti and UPM that would create a duty. I'm paraphrasing --

MR. VAUGHAN: Yes, sir.

THE COURT: The last sentence: "The Court therefore grants partial summary judgment against Digicel-Haiti's fraud claim to the extent that it alleges a material omission."

So there are three types of fraud: Affirmative misrepresentation, material omission, and active concealment.

MR. VAUGHAN: Yes.

THE COURT: So my summary judgment, throughout,

affirmative misrepresentation and material omission.  So with respect to active concealment, there, I start on the bottom of page 30:  The situation is different for Digicel-Haiti's fraud claim alleging fraud by active concealment.  Viewing the evidence in the light most favorable to plaintiff -- and I'll paraphrase -- drawing all reasonable inferences, there is a genuine dispute on whether UPM engaged in active concealment to the detriment of Digicel-Haiti.

The next sentence is:  When Digicel-Haiti believed that its SIM cards were being used in a bypass fashion and not by individual persons making local calls in Haiti or using RLYH as an individual subscriber, Digicel-Haiti deactivated or de-authorized that SIM card.  UPM was aware of that fact since 2011, and viewing the evidence in the light most favorable to Digicel-Haiti, UPM tried to mislead Digicel-Haiti into believing the SIM cards were being used by natural persons, making individual calls rather than being used with multiple SIM cards in UPM's SIM units or gateway devices.

The next paragraph:  UPM's use of human behavior software is a deceptive act or contrivance intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter.  It also creates a false impression, covering up the truth, and makes the discovery of a material fact more difficult.  If UPM did use that software to deceive Digicel-Haiti or to hinder Digicel-Haiti's ability to

identify and block SIM cards being used by other than natural persons for individual calls, and UPM did that with the requisite intent to deceive Digicel-Haiti, that is enough to allow Digicel-Haiti's claim of fraud by active concealment to proceed to trial.  To that extent, the Court denies defendants' motion for summary judgment against Digicel-Haiti's claim of fraud by active concealment.

That is all that is left in the case after summary judgment.

Now that that has been clarified, I suppose it is only fair to give you the opportunity to say, "Oh, well, now that I know that, I don't want to go to trial, I would rather appeal that point, take it up to the Ninth Circuit, and see if I can get the Ninth Circuit to reverse the District Court."

Well, if you want to do that, let me know, and I'll cancel the trial and let you do that.  Otherwise, that's what is going to trial.

However, let me tell you this, though -- and I'll give Mr. Savage the opportunity to respond to what I'm about to say a little bit later.  But I do agree with you, Mr. Vaughan, that Mr. Savage is reading this a little too narrowly.

MR. VAUGHAN:  Yes.

THE COURT:  The way I read Mr. Savage's papers, he's saying that you have to tie -- to get damages -- a specific call to that call using human behavior software.

MR. VAUGHAN:  Human behavior software.

THE COURT:  And I think that is too narrow, and here is why -- and maybe I misread plaintiff's position.  Maybe I did.  But here is how I was reading plaintiff's position:  Plaintiff was taking the position, I thought, that they were pretty good at stopping bypass calls, somewhere one of your people said -- somebody said that you can identify them to 99.9 percent accuracy.  I assumed that was before and without the use of human behavior software.

And your position was:  Well, if they used human behavior software, then that's how they got their calls through.  And if they didn't use human behavior software, then we don't have a case, and the way the damages would come about would be if they used -- let me put it this way:  But for the defendants' use of human behavior software, they never would have done any of this bypass and thus would not have been able to engage in any of these calls.  So we don't measure the damages by human behavior software associated with a specific call.  Instead, if they used human behavior software extensively, and as plaintiff alleged over a four-year period, that facilitated the bypass.

But my ruling, as a matter of law, is that bypass by itself is not fraudulent.  It is not an affirmative misrepresentation.  It's not an omission, because there is no duty.  It is not a half-truth.  And it is not by itself active

concealment.  But it's something that they did, and they would not have done that -- "they," UPM -- UPM would not have been able to do that but for its extensive use of human behavior software to thwart and deceive Digicel-Haiti's fraud detection system -- strike that -- bypass detection system.

So I'm not going to let Mr. Laborde, Mr. Castel, or any witness tell the jury that bypass by itself is fraud, is deceptive, is illegal in Haiti or anywhere else.  Bypass is what it is.  And in my opinion, if there was no human behavior software used, UPM is entitled to do bypass to their heart's content, at least as far as Oregon law is concerned.  What happens in Haiti, I won't say "stays in Haiti," but I don't really care.  But as far as Oregon fraud occurs, if it wasn't for the use of human behavior software, they are more than free to continue their bypass activities.

But I understood plaintiff's theory -- well, at least until I started reading these papers and hearing your argument, as essentially being they never would have been able to get away with bypass, because "we would have stopped them." Digicel-Haiti would have stopped them, "and the only way they were evading our stopping them was by the active concealment of human behavior software."

Now, if I have read plaintiff's claims too narrowly, well, then so be it, you're stuck with my summary judgment opinion, and you can tell me what you want to do.  But I am of

the opinion -- and that's what I put in my summary judgment opinion -- that bypass by itself, without the use of active concealment through human behavior software, is not fraud.  If you disagree, you can disagree, but that's what you've got to take to the Ninth Circuit.

MR. VAUGHAN:  Thank you, sir.  We have said it many times:  You are a scholar and a gentleman.  I appreciate you giving me the runway to respond.

Yes, Judge, I respectfully disagree, and I would not have wasted Your Honor's time.

THE COURT:  No one is wasting my time.  These are complicated issues.  We are trying to untangle them together. No one needs to apologize.  Nobody is wasting anybody's time.

Go ahead, Mr. Vaughan.

MR. VAUGHAN:  You had indicated, Judge, in document 122, page 6.

THE COURT:  Which one was 122?  I don't remember that.

MR. VAUGHAN:  It is an opinion and order, very early on, when we were going through the various iterations of the motions in this case.

THE COURT:  Yes.

MR. VAUGHAN:  On page 6 you had indicated, and I don't know if the Court has it or can pull it up, so I'll read as much of this to make sense to contextualize.

You indicated, "As discussed more fully below," when you are going to be doing an analysis of the parties' various positions. "As discussed more fully below, the parties, in essence, disagree over, A, what defendants actually did; and B, whether what plaintiff alleges defendants actually did properly can be considered fraudulent. The first question cannot be resolved at this stage of the litigation but must await either summary judgment or trial. The second question already has been answered by the Court in the affirmative."

That contextualized, Judge -- I mean, even as we were going through trying to understand Mr. Savage's, what we considered to be narrow reading, I just wanted to make sure we were properly reading your opinion and sought to contextualize that with some of our earlier interactions.

THE COURT: Mr. Vaughan, what is the date of Docket 122?

MR. VAUGHAN: It's early on in the case, May 2017.

THE COURT: Now, I do not have it in front of me right now. I can get it. Maybe Jordan can get it.

Here is my recollection of it: That was a motion to dismiss --

MR. VAUGHAN: Correct.

THE COURT: -- and it was based on one of your early iterations of the complaint where you alleged that what UPM had done was rewrite the electronic information that was ending up

in Digicel-Haiti -- on their network -- and they were misrepresenting where the call originated.

Now, at the motion to dismiss, I, of course, would have to take all well-pleaded facts as true.  That's a well-pleaded fact.  It is not conclusory.  And so I took it as true that they misrepresented -- they actually manipulated the electronic messaging that they sent to Digicel-Haiti's network in Haiti, and that's the case.  That sounds like fraud.  I had no problem concluding that allegation stated a claim for fraud.

Now, as I understood things, once we got to summary judgment, Mr. Savage said, well, we looked at the evidence.  They looked at the evidence.  We had discovery.  That's turned out not to be the case; and therefore, we move for summary judgment that there has been no affirmative misrepresentations.  And as I just read to you from my opinion on pages 29 and 30, I agreed with them.  There was no evidence presented of misrepresentations.

So when I said on page 6 in Docket 122, "Hey, what you've alleged is fraud," I stand by that.  But as the facts developed, you could not prove that, as I concluded at summary judgment, and all that you could prove, at least all that you could create a genuine issue material of fact on was the existence or the use of human behavior software, which I found was sufficient to get you to the jury on active concealment.

MR. VAUGHAN:  And, Your Honor, it will not surprise

you that even as much as we disagree with defendants' interpretation of the order, we still analyzed what the effect of their interpretation would be vis-à-vis a trial.

I'm not sure, Judge, that, one, I can meet the evidentiary burden to establish that all of the damages, as articulated in that interpretation of your order, would be attributable to the use or not of human behavior software, essentially because I don't believe the evidence -- to us -- doesn't show that that's where the damages lie. The damages lie in the active concealment of the fact that international calls were being made and terminated by UPM on Digicel's network without revealing to Digicel-Haiti's --

THE COURT: And I did not find that to be active concealment. The only active concealment I found was the human behavior software.

Now, by the way, I'm not saying and I do not agree with Mr. Savage and defendants' position that you have to tie for damages any given call to the use of human behavior software. He may disagree. He may try to talk me out of it. He may probably not succeed. But I think that's too narrow of a reading. I would accept a statement that said: UPM never would have done millions of minutes of bypass had it not been for an extensive use of human behavior software that allowed many of these calls to escape detection.

Now, if you want to tell me you don't even have

evidence of that, then maybe the right solution --

MR. VAUGHAN:  I'm sorry.  Say that again, Judge.  UPM would not have done millions of minutes of bypass --

THE COURT:  In other words, this:  I understand that Digicel-Haiti was very good at detecting bypass, and I assumed -- maybe I misunderstood something -- but I assumed that's why they went to the use of human behavior software, to try to avoid that detection.  And if your theory is:  Had they not used human behavior software, they wouldn't have basically even tried, let alone succeeded in all of these bypass minutes; and therefore, we are entitled to all of the UPM-attributed bypass minutes based on the theory of active concealment.

Now, if that's not your theory, well, then, we are sort of back to square one because I rejected the argument that bypass by itself is either fraud, by affirmative misrepresentation, omission, or even active concealment.  And if that's what you want to disagree with, I think the right vehicle is for you to figure out now what we do with the rest of the case and appeal.

And if what you want to say, and I have seen this done in other cases.  If what you want to say is, "Well, if that's what the Court is going to make us prove, we can't prove that.  So we will stipulate to an entry of judgment against us with all rights preserved to appeal your summary judgment ruling," and then you appeal summary judgment.  If you think

you can meet what I've described, then we have a jury coming in on Monday. I'm not going to insist that you answer that question right now, but I probably will expect an answer after we take a little bit of a break.

MR. VAUGHAN: I think I do need the break, Judge, because if -- not if -- understanding that the Court's decision is that bypass, as it has been described, is not fraudulent and that the termination of the international minutes, as we have made out the case, as it has been terminated, is not in and of itself fraudulent, I would be less than candid if I'm pretending that that was not the case we're bringing.

THE COURT: I understand.

By the way, let me make a suggestion right now for process. Mr. Savage has been incredibly patient. I do think it is probably appropriate to hear from him a little bit about his perspective on this. Then we should take a little bit of a recess, let you confer with your team, and we'll see where we are. You can tell me whether you want the recess to be half an hour or a couple of hours or resume tomorrow. That's not my first choice, by the way.

But let's hear if Mr. Savage wants to say anything, because, frankly, if I'm wrong about any of this, he and his team are going to have the burden of defending this on appeal at some point.

Mr. Savage, I'll give you the floor. Speak into the

microphone.  Please be seated.

MR. SAVAGE:  Thank you, Your Honor.

Let me start with, if I could, a couple of little things so I don't lose them.

This issue of how we acquired SIM cards, in the operative complaint in paragraph 65, they allege, "We purchased or otherwise secured SIM cards through agents."  And in our answer to that operative complaint, we said, "We agree with that."  So at this late stage to have there be some question about how we acquired SIM cards seems odd, since they allege something, and we agreed with it years ago.

THE COURT:  Let me ask you a question on that:  If we go to trial next week, will one of your witnesses be testifying to that and how you acquired SIM cards?

MR. SAVAGE:  Yes -- if it's necessary.  Well, this is sort of striking me as odd, because typically, which as I understand it, if it is something alleged in the complaint and admitted in the answer, it is established for purposes of the case.  I don't think at this stage --

THE COURT:  Well, they did say, "Purchase or otherwise acquired."  The "otherwise acquired" could mean bought on the black market as stolen cards.

MR. SAVAGE:  It could be, but I don't think that's actually relevant, because as we discussed at the earlier summary judgment motion, the relationship between the third

parties -- I think I gave you a pretty good hypothetical in our pleadings -- that we murdered people and tied up people and did all of this terrible stuff and still got the SIM cards -- it still doesn't affect our relationship with them.

But putting that aside, yes, Mr. Tran, who was familiar with the operation in Haiti, will describe what UPM asked its agents to do and then it got SIM cards back.

Now, it is absolutely true that we did it through agents.  If there was some testimony that one agent actually went out there and did horrible stuff, we don't know about it, and we didn't ask him to.

But on to sort of the main issue.  I will confess that in some of our pleadings we may have argued for a slightly narrower view of your summary judgment order than you are now explaining, but I don't think the difference is fundamentally material.

We understood your order to say this is a case about active concealment; active concealment by means of how we manage our SIM cards to make them look like, if we did that. Now, we deny we did that, and Mr. Tran explained that we didn't do that.  And Mr. Romero, who was actually in charge of that function, will say, "We didn't do that."

But passing that, I think you're reading -- it sounds like you may be reading our position a little too narrowly.  We are not taking the position that unless they can show that

the call that was placed at 2:15 p.m. on Monday, August 3rd, 2014, only got through by human behavior software, they get damages for that one. But in the absence of that specific proof -- I mean, I would like to believe we would force them to do that, but I don't.

THE COURT: And I'm not going to.

MR. SAVAGE: On the other hand, it should be possible with the information that they have to develop some kind of reasonable estimate of how much traffic got through by virtue of human behavior software that would not have gotten through without it. It is a classic "but for" causation.

THE COURT: I'm not positive I agree with that part of that; that it is even estimable. And that was why I was willing --

MR. SAVAGE: Well, we tried to outline it in our discussion with Mr. Castel. Absolutely it is estimable, because at the moment they cut off any given SIM card -- we may later get to the problem with all the lost records. But in theory, at the moment they cut off a SIM card, saying, "Ah-ha, that one is being used as bypass," at that moment they have a complete record of every call that SIM card made -- when, from which cell site, and for how long. So they will be able to identify, "Oh, this one, we cut off after a minute-and-a-half; this one went on for 15 minutes."

THE COURT: This is why I disagree with you --

MR. SAVAGE:  You disagree with me?

THE COURT:  Yes.  Here is why I disagree --

MR. SAVAGE:  Okay.

THE COURT:  That is true only to the extent that they cut off a SIM card.  There may be SIM cards that were never cut off because the human behavior software worked and deceived them, and that's why that measure would be too small.  That's why I come back to the theory that if human behavior software really worked, as I thought they were alleging, then a lot of SIM cards would have gotten through and not have been cut off. Only a small number may have been cut off.

But had UPM known -- or had UPM not used human behavior software, then they would have worried, "Ah, most will be cut off.  It is not worth the trouble.  We will go to some other country.  We're not going to do Haiti."  That's why the "but for" is:  "But for" the use of human behavior software, the bypass calls that got through would not have been made or not gotten through.

MR. SAVAGE:  I understand what you are saying, and let me try to clarify.  First, for the record, in case there is any doubt:  We did not use human behavior software.

THE COURT:  I know.

MR. SAVAGE:  But second --

THE COURT:  But for purposes of both summary judgment and pretrial judgment rulings, I'm assuming you did.

MR. SAVAGE:  Understood.  And I get that.

THE COURT:  Okay.

MR. SAVAGE:  But this is where their peculiar attitude about records comes into play, because they have essentially a two-layer evidentiary problem with their records. First, they say, "If we had perfect records, we still wouldn't know which ones were being used by UPM"; and then, "They lost all of their records anyway."

THE COURT:  Yes.

MR. SAVAGE:  So the next logical thing would be, well, let's do discovery, and let's look at what records UPM has.  We have provided them with records, and we have provided them with number of minutes and so on, you know, how many SIMs we bought, how many minutes, the whole thing.  We have the CDRs for every call we ever made.

Their answer to that is, "We don't believe you; you're lying."

THE COURT:  I know.

MR. SAVAGE:  And I don't doubt that there are people at Digicel-Haiti who believe we're lying.  But the fact that someone in Digicel-Haiti believes we're lying is not a sufficient basis to deny summary judgment.  And that is, I think, is their fundamental problem here.  They don't want to look at our evidence, which shows --

THE COURT:  And you are not going to win on that

point, because I'm satisfied that they have at least created an issue for the jury that all of these things were done by bypass. Where I think I'm agreeing with a lot of what defendants are saying, though, is bypass by itself, without human behavior software, is not fraudulent under Oregon law.

MR. SAVAGE: Right. And that's how we read your order. We appreciate it.

Okay. So moving on to where the conversation started, which was Mr. Castel, his analysis is not in any way tied either to UPM or to any kind of active concealment. The analysis that he has put forward, his opening and then his rebuttal disclosure, is entirely the same today as it was in the fall. It is not modified in any respect by virtue of the narrowing of the case occasioned by your order.

So the first part, as we outline in our motion, is pure speculation. He cites a newspaper report that says somebody said that there was a capacity to do 400 calls.

THE COURT: I know. That's another problem; that's a different problem.

MR. SAVAGE: Then off he goes.

The second point I want to address, and it is in the papers. I think you get this. What Mr. Wood was asked to do was starting -- our damage expert for our claim -- starting in 2014 and going forward, if Digicel-Haiti had not blocked any SIM cards, how much traffic could you do? It's an estimate.

You have to start somewhere.  "Well, we probably would have gotten 15 percent of the market," and then works forward from there.  If you look at what Mr. Castel does, he says, "Oh, they admitted they have 15 percent of the market," and then projects it back to 2011 month by month by month, even though the evidence seems undisputed that we operated for one six-month period here and one six-month period there.

THE COURT:  I understand what you are saying, and we haven't even gotten there yet.

MR. SAVAGE:  The only reason I'm getting there is if we're right about that and about the underlying cause challenges issue/analysis with Mr. Castel, they are going into trial with no estimate of damages -- none, zero, nothing.

THE COURT:  I understand.

MR. SAVAGE:  So if Mr. Vaughan takes his time and comes back and says, "Notwithstanding what we now understand the case to be narrowed, we would like to go forward because," the problems with Mr. Castel --

THE COURT:  Then we will talk about those issues.

MR. SAVAGE:  I agree with you that it is conceivable that one could have an argument that would be, "Gee, we can prove that but for UPM's use of human behavior software and their confidence in its abilities, they would have never have come into Haiti at all."

THE COURT:  Right.

MR. SAVAGE:  I can assure you that there is not a line of evidence in any deposition in any document anywhere that they could cite today or will be able to present next week to establish that fact.  So I think Mr. Vaughan --

THE COURT:  I'll let you discuss that out of my presence.

MR. SAVAGE:  There were lots of points covered, but I think we are there.

THE COURT:  By the way, one more thing.  I was looking for and didn't find and assumed nobody gave me Mr. Wood's report; am I correct?  Could I find it in these documents?

MR. SAVAGE:  I gave it to you at some point.  I know I did.  Let me see if I can find it.  It may have been an attachment to our summary judgment, but I know in one of my declarations I signed, "Attached is the report of Don Wood."

THE COURT:  Would someone on your team find it for me, please.  We did a word search of basically the entire index, but it may not have been that granular.

MR. SAVAGE:  Yes.  I apologize.  Give me a minute to look on my computer, and I will pull up what number it was.

THE COURT:  Mary, what time is our afternoon criminal matter?

THE CLERK:  3:30.

THE COURT:  Okay.  We are doing fine.

MS. ZILE:  It's the motion in limine reply.

MR. SAVAGE:  Motion in limine reply.

THE COURT:  Really?

MS. ZILE:  Let me double-check.

MR. SAVAGE:  There was a awful lot of paper flying there at the end.  I apologize for not having it right at hand.

THE COURT:  That's fine.  We looked, but we weren't going to spend an infinite amount of time looking.

MS. ZILE:  Docket 358, Exhibit 3.

THE COURT:  Great.  And that's the Wood report.

MR. SAVAGE:  Yes.  That is his report.

THE COURT:  Okay.

MR. SAVAGE:  What it says, when you find it --

THE COURT:  I understand.  I'll read it.

Here is what I suggest we do right now.  It is 11:20 Pacific Time.  Unless somebody wants to talk about something else right now, which is fine with me, I think we should take an appropriate recess.  I, frankly, think Mr. Vaughan should speak with his team.

I also think, Mr. Savage, you and Mr. Vaughan should talk a little bit about where you all want to go from here, because in terms of what the evidence will show next week, the two of you know a lot more about it than I do, even though I've read everything -- at least almost everything you have filed.  The two of you need to talk.

Now that you both clearly understand what my rulings are, both to the extent it goes against Digicel-Haiti on what's remaining for trial, but also what I would allow as damages evidence in terms of this "but for" the use of human behavior software, we wouldn't see any presence of UPM in Haiti.

Then we've got plenty of other issues to talk about. So I think that each side should confer with their own team for a while. They should speak with each other. Then I think we should come back together. My instinct is we should come back together either at 12:30 or at one o'clock. If you think that's too much time, either side, let me know. Or if you think that's not enough time, which I think it is enough time, let me know what you want.

By the way, just totally unrelated, I want to just primarily point out to UPM, you remember how Rules of Civil Procedure 37(e), failure to preserve electronically stored evidence, was amended in 2015 to deal with sanctions -- and I'll take you through that in a moment -- not enough people were aware of it, including me back in 2017 in one of my opinions. But I will blame the parties for not citing to it. But as Rule 37(e) has been amended for failure to produce electronically stored information and about the consequences, take a look at 37(e)(2).

Let me know when you are there. Are you there?

MR. SAVAGE:  Failure to preserve; should have

preserved --

THE COURT:  These are the Court's options.  Under (e)(1), if there is prejudice, I can order measures no greater than necessary to cure the prejudice.  But then that's limited by (e)(2).  Only upon finding that the party acted with the intent to deprive another of the information's use -- and you have already conceded you have no evidence that they intended that.

So only upon such a finding, which doesn't exist, may the Court -- now take a look at 2B -- instruct the jury that it may or must presume the information was unfavorable.  The way I understand it is that unless I make that finding of intent, I can't even instruct a jury that they may presume that the information would have been unfavorable.  I'm just absolutely precluded from that.

Now under E1, I can do something less drastic to cure the prejudice, and what I would be planning on doing would be letting you make that argument.  You are not going to get the imprimatur of the Court in a jury instruction that they may assume that but because --

MR. SAVAGE:  But you can say, "Ladies and gentlemen of the jury" that --

THE COURT:  Because I'm going to be telling the jury that they can use circumstantial evidence.  I would say that it is relevant to the question of damages, and you can make your

argument, "Members of the jury, this is a reasonable inference," and they can decide if it is reasonable or not, but you are not going to get the Court's imprimatur, because I can't do it under (e)(2).  Anyway, that's a different issue.

Go ahead, Mr. Vaughan.

MR. VAUGHAN:  Two quick things, Judge.  One, you were -- well, let me start with the last first.

The evidence also is -- and Mr. Savage will confirm, even though he has a slightly different read -- that UPM itself also, I will say, lost its evidence and records because of a change of their data management, their software management system in 2014.  So to the extent that there is a suggestion that they had all the CDRs for every call ever made, that's not correct either.

THE COURT:  That's fine.  What's good for the goose is good for the gander.  If the evidence shows that they lost some records at the appropriate time, and if that caused some prejudice to plaintiff, I'll let you make that same argument. We don't need to resolve this right now.

MR. SAVAGE:  Just to be clear -- I'm sorry.  I have to say that what happened in 2014 is that we changed our system so that there was more detail recorded from 2014 going forward than in the past.  We haven't lost any records at all that we're aware of.

THE COURT:  We will get into this, if we have to,

when we talk about jury instructions.  As of right now, I'm just telling you that nobody is getting a jury instruction from me -- an adverse inverse instruction, because I don't see any evidence of bad intent.  Whether or not I permit somebody to argue it will depend on, one, whether there is lost evidence; and two, whether it's prejudicial.  We are not going to resolve that right now.

Mr. Vaughan.

MR. VAUGHAN:  A second quick point, Judge, I wanted to make, you asked and were interested in understanding whether or not there was evidence of UPM's purchase of SIM cards, and you were told that Mr. Tran would be the person to speak to that.  I just wanted to point the Court to Mr. Tran's deposition testimony on page 109 when he was specifically asked that question.

The question was at line 10:  "When these people go and they buy the SIM cards, describe that process for me.  How do they buy these SIM cards?

"ANSWER:  I do not know, because I'm not in country, but I do know that they will buy them on the street mostly.

"QUESTION:  Okay.  Who do they buy the SIM cards from?

"ANSWER:  From people who get them from Digicel, obviously.  I don't know.  I don't know the answer.

"Okay.  Well, at the beginning I told you that I have

to live with your answer whether I like it or not, but now I have to push back because you have given me two answers.  You have tried to suggest that they buy them from Digicel on the street and you've also said, 'I don't know.'

"ANSWER:  Okay.  So let me repeat that answer, because I don't want to speculate.  So my answer is I don't know the answer."

So if there is a suggestion that there is a witness that is going to come in to say that UPM purchased these SIM cards, and that witness is Mr. Tran, that's not correct.

THE COURT:  Let me get to back to the "goose and gander" point.  I'm looking through Mr. Tran's witness statement filed by defendant.  It is too long right now for me to feel confident in knowing whether it is or isn't there.  But I'll say this:  If the defendants want to call a witness to explain how UPM acquired SIM cards, it had better be disclosed in a witness statement.  And if it is not adequately there right now, you too have leave to file an amended witness statement in the next couple of days.  And if there is a witness who says that, after it is properly disclosed, and Mr. Vaughan wants to impeach that witness with prior testimony, fine.  That's what happens at trial.

MR. SAVAGE:  Your Honor, depending on how this all plays out, I had literally assumed that something that they affirmatively alleged in their complaint and that we admitted

in our answer could be treated as an established fact.

THE COURT:  Well, then why isn't it in the stipulations?  I read your stipulations.  They are beautiful.  They are great.  And that's not in there.

MR. VAUGHAN:  Because it was not agreed to or stipulated.

THE COURT:  Exactly.

MR. SAVAGE:  So then I ask the question, Your Honor: If they are now on the eve of trial, saying, "We are going to dispute something that we affirmatively allege and you admitted," it is not in our witness statement, because we didn't think we needed to testify to it.

THE COURT:  Keep in mind that what they affirmatively alleged was that you purchased it or otherwise acquired it.  Nobody is disputing that you have SIM cards.  You have otherwise acquired it.

MR. SAVAGE:  Fair enough.

THE COURT:  Let's not let that tail wag this dog; we've got a bigger dog to worry about.

MR. SAVAGE:  Okay.

THE COURT:  But keep in mind, though, I will allow both sides to amend their witness statements so that you are fairly disclosing to each other -- you know, in Oregon state court across the street -- well, across the street that way now -- we have trial by ambush.  In federal court, we do not.

So go ahead, if you need to amend your witness statements to put more stuff in there, you have leave.  If you end up getting impeached to some extent, we will worry about that later.

But right now, we have a bigger problem; that is, what does the plaintiff want to do, now that they understand how I'm reading my own summary judgment order and how that is shaping what will go to trial?

So my recommendation is that maybe the plaintiff team can speak among themselves for 10 or 15 minutes, and then I would urge Mr. Vaughan and Mr. Savage, and anybody else who wants to join them, plaintiff's and defense counsel, to speak with each other in about 15 or 20 or minutes or so.

Maybe then you will have to then go back and talk privately or with your clients and then back with each other.  Then I would urge that we all get back together either in one hour or an hour-and-a-half, and I'll hear what either of you recommend.

Any recommendations in getting back in an hour or an hour-and-a-half?  What sounds better?

MR. VAUGHAN:  Because my clients are out of country, Judge --

THE COURT:  They have telephones in Digicel-Haiti.

MR. VAUGHAN:  Say again?

MR. SAVAGE:  They have telephones.

MR. VAUGHAN:  Oh, they do.  May I have the hour-and-a-half?

THE COURT:  Of course.

Is that okay, Mr. Savage?

MR. SAVAGE:  We have got some Digicel SIM cards if you need to.

THE COURT:  We will be in recess until one o'clock Pacific Time.

Thank you.

(Recess.)

(Afternoon session; open court:)

THE COURT:  Good afternoon.  We have a lot still to cover if we are going to trial.  So where are we?

MR. VAUGHAN:  Well, may I begin with two questions, Your Honor?

THE COURT:  Yes, sir.

MR. VAUGHAN:  First, would it have made a difference if I were there in person?

(Laughter.)

THE COURT:  It would have been more enjoyable for me to see you in person, but it would not have made any substantive difference.

MR. VAUGHAN:  Okay.

No. 2, I'm assuming that the Court would not be inclined to grant a request to continue the trial and reopen discovery so I can reposition my HBS case?

THE COURT:  So you can reposition your what?

MR. VAUGHAN:  My human behavior software case.

THE COURT:  Oh.  What are you asking?  You are asking to postpone the trial, reopen discovery, take some more discovery on the HBS.

Is there an objection from defendants?  Is there an objection from defendant?

MR. SAVAGE:  There is absolutely an objection from the defendant.

THE COURT:  Okay.  So then that's not going to work.

MR. VAUGHAN:  Okay.  As we have spent so many years together, I could have put good money on that one.

THE COURT:  I'm glad I'm so easy to read.

MR. VAUGHAN:  To be candid, Your Honor, as you can imagine, we took everything you said to heart and did speak to our clients.  The reality is that our case, our theory was not the HBS theory solely.  As is clear to the Court, I think by now, there was a disconnect.  We did not read your order as you clearly intended it to be read and as you intended it to be.

That said, frankly, I think it would be disrespectful and a waste of time to even try to pull it together, assuming the rest of the evidence and the rest of the hearing today does not further limit the presentation of the case.  I think it would be disrespectful to pretend to try a case before Your Honor as it is currently postured.

So that said, Judge, you mentioned a couple of possibilities and options.  I floated them to Mr. Savage, so this is not a surprise.

Question:  Would the Court be inclined therefore to grant us leave to an interlocutory appeal of the questions that have thus far been determined on summary judgment based upon 28 U.S.C. 1292?  I think we meet the criteria, the three-part criteria for the Court to grant such certification.  I'm sure you're well aware of it -- I'm not saying you suggested it, but

at least we discussed it. The concept was raised.

The controlling question of law would be the questions having to do with, of course, the positioning of bypass as fraud, and you have made the decision that you do not believe that is the case. We think that there is substantial ground for a difference of opinion in that regard with respect to that question, and we think that a determination on that question will clearly materially advance this litigation in one way or the other.

THE COURT: Before we hear from Mr. Savage's position on that, let me I share with you what I know and what I have seen on that type of issue in the Ninth Circuit. Obviously you all know that you have to get to yeses to be able to get heard on that issue. One is from me -- and that's generally not that difficult. The second is from the Ninth Circuit, and that's pretty darn difficult, because they have been rejecting a fair number of 1292(b) questions that turn on disputed issues of fact. I am skeptical. You may get it from me. I'll give Mr. Savage a chance to be heard on this. But even if I give it to you, I'm really skeptical that the Ninth Circuit will, because this question of what is an active concealment, is it really a pure question of law? We all agree that active concealment is fraud under Oregon law. I don't have a problem with that; neither does defendant nor does anybody.

The question is whether the facts presented, which I

guarantee you, if they are influx to this degree in front of me, they will be perceived by the Ninth Circuit as in flux and in dispute, and the Ninth Circuit will probably say, "We don't have a clear factual record on which to decide whether the facts presented do or do not present active concealment."

Now, I could be wrong on that, but I'll tell you something.  I did send up a 1292(b) about a year ago or so, and the Ninth Circuit accepted it.  They accepted briefing.  They heard oral argument.  Then they said, "Oops, never mind.  There are too many facts in dispute.  We revoke 1292(b).  Go back to the trial court and come up when you're all done."  I really do think that's what will happen here.

Now, that said, I think there is vehicle -- one second, Robert.  I do think there is a vehicle here where -- and it's probably not appealing, but it's probably very practical that there has got to be some way for the parties essentially to stipulate that under the ruling as is, plaintiffs do not prevail but plaintiffs disagree with the ruling and therefore they would consent to a final judgment being entered subject to their right to appeal.  Then you have a right to appeal and no matter what I say -- I wouldn't interfere anyway -- but the Ninth Circuit would have to take your appeal from a final judgment appealing my summary judgment decision.

Frankly, that's even easier for you than a 1292(b)

because then all you have to do is persuade them that there is a factual dispute on whether or not bypass counts as active concealment.  Frankly, I can see reasonable minds may disagree about that.  So then you would just simply appeal my summary judgment decision.  If you win on that, we go back to a trial the way you wanted to do it.  And if you don't win on that, well, you wouldn't have won at trial anyway, and that's probably the more practical way to do this.

But that said, if you really want the opportunity for a 1292(b), what I would rather do is punt on it right now.  I'll cancel the jury trial and then let you move for 1292(b) but on the assumption that if I don't give it to you, then we are going straight to final judgment, and I'll hear from Mr. Savage.

MR. VAUGHAN:  I'll wait.

THE COURT:  Mr. Savage, your thoughts.

MR. SAVAGE:  I really respect Mr. Vaughan's right to get these issues heard on appeal.  I tend to agree with you that the most logical thing to do is, as you suggest, final judgment on their claims -- and I apologize.  I haven't thought this through.  We'd proceed on our counterclaims at some appropriate schedule while it's up on appeal, because they are separate.

THE COURT:  Oh, God.  That's going to create another gigantic headache, and that's a 54(b).  The Ninth Circuit hates

54(b).  I've never seen a circuit that hated 54(b) more than anybody else.

MR. SAVAGE:  Well, the alternative would be to look at our schedules and figure out when -- basically our damages witness.  Our witness -- well, a couple of things.  One, I'm not expecting the liability phase of my counterclaim to be that long a thing to do, because if we can get stipulations that they cut off our SIM cards, right, that's the essential fact.  Then the question is simply does that or does that not violate the FCC's ban on restriction on resell?  And if it does, damages.

THE COURT:  Your damages there are what, 150,000?

MR. SAVAGE:  No.  Our damages there are actually closer -- depending on what assumptions you make, they are on the nature -- I think our damages expert had $60 million.

THE COURT:  Oh.  I thought the 150,000 is the value of the SIM cards.

MR. SAVAGE:  No.  Under Section 207, we are entitled to any damages caused by what they did if it violated --

THE COURT:  So your theory would be that by cutting off the SIM cards, they deprived you of the profits that you would have made had the calls gone through?

MR. SAVAGE:  Absolutely.  What our damages guy does is says, "Okay.  How many SIM cards did they have?  How big is the market?  What could they have gotten?  What are reasonable

projections?"

THE COURT:  And you'll be calling Mr. Castel for that?

MR. SAVAGE:  No, Mr. Wood, our guy.  Indeed.

MR. VAUGHAN:  Not wanting to get past my good friend.

MR. SAVAGE:  Yeah, my brain is -- right.

But all that said, I should say now we have been considering, in terms of the scheduling, whether it makes more sense to try our counterclaim to the Court and not a jury, which might ease the scheduling to some extent.  But all that said, depending on who has what schedule available, we could proceed relatively quickly to the counterclaim and then put the whole thing up on appeal, whichever one of us loses which things.

THE COURT:  All of that is fine with me, including giving Mr. Vaughan the opportunity to move forward and brief a 1292(b).  But then I would like to figure out what do we do if either I say no, which probably is unlikely, or the Ninth Circuit says no, which is pretty likely.

MR. SAVAGE:  Well, from my perspective, if we are agreeing that whatever is happening, we are not actually trying their claims against UPM, from my perspective the logical thing to do, whether it is 1292(b), whether it is a final judgment, whether it is whatever, figure out a good and reasonably prompt schedule to do our counterclaim so that as soon as possible it

can all get to the Ninth Circuit if people are so inclined.

THE COURT:  The other option is we just go to trial next week on Phase I, and we will see what the jury does.  At least then we will have a final verdict on Phase I.  I guess that does deprive Mr. Vaughan the opportunity to do a 1292(b).

MR. SAVAGE:  Right.

THE COURT:  I see that.

MR. SAVAGE:  So I hesitate to say I'm indifferent, because I understand that Mr. Vaughan needs to get to the Ninth Circuit as soon as practicable.  I think your point about the Ninth Circuit not being excited about 1292(b) counsels against sort of severing it.  What that leads me to, again, I'll have to call my witnesses and figure out when they are available, because Mr. Wood, I haven't asked about the availability next week.

In a perfect world, we would just try our counterclaim next week, but we are not ready to do that.

THE COURT:  Me neither.

MR. SAVAGE:  Yeah.  So that seems to be the most practical answer from my perspective.  And if Mr. Vaughan wants a 1292(b), that's fine.  But the next topic is let's figure out when we can get UPM's counterclaim out of the way as well.

THE COURT:  I think the way 1292(b) works is we can go forward with the counterclaims while the 1292(b) on Phase I is going up and the Ninth Circuit decides whether they will or

won't take it.

MR. VAUGHAN:  It would be just a question of scheduling, Judge, because I'm also in trial May 2nd.

THE COURT:  Don't worry about it.  We are not going to rush this through.  I will let the two of you talk to each other.  I will let you know when I am available.  I do have some availability this fall.  Frankly, I've got a decent amount of availability, I think, this fall.  Spring next year is going to be very, very tight.  We can do something this fall, and I'll let you work out what you want.

So what do you want to do, Mr. Vaughan?

MR. VAUGHAN:  Judge, as you can tell, there is some hesitancy on my part to "take a judgment" or "suggest a judgment."  If the Court is entering summary judgment on everything, that's one thing.  But to contest a judgment is a different matter.

THE COURT:  I understand.

MR. VAUGHAN:  I'm not sure what the res judicata impact of that might be.  I'm not quite sure what the waiving of that might be without consulting with appellate counsel, and I'm concerned about that.

THE COURT:  That's fine.

MR. VAUGHAN:  Because if this were to come back and I would have confessed judgment on the HBS section, I may have shot myself in the foot on that issue.

THE COURT:  I understand.

MR. VAUGHAN:  So with that being the case, I do understand, and I'm very much guided by the Court's caution with respect to the Ninth, and they may solve the problem for us.

With the Court's permission, we would like to take leave.  As you indicated, we will be in close communication with Mr. Savage, but I respectfully respect that we be removed from the docket on Monday.

THE COURT:  Let me just ask hypothetically, do you agree with Mr. Savage that if the Ninth Circuit declines 1292(b), the best thing to do is to figure out -- deal with Phase 2 and then get this whole thing somehow wrapped up after you talk to appellate counsel on the best way to get this whole thing done with a final judgment so both sides can take up whatever they want to take up to the Ninth Circuit?

MR. VAUGHAN:  I'm leaning that way.

THE COURT:  I'm reluctant to strike the jury call now if you're going to tell me in a couple of months, if the Ninth Circuit says no to the 1292(b), that you for ready to go to trial just on human behavior software.

MR. VAUGHAN:  I don't think that is likely, because you are not reopening the discovery on that.  I believe we have an obligation to put the best case forward before you and not waste your time and everybody else's time.  Unless discovery is

reopened, I don't think we can try the HBS case as it is positioned.

THE COURT:  Let me know if I'm hearing this correctly both from Mr. Vaughan and then hearing no opposition from Mr. Savage, that I should strike the jury trial for Monday.  I would then anticipate -- and you tell me how long you want to file this -- a motion and a brief for a 1292(b) interlocutory appeal on the existing summary judgment on Phase 1.  If Mr. Savage wants to oppose it -- if defendants want to oppose it, they can oppose it.  If they don't oppose it, they don't.  It doesn't matter.

But I would like to see it phrased by the plaintiff what they want and why they should get 1292(b) in front of me. I don't want to prejudge anything, but I'll tell you my history is I'm relatively easy on 1292(b) under the right circumstances.  I totally get these circumstances.

So on the assumption then that I grant a 1292(b) motion that's filed, I'll leave counsel to confer with each other.  Maybe we will speak in a few weeks about scheduling Phase 2, because that should go forward while the Ninth Circuit considers whether or not to grant 1292(b), and then we see where we go.

Is that what plaintiff wants, Mr. Vaughan?

MR. VAUGHAN:  Yes, sir.  That would include our pending motions and everything with respect to moving forward

with Phase 2, because we do have pending motions which are all deferred.

THE COURT:  Right.  Got it.

MR. VAUGHAN:  So, yes, all of that scheduling.  With that caveat, yes, Judge, understood, and we will get back to you.  We will confer with Mr. Savage and his team and continue communicating with the Court as we have.

THE COURT:  I'll put the burden on you to give me a well-crafted 1292(b) motion so that if I grant it, I'm pretty much just going to take what you're asking for.  Then we will see what the Ninth Circuit does with it.

MR. VAUGHAN:  In the colloquial term, we've got your back, Judge.

THE COURT:  Mr. Savage and defendants, are you all right with this approach?

MR. SAVAGE:  Absolutely.  The only thing I would suggest is a couple of things:  One, in order to make sure that we can move forward, I'd hoped that we could agree that whatever 1292(b) Mr. Vaughan wants to file, we could agree it would be filed by two weeks from today or a week from Friday, some time that works out with Mr, Vaughan, and I would be happy to consult.  We could give you a motion for when that would be due.

THE COURT:  Give me a stipulated scheduling motion.  And if you want to make it more broad, a stipulated scheduling

motion on lots of stuff -- Phase I, Phase II, separate motions.

Confer with each other.

MR. SAVAGE:  Right.  Then the only other thing that I would think is perhaps sometime in the next month or so you might want to schedule just a phone status conference so that -- listening to what you said, I don't want to miss the opportunity to find at least a few days and maybe a week on your schedule this fall to try our counterclaims.  So I'm concerned that if we just let things sit for too long, it will be filled up.

THE COURT:  How much time would you want for that do you think?

MR. SAVAGE:  For the trial?

THE COURT:  Yes.

MR. SAVAGE:  Well, particularly if we try it to you and start without a jury, I would think we would need maybe -- I would say three days at most for our affirmative case -- two experts and a fact witness or two.

THE COURT:  Obviously I'm not going to ask Mr. Vaughan now whether he is going to waive jury, but that's something that you all need to discuss with each other before we start scheduling that.

I will send you by email, or Mary will, relatively soon, some of the opportunities for a one-week bench trial. Let me tell you the way I do bench trials -- let me back up

this way:  For jury trials, we've cleared our criminal calendar for next week.  Frankly, next week, I will get caught up on opinions in other cases.  We clear our criminal calendars as best we can when we have jury trials.  We don't when we have bench trials.  So you might find one or two criminal hearings that will take half an hour per hearing scattered here and there.  No more than about two per day at most; sometimes fewer.  Then we just balance the bench trial with whatever I need to do on the criminal side.

MR. SAVAGE:  From my perspective, that's fine.  I mean, the theater of having the jury see it all unfold, I won't say it would be lost on you, but I think it is less necessary.

THE COURT:  So I'll send you both, or Mary will, multiple weeks between summer and fall of when we could handle a full-week trial.  But those things fill up relatively quickly.  Whatever we send you probably tomorrow probably will be basically good for a couple of weeks but not necessarily beyond two or three weeks.

Mary, do you agree?

THE CLERK:  Yes.

THE COURT:  Mary, am I missing anything here in terms of we just tell the jury coordinator to tell our jurors the trial is off, right?

THE CLERK:  Right.  That's all.

THE COURT:  So we are all on the same page on that?

MR. SAVAGE:  Yes, sir.

MR. VAUGHAN:  Yes, sir.  And we will get that time scheduling order proposal out to the Court.

THE COURT:  And I'm not going to schedule a telephone conference now.  But if for whatever reason one side or the other wants a telephone conference, contact Mary.  Tell her that you want a telephone scheduling conference, and we will put you on the calendar fairly quickly and then we will talk.

MR. VAUGHAN:  Much obliged.

MR. SAVAGE:  Great.

THE COURT:  Let me double-check one other thing.

All right.  Other than pointing out Rule 37(e) to you all, I have nothing else that I really feel compelled to share with you.

All right.  It has been a pleasure seeing you all.  I look forward to seeing you again in the future.

By the way, if you all want, and we do a bench trial, I suppose we could do a bench trial by video or by Zoom.  I have done those before.  I'm not going to do a jury trial by Zoom.

MR. VAUGHAN:  I don't want to get ahead of myself, Judge, but I certainly wouldn't want to miss the opportunity to be in the courtroom.

THE COURT:  You're always welcome.

Anything else we should talk about right now?  I'll

start with Mr. Vaughan.

MR. VAUGHAN:  Nothing further from the plaintiff.  I don't have my local counsel with me.

Am I missing anything, Ms. Talcott?

MS. TALCOTT:  You're not.  Thank you.

THE COURT:  Anything from defendants?

MR. SAVAGE:  No, Your Honor.

THE COURT:  Have a good day, everybody.  Safe travels.  I look forward to talking with you all again.

MR. VAUGHAN:  Same here, Judge.

(Court adjourned.)

--oOo--

        I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca                      May 2, 2022
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter