# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.,**<br>**dba DIGICEL-HAITI**, | Case No. 3:15-cv-185-SI |
| Plaintiff, | **OPINION AND ORDER ON DIGICEL-**<br>**HAITI'S MOTIONS FOR SUMMARY**<br>**JUDGMENT AGAINST UPM'S** |
| v. | **COUNTERCLAIMS AND TO**<br>**EXLUDE UPM'S EXPERT WITNESS,** |
| **UPM TECHNOLOGY, INC. and**<br>**DUY BRUCE TRAN**, | **AND UPM'S MOTION FOR PARTIAL**<br>**SUMMARY JUDGMENT** |
| Defendants. | |

Robert C.L. Vaughan, Cherine Smith Valbrun, Leah B. Storie, and Anisha Carla Atchanah, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394Anne M. Talcott, Kathryn E. Kelly, Andrew J. Lee, and Sara Kobak, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; and. Of Attorneys for Plaintiff.

Christopher W. Savage, DAVIS WRIGHT TREMAINE LLP, 1919 Pennsylvania Avenue NW, Suite 800, Washington, DC 20006; and Kathryn P. Salyer, Eleanor A. DuBay, and Blake Van Zile, TOMASI BRAGAR DUBAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

In its Third Amended Complaint (ECF 200), Unigestion Holding, S.A., dba Digicel-

Haiti, Inc. (Digicel-Haiti) alleges fraud, conversion, and unjust enrichment against UPM

Technology, Inc. (UPM) and Duy Bruce Tran.[1] In UPM's Amended Answer, Affirmative

Defenses, and Counterclaims (ECF 244), UPM asserts six counterclaims—one based on a federal

statute and five based on Oregon common law. As its first counterclaim (with five counts), UPM

alleges violations of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq*. (the

Communications Act). For its remaining counterclaims, UPM alleges breach of implied-in-fact

contract, money had and received, conversion, unjust enrichment, and intentional interference

with prospective economic advantage.

On January 18, 2022, the Court granted in part UPM's motion for summary judgment,

which significantly narrowed the scope of Digicel-Haiti's claims and potential recovery.

ECF 294. The Court also bifurcated this lawsuit into two phases. During Phase I, the Court

planned to consider Digicel-Haiti's claims against UPM. During Phase II, the Court planned to

consider UPM's counterclaims against Digicel-Haiti. *Id*. at 37-39. On July 26, 2022, the Court

granted Digicel-Haiti's informal letter request to lift the bifurcation order. ECF 383.

The Court previously had scheduled a jury trial on Phase I to begin April 4, 2022. At the

Phase I pretrial conference held on March 29, 2022, Digicel-Haiti announced that it could not

likely meet its evidentiary burden to establish damages under the narrowed scope that the Court

imposed. *See* ECF 379, at 35, 64 (Transcript from Hearing on March 29, 2022). After that

hearing, Digicel-Haiti filed a motion for reconsideration of the Court's decision of January 18,

2022, and alternative motions to certify an interlocutory appeal to the Ninth Circuit under 28

---

[1] Mr. Tran is the founder, owner, and chief executive officer of UPM. In this Opinion and Order, the Court generally refers to UPM and Mr. Tran together as "UPM." Digicel-Haiti also asserted claims against other individual defendants employed by UPM, but the Court dismissed those claims on January 18, 2022. ECF 294.

U.S.C. § 1292(b) or certify questions to the Oregon Supreme Court under Or. Rev.

Stat. § 28.200. On July 13, 2022, the Court denied Digicel-Haiti's motions. ECF 380.

The Court also previously had scheduled a Phase II jury trial to begin November 14,

2022, but after lifting the bifurcation order, all remaining issues that are appropriate for trial will

now be decided at the November trial. There are, however, additional preliminary matters that

need to be resolved. In this Opinion and Order, the Court addresses the following motions:

(1) Digicel-Haiti's motion for summary judgment against UPM's six counterclaims (ECF 264);

(2) Digicel-Haiti's motion to exclude the testimony of UPM's expert witness Joseph Gillan

(ECF 272); and (3) UPM's motion for partial summary judgment on portions of its first

counterclaim (ECF 255).

## STANDARDS

### A.  Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that a party is entitled to

summary judgment if the "movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving

party has the burden of establishing the lack of a genuine dispute of material fact. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most

favorable to the non-movant and draw all reasonable inferences in the non-movant's favor.

*Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although

"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for

summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's

position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

The first sentence of Rule 56(a) provides: "A party may move for summary judgment, identifying each claim or defense—or *the part of each claim or defense*—on which summary judgment is sought." Fed. R. Civ. P. 56(a) (emphasis added). The 2010 Advisory Committee explains that this sentence was "added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment; *see also Minority Police Officers Ass'n of S. Bend v. City of S. Bend, Ind.*, 721 F.2d 197, 200 (7th Cir. 1983) ("The word 'judgment' in the term 'partial summary judgment' is a misnomer. A partial summary judgment is merely an order deciding one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment on a separate claim.").

Further, Rule 56(g) states: "If the court does not grant all the relief requested by the motion, it may enter an order stating *any material fact*—including an item of damages or other relief—that is not genuinely in dispute *and treating the fact as established* in the case." Fed. R. Civ. P. 56(g) (emphasis added). As explained by the 2010 Advisory Committee, "the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute." Fed. R. Civ. P. 56(g) advisory committee's note to 2010 amendment. Finally, even if "the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event." *Id*.

## B.  Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.

It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under *Daubert*[2] and its progeny, including *Daubert II*,[3] a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quotation marks omitted). "[T]he trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 564 (quotation marks omitted). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995).

discipline." *Id.* at 565 (quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564. The judge must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona*, 750 F.3d at 1043 (quoting *Alaska Rent-A-Car*, 738 F.3d at 969). In short, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70 (alteration in original) (quoting *Alaska Rent-A-Car*, 738 F.3d at 969-70).

Further, the court must assess an expert's reasoning or methodology, using, when appropriate, criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *See Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463-64 (9th Cir. 2014) (en banc). But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted).

The test "is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (quotation marks omitted). "The objective of [*Daubert's* gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 149. When an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565. Challenges that go

to the weight of the evidence are within the province of a fact finder, not a trial court judge. *City of Pomona*, 750 F.3d at 1044. "A district court should not make credibility determinations that are reserved for the jury." *Id*.

## BACKGROUND

The factual background of this case has been thoroughly described in earlier opinions, including the Court's decision dated January 18, 2022. ECF 294. As relevant here, UPM purchased or otherwise obtained Digicel-Haiti SIM cards[4] from third parties in Haiti and then sent the cards to UPM in Oregon. UPM placed multiple SIM cards in a server, activated the SIM cards, and used them to initiate and authenticate two types of calls from the United States to Haiti. One type of call began in the United States and was sent over the internet to a radio transmitter located in Haiti, resulting in the call appearing to originate on Digicel-Haiti's network in Haiti as a local call. The parties refer to this as "in-country," or "traditional," bypass.

Another type of call also began in the United States on a network operated by a United States telecommunications carrier that was a roaming partner with Digicel-Haiti (*i.e.*, with whom Digicel-Haiti had a roaming partner contract). This call was sent by the United States roaming partner to Digicel-Haiti's international switch, located in either New York or Florida, as part of a discounted calling program that Digicel-Haiti marketed and sold under the name "Roam Like You Are Home" (RLYH). Digicel-Haiti asserts that it intended for its SIM cards in this program to be used only by its subscribers who were human beings and not have multiple SIM cards

---

[4] "SIM" is an acronym for "Subscriber Identity Module." Each SIM card contains a unique identification number and other information used to "authenticate" the card on a telecommunication carrier's network, enabling the card to be used to make calls. Typically, an individual cell phone user would purchase a SIM card to be used for making calls from a specific cell phone, or handset. The SIM card would often include a certain monetary value, or "prepaid" amount, but could be recharged or "topped off" with new payments. If a carrier, such as Digicel-Haiti, deactivates (or de-authenticates) a SIM card, that card can no longer be used to make calls.

PAGE 7 – OPINION AND ORDER

placed in a computer server. Digicel-Haiti refers to this as "RLYH bypass." Thus, in one of these two ways, UPM connected third-party calls originating in the United States and ending (or terminating[5]) with a Digicel-Haiti customer located in Haiti. Digicel-Haiti charged, or debited, the SIM card either the local rate or a RLYH discounted rate for these calls, rather than Digicel-Haiti's higher rate for inbound international calls.

If, however, Digicel-Haiti determined that a particular SIM card was being used in one of these two ways (either in-country bypass or RLYH bypass), then Digicel-Haiti would deactivate, or de-authenticate, that SIM card, thereby blocking UPM from further using it. According to Digicel-Haiti, UPM used "human behavior software" (HBS) to actively conceal from Digicel-Haiti that a SIM card was being used for some type of bypass, rather than by an individual human user for a specific call. The Court ruled that this use of HBS would constitute fraud by active concealment in violation of Oregon common law, by deceiving Digicel-Haiti into allowing the SIM cards still to be used. This would assist UPM in avoiding, or bypassing, higher charges for international calls coming from the United States to Digicel-Haiti's customers in Haiti. UPM denies using HBS.

## DISCUSSION

### A.  Digicel-Haiti's Motion for Summary Judgment Against UPM's Counterclaims

#### 1.  Whether UPM's Counterclaims Are Barred by the Statute of Limitations

Under the Communications Act, "all complaints against carriers for the recovery of damages . . . shall be filed . . . within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415. UPM filed its first iteration of counterclaims against Digicel-Haiti on

---

[5] In this context, "termination" means the location where a call is shown to be received for purposes of a cellular company's tracking and billing records.

March 1, 2016, which included UPM's claims under the Communications Act as well as its common law state claims. ECF 73.

As Digicel-Haiti correctly observes, UPM's claim under the Communications Act (as well as UPM's common law state claims) are based on Digicel-Haiti's actions deactivating the SIM cards that UPM's agents purchased or otherwise obtained for UPM in Haiti. UPM alleges that "Digicel-Haiti's actions in blocking the use by UPM of SIM cards . . . constitutes 'unreasonable discrimination' against UPM" and an "unjust or unreasonable charge, practice, classification or regulation," in violation of the Communications Act. *See* ECF 244, ¶¶ 331, 335, 339, 343, 349. Digicel-Haiti correctly states that the undisputed record evidence establishes that UPM knew that Digicel-Haiti was deactivating, or blocking, UPM's SIM cards beginning in 2011.

UPM does not dispute any of this. Indeed, in its response, UPM states that Digicel-Haiti argues that UPM's claim under the Communications Act is "barred by the Statute of Limitations. To the extent that UPM's claims as pled extend to Digicel-Haiti's actions during the 2011-2012 period, UPM agrees." ECF 279, at 7 (int. p. 3). UPM adds, however, that it also purchased or otherwise obtained Digicel-Haiti SIM cards from April through December 2014, which Digicel-Haiti also blocked. UPM argues that the two-year statute of limitations does not bar Digicel-Haiti's potential liability for violations committed after March 1, 2014, including during April to December 2014. The Court agrees with UPM.

In *Communications Vending Corp. of Arizona v. F.C.C.*, 365 F.3d 1064, 1074 (D.C. Cir. 2004), the U.S. Court of Appeals for the District of Columbia Circuit explained that under § 415 of the Communications Act, "a cause of action accrues either when a readily discoverable injury occurs or, if an injury is not readily discoverable, when the plaintiff should have

discovered it." *Id.* at 1074 (citing *MCI Telecomms. Corp. v. F.C.C.*, 59 F.3d 1407, 1417 (D.C. Cir. 1995)). Thus, the relevant question is whether a distinct injury occurred during the two years immediately preceding March 1, 2016, or whether all damages ultimately trace to the first liability-creating act in 2011.

In *Davis v. Bostick*, 282 Or. 667, 672 (1978), the Oregon Supreme Court discussed decisions applying the doctrine of "continuing tort" and concluded that the plaintiff had not alleged a continuing tort because she could have asserted a separate cause of action after each of defendant's acts. "[A]t the heart of the continuing tort idea is the concept that recovery *is for the cumulative effect of wrongful behavior*, not for discrete elements of that conduct." *Id.* (emphasis added). The doctrine of "continuing tort" provides useful guidance.

UPM contends that it paid about $4 per SIM card plus other amounts in recharge fees (or top-ups) and RLYH fees. Each time that UPM paid for a SIM card (or related charges) and Digicel-Haiti later deactivated that card, a new injury occurred for which UPM may seek damages, at least related to that deactivated card. UPM contends that these fees total about $156,000. ECF 244 ¶¶ 352-356.[6]

The real rub comes in UPM's claim for *consequential* damages of about $50 million. ECF 244 ¶¶ 332, 336, 340, 344, 350. There are several potential problems with UPM's theory of consequential damages. Perhaps the most serious is whether such damages are speculative and thus not recoverable. *See Parker v. Harris Pine Mills*, 206 Or. 187, 197 (1955) ("In every case actual damages sustained must be established by evidence upon which their existence and amount may be determined with reasonable certainty. Speculative damages are never allowed.").

---

[6] It is unclear whether the $156,000 amount includes SIM cards deactivated by Digicel-Haiti in 2011-2012 or only those deactivated by Digicel-Haiti between April and December 2014. For purposes of the pending motion, that is immaterial.

The resolution of this issue, however, will have to wait for another day, perhaps at the final pretrial conference, perhaps at the November jury trial, or even perhaps post-trial. For now, the Court simply concludes that UPM's claims between April and December 2014 are not time-barred.[7]

### 2. UPM's Counterclaim Under the Communications Act

#### a. Whether the Communications Act Applies to Digicel-Haiti

Digicel-Haiti argues that the Communications Act does not apply because Digicel-Haiti does not operate as an "international common carrier" in the United States. UPM responds by arguing, among other things, that because Digicel-Haiti has entered into roaming agreements with United States carriers to handle calls between the United States and Haiti, Digicel-Haiti is an international common carrier under the Communications Act, at least for those services. Digicel-Haiti offered its discounted RLYH program to persons in Haiti who bought Digicel-Haiti's SIM cards and then subscribed to (and paid for) Digicel-Haiti's RLYH program. ECF 200 ¶ 128 (Third Am. Compl.). Digicel-Haiti replies that it intended the RLYH plan to be used by individual customers while they are roaming outside of their home network in Haiti. *Id*. ¶ 130.

During the hearing on July 26, 2022, the Court requested additional briefing on the question of whether the Communications Act applies to Digicel-Haiti's challenged conduct. ECF 383. UPM's legal brief explaining why the Communications Act applies is due August 16, 2022, Digicel-Haiti's response is due August 30, 2022, and UPM's reply brief is due

---

[7] The same conclusion applies to UPM's Oregon tort claims, which are similarly subject to a two-year statute of limitations. *See* Or. Rev. Stat. § 12.110(1) ("An action . . . for any injury to the . . . rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years . . . .").

September 9, 2022. After receiving this briefing, the Court may decide as a matter of law whether the Communications Act applies to Digicel-Haiti's RLYH activities in the United States or may defer that decision until trial.

### b.   Whether the Foreign Sovereign Compulsion Doctrine Applies

Digicel-Haiti argues that UPM's claim under the Communications Act must be dismissed because its action in blocking UPM's SIM cards was compelled by Haitian law. For now, the Court puts aside the fact that the "foreign sovereign compulsion" doctrine has never been applied as a defense to violations of the Communications Act and appears only to apply in the context of antitrust cases.[8] Because Digicel-Haiti has moved for summary judgment on this issue, it must show the lack of a genuine issue of material fact. The record evidence, however, appears to show, at most, that Digicel-Haiti did not violate Haitian law by blocking the SIM cards that UPM was using; it does not show that Digicel-Haiti had to do so. It also appears that Digicel-Haiti's evidence of Circular No. 009 may not even apply to companies like Digicel-Haiti but only to internet service providers. *See* ECF 60, at 6-8. The Court may revisit this issue at the pretrial conference, depending on the evidence the parties submit, but Digicel-Haiti has not yet met its burden on this issue at summary judgment.

### c.   Whether International Law or Comity Requires Abstention

Digicel-Haiti argues that the Court should "abstain" from exercising its jurisdiction over UPM's claim under the Communications Act. ECF 264, at 16-17 (int. pp. 12-13). Digicel-Haiti,

---

[8] Indeed, the FCC has expressly declined to apply the foreign sovereign compulsion doctrine to limit entities' obligations under the Communications Act. *See Petition of AT&T Inc. for Settlements Stop Payment Order on the U.S.-Tonga Route, Memorandum Opinion and Order*, 29 FCC Rcd 4186 (2014) ("*Tonga* Order") at ¶ 13 (rejecting foreign carrier's attempt to rely on the foreign sovereign compulsion defense because the matter before the FCC did not involve antitrust liability).

however, provides no legal authority for that conclusion, either in its opening memorandum or its reply. Without legal authority called to the Court's attention, the Court declines Digicel-Haiti's suggestion that the Court abstain from hearing UPM's counterclaims.

### 3. UPM's Counterclaim of Breach of Implied-in-Fact Contract

As its second counterclaim, UPM alleges breach of implied-in-fact contract. According to UPM, its agents purchased or otherwise obtained Digicel-Haiti SIM cards at retail prices from authorized Digicel-Haiti dealers in Haiti and there was no writing on the SIM cards themselves or contained in the packaging surrounding the SIM cards that imposed any restrictions or limits on how the SIM card or its minutes may be used, nor were such restrictions imposed by any other materials that Digicel-Haiti or its vendors provided to UPM in connection with its acquisition of SIM cards, recharges, or payments for RLYH plans. ECF 244 ¶¶ 352, 354 (Am. Ans., Aff. Defs., and Counterclaims). UPM further alleges that it or its agents purchased or otherwise obtained a total of about 10,705 Digicel-Haiti SIM cards, at a cost of about $4.00 per card, for a total purchase payment of about $42,836. UPM also paid about $111,209 for recharges and RLYH plans to be added to UPM's other costs relating to the SIM cards. *Id*. ¶ 355. Based on these allegations, UPM contends:

> Digicel-Haiti's conduct regarding the sale and use of its SIM cards, both in its transactions with UPM's agents and in its general SIM card transactions with its other customers, manifested its intent that Digicel-Haiti would provide access to its Haiti network for the specified number of minutes in exchange for the purchase of its SIM cards, recharges/top-ups, and RLYH plans.

*Id*. ¶ 356.

When parties manifest their agreement by conduct, rather than by words, the contract is said to be "implied-in-fact." A contract implied-in-fact is still a contract. An express contract and a contract implied-in-fact are both contracts formed by a mutual manifestation of assent; the only

significant difference is the form or proof of the mutual assent. *See In re Premera Blue Cross Customer Data Sec. Breach Litig*., 198 F. Supp. 3d 1183, 1198-99 (D. Or. 2016). Thus, an implied-in-fact contract has the same legal requirements and the same legal effect as an express contract. *See Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp*., 448 F. Supp. 3d 1127, 1135-36 (D. Or. 2020) (quoting *Staley v. Taylor*, 165 Or. App. 256, 262 (2000)).

As the Washington Supreme Court explained:

> On at least four occasions, . . . this court has quoted with approval a definition of a contract implied in fact, ... as follows: "A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, and not from their words either spoken or written. *Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof*." (Italics ours.)

*Id.* (quoting *Milone & Tucci, Inc. v. Bona Fide Builders, Inc*., 49 Wash. 2d 363, 367-68 (1956) (citations omitted) (emphasis in original)). Oregon law is not materially different. *See Staley*, 165 Or. App. at 262.

Digicel-Haiti contends that it expected that the users of its SIM cards would be individual human subscribers using the purchased SIM cards in a specific mobile phone, not a business purchasing multiple SIM cards and placing them in a server to bypass international calling charges. UPM, however, appears to be correct that Digicel-Haiti did not place any restrictive conditions on its SIM cards or related packaging materials. UPM add that under the objective theory of contract, which Oregon follows, the parties' conduct is sufficient to show an implied-in-fact agreement, or a "meeting of the minds." Digicel-Haiti argues that it is not.

The Court concludes that whether an implied-in-fact contract was formed and, if so, what were its material terms present questions of fact that require resolution at trial. Among other

things, the trier of fact may need to determine how UPM acquired the SIM cards at issue and

what, if anything, was said by a relevant party (or its agents) to the other party (or its agents).

   In addition, the Court notes that consequential damages resulting from a breach of

contract are recoverable only if they were reasonably foreseeable *at the time the contract was

formed*. To hold a party responsible for a particular loss, the loss must be one that ordinarily

follows the breach in the usual course of events or that reasonable people in the position of the

parties would have foreseen as a probable result of a breach. *See* Restatement (Second) of

Contracts § 351(1) ("Damages are not recoverable for loss that the party in breach did not have

reason to foresee as a probable result of the breach when the contract was made."); *see also* 5

Timothy Murray, Arthur L. Corbin, Joseph M. Perillo, and E. Murray, Jr., *Corbin on

Contracts* 79, § 1010 (1964); *see also Cont'l Plants Corp. v. Measured Mktg. Serv., Inc.*, 274 Or.

621, 625-26 (1976) (applying the English rule from *Hadley v. Baxendale*, 9 Exch. 341 (1854)).

**B.  Digicel-Haiti's Motion to Exclude UPM's Expert Joseph Gillan**

   In support of its first counterclaim, which alleges violation of the Communications Act,

UPM offers the expert testimony of Joseph Gillan. Mr. Gillan has a Master's Degree in

Economics, which he received as part of a program that focused on the economics of public

utilities and regulated industries. ECF 273-1, at 4 (Decl. of Joseph Gillan). Mr. Gillan

summarizes what he has been asked to do by UPM as follows:

> I have been asked by attorneys representing UPM Technologies to
> address: (1) the economic and policy rationale underlying various
> FCC decisions that recognize the importance of resale as a
> regulatory tool to achieve the efficient (*i.e.*, cost-based) pricing of
> telecommunications services; (2) whether UPM's resale of
> Digicel-Haiti's wireless services as a means to terminate traffic in
> Haiti is consistent with (and furthers) the economic reasoning used
> by the FCC in determining that resale restrictions are generally
> prohibited under Sections 201 and 202 of the federal
> Communications Act; and, conversely, (3) whether Digicel-Haiti's
> discontinuing the services UPM was buying from Digicel-Haiti

> and reselling to other carriers constituted the same kind of conduct,
> from an economic and policy perspective, that the FCC's ban on
> resale restrictions was intended to prevent.

*Id*. at 6, ¶ 9.

The Court is satisfied that Mr. Gillan has the technical or specialized knowledge required of an expert in this field but is not persuaded that Mr. Gillan's knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue," which also is required under Rule 702(a) of the Federal Rules of Evidence. Instead, the Court is concerned that the proffered testimony invades the province of the Court in instructing the jury about the law and may even confuse jurors about the issues that they must decide.

In telecommunications cases, courts have placed boundaries on expert testimony purporting to give opinions about the interpretation of FCC rulings and orders and the intent or objectives of the FCC, concluding that such opinions impermissibly usurp the role of the judge. *See, e.g.*, *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 181-82 (N.D.N.Y. 2002) (excluding expert opinions when the expert's "review of FCC rulings and regulations impermissibly usurps the role of the trial judge in determining the relevant law" and further holding that "any testimony as to the intent of the Telecommunications Act or FCC regulations or how the jury should ultimately decide this case, however, is inappropriate"); *CFM Commc'ns, LLC v. Mitts Telecasting Co*., 424 F. Supp. 2d 1229, 1236 (E.D. Cal. 2005) (excluding expert testimony on (1) what factors the FCC considers in deciding control of a broadcast station and how such factors apply to the case; (2) whether and how any FCC action indicates its likely decision on any legal issue; (3) how the FCC will decide any legal issue; and (4) any other application of law to the facts of the case); *GlobalRock Networks, Inc., v. MCI Comm'ns*, 943 F. Supp. 2d 320, 343 (N.D.N.Y. 2013) (excluding expert opinions about violations of FCC rules); *Qwest Corp. v. City of Santa Fe*, 2013 WL 12239492, at *5 (D.N.M. Feb. 8, 2013) (refusing to

allow an expert to testify about "the legal standards applicable to [47 U.S.C.] § 253"). Thus, the Court excludes Mr. Gillan's testimony under Rule 702(a) of the Federal Rules of Evidence.

In addition, even if there were some aspects of Mr. Gillan's proffered expert testimony that might have some appropriate probative value, the Court still finds that any such probative value is substantially outweighed by the danger of confusing the jury on the issues that need to be decided. If Digicel-Haiti violated the Communications Act as UPM alleges, that is enough. The jury need not determine "the economic and policy rationale underlying various FCC decisions," whether how UPM used Digicel-Haiti's SIM cards is "consistent with (and furthers) the economic reasoning used by the FCC," or whether the deactivation of SIM cards by Digicel-Haiti "constituted the same kind of conduct, from an economic and policy perspective, that the FCC's ban on resale restrictions was intended to prevent." These questions are not before the jury, and UPM offering expert testimony on these issues will likely confuse the jury about what it needs to decide. Accordingly, the Court excludes Mr. Gillan's testimony under Rule 403 of the Federal Rules of Evidence as well.[9]

## C.  UPM's Motion for Partial Summary Judgment on Its First Counterclaim

UPM seeks partial summary judgment on the following aspects of its first counterclaim, which alleges violations of the Communications Act:

> (a)    Digicel-Haiti's roaming arrangements make it a telecommunications carrier subject to the Communications Act; and
>
> (b)    Digicel-Haiti's blocking of UPM's RLYH SIM cards prevented UPM from reselling RLYH service.

---

[9] UPM requests leave to ask the Court to reconsider this ruling at a later time, depending on what, if anything, the Court allows Digicel-Haiti's expert witnesses to present at trial. Such leave is granted.

ECF 265, at 38 (int. p. 34). UPM may be correct on the first point. Nevertheless, whether the

Communications Act applies to Digicel-Haiti or any of its services is a close call, the Court's

understanding on this issue is evolving, and the Court's evaluation of this question likely will

benefit from the additional briefing and argument that has been scheduled, and maybe even from

observing the evidence presented at trial. Accordingly, even if this is a fact issue that is not

genuinely in dispute, the Court might refrain from ordering that the fact be treated as established

until the time of trial.

      As for UPM's second point, this point as well may be undisputed, but it also may be

legally irrelevant if UPM cannot show consequential damages without speculation. The Court

certainly will allow UPM to seek as damages its out-of-pocket costs paid, within the limitations

period, to acquire, or recharge SIM cards and to subscribe to Digicel-Haiti's RLYH program.

The Court, however, might not allow UPM to seek consequential, or lost profit, damages

resulting from Digicel-Haiti's blocking of UPM's SIM cards in 2014, depending on the quality

of UPM's evidence. In any event, the Court will not decide that issue now. *See* Fed. R. Civ.

P. 56(g) advisory committee's note to 2010 amendment ("it is better to leave open for trial facts

and issues that may be better illuminated by the trial of related facts that must be tried in any

event").

### D.  Other Rulings Sought by UPM

      In UPM's Pre-Hearing Memorandum (ECF 381), UPM states that it seeks additional

pretrial rulings. Among other things, UPM seeks a ruling that it was a customer and purchaser of

Digicel-Haiti's RLYH service by paying Digicel-Haiti for that service. According to UPM, it

obtained SIM cards for Digicel-Haiti's network and added funds to those specific SIM cards

through third-party "top-up" services. UPM adds that Digicel-Haiti accepted those funds by

crediting them to the accounts of the SIM cards that UPM had topped up, and UPM directed

Digicel-Haiti to deduct the RLYH service fee (approximately $25 per card), which Digicel-Haiti did. According to UPM, this series of actions establishes an "implied-in-fact" contract between UPM and Digicel-Haiti that obligated Digicel-Haiti to provide RLYH service to UPM. ECF 381, at 3. Earlier in this Opinion and Order, the Court explained that UPM's claim of breach of implied-in-fact contract presents a question of fact for the jury and UPM likely will need to present evidence showing how it obtained the SIM cards at issue, how UPM paid third-party vendors or Digicel-Haiti for the services at issue, and what, if anything, was communicated between the parties (or their agents) during these transactions.

Digicel-Haiti alleges that SIM cards are sometimes purchased using false or altered identification documents, bought in bulk in unauthorized "off-book" transactions, or bought under the pretext that they will be used by an individual for that individual's personal calls in a unique cellular device. ECF 200 ¶¶ 60, 62 (Third. Am. Compl.) UPM denies these allegations. ECF 244 ¶¶ 60, 62 (Am. Ans., Aff. Defs., and Counterclaims). UPM, however, has not shown with record evidence that Digicel-Haiti's allegations are incorrect. Thus, because the circumstances showing how UPM obtained the SIM cards at issue appear to be relevant to UPM's counterclaims, UPM will need to present admissible evidence on that point at trial. UPM also asks the Court to rule on UPM's motions *in limine* seeking to exclude testimony from Digicel-Haiti's expert witnesses Mr. McEwen and Mr. Castel. ECF 381, at 7-8. UPM argues that this testimony does not relate to UPM's counterclaims. *Id*. The Court will address this issue at the pretrial conference to be held before the November trial begins.

**E. Additional Case Management Scheduling**

As discussed during the hearing held on July 26, 2022, in addition to further briefing on the question of whether the Communications Act applies to Digicel-Haiti's RLYH activities in the United States, the Court requested further briefing on whether, in light of the Court's ruling

on January 18, 2022 (ECF 294), Digicel-Haiti can present evidence sufficient to show without speculation that UPM's alleged used of HBS caused damage to Digicel-Haiti and, if so, in what amount. As noted during that hearing, the Court set the following schedule: (1) Digicel-Haiti's amended "Phase I" lay and expert witness statements, exhibits, exhibit lists, deposition excerpts in lieu of live testimony, and legal brief regarding causation and damages are due by August 16, 2022;[10] (2) UPM's motion for judgment as a matter of law on Phase I (causation and damages) based on Digicel-Haiti's trial documents filed on August 16, 2022 is due August 30, 2022; (3) Digicel-Haiti's response to UPM's motion for judgment as a matter of law is due September 9, 2022 ; and (4) UPM's reply brief in support of motion for judgment as a matter of law (causation and damages) is due September 12, 2022. The Court will hear oral argument on this issue, as well as on the applicability of the Communications Act, on Wednesday, September 14, 2022 at 1:00 p.m. The Court also sets a Pretrial Conference for October 21, 2022 at 9:00 a.m. *See also* ECF 383. As noted, trial will begin on November 14, 2022.

## CONCLUSION

In this Opinion and Order, the Court GRANTS IN PART AND DENIES IN PART Digicel-Haiti's motion for summary judgment against UPM's counterclaims (ECF 264), Digicel-Haiti's motion to exclude UPM's expert Joseph Gillan (ECF 272), and UPM's motion for partial summary judgment on its own counterclaims (ECF 255). The Court also addresses in this Opinion and Order several issues raised by UPM in its Pre-Hearing Memorandum (ECF 381). Finally, the Court sets a further case management schedule as described in this Opinion and Order and on the record during the hearing held on July 26, 2022. *See* ECF 383.

---

[10] Here, "Phase I" refers to Digicel-Haiti's remaining affirmative claim for damages against UPM. It does not include Digicel-Haiti's defenses or responses to UPM's counterclaims. Those materials will be due later, under the Court's Civil Trial Management Order. ECF 191.

**IT IS SO ORDERED**.

DATED this 29th day of July, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge