**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Bragar DuBay
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.**, a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>Plaintiff & Counterclaim-Defendant,<br><br>v.<br><br>**UPM TECHNOLOGY, INC.**, *et al.,*<br><br>Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – COMMUNICATIONS ACT**<br><br>**Hearing Date: September 14, 2022**<br>**Hearing Time: 1:00 p.m.** |

Cover Page –COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF CONTENTS

LOCAL RULE 7-1 CERTIFICATION ............................................................................................ 1

MOTION ........................................................................................................................................ 1

I.      INTRODUCTION AND SUMMARY ................................................................................. 1

II.     THE FACTS ABOUT RLYH ............................................................................................. 5

III.    APPLYING THE SUMMARY JUDGMENT STANDARD ............................................... 8

IV.     DIGICEL-HAITI IS A "TELECOMMUNICATIONS CARRIER" UNDER
        THE TELECOMMUNICATIONS ACT AND THE COMMON LAW. .......................... 10

        A.      A Very Brief History of Common Carriage In Telecommunications ................... 10

        B.      Digicel-Haiti Is A Common Carrier with Respect to RLYH Service. .................. 14

                1.      Section 152(b) Does Not Apply To Digicel-Haiti. .................................. 15

                2.      The Fact that Digicel-Haiti Provides RLYH Service Using Other
                        Carriers' Facilities Does Not Mean That It is Not a Carrier; It Means
                        That It is a Reseller (Which is a Carrier). ................................................ 16

                3.      Digicel-Haiti Offers RLYH Service to the Fraction of the Public that
                        Can Use The Service, Which Makes RLYH a Common Carrier
                        Offering. ................................................................................................... 20

                4.      Digicel-Haiti Is Not A "Private Carrier." ................................................ 21

V.      DIGICEL-HAITI VIOLATED THE COMMUNICATIONS ACT. ................................. 22

        A.      Digicel-Haiti Is Subject to the Ban On Resale Restrictions. ............................... 23

        B.      Digicel-Haiti Violated the Act and the FCC's Rules by Cutting Off UPM's
                RLYH SIM Cards. ............................................................................................... 28

VI.     CONCLUSION ................................................................................................................ 34

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

| Item | Pages |
|---|---|

*Cases*

| | |
|---|---|
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) | 8 |
| *AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978) | 3,16,17 |
| *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S. Ct. 721 (1999) | 25 |
| *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278 (9th Cir. 1982) | 8 |
| *Cellco Partnership v. FCC,* 700 F.3d 534 (D.C. Cir. 2012) | 10,12,13 |
| *Cellnet Communication, Inc. v. FCC*, 965 F. 2d 1106 (D.C. Cir. 1992) | 26 |
| *Cellnet Communs. v. FCC,* 149 F.3d 429 (6th Cir. 1998) | 26,32 |
| *Competitive Telecomm. Ass'n v. FCC,* 87 F.3d 522 (D.C. Cir. 1996) | 30 |
| *Comput. & Commc'ns Indus. Ass'n v. FCC,* 693 F.2d 198 (D.C. Cir. 1982) | 15 |
| *Crown Castle NG East, Inc. v. Town of Greenburgh,* No. 12-CV-6157 (CS), 2013 U.S. Dist. LEXIS 93699 (S.D.N.Y. July 3, 2013) | 21 |
| *FTC v. AT&T Mobility, LLC,* 883 F.3d 848 (9th Cir. 2018) | 15 |
| *Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 127 S. Ct. 1513 (2007) | *passim* |
| *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099 (D. Or. Sep. 12, 2020) | 8 |
| *Hush-A-Phone Corp. v. United States,* 238 F.2d 266 (D.C. Cir. 1956) | 32 |
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 106 S. Ct. 1348 (1986) | 8 |
| *MCI Telecomm. Corp. v. FCC,* 675 F.2d 408 (D.C. Cir. 1982) | 30 |
| *Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.,* 423 F.3d 1056 (9th Cir. 2005), *aff'd sub nom. Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 127 S. Ct. 1513 (2007) | 4,28 |
| *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630 (D.C. Cir. 1976) | 3,12,13,20 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

| Item | Pages |
|---|---|
| *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 533 F.2d 601 (D.C. Cir. 1976) | 3,12,20 |
| *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Svcs.,* 545 U.S. 967, 125 S. Ct. 2688 (2005) | 3,13,16,17,27,29 |
| *Nat'l Communs. Ass'n v. AT&T Corp.,* 238 F.3d 124 (2d Cir. 2001) | 4,24 |
| *Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003) | 3,22 |
| *Sikes v. AT&T,* 841 F. Supp. 1572 (S.D. Ga. 1993) | 7 |
| *Southwestern Bell Tel. Co. v. FCC,* 19 F.3d 1475 (D.C. Cir. 1994) | 13,21 |
| *T-Mobile West Corp. v. Crow, No. CV08-1337-PHX-NVW,* 2009 U.S. Dist. LEXIS 118033 (D. Ariz. Dec. 17, 2009) | 3,20 |
| *United States Telecomm. Ass'n v. FCC*, 295 F.3d 1326 (D.C. Cir. 2002) | 14 |
| *United States Telecomm. Ass'n v. FCC,* 825 F.3d 674 (D.C. Cir. 2016) | 13 |
| *Verizon Cal. Inc. v. FCC,* 555 F.3d 270 (D.C. Cir. 2008) | 13,14,20 |
| *Virgin Islands Tel. Co. v. FCC,* 198 F.3d 921 (D.C. Cir. 1999) | 4,13,14,21,22 |

*FCC Rulings*

| | |
|---|---|
| *1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order and Order on Reconsideration, 14 FCC Rcd. 7963 (1998) | 31 |
| *Access Charge Reform; Reform of Access Charges Imposed By Competitive Local Exchange Carriers*, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd. 9923 (2001) | 33 |
| *Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398 (2007) | 18,25,27 |
| *An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems,* Report and Order, 86 F.C.C.2d 469 (1981) | 24 |
| *AT&T Submarine Systems, Inc.,* 13 FCC Rcd. 21585 (1998) | 4 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

| Item | Pages |
|------|-------|
| *Bright House Networks, LLC, et al., Complainants, v. Verizon California, Inc., et al., Defendants,* Memorandum Opinion and Order, 23 FCC Rcd. 10704 (2008) *aff'd, Verizon Cal. Inc. v. FCC*, 555 F.3d 270 (D.C. Cir. 2008) | 13,20 |
| *China Unicom (Americas) Operations Limited,* Order on Revocation, 2022 FCC LEXIS 383, GN Docket No. 20-110, Rel. No. FCC 22-9 (rel. Feb. 2, 2022) | 3,20 |
| *Compass Global, Inc.; Apparent Liability for Forfeiture,* Notice of Apparent Liability, 23 FCC Rcd. 6125 (rel. Apr. 9, 2008) | 3,20,21 |
| *Connect America Fund; A National Broadband Plan for Our Future, et al.*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 (2011) | 33 |
| *Developing a Unified Intercarrier Compensation Regime,* Further Notice of Proposed Rulemaking, 20 FCC Rcd. 4685 (2005) | 33 |
| *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service, et al.,* Order, 18 FCC Rcd. 6077 (2003) | 32 |
| *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* First Report and Order, 11 FCC Rcd. 15499 (1996) | 25 |
| *Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services*, 11 FCC Rcd. 18455 (1996) | 26 |
| *Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services, et al.,* Memorandum Opinion and Order on Reconsideration, 14 FCC Rcd. 16340 (1999) | 26 |
| *International Settlement Rates*, Report and Order, 12 FCC Rcd. 19806 (1997) | 27,29,30 |
| *International Settlements Policy Reform International Settlement Rates,* First Report and Order, 19 FCC Rcd. 5709 (2004) | 27,29,30 |
| *Locus Telecomm., Inc.,* Memorandum Opinion and Order, 31 FCC Rcd. 12110 (2016) | 19 |
| *Mackay Radio and Telegraph Co.,* 6 F.C.C. 562 (1938) | 16,18 |
| *NobelTel, LLC, Apparent Liability for Forfeiture,* Notice of Apparent Liability for Forfeiture, 27 FCC Rcd. 11760 (2012) | 19 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

| Item | Pages |
|---|---|
| *NORLIGHT Request for Declaratory Ruling,* Declaratory Ruling, 2 FCC Rcd. 132 (1987), on reconsideration, *NORLIGHT Request for Declaratory Ruling,* Memorandum Opinion and Order, 2 FCC Rcd. 5167 (1987) | 13,21 |
| *Petitions for Rule Making Concerning Proposed Changes to the Commission's Cellular Resale Policies,* Notice of Proposed Rulemaking and Order, 6 FCC Rcd. 1719 (1991) | 26 |
| *Protecting and Promoting the Open Internet,* Report and Order On Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 (2015), *aff'd, United States Telecomm. Ass'n v. FCC,* 825 F.3d 674 (D.C. Cir. 2016) | *passim* |
| *Rates for Interstate Inmate Calling Services,* Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 (2013) | 30 |
| *Regulation of International Accounting Rates,* First Report and Order, 7 FCC Rcd. 559 (1991) | 24,27 |
| *Regulation of Prepaid Calling Card Services,* Declaratory Ruling and Report and Order, 21 FCC Rcd. 7290 (2006), *vacated in unrelated part on other grounds*, *Qwest Servs. Corp. v. FCC,* 509 F.3d 531 (D.C. Cir. 2007) | 13 |
| *Regulatory Policies Concerning Resale and Shared Use of Common Carrier International Communications Services, Notice of Proposed Rulemaking*, 77 F.C.C.2d 831 (1980) | 24 |
| *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services*, Report and Order, 83 F.C.C.2d 167 (1980), *aff'd, Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984) | 24 |
| *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, Report and Order, 60 F.C.C.2d 261 (1976) *amended by*, 62 F.C.C.2d 588 (1977), *aff'd, AT&T v. FCC*, 572 F.2d 17 (2d Cir. 1978) | *passim* |
| *Restoring Internet Freedom,* Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 (2017), *aff'd in part, vacated and remanded in part on other grounds*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) | 13,14,19 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**TABLE OF AUTHORITIES**

| Item | Pages |
|---|---|
| *US West Tariff F.C.C. Nos. 3 and 5*, Order, 10 FCC Rcd. 13708 (Common Carrier Bur. Sept. 28, 1995) | 24,28 |
| *Statutes* | |
| 47 U.S.C. §§ 151 | *passim* |
| 47 U.S.C. § 152(b) | 2,15 |
| 47 U.S.C. § 153(11) | 12,15 |
| 47 U.S.C. § 153(21) | 15,16 |
| 47 U.S.C. § 153(50) | 2,13,15 |
| 47 U.S.C. § 153(51) | 2,13,15 |
| 47 U.S.C. § 153(53) | 2,13,14,16 |
| 47 U.S.C. § 201(b) | *passim* |
| 47 U.S.C. § 202(a) | *passim* |
| 47 U.S.C. § 206 | 7,28,35 |
| 47 U.S.C. § 207 | *passim* |
| 47 U.S.C. § 251(b)(1) | 25 |
| 47 U.S.C. § 251(c)(4) | 25 |
| Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887) | 11,12 |
| Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, *currently codified at scattered sections of* 47 U.S.C. | 13,25 |
| *Rules and Regulations* | |
| 47 C.F.R. § 20.12 | 25,26 |
| Fed R. Civ. P. 56 | 1,8,23 |
| Local Rule 7-1(a) | 1 |
| *Other Materials* | |
| https://en.wikipedia.org/wiki/Elisha_Gray (last visited Aug. 11, 2022) | 12 |
| https://en.wikipedia.org/wiki/History_of_the_telephone (last visited Aug. 11, 2022) | 11 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

| Item | Pages |
|------|-------|
| https://en.wikipedia.org/wiki/Long-distance_calling (last visited Aug. 11, 2022) | 12 |
| James Speta, *A Common Carrier Approach to Internet Interconnection,* 54 Fed. Comm. L.J. 225 (2002) | 11 |
| Susan Crawford, *Transporting Communications,* 89 B.U.L. Rev. 871 (2009) | 11 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## <u>LOCAL RULE 7-1 CERTIFICATION</u>

Pursuant to Local Rule 7-1(a), Counterclaim Plaintiff UPM Technology, Inc. ("UPM") states that its counsel conferred in good faith with counsel for Counterclaim Defendant, Digicel-Haiti, to resolve the disputed issues and were unable to do so.

## <u>MOTION</u>

The Court has asked UPM to file a brief "explaining why the Communications Act applies to Digicel-Haiti's actions at issue." ECF #385. Pursuant to that directive, to the Court's Opinion and Order (ECF #384) and to Fed R. Civ. P. 56 ("Rule 56"), UPM asks the Court to rule: (1) that Digicel-Haiti is a "telecommunications carrier" and a "common carrier" within the meaning of the federal Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* (the "Act") with respect to its Roam Like You're Home ("RLYH") service; (2) that Digicel-Haiti is therefore subject to the requirements that the Act and the rulings of the Federal Communications Commission ("FCC") impose on carriers; (3) that the FCC's ban on resale restrictions applies to Digicel-Haiti's RLYH service; and (4) that Digicel-Haiti, by cutting off UPM's SIM cards, violated that ban, thereby violating 47 U.S.C. §§ 201(b) and 202(a).

## I.    INTRODUCTION AND SUMMARY

As further set forth below, there is no genuine dispute as to any of the material facts surrounding Digicel-Haiti's RLYH service. Digicel-Haiti has configured its network and systems so that any holder of a Digicel-Haiti SIM card in the United States can become a Digicel-Haiti customer by activating the card automatically on the network of Digicel-Haiti's roaming partner; topping it up via a third-party, online web service; and sign up for RLYH service by entering a few codes into the system. The system then automatically deducts the enrollment fee from the SIM card's account, and the SIM card holder can make calls using the service, which permits calls back to Digicel-Haiti subscribers in Haiti at local rates (roughly $0.09 per minute). There is no

Page 1 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

opportunity for direct communication between Digicel-Haiti and the SIM card holder; to the contrary, the process is non-negotiable, electronic and, on Digicel-Haiti's part, entirely automatic.

Offering RLYH service to SIM card holders in the United States makes Digicel-Haiti a "telecommunications carrier" under the Act. The telephone calls being offered by RLYH service (calls from the United States to Haiti) are "telecommunications." *See* 47 U.S.C. § 153(50). RLYH service is a "telecommunications service" because it is offered "for a fee…to the public." *See* 47 U.S.C. § 153(53). And because RLYH is a "telecommunications service," Digicel-Haiti, in offering it, is a "telecommunications carrier." 47 U.S.C. § 153(51). It is that simple.

Digicel-Haiti's various objections to this conclusion are meritless. First, Digicel-Haiti has claimed that under 47 U.S.C. § 152(b), the Act does not apply to it at all, essentially due to its status as a foreign carrier.[1] But that provision only exempts entities whose "sole" involvement in United States communications activities is a physical connection with an independent United States carrier. Here, Digicel-Haiti is a telecommunications carrier by virtue of its offering of RLYH service to SIM card holders in the United States. Far from being the "sole" basis for its carrier status, its physical interconnection arrangements are irrelevant.

Second, and relatedly, Digicel-Haiti has claimed that, because it does not own facilities in the United States, it cannot be a carrier subject to the Act.[2] But nothing in the definition of "telecommunications carrier" turns on ownership of facilities; an entity is a carrier if it offers telecommunications, "***regardless of the facilities used***." 47 U.S.C. § 153(53) (emphasis added). As the Supreme Court has observed, "the relevant definitions [in the Act] do not distinguish

---

[1] *See, e.g.,* [Digicel-Haiti's] Motion For Summary Judgment On Defendant UPM Technology, Inc.'s Counterclaims (ECF #264) ("Digicel-Haiti Communications Act Motion") at 8-12; [Digicel-Haiti's] Reply ISO Motion For Summary Judgment On Defendant UPM Technology, Inc.'s Counterclaims (ECF #285) ("Digicel-Haiti Communications Act Reply") at 3-4.

[2] *See, e.g.,* Digicel-Haiti Communications Act Motion at 9-11.

Page 2 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

facilities-based and non-facilities-based carriers."[3] What matters is the services Digicel-Haiti **offers.** The fact that RLYH service is physically provided by another carrier just means that Digicel-Haiti is a reseller. And resellers are carriers: "[A]n entity engaged in the resale of communications service is a common carrier."[4]

Third, Digicel-Haiti has suggested (during the hearing on July 26, 2022) that it is not a carrier because RLYH service is not available to the entire United States "public." But an entity does not have to offer its service to everyone to be a carrier; what matters is that it offer its service to whatever subset of "the public" can make use of it: a "specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently **all potential users**."[5] Sometimes (but not always), individualized negotiations can make an entity a "private carrier" rather than a "common carrier."[6] The key consideration is not the size of the pool of potential customers, but whether the carrier negotiates truly individualized deals with each customer. Here, RLYH service is useful to the

---

[3] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Svcs.,* 545 U.S. 967, 997, 125 S. Ct. 2688 (2005) ("*NCTA v. Brand X*").

[4] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* Report and Order, 60 F.C.C.2d 261 (1976) ("*Resale Order*") at ¶ 8, *amended by,* 62 F.C.C.2d 588 (1977), *aff'd, AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978); *id.* at ¶ 130 (same).

[5] *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 533 F.2d 601, 608 (D.C. Cir. 1976) ("*NARUC II*") (emphasis added). *See also In the Matter of Protecting and Promoting the Open Internet,* Report and Order On Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 (2015) ("*Open Internet Order*") at ¶ 363, nn.1011-12, *aff'd, United States Telecomm. Ass'n v. FCC,* 825 F.3d 674 (D.C. Cir. 2016) ("*United States Telecomm. Ass'n*"); *In the Matter of China Unicom (Americas) Operations Limited,* Order on Revocation, 2022 FCC LEXIS 383, GN Docket No. 20-110, Rel. No. FCC 22-9 (rel. Feb. 2, 2022) ("*China Unicom*") at ¶ 110 & n.491, quoting *NARUC I, supra,* 533 F.2d at 608-609; *T-Mobile West Corp. v. Crow,* No. CV08-1337-PHX-NVW, 2009 U.S. Dist. LEXIS 118033, at *21-22 (D. Ariz. Dec. 17, 2009), quoting *In the Matter of Compass Global, Inc.; Apparent Liability for Forfeiture,* Notice of Apparent Liability, 23 FCC Rcd. 6125, 6131-32 (rel. Apr. 9, 2008) ("*Compass Global*") at ¶ 15.

[6] *See, e.g., Orloff v. FCC*, 352 F.3d 415, 419-20 (D.C. Cir. 2003).

Page 3 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

"fraction" of the United States population that has (or potentially has) SIM cards for Digicel-Haiti's network, and Digicel-Haiti offers the service to that "fraction" without any one-on-one communication *at all*, much less any individualized negotiations. It follows that Digicel-Haiti is a common carrier and a telecommunications carrier with respect to RLYH service.[7]

Finally, resellers such as Digicel-Haiti are "fully subject to the provisions of Title II."[8] This means that Digicel-Haiti is subject to the FCC's ban on resale restrictions. The FCC "has promulgated regulations requiring common carriers" – which includes resellers – "to provide services to resellers on the same terms that such services are provided to end users."[9] Digicel-Haiti, therefore, may not restrict the resale of its RLYH service – which is exactly what it did by cutting off UPM's RLYH SIM cards.[10] It follows that, by cutting off UPM's RLYH SIM cards, Digicel-Haiti violated the FCC's rule banning resale restrictions and, therefore, the Communications Act itself.[11] Because nothing in the record contradicts the foregoing conclusions, there is no genuine issue for trial on these matters, and the Court should rule as a matter of law

---

[7] The FCC has interpreted the terms "telecommunications carrier" and "common carrier" to be equivalent. *See Virgin Islands Tel. Co. v. FCC,* 198 F.3d 921, 925 (D.C. Cir. 1999), quoting *AT&T Submarine Systems, Inc.,* 13 FCC Rcd. 21585 ¶ 6 (1998). Accordingly, UPM uses the terms interchangeably in this brief.

[8] *Resale Order, supra,* at ¶¶ 8, 130.

[9] *Nat'l Communs. Ass'n v. AT&T Corp.,* 238 F.3d 124, 125 (2d Cir. 2001).

[10] *See* Deposition of Maarten Boute as Rule 30(b)(6) witness ("Boute Dep.") at 36:24-37:14, 56:3-13, 121:14-122:2, 73-74, 120:22-121:7. Some of the record materials cited in this brief have been previously filed with the Court, but for ease of reference, UPM is submitting all of them in a new declaration filed contemporaneously herewith. *See* Declaration of Christopher Savage in Support of Counterclaim Plaintiff's Motion for Partial Summary Judgment – Carrier Status of Digicel Haiti. Citations herein refer to the underlying document, not to the declaration.

[11] If a carrier engages in a practice that the FCC has found to violate the Act, that itself constitutes a violation of the Act. *See Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.,* 423 F.3d 1056, 1061-1070 (9th Cir. 2005), *aff'd sub nom. Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 54-55, 127 S. Ct. 1513 (2007).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that Digicel-Haiti is liable to UPM on its Communications Act counterclaim, with the only issue for trial being the amount of damages to which UPM is entitled.

## II.    THE FACTS ABOUT RLYH

There is no genuine dispute as to any of the material facts surrounding RLYH service.[12] Anyone with a Digicel-Haiti SIM card in the United States can activate it by connecting it to the network of a Digicel-Haiti roaming partner (such as AT&T Wireless or T-Mobile).[13] Once it is activated, the SIM card holder may "top it up" or "recharge" it – that is, pay money to Digicel-Haiti for that specific SIM card's account – using third-party top-up websites, thereby becoming a Digicel-Haiti subscriber.[14] There can also be no genuine dispute that this is what UPM did.[15]

After there is enough money in a SIM card's account, the SIM card holder can

---

[12] *See generally* Declaration of Bruce Tran as Chief Executive Officer of UPM Technology, Inc. in Support of UPM Technology, Inc.'s Motion for Summary Judgment (ECF #256) ("Tran Decl.") at ¶¶ 25-26.

[13] *See* Boute Dep. at 76:10-79:3; Deposition of Bruce Tran as Rule 30(b)(6) witness ("Tran Dep.") at 444:17-449:24, 452:2-6, 159:5-24; Digicel Response to Interrogatory ("Digicel Int.") No. 12; Deposition of Gerard Laborde as Rule 30(b)(6) witness ("Laborde Dep.") at 10:9-11:14.

[14] *See Id.* at 73:12-74:7; Tran Decl. at ¶ 13.

[15] *See* Tran Decl. at ¶¶ 20-22; Opinion and Order (ECF #294) at 15 n.11 (Court "accepts these facts as undisputed."). At the July 26 hearing, counsel for Digicel-Haiti suggested that there was no evidence that UPM had topped up its SIM cards. In fact, several of UPM's designated exhibits for the Phase I trial provide direct evidence of this point. *See* Defendants' Exhibit List (ECF #318), designated Exhibit No. 503 ("Summary Chart: 2011, 2014 Minutes and Recharges"); Exhibit No. 504 ("2011 to 2014 Minutes and Recharges by Month (Excel Spreadsheet)"); and Exhibit No. 505 ("Composite: UPM Invoices for Recharges"). Mr. Tran also testified that UPM topped up those SIM cards. Tran Dep. at 95:22-96:19, 376:7-18, 378:18-379:16; Tran Decl. at ¶ 26. But putting that evidence aside, how could UPM have made any calls using Digicel-Haiti SIM cards without having topped them up? As Mr. Boute testified, the network will not permit a SIM card to be used to make a call unless there is enough money in the account, *see* Boute Dep. at 50:9-25, 75:19-76:9, 77:15-78:6; the network deducts charges for the call in real time as it is in progress; and the network cuts off even an ongoing call if the money runs out. *Id.* at 75:19-79:3. The only possible conclusion from the fact that UPM made any calls at all, therefore, is that it had topped up its SIM cards.

---

Page 5 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

easily subscribe to RLYH service. This is an automatic process, accomplished by sending Digicel-Haiti-specified codes to the network.[16] In response, the network deducts the enrollment fee (roughly $25 for a month of service) and sends the SIM card a message confirming that the RLYH service is active.[17] At that point, the SIM card holder can make calls using the service, which permits calls back to Digicel-Haiti subscribers in Haiti at local rates (roughly $0.09 per minute).[18]

Nothing about this process supported – or could even accommodate – any individualized negotiations between Digicel-Haiti and any of its SIM card holders. The entire process is electronic, computerized, and automatic.[19] *Any* SIM card holder could sign up for RLYH service on the same terms, which were automatically imposed by Digicel-Haiti. It is hard to imagine a more "standardized" service offering than RLYH, and there can be no genuine dispute that Digicel-Haiti indifferently offered it to all potential users in the United States.[20]

Finally, there can be no dispute that UPM activated thousands of SIM cards and

---

[16] Boute Dep. at 79:4-81:20; Digicel Int. No. 15.

[17] *See* Boute Dep. At 78:7-79:19; *id.* at 81:2-20.

[18] *Id.* at 93:24-94:25.

[19] *See* Boute Dep. at 79:4-81:20; Digicel Int. No. 15.; Tran Decl. at ¶ 29-30. *See also* Laborde Dep. at 12:6-15; ECF #294 at 16-18.

[20] Note that, for purposes of this motion, it does not matter what the precise terms of RLYH service *were*; rather, what matters is that they were established without any individual negotiation. In fact, as the Court found earlier in this case, Digicel-Haiti did not take any steps that would have imposed binding written terms on persons activating SIM cards, topping up accounts, subscribing to RLYH service, or making calls. *See* ECF #294 at 15 n.11. This means that Digicel-Haiti structured its business to impose only basic contractual terms on RLYH service – the right to make calls in exchange for payment – and those were imposed by conduct rather than in writing. That said, to the extent that Digicel-Haiti could establish that there were supposedly binding terms for RLYH service that banned or restricted resale, that would not matter either: an impermissible ban on resale, "imposed" in violation of the FCC's rules and the Act, does not become permissible or binding simply because it is laid out in some document. To the contrary, such written terms would simply be additional evidence that Digicel-Haiti had violated the Act. *See infra.*

---

enrolled them into the RLYH service – UPM's records and testimony establish this.[21] Moreover, not only has Digicel-Haiti never identified any evidence – documentary or otherwise – that would contradict UPM's evidence on this point, it has admitted that it has no such evidence, because it lost all the switch data and call detail records from the relevant period.[22] Given this, there can be no genuine dispute that UPM enrolled its SIM cards in RLYH service.[23] And, there can be no genuine dispute that Digicel-Haiti cut off those SIM cards in order to prevent UPM from reselling the RLYH service. Preventing such resale was Digicel-Haiti's entire motivation for doing so.[24]

---

[21] Tran Dep. at 442:17-452:6; *see* Tran Decl. at ¶¶ 33-34.

[22] Boute Dep. at 40:8-25, 57:22-60:20; Deposition of Paul Flanagan at 56:14-57:3.

[23] Moreover, as noted above, the fact that UPM could make any RLYH calls at all – as well as the fact that Digicel-Haiti cut off UPM's RLYH SIM cards after concluding they were being used for resale – confirms that UPM's SIM cards were, indeed, subscribed to RLYH service.

[24] This conclusion seems both incontrovertible and not in dispute. *See* Opinion and Order (ECF #294) at 27 (the parties "agree that Digicel Haiti, when it believed that a SIM card was being used" for resale (*i.e.,* when UPM linked calls from third parties to a call established using one of its SIM cards), it "deactivated (or de-authenticated) that card, thereby blocking UPM from continuing to use that SIM card."). *See also* Boute Depo. at 120:22-121:7; Defendant UPM Technology, Inc.'s Motion for Summary Judgment (ECF #255) ("UPM Summary Judgment Motion") at 35; Defendants' Reply in Support of Motion for Summary Judgment (ECF # 284) ("UPM Summary Judgment Reply") at 26-27; Digicel-Haiti Communications Act Motion at 1 ("The fact that Digicel Haiti disconnected offending SIM cards is undisputed"); *id.* at 3-4, 7.

For purposes of this motion, UPM does not contest that Digicel-Haiti viewed resale as "bypass;" that Digicel-Haiti viewed bypass as objectionable, or even illegal; and that it thought that it was legally authorized, at least by Haitian law, to cut off UPM's SIM cards. None of that has anything to do with Digicel-Haiti's status as a telecommunications carrier or with its obligation under the Act, as a carrier, not to restrict resale. There is no "scienter" requirement in the liability provisions of Title II: "[l]iability under the Communications Act only requires 'unjust' or 'unreasonable' conduct." *Sikes v. AT&T,* 841 F. Supp. 1572, 1583 (S.D. Ga. 1993); *see also* 47 U.S.C. § 206 (establishing liability for carriers that violate the Act; no mention of any scienter-related element of liability). There is nothing in Section 206 or in any case interpreting it that says carriers are only subject to sanction if their violations are "knowing" or "intentional." Put differently, it is the responsibility of entities that operate as common carriers in the telecommunications business in the United States to understand and abide by the requirements established by the Act and FCC rules and rulings interpreting it – including the ban on resale restrictions. The fact (if it is a fact) that Digicel-Haiti was unaware that its actions violated the Act

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## III.    APPLYING THE SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well-established and not in dispute. *See, e.g.,* ECF # 294 at 6-9. UPM, however, emphasizes several points regarding summary judgment that are particularly relevant to *this* motion, at *this* (late) stage of the case.

First, "when a properly supported motion for summary judgment is made, the adverse party ***must set forth specific facts*** showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986) (emphasis added; internal quotations omitted). Second, while the court "must view the evidence in the light most favorable to the nonmoving party … deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed ***must support the assertion with admissible evidence***." *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099, at *17 (D. Or. Sep. 12, 2020) (emphasis added), citing *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982) and Fed. R. Civ. P. 56(c). Third, to satisfy its burden, the party opposing summary judgment "***must do more than simply show that there is some metaphysical doubt as to the material facts***;" it must, "[i]n the language of the Rule, … come forward with 'specific facts showing that there is a ***genuine issue for trial***.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348 (1986) (first emphasis added; internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Id.* at 587 (citations omitted).

Digicel-Haiti has known since early 2016 that its status as a carrier under the Act has been at issue.[25] Discovery in this case closed a year ago. Digicel-Haiti has thus had more than

---

is not an excuse or justification; it simply shows that Digicel-Haiti failed to do its legal homework before applying its intra-Haiti anti-bypass policies to its United-States-based RLYH service.

[25] *See* Defendants' Answer, Affirmative Defenses and Counterclaims to Plaintiff's Amended Complaint and Demand for Jury Trial (ECF #73) at ¶¶ 196-207, 212-229, 241-257.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*six years* to identify any facts or legal arguments that it thinks bear on its status as a carrier. Furthermore, the parties engaged on this specific issue during briefing in late 2021,[26] and Digicel-Haiti has known since the Court bifurcated the case in early 2022 that the issue of its carrier status would be central to the Phase II trial.[27]

Given this procedural history, at this late stage of the proceedings, the Court should not permit Digicel-Haiti to skate by in its opposition with vague references to unspecified "facts" or "testimony" or other "evidence," or to unspecified "arguments" or "claims" or "considerations" that it might be able to raise at some point closer to trial. Permitting Digicel-Haiti to evade its burden under the law of summary judgment, outlined above, would be unfair, unjust, and an inefficient way to manage the remainder of the case. Failing to hold Digicel-Haiti to its clear obligation, now, in response to this motion, to identify any specific facts that it claims to be material, genuinely in dispute, and supported by admissible evidence, and to fully articulate the legal arguments that support its position, would not only prejudice UPM, but would also create a real possibility of confusing the jury with the needless presentation of potentially complicated evidence about legally immaterial matters not legitimately in dispute.

If Digicel-Haiti has any actual, admissible evidence that creates a genuine dispute about a material fact, or has any cogent arguments against the legal conclusions urged here, the time to identify them is now. UPM respectfully requests that the Court hold Digicel-Haiti to this standard and demonstrate a genuine issue for trial as to the four rulings sought by this Motion.

---

[26] Digicel-Haiti Communications Act Motion, *passim;* Digicel-Haiti Communications Act Reply, *passim;* Defendants' Opposition to Digicel-Haiti's Motion for Summary Judgment on Defendant UPM Technology, Inc.'s Counterclaims (ECF #279) ("UPM Communications Act Opposition"), *passim.*

[27] *See* ECF #294 at 37-39.

Page 9 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

## IV.    DIGICEL-HAITI IS A "TELECOMMUNICATIONS CARRIER" UNDER THE TELECOMMUNICATIONS ACT AND THE COMMON LAW.

Applying long-settled precedent regarding both the law of common carriage and the interpretation of the Act to the undisputed material facts, there can be no question that Digicel-Haiti is a telecommunications carrier and a common carrier under the Act with respect to its offering of RLYH service, and therefore subject to the obligations on carriers established by the Act and the FCC. After providing a brief history of the common law of common carriage in telecommunications, UPM explains why Digicel-Haiti is a common carrier with respect to its RLYH service, and why Digicel-Haiti's arguments against that conclusion are without merit.[28]

### A.  A Very Brief History of Common Carriage In Telecommunications

A review of the history of common carriage in the telecommunications industry is not strictly needed to determine that Digicel-Haiti is a carrier. Even so, the development of the law of common carriage affects how the Communications Act has been interpreted and is applied, so a brief consideration of that history is appropriate.[29]

For centuries, the common law held that certain business activities were subject to special rules requiring fair rates, reasonable practices, and nondiscrimination among customers. Innkeepers, ferrymen, and carriage drivers have all been viewed as common carriers at different times.[30] In the common-law, pre-regulatory era, rather than having recourse to a regulatory body,

---

[28] Based on the Court's comments at the July 26, 2022 hearing, UPM is addressing these issues in quite some detail. *See infra.* That said, UPM is not addressing Digicel-Haiti's arguments that it is shielded from liability by the foreign sovereign compulsion doctrine and that the Court should not adjudicate UPM's Communications Act claim due to considerations of international comity. Digicel-Haiti has never adequately supported those arguments, *see* ECF #384 at 12-13, and for now, UPM rests on its prior briefing with respect to them. *See* UPM Communications Act Opposition at 17-21. UPM will respond to any new Digicel-Haiti arguments as necessary.

[29] *See Global Crossing, supra,* 550 U.S. at 48 ("regulatory history helps to illuminate the proper interpretation and application of §§ 201(b) and 207").

[30] *See, e.g., Cellco Partnership v. FCC,* 700 F.3d 534, 545-46 (D.C. Cir. 2012) (recounting history

someone who had been mistreated by a common carrier, such as via an unreasonably high rate or a discriminatory practice, could bring an action in court for redress, such as a refund of unreasonably high charges. These were known as actions for "reparations."[31]

By the 1880s, the predominant common carriers in the United States were the railroads, whose operations engendered a wide range of controversies involving reasonable rates, nondiscrimination, and other practices. To deal with these issues, in 1887, Congress passed the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, in addition to laying out a number of substantive carrier obligations, established the Interstate Commerce Commission ("ICC"). The ICC was granted authority to set rates for rail transport and to dictate the practices of railroads.[32] However, despite creating the ICC and endowing it with broad regulatory powers, in the Interstate Commerce Act, Congress expressly provided that persons injured by a carrier's violation of its legal duties could sue the offending carrier in federal court.[33]

The telephone was invented around this same time, in 1876.[34] Initially, regulation

---

of common carriage in the telecommunications industry); *Global Crossing, supra,* 550 U.S. at 48-50 (same). For a much more detailed look at the common law of common carriage underlying telecommunications issues, *see, e.g.,* James Speta, *A Common Carrier Approach to Internet Interconnection,* 54 Fed. Comm. L.J. 225, 251-64 (2002); Susan Crawford, *Transporting Communications,* 89 B.U.L. Rev. 871, 878-886 (2009). Both of these articles arose from the controversy over "network neutrality" – whether broadband Internet access service should be treated as a telecommunications service – which inspired a great deal of academic consideration of the nature and roots of common carrier doctrines in the communications field.

[31] *See Global Crossing, supra,* 550 U.S. at 48-50.

[32] *Id.; see also* sources cited in note 30, *supra.*

[33] *See Global Crossing, supra,* 550 U.S. at 49 (noting that Section 207 of the Communications Act was "largely copied" from the Interstate Commerce Act).

[34] The famous "Mr. Watson, come here! I want to see you" line was delivered in March 1876. *See generally* https://en.wikipedia.org/wiki/History_of_the_telephone (last visited Aug. 11, 2022). While Alexander Graham Bell is widely held to have invented the telephone, recent scholarship has suggested that he did not invent certain key early telephone technology, but instead essentially stole it from an electrical engineer named Elisha Gray. *See* Seth Shulman, The Telephone Gambit

---

Page 11 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

of telephone service was left to the states. In 1910, however, Congress expressly brought interstate telephone service within the purview of the ICC by means of the Mann-Elkins Act.[35] Twenty-four years later, in 1934, Congress passed the Communications Act, the key regulatory provisions of which – the "Title II" obligations of common carriers – were essentially copied-and-pasted from the parallel provisions of the Interstate Commerce Act.[36]

The definition of a "common carrier" in the original Communications Act was circular, pointing back to the common law: "The term 'common carrier' or 'carrier' means any person **engaged as a common carrier for hire**, in interstate or foreign communication by wire or radio … ." 47 U.S.C. § 153(11) (emphasis added).[37] Even so, during the first several decades after 1934, essentially the only entities that were acting as telephone companies were regulated monopolies, so there was little controversy as to which entities were carriers under the Act.

By the 1960s, however, changes in technology and in regulatory policy began to move the issue of who was and was not a carrier to the forefront. Since that time, disputes over whether one or another communications-related activity constituted common carriage have included issues involving cable television systems and services,[38] specialized radio services,[39]

---

(2008); *see also* https://en.wikipedia.org/wiki/Elisha_Gray (last visited Aug. 11, 2022).

[35] *Cellco Partnership, supra,* 700 F.3d at 546. Congress may have been initially unconcerned with the regulation of interstate telephone service because it took some time for the technology to develop that made interstate calling sufficiently easy as to be generally available. *See, e.g.,* https://en.wikipedia.org/wiki/Long-distance_calling (last visited Aug. 11, 2022).

[36] *See, e.g., Cellco Partnership, supra,* 700 F.3d at 546 ("Title II's language was 'largely copied' from the Interstate Commerce Act and the concept of common carriage remained generally unchanged"), citing *Global Crossing, supra,* 550 U.S. at 49.

[37] *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,* 525 F.2d 630, 642 (D.C. Cir. 1976) ("*NARUC I*"); *NARUC II, supra,* 533 F.2d at 608; *Cellco Partnership, supra,* 700 F.3d at 538 ("the Act's definition of 'common carrier' is unsatisfyingly circular").

[38] *United States v. Southwestern Cable Co.,* 392 U.S. 157 (1968); *NARUC II, supra.*

[39] *NARUC I, supra.*

---

Page 12 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

optical fiber transport facilities and services,[40] undersea cable capacity,[41] high-speed communications services for education and healthcare providers,[42] prepaid calling cards,[43] wholesale network connectivity provided to an entity's affiliate,[44] information services provided by wireless providers,[45] and broadband Internet access service.[46] These cases addressed a range of issues as to what makes an entity a carrier, and in the aggregate provide a robust body of law that, even where not directly relevant to the case at hand, provides valuable context.

In the midst of this relentless technological and regulatory change, Congress passed the Telecommunications Act of 1996,[47] which added the definitions of "telecommunications," "telecommunications service," and "telecommunications carrier" to the Act.[48] The new definitions

---

[40] *In the Matter of NORLIGHT Request for Declaratory Ruling,* Declaratory Ruling, 2 FCC Rcd. 132 (1987), *on reconsideration, In the Matter of NORLIGHT Request for Declaratory Ruling,* Memorandum Opinion and Order, 2 FCC Rcd. 5167 (1987) (together, "*NORLIGHT*"); *Southwestern Bell Tel. Co. v. FCC,* 19 F.3d 1475 (D.C. Cir. 1994).

[41] *Virgin Islands*, *supra.*

[42] *United States Telecomm. Ass'n, supra.*

[43] *In the Matter of Regulation of Prepaid Calling Card Services,* Declaratory Ruling and Report and Order, 21 FCC Rcd. 7290 (2006), *vacated in unrelated part on other grounds*, *Qwest Servs. Corp. v. FCC,* 509 F.3d 531 (D.C. Cir. 2007).

[44] *In the Matter of Bright House Networks, LLC, et al., Complainants, v. Verizon California, Inc., et al., Defendants,* Memorandum Opinion and Order, 23 FCC Rcd. 10704 (2008) ("*Bright House Networks*") at ¶ 40, citing *NARUC I*, *supra*, 525 F.2d at 641, *aff'd, Verizon Cal. Inc. v. FCC*, 555 F.3d 270, 275-76 (D.C. Cir. 2008) ("*Verizon California*").

[45] *Cellco Partnership, supra.*

[46] *Open Internet Order*, *supra*; *In the Matter of Restoring Internet Freedom,* Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 (2017) ("*Restoring Internet Freedom Order*"), *aff'd in part, vacated and remanded in part on other grounds*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019). *See also NCTA v. Brand X, supra.*

[47] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, *currently codified at scattered sections of* 47 U.S.C.

[48] *See* 47 U.S.C. §§ 153(50) ("telecommunications"), 153(51) ("telecommunications carrier") and 153(53) ("telecommunications service"). *See also Virgin Islands, supra,* 198 F.3d at 923.

---

Page 13 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

give some clarity to the question of what activities constitute common carriage. For example, they make clear that, to be a carrier, the entity must be offering "telecommunications," as opposed to other types of services (such as information services).[49] And the traditional, common-law notion that the relevant services must be offered "for hire" is now embodied in the requirement that a carrier offer telecommunications "for a fee."[50]

The new definitions also address the "public" aspect of the common law test by requiring that the services be offered "directly to the public or to such classes of users as to be effectively available directly to the public."[51] Soon after the 1996 Act was passed, however, the FCC determined that this language did not change the common law test, so that the question of whether a service is being offered on a "public" basis (that is, as a common carrier), as opposed to a "private" basis, is determined under the statute by applying the same common law test that the courts had articulated under prior law.[52]

### B.  Digicel-Haiti Is A Common Carrier with Respect to RLYH Service.

It seems exceedingly obvious that, under both the statutory scheme and common-law doctrine, RLYH service is a common carrier service, and Digicel-Haiti is a common carrier

---

[49] 47 U.S.C. § 153(53). In this regard, the long-running controversy over network neutrality turns on whether broadband Internet access service is a telecommunications service (subject to Title II) or an information service (exempt from Title II). The courts have ruled that the FCC has the discretion under the Act to adopt either view. *See Open Internet Order*, *supra*, *reviewed denied*, *United States Telecomm. Ass'n*, *supra* (upholding treatment of broadband as a telecommunications service); *Restoring Internet Freedom Order, supra, aff'd in part, vacated and remanded in part on other grounds*, *Mozilla, supra* (upholding treatment of broadband as an information service).

[50] 47 U.S.C. § 153(53).

[51] *Id.*

[52] *Virgin Islands, supra,* 198 F.3d at 925-927, 929. *See also United States Telecomm. Ass'n v. FCC*, 295 F.3d 1326, 1332 (D.C. Cir. 2002). The D.C. Circuit in *United States Telecomm. Ass'n* questioned whether an entity could be a carrier if it had only a single user, *see* 295 F.3d at 1335, but when the issue actually presented itself in *Verizon California*, *supra*, that court affirmed the FCC's determination that an entity with only a single user was, indeed, a carrier under the Act.

Page 14 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

with respect to it. *See* 47 U.S.C. §§ 153(11), (51). RLYH telephone calls (from the United States to Haiti) are clearly "telecommunications." *See* 47 U.S.C. §§ 153(50), (21). Digicel-Haiti gets paid for providing the service, so it is offered "for a fee." *See* 47 U.S.C. § 153(53). And RLYH is offered on standard terms to anyone in the United States with a Digicel-Haiti SIM card. How could RLYH *not* be a common carrier offering? Nevertheless, Digicel-Haiti has raised three objections to this conclusion, addressed in turn below, none of which has merit.[53]

### 1. Section 152(b) Does Not Apply To Digicel-Haiti.

Digicel-Haiti has claimed that, under 47 U.S.C. § 152(b), the Act does not apply to it at all, essentially due to its status as a "foreign carrier" that merely "bring[s] communications to a U.S. international gateway where it is handed off to a U.S. carrier" and "does not engage with communications in the U.S."[54] This argument is specious.

Section 152(b) only exempts entities whose involvement in United States communications activities is limited to a physical connection with a United States carrier: an entity is not subject to the Act if it is "engaged in interstate or foreign communication *solely* through physical connection with the facilities of another [independent] carrier." 47 U.S.C. § 152(b) (emphasis added). This language has no application here. Digicel-Haiti is not a carrier with respect to RLYH by virtue of any aspect of its physical connections with carriers in the United States. Rather, it is a carrier with respect to RLYH by virtue of the fact that it offers customers in the United States the ability, for a fee, to make calls from the United States back to Haiti.[55] The

---

[53] As noted above, UPM is not here addressing Digicel-Haiti's arguments based on the foreign sovereign compulsion doctrine or on concerns about international comity. *See* note 28, *supra*.

[54] Digicel-Haiti Communications Act Motion at 9-10; *see also id.* at 8-12; Digicel-Haiti Communications Act Reply at 3-4.

[55] *See also FTC v. AT&T Mobility, LLC,* 883 F.3d 848, 860 (9th Cir. 2018) ("the term 'common carrier' is 'used to indicate not an entity but rather an activity as to which an entity is a common carrier.'"), quoting *Comput. & Commc'ns Indus. Ass'n v. FCC,* 693 F.2d 198, 209 n.59 (D.C. Cir. 1982). Whether Digicel-Haiti is a telecommunications carrier is not a binary, all-or-nothing issue.

Page 15 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

offering of that service in the United States, to those with SIM cards in the United States, means that Digicel-Haiti is engaged in international communications under the Act,[56] so that application of the Act to Digicel-Haiti is not "solely" due to whatever domestic physical connections it may or may not have.

**2.    The Fact that Digicel-Haiti Provides RLYH Service Using Other Carriers' Facilities Does Not Mean That It is Not a Carrier; It Means That It is a Reseller (Which is a Carrier).**

Digicel-Haiti has also argued that the fact that it does not own facilities in the United States means that it cannot be a United States carrier subject to the Communications Act.[57] But nothing in the definition of "telecommunications carrier" turns on ownership of facilities; an entity is a carrier if it otherwise qualifies, "regardless of the facilities used." 47 U.S.C. § 153(53). As noted above, the Supreme Court has observed that "the relevant definitions do not distinguish facilities-based and non-facilities-based carriers."[58] What matters is the services Digicel-Haiti *offers,* not the physical arrangements it uses to make good on those offers.

The fact that Digicel-Haiti provides RLYH service entirely using the facilities of Digicel-Haiti's roaming partners, therefore, does not shield Digicel-Haiti from common carrier status. It has been settled law for at least a half a century that resellers *are* carriers.[59] And any doubt on this score is eliminated by the text of 47 U.S.C. § 153(53) ("regardless of the facilities

---

The question is whether it is a common carrier with respect to RLYH service.

[56] *See* 47 U.S.C. § 153(21) ("foreign communications").

[57] *See, e.g.,* Digicel-Haiti Communications Act Motion at 9-11.

[58] *NCTA v. Brand X, supra,* 545 U.S. at 997.

[59] *See, e.g., AT&T v. FCC, supra,* 572 F.2d at 24-25 (2d Cir. 1978). In this decision, which affirmed the FCC's 1976 *Resale Order,* the Second Circuit noted that as early as 1938, the FCC had held that the Communications Act extends not only to those who own and operate communications facilities, but instead "covers all those who offer communications service for hire, including those who merely lease facilities from existing carriers." 572 F.2d at 24, citing *Mackay Radio and Telegraph Co.,* 6 F.C.C. 562 (1938).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

used"). Again, the statute does not "distinguish facilities-based and non-facilities-based carriers."[60] Whether an entity is a carrier depends on what it offers, not what facilities it does or does not have.

UPM emphasizes that this conclusion is not simply the result of some technical application of the "regardless of facilities" language in the Act. To the contrary, the status of resellers as common carriers is plain-vanilla common carrier law that has been embraced and repeatedly reaffirmed by the FCC over the course of more than forty years. As the FCC stated in its 1976 *Resale Order*:

> [W]ith the exception that some resellers may not own any transmission plant, *we perceive no difference between resale and traditional communications common carriage.* The fact that an offeror of an interstate wire and/or radio communication service leases some or all of its facilities rather than owning them ought not have any regulatory significance. The public neither cares nor inquires whether the offeror owns or leases the facilities. *Resellers will be offering a communications service for hire to the public just as the traditional carriers do. The ultimate test is the nature of the offering to the public.* No one contends that resellers will make a private offer of communications service rather than a public offering. Nor [will we] permit resellers to operate in a discriminatory fashion. Accordingly, the offering which resellers will make will satisfy the "sine qua non" of common carrier status, and they will be considered as such.[61]

Moreover, because resellers are carriers like any other, they are subject to the same obligations under Title II as any other: "[A]n entity engaged in the resale of communications service is a common carrier, and is fully subject to the provisions of Title II."[62]

The FCC defines "resale" as "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit."[63] This not only follows the

---

[60] *NCTA v. Brand X, supra,* 545 U.S. at 997.

[61] *Resale Order, supra,* at ¶ 101 (emphasis added).

[62] *Resale Order, supra,* at ¶ 8; *id.* at ¶130 (same).

[63] *Resale Order, supra,* at ¶ 17; *see also id.* at ¶ 4; *AT&T v. FCC, supra,* 572 F.2d at 24, citing

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

test for carrier status, but describes Digicel-Haiti's RLYH service to a "t" – Digicel-Haiti arranges with its roaming partner to obtain the services used by Digicel-Haiti SIM card holders in the United States, pays for those services, and charges its SIM card holders for the services they use.[64] That is, Digicel-Haiti pays its roaming partner for *its own customers'* use of the roaming partner's services, and then charges *its own customers* for that usage.[65] Digicel-Haiti, not the roaming partner, is the entity "offering" service to the public for profit.

In fact, the FCC has found that the specific arrangement used for RLYH service is a form of resale. When a wireless carrier arranges for its roaming customers to make international calls back to the wireless carrier's home country, that carrier "effectively resells" the service of the other carrier.[66] Digicel-Haiti, therefore, is reselling the services of its United States roaming partners. Its subscribers have no reason to know or care whose physical network facilities they are using.[67] As a result, the fact that Digicel-Haiti does not have physical network facilities in the United States does not mean that it is not a carrier. Its lack of physical facilities just means that it is a resale carrier, not a facilities-based carrier – but a common carrier nonetheless.

While the economics and technology of the telecommunications industry have evolved since 1976, the FCC's treatment of resellers as carriers subject to the Act has never changed. By way of example, in 2015 the FCC restated and reaffirmed that resellers are carriers, subject to all of the obligations that apply to carriers:

> ***The Commission has consistently determined that resellers of***

---

*Mackay Radio and Telegraph Co.,* 6 F.C.C. 562 (1938).

[64] Boute Dep. at 84:11-20, 89:10-18, 90:10-22, 93:24-94:14, 95:11-96:3.

[65] *Id.*

[66] *In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398 (2007) at ¶ 21. In that case, the FCC found that when a United States wireless carrier arranges for its customers who are roaming overseas to call back to this country, that is "effectively" a form of resale. RLYH service is the same arrangement in the opposite direction.

[67] *See Resale Order, supra,* at ¶ 110 ("The public neither cares nor inquires whether the offeror owns or leases the facilities.")

Page 18 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*telecommunications services are telecommunications carriers, even if they do not own any facilities* [*Resale Order* at ¶ 8] ("[A]n entity engaged in the resale of communications service is a common carrier, and is fully subject to the provisions of Title II."). Further, as the Supreme Court observed in Brand X, "the relevant definitions do not distinguish facilities-based and non-facilities-based carriers." We note that the rules apply *not only to facilities-based providers of [a telecommunications] service but also to resellers of that service.* In applying these obligations to resellers, we recognize, as the Commission has in other contexts, that consumers will expect the protections and benefits afforded by providers' compliance with the rules, regardless of whether the consumer purchase service from a facilities-based provider or a reseller. We note that *a reseller's obligation under the rules is independent from the obligation of the facilities-based provider that supplies the underlying service to the reseller*…[68]

Digicel-Haiti is clearly a reseller, and therefore a carrier subject to the Act.[69]

---

[68] *Open Internet Order, supra,* at ¶ 188 n.458 (emphasis added, citations other than to *Resale Order* omitted). This is the FCC order that established network neutrality obligations for providers of broadband Internet access service. A necessary element of that holding was that broadband Internet access is a telecommunications service. *See id.* at ¶¶ 355-356, 361-364. This led the FCC to address resale issues in this ruling. The FCC later changed its policy and eliminated its network neutrality rules; a necessary element of *that* holding was that broadband Internet access is an information service, not a telecommunications service. *See Restoring Internet Freedom Order, supra,* at ¶¶ 26-57. Because, under the new policy, broadband providers were not carriers (because Internet access was not a telecommunications service), the new order did not address resale.

[69] The status of resellers as carriers is not controversial – the FCC's rulings on this point are consistent over time, entirely unambiguous, and unquestionably in accord with the terms of both the Act and the common law. As a result, there have been relatively few occasions for the FCC or the courts to directly address the issue. That said, examples of the FCC reaffirming that resellers are carriers, fully subject to the requirements of Title II (in addition to the *Open Internet Order* quote in the text above) include *In the Matter of Locus Telecomm., Inc.,* Memorandum Opinion and Order, 31 FCC Rcd. 12110 at n.28 (2016), quoting *Resale Order* at ¶¶ 8, 101-102, and *In the Matter of NobelTel, LLC, Apparent Liability for Forfeiture,* Notice of Apparent Liability for Forfeiture, 27 FCC Rcd. 11760 at ¶ 8 n.31 (2012) ("Clearly, those in the distribution chain that provide telecommunications service are carriers subject to FCC jurisdiction"), citing *Resale Order.* UPM has been unable to find a single FCC or court decision that contradicts, undermines, or even questions the FCC's longstanding rule that resellers are carriers and must comply with the requirements imposed on carriers by the Act and the FCC's rules.

Page 19 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

### 3. Digicel-Haiti Offers RLYH Service to the Fraction of the Public that Can Use The Service, Which Makes RLYH a Common Carrier Offering.

Digicel-Haiti has suggested – or at least implied, in its argument at the July 26 hearing – that the fact that RLYH service is not available to literally the entire "public" in the United States means that it is not a common carrier in offering that service. But the law has long been clear that offering a service to everyone – to the entire "public" – is not required for common carrier status. To the contrary, what matters is that the entity broadly offer its services to *whatever subset of "the public" can readily make use of them.*

The D.C. Circuit held long ago that "[it] is not an obstacle to common carrier status that [the entity] offer a service that may be of practical use to only a fraction of the population."[70] A few months later, that court held that "a specialized carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users."[71] And, as the FCC has stated, "[t]he Commission has long maintained that offering a service to the public does not necessarily require holding it out to all end users."[72] Indeed, as the FCC observed in confirming the "common carrier" status of an entity that had *only one customer* (and an affiliate at that), "it is well-established that '[o]ne may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population.'"[73]

RLYH service is of "possible practical use" to the "fraction of the population" in

---

[70] *NARUC I, supra,* 525 F.3d at 642.

[71] *NARUC II, supra,* 533 F.2d at 608. *See also T-Mobile West Corp. v. Crow,* No. CV08-1337-PHX-NVW, 2009 U.S. Dist. LEXIS 118033, at *21-22 (D. Ariz. Dec. 17, 2009), quoting *Compass Global, supra,* at ¶ 15.

[72] *Open Internet Order, supra,* at ¶ 363; *see also id.* at ¶ 363 nn.1011-12; *China Unicom, supra,* at ¶ 110 & n.491, quoting *NARUC II, supra,* 533 F.2d at 608-609.

[73] *Bright House Networks, supra,* at ¶ 40, citing *NARUC I, supra,* 525 F.2d at 641; *Verizon California, supra,* 555 F.3d at 275-76.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the United States that has SIM cards for Digicel-Haiti's network, and Digicel-Haiti offers RLYH service to that "fraction of the population." Digicel-Haiti is therefore a common carrier with respect to RLYH service.

### 4.  Digicel-Haiti Is Not A "Private Carrier."

While the cases establish that an entity can be a carrier even if its services are of interest to only a small group of potential customers, it bears emphasis that the key distinction between common carriers and non-common carriers has ***never*** been the size of the pool of potential customers for a service. Instead, the key distinction is and always has been whether, for the relevant group of potential customers – the relevant "fraction" of the public, large or small – the entity offers its service on similar, generally available terms. If so, it is a telecommunications carrier: "A service offered to a defined class of potential customers is a telecommunications service as long as the service provider 'holds itself out indiscriminately to serve all within that class.'"[74] If, by contrast, the entity negotiates individual deals with each potential customer as to the price and technical characteristics of the service, then the entity may be a "private carrier" rather than a "common carrier" with respect to that service.[75] Indeed, the legislative history of the definitions

---

[74] *Compass Global, supra. See also Crown Castle NG East, Inc. v. Town of Greenburgh,* No. 12-CV-6157 (CS), 2013 U.S. Dist. LEXIS 93699, at *54-55 (S.D.N.Y. July 3, 2013) (to the same effect).

[75] Examples of private carriage in telecommunications include: (a) an electric utility selling excess capacity on its internal optical fiber network based on individual negotiations with potential customers, *see NORLIGHT, supra* (holding the utility to be a private carrier); (b) an owner of an undersea cable system selling capacity on that system to carrier-customers based on individualized negotiation and pricing, *see Virgin Islands, supra,* 198 F.3d at 925 (entity owning undersea cables would "engage in negotiations with each of its customers on the price and other terms which would vary depending on the customers' capacity needs, duration of the contract, and technical specifications"); and (c) an entity selling "dark" fiber to customers on an individualized basis*, see Southwestern Bell, supra,* 19 F.3d at 1481 ("If the carrier chooses its clients on an individual basis and determines in each particular case 'whether and on what terms to serve' and there is no specific regulatory compulsion to serve all indifferently, the entity is a private carrier for that particular service… .")

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

of "telecommunications," "telecommunications service," and "telecommunications carrier" notes that they were added to the Act to "recognize[] the distinction between common carrier offerings that are provided to the public … and private services."[76] The FCC itself made this distinction in the *Resale Order:* "No one contends that resellers will make a ***private offer*** of communications service rather than a ***public offering.***"[77]

In the case of RLYH service, there is no genuine dispute that the service is indiscriminately offered to anyone with a valid SIM card that pays the requisite fees. There is no negotiation or discussion of pricing, of individual customers' needs or desires, or of whether the customer requires a specific technical configuration. Digicel-Haiti has set up its systems and network so that anyone with a SIM card and sufficient money in the SIM card's account can subscribe to RLYH using an entirely automatic, scripted process. Not only ***is there*** no individualized negotiation, ***there is no mechanism for engaging in*** any individualized negotiation. As a result, RLYH service is plainly not a "private carriage" offering.[78] And, as noted above, while RLYH service is not offered to literally the entire United States public, it is offered to anyone here with a valid SIM card for Digicel-Haiti's network.

That is enough: RLYH service is common carriage, pure and simple. As a result, Digicel-Haiti is a common carrier with respect to that service. This means that with respect to RLYH service, Digicel-Haiti is bound by all the obligations of carriers under the Act.

## V. DIGICEL-HAITI VIOLATED THE COMMUNICATIONS ACT.

The undisputed facts show that Digicel-Haiti is a common carrier with respect to

---

[76] *Virgin Islands, supra,* 198 F.3d at 925-26, quoting H.R. Conf. Rep. No. 104-458, at 115 (1996).

[77] *Resale Order, supra,* at ¶ 101 (emphasis added).

[78] In fact, the FCC has held, and the courts have affirmed, that an entity may engage in a certain amount of individual deal-making without losing its common carrier/telecommunications carrier status. *See Orloff v. FCC, supra,* 352 F.3d 415 (D.C. Cir. 2003).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

RLYH service and, thus, subject to the Act's rules and requirements for carriers (including the FCC's ban on resale restrictions), as explained above. Those same facts also show that, by cutting off UPM's RLYH SIM cards, Digicel-Haiti violated the FCC's ban on resale restrictions and, therefore, violated Sections 201(b) and 202(a) of the Act.[79]

UPM emphasizes that this is entirely a question of applying the law (FCC and court rulings) to the undisputed facts. Not only is there no genuine, material issue to submit to the jury on these matters, leaving them open would require the parties to expend substantial time and effort preparing for trial on them, and the needless presentation of these highly technical issues would create a substantial danger of confusing and misleading the jury. As a result, a ruling from the Court on these points, now, is both legally appropriate under Rule 56 and would greatly clarify and simplify the trial of UPM's Communications Act counterclaim.

## A. Digicel-Haiti Is Subject to the Ban On Resale Restrictions.

The FCC rulings and court decisions addressing the FCC's ban on resale restrictions show that the ban applies fully to Digicel-Haiti. This follows from the fact that, as discussed below, the ban on resale restrictions is effectively a *per se* rule, applicable to all services and all carriers, and from the fact that, as just discussed, resellers such as Digicel-Haiti are, themselves, carriers subject to the Act.

First, the ban on resale restrictions has been stated in the broadest possible terms. In the *Resale Order*, the FCC held that "unlimited resale and sharing of ***all services*** … is just and reasonable" and that banning or restricting resale is "unjust and unreasonable, and thus ***unlawful***."[80] Over the next 15 years, the FCC confirmed this broad holding by expressly applying

---

[79] *See Global Crossing v. Metrophones, supra* (practices the FCC has declared to violate the Act, violate the Act and subject the offending carrier to suit under 47 U.S.C. § 207).

[80] *Id.* at ¶ 130 (emphasis added). The words covered by the ellipsis are "other than monopoly services." This carve-out for "monopoly services" is historically interesting but irrelevant to Digicel-Haiti's banning of resale of RLYH service. At the time of the *Resale Order* (1976), for

it to a wide range of services under the agency's jurisdiction.[81] Summarizing the ban, a later agency order stated that "***unlimited resale of communications services*** in a competitive environment is just and reasonable" and preventing or restricting resale is "unjust and unreasonable and thus unlawful under Section 201(b)."[82] Later, the Second Circuit held that "the FCC has promulgated regulations requiring ***common carriers***" – with no exception or limitation – "to provide services to resellers on the same terms that such services are provided to end users."[83] In short, the ban on resale restrictions applies, and has always been understood to apply, to all carriers and all services. It therefore applies to Digicel-Haiti's RLYH service.

In order to avoid any potential confusion on this point, UPM notes that today there are two exceptions to the universal, *per se* ban on resale restrictions. Those exceptions, however,

---

some services, a given carrier (often AT&T) had a legal monopoly. The point of the *Resale Order,* however, was to recognize that resellers are common carriers, offering to the public whatever services they were reselling. Resale of a "monopoly service," therefore, would violate the rights of the carrier with the legal monopoly. Hence, in 1976, the FCC did not authorize resale of services as to which the underlying physical carrier held a legal monopoly. This carve-out obviously has no application to Digicel-Haiti's offering of RLYH service in the twenty-first century.

[81] *See In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services*, Report and Order, 83 F.C.C.2d 167 at ¶¶ 2-14, (1980), *aff'd, Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984) (all domestic switched services); *In the Matter of An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems,* Report and Order, 86 F.C.C.2d 469 (1981) (esp. ¶¶ 103-107) (wireless services); *In the Matter of Regulatory Policies Concerning Resale and Shared Use of Common Carrier International Communications Services*, Notice of Proposed Rulemaking, 77 F.C.C.2d 831 (1980); *In the Matter of Regulation of International Accounting Rates,* First Report and Order, 7 FCC Rcd. 559 (1991) at ¶ 5. This latter order is particularly interesting because the FCC found that the only international United States carrier with market power – AT&T – had already removed resale restrictions from its tariffs, making formal action requiring such a step unnecessary. AT&T, at least, understood that when the FCC had said that the ban on resale restrictions applied to "all services," it meant it.

[82] *In the Matter of US West Tariff F.C.C. Nos. 3 and 5*, Order, 10 FCC Rcd. 13708 at ¶ 11 (Common Carrier Bur. Sept. 28, 1995) (emphasis added).

[83] *Nat'l Communs. Ass'n v. AT&T Corp., supra,* 238 F.3d at 125 (emphasis added).

---

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

do not apply to Digicel-Haiti and its actions preventing UPM from reselling RLYH service.[84]

First, the Telecommunications Act of 1996 added two provisions establishing specific resale obligations for "local exchange carriers" – a type of carrier whose services, as an historical matter, were primarily under state regulatory authority and thus (prior to the new provisions) outside the FCC's jurisdiction.[85] These new local-exchange-carrier-specific provisions create a ***presumption*** that restrictions on resale by local exchange carriers are unreasonable, but permit the carrier to attempt to justify "narrowly tailored" restrictions on a case-by-case basis.[86] This obviously does not apply to Digicel-Haiti or RLYH: Digicel-Haiti is not a local exchange carrier, and RLYH is not local exchange service.

Second, for facilities-based wireless carriers, the FCC has distinguished between "resale" and "roaming," and subjected these two arrangements to different rules.[87] For those

---

[84] UPM notes these exceptions in order to avoid being charged, later, with having somehow failed to bring them to the Court's attention. *See* Plaintiff's Motion for Reconsideration or Prompt Review By an Appellate Court (Pursuant to Either 28 U.S.C. § 1292(b) or Or. Rev. Stat. § 28.200) and Stay, (ECF #375) at 29-30 (suggesting that UPM had overlooked relevant precedent). If the Court would find it useful, UPM stands ready to discuss either or both bodies of precedent in detail; to explain in detail why they do not apply to Digicel-Haiti's offering of RLYH service; and to explain why, even if they do apply, Digicel-Haiti's ban on reselling RLYH service still violates Sections 201(b) and 202(a) of the Act.

[85] *See* 47 U.S.C. § 251(b)(1) (resale obligation of all local exchange carriers); 47 U.S.C. § 251(c)(4) (special obligation of incumbent local exchange carriers to resell certain services at wholesale rates). *See also AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 379-80, 119 S. Ct. 721 (1999) (noting that the 1996 Act extended FCC jurisdiction to a range of intrastate services).

[86] *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* First Report and Order, 11 FCC Rcd. 15499 (1996) at ¶ 939 ("resale restrictions are presumptively unreasonable. Incumbent LECs can rebut this presumption, but only if the restrictions are narrowly tailored"); *id.* at ¶ 977 ("our rules concerning resale restrictions under section 251(b)(1), such as the general presumption that all resale restrictions are unreasonable, should be the same as under section 251(c)(4)").

[87] *See* 47 C.F.R. § 20.12. *But see also In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules*, *supra* note 66 (noting that roaming is "effectively" a form or resale). This ruling shows that resale is a broad category that, in the context of facilities-based-wireless carriers,

---

Page 25 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

carriers, the FCC initially adopted a *per se* rule requiring resale, but provided that it would sunset after five years.[88] The reason for this approach is that, if a newly licensed wireless carrier, without any network infrastructure, could *not* resell an existing carrier's services, it would be competitively disadvantaged in the market, but, on the other hand, if it could require such resale indefinitely, that would dampen its incentives to invest in its own infrastructure. This approach is also based on the FCC's judgment that the market for wireless services will be sufficiently competitive that, after all facilities-based carriers have built their networks, none will have sufficient market power to impose resale restrictions.[89] Given this, the FCC concluded that, after the rule's sunset, *facilities-based wireless carriers* would not be subject to a general ban on resale restrictions.[90] But the FCC did not hold that such carriers could restrict resale; it held that resale-related complaints against such carriers will be adjudicated on a case-by-case basis.[91] In any event, as with local exchange carriers, these rules do not apply to Digicel-Haiti because it is not a facilities-based wireless carrier. In this regard, the FCC has specifically found that "a reseller's obligation under the rules is *independent from* the obligation of the facilities-based provider that supplies the underlying service to the reseller…"[92] Digicel-Haiti, therefore, cannot rely on the unique rules applicable to

---

includes (but is not limited to) roaming arrangements.

[88] *See In the Matter of Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services*, 11 FCC Rcd. 18455 (1996) ("*Wireless Resale Order*"); 47 C.F.R. § 20.12(b)(3).

[89] *Id. See also In the Matter of Petitions for Rule Making Concerning Proposed Changes to the Commission's Cellular Resale Policies,* Notice of Proposed Rulemaking and Order, 6 FCC Rcd. 1719 (1991) at ¶¶ 16-17; *In the Matter of Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Services, et al.,* Memorandum Opinion and Order on Reconsideration, 14 FCC Rcd. 16340 (1999) at ¶ 21; *Cellnet Communs. v. FCC,* 149 F.3d 429 (6th Cir. 1998); *Cellnet Communication, Inc. v. FCC,* 965 F. 2d 1106 (D.C. Cir. 1992).

[90] *See Wireless Resale Order, supra,* 11 FCC Rcd. 18455 at ¶ 22.

[91] *Id.* (an "unjust or unreasonable resale practice or unjust or unreasonable discrimination against resellers may be the subject of a complaint alleging a statutory violation").

[92] *Open Internet Order*, *supra*, at ¶ 188 n.458 (emphasis added).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

facilities-based wireless carriers to justify its own conduct in banning resale of RLYH service.

Just as the ban on resale restrictions applies to all services, it also applies to all carriers – including resellers. Starting at the beginning, the *Resale Order* held that the ban on resale restrictions applied to "all services."[93] Nothing in that order suggested that – having declared that carriers may not restrict resale, and having declared that resellers are carriers – somehow the ban on resale restrictions did not apply to resellers – carriers – themselves. To the contrary, the FCC held the opposite: "an entity engaged in the resale of communications service is a common carrier, ***and is fully subject to the provisions of Title II***."[94] With "all services" subject to the ban on resale restrictions, and resellers "fully subject to the provisions of Title II," it follows that resellers – as carriers – are subject to the ban.[95]

The FCC has never wavered from the view that resellers are subject to all the

---

[93] *Resale Order, supra*, 60 F.C.C.2d at ¶ 130.

[94] *Id*. at ¶ 8 (emphasis added); *id.* at ¶130 (same).

[95] Note that the ban on resale restrictions constitutes the FCC's interpretation of what 47 U.S.C. § 201(b) and § 202(a) require. This is inherent in the fact that the agency expressly relied on those provisions in establishing and reaffirming the ban on resale restrictions. The conclusion that the ban on resale restrictions constitutes binding law is confirmed by *Global Crossing v. Metrophones*, *supra*, in which the Supreme Court affirmed that a person injured by a carrier's actions that violate an FCC ruling are entitled to bring an action against the carrier in federal court under 47 U.S.C. § 207. Moreover, the Supreme Court in *NCTA v. Brand X*, *supra*, held that federal courts are bound by the FCC's interpretations of the Communications Act, even if those interpretations conflict with the courts' own precedents. In practical terms, under *Global Crossing* and *NCTA v. Brand X*, this Court should view FCC's rulings interpreting and applying Sections 201(b) and 202(a) of the Act as the equivalent of binding appellate or Supreme Court precedent. UPM notes that the FCC rulings cited in this brief each references Section 201 as a statutory basis for its action, confirming that they constitute binding precedent here. In addition to the *Resale Order* itself, *see also In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules, supra*, 22 FCC Rcd. 11398 at ¶ 64; *In the Matter of Regulation of International Accounting Rates*, First Report and Order, 7 FCC Rcd. 559 at ¶ 27 (same); *In the Matter of International Settlement Rates*, Report and Order, 12 FCC Rcd. 19806 at ¶ 327 (1997) ("*Benchmark Order*"), *infra* (same); *In the Matter of International Settlements Policy Reform International Settlement Rates,* First Report and Order, 19 FCC Rcd. 5709 at ¶ 103 (2004) ("*Settlements Reform Order*"), *infra* (same).

---

Page 27 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

obligations that apply to carriers. To the contrary, it has consistently reaffirmed that view. For example, as noted above, an agency order described the rule as requiring "unlimited resale of communications services."[96] More recently, in 2015, the FCC reaffirmed its original ruling from the *Resale Order* that resellers are "fully subject to the provisions of Title II."[97] Again, nothing in any FCC ruling has ever suggested that resale carriers like Digicel-Haiti are somehow exempt from the *per se* rule banning restrictions on resale. It follows that Digicel-Haiti – just like all other carriers – may not restrict resale. Instead, it is "fully subject" to the ban on resale restrictions.[98]

## B. Digicel-Haiti Violated the Act and the FCC's Rules by Cutting Off UPM's RLYH SIM Cards.

The discussion above shows that Digicel-Haiti, as a reseller and carrier, is fully subject to the FCC's ban on resale restrictions. In the case at hand, as a factual matter, there can be no genuine dispute that the purpose and effect of cutting off of UPM's RLYH SIM cards was precisely to prevent UPM from reselling RLYH service.[99] It follows that cutting off UPM's RLYH SIM cards violated the FCC's rule and, therefore, the Act itself.[100] No further discussion or analysis – or evidence – is necessary to hold that Digicel-Haiti is liable to UPM under 47 U.S.C. §§ 206-207, and UPM requests that the Court so rule.

That said, UPM emphasizes that it is not playing some kind of legal or regulatory "gotcha!" by seeking to impose liability under the *per se* ban on resale restrictions to a situation to

---

[96] *In the Matter of US West Tariff F.C.C. Nos. 3 and 5, supra*.

[97] *Open Internet Order*, *supra*, at ¶ 188 n.458, quoting *Resale Order*, *supra,* at ¶ 8 ("[A]n entity engaged in the resale of communications service is a common carrier, and is fully subject to the provisions of Title II.").

[98] *Resale Order, supra,* at ¶¶ 8, 130; *Open Internet Order, supra*, at ¶ 188 n.458.

[99] As noted above, this is both incontrovertible and not in dispute. *See* note 24, *supra.*

[100] Once the FCC has declared a practice to be a violation of Section 201(b), those harmed by the practice have a private right of action under Section 207. *See Metrophones Telecomm., supra,* 423 F.3d at 1061-1070; *Global Crossing, supra,* 550 U.S. at 53-55.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

which that ban ought not apply. To the contrary, Digicel-Haiti's conduct is ***exactly*** the kind of restrictive activity that the *per se* ban is intended to prevent. For that reason, Digicel-Haiti's cutting off of UPM's RLYH SIM cards violated Sections 201(b) and 202(a) "on the merits," as it were, irrespective of the precise scope of the *per se* rule against resale restrictions.[101]

As the FCC has explained, to be just, reasonable, and nondiscriminatory, rates must be based on cost, and restrictions on resale are unjust and unreasonable because they permit carriers to maintain rates that are ***not*** based on cost.[102] Rates that are not based on cost harm the public (and are therefore neither "just" nor "reasonable") because they interfere with the development of competition and dampen carrier incentives to invest and operate efficiently.[103] On this point, both the FCC and the courts have held that, without a specific FCC ruling establishing an exception,

---

[101] As noted above, any claim that the Court should deviate from the FCC's interpretation of the Act, including the ban on resale restrictions, is foreclosed by *NCTA v. Brand X, supra.*

[102] *See Resale Order*, *supra*, 60 F.C.C.2d 261 at ¶ 7 (bringing rates closer to cost is a "public benefit" of requiring resale); *id.* at ¶ 76 ("it has long been our policy that carriers should basically price according to service costs and that exceptions from this principle must be clearly warranted. If a carrier recognizes that its communications services and facilities can be resold or shared, it will price them according to costs") (citation omitted); *id.* at ¶ 88 ("benefits … from elimination of all tariff restrictions on resale [include] a further trend toward cost-related pricing by underlying carriers").

[103] *Id.*; *see also id.* at ¶ 41 (noting that resellers will compete with the underlying carriers from which they obtain service). Conversely, competition tends to force rates toward cost and thereby benefit the public. *See, e.g., Benchmark Order* at ¶ 2 (high "margins on international termination fees … cause U.S. consumers to pay artificially high prices for international services and discourage foreign carriers from introducing effective competition and cost-based pricing"); *id.* at ¶ 40 ("We would prefer to let competitive market forces determine settlement rates, as that would provide the best assurance that carriers are charging cost-based rates"); *id.* at ¶ 40 n.50 ("Competitive markets are superior mechanisms for protecting consumers by ensuring that goods and services are provided to consumers in the most efficient manner possible and at prices that reflect the cost of production") (internal quotation and citation omitted); *Settlements Reform Order*, *supra*, at ¶ 34 (FCC's "larger policy goal [is] achieving greater competition and more cost-based rates for U.S. customers"); *id.* at ¶ 70 ("the best way to achieve cost-based settlement rates is through effective competition"); *id.* at ¶ 91 (public interest served by … more efficient competition and more cost-based calling rates to U.S. customers").

Page 29 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Sections 201(b) and 202(a) *require* that rates be based on cost.[104]

The FCC's determination that cost-based rates benefit the public, and that competition will produce the economic benefits of cost-based rates, applies fully in the specific context of international calling markets.[105] In this context, the FCC has established benchmark rates that exceed the cost of the underlying call termination service, but it justified this initial departure from cost-based rates on the ground that it will rely on competition and technological innovation to provide market pressure to push those rates towards cost.[106] Competition, therefore, is an integral, necessary element of the FCC's rules establishing the benchmarks – it is a key reason the FCC was willing to establish above-cost benchmark rates in the first place.

As relevant to the case at hand, this means that Digicel-Haiti must take the bitter with the sweet: it is not illegal for United States carriers to pay Digicel-Haiti its desired, well-above-cost $0.23 per minute (the benchmark rate for Haiti), but it quite certainly *is* illegal for Digicel-Haiti to interfere with competitive, technologically innovative activity – such as UPM's resale of RLYH service – that provide United States consumers with international telecommunication services at reasonable rates and that properly puts market pressure on Digicel-Haiti to lower its call termination rate.

---

[104] *See In the Matter of Rates for Interstate Inmate Calling Services,* Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd. 14107 at ¶ 45 (2013) (footnote omitted) (noting general requirement to establish cost-based rates). *See also MCI Telecomm. Corp. v. FCC,* 675 F.2d 408, 410 (D.C. Cir. 1982) ("A basic principle used to ensure that rates are 'just and reasonable' is that rates are determined on the basis of cost") (footnote omitted); *Competitive Telecomm. Ass'n v. FCC,* 87 F.3d 522, 529 (D.C. Cir. 1996) (under the Act, the FCC is permitted to set rates that are not cost-based, but must "specially justify" rates that are not based on cost).

[105] *See Benchmark Order, supra*, at ¶¶ 2, 40 & n.50; *Settlements Reform Order*, *supra*, at ¶¶ 34, 70, & 91. In this regard, in arguing that it is not subject to FCC regulation as a foreign carrier, Digicel-Haiti agreed that "an understanding of relevant policy considerations informs an analysis of the black-letter law." Digicel-Haiti Communications Act Motion at 8.

[106] *See Benchmark Order, supra*, at ¶¶ 2, 40 & n.50; *Settlements Reform Order*, *supra*, at ¶¶ 34, 70, & 91.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

The FCC's detailed discussion of the role of competition and technological innovation to produce cost-based rates in the specific context of international call termination further reinforces this conclusion.[107] The agency "has sought to foster an increasingly competitive international telecommunications market by adopting policies that promote the shift away from regulated monopolies and toward private sector competition" and "encourag[e] competition in the international telecommunications marketplace."[108] Indeed, the FCC has specifically encouraged United States carriers to use innovative technology to bypass high foreign termination rates:

> We are aware … that 'services and technologies that bypass the settlements regime' … are available for carriers seeking to avoid the legal monopoly of a foreign incumbent carrier in some countries that are legally closed to competition. We find it encouraging that such activity is putting pressure on settlement rates in those countries…[109]

More recently, the FCC held that the Act requires the development of competition in international telecommunications, even if that conflicts with the rules and desires of foreign governments:

> Congress directed the Commission 'to provide for a pro-competitive, deregulatory national policy framework,' and mandated, that with respect to domestic markets, no state or local government could prohibit an entity from offering telecommunications services. We believe that the Congressional mandate to foster competitive telecommunications markets is instructive in the current context when assessing the international regulatory environment. We find that the benefits of supporting clear and consistent policies that promote all forms of competition outweigh any benefits derived from recognition and assistance in the enforcement of foreign laws intended to prohibit such competition.
>
> … [We re-emphasize] our standing policy to encourage competition in all markets, both developed and developing. … We encourage a pro-competitive … policy that

---

[107] *See, id.; see also, e.g., 1998 Biennial Regulatory Review; Reform of the International Settlements Policy and Associated Filing Requirements*, Report and Order and Order on Reconsideration, 14 FCC Rcd. 7963 at ¶ 34 (1998) ("*Settlements Order*") ("We agree … that cost-based termination rates in foreign markets are a desirable goal").

[108] *Settlements Order*, *supra*, 14 FCC Rcd. 7963 at ¶ 1 (footnote omitted).

[109] *Id.* at ¶ 63; *see also id.* at ¶ 63 & n.119 (noting "Internet telephony" as a specific innovative technology that the FCC finds "encouraging").

Page 31 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

extends to the international marketplace, embraces free and open competition, and benefits U.S. consumers as well as the global community by ensuring lower prices, new and better products and services, and greater consumer choice. Indeed, we believe that eliminating [anti-consumer, anticompetitive] prohibitions enhance[s] competition throughout the global marketplace.[110]

There can be no question that UPM's resale of RLYH service, using innovative technology, is precisely the kind of competitive activity that the FCC relies on (and encourages) to bring down high, above-cost international call termination rates for United States consumers.

Finally in regard to Section 201(b), UPM notes that a broader rule applies here as well. In establishing its ban on resale restrictions, the FCC relied on the *Hush-A-Phone* decision, under which a carrier practice is unjust and unreasonable if it interferes with customer conduct that is privately beneficial without being publicly harmful.[111] Resale clearly benefits the carrier's customer – the reseller. And it is equally clear that resale is not harmful to the public. To the contrary, for the reasons described above, it is ***beneficial*** to the public, because it puts pressure on foreign carriers to establish cost-based termination rates. There is not a shred of evidence – nor could there be any – that permitting UPM to resell RLYH service would harm the American public in any way. Rather, permitting such resale would necessarily have ***benefitted*** the public by lowering calling rates to Haiti and by providing carriers with calls bound for Haiti – that is, UPM's customers – with additional competitive alternatives. As a result, Digicel-Haiti's actions in banning the resale of RLYH service were unjust and unreasonable.

---

[110] *Enforcement of Other Nations' Prohibitions Against the Uncompleted Call Signaling Configuration of International Call-back Service, et al.,* Order, 18 FCC Rcd. 6077 at ¶¶ 10-12 (2003). In issuing this ruling, the FCC specifically relied on Section 201(b) of the Act. *Id.* at ¶ 18. This ruling, too, therefore, constitutes a binding interpretation of the meaning of Section 201(b) in the context of international calling. *See* note 95, *supra* and accompanying text.

[111] *Resale Order*, *supra*, at ¶ 35. *See Hush-A-Phone Corp. v. United States,* 238 F.2d 266 (D.C. Cir. 1956) (court overturned FCC ruling upholding an AT&T tariff that prohibited subscribers from attaching a cup-like device to their telephones in order to ensure privacy). The logic of *Hush-A-Phone* is not literally binding on the FCC. *See Cellnet Communs.*, *supra*, 149 F.3d at 437. It is nonetheless instructive in assessing the reasonableness of a challenged carrier practice.

Put another way, Digicel-Haiti's banning UPM from reselling RLYH service was both intended to, and did, have the effect of protecting Digicel-Haiti's unreasonably high, above-cost international call termination rates from precisely the competitive pressure and technological innovation that the FCC has found is necessary to meet the statutory requirement of cost-based rates (which make foreign communications reasonably accessible to American consumers). As a result – and independent of the FCC's general rule banning resale restrictions – Digicel-Haiti's actions barring UPM, specifically, from reselling RLYH service, specifically – and thereby blocking domestic consumers from accessing lower international rates – were unjust and unreasonable, in violation of Section 201(b).[112]

In addition to violating Section 201(b), it is also clear that Digicel-Haiti's banning UPM's resale of RLYH service violates Section 202(a). Under Section 201(b), an unjust and unreasonable practice is illegal, full stop. Under Section 202(a), a discriminatory practice is one which treats customers buying "like" services differently. However, only "unreasonable" discrimination is outlawed.[113] This means that, at least in the abstract, a carrier engaging in

---

[112] The Court should not entertain any claim by Digicel-Haiti that either Section 201(b) or the general *per se* ban on resale restrictions should not apply to RLYH service, on the supposed ground that there is adequate competition for delivering international calls to Digicel-Haiti subscribers in Haiti. Digicel-Haiti's entire position in the case has been that it may require all inbound international calls to its subscribers to be routed through its own preferred gateway arrangements, *i.e.,* that it is in some sense **entitled** to a monopoly on the calls that are enabled by RLYH service. Moreover, as a matter of law, the FCC has long recognized that a carrier has a "terminating access monopoly" with respect to calls to its own subscribers. *See, e.g., In the Matter of Access Charge Reform; Reform of Access Charges Imposed By Competitive Local Exchange Carriers*, Seventh Report and Order and Further Notice of Proposed Rulemaking, 16 FCC Rcd. 9923 at ¶ 30 (2001); *In the Matter of Developing a Unified Intercarrier Compensation Regime,* Further Notice of Proposed Rulemaking, 20 FCC Rcd. 4685 at ¶24 (2005); *In the Matter of Connect America Fund; A National Broadband Plan for Our Future, et al.*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663 at ¶ 674 & n.1122 (2011). Digicel-Haiti, therefore, unquestionably has market power with respect to the calls offered by its RLYH service and, as a result, there is and can be no market-based reason to exclude RLYH service from the FCC's ban on resale restrictions, whether under the *per se* rule or under Section 201(b) more generally.

[113] *See* 47 U.S.C. § 202(a).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

discrimination can try to justify it as "reasonable" under the circumstances. This abstract possibility, however, is of no help to Digicel-Haiti here.

First, banning resale of RLYH service is clearly discrimination: individual SIM card holders may use RLYH service to call Haiti, but UPM is not allowed to do so. In terms of the statute, the service that UPM sought to resell is not only "like" the service Digicel-Haiti provides to individual subscribers—it is the exact same service. Second, this discrimination cannot be considered reasonable. UPM has been unable to identify any FCC or court case since the *Resale Order* was issued in 1976 in which a complete ban on resale, such as that at issue here, was upheld as reasonable discrimination among customers. To the contrary, in the *Resale Order* itself, the FCC specifically found such bans to be "unlawfully discriminatory" in violation of Section 202(a): "discrimination against a communications customer – in this case, by the carrier's refusal to provide service to a reseller – *is unlawful if it is based only upon the fact that the customer is not the ultimate user of the service.*"[114] And in that same order, the FCC stated that it would not "permit resellers to operate in a discriminatory fashion."[115] But this unlawful discrimination is exactly what happened here. There is no evidence that Digicel-Haiti had any reason for banning UPM from reselling RLYH service other than the fact that UPM was reselling the service – that is, that UPM was "not the ultimate user of the service." This is not just "discrimination." It is unreasonable discrimination, and therefore a violation of Section 202(a) as a matter of law.

## VI.    CONCLUSION

The Court asked UPM to file a brief "explaining why the Communications Act applies to Digicel-Haiti's actions at issue." ECF #385. In this brief, UPM has shown that applying settled law to the undisputed facts, Digicel-Haiti is plainly a "telecommunications carrier" and a "common carrier" within the meaning of the Act with respect to RLYH service; that  Digicel-Haiti

---

[114] *Resale Order* at ¶ 45 (emphasis added).

[115] *Id.* at ¶ 101.

is bound by the longstanding FCC rule forbidding restrictions on the resale of a telecommunications service, such as RLYH service, as well as by 47 U.S.C. §§ 201(b) and 202(a), on which the FCC rule is based; and that Digicel-Haiti cut off UPM's RLYH SIM cards precisely in order to prevent UPM from reselling the service. It follows that Digicel-Haiti has violated the Act and is liable to UPM under 47 U.S.C. § 207. UPM respectfully requests that this Court so rule. This ruling will significantly simplify the trial of UPM's counterclaims by allowing the parties, the Court, and the jury to focus on the only material factual issue that will truly be in dispute, which is the full extent of the damages to which UPM is entitled under Section 206 of the Act.

Dated: August 16, 2022.

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Defendants

Page 35 – COUNTERCLAIM PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT – COMMUNICATIONS
ACT
UPM-L1\00663582.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2022, I served the foregoing **COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT – COMMUNICATIONS ACT** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Anisha Carla Atchanah
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com
Email: aatchanah@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Andrew J. Lee
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com
Email: ajlee@schwabe.com

Dated: August 16, 2022.

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Defendants

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236