**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Bragar DuBay
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

     Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**, <br><br>     Plaintiff & Counterclaim-Defendant, <br><br>     v. <br><br> **UPM TECHNOLOGY, INC**., *et al.,* <br><br>     Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI <br><br> **UPM'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT** <br><br> **HEARING DATE: SEPTEMBER 14, 2022** <br> **HEARING TIME: 1:30 P.M.** |

Cover Page – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY ............................................................... 1

II.     SORTING OUT THE FACTS ........................................................................ 4

        A.      UPM Got Its Facts Right ................................................................. 5

        B.      Digicel-Haiti Got Some Facts Right ............................................... 8

III.    DIGICEL-HAITI IS A COMMON CARRIER ............................................. 12

        A.      Digicel-Haiti Is Covered By Section 152(a) of the Act ................. 12

                1.      Resellers Are "Engaged In" Providing the Services They Resell ............. 13

                2.      Back-to-Home-Country Roaming Service Is Resale ............... 14

                3.      Digicel-Haiti Offers Service within the United States ............................ 16

        B.      Section 152(b)(2) Does Not Apply to Digicel-Haiti ........................... 20

        C.      The Fact That Digicel-Haiti's Is as a Foreign Carrier (as to its Haitian Operations) Does Not Mean it is Not a Common Carrier in the United States (as to RLYH Service) ........................................................... 23

IV.     ONCE DIGICEL-HAITI'S CARRIER STATUS IS ACCEPTED, ITS VIOLATION OF THE ACT IS UNDENIABLE ............................................ 25

        A.      UPM Made a "Reasonable Request" to Purchase RLYH Service by Activating Its SIM Cards, Paying Digicel-Haiti, And Subscribing to the Service .......................................................................................... 25

        B.      There Was Nothing "Reasonable" About Digicel-Haiti's Termination of UPM's RLYH Service .......................................................................... 28

                1.      Digicel-Haiti's Purported "Terms and Conditions" Have No Legal Effect ................................................................................... 29

                2.      Cutting Off UPM's RLYH SIM Cards Was Both Unreasonable and Unreasonably Discriminatory ................................................. 32

V.      CONCLUSION .......................................................................................... 34

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

| Item | Pages |
|------|-------|
| *Cases* | |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) | 4, 7, 12 |
| *AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978) | 13, 21 |
| *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278 (9th Cir. 1982) | 4 |
| *Brown v. MCI Worldcom Network Servs., Inc.,* 277 F.3d 1166 (9th Cir. 2002). | 32 |
| *Chaffin v. Atlanta Coca Cola Bottling Co.*, 194 S.E.2d 513 (Ga. Ct. App. 1972) | 31 |
| *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156 (9th Cir. 1992) | 28 |
| *Cullinane v. Uber Techs., Inc.,* 893 F.3d 53 (1st Cir. 2018) | 32 |
| *Delaware Sports Serv. v. Diamond State Tel. Co.*, 241 F. Supp. 847, 852 (D. Del. 1965), aff'd sub nom. *Delaware Sports Serv. v. Diamond State Tel. Co.*, 355 F.2d 929 (3d Cir. 1966) | 27 |
| *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099 (D. Or. Sep. 12, 2020) | 4 |
| *Lachs v. Fidelity & Casualty Co. of New York*, 118 N.E. 555 (N.Y. 1954) | 31 |
| *Slater v. Fid. & Cas. Co.*, 98 N.Y.S.2d 28, 29 (N.Y. App. Div. 1950) | 31 |
| *Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253 (D. Or. August 6, 2014) | 32 |
| *Steven v. Fid. & Cas. Co.*, 377 P.2d 284, 298 (Cal. 1962) | 31 |
| *Thornton v. Shoe Lane Parking, Ltd.* [1971] 2 QB 163 | 31 |
| *Tracy v. Southern Bell Telephone & Telegraph Co.*, 37 F. Supp. 829 (S.D. Fla. 1940) | 27 |
| *FCC Rulings* | |
| *Amendment of Parts 1 and 63 of the Commission's Rules*, Notice of Proposed Rulemaking, 19 FCC Rcd. 4231 (2004) | 15 |

Page ii – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

# TABLE OF AUTHORITIES

| Item | Pages |
|---|---|
| *Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398 (2007) | *passim* |
| *Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials,* Memorandum Opinion, Declaratory Ruling and Order, 2 FCC Rcd 2819 (1987) | 28 |
| *Harry Katz and Bertha B. Katz v. American Telephone & Telegraph Co. and The Chesapeake & Potomac Telephone Co.*, Memorandum Opinion and Order, 43 F.C.C. 1328 (1953) | 27 |
| *International Bureau Seeks Comment on Draft Filing Manual for Proposed Section 43.62 Report*, Public Notice, 26 FCC Rcd. 9540 (2011) | 17 |
| *Petition of the Continental Telephone Company of Virginia for a Declaratory Ruling that it is not Fully Subject to the Commission's Jurisdiction Under the Communications Act of 1934,* Memorandum Opinion and Order, 2 FCC Rcd 5982 (Common Carrier Bur. Oct. 5, 1987) | 21 |
| *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, Report and Order, 60 F.C.C.2d 261 (1976)  *amended by*, 62 F.C.C.2d 588 (1977), *aff'd, AT&T v. FCC*, 572 F.2d 17 (2d Cir. 1978) | 13, 21 |

## *Statutes*

| | |
|---|---|
| 47 U.S.C. § 152 | *passim* |
| 47 U.S.C. § 153 | 2, 13, 18, 24 |
| 47 U.S.C. § 201 | 4, 25, 28, 35 |
| 47 U.S.C. § 202 | 4, 34, 35 |
| 47 U.S.C. § 206 | 1, 4, 27, 35 |
| 47 U.S.C. § 207 | 27 |
| 47 U.S.C. § 208 | 27 |
| Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq* | *passim* |

## *Rules and Regulations*

| | |
|---|---|
| 47 C.F.R. § 63.09(d) | 17 |

Page iii – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## TABLE OF AUTHORITIES

| Item | Pages |
|---|---|
| 47 C.F.R. § 63.10 | 17 |
| Fed R. Civ. P. 56 | 4 |

*Other Materials*

| | |
|---|---|
| https://www.merriam-webster.com/dictionary/customer | 7 |
| https://www.merriam-webster.com/dictionary/hacker | 8 |
| https://www.merriam-webster.com/dictionary/purchase | 7 |
| Jonathan G. Rohr, *Smart Contracts and Traditional Contract Law, or: The Law of the Vending Machine*, 67 Clev. St. L. Rev. 67 (2019) | 30 |

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## I.    INTRODUCTION AND SUMMARY

Before addressing the arguments Digicel-Haiti *does* make, some arguments that it does *not* make bear emphasis. Digicel-Haiti does not dispute that resellers are common carriers under the Act.[1] It does not dispute that the FCC forbids carriers (including resellers) from preventing their customers from reselling their services.[2] And it does not dispute that violating an FCC ruling interpreting the Act *is* a violation of the Act, subjecting the violator to liability under Section 206.[3] So the parties agree: (1) resellers are carriers; (2) carriers, including resellers, may not restrict resale of their services; and (3) if they do, they are liable under Section 206.

Within this undisputed legal landscape, Digicel-Haiti makes three arguments to try to escape liability: (1) Digicel-Haiti is not a common carrier with respect to Roam Like You're Home ("RLYH") service;[4] (2) UPM was not a customer of the service;[5] and (3) even if Digicel-Haiti was a carrier and UPM was a customer, it was not unlawful for it to cut off UPM.[6] Along the way, it argues that UPM misstated various facts.[7] All of these arguments are wrong.

With regard to the facts, Digicel-Haiti does not provide any evidence that anything

---

[1] Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* (the "Act"). In this brief, UPM uses the terms "common carrier" or "carrier" to refer to entities subject to the Act.

[2] Counterclaim Plaintiff's Motion for Summary Judgment – Communications Act (ECF #386) ("UPM Communications Act Motion") at 4-5, 16-19, 23-28 (carriers may not ban resale).

[3] *Id.* at 4 n.11 and accompanying text; 23 n.79 and accompanying text; 27 n.95, 28 n.100 and accompanying text (violations of FCC interpretations of the Act are violations of the Act). All references in this brief to "Section xxx" refer to Sections of the Act, unless otherwise noted.

[4] *See* Plaintiff Unigestion Holdings' Cross Motion For Summary Judgment On Defendant UPM Technology, Inc.'s Communications Act Counterclaims and Response in Opposition to Defendant UPM Technology, Inc.'s Motion For Summary Judgment – Communications Act (ECF #397) ("Digicel-Haiti Communications Act Brief") at 11-20.

[5] *See* Digicel-Haiti Communications Act Brief at 2, 4-5, 20-21.

[6] *Id.* at 22-25.

[7] *Id.* at 3-8

---

Page 1 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

UPM stated as fact was not true. Its complaint seems to be that UPM did not highlight certain claimed facts that, while irrelevant under governing law, might matter under Digicel-Haiti's erroneous legal theories. Moreover, Digicel-Haiti's irrelevant claimed "facts" are subject to genuine dispute and so cannot support granting summary judgment for Digicel-Haiti, even if one were to indulge its view of the law.[8]

Digicel-Haiti's legal claims are also meritless. Digicel-Haiti is a common carrier with respect to RLYH service, plainly and as a matter of law. With RLYH, Digicel-Haiti offers telecommunications (calls from the United States to Haiti) to the public (SIM card holders in the United States) for a fee (the RLYH subscription fee and the per-minute charges). That is all it takes. It really is that simple.[9]

Probably precisely because Digicel-Haiti's status as a common carrier is so obvious, its arguments to the contrary are poorly stated, poorly reasoned, and – to the extent they are coherent at all – directly contradicted by well-settled precedent. Its brief is a master class in rhetoric and misdirection, all in an effort to get the Court to throw up its hands in frustration or confusion and let Digicel-Haiti skate by, at least until trial, in the hope of confusing a jury as well. Unfortunately, in practical terms that means that UPM has no choice but to go down a few rabbit-holes of common carrier law to clean up Digicel-Haiti's mess – which UPM does below. But again, the answer really is very simple: RLYH service is offering telecommunications to the public for a

---

[8] Digicel-Haiti was evidently so flustered by UPM's arguments that it felt it necessary to assert that counsel made claims with "no good faith basis," *id.* at 1; that counsel "affirmatively" "misrepresented" relevant facts, *id.* at 3; and even that counsel made a "purposeful effort" to make "false statements." *Id.* at 6-7. UPM will ascribe these baseless aspersions – Digicel-Haiti's "pointed indictment" of UPM, *id.* at 2 – to overly zealous advocacy, *see id.* at 2, and will not address Digicel-Haiti's random rhetorical excesses except where absolutely necessary.

[9] *See* 47 U.S.C. §§153(50) ("telecommunications"), (53) ("telecommunications service"), and (51) ("telecommunications carrier"). *See also* 47 U.S.C. § 153(11) ("common carrier"). As UPM has noted, for these purposes the terms "common carrier" and "telecommunications carrier" under the Act are interchangeable, both referring to entities subject to the Act and to the FCC's regulatory authority. *See Virgin Islands Tel. Co. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999).

Page 2 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

fee. Therefore Digicel-Haiti is a carrier. Therefore it is illegal for it to block the resale of RLYH service. Therefore Digicel-Haiti is liable to UPM. The rest, as they say, is commentary.

To avoid the obvious, Digicel-Haiti clings desperately to the baseless notion that that because its physical network is in Haiti, it cannot be subject to the Act. And it remains in glassy-eyed denial of the fact that when it charges SIM card holders in the United States for RLYH calls from the United States, that means that it is providing telecommunications service – "foreign communications" – in the United States, making it a carrier here. It simply refuses to acknowledge that resellers with no physical facilities are, as a matter of law, common carriers.

As to UPM's status as a customer, Digicel-Haiti (regardless of its subjective intent) makes RLYH service available to any SIM card holder in the United States. To sign up, all a SIM card holder has to do is activate the SIM card, pay money into the SIM card's account (that is, pay money to Digicel-Haiti), and then have the SIM card exchange some electronic codes with Digicel-Haiti's network. To claim that Digicel-Haiti took UPM's money and provided service, but that UPM still did not become Digicel-Haiti's customer, is absurd. Digicel-Haiti's claim depends on the idea that UPM did not comply with supposed RLYH terms of service that Digicel-Haiti does not show to prospective customers. Digicel-Haiti never explains how those terms could be binding, and ignores the Court's earlier discussion of this specific issue, holding that they cannot be.[10]

Finally, Digicel-Haiti's arguments contending that, granting its status as a carrier, it was lawful for it to refuse to provide service (or cut off service) to UPM, are equally absurd. It argues that it has the right to refuse or cut off service based on a belief that is services are being used illegally, but such a right simply does not exist under federal common carrier law. Its argument that UPM was bound by some written terms of service is baseless, because RLYH

---

[10] *See* Opinion and Order, ECF #294 at 15 n.11 ("Digicel Haiti offers no facts or argument explaining how UPM would have become obligated to Digicel Haiti's terms, for example by 'shrink wrap' terms, electronic 'click' agreement, or some other means"), 18 n.13 (Digicel-Haiti "presents no evidence" that could explain "how UPM might have become bound to" purported "terms Digicel Haiti tried to attach to its RLYH program").

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

customers never had to accept or even acknowledge the existence of any such terms. And in any event, terms of service cannot override the FCC's ban on resale restrictions.

In these circumstances, the Court should rule that: (1) Digicel-Haiti is a common carrier under the Act with respect to RLYH service; (2) as a common carrier, Digicel-Haiti is subject to the ban on resale restrictions established by the FCC under Sections 201 and 202; and (3) Digicel-Haiti violated that ban by preventing UPM from reselling RLYH service, thereby making Digicel-Haiti liable to UPM under Section 206, with the amount of damages being the only issue remaining for trial.

## II.    SORTING OUT THE FACTS

UPM has emphasized that the law of summary judgment requires a party claiming that a fact is genuinely disputed to present admissible evidence that the stated fact is wrong.[11] UPM has emphasized this point because it should not be required to undertake the time, expense, and risk of trial on issues where all Digicel-Haiti offers in opposition is rhetoric and misdirection. This is the situation here. Digicel-Haiti does not identify a single UPM factual assertion that is not both true and supported by the record, and Digicel-Haiti offers no admissible evidence suggesting that any of UPM's factual assertions are wrong. As a matter of law, therefore, those facts are established as true for purposes of this case.

Because Digicel-Haiti makes factual claims of its own in support of its own summary judgment motion, UPM reviews those claimed facts as well.

---

[11] In response to UPM's summary judgment motion, Digicel-Haiti must come forward with "admissible evidence" of "specific facts" showing that there is a "genuine" dispute as to a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986); *Gonsalez v. Amsberry*, No. 2:18-cry-01839-AC, 2020 U.S. Dist. LEXIS 167099, at *17 (D. Or. Sep. 12, 2020); *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982); Fed. R. Civ. P. 56(c). At this late stage of the case, failure to provide admissible evidence showing that a claimed fact is wrong constitutes an admission that it is true. *See* UPM Communications Act Motion at 8-9.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## A.  UPM Got Its Facts Right

Digicel-Haiti claims that UPM misstated the "target demographic" of RLYH service.[12] But UPM did not say anything about any "target demographic." It stated as a fact that anyone with a Digicel-Haiti SIM card in the United States and enough money in the SIM card's account could subscribe that SIM card to RLYH service.[13] This is true. UPM gave record citations showing this is true.[14] Digicel-Haiti does not deny that this is true. And it presents no admissible evidence to suggest that it is not true. So this must now be taken as true.[15]

Digicel-Haiti's concern seems not to be with what UPM said, but with what it did not say. UPM did not say anything about Digicel-Haiti's subjective intentions for RLYH service (its "target demographic") because those subjective intentions are irrelevant. Digicel-Haiti seems to want to argue that its web page or "Terms and Conditions" (and related subjective intentions) prevent UPM from being a RLYH "customer."[16] But those materials do not matter, because Digicel-Haiti offers RLYH service without requiring customers or prospective customers to review or assent to them. Digicel-Haiti's subjective intentions, and the written materials it cites, do not change what customers actually had to do to subscribe to the service in light of how it was actually, physically configured. This means that neither the written materials nor Digicel-Haiti's subjective intentions have any significance – they are not "material."[17]

Digicel-Haiti also objects to UPM's statement that "Digicel-Haiti has configured

---

[12] Digicel-Haiti Communications Act Brief. at 3-4.

[13] UPM Communications Act Motion at 5.

[14] *Id.* at n.13.

[15] Again, as the party opposing summary judgment, Digicel-Haiti present with specific facts and admissible evidence to show there is a genuine dispute as to a material fact. *See* n.11, *supra.*

[16] *See* Digicel-Haiti Communications Act Brief at 3-4, citing Plaintiff's Trial Exhibit 66.

[17] *See* note 10, *supra.* Digicel-Haiti does not even try to explain why or how its purported terms and conditions could have become binding on UPM. *See also* Opinion and Order, ECF #294 at 11 n.13.

---

Page 5 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

its network and systems so that any holder of a Digicel-Haiti SIM card in the United States can become a Digicel-Haiti customer by activating the card automatically on the network of Digicel-Haiti's roaming partner."[18] But here again, this is simply factually true; UPM provided citations to the record showing that it is true;[19] and Digicel-Haiti presents no admissible evidence (or indeed any evidence) to suggest that it is false. So these facts, too, are established.

Digicel-Haiti's concerns with this supposedly "insidiously deceptive" statement are difficult to parse.[20] It says it did not take "affirmative steps" to "configure its network" to "facilitate" "non-subscribers," "bypass," or "RLYH re-sale,"[21] but UPM did not say anything about "affirmative steps." And in any event, certainly nobody *else* set up Digicel-Haiti's network and systems. This necessarily means that Digicel-Haiti itself took the "steps" to set them up the way they are, in fact, set up. And Digicel-Haiti does not claim there is some *other* way to establish an account on Digicel-Haiti's network or to subscribe to and pay for Digicel-Haiti services, other than as UPM described.

All Digicel-Haiti seems to be saying is that, when it set up its network and systems as it did, it had some subjective ideas about RLYH and its target subscribers – basically, who it hoped would set up accounts and how it hoped its subscribers would use those accounts. UPM does not dispute that Digicel-Haiti had ideas, but whatever they might have been, they were not communicated in any legally relevant way (or at all) to UPM or any other RLYH customers or potential customers – and Digicel-Haiti does not claim that they were. So again, even if Digicel-Haiti's subjective ideas are "facts," they are not *material* – and Digicel-Haiti provides nothing to

---

[18] Digicel-Haiti Communications Act Brief at 4, quoting UPM Communications Act Motion at 1.

[19] Digicel-Haiti quotes from the introduction to UPM's filing, which did not include citations. The citations showing that UPM's statement is true are set out later. *See* UPM Communications Act Motion at 5-6 & nn.16-18.

[20] Digicel-Haiti Communications Act Brief at 4.

[21] *Id.*

suggest that they are.[22]

Digicel-Haiti is particularly exercised that UPM noted that it was Digicel-Haiti's customer.[23] But this is true. A "customer" is simply "one that purchases a commodity or service,"[24] and "purchase" simply means "to obtain by paying money or its equivalent."[25] Digicel-Haiti does not deny that UPM paid Digicel-Haiti to use RLYH service; UPM, therefore, was Digicel-Haiti's customer. And UPM became a customer the same way any other RLYH subscriber did: by activating its SIM cards, topping them up, and sending the requisite codes to the network. If UPM is not a RLYH customer, then Digicel-Haiti had no customers at all.

Digicel-Haiti then descends into trivial word games. UPM said that there "is no opportunity for direct communication between Digicel-Haiti and the SIM card holder" and that the automated subscription process is "accomplished by sending Digicel-Haiti-specified codes to the network."[26] Digicel-Haiti claims that this statement "omitted" the fact that the SIM card holder exchanges codes with Digicel-Haiti's network to subscribe to RLYH.[27] But that exchange of codes is exactly what UPM described.[28] UPM's point, in that segment of in its brief, was that the automatic process of signing up for RLYH service did not entail discussion of a prospective customer's individual needs. Digicel-Haiti does not contest this. Digicel-Haiti also does not contest that the exchange of electronic signaling, that it itself established, does not entail any human-to-

---

[22] What facts are "material" is determined by relevant substantive law. See *Anderson*, *supra*, 477 U.S. at 248. There is no sound theory under which Digicel-Haiti's subjective intentions or non-conspicuously-disclosed documents are relevant to its liability under the Communications Act.

[23] *See, e.g.,* Digicel-Haiti Communications Act Brief at 4-5.

[24] *See* https://www.merriam-webster.com/dictionary/customer (last visited Sept. 3, 2022).

[25] *See* https://www.merriam-webster.com/dictionary/purchase (last visited Sept. 3, 2022).

[26] UPM Communications Act Motion at 1-2.

[27] Digicel-Haiti Communications Act Brief at 5.

[28] As before, the Digicel-Haiti quotes from the introduction to UPM's filing; the record citations are set out a few pages later. *See* UPM Communications Act Motion at 5-6 & nn.16-18.

Page 7 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

human interaction. While UPM does not see how it matters for purposes of the Communications Act claim, UPM submits that it is entirely appropriate to say that this non-human signal exchange does not constitute "direct communication."[29]

In short, every one of UPM's stated facts is accurate; none has been challenged with admissible evidence; and so they all are established for purposes of UPM's motion.

### B. Digicel-Haiti Got Some Facts Right

Digicel-Haiti provides record citations for some of its factual claims, but not others; UPM accepts some as true, but disputes others; and some are irrelevant to the Communications Act claim. To avoid ambiguity, UPM briefly notes the status of each of Digicel-Haiti's claimed "actual facts."[30]

Digicel-Haiti states that "Digicel-Haiti operates a telecommunications network in Haiti and is part of the 'Digicel Group' of companies."[31] UPM does not contest this claim.

Digicel-Haiti states that it "operates solely in Haiti, and through its relationships with Digicel USA and Digicel Jamaica, it engages in roaming relationships with

---

[29] Digicel-Haiti also resorts to name-calling, saying UPM is a "hacker." Digicel-Haiti Communications Act Brief at 4 (six times), 25. A "hacker" is "a person who illegally gains access to and sometimes tampers with information in a computer system." *See* https://www.merriam-webster.com/dictionary/hacker (last visited September 4, 2022). More formally, a hacker evades technical restrictions on a system in order to exploit system capabilities it is not entitled to use. *See* Defendant UPM Technology, Inc.'s Motion for Summary Judgment (ECF #264) at 19 (noting that 18 U.S.C. § 1030– the anti-hacking law – does not apply to someone who does not evade system technical restrictions). But someone who pays for access to a system, accesses it like anyone else, and then uses it in a way the system owner does not like, is not hacking; they are simply using a system in a way the system owner does not like. *Id. See also* Defendants' Reply in Support of Motion for Summary Judgment (ECF #284) at 10-11 (using a system as it is designed is not tortious even if contrary to the desires of the system operator).

[30] Digicel-Haiti Communications Act Brief at 8. UPM notes that many of Digicel-Haiti's purported "facts" seem more directed towards supporting its fraud claim than to defending against UPM's Communications Act claim.

[31] Digicel-Haiti Communications Act Brief at 8.

Page 8 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

telecommunications carriers throughout the world."[32] Digicel-Haiti provides no citations for these assertions, but UPM does not contest them, as long as the term "operates" is construed as applying only to Digicel-Haiti's physical wireless network. Digicel-Haiti's "roaming relationships" are what make it a common carrier, and it certainly "operates" in the United States in that sense.[33] In addition, as discussed below, Digicel-Haiti "operates" in the United States by engaging in extensive marketing efforts here.

Digicel-Haiti states that "UPM acquired Digicel Haiti SIM cards from individuals in Haiti who allegedly purchased [them] [from undetermined sources] and had those SIM cards shipped to UPM in Oregon."[34] This claim is not quite correct. UPM does not know the specific details of how its SIM cards were obtained, *e.g.,* from which specific stores or street vendors its agents in Haiti bought them, but its understanding is that the SIM cards came from stores and street vendors.[35] So it is not quite correct to say that the SIM cards were acquired "from undetermined sources." Moreover, UPM certainly disputes any suggestion that there was anything improper or nefarious about how it acquired its SIM cards. But in any event, the specific provenance of its SIM cards is irrelevant either to Digicel-Haiti's status as a common carrier or to UPM's status as its customer, so this issue is not material to the Communications Act claim.[36]

Digicel-Haiti states that "UPM activated [its] SIM cards and used them to initiate and authenticate two types of bypass calls: (a) calls sent to Haiti via the Internet and originated on

---

[32] *Id.*

[33] *See* UPM Communications Act Motion, *passim.*

[34] Digicel-Haiti Communications Act Brief at 8.

[35] *See, e.g.,* Tran Depo. at 104:5-21; 106:19-108:3; 109:10-19; 110:13-19. (The attached Declaration of Christopher Savage provides the deposition excerpts cited in this brief.)

[36] *See infra. See also, e.g.,* [UPM's] Opposition to Digicel-Haiti's Motion for Partial Summary Judgment (Fraud) (ECF #278) at 7-8; [UPM's] Opposition to [Digicel=Haiti's] Motion for Summary Judgment on [UPM's] Counterclaims (ECF #279) 14-15**.**

Page 9 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti's network. and (b) [RLYH] calls sent through the United States network of a Digicel Haiti domestic roaming partner, sent by that carrier to Digicel Haiti."[37] Here, UPM notes that calls sent to Haiti via the Internet are entirely irrelevant to the Communications Act claim, and also that RLYH calls are not "bypass."[38] UPM, however, does not dispute that it sent calls to Haiti via the Internet and that it resold RLYH service from within the United States.

Digicel-Haiti states that "UPM linked or packaged third party calls bound for Digicel-Haiti customers with the calls UPM initiated using the Digicel Haiti SIMs."[39] Here again, with a qualification that seems not to matter to this motion, UPM does not dispute this assertion.[40]

Digicel-Haiti states that UPM "acknowledge[s]" that Digicel-Haiti "relied on the actions taken by [UPM] by charging UPM the rate for local calls in Haiti, rather than the standard rate for inbound international calls."[41] UPM agrees to the extent that, when it resold a RLYH call, it was charged the "local" rather than the "international" rate on a call-by-call basis.[42] But Digicel-Haiti is playing a bit fast and loose with its citations. UPM has never stated that Digicel-Haiti "relied on" anything UPM did or did not do. This is a legal conclusion bearing on Digicel-Haiti's

---

[37] Digicel-Haiti Communications Act Brief at 8 (citations omitted).

[38] As UPM has noted, resale of RLYH is not "bypass" because RLYH calls are all routed through Digicel-Haiti's international gateway switches and charged Digicel-Haiti's desired $0.23 per minute. *See, e.g.,* [UPM's] Motion for Summary Judgment (ECF #264) at 28 (citing deposition of Mr. Boute and the Third Amended Complaint (ECF #200) at ¶ 136).

[39] Digicel-Haiti Communications Act Brief at 8 (citations omitted).

[40] It is fair to say that UPM "linked" third party calls with the calls it initiated using its SIM cards – that is simply resale. UPM does not agree that it "packaged" third party calls with calls made using its SIM cards; moreover, Digicel-Haiti has never explained what it means by "packaging."

[41] Digicel-Haiti Communications Act Brief at 9.

[42] UPM was effectively charged a much higher rate due to Digicel-Haiti retaining the top-up payments that UPM made on its SIM cards. If Digicel-Haiti is trying to claim that the local rate reflects *all* the money it received from UPM, that is simply false and UPM disputes it. *See, e.g.,* Declaration Of Bruce Tran As Chief Executive Officer Of UPM Technology, Inc. In Support Of UPM Technology, Inc.'s Motion For Summary Judgment (ECF #256) at 8-12 & Exh. 1 The specific amounts that UPM paid, however, are not relevant to the Communication Act claim.

fraud claim, not a "fact" bearing on UPM's Communications Act claim.

Digicel-Haiti states that "when it concluded that a SIM card was being used for bypass, Digicel Haiti took action to interrupt or block the SIM Card from being further used."[43] UPM agrees with this statement, which establishes that Digicel-Haiti, in cutting off UPM's SIM cards, was consciously and affirmatively seeking to block UPM from reselling RLYH service.

Finally, Digicel-Haiti states that "Defendants utilized multiple anti-bypass detection techniques in both types of bypass, including the use of HBS, to induce Digicel Haiti to connect calls being routed through bypass by creating the false impression that calls were being placed by individual [human] subscribers rather than by UPM's SIM Servers and Gateways."[44] UPM disputes these statements, which are not supported by the citations that Digicel-Haiti provides.[45] Again, however, these issues seem unrelated to the Communications Act claim, and reflect an effort by Digicel-Haiti to back-door some claimed "facts" regarding its fraud claim into

---

[43] Digicel-Haiti Communications Act Brief at 9.

[44] *Id.*

[45] Digicel-Haiti cites three items:

(1) UPM's response to Digicel-Haiti's First Request for Admissions No. 22 states that "software is used to select which SIM Card should be used to route a call" in UPM's operations. UPM used software to control the selection of SIM cards to authenticate calls, but different software does different things. The cited admission says nothing about "anti-bypass detection" or human behavior software.

(2) Mr. Tran's deposition testimony refers to software that generated calls in a lab environment to conduct tests, not software that made UPM's resold calls look like they were coming from individual subscribers. Nothing in the testimony suggests that the software was an "anti-bypass detection technique" or that it was a form of HBS.

(3) Mr. McEwen's testimony says that he is generally familiar with "the idea of human behavior software." It does not say that he knows anything about any software that UPM in particular used or that UPM ever used HBS. In fact, he testified that he does not know anything about UPM's operations: none of his testimony was "based on … anything that's … been passed on to me in reference to the way UPM has particularly behaved… ." McEwen Dep. at 148:17-22. (included in attached Declaration of Christopher Savage). As a result, his testimony lacks foundation as to what UPM actually did, and so has no bearing on that point.

Page 11 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the Court's consideration of Communications Act issues.

* * * * *

All Digicel-Haiti seems to be saying about factual issues is that UPM did not present certain facts that Digicel-Haiti views as material. Specifically, Digicel-Haiti seems to think that its unexpressed, subjective intentions about RLYH service, a web page talking about it, and a document of mysterious provenance supposedly containing "Terms and Conditions," matter to the resolution of the Communications Act claim.[46] They do not matter. What facts are material depends on the governing substantive law,[47] and Digicel-Haiti's purported "facts" have nothing to do with its liability under the Communications Act. Before discussing those issues, however, UPM addresses Digicel-Haiti's claim that it is not a common carrier in the first place.

## III.    DIGICEL-HAITI IS A COMMON CARRIER

Digicel-Haiti claims that it is not a common carrier subject to the Act, but its arguments are scattered, incoherent, contradicted by obvious and undisputed facts, and contrary to governing law. Digicel-Haiti's status as a common carrier is irrefutable, whether the focus is on the language of the Communications Act or on binding FCC rulings interpreting the Act. And because Digicel-Haiti is a carrier, the fact that it has openly admitted that it cut off UPM's SIM cards precisely to prevent UPM from reselling RLYH service[48] means that it is liable on UPM's Communications Act counterclaim, with the only issue for trial being the amount of damages.

### A.   Digicel-Haiti Is Covered By Section 152(a) of the Act

The reach of the Communications Act is laid out in Section 152(a). That provision states that the Act applies to

---

[46] Digicel-Haiti Communications Act Brief at 8-9.

[47] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

[48] Digicel-Haiti Communications Act Brief at 9 (Digicel-Haiti cut SIM cards "when it concluded that [they were] being used for bypass").

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

all interstate and foreign communication … which originates and/or is received within the United States, and to all persons engaged within the United States in such communication …[49]

RLYH calls are clearly "foreign communication" under the Act: every RLYH call starts in the United States and ends in Haiti.[50] So the Act plainly applies to RLYH calls. The only question is whether Digicel-Haiti is "engaged in" providing those calls. The answer is obviously "yes." It would make no sense to argue that Digicel-Haiti is somehow not "engaged in" providing a service that it, itself, sells. Yet that is what Digicel-Haiti argues.[51] It is wrong, for several different reasons.

### 1. Resellers Are "Engaged In" Providing the Services They Resell

UPM explained that in offering RLYH service, Digicel-Haiti is reselling foreign communications (calls from the United States to Haiti) that are physically provided by its roaming partners.[52] In determining that resellers (such as Digicel-Haiti) are carriers, the FCC found that resellers are "engaged in" providing the services they resell. In the same order in which the FCC determined that resellers were carriers, it expressly stated that it had "considered and *rejected* arguments that … resellers are *not engaged in* common carriage under the Act and thus are not subject to our jurisdiction."[53] And it stated that it had "decided that resellers will be *engaged in* interstate communication by wire and radio."[54] Resellers are "engaged in" providing the services they resell – which brings them squarely within the scope of Section 152(a).[55]

---

[49] 47 U.S.C. § 152(a).

[50] *See* 47 U.S.C. § 153(21) foreign communication "means communication … *from or to any place in the United States to or from a foreign country*").

[51] *See* Digicel-Haiti Communications Act Brief at 11-15.

[52] UPM Communications Act Motion at 16-19.

[53] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* Report and Order, 60 F.C.C.2d 261 (1976) ("*Resale Order*") at ¶ 8 (emphasis added), *amended by,* 62 F.C.C.2d 588 (1977), *aff'd, AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978).

[54] *Id.* at ¶ 101 (emphasis added).

[55] This also means that Section 52(b)(2) – which exempts entities whose "sole" "engagement" is interconnection with an unaffiliated carrier – will never apply to resellers. *See infra.*

Page 13 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

It bears emphasis that this holding – that resellers are "engaged in" providing service under the Act – was a necessary element of the FCC's main holding that resellers were common carriers. If resale did **not** constitute "engaging in" the provision of communications, then under Section 152(a), the Act would not apply to resellers, and the FCC would have no authority over them. As a result, as a necessary part of its decision to classify resellers as common carriers, the FCC had to find – and did find – that resellers **are** "engaged in" providing the communications they resell, and **are** "engaged in" common carriage.

This means that Digicel-Haiti is subject to the Act under Section 152(a). By offering RLYH service – that is, by reselling calls from the United States to Haiti – Digicel-Haiti has "engaged in" providing those calls.

### 2. Back-to-Home-Country Roaming Service Is Resale

To try to avoid the conclusion that providing RLYH service makes it subject to the Act, Digicel-Haiti argues, somewhat incoherently, that RLYH service is not really a form of resale. But its argument is based on a blatant misreading of an FCC ruling that holds the opposite.[56]

Resale entails one carrier (the reseller) buying the services of another carrier and then (re)selling those services to third parties.[57] It is obvious that roaming arrangements are a form of resale. The home carrier (whose subscribers are roaming) buys service from the host carrier (in the country where the subscribers are roaming), and (re)sells those services to the roaming subscribers. The subscribers have no economic or business relationship with the host carrier at all. They pay their home carrier, which pays the host carrier. So it is clear that when Digicel-Haiti

---

[56] Digicel-Haiti Communications Act Brief at 18-20, discussing *In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules*, Report and Order, 22 FCC Rcd. 11398 (2007) ("*Parts 1 and 63 Order*").

[57] *Resale Order, supra,* at ¶ 17 (resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit.")

Page 14 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

offers RLYH service, it is engaged in reselling the services of its roaming partner.

This is confirmed by the FCC's ruling in the *Parts 1 and 63 Order,* on which Digicel-Haiti relies. That order arose from the FCC conducting a statutorily-mandated periodic review of its regulations to revise or repeal those that are no longer in the public interest.[58] One proposed rule change was "to amend the rules to clarify that U.S.-authorized resale carriers can resell the U.S.-inbound international services of either U.S. carriers or foreign carriers."[59] On this issue, in the Notice of Proposed Rulemaking ("NPRM") leading up to the order, the FCC stated that when the customer of a United States wireless carrier

> is roaming in a foreign country and calls back to the United States, the service provided to that customer includes termination of the call in the United States … . The U.S.-[wireless] carrier, by providing to a U.S. customer foreign-to-U.S. calling (***which would include roaming service in the foreign country***), is ***reselling*** the inbound delivery of an authorized carrier.[60]

The FCC's view could not be clearer: international roaming service "is reselling" the back-to-home-country calls that the roaming subscriber makes.

Following up on the NPRM, in the *Parts 1 and 63 Order* itself, the FCC confirmed this view. It noted that some wireless carriers argued that international roaming – permitting customers roaming overseas to call back to the United States – ***did not*** constitute resale – that is, they made the same argument Digicel-Haiti makes here.[61] The FCC, however, ***rejected*** that argument. While it acknowledged that its rules distinguish between "roaming" and "resale" in

---

[58] *Parts 1 and 63 Order* at ¶ 1.

[59] *Id.* at ¶ 3 (citation omitted).

[60] *In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules*, Notice of Proposed Rulemaking, 19 FCC Rcd. 4231 (2004) at ¶ 24 (footnote omitted, emphasis added).

[61] "Several commenters argue that U.S.-[wireless] carrier provision of international roaming service that allows customers roaming abroad to call back to the United States does not involve the 'resale' of the U.S.-inbound service of foreign carriers." *Parts 1 and 63 Order* at ¶ 17.

Page 15 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

some settings,[62] that did not mean that roaming was not resale:

> *We __disagree__* … with certain commenters who argue *that U.S.-[wireless] carriers' offering of international roaming service* which allows customers roaming abroad to call back to the United States *does __not__ involve the "resale" of the U.S.-inbound service of a foreign carrier.* For the purposes of our international service authorization rules, unless a U.S.-international carrier provides U.S.-inbound service to its customers [using its own facilities], the carrier *effectively resells the U.S.-inbound service of another carrier,* regardless of whether the underlying carrier-to-carrier arrangement is a resale, roaming, or other type of arrangement.[63]

The FCC *disagrees* with the argument that roaming calls that subscribers make back to the home country are *not* resale. In other words, the FCC held that that kind of roaming *does* involve resale.

This is exactly the point that UPM made. UPM cited the *Parts 1 and 63 Order* to show that back-to-home-country roaming is a form of resale – just what the FCC concluded. This means, as UPM explained, that the *Parts 1 and 63 Order* confirms that Digicel-Haiti, by virtue of its roaming arrangements, is a reseller – and therefore a carrier.

### 3.  Digicel-Haiti Offers Service within the United States

It is uncontested that RLYH service is used by Digicel-Haiti subscribers in the United States. And it is uncontested that SIM card holders can activate their SIM cards and subscribe to RLYH service from the United States. And it is uncontested that RLYH provides calls from within the United States to Haiti. Yet somehow, according to Digicel-Haiti, it is not subject to the Act because it does not "offer" RLYH service within the United States.[64]

---

[62] *Id.* at ¶ 20.

[63] *Id.* at ¶ 21 (emphasis added, footnote omitted). The commenters suggested that roaming was not a form of resale because the FCC, for some purposes, treats "resale" and "roaming" as different things. UPM explained the basis for the FCC's having separate rules for roaming and resale. *See* UPM Communications Act Brief at 25-27. Special concerns about wireless resale arise when one licensed wireless carrier wants to rely on the facilities and services of another licensed wireless carrier in a region in which both carriers are authorized to use spectrum and expected to build their own facilities. *See id.; Parts 1 and 63 Order* at ¶ 20.

[64] Digicel-Haiti Communications Act Brief at 15-20.

Page 16 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Digicel-Haiti is wrong. First, Digicel-Haiti does not even discuss the uncontested facts just stated. And it does not explain whatever its idiosyncratic idea of "offer" might be, that would exclude from the term "offer" its sale and provision of RLYH service within the United States. How do SIM card holders in the United States subscribe to or use RLYH service, if that service is not "offered" here? Digicel-Haiti never even tries to make sense of its position.[65]

Instead, it claims that the *Parts 1 and 63 Order* supports the view that a carrier providing back-to-home-country roaming service "offers" it in the carrier's home country, not in the country where subscribers using the service are located.[66] This makes no sense. As described above, the question before the FCC was whether United States wireless carriers offering back-to-home-country roaming were engaged in international calling subject to the Act. To answer that question in the affirmative – which the FCC did – required that it find that those United States wireless carriers were providing communications that started overseas and ended in the United States, *i.e.,* that they were offering "foreign communications" under the Act's definition (or "international communications" under informal industry usage).[67] The FCC had authority over

---

[65] After three pages of quoting seemingly random portions of the Act and FCC rulings, Digicel-Haiti declares, without citation or explanation, that "it is undisputable that the RLYH services offered by Digicel Haiti are offered in Haiti—whether by resale or otherwise—and not in the United States." Digicel-Haiti Communications Act Brief at 17. This effort at legal gaslighting does not create a genuine dispute as to any material facts, and certainly does not constitute a cogent legal argument about the application of the Act here.

[66] Digicel-Haiti Communications Act Brief at 18-19 ("offering of outbound roaming services (from the US to an international destination) by foreign carriers to their subscribers traveling in the United States and using the networks of U.S. carriers to facilitate that access, would be an offering of resale services *in the foreign market* – not resale in the United States") (emphasis added, footnote omitted).

[67] The terminology can be confusing. The Communications Act does not define the terms "foreign carrier" or "international carrier." FCC rules and industry usage define a "foreign carrier" as an entity that provides services within a foreign country, *see* 47 C.F.R. § 63.09(d), while an "international carrier" provides services between the United States and a foreign country. *See, e.g., International Bureau Seeks Comment on Draft Filing Manual for Proposed Section 43.62 Report,* Public Notice, 26 FCC Rcd. 9540 (2011) at ¶ 4; 47 C.F.R. § 63.10 (noting different classes of

---

Page 17 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

back-to-home-country roaming not because the service was somehow being "offered" in the United States, but because *one end of the calls made using the service* was in the United States:

> [We] find determinative that a U.S.-licensed [wireless] carrier *offers* its customers a telecommunications service *from a point outside the United States* to a point within the United States. Section 2 of the Act [47 U.S.C. § 152] establishes that the provisions of the Act apply to, *inter alia*, "all interstate and *foreign* communication by wire or radio ... which originates *and/or is received within the United States* and to all persons engaged within the United States in such communication...." Accordingly, the fact that the U.S.-[wireless] carrier's customer originates a U.S.-inbound call on the facilities of a foreign carrier does not affect our jurisdiction. The use of a foreign-authorized facility by a U.S.-licensed telecommunications carrier to provide its customers a telecommunications service that originates in a foreign point and terminates within the United States does not divest the Commission of its Title II jurisdiction over the offer of that service.[68]

In other words, this FCC ruling *confirms* the agency's authority over RLYH service, because RLYH service "originates and/or is received within the United States."

UPM does not understand why Digicel-Haiti cited this ruling for the idea that back-to-home-country roaming is "offered" in the home country and not where the subscribers are located. To the extent that the FCC talks about where the service is being "offered," it notes that the "offer" is for service "from a point outside the United States." This destroys Digicel-Haiti's claim that the FCC viewed back-to-home-country roaming as being "offered" in the home country rather than overseas. And the FCC notes that a call using the service "originates … on the facilities of a foreign carrier," which just confirms that the "offering" occurs overseas, not at home. As relevant here, this means that RLYH service is "offered" in the United States.[69]

---

"international carriers"). For its part, the *Communications Act* defines "foreign *communication*" as a call between the United States and a foreign country. 47 U.S.C. § 153(21). So entities that offer "foreign communications" are (in informal usage) *international carriers* subject to the Act, but pure "foreign *carriers*" – under the rules, entities that provide services only in foreign countries – do not provide "foreign *communications*."

[68] *Parts 1 and 63 Order* at ¶ 19 (footnotes omitted; first two emphases added).

[69] It does not matter that foreign wireless providers may not have obtained formal authority from the FCC for back-to-home-country roaming. *See* Digicel-Haiti Communications Act Brief at 19-

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

In addition to having no basis in precedent, Digicel-Haiti's argument about the location of "offers" makes no sense in the real, physical world either. Subscribers can sign up for RLYH service while in the United States, and the only time they ever use the service is when they are "outside of Haiti" and "in the United States." This clearly entails "offering" RLYH in the United States. So what can Digicel-Haiti possibly mean by saying the opposite?

One could perhaps imagine scenarios in which only subscribers physically in Haiti could subscribe to RLYH service, while subscribers physically in the United States could not. For example, one could imagine a set-up where Digicel-Haiti would only subscribe a SIM card to RLYH service when the SIM card was communicating with Digicel-Haiti's network through a radio connection in Haiti. Or, one could imagine a set-up where subscribers could not sign up for RLYH service without checking an online box affirming that they are physically in Haiti. But RLYH service is not set up that way – and Digicel-Haiti does not claim that it is. To the contrary, the record is clear and uncontradicted that subscribers can subscribe their SIM cards to RLYH service from the United States.[70] When SIM card holders in the United States can pay for and subscribe to a service that they will use in the United States and that is physically provided by carriers located in the United States, it is simply irrational to suggest that the service is not being "offered" in the United Sates.

---

20. The FCC does not waste resources addressing issues that are not causing problems. Note that in the *Parts 1 and 63 Order* the FCC did not prospectively grant wireless carriers new authority to offer back-to-home-country roaming; it retroactively approved services already being offered. *Parts 1 and 63 Order.* at ¶¶ 15-17, 23. This illustrates why Digicel-Haiti's claim that ruling for UPM here would create an "upheaval of telecommunications policy" is, to put it charitably, unfounded. *See* Digicel-Haiti Communications Act Brief at 19-20. The FCC would likely be unconcerned about foreign wireless carriers' back-to-home-country roaming services, but if the issue came up, it could simply issue a blanket authorization for those services, just as it did in the *Parts 1 and 63 Order.* Of course, if there *are* problems with back-to-home-country roaming, a ruling here confirming that such services are within the FCC's jurisdiction would help, not hurt.

[70] *See* UPM Communications Act Motion at 13.

---

Page 19 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

The only thing Digicel-Haiti cites in support of its absurd claim that RLYH service is offered only in Haiti, and not in the United States,[71] is a UPM response to a request for admission that shows the opposite:

> 9. Please admit that Digicel Haiti operates solely in Haiti.
>
> RESPONSE: UPM can neither admit nor deny this request because the term "operates" is ambiguous in this context. UPM admits that Digicel-Haiti's physical wireless retail network is entirely located in Haiti, so the "operation" of that network occurs solely in Haiti. At the same time, Digicel-Haiti, through roaming arrangements with United States carriers, **resells the services of those carriers within the United States,** so that Digicel-Haiti's resale "operations" **occur in the United States**.[72]

Far from supporting the idea that Digicel-Haiti only offers RLYH service within Haiti, this statement – on which Digicel-Haiti has chosen to rely – shows that RLYH service is offered and provided in the United States.

### B. Section 152(b)(2) Does Not Apply to Digicel-Haiti

The discussion just above shows that RLYH service is covered by the language of Section 152(a), and that Digicel-Haiti itself, in providing that service, is "engaged in" foreign communication and is therefore subject to the Act. The discussion below shows that Digicel-Haiti is not exempt under Section 152(b)(2). That provision states that the Act does not apply to:

> (2) any carrier engaged in interstate or foreign communication **solely** through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier …[73]

As described below, however, Digicel-Haiti is "engaged in … foreign communications" in ways other than physical interconnection with a non-affiliate. It therefore cannot avail itself of this

---

[71] Digicel-Haiti Communications Act Brief at 12-14.

[72] [UPM's] Response to [Digicel-Haiti's] Second Request for Admissions, No. 9 (emphasis added).

[73] 47 U.S.C. § 152(b)(2) (emphasis added).

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

exemption.

First, as discussed above, the FCC has flatly held that a reseller is "engaged in" providing the services it resells.[74] When it determined that resellers were common carriers, it held that it had "considered and *rejected* arguments that …  resellers are *not engaged in* common carriage under the Act and thus are not subject to our jurisdiction,"[75] and that it resellers are "*engaged in* interstate communication by wire and radio."[76] This means that, in addition to its physical interconnection arrangements, Digicel-Haiti is "engaged in" providing RLYH service. As a result, Digicel-Haiti's physical interconnection arrangements are not the "sole" means by which it is "engaged in" providing services. In other words, its status as a reseller is sufficient, standing alone, to conclude that Digicel-Haiti is not covered by the Section 152(b)(2) exemption.

Second, Digicel-Haiti's physical interconnection arrangements do not qualify for the Section 152(b) exemption in the first place. That exemption applies only to carriers whose "sole" interaction with interstate or foreign communication is via interconnection with "the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier" – that is, through an *unaffiliated* entity. But Digicel-Haiti's connection to the United States is by means of the facilities of Digicel-USA – an affiliate.[77] This means that Section 152(b)(2) does not apply to Digicel-Haiti at all.[78]

---

[74] *Resale Order, supra,* at ¶¶8, 101. *See also* note 55, *supra*, and accompanying text.

[75] *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* Report and Order, 60 F.C.C.2d 261 (1976) ("*Resale Order*") at ¶ 8 (emphasis added), *amended by,* 62 F.C.C.2d 588 (1977), *aff'd, AT&T v. FCC,* 572 F.2d 17 (2d Cir. 1978).

[76] *Id.* at ¶ 101 (emphasis added).

[77] *See* Digicel-Haiti Communications Act Brief at 8 (noting role of Digicel-USA). *See also* Third Amended Complaint (ECF #200) at ¶¶ 17-18, 21, 35-36 (describing role of Digicel-USA).

[78] *See In the Matter of Petition of the Continental Telephone Company of Virginia for a Declaratory Ruling that it is not Fully Subject to the Commission's Jurisdiction Under the Communications Act of 1934,* Memorandum Opinion and Order, 2 FCC Rcd 5982 (Common Carrier Bur. Oct. 5, 1987) at ¶¶ 3, 20, 22 (Section 152(b)(2) exemption not available to carriers

Page 21 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Third, as the Court has suggested, Digicel-Haiti cannot credibly claim to be somehow isolated from, and uninvolved with, selling services within the United States when its "Diaspora" program directly markets those services here.[79] The actual marketing activity for the Diaspora program is conducted by a Digicel-Haiti affiliate, but Digicel-Haiti is well aware of these efforts, including, specifically, the facts about these efforts laid out in its parent company's SEC filing.[80] This is not surprising, because, as Digicel-Haiti fully understands, these marketing efforts are undertaken "for the benefit of" Digicel-Haiti.[81]

Several exemplar advertisements directed to members of the Haitian diaspora in the United States are attached for the Court's reference.[82] The point of these advertisements – and of

---

connected via affiliates).

[79] *See* ECF #401 (noting that Digicel-Haiti parent company's SEC filing stated that "By marketing directly to this diaspora, Digicel can *drive international calling* and allow these communities to "gift" top-up to people in their markets. To develop our Diaspora product, we have established a Miami-based team and marketing presence in New York, Los Angeles" and other cities) (emphasis added).

[80] *See* Unigestion Holdings' Amended Phase I Lay Witness Statements (ECF #390) at 6 ("Mr. Boute will discuss marketing, distribution, and/or advertising of any Digicel-Haiti services *within or directed to the United States*, including remote top-ups and recharges for individual Digicel Haiti accounts within Haiti, and the economic impact and overall importance of calls from the United States to Digicel Haiti customers in Haiti. … *He will specifically discuss the Digicel Haiti "Diaspora" program described in Digicel Group's Form F-1, dated June 26, 2015* … . He will describe Digicel Group's activities designed to market services to the diaspora in America, promoting the availability of top-ups (remittances) and calling plans to various Digicel markets, including, in particular, Haiti …") (emphasis added). *See also* Boute Depo. at 102:22-107:12 (included in attached Declaration of Christopher Savage).

In response to the Court's question regarding the admissibility of the SEC document, *see* ECF #401, Digicel-Haiti's proffer of testimony from its CEO about the contents of that document constitutes adoption of those contents under Fed. R. Evid. 801(d)(2)(B) (a statement is not hearsay if it is "one the party manifested that it adopted or believed to be true"). The document is therefore admissible on that ground, if not others as well.

[81] Boute Depo. at 106:19-23.

[82] *See* Declaration of Bruce Tran in Support of UPM's Motion for Summary Judgment and in Opposition to Digicel-Haiti's Motion for Summary Judgment on Communications Act Issues. As Mr. Tran explains, by virtue of UPM's participation in the market for resale of Digicel-Haiti's

---

Page 22 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the Diaspora program writ large – is to "drive international calling" between members of the Haitian diaspora in the United States and their friends and family back in Haiti.[83] That is, the Diaspora program was designed to get people in the United States to pay for calls between the United States and Haiti and to encourage such calls to be made. These direct efforts to encourage such calls, *and to have United States residents pay for them,* shows that it is absurd to claim that Digicel-Haiti's "engagement in" providing calling between the United States and Haiti is "solely" limited to its physical interconnection arrangements. It actively markets such calling in the United States, to people who have a strong reason – friends and family back in Haiti – to engage in it.

In sum, there is no factual or legal basis to conclude that Digicel-Haiti is exempt from the reach of the Communications Act under Section 152(b)(2). Its status as a reseller by itself means that Section 152(b)(2) does not apply; the fact that its interconnection arrangements with the United States are via an affiliate means that Section 152(b)(2) does not apply; and its active efforts to market payment for and engaging in international calling between the United States and Haiti surely constitute "engagement in" such calling, which means that its interconnection arrangements are not the "sole" form of its engagement.

**C. The Fact That Digicel-Haiti's Is as a Foreign Carrier (as to its Haitian Operations) Does Not Mean it is Not a Common Carrier in the United States (as to RLYH Service)**

UPM explained that an entity's status as a common carrier is not a one-time, all-or-nothing classification.[84] Instead, an entity is a common carrier with respect to particular activities that it undertakes. So, Digicel-Haiti can be a common carrier with respect to RLYH service even as it is a foreign carrier with respect to its provision of wireless services within Haiti.

---

services, it received copies of the advertisements that Digicel-Haiti was using to promote its services in the United States. Digicel-Haiti was, of course, aware of this advertising. *See* Boute Depo. at 104:17-105:17.

[83] ECF #401, quoting SEC document.

[84] UPM Communications Act Motion at 15-16 & n.55.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

This is a complete answer to Digicel-Haiti's argument that it is not subject to the Act because it is a "foreign carrier."[85] It is a "foreign carrier" with respect to the provision of wireless services within Haiti. But it is a common carrier subject to the Act with respect to its provision of RLYH service. That service is physically provided in the United States by Digicel-Haiti's roaming partners. The actual service – calls from the United States to Haiti – is unquestionably subject to the Act. For its part, Digicel-Haiti becomes subject to the Act, with respect to that service, by reselling it – that is, by selling RLYH service.[86] Digicel-Haiti can claim all it wants that it only "operates" in Haiti, and that that means that it is a "foreign" carrier.[87] Those claims literally makes no difference to its status as a common carrier, subject to the Act, with respect to RLYH service.[88]

---

[85] *See, e.g.,* Digicel-Haiti Communications Act Brief at 11-5.

[86] *See* UPM Communications Act Motion at 1-2, 5-6, 14-22. *See also* text at nn.52-72, *supra*. In statutory terms, every RLYH call is a "foreign communication," subject to the Act, because every RLYH call starts in the United States and ends in a foreign country. *See* 47 U.S.C. § 153(21). *See also* n.67, *supra* (discussing terminology of "foreign communication," "foreign carrier," and "international carrier").

[87] *E.g.,* Digicel-Haiti Communications Act Brief at 11-15.

[88] Digicel-Haiti admits all the facts that show that RLYH is "foreign communication." It states that RLYH calls are "sent through the United States network of a Digicel Haiti domestic roaming partner [and] sent by that carrier to Digicel Haiti." Digicel-Haiti Communications Act Brief at 8 (citations omitted). That is, RLYH calls travel from the United States ("the United States network of a Digicel-Haiti domestic roaming partner") to Haiti ( "sent … to Digicel-Haiti"). So, RLYH calls are "from [a] place in the United States [to] a foreign country," and are thus "foreign communications." *See* 47 U.S.C. § 153(21). Digicel-Haiti acknowledges that this means the FCC has jurisdiction over such calls: "the Act authorizes the FCC to regulate each interstate and *foreign communication* … ." Digicel-Haiti Communications Act Brief at 12 (citations omitted, emphasis in original). UPM is befuddled as to how Digicel-Haiti can acknowledge that RLYH calls go from the United States to Haiti, and acknowledge that the Communications Act covers such calls, but then deny that the FCC has regulatory authority over RLYH service. It simply makes no sense.

Page 24 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## IV.    ONCE DIGICEL-HAITI'S CARRIER STATUS IS ACCEPTED, ITS VIOLATION OF THE ACT IS UNDENIABLE

Digicel-Haiti's remaining arguments proceed from the assumption that it is a carrier.[89] Specifically, it argues that under Section 201, carriers are obliged to provide service on "reasonable request," and that UPM never made a such a request.[90] And finally, in a last-ditch effort to avoid liability, it claims for several reasons that it was supposedly reasonable and non-discriminatory for it to cut off UPM's RLYH service.[91] These arguments are baseless.

### A. UPM Made a "Reasonable Request" to Purchase RLYH Service by Activating Its SIM Cards, Paying Digicel-Haiti, And Subscribing to the Service

Digicel-Haiti argues that it did not violate the Act when it denied UPM the ability to purchase and resell RLYH service, supposedly because UPM never made a "reasonable request" to obtain the service.[92] This argument fails for several reasons.

First, UPM made exactly the same "request" for RLYH service as did as any other RLYH customer. It had its SIM cards send the signals to Digicel-Haiti's network that told the network to enroll the SIM cards in the service. There is no evidence that Digicel-Haiti had any other way to sign up. To the contrary, sending the signals is the only way for any prospective RLYH subscriber to request service. In this regard, there was nothing "secret" or "illicit" about UPM's signing up for and using the service.[93] UPM provided the same information as did any other RLYH subscriber: a valid SIM card, enough money in the account, and the exchange of the requisite signaling. This was, therefore, a "reasonable" request for RLYH service by UPM.

Implicit in Digicel-Haiti's argument is the claim – never explained or justified –

---

[89] Digicel-Haiti does not literally say, "Assuming *arguendo* that it is a carrier…", but its arguments only make sense on that assumption.

[90] Digicel-Haiti Communications Act Brief at 20-21.

[91] *Id.* at 22-25.

[92] *Id.* at 20-21.

[93] *Id.* at 20.

Page 25 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

that UPM, unlike any other customer, had to do something special to trigger Digicel-Haiti's obligation to provide RLYH service. But this is wrong. Digicel-Haiti offered RLYH service to anyone with a SIM card that had enough money in its account and sent the proper codes to the network. By sending the codes, UPM accepted that offer. Had Digicel-Haiti wanted to condition its offer on providing other information or meeting some other criteria, it could have done so – again, for example, by requiring a prospective RLYH customer to click "I agree" to certain terms or to fill out an online form – but it did not. So, when UPM took the steps that Digicel-Haiti itself established to "request" RLYH service, UPM's "request" was surely "reasonable."

Critically, the FCC has specifically held that treating a prospective customer that wants to resell a service differently from other prospective customers is illegal discrimination under the Act. In the *Resale Order,* the FCC found that "discrimination against a communications customer – in this case, by the carrier's refusal to provide service to a reseller – is unlawful if it is based only upon the fact that the customer is not the ultimate user of the service."[94] This means that UPM had the right to sign up for RLYH service in the same manner as anyone else, and then to resell it.[95] By arguing that if UPM wanted to resell RLYH service, it could not get the service at all or needed to go through special hoops,[96] Digicel-Haiti is confessing that it unlawfully discriminated against UPM. This admission is enough to establish that it is liable to UPM on the Communications Act claim.

Digicel-Haiti also argues that it was not required to provide RLYH service to UPM because Digicel-Haiti supposedly had "reasonable cause to believe" that UPM would use the service "in furtherance of illegal enterprises."[97] This argument is specious. Of course, there was nothing illegal about UPM's activities regarding RLYH service – from acquiring SIM cards, to

---

[94]*Resale Order* at ¶ 45.

[95] UPM Communications Act Motion, *passim.*

[96] Digicel-Haiti Communications Act Brief at 21.

[97] *Id.* at 20.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

topping them up, to activating them, to subscribing them to the service. But even if it thought what UPM was doing was illegal, Digicel-Haiti's statement of the law is flat wrong. The cases on which Digicel-Haiti relies arose under *state* common carrier law.[98] *Federal* common carrier law – the Communications Act – is different. Sixty years ago, in *Katz v. AT&T,* the FCC held that if a common carrier terminated service based on the belief that the service was being used illegally, the carrier was fully liable for harm caused by the termination.[99] In that case, the FCC specifically *rejected* a proposal to permit carriers to refuse or discontinue service based on "probable cause" that service was being used illegally.[100] More recently, the FCC explained that carriers act at their own risk when they refuse or terminate service on grounds of supposed "illegality":

> [If] a common carrier [is] confronted with what appears to be illicit use of its facilities by its customers [it must] "petition the affected jurisdictions for a determination as to whether the [use] is, or would be, in violation of state law." … [A] common carrier who has reason to believe that its facilities are being used for an illegal purpose [may] ***petition the appropriate state, local or federal authority*** (e.g., United States Attorney) for a ruling that its customer's [use of service] violates … applicable law. … [C]arriers who undertake such action without following [these] procedures … ***may later be subject to legal action if the [customer's] activities] are found to be lawful***. … If a [carrier's customer] takes legal action against [a carrier] for wrongful termination of service … and the [customer's actions are] subsequently determined not to be unlawful, ***the [carrier] may be subject to complaint under sections 206, 207 and 208 of the Act for violating the conditions and terms of its tariff, as well as for [violating] the Commission's rules***

---

[98] *Tracy v. Southern Bell Telephone & Telegraph Co.*, 37 F. Supp. 829 (S.D. Fla. 1940) (Florida law); *Delaware Sports Serv. v. Diamond State Tel. Co.*, 241 F. Supp. 847, 852 (D. Del. 1965), *aff'd sub nom.*, 355 F.2d 929 (3d Cir. 1966) (Delaware law).

[99] *Harry Katz and Bertha B. Katz v. American Telephone & Telegraph Co. and The Chesapeake & Potomac Telephone Co.*, Memorandum Opinion and Order, 43 F.C.C. 1328 (1953) ("*Katz v. AT&T*").

[100] *Id.* at ¶ 8 (proposed "probable cause" provision rejected because it "constitutes a further attempt by the telephone companies to insulate themselves from any liabilities that may result from their discontinuance of telephone service … [C]arriers cannot by means of a tariff regulation binding them to refuse service under specified circumstances avoid the responsibilities for the decisions taken in connection with the rendering of or refusal to render telephone service.")

***TOMASI BRAGAR DUBAY***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

*and section 201(a) of the Act.*[101]

Under the Communications Act – that is, under the law applicable to Digicel-Haiti's RLYH service – a belief (reasonable or not) that UPM was using the service for an illegal purpose is not a valid basis for terminating or refusing service. Moreover, and irrespective of its beliefs, under the Act, Digicel-Haiti is fully liable for the damages caused terminating UPM's RLYH service if UPM's use of the service was lawful – which it was. This confirms UPM's earlier point that Digicel-Haiti's state of mind as to why it terminated UPM's RLYH service is irrelevant under the Act.[102]

Because Digicel-Haiti's beliefs are irrelevant, factual disputes about them are not material. The Court, therefore, should disregard Digicel-Haiti's pious protestations that it cut UPM off based on its belief that UPM's use of RLYH service was illegal. Whether Digicel-Haiti believed that or not has nothing to do with its liability under the Communications Act.[103]

## B.  There Was Nothing "Reasonable" About Termination of UPM's RLYH Service

Digicel-Haiti's discussion of the purported reasonableness of cutting off UPM's RLYH SIM cards completely ignores its own admission that it cut off the SIM cards precisely because UPM was reselling the service.[104] This is exactly what decades of binding FCC precedent

---

[101] *In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials*, Memorandum Opinion, Declaratory Ruling and Order, 2 FCC Rcd 2819 (1987) at ¶¶ 6-7 & n.21 (emphasis added).

[102] *See* UPM Communications Act Motion at 7 n.24 (there is no "scienter" element to liability under the Act).

[103] If the Court permits this issue to go forward, UPM will show that Digicel-Haiti was either willfully or negligently ignorant of the requirements of United States law in regard to resale, or that it simply never considered those issues, before cutting off UPM's RLYH SIM cards. Note that for Digicel-Haiti to rely on its purported beliefs about the legality of UPM's activities is essentially an "advice of counsel" defense. In such a situation, Digicel-Haiti will have waived any attorney-client privilege it may have had with respect to legal advice it sought and received regarding how United States law treats resale of services such as RLYH, *see Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1162-63 (9th Cir. 1992), and UPM will fully explore those issues in its cross-examination of Mr. Boute, Mr. Laborde, and any other witness with knowledge.

[104] Digicel-Haiti Communications Act Brief at 22-25.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

forbids.[105] Digicel-Haiti accomplishes this act of massive legal denial by trying to frame its actions as simply "taking remedial action against a customer consistent with its terms and conditions of service, including billing the customer for all unauthorized charges."[106] As Digicel-Haiti tells it, it "terminated service to SIM cards which it determined were being used illegally and for fraudulent purpose – terminating international calls on its network without payment – or improperly and inconsistent with Digicel-Haiti's Terms and Conditions."[107] These arguments are unavailing.

### 1.  Digicel-Haiti's Purported "Terms and Conditions" Have No Legal Effect

At the outset, there is no basis on which Digicel-Haiti can claim that its purported "Terms and Conditions" were ever binding on, or ever became part of any contract between, UPM and Digicel-Haiti. The Court has already ruled that there is no evidence that any Digicel-Haiti customer ever had to sign any forms, review any terms of service, or click "I agree" on any online platform, to pay for and receive service from Digicel-Haiti.[108] This means that Digicel-Haiti's supposed terms are legally irrelevant to the parties' contractual relationship.

But that does not mean that the parties had no contractual relationship. To the contrary, the parties' actions established an implied-in-fact contract. Digicel-Haiti set up its systems so that anyone with a SIM card could automatically activate the card, pay Digicel-Haiti, sign up for RLYH service, and use the service. The physical configuration of Digicel-Haiti's systems constitutes its offer. The customer activating a SIM card and sending the requisite

---

[105] UPM Communications Act Motion at 16-19, 22-34.

[106] Digicel-Haiti Communications Act Brief at 22.

[107] *Id.*

[108] Opinion and Order, ECF #294 at 15 n.11 ("Digicel Haiti offers no facts or argument explaining how UPM would have become obligated to Digicel Haiti's terms, for example by 'shrink wrap' terms, electronic 'click' agreement, or some other means"), 18 n.13 (Digicel-Haiti "presents no evidence" that could explain "how UPM might have become bound to" purported "terms Digicel Haiti tried to attach to its RLYH program"). Nothing in Digicel-Haiti's briefing indicates that it has any evidence to offer on these points, which means that the Court's earlier ruling stands.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

signaling was acceptance. Paying Digicel-Haiti was consideration. And Digicel-Haiti's permitting calls to go through (before cutting off the SIM card) constitutes performance, confirming the existence of the contract in the first place. As UPM has explained, there is no rational way to look at this sequence of behavior by the parties other than to conclude that it constitutes an implied-in-fact contract.[109] And, as relevant to this motion, none of the facts that confirm the existence of the contract is in dispute. Not only should the Court rule that the parties had an implied-in-fact contract for RLYH service – confirming UPM's status as a Digicel-Haiti "customer" – UPM respectfully submits that it would be plain error for the Court to fail to do so.

To see how UPM and Digicel-Haiti formed an implied-in-fact contract, consider the "humble vending machine."[110] Assume the owner of a vending machine stocks it with snacks and puts it in a break room. Assume it has a keypad with numbers and letters with a different code for each snack (say, "A2" for Snickers, "C3" for M&Ms, etc.). Now a hungry employee puts money into the machine and pushes "A2" to get a Snickers bar. If the machine fails to deliver, the owner of the machine has breached its contract with the hungry employee to deliver the Snickers bar. The physical configuration of the machine constitutes an offer to sell each of the snacks by entering in the corresponding code. By entering the code and depositing money, the employee simultaneously accepts the offer and provides consideration. So if the Snickers bar is not forthcoming, the contract has been breached.[111]

The amounts at issue in vending machine cases are typically so small that court decisions are rare. They do exist, however, and they uniformly affirm the existence of an implied-

---

[109] *See, e.g.,* a [UPM's] Opposition to Digicel-Haiti's Motion for Summary Judgment on [UPM's] Counterclaims (ECF #279) at 13-17, 25-28.

[110] *See* Jonathan G. Rohr, *Smart Contracts and Traditional Contract Law, or: The Law of the Vending Machine,* 67 Clev. St. L. Rev. 67, 74-81 (2019) ("*The Law of the Vending Machine*").

[111] *See The Law of the Vending Machine, supra*, at 69-70, and cases cited therein at 74-81.

Page 30 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

in-fat contract in this type of automatic transaction.[112] And while Digicel-Haiti's network and systems are more complicated than a candy machine, the governing legal principles are identical. The terms of the offeror's offer are set by the objective requirements for obtaining the candy (or RLYH service) embodied in the physical configuration of its devices and by the information they make available to the purchaser at the time of purchase. Acceptance of the offer and consideration are accomplished by the customer taking the relevant technical steps and paying the money the devices call for. Offer, acceptance, and consideration: all the elements of a valid contract.

In the case of RLYH service, Digicel-Haiti configured its systems such that any valid SIM card with money in its account can subscribe by entering the appropriate series of codes; that objective behavior by Digicel-Haiti constitutes the offer. The subscriber entering the requisite codes constitutes acceptance. And once that happens, the consideration – money already in the SIM card's account – is paid by Digicel-Haiti automatically taking it from the account.

So, UPM and Digicel-Haiti unquestionably had a contract for the provision of RLYH service. Moreover, the cases are uniform in holding that the customer is not bound by terms that are not presented and available from the machine, at the time of purchase.[113] The physical

---

[112] *See id.* at 74-81, discussing *Chaffin v. Atlanta Coca Cola Bottling Co.*, 194 S.E.2d 513 (Ga. Ct. App. 1972) (implied contract for sale of a tainted bottle of soda); *Thornton v. Shoe Lane Parking, Ltd.* [1971] 2 QB 163 at 165 (implied contract for purchase of use of parking space via automated machine at entry); *Slater v. Fid. & Cas. Co.,* 98 N.Y.S.2d 28, 29 (N.Y. App. Div. 1950) (contract for flight insurance sold via vending machine); *Steven v. Fid. & Cas. Co.,* 377 P.2d 284, 298 (Cal. 1962) (same); *Lachs v. Fidelity & Casualty Co. of New York*, 118 N.E. 555 (N.Y. 1954) (same).

[113] *See* cases cited in note 112, *supra.* Note that at no point in the process of signing up for RLYH service does the system indicate in any way that it wants to know, or cares about, where or how the SIM card holder obtained its SIM cards. Digicel-Haiti sells SIM cards to third-party distributors, who then sell them into the market without further Digicel-Haiti involvement. As a result, the provenance of UPM's SIM cards is entirely irrelevant to its relationship with Digicel-Haiti, and entirely irrelevant to UPM's claims under the Communications Act. *See e.g.,* [UPM's] Opposition to Digicel-Haiti's Motion for Partial Summary Judgment (Fraud) (ECF #278) at 7-8; [UPM's] Opposition to [Digicel=Haiti's] Motion for Summary Judgment on [UPM's] Counterclaims (ECF #279) 14-15.

---

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

configuration of the relevant devices constitutes an objective manifestation of the terms of the offer; unexpressed subjective thoughts are irrelevant. In this respect, the vending machine cases are completely consistent with more modern website/click-through cases, which establish that a user cannot be bound by purported contractual terms, the existence of which is not conspicuously evident to the user.[114] For this reason, Digicel-Haiti's claimed "Terms and Conditions" are simply irrelevant to this case. There is no evidence – and Digicel-Haiti certainly cites to none – to suggest that prospective or ongoing customers of RLYH service were required to assent to those "Terms and Conditions" prior to paying for and receiving service.[115]

### 2. Cutting Off UPM's RLYH SIM Cards Was Both Unreasonable and Unreasonably Discriminatory

The fact that Digicel-Haiti's Terms and Conditions are, in this context, a legal nullity means that Digicel-Haiti cannot make cutting off UPM's SIM cards reasonable by analogy to a carrier enforcing tariff terms regarding payment for unauthorized calls.[116] In this same vein, its assertion that it cut off the SIM cards that "it determined were being used for [a] fraudulent

---

[114] *See Cullinane v. Uber Techs., Inc.,* 893 F.3d 53, 62-64 (1st Cir. 2018) (customers must have conspicuous notice of terms for them to be binding); *Sleash, LLC v. One Pet Planet LLC,* 2014 U.S. Dist. LEXIS 109253, at *42-48 (D. Or. August 6, 2014) (to impose a contractual condition, a party must use "clear and unambiguous language"); Opinion and Order, ECF #294 at 15 n.11.

[115] There is also no evidence that either the "Terms and Conditions" or the RLYH web site on which Digicel-Haiti relies were even in effect when UPM was using Digicel-Haiti's services. The print-out of the RLYH web page is dated February 12, 2015 – *after* Digicel-Haiti filed this case, and after UPM had ceased using Digicel-Haiti's services. *See* Digicel-Haiti Communications Act Brief at 3, 5 (citing Plaintiff's Trial Exhibit 66, the web page). The "Terms and Conditions" document on which Digicel-Haiti relies bears no date at all. *See* Digicel-Haiti Communications Act Brief at 22-23 (citing Plaintiff's Trial Exhibit 337, the Terms and Conditions). Even if these documents were, in theory, relevant, there is still no triable issue of fact regarding their impact on UPM because Digicel-Haiti has no evidence that they even existed during the relevant time frame.

[116] Digicel-Haiti Communications Act Brief at 22. It appears that Digicel-Haiti may be confusing its "Terms and Conditions" with a valid tariff on file with a regulatory commission. Unlike normal contracts, filed tariffs are binding whether a customer is aware of their terms or not. *See Brown v. MCI Worldcom Network Servs., Inc.,* 277 F.3d 1166, 1169-70 (9th Cir. 2002).

---

***TOMASI BRAGAR DUBAY***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

purpose"[117] is wrong for the same reasons discussed above. Digicel-Haiti admits – it is completely undisputed – that the reason it cut off UPM's RLYH SIM cards is because UPM was reselling RLYH service to third parties.[118] This is neither fraudulent nor illegal; it is expressly permitted by longstanding FCC rulings holding that restrictions on resale violate the Act. Digicel-Haiti, therefore, is liable to UPM for the consequences of cutting off UPM's services.

Moreover, because the FCC has concluded that a carrier may not restrict resale of its services by its customers, Digicel-Haiti's Terms and Conditions and RLYH web page – to the extent that they could be read to forbid resale – are not a ***defense*** for Digicel-Haiti. To the contrary, if that is what they say, and if they applied at all, then they are plain written evidence that Digicel-Haiti acted in defiance of the FCC's binding requirements and is liable to UPM for doing so. The FCC's rulings do not say that a carrier cannot restrict resale unless a customer agrees. They say that a carrier cannot restrict resale, full stop. Generating a written record of its violation does not protect Digicel-Haiti from the consequences of its illegal actions.

Finally, Digicel-Haiti attempts to argue that cutting off UPM's RLYH SIM cards was not unlawful discrimination.[119] But this argument is foreclosed by the FCC's ruling that discriminating against resellers because they are resellers is unreasonable. The FCC found that bans on resale were unlawfully discriminatory: "[D]iscrimination against a communications customer – in this case, by the carrier's refusal to provide service to a reseller – ***is unlawful if it is based only upon the fact that the customer is not the ultimate user of the service.***"[120] As noted above, Digicel-Haiti admits that this is why it cut off UPM's SIM cards. It therefore can have no

---

[117] Digicel-Haiti Communications Act Brief at 22.

[118] *Id.* at 9 ("when it concluded that a SIM card was being used for bypass, Digicel Haiti took action to interrupt or block the SIM Card from being further used").

[119] *Id.* at 24-25.

[120] *Resale Order* at ¶ 45 (emphasis added). In that same order, the FCC said that it would not "permit resellers to operate in a discriminatory fashion." *Id.* at ¶ 101.

Page 33 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

"reasonableness" defense under Section 202(a).

It is certainly no defense for Digicel-Haiti to say that UPM, as a reseller, is not like other customers, and that Digicel-Haiti cut off *all* resellers, not just UPM.[121] The *Resale Order,* quoted above, makes clear that the relevant discrimination – the discrimination that the FCC has forbidden – is between resellers and customers who purchase service for their own use. Yet Digicel-Haiti argues that "UPM … cannot point to a single bypasser who has been knowingly offered free access to misuse Digicel-Haiti's network and SIM cards."[122] Digicel-Haiti's argument is akin to an employer defending a discrimination lawsuit by saying that he never promoted *any* women or people of color, so the employees in those groups, stuck in low-level jobs, have nothing to complain about, because they were all treated the same way.

## V.    CONCLUSION

The undisputed facts show that there are no genuine issues for trial and that UPM is entitled to judgment in its favor on its Communications Act claim as a matter of law:

- UPM has shown that Digicel-Haiti is a common carrier under the Act with respect to RLYH service, because that service is simply the resale of foreign communications (calls from the United States to Haiti) subject to the Act, and because resellers are carriers.

- UPM has shown that the FCC prohibits carriers from restricting the resale of their services, which means that Digicel-Haiti may not restrict the resale of RLYH.

- UPM has shown that it was a RLYH customer, pursuant to an implied-in-fact contract established when UPM accepted Digicel-Haiti's offer (in the form of its configuration of its network and systems) to purchase that service and paid the requisite enrollment fees.

- UPM has shown – indeed, Digicel-Haiti has admitted – that the reason Digicel-Haiti cut UPM off is that UPM was reselling RLYH service.

- UPM has shown that Digicel-Haiti's efforts to justify its action, and avoid the force of the

---

[121] *See* Digicel-Haiti Communications Act Brief at 24-25. UPM notes that Digicel-Haiti provides no evidentiary support for its claims about how it treats other resellers.

[122] *Id.* Of course, UPM did not get "free" access to anything; it is undisputed that it paid to top up its SIM cards, paid for RLYH subscriptions, and paid for each minute of traffic that it completed. And of course, UPM's resale of RLYH service was not "misuse" of anything.

Page 34 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

FCC's ban on resale restrictions, are unavailing.

In these circumstances, UPM respectfully requests that the Court grant its motion for summary judgment and rule that Digicel-Haiti is liable to UPM under Section 206 of the Act for violating Sections 201 and 202(a), with damages being the only issue for trial.

Even if the Court does not grant UPM's motion, it should nonetheless deny Digicel-Haiti's motion, which is based on erroneous legal theories and depends on factual claims that are unsupported and subject to dispute, including the notion that it "reasonably believed" that UPM's activities were illegal, and that the documents on which it relies (its Terms and Conditions and a RLYH web page) were in effect when UPM was reselling RLYH service. UPM has explained why these claims are not material, but if they are, then Digicel-Haiti needs to prove them at trial.

Dated: September 9, 2022

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Defendants

Page 35 – UPM'S REPLY IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION
TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT
UPM-L1\00682269.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I served the foregoing **UPM'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Anisha Carla Atchanah
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com
Email: aatchanah@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Andrew J. Lee
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com
Email: ajlee@schwabe.com

Dated: September 9, 2022

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Defendants

***TOMASI BRAGAR DUBAY***
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236