**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Bragar DuBay
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

　　　　Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>　　　Plaintiff & Counterclaim-Defendant,<br><br>　　　v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>　　　Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT**<br><br>**HEARING DATE: SEPTEMBER 14, 2022**<br>**HEARING TIME: 1:30 P.M.** |

I, Christopher W. Savage, declare under penalty of perjury:

1.      I am an attorney at Davis Wright Tremaine LLP. I am one of the attorneys representing the defendants in the above-captioned action. I make this declaration based on personal knowledge and my review of the records and files in this proceeding and public records referenced herein. I am competent to testify if called to do so.

2.      I make this declaration in support of UPM's Motion For Summary Judgment and in Opposition to Digicel-Haiti's Motion for Summary Judgment regarding UPM's claims against Digicel-Haiti under the Communications Act.

3.      On October 22, 2021, I took the deposition of Unigestion Holdings, S.A. d/b/a Digicel-Haiti's corporate representative Maarten Boute. Attached hereto as Exhibit 1 is a true and correct copy of the following pages from the transcript of Mr. Boute's deposition: 102-108.

4.      On October 27, 2021, I attended the deposition of UPM Technology, Inc.'s corporate representative Bruce Ngoc Quang Tran. Attached hereto as Exhibit 2 is a true and correct copy of the following pages from the transcript of Mr. Tran: 104, 106-110.

5.      On October 13, 2021, I took the deposition of Kenneth McEwen. Attached hereto as Exhibit 3 is a true and correct copy of the following pages from the transcript of Mr. McEwen's deposition: 148.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated: September 9, 2022.

Christopher W. Savage
Bethesda, Maryland

Page 2 of 2 – DECLARATION OF CHRISTOPHER SAVAGE
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DIGICEL-HAITI'S MOTION FOR
SUMMARY JUDGMENT
UPM-L1\00682265.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I served the foregoing **DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DIGICEL-HAITI'S MOTION FOR SUMMARY JUDGMENT** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan  
Cherine Smith Valbrun  
Leah Storie  
Anisha Carla Atchanah  
Kim Vaughan Lerner LLP  
One Financial Plaza  
100 SE Third Avenue • Suite 2001  
Fort Lauderdale, FL 33394  
Email: rvaughan@kvllaw.com  
Email: cvalbrun@kvllaw.com  
Email: lstorie@kvllaw.com  
Email: aatchanah@kvllaw.com  

Anne M. Talcott  
Kathryn E. Kelly  
Andrew J. Lee  
Schwabe, Williamson & Wyatt, PC  
Pacwest Center  
1211 SW 5th Ave., Suite 1900  
Portland, OR 97204  
Email: atalcott@schwabe.com  
Email: kkelly@schwabe.com  
Email: ajlee@schwabe.com  

Dated: September 9, 2022

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay  
    Kathryn P. Salyer, OSB #883017  
    Eleanor A. DuBay, OSB #073755  
    Blake Van Zile, OSB #184672  
    ksalyer@tomasilegal.com  
    edubay@tomasilegal.com  
    bvanzile@tomasilegal.com  
    Telephone: (503) 894-9900  

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage  
    Christopher W. Savage, D.C. Bar #362657  
    chrissavage@dwt.com  
    *(Admitted Pro Hac Vice)*  
    Katherine Sheriff  
    katherinesheriff@dwt.com  
    Telephone: (202) 973-4200  

Of Attorneys for Defendants

HIGHLY CONFIDENTIAL/AEO INFORMATION
Transcript of Maarten Boute, Designated Representative
Conducted on October 22, 2021                    102

matter.  They just determine that they are going to cut them off at that point, which, again, I'm not trying to judge it, I just want to make sure I understand how it would work.

Q    And, Mr. Boute, that's fair, right?  You would cut them off when they ran out of minutes no matter what they thought?

MR. VAUGHAN:  You have my objection.

Maarten, just give me a beat to get the objection in so that Cindy has it.

THE WITNESS:  Absolutely, absolutely.

MR. VAUGHAN:  Go ahead.

Q    Okay.

A    As soon as those controls were implemented, Mr. Savage, you are right.  Again, we need to find the exact date at which they were implemented.  I think it was in the latter part of 2014, but yes, once they were implemented, that is what would happen, yes.

Q    Let us move on a little bit.  Let me make sure I'm still in your file.

So just to frame things, one of the issues in the case that you are probably aware of is UPM argues that Digicel Haiti's activities in the United States, in particular in Roam Like

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit 1
Page 1 of 7

HIGHLY CONFIDENTIAL/AEO INFORMATION

Transcript of Maarten Boute, Designated Representative

Conducted on October 22, 2021                    103

You're Home but more generally, have the effect of subjecting Digicel Haiti to and its activities to the United States Communications Act.  Now, Digicel Haiti through Mr. Vaughan says that's not true, you are not subject to that, but as part of that issue, I have a series of questions about just what Digicel Haiti did or didn't do in relationship to the United States market generally.  And this is issue No. 5 in the designated set of issues.  So my next set of questions are going to be kind of about that.

So much earlier on you mentioned the diaspora, which I believe, in fairness, refers to people from Haiti or with a strong connection to Haiti living, in this case, in the United States. Is that fair?

A    That is a correct definition of diaspora, yes.

Q    Okay.  And obviously there are people from Haiti who have strong connections to other places but I'm only asking about the U.S.

First, is it fair to say that Digicel Haiti has activities in place designed to market services to the diaspora in America?

A    It is not directly Digicel Haiti, it is

Exhibit 1
Page 2 of 7

another entity of the Digicel group, and they have an entity in place in the United States that promotes the selling of top-up primarily and plans to various geographies, in particular Haiti, Jamaica, El Salvador, because it is a large Haitian, Jamaican and Salvadorian communities in the U.S., which allows them -- their main focus is to allow them to top-up their families back home. It is actually kind of limited to that, is finding any way to sell top-up to the Haitian and Jamaican and Salvadorian diaspora in the United States.

Q   At some high level this is a form of encouraging remittances?

A   It is a form of remittances if you would like, but in this case they are remitting minutes instead of remitting money.

Q   Okay.  And broadly speaking the way this would work is there would be advertisements of some form, some marketing communication, designed to reach the diaspora in the United States saying, stripping through the advertising speech, we would like you to take money that you have here in the United States and give it to Digicel Haiti in order to top-up and recharge the phones of your friends and family back in Haiti?

Exhibit 1
Page 3 of 7

MR. VAUGHAN: Objection; misstates testimony, and scope, and you do realize his answer was that was not being done by Digicel Haiti. I just want to make sure your question is --

MR. SAVAGE: Fair enough.

MR. VAUGHAN: Thank you.

Q    But, just so the record is clear, to the extent this occurred, Digicel Haiti benefitted by receiving the remittance money to go into these accounts so the people in Haiti could use their phones more. Is that fair?

MR. VAUGHAN: Objection; foundation, predicate, misstates testimony.

Go ahead, Mr. Boute.

Q    The question is, is that fair?

A    Yes. So when a subscriber tops-up from the United States -- sorry. When a family member in the United States tops-up an account which is a Digicel Haiti subscriber, in that case, yes, the money does end up in Digicel Haiti and the service is rendered by Digicel, yes.

Q    Okay. And when the folks in the diaspora are doing these top-ups, would they do them online the way we talked about earlier, put in the phone

Exhibit 1
Page 4 of 7

HIGHLY CONFIDENTIAL/AEO INFORMATION
Transcript of Maarten Boute, Designated Representative

Conducted on October 22, 2021                                    106

number that needs to be topped-up on some site and put in the money and it would top-up, or was it done in some other way?

MR. VAUGHAN:  Objection; scope. Objection; scope.

Go ahead if you know.

THE WITNESS:  Thank you, Robert.  I will try to hold back a little longer.

A    Yes.  The online method is one method, Mr. Savage.  It is not the main method.  The main method is people going into retail locations which are typically subdistributors of distributors that we have a grievance with, that the diaspora entity, I want to be precise, has a grievance with.

Q    Right.  And we can take it as stipulated that Digicel Haiti, the legal entity, Unigestion Holdings, S.A., whatever it is, is not the entity doing this but rather this is something being done by the broader Digicel group for the benefit of Digicel Haiti, Digicel Jamaica and I guess is it Digicel El Salvador, or whatever it is called?

A    Correct.

Q    And, again, the way analogous things are sometimes done in the United States is the points

Exhibit 1
Page 5 of 7

HIGHLY CONFIDENTIAL/AEO INFORMATION

Transcript of Maarten Boute, Designated Representative
Conducted on October 22, 2021                    107

of sale for this are often convenience stores or other locations in the neighborhoods where the target population lives.  Is that something that this does if you are aware?

MR. VAUGHAN:  Objection; foundation and scope, predicate.

Go ahead.

A    That is correct, Mr. Savage.  It is typically retail locations, supermarkets, mom and pop stores, money transfer locations, et cetera, that would also allow this service to top-up SIM cards in some of the markets.

Q    Are you familiar with the filings with the United States Security and Exchange Commission back in the 2015 time frame in connection with an effort to register securities in the United States?

A    I have read about it in the depositions. I was not -- this is not typically something that any CEOs are informed of in the Digicel group. These things happen by the investor relations team and typically do not concern any of the subsidiaries of the group.

Q    Colloquially in the U.S. the answer is that would have been above my pay grade?

Exhibit 1
Page 6 of 7

HIGHLY CONFIDENTIAL/AEO INFORMATION
Transcript of Maarten Boute, Designated Representative

Conducted on October 22, 2021                                    108

A    That's a better way to put it, above my pay grade.

Q    I'm going to ask you some questions based on information contained in those SEC filings to see if you know whether it is true or not.

MR. VAUGHAN:  SEC filings by which entity, please?

MR. SAVAGE:  The Digicel group, by the above his pay grade group.

Q    But I'm going to ask you questions based on facts there about the talk of Digicel Haiti to see if they are true from your knowledge of Digicel Haiti.

MR. VAUGHAN:  And this falls into what part of the scope?

MR. SAVAGE:  Comes into 5 and also comes into --

MR. VAUGHAN:  Okay.  All right.  I'm going to object to scope.

Go ahead.

MR. SAVAGE:  Object to scope, object to relevance, you can have all that.

MR. VAUGHAN:  Thank you.

Q    One of the statements in that document indicates that Digicel Haiti has for now let's

Exhibit 1
Page 7 of 7

ATTORNEYS' EYES ONLY - SUPER CONFIDENTIAL

Transcript of Bruce Ngoc Quang Tran, Designated Representative
Conducted on October 25, 2021                                    104

A  -- email --

Q  How did they know what to do?

A  Well, the project manager would instruct them.

Q  Okay.  And you indicated that they were hired -- they were contracted -- apologies -- contracted to buy SIM cards.  Describe that contracting relationship, please.

A  Well, that's a -- we say, "We need a hundred SIM cards," they will tell us, "The SIM card costs $3," and we would send them $300, and they would go buy the SIM cards.

Q  Did you give them instructions as to how to buy the SIM cards?

A  Sometimes if they had no idea, we would tell -- we would tell them go to the store, go on the streets in Haiti.  There were stores on the streets.  But normally, we don't -- actually we ask them actually because we are not present there; right, so we just tell them we need SIM cards.

Q  Mr. Tran, I really apologize for the implication in this question.  There is a light that's flashing that appears that you're looking at something, and I -- Chris, I don't know if --

Exhibit 2
Page 1 of 6

Q  It's my old eyes.

A  Actually, it's -- the light is changing on your side.

Q  That's probably -- that's probably it. Okay.

Now, you would contract with these individuals.  Was there a written agreement?

A  No, I don't think so.

Q  Was there any kind of communication that indicated exactly what you were instructing them to do?  Written communication, I should say.

A  No.  There is emails for sure.  I mean, I never did it myself.  The project manager did it. But yes, there are emails saying, "Hey, we need you to go here," instructions to buy SIMs and to buy recharges.  If you go get five megabits of speed or whatever, WiMAX, there were instructions, yes.

Q  So right before I got distracted with the light thing, you were explaining to me that you never told them how to get the SIMs; you asked them.  Can you explain that to me, please?

A  Well, and don't take that as a hundred percent because I actually was not actively a project manager; right?  However -- however, the

Exhibit 2
Page 2 of 6

ATTORNEYS' EYES ONLY - SUPER CONFIDENTIAL
Transcript of Bruce Ngoc Quang Tran, Designated Representative
Conducted on October 25, 2021          107

way is normally we would tell them let's -- it
depends on the agent also; right?  Some agent
would say, "Hey, can you get some SIM cards?"
"Okay.  I got it"; right?  And some agents asking,
"Where do I get it"; right?  So it really depends.

Some agents, we ask them, "Hey, maybe you
go in supermarket."  That would be my first thing,
"Go in supermarket and see if you can buy SIM
cards."  And he would come back, "Well, I don't
need to go in supermarkets because they sell them
on the streets."  So that's how it could work.

Q  When these -- what specific instructions,
other than what you just described in terms of the
how, were they given, if any, regarding the
acquisition of these SIM cards?

A  I think the first thing they would just
say is, "Go get SIM cards."

Q  That's it?

A  Yeah.

Q  Okay.  Were they given any restrictions on
how they were to acquire these SIM cards?

A  Restriction?

MR. SAVAGE:  Objection.  Vague.  But you
may answer it if you understand.

THE WITNESS:  Were there any restrictions

Exhibit 2
Page 3 of 6

ATTORNEYS' EYES ONLY - SUPER CONFIDENTIAL
Transcript of Bruce Ngoc Quang Tran, Designated Representative
Conducted on October 25, 2021                    108

how to acquire them?  I don't know.  I would just say, "Go get SIM cards on the street or at" -- "in the supermarket."

Q  (By Mr. Vaughan)  Okay.  You indicated that these people were -- had to be people you could trust because sometimes you would send them money and they would disappear.  Explain that to me.

A  Well, because we have no relationship with them, we don't know them, so it happens quite a lot that you send them a thousand dollars and then never respond to you again.  It happens quite often.

Q  But they are people you have contracted with.

A  So?  I mean --

Q  Okay.

A  -- if they go, they go.  They know there is no recourse.  You lose their phone number or they lose your phone number.  They change --

Q  Okay.

A  -- their phone number.

Q  So these people were supposed to buy SIM cards, and then how does UPM get them?  Do they sell them back to UPM?  What -- how do they -- how

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit 2
Page 4 of 6

do you get the SIM cards after they buy them?

A  They will send it to us.

Q  And then UPM pays them back for the SIM cards?

A  No.  We pay them in advance.

Q  You pay them in advance for the SIM cards?

A  Correct.  It's a prepayment.

Q  So you prepaid them for the SIM cards?

A  Correct.

Q  When these people go and buy the SIM cards, describe that process for me.  How do they buy these SIM cards?

A  I do not know because I'm not in country, but I do know that they will buy them on the street, mostly.

Q  Okay.  Who do they buy the SIM cards from?

A  From -- from people who gets them from Digicel, obviously.  I don't know.  I don't know the answer.

Q  Okay.  Well, at the beginning I told you that I have to live with your answer, whether I like it or not, but now I have to push back because you've given me two answers.  You've tried to suggest that they buy them from Digicel on the streets and you have also said, "I don't know."

Exhibit 2
Page 5 of 6

A  Okay.  So let me repeat that answer because I don't want to speculate.  So my answer is I don't know the answer.

Q  So when UPM would contract with these folks and ask them to get SIM cards, go buy SIM cards, you cannot -- UPM cannot tell me under oath how they buy them; correct?

A  I cannot because --

Q  And you --

A  -- if I tell you something, I would just speculate, but I cannot.  I don't know the answer because I didn't do it.

Q  And you cannot tell me who they buy them from specifically?

A  If I can't tell you a hundred percent, I don't know.  I can speculate, but however they told us that they bought them on the streets, they sold them in the back of pickup trucks on stands, but people on the streets.

Q  Okay.  Let me ask you a very tough question.  None of them have been tough so far.  Have you ever encountered scenarios where these contractors have purchased stolen SIMs?

A  No, I have never.  I hope they didn't.

Q  What did you do to confirm that these SIMs

Exhibit 2
Page 6 of 6

of how bypass operators typically behave rather than anything that's been provided to me.

MR. VAUGHAN:  We're going for a fourth?

Q  Perhaps.  Is it based in any way on any knowledge you have or believe you have about UPM?

MR. VAUGHAN:  Objection.  Asked and answered thrice.  You want her to just read my objection?

Q  No, I'd like -- if we can get a direct answer to this question, I am done.

MR. VAUGHAN:  Say it again, Mr. McEwen.

Q  The question is, is this based in any way on any information specific to UPM?

MR. VAUGHAN:  Fifth time, asked and answered.  You can give him the answer again, Mr. McEwen.

A  This is based on my knowledge of how these people behave and how bypass operators typically behave rather than anything that's been typically passed to me or been passed to me in reference to the way UPM has particularly behaved during any investigation done by Digicel.

MR. VAUGHAN:  Going for a fifth or a sixth?

MR. SAVAGE:  No.  We're good.  That's what

Exhibit 3
Page 1 of 1