IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNIGESTION HOLDING, S.A., a foreign corporation doing business as Digicel Haiti, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:15-cv-00185-SI |
| v. | ) ) | |
| UPM Technology, Inc., doing business as UPM Telecom, Inc., et al., | ) ) ) ) | July 26, 2022 |
| Defendants. | ) ) | Portland, Oregon |

(Motion Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

                              APPEARANCES


FOR THE PLAINTIFF:      Mr. Robert C.L. Vaughan
                        Ms. Cherine Smith Valbrun
                        Ms. Anisha Carla Atchanah
                        Kim Vaughan Lerner LLP
                        312 SE 17th Street, Suite 300
                        Fort Lauderdale, FL 33316


                        Ms. Anne M. Talcott
                        Mr. Andrew Lee
                        Schwabe, Williamson & Wyatt
                        1211 S.W. Fifth Avenue, Suite 1900
                        Portland, OR 97204



FOR THE DEFENDANTS:     Mr. Christopher W. Savage
                        Davis Wright Tremaine, LLP
                        1301 K Street, NW, No. Suite 500
                        Washington, D.C. 20005

                        Ms. Blake Van Zile
                        Ms. Eleanor A. DuBay
                        Tomasi Bragar DuBay
                        121 S.W. Morrison Street, Suite 1850
                        Portland, OR 97204


COURT REPORTER:         Dennis W. Apodaca, CSR, RMR, RDR
                        United States District Courthouse
                        1000 S.W. Third Avenue, Room 301
                        Portland, OR 97204
                        (503)326-8182

                                    INDEX

Motion hearing                                                    4

(July 26, 2022)

P R O C E E D I N G S

(Open court:)

THE COURT:  Good afternoon, everyone.

We are here in Unigestion Holding versus UPM Technology, Case No. 3:15-cv-185.  We have a hybrid hearing. Some folks are here in person; some folks are participating by video.

Let me first invite counsel for the plaintiff to enter an appearance and identify all parties appearing for plaintiff.

MR. VAUGHAN:  Thank you, Your Honor.  I will take the role of introducing the folks on the KVL team and then turn it over to Ms. Talcott to introduce the folks from Schwabe.  You have Robert Vaughan, Anisha Atchanah, and Cherine Smith Valbrun appearing on behalf of Unigestion-Digicel Haiti.

MS. TALCOTT:  Good afternoon, Your Honor. Ann Talcott with Schwabe, and I believe I have Andrew Lee from Schwabe in the courtroom also appearing on behalf of plaintiff today.

THE COURT:  Yes.  We have Mr. Vaughan, Ms. Valbrun, and Ms. Atchanah all appearing by video.  Then we have Ms. Talcott appearing by video, and we have Mr. Lee in the courtroom.

Welcome, you all.

At this time I will invite counsel for defendants to enter an appearance.

MR. SAVAGE:  This is Chris Savage with Davis Wright Tremaine for defendants UPM and Mr. Tran.  With me in the courtroom is Blake Van Zile.  I was going to Tomasi Salyer, but it is not anymore because Ms. DuBay, appearing by video, is now an official named partner in the firm.  So we have Eleanor DuBay by video.  Also, my associate, Katherine Sheriff, who is in Washington, D.C.  She has not formally appeared in the case, but she is here to watch the proceedings.

THE COURT:  So, Ms. DuBay, what is the correct name of the new firm -- and congratulations, I think.  What's the name of the new firm?

MS. DuBAY:  Thank you, Your Honor.  It is Tomasi Bragar DuBay.

THE COURT:  How do you spell the second name?

MS. DuBAY:  B-R-A-G-A-R.

THE COURT:  Thank you.

MR. SAVAGE:  I actually don't remember if we filed a formal "by the way, the name has changed" pleading.

THE COURT:  Please do that sometime this week.

Okay.  Welcome, everyone.

I will begin by saying that ever since this case

was filed in 2015, this has been a really interesting case. There has been nothing or relatively little that has been boring about it.  Unfortunately, that's continuing.  But, fortunately, this case will come to an end, at least in the District Court, no later than November of this year.  I'm not quite sure what that is going to look like, but it will be no later than November 2022, unless COVID or some variant plays a role in messing things up.

What I was hoping to do would be to discuss in this hearing the pending motions before me, which include Digicel Haiti's motions for summary judgment against UPM's counterclaims and UPM's motion -- excuse me -- and Digicel Haiti's motions to exclude UPM's expert witness and UPM's motion for partial summary judgment.

I believe I sent you all a tentative opinion by email dated July 15, 2022, about eleven days ago.  I am not entering that in the official docket.  That's just a tentative opinion.  Frankly, my thinking has evolved on some of those issues since then.  That's what I was hoping and expecting to talk about today.

I also received Mr. Vaughan's letter dated July 20th, 2022, objecting to some of my statements in my tentative opinion and also requesting that I vacate the bifurcation order and that the trial in November be both on whatever remains of Digicel Haiti's affirmative claim and

whatever remains of UPM's counterclaims.

Maybe we should start there, because when I read your letter, Mr. Vaughan, I went back and re-read the transcript from our March 29th hearing, and I noted that on page 35 of the transcript -- that's Docket 379, at page 35 -- after you were explaining to me that you had been taken by surprise of the understanding of my January 18th written order, you said on page 35, line 4: "I'm not sure, Judge, that, one, I can meet the evidentiary burden to establish that all of the damages, as articulated in that interpretation of your order, would be attributable to the use, or not, of human behavior software, essentially because I don't believe the evidence to us doesn't show that that's where the damages lie."

So I would like to begin by asking Mr. Vaughan if your thinking on that has evolved and if you now believe you can present a damages case within the narrowed confines of my January 18th summary judgment ruling; and if you can, what it would look like.

MR. VAUGHAN:  I was right there with you until that last sentence, "what it would look like."  I think what it would look like is still evolving.  Obviously Your Honor has graciously allowed us to amend and update and conform our witness statements to the further instructions that you had given on the day of that hearing before we decided to

press pause for the possibility of an interlocutory appeal.

To more directly answer your question, yes, you articulated it just correctly.  In the midst of my shock and disappointment at my misread of your opinion, I did have concerns, one, about the narrowed scope of the fraud case that was remaining after your opinion, and I did have concerns that the case, as it was prepared and structured a mere less than a week before we were supposed to be before you, was not packaged in a manner that would meet -- and I still -- my concern was I wasn't sure it was packaged in a manner that would meet the evidentiary burden.

With time, having an opportunity to revisit it and look at it again, my thoughts have evolved.  You have also articulated it even more clearly -- I was about to say "succinctly," but it was succinct before.  You have articulated your vision of what you will allow, and that articulation -- hopefully I'm not missing it this time. That articulation is:  Should we be able to present a case that illustrates the utilization of human behavior software to further the misrepresentations as against UPM vis-à-vis its utilization of Digicel's network.  Should we be able to articulate a case that illustrates the utilization of human behavior type software to hide the fact that UPM was improperly utilizing Digicel Haiti's network to terminate international phone calls for profit to Digicel's detriment,

that we would be able to present that case.  If we were further able to illustrate that only by utilization of that type of software was UPM able to delay Digicel Haiti's identification and interruption or interception of that illicit conduct, we would be able to present that case.

I have looked at the witness statements that we have.  I have looked at the fact witnesses and the experts, and I believe we will be able to stay in that lane, all of the objections obviously being preserved, but you have ruled.  So do not hear me to say that I'm plotting that course any further at this moment.

But hopefully that answers the Court's question.  So, yes, you have quite accurately captured my shock.  I articulated, quite candidly, where I was in my response and my concerns, and I think I even went so far as to say I was concerned that if I just ran blindly forward, I would be doing a disservice to the client, wasting your time and everybody's time, to the extent that was not the case that was prepared.  I do not believe, and I've read the transcript myself, I do not think at any point in time I acceded to my friend-on-the-other-side's suggestion that we take a judgment.

THE COURT:  I understand.  I'm not asking you about that right now.  I understand.

And, of course, I understand and accept that all

of plaintiff's objections to my previous orders are fully preserved. I have never said and I'm not saying that you have waived any of that. You can always take that up on appeal.

But what I still don't understand is how much has Digicel Haiti been damaged by the allegedly unlawful use of human behavior software, how is that amount calculated, and where is the evidence going to be?

MR. VAUGHAN: Your Honor asked that question during the last hearing, and I think it was articulated, to the extent, "Mr. Vaughan, should my order be as you now understand it to be" -- and forgive me for putting words in your mouth -- "how does your damage analysis change?" And I believe I said, "It doesn't, because at end of the day the damages to Digicel Haiti remain exactly the same."

The methodology of the fraud, the methodology of the improper conduct resulting in the improper termination of UPM's calls on Digicel's network might be different. It certainly was not the case I was planning. But the end result, the damages are exactly the same.

THE COURT: How can that be? Because I thought that your original theory of fraud was that everything that UPM was doing was fraudulent, and that caused a certain very large number of damages -- a large amount of damages to Digicel Haiti. But now by saying, no, you have got to show

how the specific damages that you'd seek were caused by the use of human behavior software, how can that possibly be the same number?  I'm not following you.

MR. VAUGHAN:  I missed the last sentence.

THE COURT:  How can that possibly be the same number?  I'm not following your analysis.

MR. VAUGHAN:  Sure.  It is the same number because the totality of what I had initially presented or hoped to present was that UPM engaged in a series of transactions, a part of a broad scheme, a fraudulent scheme, to effectively allow UPM to utilize Digicel Haiti's network for purposes of terminating international calls on Digicel Haiti's network, pretending that those calls were local calls.  That is in-country bypass.  The termination of those calls and the lost revenue is what results in the damage number, or that is the basis for the calculation/the analysis with respect to damages.

What you have indicated is that it must be hinged on the utilization of human behavior software.  The testimony is that the human behavior software utilized by UPM was done throughout the course of their conduct.  One, the human behavior software was utilized by UPM to determine which SIMs were going to be associated with which incoming calls, so as to -- quote/unquote -- simulate the normal pattern of a regular human being making a phone call from

wherever.

The testimony is that the human behavior software was utilized to create the appearance that a particular SIM was not being randomly used to initiate phone calls, for example, in one part of the country in one minute, and then ten minutes later, 500 miles away in another part of the country.

The human behavior software was utilized to make sure that the calling patterns associated with any particular SIM at any particular point in time did not appear to any algorithm, any human being, any monitoring from Digicel to be robotic but something that mimicked the behavior pattern of a regular human being utilizing their SIM for the in-country software and regular human pattern in Haiti in-country.

The human behavior software was used to randomly associate a SIM card with a particular gateway within the area in which the call was initiated to approximate and assimilate normal movement patterns of a regular person utilizing the SIM.

You will hear that only through the utilization of that software was UPM able to -- for the period of time that it did; for as long as it did, with respect to any particular SIM -- avoid the detection of that SIM card as being associated with possible bypass.

It is going to be our position that only through the utilization of that human behavior software was UPM able to utilize any SIM for any period of time in its servers using the methodology that it did to complete any phone calls. And that is the case you're allowing -- the only case we're allowed to bring. That's why right now, instead of being articulated as a part of, but an integral part of the case, it, frankly, is the only part of the case we're allowed to put before you.

THE COURT: All right. Thank you.

Mr. Savage, do you want to be heard on this issue right now?

We have got a lot of other things to talk about, but this issue.

MR. SAVAGE: I would, Your Honor.

THE COURT: One second.

Mr. Vaughan, can you hear Mr. Savage?

MR. VAUGHAN: I can. Loud and clear, Judge.

MR. SAVAGE: Excellent.

So the critical thing I heard last March was essentially: Without reopening discovery, which, of course, we did not consent to, Mr. Vaughan did not have sufficient evidence to present a case based on human behavior software.

THE COURT: And I heard the same thing, and I think he is now implying that, well, he went back and looked

at his discovery, and even without reopening it, because he is not going to get it reopened, he thinks he has enough.

MR. SAVAGE:  He is implying that.  He actually said that.  "The testimony is; the testimony is; the testimony is."  What he neglected to do here today is to say which testimony he is talking about.

THE COURT:  Sure.

MR. SAVAGE:  And the reason he is doing that, I would submit, he doesn't actually have any.

We can review in as much detail as you would like what evidence there is about human behavior software that originally allowed that part of the claim to survive summary judgment.  But if you look at that testimony, whether from -- I'm blanking on my former witness's name -- Mr. Ruiz -- that's right -- or some emails, none of that testimony actually says what Mr. Vaughan just said.  It just isn't there.

So what he is really doing from my listening, he is trying to re-allege.  He is making allegations about what human behavior software must be; and therefore, it shows such and such.  But he has not a whit, not a scintilla of evidence, either that we actually used it -- well, he has got a scintilla that we actually used it --

THE COURT:  I think what Mr. Ruiz said --

MR. SAVAGE:  Fair point.  He has got a scintilla

that they actually used it.  He has not a scintilla that it did anything to them.  He has not a scintilla that it worked.  Mr. Ruiz didn't have anything to do with what was going on.  He says -- wrongly, as it turns out -- but he says, "Okay, we used it."  But there is no evidence anywhere in this discovery record anywhere at all that it had any effect on them.

I know that I filed a lot of complicated stuff last spring about what is the logical implication of saying it has to be based on human behavior software.  And we didn't get into that in any detail, but maybe we should, because the fact of the matter is, nothing -- zero -- there is nothing in the factual record of this case that supports any conclusion that any use of human behavior software by UPM harmed them at all.

One final point:  Legally it's pure speculation.  As we're going to discuss, doubtless in connection with some of my counterclaims, damages can't be based on speculation.  There has to be a reasonable probability that they actually happened, and they do not have any evidence to show that.  So the right thing to do, I would submit, is to end -- let our long, nice, national nightmare about these fraud claims come to an end and move on to Phase II.

THE COURT:  I did take a look at my recent opinion, the one issued on July 13, where I denied UPM's

renewed motions for summary trial based on the trial evidence. I looked closely. You never made that argument specifically that they didn't tie -- they can't prove damages attributable to human behavior software. You made a number of other damage arguments, but I didn't see that specific argument. So that, I don't think, has ever been before me.

Am I mistaken? If I am, show me where.

MR. SAVAGE: I think you're mistaken. I think in both our renewed summary motion and in, I think in our motions in limine back and forth about what should and shouldn't be admitted, I made a repeated set of arguments that they had no evidence that our use of human behavior software, if it existed, caused them any damages. Now, I don't have --

THE COURT: You definitely made as your first of the arguments on the renewed motions that Digicel Haiti can't show that it was harmed by the alleged fraudulent activity. But the way I read that, and I'm looking over your specific arguments as well as my opinion, was that as a general proposition, whatever they've alleged was fraud, they can't show and haven't shown caused harmed. And you made the argument, in part, because of a lot of monetary issues and pricing issues. But I don't recall seeing, and, frankly, you made the argument that Digicel Haiti would have

received more money that than it did.  I didn't see anything that said that they can't tie any specific harm to the use of human behavior software.

Am I missing it somewhere?

MR. SAVAGE:  I think you are.

THE COURT:  Okay.

MR. SAVAGE:  In our renewed motion for summary judgment, which is ECF 335 --

THE COURT:  335?

MR. SAVAGE:  335, starting at page 7, there is a whole section that says that Digicel Haiti has no evidence that it was damaged by our use of HBS.

THE COURT:  Okay.

MR. SAVAGE:  And what I said is, what they have got evidence of -- the Ruiz evidence.  They've got evidence it was there, but they have no evidence that it harmed them.

THE COURT:  I do recall that.  At least this is my recollection of my thinking and how I thought I expressed it in the opinion, but I recall you said, "No evidence generally of damage by HBS," and I thought it was a fair inference, especially on summary judgment, where I have to resolve reasonable inferences in favor of the nonmoving party, that you wouldn't have used it.  And by the way, I'm assuming for summary judgment that there was adequate evidence that UPM used HBS, and you wouldn't have used it if

you didn't believe it was going to enable you to deceive Digicel Haiti into thinking that these were local, real, natural human being users of a SIM card, and that struck me as sufficient for the general proposition of damage causation.

But what I was still struggling with in my own mind, but I didn't see your argument being expressed, at least not this way, was:  But that still doesn't show how you quantify how much that harm would have caused Digicel Haiti.

Maybe I'm cutting that a little too finely.  But I saw your argument as a causation that I was rejecting, and I never saw and I was looking for an argument of:  But where are the damages attributable to UPM and how can you quantify it without speculation?

MR. SAVAGE:  Well, I certainly raised the argument that if you're going to try to quantify damages from HBS, you have to think through a little bit what HBS does and doesn't do and what harm would be caused by use of HBS and what would not.

THE COURT:  Right.

MR. SAVAGE:  I don't think I literally said how can they calculate damages due to HBS, because my principal argument was, and remains, they lose on causation.  They have no evidence of a causal link between us doing it and it

working.  I did give an example in one of the pleadings of a hypothetical that if I want to undercut a delivery service, I destroy everyone's maps -- or I take down all the street signs, because I believe that will slow them down, but the drivers all have their routes memorized, and it doesn't slow them down at all.  So the link you are assuming -- I think you seem to be assuming their conversation of, well, if we tried it, it must have had an effect is, in fact, an assertion that needs to be supported by evidence -- of which they have none.  So that's point one.

So point 2:  I do attack the calculation of damages from HBS.  Logically you have to do this, you would have to do that, and would have to do these other things.  I didn't specifically say, "And because they have no logical calculation of their damages, you should throw out their case," but I think that is actually fairly implicit in the argument.

THE COURT:  I think I agree on the second point, at least that's what I was understanding, and that's what started the March 29th discussion.

On the first point, whether I'm right or wrong, I was rejecting that argument, finding at least a reasonable inference that the sophisticated folks at UPM wouldn't have been using that -- and I'm assuming they're using it -- wouldn't have been using it if it wasn't successful for

delaying being caught.  Maybe I was wrong on that, but that was my thinking.

MR. SAVAGE:  Let me ask you a question:  Are you, therefore, prepared to say that the sophisticated folks at Digicel Haiti wouldn't spend all the time and money they spend on blocking software and so on if it wasn't going to work?

THE COURT:  Well, sometimes we try to prevent things from happening, and we don't succeed.

MR. SAVAGE:  And sometimes we try to do things and don't succeed.

THE COURT:  I agree.  And that's why I was looking forward to the jury trial to seeing how the facts to develop.  That still wasn't enough for damages to quantify damages.

MR. SAVAGE:  Correct.

THE COURT:  And that's why, if you recall, my opening question to Mr. Vaughan on March 29th was, "Okay.  How are you going to prove damages specifically linked to the use of HBS?"

And that's when Mr. Vaughan said, "We don't have to specifically link it to HBS.  The whole thing is a fraud."

And I said, "No, it is not.  Read my January 18th opinion."

Then we clarified -- and it is on pages 27, 28, and 29 of the transcript from March 29th, our clarification.

Then Mr. Vaughan said, and I was not surprised by this, "So narrowed," he says on page 35, "So narrowed, I'm not sure we can attribute it to human behavior software. I was just having damages attributable to the entire operation."

And now I'm hearing from Mr. Vaughan, "Well, we can," but it's still not clear in my mind how you can attribute damages to the use of human behavior software to come up with any number that is not speculative.

MR. SAVAGE: And, Your Honor, that's --

THE COURT: That's your point too.

MR. SAVAGE: My point is, although you heard today, "The testimony is," the testimony is from Mr. Vaughan. It has been four months. I would think that four months on, with his fraud case in the balance, if there was a, "Well, in fact, in the deposition of Mr. X, it says this. In fact, in the email from person A to person B on this date, it says that." If that evidence existed, why aren't we hearing about it now?

Honestly I think what is going on is -- with due respect to your courtroom clerk, it's a "Hail Mary." It's an effort --

THE COURT: We do that a lot in this courtroom.

MR. SAVAGE:  We all do.

It is an effort to somehow keep something alive, so maybe by the time of the fall -- but I would urge you, if Mr. Vaughan cannot today right now say that this transcript, this document, this thing actually supports the notion that there are damages -- can we please be done with this?

THE COURT:  Maybe.  Although I think one of the things I'm thinking about, but I just have a whole bunch of tentative thoughts in my head, is to give you the opportunity to move for summary judgment on that specific point.  Now that Mr. Vaughan -- and I know I'm giving him a lot of flexibility on this, and I think that's fair.  I am going to accept him, when he says he misunderstood my January 18th ruling, that's why he filed his pretrial papers the way he did.

Let me ask Mr. Vaughan this question:  Now that you understand, at least what I was intending and intending to express in my January 18th ruling, as clarified in our discussion on March 29th, did you want leave to amend or refile an expert damages report that will specifically tie your damages to the use of HBS?

MR. VAUGHAN:  I think that would be fair to Mr. Savage and to my client to be able to articulate it in the manner that you have set forth.

Under normal circumstances, we would have gone

through the summary judgment, we would have all understood where the case lay, then the witness statements and expectation of proof would have been put before the Court. We did that, except I missed the boat.

THE COURT:  Right.

So what I'm thinking is the right way to proceed but on an expedited calendar, so we don't wait too close to November, is to give the plaintiff an opportunity, now that you've gotten on the right boat and understand the limitations of my January 18th ruling, to give you an opportunity to refile your witness statements, the Phase I witness statements -- Phase I, expert witness statements. Probably give Mr. Savage an expedited opportunity, if he needs to, to depose an expert witness on that damage theory. For you to file that and then to also give UPM an opportunity to not only time its responsive amended documents, if you want, but also then to move for summary judgment based on those new trial documents, saying if this is all they can present at trial, this isn't enough.  We will do that and do that on an expedited basis.

That's my tentative thinking of how it is going to be fair to both sides.

MR. VAUGHAN:  Okay, Judge.  Obviously I will not and cannot complain about that.  To the extent you had indicated earlier that you were going to allow us to -- both

sides, I believe -- to articulate the witness statements in a manner that you clarified for us you wanted to see, I think I --

THE COURT:  I don't recall saying that, and I don't recall saying that on March 29th with respect to Phase I.  Because I have got to tell you, I really assumed from your comments at Phase I, and I agree you did not go all the way and say, "We give up on Phase I."  I agree.  But from what I read in what you did say, I thought that you were basically saying, "You know what, I don't see how we can win on Phase I."  And I kind of agreed with you.

So I didn't discuss whether I would allow you to refile amended statements.  But after receiving your recent letter, I'm thinking, well, if you ask to refile some amended statements, including an expert witness report, as long as you do it relatively soon, and I give Mr. Savage the opportunity to not only refile whatever things you want refiled, including an expert report on that, but also then to say, with renewed motion that says:  "Motion for judgment as a matter of law; if that's all they're going to present at trial, they don't get to go to a jury in Phase I," that's probably the fairest thing to do to both sides.

MR. VAUGHAN:  I won't belabor the point.  I kind of remember that happening, Judge, but at this point you are allowing us to do it now, so that's fine.

THE COURT: All right. So, Mr. Savage, I know that's not the way you want me to resolve it right now, but anything truly horrendously objectionable about that process?

MR. SAVAGE: Well --

THE COURT: You're right. I'm not reopening discovery. So if you're right about what's in the record already --

MR. SAVAGE: So let me just state on the record what I feel, and then we can decide whether it means anything.

THE COURT: That's fine.

MR. SAVAGE: What I feel, Your Honor, is you owe me one, because what this is -- and this has occurred, frankly -- I'm a merits kind of guy; I'm not a procedural kind of guy. But if you go back to almost a year ago when we were filing our motions for summary judgment, they literally ignored a fair number of specific arguments that we made explaining why their case was defective. They just ignored it. And in my reply, I said, "Oh, by the way, they didn't respond to this; they didn't respond to this." The general rule is, well, if you don't oppose summary judgment -- partial summary judgment that someone has done, that means you lose.

Now, the fair-minded guy that you are, you didn't

hold them to that.  Instead you left things open, because maybe a jury could find; maybe they would blah, blah, blah. And I get that.  Then we get to March, and they still don't have anything.

Here we are again holding it open, despite the fact that, according to whatever the procedural schedule is supposed to be, they didn't oppose a range of arguments I made --

THE COURT:  But you didn't make that specific one.

MR. SAVAGE:  Your Honor, I kind of did.

THE COURT:  Well, you may "kind of" have done it, but you didn't hit anybody between the eyes let alone me.

MR. SAVAGE:  For the same reason -- once I read your January order and sort of understood it, if you read all of the pleadings that we filed, you will see that we object repeatedly to this notion that they can show any damages attributable to -- so my point is --

THE COURT:  I think I respectfully disagree with you.

MR. SAVAGE:  So the answer is, Your Honor, I'm mad.  But I understand what you're going to do.  We will live with it.  We will file a summary judgment motion, and then we will deal with it that way.

THE COURT:  And thank you for sharing your feelings.

MR. SAVAGE:  My client would have been disappointed if I didn't.

THE COURT:  And you did it very well.

MR. VAUGHAN:  Your Honor, just so you don't think I'm abusing the grace of the Court, it was at page 10 of the transcript where we talked about --

THE COURT:  Let me take a look.

MR. VAUGHAN:  We talked about amending the --

THE COURT:  I'm on page 10.  What lines?

MR. VAUGHAN:  It looks like starting at line 2.

THE COURT:  Line 2 is me talking.  Page 10 of the transcript.

Oh, I see.  "Well, you are going to need to amend the witness statement."

Good point.  All right.

MR. VAUGHAN:  I mean, you have already allowed this.  I just didn't want you to think I was taking advantage of you.

THE COURT:  No, no.  I would never think that either one of you would do it.  Thank you for sharing your feelings as well.

All right.  I want to keep this moving.  But one thing we are not going to do is move the November trial date.  We will talk a little bit later what will be tried in November, but it's not moving.  And I would like to get

these under control sooner rather than later.

So, Mr. Vaughan --

MR. VAUGHAN:  Yes, sir.

THE COURT:  -- using all due diligence and highest priority, when would you like to get me your revised witness statements, expert reports, and exhibits on the assumption, but no final decision yet, that you will get to present your Phase I case in November?  Can you get it to me within two weeks?  If the answer to that is, "Oh, no.  Can I please have three or four," I'll say "yes."  But don't go beyond that.

MR. VAUGHAN:  Let me look to my team, and I'll tell you why.  Just so Your Honor knows -- we are not here being -- what's the word I'm looking for?  Anything less than diligent.  I can tell you right now sitting here, I have a trial August 15th, September 9th, and December 5.

THE COURT:  Let's get this done before your trial starts.  Let's get the filing done before your trial starts. Then Mr. Savage can work on it while you are on trial.

MR. VAUGHAN:  I would note that not include November 19, which is our trial, which we have already booked.

THE COURT:  Mr. Vaughan, I note that you are a fellow of the American College of Trial Lawyers; so am I, since 2006.  Congratulations.  I think yours is a more

recent entry.  But one of the things that means is we can try back-to-back jury trials.

MR. VAUGHAN:  Challenge accepted, Your Honor.

THE COURT:  Okay.  Two, three, or four weeks to get these new papers filed?  Your choice.

MR. VAUGHAN:  Let's go with the --

THE COURT:  If you want to do it on the two-week side, it will be before the trial starts.  Whatever you want.

MR. VAUGHAN:  I have been given wise counsel.  I was going to say two, in light of what you said, but may I have three.  My expert is in England.

THE COURT:  Yes.  So today is July 26th, I believe.  So then plaintiff's Phase I pretrial documents are due August 16th.  And by the way, it will be a lot easier for me, and since we all have word processing and things like that, there shouldn't be a problem for you.  Don't give me anything that says, "Oh, we incorporate our previous filing at such and such."  Give it to me new and fresh. Whatever evidence you want to present on Phase I issues, consistent with my January 18th ruling, as clarified during our March 29th discussion, those will be your Phase I pretrial documents.

Understood?

MR. VAUGHAN:  Yes, sir.

THE COURT:  That will be due on August 16th.

Mr. Savage, I really do want to try to get this resolved sooner rather than later.  I'm not going to make you file your Phase I pretrial affirmative documents -- your trial documents.  But I would like to see -- and maybe you probably should -- but at least at the minimum I would like to see -- if you're going to file a motion for judgment as a matter of law saying those Phase I pretrial documents are insufficient -- and don't repeat your previous arguments. They are already preserved.  If you want to say that they are insufficient either to show damages, without undue speculation, or some new argument that you haven't already made or truly if something new that they present legitimately creates a new argument for you, you're welcome to do that.

How much time do you want?  Two weeks would be great, but if you need three, you can have it.

MR. SAVAGE:  Make it two weeks.  We are going to be quite busy with our affirmative case on the counterclaims.

THE COURT:  So that will be due August 30th.

Mr. Vaughan, can you reply within one week, by September 6th?  That is Labor Day.  I will give you to the end of the week.  Can you reply by September 9th?

MR. VAUGHAN:  Yes, sir.

THE COURT:  Thank you.  If you tell me your trial schedule, when you want, we can schedule oral argument now for the following week or the week after.  What works well for you the week of September 12th through 19th?

Mr. Savage, you don't need to keep coming in person.  It is a pleasure to see you in person, but you are welcome to do this by phone or video too.

MR. SAVAGE:  What I will have to check, Your Honor, there is a week period in September when a COVID-deferred trip down the Grand Canyon is happening.

THE COURT:  I remember hearing about that.

MR. SAVAGE:  There is no place I could step out to do it.

THE COURT:  You figure out when that is.  Then let me hear from Mr. Vaughan what his preference is.

MR. SAVAGE:  I do have a question that arises from their commentary as to where their expert is, because the only expert they've revealed, who is in England, is Mr. McEwen.  In our motion in limine to exclude his testimony, one of the things that we pointed to was the fact that in his deposition he admitted that nothing that he was saying was based in any way on any knowledge of anything about what UPM actually did.

THE COURT:  Right.

MR. SAVAGE:  He had no such knowledge.

I know you have advised me not to restate arguments, but it seems to me that front and center will be: This guy knows nothing about what UPM actually did.

THE COURT:  Well, let's see what he purports to say in his refiling.  They may not even try to present him for something.

MR. SAVAGE:  "Sufficient unto the day is the evil thereof."

I will look forward to responding to this, but I still think you owe me one.  (Laughter.)

THE COURT:  Mr. Vaughan, when would be good for you for oral argument sometime in September?  Then we will see if that will work for Mr. Savage.

MR. VAUGHAN:  The 14th through the 16th, which is Wednesday, Thursday, or Friday.  I begin trial on the 19th.

THE COURT:  Okay.  Mr. Savage, how would the 14th or 15th or 16th -- oh, ouch.

How would the 14th look to you, Mr. Savage? Wednesday, the 14th?

MR. SAVAGE:  I'm at the moment unable to answer, because I followed the rules and turned off my cell phone, which has the schedule.

THE COURT:  Well, I owe you one, so feel free to turn your phone on.

MR. SAVAGE:  We are even, Your Honor.  That's

completely perfect.

THE COURT: I'll be heading to Washington, D.C. on the 15th.

MR. SAVAGE: Your Honor, I apologize. I'm going to have to consult with my personal schedule.

THE COURT: Do you want to take a short break now and do it? We won't be on the record.

MR. SAVAGE: If we could do it at a natural point. Actually, let's do the following: Let's say we will have it on the 14th, and I will get back to you if that doesn't work.

THE COURT: Fine. It looks it to me -- Mary, none of those are going to trial on the 14th? We are not going to be in trial those days.

What works really well for me is 1:00 p.m. Pacific Time. Does that work for you, Mr. Vaughan?

MR. VAUGHAN: That's four o'clock Eastern. I will make it work, Judge.

THE COURT: Thanks. Mr. Savage, we will figure it out today, I hope.

MR. SAVAGE: Yeah.

THE COURT: All right. That takes care of Phase I for right now.

What do we do, Mr. Savage, if I do allow Phase I to go to trial, and it is going to be in November, and I

lift the bifurcation order.  When would you want to file your Phase I related documents?  What I'm proposing generally, when I was looking just at Phase II, is that we have a pretrial conference scheduled for October 21st. That's what I proposed in my tentative order.  Under normal circumstances everybody's pretrial documents for an October 21st pretrial conference would be due, I believe, September 16th -- no.  September 23rd.  For an October 21st pretrial conference, the first wave of pretrial filings for that November trial will be due September 23rd.  If you want to wait until then, I can live with that, and then we can deal with any objections and everything.

Then what I plan on doing is ruling from the bench or very promptly -- probably from the bench, with an opinion to follow, maybe not, on September 14th, assuming that's our argument date.  So you will know whether or not there is anything from Phase I that's going to trial in November. Then that gives you nine days to get your trial documents in.  My guess is you can be working on them anyway.

MR. SAVAGE:  I was going to wait --

THE COURT:  Pardon me?

MR. SAVAGE:  No, I'll work on them.

THE COURT:  That's nine days.  I think that should work.  If we schedule the pretrial conference for our November trial for October 21.  Our trial is scheduled for

November 14th.  Absent COVID or other global emergency, that's not moving.  And so if we have a pretrial conference on October 21st, that's going to be more than enough time to settle everything down.  If we need to have a second pretrial conference, there is enough time built in for that before a jury trial.  And if we have an October 21st pretrial conference, then the first wave of the four weeks of filings will be due September 23rd.  Assuming I give everybody a ruling from the bench on or about at September 14th at that hearing on Phase I, then everybody will know whether or not or to what extent Phase I issues are going to trial in November.  Certainly Phase II issues are going to trial, and this is, of course, assuming that I'm going to lift the bifurcation.

I think that schedule could work.

MR. SAVAGE:  I think it could work.  Let me clarify some things, because I want to make sure I've got this.  Last spring is lost in mists of time.  But as I recall, on the party who files first, under the round of pretrial filings, is essentially the plaintiff with respect to whatever claim it is.  And if I'm right about that, then on September 23rd, the first filing day, we would have our Phase II filings, as we are the plaintiff in effect, but we would be waiting to see -- assuming you are allowing it to go forward after summary judgment, we would be waiting to

see what they file on Phase I, which is to say that I wouldn't have any Phase I --

THE COURT: Correct.

MR. SAVAGE: -- filings on the 23rd. My Phase I filings are the following week or however the schedule explains out.

So with that understanding -- because I was planning on filing our Phase II stuff, based on your tentative order, on that day anyway. This wouldn't change that. It would just be a little bit more work to do for the next round.

THE COURT: You are correct. But your affirmative findings on Phase II claims, the counterclaims, would be due on September 23rd.

MR. SAVAGE: Correct. I think that works.

THE COURT: Okay.

Mr. Vaughan, are you with me, and do you understand what we are doing? Is this all right with plaintiff?

MR. VAUGHAN: I believe I do. To the extent I don't think, I think the team does.

THE COURT: Now is a much better time to clarify any misunderstandings or questions.

MR. VAUGHAN: It certainly is. I think we followed the schedule. We do, however, have arguments to

raise on at least one point with respect to the presumption that the counterclaims are going forward.

THE COURT:  What would that be?

MR. VAUGHAN:  I would like to have a discussion -- and I'll make it quick, as quick as I can -- on Digicel Haiti as a common carrier.

THE COURT:  Oh, sure.  That's back to my tentative order.

MR. VAUGHAN:  Yes, sir.

THE COURT:  We will definitely have a full argument on that in a few moments, absolutely.

Okay.  Well, maybe now is the right time to turn to that.  You've got my tentative order.  Now is a perfect time for me to make it up to Mr. Savage the points that he thinks that I owe him, because I have been rethinking that tentative order, and I'm coming to a slightly different perspective on two points in UPM's favor, so we will be even.

MR. SAVAGE:  All right.  And I got to turn on my cell phone.

THE COURT:  The first point is I think my statute of limitations analysis was wrong -- and I didn't make an final decision -- but I was speculating that maybe statute of limitations can be broken up by damage theories, and the more I think about it, the more I research it, the more I

conclude, no, that's just a bridge too far.

So I think because you concede, as far as I can see, statute of limitations with respect to whatever was done in 2011, the first part of your claim, that's gone. It's a two-year statute, whether we look at the Communications Act or tort, that's gone.

I think that I'm going to take out from my tentative opinion any of my sort of ruminations that expectation or lost profits would be time-barred.  If there was wrongful conduct within the statutory period, it's not time-barred.  Then whatever damages the law would allow to flow from that, flows from that.

I will tell you that, much as I have concern about plaintiff's damages being not sufficiently connected to human behavior software, I have got similar concerns about UPM's lost profit damages being unreasonably speculative. But that's a different issue.  That's classic law.  But I think I'm going to take back all of that speculation about statute of limitations having two different applications.

By the way, was there a case that really shows I was wrong?  I couldn't find one.

MR. SAVAGE:  It is not that there is a case that shows you're wrong.  It's that our damages theory is based entirely on behavior that occurred in 2014 and after.  So we had never intended to present any claim -- once we looked at

the statute of limitations and realized, if the years applied, it is all about banning resale of Roam Like You're Home, all of which happened in 2014 and after.

THE COURT:  I got myself a little bit confused when I started thinking about the continuing tort doctrine and then viewing it in the reverse, and that just isn't a good analysis, and so I'm taking all of that out.

MR. SAVAGE:  Okay.

THE COURT:  Also, if you want, I want to give you an opportunity to argue about implied-in-fact contract.

MR. SAVAGE:  Indeed.

THE COURT:  Although I still think that my conclusion is correct on having a lot of concern now about whether it's a fact question for a jury to decide whether the facts support an implied-in-fact contract.  I'm thinking that I probably should not enter summary judgment on that question.  At the minimum, wait and see how the evidence presents at trial.  Then looking at that evidence and/or the evidence that you present in your Phase II filings, I can ask:  Can a reasonable jury find an implied-in-fact contract?  That's probably the better approach than right now just simply throwing out implied-in-fact contract at summary judgment.

MR. SAVAGE:  There is an even better approach, which is to grant my motion against them on that point, and

I would like to be heard on that.

THE COURT:  I'm not following you.

MR. SAVAGE:  I'm moving for summary judgment on an implied-in-fact contract against them.

THE COURT:  Oh, got it.  That's not going to happen, because I just don't see a meeting of the minds there.

MR. SAVAGE:  That's exactly what I want to address.

THE COURT:  Okay.

MR. SAVAGE:  Exactly what I want to address.  What you found --

MR. VAUGHAN:  Are we --

THE COURT:  Go ahead, Mr. Vaughan.

MR. VAUGHAN:  Are we to lead off with that argument?

THE COURT:  I don't know.  I am going to give Mr. Savage an opportunity to say something now, and I will give you an opportunity to respond.  You will each get to respond to the other.  Don't ever worry about not having that opportunity.

Right now, I'll give the floor to Mr. Savage.

MR. SAVAGE:  Okay.  So it is undisputed that you found last January that these parties never talked to each other.  So to the extent there is a contractual relationship

between the parties, it is an implied-in-fact contract based on their behavior. Discovery showed -- and I think if we go back to your January order, it found -- you found -- here is what happened: We show up with a SIM card and say, "Hey, authenticate this SIM card." Because it is one they had manufactured for them, their system says, "Sure, you're one of our SIM cards." We say, "Awesome, now we have an account on your system," because the SIM card is activated. "Here's money to go into that account so we can make calls."

Now, let's look at that behavior, which is the extent of the communication between the parties traditional contractual terms. Digicel Haiti, by the way it set up its business, is making an offer. The offer is, "If you have a valid SIM card and pay me money for that account, you can make calls."

We, by having a SIM card that registers on their system, and paying money, simultaneously accept the offer and provide consideration -- offer, acceptance, consideration.

I would submit to you that no rational finder of fact could find that the process by which they'd set up an account for a particular SIM card with particular money, a particular phone number associated, and then they take our money for that specific account that we provided them, because that's how you get to make calls on their network,

does not establish an implied-in-fact contract that we can make calls on their network.

Now, with respect to meeting of the minds, first, there is a great quote from, I believe it was Judge Aiken, but I don't remember exactly, that basically said that the meeting of the minds is a much abused metaphor.

THE COURT: I know. It is a subjective theory.

MR. SAVAGE: But it is particularly abused in the modern world in these circumstances, particularly in light of the UETA, the Uniform Electronic Transactions Act, which doesn't create new contract law, but it does say that if the electronic agents of two entities talk to each other, that can form a valid contract, completely irrespective of the fact that no person was aware it was happening.

Given those facts --

THE COURT: We're looking at it differently.

MR. SAVAGE: I know we are. But what I'm trying to present to you is the actually implied-in-fact contract argument that we made. One of the things that troubled me about the tentative opinion is it was relying on what we alleged six years ago. Now, what we alleged six years ago was based on -- or our counterclaim -- based on your understanding six years ago that Digicel Haiti itself sold the SIM cards, and that when our agents in Haiti got the SIM cards, they bought them from Digicel Haiti.

We learned in discovery that's actually not true. They send their SIM cards out into the world. They sell them to distributors, like dandelion seeds on the wind, and wait for them to come back to take people's money. And because that's true, A, how we acquired the SIM cards is totally irrelevant. It has nothing to do with the interactions between our companies. And B, given that they set their business up that way, the only way to establish a contract with them is: Have a valid SIM card; give them money.

I cannot imagine a rational finder of fact saying that does not establish an implied-in-fact contract.

Now, was there a meeting of the minds about things they wring their hands about, like what have you done for resale? No. There was no meeting of the minds about that. And what that means is that's not a part of the contract. That doesn't mean there is no contract. It means a term that they really wish was in there somehow. They took no effort -- they made no effort whatsoever to require anyone to assent to. Therefore, it is a classic unexpressed desire of a party that has zero implication for contract.

That is the implied-in-fact contract argument that evolved, frankly, over the course of the pleadings last fall. But in our little pretrial memorandum, I think I pointed to the places where I articulated the argument I

just made.  But without question -- offer, acceptance, consideration; how can there not be a contract?

THE COURT:  So, Mr. Vaughan, what's the answer to that question?

MR. VAUGHAN:  The answer to that question is, Judge -- and I'm sure I don't have to remind the Court, as much as there was -- I was to going to make a not-so-funny joke.  As much as Mr. Savage states that there is one owing to him, what that does not mean is that he gets to skip over basic law, and he gets to testify, because there is not a scintilla of evidence -- not a single fact -- not a witness that supports anything my friend on the other side just told you.

The facts are that UPM, as testified by Mr. Tran, acquired these SIM cards through shadow personnel in Haiti.  There is not an invoice, not a receipt, not a document that purports to reflect anything that Mr. Savage just said about some legitimate transaction between --

THE COURT:  Although, Mr. Vaughan, what I thought I heard Mr. Savage say is it doesn't matter how they acquired the SIM cards.  Once they got the SIM cards, they electronically paid for some topping off or paid for Roam Like You're Home, and that's the only contract that he contends.

So he's saying you may be right; that there is no

evidence how they acquired the SIM cards.  But he is arguing, legally that doesn't matter.

Is he right, or is he wrong?

MR. VAUGHAN:  I'm sorry.  I don't mean to interrupt you.  Go ahead.

THE COURT:  My question to you is:  Is he right, or is he wrong?  He says, "Mr. Vaughan may be correct. There is no evidence on how UPM acquired the SIM cards other than through their agents, by purchase or otherwise," whatever the heck "otherwise" may mean.

So he agrees with you there's no evidence how they got the SIM cards, but he also says it's undisputed that once they got the SIM cards in their hands, through electronic means, through Digicel Haiti's distributors, they paid to top them off or get additional minutes on them, but most importantly, they subscribed to Roam Like You're Home. And that, according to Mr. Savage, is where the contract was made.

MR. VAUGHAN:  He is wrong, because Mr. Savage cannot produce to you a single witness, a single document that shows that UPM purchased a minute of top-off.  UPM has not a single receipt, invoice, proof of payment for a single minute of alleged top-off with Digicel.  There is no document in this case that reflects that UPM bought a single minute of top-off from Digicel.  We hear these allegations

of agency.  There's not a document to reflect that agency relationship between UPM and whoever it is that allegedly top-offed, purchased, bought these minutes that they allege.

We hear about Digicel's minutes and SIM cards floating on the wind like dandelion seeds, yet there is not a document, agency relationship, contract that reflects, as evidence in this case, any relationship between Digicel and anyone that UPM or anyone on its behalf allegedly purchased top-offs from.

So as a matter of law, with respect to your analysis on summary judgment, there is not a shred of evidence to suggest that there's a material fact in dispute with respect to this alleged implied-in-fact contract my friend speaks of.

THE COURT:  Mr. Savage, where is that evidence?

MR. SAVAGE:  I'm assembling things in my mind here, Your Honor.

No. 1, to the extent Mr. Vaughan is saying that we don't have any evidence how far we got the SIM cards, my answer is the same.  So what?

THE COURT:  That's not what he is saying.

MR. SAVAGE:  I understand.  But he did say that.

Moving on to the other question, it is absolutely clear that UPM had these SIM cards.

It is absolutely clear that UPM used them to make

some number of calls.  That is literally impossible, given the testimony from their witnesses as to how their system works, had there not been money placed in them.

No. 3.  Mr. Tran indeed testified at his deposition that we would recharge those things.

No. 4.  We presented -- now, admittedly, we provided them with, I think, dozens of thousands of pages of material in response to discovery, but among that were the invoices that UPM received from the top-off vendors for paying the top-off vendors for calls for Digicel Haiti cards.

Now, Mr. Vaughan, I see you shaking your head.  I didn't come here today prepared with that set of documents, but they absolutely received them, and, frankly, they received them whenever it was, in 2018 or 2019 or before, in the course of the mediation we had, which we resubmitted as information in the context of formal discovery.

So I don't doubt that Mr. Vaughan has not focused on that, but there is absolutely no question, and, frankly, until this moment there has been no dispute that we paid that money.

THE COURT:  It's really interesting how every time we have another argument each side says, "Oh, I didn't realize that was the focus of somebody's argument or my analysis."

Let me give the bottom line to both sides:  There will not be summary judgment granted on either side of the implied-in-fact contract.  I look forward, if this issue goes to the jury, of both seeing what the jury has to say and probably having to struggle with motions or cross-motions for judgment as a matter of law at trial on this question, but it's not happening now.

MR. SAVAGE:  Okay.

MR. VAUGHAN:  Understood, Judge.  To be fair to both sides, I think in the analysis, where there was concern about evidence from our side, you did articulate that we should expect therefore to have that articulation and that evidence pretrial so that we're not surprised, because if it is not provided by virtue of the witness statements and the pretrial documents, then we would be making the appropriate motions.

THE COURT:  Although keep in my mind what Mr. Savage just said.  He may be making the argument at trial that it is a reasonable inference that Digicel Haiti would not have transmitted any calls with a SIM card on a Roam Like You're Home account, unless it had been topped-off.  Whether he thinks that's sufficient and whether that's the direction he wants to go, we will see.

MR. VAUGHAN:  Understood.

THE COURT:  Okay.  Is there anything else that we

should talk about now in my tentative opinion?

MR. VAUGHAN:  It's a resounding yes.  My turn.

THE COURT:  Your turn.  It's Mr. Vaughan's turn. Sorry.  I didn't see your hand.  We will go back to you.

MR. VAUGHAN:  Before I begin, I overhear, in my zeal, I hope when Chris was arguing, I didn't come across as if I was being disrespectful.

THE COURT:  Neither of you have ever been disrespectful.  You are both delightful.  As much as I want to continue this for another seven years, unfortunately, we can't.  So it will end in November, unless the Ninth Circuit sends it back to us.  But neither side has ever been disrespectful.  You both have been incredibly professional and, frankly, quite talented, both sides.

MR. VAUGHAN:  Thank you.  I just wanted to make sure I wasn't distracting him with his argument, because he noted I shook my head.  So I am just making sure.

THE COURT:  By the way, in all seriousness, shaking your head when it is just us talking in argument is fine with me.  I don't let people shake their head when we have a jury in the jury box.

MR. VAUGHAN:  Perfectly understood and wouldn't do it.

Thank you, sir.

Okay.  The point I wanted to raise, and this is

again, Judge, being very mindful of not wanting to quibble. There are things we may or may not agree on, but I'm not trying to go at everything. I'm focusing on what I believe is a key point and one where I think there is definitely room for the Court to continue to think about the facts, the definitions, and the law that apply to whether or not this Court concludes that Digicel Haiti is a common carrier subjecting it to the jurisdiction of the FCC and the Telecommunications Act.

THE COURT: And by the way, my tentative opinion was reflecting that it's a tentative opinion that, yes, they are, but only with respect to the Roam Like You're Home.

MR. VAUGHAN: Understood.

THE COURT: The Digicel USA stuff, that's out of the case.

MR. VAUGHAN: Understood.

THE COURT: Okay.

MR. VAUGHAN: I'm getting feedback, and I sound horrible.

THE COURT: You sound fine to us.

MR. VAUGHAN: So, Judge, you had, and my friend on the other side, relies heavily on an order that you had entered with respect to a motion to dismiss early on in the case. That motion to dismiss contained within it your views at the time -- and Chris just articulated it perfectly.

This was six, seven years ago --

THE COURT:  I know.

MR. VAUGHAN:  -- and we have all been evolving in our positions.  But even that said, it contained your views at the time in an opinion as we were probing the pleadings.

THE COURT:  Right.  By the way, just for clarification, I'm not accepting UPM's argument of law of the case.  If I got it wrong six years ago, you tell me how, and I'll try to get it right now, but it looked right to me.

MR. VAUGHAN:  Well, then challenge accepted.

THE COURT:  Okay.  Go for it.

MR. VAUGHAN:  Okay.  Put simply, Judge, UPM argues that Digicel Haiti is a upon carrier under the Communications Act, because Digicel Haiti entered into a roaming agreement with U.S.-based facility carriers that allowed Digicel Haiti subscribers from Haiti to roam on that or those domestic carriers' networks while they were traveling in the U.S.

The Court also reflected UPM's argument, to the extent that the Court indicates that "Digicel Haiti has entered into roaming agreements" -- in the tentative order on page 6 -- "with United States carriers to handle calls between the United States and Haiti, Digicel Haiti is an international common carrier under the Communications Act at least for those services," which is the point you just

clarified.

THE COURT:  Right.

MR. VAUGHAN:  Very quickly, I want to talk about the definitions that apply, which I think we all agree on, but I think those definitions may be read in different ways by my friend on the other side and by Digicel.

First, 47 U.S.C. 152.  If I may share a screen, Judge.

THE COURT:  Please.

MR. VAUGHAN:  Thank you.  47 U.S.C. 152(b).  Just in the interest of time, 152(b) indicates, "Except as provided in Sections 223 through 227" -- and I'm going to focus on the salient sections -- "nothing in this act shall be construed to apply or to give the Commission jurisdiction with respect to" -- and if we go to (2) -- "any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct, or indirect common control with such carrier."

It is Digicel Haiti's position -- it is the position we believe articulated in the FCC orders and case law -- that Digicel Haiti, one, does not have communication facilities in the U.S., which the Court has already acknowledged in its opinion.

THE COURT:  Right.  And UPM agrees.

MR. VAUGHAN:  Yes.  Thank you.

It does not have a network in the U.S., only a physical network in Haiti, which I think there is no dispute about.

Does not provide communication services within the U.S., which is the crux of our disagreement.

I would like to talk about the additional definitions that apply, because we believe Digicel Haiti does not fall under the definition.  We will go to 47 U.S.C. 153, cited in the Court's opinion, I think being led by the papers and briefings from UPM.  47 U.S.C. 153, at various subsections, gives certain definitions that are applicable.

It talks about telecommunication service.  "The telecommunication service means offering of telecommunications for a fee directly to the public, or to such classes of users as to effectively available directly to the public, regardless of the facilities used."

I want to harken to my friend's papers, where they cite to this very definition, but ellipses are inserted wherever there is a reference to "directly to the public." They say, "Telecommunication service means the offering of telecommunications," and then it skips to "regardless of the facilities used."

THE COURT:  By the way, let me say, the way I

understood UPM's argue -- and if I misunderstood, everybody needs to correct me.  I understood with respect to Roam Like You're Home, that's not being offered directly to the U.S. public.  That's only being offered to folks in Haiti but that UPM was focusing on the second conjunction -- sorry -- the second disjunction; namely, "such classes of users as to be effectively available," and that's the roaming partner agreements.

Did I misunderstand UPM's argument, Mr. Savage, or do you contend that Roam Like You're Home was being offered directly to the public where "the public" includes people in the U.S.?

MR. SAVAGE:  Well, the short answer is both, and it is for the following reason:  First, there is plenty of case law, which we can cite as we go forward, if we need to, to the effect that, what does that mean, "directly to the public"?  There is case law that says that you're free to say you're making an offering to people in Montana only or people of whatever only.  But whatever your restriction is, if it is a subset of the public, a class of users that can make use of the service, that is sufficient to make you a carrier.

It's USDA v. FCC -- I apologize.  I don't remember the citation.  It is about 2003, 2004.  There is a case called Vitelco v. FCC involving whether AT&T was a common

carrier with respect to an inter-undersea cable that only like three or four entities could possibly use. There are any number of cases that say it doesn't have to be everybody, okay. So that's No. 1. So, yes, I would argue that it is a class of users to be effectively available to the public.

Second, it's factually not true, as their witness Mr. Boute explained in his deposition, because I asked him, that this service is available only to people in Haiti. The implication of that statement is somebody in Haiti has to sit there and in Haiti activate their SIM card and in Haiti pay the fee in order to be able to use Roam Like You're Home. That's simply not true.

You can activate a SIM card on Digicel Haiti's network anywhere that they have a roaming agreement. In the United States, you activate a SIM card. Here, AT&T picks it up, sends the data back, it's legit, that's great. Then in the United States, you buy the Roam Like You're Home service. You send the 25 bucks in.

So the notion that this occurs in Haiti is simply factually false.

THE COURT: Can I interrupt both of you with the following proposal: And when I say "proposal," and you are a federal district judge, what does that really mean?

Anyway, here is what I would like to do: I

recognize the importance of this question.  I also recognize that this is one of the areas that I just don't feel really comfortable in my understanding of.  So here is what I would like to do, and then I'll let everybody be heard on why this is a terrible idea, but I think it is a good idea.

On the same schedule that we have already set, opening brief, August 13th; response brief, August 30th; reply, September 9th; oral argument, September 14th at 1:00 p.m., I would like to let both sides brief this issue further, but now starting with UPM.  I want to UPM to brief on August 16th, without argument to what my previous ruling was -- I don't want to hear what I previously ruled.  I want to pretend we are on a blank slate, and somebody can now tell me your respective positions so we get the right answer, as if you were briefing this on appeal even.

By August 16th, UPM can give me argument for why the Communications Act, specifically the discrimination provisions you're alleging in your Phase II counterclaims, applies to what Digicel Haiti was doing with respect to Roam Like You're Home.  Then August 30th, Digicel Haiti responds.  September 9, UPM replies.  Then we will discuss that on September 14th on a blank slate.

I don't want to hear anything about law of the case.  I don't want anybody to quote my earlier opinions.  Pretend I'm a single judge, three-judge panel, hearing this

for the first time, and the sole question is:  Does the Communications Act provisions that are relied upon as UPM's counterclaims, do they apply to what appear to be the facts of the case here; and if there is a factual dispute, what facts does a jury need to resolve before I can then tell the jury, "If you resolve the facts this way, the Communications Act applies.  If you resolve the facts that way, the Act doesn't apply.  The counterclaims are gone."

So I think that's the right way to approach it.

Can we do that, Mr. Savage?

MR. SAVAGE:  From my perspective, that's fine.  I think, just jumping ahead, I think what it is going to come down to may simply be -- never underestimating Mr. Vaughan's ability to find a factual dispute when maybe there isn't one, I think the evidence is undisputed that people in the United States with a Digicel Haiti SIM cards can take the steps necessary to enroll in the Roam Like You're Home program and use it, which establishes implied-in-fact contract, but we will let that pass.  But at a minimum, that constitutes the sale of a service.  I'm happy to do it, but my guess is, at the end of the day, it will be, "Eh, the jury has got to decide what actually happens."

MR. VAUGHAN:  I find it absolutely amazing, and it is one of the things I have been trying to learn over the last six years, is how to say, "Yes, Judge, that schedule is

fine," and still get a full-throated argument in on my side. I haven't quite yet learned that yet from Chris, but I am working on it.

THE COURT:  It is possible that it can't be done, but you are welcome to keep trying.

(Laughter.)

THE COURT:  All right.  Is there anything else we should talk about now?

MR. SAVAGE:  Oh, yes.  Mr. Gillan.

THE COURT:  All right.  Fine.

MR. SAVAGE:  Let me tell you why -- your tentative ruling with regard to Mr. Gillan is either completely correct or way wrong.

THE COURT:  Well, that's why I flip a coin most of the time.

MR. SAVAGE:  I know.  But this is important, because it relates to what we have to prove to prove our case.

THE COURT:  Yes.

MR. SAVAGE:  If you refer back, as I'm sure you have memorized as I have, our opposition to their motion to disqualify Mr. Gillan, I articulated two different theories as to what the Court might think about what law applies here.

One theory I call the "per se theory."  If you

agree with me that a proper reading of the FCC's orders is -- if you're a carrier, and let's assume they are for these purposes -- if you are a carrier and you block resale, you have violated the Act; you are liable. If that's the law, and that's the law you are going to apply in this case, we don't need Mr. Gillan at all, because all we have to show is they were a carrier, they blocked the calls, and therefore they violated the Act.

However, if you are inclined to permit them to argue, "Yes, I'm a carrier, but that rule doesn't apply to me because," or "maybe the rule applies to me, but what I did in this case is okay because," there then arises a question of how do you decide what's reasonable?

At this point I would like to, if it is okay, hand out to you and have emailed to everyone else something I have gone through with Mr. Gillan's document. I would like people to be able to look at it.

Eleanor, can you email that to people?

MS. DuBAY: I'm working on it right now. It will take me one minute.

MR. SAVAGE: Great.

THE COURT: By the way, I have another matter at three o'clock. I need to leave a few minutes before 3:00 just to rearrange for that.

MR. SAVAGE: This actually shouldn't take very

long, once you see the wisdom of my position.

Mr. Gillan does two things.  He absolutely in his report -- whatever it's called; his disclosure -- he spends a fair bit of time talking about what the FCC said and why. Let's just say reasonable minds may differ as to whether that's proper or not, but I understand where your mind is, so my mind doesn't matter.  That's not proper.  I get that.

However --

THE COURT:  Two out of three Ninth Circuit judges could go in your favor.

MR. SAVAGE:  There you go.  That's right. Assuming that's right, nonetheless, if you are not going to restrict the case to my per se theory of liability under the Communications Act, then I have the task of explaining to the jury a lot of stuff about the economics of the telecom industry.

THE COURT:  Why?

MR. SAVAGE:  Because if --

THE COURT:  Give me an understanding of what would I likely be instructing the jury?  If I don't just simply tell them, "If this thing was done, then that's a violation."  If I don't do that, what would my instruction be?  Frankly, what I typically do is I tell the jury what the law is, and then I say, "You figure out what the facts are and then apply that law."

MR. SAVAGE:  What the law is in this case -- the law that we are very clear Mr. Gillan cannot testify to -- is a bunch of fairly complicated FCC orders that in fact make a series of economic arguments and discussions that say:  We find that restrictions on resale permit a carrier with market power to maintain rates that diverge from costs, and that rates that diverge from costs, A, are discriminatory in the way they do it; and B, are unreasonable, because they have the effect of raising the prices that American consumers pay.

THE COURT:  But that sounds to me like that's a argument for why this is a good law; this is a good regulation.  All I want to do is tell the jury what the law is and then they apply the facts to it.  I don't want to tell them why it's a good law, nor do I want you to have an expert tell them why it is a good law.

MR. SAVAGE:  Fair enough.  But if you look at the cover sheet of what I've put together --

THE COURT:  I have it.

MR. SAVAGE:  -- and if I can indulge a brief personal -- I teach law school.  One of the courses I teach is Internet law.

THE COURT:  And I used to teach antitrust.

MR. SAVAGE:  There you go.  So you and I actually suffer from the same problem.

MR. VAUGHAN:  I teach trial advocacy to lawyers.

THE COURT:  That's got to be a lot more fun than teaching Internet law or antitrust.

MR. SAVAGE:  But the problem is lots of issues in Internet law and certainly antitrust law involves economics. So I always ask my students, "How many of you took economics at undergraduate?"  Out of a class at GW, I'll get three. So built into my course schedule is I teach economics for two hours, and I teach supply and demand.

THE COURT:  And I did the same thing in antitrust.

MR. SAVAGE:  So the jury is going to be sitting here comprised of people who have heard of supply and demand and free market and have not a clue in the world how it works.  So I believe that I have to be able to argue to them that the FCC says that restrictions on resale are bad because they cause rates to diverge from costs, and that hurts consumers --

THE COURT:  I disagree with you.  I think the furthest you should be able to argue -- you are not going to argue; I am going to tell the jury.  If you are right, the FCC or the law prohibits restrictions on resale.  Here is how we define "resale"; maybe "here is how we define 'restrictions'; you figure out the facts, and you figure out if that happened here."

I don't generally let people argue to the jury why

this law is a good idea; why it benefits us economically to have this law.

MR. SAVAGE:  But are you going to let Digicel Haiti argue -- and it would be an argument in the alternative, right.  If we get there, yes, they are a carrier.  Obviously if they're not a carrier, my claim goes away.  So, yes, they are a carrier; yes, they restricted resale, because I think there is no question that by blocking -- they may argue it, but I think the jury will go in a minute, "Yeah, they cut off the things, and their testimony is they don't like us reselling, of course, they're restricting resale."

If their case is done at that point, then I agree. We don't need Mr. Gillan.  But if you are going to let them have Mr. Boute or one of their economists say, "Oh, but in context, for us doing it, that rule shouldn't really apply to us, because of blah, blah, blah," or "doing it in this context is okay, because of blah, blah, blah."

I've got to be able to rebut that, and the rebuttal is going to be, no, the rule should apply, because the same ill economic effects that the rule prevents are captured here.  But if you are not going to let them get into that, I'm a happy guy.

THE COURT:  Why don't we just assume this:  Final decisions on what I'll let them get into will be made at our

final pretrial conference. And if for whatever reason I allow them to get into stuff like that, then you can renew your argument, oh, well, then you need to be able to rebut it.

For right now, I don't anticipate letting either side argue why what the other side is doing or accusing is or is not something that the law should or shouldn't allow. I'm going to instruct the jury what the law does allow, what it doesn't allow, and then you all argue to the jury the facts of whether or not your side or the other side did these things.

MR. SAVAGE: Then the last thing that I think Mr. Gillan -- I'm cheered by that. That makes my case much more simpler, frankly.

Nonetheless, I think it would be useful to the jury to have some background information about how the telecommunications industry works, the fact that resale is pervasive in the industry in various ways. It may be very limited.

THE COURT: And I agree with you, but here is my suggestion of how to do it: Confer with Mr. Vaughan, come up with a very simple, objectively correct, and neutral description. If both sides agree, run it by me, and then I'll toss my two cents in to make it more simple and understandable to a jury. And once we all agree on what it

looks like, I will, at the minimum, read it to the jury and probably even let them keep a copy so they can keep re-reading it themselves.  But I think that's the best way to give the jury the background that is appropriate and neutral.

If you want to add some diagrams or some charts, you and Mr. Vaughan can work together, but know that I agree with you in concept, telecommunications stuff like this, including how the whole operation works here, is pretty complicated.  It has taken us all a few years to figure it out.  I'm fine if both plaintiff and defendant can agree upon a relatively simple statement of a primer, how this works, that a jury can understand, and if you both agree on it.

MR. SAVAGE:  Your Honor, I'm delighted to try to work it out.

MR. VAUGHAN:  Your Honor --

THE COURT:  You are both are saying yes.

MR. VAUGHAN:  No.

MR. SAVAGE:  What I would like to be able to do then is ask you to defer ruling on what to do.

MR. VAUGHAN:  Your Honor, if I might.

THE COURT:  One second, Mr. Vaughan.

MR. SAVAGE:  It may well turn out that we can't agree.

THE COURT:  I understand.  And if I don't defer ruling, it will be with leave to ask for reconsideration on that point.  We'll see.  One way or the other -- but I get it.

Mr. Vaughan.

MR. VAUGHAN:  Yes, sir.  I didn't want the time to run out.  That's why I am doing the Jack-in-the-box.

THE COURT:  That's fine.  Go for it.

MR. VAUGHAN:  Mr. Gillan was not in any way, shape, or form disclosed.  And if I may share a screen, Judge.  He was not disclosed for anything that my friend suggested for the workings of telecommunications and the technicalities of it.

THE COURT:  Understood.  I don't really want to call an expert, especially one retained by one side, to give a neutral explanation of how the industry works.

MR. VAUGHAN:  Okay.  I just didn't want to be in a situation where it appeared that I had acquiesced or agreed or thought that it was proper, even to be deferred, because your ruling on 702 and 403 with respect to this expert and this disclosure, I think, was spot on.

MR. SAVAGE:  Your Honor, the only thing -- the reason I handed it out, it is an annotated list of places where in this disclosure this experts talks about these general economic phenomena relevant to the case, depending

on what your instructions are, without any reference to the FCC.

THE COURT:  And that's the danger of submitting a 20-page expert opinion, 18 pages of which are really inappropriate, but that's my two cents.

MR. SAVAGE:  Eh, maybe 15 pages.

THE COURT:  I don't think I'm going to defer, but I will add something about with leave to seek reconsideration as we talk at the final pretrial conference.

MR. SAVAGE:  Will you do me a favor, Your Honor, and impose on Mr. Vaughan and myself a hard deadline to reach that stipulation.

THE COURT:  Sure.  What should that deadline be, Mr. Vaughan?  How about the first filing, the first wave, September 23rd?

MR. VAUGHAN:  Yes, Judge.  Everybody knows by now my schedule since I have been squawking about it since the beginning.  I don't want that as something distracting me from that initial round of filings, which are case dispositive.

THE COURT:  Okay.  Fine.

MR. VAUGHAN:  Thank you.

THE COURT:  All right.  Please do it by September 23rd.  If both sides can agree to a postponement, that's fine by me.  But I just want to see where we are by

the time you all come before me on the pretrial conference on the 21st of October.

MR. SAVAGE:  And I apologize, Your Honor --

THE COURT:  Now let's go to Mr. Vaughan.

MR. VAUGHAN:  We can work on it while Chris is working on his initial briefings.

THE COURT:  Sure.  And while you are in trial or at least during recesses from trial.

(Laughter.)

MR. SAVAGE:  I was just going to say, Your Honor, the reason for my, "Well, what if we argue this; what if we argue that," by virtue of your severing the matter, I don't have anything from them on their contentions on my claims.

THE COURT:  I know.  I really am going in the direction of granting Digicel Haiti's request to lift the bifurcation order.  Frankly, I'll do that.  I'm going to lift the bifurcation order, but we still don't know for sure whether Digicel Haiti's affirmative claims are going to the jury or UPM's counterclaims or some of them or all of them. But we're getting closer.  All we do know is that whatever is going to the jury, if anything, will go to the jury in November.

MR. VAUGHAN:  Understood.

THE COURT:  Anything else we really need to talk about this afternoon?

Mr. Vaughan first.

MR. VAUGHAN:  What is the weather like in Oregon? It is raining here.

THE COURT:  It is 102 degrees here.

MR. VAUGHAN:  It is supposed to be the reverse.

THE COURT:  I was going to tell Mr. Savage that we are really turning up the heat on him.

MR. SAVAGE:  I love coming to Portland.

THE COURT:  I like it here too.

By the way, as much as I really do like hearing from you, and I think most of my court staff are really looking forward to this trial, as we progress and get closer and you know that we are not going past mid-November, if you want to settle the case, you go right ahead.  But here is what you may not do:  You may not come to me -- of if you do come to me -- fine, you may come to me, but the answer is going to be no.

"Judge, we are really close to settling the case. We just need a postponement of X number weeks or months," the answer will be no.  But that said, if you want to settle it before our trial date, you go right ahead.

MR. VAUGHAN:  What I'm struggling with, Judge, is your thoughts about whether or not we are proceeding for sure in November.

(Laughter.)

THE COURT: Let's see. COVID could interfere. Monkeypox could interfere. There are relatively few other things.

All right. Anything else we should talk about this afternoon?

Mr. Vaughan

MR. VAUGHAN: Not from me.

THE COURT: Mr. Savage?

MR. SAVAGE: No.

THE COURT: Anybody else on the call or in court?

It is, as always, a pleasure seeing you all. I'm going to try to finalize my tentative opinion and order, but I don't think it will be this week. It will be, at the latest, middle of next week. I will get to it as soon as I can.

MR. VAUGHAN: Thank you for your patience.

THE COURT: A pleasure seeing you all.

MR. VAUGHAN: Take care, Judge.

MR. SAVAGE: Thank you.

(Court adjourned.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca                    August 16, 2022
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter

MR. SAVAGE: [86]
MR. VAUGHAN: [66] 4/11 7/19 10/8 11/3 11/6 13/17 22/21 23/22 24/22 27/3 27/7 27/9 27/15 28/2 28/11 28/19 29/2 29/5 29/9 29/24 30/24 32/13 33/16 36/19 36/23 37/3 37/8 40/12 40/14 44/4 45/3 45/18 48/8 48/23 49/1 49/4 49/14 49/21 50/12 50/15 50/17 50/20 51/2 51/9 51/11 52/2 52/9 53/1 57/22 61/25 65/16 65/18 65/21 66/5 66/8 66/16 67/15 67/21 68/4 68/22 69/1 69/4 69/21 70/6 70/15 70/17
MS. DuBAY: [3] 5/15 5/18 59/18
MS. TALCOTT: [1] 4/17
THE COURT: [144]

**'**

**'restrictions' [1]** 62/23

**-**

**--oOo [1]** 71/2

**/**

**/s [1]** 71/9

**1**

**10 [3]** 27/5 27/9 27/11
**1000 [1]** 2/23
**102 [1]** 69/4
**121 [1]** 2/15
**1211 [1]** 2/8
**13 [1]** 15/25
**1301 [1]** 2/12
**13th [1]** 56/7
**14th [6]** 32/19 33/10 33/13 34/15 35/1 56/8
**14th look [1]** 32/18
**14th or [1]** 32/17
**14th through [1]** 32/14
**15 [2]** 6/16 67/6
**152 [3]** 52/7 52/10 52/11
**153 [2]** 53/11 53/12
**15th [3]** 28/16 32/17 33/3
**16 [1]** 71/9
**16th [7]** 29/15 30/1 32/14 32/17 34/8 56/11 56/16
**17th [1]** 2/5
**18 [1]** 67/4
**185 [1]** 4/6
**1850 [1]** 2/15
**19 [1]** 28/21
**1900 [1]** 2/8
**19th [2]** 31/4 32/15
**1:00 p.m [2]** 33/15 56/9

**2**

**20-page [1]** 67/4
**20005 [1]** 2/13
**2003 [1]** 54/24
**2004 [1]** 54/24
**2006 [1]** 28/25
**2011 [1]** 38/4
**2014 [2]** 38/24 39/3
**2015 [1]** 6/1
**2018 [1]** 47/15
**2019 [1]** 47/15
**2022 [6]** 1/7 4/1 6/7 6/16 6/22 71/9
**20th [1]** 6/22
**21 [1]** 34/25
**21st [6]** 34/4 34/7 34/8 35/3 35/6 68/2
**223 [1]** 52/12
**227 [1]** 52/12

**23rd [8]** 34/8 34/10 35/8 35/22 36/4 36/14 67/15 67/24
**25 [1]** 55/19
**26 [2]** 1/7 4/1
**26th [1]** 29/13
**27 [1]** 21/1
**28 [1]** 21/1
**29 [1]** 21/2
**29th [3]** 20/18 21/2 22/19
**29th discussion [1]** 29/22

**3**

**300 [1]** 2/5
**301 [1]** 2/23
**30th [3]** 30/21 56/7 56/20
**312 [1]** 2/5
**326-8182 [1]** 2/24
**33316 [1]** 2/5
**335 [3]** 17/8 17/9 17/10
**35 [4]** 7/5 7/6 7/8 21/4
**379 [1]** 7/5
**3:00 [1]** 59/23
**3:15-cv-00185-SI [1]** 1/5

**4**

**403 [1]** 66/20
**47 [4]** 52/7 52/10 53/10 53/12

**5**

**500 [2]** 2/12 12/6
**503 [1]** 2/24

**6**

**6th [1]** 30/23

**7**

**702 [1]** 66/20

**8**

**8182 [1]** 2/24

**9**

**97204 [3]** 2/9 2/16 2/23
**9th [3]** 28/16 30/24 56/8

**A**

**a lot [1]** 22/12
**ability [1]** 57/14
**able [17]** 8/18 8/21 9/1 9/2 9/3 9/5 9/8 12/22 13/2 22/23 55/12 59/17 62/14 62/19 63/19 64/3 65/20
**about [61]** 6/3 6/16 6/20 8/5 8/14 9/24 13/13 14/6 14/11 14/19 15/9 15/22 16/11 21/21 22/8 23/24 25/3 25/7 27/6 27/8 31/11 31/23 32/3 35/9 35/21 37/25 38/13 38/15 38/18 39/2 39/5 39/10 39/13 40/20 42/20 43/13 43/14 43/15 44/17 46/4 48/11 49/1 50/5 52/3 53/5 53/8 53/14 54/24 56/23 58/8 58/23 60/4 60/15 64/16 66/24 67/8 67/14 67/17 68/25 69/23 70/4
**above [1]** 71/6
**above-entitled [1]** 71/6
**Absent [1]** 35/1
**absolutely [7]** 37/11 46/23 46/25 47/14 47/19 57/23 60/2
**abused [2]** 42/6 42/8
**abusing [1]** 27/5
**acceded [1]** 9/21
**accept [3]** 9/25 22/13 41/17
**acceptance [2]** 41/18 44/1
**accepted [2]** 29/3 51/10
**accepting [1]** 51/7
**according [2]** 26/6 45/17

**account [6]** 41/7 41/9 41/14 41/22 41/24 48/21
**accurately [1]** 9/13
**accusing [1]** 64/6
**acknowledged [1]** 52/25
**acquiesced [1]** 66/18
**acquired [5]** 43/5 44/15 44/21 45/1 45/8
**across [1]** 49/6
**act [13]** 38/6 42/10 50/9 51/14 51/24 52/13 56/17 57/2 57/7 57/7 59/4 59/8 60/14
**activate [3]** 55/11 55/14 55/16
**activated [1]** 41/8
**activity [1]** 16/19
**actually [18]** 5/21 14/3 14/9 14/16 14/22 14/23 15/1 15/19 19/16 22/5 31/23 32/3 33/9 42/18 43/1 57/22 59/25 61/24
**add [2]** 65/6 67/8
**additional [2]** 45/15 53/8
**address [2]** 40/9 40/11
**adequate [1]** 17/24
**adjourned [1]** 70/20
**admitted [2]** 16/12 31/21
**admittedly [1]** 47/6
**advantage [1]** 27/18
**advised [1]** 32/1
**advocacy [1]** 62/1
**affirmative [5]** 6/25 30/4 30/19 36/12 68/18
**after [7]** 7/6 8/6 24/13 31/3 35/25 38/24 39/3
**afternoon [4]** 4/4 4/18 68/25 70/5
**again [3]** 8/13 26/5 50/1
**against [4]** 6/11 8/20 39/25 40/4
**agency [3]** 46/1 46/1 46/6
**agents [3]** 42/12 42/24 45/9
**ago [7]** 6/16 25/16 42/21 42/21 42/23 51/1 51/8
**agree [16]** 19/18 20/12 24/7 24/8 50/2 52/4 59/1 63/13 64/20 64/23 64/25 65/7 65/11 65/13 65/25 67/24
**agreed [2]** 24/11 66/18
**agreement [2]** 51/15 55/15
**agreements [2]** 51/21 54/8
**agrees [2]** 45/11 53/1
**ahead [5]** 40/14 45/5 57/12 69/14 69/21
**Aiken [1]** 42/4
**al [1]** 1/8
**algorithm [1]** 12/11
**alive [1]** 22/2
**all [50]** 4/10 4/23 5/1 6/15 7/10 9/8 9/25 13/10 15/6 15/15 19/3 19/5 19/6 20/5 22/1 23/1 23/19 24/8 24/20 25/1 26/15 27/15 27/22 28/4 29/16 33/22 36/18 37/19 38/18 39/2 39/3 39/7 49/18 51/3 52/4 58/7 58/10 59/6 59/6 61/13 64/9 64/25 65/10 67/23 68/1 68/19 68/20 70/4 70/11 70/17
**allegations [2]** 14/19 45/25
**allege [2]** 14/19 46/3
**alleged [6]** 16/18 16/21 42/21 42/21 45/23 46/13
**allegedly [3]** 10/6 46/2 46/8
**alleging [1]** 56/18
**allow [10]** 8/16 11/11 23/25 24/12 33/24 38/11 64/2 64/7 64/8 64/9
**allowed [6]** 7/23 13/6 13/9 14/12 27/16 51/16
**allowing [3]** 13/5 24/25 35/24
**almost [1]** 25/16
**alone [1]** 26/12
**already [7]** 25/8 27/16 28/21 30/10 30/12 52/24 56/6
**also [12]** 4/20 5/9 6/21 6/23 8/13 23/15 23/17 24/18 39/9 45/12 51/19 56/1
**alternative [1]** 63/5
**although [5]** 21/14 22/7 39/12 44/19 48/17
**always [3]** 10/3 62/6 70/11
**am [12]** 6/16 16/8 16/8 17/4 22/12 28/24 40/17 49/17 58/2

**amazing [1]** 57/23
**amend [3]** 7/23 22/19 27/13
**amended [3]** 23/16 24/13 24/15
**amending [1]** 27/8
**amending the [1]** 27/8
**American [2]** 28/24 61/10
**among [1]** 47/8
**amount [2]** 10/7 10/24
**analysis [8]** 10/13 11/6 11/16 37/22 39/7 46/11 47/25 48/10
**and/or [1]** 39/18
**Andrew [2]** 2/7 4/19
**Anisha [2]** 2/4 4/15
**Ann [1]** 4/19
**Ann Talcott [1]** 4/19
**Anne [1]** 2/7
**annotated [1]** 66/23
**another [5]** 12/6 47/23 49/10 52/17 59/22
**answer [11]** 8/2 26/20 28/9 32/20 44/3 44/5 46/20 54/13 56/15 69/16 69/20
**answers [1]** 9/12
**anticipate [1]** 64/5
**antitrust [4]** 61/23 62/3 62/5 62/10
**any [36]** 9/11 9/20 10/3 12/9 12/10 12/11 12/11 12/11 12/23 13/3 13/3 13/4 14/9 15/6 15/11 15/14 15/14 15/20 16/14 17/2 21/11 26/16 31/22 31/22 34/12 36/2 36/23 38/8 38/25 46/7 46/19 48/20 52/15 55/3 66/9 67/1
**anybody [3]** 26/12 56/24 70/10
**anymore [1]** 5/7
**anyone [3]** 43/19 46/8 46/8
**anything [20]** 15/2 15/3 17/1 25/3 25/11 26/4 28/14 29/18 31/22 34/17 44/12 44/17 48/25 56/23 58/7 66/11 68/13 68/21 68/24 70/4
**anyway [3]** 34/19 36/9 55/25
**anywhere [3]** 15/5 15/6 55/15
**Apodaca [3]** 2/22 71/9 71/10
**apologize [3]** 33/4 54/23 68/3
**appeal [3]** 8/1 10/4 56/15
**appear [2]** 12/11 57/3
**appearance [3]** 4/10 5/3 12/3
**APPEARANCES [1]** 2/1
**appeared [2]** 5/11 66/18
**appearing [6]** 4/10 4/16 4/20 4/23 4/24 5/7
**applicable [1]** 53/13
**applications [1]** 38/19
**applied [1]** 39/2
**applies [4]** 56/19 57/7 58/23 59/11
**apply [12]** 50/6 52/4 52/14 53/9 57/3 57/8 59/5 59/10 60/25 61/14 63/16 63/20
**approach [3]** 39/21 39/24 57/9
**appropriate [2]** 48/15 65/4
**approximate [1]** 12/18
**are [85]**
**area [1]** 12/18
**areas [1]** 56/2
**aren't [1]** 21/21
**argue [14]** 39/10 54/1 55/4 59/10 62/14 62/19 62/20 62/25 63/4 63/9 64/6 64/9 68/11 68/12
**argues [1]** 51/12
**arguing [2]** 45/2 49/6
**argument [36]** 16/2 16/6 16/23 16/25 18/7 18/12 18/13 18/16 18/24 19/17 19/22 30/12 30/14 31/2 32/12 34/16 37/11 40/16 42/19 43/22 43/25 47/23 47/24 48/18 49/16 49/19 51/7 51/19 54/9 56/8 56/11 56/16 58/1 61/12 63/4 64/3
**arguments [10]** 16/5 16/12 16/17 16/20 25/18 26/7 30/9

# A

**arguments... [3]** 32/2 36/25 61/4
**arises [2]** 31/16 59/12
**articulate [4]** 8/22 22/23 24/1 48/11
**articulated [11]** 7/10 8/3 8/14 8/16 9/14 10/10 13/7 43/25 50/25 52/22 58/22
**articulation [3]** 8/17 8/18 48/12
**as [71]** 1/4 1/7 7/10 8/7 8/20 9/15 10/11 11/24 12/23 12/23 12/24 13/7 14/10 14/10 15/4 15/17 16/16 16/20 16/20 16/20 18/4 18/12 22/18 24/15 24/16 24/20 27/21 29/21 30/7 31/17 35/18 35/23 37/5 37/5 37/6 38/2 38/2 38/13 44/6 44/7 44/8 44/8 44/14 46/6 46/10 47/2 47/16 48/6 49/6 49/9 49/9 51/5 52/11 53/17 54/6 54/15 55/7 56/15 57/2 58/20 58/21 58/23 60/5 67/9 67/18 69/10 69/10 69/12 70/11 70/14 70/14
**ask [7]** 20/3 22/16 24/14 39/20 62/6 65/21 66/2
**asked [2]** 10/9 55/8
**asking [2]** 7/15 9/23
**assembling [1]** 46/16
**assent [1]** 43/20
**assertion [1]** 19/9
**assimilate [1]** 12/19
**associate [2]** 5/9 12/17
**associated [4]** 11/23 12/9 12/25 41/23
**assume [2]** 59/2 63/24
**assumed [1]** 24/6
**assuming [9]** 17/24 19/6 19/7 19/24 34/15 35/8 35/13 35/24 60/12
**assumption [1]** 28/6
**Atchanah [3]** 2/4 4/15 4/23
**attack [1]** 19/11
**attributable [5]** 7/11 16/4 18/14 21/6 26/17
**attributable to [1]** 26/17
**attribute [2]** 21/5 21/10
**August [10]** 28/16 29/15 30/1 30/21 56/7 56/7 56/11 56/16 56/20 71/9
**August 13th [1]** 56/7
**August 15th [1]** 28/16
**August 16th [4]** 29/15 30/1 56/11 56/16
**August 30th [3]** 30/21 56/7 56/20
**authenticate [1]** 41/5
**available [4]** 53/17 54/7 55/5 55/9
**Avenue [2]** 2/8 2/23
**avoid [1]** 12/24
**aware [1]** 42/14
**away [2]** 12/6 63/7
**Awesome [1]** 41/7

# B

**B-R-A-G-A-R [1]** 5/19
**back [15]** 7/3 13/25 16/11 25/16 29/2 29/2 33/10 37/7 38/18 41/3 43/4 49/4 49/12 55/17 58/20
**back-to-back [1]** 29/2
**background [2]** 64/16 65/4
**bad [1]** 62/15
**balance [1]** 21/17
**banning [1]** 39/2
**barred [2]** 38/9 38/11
**based [12]** 13/23 15/10 15/18 16/1 23/18 31/22 36/8 38/23 41/1 42/22 42/22 51/15
**basic [1]** 44/10
**basically [2]** 24/10 42/5
**basis [2]** 11/16 23/20
**be [107]**
**because [45]** 5/7 7/2 7/13 10/14 10/21 11/7 14/1 15/12 16/23 18/23 19/4 19/14 24/6 25/14 26/1 31/17 32/21 35/17 36/7 37/15 38/2 40/6 41/5 41/8 41/25 43/5 44/10 45/19 48/13 49/16 51/14 53/9 55/8 58/17 59/6 59/11 59/12 60/18

**Because if [1]** 60/18
**been [22]** 6/1 6/2 6/2 7/6 10/6 16/6 19/24 19/25 21/16 23/3 27/1 29/10 37/15 47/3 47/20 48/21 49/8 49/12 49/13 51/3 57/24 67/17
**before [19]** 1/17 6/10 7/25 8/8 8/8 8/15 13/9 16/7 23/3 28/17 28/18 29/8 35/6 47/15 49/5 57/5 59/23 68/1 69/21
**begin [4]** 5/25 7/15 32/15 49/5
**beginning [1]** 67/18
**behalf [3]** 4/16 4/20 46/8
**behavior [27]** 7/12 8/19 8/23 10/7 11/2 11/19 11/20 11/22 12/2 12/8 12/13 12/16 13/2 13/23 14/11 14/20 15/10 15/14 16/4 16/13 17/3 21/5 21/10 38/15 38/24 41/2 41/10
**being [19]** 9/9 11/25 12/4 12/11 12/13 12/25 13/7 18/3 18/7 20/1 28/14 38/14 38/16 49/7 50/1 53/11 54/3 54/4 54/10
**belabor [1]** 24/23
**believe [18]** 4/19 6/15 7/13 7/16 9/8 9/19 10/14 18/1 19/4 24/1 29/14 34/7 36/20 42/4 50/3 52/22 53/9 62/14
**below [1]** 71/4
**bench [3]** 34/13 34/14 35/9
**benefits [1]** 63/1
**best [1]** 65/3
**better [3]** 36/22 39/21 39/24
**between [9]** 18/25 26/12 41/1 41/11 43/7 44/18 46/2 46/7 51/23
**beyond [1]** 28/10
**bifurcation [5]** 6/24 34/1 35/14 68/16 68/17
**bit [5]** 18/18 27/24 36/10 39/4 60/4
**blah [9]** 26/2 26/2 26/2 63/17 63/17 63/17 63/18 63/18 63/18
**Blake [2]** 2/14 5/6
**blank [2]** 56/13 56/22
**blanking [1]** 14/14
**blindly [1]** 9/16
**block [1]** 59/3
**blocked [1]** 59/7
**blocking [2]** 20/6 63/9
**boat [2]** 23/4 23/9
**booked [1]** 28/22
**boring [1]** 6/3
**both [19]** 6/24 16/10 23/22 23/25 24/22 48/1 48/4 48/10 49/9 49/13 49/14 54/13 55/22 56/9 64/23 65/11 65/13 65/18 67/24
**bottom [1]** 48/1
**bought [3]** 42/25 45/24 46/3
**Boute [2]** 55/8 63/15
**box [2]** 49/21 66/7
**Bragar [2]** 2/15 5/17
**break [1]** 33/6
**bridge [1]** 38/1
**brief [5]** 56/7 56/7 56/9 56/10 61/21
**brief personal [1]** 61/21
**briefing [1]** 56/15
**briefings [2]** 53/12 68/6
**bring [1]** 13/6
**broad [1]** 11/10
**broken [1]** 37/24
**bucks [1]** 55/19
**built [2]** 35/5 62/8
**bunch [2]** 22/8 61/3
**burden [2]** 7/10 8/11
**business [4]** 1/4 1/7 41/13 43/8
**busy [1]** 30/19
**buy [1]** 55/18
**bypass [2]** 11/14 12/25

**C**

cable [1] 55/1
calculate [1] 18/23
calculated [1] 10/7
calculation [3] 11/16 19/11 19/15
calculation/the [1] 11/16
calendar [1] 23/7
call [5] 11/25 12/18 58/25 66/15 70/10
called [2] 54/25 60/3
calling [1] 12/9
calls [18] 8/25 10/18 11/12 11/13 11/13 11/14 11/24 12/4 13/5 41/9 41/15 41/25 42/2 47/1 47/10 48/20 51/22 59/7
can [61] 7/9 7/17 7/18 10/3 10/21 11/2 11/5 13/17 13/18 14/10 18/14 18/23 21/5 21/9 21/9 22/6 23/19 24/11 25/10 26/16 28/8 28/9 28/15 28/19 29/1 30/17 30/22 30/24 31/2 34/11 34/11 34/19 37/5 37/24 38/2 39/19 39/20 41/9 41/14 42/1 42/13 44/2 54/15 54/20 55/14 55/22 56/13 56/16 57/5 57/10 57/16 59/18 61/20 64/2 65/2 65/7 65/11 65/13 67/24 68/5 70/15
can't [8] 15/18 16/3 16/18 16/22 17/2 49/11 58/4 65/24
candidly [1] 9/14
cannot [5] 22/4 23/24 43/11 45/20 61/2
Canyon [1] 31/10
captured [2] 9/13 63/22
card [14] 12/17 12/24 18/3 41/4 41/5 41/8 41/14 41/16 41/22 43/9 48/20 55/11 55/14 55/16
cards [17] 41/7 42/24 42/25 43/2 43/5 44/15 44/21 44/21 45/1 45/8 45/12 45/13 46/4 46/19 46/24 47/11 57/16
care [2] 33/22 70/18
Carla [1] 2/4
carrier [17] 37/6 50/7 51/13 51/24 52/15 52/18 52/20 54/22 55/1 59/2 59/3 59/7 59/10 61/5 63/6 63/6 63/7
carriers [2] 51/15 51/22
carriers' [1] 51/17
case [51] 1/5 4/6 5/11 5/25 6/1 6/4 7/17 8/5 8/7 8/18 8/22 9/1 9/5 9/18 10/19 13/5 13/6 13/8 13/8 13/23 15/13 19/16 21/17 23/2 25/19 28/8 30/19 38/20 38/22 45/24 46/7 50/15 50/24 51/8 52/22 54/15 54/17 54/24 56/24 57/4 58/18 59/5 59/12 60/13 61/1 63/13 64/13 66/25 67/19 69/14 69/18
cases [1] 55/3
caught [1] 20/1
causal [1] 18/25
causation [3] 18/5 18/12 18/24
cause [2] 62/16 71/6
caused [6] 10/23 11/1 16/14 16/22 18/9 18/19
cell [2] 32/21 37/20
center [1] 32/2
cents [2] 64/24 67/5
certain [2] 10/23 53/13
certainly [5] 10/19 18/16 35/12 36/24 62/5
certified [1] 71/8
certify [1] 71/4
challenge [2] 29/3 51/10
change [2] 10/13 36/9
changed [1] 5/22
charts [1] 65/6
check [1] 31/8
cheered [1] 64/13
Cherine [2] 2/3 4/16
choice [1] 29/5
Chris [5] 5/4 49/6 50/25 58/2 68/5
Christopher [1] 2/11
Circuit [2] 49/11 60/9
circumstances [3] 22/25 34/6 42/9
citation [1] 54/24
cite [2] 53/20 54/15
cited [1] 53/11

claim [6] 6/25 14/12 35/21 38/4 38/25 63/6
claims [4] 15/22 36/13 68/13 68/18
clarification [2] 21/2 51/7
clarified [5] 21/1 22/18 24/2 29/21 52/1
clarify [2] 35/17 36/22
class [3] 54/20 55/5 62/7
classes [2] 53/17 54/6
classic [2] 38/17 43/20
clear [5] 13/18 21/9 46/24 46/25 61/2
clearly [1] 8/14
clerk [1] 21/23
client [3] 9/17 22/23 27/1
close [2] 23/7 69/18
closely [1] 16/2
closer [2] 68/20 69/12
clue [1] 62/13
coin [1] 58/14
College [1] 28/24
come [12] 6/4 15/23 21/11 43/4 47/13 49/6 57/12 64/21 68/1 69/15 69/16 69/16
comfortable [1] 56/3
coming [3] 31/5 37/16 69/8
commentary [1] 31/17
comments [1] 24/7
Commission [1] 52/14
common [5] 37/6 50/7 51/24 52/19 54/25
communication [4] 41/11 52/16 52/23 53/6
Communications [7] 38/6 51/14 51/24 56/17 57/2 57/6 60/14
companies [1] 43/7
complain [1] 23/24
complete [1] 13/4
completely [3] 33/1 42/13 58/12
complicated [3] 15/8 61/3 65/10
comprised [1] 62/12
concede [1] 38/2
concept [1] 65/8
concern [4] 8/10 38/13 39/13 48/10
concerned [1] 9/16
concerns [4] 8/5 8/7 9/15 38/15
conclude [1] 38/1
concludes [1] 50/7
conclusion [2] 15/14 39/13
conduct [4] 9/5 10/17 11/21 38/10
Confer [1] 64/21
conference [10] 34/4 34/7 34/9 34/24 35/2 35/5 35/7 64/1 67/9 68/1
confines [1] 7/17
conform [1] 7/23
conformed [1] 71/7
confused [1] 39/4
congratulations [2] 5/14 28/25
conjunction [1] 54/5
connected [1] 38/14
connection [2] 15/17 52/17
consent [1] 13/22
consideration [3] 41/18 41/19 44/2
consistent [1] 29/21
constitutes [1] 57/20
construed [1] 52/14
consult [1] 33/5
consumers [2] 61/10 62/17
contained [2] 50/24 51/4
contend [1] 54/10
contends [1] 44/24
contentions [1] 68/13
context [3] 47/17 63/16 63/18

**C**

continue [2] 49/10 50/5
continuing [2] 6/3 39/5
contract [23] 39/10 39/15 39/21 39/22 40/4 41/1 42/1
 42/11 42/13 42/18 43/9 43/12 43/16 43/17 43/21 43/22 44/2
 44/23 45/17 46/6 46/13 48/3 57/19
contractual [2] 40/25 41/12
control [2] 28/1 52/19
controlled [1] 52/18
controlling [1] 52/18
conversation [1] 19/7
copy [1] 65/2
corporation [1] 1/3
correct [11] 5/13 20/16 36/3 36/12 36/15 39/13 45/7 54/2
 58/13 64/22 71/5
correctly [1] 8/3
costs [3] 61/6 61/7 62/16
could [10] 26/2 31/12 33/8 35/15 35/16 41/21 55/2 60/10
 70/1 70/2
couldn't [1] 38/21
counsel [3] 4/9 5/2 29/10
counterclaim [1] 42/22
counterclaims [10] 6/12 7/1 15/18 30/20 36/13 37/2 56/18
 57/3 57/8 68/19
country [5] 11/14 12/5 12/7 12/14 12/15
course [9] 9/11 9/25 11/21 13/21 35/13 43/23 47/16 62/8
 63/11
courses [1] 61/21
court [18] 1/1 1/18 2/22 4/3 6/5 23/3 27/5 44/6 50/5 50/7
 51/19 51/20 52/24 58/23 69/11 70/10 70/20 71/10
Court's [2] 9/12 53/11
Courthouse [1] 2/22
courtroom [5] 4/20 4/25 5/6 21/23 21/25
cover [1] 61/18
COVID [4] 6/7 31/10 35/1 70/1
COVID-deferred [1] 31/10
create [2] 12/3 42/11
creates [1] 30/14
critical [1] 13/20
cross [1] 48/6
cross-motions [1] 48/6
CRR [1] 71/10
crux [1] 53/7
CSR [1] 2/22
cut [1] 63/10
cutting [1] 18/11
cv [2] 1/5 4/6

**D**

D.C [3] 2/13 5/10 33/2
damage [7] 10/13 11/15 16/5 17/20 18/4 23/14 37/24
damaged [2] 10/6 17/12
damages [31] 7/10 7/14 7/17 10/15 10/20 10/24 10/24 11/1
 11/17 15/18 16/4 16/14 18/14 18/17 18/23 19/12 19/15
 20/14 20/15 20/19 21/6 21/10 22/6 22/20 22/21 26/17 30/11
 38/11 38/14 38/16 38/23
dandelion [2] 43/3 46/5
danger [1] 67/3
data [1] 55/17
date [5] 21/20 27/24 34/16 69/21 71/10
dated [2] 6/16 6/21
Davis [2] 2/12 5/4
day [7] 7/25 10/14 30/23 32/7 35/22 36/9 57/21
days [4] 6/16 33/14 34/18 34/23
deadline [2] 67/11 67/13
deal [2] 26/23 34/12
deceive [1] 18/1

December [1] 28/16
December 5 [1] 28/16
decide [4] 25/10 39/14 57/22 59/13
decided [1] 7/25
decision [2] 28/7 37/23
decisions [1] 63/25
defective [1] 25/19
defendant [1] 65/11
defendants [4] 1/9 2/11 5/2 5/5
defer [3] 65/21 66/1 67/7
deferred [2] 31/10 66/19
define [2] 62/22 62/22
definitely [3] 16/16 37/10 50/4
definition [2] 53/10 53/20
definitions [5] 50/6 52/4 52/5 53/9 53/13
degrees [1] 69/4
delay [1] 9/3
delaying [1] 20/1
delighted [1] 65/15
delightful [1] 49/9
delivery [1] 19/2
demand [2] 62/9 62/12
denied [1] 15/25
Dennis [3] 2/22 71/9 71/10
depending [1] 66/25
depose [1] 23/14
deposition [4] 21/18 31/21 47/5 55/8
description [1] 64/23
desire [1] 43/20
despite [1] 26/5
destroy [1] 19/3
detail [2] 14/10 15/11
detection [1] 12/24
determine [1] 11/22
detriment [1] 8/25
develop [1] 20/14
diagrams [1] 65/6
did [27] 8/4 8/6 12/10 12/23 12/23 13/4 13/22 13/22 15/2
 15/24 17/1 19/1 22/15 22/19 23/4 24/7 24/9 26/10 27/3
 31/23 32/3 46/22 48/11 54/9 59/12 62/10 64/10
didn't [24] 15/3 15/11 16/3 16/5 17/1 18/1 18/7 19/14 24/12
 25/21 25/21 25/25 26/7 26/9 26/12 27/2 27/17 37/22 47/13
 47/23 49/4 49/6 66/6 66/17
differ [1] 60/5
different [6] 10/18 37/16 38/17 38/19 52/5 58/22
differently [1] 42/16
Digicel [47] 1/4 4/17 6/11 6/13 6/25 8/24 9/3 10/6 10/15
 10/25 11/11 11/12 12/12 16/17 16/25 17/11 18/2 18/9 20/5
 37/5 41/12 42/23 42/25 45/14 45/23 45/25 46/7 47/10 48/19
 50/7 50/14 51/13 51/14 51/16 51/20 51/23 52/6 52/21 52/23
 53/9 55/14 56/19 56/20 57/16 63/4 68/15 68/18
Digicel Haiti [1] 63/4
Digicel Haiti's [1] 6/13
Digicel's [4] 8/21 8/25 10/18 46/4
digitally [1] 71/7
diligence [1] 28/4
diligent [1] 28/15
direct [1] 52/19
direction [2] 48/23 68/15
directly [8] 8/2 52/18 53/16 53/17 53/21 54/3 54/11 54/16
disagree [2] 26/18 62/18
disagreement [1] 53/7
disappointed [1] 27/2
disappointment [1] 8/4
disclosed [2] 66/10 66/11
disclosure [3] 60/3 66/21 66/24
discovery [8] 13/21 14/1 15/6 25/7 41/2 43/1 47/8 47/17

**discrimination [1]** 56/17
**discriminatory [1]** 61/8
**discuss [4]** 6/9 15/17 24/12 56/21
**discussion [4]** 19/20 22/19 29/22 37/4
**discussions [1]** 61/4
**disjunction [1]** 54/6
**dismiss [2]** 50/23 50/24
**dispositive [1]** 67/20
**dispute [5]** 46/12 47/20 53/4 57/4 57/14
**disqualify [1]** 58/22
**disrespectful [3]** 49/7 49/9 49/13
**disservice [1]** 9/17
**distracting [2]** 49/16 67/18
**distributors [2]** 43/3 45/14
**district [6]** 1/1 1/2 1/18 2/22 6/5 55/24
**diverge [3]** 61/6 61/7 62/16
**do [70]** 5/18 5/23 6/9 9/10 9/19 9/20 13/11 14/5 15/3 15/20
 15/21 17/17 18/19 19/11 19/12 19/13 19/13 20/10 21/25
 22/1 23/20 23/20 24/16 24/22 24/25 26/21 27/20 27/23 29/7
 30/2 30/15 30/16 31/7 31/13 31/16 33/6 33/7 33/8 33/9
 33/24 33/24 33/24 36/10 36/17 36/20 36/25 43/6 49/22
 54/10 55/25 56/4 57/3 57/10 57/20 59/13 60/22 60/23 61/8
 61/13 61/15 64/21 65/20 65/21 67/10 67/23 68/16 68/20
 69/10 69/15 69/15
**docket [2]** 6/17 7/5
**doctrine [1]** 39/5
**document [7]** 22/5 44/16 45/20 45/24 46/1 46/6 59/16
**documents [12]** 23/17 23/18 29/14 29/23 30/4 30/5 30/8
 34/2 34/6 34/18 47/13 48/15
**does [18]** 10/13 18/18 33/16 36/21 42/1 42/11 43/12 44/9
 52/23 53/3 53/6 53/10 54/16 55/24 57/1 57/5 60/2 64/8
**doesn't [16]** 7/13 10/14 14/9 18/8 18/19 19/5 33/10 42/11
 43/17 44/20 45/2 55/3 57/8 59/10 60/7 64/9
**doing [14]** 1/3 1/7 9/17 10/23 14/8 14/18 18/25 34/13
 36/18 56/19 63/16 63/17 64/6 66/7
**domestic [1]** 51/17
**don't [53]** 5/21 7/13 10/5 16/6 16/15 16/24 18/22 20/9
 20/11 20/21 23/7 24/4 24/5 24/10 24/21 25/22 26/3 27/4
 28/10 29/17 30/9 31/5 36/21 40/6 40/17 40/20 42/5 44/6
 45/4 46/19 47/18 49/20 54/23 56/2 56/12 56/23 56/24 59/6
 60/20 60/22 61/14 62/25 63/11 63/14 63/24 64/5 66/1 66/14
 67/7 67/18 68/12 68/17 70/13
**done [11]** 11/21 22/6 25/23 26/11 28/17 28/18 38/4 43/14
 58/4 60/21 63/13
**doubt [1]** 47/18
**doubtless [1]** 15/17
**down [6]** 19/3 19/4 19/6 31/10 35/4 57/13
**dozens [1]** 47/7
**drivers [1]** 19/5
**DuBay [6]** 2/14 2/15 5/7 5/9 5/13 5/17
**due [10]** 18/23 21/22 28/4 29/15 30/1 30/21 34/7 34/10
 35/8 36/13
**during [3]** 10/10 29/21 68/8

**E**

**each [4]** 40/19 40/24 42/12 47/23
**earlier [2]** 23/25 56/24
**early [1]** 50/23
**easier [1]** 29/15
**Eastern [1]** 33/17
**ECF [1]** 17/8
**economic [3]** 61/4 63/21 66/25
**economically [1]** 63/1
**economics [4]** 60/15 62/5 62/6 62/8
**economists [1]** 63/15
**effect [5]** 15/7 19/8 35/23 54/16 61/9

**effectively [4]** 11/10 53/17 54/7 55/5
**effects [1]** 63/21
**effort [4]** 21/24 22/2 43/19 43/19
**Eh [2]** 57/21 67/6
**either [6]** 14/22 27/20 30/11 48/2 58/12 64/5
**Eleanor [3]** 2/14 5/9 59/18
**electronic [3]** 42/10 42/12 45/14
**electronically [1]** 44/22
**eleven [1]** 6/16
**ellipses [1]** 53/20
**else [6]** 48/25 58/7 59/15 68/24 70/4 70/10
**email [3]** 6/16 21/19 59/18
**emailed [1]** 59/15
**emails [1]** 14/15
**emergency [1]** 35/1
**enable [1]** 18/1
**end [8]** 6/4 10/14 10/19 15/21 15/23 30/24 49/11 57/21
**engaged [2]** 11/9 52/16
**England [2]** 29/12 31/18
**enough [6]** 14/2 20/14 23/19 35/3 35/5 61/17
**enroll [1]** 57/17
**enter [3]** 4/10 5/3 39/16
**entered [3]** 50/23 51/14 51/21
**entering [1]** 6/17
**entire [1]** 21/6
**entirely [1]** 38/24
**entities [2]** 42/12 55/2
**entitled [1]** 71/6
**entry [1]** 29/1
**especially [2]** 17/21 66/15
**essentially [3]** 7/12 13/21 35/20
**establish [4]** 7/10 42/1 43/8 43/12
**establishes [1]** 57/18
**et [1]** 1/8
**even [11]** 8/14 9/15 14/1 32/5 32/25 37/18 39/24 51/4
 56/15 65/2 66/19
**ever [5]** 5/25 16/6 40/20 49/8 49/12
**every [1]** 47/22
**everybody [6]** 35/9 35/10 54/1 55/4 56/4 67/16
**everybody's [2]** 9/18 34/6
**everyone [3]** 4/4 5/24 59/15
**everyone's [1]** 19/3
**everything [4]** 10/22 34/12 35/4 50/3
**evidence [34]** 7/13 10/8 13/23 14/11 14/22 15/5 15/20 16/2
 16/13 17/11 17/15 17/15 17/15 17/16 17/19 17/25 18/25
 19/9 21/20 29/20 39/17 39/18 39/19 44/11 45/1 45/8 45/11
 46/7 46/12 46/15 46/19 48/11 48/13 57/15
**evidentiary [2]** 7/9 8/11
**evil [1]** 32/7
**evolved [4]** 6/18 7/16 8/13 43/23
**evolving [2]** 7/22 51/3
**exactly [5]** 10/15 10/20 40/8 40/11 42/5
**example [2]** 12/5 19/1
**Excellent [1]** 13/19
**except [2]** 23/4 52/11
**exclude [2]** 6/13 31/19
**excuse [1]** 6/12
**exhibits [1]** 28/6
**existed [2]** 16/14 21/20
**expect [1]** 48/12
**expectation [2]** 23/3 38/9
**expecting [1]** 6/20
**expedited [3]** 23/7 23/13 23/20
**expert [14]** 6/13 22/20 23/12 23/14 24/15 24/18 28/6 29/12
 31/17 31/18 61/16 66/15 66/20 67/4
**experts [2]** 9/7 66/24
**explained [1]** 55/8

**explaining [3]** 7/6 25/19 60/14
**explains [1]** 36/6
**explanation [1]** 66/16
**express [1]** 22/18
**expressed [2]** 17/18 18/7
**extent [9]** 9/18 10/11 23/24 35/11 36/20 40/25 41/11 46/18 51/20
**eyes [1]** 26/12

**F**

**facilities [4]** 52/17 52/24 53/18 53/24
**facility [1]** 51/15
**fact [29]** 8/23 9/7 15/12 19/8 21/18 21/19 26/6 31/20 39/10 39/14 39/15 39/20 39/22 40/4 41/1 41/21 42/1 42/14 42/18 43/11 43/12 43/22 44/11 46/12 46/13 48/3 57/18 61/3 64/17
**facts [13]** 20/13 39/15 42/15 44/14 50/5 57/3 57/5 57/6 57/7 60/24 61/14 62/23 64/10
**factual [3]** 15/13 57/4 57/14
**factually [2]** 55/7 55/21
**fair [10]** 14/25 17/20 22/12 22/22 23/22 25/18 25/25 48/9 60/4 61/17
**fair-minded [1]** 25/25
**fairest [1]** 24/22
**fairly [2]** 19/16 61/3
**fall [3]** 22/3 43/24 53/10
**false [1]** 55/21
**far [4]** 9/15 38/1 38/2 46/19
**favor [4]** 17/22 37/17 60/10 67/10
**FCC [9]** 50/8 52/22 54/23 54/25 60/4 61/3 62/15 62/21 67/2
**FCC's [1]** 59/1
**FCRR [1]** 71/10
**federal [1]** 55/24
**fee [2]** 53/16 55/12
**feedback [1]** 50/18
**feel [4]** 25/10 25/13 32/23 56/2
**feelings [2]** 26/25 27/21
**fellow [1]** 28/24
**few [4]** 37/11 59/23 65/10 70/2
**Fifth [1]** 2/8
**figure [6]** 31/14 33/19 60/24 62/23 62/23 65/10
**file [6]** 23/15 26/22 30/4 30/7 34/1 36/1
**filed [6]** 5/21 6/1 15/8 22/14 26/15 29/5
**files [1]** 35/19
**filing [6]** 25/17 28/18 29/19 35/22 36/8 67/14
**filings [8]** 34/9 35/8 35/20 35/23 36/4 36/5 39/19 67/19
**final [6]** 15/16 28/7 37/23 63/24 64/1 67/9
**finalize [1]** 70/12
**find [7]** 26/2 38/21 39/20 41/21 57/14 57/23 61/5
**finder [2]** 41/20 43/11
**finding [1]** 19/22
**findings [1]** 36/13
**fine [13]** 24/25 25/12 33/12 49/20 50/20 57/11 58/1 58/10 65/11 66/8 67/21 67/25 69/16
**finely [1]** 18/11
**firm [3]** 5/8 5/14 5/15
**first [16]** 4/9 16/16 19/21 34/9 35/7 35/19 35/22 37/21 38/4 42/3 52/7 54/14 57/1 67/14 67/14 69/1
**FL [1]** 2/5
**flexibility [1]** 22/12
**flip [1]** 58/14
**floating [1]** 46/5
**floor [1]** 40/22
**flow [1]** 38/12
**flows [1]** 38/12
**focus [2]** 47/24 52/13
**focused [1]** 47/18

**focusing [2]** 50/3 54/5
**folks [7]** 4/7 4/7 4/13 4/14 19/23 20/4 54/4
**follow [1]** 34/15
**followed [2]** 32/21 36/25
**following [8]** 11/3 11/6 31/3 33/9 36/5 40/2 54/14 55/23
**foregoing [1]** 71/4
**foreign [2]** 1/3 52/16
**forgive [1]** 10/12
**form [2]** 42/13 66/10
**formal [2]** 5/22 47/17
**formally [1]** 5/11
**former [1]** 14/14
**Fort [1]** 2/5
**forth [2]** 16/11 22/24
**fortunately [1]** 6/4
**forward [8]** 9/16 20/13 32/9 35/25 37/2 48/3 54/15 69/12
**found [4]** 40/12 40/24 41/3 41/3
**four [7]** 21/16 21/17 28/10 29/4 33/17 35/7 55/2
**four o'clock [1]** 33/17
**frankly [11]** 6/18 13/8 16/25 25/15 43/23 47/14 47/19 49/14 60/23 64/14 68/16
**fraud [7]** 8/5 10/16 10/22 15/22 16/21 20/23 21/17
**fraudulent [3]** 10/23 11/10 16/18
**free [3]** 32/23 54/17 62/13
**fresh [1]** 29/19
**Friday [1]** 32/15
**friend [6]** 9/21 44/12 46/14 50/21 52/6 66/11
**friend's [1]** 53/19
**friend-on-the-other-side's [1]** 9/21
**front [1]** 32/2
**full [2]** 37/10 58/1
**full-throated [1]** 58/1
**fully [1]** 10/1
**fun [1]** 62/2
**funny [1]** 44/7
**further [5]** 7/24 8/20 9/2 9/11 56/10
**furthest [1]** 62/19

**G**

**gateway [1]** 12/17
**general [4]** 16/21 18/4 25/22 66/25
**generally [3]** 17/20 34/3 62/25
**get [30]** 14/2 15/11 24/21 26/3 26/3 27/25 28/5 28/7 28/8 28/17 28/18 29/5 30/2 33/10 34/18 40/19 41/25 45/15 51/9 56/14 58/1 60/7 62/7 63/5 63/22 63/25 64/2 66/3 69/12 70/14
**gets [2]** 44/9 44/10
**getting [2]** 50/18 68/20
**Gillan [9]** 58/9 58/12 58/22 59/6 60/2 61/2 63/14 64/13 66/9
**Gillan's [1]** 59/16
**give [23]** 19/1 22/9 23/8 23/10 23/13 23/15 24/8 24/16 29/17 29/19 30/23 35/8 39/9 40/17 40/19 40/22 43/9 48/1 52/14 56/16 60/19 65/4 66/15
**given [5]** 7/25 29/10 42/15 43/7 47/1
**gives [2]** 34/18 53/13
**giving [1]** 22/11
**global [1]** 35/1
**go [27]** 24/7 24/21 25/16 28/10 29/6 33/25 35/25 40/14 41/2 41/9 45/5 48/23 49/4 50/3 51/11 52/15 53/10 54/15 60/10 60/11 61/24 63/9 66/8 68/4 68/21 69/14 69/21
**goes [2]** 48/4 63/6
**going [62]** 5/6 6/6 10/8 11/23 13/1 14/2 15/4 15/17 18/1 18/17 20/6 20/19 21/22 22/13 23/21 23/25 24/20 26/21 27/13 27/23 29/11 30/3 30/7 30/18 33/4 33/13 33/13 33/25 34/17 34/20 35/3 35/12 35/13 35/14 37/2 38/7 38/18 40/5 40/17 44/7 52/12 57/12 59/5 60/12 62/11 62/19 62/20 63/3

**going... [14]** 63/14 63/20 63/22 64/8 67/7 68/10 68/14 68/16 68/18 68/21 69/6 69/13 69/17 70/12
**gone [5]** 22/25 38/4 38/6 57/8 59/16
**good [11]** 4/4 4/18 27/15 32/11 39/7 56/5 61/12 61/12 61/15 61/16 63/1
**got [22]** 10/25 13/13 14/23 14/25 17/15 17/15 24/6 35/17 37/13 37/19 38/15 39/4 40/5 42/24 44/21 45/12 45/13 46/19 51/8 57/22 62/2 63/19
**gotten [1]** 23/9
**grace [1]** 27/5
**graciously [1]** 7/23
**Grand [1]** 31/10
**grant [1]** 39/25
**granted [1]** 48/2
**granting [1]** 68/15
**great [4]** 30/17 42/4 55/17 59/21
**guess [2]** 34/19 57/21
**guy [5]** 25/15 25/16 25/25 32/3 63/23
**GW [1]** 62/7

## H

**had [17]** 7/6 7/25 11/8 15/6 16/13 19/8 23/24 31/25 38/25 41/5 46/24 47/3 47/16 48/21 50/21 50/22 66/18
**Hail [1]** 21/23
**Haiti [41]** 1/4 4/17 10/6 10/15 10/25 12/15 16/17 16/25 17/11 18/2 18/10 20/5 37/6 41/12 42/23 42/24 42/25 44/15 47/10 48/19 50/7 51/13 51/14 51/16 51/16 51/20 51/23 51/23 52/23 53/4 53/9 54/4 55/9 55/10 55/11 55/11 55/20 56/19 56/20 57/16 63/4
**Haiti's [12]** 6/11 6/13 6/25 8/24 9/3 11/11 11/12 45/14 52/21 55/14 68/15 68/18
**hand [2]** 49/4 59/14
**handed [1]** 66/23
**handle [1]** 51/22
**hands [2]** 43/14 45/13
**happen [1]** 40/6
**happened [4]** 15/20 39/3 41/4 62/24
**happening [5]** 20/9 24/24 31/10 42/14 48/7
**happens [1]** 57/22
**happy [2]** 57/20 63/23
**hard [1]** 67/11
**harken [1]** 53/19
**harm [3]** 17/2 18/9 18/19
**harmed [4]** 15/15 16/18 16/22 17/16
**has [35]** 5/10 5/22 6/1 6/2 6/2 6/18 7/16 7/23 10/5 14/2 14/21 14/22 14/25 15/1 15/2 15/10 15/19 16/6 17/11 21/16 25/14 25/23 32/22 43/6 43/21 45/21 47/18 47/20 48/4 49/12 51/20 52/24 55/10 57/22 65/10
**have [119]**
**haven't [3]** 16/22 30/12 58/2
**having [7]** 8/12 21/6 38/19 39/13 40/20 41/16 48/5
**HBS [11]** 17/12 17/20 17/25 18/17 18/18 18/19 18/23 19/12 20/20 20/22 22/21
**he [53]** 13/25 13/25 14/1 14/2 14/2 14/3 14/3 14/5 14/6 14/8 14/9 14/18 14/18 14/19 14/21 14/22 14/25 15/1 15/2 15/4 15/4 21/4 22/13 22/13 22/14 22/15 23/13 31/21 31/21 31/25 32/4 37/14 44/9 44/10 44/23 45/1 45/3 45/3 45/6 45/7 45/7 45/11 45/12 45/19 46/21 46/22 48/18 48/22 48/23 49/16 60/2 60/3 66/11
**he's [1]** 44/25
**head [5]** 22/9 47/12 49/17 49/19 49/20
**heading [1]** 33/2
**hear [8]** 9/10 12/21 13/17 31/15 45/25 46/4 56/12 56/23
**heard [8]** 13/11 13/20 13/24 21/14 40/1 44/20 56/4 62/12
**hearing [13]** 1/15 3/2 4/6 6/10 7/4 7/25 10/10 21/8 21/21 31/11 35/10 56/25 69/10

**heat [1]** 69/7
**heavily [1]** 50/22
**heck [1]** 45/10
**here [26]** 4/5 4/7 5/11 14/5 26/5 28/13 28/15 41/3 46/17 47/13 55/16 55/25 56/3 57/4 58/24 62/12 62/21 62/22 62/24 63/22 64/20 65/9 69/3 69/4 69/9 69/14
**Here's [1]** 41/8
**Hey [1]** 41/4
**hide [1]** 8/23
**highest [1]** 28/4
**him [8]** 22/11 22/13 32/5 37/15 44/9 49/16 55/8 69/7
**hinged [1]** 11/18
**his [13]** 14/1 21/17 22/14 31/15 31/19 31/21 32/5 47/4 49/16 55/8 60/2 60/3 68/6
**hit [1]** 26/12
**hold [1]** 26/1
**holding [3]** 1/3 4/5 26/5
**Home [11]** 39/3 44/23 45/16 48/21 50/12 54/3 54/10 55/13 55/18 56/20 57/17
**Honestly [1]** 21/22
**Honor [24]** 4/12 4/18 5/16 7/22 10/9 13/15 21/12 25/13 26/10 26/20 27/4 28/13 29/3 31/9 32/25 33/4 46/17 65/15 65/17 65/22 66/22 67/10 68/3 68/10
**HONORABLE [1]** 1/17
**hope [2]** 33/20 49/6
**hoped [1]** 11/8
**hopefully [2]** 8/17 9/12
**hoping [2]** 6/9 6/19
**horrendously [1]** 25/3
**horrible [1]** 50/19
**hours [1]** 62/9
**how [45]** 5/18 10/5 10/7 10/13 10/21 11/1 11/2 11/5 17/18 18/8 18/9 18/14 18/22 20/13 20/19 21/9 23/21 24/10 30/16 32/16 32/18 39/17 41/25 43/5 44/2 44/20 45/1 45/8 45/11 46/19 47/2 47/22 51/8 57/25 59/13 62/6 62/13 62/22 62/22 64/16 64/21 65/9 65/12 66/16 67/14
**however [4]** 36/5 36/25 59/9 60/8
**human [28]** 7/12 8/19 8/22 10/7 11/2 11/19 11/20 11/22 11/25 12/2 12/8 12/11 12/13 12/14 12/16 13/2 13/23 14/11 14/20 15/10 15/14 16/4 16/13 17/3 18/3 21/5 21/10 38/15
**hurts [1]** 62/17
**hybrid [1]** 4/6
**hypothetical [1]** 19/2

## I

**I'll [12]** 28/10 28/12 33/2 34/22 37/5 40/22 51/9 56/4 62/7 63/25 64/24 68/16
**I'm [63]** 6/5 7/9 8/17 9/10 9/23 10/2 11/3 11/6 14/14 16/19 17/23 18/11 19/21 19/24 21/4 21/8 22/8 22/11 23/6 24/14 25/6 25/15 25/15 26/20 27/5 27/9 28/14 30/3 32/20 33/4 34/2 35/14 35/21 37/16 38/7 38/18 39/7 39/15 40/2 40/3 42/17 44/6 45/4 46/16 50/2 50/3 50/18 51/7 52/12 56/25 57/20 58/20 59/10 59/19 63/23 64/8 64/13 65/11 65/15 67/7 68/16 69/22 70/11
**I've [4]** 9/19 35/17 61/18 63/19
**idea [3]** 56/5 56/5 63/1
**identification [1]** 9/4
**identify [1]** 4/10
**ignored [2]** 25/18 25/20
**II [8]** 15/23 34/3 35/12 35/23 36/8 36/13 39/19 56/18
**ill [1]** 63/21
**illicit [1]** 9/5
**illustrate [1]** 9/2
**illustrates [2]** 8/19 8/22
**imagine [1]** 43/11
**implication [3]** 15/9 43/21 55/10
**implicit [1]** 19/16

**I**

**implied [13]** 39/10 39/15 39/20 39/22 40/4 41/1 42/1 42/18 43/12 43/22 46/13 48/3 57/18
**implied-in-fact [13]** 39/10 39/15 39/20 39/22 40/4 41/1 42/1 42/18 43/12 43/22 46/13 48/3 57/18
**implying [2]** 13/25 14/3
**importance [1]** 56/1
**important [1]** 58/16
**importantly [1]** 45/16
**impose [1]** 67/11
**impossible [1]** 47/1
**improper [2]** 10/17 10/17
**improperly [1]** 8/24
**in-country [3]** 11/14 12/14 12/15
**inappropriate [1]** 67/5
**lnc [2]** 1/7 1/7
**inclined [1]** 59/9
**include [2]** 6/10 28/20
**includes [1]** 54/11
**including [3]** 24/15 24/18 65/9
**incoming [1]** 11/23
**incorporate [1]** 29/18
**incredibly [1]** 49/13
**indeed [2]** 39/11 47/4
**INDEX [1]** 3/1
**indicated [2]** 11/18 23/25
**indicates [2]** 51/20 52/11
**indirect [1]** 52/19
**indirectly [1]** 52/18
**indulge [1]** 61/20
**industry [4]** 60/16 64/17 64/18 66/16
**inference [3]** 17/21 19/23 48/19
**inferences [1]** 17/22
**information [2]** 47/17 64/16
**initial [2]** 67/19 68/6
**initially [1]** 11/8
**initiate [1]** 12/4
**initiated [1]** 12/18
**inserted [1]** 53/20
**instead [2]** 13/6 26/1
**instruct [1]** 64/8
**instructing [1]** 60/20
**instruction [1]** 60/22
**instructions [2]** 7/24 67/1
**insufficient [2]** 30/9 30/11
**integral [1]** 13/7
**intended [1]** 38/25
**intending [2]** 22/17 22/17
**inter [1]** 55/1
**inter-undersea [1]** 55/1
**interactions [1]** 43/7
**interception [1]** 9/4
**interest [1]** 52/11
**interesting [2]** 6/1 47/22
**interfere [2]** 70/1 70/2
**interlocutory [1]** 8/1
**international [3]** 8/25 11/12 51/24
**Internet [3]** 61/22 62/3 62/5
**interpretation [1]** 7/11
**interrupt [2]** 45/5 55/22
**interruption [1]** 9/4
**interstate [1]** 52/16
**introduce [1]** 4/14
**introducing [1]** 4/13
**invite [2]** 4/9 5/2
**invoice [2]** 44/16 45/22
**invoices [1]** 47/9

**involves [1]** 62/5
**involving [1]** 54/25
**irrelevant [1]** 43/6
**irrespective [1]** 42/13
**is [259]**
**isn't [4]** 14/17 23/19 39/6 57/14
**issue [5]** 13/11 13/14 38/17 48/3 56/9
**issued [1]** 15/25
**issues [7]** 6/19 16/24 16/24 29/20 35/11 35/12 62/4
**it [226]**
**it's [20]** 15/16 21/9 21/23 21/23 27/25 38/5 38/10 38/23 39/14 45/12 47/22 48/7 49/2 49/3 50/11 54/23 55/7 55/17 60/3 61/15
**its [6]** 8/21 13/3 23/16 41/12 46/8 52/25
**itself [1]** 42/23

**J**

**Jack [1]** 66/7
**Jack-in-the-box [1]** 66/7
**January [10]** 7/8 7/18 20/25 22/14 22/18 23/10 26/14 29/21 40/24 41/3
**January 18th opinion [1]** 20/25
**January 18th ruling [4]** 22/14 22/18 23/10 29/21
**January 18th summary [1]** 7/18
**January 18th written [1]** 7/8
**joke [1]** 44/8
**judge [22]** 1/18 7/9 13/18 23/23 24/24 33/18 42/4 44/6 48/9 50/1 50/21 51/12 52/8 55/24 56/25 56/25 57/25 66/11 67/16 69/18 69/22 70/18
**judges [1]** 60/9
**judgment [24]** 6/11 6/14 7/18 9/22 14/13 17/8 17/21 17/24 22/10 23/1 23/18 24/19 25/17 25/23 25/23 26/22 30/7 35/25 39/16 39/23 40/3 46/11 48/2 48/6
**July [6]** 1/7 4/1 6/16 6/22 15/25 29/13
**July 13 [1]** 15/25
**July 15 [1]** 6/16
**July 20th [1]** 6/22
**July 26th [1]** 29/13
**jumping [1]** 57/12
**jurisdiction [2]** 50/8 52/14
**jury [32]** 20/13 24/21 26/2 29/2 35/6 39/14 39/20 48/4 48/4 49/21 49/21 57/5 57/6 57/22 60/15 60/20 60/23 61/13 62/11 62/20 62/25 63/9 64/8 64/9 64/16 64/25 65/1 65/4 65/13 68/19 68/21 68/21
**just [39]** 6/17 8/3 9/16 14/16 14/16 21/6 22/8 25/9 25/19 27/4 27/17 28/13 34/3 36/10 38/1 39/6 39/22 40/6 44/1 44/12 44/17 48/18 49/15 49/17 49/19 50/25 51/6 51/25 52/10 56/2 57/12 59/24 60/5 60/20 63/24 66/17 67/25 68/10 69/19

**K**

**Katherine [1]** 5/10
**keep [7]** 22/2 27/22 31/5 48/17 58/5 65/2 65/2
**key [1]** 50/4
**Kim [1]** 2/4
**kind [6]** 24/11 24/23 25/15 25/16 26/10 26/11
**know [17]** 15/8 22/11 24/10 25/1 32/1 34/16 35/11 40/17 42/7 42/17 51/2 58/16 65/7 68/14 68/17 68/20 69/13
**knowledge [2]** 31/22 31/25
**knows [3]** 28/13 32/3 67/16
**KVL [1]** 4/13

**L**

**Labor [1]** 30/23
**lane [1]** 9/8
**large [2]** 10/24 10/24
**last [10]** 7/21 10/10 11/4 13/20 15/9 35/18 40/24 43/23

**L**

**last... [2]** 57/25 64/12
**later [6]** 6/5 6/7 12/6 27/24 28/1 30/3
**latest [1]** 70/14
**Lauderdale [1]** 2/5
**Laughter [4]** 32/10 58/6 68/9 69/25
**law [35]** 24/20 30/8 38/11 38/17 42/11 44/10 46/10 48/6 50/6 51/7 52/23 54/15 54/17 56/23 58/23 59/5 59/5 60/24 60/25 61/1 61/2 61/12 61/13 61/15 61/16 61/21 61/22 62/3 62/5 62/5 62/21 63/1 63/2 64/7 64/8
**lawyers [2]** 28/24 62/1
**lay [1]** 23/2
**lead [1]** 40/15
**learn [1]** 57/24
**learned [2]** 43/1 58/2
**least [10]** 6/4 17/17 18/8 19/19 19/22 22/17 30/6 37/1 51/25 68/8
**leave [4]** 22/19 59/23 66/2 67/8
**led [1]** 53/11
**Lee [3]** 2/7 4/19 4/24
**left [1]** 26/1
**legally [2]** 15/16 45/2
**legit [1]** 55/17
**legitimate [1]** 44/18
**legitimately [1]** 30/14
**Lerner [1]** 2/4
**less [2]** 8/8 28/14
**let [23]** 4/9 15/21 20/3 22/16 25/9 26/12 27/7 28/12 31/14 35/16 48/1 49/20 53/25 56/4 56/9 57/19 58/11 62/25 63/3 63/14 63/22 63/25 65/2
**let's [11]** 28/17 28/18 29/6 32/4 33/9 33/9 41/10 59/2 60/5 68/4 70/1
**letter [3]** 6/21 7/3 24/14
**letting [1]** 64/5
**liability [1]** 60/13
**liable [1]** 59/4
**lie [1]** 7/14
**lift [4]** 34/1 35/14 68/15 68/17
**light [2]** 29/11 42/9
**like [44]** 6/6 7/15 7/19 7/21 7/22 14/10 27/10 27/25 28/5 29/17 30/5 30/6 37/4 39/2 40/1 43/3 43/14 44/23 45/16 46/5 48/21 50/12 53/8 54/2 54/10 55/2 55/12 55/18 55/25 56/4 56/9 56/20 57/17 59/14 59/16 61/11 63/11 64/2 65/1 65/8 65/20 69/2 69/9 69/10
**likely [1]** 60/20
**limine [2]** 16/11 31/19
**limitations [6]** 23/10 37/22 37/24 38/3 38/19 39/1
**limited [1]** 64/19
**line [4]** 7/8 27/10 27/11 48/1
**lines [1]** 27/9
**link [3]** 18/25 19/6 20/22
**linked [1]** 20/19
**list [1]** 66/23
**listening [1]** 14/18
**literally [3]** 18/22 25/18 47/1
**little [7]** 6/2 18/11 18/18 27/24 36/10 39/4 43/24
**live [2]** 26/22 34/11
**LLP [2]** 2/4 2/12
**local [2]** 11/13 18/2
**logical [2]** 15/9 19/14
**Logically [1]** 19/12
**long [4]** 12/23 15/22 24/16 60/1
**look [16]** 6/6 7/19 7/21 7/22 8/13 14/13 15/24 27/7 28/12 32/9 32/18 38/5 41/10 48/3 59/17 61/17
**looked [6]** 9/6 9/7 13/25 16/2 38/25 51/9
**looking [8]** 16/19 18/13 20/12 28/14 34/3 39/18 42/16 69/12

**looks [3]** 27/10 33/12 65/1
**lose [2]** 18/24 25/24
**lost [4]** 11/15 35/18 38/9 38/16
**lot [9]** 13/13 15/8 16/23 21/25 22/12 29/15 39/13 60/15 62/2
**lots [1]** 62/4
**Loud [1]** 13/18
**love [1]** 69/8

**M**

**mad [1]** 26/21
**made [14]** 16/2 16/4 16/12 16/16 16/23 16/25 25/19 26/8 30/13 42/19 43/19 44/1 45/18 63/25
**maintain [1]** 61/6
**make [20]** 12/8 26/9 30/3 30/18 33/18 35/17 37/5 37/14 37/22 41/9 41/15 41/25 42/2 44/7 46/25 49/15 54/21 54/21 61/4 64/24
**makes [1]** 64/13
**making [7]** 11/25 14/19 41/13 48/15 48/18 49/17 54/18
**manner [4]** 8/9 8/11 22/24 24/2
**manufactured [1]** 41/6
**many [1]** 62/6
**maps [1]** 19/3
**March [9]** 7/4 13/20 19/20 20/18 21/2 22/19 24/5 26/3 29/22
**March 29th [3]** 20/18 21/2 22/19
**March 29th discussion [1]** 19/20
**March 29th hearing [1]** 7/4
**March 29th with [1]** 24/5
**market [2]** 61/6 62/13
**Mary [2]** 21/23 33/12
**material [2]** 46/12 47/8
**matter [10]** 15/12 24/20 30/8 44/20 45/2 46/10 48/6 59/22 60/7 68/12
**may [20]** 26/11 29/11 32/5 44/25 45/7 45/10 48/18 50/2 50/2 52/5 52/7 57/13 60/5 63/9 64/18 65/24 66/10 69/15 69/15 69/16
**maybe [16]** 7/2 15/11 18/11 20/1 22/3 22/7 26/2 26/2 30/5 34/15 37/12 37/23 57/14 59/11 62/22 67/6
**McEwen [1]** 31/19
**me [61]** 4/9 5/5 6/10 6/12 7/6 9/10 10/12 16/7 16/8 18/3 20/3 22/16 25/2 25/9 25/14 26/12 27/7 27/11 28/5 28/8 28/12 29/16 29/18 29/19 31/1 31/15 32/1 32/2 32/10 33/12 33/15 34/21 35/16 36/17 37/14 41/14 42/19 48/1 49/20 51/8 51/9 53/25 54/2 56/14 56/16 58/11 59/1 59/11 59/11 59/20 60/19 61/11 64/23 67/10 67/18 67/25 68/1 69/15 69/16 69/16 70/7
**mean [7]** 27/16 43/17 44/9 45/4 45/10 54/16 55/24
**means [8]** 25/10 25/24 29/1 43/16 43/17 45/14 53/15 53/22
**mediation [1]** 47/16
**meet [3]** 7/9 8/9 8/11
**meeting [5]** 40/6 42/3 42/6 43/13 43/15
**memorandum [1]** 43/24
**memorized [2]** 19/5 58/21
**mere [1]** 8/8
**merits [1]** 25/15
**messing [1]** 6/8
**metaphor [1]** 42/6
**methodology [3]** 10/16 10/16 13/4
**MICHAEL [1]** 1/17
**mid [1]** 69/13
**mid-November [1]** 69/13
**middle [1]** 70/14
**midst [1]** 8/3
**might [3]** 10/18 58/23 65/22
**miles [1]** 12/6
**mimicked [1]** 12/12

**mind [6]** 18/7 21/9 46/16 48/17 60/6 60/7
**minded [1]** 25/25
**mindful [1]** 50/1
**minds [6]** 40/6 42/3 42/6 43/13 43/15 60/5
**minimum [4]** 30/6 39/17 57/19 65/1
**minute [6]** 12/5 45/21 45/23 45/25 59/20 63/10
**minutes [5]** 12/6 45/15 46/3 46/4 59/23
**misread [1]** 8/4
**misrepresentations [1]** 8/20
**missed [2]** 11/4 23/4
**missing [2]** 8/17 17/4
**mistaken [2]** 16/8 16/9
**mists [1]** 35/18
**misunderstand [1]** 54/9
**misunderstandings [1]** 36/23
**misunderstood [2]** 22/13 54/1
**modern [1]** 42/9
**moment [3]** 9/11 32/20 47/20
**moments [1]** 37/11
**monetary [1]** 16/23
**money [11]** 17/1 20/5 41/9 41/14 41/17 41/22 41/24 43/4 43/10 47/3 47/21
**monitoring [1]** 12/11
**Monkeypox [1]** 70/2
**Montana [1]** 54/18
**months [3]** 21/16 21/17 69/19
**more [12]** 8/2 8/14 17/1 28/25 35/3 36/10 37/25 37/25 37/25 62/2 64/14 64/24
**Morrison [1]** 2/15
**most [3]** 45/16 58/14 69/11
**motion [15]** 1/15 3/2 6/12 6/14 16/10 17/7 24/19 24/19 26/22 30/7 31/19 39/25 50/23 50/24 58/21
**motions [10]** 6/10 6/11 6/13 16/1 16/11 16/17 25/17 48/5 48/6 48/16
**mouth [1]** 10/13
**move [4]** 15/23 22/10 23/17 27/23
**movement [1]** 12/19
**moving [5]** 27/22 27/25 35/2 40/3 46/23
**Mr [11]** 2/3 2/7 2/11 21/3 33/19 37/14 40/14 44/8 49/3 58/9 60/2
**Mr. [82]**
**Mr. Boute [2]** 55/8 63/15
**Mr. Gillan [7]** 58/12 58/22 59/6 61/2 63/14 64/13 66/9
**Mr. Gillan's [1]** 59/16
**Mr. Lee [1]** 4/24
**Mr. McEwen [1]** 31/19
**Mr. Ruiz [3]** 14/15 14/24 15/3
**Mr. Savage [25]** 13/11 13/17 22/23 23/13 24/16 25/1 28/19 30/2 31/5 32/13 32/16 32/18 33/24 40/18 40/22 44/17 44/20 45/17 45/19 46/15 48/18 54/9 57/10 69/6 70/8
**Mr. Tran [3]** 5/5 44/14 47/4
**Mr. Vaughan [36]** 4/22 7/3 7/15 10/11 13/17 13/22 14/16 20/18 20/21 21/8 21/16 22/4 22/11 22/16 28/2 28/23 30/22 31/15 32/11 33/16 36/17 44/3 44/19 45/7 46/18 47/12 47/18 64/21 65/7 65/23 66/5 67/11 67/14 68/4 69/1 70/6
**Mr. Vaughan's [2]** 6/21 57/13
**Mr. X [1]** 21/18
**Ms [8]** 2/3 2/4 2/7 2/14 2/14 4/23 4/24 5/7
**Ms. [3]** 4/14 4/23 5/13
**Ms. DuBay [1]** 5/13
**Ms. Talcott [1]** 4/14
**Ms. Valbrun [1]** 4/23
**much [12]** 10/5 14/10 18/9 30/16 36/22 38/13 42/6 44/7 44/8 49/9 64/13 69/10
**must [3]** 11/18 14/20 19/8
**my [93]**

**N**

**myself [3]** 9/20 39/4 67/11
**name [5]** 5/14 5/15 5/18 5/22 14/14
**named [1]** 5/8
**namely [1]** 54/6
**narrowed [4]** 7/17 8/5 21/4 21/4
**national [1]** 15/22
**natural [2]** 18/3 33/8
**necessary [1]** 57/17
**need [12]** 27/13 30/17 31/5 35/4 54/15 57/5 59/6 59/23 63/14 64/3 68/24 69/19
**needs [3]** 19/9 23/14 54/2
**neglected [1]** 14/5
**neither [2]** 49/8 49/12
**network [10]** 8/21 8/24 10/18 11/11 11/12 41/25 42/2 53/3 53/4 55/15
**networks [1]** 51/17
**neutral [3]** 64/22 65/5 66/16
**never [7]** 10/2 16/2 18/13 27/19 38/25 40/24 57/13
**new [9]** 5/14 5/15 23/18 29/5 29/19 30/12 30/13 30/14 42/11
**next [2]** 36/11 70/14
**nice [1]** 15/22
**nightmare [1]** 15/22
**nine [2]** 34/18 34/23
**Ninth [2]** 49/11 60/9
**Ninth Circuit [2]** 49/11 60/9
**no [44]** 1/5 2/12 6/5 6/7 10/25 15/5 16/13 17/11 17/16 17/19 18/25 19/14 20/24 27/19 27/19 28/7 28/9 31/12 31/25 34/8 34/22 38/1 41/20 42/14 43/15 43/15 43/17 43/18 43/19 44/25 45/8 45/11 45/23 46/18 47/19 47/20 53/4 55/4 63/8 63/20 65/19 69/17 69/20 70/9
**No. [3]** 4/6 47/4 47/6
**No. 3 [1]** 47/4
**No. 3:15-cv-185 [1]** 4/6
**No. 4 [1]** 47/6
**none [3]** 14/15 19/10 33/12
**nonetheless [2]** 60/12 64/15
**nonmoving [1]** 17/22
**normal [4]** 11/24 12/19 22/25 34/5
**not [115]**
**not-so-funny [1]** 44/7
**note [2]** 28/20 28/23
**noted [2]** 7/4 49/17
**nothing [7]** 6/2 15/12 15/13 31/21 32/3 43/6 52/13
**notion [3]** 22/5 26/16 55/20
**November [18]** 6/5 6/7 6/24 23/8 27/23 27/25 28/8 28/21 33/25 34/10 34/17 34/25 35/1 35/12 49/11 68/22 69/13 69/24
**November 14th [1]** 35/1
**November 19 [1]** 28/21
**November 2022 [1]** 6/7
**now [46]** 5/8 7/16 9/24 10/11 10/25 13/6 13/12 13/25 16/14 21/8 21/21 22/4 22/11 22/16 23/8 24/25 25/2 25/25 28/15 31/2 33/6 33/23 36/22 37/12 37/13 39/13 39/22 40/18 40/22 41/7 41/10 42/3 42/21 43/13 47/6 47/12 48/7 49/1 51/9 56/10 56/13 58/8 59/19 64/5 67/16 68/4
**number [12]** 10/24 11/3 11/6 11/7 11/15 16/5 21/11 25/18 41/23 47/1 55/3 69/19
**NW [1]** 2/12

**O**

**o'clock [2]** 33/17 59/23
**object [1]** 26/16
**objecting [1]** 6/22
**objectionable [1]** 25/3

**objections [3]** 9/9 10/1 34/12
**objectively [1]** 64/22
**obviously [4]** 7/22 9/9 23/23 63/6
**occurred [2]** 25/14 38/24
**occurs [1]** 55/20
**October [7]** 34/4 34/7 34/8 34/25 35/3 35/6 68/2
**October 21 [1]** 34/25
**October 21st [5]** 34/4 34/7 34/8 35/3 35/6
**off [11]** 32/21 40/15 44/22 45/15 45/21 45/23 45/25 47/9 47/10 48/22 63/10
**offed [1]** 46/3
**offer [5]** 41/13 41/13 41/17 41/18 44/1
**offered [3]** 54/3 54/4 54/10
**offering [3]** 53/15 53/22 54/18
**official [3]** 5/8 6/17 71/10
**offs [1]** 46/9
**oh [11]** 25/20 27/13 28/9 29/18 32/17 37/7 40/5 47/23 58/9 63/15 64/3
**okay [25]** 5/24 15/5 17/6 17/13 20/18 23/23 29/4 32/16 36/16 37/12 39/8 40/10 40/23 48/8 48/25 49/25 50/17 51/11 51/12 55/4 59/12 59/14 63/18 66/17 67/21
**once [6]** 26/13 38/25 44/21 45/13 60/1 64/25
**one [39]** 7/9 8/5 11/21 12/5 12/5 13/16 15/16 15/25 19/1 19/10 22/7 25/14 26/9 27/20 27/22 29/1 30/22 31/20 32/10 32/23 37/1 38/21 41/5 41/6 42/19 44/8 50/4 52/23 56/2 57/15 57/24 58/25 59/20 61/21 63/15 65/23 66/3 66/15 66/15
**only [18]** 9/2 12/21 13/1 13/5 13/8 23/16 24/17 31/18 43/8 44/23 50/12 53/3 54/4 54/18 54/19 55/1 55/9 66/22
**oOo [1]** 71/2
**open [3]** 4/3 26/1 26/5
**opening [2]** 20/18 56/7
**operation [2]** 21/7 65/9
**opinion [20]** 6/15 6/18 6/23 8/4 8/6 15/25 16/20 17/19 20/25 34/14 38/8 42/20 49/1 50/10 50/11 51/5 52/25 53/11 67/4 70/12
**opinions [1]** 56/24
**opportunity [11]** 8/12 22/10 23/8 23/11 23/13 23/16 24/17 39/10 40/18 40/19 40/21
**oppose [2]** 25/22 26/7
**opposition [1]** 58/21
**oral [3]** 31/2 32/12 56/8
**order [18]** 6/24 7/8 7/11 10/11 26/14 34/1 34/5 36/9 37/8 37/13 37/16 41/3 50/22 51/21 55/12 68/16 68/17 70/12
**orders [4]** 10/1 52/22 59/1 61/3
**OREGON [3]** 1/2 1/9 69/2
**original [2]** 10/22 71/6
**originally [1]** 14/12
**other [17]** 9/21 13/13 16/5 19/13 35/1 40/20 40/25 42/12 44/12 45/8 46/23 50/22 52/6 64/6 64/10 66/3 70/2
**otherwise [2]** 45/9 45/10
**ouch [1]** 32/17
**our [36]** 7/4 7/24 13/1 15/22 16/10 16/10 16/13 17/7 17/12 21/2 22/18 25/17 28/21 29/18 29/22 30/19 31/19 34/15 34/24 34/25 35/22 36/8 38/23 41/7 41/23 42/22 42/24 43/7 43/24 48/11 51/4 53/7 58/17 58/21 63/25 69/21
**out [22]** 15/4 19/15 31/12 31/14 33/20 36/6 38/7 39/7 39/22 43/2 50/14 59/15 60/9 60/24 62/7 62/23 62/23 65/11 65/16 65/24 66/7 66/23
**over [5]** 4/14 16/19 43/23 44/9 57/24
**overhear [1]** 49/5
**owe [4]** 25/13 32/10 32/23 37/15
**owing [1]** 44/8
**own [1]** 18/6

**p.m [2]** 33/15 56/9
**Pacific [1]** 33/15
**packaged [2]** 8/9 8/10
**page [10]** 7/5 7/5 7/8 17/10 21/4 27/5 27/9 27/11 51/22 67/4
**pages [4]** 21/1 47/7 67/4 67/6
**paid [4]** 44/22 44/22 45/15 47/20
**panel [1]** 56/25
**papers [4]** 22/14 29/5 53/12 53/19
**Pardon [1]** 34/21
**part [10]** 11/10 12/5 12/6 13/7 13/7 13/8 14/12 16/23 38/4 43/16
**partial [2]** 6/14 25/23
**participating [1]** 4/7
**particular [8]** 12/3 12/10 12/10 12/17 12/24 41/22 41/22 41/23
**particularly [2]** 42/8 42/9
**parties [4]** 4/10 40/24 41/1 41/11
**partner [2]** 5/8 54/7
**party [3]** 17/23 35/19 43/21
**pass [1]** 57/19
**past [1]** 69/13
**patience [1]** 70/16
**pattern [3]** 11/25 12/13 12/14
**patterns [2]** 12/9 12/19
**pause [1]** 8/1
**pay [3]** 41/14 55/12 61/10
**paying [2]** 41/17 47/10
**payment [1]** 45/22
**pending [1]** 6/10
**people [10]** 49/20 54/11 54/18 54/19 55/9 57/15 59/17 59/18 62/12 62/25
**people's [1]** 43/4
**per [2]** 58/25 60/13
**per se [2]** 58/25 60/13
**perfect [2]** 33/1 37/13
**perfectly [2]** 49/22 50/25
**period [4]** 12/22 13/3 31/9 38/10
**permit [2]** 59/9 61/5
**person [7]** 4/7 12/19 21/19 21/19 31/6 31/6 42/14
**personal [2]** 33/5 61/21
**personnel [1]** 44/15
**perspective [2]** 37/17 57/11
**pervasive [1]** 64/18
**Phase [30]** 15/23 23/11 23/12 24/6 24/7 24/8 24/11 24/21 28/8 29/14 29/20 29/22 30/4 30/8 33/22 33/24 34/2 34/3 34/17 35/10 35/11 35/12 35/23 36/1 36/2 36/4 36/8 36/13 39/19 56/18
**Phase I [21]** 23/11 23/12 24/6 24/7 24/8 24/11 24/21 28/8 29/14 29/20 29/22 30/4 30/8 33/22 34/2 34/17 35/10 35/11 36/1 36/2 36/4
**Phase II [7]** 34/3 35/12 35/23 36/8 36/13 39/19 56/18
**phenomena [1]** 66/25
**phone [9]** 8/25 11/25 12/4 13/4 31/7 32/21 32/24 37/20 41/23
**physical [2]** 52/17 53/4
**picks [1]** 55/16
**place [1]** 31/12
**placed [1]** 47/3
**places [2]** 43/25 66/23
**plaintiff [10]** 1/5 2/3 4/9 4/11 4/21 23/8 35/20 35/23 36/19 65/11
**plaintiff's [3]** 10/1 29/14 38/14
**plan [1]** 34/13
**planning [2]** 10/19 36/8
**plays [1]** 6/8

**P**

**pleading [1]** 5/22
**pleadings [4]** 19/1 26/15 43/23 51/5
**please [5]** 5/23 22/6 28/9 52/9 67/23
**pleasure [3]** 31/6 70/11 70/17
**plenty [1]** 54/14
**plotting [1]** 9/10
**point [25]** 9/20 12/10 14/25 15/16 19/10 19/11 19/18 19/21 21/13 21/14 22/11 24/23 24/24 26/17 27/15 33/8 37/1 37/21 39/25 49/25 50/4 51/25 59/14 63/13 66/3
**pointed [2]** 31/20 43/25
**points [2]** 37/14 37/17
**Portland [5]** 1/9 2/9 2/16 2/23 69/8
**position [4]** 13/1 52/21 52/22 60/1
**positions [2]** 51/4 56/14
**possibility [1]** 8/1
**possible [2]** 12/25 58/4
**possibly [3]** 11/2 11/5 55/2
**postponement [2]** 67/24 69/19
**power [1]** 61/6
**preference [1]** 31/15
**prepared [4]** 8/7 9/19 20/4 47/13
**present [15]** 7/17 8/18 9/1 9/5 11/9 13/23 23/19 24/20 28/7 29/20 30/13 32/5 38/25 39/19 42/18
**presented [2]** 11/8 47/6
**presents [1]** 39/18
**preserved [3]** 9/9 10/2 30/10
**press [1]** 8/1
**presumption [1]** 37/1
**pretend [2]** 56/13 56/25
**pretending [1]** 11/13
**pretrial [21]** 22/14 29/14 29/23 30/4 30/8 34/4 34/6 34/7 34/9 34/9 34/24 35/2 35/5 35/7 35/20 43/24 48/13 48/15 64/1 67/9 68/1
**pretty [1]** 65/9
**prevent [1]** 20/8
**prevents [1]** 63/21
**previous [4]** 10/1 29/18 30/9 56/11
**previously [1]** 56/12
**prices [1]** 61/10
**pricing [1]** 16/24
**primer [1]** 65/12
**principal [1]** 18/23
**priority [1]** 28/5
**probability [1]** 15/19
**probably [8]** 23/13 24/22 30/6 34/14 39/16 39/21 48/5 65/2
**probing [1]** 51/5
**problem [3]** 29/17 61/25 62/4
**procedural [2]** 25/15 26/6
**proceed [1]** 23/6
**proceeding [1]** 69/23
**proceedings [3]** 1/16 5/12 71/5
**process [2]** 25/4 41/21
**processing [1]** 29/16
**produce [1]** 45/20
**professional [1]** 49/13
**profit [2]** 8/25 38/16
**profits [1]** 38/9
**program [1]** 57/18
**progress [1]** 69/12
**prohibits [1]** 62/21
**promptly [1]** 34/14
**proof [2]** 23/3 45/22
**proper [4]** 59/1 60/6 60/7 66/19
**proposal [2]** 55/23 55/23
**proposed [1]** 34/5
**proposing [1]** 34/2

**proposition [2]** 16/21 18/4
**prove [4]** 16/3 20/19 58/17 58/17
**provide [2]** 41/18 53/6
**provided [4]** 41/24 47/7 48/14 52/12
**provisions [2]** 56/18 57/2
**public [9]** 53/16 53/18 53/21 54/4 54/11 54/11 54/17 54/20 55/6
**purchase [1]** 45/9
**purchased [3]** 45/21 46/3 46/8
**pure [1]** 15/16
**purports [2]** 32/4 44/17
**purposes [2]** 11/11 59/3
**put [4]** 13/9 23/3 51/12 61/18
**putting [1]** 10/12

**Q**

**quantify [4]** 18/9 18/14 18/17 20/14
**question [20]** 8/2 9/12 10/9 20/3 20/18 22/16 31/16 39/14 39/17 44/1 44/4 44/5 45/6 46/23 47/19 48/7 56/1 57/1 59/13 63/8
**questions [1]** 36/23
**quibble [1]** 50/1
**quick [2]** 37/5 37/5
**quickly [1]** 52/3
**quite [6]** 6/6 9/13 9/14 30/19 49/14 58/2
**quote [3]** 11/24 42/4 56/24
**quote/unquote [1]** 11/24

**R**

**raining [1]** 69/3
**raise [2]** 37/1 49/25
**raised [1]** 18/16
**raising [1]** 61/9
**ran [1]** 9/16
**randomly [2]** 12/4 12/16
**range [1]** 26/7
**rates [3]** 61/6 61/7 62/16
**rather [2]** 28/1 30/3
**rational [2]** 41/20 43/11
**RDR [2]** 2/22 71/10
**re [3]** 7/3 14/19 65/3
**re-allege [1]** 14/19
**re-read [1]** 7/3
**re-reading [1]** 65/3
**reach [1]** 67/12
**read [10]** 7/2 7/3 9/19 16/19 20/24 24/9 26/13 26/14 52/5 65/1
**reading [2]** 59/1 65/3
**real [1]** 18/2
**realize [1]** 47/24
**realized [1]** 39/1
**really [19]** 6/1 14/18 24/6 30/2 33/15 38/20 43/18 47/22 55/24 56/2 63/16 66/14 67/4 68/14 68/24 69/7 69/10 69/11 69/18
**rearrange [1]** 59/24
**reason [6]** 14/8 26/13 54/14 64/1 66/23 68/11
**reasonable [7]** 15/19 17/22 19/22 39/20 48/19 59/13 60/5
**rebut [2]** 63/19 64/3
**rebuttal [1]** 63/20
**recall [7]** 16/24 17/17 17/19 20/17 24/4 24/5 35/19
**receipt [2]** 44/16 45/22
**received [5]** 6/21 17/1 47/9 47/14 47/15
**receiving [1]** 24/13
**recent [3]** 15/24 24/13 29/1
**recesses [1]** 68/8
**recharge [1]** 47/5
**recognize [2]** 56/1 56/1

**recollection [1]** 17/18
**reconsideration [2]** 66/2 67/9
**record [6]** 15/6 15/13 25/7 25/9 33/7 71/5
**refer [1]** 58/20
**reference [2]** 53/21 67/1
**refile [5]** 22/20 23/11 24/13 24/14 24/17
**refiled [1]** 24/18
**refiling [1]** 32/5
**reflect [2]** 44/17 46/1
**reflected [1]** 51/19
**reflecting [1]** 50/11
**reflects [2]** 45/24 46/6
**regard [1]** 58/12
**regardless [2]** 53/18 53/23
**registers [1]** 41/16
**regular [4]** 11/25 12/13 12/14 12/19
**regulation [1]** 61/13
**rejecting [2]** 18/12 19/22
**related [1]** 34/2
**relates [1]** 58/17
**relationship [4]** 40/25 46/2 46/6 46/7
**relatively [4]** 6/2 24/16 65/12 70/2
**relevant [1]** 66/25
**relied [1]** 57/2
**relies [1]** 50/22
**relying [1]** 42/20
**remain [1]** 10/15
**remaining [1]** 8/6
**remains [3]** 6/25 7/1 18/24
**remember [5]** 5/21 24/24 31/11 42/5 54/23
**remind [1]** 44/6
**renew [1]** 64/2
**renewed [5]** 16/1 16/10 16/17 17/7 24/19
**reopened [1]** 14/2
**reopening [3]** 13/21 14/1 25/6
**repeat [1]** 30/9
**repeated [1]** 16/12
**repeatedly [1]** 26/16
**replies [1]** 56/21
**reply [4]** 25/20 30/22 30/24 56/8
**report [4]** 22/20 24/15 24/18 60/3
**REPORTER [2]** 2/22 71/10
**reports [1]** 28/6
**request [1]** 68/15
**requesting [1]** 6/23
**require [1]** 43/19
**resale [10]** 39/2 43/15 59/3 61/5 62/15 62/21 62/22 63/8 63/12 64/17
**research [1]** 37/25
**reselling [1]** 63/11
**resolve [5]** 17/22 25/2 57/5 57/6 57/7
**resolved [1]** 30/3
**resounding [1]** 49/2
**respect [17]** 11/16 12/23 21/23 24/5 35/20 37/1 38/3 42/3 46/10 46/13 50/12 50/23 52/15 54/2 55/1 56/19 66/20
**respectfully [1]** 26/18
**respective [1]** 56/14
**respond [4]** 25/21 25/21 40/19 40/20
**responding [1]** 32/9
**responds [1]** 56/21
**response [3]** 9/14 47/8 56/7
**responsive [1]** 23/16
**restate [1]** 32/1
**restrict [1]** 60/13
**restricted [1]** 63/7
**restricting [1]** 63/12

**restriction [1]** 54/19
**restrictions [3]** 61/5 62/15 62/21
**resubmitted [1]** 47/16
**result [1]** 10/20
**resulting [1]** 10/17
**results [1]** 11/15
**retained [1]** 66/15
**rethinking [1]** 37/15
**revealed [1]** 31/18
**revenue [1]** 11/15
**reverse [2]** 39/6 69/5
**review [1]** 14/10
**revised [1]** 28/5
**revisit [1]** 8/12
**right [51]** 7/20 9/24 13/6 13/10 13/12 14/15 15/21 18/21 19/21 22/4 23/5 23/6 23/9 25/1 25/2 25/6 25/7 27/15 27/22 28/15 31/24 33/22 33/23 35/21 36/18 37/12 37/19 39/21 40/22 44/25 45/3 45/6 51/6 51/9 51/9 52/2 53/1 56/14 57/9 58/7 58/10 59/19 60/11 60/12 62/20 63/5 64/5 67/23 69/14 69/21 70/4
**RMR [2]** 2/22 71/10
**roam [12]** 39/2 44/22 45/16 48/21 50/12 51/16 54/2 54/10 55/12 55/18 56/20 57/17
**Roam Like [1]** 56/20
**roaming [4]** 51/15 51/21 54/7 55/15
**Robert [2]** 2/3 4/15
**robotic [1]** 12/12
**role [2]** 4/13 6/8
**room [2]** 2/23 50/5
**round [3]** 35/19 36/11 67/19
**routes [1]** 19/5
**Ruiz [4]** 14/15 14/24 15/3 17/15
**rule [6]** 25/22 59/10 59/11 63/16 63/20 63/21
**ruled [2]** 9/10 56/12
**rules [1]** 32/21
**ruling [12]** 7/18 22/14 22/18 23/10 29/21 34/13 35/9 56/11 58/12 65/21 66/2 66/20
**ruminations [1]** 38/8
**run [2]** 64/23 66/7

**S**

**S.A [1]** 1/3
**S.W [3]** 2/8 2/15 2/23
**said [21]** 7/8 10/2 10/14 14/4 14/16 14/24 17/2 17/14 17/19 18/22 20/21 20/24 21/3 25/20 29/11 42/5 44/17 48/18 51/4 60/4 69/20
**sale [1]** 57/20
**salient [1]** 52/13
**Salyer [1]** 5/7
**same [12]** 10/15 10/20 11/3 11/5 11/7 13/24 26/13 46/20 56/6 61/25 62/10 63/21
**Savage [30]** 2/11 5/4 13/11 13/17 22/23 23/13 24/16 25/1 28/19 30/2 31/5 32/13 32/16 32/18 33/19 33/24 37/14 40/18 40/22 44/8 44/17 44/20 45/17 45/19 46/15 48/18 54/9 57/10 69/6 70/8
**saw [2]** 18/12 18/13
**say [34]** 8/14 9/10 9/15 14/5 19/14 20/4 22/4 24/8 24/9 24/19 28/10 29/11 30/10 32/5 33/9 36/1 40/18 41/4 41/7 42/11 44/20 46/22 48/4 53/22 53/25 54/18 55/3 55/23 57/25 60/5 60/24 61/5 63/15 68/10
**saying [15]** 5/25 10/2 10/25 15/9 23/18 24/4 24/5 24/10 30/8 31/22 43/11 44/25 46/18 46/21 65/18
**says [16]** 14/16 15/4 15/5 17/11 21/4 21/18 21/20 22/13 24/19 29/18 41/6 45/7 45/12 47/23 54/17 62/15
**schedule [13]** 26/6 31/2 31/2 32/22 33/5 34/24 35/15 36/5 36/25 56/6 57/25 62/8 67/17
**scheduled [2]** 34/4 34/25

**S**

**scheme [2]** 11/10 11/10
**school [1]** 61/21
**Schwabe [4]** 2/8 4/15 4/19 4/20
**scintilla [6]** 14/21 14/23 14/25 15/1 15/2 44/11
**scope [1]** 8/5
**screen [2]** 52/7 66/10
**se [3]** 2/5 58/25 60/13
**second [8]** 5/18 13/16 19/18 35/4 54/5 54/6 55/7 65/23
**section [1]** 17/11
**sections [2]** 52/12 52/13
**see [24]** 16/5 17/1 18/7 24/2 24/10 26/15 27/13 30/5 30/7 31/6 32/4 32/13 35/24 36/1 38/3 39/17 40/6 47/12 48/23 49/4 60/1 66/3 67/25 70/1
**seeds [2]** 43/3 46/5
**seeing [5]** 16/24 20/13 48/4 70/11 70/17
**seek [2]** 11/1 67/8
**seem [1]** 19/7
**seems [1]** 32/2
**sell [1]** 43/2
**send [2]** 43/2 55/19
**sends [2]** 49/12 55/17
**sent [1]** 6/15
**sentence [2]** 7/21 11/4
**September [20]** 28/16 30/23 30/24 31/4 31/9 32/12 34/8 34/8 34/10 34/15 35/8 35/10 35/22 36/14 56/8 56/8 56/21 56/22 67/15 67/24
**September 12th through [1]** 31/4
**September 14th [2]** 34/15 56/8
**September 14th at [1]** 35/10
**September 14th on [1]** 56/22
**September 16th [1]** 34/8
**September 23rd [7]** 34/8 34/10 35/8 35/22 36/14 67/15 67/24
**September 6th [1]** 30/23
**September 9 [1]** 56/21
**September 9th [3]** 28/16 30/24 56/8
**series [2]** 11/9 61/4
**seriousness [1]** 49/18
**servers [1]** 13/3
**service [8]** 19/2 53/14 53/15 53/22 54/21 55/9 55/19 57/20
**services [2]** 51/25 53/6
**set [7]** 16/12 22/24 41/12 41/21 43/8 47/13 56/6
**settle [3]** 35/4 69/14 69/20
**settling [1]** 69/18
**seven [2]** 49/10 51/1
**severing [1]** 68/12
**shadow [1]** 44/15
**shake [1]** 49/20
**shaking [2]** 47/12 49/19
**shall [1]** 52/13
**shape [1]** 66/10
**share [2]** 52/7 66/10
**sharing [2]** 26/24 27/20
**she [2]** 5/10 5/11
**sheet [1]** 61/18
**Sheriff [1]** 5/10
**shock [2]** 8/3 9/13
**shook [1]** 49/17
**short [2]** 33/6 54/13
**should [18]** 7/2 8/18 8/21 10/11 15/11 16/11 19/15 30/6 34/23 39/16 48/12 49/1 58/8 62/19 63/20 64/7 67/13 70/4
**shouldn't [5]** 16/12 29/17 59/25 63/16 64/7
**show [11]** 7/13 10/25 15/20 16/8 16/18 16/22 18/8 26/16 30/11 41/4 59/6
**showed [1]** 41/2
**shown [1]** 16/22

**shows [4]** 14/20 38/20 38/23 45/21
**shred [1]** 46/11
**SI [1]** 1/5
**side [14]** 29/8 44/12 47/23 48/2 48/11 49/12 50/22 52/6 58/1 64/6 64/6 64/10 64/10 66/15
**side's [1]** 9/21
**sides [9]** 23/22 24/1 24/22 48/1 48/10 49/14 56/9 64/23 67/24
**signature [3]** 71/7 71/7 71/8
**signed [1]** 71/7
**signing [1]** 71/4
**signs [1]** 19/4
**SIM [36]** 12/3 12/10 12/14 12/17 12/20 12/24 12/24 13/3 18/3 41/4 41/5 41/7 41/8 41/14 41/16 41/22 42/24 42/24 43/2 43/5 43/9 44/15 44/21 44/21 45/1 45/8 45/12 45/13 46/4 46/19 46/24 48/20 55/11 55/14 55/16 57/16
**similar [1]** 38/15
**SIMON [1]** 1/17
**simple [3]** 64/22 64/24 65/12
**simpler [1]** 64/14
**simply [6]** 39/22 51/12 55/13 55/20 57/13 60/20
**SIMs [1]** 11/23
**simulate [1]** 11/24
**simultaneously [1]** 41/17
**since [6]** 5/25 6/19 28/25 29/16 67/17 67/17
**single [7]** 44/11 45/20 45/20 45/22 45/22 45/24 56/25
**sir [6]** 28/3 29/25 30/25 37/9 49/24 66/6
**sit [1]** 55/11
**sitting [2]** 28/15 62/11
**situation [1]** 66/18
**six [6]** 42/21 42/21 42/23 51/1 51/8 57/25
**skip [1]** 44/9
**skips [1]** 53/23
**slate [2]** 56/13 56/22
**slightly [1]** 37/16
**slow [2]** 19/4 19/5
**Smith [2]** 2/3 4/16
**so [70]** 5/8 5/13 7/15 9/10 9/13 9/15 11/24 13/20 14/18 15/21 16/6 19/6 19/10 19/11 20/6 21/4 21/4 22/3 23/6 23/7 24/12 24/25 25/1 25/7 25/9 26/17 26/20 27/4 28/2 28/13 28/24 29/13 29/14 30/21 32/23 34/16 35/2 36/7 37/17 38/2 38/24 39/7 40/23 40/25 41/9 44/3 44/7 44/25 45/11 46/10 46/20 47/18 48/13 49/11 49/17 50/21 55/4 55/4 55/20 56/3 56/14 57/9 60/7 61/24 62/6 62/8 62/11 62/14 63/7 65/2
**So let [1]** 25/9
**software [27]** 7/12 8/19 8/23 9/3 10/7 11/2 11/19 11/20 11/22 12/2 12/8 12/14 12/16 12/22 13/2 13/23 14/11 14/20 15/10 15/14 16/4 16/14 17/3 20/6 21/5 21/10 38/15
**sold [1]** 42/23
**sole [1]** 57/1
**solely [1]** 52/16
**some [17]** 4/7 4/7 6/7 6/18 6/22 14/15 15/17 24/14 30/12 35/17 44/18 44/22 47/1 64/16 65/6 65/6 68/19
**somebody [2]** 55/10 56/13
**somebody's [1]** 47/24
**somehow [2]** 22/2 43/18
**someone [1]** 25/23
**something [9]** 12/12 22/2 30/13 32/6 40/18 59/15 64/7 67/8 67/18
**sometime [2]** 5/23 32/12
**sometimes [2]** 20/8 20/10
**somewhere [1]** 17/4
**soon [2]** 24/16 70/14
**sooner [2]** 28/1 30/3
**sophisticated [2]** 19/23 20/4
**sorry [3]** 45/4 49/4 54/5
**sort [2]** 26/14 38/8

**sound [2]** 50/18 50/20
**sounds [1]** 61/11
**speaks [1]** 46/14
**specific [8]** 11/1 16/6 16/20 17/2 22/10 25/18 26/9 41/24
**specifically [6]** 16/3 19/14 20/19 20/22 22/20 56/17
**speculating [1]** 37/23
**speculation [5]** 15/16 15/18 18/15 30/12 38/18
**speculative [2]** 21/11 38/16
**spell [1]** 5/18
**spend [2]** 20/5 20/6
**spends [1]** 60/3
**spot [1]** 66/21
**spring [2]** 15/9 35/18
**squawking [1]** 67/17
**staff [1]** 69/11
**start [1]** 7/2
**started [2]** 19/20 39/5
**starting [3]** 17/10 27/10 56/10
**starts [3]** 28/18 28/18 29/8
**state [1]** 25/9
**statement [3]** 27/14 55/10 65/12
**statements [12]** 6/22 7/24 9/6 23/2 23/11 23/12 23/12 24/1 24/13 24/15 28/6 48/14
**states [9]** 1/1 1/18 2/22 44/8 51/22 51/23 55/16 55/18 57/16
**statute [6]** 37/21 37/23 38/3 38/5 38/19 39/1
**statutory [1]** 38/10
**stay [1]** 9/8
**step [1]** 31/12
**steps [1]** 57/17
**still [12]** 7/22 8/10 10/5 18/6 18/8 20/14 21/9 26/3 32/10 39/12 58/1 68/17
**stipulation [1]** 67/12
**street [4]** 2/5 2/12 2/15 19/3
**struck [1]** 18/3
**structured [1]** 8/7
**struggle [1]** 48/5
**struggling [2]** 18/6 69/22
**students [1]** 62/6
**stuff [6]** 15/8 36/8 50/14 60/15 64/2 65/8
**subjecting [1]** 50/8
**subjective [1]** 42/7
**submit [3]** 14/9 15/21 41/20
**submitting [1]** 67/3
**subscribed [1]** 45/16
**subscribers [1]** 51/16
**subsections [1]** 53/13
**subset [1]** 54/20
**succeed [2]** 20/9 20/11
**successful [1]** 19/25
**succinct [1]** 8/15
**succinctly [1]** 8/15
**such [8]** 14/21 14/21 29/19 29/19 31/25 52/19 53/17 54/6
**suffer [1]** 61/25
**sufficient [5]** 13/22 18/4 32/7 48/22 54/21
**sufficiently [1]** 38/14
**suggest [1]** 46/12
**suggested [1]** 66/12
**suggestion [2]** 9/21 64/21
**Suite [4]** 2/5 2/8 2/12 2/15
**summary [22]** 6/11 6/14 7/18 14/12 16/1 16/10 17/7 17/21 17/24 22/10 23/1 23/17 25/17 25/22 25/23 26/22 35/25 39/16 39/23 40/3 46/11 48/2
**supply [2]** 62/9 62/12
**support [1]** 39/15
**supported [1]** 19/9

**supports [3]** 15/13 22/5 44/12
**supposed [3]** 8/8 26/7 69/5
**sure [18]** 6/6 7/9 8/10 11/7 12/9 14/7 21/5 35/17 37/7 41/6 44/6 49/16 49/17 58/20 67/13 68/7 68/17 69/24
**surprise [1]** 7/7
**surprised [2]** 21/3 48/13
**survive [1]** 14/12
**system [4]** 41/6 41/8 41/17 47/2

---

**T**

**take [15]** 4/12 9/22 10/3 15/24 19/3 27/7 33/6 38/7 38/18 41/23 43/4 57/16 59/20 59/25 70/18
**taken [2]** 7/7 65/10
**takes [1]** 33/22
**taking [2]** 27/17 39/7
**Talcott [4]** 2/7 4/14 4/19 4/24
**talented [1]** 49/14
**talk [11]** 6/20 13/13 27/24 42/12 49/1 52/3 53/8 58/8 67/9 68/24 70/4
**talked [3]** 27/6 27/8 40/24
**talking [4]** 14/6 27/11 49/19 60/4
**talks [2]** 53/14 66/24
**task [1]** 60/14
**teach [6]** 61/21 61/22 61/23 62/1 62/8 62/9
**teaching [1]** 62/3
**team [3]** 4/13 28/12 36/21
**technicalities [1]** 66/13
**Technology [2]** 1/7 4/6
**telecom [2]** 1/7 60/15
**telecommunication [3]** 53/14 53/15 53/22
**telecommunications [6]** 50/9 53/16 53/23 64/17 65/8 66/12
**tell [16]** 24/6 28/13 28/15 31/1 38/13 51/8 56/14 57/5 58/11 60/21 60/23 61/13 61/15 61/16 62/20 69/6
**ten [1]** 12/6
**tentative [18]** 6/15 6/18 6/23 22/9 23/21 34/5 36/9 37/7 37/13 37/16 38/8 42/20 49/1 50/10 50/11 51/21 58/11 70/12
**term [1]** 43/17
**terminate [1]** 8/24
**terminating [1]** 11/12
**termination [2]** 10/17 11/14
**terms [1]** 41/12
**terrible [1]** 56/5
**testified [2]** 44/14 47/4
**testify [2]** 44/10 61/2
**testimony [13]** 11/20 12/2 14/4 14/4 14/5 14/6 14/13 14/16 21/15 21/15 31/20 47/2 63/11
**than [11]** 6/5 6/7 8/8 17/1 28/1 28/15 30/3 35/3 39/21 45/9 62/2
**thank [14]** 4/12 5/16 5/20 13/10 26/24 27/20 31/1 49/15 49/24 52/10 53/2 67/22 70/16 70/19
**Thanks [1]** 33/19
**that [422]**
**that's [73]**
**their [29]** 11/21 12/13 19/5 19/7 19/15 19/15 25/19 31/17 31/17 41/2 41/6 41/16 41/25 42/2 43/2 43/8 43/14 45/9 45/13 47/2 47/2 49/20 55/7 55/11 58/21 63/10 63/13 63/15 68/13
**them [39]** 15/2 15/7 15/15 16/14 17/16 19/4 19/6 26/1 34/19 34/22 39/25 40/4 41/6 41/24 42/25 43/3 43/4 43/9 43/9 45/15 45/15 46/25 47/3 47/7 47/14 47/15 59/9 60/21 61/15 61/16 62/14 63/14 63/22 63/25 64/2 65/2 68/13 68/19 68/19
**themselves [1]** 65/3
**then [49]** 4/13 4/23 6/19 12/5 21/1 21/3 23/2 23/15 23/17 24/18 25/10 26/3 26/23 28/19 29/14 31/14 32/12 34/11 34/11 34/13 34/18 35/7 35/10 35/21 38/11 39/6 39/18 41/23

**then... [21]** 48/15 51/10 53/23 55/17 56/4 56/20 56/21 57/5 59/12 60/14 60/21 60/24 60/25 61/14 63/13 64/2 64/3 64/9 64/12 64/23 65/21
**theories [2]** 37/24 58/22
**theory [7]** 10/22 23/14 38/23 42/7 58/25 58/25 60/13
**there [63]** 6/2 7/2 7/20 14/11 14/17 15/5 15/12 15/19 17/10 17/16 17/24 21/17 22/6 29/17 31/9 31/12 34/16 35/5 38/9 38/20 38/22 39/24 40/7 40/25 42/4 43/13 43/15 43/17 43/18 44/2 44/7 44/8 44/10 44/16 44/25 45/8 45/23 46/5 46/11 47/3 47/19 47/20 48/1 48/10 48/25 50/2 50/4 53/4 53/21 54/14 54/17 54/24 55/2 55/11 57/4 57/14 58/7 59/12 60/11 61/24 63/5 63/8 70/2
**there's [3]** 45/11 46/1 46/12
**therefore [5]** 14/20 20/4 43/20 48/12 59/8
**thereof [1]** 32/8
**these [14]** 15/22 18/2 19/13 28/1 29/5 40/24 42/9 44/15 45/25 46/3 46/24 59/3 64/11 66/24
**they [73]**
**they'd [1]** 41/21
**they're [4]** 19/24 24/20 63/6 63/12
**they've [3]** 16/21 17/15 31/18
**thing [11]** 13/20 13/24 15/21 20/22 22/5 24/22 27/23 60/21 62/10 64/12 66/22
**thing that [1]** 64/12
**things [22]** 6/8 13/13 19/13 20/9 20/10 22/8 24/17 26/1 29/1 29/16 31/20 35/17 42/19 43/13 46/16 47/5 50/2 57/24 60/2 63/10 64/11 70/3
**think [68]** 5/14 7/21 9/15 9/20 10/10 13/25 14/24 16/6 16/9 16/9 16/10 17/5 18/18 18/22 19/6 19/16 19/18 21/16 21/22 22/7 22/12 22/22 24/3 26/18 27/4 27/17 27/19 28/25 32/10 34/23 35/15 35/16 36/15 36/21 36/21 36/24 37/21 37/25 38/2 38/7 38/18 39/12 41/2 43/24 47/7 48/10 50/4 50/5 52/4 52/5 53/4 53/11 56/5 57/9 57/12 57/12 57/15 58/23 62/18 63/8 63/9 64/12 64/15 65/3 66/21 67/7 69/11 70/13
**think I [2]** 18/22 24/3
**thinking [11]** 6/18 7/16 17/18 18/2 20/2 22/8 23/6 23/21 24/14 39/5 39/15
**thinks [3]** 14/2 37/15 48/22
**Third [1]** 2/23
**this [92]**
**those [13]** 6/19 11/13 11/14 23/18 29/22 30/8 33/13 33/14 42/15 47/5 51/17 51/25 52/5
**thought [6]** 10/21 17/18 17/20 24/9 44/19 66/19
**thoughts [3]** 8/13 22/9 69/23
**thousands [1]** 47/7
**three [9]** 28/10 29/4 29/12 30/17 55/2 56/25 59/23 60/9 62/7
**three o'clock [1]** 59/23
**three-judge [1]** 56/25
**throated [1]** 58/1
**through [13]** 12/21 13/1 18/18 23/1 31/4 32/14 44/15 45/9 45/13 45/14 52/12 52/17 59/16
**throughout [1]** 11/21
**throw [1]** 19/15
**throwing [1]** 39/22
**Thursday [1]** 32/15
**tie [3]** 16/3 17/2 22/20
**time [31]** 5/2 8/12 8/17 9/17 9/18 9/20 12/10 12/22 13/3 20/5 22/3 23/16 30/16 33/16 35/3 35/5 35/18 36/22 37/12 37/14 38/9 38/11 47/22 50/25 51/5 52/11 57/1 58/15 60/4 66/6 68/1
**time-barred [2]** 38/9 38/11
**today [8]** 4/21 6/20 14/5 21/15 22/4 29/13 33/20 47/13
**together [2]** 61/18 65/7
**told [1]** 44/12
**Tomasi [3]** 2/15 5/6 5/16

**too [6]** 18/11 21/13 23/7 31/7 38/1 69/9
**took [2]** 43/18 62/6
**top [8]** 45/15 45/21 45/23 45/25 46/3 46/9 47/9 47/10
**top-off [5]** 45/21 45/23 45/25 47/9 47/10
**top-offed [1]** 46/3
**top-offs [1]** 46/9
**topped [1]** 48/22
**topped-off [1]** 48/22
**topping [1]** 44/22
**tort [2]** 38/6 39/5
**toss [1]** 64/24
**totality [1]** 11/8
**totally [1]** 43/6
**traditional [1]** 41/11
**Tran [3]** 5/5 44/14 47/4
**transaction [1]** 44/18
**transactions [2]** 11/9 42/10
**transcript [10]** 1/16 7/4 7/5 9/20 21/2 22/4 27/6 27/12 71/5 71/6
**transmitted [1]** 48/20
**traveling [1]** 51/18
**Tremaine [2]** 2/12 5/5
**trial [37]** 6/24 16/1 16/1 20/13 23/18 23/19 24/21 27/23 28/16 28/17 28/18 28/19 28/21 28/24 29/8 30/5 31/1 32/15 33/13 33/14 33/25 34/10 34/17 34/18 34/25 34/25 35/6 35/12 35/13 39/18 48/6 48/19 62/1 68/7 68/8 69/12 69/21
**trials [1]** 29/2
**tried [2]** 19/8 27/24
**trip [1]** 31/10
**troubled [1]** 42/19
**true [4]** 43/1 43/5 55/7 55/13
**truly [2]** 25/3 30/13
**try [9]** 18/17 20/8 20/10 29/2 30/2 32/5 51/9 65/15 70/12
**trying [5]** 14/19 42/17 50/3 57/24 58/5
**turn [8]** 4/14 32/24 37/12 37/19 49/2 49/3 49/3 65/24
**turned [1]** 32/21
**turning [1]** 69/7
**turns [1]** 15/4
**two [16]** 28/8 29/4 29/7 29/11 30/16 30/18 37/17 38/5 38/19 42/12 58/22 60/2 60/9 62/9 64/24 67/5
**two-week [1]** 29/7
**two-year [1]** 38/5
**type [2]** 8/23 9/3
**typically [1]** 60/23

## U

**U.S [6]** 51/18 52/24 53/3 53/7 54/3 54/12
**U.S. [1]** 51/15
**U.S.-based [1]** 51/15
**U.S.C [4]** 52/7 52/10 53/10 53/12
**UETA [1]** 42/10
**unable [1]** 32/20
**under [9]** 22/25 28/1 34/5 35/19 51/13 51/24 52/19 53/10 60/13
**undercut [1]** 19/2
**underestimating [1]** 57/13
**undergraduate [1]** 62/7
**undersea [1]** 55/1
**understand [13]** 9/23 9/24 9/25 10/5 10/12 22/17 23/9 26/21 36/18 46/22 60/6 65/13 66/1
**understandable [1]** 64/25
**understanding [6]** 7/7 19/19 36/7 42/23 56/3 60/19
**understood [12]** 23/1 26/14 29/24 48/9 48/24 49/22 50/13 50/16 54/1 54/2 66/14 68/23
**undisputed [3]** 40/23 45/12 57/15
**undue [1]** 30/11
**unexpressed [1]** 43/20

**U**

**unfortunately [2]** 6/3 49/10
**Uniform [1]** 42/10
**UNIGESTION [3]** 1/3 4/5 4/17
**Unigestion-Digicel [1]** 4/17
**UNITED [8]** 1/1 1/18 2/22 51/22 51/23 55/16 55/18 57/16
**United States [4]** 51/22 51/23 55/16 57/16
**unlawful [1]** 10/6
**unless [3]** 6/7 48/21 49/11
**unquote [1]** 11/24
**unreasonable [1]** 61/9
**unreasonably [1]** 38/16
**until [3]** 7/20 34/11 47/20
**unto [1]** 32/7
**up [13]** 6/8 10/3 21/11 24/8 37/14 37/24 41/4 41/12 41/21 43/8 55/17 64/22 69/7
**update [1]** 7/23
**UPM [39]** 1/7 1/7 4/5 5/5 8/20 8/23 9/3 10/23 11/9 11/11 11/21 11/22 12/22 13/2 15/15 17/25 18/14 19/23 23/15 31/23 32/3 44/14 45/8 45/21 45/21 45/24 46/2 46/8 46/24 46/25 47/9 51/12 53/1 53/12 54/5 56/10 56/10 56/16 56/21
**UPM's [15]** 6/11 6/12 6/13 6/14 7/1 10/18 15/25 37/17 38/16 51/7 51/19 54/1 54/9 57/2 68/19
**upon [3]** 51/13 57/2 65/12
**urge [1]** 22/3
**us [14]** 7/13 7/23 18/25 23/25 24/2 24/25 49/12 49/19 50/20 63/1 63/11 63/16 63/17 65/10
**USA [1]** 50/14
**USDA [1]** 54/23
**use [15]** 7/12 10/6 11/2 15/14 16/13 17/2 17/12 18/19 20/20 21/10 22/21 54/21 55/2 55/12 57/18
**used [13]** 12/4 12/16 14/22 14/23 15/1 15/5 17/23 17/25 17/25 46/25 53/18 53/24 61/23
**useful [1]** 64/15
**users [5]** 18/3 53/17 54/6 54/20 55/5
**using [5]** 13/4 19/24 19/24 19/25 28/4
**utilization [7]** 8/19 8/21 8/22 9/2 11/19 12/21 13/2
**utilize [2]** 11/11 13/3
**utilized [4]** 11/20 11/22 12/3 12/8
**utilizing [3]** 8/24 12/13 12/20

**V**

**vacate [1]** 6/23
**Valbrun [3]** 2/3 4/16 4/23
**valid [3]** 41/14 42/13 43/9
**Van [2]** 2/14 5/6
**variant [1]** 6/7
**various [2]** 53/12 64/18
**Vaughan [41]** 2/3 2/4 4/15 4/22 7/3 7/15 10/11 13/17 13/22 14/16 20/18 20/21 21/3 21/8 21/16 22/4 22/11 22/16 28/2 28/23 30/22 31/15 32/11 33/16 36/17 40/14 44/3 44/19 45/7 46/18 47/12 47/18 64/21 65/7 65/23 66/5 67/11 67/14 68/4 69/1 70/6
**Vaughan's [3]** 6/21 49/3 57/13
**vendors [2]** 47/9 47/10
**versus [1]** 4/5
**very [10]** 10/23 27/3 34/14 50/1 52/3 53/20 59/25 61/2 64/18 64/22
**video [6]** 4/8 4/23 4/24 5/8 5/9 31/7
**viewing [1]** 39/6
**views [2]** 50/24 51/4
**violated [2]** 59/4 59/8
**violation [1]** 60/22
**virtue [2]** 48/14 68/12
**vis [2]** 8/20 8/20
**vis-à-vis [1]** 8/20
**vision [1]** 8/16

**Vitelco [1]** 54/25

**W**

**wait [5]** 23/7 34/11 34/20 39/17 43/4
**waiting [2]** 35/24 35/25
**waived [1]** 10/3
**want [42]** 13/11 19/2 22/19 23/17 24/17 25/2 27/17 27/22 29/7 29/9 29/20 30/2 30/10 30/16 31/2 33/6 34/1 34/10 35/17 39/9 39/9 40/8 40/11 49/9 52/3 53/19 56/10 56/12 56/12 56/23 56/24 61/13 61/14 61/15 65/6 66/6 66/14 66/17 67/18 67/25 69/14 69/20
**wanted [3]** 24/2 49/15 49/25
**wanting [1]** 50/1
**wants [1]** 48/23
**was [105]**
**Washington [3]** 2/13 5/10 33/2
**wasn't [5]** 8/10 19/25 20/6 20/14 49/16
**wasting [1]** 9/17
**watch [1]** 5/11
**wave [3]** 34/9 35/7 67/14
**way [31]** 5/22 16/19 17/23 18/8 22/15 23/6 24/8 25/2 25/20 26/23 29/15 31/22 38/20 41/12 43/8 43/8 49/18 50/10 51/6 53/25 53/25 57/6 57/7 57/9 58/13 59/22 61/8 65/3 66/3 66/9 69/10
**ways [2]** 52/5 64/18
**we [172]**
**We'll [1]** 66/3
**we're [6]** 13/6 13/8 15/17 42/16 48/13 68/20
**weather [1]** 69/2
**Wednesday [2]** 32/15 32/19
**week [12]** 5/23 8/8 29/7 30/22 30/24 31/3 31/3 31/4 31/9 36/5 70/13 70/14
**weeks [6]** 28/9 29/4 30/16 30/18 35/7 69/19
**welcome [5]** 5/1 5/24 30/14 31/7 58/5
**well [26]** 13/25 14/22 16/20 18/16 19/7 20/8 21/8 21/18 24/14 25/5 25/22 26/11 27/3 27/13 27/21 31/3 32/4 32/23 33/15 37/12 51/10 54/13 58/14 64/3 65/24 68/11
**went [3]** 7/3 9/15 13/25
**were [15]** 7/6 8/8 9/1 11/1 11/13 11/23 18/2 23/25 24/10 25/17 47/8 51/5 51/17 56/15 59/7
**what [111]**
**what's [5]** 5/15 25/7 28/14 44/3 59/13
**whatever [16]** 6/25 7/1 16/21 24/17 26/6 29/8 29/20 35/21 38/3 38/11 45/10 54/19 54/19 60/3 64/1 68/20
**whatsoever [1]** 43/19
**when [18]** 7/2 20/21 22/13 25/16 28/5 31/2 31/9 31/14 32/11 34/1 34/3 39/5 42/24 49/6 49/19 49/20 55/23 57/14
**whenever [1]** 47/15
**where [21]** 7/14 9/14 10/8 15/25 16/8 17/21 18/13 23/2 27/6 31/17 43/25 45/17 46/15 48/10 50/4 53/19 54/11 60/6 66/18 66/24 67/25
**wherever [2]** 12/1 53/21
**whether [17]** 14/13 19/21 24/12 25/10 34/16 35/11 38/5 39/14 39/14 48/22 48/22 50/6 54/25 60/5 64/10 68/18 69/23
**which [28]** 6/10 11/23 11/23 12/18 13/21 14/6 17/8 19/9 28/21 28/21 32/14 32/22 36/1 39/3 39/25 41/10 41/21 42/10 47/16 51/25 52/4 52/24 53/4 53/7 54/15 57/18 67/4 67/19
**while [4]** 28/19 51/17 68/5 68/7
**whit [1]** 14/21
**who [4]** 5/10 31/18 35/19 62/12
**whoever [1]** 46/2
**whole [4]** 17/11 20/22 22/8 65/9
**why [21]** 13/6 20/12 20/17 21/20 22/14 25/19 28/13 56/4 56/16 58/11 58/14 60/4 60/17 61/12 61/15 61/16 62/25 63/1 63/24 64/6 66/7
**will [63]** 4/12 5/2 5/25 6/4 6/6 8/16 9/8 12/21 19/4 22/20 23/20 23/23 26/15 26/21 26/22 26/23 27/24 27/24 28/7 29/8

**W**

**will... [43]** 29/15 29/22 30/1 30/21 30/23 31/8 32/2 32/9 32/12 32/13 33/9 33/10 33/17 33/19 34/10 34/16 35/8 35/11 37/10 37/17 38/13 40/18 40/19 48/2 48/23 49/4 49/11 53/10 56/21 57/19 57/21 59/19 63/9 63/25 65/1 66/2 67/8 67/10 68/21 69/20 70/13 70/13 70/14
**Williamson [1]** 2/8
**win [1]** 24/11
**wind [2]** 43/3 46/5
**wisdom [1]** 60/1
**wise [1]** 29/10
**wish [1]** 43/18
**within [7]** 7/17 12/17 28/8 30/22 38/10 50/24 53/6
**without [8]** 13/21 14/1 18/15 30/11 44/1 56/11 67/1 71/6
**witness [16]** 6/13 7/24 9/6 23/2 23/11 23/12 23/12 23/14 24/1 24/15 27/14 28/5 44/11 45/20 48/14 55/7
**witness's [1]** 14/14
**witnesses [2]** 9/7 47/2
**won't [2]** 24/23 33/7
**word [2]** 28/14 29/16
**words [1]** 10/12
**work [14]** 20/7 28/19 32/13 33/11 33/16 33/18 34/22 34/24 35/15 35/16 36/10 65/7 65/16 68/5
**worked [1]** 15/3
**working [5]** 19/1 34/19 58/3 59/19 68/6
**workings [1]** 66/12
**works [9]** 31/3 33/15 36/15 47/3 62/14 64/17 65/9 65/13 66/16
**world [3]** 42/9 43/2 62/13
**worry [1]** 40/20
**would [69]** 6/9 7/11 7/15 7/19 7/21 7/22 8/9 8/11 9/1 9/5 9/16 13/15 14/9 14/10 15/21 16/25 18/9 18/19 18/20 19/12 19/13 21/16 22/3 22/22 22/25 23/1 23/3 24/12 26/2 27/1 27/19 27/20 27/25 28/5 28/20 30/5 30/6 30/16 32/11 32/16 32/18 34/1 34/7 35/22 35/24 35/25 36/10 36/13 37/3 37/4 38/9 38/11 40/1 41/20 47/5 48/15 48/20 53/8 55/4 55/25 56/3 56/9 59/14 59/16 60/19 60/22 63/4 64/15 65/20
**wouldn't [8]** 17/23 17/25 19/23 19/25 20/5 36/2 36/9 49/22
**Wright [2]** 2/12 5/5
**wring [1]** 43/14
**written [1]** 7/8
**wrong [10]** 19/21 20/1 37/22 38/21 38/23 45/3 45/7 45/19 51/8 58/13
**wrongful [1]** 38/10
**wrongly [1]** 15/4
**Wyatt [1]** 2/8

**Y**

**Yeah [2]** 33/21 63/10
**year [3]** 6/5 25/16 38/5
**years [9]** 39/1 42/21 42/21 42/23 49/10 51/1 51/8 57/25 65/10
**yes [23]** 4/22 8/2 9/13 28/3 28/10 29/13 29/25 30/25 37/9 49/2 50/11 53/2 55/4 57/25 58/9 58/19 59/10 63/5 63/7 63/7 65/18 66/6 67/16
**yet [4]** 28/7 46/5 58/2 58/2
**you [264]**
**you'd [1]** 11/1
**you're [25]** 13/5 16/9 18/17 25/6 25/7 26/21 30/7 30/14 38/23 39/2 41/6 44/23 45/16 48/21 50/12 54/3 54/10 54/17 54/18 55/12 55/18 56/18 56/20 57/17 59/2
**you've [2]** 23/9 37/13
**your [89]**
**Your Honor [21]** 4/12 7/22 10/9 13/15 21/12 25/13 26/10 26/20 27/4 28/13 29/3 31/9 32/25 33/4 65/15 65/17 65/22 66/22 67/10 68/3 68/10
**yours [1]** 28/25

**Z**

**zeal [1]** 49/6
**zero [2]** 15/12 43/21
**Zile [2]** 2/14 5/6