IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNIGESTION HOLDING, S.A., a    )
foreign corporation doing      )
business as Digicel Haiti,     )
                               )
            Plaintiff,         )    Case No. 3:15-cv-00185-SI
                               )
      v.                       )
                               )
UPM Technology, Inc., doing    )    September 14, 2022
business as UPM Telecom, Inc., )
et al.,                        )
                               )
            Defendants.        )    Portland, Oregon
_____  )

(Motion Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES


FOR THE PLAINTIFF:      Mr. Robert C.L. Vaughan
                        Ms. Cherine Smith Valbrun
                        Ms. Anisha Carla Atchanah
                        Kim Vaughan Lerner LLP
                        312 SE 17th Street, Suite 300
                        Fort Lauderdale, FL 33316


                        Mr. Kent D. Bressie
                        Harris, Wiltshire & Grannis LLP
                        1919 M Street, N.W., Suite 800
                        Washington, DC  20036


                        Ms. Anne M. Talcott
                        Schwabe, Williamson & Wyatt
                        1211 S.W. Fifth Avenue, Suite 1900
                        Portland, OR  97204


FOR THE DEFENDANTS:     Mr. Christopher W. Savage
                        Davis Wright Tremaine, LLP
                        1301 K Street, NW, Suite 500
                        Washington, D.C. 20005

                        Ms. Eleanor A. DuBay
                        Ms. Blake Van Zile
                        Tomasi Bragar DuBay
                        121 S.W. Morrison Street, Suite 1850
                        Portland, OR 97204


COURT REPORTER:         Dennis W. Apodaca, CSR, RMR, RDR
                        United States District Courthouse
                        1000 S.W. Third Avenue, Room 301
                        Portland, OR 97204
                        (503)326-8182

INDEX

Motion hearing                                                    4

(September 14, 2022)

P R O C E E D I N G S

(Open court:)

THE COURT:  Good afternoon, everyone.

MR. SAVAGE:  Good afternoon.

MR. VAUGHAN:  Good afternoon, Judge.

THE COURT:  We are here in Unigestion Holding, S.A., versus UPM Technology, Inc. et al., Case No. 3:15-cv-185.  I'll invite counsel for plaintiff to enter an appearance.

MR. VAUGHAN:  Good afternoon, Judge.  Robert Vaughan, Cherine Smith Valbrun, Anisha Atchanah, Kim Vaughan Lerner, appearing on behalf of Digicel Haiti.  I have a guest, and I will allow him to introduce himself as my co-counsel for the proceedings.

THE COURT:  Is that Mr. Bressie?

MR. BRESSIE:  Yes.  Good afternoon, Judge Simon.  I am Kent Bressie see with HWG, LLP, representing Digicel Haiti.

THE COURT:  Good afternoon, sir.

MS. TALCOTT:  Good afternoon, Your Honor.  Anne Talcott from Schwabe also here for Digicel Haiti.

THE COURT:  Welcome.  Good to see you.

All right.  I'll invite counsel for defendants to enter an appearance.

MR. SAVAGE:  Chris Savage with Davis Wright Tremaine for defendants.

MS. DuBAY:  Eleanor DuBay from Tomasi Bragar DuBay for the defendants.

MS. VAN ZILE:  Blake Van Zile for defendants.

THE COURT:  And good to see you all.

All right.  I have a lot of questions for you all, so we are going to go through my questions, and there will be time for you to say anything else that you want to afterwards.  I'll take whatever time is needed for you to say whatever you want.  But most of my questions, I think, should call for relatively short answers that are more factual in nature than argumentative, and so I would appreciate you taking them with that spirit.  Obviously if I have misunderstood something, please correct me.

I want to begin with questions for plaintiff's counsel, and obviously, Mr. Vaughan, you're welcome to take the lead.  You're welcome to defer to any of your co-counsel if you wish; just let me know.

MR. VAUGHAN:  I appreciate it.

THE COURT:  But I want to start with Mr. Castel's expert report.  We will turn to his rebuttal report a little bit later.  But his expert report is Docket 391-1.  By way of preface -- and I'll wait until you get that, Mr. Vaughan.

MR. VAUGHAN:  I'm trying to pull it up, Judge.

THE COURT:  Let me know whenever you're ready.

MR. VAUGHAN:  I think we should have it here.  Are

you going to direct me to a particular section in it, Judge?

THE COURT:  Yes.  Starting on Exhibit A, page 12, or our CM/ECF docket sheet, it's Docket 391-1, page 13 of 23. I'll refer you to your internal pagination, page 12 of 22.

MR. VAUGHAN:  Okay.  Yes, Judge.

THE COURT:  Section 8.1 of Mr. Castel's expert report is titled "The Legal and Regulatory Framework in Haiti."

MR. VAUGHAN:  Yes, sir.

THE COURT:  He then states on page 13 within that section, the next page, he states, "Within such" -- and I'm looking at the middle of the page.  "Within such anti-bypass framework, surveillance became more effective and several cases of fraud have been detected, reported to the regulators' antifraud unit, which, after verification, set in motion the police and judiciary, which dismantled several bypass operations, including those of UPM."

So my first question is:  How many such bypass operations in Haiti were discovered or dismantled besides UPM's?

MR. VAUGHAN:  Thank you for asking the question, Judge.

In the spirit in which you asked it, the shortest possible answer is:  There was one main operation, to the extent there was one corporate type of entity discovered, which was UPM.  In addition, there were some ad hoc individual

players that were found.  Some of those individuals were tied back to UPM.  If memory serves me correctly -- and we have the evidence of this in the record.  I believe it is 71-1, but I can confirm that, that makes reference to, for example, Maceus Outger.

In addition to Mr. Outger, there was another individual whose name escapes me.  The rest of that answer is that, in short, only one entity, in terms of a bypass operation, was found.  Everything else was one-off individuals, at least two of which Mr. Augter and somebody else -- whose name I'll get for you -- were then determined to be related to UPM.

MR. SAVAGE:  The other individual is Lewis Wakinson (phonetic).

THE COURT:  Thank you.

MR. VAUGHAN:  Thank you so much, Counsel.  I appreciate it.

THE COURT:  All right.  Let me make sure I have got my terminology right.

I know that as we were getting ready for trial previously, I believe it was UPM used the term "traditional bypass."  As I understand it, traditional bypass, as distinct from Roam Like You're Home, tradition bypass involved sending calls to Haiti from the United States via Voice Over Internet Protocol, VOIP, or Global System for Mobile communication, GSM.

And that's one type of bypass.  The other type that we were talking about is Roam Like You're Home.

Am I correct, Mr. Vaughan?

MR. VAUGHAN:  Yes, sir.

THE COURT:  Okay.  Now, looking at Mr. Castel's report, I see nothing at all that refers to Roam Like You're Home, RLYH, the Roam Like You're Home program.  It reads to me that his entire report focuses on what Digicel Haiti describes as or refers to as "traditional bypass."

Am I correct?

MR. VAUGHAN:  That was not the intent.  The entire report does not distinguish between traditional and Roam Like You're Home, and you can tell because the report, you will see, focuses specifically on the years 2013 through 2015.  Those years, as you will recall the evidence reflects, involve -- if you take our interpretation of the facts -- both what's being called traditional bypass and what's being called Roam Like You're Home bypass.  But from Digicel's perspective, it's all bypass.  The term is designed to avoid paying the full international termination rate for international minutes.  That's one --

THE COURT:  When I read Mr. Castel's report, he describes what bypass is, and he only talks about it in terms of VOIP or GSM.  He never mentions Roam Like You're Home bypass.

Why not?

MR. VAUGHAN:  I don't have an answer for that, Judge. The damages that the expert was expected to provide for us is essentially damages resulting from bypass activities during that period in time.  It wasn't our intent to segregate the two.  So to the extent that he defined what he understood to be bypass, that's all that was intended.

THE COURT:  When you take a look at page 15 --

MR. VAUGHAN:  Yes, sir.

THE COURT:  -- internal page 15, 15 of 22 of Exhibit A, he says near the top, "Total losses for Digicel were estimated in the range" -- and I'll round the numbers -- $37 million to $50 million U.S.

Do you see that?

MR. VAUGHAN:  Yes, sir.

THE COURT:  Is it your understanding that that includes all damages that UPM is seeking in this case both for traditional bypass and for Roam Like You're Home?

MR. VAUGHAN:  Now, that is a more difficult question.

THE COURT:  No, it's not.

MR. SAVAGE:  Your Honor, you said damages that UPM is seeking.

THE COURT:  I know.  All right.  Fine.  Thank you. Let me rephrase that:  That Digicel Haiti is seeking.

Does that number of $37 million to $50 million U.S.,

is that the entirety -- putting aside some of these nonmonetary issues -- but is that the entirety of the monetary damages that Digicel Haiti believes it has suffered due to the activities of UPM involved in this lawsuit?

MR. VAUGHAN:  The short answer to your question is no.  The non-answer to your question is -- because you just asked me is that the entirety of the damages that Digicel Haiti believes it has suffered as a result of UPM's bypass, the short answer is no.  The long answer is --

THE COURT:  So does that mean the Roam Like You're Home damages are not included in Mr. Castel's damage report?

MR. VAUGHAN:  Exactly.

THE COURT:  All right.  Then where will I find the damage report or expert opinion testimony that will be the calculation of Digicel Haiti's Roam Like You're Home damages?

MR. VAUGHAN:  You will not find it in our expert report, and you will not find it articulated anywhere other than through the examination of the witnesses, who will confirm that for every -- based upon our technical expert, Mr. McEwen, for every Roam Like You're Home minute that was completed, Digicel believes it is entitled to a full 23 cents.

Now, I know you don't want a long answer on that, but may I have two minutes?

THE COURT:  Yes.  But don't ask for that too often.

MR. VAUGHAN:  I will not.

The reason why it is important to make this distinction is you will also note in our damage analysis that our damage analysis is predicated upon the minutes completed and the damage to be resulting from one site -- one.  That limitation was placed to present the most conservative damage analysis possible, knowing full well there were multiple sites, knowing full well Roam Like You're Home was not contemplated in this particular analysis, and so an understanding that, to the layperson these numbers may look magnificent, but understanding that within the context of this particular industry and within the context of even what UPM is saying, it is entirely a reasonable -- that was what we were trying to accomplish -- a reasonable approximation of what Digicel estimates its losses to be.

I hope that answers the question.

THE COURT:  You just said in your answer that Roam Like You're Home was not contemplated in this particular analysis, but a moment or two ago you also said that Mr. Castel's report does include Roam Like You're Home.

Which is it?

MR. VAUGHAN:  Yes, sir.  Yes, sir.  To be clear, not contemplated in the numerical calculation section.  You will note that in our numerical calculation, what we did was we took the minutes capacity from one site.  That one site was expected to be able to bear the capacity of 400 minutes simulated.  We

then used 80 percent of that 400 to use 320 minutes, times 14 hours, which gave us the total number of minutes from that site per month, which would be -- I believe it was 1.86 million minutes per month, resulting in 8.06 million minutes per year, which gave us our damages minutes resulting in the damages figures that you are looking at here, which approximate periods of 20 months, 22 months, and 27 months.

So, yes, Judge, the entire analysis contemplates all of the bypass damage.  The numbers are significantly curtailed and limited, to the extent that it's focused on traditional bypass at one site operating at 80 percent capacity in order to satisfy our reasonable approximation requirement under the case law.

THE COURT:  You have already been required to, and as I understand, you did, file all of your trial documents, at least on the Phase I issues, on your claims.  Where in those documents will I find the calculation of how much Roam Like You're Home minutes and/or damages you are seeking?

MR. VAUGHAN:  If I can direct the Court to Mr. Castel's expert report.  If you look at page 16.

THE COURT:  I'm there.

MR. VAUGHAN:  At page 16, Mr. Castel -- may I share a screen, Judge?

THE COURT:  No.  I have got page 16 in front of me.

MR. VAUGHAN:  Okay.  Perfect.

At page 16, Mr. Castel goes through and he outlines his calculation of the damages scenario, and he was also examined about it during his deposition.

THE COURT:  Now, does that include Roam Like You're Home damages?

MR. VAUGHAN:  Numerically, no, because, again --

THE COURT:  I understand.  You don't need to repeat yourself.  So where in your trial documents will he find the numerical calculation of your Roam Like You're Home damages:  How many minutes you are claiming; how many dollars you are claiming?  Where will I find that?

MR. VAUGHAN:  You will not.  What you will find is the testimony of Mr. Maarten Boute, who explains that from Digicel's standpoint every Roam Like You're Home minute that was completed, did not account for the payment for the third-party call that was hidden within that Roam Like You're Home call.

THE COURT:  I read Mr. Boute's testimony closely, and we will talk about that a little bit later.  But I did not see any calculation of the number of minutes that plaintiff contends were used by UPM in Roam Like You're Home and for which you are seeking those damages.

Did I miss it?

MR. VAUGHAN:  No, sir, you did not.  Again, to be clear, to the extent the Court is asking, and you have asked me

in three different ways, and I want to make sure I'm not being unclear:  There is no calculation of the Roam Like You're Home minutes.  And I understand why you are being pointed in that question.  But it is our position that Digicel Haiti is entitled under the case law to articulate that it suffered damages, which are not subject to specific and clear exactitude because of the conduct of the offending party.

THE COURT:  I totally get that a jury is entitled to a reasonable estimate and to reasonably estimate damages, but, you, of course, understand that a jury is not entitled to speculate.

MR. VAUGHAN:  Of course.

THE COURT:  So where in the evidence that has been filed by Digicel Haiti will I find any evidence of how many Roam Like You're Home minutes -- even approximately or even an estimate -- UPM is responsible to Digicel Haiti for without having the jury unreasonably speculate?

MR. VAUGHAN:  I will answer that in two ways:  First, with respect to an approximation of how many minutes we would be, quote/unquote, entitled to Roam Like You're Home damages for, that, at a minimum, would be reflected in UPM's admission of how many Roam Like You're Home minutes they completed.  But, Judge, recall that that is still only to provide totality of the circumstances to the jury.  Based upon this expert report, we will not be walking into your court and saying, "Now give us

100 million Roam Like You're Home minutes."  We will be saying, "In light of everything that you have heard" -- note that all we are asking for are the minutes calculated from -- and you said do not be repetitive -- the one site that we used as a reasonable approximation.

THE COURT:  But did you offer as a plaintiff's exhibit any documents, even from UPM, that shows how much Roam Like You're Home minutes they believe they used?  If so, let me know.  I have got your exhibit list in front of me.

MR. VAUGHAN:  I believe we did, Judge.  I may need a minute or two to pull that up.

THE COURT:  By all means.

MR. VAUGHAN:  Thank you so much.

THE COURT:  I just want to know where the evidence is in the record.

MR. VAUGHAN:  Okay.

(Pause).

MR. VAUGHAN:  Your Honor, at Exhibit 168 of our trial exhibits, we have, for example, a schedule of minutes that UPM alleges it completed, which is 25 pages.  It is a schedule of, quote/unquote, UPM clients, minutes completed, number of calls, and months.  That is one that I'm able to find so far.  I did not expect the question, so I apologize for stumbling over trying to answer.

THE COURT:  Does 168 break it down into traditional

bypass and Roam Like You're Home?

MR. VAUGHAN:  It does not.

THE COURT:  Is there any trial exhibit that you submitted that will show the total number of minutes, even an estimate of the total number of minutes, that Digicel Haiti is seeking for Roam Like You're Home damages?

MR. VAUGHAN:  There are not.  And a part of that is the running dispute that you will recall we're having where -- frankly, if I can be blunt, we put no credence in the documents reflecting minutes completed that have been submitted by UPM.

THE COURT:  I understand.  I'm just looking for how our jury can determine a damage figure for Roam Like You're Home damages under your theory, if they accept your theory, without unreasonable speculation.

All right.

MR. VAUGHAN:  I agree with you.  And that is why our damages model does not specifically contemplate using Roam Like You're Home numbers to calculate the damages.  Again, Judge, I don't think I'm being clear in articulating that it all went into the determination of this particular model.

THE COURT:  All right. let's look at your model then. Let's go back to Mr. Castel's report, page 16, his table 2. Let me know when you are there.

MR. VAUGHAN:  I am.

THE COURT:  First of all, this is a basic question or

confusion on my part.  He divides his time periods into three periods:  August 2011 through July 2012, a 12-month period; then May 2013 through November 2013, a seven-month period; and then May 2014 through December 2014, an eight-month period.  I didn't see any explanation in Mr. Castel's report of why he selected those three periods.

Can you help me understand that?

MR. VAUGHAN:  Of course.  Those were the time periods he was asked to assume, based upon the correspondence that we have in the evidence regarding UPM's, quote/unquote, alleged presence or activity.

You will find the evidence -- and they are in our exhibits -- and please don't ask me to pull which one right now -- but they are in the evidence -- where UPM, in its internal communications, indicates their entry into Haiti. There was a period of time, I believe it was in late 2012, when they significantly reduced, if not pulled out of Haiti, and then in 2013, they resumed operations back in Haiti, based upon the correspondence of what we're seeing.

So in order to remain true to that, we asked him to make the assumptions regarding these periods of activity.

THE COURT:  All right.  Understood.

I see that he has three different periods.  One is a period of 27 months --

MR. VAUGHAN:  Yes.

THE COURT: -- and that's obviously the sum of all three -- a 12-month period, a 7-month period, and an 8-month period. That's 27.

MR. VAUGHAN: Yes, sir.

THE COURT: He also assumes a 20-month period, which I assume is the sum of the 12-month period and the 8-month period, right?

MR. VAUGHAN: Yes.

THE COURT: For the life of me, I can't figure out where you come up with a 22-month period. How do you get a 22-month period out of three periods that are twelve months, seven months, and eight months? No combination totals 22.

MR. VAUGHAN: You're right. And you may not like the answer, but this is the truth: The evidence regarding the 12-month period in 2011 to '12, the evidence regarding the 8-month period from May 2014 to December, were for much more reliable and strident. The 2013 time period, frankly, was less documented in the correspondence. So that 22-month period is compromised. It is an alternative for the jury if they're not convinced about the full 2013 period articulated here, May 2013 to November 2013, but it fully contemplates a more aggressive damage number based upon everything included. It contemplates a least a case damage number based upon just the August to July, twelve months, plus the May 2014 to December 2014, eight months, and then it provides -- I don't want to say middle

alternative but less than aggressive alternative, which contemplates some time within May 2013 to November 2013.

That is the assumption that he was asked to make.

THE COURT:  And where does Mr. Castel explain that in his report?  I didn't see it.

MR. VAUGHAN:  I do not think that the 22 -- rephrase. The 22-month period is not explained.  You will note that there is -- go ahead.

THE COURT:  I have your answer:  It is not explained. And I have read his report several times.

Where does he give any explanation -- and I think the answer is he doesn't -- for why a 22-month period is a reasonable assumption as opposed to pure speculation?  He doesn't explain that, does he?  It could have been 21.  It could have been 23.  It could have been 26.

MR. VAUGHAN:  I'm sorry.  Could you ask that again, please?

THE COURT:  Sure.  Does he in any way in any place in his report explain why a 21-month period is a reasonable period of time to consider as opposed to pure speculation?

MR. VAUGHAN:  21 months, Judge?

THE COURT:  22 months.

MR. VAUGHAN:  No, he does not.  That's what I'm saying.  The 22-month period is an assumption he was asked to make as --

THE COURT:  Understood.  All right.  Let's move on.

MR. VAUGHAN:  Judge, in answer to your earlier question, you would also find some approximation of minutes at Exhibit 237.  I appreciate the Court's patience on that.

THE COURT:  What exhibit number?

MR. VAUGHAN:  237.

THE COURT:  All right.  Thank you.

MR. VAUGHAN:  It is a 51-pager.

THE COURT:  Thank you.

MR. VAUGHAN:  You're welcome.

THE COURT:  All right.  Now, within the tab that Mr. Castel has on page 16 --

MR. VAUGHAN:  Your Honor --

THE COURT:  Yes.

MR. VAUGHAN:  Exhibit 237, you were asking for making the distinction between Roam Like You're Home and in-country. It is also included in there.

THE COURT:  Very good.  I'll take a close look at 237.  Does it break it out between Roam Like You're Home versus traditional?

MR. VAUGHAN:  It does break it out in the fourth column.

THE COURT:  Very good.

MR. VAUGHAN:  You're welcome.

THE COURT:  So back to Mr. Castel's page 16, tab 2,

and here we see the 20-month period and the 27-month period.

Do those number of minutes include any minutes that would include Roam Like You're Home calls?

MR. VAUGHAN:  No, sir.

THE COURT:  Okay.  Now let's go to the top of page 15, back at the top, where it says, "Item 10, Digicel Bypass Losses."  In order to make these calculations, Mr. Castel says that the total losses for Digicel -- by the way, why does he use the phrase "total losses for Digicel" if he doesn't include the Roam Like You're Home losses?

MR. VAUGHAN:  Imprecise articulation.

THE COURT:  Okay.  He says that total losses for Digicel were estimated in the range of -- and I'll round -- $37 million to $50 million U.S.

Then he says, "These estimates concern the periods of time 20, 22, and 27 months.  They are based on the following assumptions," and then he lists three assumptions, correct?

MR. VAUGHAN:  Yes, sir.

THE COURT:  The first assumption is that the equipment used by fraudsters seized by the Haitian National Police, PNH, and he says that equipment was able to manage 400 calls simultaneously.

Do you see where I am?

MR. VAUGHAN:  I do.

THE COURT:  Was that equipment UPM's equipment?

MR. VAUGHAN:  Yes, it was.

Now may I share a screen?

THE COURT:  Why?  What are you going to show me?

MR. VAUGHAN:  Well, can I answer you honestly?

THE COURT:  You know what, you're an officer of the court.  I expect everything you say is honest.  Am I wrong in that expectation?

MR. VAUGHAN:  You know you were just being led to that response.  (Laughter.)

It was suggested to Your Honor that we may have taken liberties with our description of the characterization of the ownership of that equipment that was seized, and I was chomping at the bit to demonstrate for the Court that there were no such liberties taken and it is entirely --

THE COURT:  Then cite me an exhibit number.  That's all I want to see.  Where do I find the evidence in the record that that equipment is attributable to UPM?

Let me just ask you:  What did up want to show me on your shared screen?  I don't want to see it.  What is it?  If it is one of the trial exhibits, just give me the number.  If it is not one of the trial exhibits, I do not want to see it.

MR. VAUGHAN:  Okay.  It is not a trial exhibit.  It is a matter of record in this file.  It was not a trial exhibit, because to be perfectly candid with you, we did not expect or contemplate that there would be any dispute as to the

veracity of the statement.  However, if a witness were to go on the witness stand and contest the veracity of this statement, it is entirely proper to be used as impeachment.  What you will find in the record as an exhibit at ECF 77-1 and trial Exhibit 91, ECF 104-10 -- let me explain the difference.  Only a portion of materials referenced in ECF 77, which is a part of the record, was included in our trial exhibit, Exhibit 104 -- Exhibit 91.  Those were shipping documents, DHL receipts, which were the only things we thought were necessary.

THE COURT:  I know about the shipping documents.  I recall that issue.  Was that the equipment that was seized by the Haitian National Police?

MR. VAUGHAN:  That was a part of what happen was seized.  That included the SIM cards.  In ECF 77, what we wanted to show was the actual equipment seized.  What we wanted to show you was the official police report from the Haitian government, which we asked the Court take judicial notice of, which you did, and it includes a full police report articulating that, in an operation, Mr. Maceus Outger, who is an employee of CONATEL, was surveilled.  His house was raided.  When his door was knocked upon, he let them in, and inside were seized the following:  Three servers, hundreds of SIM cards addressed to Mr. Baltazar Ruiz, material to be sent to Tyler Allen, Ben Sanchez, and Baltazar Ruiz.  You will remember those three names.

THE COURT: I do. I do.

Now, is that the equipment that Mr. Castel was referring to in his first assumption on page 15 of Exhibit A of his report?

MR. VAUGHAN: Now I'll go back to following your instructions: Yes.

THE COURT: Okay. That's fine.

Now, he said that equipment was able to manage 400 calls simultaneously. I just want to make sure I understand what that means. Does that mean it would hold 400 SIM cards?

MR. VAUGHAN: It's a combination of the two. It means that between the servers that were on site, which in this instance appears to have been servers which could hold SIM cards, and the gateway equipment that was on site, which means it could accommodate the digitally transmitted information from abroad, that site could manage 400 calls simultaneously.

So I hope that answers your question.

THE COURT: Is there any way to handle or manage 400 bypass calls simultaneously without having and using 400 SIM cards?

MR. VAUGHAN: I do not think that that is possible without, as Mr. McEwen explained, some sort of trunk technology. So it is technically possible for one trunk called to transmit multiple calls within it, and then when it gets to the retransmission location -- the gateway -- then those

multiple calls are split.  I believe that the evidence in this instance does not involve trunk calls.  It involves encapsulation, which is the digital packaging -- okay.  Now, you nodded, and I don't want my record to look choppy and incomplete.

THE COURT:  No.  Give complete answers.  That's fine.

MR. VAUGHAN:  It includes a digital packaging of the third-party call on top of or inside of either the Roam Like You're Home call that's being transmitted or the local call that's being reinitiated in-country, where you will have two calls being transmitted.

But to answer your specific question, I do believe that, under the circumstances, it would require the 400 SIMs, and I hope I'm not bastardizing the technology here.  I see that Mr. Bressie is not shaking his head, and so I think I may have gotten it.

THE COURT:  All right.

The second assumption by Mr. Castel is that 80 percent of the call circuits, 80 percent of 400 -- and 400 is the total capacity of this equipment, right?

MR. VAUGHAN:  On this one site, yes.

THE COURT:  80 percent of those call circuits, which is 320, were occupied 14 hours per day.

Do you see that second assumption?

MR. VAUGHAN:  Yes, sir.

THE COURT:  I assume 14 hours per day means 14 hours a day, seven days a week, every single day of the month for the relevant periods, correct?

MR. VAUGHAN:  Correct.

THE COURT:  Where do I find, because I didn't see it in Mr. Castel's report, so I will ask first, did I miss it?  Is there anything in Mr. Castel's report that explains why 80 percent was a correct or reasonable assumption?

MR. VAUGHAN:  It is not in Mr. Castel's report.  It would have to come from a combination Mr. McEwen's report and the cross-examination of the defendants.  And if I might, the whole point of HBS is to simulate normal human behavior.  This assumption of 14 hours per day was made to simulate the waking hours of a normal human being.  There's no human being who would be using their cell phone/SIM card 24 hours a day nonstop every day all day.  It is not reasonable.  It is not likely.  It will raise a flag.  So that is the testimony from Mr. McEwen regarding how bypass operators will regulate and moderate the operating hours, the "on time" of any particular SIM cards.

What you will find, however, is that, in cross, in their damage analysis, the defendants, UPM, actually contemplate 24 hours a day.  They have in their damage analysis that the SIM cards will be -- I am doing this from memory -- 1,440 minutes for every 24-hour day for a 30-day standard month.  So when compared to the reasoning for the assumption of

14 hours, meaning simulating the normal waking hours of someone's cell phone being active compared to what the defendants articulated as their baseline for calculating their projected damages, we believe that the assumption of a 14-hour day was reasonable.

THE COURT: Where did you get the 80 percent? Why is that reasonable?

MR. VAUGHAN: The 80 percent, sir, was an assumption made by the expert essentially to recognize that it is highly unlikely that an operation with a 400 simultaneous call capacity would be operating full tilt at 100 percent 100 percent of the time. It is just not reasonable.

THE COURT: And where does the expert, Mr. Castel, explain why 80 percent is a reasonable estimate as opposed to speculation?

MR. VAUGHAN: That explanation is not in Mr. Castel's report. He was asked to assume that from counsel based upon the testimony to be received from Mr. McEwen, who is the technical expert. Remember, Mr. Castel is not being offered to opine as to the technical underpinnings of the operation.

THE COURT: And I read Mr. McEwen's report as well. I didn't see any reference to 80 percent, I think, but it was a while ago, and I didn't read it as closely as Castel's. Did it miss it?

Did Mr. McEwen, in his expert report, explain why

80 percent is a reasonable number?

MR. VAUGHAN:  His report did not explain 80 percent specifically.  What he will explain is that the operation of HBS vis-à-vis bypass, the operation of anti-bypass activities, the operation of the artificial intelligence utilized to try and flag bypass, and why an 80 percent number is reasonable.

THE COURT:  Now, if it's not in Mr. McEwen's expert report, and if it's not in your expert witness statement -- and I don't think it is there either; that's Docket 390 -- it is not coming in.  You've read my case management order.  It has got to be fairly disclosed in either an expert witness report or expert witness statement.

MR. VAUGHAN:  If you look at Mr. McEwen's report at --

THE COURT:  One second.  Let me get that in front of me.  Is it in his report?  I have got Mr. McEwen's report in front of me.  That's Docket 392-1.  What page should I look at? I'm looking for where an 80 percent is a reasonable estimate and not speculation.

MR. VAUGHAN:  It doesn't say 80 percent.  It talks about the benefits and risks of SIM banks to an LCRO.

THE COURT:  I know.  I read it.

MR. VAUGHAN:  Okay.

THE COURT:  So there is nothing in any document that you've filed -- any exhibit, any expert report, any expert

witness statement -- that explains why 80 percent is a reasonable number, correct?

MR. VAUGHAN:  Let me double-check before I shoot myself in the foot.

THE COURT:  All right.

MR. VAUGHAN:  In his deposition testimony --

THE COURT:  No.  Deposition testimony is not going to do it.  It has got to be an expert report or a witness statement.  You've read my case management order?

MR. VAUGHAN:  I did.

THE COURT:  All right.  Let's move on.

MR. VAUGHAN:  I'm trying to pull that up for you in the meantime.

THE COURT:  All right.  Go ahead.  I'll wait.

MR. VAUGHAN:  Oh, no, Judge.  If it is okay with you, we will try to pull that up so we are not wasting time.

THE COURT:  Okay.

MR. VAUGHAN:  Thank you.

THE COURT:  You mentioned a few minutes ago that the 14 hours per day and some other information came from defendants' damage analysis.  Do you recall you made that statement?

MR. VAUGHAN:  I did.

THE COURT:  Let me ask you this:  I want some clarification, because Plaintiff Digicel Haiti is asking for

damages against UPM, and obviously UPM can challenge and contest the amount of damages, including having its own alternative damages theory of what the correct damages figure is.

In addition, UPM is making its own counterclaims, based upon its Communications Act counterclaims.  Which were you referring to?  Were you referring to UPM's damages analysis to rebut or respond to plaintiff's damage theory in plaintiff's case-in-chief, or were you referring to UPM's own damages case, affirmative case, in its Communications Act claim?

MR. VAUGHAN:  I was referring to their own damages case in their Communications Act claim, not because we believe that that ought to proceed or that it is --

THE COURT:  I know.  All of your objections against their Communications Act claim are preserved.  We will talk more about it.  Boy, have I got some questions for Mr. Savage about that.  Don't worry about that.  I wanted to know what you were referring to by UPM's damages numbers.

MR. VAUGHAN:  Let me cut to the chase, because I see where you are going.  The only way that would come in is if the defendants contest the reasonableness of these assumptions.  It would be impeachment, because they have offered something significantly higher.  That's it.

THE COURT:  There's a much bigger problem that you've got, in my opinion, I think.  You're welcome to explain why I'm

wrong.  I assume you are referring to the Wood report, correct?

MR. VAUGHAN:  I am referring to the Wood report and the testimony of Mr. Tran.

THE COURT:  Right.  So what is the underlying assumption that you believe defendants are making in their affirmative damages claim for their Communications Act claims.  What do you believe is their assumption?

If my question is not clear, let me tell you what I think it is, and you can tell me whether you agree or disagree.

MR. VAUGHAN:  Okay.

THE COURT:  As I understand UPM's Communications Act counterclaim, and because we're dealing with statute of limitation issues that we've dealt with already, we're only talking about Roam Like You're Home.  So as I understand their claim, they're saying that it was illegal -- under United States law -- for Digicel Haiti to deactivate the SIM cards that UPM purchased and that had -- by the way, of course, I know you disagree with that.  That goes without saying.

Had -- this is UPM's theory -- had Digicel Haiti complied with the Communications Act and not deactivated those cards, then, as expressed by Mr. Wood in his report, as Mr. Tran in his testimony, they believe they could have been able to use Roam Like You're Home and generated an awful lot of minutes and an awful lot of profit.

That's their assumption, correct?

MR. VAUGHAN: Yes.

THE COURT: And that's where their numbers come from. Their numbers assume no deactivation by Digicel Haiti, correct?

MR. VAUGHAN: Correct.

THE COURT: Now, in fact, we know that Digicel Haiti did an awful lot of deactivation. Frankly, that's why we have that counterclaim, right?

MR. VAUGHAN: Well, you're stretching the limits of my ability to go "correct." That is their allegation.

THE COURT: I know that I've seen in some of the evidence, in some of the documents, even some of the pleadings, that you've said that Digicel Haiti employed anti-bypass software and tried to detect bypass whenever they found it, including Roam Like You're Home bypass, and that's what Digicel Haiti tried to accomplish on a number of occasions, right?

MR. VAUGHAN: Correct. According to the allegations.

THE COURT: So isn't it comparing apples and oranges, although I've got a story about that in a moment. But isn't it an incorrect comparison to look at the minutes that UPM says they would likely have been able to achieve had Digicel Haiti not engaged in any deactivation at all as a measure for what Digicel Haiti believes they in fact actually achieved in the real world with Digicel Haiti engaging in deactivation.

MR. VAUGHAN: May I?

THE COURT: Please. What's wrong with that

conclusion?

MR. VAUGHAN:  The conclusion, I would respectfully disagree with, because our comparison is not apples to oranges. It is apples to apples, to the extent that all we intend to compare is the stated versus assumed capacity to terminate calls.

THE COURT:  Okay.

MR. VAUGHAN:  The assumption that we have made is that UPM -- if you look at our total model, the assumption we have made is that UPM completed 320 simultaneous calls at any given point in time at one site for 14 hours per day.  That's it.

The capacity stated by UPM blows that out of the water.  Our capacity is in the realm of -- I want to say 30 -- I have the numbers.  One second.  Our capacity is in the realm of 25,200 minutes per standard 30-day month.  Their capacity is 43,200 minutes in a standard 30-day month, making our assumption imminently reasonable.

So while I agree with the Court, if what I have been trying to do was to say, "Their absolute number is this; therefore, my absolute number is correct," I would agree with you.  But I'm not doing that.

THE COURT:  I'm truly not understanding you, and here is why:  Their number is what they could have achieved, they believe, had there been no efforts to block or deactivate the

SIM cards.

MR. VAUGHAN:  Correct.

THE COURT:  Your number, offered by Mr. Castel, is what you believe, or what Mr. Castel presents, I first thought what was actually getting through and being done by UPM.  But as I'm hearing you now, and as I think I read in his report, it is really more of a mathematical capacity figure.  If you assume one site, and you assume the capacity at that one site to handle 400 calls simultaneously, and if you assume that 80 percent of those circuits were being used 14 hours a day, then the total number of minutes, multiplied by 23 cents per minute during the relevant periods, results in between $37 million and $50 million, right?

MR. VAUGHAN:  Yes.

THE COURT:  And where is there any evidence at all that that capacity assumption is what in fact UPM succeeded in getting through without unreasonable speculation?

MR. VAUGHAN:  Okay.  Let me answer that question in two ways:  First, we did find the section in Mr. McEwen's witness statement, paragraph K beginning at page 4 through page 5.

THE COURT:  One second.  What paragraph letter?

MR. VAUGHAN:  K, as in kilo.

THE COURT:  One.  Second.  All right.  I'm there.

I'm looking at paragraph K.  I do not see anything

about 80 percent.

MR. VAUGHAN:  Sir, it says on the top line, page 5.

THE COURT:  Top line -- page 5 of your internal pagination?

MR. VAUGHAN:  You're correct.

THE COURT:  That's paragraph I.  I read that to saying, "He will discuss the negative impacts" -- who are we talking about?  I'm on Boute.  I'm sorry.

What page did you want me to look at of the witness statements?  Is this the lay witness statement or is this an expert witness report?

MR. VAUGHAN:  It is the amended expert report, ECF 391 --

THE COURT:  Let me get to that.  Got it.

All right.  I'm there I'm at page 5.  That starts with paragraph 2, right, "Benefits and risks of SIM banks to an LCRO"?  We are looking at McEwen, right?

MR. VAUGHAN:  Are you looking at the report or the expert witness statement, Your Honor?

THE COURT:  All I have is Docket 392-1.  Is that the wrong one?

MR. VAUGHAN:  It is the wrong one.  It is ECF 391.

THE COURT:  All right.  One moment.  Let me get there.  Okay.  I got it.  I'm at 391; page 5 of 391.  There, I see 80 percent.  Got it.

MR. VAUGHAN:  Very good.

THE COURT:  Very good.  Give me one moment to see what he says about it.

MR. VAUGHAN:  Sure.

THE COURT:  So he is saying there are certain assumptions to the analysis.  He is assuming a 400-call capacity was operated at 80 percent capacity, and all he is stating there is that those are the assumptions.  Does he in any way explain -- he also says something in paragraph I why that 80 percent is a reasonable assumption.

MR. VAUGHAN:  Correct.  And remember, Judge, where these assumptions begin.  These assumptions begin from a report from the government indicating that the equipment seized had that capacity.  This 400 wasn't just plucked --

THE COURT:  I get the 400 capacity comes from a government report.  What I'm still not seeing is where he explains 80 percent is a reasonable assumption.

MR. VAUGHAN:  If you go to paragraph L, Lima.

THE COURT:  I'm at L.

MR. VAUGHAN:  In the middle of the paragraph --

THE COURT:  Yes.

MR. VAUGHAN:  -- it says, "The assumption that UPM was utilizing approximately 80 percent of its circuits for 14 hours a day on average for 20 to 27 months is entirely reasonable because the evidence confirms that UPM did in fact

operate multiple sites simultaneously and shift multiple gateways into Haiti," the thought there being -- do you want me to stop?

THE COURT:  No, I don't want you to stop.

MR. VAUGHAN:  The thought there being that if the jury were then to contemplate that this one site and damages from that site is intended to reasonably approximate the production and minutes over multiple sites, as the evidence suggests, and these numbers, which are calculated from one site, are entirely reasonable and an entirely reasonable approximation of the production, the capacity, and the revenue.

THE COURT:  So what you are saying is --

MR. VAUGHAN:  You've also asked.

THE COURT:  What you are saying --

MR. VAUGHAN:  I'm sorry.

THE COURT:  Go ahead.

MR. VAUGHAN:  You also touched upon something which is very important.  Digicel's analysis being done is not a prospective speculative analysis.  It is a retrospective lost income analysis that is being done utilizing a comparison of the capacity and revenue generation potential as compared to Digicel's actual bypass losses.

When those two data points are compared, it becomes apparent that the loss claimed by Digicel is entirely approximated by the revenue generated by UPM, as reflected in

this model during the exact same time, while they admit they were there, while they admit they were doing bypass.

THE COURT:  And I'll come back to that in a moment, because that's another question I wanted to ask you.

MR. VAUGHAN:  Okay.

THE COURT:  But as I understand it, this expert report from -- it looks like it is from Mr. Castel that you are pointing me to, not McEwen, right?

MR. VAUGHAN:  That was Mr. McEwen, Your Honor.

THE COURT:  I thought you pointed me to 391.

MR. VAUGHAN:  I did.

THE COURT:  391, page 5.

MR. VAUGHAN:  391 -- I'm sorry.  I don't want to talk over you, Judge.

THE COURT:  391.  And you pointed me to page 5 where at paragraphs K, for kilo, and L, for Lima, talk about 80 percent.  That looks to me like it is under the section of Charles Castel.

MR. VAUGHAN:  You are correct.

THE COURT:  So why did you say McEwen?

MR. VAUGHAN:  Because I made a huge error.

THE COURT:  Fine.  Okay.

MR. VAUGHAN:  If I may.  McEwen also speaks about it in his section, so my apologies.  I'm not entirely incorrect. I directed you to the wrong section, and I neglected to point

out that Mr. Castel also speaks about it.

THE COURT:  Where does McEwen talk about 80 percent?  I am looking now at McEwen.  McKewn starts on page 7.  Where does he talk about 80 percent?

MR. VAUGHAN:  If you go to page 11, your numbers, and it --

THE COURT:  Okay.  I'm there.

MR. VAUGHAN:  Page 10, I'm sorry.  Paragraph H, as in hotel.

THE COURT:  Okay.  I'm there.

MR. VAUGHAN:  May I?

THE COURT:  Please.

MR. VAUGHAN:  "He will explain the assumption that he has made about UPM's business model based upon the record evidence established in this case and explain the technical aspects of UPM Haiti's operations based upon those assumptions and the record evidence.  Specifically he will explain that the gateways and SIM servers, employed by UPM in Oregon and in Haiti, had the capacity to handle hundreds of simultaneously calls.  He will explain why UPM, more likely than not, based on the size and the sophistication of the UPM equipment that was seized in the publicized raid, deployed multiple gateways in multiple varied locations in order to complete HBS-enhanced bypass."

A very short explanation of that, you'll remember

that HBS, among other things, dictated the allocation of call to gateway to simulate movement between cell types and geolocations; therefore, an HBS-enhanced operation cannot, by definition, effectively operate from one site.  There is no way to randomize the geolocation of that.  And we know there were multiple sites operated in Haiti simultaneously.

THE COURT:  So where in either paragraph H of McEwen, or anywhere else in McEwen's statement, does he explain why 80 percent is a reasonable assumption?  It is not in what you just read.

MR. VAUGHAN:  Nothing what I just read -- as I said, I made that error where I recalled the 80 being in McEwen.  It was in Castel.  I apologize for leading you astray.

THE COURT:  And what I recall you telling me about Castel is he didn't make any opinions about 80 percent.  He was told to assume it.

MR. VAUGHAN:  I was mistaken.  I apologize.

THE COURT:  So Castel was only told to assume it; is that right?

MR. VAUGHAN:  I apologize.  Wait.  Hold on.  Ask that again.

THE COURT:  So Castel was only told to assume 80 percent.  He did not make any opinions in his report about why that's appropriate.

You told me before that Castel was just told to

assume 80 percent, and I did not see anything in Castel's report explaining why 80 percent is reasonable.

Now, what you point to me in the Castel witness statement is just simply:  Well, Castel was working with one site, and he was assuming that there would be multiple sites; and therefore, to avoid doing multiple site calculations, he is assuming that 80 percent at one site is a reasonable approximation.  But he never explains why 80 percent is a reasonable number.

What am I missing?

MR. VAUGHAN:  Because, Judge, he was not assuming there were multiple sites.  There are multiple sites.

THE COURT:  Okay.  So then why is 80 percent a reasonable number for one site, given that there are multiple sites?

MR. VAUGHAN:  Because the assumption being made is that the operation could not reasonably be going at 100 percent all the time every day all day.

THE COURT:  I totally get that.  So why is 80 percent the right number instead of 70?  Or 50?  Or 40?  Or 30?  Or 20?

MR. VAUGHAN:  Because in the combined expertise and judgment of both experts, the technical expert, who opines that essentially the equipment had the capacity to do much more, the economic expert, who in terms of trying to determine reasonable inputs, cannot simply assume that most aggressive tracks are

possible --

THE COURT:  I totally agree with that.  So why didn't he assume 20 percent?  Why is 80 percent a better assumption than 20 percent?

MR. VAUGHAN:  Because 20 percent, Your Honor, would result in a ridiculously limited number when you factor in the fact that there are multiple sites.  So you take the 80 percent for one site.  When we establish that it wasn't just one site -- let's assume that all we are able to establish is that there are two -- there has to be at least two in order for the HBS to make any sense.

THE COURT:  All right.

MR. VAUGHAN:  If you take two sites, and you divide this number we have provided for one site in two, what you have resulted in is essentially half of the calls being assumed here per site.

THE COURT:  I understand.  So why is 80 percent the right number, or why is it a reasonable number?

MR. VAUGHAN:  Your Honor, that is something that the defendants will have the opportunity to cross-examine on.

THE COURT:  Well, if the expert gets to testify.  I'm considering whether or not there is an adequate basis for this testimony.  Where is it?

MR. VAUGHAN:  The basis, Judge, is as we just articulated.  Any number -- and we need to embrace that any

number would be an assumption.  Because of the defendant's conduct, we do not have sight of, we would never have knowledge of, we would not have access to their data, their production, their business model.  There is no way we are going to know that.  It then becomes on us to provide a reasonable approximation.  It is entirely possible for us to have said to you that we're going to be using 80 percent over eight sites. There is testimony in this record that they had seven gateways operating simultaneously.  There is testimony that eight gateways were sent at one point in time.

In order to accommodate all of those considerations and to determine a reasonable approximation only one site was used for purposes of the calculation.  That one site contemplates, even if in actuality the production is low, it is 60 percent, or as Your Honor said, 20 percent.  20 percent would be accommodated in this number over four sites. 40 percent would be accommodated in this number if we established two sites.  30 percent would be accommodated in this number if we established three sites.  So the reasonableness of the number is factored in by the limitation that the expert employed by using only one site.  There is absolutely no question there can be no denial that you can't operate in multiple sites.  This damage model is based on one.

If you look at Exhibit 315 --

THE COURT:  What is 315?

MR. VAUGHAN:  315 is a piece of correspondence from 2014 between Mr. Duy Tran, Jose Manuel Del Toro, Ester Machuca, Jaspaul Gosal, and it talks about projects which are on hold. It makes reference in one section -- and this is something we pulled up quickly -- to a blanked-out section which talks about "reducing to seven siting for now."  It seems to be talking about Haiti; reduction of capacity.

There is -- I have notes on here.  It redacts one of the words right after the number "1" under "reduction of capacity."  I don't want to make any misrepresentations.  The entire Haiti section is blacked out.  But the point being:  The evidence in this case suggests that there were multiple sites operating simultaneously --

THE COURT:  I understand.

MR. VAUGHAN:  -- and we believe the 80 percent was reasonable.

THE COURT:  All right.  I'm not quite sure that conclusion follows from the premise that there is multiple sites, but let's move on.

By the way, I do want to share with you a hypothetical.  You can tell me whether this is or is not a good hypothetical.

You're in Florida, so I started thinking about Disney World.  Imagine someone started making counterfeit tickets to get people free into Disney world.  They'll have to pay

something to the counterfeiters but something a lot less than the face value.  We later discover that Disney World discovers these counterfeiters, and they know they've been for a couple of years been selling counterfeit tickets to get people into Disney World, but Disney World has no way of knowing how many of these counterfeit tickets came in versus true tickets. Because they're such good counterfeits, they just come in through the system.  But Disney World sues the counterfeiting company and has difficulty figuring out how many people actually got in.

Well, isn't one reasonable measure of that damage to Disney World, and a reasonable damage figure in a civil lawsuit, well, to look at how much money the counterfeiter earned and how much -- looking at the counterfeiters can come in.  If we can't figure out how much Disney World lost, maybe we will look at how much the counterfeiter earned and do the multiplication from that.  That seems to be a reasonable way of figuring out damages, when Disney World has no way of really knowing how many people got in for free or with these counterfeit tickets.

That seems to be analogous to our situation here, yet you have so many times told me that you do not want to use UPM's records of how many calls they've placed or how much money they've earned or things like that.  But it seems to me that is a reasonable alternative when one just simply doesn't

know without speculating how many free people got through those turnstiles.

What am I missing?

MR. VAUGHAN:  I appreciate the analogy, and let me see if I can do it justice.

In your scenario, assume that your counterfeiters were identified to have the latest Xerox Model 3000.  That Xerox Model 3000 has the capacity to put out 100,000 tickets per year.

THE COURT:  Right.

MR. VAUGHAN:  The counterfeiters are deemed, based upon the evidence, to have been working at full flight for the last two years.  Disney World has come to the conclusion that they were committing fraud, they have been nabbed, because one of their distributors was found with a bag full of tickets, and he gave them up.  Disney has asked and believes that what it has been told in response to "you've been nabbed," providing proof of how much you have been producing is significantly less than the capacity because the counterfeiter said, "We did 20,000 tickets, and those 20,000 tickets were in the possession of the two guys you grabbed."

Disney says, "You expect me to believe that you have the capacity of doing 200,000 over the two years, and you are now generously and magnanimously admitting that all you've produced is all I'm able to verify, because these are the two

guys I nabbed"?  Disney then says, "How about this?  While I appreciate your generosity, I do not trust it.  This is fraud after all."

Disney goes and looks at its historical numbers, and it realizes that its ticket revenues have decreased over the last two years.  It does a comparison of its reduced revenue from ticket sales, and lo and behold, its lost revenue approximates the production capacity of the people who have been victimizing it over the same two-year period.  It doesn't necessarily have to be 200,000, but it's not a situation where they have experienced, let's say, 50,000 in loss, and the capacity of the counterfeiters is $2,000.  When they compare their ticket loss to the capacity of the counterfeiters, it almost matches.  It's analogous.  It appears that they have the capacity to meet or exceed what appears to be the losses from ticket sales.

In that circumstance, Your Honor, I think where the case law says that the victim should not be held to prove with exactitude its damages, where the nature of the fraud prevents that proof with exactitude, the victim, the plaintiff, is entitled to present a damage analysis that is a reasonable approximation of its loss.

Here, Digicel Haiti's damage model is limited to that 2013 to 2015 time period.  Digicel Haiti's publicly available financial records reflect a drop in gross revenues from

527 million to 477 million over the time period 2013 to 2015. When compared to gross revenue, the publicly available records also reflect that its bypass losses reflect between 4.2 to 4.6 percent of the gross revenue over the same period of time. That 4.2 to 4.6 percent of gross revenue is approximately $22 million.  It is 22.1 to 21.9, because it's the 4.2 of 577 -- 4.6 of 527; 4.6 of 477.

When you look also at the rest of the financial records, you will see that as a percentage of EBITDA, Earnings Before Interest, Taxes, Depreciation, and Amortization, the bypass losses hover around 9 percent of EBITDA.  That number also approximates to around $20 million. When you look at the reasonable approximation of the capacity of UPM and their revenue-generating potential, that also approximates $20 million.

So, Judge, in your analysis, in your hypothetical, the exact same holds true, unless we're going to be asked to hold as gospel truth, the representations from the very people who have been perpetrating fraud for their own profit.

THE COURT:  How did Digicel Haiti calculate its bypass losses?

MR. VAUGHAN:  Those numbers, I do not know the answer, because those numbers were publicly available and verifiable.

THE COURT:  Did they take any opinions or questions

of judgment so that an expert in financial analysis would look at the data and say, "In my expert opinion, Digicel Haiti incurred approximate bypass losses of such and such amount or 9 percent of their gross business," or whatever it turns out to be. That takes judgment and opinions, doesn't it?

MR. VAUGHAN: The short answer is yes.

THE COURT: So where, in any of your expert testimony, are we going to see a disclosure of any expert who has told us, "In my expert opinion, these are a correct assessment of Digicel Haiti's bypass losses. Here is how I calculated that. Here is where they are. This is accurate, in my expert opinion, or at least a reasonable estimate. And by the way, they pretty well correlate with the capacity of UPM during this time period."

I don't see any of that expert analysis. Why not?

MR. VAUGHAN: Your Honor, I am looking at Mr. Castel's report. He has a section -- one second, Judge. I don't want to just talk for talking sake and not come up with the answer you need.

The expert report details the Digicel financial losses due to bypass. It details the financial losses due to bypass as a function of EBITDA, a function of total revenue, and a function of the percentage that bypass represents in terms of the losses of total international incoming calls. What I was looking for was a footnote for that source, and I

don't see one here.  I see a source for the financial information, which reflects the gross revenues and the EBITDA. That's what I was looking for.  So I didn't mean to filibuster, but the information --

THE COURT:  If you take a look at the expert report of Castel, he says in paragraph 2 he's reporting from Digicel's financials of what their bypass-related losses were, but I saw no explanation of how either he or Digicel calculated how those losses came to be determined to know whether that's reasonable or not.  It looks to me that all he's saying is, well, Digicel Haiti reported in its financial documents bypass-related losses of certain percentages of their revenues, and lo and behold, that's the same capacity of this one company that we are suing and, therefore, that's reasonable.  But what's missing there is any explanation of why that is a reasonable estimate of bypass-related losses.

When a company reports their earnings, they report their sales, they report their expenses, and that's just math. But in order to come up with an opinion that a certain number represents a bypass-related loss, I think takes some expert analysis and opinions, and I just don't see that is being presented to our jury, and so they're just being asked to speculate from these numbers.

What am I missing?

MR. VAUGHAN:  I'm going to give a more aggressive

answer and hopefully you take it in the spirit intended.  I would disagree that it's speculative.  Mr. Castel obviously got this from somewhere.  There are footnotes at the bottom of his report including -- that's titled "References" -- that include documents referenced.  There is one -- and I'm going to massacre this, and I apologize to your court reporter. "Le Bypass du trafic telephonique est-il prejudiciable" -- prejudicial -- "au secteur des communications electroniques."

There is information that the expert is entitled to factor into their analysis and their report and their conclusion.  It may be, Your Honor, that you're correct, that this source was not referenced and footnoted.

It may be that you're correct -- and I'm now going the other side, not the aggressive side -- it may be that source may be questionable.  That is cross-examination.  That is where the defendants get to challenge the input into the expert's analysis.  But to say that the entire analysis is speculative, because there may be sources, there may be inputs that are subject to challenge, undermines the entire analysis with respect to cross-examination and attacking methodology and input.

THE COURT:  Is that consistent with Daubert?

MR. VAUGHAN:  I do believe it is consistent with Daubert, because you are at this point -- it is not that there is an absence of methodology.  It is not that the inputs are

completely made up.  What I am saying to you right now is there is no source footnoted on this data.  It doesn't mean that it doesn't exist.  It may mean that, upon cross-examination, Mr. Castel will say, "Oh, no, I got that figure from the national numbers from CONATEL."

I don't want to tell him how to cross-examine, but Mr. Savage, at that point would be able to say, "Sir, how is a jury supposed to rely upon your" -- we say "ipsa dixit" in here all time.  Mr. Savage isn't the only one who can do it.  So that is cross-examination and --

THE COURT:  I get your point.  Let's move on.  I have a few more questions I want to ask you.  Then I have got some questions for Mr. Savage.  And then later, I'll let you say whatever comments you want to say.

MR. VAUGHAN:  I would like to reserve some time on the Communications Act for Mr. Bressie, please.

THE COURT:  You can do whatever you want, but I'm getting my questions in first.

On the terms and conditions, I see that in your exhibit list, you attach as an exhibit the prepaid roaming service plans' terms and conditions at Exhibit 394.  I forgot to go look.  If you know, what was the effective date of those terms and conditions?

MR. VAUGHAN:  I don't know the answer to that, Your Honor.

THE COURT:  Okay.

MR. VAUGHAN:  We have been looking at web pages, terms and condition pages, that are not dated.  Just from counsel to the Court, we did do our due diligence, went to the Wayback Machine and try to confirm the dates of these, and they go back to, I think, 2009.  But that is not evidence.  I'm just telling you and counsel that's what we did.

THE COURT:  I note that in UPM's reply brief, Docket 402 at footnote 115, they comment that the terms and conditions that were provided was after the case was filed and after UPM ceased using Digicel Haiti's services, but let's worry about that later.  Let me ask you a bigger-picture question.

MR. VAUGHAN:  Your Honor, for your consideration, Mr. Tran also acknowledges that he was aware of the terms and conditions.  There is a communication in the file where they are looking at the websites for the --

THE COURT:  I totally get that.  I understand that. Now let's talk about how that fits into the law.

First, let me just ask a few predicate questions, and then I'll ask you a big-picture legal question.

During the relevant time between 2011 and 2014, did the Digicel Haiti SIM cards themselves either say that they were subject to terms and conditions or words to that effect, or were they wrapped in any type of packaging or wrapping that

said, "Using this card indicates an agreement to the terms and conditions"?

It is a very narrow question.  What's the answer?  If you know.

MR. VAUGHAN:  The very narrow answer is no.  And you will remember that we had this difficulty of --

THE COURT:  I know.  I'll let you give me the big-picture legal answer in a few minutes.

MR. VAUGHAN:  I appreciate it.

THE COURT:  When a company like UPM would go to top off a SIM cards in the period of 2011 to 2014, would they have to click on those little boxes that say, "I agree to the terms and conditions"?

I didn't see any evidence of that.

MR. VAUGHAN:  Well, this is the problem -- okay.  This is understanding that Digicel Haiti does not in any way, shape, or form agree or concede that UPM ever did that -- ever.

THE COURT:  I'm not following you.  My question is -- let's put UPM aside.  When SIM cards were being topped off or additional money being put onto them in the 2011 to 2014 period, did the programming require the topper-off person to click a box that says, "I agree to the terms and conditions," or something to that effect?

MR. VAUGHAN:  I have not seen that.  What I have seen is the first paragraph or second paragraph that says by

accepting the services herein, you agree that you are abiding by the terms and conditions here.  So the short answer to your question, I have not seen a --

THE COURT:  Got it.  Let's go to that second answer then, because that was going to be my next question.  Did it say, between 2011 and 2014, when you're topping it off or adding money to a SIM card, did it say right upfront or somewhere, by using the card, you are subject to terms and conditions?  You just said it did.  Can you point to that evidence for me?  I don't remember seeing it, but maybe I missed it.

MR. VAUGHAN:  Just a second, Your Honor.

THE COURT:  Fine.  Sure.

MR. VAUGHAN:  I'm sorry, Your Honor.  I'm pressuring my team rather aggressively.

THE COURT:  Good.  I'm pressuring you; you're pressuring them; pressure is transitive.

MR. VAUGHAN:  I hate to keep you waiting.

THE COURT:  No, that's fine.  I have to get on a plane tomorrow morning.  But other than that, we are doing fine.

I will tell you that Mr. Savage pointed out this issue in several of his briefs, and I don't recall ever reading in your response that a user was told, on the terms and conditions, that use of a card indicates acceptance of the

terms and conditions -- sorry -- that a user was told on the website that use of the card indicates agreement of the terms and conditions, at least during the relevant period.

MR. VAUGHAN:  Because we did not know.  I think at this point, Judge, I will be the first, even though I don't think I should be the only, I'll be the first to admit that this has been a journey for all of us.  It has been an evolving journey for all of us where we have been learning different things along the way.

I want to point out -- you noted quite correctly that at the beginning I was pulled -- I am going to say it this way: I was pulled into a shrink-wrapped conversation, which was a red herring.  There is no shrink wrap on the card.  There is nothing there, and that's where unfortunately my --

THE COURT:  We're past that.

MR. VAUGHAN:  I'll move on.

THE COURT:  Is there anything on the website, or however the process was, that someone would top off a card or add money to it that said during the relevant time period that use of the card indicates acceptance of the terms and conditions?

MR. VAUGHAN:  Yes.  And we have articulated them in our --

THE COURT:  And where do I find the evidence that's on the website during the relevant period?

MR. VAUGHAN:  415-4 deals with the prepaid service.

THE COURT:  By the way, what is 415-4?  Can you remind me what that is.

MR. VAUGHAN:  415-4 is the terms and conditions of the prepaid service.

THE COURT:  That's the terms and conditions.  I get that it says that in the terms and conditions.  I want to see --

MR. VAUGHAN:  I misunderstood.

THE COURT:  -- where it says somewhere in the process of topping off or buying something that, "Hey, by using this card, you agree to the terms and conditions."

Now, if you tell me the only place that's in the terms and conditions, that's consistent with my general review, and maybe now is the time for me to ask you about your big-picture legal theory.  What is the legal basis for concluding that UPM, when they top off or recharge the card or anything like that, that they agree to be bound by the terms and conditions?

Is your answer to that only, "Well, that's what the terms and conditions say"?  And if so, then I have got a follow-up legal question; the legal question being where in the law, either Oregon or anywhere else in this country, is there legal authority that says that is sufficient; namely, if it says in the terms and conditions, "By using this product,

you're bound by the terms and conditions"?  Is that legally enough to contractually bind someone to the terms and conditions?  If so, what's the legal authority for that conclusion?

MR. VAUGHAN:  I don't have -- that's where it is, Judge, and I'll have to get that authority to you.  I do not have that at my fingertips.

THE COURT:  Okay.  You know, this has been an issue that has been constantly raised in this briefing and even the earlier rounds of briefing.  When will you get me that legal authority?  Can you do it by Monday?

MR. VAUGHAN:  Absolutely.  If I can't find it, I will also let the Court know.  But you will remember, Judge, our position is this is a fraud claim, and there is no contractual relationship between the parties.

THE COURT:  I totally get it.  All I want to know is a lot of issues, including on the Communications Act, seem to turn on the terms and conditions.  So I just want to find out why or whether or not UPM is legally bound to those terms and conditions.

MR. VAUGHAN:  Before I wrap up my answer, if I might, I would like to ask you to hold any final determination on the relevance of the terms and conditions with respect to that Communications Act issue as well until we hear from Mr. Bressie.

THE COURT:  That's fine.  I'm not ruling from the bench anyway.

MR. VAUGHAN:  In the meantime, I will find the exhibit from my declaration -- exhibits -- which are the terms and conditions of the prepaid and the terms and conditions of the top-off.

THE COURT:  During the time period of 2011 to 2014, right?

MR. VAUGHAN:  Yes, sir.

THE COURT:  Let's turn to a totally different topic. This topic relates a little bit to your damages claim, but, frankly, it relates more, I think, to the Communications Act claim.  I'm just going to ask some factual questions.

These are about the nonmonetary damages or the harm to Digicel Haiti caused by the alleged bypass by UPM.

In the Castel report, Docket 391-1, Castel makes a few statements.  He talks on page -- and I'll refer to your page numbers.  Page 10, loss of reputation due to quality of services and signal deterioration and a number of calls successfully terminated.  Then on your page 19, toward the bottom -- I'm sorry.  Let's go to your page 18 first.  He talks about another negative side effect.  "There is missing or incorrect calling line identifier, which means that many calls are declined by the receiving party and missed calls are not returned."

Then at the top of the next page, page 19, he talks about "degraded voice quality due to latency issues, highly compressed IP connections, and longer calls," and that's about it for now.

Then in Mr. Boute's -- how do you pronounce his last name?  B-O-U-T-E.

MR. VAUGHAN:  Exactly that.  Boute (enunciating).

THE COURT:  In Mr. Boute's lay witness statement, Docket 390, he says at paragraphs I, K, and N -- he talks about similar issues.  He talks about the negative impacts on Digicel Haiti's roaming relationships and the resulting damages incurred by Digicel Haiti, including limitations placed on Digicel Haiti's ability to provide roaming access to its subscribers.

He talks in paragraph K about the forced limitation and the arrangements between Digicel Haiti's Group Services carrier team and its United States roaming partners in 2014 that resulted in a force limit on the number of minutes roaming Digicel Haiti's SIMs could use on the domestic host carrier.

Boute talks about the fact that this was put in place because the Digicel Haiti usage was inexplicably over-subscribed and beyond what the group and domestic roaming partners contemplated.

Then in paragraph N Boute says, among other things, that there was damages or at least injury or harm to Digicel's

relationship with the regulator and the wider Haitian authorities because of concerns about the taxes.

Then similarly, Gerard Laborde, at paragraph 9, makes similar comments.

Here is my big-picture question for you -- and now I'm talking about the Communications Act counterclaims. Were these nonmonetary harms that Digicel Haiti says it experienced, that I've just described, were those a substantial factor in Digicel Haiti's decision to deactivate the UPM SIM cards that Digicel Haiti believed were used for either traditional bypass or Roam Like You're Home bypass? Were those issues a substantial factor in Digicel Haiti's decision to deactivate UPM's cards?

MR. VAUGHAN: I will start, and if Mr. Bressie wants to kick in, because you've just tied this to the Communications Act counterclaims. But, yes, to the extent that the ongoing impact of bypass operations resulted in reputational damage to Digicel with respect to its relationships with roaming partners, to Digicel with respect to its relationship to the Government that regulated its activities in Haiti, with respect to reputational damage with respect to its customers who experienced deteriorated call signals and unreliable call service and service which did not have the CLI information, yes, interrupting and terminating SIMs that were determined to be involved in bypass was impacted by those things.

To the extent -- there's more.

THE COURT:  Go ahead.

MR. VAUGHAN:  To the extent that Digicel incurred millions of dollars, the testimony is $3 million to $5 million per year in combating bypass activities, yes, it factored into determinations about how to address bypass and SIMs identified in bypass.

Mr. Bressie, is there anything with respect to the Communications Act that I missed?

MR. BRESSIE:  Your Honor, I'll talk a little bit about this in the comments later about regulatory theories and issues in the case, but I think it's relevant here because, to the extent that Digicel Haiti was providing a common carrier service in the United States, and we do not believe it was, and I'll explain further why --

THE COURT:  Not now.  To the extent it was; if we assume it was.

Go ahead.

MR. BRESSIE:  Yes.  It goes to the question of -- assuming, for the sake of argument, that it was a common carrier, were its actions reasonable under 201(b) and 202 --

THE COURT:  Exactly.

MR. BRESSIE:  -- and our position is they were eminently reasonable in complying with Haitian regulatory requirements.

THE COURT:  Understood.  By the way, is it your position, Mr. Bressie, that the standards in both Section 201 and Section 202 are essentially the same standards for reasonableness?

MR. BRESSIE:  They have been applied in different ways, but essentially, yes, I think that the relevant court decisions have interpreted reasonableness the same under both of those provisions.  And claims are often handled, in various decisions adjudicating whether or not particular actions were appropriate, under Section 201(b) and 202, the claims are always made together and addressed together.

THE COURT:  And so to the extent that I find that there is a fact question on whether or not Digicel Haiti's actions in deactivating the SIM cards were just and reasonable, or not, the answer should be the same under 202(a) and 201(b), correct?

MR. BRESSIE:  Well, again, just to keep in mind the standard in 202 is with respect to discrimination, whether or not -- 202 does not prohibit any discrimination.  It prohibits unreasonable discrimination.

THE COURT:  Right.

MR. BRESSIE:  In Section 201, if you can bear with me a second.

THE COURT:  It says, "all charges, practices, classifications, regulations for and in connection with such

communication service shall be just and reasonable."

MR. BRESSIE:  Yes.

THE COURT:  So "just and reasonable" is a concept in both 201(b) and 202(a), and if I reject UPM's motion for partial summary judgment by saying that there is a fact issue on whether or not the deactivation was or was not just and reasonable, then the same answer and analysis applies to both statutes, right?

MR. BRESSIE:  I think that is a reasonable understanding.

THE COURT:  Okay.  Mr. Savage can tell me why I'm wrong when he gets to speak -- if he thinks that.

All right.  The last topic that I have for you, Mr. Vaughan, let's just talk about Roam Like You're Home.  Can you explain to me, please, and I'm trying to figure this out from the papers, and I'm having trouble.  How does Digicel Haiti get compensated?  I know that when someone subscribes to Roam Like You're Home, they have to start off by paying either a $20 or $25 subscription fee or something like that, an enrollment fee.

But then -- and this is what Mr. Savage talks about in his papers.  He says that in Roam Like You're Home calls, Digicel Haiti gets paid 23 cents per minute from the United States carriers, plus 9 cents per minute relating to its local rates.  I'm a little confused on that.

Before I go to Mr. Savage on that point, can you explain to me from Digicel Haiti's perspective how the economics works of the Roam Like You're Home service there?  I get the subscription cost.  I don't want to hear about that. But how does this per-minute stuff work?  The 23 cents per minute and 9 cents per minute, how does that all work from Digicel Haiti's perspective?

MR. VAUGHAN:  The testimony is that there are multiple sources of revenue, and I'll explain to you the revenue per the standard roaming, and I'll explain the revenue that is lost.  The revenue, per the standard roaming understanding and agreement is, as you just said, a subscriber -- well, let's take a regular roaming customer.  A regular roaming customer travels.  They roam on the network of the home carrier, the domestic carrier here in the U.S.  A call is made back to Digicel Haiti.

There are two sources or two streams of income for any regular call.  One stream of income includes the negotiated payment from the domestic carrier that is in effect sending a call to Haiti to Digicel Haiti, and that includes whatever the back-end negotiated roaming terms are, which includes barters, set-offs.  It includes negotiated rates that factor in how many roaming minutes I can expect from you, how many roaming minutes you can expect from me, and rates are determined that way.  It also includes -- which may or may not result in an effective

23-cent-a-minute landing rate.

THE COURT:  When you said "landing rate," that means to Digicel Haiti?

MR. VAUGHAN:  Termination.  Yes.

THE COURT:  Got it.

MR. VAUGHAN:  In addition, the subscriber, who is traveling, gets charged a roaming rate for making that phone call.  Just as if you decide to go to China on vacation, and you don't call Haiti and say, "Hey, I'm traveling.  I would like your world traveler rate for the following months," when you get your roaming bill, you will have a conniption.  It is bad.

THE COURT:  I know.  I've experienced that, yes.  But I'm not going to be your witness.  I have experienced that.

MR. VAUGHAN:  So those are the two streams.  All your Roam Like You're Home is is just like AT&T, the world traveler, where you call in and say, "I'm going to be away.  So I'll pay you the $20, and I'll get a reduced roaming charge."  That's it.

The subscriber in Haiti says, "I'm going to be away, so I would like to subscribe to Roam Like You're Home."  I pay that monthly subscription fee, and I get to pay the same rate as if I was calling in Haiti.

THE COURT:  So does the subscriber pay 23 cents per minute or 9 cents per minutes?

MR. VAUGHAN:  9 cents.  They pay as if they were in Haiti calling a friend in Haiti -- Roam Like You're Home.  You are charged like you're making a local call.  So those are the two sources of income, whatever that negotiated "net" landing right is -- and I say "net," and I say it in quotes, because the floor rate set by the Government is 23 cents.

THE COURT:  Let me stop you there for one second.  Assume I'm just a regular individual subscriber from Haiti.  I subscribe to Roam Like You're Home.  I travel to the U.S.  I pick up the phone, and I use my Roam Like You're Home.  How much am I paying?

MR. VAUGHAN:  You're paying whatever the retail roaming rate is for Digicel Haiti traveling to the U.S. with no subscription.  It's like your "shock-and-ah fee" from AT&T.  Whatever the rate is, that's what the subscriber is paying.

THE COURT:  That's like a Roam Like You're Home subscriber.

MR. VAUGHAN:  No.

THE COURT:  That's what I'm asking.  What I'm asking is:  I'm a Roam Like You're Home subscriber, a real legitimate subscriber.  I'm in Haiti.  I subscribe to Roam Like You're Home.  I travel to the U.S.  And now I call back home, using Roam Like You're Home, the way you want me to use it.

How much do I pay and to whom?

MR. VAUGHAN:  9 cents a minute to Digicel Haiti.  You

have no direct relationship with the domestic carrier that is your host while you are traveling.

THE COURT: Now, if I --

MR. VAUGHAN: Plus your subscription fee, right?

THE COURT: Right. I don't want to talk about subscription fees. I won't forget that.

Now, I know that if I live in Haiti, I travel to the U.S., and I don't have Roam Like You're Home, and I don't use a bypass -- UPM -- I pay a ridiculous amount of money, and that's going to be my gigantic roaming charge. I get that.

What's your understanding -- let me ask you this. Let me take a step back. Does UPM, in your understanding for Roam Like You're Home, do they sell and market to individuals or only to U.S. carriers, or both?

MR. VAUGHAN: That's a very good question. The evidence seems to suggest that there were institutional clients. So it appears that they were selling to other telecoms. It also appears that they were terminating calls. So I don't know the exact answer to that, because it appears there were multiple facets to this business. Then, of course, you heard that there were segments of the call that were arbitraged, where they were literally in the middle of chain reselling at wholesale. So we know that they were terminating individual calls. We know that there were sales to others through arbitrage and resale.

THE COURT:  Relatedly, when Digicel Haiti or the Digicel Group would market to the diaspora, to the people from Haiti living in the United States, I get part of that is urging people in the United States to top off their family members' in Haiti's Roam Like You're Home cards.  I get that.  But were you also marketing to the diaspora, the people from Haiti who are now living in the United States, whether Los Angeles, New York, Florida, were you marketing to them Roam Like You're Home so that they could call their family members back in Haiti without paying gigantic roaming charges?

MR. VAUGHAN:  At this point I must step back and defer to Mr. Bressie, because we are on the entirely wrong road.  So now I need to give it to Mr. Bressie.

THE COURT:  Go ahead, Mr. Bressie.

MR. BRESSIE:  So this is a factual question --

THE COURT:  Correct.

MR. BRESSIE:  -- as to the actual marketing materials, which I'm not familiar with.

THE COURT:  Okay.  So then neither of one of you know the answer to my question.

MR. VAUGHAN:  No, no.  This was my problem.  I can answer the factual question, but the premise was incorrect, to the extent of Digicel Haiti marketed to anyone, and the premise of the top-offs being a communication service was incorrect as well.  So the answer to your question is Digicel Haiti did not

do any marketing.  Digicel Group did marketing.  It was not Digicel Haiti offering.

THE COURT:  Okay.  So let's talk then about the marketing that Digicel Group did.  We've got Haitians in the diaspora living in the United States, right; people from Haiti that now live in the United States; right?

MR. VAUGHAN:  That is one component of the diaspora.  It also includes blend.

THE COURT:  What's another component?

MR. VAUGHAN:  It includes just family descendents, relatives, third-generation folks.  It includes anybody with a connection.

THE COURT:  I'm not quite sure that I understood "diaspora" to be people living somewhere else who are just traveling.  But I definitely get people with a connection -- first, second, third-generation folks living here, who have family in Haiti, friends in Haiti but they're living in the United States.

Did Digicel Group market to them, whether through any of their marketing offices -- New York or Los Angeles or Florida -- did Digicel Group market to those folks, "Hey, you can use our Roam Like You're Home service.  Call your friends or family back in Haiti, and it will be a lot less expensive for you."

Was there any such marketing done to them?

MR. VAUGHAN:  Mr. Bressie, let me know when you want to jump in.  I'll answer until you say.

The short answer, Your Honor, is no.  Remember, I don't represent Digicel Group.  I can tell you Digicel Haiti did not do that.

THE COURT:  That's not my question.  My question is, what's your understanding of what Digicel group did?

MR. VAUGHAN:  Okay.  That's an easy question to answer.  Digicel group marketed the provision of financial services through this top-off program.  That financial service is not a telecommunication service.  It is the ability to transfer funds, revenue, and in the top-off agreement -- I know you are making your notes -- but the two exhibits we were talking about, 415-9I is the top-off agreement.  415-9D, Delta, is the prepaid terms and conditions agreement.  Remember, you asked me what those two were.

So with respect to the top-off agreement, it says in the agreement that what is being provided is the ability to submit funds to the account of a subscriber in Haiti.  What you will hear from Mr. Bressie is what that mobile or digital wallet represents.

THE COURT:  I understand that from your papers.

So did any people living in the United States, or here even temporarily, not traveling, but maybe here for a couple of years as college students or working or whatever, or

first, second, or third-generation people living here, did any of them ever buy and use Roam Like You're Home accounts to call back Haiti to save money?

MR. VAUGHAN:  It is not offered in the United States. Roam Like You're Home is subscriber service that is offered in Haiti.  It is not offered in the United States.  So if I'm hearing you correctly, if someone leaves Port-au-Prince to come to the University of Oregon to become a Duck for four years -- can they -- they're in Oregon living for four years buy Roam Like You're Home?  No.  If someone doesn't buy that cell phone for them and that SIM card in Haiti, exactly as UPM did, and ship it up to the United States, it's not available.

THE COURT:  So no marketing by Digicel Group is trying to persuade people spending an indefinite period of time, or four years at a university in the United States, to buy or subscribe to Roam Like You're Home, correct?

MR. VAUGHAN:  No, not as we understand from Digicel Haiti, not at all.  No.

THE COURT:  Okay.  Got it.

All right.  That ends all of the questions that I have for Digicel Haiti.

Dennis, will ten minutes be enough?

THE COURT REPORTER:  I need 15, Judge.

THE COURT:  All right.  Let's take a recess.

(Recess.)

(Open court; proceedings resumed:)

THE COURT:  The first question for UPM is -- I am focusing the Ninth Circuit's decision in Plantronic v. AT&T where the third inquiry now switches over -- and the burden, of course, will be on Digicel Haiti, of course, to show that their conduct in deactivating the SIM cards were just and reasonable, and the Ninth Circuit teaches us that a difference in price, or I think any other activity that's challenged -- is not unreasonable if there is a neutral, rational basis underlying the action.

I think that standard applies in both 201(b) and 202(a).  I guess technically Question No. 1 is:  Does UPM disagree with that legal conclusion?  And if so, what's your authority for that?  But if not, if you don't disagree, then it seems to me that if all of the other factors on the Communications Act claim are right that you argue for, we at least have a question of fact on whether or not the discrepancy is just and reasonable.  That's the real key question.

The second question asks about my assumption, and that is, are the other factors right?  In light of what Mr. Vaughan and Mr. Bressie have said about the marketing, and I really don't see any evidence of marketing activities in the U.S. other than what I've asked about and what they've explained, does UPM have any evidence that Digicel Haiti has marketed Roam Like You're Home to people in the United States,

and if not, why doesn't that then mean that all they've done is just simply act like a foreign carrier and have nothing but physical connections?  Those are really the two different issues that I'm most interested in hearing from UPM.

MR. SAVAGE:  Would you indulge for just a minute for a couple of notes that I have from the earlier discussion?

THE COURT:  Then, of course, you can respond to anything and everything that Mr. Vaughan said, but I would love it if you'd start with those two things after I indulge you.

MR. SAVAGE:  I don't want to get too pedantic, but I think 201(b) and 202(a), the right way to look at them would be -- 201(b), I'm drawing a big square, is the realm of unjust, unreasonable, bad, awful behavior that carriers can engage in, and that is subject indeed -- we can debate the wording, but basically it has got to be reasonable in light of -- I think I will debate the wording actually.  It has got to be reasonable in light of the purposes of the particular practice; that there is more to it than just the "is there some neutral purpose?"

Let me start over.  201(b) embraces all unreasonable behavior.  202(a) is a subspecies of unreasonable behavior, and that is unreasonable discrimination, and there are some specific tests that you look at to decide whether or not behavior is unreasonably discriminatory that would not necessarily apply in a general 201(b) case.  In particular, it is a three-part test that I think Mr. Vaughan put in one of his

papers. First of all, is the service alike? Because a lot of discrimination cases say, "Well, I'm buying this, and you're buying that, but it is really like." Here, that's not an issue, because are just talking about the one service, Roam Like You're Home.

The second is: Was there discrimination, which is, is there a difference in treatment? In this case the answer is, obviously: Plain old subscribers were allowed to use their service; we weren't. Treated differently. Then was that discrimination reasonable? Yes, that's a species of is it reasonable under 201(b) on some level? But there is, I think, a fair amount of law, and we can get into it, if we can, on particular cases of, "Well, this is reasonable under this circumstance because of this and this." Again, not getting unduly pedantic, this comes out of like the common carrier law where you can charge a different per-ton rate for bricks versus uranium and all that kind of stuff.

Okay. What that means is, if you are asking the question did you violate 202(a), the anti-discrimination statute, and you simply apply the "well, general standard," I suspect you can get to the right answer, but you might also be led astray, because the general statement of what's reasonable or not under 201(b) is broader and covers a lot more broader things.

So when we get to that point in the case where we're

talking about was it reasonable discrimination or not, I just want to put a little marker that that may be a different -- a slightly different legal inquiry than was it a violation of 201(b), because it would just be stated broader. "Don't be negligent" is a standard that applies everywhere. "Don't drive down a school district at 50 miles an hour" is a specific thing that may be covered by specific law. So that's the analogy I draw from that.

On the broader question, I believe you are -- if I understand the premise of your question, I'll give you a factual answer and a legal answer. The factual answer is -- and we can get there at trial if it comes to that -- we have not scrutinized everything we know about Digicel Haiti's activities to be able to say whether or not they market to people in the United States. Now, I believe it to be a true statement that if I have a Digicel Haiti phone, and I turn it on in the United States, something pops up on the screen that basically says, "Hey, do you want to sign up for a roaming plan?" So that interaction between the device, what the person sees and the system, if I'm right about that -- and we will nail that down -- that's plainly something being offered in the United States to somebody in the United States. So if that's true, then I think this issue goes away.

Again, the thing that you and the others graciously agreed to put off until September 30th for us to file is our

affirmative case on the Communications Act stuff.  So note taken, we will make sure we address that.

But it also doesn't matter.  It literally doesn't matter, because I think built into the way you have framed the question, there's a distinction that is important that I think you're aligning one way or another between what it means to offer a service for purposes of regulation of the Communications Act versus marketing of a service.

There is no question that if I am selling hamburgers, right, and I say, "Come buy my hamburgers," that's marketing, right.  There is no question if I'm selling candy bars.  If I say, "Come buy my candy bars," that's marketing.  But it's also true that if I put a vending machine on the corner, accessible to anybody on that corner -- you put in a buck, you get your candy bar -- I'm offering candy bars to people on that corner.  I may not be actively marketing it.  Without question, I'm offering it.

THE COURT:  I didn't see them putting a vending machine in.  Putting aside the marketing issue, all I saw them doing is entering into a roaming contract and then operating through the physical facilities of their switch, or really their partner's switched.

MR. SAVAGE:  This is the critical thing, right.  I really don't mean to denigrate their very sophisticated GSM worldwide network to a candy page, but for these purposes,

that's all it is.  So where you can go and put a dollar into the machine and get your Snickers bar is where that Snickers bar is being offered.

They have configured their system so that if I have a friend in Haiti ship me a Digicel Haiti SIM card today, tomorrow, and I put it into my phone, at that time I can enroll in Roam Like You're Home.  I mean, I have to top it off, but I can then enroll in Roam Like You're Home.

The vending machine analogy -- but the vending machine runs through the Internet and runs through the phone network, which is what they want.  If someone leaves Haiti and comes to the United States and says, "Oh, my gosh, I am going to have to pay too much for roaming.  What can I do?"  You don't have to go back to Haiti.  They can do it right there.

And precisely because there are no one written terms and conditions, because actually you don't have to say, "I agree," blah, blah, blah, the only contractual relationship that exists between these parties is a contractual relationship created by their behavior.  It is a classic implied-in-fact contract, which is, again, why -- that article on the vending machine, in your copious free time, I recommend it, because it is really about modern smart contract stuff.

THE COURT:  It is an interesting problem.

MR. SAVAGE:  It is an interesting problem, but I believe it to be -- it is much more interesting technically

than legally.  As I said, at some point how can it possibly be that they set up their system, and so I say, "Bah, bah, bah, bah."  They say, "Are you sure you want to have that $25 deducted from your account?  Yep."  They take the money.  And we don't have a contract?  Of course we have a contract.  It is an implied-in-fact contract based on the behavior of the parties.

Given that that implied-in-fact contract exists and is executed entirely in the United States, irrespective of marketing, to say that there are no offer in the United States of this service that can be bought by anyone in the United States with a relevant SIM card, is just untenable.

I'm sure you could write an opinion that came to that conclusion, but in the real world how could it possibly be that I can sit here in the United States, do something in the United States, get a service in the United States, but it's not being offered in the United States?  I submit the confusion is between the term "offer" and "market."

Now, I was not able to find time, as I was doing everything else here, to go back and look at the Supreme Court's discussion of what constitutes telecommunication service versus a telecommunications aspect of an information service in the Brandex case that we've cited.  But if memory serves, the Brandex case contains a discussion of what it means to offer this or that or the other, because the Court in that

case was struggling over whether a broadband Internet service that includes a high-speed transmission aspect of the service, is that a telecommunication service or just an information service?  It is really complicated.  But they do talk about "offer" as being a term in the Communications Act that is much broader than marketing.

So the assumption that we would have to show that there was marketing of Roam Like You're Home service in the United States to show that that service is offered within the meaning of the Communications Act is, I think, wrong.  And I'm happy to provide some more citations to that, but I think that underlying assumption is a mistake.

So for that reason, yeah, I would say that when my phone in the United States says do you want a roaming plan, that's an offer in the United States.  But even if only the "Secret Society of Bypassers" knew you could do this, the fact of the matter is, it's physically offered in the United States to anyone "who puts in the right codes on the vending machine" analogy.

So as to that I would say -- that is essentially my answer to that.

On the question of isn't it a factual question, the answer is maybe.  Back in the day, meaning about a year ago when we were fighting about the original briefing on Mr. Vaughan's motion to exclude Mr. Gillan, in defense of

Mr. Gillan's testimony, I said, you know, one of the theories that I am going to present is what I was calling the "per se theory"; that the right way to view the FCC's law on resale restriction is to simply say, "You can't do it.  If you are a carrier, you can't do it."  That's what they said.  They didn't say, "You can do it if it is reasonable."  They said, "No, resale restrictions are unreasonable."

And if you go with me that that's the law, we don't need facts.  They restricted resale.  Just like in an antitrust case you don't hear about why they got together to fix price.  You know why they did it.

THE COURT:  In a rule of reason case, you hear a lot of reasons.

MR. SAVAGE:  That's right.  And that was my second point with respect to Mr. Gillan.  What I said was, "Look, if you don't want to hear about reasons, we don't need Mr. Gillan."  But if you are going to entertain testimony about whether this is reasonable -- and now getting back to your first question, reasonable in relation to what?  Because this is not a naked statutory interpretation case.  This is not Section 201(b) says, "Thou shalt not be unreasonable."  What counts as unreasonable?

We are specifically arguing that they acted unreasonably by restricting our ability to resell their service.  And the FCC has a fair amount of explanation about

what they mean by "unreasonable" in that context and what they think is unreasonable and why they think it is unreasonable.

So, you know, if we have to get there on motions in limine and stuff, I'm sure we will, but it's not -- it is definitely not Savage wins on a per se rule theory or a free-for-all about reasonable.  To the contrary, the only kind of evidence that will be relevant to a claim that the restriction of resale was unreasonable would have to be in the context both of the FCC's multiple rulings as to why resale is great and their rulings about what are the bad stuff that carriers do that resale prevents.

And to their rulings about why are we tolerating an insanely high 23-cent-a-minute rate, when we know it's much less than that, as we put in one of the briefs.  It's because they said, "We expect competition to have this effect."  And that gets to a point you asked Mr. Vaughan about, which is, "Well, gee, we did it because AT&T was mad at us," or "we did it for this," or "we did it for that."

Why was AT&T mad at them?  AT&T was mad at them because a whole bunch of traffic was coming over these Roam Like You're Home lines, right.  In other words, the effect of reselling it was to put economic pressure on them, and the economic pressure was, "Well, they could go back to the Haitian government and say, 'This 23-cent thing isn't working; it's causing us a lot of problems.'"  Or they could say, "Well, AT&T

will only tolerate 500 minutes a month; 400 minutes a month." But by limiting it to 400 minutes a month, that does exactly what the FCC said they wanted to do, which was to tie the rate charged for a service to its cost.

THE COURT:  I understand what you're saying.  Am I correct -- and this is a real basic question.  If I'm correct, fine, we will move on.  If I'm incorrect, we are in a lot of trouble.

Am I correct that this is the sort of dispute that UPM has with Digicel Haiti on this very point -- your counterclaims -- that could have been brought before the FCC?

MR. SAVAGE:  Absolutely.

THE COURT:  Good.  Okay.

MR. SAVAGE:  Just to be clear, without revealing any deep attorney-client communications, once, back in January or February of 2016, whenever it was that you sustained their version of the complaint, we sat around and said:  Compulsory counterclaims; what gripes have we got against them based on this same stuff?  But, yeah, this could have been brought to them under 208 or under 207.  We believe that, in light of their having raised this dispute, we had to raise it here.

THE COURT:  And I have so much concern about my lack of understanding of what is reasonable or not under FCC regulations, for the reasons you've just described, and I have even more concern about letting Mr. Gillan testify to a jury

about regulatory purposes that where I'm being pushed now is thinking that the right solution is to -- and maybe it's sua sponte -- grant primary jurisdiction on your counterclaims and send the counterclaims to the FCC, thinking, look, I don't want to deprive you of any rights to assert a compulsory counterclaim, but you won't be deprived of that if I find that FCC has primary jurisdiction.

Why shouldn't I do that?

MR. SAVAGE:  Well, there are a lot of reasons.  One is I would miss my trips to Portland.

THE COURT:  I didn't hear you.

MR. SAVAGE:  I would miss my trips to Portland.

THE COURT:  No, no.  We still might have a trial here.

MR. SAVAGE:  Fair enough.

But failing that, I would submit to you that perhaps if this were a naked Section 201(b) claim, if no one had ever suggested that resale restrictions were a problem, and here I am saying, "Resale restrictions are a problem.  It's unreasonable.  201(b)."  And you would reasonably say, "Well, do you have any precedent on that?"  And I would say, "Well, I have got this economic theory," sure, send us to the FCC, because that is how do you apply the general vague standard to something new.  This is not new.  This is not even hard.

THE COURT:  I don't think Mr. Bressie will agree with

you on that.

MR. SAVAGE:  He will agree that it is not new.  He will agree it is not hard.  He will just say it comes out the other way.

THE COURT:  Fine.  And you know what, that probably means that it should go to the FCC.

MR. SAVAGE:  Your Honor, again, let me disagree with you.

THE COURT:  Not a jury.

MR. SAVAGE:  I'll take a jury.

THE COURT:  I know you will.

MR. SAVAGE:  A jury -- international bureau, enforcement bureau -- a jury.  But I would strongly disagree with that, precisely because the issues we're asking you to adjudicate -- the legal issues we're asking you to adjudicate are well within the competence of a federal court that can also handle Lanham Act and antitrust.  There is nothing that complicated about this, A.  And B --

THE COURT:  Here is where I'm getting concerned about the complication.  I thought when I read the Plantronic case, it looked pretty easy to me, that says, well, they have a defense if what they did is a neutral reason based upon reasonable facts and not just because they wanted to make more profit by getting rid of a competitor.  And I figured, okay, they probably have, from what I've read -- and Mr. Vaughan

confirmed this -- that they at least say they have a neutral reason; namely, because of all of the problems that these concentrated periods of radio usage was causing -- the signal deterioration, stuff like that.

MR. SAVAGE:  Okay.  But let's be clear:  Those things that you were reading from were Mr. Castel's report talking about --

THE COURT:  They were also in Boute's statements as well as Laborde's.

MR. SAVAGE:  Let me finish, please.

THE COURT:  That's fine.

MR. SAVAGE:  I agree.  But the exhibit you are quoting from Mr. Castel was dealing with in-country bypass.

Now, the things that Mr. Boute complains about, "Oh, my gosh.  We had a problem, AT&T.  We had to do this; we had to do that."  That means that resale was working.  That means -- those are the kind of problems they should be having, and they should be having them, because the way they set up their price was unrelated to the cost of the service.

By virtue of the fact that their United States roaming partners pay the 23 cents -- and I will get to that in a minute -- the United States roaming partners are the place where the rubber hits the road in terms of the market impact of resale.  In the Roam Like You're Home situation, where Digicel Haiti doesn't get hurt at all, and we will talk about that in a

minute, they do indeed make the 23 cents on every Roam Like You're Home call.  Mr. Boute testified to that.  They allege it in their complaint.  There is no possible ground on this record to dispute that.

They cut us off in the U.S. for one of two reasons, right.  No. 1 is they weren't thinking about it, and their AI said, "Oh, this looks like this is being used for bypass," and didn't even care it was in the U.S. or not.  That's one.  Or No. 2, GR roaming partners will get mad, because the service we are being offering an unlimited service on is being overused.  And the proper market response to that, if it is what they did, is what they did:  You put a limit on the service in order to tie it more to the price they're charging for.

THE COURT:  Although the way I see it, the original problem was the traditional in-country bypass.  They probably did have -- at least they say; I will accept it for now -- they did have problems of poor quality receptions, maybe too many channels being loaded at once, the lack of caller identification, problems for the recipients, things like that, and a smidgen maybe of the Haitian tax regulators also having some concern about some bypass there.  So they developed this habit, and they developed some AI to de-authenticate or deactivate SIM cards.  Then they saw UPM come back a year or two later.  This is in the Roam Like You're Home context.  They said, "Oh, they are back again; let's deactivate them."

And if you are right on the FCC stuff -- and I'm not ready to weigh in on that yet -- but if you are right on this FCC analysis, then they didn't realize there is a distinction between deactivating Roam Like You're Home resale versus the traditional bypass.

MR. SAVAGE:  Right.  And honestly, I think that's probably true, and I think that's why scattered throughout my pleadings are:  Their state of mind doesn't matter.

THE COURT:  And if you are right on all of this point, you are going to win in front of the FCC.  Who knows what a jury would do; who knows what a confused judge would do.  You will win in front of the FCC, if you're right.  And if you're wrong, you will lose in front of the FCC.  That strikes me as a better way to go.

MR. SAVAGE:  So a couple of problems there.  One is justice delayed is justice denied, right.

THE COURT:  Nobody stopped you from two years ago from asking --

MR. SAVAGE:  I may lose in front of you or in front of a jury, but win, lose, or draw, I will know by mid-November where we stand on this.  And if I win, I'm a happy guy, and Mr. Vaughan will appeal.  If I lose, he is a happy guy, and I will appeal, and it will do the thing it is supposed to do.  If we have to go to the FCC --

THE COURT:  Well, you don't have to.

MR. SAVAGE:  If my only option is to go to the FCC --

THE COURT:  On this counterclaim.

MR. SAVAGE:  -- on this counterclaim, that probably won't take another six years, but it might.  The FCC is dreadful at responding to these kinds of things.

THE COURT:  But look what happens here.  Let's say you go to the jury and you win on this counterclaim --

MR. SAVAGE:  Right.

THE COURT:  -- then Mr. Vaughan and Mr. Bressie are going to appeal to the Ninth Circuit.

MR. SAVAGE:  And I think I'll win there.

THE COURT:  All right.  Fine.

MR. SAVAGE:  Honestly, I'm very interested to see what Mr. Bressie says -- and I haven't had a chance to affirmatively argue my Communications Act stuff, which I can either do or wait until rebuttal but --

THE COURT:  All right.  I want to end at five o'clock, so do whatever you want to do.

MR. SAVAGE:  A couple of things.  Going back to what Mr. Vaughan said, back to that conversation, very early on when you were asking him about Mr. Castel and the 400 and blah, blah, blah, and the question was, "Well, what were they talking about?"  And the answer was, "SIM cards."  What they confiscated were the SIM cards that were being shipped back to the U.S.  We got thousands of SIM cards.  We paid thousands of

dollars for SIM cards.  SIM cards are not the limiting factor in terms of making calls.  What's the limiting factor in terms of making calls are radios on the gateways?

THE COURT:  And these are gateways in Haiti itself?

MR. SAVAGE:  That's what I'm talking about now.  It is a looming factor anywhere.  But with respect to Roam Like You're Home, when you have reliable power, reliable Internet, and don't have to ship anything anywhere, we can build as many gateways that we need and make them run, which is why our damages is as crazy as it sounds.  There is no effective physical limit on how we could do that volume of calling, assuming we weren't being blocked.

Putting that aside, back down in Haiti, this claim of 400 is misbegotten if you -- Mr. Castel knows nothing about what we were doing.  That's what I would emphasize.  There is this press report, "Well, it could be 400 calls."  What does that mean?  He assumes that it means 400 radios, but he doesn't know that.  And the fact that some police report says "400 things" is not admissible evidence.  You can take judicial notice of it, but it doesn't mean it's admissible.

THE COURT:  Although it might be an official record. We will talk about that.

MR. SAVAGE:  We will talk about that, if we have to. But the point being, even Mr. Vaughan said that it was SIM cards, not radios.  The way to think of this, in sort of

schematic terms, is you need an array -- you need a big pile of SIM cards to be putting -- authenticating calls coming out of small number of radios.  As the SIM card is authenticating, you throw it out and use a new one.  So the SIM cards get used up, which is why we had to keep buying thousands of them.  And the radios, when they worked, didn't get used up.  There they were, No. 1.

I would note that Mr. Vaughan claims to be an expert on how HBS works, yet he said -- it sounds sensible, and you agreed -- "Well, if you have an HBS, you have to have multiple sites."

THE COURT:  I understand.

MR. SAVAGE:  My sole point on that is, one, that's not even true.

THE COURT:  I know.

MR. SAVAGE:  But two, everything I've said about HBS, they don't know what they're talking about.

THE COURT:  The other thing that is pretty obvious to me too is that Mr. Castel's report and calculations were prepared before my summary judgment ruling --

MR. SAVAGE:  Correct.

THE COURT:  -- that limited everything to just HBS. And now, somehow he says -- he didn't even change his report. He says, "Same stuff applies, and that should be it."  And we will see what the jury thinks about that.

MR. SAVAGE:  Well, I would like to not let the jury --

THE COURT:  I know.

MR. SAVAGE:  Second, just to be very precise, when Mr. Vaughan was reading in French, he stopped reading the title of that French report, because the next word he skipped indicated that it related to the nation of Gabon.  It had nothing to do with Haiti.  So --

MR. VAUGHAN:  I don't speak French.

MR. SAVAGE:  Neither do I, but I could see "Gabon."

THE COURT:  But the legal ruling is c'est la vie.

MR. SAVAGE:  Que sera, sera.

(Laughter.)

MR. VAUGHAN:  Que sera, sera.

(Laughter.)

THE COURT:  That's not French, is it?

MR. SAVAGE:  That's Spanish.  I am expanding our linguistic repertoire here.

Finally, the other point I had left over -- well, the next-to-last point I had left over, those figures about the publicly available figures of impact of bypass on Digicel Haiti, if you look at his numbers and the charts carefully, what he did is he takes his concocted number and then uses that as the numerator and divides it by the publicly reported revenue.  There is no publicly reported revenue --

there is no publicly reported statement by Digicel Group or Digicel Haiti anywhere that quantifies the amount of bypass they experienced.  He made it up the same way he made up the rest of it.

Last but not least, everyone seems to -- it seems not to be questionable, because it's true, that we engage in a lot of arbitrage for calls into Haiti.

THE COURT:  Who did UPM sell to?

MR. SAVAGE:  My computer died, but the answer is, that spreadsheet -- one of the spreadsheets -- what it actually shows is -- it is three spreadsheets.  One is, who is our customer?  During July 2011, we sold to "XYZ Company" -- whatever it was -- so many minutes of calls -- so many minutes and so many calls into Haiti.  You can see it on the spreadsheet.  Then there is the vendor who did we buy from?  Because we are in the resale.  We are arbitrage.

Now, if you think about that for a minute, what that means is, this notion that -- it's simply irrational to presume that we were the sole, biggest, blah, blah, blah, because what are all these people we were buying termination from doing?

So to the extent -- and I have to comment on this a little bit.  They need to decide, I think, and I think, frankly, you have to make them decide that either we have evidence from our business records that is relevant and probative, or we don't.  Because if they want to say, "Their

records are all nonsense, because they're liars and frauds; and therefore, we are going to rely on Mr. Castel," they have no case, because Mr. Castel does not meet the Daubert standard. And if you are inclined not to dismiss the case now, we're going to have a Daubert hearing with Mr. Castel before he ever gets to the jury, because we need have an absolutely clear record as to why everything is wrong. And I don't know when we will do it. As long as it is not next week, I will be okay. But that has to happen.

I lost my train of thought there. I was talking about Mr. -- oh, arbitrage. If they're not going to pay attention to our business records, then they have nothing. But if, as is common, as I think you mentioned in one of your discussions with Mr. Vaughan -- it's common; sure, sometimes; it happens all the time. I've been harmed. I don't know the details. I sue. I get information in discovery. That's what I work with.

I know it's a little out there -- a little levity floating, or at least alluding to Shakespeare. But we told them, "Here are the thousands of SIM cards we bought. Here are the hundreds of thousands of minutes that we completed. Here we are the people we bought from. Here are the people we sold to." We laid it all out there. Mr. Vaughan's premise seems to be, "I can get to the jury by saying, 'No, I don't believe it. It didn't happen. You concocted all of that to create a story

because we caught you.'"

Frankly, from somebody who lost all of their business records from, which they could have generated reasonable estimates, to say that to my client and imply that my client is lying, and, frankly, since I managed the discovery and I did the document review, I try not to take it personally, but it feels personal.  I don't think that's an appropriate basis for them to avoid summary judgment.  "We don't believe you."

THE COURT:  I understand.

MR. SAVAGE:  So I want to emphasize that the only admissible evidence of what we did shows we already paid them.

With that, I'll let it sit.  The only other thing I would say before Mr. Bressie explains why I'm completely wrong is nobody disagrees that carriers are not allowed to resell. Nobody disagrees that resellers are carriers, right.  So somehow the question is:  Is roaming a form of resale?

THE COURT:  Right.

MR. SAVAGE:  And are they doing it?  I think there are two answers as to why the answer has to be yes.  One is the FCC defined "resale" as what roaming is.

As Mr. Vaughan said, there is no relationship between our subscriber and the underlying provider of service.  They pay us, and we pay them.  That's resale.

No. 2, although it does seem like a rabbit hole, when you drill down in what the FCC considered and did in the

Parts 1 and 63 order that we talk about in our papers --

THE COURT:  Although you referred to different ones. Are you referring to the 2007, the 2010, or the 2004?  Because you said the 2007 -- that was the one I spent most of my time reading, and I couldn't find exactly which point you were saying.

MR. SAVAGE:  Maybe I mis-cited it.  Let me put it this way:  I certainly quoted -- the things I quoted -- let me back up for a second.  The FCC does not flat out say -- well, what they say --

THE COURT:  I know how you did it in reverse in the argument, but I didn't even see that portion in the 2007 version.

MR. SAVAGE:  Then I must have mis-cited it.  Trust me, I wasn't making it up.

THE COURT:  Or I misunderstood; I read it and didn't understand what I was reading.

MR. SAVAGE:  So in simple terms -- and I apologize it is so complicated.  But what happened is this:  The FCC realized, in the course of a normal regulatory review:  Hey, United States carriers who had roaming agreements with people overseas were offering Roam Like You're Home to people overseas.

My daughter just went to something in Europe, and she is still on my cell phone plan.  So every day I will get a

notice from Verizon that says:  World traveler, ten bucks a day for unlimited roaming.

So they offer that to their travelers, and the FCC, having had it brought to their attention, said, "You know, this looks like something they need authority to do from us, and their existing authority doesn't include authority to resell service back to the U.S."  And the carriers, understandably, said, "No, no, no.  This is roaming.  Roaming isn't resale.  Roaming is something else."  And what the FCC said is, "Yeah, roaming is something else for purposes of our regulation of the domestic wireless industry.  But this is resale.  This is effectively resale.  It's relevant here and, therefore, we have to authorize that."

THE COURT:  That's what I read in the 2007 version of the order.

MR. SAVAGE:  Okay.

THE COURT:  What that tells me is, therefore, when they engaged in roaming in another country, the FCC says, "We have authority over it."  What I interpret that to mean here is that if Digicel Haiti has these roaming contracts in the U.S., the regulator of communications in Haiti has authority over Digicel Haiti.  That doesn't mean they're engaged in resale in the U.S.

MR. SAVAGE:  I see what's going on.

THE COURT:  Where did I get it wrong?

MR. SAVAGE:  You didn't get it wrong, but neither did I.

The FCC has plenary authority over United States licensed wireless carriers.  Under Title III of the Act, which is what governs all the wireless stuff, they can essentially impose whatever conditions on wireless carriers they want.  So they could say, "As part of your Title III license limitations, to the extent that you, domestic United States wireless carrier, want to offer this service, you have to do it in the following way."  But that's not what they did.  What they said is, "When you sell to one of your customers overseas the service of a call from Germany to the United States, you are reselling the services of whatever physical carrier is authorized to do that inbound international service."  I mean, they didn't care.  "But to dot the I's and cross the T's, it is necessary for us to authorize you to resell the services of these other people."

In other words, they weren't asserting jurisdiction over them because they had plenary jurisdiction over wireless carriers, which they do.  They were asserting jurisdiction over this activity, because it constitutes foreign communication within the meaning of the Act.

So what that means is -- I have no doubt that the Haitian regulator has the authority to tell Digicel Haiti to do whatever it wants to tell them about Roam Like You're Home.

That does not deprive the FCC of authority over the same functions when it happens in the U.S.

THE COURT:  I get your point.

Can we go to Mr. Bressie?

MR. SAVAGE:  Yes.  I think that's it for now.

THE COURT:  Mr. Bressie, you have got five minutes.

MR. BRESSIE:  All right.  Well, there is a lot to address, because I believe UPM has taken a funhouse mirror to the Communications Act --

THE COURT:  No, no.  Let's stop all this.  I'm really tired, by the way, folks, of all this stuff about gas-lighting and other pejoratives and funhouse mirror stuff.  Just give me facts and give me law.  Do not give me any more pejoratives.

MR. BRESSIE:  I'm happy to give you law.  I'm going to start actually by talking about primary jurisdiction.  We are well aware of your statements suggesting that you are not an expert in matters of federal telecom regulations, but given the length of these proceedings, the number of telecom issues that have been presented, and your adjudication of them, that may no longer be the case.

Nevertheless, we think that these regulatory issues are not simply the reasonableness of resale but whether or not there is an offer and how roaming services are treated by the FCC or within the FCC's experience, expertise, and jurisdiction.  So while I believe these issues are

straightforward and the FCC's treatment is clear under the Communications Act, we would support the concept of a primary jurisdiction referral to the FCC.

This is something the parties have to do. We would ask for a stay of the counterclaim and refer the regulatory issues in a vehicle like a petition for declaratory ruling to the FCC. The FCC's Office of General Counsel has noted that it as misnomer to call this a primary jurisdiction overall, because the Court doesn't make the referral. The parties seek permission from the Court to take the issue to the FCC.

THE COURT: Would you put that in a formal motion and file that by the end of this week, please?

MR. BRESSIE: We would be happy to, because we think that would resolve a lot of these issues that we think are clear.

THE COURT: You may remember -- and I don't know if you were with us in the beginning or in the earlier part of this case, I really wanted to bifurcate this and try Digicel Haiti's claim first and then do the Communications Act stuff later. I don't think the same issues belong in the same case in a trial to the same jury.

I'll let you say whatever else you want, but I would like you to file that motion by Friday, please.

MR. SAVAGE: Your Honor, could I have until --

THE COURT: A week from Friday?

MR. SAVAGE:  A week from Friday, I'll still be in the canyon.  Could I have two weeks from Friday?

THE COURT:  Fine.

MR. VAUGHAN:  Your Honor, if we are going to be pushing that, Your Honor -- remember, Judge, I start trial -- I leave for trial tomorrow.

THE COURT:  What are you asking me to do?

MR. VAUGHAN:  The same.  I think you had wanted a week to allow Mr. --

THE COURT:  Oh, I see.  You want Mr. Bressie to have more than one week just to file a two-page motion?  Oh, come on.  Just to file a two-page motion requesting primary jurisdiction or a stay of the Communications Act?  That can't take more than four days.

MR. VAUGHAN:  It is not so much what is required.  Remember, Your Honor, what you are trying to regulate is to give Mr. Savage the time he needs.  If he is not going to be here to be able look at it or deal with it, then the urgency on us is not necessarily the same, I would suggest.

THE COURT:  Who was the one that had COVID that I delayed everything for a while?

MR. VAUGHAN:  Me.

THE COURT:  Okay.  You have had your delay.  I am giving Mr. Savage his vacation delay.

MS. TALCOTT:  Can we have until Monday?

THE COURT:  Yes.

And two weeks from Monday for the response.

Anything further, Mr. Bressie?

MR. BRESSIE:  Yes.  I was just going to note that the relevant question for this Court in the counterclaim is not was Digicel Haiti doing anything in the U.S. market or even were Digicel Haiti's activities in the U.S. market limited to having physical connections with U.S. carriers.  The relevant question is whether or not Digicel Haiti itself -- not its affiliates or other members of the group -- offered a common carrier service to UPM that was subject to Sections 201, 202, and 214 of the Communications Act.  And if so -- and we believe that it did not -- was Digicel Haiti's termination of that service due to misuse and other reasons?  Did that constitute an unreasonable action, an unreasonable discrimination, for purposes of Sections 201 and 202?  We believe those are the questions that should be referred to the FCC for adjudication.

THE COURT:  I look forward to reading that in your brief.

MR. BRESSIE:  We would be happy to.

If I could just note a few points in terms of our view of the law on some of the comments that Mr. Savage has made.  We think the U.S. regulatory regime is clear, given our explanation of the 2007 Parts 1 and 63 order.

We think that the case of Chris's daughter traveling

in Europe is a good one, because the French regulator didn't say in response to Verizon's notice, "We regulate Verizon for offering a service there."  When those messages pop up, that might be from the home carrier.  But if you try to roam and look on your phone, it will tell you whose service you are using to do that.  And there is information within the SIM called IMSI, an International Mobile Subscriber Identity, that is used to track roamers and identify if they're on a home network or on a visiting network.

THE COURT:  Let me ask you, Mr. Bressie, if someone in Haiti sends me a cell phone purchased in Haiti with a Digicel Haiti SIM card, mails it to me out here, and no one subscribed to Roam Like You're Home.  If I turn that phone on here, will I get popped up an advertisement or some message either offering me or encouraging me to subscribe to Roam Like You're Home?

MR. BRESSIE:  Your Honor, that, I don't know in terms of the marketing of that.  But the marketing of various services offered by the Digicel Group and its individual companies, including Digicel Haiti, including the payment arrangements and other financial services, reference whether or not you are in a listed region.  The United States is not a listed region for Digicel and, therefore, subscription from an unlisted region is not vetted.

But if I could just go to Mr. Savage's comment about

that message popping up offering roaming, on that theory, every large foreign mobile carrier in the world has to have a license from the FCC.  In fact, as we referenced --

THE COURT:  I understand that.  I saw that in your brief.

MR. BRESSIE:  None of them do.

THE COURT:  I saw that in your brief.

MR. BRESSIE:  None of them do.  The FCC has never taken an enhancement action against a foreign mobile carrier for offering roaming to its own foreign subscribers, because the regulatory regime that Mr. Savage has described does not exist.  That's not resale.  That is roaming.  So it is clever to argue about --

THE COURT:  Okay.

MR. BRESSIE:  -- trying to obscure with the 2007 decision.  We don't think it is obscure.

THE COURT:  Thank you, Mr. Bressie.

MR. BRESSIE:  The second point, activity beyond a mere physical connection is not sufficient to trigger the licensing obligations in Title II, including Section 214.  As various courts have found, Title I, including Section 152(b), involves the FCC's ancillary jurisdiction.  So even if Digicel Haiti was doing more than having a physical connection, it was not doing something that triggered the licensing obligation.

THE COURT:  I understand.  I read that in your brief

too.

All right.  Can we close out this issue now?  I look forward to reading your filing by Monday.

MR. BRESSIE:  Yes.  I think, given the Court's willingness to entertain a primary jurisdiction referral, we will take pleasure in presenting these issues to the FCC.

THE COURT:  Very good.

MR. VAUGHAN:  Your Honor, I know you're tired.  I know you're --

THE COURT:  If you had any idea how much more work I have to do on other cases before I get on my plane tomorrow morning.  You do not.  But go ahead.

We have been at this argument now for about three hours, counting our break time.  I did originally schedule it for a 90-minute argument.

What must you say right now?

MR. VAUGHAN:  No, Judge.  I think all of that is correct.  I don't think anybody here can ever argue that you don't give us time, and I don't want to take advantage.

THE COURT:  Very good.  Let's schedule a Daubert hearing for Mr. Castel.

What will work for your respective calendars generally, and then I'll look at mine.

MR. SAVAGE:  I'm turning my phone back on.

THE COURT:  Of course.  Other people are more fussy

about those things.  During a jury trial, I would rather your phone not ring, but I don't care when we don't have a jury.

Mr. Vaughan, let me know your availability too, given your trial.

When would you like to propose for a Daubert hearing? I'll tell you our trial begins on November 14th.

MR. VAUGHAN:  Yes.

THE COURT:  We have a pretrial conference October 28th, as you've requested.  I don't care whether the Daubert takes place at, on, or after the pretrial conference. The only time I'll tell you right now that absolutely positively will not work for me is October 31 through November 5.

MR. VAUGHAN:  I do recall our pretrial conference on the 28th is time-limited because of conflicts.  We worked feverishly to try to accommodate our friend on the other side beginning with respect to that request.

THE COURT:  A conflict by me or somebody else.

MS. TALCOTT:  Your Honor, it is my calendar.

MR. VAUGHAN:  It is one of my team, but this is internal negotiations between us.

THE COURT:  As of right now, I'm wide open the entire day October 28th, and I'll be glad to give you the entire day if you want it.  If you don't, fine.  Then tell me what other -- when else you would like me to consider a Castel

Daubert hearing.  The only thing that is just absolutely off the table is October 31 to November 5.

MR. SAVAGE:  Your Honor, if it were up to me -- I don't know what the other schedule is.  I'd prefer it to be before the 28th pre-hearing as compared to after:  I just figure the pre-hearing will be a lot more effective.

THE COURT:  We can talk about everything but that, or we would include that.  We could the morning for the Daubert hearing and the afternoon for the rest.

MR. SAVAGE:  That is fine.  I understand that Ms. Talbot has some issues on the 28th.

THE COURT:  Mary, am I correct, the three trials we have scheduled on the 27th, they are not likely to go, right?

THE CLERK:  I don't know about Smith, but I don't think it will go.

THE COURT:  I don't think it will go either.

So I have a ten o'clock sentencing and nothing else scheduled for that day, the 27th.  If you want, we could do a Daubert hearing on the 27th and pick up with our pretrial conference, as scheduled, at the 10:00 a.m. on the 28th.  Will that work for you all?  Do you want to do that?

MR. SAVAGE:  That's fine with me.

MR. VAUGHAN:  Your Honor, would you mind if we utilize your web to communicate?  I have to ask my co-counsel who isn't sitting here.

THE COURT:  That's fine.  We will even do it off the record.  Let's go off the record.

(Discussion held off the record.)

(Proceedings resumed:)

THE COURT:  Back on the record.

First of all, let me say this:  I would like right now -- let me ask, Mr. Vaughan, what's the time difference between here and Haiti?  Do you know?  Or East Coast and Haiti?

MR. VAUGHAN:  I think they are an hour behind our East Coast time.

THE COURT:  I would assume the best thing for Mr. Castel, if he is going to do this by video conference from Haiti, is our morning in Portland.  So if we look at 11:00 a.m. on the 27th, that would be 2:00 p.m. your time; 3:00 p.m. his time.  Does that look like it is going to make sense?

MR. VAUGHAN:  The Internet says they are three hours ahead of Oregon, so probably the same time as me.

THE COURT:  So 11:00 a.m. Pacific Time; 2:00 p.m. East Coast and Haitian time.  Does that sound reasonable to everybody, subject to Mr. Castel confirming?

MR. VAUGHAN:  Subject to the confirmation.

MR. SAVAGE:  The only comment I'd make -- I have had this issue before.  I don't remember when we in the United States click onto Daylight Savings Time, but that changes it.  During Daylight Savings Time.

MS. DuBAY:  November 6th.

THE COURT:  November 6th?  Then we are fine.  We will all just be an hour late or an hour early for our trial.

So I'll schedule a Daubert hearing for Mr. Castel on November 27th -- sorry, I said "November" -- I meant October 27th at 11:00 a.m. Pacific Time.  Please check with him tomorrow.  If that doesn't work, let my courtroom deputy know, and we will be communicating with each other.  If he wants to come here in person, that's fine with me.  If he wants to appear by video conference, we will make that work too.

MR. VAUGHAN:  I appreciate it.

THE COURT:  All right.  Back to you, Mr. Savage.  We have the pretrial filings for our upcoming trial on Phase I from Digicel Haiti.  When would you like to file your witness list, exhibit list, objections to their witnesses and exhibits, et cetera, et cetera, motions in limine?

MR. VAUGHAN:  That's all due on the -- it was first the 23rd, September 23rd.  I think that has been set.

THE COURT:  Okay.

MR. SAVAGE:  September 23rd is next Friday, and that's when I'm --

THE COURT:  That was for the Phase II stuff.

MR. SAVAGE:  Let me relate what I believe the current schedule is:  On September 30th, we file our Phase II case; September 30th.  We file our Phase II case.  On October 11th,

they respond to our Phase II case.  Then on the 21st, we respond to their response.

THE COURT:  By the way, I'm not going to prejudge anything, but I want to help you and your team focus your time and your efforts.  To use this number of 80 percent, I'm 80 percent towards primary jurisdiction.

MR. SAVAGE:  I was gathering that, Your Honor.  I am saddened, but I understand.

THE COURT:  I know.  This will give you two bites at the apple.

MR. SAVAGE:  But where I was going with that is, to accommodate that, it seems to me that within the current schedule, if we on October 11th file our response to the Phase I stuff, because that way -- we file on the 30th on our Phase II stuff.  They, on the 11th, respond to Phase II, and respond to Phase I, and they can give their final response at the same time.

THE COURT:  Let's take Phase II out of the discussion for a minute.  They have already filed everything on Phase I, right?

MR. VAUGHAN:  And they have already responded.

THE COURT:  So when do you want to file your Phase I second round?

MR. SAVAGE:  October 11th.

THE COURT:  Let's play this out.  You file

October 11.  The way this normally works is then Digicel Haiti files their third round -- really, both sides file a third round of whatever they want to do -- October 18th.  Then the final fourth round, which is pretty minor, just after conferral, let me know what is left, which is October 25th.  Our pretrial conference is now set for October 28th, which only jams me, and I'll live with that.

MR. VAUGHAN:  Your Honor --

THE COURT:  Let's go to Mr. Vaughan.

MR. VAUGHAN:  Judge, I am at a loss.  You were very clear -- and one of the things that I wanted to respond to is you made it crystal clear there will be no new filings, which is why there was no new reports.  When you said that --

THE COURT:  I didn't say there would be no new filings.  That's why you filed all this new stuff a few days ago or last week.

When did I say there would be no new filings?  I said, "You now have my summary judgment report (sic.)."  Frankly, I expected and looked for a new expert report that would be tied to my rulings.  I never said there will be no new filings, did I?

MR. VAUGHAN:  We were not under that expectation, Judge, because that makes a huge difference.  It was clear -- and I thought you said -- and we are looking up the order as to what was allowed.  Again, here we are taking advantage of

your --

THE COURT:  If you want to make new filings -- if there was a misunderstanding, you make your new filings by October 4th.

MR. VAUGHAN:  I'm sorry, Your Honor --

MR. SAVAGE:  Can I interject here?  Your Honor, you were absolutely clear.

THE COURT:  Wait, Mr. Vaughan.

MR. SAVAGE:  On July 26th, we were talking about the various things.  You asked Mr. Vaughan -- this is after denying his motion for reconsideration.  He said, "But wait.  I can reformulate my case to be an HBS case."  And I thought what I thought.  And you said, okay, on August 16th, which got moved to the 22nd, or whenever it got moved to, file your case that presents the case as an HBS case.

THE COURT:  Right.

MR. SAVAGE:  Now, I did not interpret that, and I don't know why Mr. Vaughan did, to be:  Don't file anything new.  He wasn't going to make up new facts, I assumed, but I expected to see something different from the experts.  Then I was worried about do we need to have additional blah, blah, blah, and that sort of stuff.  Indeed, when it was filed, I sent an email saying, "You filed Mr. McEwen under seal.  Is it just the same?"  And I have an email back saying, "No, it's the same as it was before."  And I said, "Okay," and moved on from

there.

        To hear Mr. Vaughan saying at our hearing on July 26th, "I have evidence.  I will reformulate my case to deal with HBS," and then you let him do it -- I have to say the idea that you would let him try again is very troubling, because what's he going to do?  Come up with more expert reports?  Fine.  Then I have to take their deposition again because it is new material?

        You understand my frustration.

        THE COURT:  All right.  Now, we will go to Mr. Vaughan for a response.

        Mr. Vaughan.

        MR. VAUGHAN:  Your Honor, when we had the discussion, what was clear -- and we pointed out that you had even said it before -- was that you expected the witness statements to be done as you have instructed and to be inclusive.  You did not want anything to come in saying, "See deposition transcript." You could refer back to and incorporate the report, but that was it.

        There was no understanding on our part that we had an opportunity to redo the reports.  And when Mr. Savage just said that -- and I don't remember what the Court's response was.  It did come as a surprise, because the witness statements are not "you get to reissue new reports."  If the Court expected a new expert report, that's a different analysis.  That's a different

kettle of fish.

THE COURT:  You told me on March 29th of this year, and I have the transcript at page 35, Docket 379, after I had been saying, "The only allegation of fraud is human behavior software, and it doesn't look to me like that's what you've pled."

I asked you, "So is there anything left for trial?"

Your answer, page 35, line 4:  "I'm not sure, Judge, that, one, I can meet the evidentiary burden to establish that all the damages, as articulated in that interpretation of your order, would be attributable to the use or not of human behavior software, essentially because I don't believe the evidence -- to us -- doesn't show that that's where the damages lie."

And I kind of agreed with you, which is why I thought that trial was off and over and your only remedy was to appeal my ruling.  You then asked if you could have another opportunity to argue why you did have that evidence.  And I said, "Sure."  You also asked for an opportunity to file an interlocutory appeal, and I said that you may ask me for that. You then filed that.  I denied it.  Then I said, "All right. Now it is time to get this case ready for trial for Phase I. File your best stuff, and I want to see if you can now satisfy that standard, and I want to give Mr. Savage an opportunity to argue whether you didn't satisfy it, and that's why we are here

at this hearing."

I mean, when you look at what you filed -- let me pull it up -- exactly on causation and damages. You filed Plaintiff Unigestion Holdings' Supplemental Trial Memorandum on Causation and Damages, 388, exactly as you asked for permission to file, and I said yes.

Okay. You were going to file that, followed by all of your Phase I trial materials, and then we would now have today's hearing, in part, to decide whether or not that's good enough to go to a jury.

Okay. How could you say that you didn't know you could refile stuff and file new reports? All I said is, "Don't give me a new witness statement that simply refers back to another thing in the docket." What I wanted was a standalone witness statement that gives me your best argument for why you think you've got a case on the limited fraud theory of HBS act of concealment.

MR. VAUGHAN: Yes, sir. I do not disagree with anything the Court has said. Judge, the July 26th order, following our discussion, which you just very accurately and in great detail articulated, you ordered that the Court sets an additional briefing schedule as follows: Digicel Haiti's amended Phase I lay and expert witness statements, exhibits, exhibit lists, deposition excerpts in lieu of testimony, legal brief regarding causation and damages, UPM's legal brief

explaining why Communications Act --

THE COURT:  Ignore the Communications Act stuff. That's a different issue.

MR. VAUGHAN:  Your Honor, it says --

THE COURT:  It says, "Lay and amended witness statements."

MR. VAUGHAN:  Yes, sir.  I'm not complaining about that, Judge.  Please do not hear me to say that.  That is clearly understood.  What we just discussed was Mr. Savage said, and it sounded like you agreed, you expected me to file a new expert report.  Do not hear me to complain about witness statement.  We talked about it.  It was crystal clear.  And we did that.  There is nothing in here that said "expert report," and I would have gladly tweaked it or had the expert tweak it -- not me -- if that were the case, because as we talked about it, and as you just articulated, when the case was narrowed, it did put me in a box.  We had a lot of work to do to reconfigure our case within the parameters --

THE COURT:  And that's why you filed in your amended expert report, although I still was surprised that it was mostly conclusions with no explanations, but so be it.

MR. VAUGHAN:  Expert witness statements, sir.  We did not refile a new report.  I did not know I had to leave to go back and reopen the witness expert disclosure deadline.  It is just the statements.  So you just -- I hate leaning on the

Court's grace so often, as it appears.  I don't know why we keep missing it.  But in the order it seemed like you were very clear about what you allowed.  What was not in there, I was not going to take liberty to just do.

MR. SAVAGE:  Your Honor, may I?  The way it seemed to play out to me was:  We brought the case.  We had discovery.  Discovery closed last fall.  Summary judgment, in January, you said was limited to HBS.

Now, putting aside who understood what when, the logic of that is:  Okay.  You have got the data you got in discovery.  You got the expert reports you've got.  Is that enough to make an HBS case?

At the March 29th hearing Mr. Vaughan said, "I don't think so."  In the course of the reconsideration, he said, "But give me another chance."  Indeed, you gave him another chance.  So I think it's entirely appropriate that the expert reports are the same.  I was afraid they would be different and I would have to fight about it.  But I thought what you were saying before was, "Do you have an HBS case based on this record?"

You recall on March 29 you said, "Would UPM be willing to reopen discovery?  No.  We don't want to do that.  We want to go on this record."

When I said, "We need to file something back," in response to what they filed, it was simply this:  Their lay witness statements are different.  They say different things

than they said before.

THE COURT:  Right.

MR. SAVAGE:  There are things that I might want to have a motion in limine about that I couldn't have filed before because I didn't see it.

THE COURT:  Right.

MR. SAVAGE:  So it is one thing to say -- you see what I'm saying.  This should not be an opportunity to reopen discovery.  The factual record going into trial is as it is.  Obviously we don't think they have an HBS case.  But for me to say, "We would like to look at what they filed as their amended witness statements and respond to the amended witness statements as we get ready for trial" doesn't remotely suggest that we ought to reopen the underlying record.

That's my concern.

MR. VAUGHAN:  Your Honor, Mr. Savage is talking out of both sides of his mouth, respectfully.  I know you don't like when we do this.

But, sir, your schedule allowed for Daubert and dispositive motions.  We believe we complied with that deadline, and we filed it.  Mr. Savage did not.  He instead filed a motion in limine, and that's what's pending.  He is now asking for another asking for an opportunity to file a Daubert, which is not contemplated in the schedule.

THE COURT:  He didn't file a motion in limine.  He

filed a motion for judgment as a matter of law, which I'm taking as a summary judgment based on the pre-filing documents. It wasn't a motion in limine. Please be precise.

MR. SAVAGE: And we have a motion in limine pending about Mr. Castel from before that was never ruled on.

MR. VAUGHAN: He filed a motion in limine with respect to the expert witnesses, not a Daubert. That was after the schedule, which permitted Daubert to be filed. We filed ours; he chose not to. Now, Your Honor allowed to us do witness statements.

THE COURT: I thought he did file a long time ago a Daubert motion against Mr. Castel.

MR. SAVAGE: What we said, Your Honor -- we filed a motion in limine and said, "If you are inclined to consider this at all, then we need a Daubert." We raised the Daubert point in our motion in limine.

THE COURT: Right. I remember that. Didn't he say that, Mr. Vaughan?

MR. VAUGHAN: I'm sorry, sir?

THE COURT: Didn't he say that? I remember reading it.

MR. VAUGHAN: He did. He did, Judge. But I think I'm correct in saying he did not file a Daubert motion on the schedule that you set forth. He filed a motion in limine during the motion in limine period. I'm not going to be one to

complain about whether or not you want to allow the parties or you want to give extra time or grace. Don't hear me to say that.

What I'm saying is for him to now complain that we tried to assiduously stick to the schedule by following what your minute order from July 26th specifically said and deem that as some sort of dereliction of our duty, while at the same time he is benefiting from the Court's grace, I think is a little --

THE COURT: What do you want me to do?

MR. VAUGHAN: -- inappropriate.

What I would like for the Court to do is this: If Mr. Savage is -- I don't understand -- and maybe it's just me -- the additional briefing that Mr. Savage is going to be allowed to do. Your Honor just said that it is the third round and second round. I wasn't aware there was going to be second and third rounds.

THE COURT: Then why didn't you read my case management order? The case management order talks about four rounds of briefing in the four weeks before our pretrial conference. You filed yours last week. Now, all we have from Mr. Savage, is a request that his be filed on October 11th because of his vacation schedule.

MR. VAUGHAN: We filed it in August, Your Honor. What we just went through, Your Honor, respectfully, is the

third or fourth round.  You have given us rounds of briefing.

THE COURT:  That was the first round for this new trial date.

MR. VAUGHAN:  I see.

THE COURT:  It is all spelled out in my case management civil trial order.

MS. TALCOTT:  Your Honor, I think there is just a confusion with the word "briefing."  It is the "pretrial filings."

THE COURT:  It is pretrial filings.  Ms. Talcott has been before me before.

She can help you out with this, Mr. Vaughan.

If you want to file something else, Mr. Vaughan, you are welcome to do it by October 4.

MR. VAUGHAN:  If we want to do?

THE COURT:  If you want to file something else by October 4, including an amended expert report, you may do it by October 4.

MR. VAUGHAN:  Thank you, sir.

THE COURT:  Mr. Savage will then file whatever he wants, as my second round of pretrial documents under my case management order, October 11th.

Then there is the third round, as set forth in my pretrial management order, October 18th.

The fourth and final round, which is really is not

very much.  It's just you all confer with each other.  Tell me where you agree.  My best guess is that you won't agree on anything, but don't call each other more names.

That will be due on October 25th.  Then we will talk on October 27th at 11:00 a.m. with Mr. Castel.  We will continue with our final pretrial conference on October 28th, and trial begins on November 14th.

At some point before November 14th, I will give you my draft voir dire script, preliminary jury instructions, tentative final jury instructions, verdict form.  And as I have said, I'm about 80 percent there on the primary jurisdiction, so we're only going to be trying the Phase I issues, like I wanted to do a few months ago.

MR. SAVAGE:  One final little point, Your Honor.  Not knowing what they are going to file on the 4th, I can imagine a world in which what they filed in an expert report is sufficiently different from anything I have seen before that some form of additional discovery from their experts will be necessary, in fairness to understand what they are saying.

THE COURT:  Yes.

MR. SAVAGE:  I don't know how we will do that.

THE COURT:  We are not going to reopen fact discovery.  I'm not going to let you go into what types of marketing they did of Roam Like You're Home.  But if you need to redepose their expert, you're welcome to do it.  But here is

the other option:  Just do it in the Daubert hearing.  That's probably the most efficient way to do it.

MR. SAVAGE:  I think that will probably work for Mr. Castel.  I know that all of my pleadings are burned into your memory, but you may recall that our motion in limine with respect to Mr. McEwen is of a different nature.

THE COURT:  I really don't remember that.

MR. SAVAGE:  We have a great deal of difficulty with Mr. Castel.

With regard to Mr. McEwen, he is clearly an expert in a lot of things.  It's just that I think there was some -- there are sufficiently significant limitations to his underlying facts.  My concern is if he somehow comes forward with additional underlying facts, I don't know that we will need Daubert on him, but I may need additional discovery of him.

THE COURT:  Fair enough.  We will see if there is anything new on McEwen.  I mean, there is a lot that Mr. McEwen talks about that I'm not going to allow.

MR. SAVAGE:  Fair enough.

THE COURT:  All right.

At the risk of saying, "Is there anything else we must talk about this afternoon" --

MR. SAVAGE:  Yes, Your Honor -- no.

THE COURT:  All right.  I look forward to seeing you

all on October 27th.  We will bring this case to resolution. The jury will do what the jury does, and most likely the FCC will do what the FCC does.

MR. VAUGHAN:  The only thing I regret, Judge, is that I'm not there in court.  At some point in time we have got to remedy this.  I may just have to move to Portland.

THE COURT:  Do you plan on being here for trial?

(Laughter.)

MR. VAUGHAN:  Yes.

THE COURT:  Okay.  Some of my colleagues speak very highly of Zoom trials; some of my colleagues do not.  I have never done one with a jury.  I have done some bench ones.  I don't want to do one with a jury, and this one will not be a Zoom trial with a jury.  Although that said, if you do have specific witnesses, and it is appropriate, especially if there is no serious objection, I'm fine with having a few witnesses here and there testify by Zoom.  If they are truly important witnesses, and there's an objection, we will have to talk.  But if somebody wants a witness to testify to the jury by Zoom, especially if there is no objection, that's fine with me.

But I have never had one with trial lawyers by Zoom, and I don't want to start now.

Let's go off the record.  We are done with this hearing.

(End of proceedings.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca                    September 26, 2022
DENNIS W. APODACA, RDR, RMR, FCRR, CRR              DATE
Official Court Reporter

MR. BRESSIE: [22]  4/15 62/9 62/18 62/22 63/4 63/16 63/21 64/1 64/8 69/14 69/16 99/6 99/13 100/12 102/3 102/19 103/16 104/5 104/7 104/14 104/17 105/3
MR. SAVAGE: [76]  4/4 4/23 7/12 9/20 74/4 74/9 77/22 78/23 81/13 83/11 83/13 84/8 84/11 84/14 85/1 85/6 85/9 85/11 86/4 86/9 86/11 88/5 88/14 88/18 88/25 89/2 89/7 89/10 89/12 89/18 90/4 90/22 91/12 91/15 91/20 91/25 92/3 92/9 92/11 92/16 93/8 95/9 95/17 96/6 96/13 96/17 97/15 97/23 97/25 99/4 100/23 100/25 105/23 107/2 107/9 107/21 108/21 109/19 109/22 110/6 110/10 110/23 112/5 112/8 112/16 117/4 118/2 118/6 119/3 119/12 122/13 122/20 123/2 123/7 123/19 123/23
MR. VAUGHAN: [224]
MS. DuBAY: [2]  4/25 108/25
MS. TALCOTT: [4]  4/18 101/24 106/18 121/6
MS. VAN ZILE: [1]  5/2
THE CLERK: [1]  107/13
THE COURT REPORTER: [1]  72/22
THE COURT: [317]

## $

$2,000 [1]  47/12
$20 [4]  48/12 48/15 64/19 66/18
$20 million [2]  48/12 48/15
$22 [1]  48/6
$22 million [1]  48/6
$25 [2]  64/19 79/3
$3 [1]  62/4
$37 [4]  9/13 9/25 21/13 34/12
$37 million [1]  9/13
$5 [1]  62/4
$5 million [1]  62/4
$50 [4]  9/13 9/25 21/14 34/13
$50 million [4]  9/13 9/25 21/14 34/13

## '

'12 [1]  18/15
'No [1]  94/24
'This [1]  82/24

## -

--oOo [1]  125/2

## /

/s [1]  125/9

## 1

1,440 [1]  26/24
1.86 million [1]  12/3
10 [4]  21/6 23/5 39/8 59/18
100 [3]  15/1 27/11 41/17
100 percent [1]  27/12
100,000 [1]  46/8
1000 [1]  2/23
104 [1]  23/7
104-10 [1]  23/5
10:00 a.m [1]  107/20
11 [2]  39/5 111/1
115 [1]  53/9
11:00 [2]  108/18 109/6
11:00 a.m [2]  108/13 122/5
11th [6]  109/25 110/13 110/15 110/24 120/22 121/22
12 [2]  6/2 6/4
12-month [4]  17/2 18/2 18/6 18/15
121 [1]  2/17
1211 [1]  2/11
13 [2]  6/3 6/9
1301 [1]  2/14
14 [12]  1/7 4/1 12/1 25/23 26/1 26/1 26/13 27/1 29/20 33/11 34/10 36/23
14-hour [1]  27/4
14th [3]  106/6 122/7 122/8
15 [6]  9/8 9/10 9/10 21/6 24/3 72/23
152 [1]  104/21
16 [7]  12/20 12/22 12/24 13/1 16/22 20/12 20/25
168 [2]  15/18 15/25
16th [1]  112/13
17th [1]  2/5
18 [1]  59/21
185 [1]  4/8
1850 [1]  2/17
18th [2]  111/3 121/24
19 [2]  59/20 60/1
1900 [1]  2/11
1919 [1]  2/8

## 2

20 [5]  12/7 21/16 36/24 41/20 42/4
20 percent [4]  42/3 42/5 43/15 43/15
20,000 [2]  46/20 46/20
20-month [2]  18/5 21/1
200,000 [2]  46/23 47/10
20005 [1]  2/15
20036 [1]  2/8
2004 [1]  96/3
2007 [6]  96/3 96/4 96/12 97/14 102/24 104/15
2009 [1]  53/6
201 [19]  62/21 63/2 63/10 63/15 63/22 64/4 73/11 74/11 74/12 74/19 74/24 75/11 75/23 76/4 81/21 84/17 84/20 102/11 102/16
2010 [1]  96/3
2011 [8]  17/2 18/15 53/22 54/11 54/20 55/6 59/7 93/12
2012 [2]  17/2 17/16
2013 [12]  8/14 17/3 17/3 17/18 18/17 18/20 18/20 18/21 19/2 19/2 47/24 48/1
2014 [12]  17/4 17/4 18/16 18/24 18/24 44/2 53/22 54/11 54/20 55/6 59/7 60/17
2015 [3]  8/14 47/24 48/1
2016 [1]  83/16
202 [13]  62/21 63/3 63/10 63/15 63/18 63/19 64/4 73/12 74/11 74/20 75/19 102/11 102/16
2022 [3]  1/7 4/1 125/9
207 [1]  83/20
208 [1]  83/20
21 [2]  19/14 19/21
21-month [1]  19/19
21.9 [1]  48/6
214 [2]  102/11 104/20
21st [1]  110/1
22 [7]  6/4 9/10 12/7 18/12 19/6 19/22 21/16
22-month [6]  18/10 18/11 18/18 19/7 19/12 19/24
22.1 [1]  48/6
22nd [1]  112/14
23 [10]  6/3 10/21 19/15 34/11 64/23 65/5 66/24 67/6 86/21 87/1
23-cent [1]  82/24
23-cent-a-minute [2]  66/1 82/13
237 [4]  20/4 20/6 20/15 20/19
23rd [2]  109/18 109/18
24 [2]  26/15 26/22
24-hour [1]  26/24
25 [1]  15/20
25,200 [1]  33/16

**25th [2]** 111/5 122/4
**26 [2]** 19/15 125/9
**26th [2]** 112/9 113/3
**26th specifically [1]** 120/6
**27 [5]** 12/7 17/24 18/3 21/16 36/24
**27-month [1]** 21/1
**27th [5]** 107/13 107/18 108/14 109/5 124/1
**27th and [1]** 107/19
**28th [6]** 106/9 106/23 107/11 107/20 111/6 122/6
**28th is [1]** 106/15
**28th pre-hearing [1]** 107/5
**29 [1]** 117/20
**2:00 [1]** 108/18
**2:00 p.m [1]** 108/14

**3**

**30 [2]** 33/14 41/20
**30 percent [1]** 43/18
**30-day [3]** 26/24 33/16 33/17
**300 [1]** 2/5
**3000 [2]** 46/7 46/8
**301 [1]** 2/23
**30th [2]** 109/24 109/25
**30th on [1]** 110/14
**31 [2]** 106/12 107/2
**312 [1]** 2/5
**315 [3]** 43/24 43/25 44/1
**320 [3]** 12/1 25/23 33/10
**326-8182 [1]** 2/24
**33316 [1]** 2/5
**35 [2]** 114/3 114/8
**379 [1]** 114/3
**388 [1]** 115/5
**390 [2]** 28/9 60/9
**391 [8]** 35/13 35/22 35/24 35/24 38/10 38/12 38/13 38/15
**391-1 [3]** 5/21 6/3 59/16
**392-1 [2]** 28/17 35/20
**394 [1]** 52/21
**3:00 p.m [1]** 108/14
**3:15-cv-00185-SI [1]** 1/5

**4**

**4.2 [3]** 48/3 48/5 48/6
**4.6 [1]** 48/7
**4.6 of [1]** 48/7
**4.6 percent [2]** 48/4 48/5
**40 [1]** 41/20
**40 percent [1]** 43/17
**400 [22]** 11/25 12/1 21/21 24/8 24/10 24/16 24/18 24/19 25/13 25/19 25/19 27/10 34/9 36/14 36/15 83/1 83/2 89/21 90/14 90/16 90/17 90/18
**400-call [1]** 36/6
**402 [1]** 53/9
**415-4 [3]** 57/1 57/2 57/4
**415-9D [1]** 71/14
**415-9I [1]** 71/14
**43,200 [1]** 33/17
**477 [1]** 48/7
**477 million [1]** 48/1
**4th [2]** 112/4 122/15

**5**

**50 [1]** 41/20
**50 miles [1]** 76/6
**50,000 [1]** 47/11
**500 [2]** 2/14 83/1

**503 [1]** 2/24
**51-pager [1]** 20/8
**527 [1]** 48/7
**527 million [1]** 48/1
**577 [1]** 48/7

**6**

**60 percent [1]** 43/15
**63 [2]** 96/1 102/24
**6th [2]** 109/1 109/2

**7**

**7-month [1]** 18/2
**70 [1]** 41/20
**71-1 [1]** 7/3
**77 [2]** 23/6 23/14
**77-1 [1]** 23/4

**8**

**8-month [3]** 18/2 18/6 18/16
**8.06 million [1]** 12/4
**8.1 [1]** 6/6
**80 [5]** 12/1 25/18 28/2 40/12 42/3
**80 percent [39]** 12/11 25/19 25/22 26/8 27/6 27/8 27/14 27/22 28/1 28/6 28/18 28/20 29/1 34/10 35/1 35/25 36/7 36/10 36/17 36/23 38/17 39/2 39/4 40/9 40/15 40/23 41/1 41/2 41/7 41/8 41/13 41/19 42/7 42/17 43/7 44/15 110/5 110/6 122/11
**800 [1]** 2/8
**8182 [1]** 2/24

**9**

**9 percent [1]** 49/4
**90-minute [1]** 105/15
**91 [2]** 23/5 23/8
**97204 [3]** 2/11 2/18 2/23
**9D [1]** 71/14
**9I [1]** 71/14

**A**

**a.m [5]** 107/20 108/13 108/18 109/6 122/5
**abiding [1]** 55/1
**ability [5]** 32/9 60/13 71/11 71/18 81/24
**able [12]** 11/25 15/22 21/21 24/8 31/23 32/20 42/9 46/25 52/7 76/14 79/19 101/18
**about [117]** 8/2 8/23 13/3 13/19 18/20 23/10 28/21 30/16 30/17 30/17 31/14 32/18 35/1 35/8 36/3 38/16 38/23 39/1 39/2 39/4 39/14 40/14 40/15 40/23 44/3 44/5 44/7 44/23 47/1 53/12 53/19 57/15 59/14 59/22 60/2 60/3 60/9 60/10 60/15 60/20 61/2 61/6 62/6 62/11 62/11 64/14 64/21 65/4 68/5 70/3 71/14 73/19 73/21 73/23 75/4 76/1 76/13 76/20 78/22 80/4 80/23 80/24 81/10 81/16 81/17 81/25 82/6 82/10 82/12 82/16 83/22 83/25 84/1 85/18 85/19 86/7 86/14 86/25 87/6 87/21 89/21 89/23 90/5 90/14 90/22 90/23 91/16 91/17 91/25 92/20 93/17 94/11 96/1 98/25 99/11 99/15 103/25 104/13 105/13 106/1 107/7 107/14 112/9 112/21 116/7 116/11 116/12 116/16 117/3 117/18 118/4 119/5 120/1 120/19 122/11 123/19 123/23
**above [1]** 125/6
**above-entitled [1]** 125/6
**abroad [1]** 24/16
**absence [1]** 51/25
**absolute [2]** 33/20 33/21
**absolutely [7]** 43/22 58/12 83/12 94/6 106/11 107/1 112/7
**accept [2]** 16/13 87/16
**acceptance [2]** 55/25 56/20
**accepting [1]** 55/1
**access [2]** 43/3 60/13

**accessible [1]** 77/13
**accommodate [4]** 24/15 43/11 106/16 110/12
**accommodated [3]** 43/16 43/17 43/18
**accomplish [2]** 11/12 32/15
**According [1]** 32/16
**account [3]** 13/15 71/19 79/4
**accounts [1]** 72/2
**accurate [1]** 49/11
**accurately [1]** 115/20
**achieve [1]** 32/20
**achieved [2]** 32/22 33/24
**acknowledges [1]** 53/15
**act [32]** 30/6 30/10 30/12 30/15 31/6 31/11 31/20 52/16 58/17 58/24 59/12 61/6 61/16 62/9 73/16 74/2 77/1 77/8 80/5 80/10 85/17 89/15 98/4 98/22 99/9 100/2 100/19 101/13 102/12 115/16 116/1 116/2
**acted [1]** 81/23
**action [3]** 73/10 102/15 104/9
**actions [3]** 62/21 63/9 63/14
**active [1]** 27/2
**actively [1]** 77/16
**activities [8]** 9/4 10/3 28/4 61/20 62/5 73/22 76/14 102/7
**activity [5]** 17/11 17/21 73/8 98/21 104/18
**actual [3]** 23/15 37/22 69/17
**actuality [1]** 43/14
**actually [8]** 26/21 32/22 34/5 45/10 74/16 78/16 93/10 99/15
**ad [1]** 6/25
**add [1]** 56/19
**adding [1]** 55/7
**addition [4]** 6/25 7/6 30/5 66/6
**additional [7]** 54/20 112/21 115/22 120/14 122/18 123/14 123/15
**address [3]** 62/6 77/2 99/8
**addressed [2]** 23/23 63/11
**adequate [1]** 42/22
**adjudicate [2]** 85/15 85/15
**adjudicating [1]** 63/9
**adjudication [2]** 99/19 102/17
**admissible [3]** 90/19 90/20 95/11
**admission [1]** 14/21
**admit [3]** 38/1 38/2 56/6
**admitting [1]** 46/24
**advantage [2]** 105/19 111/25
**advertisement [1]** 103/14
**affiliates [1]** 102/9
**affirmative [3]** 30/10 31/6 77/1
**affirmatively [1]** 89/15
**afraid [1]** 117/17
**after [12]** 6/14 44/9 47/3 53/10 53/11 74/9 106/10 107/5 111/4 112/10 114/3 119/7
**afternoon [9]** 4/4 4/5 4/6 4/10 4/16 4/18 4/19 107/9 123/23
**afterwards [1]** 5/7
**again [14]** 13/6 13/24 16/18 19/16 40/21 63/17 75/14 76/24 78/20 85/7 87/25 111/25 113/5 113/7
**against [5]** 30/1 30/14 83/18 104/9 119/12
**aggressive [5]** 18/21 19/1 41/25 50/25 51/14
**aggressively [1]** 55/15
**ago [8]** 11/18 27/23 29/19 80/23 88/17 111/16 119/11 122/13
**agree [18]** 16/16 31/9 33/19 33/21 42/2 54/12 54/17 54/22 55/1 57/12 57/18 78/17 84/25 85/2 85/3 86/12 122/2 122/2
**agreed [4]** 76/25 91/10 114/15 116/10
**agreement [8]** 54/1 56/2 65/12 71/12 71/14 71/15 71/17 71/18
**agreements [1]** 96/21

**ah [1]** 67/14
**ahead [8]** 19/8 29/14 37/16 62/2 62/18 69/14 105/12 108/17
**AI [2]** 87/6 87/22
**al [2]** 1/8 4/8
**aligning [1]** 77/6
**alike [1]** 75/1
**all [105]** 4/22 5/4 5/5 5/5 7/18 8/6 8/18 9/7 9/17 9/23 10/13 12/8 12/15 15/2 15/12 16/15 16/19 16/21 16/25 17/22 18/1 20/1 20/7 20/11 22/16 25/17 26/16 29/5 29/11 29/14 30/14 32/21 33/4 34/15 34/24 35/15 35/20 35/23 36/7 41/18 41/18 42/9 42/12 43/11 44/17 46/24 46/25 47/3 50/10 52/9 56/7 56/8 58/16 63/24 64/13 65/6 66/15 72/18 72/20 72/20 72/24 73/15 74/1 74/19 75/1 75/17 77/19 78/1 82/6 86/2 86/25 88/9 89/12 89/17 93/20 94/1 94/15 94/23 94/25 95/2 98/5 99/7 99/10 99/11 105/2 105/17 107/21 108/6 109/3 109/12 109/17 111/15 113/10 114/10 114/21 115/7 115/12 119/15 120/21 121/5 122/1 123/4 123/21 123/25 124/1
**allegation [2]** 32/9 114/4
**allegations [1]** 32/16
**allege [1]** 87/2
**alleged [2]** 17/10 59/15
**alleges [1]** 15/20
**Allen [1]** 23/24
**allocation [1]** 40/1
**allow [4]** 4/13 101/9 120/1 123/19
**allowed [7]** 75/8 95/14 111/25 117/3 118/19 119/9 120/15
**alluding [1]** 94/19
**almost [1]** 47/14
**along [1]** 56/9
**already [5]** 12/14 31/13 95/11 110/19 110/21
**also [29]** 4/20 11/2 11/18 13/2 18/5 20/3 20/17 36/9 37/13 37/17 38/23 39/1 48/3 48/8 48/12 48/14 53/15 58/13 65/25 68/18 69/6 70/8 75/21 77/3 77/12 85/16 86/8 87/20 114/19
**alternative [5]** 18/19 19/1 19/1 30/3 45/25
**although [7]** 32/18 87/14 90/21 95/24 96/2 116/20 124/14
**always [1]** 63/11
**am [28]** 4/17 8/3 8/10 16/24 21/23 22/6 26/23 31/2 39/3 41/10 46/3 49/16 50/24 52/1 56/11 67/11 73/2 77/9 78/12 81/2 83/5 83/9 84/19 92/17 101/23 107/12 110/7 111/10
**amended [7]** 35/12 115/23 116/5 116/19 118/11 118/12 121/17
**among [2]** 40/1 60/24
**Amortization [1]** 48/11
**amount [6]** 30/2 49/3 68/9 75/12 81/25 93/2
**analogous [2]** 45/21 47/14
**analogy [4]** 46/4 76/7 78/9 80/19
**analysis [26]** 11/2 11/3 11/6 11/8 11/18 12/8 26/21 26/22 29/21 30/7 36/6 37/18 37/19 37/20 47/21 48/16 49/1 49/15 50/21 51/10 51/17 51/17 51/19 64/7 88/3 113/25
**ancillary [1]** 104/22
**and it [1]** 22/14
**and/or [1]** 12/18
**Angeles [2]** 69/7 70/20
**Anisha [2]** 2/4 4/11
**Anne [2]** 2/10 4/20
**Anne Talcott [1]** 4/20
**another [12]** 7/6 38/4 59/22 70/9 77/6 89/4 97/18 114/17 115/14 117/15 117/15 118/23
**answer [50]** 6/23 7/7 9/2 10/5 10/6 10/9 10/9 10/22 11/16 14/18 15/24 18/14 19/9 19/12 20/2 22/4 25/12 34/18 48/23 49/6 49/19 51/1 52/24 54/3 54/5 54/8 55/2 55/4 57/20 58/21 63/15 64/7 68/19 69/20 69/22 69/25 71/2 71/3 71/9 75/7 75/21 76/11 76/11 76/11 80/21 80/23 89/23 93/9 95/19 114/8
**answer is [1]** 10/9
**answers [5]** 5/10 11/15 24/17 25/6 95/19

**anti [4]** 6/11 28/4 32/12 75/19
**anti-bypass [3]** 6/11 28/4 32/12
**anti-discrimination [1]** 75/19
**antifraud [1]** 6/14
**antitrust [2]** 81/9 85/17
**any [52]** 5/16 13/20 14/14 15/7 16/3 17/5 19/11 19/18 19/18 21/2 22/25 24/18 26/19 27/22 28/24 28/25 28/25 28/25 32/21 33/10 34/15 36/9 40/15 40/23 42/11 42/25 42/25 44/10 48/25 49/7 49/8 49/15 50/15 53/25 54/14 54/16 58/22 63/19 65/18 70/1 70/19 70/25 71/23 72/1 73/8 73/22 73/24 83/14 84/5 84/21 99/13 105/10
**anybody [3]** 70/11 77/14 105/18
**anyone [3]** 69/23 79/11 80/18
**anything [20]** 5/7 26/7 34/25 41/1 56/17 57/18 62/8 74/8 90/8 102/3 102/6 110/4 112/18 113/17 114/7 115/19 122/3 122/17 123/18 123/22
**anyway [1]** 59/2
**anywhere [6]** 10/17 40/8 57/23 90/6 90/8 93/2
**Apodaca [3]** 2/22 125/9 125/10
**apologies [1]** 38/24
**apologize [6]** 15/23 40/13 40/17 40/20 51/6 96/18
**apparent [1]** 37/24
**appeal [5]** 88/22 88/23 89/10 114/16 114/20
**appear [1]** 109/10
**appearance [2]** 4/9 4/23
**APPEARANCES [1]** 2/1
**appearing [1]** 4/12
**appears [7]** 24/13 47/14 47/15 68/17 68/18 68/19 117/1
**apple [1]** 110/10
**apples [4]** 32/17 33/3 33/4 33/4
**applied [1]** 63/5
**applies [4]** 64/7 73/11 76/5 91/24
**apply [3]** 74/24 75/20 84/23
**appreciate [8]** 5/11 5/18 7/17 20/4 46/4 47/2 54/9 109/11
**appropriate [5]** 40/24 63/10 95/7 117/16 124/15
**approximate [3]** 12/6 37/7 49/3
**approximated [1]** 37/25
**approximately [3]** 14/15 36/23 48/5
**approximates [3]** 47/8 48/12 48/15
**approximation [11]** 11/13 12/12 14/19 15/5 20/3 37/11 41/8 43/6 43/12 47/22 48/13
**arbitrage [4]** 68/25 93/7 93/16 94/11
**arbitraged [1]** 68/22
**are [166]**
**argue [6]** 73/16 89/15 104/13 105/18 114/18 114/25
**arguing [1]** 81/23
**argument [5]** 62/20 96/12 105/13 105/15 115/15
**argumentative [1]** 5/11
**around [3]** 48/11 48/12 83/17
**arrangements [2]** 60/16 103/21
**array [1]** 91/1
**article [1]** 78/20
**articulate [1]** 14/5
**articulated [8]** 10/17 18/20 27/3 42/25 56/22 114/10 115/21 116/16
**articulating [2]** 16/19 23/19
**articulation [1]** 21/11
**artificial [1]** 28/5
**as [108]** 1/4 1/7 4/13 7/20 7/22 7/22 8/9 8/9 8/15 10/8 12/14 15/4 15/6 19/13 19/20 19/25 22/25 23/3 23/4 24/22 27/3 27/14 27/20 27/21 27/23 27/23 31/11 31/14 31/21 31/21 32/21 34/6 34/6 34/23 37/8 37/21 37/25 38/6 39/8 40/11 42/24 43/15 48/9 48/18 49/22 52/20 58/24 65/12 66/8 66/23 67/1 69/17 69/24 71/25 72/11 72/17 79/1 79/19 80/5 80/20 81/22 82/9 82/14 86/8 86/9 88/14 90/8 90/10 90/10 91/3 92/24 94/7 94/8 94/8 94/13 94/13 95/19 95/20 95/21

**aside [5]** 10/1 54/19 77/19 90/13 117/9
**ask [21]** 10/24 17/13 19/16 22/18 26/6 29/24 38/4 40/20 52/12 53/12 53/20 53/21 57/15 58/22 59/13 68/11 100/5 103/10 107/24 108/7 114/20
**asked [21]** 6/22 10/7 13/25 17/9 17/20 19/3 19/24 23/17 27/17 37/13 46/16 48/17 50/22 71/16 73/23 82/16 112/10 114/7 114/17 114/19 115/5
**asking [15]** 6/20 13/25 15/3 20/15 29/25 67/19 67/19 75/18 85/14 85/15 88/18 89/21 101/7 118/23 118/23
**asks [1]** 73/19
**aspect [2]** 79/22 80/2
**aspects [1]** 39/16
**assert [1]** 84/5
**asserting [2]** 98/18 98/20
**assessment [1]** 49/10
**assiduously [1]** 120/5
**assume [20]** 17/9 18/6 26/1 27/17 31/1 32/3 34/8 34/8 34/9 40/16 40/18 40/22 41/1 41/25 42/3 42/9 46/6 62/17 67/8 108/11
**assumed [3]** 33/5 42/15 112/19
**assumes [2]** 18/5 90/17
**assuming [6]** 36/6 41/5 41/7 41/11 62/20 90/12
**assumption [30]** 19/3 19/13 19/24 21/19 24/3 25/18 25/24 26/8 26/13 26/25 27/4 27/8 31/5 31/7 31/25 33/8 33/9 33/18 34/16 36/10 36/17 36/22 39/13 40/9 41/16 42/3 43/1 73/19 80/7 80/12
**assumptions [9]** 17/21 21/17 21/17 30/21 36/6 36/8 36/12 36/12 39/16
**astray [2]** 40/13 75/22
**Atchanah [2]** 2/4 4/11
**attach [1]** 52/20
**attacking [1]** 51/20
**attention [2]** 94/12 97/4
**attorney [1]** 83/15
**attorney-client [1]** 83/15
**attributable [2]** 22/17 114/11
**au [2]** 51/8 72/7
**Augter [1]** 7/10
**August [4]** 17/2 18/23 112/13 120/24
**August 16th [1]** 112/13
**August 2011 [1]** 17/2
**authenticate [1]** 87/22
**authenticating [2]** 91/2 91/3
**authorities [1]** 61/2
**authority [13]** 57/24 58/3 58/6 58/11 73/14 97/5 97/6 97/6 97/19 97/21 98/3 98/24 99/1
**authorize [2]** 97/13 98/16
**authorized [1]** 98/14
**availability [1]** 106/3
**available [5]** 47/24 48/2 48/23 72/12 92/21
**Avenue [2]** 2/11 2/23
**average [1]** 36/24
**avoid [3]** 8/19 41/6 95/8
**aware [3]** 53/15 99/16 120/16
**away [3]** 66/17 66/20 76/23
**awful [4]** 31/23 31/24 32/6 74/13

**B**

**B-O-U-T-E [1]** 60/6
**back [38]** 7/2 16/22 17/18 20/25 21/6 24/5 38/3 53/6 65/16 65/21 67/22 68/12 69/9 69/11 70/23 72/3 78/14 79/20 80/23 81/18 82/23 83/15 87/23 87/25 89/19 89/20 89/24 90/13 96/9 97/7 105/24 108/5 109/12 112/24 113/18 115/13

**B**

back... [2] 116/24 117/23
back-end [1] 65/21
bad [3] 66/12 74/13 82/10
bag [1] 46/15
bah [4] 79/2 79/2 79/2 79/3
Baltazar [2] 23/23 23/24
banks [2] 28/21 35/16
bar [3] 77/15 78/2 78/3
bars [3] 77/11 77/12 77/15
barters [1] 65/21
based [19] 10/19 14/24 17/9 17/18 18/22 18/23 21/16
 27/17 30/6 39/14 39/16 39/20 43/23 46/11 79/6 83/18 85/22
 117/19 119/2
baseline [1] 27/3
basic [2] 16/25 83/6
basically [2] 74/15 76/18
basis [5] 42/22 42/24 57/16 73/9 95/7
bastardizing [1] 25/14
be [140]
bear [2] 11/25 63/22
became [1] 6/12
because [84] 8/13 10/6 13/6 14/7 22/24 26/5 29/25 30/12
 30/19 30/22 31/12 33/3 36/25 38/4 38/21 41/11 41/16 41/21
 42/5 43/1 45/7 46/14 46/19 46/25 48/6 48/23 51/18 51/24
 55/5 56/4 60/21 61/2 61/15 62/12 67/5 68/19 69/12 75/1
 75/4 75/14 75/22 76/4 77/4 78/15 78/16 78/21 79/25 81/19
 82/14 82/17 82/20 84/23 85/14 85/23 86/2 86/18 87/9 92/6
 93/6 93/16 93/19 93/25 94/1 94/3 94/6 95/1 96/3 98/19
 98/21 99/8 100/9 100/13 103/1 104/10 106/15 110/14
 111/23 113/6 113/8 113/23 114/12 116/15 118/5 120/23
become [1] 72/8
becomes [2] 37/23 43/5
been [36] 6/13 12/14 14/13 16/10 19/14 19/15 19/15 24/13
 31/22 32/20 33/19 33/25 45/3 45/4 46/12 46/14 46/17 46/17
 46/18 47/9 48/19 53/2 56/7 56/7 56/8 58/8 58/9 63/5 83/11
 83/19 94/15 99/19 105/13 109/18 114/4 121/11
before [24] 1/17 29/3 40/25 48/10 58/21 65/1 83/11 91/20
 94/5 95/13 105/11 107/5 108/23 112/25 113/15 117/19
 118/1 118/4 119/5 120/20 121/11 121/11 122/8 122/17
begin [3] 5/14 36/12 36/12
beginning [4] 34/20 56/11 100/17 106/17
begins [2] 106/6 122/7
behalf [1] 4/12
behavior [9] 26/12 74/13 74/20 74/20 74/23 78/19 79/6
 114/4 114/12
behind [1] 108/9
behold [2] 47/7 50/12
being [43] 8/16 8/17 14/1 14/3 16/19 22/8 25/9 25/10 25/11
 26/14 26/14 27/2 27/19 34/5 34/10 37/2 37/5 37/18 37/20
 40/12 41/16 42/15 44/11 50/21 50/22 54/19 54/20 57/22
 69/24 71/18 76/21 78/3 79/17 80/5 84/1 87/7 87/10 87/10
 87/18 89/24 90/12 90/24 124/7
believe [32] 7/3 7/21 12/3 15/8 15/10 17/16 25/1 25/12
 27/4 30/12 31/5 31/7 31/22 33/25 34/4 44/15 46/22 51/23
 62/14 76/9 76/15 78/25 83/20 94/24 95/8 99/8 99/25 102/12
 102/16 109/23 114/12 118/20
believed [1] 61/10
believes [5] 10/3 10/8 10/21 32/22 46/16
belong [1] 100/20
below [1] 125/4
Ben [1] 23/24
bench [2] 59/2 124/12
benefiting [1] 120/8
benefits [2] 28/21 35/16
besides [1] 6/18
best [4] 108/11 114/23 115/15 122/2

better [2] 42/3 88/14
between [20] 8/12 20/16 20/19 24/12 34/12 40/2 44/2 48/3
 53/22 55/6 58/15 60/16 76/19 77/6 78/18 79/18 88/4 95/21
 106/21 108/8
beyond [2] 60/22 104/18
bifurcate [1] 100/18
big [6] 53/21 54/8 57/16 61/5 74/12 91/1
big-picture [4] 53/21 54/8 57/16 61/5
bigger [2] 30/24 53/12
bigger-picture [1] 53/12
biggest [1] 93/19
bill [1] 66/11
bind [1] 58/2
bit [6] 5/21 13/19 22/13 59/11 62/10 93/22
bites [1] 110/9
blacked [1] 44/11
blah [12] 78/17 78/17 78/17 89/21 89/22 89/22 93/19 93/19
 93/19 112/21 112/21 112/22
Blake [2] 2/16 5/3
blanked [1] 44/5
blanked-out [1] 44/5
blend [1] 70/8
block [1] 33/25
blocked [1] 90/12
blows [1] 33/13
blunt [1] 16/9
both [12] 8/16 9/17 41/22 63/2 63/7 64/4 64/7 68/14 73/11
 82/9 111/2 118/17
bottom [2] 51/3 59/21
bought [3] 79/11 94/20 94/22
bound [3] 57/18 58/1 58/19
Boute [7] 13/13 35/8 60/7 60/20 60/24 86/14 87/2
Boute's [4] 13/18 60/5 60/8 86/8
box [2] 54/22 116/17
boxes [1] 54/12
Boy [1] 30/16
Bragar [2] 2/17 5/1
Brandex [2] 79/23 79/24
break [4] 15/25 20/19 20/21 105/14
Bressie [25] 2/7 4/15 4/17 25/15 52/16 58/25 61/14 62/8
 63/2 69/12 69/13 69/14 71/1 71/20 73/21 84/25 89/9 89/14
 95/13 99/4 99/6 101/10 102/3 103/10 104/17
bricks [1] 75/16
brief [7] 53/8 102/19 104/5 104/7 104/25 115/25 115/25
briefing [8] 58/9 58/10 80/24 115/22 120/14 120/20 121/1
 121/8
briefs [2] 55/23 82/14
bring [1] 124/1
broadband [1] 80/1
broader [5] 75/23 75/23 76/4 76/9 80/6
brought [4] 83/11 83/19 97/4 117/6
buck [1] 77/14
bucks [1] 97/1
build [1] 90/8
built [1] 77/4
bunch [1] 82/20
burden [2] 73/4 114/9
bureau [2] 85/12 85/13
burned [1] 123/4
business [9] 1/4 1/7 39/14 43/4 49/4 68/20 93/24 94/12
 95/2
buy [7] 72/2 72/10 72/10 72/16 77/10 77/12 93/15
buy Roam Like [1] 72/10
buying [5] 57/11 75/2 75/3 91/5 93/20
bypass [62] 6/11 6/15 6/17 7/8 7/22 7/22 7/23 8/1 8/9 8/17
 8/18 8/19 8/23 8/25 9/4 9/7 9/18 10/8 12/9 12/11 16/1 21/6
 24/19 26/18 28/4 28/4 28/6 32/12 32/13 32/14 37/22 38/2

**bypass... [30]**  39/24 48/3 48/11 48/21 49/3 49/10 49/21 49/22 49/23 50/7 50/11 50/16 50/20 51/7 59/15 61/10 61/11 61/17 61/25 62/5 62/6 62/7 68/9 86/13 87/7 87/15 87/21 88/5 92/21 93/2
**bypass-related [4]**  50/7 50/11 50/16 50/20
**Bypassers [1]**  80/16

**C**

**c'est [1]**  92/11
**C.L [1]**  2/3
**calculate [2]**  16/18 48/20
**calculated [4]**  15/3 37/9 49/11 50/8
**calculating [1]**  27/3
**calculation [9]**  10/15 11/22 11/23 12/17 13/2 13/9 13/20 14/2 43/13
**calculations [3]**  21/7 41/6 91/19
**calendar [1]**  106/19
**calendars [1]**  105/22
**call [29]**  5/9 13/16 13/17 25/8 25/9 25/9 25/19 25/22 27/10 36/6 40/1 61/22 61/22 65/15 65/18 65/20 66/8 66/9 66/17 67/3 67/22 68/21 69/9 70/22 72/2 87/2 98/12 100/8 122/3
**called [4]**  8/17 8/17 24/23 103/7
**caller [1]**  87/18
**calling [5]**  59/23 66/23 67/2 81/2 90/11
**calls [32]**  7/24 15/21 21/3 21/22 24/9 24/16 24/19 24/24 25/1 25/2 25/11 33/6 33/10 34/9 39/20 42/15 45/23 49/24 59/19 59/23 59/24 60/3 64/22 68/18 68/24 90/2 90/3 90/16 91/2 93/7 93/13 93/14
**came [4]**  29/20 45/6 50/9 79/13
**can [64]**  7/4 8/13 12/19 16/9 16/12 17/7 22/4 30/1 31/9 43/22 44/21 45/14 46/5 52/9 52/17 55/9 57/2 58/11 63/22 64/11 64/14 65/1 65/23 65/24 69/21 70/22 71/4 72/9 74/7 74/13 74/14 75/12 75/12 75/16 75/21 76/12 78/1 78/6 78/8 78/13 78/14 79/1 79/11 79/15 81/6 85/16 89/15 90/8 90/19 93/14 94/24 98/5 99/4 101/25 105/2 105/18 107/7 110/16 112/6 112/11 114/9 114/23 121/12 122/15
**can't [7]**  18/9 43/22 45/15 58/12 81/4 81/5 101/13
**candid [1]**  22/24
**candy [5]**  77/11 77/12 77/15 77/15 77/25
**cannot [2]**  40/3 41/25
**canyon [1]**  101/2
**capacity [33]**  11/24 11/25 12/11 25/20 27/11 33/5 33/13 33/14 33/15 33/16 34/7 34/8 34/16 36/7 36/7 36/14 36/15 37/11 37/21 39/19 41/23 44/7 44/10 46/8 46/19 46/23 47/8 47/12 47/13 47/15 48/13 49/13 50/13
**card [16]**  26/15 54/1 55/7 55/8 55/25 56/2 56/13 56/18 56/20 57/12 57/17 72/11 78/5 79/12 91/3 103/12
**cards [28]**  23/14 23/22 24/10 24/14 24/20 26/19 26/23 31/17 31/21 34/1 53/23 54/11 54/19 61/9 61/13 63/14 69/5 73/6 87/23 89/23 89/24 89/25 90/1 90/1 90/25 91/2 91/4 94/20
**care [4]**  87/8 98/15 106/2 106/9
**carefully [1]**  92/23
**Carla [1]**  2/4
**carrier [17]**  60/17 60/19 62/13 62/21 65/15 65/15 65/19 68/1 74/2 75/15 81/5 98/9 98/13 102/10 103/4 104/2 104/9
**carriers [12]**  64/24 68/14 74/13 82/11 95/14 95/15 96/21 97/7 98/4 98/6 98/20 102/8
**case [57]**  1/5 4/8 9/17 12/12 14/5 18/23 28/10 29/9 30/9 30/9 30/10 30/12 39/15 44/12 47/18 53/10 62/12 74/24 75/7 75/25 77/1 79/23 79/24 80/1 81/10 81/12 81/20 85/20 94/3 94/4 99/20 100/18 100/21 102/25 109/24 109/25 110/1 112/12 112/12 112/14 112/15 112/15 113/3 114/22 115/16 116/15 116/16 116/18 117/6 117/12 117/19 118/10 120/18 120/19 121/5 121/21 124/1
**case-in-chief [1]**  30/9

**cases [4]**  6/12 75/2 75/13 105/11
**Castel [42]**  12/22 13/1 19/4 20/12 21/7 24/2 25/18 27/13 27/19 34/3 34/4 38/7 38/18 39/1 40/13 40/15 40/18 40/22 40/25 41/3 41/4 50/6 51/2 52/4 59/16 59/16 86/13 89/21 90/14 94/2 94/3 94/5 105/21 106/25 108/12 108/20 109/4 119/5 119/12 122/5 123/4 123/9
**Castel's [19]**  5/19 6/6 8/5 8/22 10/11 11/19 12/20 16/22 17/5 20/25 26/6 26/7 26/9 27/16 27/23 41/1 49/17 86/6 91/19
**caught [1]**  95/1
**causation [3]**  115/3 115/5 115/25
**cause [1]**  125/6
**caused [1]**  59/15
**causing [2]**  82/25 86/3
**ceased [1]**  53/11
**cell [6]**  26/15 27/2 40/2 72/11 96/25 103/11
**cent [3]**  66/1 82/13 82/24
**cents [13]**  10/21 34/11 64/23 64/24 65/5 65/6 66/24 66/25 67/1 67/6 67/25 86/21 87/1
**certain [3]**  36/5 50/12 50/19
**certainly [1]**  96/8
**certified [1]**  125/8
**certify [1]**  125/4
**cetera [2]**  109/16 109/16
**chain [1]**  68/22
**challenge [3]**  30/1 51/16 51/19
**challenged [1]**  73/8
**chance [3]**  89/14 117/15 117/15
**change [1]**  91/23
**changes [1]**  108/25
**channels [1]**  87/18
**characterization [1]**  22/11
**charge [3]**  66/18 68/10 75/16
**charged [3]**  66/7 67/3 83/4
**charges [2]**  63/24 69/10
**charging [1]**  87/13
**Charles [1]**  38/18
**charts [1]**  92/22
**chase [1]**  30/19
**check [2]**  29/3 109/6
**Cherine [2]**  2/3 4/11
**chief [1]**  30/9
**China [1]**  66/8
**chomping [1]**  22/12
**choppy [1]**  25/4
**chose [1]**  119/9
**Chris [1]**  4/24
**Chris's [1]**  102/25
**Christopher [1]**  2/13
**Circuit [2]**  73/7 89/10
**Circuit's [1]**  73/3
**circuits [4]**  25/19 25/22 34/10 36/23
**circumstance [2]**  47/17 75/14
**circumstances [2]**  14/24 25/13
**citations [1]**  80/11
**cite [1]**  22/15
**cited [3]**  79/23 96/7 96/14
**civil [2]**  45/12 121/6
**claim [13]**  30/10 30/12 30/15 31/6 31/15 58/14 59/11 59/13 73/16 82/7 84/17 90/13 100/19
**claimed [1]**  37/24
**claiming [2]**  13/10 13/11
**claims [5]**  12/16 31/6 63/8 63/10 91/8
**clarification [1]**  29/25
**classic [1]**  78/19
**classifications [1]**  63/25
**clear [18]**  11/21 13/25 14/6 16/19 31/8 83/14 86/5 94/6

**C**

clear... **[10]** 100/1 100/15 102/23 111/11 111/12 111/23 112/7 113/14 116/12 117/3
clearly **[2]** 116/9 123/10
clever **[1]** 104/12
CLI **[1]** 61/23
click **[3]** 54/12 54/22 108/24
client **[3]** 83/15 95/4 95/4
clients **[2]** 15/21 68/17
close **[2]** 20/18 105/2
closed **[1]** 117/7
closely **[2]** 13/18 27/23
CM **[1]** 6/3
CM/ECF **[1]** 6/3
co **[3]** 4/13 5/16 107/24
co-counsel **[3]** 4/13 5/16 107/24
Coast **[3]** 108/8 108/10 108/19
codes **[1]** 80/18
colleagues **[2]** 124/10 124/11
college **[1]** 71/25
column **[1]** 20/22
combating **[1]** 62/5
combination **[3]** 18/12 24/11 26/10
combined **[1]** 41/21
come **[19]** 18/10 26/10 30/20 32/2 38/3 45/7 45/14 46/13 49/18 50/19 72/7 77/10 77/12 87/23 101/11 109/9 113/6 113/17 113/23
comes **[6]** 36/15 75/15 76/12 78/12 85/3 123/13
coming **[3]** 28/10 82/20 91/2
comment **[4]** 53/9 93/21 103/25 108/22
comments **[4]** 52/14 61/4 62/11 102/22
committing **[1]** 46/14
common **[6]** 62/13 62/20 75/15 94/13 94/14 102/10
communicate **[1]** 107/24
communicating **[1]** 109/8
communication **[5]** 7/25 53/16 64/1 69/24 98/21
communications **[31]** 17/15 30/6 30/10 30/12 30/15 31/6 31/11 31/20 51/8 52/16 58/17 58/24 59/12 61/6 61/15 62/9 73/16 77/1 77/8 80/5 80/10 83/15 89/15 97/21 99/9 100/2 100/19 101/13 102/12 116/1 116/2
Communications Act **[1]** 99/9
companies **[1]** 103/20
company **[5]** 45/9 50/13 50/17 54/10 93/12
compare **[2]** 33/5 47/12
compared **[6]** 26/25 27/2 37/21 37/23 48/2 107/5
comparing **[1]** 32/17
comparison **[4]** 32/19 33/3 37/20 47/6
compensated **[1]** 64/17
competence **[1]** 85/16
competition **[1]** 82/15
competitor **[1]** 85/24
complain **[3]** 116/11 120/1 120/4
complaining **[1]** 116/7
complains **[1]** 86/14
complaint **[2]** 83/17 87/3
complete **[2]** 25/6 39/23
completed **[9]** 10/20 11/3 13/15 14/22 15/20 15/21 16/10 33/10 94/21
completely **[2]** 52/1 95/13
complicated **[3]** 80/4 85/18 96/19
complication **[1]** 85/20
complied **[2]** 31/20 118/20
complying **[1]** 62/24
component **[2]** 70/7 70/9
compressed **[1]** 60/3
compromised **[1]** 18/19
compulsory **[2]** 83/17 84/5

computer **[1]** 93/9
CONATEL **[2]** 23/20 52/5
concealment **[1]** 115/17
concede **[1]** 54/17
concentrated **[1]** 86/3
concept **[2]** 64/3 100/2
concern **[6]** 21/15 83/22 83/25 87/21 118/15 123/13
concerned **[1]** 85/19
concerns **[1]** 61/2
concluding **[1]** 57/17
conclusion **[8]** 33/1 33/2 44/18 46/13 51/11 58/4 73/13 79/14
conclusions **[1]** 116/21
concocted **[2]** 92/23 94/25
condition **[1]** 53/3
conditions **[33]** 52/19 52/21 52/23 53/10 53/16 53/24 54/2 54/13 54/22 55/2 55/9 55/25 56/1 56/3 56/21 57/4 57/6 57/7 57/12 57/14 57/19 57/21 57/25 58/1 58/3 58/18 58/20 58/23 59/5 59/5 71/15 78/16 98/6
conduct **[3]** 14/7 43/2 73/6
confer **[1]** 122/1
conference **[9]** 106/8 106/10 106/14 107/20 108/12 109/10 111/6 120/21 122/6
conferral **[1]** 111/5
configured **[1]** 78/4
confirm **[3]** 7/4 10/18 53/5
confirmation **[1]** 108/21
confirmed **[1]** 86/1
confirming **[1]** 108/20
confirms **[1]** 36/25
confiscated **[1]** 89/24
conflict **[1]** 106/18
conflicts **[1]** 106/15
conformed **[1]** 125/7
confused **[2]** 64/25 88/11
confusion **[3]** 17/1 79/17 121/8
connection **[5]** 63/25 70/12 70/15 104/19 104/23
connections **[3]** 60/3 74/3 102/8
conniption **[1]** 66/11
conservative **[1]** 11/5
consider **[3]** 19/20 106/25 119/14
consideration **[1]** 53/14
considerations **[1]** 43/11
considered **[1]** 95/25
considering **[1]** 42/22
consistent **[3]** 51/22 51/23 57/14
constantly **[1]** 58/9
constitute **[1]** 102/14
constitutes **[2]** 79/21 98/21
contains **[1]** 79/24
contemplate **[4]** 16/17 22/25 26/22 37/6
contemplated **[5]** 11/7 11/17 11/22 60/23 118/24
contemplates **[5]** 12/8 18/21 18/22 19/2 43/14
contends **[1]** 13/21
contest **[3]** 23/2 30/2 30/21
context **[5]** 11/10 11/11 82/1 82/9 87/24
continue **[1]** 122/6
contract **[7]** 77/20 78/20 78/22 79/5 79/5 79/6 79/8
contracts **[1]** 97/20
contractual **[3]** 58/14 78/17 78/18
contractually **[1]** 58/2
contrary **[1]** 82/6
conversation **[2]** 56/12 89/20
convinced **[1]** 18/20
copious **[1]** 78/21
corner **[3]** 77/13 77/14 77/15
corporate **[1]** 6/24

**corporation [1]** 1/3
**correct [34]** 5/13 8/3 8/10 21/17 26/3 26/4 26/8 29/2 30/3 31/1 31/25 32/3 32/4 32/9 32/16 33/21 34/2 35/5 36/11 38/19 49/9 51/11 51/13 63/16 69/16 72/16 83/6 83/6 83/9 91/21 105/18 107/12 119/23 125/5
**correctly [3]** 7/2 56/10 72/7
**correlate [1]** 49/13
**correspondence [4]** 17/9 17/19 18/18 44/1
**cost [3]** 65/4 83/4 86/19
**could [34]** 19/14 19/15 19/15 19/16 24/13 24/15 24/16 31/22 33/24 41/17 60/19 69/9 79/13 79/14 80/16 82/23 82/25 83/11 83/19 90/11 90/16 92/10 95/3 98/7 100/24 101/2 102/21 103/25 107/8 107/18 113/18 114/17 115/11 115/12
**couldn't [2]** 96/5 118/4
**counsel [11]** 4/9 4/13 4/22 5/15 5/16 7/16 27/17 53/4 53/7 100/7 107/24
**counterclaim [8]** 31/12 32/7 84/6 89/2 89/3 89/7 100/5 102/5
**counterclaims [8]** 30/5 30/6 61/6 61/16 83/11 83/18 84/3 84/4
**counterfeit [4]** 44/24 45/4 45/6 45/20
**counterfeiter [3]** 45/13 45/16 46/19
**counterfeiters [7]** 45/1 45/3 45/14 46/6 46/11 47/12 47/13
**counterfeiting [1]** 45/8
**counterfeits [1]** 45/7
**counting [1]** 105/14
**country [6]** 20/16 25/10 57/23 86/13 87/15 97/18
**counts [1]** 81/22
**couple [5]** 45/3 71/25 74/6 88/15 89/19
**course [12]** 14/10 14/12 17/8 31/17 68/20 73/5 73/5 74/7 79/5 96/20 105/25 117/14
**court [27]** 1/1 1/18 2/22 4/3 12/19 13/25 14/25 22/6 22/13 23/17 33/19 51/6 53/4 58/13 63/6 73/1 79/25 85/16 100/9 100/10 102/5 113/24 115/19 115/21 120/12 124/5 125/10
**Court's [6]** 20/4 79/21 105/4 113/22 117/1 120/8
**Courthouse [1]** 2/22
**courtroom [1]** 109/7
**courts [1]** 104/21
**covered [1]** 76/7
**covers [1]** 75/23
**COVID [1]** 101/20
**crazy [1]** 90/10
**create [1]** 94/25
**created [1]** 78/19
**credence [1]** 16/9
**critical [1]** 77/23
**cross [9]** 26/11 26/20 42/20 51/15 51/20 52/3 52/6 52/10 98/15
**cross-examination [5]** 26/11 51/15 51/20 52/3 52/10
**cross-examine [2]** 42/20 52/6
**CRR [1]** 125/10
**crystal [2]** 111/12 116/12
**CSR [1]** 2/22
**current [2]** 109/23 110/12
**curtailed [1]** 12/9
**customer [3]** 65/13 65/14 93/12
**customers [2]** 61/21 98/11
**cut [2]** 30/19 87/5
**cv [2]** 1/5 4/8

**D**

**D.C [1]** 2/15
**damage [21]** 10/11 10/14 11/2 11/3 11/4 11/5 12/9 16/12 18/22 18/23 26/21 26/22 29/21 30/8 43/23 45/11 45/12 47/21 47/23 61/17 61/21

**damages [45]** 9/3 9/4 9/17 9/21 10/2 10/7 10/11 10/15 12/5 12/5 12/18 13/2 13/5 13/9 13/22 14/6 14/9 14/20 16/6 16/13 16/17 16/18 27/4 30/1 30/2 30/3 30/3 30/7 30/9 30/11 30/18 31/6 37/6 45/18 47/19 59/11 59/14 60/11 60/25 90/10 114/10 114/13 115/3 115/5 115/25
**data [5]** 37/23 43/3 49/2 52/2 117/10
**date [3]** 52/22 121/3 125/10
**dated [1]** 53/3
**dates [1]** 53/5
**Daubert [21]** 51/22 51/24 94/3 94/5 105/20 106/5 106/10 107/1 107/8 107/19 109/4 118/19 118/23 119/7 119/8 119/12 119/15 119/15 119/23 123/1 123/15
**daughter [2]** 96/24 102/25
**Davis [2]** 2/14 4/24
**day [26]** 25/23 26/1 26/2 26/2 26/13 26/15 26/16 26/16 26/22 26/24 26/24 27/5 29/20 33/11 33/16 33/17 34/10 36/24 41/18 41/18 80/23 96/25 97/1 106/23 106/23 107/18
**Daylight [2]** 108/24 108/25
**days [3]** 26/2 101/14 111/15
**DC [1]** 2/8
**de [1]** 87/22
**de-authenticate [1]** 87/22
**deactivate [6]** 31/16 33/25 61/9 61/12 87/23 87/25
**deactivated [1]** 31/20
**deactivating [3]** 63/14 73/6 88/4
**deactivation [5]** 32/3 32/6 32/21 32/23 64/6
**deadline [2]** 116/24 118/21
**deal [3]** 101/18 113/4 123/8
**dealing [2]** 31/12 86/13
**deals [1]** 57/1
**dealt [1]** 31/13
**debate [2]** 74/14 74/16
**December [3]** 17/4 18/16 18/24
**December 2014 [2]** 17/4 18/24
**decide [5]** 66/8 74/22 93/22 93/23 115/9
**decision [4]** 61/9 61/12 73/3 104/16
**decisions [2]** 63/7 63/9
**declaration [1]** 59/4
**declaratory [1]** 100/6
**declined [1]** 59/24
**decreased [1]** 47/5
**deducted [1]** 79/4
**deem [1]** 120/6
**deemed [1]** 46/11
**deep [1]** 83/15
**defendant's [1]** 43/1
**defendants [13]** 1/9 2/13 4/22 4/25 5/2 5/3 26/11 26/21 27/3 30/21 31/5 42/20 51/16
**defendants' [1]** 29/21
**defense [2]** 80/25 85/22
**defer [2]** 5/16 69/12
**defined [2]** 9/6 95/20
**definitely [2]** 70/15 82/5
**definition [1]** 40/4
**degraded [1]** 60/2
**Del [1]** 44/2
**delay [2]** 101/23 101/24
**delayed [2]** 88/16 101/21
**Delta [1]** 71/14
**demonstrate [1]** 22/13
**denial [1]** 43/22
**denied [2]** 88/16 114/21
**denigrate [1]** 77/24
**Dennis [4]** 2/22 72/22 125/9 125/10
**denying [1]** 112/10
**deployed [1]** 39/22
**deposition [6]** 13/3 29/6 29/7 113/7 113/17 115/24

**Depreciation [1]** 48/10
**deprive [2]** 84/5 99/1
**deprived [1]** 84/6
**deputy [1]** 109/7
**dereliction [1]** 120/7
**des [1]** 51/8
**descendents [1]** 70/10
**described [3]** 61/8 83/24 104/11
**describes [2]** 8/8 8/23
**description [1]** 22/11
**designed [1]** 8/19
**detail [1]** 115/21
**details [3]** 49/20 49/21 94/16
**detect [1]** 32/13
**detected [1]** 6/13
**deteriorated [1]** 61/22
**deterioration [2]** 59/19 86/4
**determination [2]** 16/20 58/22
**determinations [1]** 62/6
**determine [3]** 16/12 41/24 43/12
**determined [4]** 7/11 50/9 61/24 65/24
**developed [2]** 87/21 87/22
**device [1]** 76/19
**DHL [1]** 23/8
**diaspora [5]** 69/2 69/6 70/5 70/7 70/14
**dictated [1]** 40/1
**did [90]** 11/23 12/15 13/15 13/19 13/23 13/24 15/6 15/10 15/22 22/18 22/24 23/18 26/6 27/6 27/23 27/25 28/2 29/10 29/23 32/6 34/19 35/9 36/25 38/11 38/20 40/23 41/1 46/19 48/20 48/25 53/4 53/7 53/22 54/17 54/21 55/5 55/7 55/9 56/4 61/23 69/25 70/1 70/4 70/19 70/21 71/5 71/7 71/23 72/1 72/12 75/19 81/11 82/17 82/17 82/18 85/22 87/11 87/12 87/16 87/17 92/23 93/8 93/15 95/5 95/11 95/25 96/11 97/25 98/1 98/10 102/12 102/14 105/14 111/17 111/21 112/17 112/18 113/16 113/23 114/18 116/13 116/17 116/22 116/23 118/21 119/11 119/22 119/22 119/23 122/24
**didn't [30]** 17/5 19/5 26/5 27/22 27/23 40/15 42/2 50/3 54/14 77/18 81/5 84/11 87/8 88/3 91/6 91/23 94/25 96/12 96/16 98/1 98/15 103/1 111/14 114/25 115/11 118/5 118/25 119/17 119/20 120/18
**died [1]** 93/9
**difference [5]** 23/5 73/7 75/7 108/7 111/23
**different [19]** 14/1 17/23 56/8 59/10 63/5 74/3 75/16 76/2 76/3 96/2 112/20 113/25 113/25 116/3 117/17 117/25 117/25 122/17 123/6
**differently [1]** 75/9
**difficult [1]** 9/19
**difficulty [3]** 45/9 54/6 123/8
**Digicel [109]** 1/4 4/12 4/17 4/20 8/8 9/11 9/24 10/3 10/7 10/15 10/21 11/13 14/4 14/14 14/16 16/5 21/6 21/8 21/9 21/13 29/25 31/16 31/19 32/3 32/5 32/12 32/14 32/20 32/22 32/23 37/24 47/23 47/24 48/20 49/2 49/10 49/20 50/8 50/10 53/11 53/23 54/16 59/15 60/11 60/12 60/13 60/16 60/19 60/21 61/7 61/9 61/10 61/12 61/18 61/19 62/3 62/13 63/13 64/16 64/23 65/2 65/7 65/16 65/20 66/3 67/13 67/25 69/1 69/2 69/23 69/25 70/1 70/2 70/4 70/19 70/21 71/4 71/4 71/7 71/9 72/13 72/17 72/21 73/5 73/24 76/13 76/16 78/5 83/10 86/24 92/22 93/1 93/2 97/20 97/22 98/24 100/19 102/6 102/7 102/9 102/13 103/12 103/19 103/20 103/23 104/22 109/14 111/1 115/22
**Digicel Haiti [1]** 92/22
**Digicel Haiti's [2]** 60/11 100/19
**Digicel's [6]** 8/18 13/14 37/18 37/22 50/6 60/25
**digital [3]** 25/3 25/7 71/20
**digitally [2]** 24/15 125/7
**diligence [1]** 53/4

**dire [1]** 122/9
**direct [3]** 6/1 12/19 68/1
**directed [1]** 38/25
**disagree [9]** 31/9 31/18 33/3 51/2 73/13 73/14 85/7 85/13 115/18
**disagrees [2]** 95/14 95/15
**disclosed [1]** 28/11
**disclosure [2]** 49/8 116/24
**discover [1]** 45/2
**discovered [2]** 6/18 6/24
**discovers [1]** 45/2
**discovery [10]** 94/16 95/5 117/6 117/7 117/11 117/21 118/9 122/18 122/23 123/15
**discrepancy [1]** 73/17
**discrimination [10]** 63/18 63/19 63/20 74/21 75/2 75/6 75/10 75/19 76/1 102/15
**discriminatory [1]** 74/23
**discuss [1]** 35/7
**discussed [1]** 116/9
**discussion [7]** 74/6 79/21 79/24 108/3 110/18 113/13 115/20
**discussions [1]** 94/14
**dismantled [2]** 6/15 6/18
**dismiss [1]** 94/4
**Disney [14]** 44/23 44/25 45/2 45/5 45/5 45/8 45/12 45/15 45/18 46/13 46/16 46/22 47/1 47/4
**dispositive [1]** 118/20
**dispute [5]** 16/8 22/25 83/9 83/21 87/4
**distinct [1]** 7/22
**distinction [4]** 11/2 20/16 77/5 88/3
**distinguish [1]** 8/12
**distributors [1]** 46/15
**district [5]** 1/1 1/2 1/18 2/22 76/6
**divide [1]** 42/13
**divides [2]** 17/1 92/24
**dixit [1]** 52/8
**do [124]** 9/14 15/4 18/10 19/6 21/2 21/23 21/24 22/16 22/21 24/1 24/1 24/21 25/12 25/24 26/5 29/8 29/21 31/7 33/20 34/25 37/2 41/23 43/2 44/20 45/16 45/22 46/5 47/2 48/22 51/23 52/9 52/17 53/4 56/24 58/6 58/11 60/5 62/14 67/24 68/13 70/1 71/5 76/18 78/13 78/14 79/15 80/4 80/14 80/16 81/4 81/5 81/6 82/11 83/3 84/8 84/21 84/23 86/15 86/16 87/1 88/11 88/11 88/23 88/23 89/16 89/18 89/18 90/11 92/8 92/10 94/8 97/5 98/9 98/14 98/20 98/24 99/13 100/4 100/19 101/7 103/6 104/6 104/8 105/11 105/12 106/14 107/18 107/21 107/21 108/1 108/8 108/12 110/22 111/3 112/21 113/4 113/6 115/18 116/8 116/11 116/17 117/4 117/19 117/21 118/18 119/9 120/10 120/10 120/12 120/15 121/14 121/15 121/17 122/13 122/21 122/25 123/1 123/2 124/2 124/3 124/7 124/11 124/13 124/14
**docket [11]** 5/21 6/3 6/3 28/9 28/17 35/20 53/9 59/16 60/9 114/3 115/14
**Docket 402 [1]** 53/9
**document [2]** 28/24 95/6
**documented [1]** 18/18
**documents [12]** 12/15 12/17 13/8 15/7 16/9 23/8 23/10 32/11 50/11 51/5 119/2 121/21
**does [44]** 8/12 9/25 10/10 11/19 13/4 15/25 16/2 16/17 19/4 19/11 19/14 19/18 19/23 20/19 20/21 21/8 24/10 25/2 27/13 36/8 39/2 39/4 40/8 47/6 54/16 63/19 64/16 65/5 65/6 66/24 68/12 73/12 73/24 83/2 90/16 94/3 95/24 96/9 99/1 104/11 108/15 108/19 124/2 124/3
**doesn't [24]** 19/12 19/14 21/9 28/20 45/25 47/9 49/5 52/2 52/3 72/10 74/1 77/3 77/3 86/25 88/8 90/17 90/20 97/6 97/22 100/9 109/7 114/5 114/13 118/13
**doing [16]** 1/3 1/7 26/23 33/22 38/2 41/6 46/23 55/20 77/20 79/19 90/15 93/20 95/18 102/6 104/23 104/24

**D**

**dollar [1]** 78/1
**dollars [3]** 13/10 62/4 90/1
**domestic [7]** 60/19 60/22 65/15 65/19 68/1 97/11 98/8
**don't [90]** 9/2 10/22 10/24 13/7 16/19 17/13 18/25 22/19 25/4 28/9 30/17 37/4 38/13 44/10 49/15 49/18 50/1 50/21 52/6 52/24 55/10 55/23 56/5 58/5 65/4 66/9 68/5 68/8 68/8 68/19 71/4 73/14 73/22 74/10 76/4 76/5 77/24 78/14 78/16 79/5 81/8 81/10 81/16 81/16 84/4 84/25 88/25 90/8 91/17 92/9 93/25 94/7 94/15 94/24 95/7 95/8 100/16 100/20 103/17 104/16 105/18 105/19 105/19 106/2 106/2 106/9 106/24 107/4 107/14 107/14 107/16 108/23 112/18 112/18 113/22 114/12 115/12 117/1 117/13 117/21 118/10 118/17 120/2 120/13 122/3 122/21 123/7 123/14 124/13 124/22
**done [9]** 34/5 37/18 37/20 70/25 74/1 113/16 124/12 124/12 124/23
**door [1]** 23/21
**dot [1]** 98/15
**double [1]** 29/3
**double-check [1]** 29/3
**doubt [1]** 98/23
**down [5]** 15/25 76/6 76/21 90/13 95/25
**draft [1]** 122/9
**draw [2]** 76/8 88/20
**drawing [1]** 74/12
**dreadful [1]** 89/5
**drill [1]** 95/25
**drive [1]** 76/5
**drop [1]** 47/25
**du [1]** 51/7
**DuBay [4]** 2/16 2/17 5/1 5/1
**Duck [1]** 72/8
**due [9]** 10/3 49/21 49/21 53/4 59/18 60/2 102/13 109/17 122/4
**during [14]** 9/4 13/3 34/12 38/1 49/14 53/22 56/3 56/19 56/25 59/7 93/12 106/1 108/25 119/25
**duty [1]** 120/7
**Duy [1]** 44/2

**E**

**each [3]** 109/8 122/1 122/3
**earlier [4]** 20/2 58/10 74/6 100/17
**early [2]** 89/20 109/3
**earned [3]** 45/14 45/16 45/24
**earnings [2]** 48/10 50/17
**Earnings Before [1]** 48/10
**East [3]** 108/8 108/10 108/19
**easy [2]** 71/8 85/21
**EBITDA [4]** 48/9 48/12 49/22 50/2
**ECF [7]** 6/3 23/4 23/5 23/6 23/14 35/13 35/22
**ECF 391 [1]** 35/13
**economic [4]** 41/24 82/22 82/23 84/22
**economics [1]** 65/3
**effect [6]** 53/24 54/23 59/22 65/19 82/15 82/21
**effective [5]** 6/12 52/22 65/25 90/10 107/6
**effectively [2]** 40/4 97/12
**efficient [1]** 123/2
**efforts [2]** 33/25 110/5
**eight [5]** 17/4 18/12 18/24 43/7 43/9
**eight-month [1]** 17/4
**either [13]** 25/8 28/9 28/11 40/7 50/8 53/23 57/23 61/10 64/18 89/16 93/23 103/15 107/16
**Eleanor [2]** 2/16 5/1
**electroniques [1]** 51/8
**else [16]** 5/7 7/9 7/10 40/8 57/23 70/14 79/20 97/9 97/10 100/22 106/18 106/25 107/17 121/13 121/16 123/22
**email [2]** 112/23 112/24

**embrace [1]** 42/25
**embraces [1]** 74/19
**eminently [1]** 62/24
**emphasize [2]** 90/15 95/10
**employed [3]** 32/12 39/18 43/21
**employee [1]** 23/20
**encapsulation [1]** 25/3
**encouraging [1]** 103/15
**end [4]** 65/21 89/17 100/12 124/25
**ends [1]** 72/20
**enforcement [1]** 85/13
**engage [2]** 74/13 93/6
**engaged [3]** 32/21 97/18 97/22
**engaging [1]** 32/23
**enhanced [2]** 39/23 40/3
**enhancement [1]** 104/9
**enough [7]** 58/2 72/22 84/15 115/10 117/12 123/17 123/20
**enroll [2]** 78/6 78/8
**enrollment [1]** 64/20
**enter [2]** 4/9 4/23
**entering [1]** 77/20
**entertain [2]** 81/17 105/5
**entire [8]** 8/8 8/11 12/8 44/11 51/17 51/19 106/22 106/23
**entirely [12]** 11/11 22/14 23/3 36/24 37/10 37/10 37/24 38/24 43/6 69/12 79/9 117/16
**entirety [3]** 10/1 10/2 10/7
**entitled [8]** 10/21 14/5 14/8 14/10 14/20 47/21 51/9 125/6
**entity [2]** 6/24 7/8
**entry [1]** 17/15
**enunciating [1]** 60/7
**equipment [15]** 21/20 21/21 21/25 21/25 22/12 22/17 23/11 23/15 24/2 24/8 24/14 25/20 36/13 39/21 41/23
**error [2]** 38/21 40/12
**escapes [1]** 7/7
**especially [2]** 124/15 124/20
**essentially [9]** 9/4 27/9 41/23 42/15 63/3 63/6 80/20 98/5 114/12
**est [1]** 51/7
**est-il [1]** 51/7
**establish [3]** 42/8 42/9 114/9
**established [3]** 39/15 43/18 43/19
**Ester [1]** 44/2
**estimate [8]** 14/9 14/9 14/16 16/5 27/14 28/18 49/12 50/15
**estimated [2]** 9/12 21/13
**estimates [3]** 11/13 21/15 95/4
**et [4]** 1/8 4/8 109/16 109/16
**et cetera [2]** 109/16 109/16
**Europe [2]** 96/24 103/1
**even [22]** 11/11 14/15 14/15 15/7 16/4 32/11 43/14 56/5 58/9 71/24 80/15 83/25 84/24 87/8 90/24 91/14 91/23 96/12 102/6 104/22 108/1 113/14
**ever [7]** 54/17 54/17 55/23 72/2 84/17 94/5 105/18
**every [10]** 10/19 10/20 13/14 26/2 26/16 26/24 41/18 87/1 96/25 104/1
**everybody [1]** 108/20
**everyone [2]** 4/4 93/5
**everything [13]** 7/9 15/2 18/22 22/6 74/8 76/13 79/20 91/16 91/22 94/7 101/21 107/7 110/19
**everywhere [1]** 76/5
**evidence [34]** 7/3 8/15 14/13 14/14 15/14 17/10 17/12 17/14 18/14 18/15 22/16 25/1 32/11 34/15 36/25 37/8 39/15 39/17 44/12 46/12 53/6 54/14 55/10 56/24 68/16 73/22 73/24 82/7 90/19 93/24 95/11 113/3 114/13 114/18
**evidentiary [1]** 114/9
**evolving [1]** 56/7
**exact [3]** 38/1 48/17 68/19
**exactitude [3]** 14/6 47/19 47/20

**exactly [8]** 10/12 60/7 62/22 72/11 83/2 96/5 115/3 115/5
**examination [6]** 10/18 26/11 51/15 51/20 52/3 52/10
**examine [2]** 42/20 52/6
**examined [1]** 13/3
**example [2]** 7/4 15/19
**exceed [1]** 47/15
**excerpts [1]** 115/24
**exclude [1]** 80/25
**executed [1]** 79/9
**exhibit [27]** 6/2 9/11 15/7 15/9 15/18 16/3 20/4 20/5 20/15
 22/15 22/22 22/24 23/4 23/5 23/7 23/7 23/8 24/3 28/25
 43/24 52/20 52/20 52/21 59/4 86/12 109/15 115/24
**Exhibit 91 [1]** 23/5
**Exhibit A [1]** 9/11
**exhibits [8]** 15/19 17/13 22/20 22/21 59/4 71/13 109/15
 115/23
**exist [2]** 52/3 104/12
**existing [1]** 97/6
**exists [2]** 78/18 79/8
**expanding [1]** 92/17
**expect [7]** 15/23 22/6 22/25 46/22 65/23 65/24 82/15
**expectation [2]** 22/7 111/22
**expected [7]** 9/3 11/24 111/19 112/20 113/15 113/24
 116/10
**expenses [1]** 50/18
**expensive [1]** 70/23
**experience [1]** 99/24
**experienced [6]** 47/11 61/7 61/22 66/13 66/14 93/3
**expert [58]** 5/20 5/21 6/6 9/3 10/14 10/16 10/19 12/20
 14/24 27/9 27/13 27/19 27/25 28/7 28/8 28/11 28/12 28/25
 28/25 29/8 35/11 35/12 35/19 38/6 41/22 41/24 42/21 43/21
 49/1 49/2 49/7 49/8 49/9 49/12 49/15 49/20 50/5 50/20 51/9
 91/8 99/17 111/19 113/6 113/25 115/23 116/11 116/13
 116/14 116/20 116/22 116/24 117/11 117/16 119/7 121/17
 122/16 122/25 123/10
**expert's [1]** 51/17
**expertise [2]** 41/21 99/24
**experts [3]** 41/22 112/20 122/18
**explain [20]** 19/4 19/14 19/19 23/5 27/14 27/25 28/2 28/3
 30/25 36/9 39/13 39/15 39/17 39/20 40/8 62/15 64/15 65/2
 65/9 65/10
**explain is [1]** 28/3
**explained [4]** 19/7 19/9 24/22 73/24
**explaining [2]** 41/2 116/1
**explains [6]** 13/13 26/7 29/1 36/17 41/8 95/13
**explanation [8]** 17/5 19/11 27/16 39/25 50/8 50/15 81/25
 102/24
**explanations [1]** 116/21
**expressed [1]** 31/21
**extent [14]** 6/24 9/6 12/10 13/25 33/4 61/16 62/1 62/3
 62/13 62/16 63/12 69/23 93/21 98/8
**extra [1]** 120/2

**F**

**face [1]** 45/2
**facets [1]** 68/20
**facilities [1]** 77/21
**fact [17]** 32/5 32/22 34/16 36/25 42/7 60/20 63/13 64/5
 73/17 78/19 79/6 79/8 80/16 86/20 90/18 104/3 122/22
**factor [8]** 42/6 51/10 61/8 61/12 65/22 90/1 90/2 90/6
**factored [2]** 43/20 62/5
**factors [2]** 73/15 73/20
**facts [7]** 8/16 81/9 85/23 99/13 112/19 123/13 123/14
**factual [8]** 5/10 59/13 69/15 69/22 76/11 76/11 80/22 118/9
**failing [1]** 84/16
**fair [5]** 75/12 81/25 84/15 123/17 123/20

**fairly [1]** 28/11
**fairness [1]** 122/19
**fall [1]** 117/7
**familiar [1]** 69/18
**family [5]** 69/4 69/9 70/10 70/17 70/23
**far [1]** 15/22
**FCC [35]** 81/25 83/3 83/11 83/23 84/4 84/7 84/22 85/6 88/1
 88/3 88/10 88/12 88/13 88/24 89/1 89/4 95/20 95/25 96/9
 96/19 97/3 97/9 97/18 98/3 99/1 99/24 100/3 100/7 100/10
 102/17 104/3 104/8 105/6 124/2 124/3
**FCC's [6]** 81/3 82/9 99/24 100/1 100/7 104/22
**FCRR [1]** 125/10
**February [1]** 83/16
**federal [2]** 85/16 99/17
**fee [5]** 64/19 64/20 66/22 67/14 68/4
**feels [1]** 95/7
**fees [1]** 68/6
**feverishly [1]** 106/16
**few [9]** 29/19 52/12 53/20 54/8 59/17 102/21 111/15
 122/13 124/16
**Fifth [1]** 2/11
**fight [1]** 117/18
**fighting [1]** 80/24
**figure [9]** 16/12 18/9 30/3 34/7 45/12 45/15 52/4 64/15
 107/6
**figured [1]** 85/24
**figures [3]** 12/6 92/20 92/21
**figuring [2]** 45/9 45/18
**file [33]** 12/15 22/23 53/16 76/25 100/12 100/23 101/11
 101/12 109/14 109/24 109/25 110/13 110/14 110/22 110/25
 111/2 112/14 112/18 114/19 114/23 115/6 115/7 115/12
 116/10 117/23 118/23 118/25 119/11 119/23 121/13 121/16
 121/20 122/15
**filed [26]** 14/14 28/25 53/10 110/19 111/15 112/22 112/23
 114/21 115/2 115/3 116/19 117/24 118/4 118/11 118/21
 118/22 119/1 119/6 119/8 119/8 119/13 119/24 120/21
 120/22 120/24 122/16
**files [1]** 111/2
**filibuster [1]** 50/3
**filing [2]** 105/3 119/2
**filings [9]** 109/13 111/12 111/15 111/17 111/21 112/2
 112/3 121/9 121/10
**final [7]** 58/22 110/16 111/4 121/25 122/6 122/10 122/14
**Finally [1]** 92/19
**financial [10]** 47/25 48/8 49/1 49/20 49/21 50/1 50/11 71/9
 71/10 103/21
**financials [1]** 50/7
**find [24]** 10/13 10/16 10/17 12/17 13/8 13/11 13/12 14/14
 15/22 17/12 20/3 22/16 23/4 26/5 26/20 34/19 56/24 58/12
 58/18 59/3 63/12 79/19 84/6 96/5
**fine [22]** 9/23 24/7 25/6 38/22 55/13 55/19 55/21 59/1 83/7
 85/5 86/11 89/12 101/3 106/24 107/10 107/22 108/1 109/2
 109/9 113/7 124/16 124/20
**fingertips [1]** 58/7
**finish [1]** 86/10
**first [23]** 6/17 14/18 16/25 21/19 24/3 26/6 34/4 34/19
 52/18 53/20 54/25 56/5 56/6 59/21 70/16 72/1 73/2 75/1
 81/19 100/19 108/6 109/17 121/2
**fish [1]** 114/1
**fits [1]** 53/19
**five [2]** 89/18 99/6
**five o'clock [1]** 89/18
**fix [1]** 81/10
**FL [1]** 2/5
**flag [2]** 26/17 28/6
**flat [1]** 96/9
**flight [1]** 46/12

**F**

**floating [1]** 94/19
**floor [1]** 67/6
**Florida [3]** 44/23 69/8 70/21
**focus [1]** 110/4
**focused [1]** 12/10
**focuses [2]** 8/8 8/14
**focusing [1]** 73/3
**folks [4]** 70/11 70/16 70/21 99/11
**follow [1]** 57/22
**follow-up [1]** 57/22
**followed [1]** 115/7
**following [8]** 21/16 23/22 24/5 54/18 66/10 98/10 115/20 120/5
**follows [2]** 44/18 115/22
**foot [1]** 29/4
**footnote [2]** 49/25 53/9
**footnoted [2]** 51/12 52/2
**footnotes [1]** 51/3
**force [1]** 60/18
**forced [1]** 60/15
**foregoing [1]** 125/4
**foreign [6]** 1/3 74/2 98/21 104/2 104/9 104/10
**forget [1]** 68/6
**forgot [1]** 52/21
**form [4]** 54/17 95/16 122/10 122/18
**formal [1]** 100/11
**Fort [1]** 2/5
**forth [2]** 119/24 121/23
**forward [4]** 102/18 105/3 123/13 123/25
**found [5]** 7/1 7/9 32/13 46/15 104/21
**four [7]** 43/16 72/8 72/9 72/15 101/14 120/19 120/20
**fourth [4]** 20/21 111/4 121/1 121/25
**framed [1]** 77/4
**framework [2]** 6/7 6/12
**frankly [8]** 16/9 18/17 32/6 59/12 93/23 95/2 95/5 111/19
**fraud [8]** 6/13 46/14 47/2 47/19 48/19 58/14 114/4 115/16
**frauds [1]** 94/1
**fraudsters [1]** 21/20
**free [5]** 44/25 45/19 46/1 78/21 82/6
**free-for-all [1]** 82/6
**French [5]** 92/5 92/6 92/9 92/16 103/1
**Friday [5]** 100/23 100/25 101/1 101/2 109/20
**friend [3]** 67/2 78/5 106/16
**friends [2]** 70/17 70/22
**front [9]** 12/24 15/9 28/15 28/17 88/10 88/12 88/13 88/19 88/19
**frustration [1]** 113/9
**full [9]** 8/19 10/21 11/6 11/7 18/20 23/18 27/11 46/12 46/15
**fully [1]** 18/21
**function [3]** 49/22 49/22 49/23
**functions [1]** 99/2
**funds [2]** 71/12 71/19
**funhouse [2]** 99/8 99/12
**further [2]** 62/15 102/3
**fussy [1]** 105/25

**G**

**Gabon [2]** 92/7 92/10
**gas [1]** 99/11
**gas-lighting [1]** 99/11
**gateway [3]** 24/14 24/25 40/2
**gateways [8]** 37/2 39/18 39/22 43/8 43/10 90/3 90/4 90/9
**gathering [1]** 110/7
**gave [4]** 12/2 12/5 46/16 117/15
**gee [1]** 82/17
**general [6]** 57/14 74/24 75/20 75/22 84/23 100/7

**generally [1]** 105/23
**generated [3]** 31/23 37/25 98/3
**generating [1]** 48/14
**generation [4]** 37/21 70/11 70/16 72/1
**generosity [1]** 47/2
**generously [1]** 46/24
**geolocation [1]** 40/5
**geolocations [1]** 40/3
**Gerard [1]** 61/3
**Germany [1]** 98/12
**get [54]** 5/22 7/11 14/8 18/10 27/6 28/15 35/14 35/23 36/15 41/19 44/25 45/4 51/16 52/11 53/18 55/19 57/6 58/6 58/10 58/16 64/17 65/4 66/11 66/18 66/22 68/10 69/3 69/5 70/15 74/10 75/12 75/21 75/25 76/12 77/14 78/2 79/16 82/3 86/21 86/25 87/9 91/4 91/6 94/16 94/24 96/25 97/25 98/1 99/3 103/14 105/11 113/24 114/22 118/13
**gets [7]** 24/24 42/21 64/12 64/23 66/7 82/16 94/6
**getting [8]** 7/20 34/5 34/17 52/18 75/14 81/18 85/19 85/24
**gigantic [2]** 68/10 69/10
**Gillan [4]** 80/25 81/15 81/17 83/25
**Gillan's [1]** 81/1
**give [23]** 14/25 19/11 22/20 25/6 36/2 50/25 54/7 69/13 76/10 99/12 99/13 99/13 99/14 101/17 105/19 106/23 110/9 110/16 114/24 115/13 117/15 120/2 122/8
**given [8]** 33/11 41/14 79/8 99/17 102/23 105/4 106/3 121/1
**gives [1]** 115/15
**giving [1]** 101/24
**glad [1]** 106/23
**gladly [1]** 116/14
**Global [1]** 7/25
**go [45]** 5/6 16/22 19/8 21/5 23/1 24/5 29/14 32/9 36/18 37/16 39/5 52/22 53/6 54/10 55/4 59/21 62/2 62/18 65/1 66/8 69/14 78/1 78/14 79/20 81/8 82/23 85/6 88/14 88/24 89/1 89/7 99/4 103/25 105/12 107/13 107/15 107/16 108/2 111/9 113/10 115/10 116/23 117/22 122/23 124/23
**goes [5]** 13/1 31/18 47/4 62/19 76/23
**going [51]** 5/6 6/1 22/3 29/7 30/20 41/17 43/4 43/7 48/17 49/8 50/25 51/5 51/13 55/5 56/11 59/13 66/14 66/17 66/20 68/10 78/12 81/2 81/17 88/10 89/10 89/19 94/2 94/5 94/11 97/24 99/14 101/4 101/17 102/4 108/12 108/15 110/3 110/11 112/19 113/6 115/7 117/4 118/9 119/25 120/14 120/16 122/12 122/15 122/22 122/23 123/19
**good [22]** 4/4 4/5 4/6 4/10 4/16 4/18 4/19 4/21 5/4 20/18 20/23 36/1 36/2 44/21 45/7 55/16 68/15 83/13 103/1 105/7 105/20 115/9
**Gosal [1]** 44/3
**gosh [2]** 78/12 86/15
**gospel [1]** 48/18
**got [38]** 7/18 12/24 15/9 28/11 28/16 29/8 30/16 30/25 32/18 35/14 35/24 35/25 45/10 45/19 46/1 51/2 52/4 52/12 55/4 57/21 66/5 70/4 72/19 74/15 74/16 81/10 83/18 84/22 89/25 99/6 112/13 112/14 115/16 117/10 117/10 117/11 117/11 124/5
**gotten [1]** 25/16
**government [6]** 23/17 36/13 36/16 61/20 67/6 82/24
**governs [1]** 98/5
**GR [1]** 87/9
**grabbed [1]** 46/21
**grace [3]** 117/1 120/2 120/8
**graciously [1]** 76/24
**Grannis [1]** 2/7
**grant [1]** 84/3
**great [3]** 82/10 115/21 123/8
**gripes [1]** 83/18
**gross [6]** 47/25 48/2 48/4 48/5 49/4 50/2
**ground [1]** 87/3
**group [14]** 60/16 60/22 69/2 70/1 70/4 70/19 70/21 71/4

**group... [6]** 71/7 71/9 72/13 93/1 102/10 103/19
**GSM [3]** 7/25 8/24 77/24
**guess [2]** 73/12 122/2
**guest [1]** 4/12
**guy [2]** 88/21 88/22
**guys [2]** 46/21 47/1

**H**

**habit [1]** 87/22
**had [37]** 31/17 31/19 31/19 32/20 33/25 36/13 39/19 41/23 43/8 54/6 83/21 84/17 86/15 86/15 86/15 89/14 91/5 92/7 92/19 92/20 96/21 97/4 98/19 101/8 101/20 101/23 105/10 108/22 113/13 113/14 113/20 114/3 116/14 116/17 116/23 117/6 124/21
**Haiti [111]** 1/4 4/12 4/17 4/20 6/7 6/18 7/24 8/8 9/24 10/3 10/7 14/4 14/14 14/16 16/5 17/15 17/17 17/18 29/25 31/16 31/19 32/3 32/5 32/12 32/15 32/20 32/22 32/23 37/2 39/19 40/6 44/7 44/11 48/20 49/2 50/11 53/23 54/16 59/15 60/12 60/21 61/7 61/10 61/20 62/13 64/17 64/23 65/16 65/20 65/20 66/3 66/9 66/20 66/23 67/2 67/2 67/8 67/13 67/21 67/25 68/7 69/1 69/3 69/6 69/9 69/23 69/25 70/2 70/5 70/17 70/17 70/23 71/4 71/19 72/3 72/6 72/11 72/18 72/21 73/5 73/24 76/16 78/5 78/5 78/11 78/14 83/10 86/25 90/4 90/13 92/8 92/22 93/2 93/7 93/14 97/20 97/21 97/22 98/24 102/6 102/9 103/11 103/11 103/12 103/20 104/23 108/8 108/8 108/13 109/14 111/1
**Haiti's [21]** 10/15 39/16 47/23 47/24 49/10 53/11 60/11 60/13 60/16 60/19 61/9 61/12 63/13 65/2 65/7 69/5 76/13 100/19 102/7 102/13 115/22
**Haitian [9]** 21/20 23/12 23/16 61/1 62/24 82/23 87/20 98/24 108/19
**Haitians [1]** 70/4
**half [1]** 42/15
**hamburgers [2]** 77/9 77/10
**handle [4]** 24/18 34/9 39/19 85/17
**handled [1]** 63/8
**happen [3]** 23/13 94/9 94/25
**happened [1]** 96/19
**happens [3]** 89/6 94/15 99/2
**happy [6]** 80/11 88/21 88/22 99/14 100/13 102/20
**hard [2]** 84/24 85/3
**harm [2]** 59/14 60/25
**harmed [1]** 94/15
**harms [1]** 61/7
**Harris [1]** 2/7
**has [44]** 10/3 10/8 14/13 17/23 20/12 28/10 29/8 39/14 42/10 45/5 45/9 45/18 46/8 46/13 46/16 46/17 49/9 49/17 56/7 56/7 58/8 58/9 73/24 74/15 74/16 81/25 83/10 84/7 94/9 95/19 97/20 97/21 98/3 98/24 99/8 100/7 102/22 104/2 104/8 104/11 107/11 109/18 115/19 121/10
**hate [2]** 55/18 116/25
**have [193]**
**haven't [1]** 89/14
**having [13]** 14/17 16/8 24/19 30/2 64/16 83/21 86/17 86/18 87/20 97/4 102/7 104/23 124/16
**HBS [18]** 26/12 28/4 39/23 40/1 40/3 42/11 91/9 91/10 91/16 91/22 112/12 112/15 113/4 115/16 117/8 117/12 117/19 118/10
**HBS-enhanced [2]** 39/23 40/3
**he [114]** 6/9 6/10 8/22 8/23 8/24 9/6 9/6 9/11 13/1 13/2 13/8 17/1 17/5 17/9 17/23 18/5 19/3 19/11 19/12 19/13 19/14 19/18 19/23 19/24 21/8 21/9 21/12 21/15 21/17 21/21 23/21 24/8 27/17 28/3 35/7 36/3 36/5 36/6 36/7 36/8 36/9 36/16 39/4 39/13 39/13 39/17 39/20 40/8 40/15 40/15 40/23 41/5 41/6 41/8 41/11 42/3 46/16 49/17 50/6 50/8 53/15 59/17 59/21 60/1 60/9 60/9 60/10 60/15 64/12 64/12 64/22

**85/2 85/2 85/3 88/22 90/17 90/17 91/9 91/23 91/23 91/24 92/5 92/6 92/23 92/23 93/3 98/3 94/5 101/17 101/17 108/12 109/8 109/9 112/11 112/19 113/6 117/14 118/21 118/22 118/25 118/25 119/6 119/9 119/11 119/17 119/20 119/22 119/22 119/23 119/24 120/8 121/20 123/10 123/13**
**he's [2]** 50/6 50/10
**head [1]** 25/15
**hear [11]** 58/24 65/4 71/20 81/10 81/12 81/16 84/11 113/2 116/8 116/11 120/2
**heard [2]** 15/2 68/21
**hearing [20]** 1/15 3/2 34/6 72/7 74/4 94/5 105/21 106/5 107/1 107/5 107/6 107/9 107/19 109/4 113/2 115/1 115/9 117/13 123/1 124/24
**held [2]** 47/18 108/3
**help [3]** 17/7 110/4 121/12
**here [53]** 4/7 4/20 5/25 12/6 18/20 21/1 25/14 33/23 42/15 44/8 45/21 47/23 49/10 49/11 50/1 52/8 55/2 61/5 62/12 65/15 70/16 71/24 71/24 72/1 75/3 79/15 79/20 83/21 84/14 84/18 85/19 89/6 92/18 94/20 94/20 94/21 94/22 97/12 97/19 101/18 103/12 103/14 105/18 107/25 108/8 109/9 111/25 112/6 114/25 116/13 122/25 124/7 124/17
**herein [1]** 55/1
**herring [1]** 56/13
**Hey [5]** 57/11 66/9 70/21 76/18 96/20
**hidden [1]** 13/16
**high [2]** 80/2 82/13
**high-speed [1]** 80/2
**higher [1]** 30/23
**highly [3]** 27/9 60/2 124/11
**him [11]** 4/13 17/20 52/6 89/21 109/6 113/4 113/5 117/15 120/4 123/15 123/16
**himself [1]** 4/13
**his [39]** 5/20 5/21 8/8 13/2 13/3 16/22 17/1 19/5 19/10 19/19 23/20 23/21 24/3 24/4 25/15 27/25 28/2 28/16 29/6 31/21 31/22 34/6 38/24 40/23 51/3 55/23 60/5 64/22 74/25 91/23 92/22 92/23 101/24 108/14 112/11 118/17 120/22 120/23 123/12
**historical [1]** 47/4
**hits [1]** 86/23
**hoc [1]** 6/25
**hold [6]** 24/10 24/13 40/20 44/3 48/18 58/22
**HOLDING [2]** 1/3 4/7
**Holdings' [1]** 115/4
**holds [1]** 48/17
**hole [1]** 95/24
**home [81]** 7/23 8/2 8/7 8/7 8/13 8/18 8/24 9/18 10/11 10/15 10/20 11/7 11/17 11/19 12/18 13/5 13/9 13/14 13/17 13/21 14/2 14/15 14/20 14/22 15/1 15/8 16/1 16/6 16/13 16/18 20/16 20/19 21/3 21/10 25/9 31/14 31/23 32/14 61/11 64/14 64/18 64/22 65/3 65/15 66/16 66/21 67/2 67/9 67/10 67/16 67/20 67/22 67/22 67/23 68/8 68/13 69/5 69/8 70/22 72/2 72/5 72/10 72/16 73/25 75/5 78/7 78/8 80/8 82/21 86/24 87/2 87/24 88/4 90/7 96/22 98/25 103/4 103/8 103/13 103/16 122/24
**honest [1]** 22/6
**honestly [3]** 22/4 88/6 89/13
**Honor [45]** 4/19 9/21 15/18 20/13 22/10 35/19 38/9 42/5 42/19 43/15 47/17 49/16 51/11 52/25 53/14 55/12 55/14 62/10 71/3 85/7 100/24 101/4 101/5 101/16 103/17 105/8 106/19 107/3 107/23 110/7 111/8 112/5 112/6 113/13 116/4 117/5 118/16 119/9 119/13 120/15 120/24 120/25 121/7 122/14 123/24
**HONORABLE [1]** 1/17
**hope [3]** 11/15 24/17 25/14
**hopefully [1]** 51/1
**host [2]** 60/19 68/2
**hotel [1]** 39/9

**hour [6]** 26/24 27/4 76/6 108/9 109/3 109/3
**hours [17]** 12/2 25/23 26/1 26/1 26/13 26/14 26/15 26/19 26/22 27/1 27/1 29/20 33/11 34/10 36/24 105/14 108/16
**house [1]** 23/20
**hover [1]** 48/11
**how [50]** 6/17 12/17 13/10 13/10 14/14 14/19 14/22 15/7 16/11 18/10 26/18 45/5 45/9 45/13 45/14 45/15 45/16 45/19 45/23 45/23 46/1 46/18 47/1 48/20 49/10 50/8 50/8 52/6 52/7 53/19 60/5 62/6 64/16 65/2 65/5 65/6 65/22 65/23 67/10 67/24 79/1 79/14 84/23 90/11 91/9 96/11 99/23 105/10 115/11 122/21
**however [3]** 23/1 26/20 56/18
**huge [2]** 38/21 111/23
**human [5]** 26/12 26/14 26/14 114/4 114/11
**hundreds [3]** 23/22 39/19 94/21
**hurt [1]** 86/25
**HWG [1]** 4/17
**hypothetical [3]** 44/21 44/22 48/16

**I**

**I'd [2]** 107/4 108/22
**I'll [38]** 4/8 4/22 5/7 5/22 6/4 7/11 9/12 20/18 21/13 24/5 29/14 38/3 52/13 53/21 54/7 56/6 56/16 58/6 59/17 62/10 62/15 65/9 65/10 66/17 66/18 71/2 76/10 85/10 89/11 95/12 100/22 101/1 105/23 106/6 106/11 106/23 109/4 111/7
**I'm [104]** 5/23 6/10 12/21 14/1 15/22 16/11 16/19 19/16 19/23 25/14 28/18 29/12 30/25 33/22 33/23 34/6 34/24 34/25 35/8 35/8 35/15 35/15 35/24 36/16 36/19 37/15 38/13 38/24 39/7 39/8 39/10 42/21 44/17 46/25 50/25 51/5 51/13 52/17 53/6 54/18 55/14 55/14 55/16 59/1 59/13 59/21 61/6 64/11 64/15 64/16 64/25 66/9 66/14 66/17 66/20 67/8 67/19 67/19 67/20 67/21 69/18 70/13 72/6 74/4 74/12 75/2 76/20 77/11 77/15 77/16 79/13 80/10 82/4 83/6 83/7 84/1 85/19 88/1 88/21 89/13 90/5 95/13 99/10 99/14 99/14 105/24 106/22 109/21 110/3 110/5 112/5 114/8 116/7 118/8 119/1 119/19 119/23 119/25 120/4 122/11 122/23 123/19 124/5 124/16
**I's [1]** 98/15
**I've [8]** 32/10 32/18 61/8 66/13 73/23 85/25 91/16 94/15
**idea [2]** 105/10 113/5
**identification [1]** 87/19
**identified [2]** 46/7 62/6
**identifier [1]** 59/23
**identify [1]** 103/8
**Identity [1]** 103/7
**Ignore [1]** 116/2
**II [8]** 104/20 109/22 109/24 109/25 110/1 110/15 110/15 110/18
**III [2]** 98/4 98/7
**il [1]** 51/7
**illegal [1]** 31/15
**imagine [2]** 44/24 122/15
**imminently [1]** 33/18
**impact [3]** 61/17 86/23 92/21
**impacted [1]** 61/25
**impacts [2]** 35/7 60/10
**impeachment [2]** 23/3 30/22
**implied [3]** 78/19 79/6 79/8
**implied-in-fact [3]** 78/19 79/6 79/8
**imply [1]** 95/4
**important [4]** 11/1 37/18 77/5 124/17
**impose [1]** 98/6
**Imprecise [1]** 21/11
**IMSI [1]** 103/7
**in-country [4]** 20/16 25/10 86/13 87/15
**inappropriate [1]** 120/11

**inbound [1]** 98/14
**Inc [3]** 1/7 1/7 4/8
**inclined [2]** 94/4 119/14
**include [8]** 11/19 13/4 21/2 21/3 21/9 51/4 97/6 107/8
**included [5]** 10/11 18/22 20/17 23/7 23/14
**includes [12]** 9/17 23/18 25/7 65/18 65/20 65/21 65/22 65/25 70/8 70/10 70/11 80/2
**including [11]** 6/16 30/2 32/14 51/4 58/17 60/12 103/20 103/20 104/20 104/21 121/17
**inclusive [1]** 113/16
**income [4]** 37/20 65/17 65/18 67/4
**incoming [1]** 49/24
**incomplete [1]** 25/5
**incorporate [1]** 113/18
**incorrect [6]** 32/19 38/24 59/23 69/22 69/24 83/7
**incurred [3]** 49/3 60/12 62/3
**indeed [4]** 74/14 87/1 112/22 117/15
**indefinite [1]** 72/14
**INDEX [1]** 3/1
**indicated [1]** 92/7
**indicates [5]** 17/15 54/1 55/25 56/2 56/20
**indicating [1]** 36/13
**individual [6]** 6/25 7/7 7/13 67/8 68/24 103/19
**individuals [3]** 7/1 7/9 68/13
**indulge [2]** 74/5 74/9
**industry [2]** 11/10 97/11
**inexplicably [1]** 60/21
**information [10]** 24/15 29/20 50/2 50/4 51/9 61/23 79/22 80/3 94/16 103/6
**injury [1]** 60/25
**input [2]** 51/16 51/21
**inputs [3]** 41/25 51/18 51/25
**inquiry [2]** 73/4 76/3
**insanely [1]** 82/13
**inside [2]** 23/21 25/8
**instance [2]** 24/13 25/2
**instead [2]** 41/20 118/21
**institutional [1]** 68/16
**instructed [1]** 113/16
**instructions [3]** 24/6 122/9 122/10
**intelligence [1]** 28/5
**intend [1]** 33/4
**intended [3]** 9/7 37/7 51/1
**intent [2]** 8/11 9/5
**interaction [1]** 76/19
**Interest [1]** 48/10
**interested [2]** 74/4 89/13
**interesting [3]** 78/23 78/24 78/25
**interject [1]** 112/6
**interlocutory [1]** 114/20
**internal [5]** 6/4 9/10 17/15 35/3 106/21
**international [6]** 8/20 8/20 49/24 85/12 98/14 103/7
**Internet [5]** 7/24 78/10 80/1 90/7 108/16
**interpret [2]** 97/19 112/17
**interpretation [3]** 8/16 81/20 114/10
**interpreted [1]** 63/7
**interrupting [1]** 61/24
**introduce [1]** 4/13
**invite [2]** 4/9 4/22
**involve [2]** 8/15 25/2
**involved [3]** 7/23 10/4 61/25
**involves [2]** 25/2 104/22
**IP [1]** 60/3
**ipsa [1]** 52/8
**irrational [1]** 93/18
**irrespective [1]** 79/9
**is [552]**

**isn't [8]** 32/17 32/18 45/11 52/9 80/22 82/24 97/8 107/25
**issue [12]** 23/11 55/23 58/8 58/24 64/5 75/4 76/23 77/19 100/10 105/2 108/23 116/3
**issues [20]** 10/2 12/16 31/13 58/17 60/2 60/10 61/11 62/12 74/4 85/14 85/15 99/18 99/21 99/25 100/6 100/14 100/20 105/6 107/11 122/12
**it [408]**
**it's [34]** 6/3 8/18 9/20 12/10 24/11 28/7 28/8 47/10 47/14 48/6 51/2 62/12 67/14 72/12 77/12 79/16 80/17 82/4 82/13 82/14 82/24 84/2 84/19 90/20 93/6 93/18 94/14 94/18 97/12 112/24 117/16 120/13 122/1 123/11
**Item [1]** 21/6
**its [28]** 11/13 17/14 30/2 30/5 30/6 30/10 36/23 47/4 47/5 47/6 47/7 47/19 47/22 48/3 48/20 50/11 60/13 60/17 61/18 61/19 61/20 61/21 62/21 64/24 83/4 102/9 103/19 104/10
**itself [2]** 90/4 102/9

**J**

**jams [1]** 111/7
**January [2]** 83/15 117/7
**Jaspaul [1]** 44/3
**Jose [1]** 44/2
**journey [2]** 56/7 56/8
**judge [37]** 1/18 4/6 4/10 4/16 5/23 6/1 6/5 6/21 9/2 12/8 12/23 14/23 15/10 16/18 19/21 20/2 29/15 36/11 38/14 41/11 42/24 48/16 49/17 56/5 58/6 58/13 72/23 88/11 101/5 105/17 111/10 111/23 114/8 115/19 116/8 119/22 124/4
**judgment [10]** 41/22 49/1 49/5 64/5 91/20 95/8 111/18 117/7 119/1 119/2
**judicial [2]** 23/17 90/19
**judiciary [1]** 6/15
**July [7]** 17/2 18/24 93/12 112/9 113/3 115/19 120/6
**July 2011 [1]** 93/12
**July 2012 [1]** 17/2
**July 26th [2]** 112/9 113/3
**July 26th order [1]** 115/19
**jump [1]** 71/2
**jurisdiction [14]** 84/3 84/7 98/18 98/19 98/20 99/15 99/25 100/3 100/8 101/13 104/22 105/5 110/6 122/11
**jury [33]** 14/8 14/10 14/17 14/24 16/12 18/19 37/6 50/22 52/8 83/25 85/9 85/10 85/12 85/13 88/11 88/20 89/7 91/25 92/2 94/6 94/24 100/21 106/1 106/2 115/10 122/9 122/10 124/2 124/2 124/12 124/13 124/14 124/19
**just [89]** 5/17 10/6 11/16 15/14 16/11 18/23 22/8 22/18 22/20 24/9 27/12 36/14 40/10 40/11 40/25 41/4 42/8 42/24 45/7 45/25 49/18 50/18 50/21 50/22 53/3 53/6 53/20 55/9 55/12 58/18 59/13 61/8 61/15 63/14 63/17 64/1 64/3 64/6 64/14 65/12 66/8 66/16 67/8 70/10 70/14 73/6 73/18 74/2 74/5 74/18 75/4 76/1 76/4 79/12 80/3 81/9 83/14 83/24 85/3 85/23 91/22 92/4 96/24 99/12 101/11 101/12 102/4 102/21 103/25 107/1 107/5 109/3 111/4 112/24 113/21 115/20 116/9 116/16 116/25 116/25 117/4 120/13 120/15 120/25 121/7 122/1 123/1 123/11 124/6
**justice [3]** 46/5 88/16 88/16

**K**

**keep [4]** 55/18 63/17 91/5 117/2
**Kent [2]** 2/7 4/17
**kettle [1]** 114/1
**key [1]** 73/18
**kick [1]** 61/15
**kilo [2]** 34/23 38/16
**Kim [2]** 2/4 4/11
**kind [4]** 75/17 82/6 86/17 114/15
**kinds [1]** 89/5
**knew [1]** 80/16

**knocked [1]** 23/21
**know [76]** 3/17 5/24 7/20 9/23 10/22 15/9 15/14 16/23 22/5 22/8 23/10 28/22 30/14 30/17 31/18 32/5 32/10 40/5 43/4 45/3 46/1 48/22 50/9 52/22 52/24 54/4 54/7 56/4 58/8 58/13 58/16 64/17 66/13 68/7 68/19 68/23 68/24 69/19 71/1 71/12 76/13 81/1 81/11 82/3 82/13 85/5 85/11 88/20 90/18 91/15 91/17 92/3 94/7 94/15 94/18 96/11 97/4 100/16 103/17 105/8 105/9 106/3 107/4 107/14 108/8 109/7 110/9 111/5 112/18 115/11 116/23 117/1 118/17 122/21 123/4 123/14
**knowing [5]** 11/6 11/7 45/5 45/19 122/15
**knowledge [1]** 43/2
**knows [3]** 88/10 88/11 90/14

**L**

**la [1]** 92/11
**Laborde [1]** 61/3
**Laborde's [1]** 86/9
**lack [2]** 83/22 87/18
**laid [1]** 94/23
**landing [3]** 66/1 66/2 67/4
**Lanham [1]** 85/17
**large [1]** 104/2
**last [9]** 46/13 47/6 60/5 64/13 92/20 93/5 111/16 117/7 120/21
**late [2]** 17/16 109/3
**latency [1]** 60/2
**later [8]** 5/21 13/19 45/2 52/13 53/12 62/11 87/24 100/20
**latest [1]** 46/7
**Lauderdale [1]** 2/5
**Laughter [4]** 22/9 92/13 92/15 124/8
**law [15]** 12/13 14/5 31/16 47/18 53/19 57/23 75/12 75/15 76/7 81/3 81/8 99/13 99/14 102/22 119/1
**lawsuit [2]** 10/4 45/13
**lawyers [1]** 124/21
**lay [5]** 35/10 60/8 115/23 116/5 117/24
**layperson [1]** 11/9
**LCRO [2]** 28/21 35/17
**Le [1]** 51/7
**Le Bypass [1]** 51/7
**lead [1]** 5/16
**leading [1]** 40/13
**leaning [1]** 116/25
**learning [1]** 56/8
**least [12]** 7/10 12/16 18/23 42/10 49/12 56/3 60/25 73/17 86/1 87/16 93/5 94/19
**leave [2]** 101/6 116/23
**leaves [2]** 72/7 78/11
**led [2]** 22/8 75/22
**left [4]** 92/19 92/20 111/5 114/7
**legal [17]** 6/7 53/21 54/8 57/16 57/16 57/22 57/22 57/24 58/3 58/10 73/13 76/3 76/11 85/15 92/11 115/24 115/25
**legally [3]** 58/1 58/19 79/1
**legitimate [1]** 67/20
**length [1]** 99/18
**Lerner [2]** 2/4 4/11
**less [6]** 18/17 19/1 45/1 46/18 70/23 82/14
**let [46]** 5/17 5/24 7/18 9/24 15/9 16/23 22/18 23/5 23/21 28/15 29/3 29/24 30/19 31/8 34/18 35/14 35/23 46/4 52/13 53/12 53/20 54/7 58/13 67/7 68/11 68/12 71/1 74/19 85/7 86/10 92/1 95/12 96/7 96/8 100/22 103/10 106/3 108/6 108/7 109/7 109/23 111/5 113/4 113/5 115/2 122/23
**let's [29]** 16/21 16/22 20/1 21/5 29/11 42/9 44/19 47/11 52/11 53/11 53/19 54/19 55/4 59/10 59/21 64/14 65/13 70/3 72/24 86/5 87/25 89/6 99/10 105/20 108/2 110/18 110/25 111/9 124/23
**letter [1]** 34/22
**letting [1]** 83/25

**level [1]** 75/11
**levity [1]** 94/18
**Lewis [1]** 7/13
**liars [1]** 94/1
**liberties [2]** 22/11 22/14
**liberty [1]** 117/4
**license [2]** 98/7 104/2
**licensed [1]** 98/4
**licensing [2]** 104/20 104/24
**lie [1]** 114/14
**lieu [1]** 115/24
**life [1]** 18/9
**light [5]** 15/2 73/20 74/15 74/17 83/20
**lighting [1]** 99/11
**like [116]** 7/23 8/2 8/6 8/7 8/12 8/17 8/24 9/18 10/10 10/15 10/20 11/7 11/17 11/19 12/17 13/4 13/9 13/14 13/16 13/21 14/2 14/15 14/20 14/22 15/1 15/8 16/1 16/6 16/12 16/17 18/13 20/16 20/19 21/3 21/10 25/8 31/14 31/23 32/14 38/7 38/17 45/24 52/15 54/10 57/18 58/22 61/11 64/14 64/18 64/19 64/22 65/3 66/10 66/16 66/16 66/21 66/21 67/2 67/3 67/9 67/10 67/14 67/16 67/16 67/20 67/21 67/23 68/8 68/13 69/5 69/8 70/22 72/2 72/5 72/10 72/16 73/25 74/2 75/3 75/5 75/15 78/7 78/8 80/8 81/9 82/21 86/4 86/24 87/1 87/7 87/19 87/24 88/4 90/6 92/1 95/24 96/22 97/5 98/25 100/6 100/23 103/13 103/15 106/5 106/25 108/6 108/15 109/14 114/5 116/10 117/2 118/11 118/18 120/12 122/12 122/24
**likely [5]** 26/16 32/20 39/20 107/13 124/2
**Lima [2]** 36/18 38/16
**limine [13]** 82/4 109/16 118/4 118/22 118/25 119/3 119/4 119/6 119/14 119/16 119/24 119/25 123/5
**limit [3]** 60/18 87/12 90/11
**limitation [4]** 11/5 31/13 43/20 60/15
**limitations [3]** 60/12 98/7 123/12
**limited [8]** 12/10 42/6 47/23 91/22 102/7 106/15 115/16 117/8
**limiting [3]** 83/2 90/1 90/2
**limits [1]** 32/8
**line [4]** 35/2 35/3 59/23 114/8
**lines [1]** 82/21
**linguistic [1]** 92/18
**list [4]** 15/9 52/20 109/15 109/15
**listed [2]** 103/22 103/23
**lists [2]** 21/17 115/24
**literally [2]** 68/22 77/3
**little [12]** 5/20 13/19 54/12 59/11 62/10 64/25 76/2 93/22 94/18 94/18 120/9 122/14
**live [3]** 68/7 70/6 111/7
**living [9]** 69/3 69/7 70/5 70/14 70/16 70/17 71/23 72/1 72/9
**LLP [4]** 2/4 2/7 2/14 4/17
**lo [2]** 47/7 50/12
**loaded [1]** 87/18
**local [3]** 25/9 64/25 67/3
**location [1]** 24/25
**locations [1]** 39/23
**logic [1]** 117/10
**long [4]** 10/9 10/22 94/8 119/11
**longer [2]** 60/3 99/20
**look [37]** 9/8 11/9 12/20 16/21 20/18 25/4 28/13 28/17 32/19 33/9 35/9 43/24 45/13 45/16 48/8 48/13 49/1 50/5 52/22 74/11 74/22 79/20 81/15 84/4 89/6 92/22 101/18 102/18 103/5 105/2 105/23 108/13 108/15 114/5 115/2 118/11 123/25
**looked [2]** 85/21 111/19
**looking [16]** 6/11 8/5 12/6 16/11 28/18 34/25 35/17 35/18 39/3 45/14 49/16 49/25 50/3 53/2 53/17 111/24
**looks [6]** 38/7 38/17 47/4 50/10 87/7 97/5

**looming [1]** 90/6
**Los [2]** 69/7 70/20
**Los Angeles [2]** 69/7 70/20
**lose [4]** 88/13 88/19 88/20 88/22
**loss [7]** 37/24 47/11 47/13 47/22 50/20 59/18 111/10
**losses [21]** 9/11 11/13 21/7 21/8 21/9 21/10 21/12 37/22 47/15 48/3 48/11 48/21 49/3 49/10 49/21 49/21 49/24 50/7 50/9 50/11 50/16
**lost [6]** 37/19 45/15 47/7 65/11 94/10 95/2
**lot [20]** 5/5 31/23 31/24 32/6 45/1 58/17 70/23 75/1 75/23 81/12 82/25 83/7 84/9 93/6 99/7 100/14 107/6 116/17 123/11 123/18
**love [1]** 74/8
**low [1]** 43/14
**lying [1]** 95/5

**M**

**Maarten [1]** 13/13
**Maceus [2]** 7/5 23/19
**Maceus Outger [1]** 7/5
**machine [8]** 53/5 77/13 77/19 78/2 78/9 78/10 78/21 80/18
**Machuca [1]** 44/2
**mad [4]** 82/17 82/19 82/19 87/9
**made [16]** 26/13 27/9 29/21 33/8 33/10 38/21 39/14 40/12 41/16 52/1 63/11 65/16 93/3 93/3 102/23 111/12
**magnanimously [1]** 46/24
**magnificent [1]** 11/9
**mails [1]** 103/12
**main [1]** 6/23
**make [25]** 7/18 11/1 14/1 17/21 19/3 19/25 21/7 24/9 40/15 40/23 42/11 44/10 77/2 85/23 87/1 90/9 93/23 100/9 108/15 108/22 109/10 112/2 112/3 112/19 117/12
**make as [1]** 19/25
**makes [5]** 7/4 44/4 59/16 61/3 111/23
**making [11]** 20/15 30/5 31/5 33/17 44/24 66/7 67/3 71/13 90/2 90/3 96/15
**manage [4]** 21/21 24/8 24/16 24/18
**managed [1]** 95/5
**management [7]** 28/10 29/9 120/19 120/19 121/6 121/22 121/24
**Manuel [1]** 44/2
**many [20]** 6/17 13/10 13/10 14/14 14/19 14/22 45/5 45/9 45/19 45/22 45/23 46/1 59/23 65/22 65/23 87/17 90/8 93/13 93/13 93/14
**March [3]** 114/2 117/13 117/20
**March 29 [1]** 117/20
**March 29th hearing [1]** 117/13
**March 29th of [1]** 114/2
**marker [1]** 76/2
**market [10]** 68/13 69/2 70/19 70/21 76/14 79/18 86/23 87/11 102/6 102/7
**marketed [3]** 69/23 71/9 73/25
**marketing [22]** 69/6 69/8 69/17 70/1 70/1 70/4 70/20 70/25 72/13 73/21 73/22 77/8 77/10 77/12 77/16 77/19 79/10 80/6 80/8 103/18 103/18 122/24
**Mary [1]** 107/12
**massacre [1]** 51/6
**matches [1]** 47/14
**material [2]** 23/23 113/8
**materials [3]** 23/6 69/18 115/8
**math [1]** 50/18
**mathematical [1]** 34/7
**matter [6]** 22/23 77/3 77/4 80/17 88/8 119/1
**matters [1]** 99/17
**may [38]** 10/23 11/9 12/22 15/10 17/3 17/4 18/13 18/16 18/20 18/24 19/2 22/2 22/10 25/15 32/24 38/23 39/11 51/11 51/13 51/14 51/15 51/18 51/18 52/3 65/25 65/25 76/2 76/7

**may... [10]** 77/16 88/19 99/20 100/16 114/20 117/5 121/17 123/5 123/15 124/6

**May 2013 [3]** 17/3 18/20 19/2

**May 2014 [2]** 17/4 18/24

**maybe [10]** 45/15 55/10 57/15 71/24 80/23 84/2 87/17 87/20 96/7 120/13

**McEwen [19]** 10/19 24/22 26/17 27/18 27/25 35/17 38/8 38/9 38/20 38/23 39/2 39/3 40/7 40/12 112/23 123/6 123/10 123/18 123/18

**McEwen's [7]** 26/10 27/21 28/7 28/13 28/16 34/19 40/8

**McKewn [1]** 39/3

**me [128]**

**mean [16]** 10/10 24/10 50/3 52/2 52/3 74/1 77/24 78/7 82/1 90/17 90/20 97/19 97/22 98/14 115/2 123/18

**meaning [4]** 27/1 80/10 80/23 98/22

**means [16]** 15/12 24/10 24/12 24/14 26/1 59/23 66/2 75/18 77/6 79/24 85/6 86/16 86/16 90/17 93/18 98/23

**meant [1]** 109/5

**meantime [2]** 29/13 59/3

**measure [2]** 32/21 45/11

**meet [3]** 47/15 94/3 114/9

**members [2]** 69/9 102/10

**members' [1]** 69/4

**Memorandum [1]** 115/4

**memory [4]** 7/2 26/23 79/23 123/5

**mentioned [2]** 29/19 94/13

**mentions [1]** 8/24

**mere [1]** 104/19

**message [2]** 103/14 104/1

**messages [1]** 103/3

**methodology [2]** 51/20 51/25

**MICHAEL [1]** 1/17

**mid [1]** 88/20

**mid-November [1]** 88/20

**middle [4]** 6/11 18/25 36/20 68/22

**might [8]** 26/11 58/21 75/21 84/13 89/4 90/21 103/4 118/3

**miles [1]** 76/6

**million [18]** 9/13 9/13 9/25 9/25 12/3 12/4 15/1 21/14 21/14 34/13 34/13 48/1 48/1 48/6 48/12 48/15 62/4 62/4

**millions [1]** 62/4

**mind [3]** 63/17 88/8 107/23

**mine [1]** 105/23

**minimum [1]** 14/21

**minor [1]** 111/4

**minute [20]** 10/20 13/14 15/11 34/12 64/23 64/24 65/5 65/6 65/6 66/1 66/25 67/25 74/5 82/13 86/22 87/1 93/17 105/15 110/19 120/6

**minutes [49]** 8/20 10/23 11/3 11/24 11/25 12/1 12/2 12/4 12/4 12/5 12/18 13/10 13/20 14/3 14/15 14/19 14/22 15/1 15/3 15/8 15/19 15/21 16/4 16/5 16/10 20/3 21/2 21/2 26/24 29/19 31/24 32/19 33/16 33/17 34/11 37/8 54/8 60/18 65/23 65/23 66/25 72/22 83/1 83/1 83/2 93/13 93/13 94/21 99/6

**mirror [2]** 99/8 99/12

**mis [2]** 96/7 96/14

**mis-cited [2]** 96/7 96/14

**misbegotten [1]** 90/14

**misnomer [1]** 100/8

**misrepresentations [1]** 44/10

**miss [5]** 13/23 26/6 27/24 84/10 84/12

**missed [3]** 55/11 59/24 62/9

**missing [6]** 41/10 46/3 50/14 50/24 59/22 117/2

**mistake [1]** 80/12

**mistaken [1]** 40/17

**misunderstanding [1]** 112/3

**misunderstood [3]** 5/12 57/9 96/16

**misuse [1]** 102/14

**mobile [5]** 7/25 71/20 103/7 104/2 104/9

**model [11]** 16/17 16/20 16/21 33/9 38/1 39/14 43/4 43/23 46/7 46/8 47/23

**moderate [1]** 26/18

**modern [1]** 78/22

**moment [5]** 11/18 32/18 35/23 36/2 38/3

**Monday [4]** 58/11 101/25 102/2 105/3

**monetary [1]** 10/2

**money [8]** 45/13 45/24 54/20 55/7 56/19 68/9 72/3 79/4

**month [29]** 12/3 12/4 17/2 17/3 17/4 18/2 18/2 18/2 18/5 18/6 18/6 18/10 18/11 18/15 18/16 18/18 19/7 19/12 19/19 19/24 21/1 21/1 26/2 26/25 33/16 33/17 83/1 83/1 83/2

**monthly [1]** 66/22

**months [16]** 12/7 12/7 12/7 15/22 17/24 18/11 18/12 18/12 18/24 18/25 19/21 19/22 21/16 36/24 66/10 122/13

**more [29]** 5/10 6/12 9/19 18/16 18/21 30/16 34/7 39/20 41/23 50/25 52/12 59/12 62/1 74/18 75/23 78/25 80/11 83/25 85/23 87/13 99/13 101/11 101/14 104/23 105/10 105/25 107/6 113/6 122/3

**morning [4]** 55/20 105/12 107/8 108/13

**Morrison [1]** 2/17

**most [7]** 5/9 11/5 41/25 74/4 96/4 123/2 124/2

**mostly [1]** 116/21

**motion [24]** 1/15 3/2 6/14 64/4 80/25 100/11 100/23 101/11 101/12 112/11 118/4 118/22 118/25 119/1 119/3 119/4 119/6 119/12 119/14 119/16 119/23 119/24 119/25 123/5

**motions [3]** 82/3 109/16 118/20

**mouth [1]** 118/17

**move [7]** 20/1 29/11 44/19 52/11 56/16 83/7 124/6

**moved [3]** 112/13 112/14 112/25

**movement [1]** 40/2

**Mr [17]** 2/3 2/7 2/13 28/16 34/3 52/9 94/3 94/5 94/11 99/6 101/9 108/20 113/12 119/12 121/12 123/9 123/18

**Mr. [149]**

**Mr. Augter [1]** 7/10

**Mr. Baltazar [1]** 23/23

**Mr. Boute [2]** 86/14 87/2

**Mr. Boute's [3]** 13/18 60/5 60/8

**Mr. Bressie [22]** 4/15 25/15 52/16 58/25 61/14 62/8 63/2 69/12 69/13 69/14 71/1 71/20 73/21 84/25 89/9 89/14 95/13 99/4 101/10 102/3 103/10 104/17

**Mr. Castel [24]** 12/22 13/1 19/4 20/12 21/7 24/2 25/18 27/13 27/19 34/4 38/7 39/1 51/2 52/4 86/13 89/21 90/14 94/2 105/21 108/12 109/4 119/5 122/5 123/4

**Mr. Castel's [17]** 5/19 6/6 8/5 8/22 10/11 11/19 12/20 16/22 17/5 20/25 26/6 26/7 26/9 27/16 49/17 86/6 91/19

**Mr. Duy [1]** 44/2

**Mr. Gillan [4]** 80/25 81/15 81/17 83/25

**Mr. Gillan's [1]** 81/1

**Mr. Maarten [1]** 13/13

**Mr. Maceus [1]** 23/19

**Mr. McEwen [9]** 10/19 24/22 26/17 27/18 27/25 38/9 112/23 123/6 123/10

**Mr. McEwen's [5]** 26/10 27/21 28/7 28/13 34/19

**Mr. Outger [1]** 7/6

**Mr. Savage [21]** 30/16 52/7 52/13 55/22 64/11 64/21 65/1 101/17 101/24 102/22 104/11 109/12 113/21 114/24 116/9 118/16 118/21 120/13 120/14 120/22 121/20

**Mr. Savage's [1]** 103/25

**Mr. Tran [3]** 31/3 31/22 53/15

**Mr. Vaughan [28]** 5/15 5/22 8/3 64/14 73/21 74/8 74/25 82/16 85/25 88/22 89/9 89/20 90/24 91/8 92/5 94/14 95/21 106/3 108/7 111/9 112/8 112/10 112/18 113/2 113/11 117/13 119/18 121/13

**Mr. Vaughan's [2]** 80/25 94/23

**Mr. Wood [1]** 31/21

**Ms [5]** 2/3 2/4 2/10 2/16 2/16
**Ms. [2]** 107/11 121/10
**Ms. Talbot [1]** 107/11
**Ms. Talcott [1]** 121/10
**much [23]** 7/16 12/17 15/7 15/13 18/16 30/24 41/23 45/13 45/14 45/15 45/16 45/23 46/18 67/11 67/24 78/13 78/25 80/5 82/13 83/22 101/15 105/10 122/1
**multiple [22]** 11/6 24/24 25/1 37/1 37/1 37/8 39/22 39/23 40/6 41/5 41/6 41/12 41/12 41/14 42/7 43/23 44/12 44/18 65/9 68/20 82/9 91/10
**multiplication [1]** 45/17
**multiplied [1]** 34/11
**must [4]** 69/11 96/14 105/16 123/23
**my [81]** 4/13 5/6 5/9 6/17 7/19 17/1 25/4 28/10 29/9 30/25 31/8 32/9 33/21 38/24 49/2 49/9 49/12 52/18 54/18 55/5 55/15 56/14 57/14 58/7 58/21 59/4 61/5 67/10 68/10 69/20 69/21 71/6 71/6 73/19 77/10 77/12 78/6 78/12 80/13 80/20 81/14 83/22 84/10 84/12 86/15 88/7 89/1 89/15 91/13 91/20 93/9 94/10 95/4 95/4 96/4 96/24 96/25 105/11 105/24 106/19 106/20 107/24 109/7 111/18 111/20 112/12 113/3 113/9 114/17 118/15 120/18 121/5 121/21 121/21 121/23 122/2 122/9 123/4 123/13 124/10 124/11
**myself [1]** 29/4

# N

**N.W [1]** 2/8
**nabbed [3]** 46/14 46/17 47/1
**nail [1]** 76/21
**naked [2]** 81/20 84/17
**name [3]** 7/7 7/11 60/6
**namely [2]** 57/24 86/2
**names [2]** 23/25 122/3
**narrow [2]** 54/3 54/5
**narrowed [1]** 116/17
**nation [1]** 92/7
**national [3]** 21/20 23/12 52/5
**nature [3]** 5/10 47/19 123/6
**near [1]** 9/11
**necessarily [3]** 47/10 74/24 101/19
**necessary [3]** 23/9 98/16 122/19
**need [20]** 13/7 15/10 42/25 49/19 69/13 72/23 81/9 81/16 90/9 91/1 91/1 93/22 94/6 97/5 112/21 117/23 119/15 122/24 123/15 123/15
**need a [1]** 119/15
**needed [1]** 5/8
**needs [1]** 101/17
**negative [3]** 35/7 59/22 60/10
**neglected [1]** 38/25
**negligent [1]** 76/5
**negotiated [4]** 65/18 65/21 65/22 67/4
**negotiations [1]** 106/21
**neither [3]** 69/19 92/10 98/1
**net [2]** 67/4 67/5
**network [5]** 65/14 77/25 78/11 103/9 103/9
**neutral [4]** 73/9 74/18 85/22 86/1
**never [8]** 8/24 41/8 43/2 104/8 111/20 119/5 124/12 124/21
**Nevertheless [1]** 99/21
**new [26]** 69/7 70/20 84/24 84/24 85/2 91/4 111/12 111/13 111/14 111/15 111/17 111/19 111/20 112/2 112/3 112/19 112/19 113/8 113/24 113/24 115/12 115/13 116/11 116/23 121/2 123/18
**New York [2]** 69/7 70/20
**next [7]** 6/10 55/5 60/1 92/6 92/20 94/8 109/20
**next-to-last [1]** 92/20
**Ninth [3]** 73/3 73/7 89/10
**Ninth Circuit [2]** 73/7 89/10

**no [83]** 1/5 9/20 10/6 10/9 12/24 13/6 13/24 14/2 16/9 18/12 19/23 21/4 22/13 25/6 26/14 29/7 29/15 32/3 33/25 37/4 40/4 43/4 43/22 43/22 45/5 45/18 50/8 52/2 52/4 54/5 55/19 56/13 58/14 67/13 67/18 68/1 69/21 69/21 71/3 72/10 72/13 72/17 72/18 73/12 77/9 77/11 78/15 79/10 81/6 84/13 84/13 84/17 87/3 87/6 87/9 90/10 91/7 92/25 93/1 94/2 95/21 95/24 97/8 97/8 97/8 98/23 99/10 99/10 99/20 103/12 105/17 111/12 111/13 111/14 111/17 111/20 112/24 113/20 116/21 117/21 123/24 124/16 124/20
**no one [2]** 84/17 103/12
**No. [1]** 4/8
**No. 3:15-cv-185 [1]** 4/8
**nobody [3]** 88/17 95/14 95/15
**nodded [1]** 25/4
**non [1]** 10/6
**non-answer [1]** 10/6
**None [2]** 104/6 104/8
**nonmonetary [3]** 10/1 59/14 61/7
**nonsense [1]** 94/1
**nonstop [1]** 26/15
**normal [4]** 26/12 26/14 27/1 96/20
**normally [1]** 111/1
**not [226]**
**note [9]** 11/2 11/23 15/2 19/7 53/8 77/1 91/8 102/4 102/21
**note that [1]** 19/7
**noted [2]** 56/10 100/7
**notes [3]** 44/8 71/13 74/6
**nothing [11]** 8/6 28/24 40/11 56/14 74/2 85/17 90/14 92/8 94/12 107/17 116/13
**notice [4]** 23/17 90/20 97/1 103/2
**notion [1]** 93/18
**November [13]** 17/3 18/21 19/2 88/20 106/6 106/13 107/2 109/1 109/2 109/5 109/5 122/7 122/8
**November 14th [2]** 122/7 122/8
**November 2013 [3]** 17/3 18/21 19/2
**November 27th [1]** 109/5
**November 5 [2]** 106/13 107/2
**November 6th [1]** 109/1
**now [65]** 8/5 9/19 10/22 13/4 14/25 17/14 20/11 21/5 22/2 24/2 24/5 24/8 25/3 28/7 32/5 34/6 39/3 41/3 44/6 46/24 51/13 52/1 53/19 57/13 57/15 60/4 61/5 62/16 67/22 68/3 68/7 69/7 69/13 70/6 73/4 76/15 79/19 81/18 84/1 86/14 87/16 90/5 91/23 93/17 94/4 99/5 105/2 105/13 105/16 106/11 106/22 108/7 111/6 111/18 112/17 113/10 114/22 114/23 115/8 117/9 118/22 119/9 120/4 120/21 124/22
**number [43]** 9/25 12/2 13/20 15/21 16/4 16/5 18/22 18/23 20/5 21/2 22/15 22/20 28/1 28/6 29/2 32/15 33/20 33/21 33/24 34/3 34/11 41/9 41/14 41/20 42/6 42/14 42/18 42/18 42/25 43/1 43/16 43/17 43/19 43/20 44/9 48/12 50/19 59/19 60/18 91/3 92/23 99/18 110/5
**numbers [17]** 9/12 11/9 12/9 16/18 30/18 32/2 32/3 33/15 37/9 39/5 47/4 48/22 48/23 50/23 52/5 59/18 92/22
**numerator [1]** 92/24
**numerical [3]** 11/22 11/23 13/9
**Numerically [1]** 13/6
**NW [1]** 2/14

# O

**o'clock [2]** 89/18 107/17
**objection [3]** 124/16 124/18 124/20
**objections [2]** 30/14 109/15
**obligation [1]** 104/24
**obligations [1]** 104/20
**obscure [2]** 104/15 104/16
**obvious [1]** 91/18
**obviously [7]** 5/12 5/15 18/1 30/1 51/2 75/8 118/10
**occasions [1]** 32/15

**occupied [1]** 25/23
**October [23]** 106/9 106/12 106/23 107/2 109/6 109/25 110/13 110/24 111/1 111/3 111/5 111/6 112/4 120/22 121/14 121/17 121/18 121/22 121/24 122/4 122/5 122/6 124/1
**October 11 [1]** 111/1
**October 11th [5]** 109/25 110/13 110/24 120/22 121/22
**October 18th [2]** 111/3 121/24
**October 25th [2]** 111/5 122/4
**October 27th [1]** 124/1
**October 27th at [2]** 109/6 122/5
**October 28th [4]** 106/9 106/23 111/6 122/6
**October 31 [2]** 106/12 107/2
**October 4 [3]** 121/14 121/17 121/18
**October 4th [1]** 112/4
**off [24]** 7/9 54/11 54/19 54/21 55/6 56/18 57/11 57/17 59/6 64/18 69/4 71/10 71/12 71/14 71/17 76/25 78/7 87/5 107/1 108/1 108/2 108/3 114/16 124/23
**offending [1]** 14/7
**offer [10]** 15/6 77/7 79/10 79/18 79/25 80/5 80/15 97/3 98/9 99/23
**offered [13]** 27/19 30/22 34/3 72/4 72/5 72/6 76/21 78/3 79/17 80/9 80/17 102/10 103/19
**offering [9]** 70/2 77/15 77/17 87/10 96/22 103/3 103/15 104/1 104/10
**Office [1]** 100/7
**officer [1]** 22/5
**offices [1]** 70/20
**official [3]** 23/16 90/21 125/10
**offs [2]** 65/22 69/24
**often [3]** 10/24 63/8 117/1
**oh [9]** 29/15 52/4 78/12 86/14 87/7 87/25 94/11 101/10 101/11
**okay [44]** 6/5 8/5 12/25 15/16 21/5 21/12 22/22 24/7 25/3 28/23 29/15 29/17 31/10 33/7 34/18 35/24 38/5 38/22 39/7 39/10 41/13 53/1 54/15 58/8 64/11 69/19 70/3 71/8 72/19 75/18 83/13 85/24 86/5 94/8 97/16 101/23 104/14 109/19 112/13 112/25 115/7 115/11 117/10 124/10
**old [1]** 75/8
**once [2]** 83/15 87/18
**one [91]** 6/23 6/24 7/8 7/9 8/1 8/21 11/4 11/4 11/24 11/24 12/11 15/4 15/22 17/13 17/23 22/20 22/21 24/23 25/21 28/15 33/11 33/15 34/8 34/8 34/22 34/24 35/21 35/22 35/23 36/2 37/6 37/9 40/4 41/4 41/7 41/14 42/8 42/8 42/14 43/10 43/12 43/13 43/21 43/23 44/4 44/8 45/11 45/25 46/14 49/17 50/1 50/13 51/5 52/9 65/18 67/7 69/19 70/7 74/25 75/4 77/6 78/15 81/1 82/14 84/9 84/17 87/5 87/8 88/15 91/4 91/13 93/10 93/11 94/13 95/19 96/4 98/11 101/11 101/20 103/1 103/12 106/20 111/11 114/9 118/7 119/25 122/14 124/12 124/13 124/13 124/21
**one-off [1]** 7/9
**ones [2]** 96/2 124/12
**ongoing [1]** 61/16
**only [31]** 7/8 8/23 14/23 23/5 23/9 30/20 31/13 40/18 40/22 43/12 43/21 52/9 56/6 57/13 57/20 68/14 78/17 80/15 82/6 83/1 89/1 95/10 95/12 106/11 107/1 108/22 111/6 114/4 114/16 122/12 124/4
**oOo [1]** 125/2
**open [3]** 4/3 73/1 106/22
**operate [3]** 37/1 40/4 43/23
**operated [2]** 36/7 40/6
**operating [6]** 12/11 26/19 27/11 43/9 44/13 77/20
**operation [10]** 6/23 7/9 23/19 27/10 27/20 28/3 28/4 28/5 40/3 41/17
**operations [5]** 6/16 6/18 17/18 39/16 61/17
**operators [1]** 26/18

**opine [1]** 27/20
**opines [1]** 41/22
**opinion [7]** 10/14 30/25 49/2 49/9 49/12 50/19 79/13
**opinions [5]** 40/15 40/23 48/25 49/5 50/21
**opportunity [7]** 42/20 113/21 114/18 114/19 114/24 118/8 118/23
**opposed [3]** 19/13 19/20 27/14
**option [2]** 89/1 123/1
**oranges [2]** 32/17 33/3
**order [23]** 12/11 17/20 21/7 28/10 29/9 39/23 42/10 43/11 50/19 87/12 96/1 97/15 102/24 111/24 114/11 115/19 117/2 120/6 120/19 120/19 121/6 121/22 121/24
**ordered [1]** 115/21
**OREGON [7]** 1/2 1/9 39/18 57/23 72/8 72/9 108/17
**original [3]** 80/24 87/14 125/6
**originally [1]** 105/14
**other [34]** 7/13 8/1 10/17 29/20 40/1 51/14 55/20 60/24 68/17 73/8 73/15 73/20 73/23 79/25 82/21 85/4 91/18 92/19 95/12 98/17 98/18 99/12 102/10 102/14 103/21 105/11 105/25 106/16 106/25 107/4 109/8 122/1 122/3 123/1
**others [2]** 68/24 76/24
**ought [2]** 30/13 118/14
**our [65]** 6/3 8/16 9/5 10/16 10/19 11/2 11/3 11/23 12/5 12/12 14/4 15/18 16/12 16/16 17/12 22/11 23/7 33/3 33/9 33/14 33/15 33/17 45/21 50/22 53/4 56/23 58/13 62/23 70/22 76/25 81/24 90/9 92/17 93/11 93/24 94/12 95/22 96/1 97/10 102/21 102/23 105/14 106/6 106/14 106/16 107/19 108/9 108/13 109/3 109/13 109/24 109/25 110/1 110/13 110/14 111/6 113/2 113/20 115/20 116/18 119/16 120/7 120/20 122/6 123/5
**ours [1]** 119/9
**out [34]** 17/17 18/9 18/11 20/19 20/21 33/13 39/1 44/5 44/11 45/9 45/15 45/18 46/8 49/4 55/22 56/10 58/18 64/15 75/15 85/3 91/2 91/4 94/18 94/23 96/9 103/12 105/2 110/18 110/25 113/14 117/6 118/16 121/5 121/12
**Outger [3]** 7/5 7/6 23/19
**outlines [1]** 13/1
**over [26]** 7/24 15/23 37/8 38/14 43/7 43/16 46/23 47/5 47/9 48/1 48/4 60/22 73/4 74/19 80/1 82/20 92/19 92/20 97/19 97/21 98/3 98/19 98/19 98/20 99/1 114/16
**over-subscribed [1]** 60/22
**overall [1]** 100/8
**overseas [3]** 96/22 96/23 98/11
**overused [1]** 87/10
**own [6]** 30/2 30/5 30/9 30/11 48/19 104/10
**ownership [1]** 22/12

**P**

**p.m [3]** 108/14 108/14 108/18
**Pacific [2]** 108/18 109/6
**packaging [3]** 25/3 25/7 53/25
**page [42]** 6/2 6/3 6/4 6/9 6/10 6/11 9/8 9/10 12/20 12/22 12/24 13/1 16/22 20/12 20/25 21/5 24/3 28/17 34/20 34/20 35/2 35/3 35/9 35/15 35/24 38/12 38/15 39/3 39/5 39/8 59/17 59/18 59/18 59/20 59/21 60/1 60/1 77/25 101/11 101/12 114/3 114/8
**page 7 [1]** 39/3
**pager [1]** 20/8
**pages [3]** 15/20 53/2 53/3
**pagination [2]** 6/4 35/4
**paid [3]** 64/23 89/25 95/11
**papers [5]** 64/16 64/22 71/22 75/1 96/1
**paragraph [16]** 34/20 34/22 34/25 35/6 35/16 36/9 36/18 36/20 39/8 40/7 50/6 54/25 54/25 60/15 60/24 61/3
**paragraphs [2]** 38/16 60/9
**parameters [1]** 116/18
**part [10]** 16/7 17/1 23/6 23/13 69/3 74/25 98/7 100/17

**part... [2]** 113/20 115/9
**partial [1]** 64/5
**particular [10]** 6/1 11/8 11/10 11/17 16/20 26/19 63/9 74/17 74/24 75/13
**parties [6]** 58/15 78/18 79/7 100/4 100/9 120/1
**partner's [1]** 77/22
**partners [6]** 60/17 60/23 61/19 86/21 86/22 87/9
**Parts [2]** 96/1 102/24
**Parts 1 [1]** 96/1
**party [4]** 13/16 14/7 25/8 59/24
**past [1]** 56/15
**patience [1]** 20/4
**Pause [1]** 15/17
**pay [13]** 44/25 66/17 66/21 66/22 66/24 67/1 67/24 68/9 78/13 86/21 94/11 95/23 95/23
**paying [6]** 8/19 64/18 67/11 67/12 67/15 69/10
**payment [3]** 13/15 65/19 103/20
**pedantic [2]** 74/10 75/15
**pejoratives [2]** 99/12 99/13
**pending [2]** 118/22 119/4
**people [26]** 44/25 45/4 45/9 45/19 46/1 47/8 48/18 69/2 69/4 69/6 70/5 70/14 70/15 71/23 72/1 72/14 73/25 76/15 77/15 93/20 94/22 94/22 96/21 96/22 98/17 105/25
**per [25]** 12/3 12/4 12/4 25/23 26/1 26/13 29/20 33/11 33/16 34/11 42/16 46/9 62/5 64/23 64/24 65/5 65/5 65/6 65/10 65/11 66/24 66/25 75/16 81/2 82/5
**per se [2]** 81/2 82/5
**per-minute [1]** 65/5
**per-ton [1]** 75/16
**percent [58]** 12/1 12/11 25/19 25/19 25/22 26/8 27/6 27/8 27/11 27/12 27/14 27/22 28/1 28/2 28/6 28/18 28/20 29/1 34/10 35/1 35/25 36/7 36/10 36/17 36/23 38/17 39/2 39/4 40/9 40/15 40/23 41/1 41/2 41/7 41/8 41/13 41/17 41/19 42/3 42/3 42/4 42/5 42/7 42/17 43/7 43/15 43/15 43/15 43/17 43/18 44/15 48/4 48/5 48/11 49/4 110/5 110/6 122/11
**percentage [2]** 48/9 49/23
**percentages [1]** 50/12
**Perfect [1]** 12/25
**perfectly [1]** 22/24
**perhaps [1]** 84/16
**period [39]** 9/5 17/2 17/3 17/4 17/16 17/24 18/2 18/2 18/3 18/5 18/6 18/7 18/10 18/11 18/15 18/16 18/17 18/18 18/20 19/7 19/12 19/19 19/19 19/24 21/1 21/1 47/9 47/24 48/1 48/4 49/14 54/11 54/21 56/3 56/19 56/25 59/7 72/14 119/25
**periods [12]** 12/6 17/1 17/2 17/6 17/8 17/21 17/23 18/11 21/15 26/3 34/12 86/3
**permission [2]** 100/10 115/5
**permitted [1]** 119/8
**perpetrating [1]** 48/19
**person [3]** 54/21 76/19 109/9
**personal [1]** 95/7
**personally [1]** 95/6
**perspective [3]** 8/18 65/2 65/7
**persuade [1]** 72/14
**petition [1]** 100/6
**Phase [17]** 12/16 109/13 109/22 109/24 109/25 110/1 110/14 110/15 110/15 110/16 110/18 110/19 110/22 114/22 115/8 115/23 122/12
**Phase I [10]** 12/16 109/13 110/14 110/16 110/19 110/22 114/22 115/8 115/23 122/12
**phone [15]** 26/15 27/2 66/7 67/10 72/11 76/16 78/6 78/10 80/14 96/25 103/5 103/11 103/13 105/24 106/2
**phone/SIM [1]** 26/15
**phonetic [1]** 7/14
**phrase [1]** 21/9
**physical [7]** 74/3 77/21 90/11 98/13 102/8 104/19 104/23

**physically [1]** 80/17
**pick [2]** 67/10 107/19
**picture [5]** 53/12 53/21 54/8 57/16 61/5
**piece [1]** 44/1
**pile [1]** 91/1
**place [5]** 19/18 57/13 60/20 86/22 106/10
**placed [3]** 11/5 45/23 60/12
**Plain [1]** 75/8
**plainly [1]** 76/21
**plaintiff [7]** 1/5 2/3 4/9 13/20 29/25 47/20 115/4
**plaintiff's [4]** 5/14 15/6 30/8 30/8
**plan [4]** 76/19 80/14 96/25 124/7
**plane [2]** 55/20 105/11
**plans' [1]** 52/21
**Plantronic [2]** 73/3 85/20
**play [2]** 110/25 117/6
**players [1]** 7/1
**pleadings [3]** 32/11 88/8 123/4
**please [13]** 5/13 17/13 19/17 32/25 39/12 52/16 64/15 86/10 100/12 100/23 109/6 116/8 119/3
**pleasure [1]** 105/6
**pled [1]** 114/6
**plenary [2]** 98/3 98/19
**plucked [1]** 36/14
**plus [3]** 18/24 64/24 68/4
**PNH [1]** 21/21
**point [31]** 26/12 33/11 38/25 41/3 43/10 44/11 51/24 52/7 52/11 55/9 56/5 56/10 65/1 69/11 75/25 79/1 81/15 82/16 83/10 88/10 90/24 91/13 92/19 92/20 96/5 99/3 104/18 119/16 122/8 122/14 124/5
**pointed [5]** 14/3 38/10 38/15 55/22 113/14
**pointing [1]** 38/8
**points [2]** 37/23 102/21
**police [6]** 6/15 21/21 23/12 23/16 23/18 90/18
**poor [1]** 87/17
**pop [1]** 103/3
**popped [1]** 103/14
**popping [1]** 104/1
**pops [1]** 76/17
**Port [1]** 72/7
**Port-au-Prince [1]** 72/7
**portion [2]** 23/6 96/12
**Portland [8]** 1/9 2/11 2/18 2/23 84/10 84/12 108/13 124/6
**position [4]** 14/4 58/14 62/23 63/2
**positively [1]** 106/12
**possession [1]** 46/20
**possible [7]** 6/23 11/6 24/21 24/23 42/1 43/6 87/3
**possibly [2]** 79/1 79/14
**potential [2]** 37/21 48/14
**power [1]** 90/7
**practice [1]** 74/17
**practices [1]** 63/24
**pre [3]** 107/5 107/6 119/2
**pre-filing [1]** 119/2
**pre-hearing [1]** 107/6
**precedent [1]** 84/21
**precise [2]** 92/4 119/3
**precisely [2]** 78/15 85/14
**predicate [1]** 53/20
**predicated [1]** 11/3
**preface [1]** 5/22
**prefer [1]** 107/4
**prejudge [1]** 110/3
**prejudiciable [1]** 51/7
**prejudicial [1]** 51/8
**preliminary [1]** 122/9
**premise [5]** 44/18 69/22 69/23 76/10 94/23

**prepaid [5]** 52/20 57/1 57/5 59/5 71/15
**prepared [1]** 91/20
**presence [1]** 17/11
**present [3]** 11/5 47/21 81/2
**presented [2]** 50/22 99/19
**presenting [1]** 105/6
**presents [2]** 34/4 112/15
**preserved [1]** 30/15
**press [1]** 90/16
**pressure [3]** 55/17 82/22 82/23
**pressuring [3]** 55/14 55/16 55/17
**presume [1]** 93/18
**pretrial [12]** 106/8 106/10 106/14 107/19 109/13 111/6 120/20 121/8 121/10 121/21 121/24 122/6
**pretty [4]** 49/13 85/21 91/18 111/4
**prevents [2]** 47/19 82/11
**previously [1]** 7/21
**price [4]** 73/7 81/10 86/18 87/13
**primary [9]** 84/3 84/7 99/15 100/2 100/8 101/12 105/5 110/6 122/11
**Prince [1]** 72/7
**probably [8]** 85/5 85/25 87/15 88/7 89/3 108/17 123/2 123/3
**probative [1]** 93/25
**problem [9]** 30/24 54/15 69/21 78/23 78/24 84/18 84/19 86/15 87/15
**problems [5]** 86/2 86/17 87/17 87/19 88/15
**problems.' [1]** 82/25
**proceed [1]** 30/13
**proceedings [7]** 1/16 4/14 73/1 99/18 108/4 124/25 125/5
**process [2]** 56/18 57/10
**produced [1]** 46/25
**producing [1]** 46/18
**product [1]** 57/25
**production [5]** 37/8 37/11 43/3 43/14 47/8
**profit [3]** 31/24 48/19 85/24
**program [2]** 8/7 71/10
**programming [1]** 54/21
**prohibit [1]** 63/19
**prohibits [1]** 63/19
**projected [1]** 27/4
**projects [1]** 44/3
**pronounce [1]** 60/5
**proof [2]** 46/18 47/20
**proper [2]** 23/3 87/11
**propose [1]** 106/5
**prospective [1]** 37/19
**Protocol [1]** 7/25
**prove [1]** 47/18
**provide [5]** 9/3 14/23 43/5 60/13 80/11
**provided [3]** 42/14 53/10 71/18
**provider [1]** 95/22
**provides [1]** 18/25
**providing [2]** 46/17 62/13
**provision [1]** 71/9
**provisions [1]** 63/8
**publicized [1]** 39/22
**publicly [7]** 47/24 48/2 48/23 92/21 92/24 92/25 93/1
**pull [6]** 5/23 15/11 17/13 29/12 29/16 115/3
**pulled [4]** 17/17 44/5 56/11 56/12
**purchased [2]** 31/17 103/11
**pure [2]** 19/13 19/20
**purpose [1]** 74/18
**purposes [7]** 43/13 74/17 77/7 77/25 84/1 97/10 102/15
**pushed [1]** 84/1
**pushing [1]** 101/5

**put [18]** 16/9 46/8 54/19 54/20 60/20 74/25 76/2 76/25 77/13 77/14 78/1 78/6 82/14 82/22 87/12 96/7 100/11 116/17
**puts [1]** 80/18
**putting [6]** 10/1 77/18 77/19 90/13 91/2 117/9

**Q**

**quality [3]** 59/18 60/2 87/17
**quantifies [1]** 93/2
**Que [2]** 92/12 92/14
**question [55]** 6/17 6/20 9/19 10/5 10/6 11/15 14/4 15/23 16/25 20/3 24/17 25/12 31/8 34/18 38/4 43/22 53/13 53/21 54/3 54/18 55/3 55/5 57/22 57/22 61/5 62/19 63/13 68/15 69/15 69/20 69/22 69/25 71/6 71/6 71/8 73/2 73/12 73/17 73/18 73/19 75/19 76/9 76/10 77/5 77/9 77/11 77/16 80/22 80/22 81/19 83/6 89/22 95/16 102/5 102/8
**Question No [1]** 73/12
**questionable [2]** 51/15 93/6
**questions [13]** 5/5 5/6 5/9 5/14 30/16 48/25 52/12 52/13 52/18 53/20 59/13 72/20 102/16
**quickly [1]** 44/5
**quite [3]** 44/17 56/10 70/13
**quote [3]** 14/20 15/21 17/10
**quote/unquote [3]** 14/20 15/21 17/10
**quoted [2]** 96/8 96/8
**quotes [1]** 67/5
**quoting [1]** 86/13

**R**

**rabbit [1]** 95/24
**radio [1]** 86/3
**radios [5]** 90/3 90/17 90/25 91/3 91/6
**raid [1]** 39/22
**raided [1]** 23/20
**raise [2]** 26/17 83/21
**raised [3]** 58/9 83/21 119/15
**randomize [1]** 40/5
**range [2]** 9/12 21/13
**rate [12]** 8/20 66/1 66/2 66/7 66/10 66/22 67/6 67/13 67/15 75/16 82/13 83/3
**rates [3]** 64/25 65/22 65/24
**rather [2]** 55/15 106/1
**rational [1]** 73/9
**RDR [2]** 2/22 125/10
**read [18]** 8/22 13/18 19/10 27/21 27/23 28/10 28/22 29/9 34/6 35/6 40/10 40/11 85/20 85/25 96/16 97/14 104/25 120/18
**reading [9]** 55/23 86/6 92/5 92/5 96/5 96/17 102/18 105/3 119/20
**reads [1]** 8/7
**ready [5]** 5/24 7/20 88/2 114/22 118/13
**real [5]** 32/23 67/20 73/18 79/14 83/6
**realize [1]** 88/3
**realized [1]** 96/20
**realizes [1]** 47/5
**really [14]** 34/7 45/18 73/22 74/3 75/3 77/21 77/24 78/22 80/4 99/10 100/18 111/2 121/25 123/7
**realm [3]** 33/14 33/15 74/12
**reason [5]** 11/1 80/13 81/12 85/22 86/2
**reasonable [67]** 11/12 11/13 12/12 14/9 15/5 19/13 19/19 26/8 26/16 27/5 27/7 27/12 27/14 28/1 28/6 28/18 29/2 33/18 36/10 36/17 36/25 37/10 37/10 40/9 41/2 41/7 41/9 41/14 41/24 42/18 43/5 43/12 44/16 45/11 45/12 45/17 45/25 47/21 48/13 49/12 50/9 50/14 50/15 62/21 62/24 63/14 64/1 64/3 64/7 64/9 73/6 73/18 74/15 74/16 75/10 75/11 75/13 75/22 76/1 81/6 81/18 81/19 82/6 83/23 85/23 95/3 108/19

**reasonable under [1]** 62/21
**reasonableness [5]** 30/21 43/20 63/4 63/7 99/22
**reasonably [4]** 14/9 37/7 41/17 84/20
**reasoning [1]** 26/25
**reasons [6]** 81/13 81/16 83/24 84/9 87/5 102/14
**rebut [1]** 30/8
**rebuttal [2]** 5/20 89/16
**recall [10]** 8/15 14/23 16/8 23/11 29/21 40/14 55/23 106/14 117/20 123/5
**recalled [1]** 40/12
**receipts [1]** 23/8
**received [1]** 27/18
**receiving [1]** 59/24
**receptions [1]** 87/17
**recess [2]** 72/24 72/25
**recharge [1]** 57/17
**recipients [1]** 87/19
**recognize [1]** 27/9
**recommend [1]** 78/21
**reconfigure [1]** 116/18
**reconsideration [2]** 112/11 117/14
**record [23]** 7/3 15/15 22/16 22/23 23/4 23/7 25/4 39/14 39/17 43/8 87/3 90/21 94/7 108/2 108/2 108/3 108/5 117/19 117/22 118/9 118/14 124/23 125/5
**records [8]** 45/23 47/25 48/2 48/9 93/24 94/1 94/12 95/3
**red [1]** 56/13
**redacts [1]** 44/8
**redepose [1]** 122/25
**redo [1]** 113/21
**reduced [3]** 17/17 47/6 66/18
**reducing [1]** 44/6
**reduction [2]** 44/7 44/9
**refer [4]** 6/4 59/17 100/5 113/18
**reference [4]** 7/4 27/22 44/4 103/21
**referenced [4]** 23/6 51/5 51/12 104/3
**References [1]** 51/4
**referral [3]** 100/3 100/9 105/5
**referred [2]** 96/2 102/17
**referring [9]** 24/3 30/7 30/7 30/9 30/11 30/18 31/1 31/2 96/3
**refers [3]** 8/6 8/9 115/13
**refile [2]** 115/12 116/23
**reflect [3]** 47/25 48/3 48/3
**reflected [2]** 14/21 37/25
**reflecting [1]** 16/10
**reflects [2]** 8/15 50/2
**reformulate [2]** 112/12 113/3
**regard [1]** 123/10
**regarding [6]** 17/10 17/21 18/14 18/15 26/18 115/25
**regime [2]** 102/23 104/11
**region [3]** 103/22 103/23 103/24
**regret [1]** 124/4
**regular [4]** 65/13 65/14 65/18 67/8
**regulate [3]** 26/18 101/16 103/2
**regulated [1]** 61/20
**regulation [2]** 77/7 97/10
**regulations [3]** 63/25 83/24 99/17
**regulator [4]** 61/1 97/21 98/24 103/1
**regulators [1]** 87/20
**regulators' [1]** 6/13
**regulatory [9]** 6/7 62/11 62/24 84/1 96/20 99/21 100/5 102/23 104/11
**reinitiated [1]** 25/10
**reissue [1]** 113/24
**reject [1]** 64/4
**relate [1]** 109/23

**related [6]** 7/11 50/7 50/11 50/16 50/20 92/7
**Relatedly [1]** 69/1
**relates [2]** 59/11 59/12
**relating [1]** 64/24
**relation [1]** 81/19
**relationship [7]** 58/15 61/1 61/19 68/1 78/17 78/18 95/21
**relationships [2]** 60/11 61/18
**relatively [1]** 5/9
**relatives [1]** 70/11
**relevance [1]** 58/23
**relevant [14]** 26/3 34/12 53/22 56/3 56/19 56/25 62/12 63/6 79/12 82/7 93/24 97/12 102/5 102/8
**reliable [3]** 18/17 90/7 90/7
**rely [2]** 52/8 94/2
**remain [1]** 17/20
**remedy [2]** 114/16 124/6
**remember [17]** 23/24 27/19 36/11 39/25 54/6 55/10 58/13 71/3 71/15 100/16 101/5 101/16 108/23 113/22 119/17 119/20 123/7
**remind [1]** 57/3
**remotely [1]** 118/13
**reopen [5]** 116/24 117/21 118/8 118/14 122/22
**repeat [1]** 13/7
**repertoire [1]** 92/18
**repetitive [1]** 15/4
**rephrase [2]** 9/24 19/6
**reply [1]** 53/8
**report [74]** 5/20 5/20 5/21 6/6 8/6 8/8 8/12 8/13 8/22 10/11 10/14 10/17 11/19 12/20 14/24 16/22 17/5 19/5 19/10 19/19 23/16 23/18 24/4 26/6 26/7 26/9 26/10 27/17 27/21 27/25 28/2 28/8 28/11 28/13 28/16 28/16 28/25 29/8 31/1 31/2 31/21 34/6 35/11 35/12 35/18 36/12 36/16 38/7 40/23 41/2 49/17 49/20 50/5 50/17 50/18 51/4 51/10 59/16 86/6 90/16 90/18 91/19 91/23 92/6 111/18 111/19 113/18 113/25 116/11 116/13 116/20 116/23 121/17 122/16
**reported [5]** 6/13 50/11 92/25 92/25 93/1
**reporter [3]** 2/22 51/6 125/10
**reporting [1]** 50/6
**reports [8]** 50/17 111/13 113/7 113/21 113/24 115/12 117/11 117/16
**represent [1]** 71/4
**representations [1]** 48/18
**representing [1]** 4/17
**represents [3]** 49/23 50/20 71/21
**reputation [1]** 59/18
**reputational [2]** 61/17 61/21
**request [2]** 106/17 120/22
**requested [1]** 106/9
**requesting [1]** 101/12
**require [2]** 25/13 54/21
**required [2]** 12/14 101/15
**requirement [1]** 12/12
**requirements [1]** 62/25
**resale [22]** 68/25 81/3 81/7 81/9 82/8 82/9 82/11 84/18 84/19 86/16 86/24 88/4 93/16 95/16 95/20 95/23 97/8 97/11 97/12 97/22 99/22 104/12
**resell [4]** 81/24 95/14 97/6 98/16
**resellers [1]** 95/15
**reselling [3]** 68/23 82/22 98/13
**reserve [1]** 52/15
**resolution [1]** 124/1
**resolve [1]** 100/14
**respect [15]** 14/19 51/20 58/23 61/18 61/19 61/20 61/21 62/8 63/18 71/17 81/15 90/6 106/17 119/7 123/6
**respectfully [3]** 33/2 118/17 120/25
**respective [1]** 105/22
**respond [8]** 30/8 74/7 110/1 110/2 110/15 110/16 111/11

**respond... [1]** 118/12
**responded [1]** 110/21
**responding [1]** 89/5
**response [12]** 22/9 46/17 55/24 87/11 102/2 103/2 110/2 110/13 110/16 113/11 113/22 117/24
**responsible [1]** 14/16
**rest [4]** 7/7 48/8 93/4 107/9
**restricted [1]** 81/9
**restricting [1]** 81/24
**restriction [2]** 81/4 82/8
**restrictions [3]** 81/7 84/18 84/19
**result [3]** 10/8 42/6 65/25
**resulted [3]** 42/15 60/18 61/17
**resulting [5]** 9/4 11/4 12/4 12/5 60/11
**results [1]** 34/12
**resumed [3]** 17/18 73/1 108/4
**retail [1]** 67/12
**retransmission [1]** 24/25
**retrospective [1]** 37/19
**returned [1]** 59/25
**revealing [1]** 83/14
**revenue [17]** 37/11 37/21 37/25 47/6 47/7 48/2 48/4 48/5 48/14 49/22 65/9 65/10 65/10 65/11 71/12 92/25 92/25
**revenue-generating [1]** 48/14
**revenues [4]** 47/5 47/25 50/2 50/12
**reverse [1]** 96/11
**review [3]** 57/14 95/6 96/20
**rid [1]** 85/24
**ridiculous [1]** 68/9
**ridiculously [1]** 42/6
**right [93]** 4/22 5/5 7/18 7/19 9/23 10/13 16/15 16/21 17/13 17/22 18/7 18/13 20/1 20/7 20/11 25/17 25/20 29/5 29/11 29/14 31/4 32/7 32/15 34/13 34/24 35/15 35/16 35/17 35/23 38/8 40/19 41/20 42/12 42/18 44/9 44/17 46/10 52/1 55/7 59/8 63/21 64/8 64/13 67/5 68/4 68/5 70/5 70/6 72/20 72/24 73/16 73/20 74/11 75/21 76/20 77/10 77/11 77/23 78/14 80/18 81/3 81/14 82/21 84/2 87/6 88/1 88/2 88/6 88/9 88/12 88/16 89/8 89/12 89/17 95/15 95/17 99/7 105/2 105/16 106/11 106/22 107/13 108/6 109/12 110/20 112/16 113/10 114/21 118/2 118/6 119/17 123/21 123/25
**rights [1]** 84/5
**ring [1]** 106/2
**risk [1]** 123/22
**risks [2]** 28/21 35/16
**RLYH [1]** 8/7
**RMR [2]** 2/22 125/10
**road [2]** 69/13 86/23
**roam [79]** 7/23 8/2 8/6 8/7 8/12 8/17 8/24 9/18 10/10 10/15 10/20 11/7 11/17 11/19 12/17 13/4 13/9 13/14 13/16 13/21 14/2 14/15 14/20 14/22 15/1 15/8 16/1 16/6 16/12 16/17 20/16 20/19 21/3 21/10 25/8 31/14 31/23 32/14 61/11 64/14 64/18 64/22 65/3 65/14 66/16 66/21 67/2 67/9 67/10 67/16 67/20 67/21 67/23 68/8 68/13 69/5 69/8 70/22 72/2 72/5 72/10 72/16 73/25 75/5 78/7 78/8 80/8 82/20 86/24 87/1 87/24 88/4 90/6 96/22 98/25 103/4 103/13 103/15 122/24
**Roam Like [4]** 11/17 15/8 66/16 75/5
**roamers [1]** 103/8
**roaming [41]** 52/20 60/11 60/13 60/17 60/18 60/22 61/18 65/10 65/11 65/13 65/14 65/21 65/23 65/23 66/7 66/11 66/18 67/13 68/10 69/10 76/18 77/20 78/13 80/14 86/21 86/22 87/9 95/16 95/20 96/21 97/2 97/8 97/8 97/9 97/10 97/18 97/20 99/23 104/1 104/10 104/12
**Robert [2]** 2/3 4/10
**Room [1]** 2/23
**round [13]** 9/12 21/13 110/23 111/2 111/3 111/4 120/15 120/16 121/1 121/2 121/21 121/23 121/25

**rounds [4]** 58/10 120/17 120/20 121/1
**rubber [1]** 86/23
**Ruiz [2]** 23/23 23/24
**rule [2]** 81/12 82/5
**ruled [1]** 119/5
**ruling [5]** 59/1 91/20 92/11 100/6 114/17
**rulings [4]** 82/9 82/10 82/12 111/20
**run [1]** 90/9
**running [1]** 16/8
**runs [2]** 78/10 78/10

## S

**S.A [2]** 1/3 4/7
**S.W [3]** 2/11 2/17 2/23
**saddened [1]** 110/8
**said [67]** 9/21 11/16 11/18 15/4 24/8 32/12 40/11 43/6 43/15 46/19 54/1 55/9 56/19 65/12 66/2 73/21 74/8 79/1 81/1 81/5 81/6 81/15 82/15 83/3 83/17 87/7 87/25 89/20 90/24 91/9 91/16 95/21 96/4 97/4 97/8 97/9 98/10 109/5 111/13 111/18 111/20 111/24 112/11 112/13 112/25 113/14 113/21 114/19 114/20 114/21 115/6 115/12 115/19 116/10 116/13 117/8 117/13 117/14 117/20 117/23 118/1 119/13 119/14 120/6 120/15 122/11 124/14
**sake [2]** 49/18 62/20
**sales [4]** 47/7 47/16 50/18 68/24
**same [25]** 38/1 47/9 48/4 48/17 50/13 63/3 63/7 63/15 64/7 66/22 83/19 91/24 93/3 99/1 100/20 100/20 100/21 101/8 101/19 108/17 110/17 112/24 112/25 117/17 120/7
**Sanchez [1]** 23/24
**sat [1]** 83/17
**satisfy [3]** 12/12 114/23 114/25
**Savage [25]** 2/13 4/24 30/16 52/7 52/9 52/13 55/22 64/11 64/21 65/1 82/5 101/17 101/24 102/22 104/11 109/12 113/21 114/24 116/9 118/16 118/21 120/13 120/14 120/22 121/20
**Savage's [1]** 103/25
**save [1]** 72/3
**Savings [2]** 108/24 108/25
**saw [5]** 50/7 77/19 87/23 104/4 104/7
**say [68]** 5/7 5/8 18/25 22/6 28/20 33/14 33/20 38/20 47/11 49/2 51/17 52/4 52/7 52/8 52/13 52/14 53/23 54/12 55/6 55/7 56/11 57/21 66/9 66/17 67/5 67/5 71/2 75/2 76/14 77/10 77/12 78/16 79/2 79/3 79/10 80/13 80/20 81/4 81/6 82/24 82/25 84/20 84/21 85/3 86/1 87/16 89/6 93/25 95/4 95/13 96/9 96/10 98/7 100/22 103/2 105/16 108/6 111/14 111/17 113/4 115/11 116/8 117/25 118/7 118/11 119/17 119/20 120/2
**saying [28]** 11/11 14/25 15/1 19/24 31/15 31/18 35/7 36/5 37/12 37/14 50/10 52/1 64/5 83/5 84/19 94/24 96/6 112/23 112/24 113/2 113/17 114/4 117/18 118/8 119/23 120/4 122/19 123/22
**says [42]** 9/11 21/6 21/7 21/12 21/15 21/21 32/19 35/2 36/3 36/9 36/22 46/22 47/1 47/18 50/6 54/22 54/25 57/7 57/10 57/24 57/25 60/9 60/24 61/7 63/24 64/22 66/20 71/17 76/18 78/12 80/14 81/21 85/21 89/14 90/18 91/23 91/24 97/1 97/18 108/16 116/4 116/5
**scattered [1]** 88/7
**scenario [2]** 13/2 46/6
**schedule [15]** 15/19 15/20 105/14 105/20 107/4 109/4 109/24 110/13 115/22 118/19 118/24 119/8 119/24 120/5 120/23
**scheduled [3]** 107/13 107/18 107/20
**schematic [1]** 91/1
**school [1]** 76/6
**Schwabe [2]** 2/10 4/20
**screen [4]** 12/23 22/2 22/19 76/17
**script [1]** 122/9

**scrutinized [1]** 76/13
**se [3]** 2/5 81/2 82/5
**seal [1]** 112/23
**second [24]** 25/18 25/24 28/15 33/15 34/22 34/24 49/17 54/25 55/4 55/12 63/23 67/7 70/16 72/1 73/19 75/6 81/14 92/4 96/9 104/18 110/23 120/16 120/16 121/21
**Secret [1]** 80/16
**secteur [1]** 51/8
**section [20]** 6/1 6/6 6/10 11/22 34/19 38/17 38/24 38/25 44/4 44/5 44/11 49/17 63/2 63/3 63/10 63/22 81/21 84/17 104/20 104/21
**Section 201 [5]** 63/2 63/10 63/22 81/21 84/17
**Section 202 [1]** 63/3
**Section 214 [1]** 104/20
**Section 8.1 [1]** 6/6
**Sections [2]** 102/11 102/16
**see [51]** 4/17 4/21 5/4 8/6 8/13 9/14 13/19 17/5 17/23 19/5 21/1 21/23 22/16 22/19 22/21 25/14 25/24 26/5 27/22 30/19 34/25 35/25 36/2 41/1 46/5 48/9 49/8 49/15 50/1 50/1 50/21 52/19 54/14 57/8 73/22 77/18 87/14 89/13 91/25 92/10 93/14 96/12 97/24 101/10 112/20 113/17 114/23 118/5 118/7 121/4 123/17
**seeing [4]** 17/19 36/16 55/10 123/25
**seek [1]** 100/9
**seeking [6]** 9/17 9/22 9/24 12/18 13/22 16/6
**seem [2]** 58/17 95/24
**seemed [2]** 117/2 117/5
**seems [10]** 44/6 45/17 45/21 45/24 68/16 73/15 93/5 93/5 94/23 110/12
**seen [5]** 32/10 54/24 54/24 55/3 122/17
**sees [1]** 76/20
**segments [1]** 68/21
**segregate [1]** 9/5
**seized [8]** 21/20 22/12 23/11 23/14 23/15 23/22 36/13 39/22
**selected [1]** 17/6
**sell [3]** 68/13 93/8 98/11
**selling [4]** 45/4 68/17 77/9 77/11
**send [2]** 84/4 84/22
**sending [2]** 7/23 65/19
**sends [1]** 103/11
**sense [2]** 42/11 108/15
**sensible [1]** 91/9
**sent [3]** 23/23 43/10 112/23
**sentencing [1]** 107/17
**September [8]** 1/7 4/1 76/25 109/18 109/20 109/24 109/25 125/9
**September 23rd [1]** 109/18
**September 23rd is [1]** 109/20
**September 30th [2]** 109/24 109/25
**September 30th for [1]** 76/25
**sera [4]** 92/12 92/12 92/14 92/14
**serious [1]** 124/16
**servers [4]** 23/22 24/12 24/13 39/18
**serves [2]** 7/2 79/24
**service [43]** 52/21 57/1 57/5 61/23 61/23 62/14 64/1 65/3 69/24 70/22 71/10 71/11 72/5 75/1 75/4 75/9 77/7 77/8 79/11 79/16 79/22 79/23 80/1 80/2 80/3 80/4 80/8 80/9 81/25 83/4 86/19 87/9 87/10 87/12 95/22 97/7 98/9 98/12 98/14 102/10 102/13 103/3 103/5
**services [10]** 53/11 55/1 59/19 60/16 71/10 98/13 98/16 99/23 103/19 103/21
**set [9]** 6/14 65/22 67/6 79/2 86/18 109/18 111/6 119/24 121/23
**set-offs [1]** 65/22
**sets [1]** 115/21

**seven [5]** 17/3 18/12 26/2 43/8 44/6
**seven-month [1]** 17/3
**several [4]** 6/12 6/15 19/10 55/23
**Shakespeare [1]** 94/19
**shaking [1]** 25/15
**shall [1]** 64/1
**shalt [1]** 81/21
**shape [1]** 54/17
**share [3]** 12/22 22/2 44/20
**shared [1]** 22/19
**she [2]** 96/24 121/12
**sheet [1]** 6/3
**shift [1]** 37/1
**ship [3]** 72/12 78/5 90/8
**shipped [1]** 89/24
**shipping [2]** 23/8 23/10
**shock [1]** 67/14
**shock-and-ah [1]** 67/14
**shoot [1]** 29/3
**short [8]** 5/10 7/8 10/5 10/8 39/25 49/6 55/2 71/3
**shortest [1]** 6/22
**should [12]** 5/9 5/25 28/17 47/18 56/6 63/15 85/6 86/17 86/18 91/24 102/17 118/8
**shouldn't [1]** 84/8
**show [9]** 16/4 22/3 22/18 23/15 23/16 73/5 80/7 80/9 114/13
**shows [3]** 15/7 93/11 95/11
**shows is [1]** 93/11
**shrink [2]** 56/12 56/13
**shrink-wrapped [1]** 56/12
**SI [1]** 1/5
**sic [1]** 111/18
**side [4]** 51/14 51/14 59/22 106/16
**sides [2]** 111/2 118/17
**sight [1]** 43/2
**sign [1]** 76/18
**signal [2]** 59/19 86/3
**signals [1]** 61/22
**signature [3]** 125/7 125/7 125/7
**signed [1]** 125/7
**significant [1]** 123/12
**significantly [4]** 12/9 17/17 30/23 46/18
**signing [1]** 125/4
**SIM [36]** 23/14 23/22 24/10 24/13 24/19 26/15 26/19 26/23 28/21 31/16 34/1 35/16 39/18 53/23 54/11 54/19 55/7 61/9 63/14 72/11 73/6 78/5 79/12 87/23 89/23 89/24 89/25 90/1 90/1 90/24 91/2 91/3 91/4 94/20 103/6 103/12
**similar [2]** 60/10 61/4
**similarly [1]** 61/3
**SIMON [2]** 1/17 4/16
**simple [1]** 96/18
**simply [10]** 41/4 41/25 45/25 74/2 75/20 81/4 93/18 99/22 115/13 117/24
**SIMs [4]** 25/13 60/19 61/24 62/6
**simulate [3]** 26/12 26/13 40/2
**simulated [1]** 11/25
**simulating [1]** 27/1
**simultaneous [2]** 27/10 33/10
**simultaneously [10]** 21/22 24/9 24/16 24/19 34/9 37/1 39/19 40/6 43/9 44/13
**since [1]** 95/5
**single [1]** 26/2
**sir [22]** 4/18 6/8 8/4 9/9 9/15 11/21 11/21 13/24 18/4 21/4 21/18 25/25 27/8 35/2 52/7 59/9 115/18 116/7 116/22 118/19 119/19 121/19
**sit [2]** 79/15 95/12
**site [28]** 11/4 11/24 11/24 12/2 12/11 15/4 24/12 24/14

**site... [20]** 24/16 25/21 33/11 34/8 34/8 37/6 37/7 37/10 40/4 41/5 41/6 41/7 41/14 42/8 42/9 42/14 42/16 43/12 43/13 43/21

**sites [18]** 11/6 37/1 37/8 40/6 41/5 41/12 41/12 41/15 42/7 42/13 43/7 43/16 43/18 43/19 43/23 44/12 44/19 91/11

**siting [1]** 44/6

**sitting [1]** 107/25

**situation [3]** 45/21 47/10 86/24

**six [1]** 89/4

**size [1]** 39/21

**skipped [1]** 92/6

**slightly [1]** 76/3

**small [1]** 91/3

**smart [1]** 78/22

**smidgen [1]** 87/20

**Smith [3]** 2/3 4/11 107/14

**Snickers [2]** 78/2 78/2

**so [124]** 5/5 5/11 6/17 7/16 9/6 10/10 11/8 12/8 13/8 14/13 15/8 15/13 15/22 15/23 17/20 18/18 20/25 24/17 24/23 25/15 26/6 26/17 26/25 28/24 29/16 31/4 31/14 32/17 33/19 36/5 37/12 38/20 38/24 40/7 40/18 40/22 41/13 41/19 42/2 42/7 42/17 43/19 44/23 45/22 48/16 49/1 49/7 50/3 50/22 52/9 55/2 57/21 58/3 58/18 63/12 64/3 66/15 66/17 66/21 66/24 67/3 68/17 68/19 68/23 69/8 69/13 69/15 69/19 69/25 70/3 71/17 71/23 72/6 72/13 73/13 75/25 76/7 76/19 76/22 77/1 78/1 78/4 79/2 80/7 80/13 80/20 82/3 83/22 87/21 88/15 89/18 91/4 92/8 93/13 93/13 93/14 93/21 95/10 95/15 96/18 96/19 96/25 97/3 98/6 98/23 99/25 101/15 102/12 104/12 104/22 107/17 108/13 108/17 108/18 109/4 110/22 114/7 116/21 116/25 117/1 117/14 117/16 118/7 122/12

**Society [1]** 80/16

**software [3]** 32/13 114/5 114/12

**sold [2]** 93/12 94/22

**sole [2]** 91/13 93/19

**solution [1]** 84/2

**some [36]** 6/25 7/1 10/1 19/2 20/3 24/22 29/20 29/24 30/16 32/10 32/11 32/11 50/20 52/12 52/15 59/13 74/18 74/21 75/11 79/1 80/11 87/21 87/21 87/22 90/18 102/22 103/14 107/11 120/7 122/8 122/18 123/11 124/5 124/10 124/11 124/12

**somebody [5]** 7/10 76/22 95/2 106/18 124/19

**somehow [3]** 91/23 95/16 123/13

**someone [8]** 44/24 56/18 58/2 64/17 72/7 72/10 78/11 103/10

**someone's [1]** 27/2

**something [25]** 5/12 30/22 36/9 37/17 42/19 44/4 45/1 45/1 54/23 57/11 64/19 76/17 76/21 79/15 84/24 96/24 97/5 97/9 97/10 100/4 104/24 112/20 117/23 121/13 121/16

**sometimes [1]** 94/14

**somewhere [4]** 51/3 55/8 57/10 70/14

**sophisticated [1]** 77/24

**sophistication [1]** 39/21

**sorry [11]** 19/16 35/8 37/15 38/13 39/8 55/14 56/1 59/21 109/5 112/5 119/19

**sort [5]** 24/22 83/9 90/25 112/22 120/7

**sound [1]** 108/19

**sounded [1]** 116/10

**sounds [2]** 90/10 91/9

**source [5]** 49/25 50/1 51/12 51/15 52/2

**sources [4]** 51/18 65/9 65/17 67/4

**Spanish [1]** 92/17

**speak [3]** 64/12 92/9 124/10

**speaks [2]** 38/23 39/1

**species [1]** 75/10

**specific [6]** 14/6 25/12 74/22 76/6 76/7 124/15

**specifically [6]** 8/14 16/17 28/3 39/17 81/23 120/6

**speculate [3]** 14/11 14/17 50/23

**speculating [1]** 46/1

**speculation [6]** 16/14 19/13 19/20 27/15 28/19 34/17

**speculative [3]** 37/19 51/2 51/18

**speed [1]** 80/2

**spelled [1]** 121/5

**spending [1]** 72/14

**spent [1]** 96/4

**spirit [3]** 5/12 6/22 51/1

**split [1]** 25/1

**sponte [1]** 84/3

**spreadsheet [2]** 93/10 93/15

**spreadsheets [2]** 93/10 93/11

**square [1]** 74/12

**stand [2]** 23/2 88/21

**standalone [1]** 115/14

**standard [12]** 26/24 33/16 33/17 63/18 65/10 65/11 73/11 75/20 76/5 84/23 94/3 114/24

**standards [2]** 63/2 63/3

**standpoint [1]** 13/14

**start [8]** 5/19 61/14 64/18 74/9 74/19 99/15 101/5 124/22

**started [2]** 44/23 44/24

**Starting [1]** 6/2

**starts [2]** 35/15 39/3

**state [1]** 88/8

**stated [3]** 33/5 33/13 76/4

**statement [19]** 23/1 23/2 28/8 28/12 29/1 29/9 29/22 34/20 35/10 35/19 40/8 41/4 60/8 75/22 76/16 93/1 115/13 115/15 116/12

**statements [14]** 35/10 59/17 86/8 99/16 113/15 113/23 115/23 116/6 116/22 116/25 117/25 118/12 118/13 119/10

**states [46]** 1/1 1/18 2/22 6/9 6/10 7/24 31/16 60/17 62/14 64/24 69/3 69/4 69/7 70/5 70/6 70/18 71/23 72/4 72/6 72/12 72/15 73/25 76/15 76/17 76/22 76/22 78/12 79/9 79/10 79/12 79/15 79/16 79/16 79/17 80/9 80/14 80/15 80/17 86/20 86/22 96/21 98/3 98/8 98/12 103/22 108/24

**stating [1]** 36/8

**statute [2]** 31/12 75/20

**statutes [1]** 64/8

**statutory [1]** 81/20

**stay [2]** 100/5 101/13

**step [2]** 68/12 69/11

**stick [1]** 120/5

**still [6]** 14/23 36/16 84/13 96/25 101/1 116/20

**stop [4]** 37/3 37/4 67/7 99/10

**stopped [2]** 88/17 92/5

**story [2]** 32/18 94/25

**straightforward [1]** 100/1

**stream [1]** 65/18

**streams [2]** 65/17 66/15

**Street [4]** 2/5 2/8 2/14 2/17

**stretching [1]** 32/8

**strident [1]** 18/17

**strikes [1]** 88/13

**strongly [1]** 85/13

**struggling [1]** 80/1

**students [1]** 71/25

**stuff [23]** 65/5 75/17 77/1 78/22 82/4 82/10 83/19 86/4 88/1 89/15 91/24 98/5 99/11 99/12 100/20 109/22 110/14 110/15 111/15 112/22 114/23 115/12 116/2

**stumbling [1]** 15/23

**sua [1]** 84/3

**sua sponte [1]** 84/3

**subject [8]** 14/6 51/19 53/24 55/8 74/14 102/11 108/20 108/21

**submit [3]** 71/19 79/17 84/16

**submitted [2]** 16/4 16/10

**S**

**subscribe [5]** 66/21 67/9 67/21 72/16 103/15
**subscribed [2]** 60/22 103/13
**subscriber [13]** 65/13 66/6 66/20 66/24 67/8 67/15 67/17 67/20 67/21 71/19 72/5 95/22 103/7
**subscribers [3]** 60/14 75/8 104/10
**subscribes [1]** 64/17
**subscription [7]** 64/19 65/4 66/22 67/14 68/4 68/6 103/23
**subspecies [1]** 74/20
**substantial [2]** 61/8 61/12
**succeeded [1]** 34/16
**successfully [1]** 59/20
**such [9]** 6/10 6/11 6/17 22/13 45/7 49/3 49/3 63/25 70/25
**sue [1]** 94/16
**sues [1]** 45/8
**suffered [3]** 10/3 10/8 14/5
**sufficient [2]** 57/24 104/19
**sufficiently [2]** 122/17 123/12
**suggest [3]** 68/16 101/19 118/13
**suggested [2]** 22/10 84/18
**suggesting [1]** 99/16
**suggests [2]** 37/9 44/12
**suing [1]** 50/13
**Suite [5]** 2/5 2/8 2/11 2/14 2/17
**sum [2]** 18/1 18/6
**summary [6]** 64/5 91/20 95/8 111/18 117/7 119/2
**Supplemental [1]** 115/4
**support [1]** 100/2
**supposed [2]** 52/8 88/23
**Supreme [1]** 79/20
**sure [16]** 7/18 14/1 19/18 24/9 36/4 44/17 55/13 70/13 77/2 79/3 79/13 82/4 84/22 94/14 114/8 114/19
**surprise [1]** 113/23
**surprised [1]** 116/20
**surveillance [1]** 6/12
**surveilled [1]** 23/20
**suspect [1]** 75/21
**sustained [1]** 83/16
**switch [1]** 77/21
**switched [1]** 77/22
**switches [1]** 73/4
**system [5]** 7/25 45/8 76/20 78/4 79/2

**T**

**T's [1]** 98/15
**tab [2]** 20/11 20/25
**table [2]** 16/22 107/2
**take [26]** 5/8 5/15 8/16 9/8 20/18 23/17 42/7 42/13 48/25 50/5 51/1 65/13 68/12 72/24 79/4 85/10 89/4 90/19 95/6 100/10 101/14 105/6 105/19 110/18 113/7 117/4
**taken [5]** 22/10 22/14 77/2 99/8 104/9
**takes [4]** 49/5 50/20 92/23 106/10
**taking [3]** 5/11 111/25 119/2
**Talbot [1]** 107/11
**Talcott [3]** 2/10 4/20 121/10
**talk [21]** 13/19 30/15 38/13 38/16 39/2 39/4 49/18 53/19 62/10 64/14 68/5 70/3 80/4 86/25 90/22 90/23 96/1 107/7 122/4 123/23 124/18
**talked [2]** 116/12 116/15
**talking [17]** 8/2 31/14 35/8 44/6 49/18 61/6 71/14 75/4 76/1 86/6 89/22 90/5 91/17 94/10 99/15 112/9 118/16
**talks [14]** 8/23 28/20 44/3 44/5 59/17 59/21 60/1 60/9 60/10 60/15 60/20 64/21 120/19 123/19
**tax [1]** 87/20
**taxes [2]** 48/10 61/2
**teaches [1]** 73/7
**team [4]** 55/15 60/17 106/20 110/4

**technical [5]** 10/19 27/19 27/20 39/15 41/22
**technically [3]** 24/23 73/12 76/25
**technology [4]** 1/7 4/8 24/23 25/14
**telecom [3]** 1/7 99/17 99/18
**telecommunication [3]** 71/11 79/21 80/3
**telecommunications [1]** 79/22
**telecoms [1]** 68/18
**telephonique [1]** 51/7
**tell [16]** 8/13 31/8 31/9 44/21 52/6 55/22 57/13 64/11 71/4 98/24 98/25 103/5 106/6 106/11 106/24 122/1
**telling [2]** 40/14 53/7
**tells [1]** 97/17
**temporarily [1]** 71/24
**ten [3]** 72/22 97/1 107/17
**ten o'clock [1]** 107/17
**tentative [1]** 122/10
**term [4]** 7/21 8/19 79/18 80/5
**term is [1]** 8/19
**terminate [1]** 33/5
**terminated [1]** 59/20
**terminating [3]** 61/24 68/18 68/23
**termination [4]** 8/20 66/4 93/20 102/13
**terminology [1]** 7/19
**terms [45]** 7/8 8/23 41/24 49/24 52/19 52/21 52/23 53/3 53/9 53/15 53/24 54/1 54/12 54/22 55/2 55/8 55/24 56/1 56/2 56/20 57/4 57/6 57/7 57/12 57/14 57/18 57/21 57/25 58/1 58/2 58/18 58/19 58/23 59/4 59/5 65/21 71/15 78/15 86/23 90/2 90/2 91/1 96/18 102/21 103/17
**test [1]** 74/25
**testified [1]** 87/2
**testify [4]** 42/21 83/25 124/17 124/19
**testimony [18]** 10/14 13/13 13/18 26/17 27/18 29/6 29/7 31/3 31/22 42/23 43/8 43/9 49/8 62/4 65/8 81/1 81/17 115/24
**tests [1]** 74/22
**than [18]** 5/10 10/18 19/1 39/20 42/4 45/1 46/19 55/20 73/23 74/18 76/3 79/1 80/6 82/14 101/11 101/14 104/23 118/1
**Thank [10]** 6/20 7/15 7/16 9/23 15/13 20/7 20/9 29/18 104/17 121/19
**that [757]**
**that's [95]** 8/1 8/21 9/7 18/1 18/3 19/23 22/15 24/7 25/6 25/9 25/10 28/9 28/17 30/23 31/25 32/2 32/6 32/14 33/11 35/6 38/4 40/24 50/3 50/9 50/13 50/14 50/18 51/4 53/7 55/19 56/14 56/24 57/6 57/13 57/14 57/20 58/5 59/1 60/3 66/18 67/15 67/16 67/19 68/9 68/15 71/6 71/8 73/8 73/18 75/3 75/10 76/7 76/21 76/22 77/10 77/12 78/1 80/15 81/5 81/8 81/14 86/11 87/8 88/6 88/7 90/5 90/15 91/13 92/16 92/17 94/16 95/7 95/23 97/14 98/10 99/5 104/12 107/22 108/1 109/9 109/17 109/21 111/15 113/25 113/25 114/5 114/13 114/25 115/9 116/3 116/19 118/15 118/22 123/1 124/20
**that's when [1]** 109/21
**their [71]** 17/15 26/15 26/21 26/22 27/3 27/3 30/11 30/12 30/15 31/5 31/6 31/7 31/14 31/25 32/2 32/3 32/9 33/16 33/20 33/24 43/3 43/3 43/4 46/15 47/13 48/14 48/19 49/4 50/7 50/12 50/17 50/18 50/18 51/10 51/10 51/10 69/4 69/9 70/20 73/5 75/8 77/21 77/22 77/24 78/4 78/19 79/2 81/24 82/10 82/12 83/16 83/21 86/18 86/20 87/3 87/6 88/8 93/25 95/2 97/3 97/4 97/6 109/15 110/2 110/16 111/2 113/7 117/24 118/11 122/18 122/25
**them [33]** 5/11 23/21 46/16 54/20 55/17 56/22 69/8 70/19 70/25 72/2 72/11 74/11 77/18 77/19 82/19 82/19 82/22 83/18 83/20 86/18 87/25 90/9 91/5 93/23 94/20 95/8 95/11 95/23 98/19 98/25 99/19 104/6 104/8
**them do [1]** 104/6
**themselves [1]** 53/23

**then [69]** 6/9 7/11 10/13 12/1 16/21 17/3 17/4 17/18 18/25 21/15 21/17 22/15 24/24 24/25 31/21 34/11 37/6 41/13 43/5 47/1 52/12 52/13 53/21 55/5 57/21 59/20 60/1 60/5 60/24 61/3 64/7 64/21 68/20 69/19 70/3 73/14 74/1 74/7 75/9 76/23 77/20 78/8 87/23 88/3 89/9 92/24 93/15 94/12 96/14 100/19 101/18 105/23 106/24 109/2 110/1 111/1 111/3 112/20 113/4 113/7 114/17 114/21 114/21 115/8 119/15 120/18 121/20 121/23 122/4
**theories [2]** 62/11 81/1
**theory [11]** 16/13 16/13 30/3 30/8 31/19 57/16 81/3 82/5 84/22 104/1 115/16
**there [142]**
**there's [5]** 26/14 30/24 62/1 77/5 124/18
**therefore [8]** 33/21 40/3 41/6 50/14 94/2 97/12 97/17 103/23
**these [32]** 10/1 11/9 17/21 21/7 21/15 30/21 36/12 36/12 37/9 45/3 45/6 45/19 46/25 49/9 50/23 53/5 59/14 61/7 77/25 78/18 82/20 86/2 89/5 90/4 93/20 97/20 98/17 99/18 99/21 99/25 100/14 105/6
**they [150]**
**They'll [1]** 44/25
**they're [12]** 18/19 31/15 45/7 50/22 70/17 72/9 87/13 91/17 94/1 94/11 97/22 103/8
**they've [5]** 45/3 45/23 45/24 73/23 74/1
**thing [12]** 76/6 76/24 77/23 82/24 88/23 91/18 95/12 107/1 108/11 115/14 118/7 124/4
**things [21]** 23/9 40/1 45/24 56/9 60/24 61/25 74/9 75/24 86/5 86/14 87/19 89/5 89/19 90/19 96/8 106/1 111/11 112/10 117/25 118/3 123/11
**think [70]** 5/9 5/25 16/19 19/6 19/11 24/21 25/15 27/22 28/9 30/25 31/9 34/6 47/17 50/20 53/6 56/4 56/6 59/12 62/12 63/6 64/9 73/8 73/11 74/11 74/15 74/25 75/11 76/23 77/4 77/5 80/10 80/11 82/2 82/2 84/25 88/6 88/7 89/11 90/25 93/17 93/22 93/22 94/13 95/7 95/18 99/5 99/21 100/13 100/14 100/20 101/8 102/23 102/25 104/16 105/4 105/17 105/18 107/15 107/16 108/9 109/18 115/16 117/14 117/16 118/10 119/22 120/8 121/7 123/3 123/11
**thinking [4]** 44/23 84/2 84/4 87/6
**thinks [2]** 64/12 91/25
**third [13]** 2/23 13/16 25/8 70/11 70/16 72/1 73/4 111/2 111/2 120/15 120/17 121/1 121/23
**third-generation [3]** 70/11 70/16 72/1
**third-party [2]** 13/16 25/8
**this [167]**
**this difficulty [1]** 54/6
**those [42]** 6/16 7/1 8/14 12/16 13/22 17/6 17/8 21/2 23/8 23/24 24/25 25/22 31/20 34/10 36/8 37/23 39/16 43/11 46/1 46/20 48/22 48/23 50/8 52/22 54/12 58/19 61/8 61/11 61/25 63/8 66/15 67/3 70/21 71/16 74/3 74/9 86/5 86/17 92/20 102/16 103/3 106/1
**Thou [1]** 81/21
**though [1]** 56/5
**thought [13]** 23/9 34/4 37/2 37/5 38/10 85/20 94/10 111/24 112/12 112/13 114/15 117/18 119/11
**thousands [5]** 89/25 89/25 91/5 94/20 94/21
**three [15]** 14/1 17/1 17/6 17/23 18/2 18/11 21/17 23/22 23/25 43/19 74/25 93/11 105/13 107/12 108/16
**three-part [1]** 74/25
**through [20]** 5/6 8/14 10/18 13/1 17/2 17/3 17/4 34/5 34/17 34/20 45/8 46/1 68/25 70/19 71/10 77/21 78/10 78/10 106/12 120/25
**throughout [1]** 88/7
**throw [1]** 91/4
**ticket [4]** 47/5 47/7 47/13 47/16
**tickets [9]** 44/24 45/4 45/6 45/6 45/20 46/8 46/15 46/20 46/20

**tie [2]** 83/3 87/13
**tied [3]** 77/61/15 111/20
**tilt [1]** 27/11
**time [55]** 5/6 5/8 9/5 17/1 17/8 17/16 18/17 19/2 19/20 21/16 26/19 27/12 29/16 33/11 38/1 41/18 43/10 47/24 48/1 48/4 49/14 52/9 52/15 53/22 56/19 57/15 59/7 72/15 78/6 78/21 79/19 94/15 96/4 101/17 105/14 105/19 106/11 106/15 108/7 108/10 108/14 108/15 108/17 108/18 108/19 108/24 108/25 109/6 110/4 110/17 114/22 119/11 120/2 120/8 124/5
**time-limited [1]** 106/15
**times [3]** 12/1 19/10 45/22
**tired [2]** 99/11 105/8
**title [5]** 92/5 98/4 98/7 104/20 104/21
**titled [2]** 6/7 51/4
**today [1]** 78/5
**today's [1]** 115/9
**together [3]** 63/11 63/11 81/10
**told [12]** 40/16 40/18 40/22 40/25 40/25 45/22 46/17 49/9 55/24 56/1 94/19 114/2
**tolerate [1]** 83/1
**tolerating [1]** 82/12
**Tomasi [2]** 2/17 5/1
**tomorrow [5]** 55/20 78/6 101/6 105/11 109/7
**ton [1]** 75/16
**too [8]** 10/24 74/10 78/13 87/17 91/19 105/1 106/3 109/10
**took [1]** 11/23
**top [18]** 9/11 21/5 21/6 25/8 35/2 35/3 54/10 56/18 57/17 59/6 60/1 69/4 69/24 71/10 71/12 71/14 71/17 78/7
**top-off [5]** 59/6 71/10 71/12 71/14 71/17
**top-offs [1]** 69/24
**topic [3]** 59/10 59/11 64/13
**topped [1]** 54/19
**topper [1]** 54/21
**topper-off [1]** 54/21
**topping [2]** 55/6 57/11
**Toro [1]** 44/2
**total [12]** 9/11 12/2 16/4 16/5 21/8 21/9 21/12 25/20 33/9 34/11 49/22 49/24
**totality [1]** 14/23
**totally [6]** 14/8 41/19 42/2 53/18 58/16 59/10
**totals [1]** 18/12
**touched [1]** 37/17
**toward [1]** 59/20
**towards [1]** 110/6
**track [1]** 103/8
**tracks [1]** 41/25
**tradition [1]** 7/23
**traditional [12]** 7/21 7/22 8/9 8/12 8/17 9/18 12/10 15/25 20/20 61/10 87/15 88/5
**traffic [1]** 82/20
**trafic [1]** 51/7
**train [1]** 94/10
**Tran [4]** 31/3 31/22 44/2 53/15
**transcript [5]** 1/16 113/17 114/3 125/5 125/6
**transfer [1]** 71/12
**transitive [1]** 55/17
**transmission [1]** 80/2
**transmit [1]** 24/24
**transmitted [3]** 24/15 25/9 25/11
**travel [3]** 67/9 67/22 68/7
**traveler [3]** 66/10 66/16 97/1
**travelers [1]** 97/3
**traveling [7]** 66/7 66/9 67/13 68/2 70/15 71/24 102/25
**travels [1]** 65/14
**treated [2]** 75/9 99/23
**treatment [2]** 75/7 100/1

**T**

**Tremaine [2]** 2/14 4/24
**trial [34]** 7/20 12/15 13/8 15/18 16/3 22/20 22/21 22/22 22/23 23/4 23/7 76/12 84/13 100/21 101/5 101/6 106/1 106/4 106/6 109/3 109/13 114/7 114/16 114/22 115/4 115/8 118/9 118/13 121/3 121/6 122/7 124/7 124/14 124/21
**trials [2]** 107/12 124/11
**tried [3]** 32/13 32/15 120/5
**trigger [1]** 104/19
**triggered [1]** 104/24
**trips [2]** 84/10 84/12
**trouble [2]** 64/16 83/8
**troubling [1]** 113/5
**true [9]** 17/20 45/6 48/17 76/15 76/23 77/13 88/7 91/14 93/6
**truly [2]** 33/23 124/17
**trunk [3]** 24/22 24/23 25/2
**trust [2]** 47/2 96/14
**truth [2]** 18/14 48/18
**try [8]** 28/5 29/16 53/5 95/6 100/18 103/4 106/16 113/5
**trying [11]** 5/23 11/12 15/24 29/12 33/20 41/24 64/15 72/14 101/16 104/15 122/12
**turn [5]** 5/20 58/18 59/10 76/16 103/13
**turning [1]** 105/24
**turns [1]** 49/4
**turnstiles [1]** 46/2
**tweak [1]** 116/14
**tweaked [1]** 116/14
**twelve [2]** 18/11 18/24
**two [39]** 7/10 9/6 10/23 11/18 14/18 15/11 24/11 25/10 34/19 37/23 42/10 42/10 42/13 42/14 43/18 46/13 46/21 46/23 46/25 47/6 47/9 65/17 65/17 66/15 67/4 71/13 71/16 74/3 74/9 87/5 87/24 88/17 91/16 95/19 101/2 101/11 101/12 102/2 110/9
**two-page [2]** 101/11 101/12
**two-year [1]** 47/9
**Tyler [1]** 23/23
**type [4]** 6/24 8/1 8/1 53/25
**types [2]** 40/2 122/23

**U**

**U.S [21]** 9/13 9/25 21/14 65/15 67/9 67/13 67/22 68/8 68/14 73/23 87/5 87/8 89/25 97/7 97/20 97/23 99/2 102/6 102/7 102/8 102/23
**unclear [1]** 14/2
**under [22]** 12/12 14/5 16/13 25/13 31/15 38/17 44/9 62/21 63/7 63/10 63/15 75/11 75/13 75/23 83/20 83/20 83/23 98/4 100/1 111/22 112/23 121/21
**underlying [7]** 31/4 73/9 80/12 95/22 118/14 123/13 123/14
**undermines [1]** 51/19
**underpinnings [1]** 27/20
**understand [28]** 7/22 12/15 13/7 14/3 14/10 16/11 17/7 24/9 31/11 31/14 38/6 42/17 44/14 53/18 71/22 72/17 76/10 83/5 91/12 95/9 96/17 104/4 104/25 107/10 110/8 113/9 120/13 122/19
**understandably [1]** 97/7
**understanding [12]** 9/16 11/8 11/9 33/23 54/16 64/10 65/12 68/11 68/12 71/7 83/23 113/20
**understood [7]** 9/6 17/22 20/1 63/1 70/13 116/9 117/9
**unduly [1]** 75/15
**unfortunately [1]** 56/14
**UNIGESTION [3]** 1/3 4/7 115/4
**unit [1]** 6/14
**UNITED [44]** 1/1 1/18 2/22 7/24 31/16 60/17 62/14 64/24 69/3 69/4 69/7 70/5 70/6 70/18 71/23 72/4 72/6 72/12 72/15 73/25 76/15 76/17 76/22 76/22 78/12 79/9 79/10 79/12

79/15 79/16 79/16 79/17 80/9 80/14 80/15 80/17 86/20 86/22 96/21 98/3 98/8 98/12 103/22 108/24
**United States [40]** 7/24 31/16 60/17 62/14 64/24 69/3 69/4 69/7 70/5 70/6 70/18 71/23 72/4 72/6 72/12 72/15 73/25 76/15 76/17 76/22 76/22 78/12 79/9 79/10 79/12 79/16 79/16 79/17 80/9 80/14 80/15 80/17 86/20 86/22 96/21 98/3 98/8 98/12 103/22 108/24
**university [2]** 72/8 72/15
**unjust [1]** 74/12
**unless [1]** 48/17
**unlikely [1]** 27/10
**unlimited [2]** 87/10 97/2
**unlisted [1]** 103/24
**unquote [3]** 14/20 15/21 17/10
**unreasonable [18]** 16/14 34/17 63/20 73/9 74/13 74/19 74/20 74/21 81/7 81/21 81/22 82/1 82/2 82/2 82/8 84/20 102/14 102/15
**unreasonably [3]** 14/17 74/23 81/24
**unrelated [1]** 86/19
**unreliable [1]** 61/22
**untenable [1]** 79/12
**until [7]** 5/22 58/24 71/2 76/25 89/16 100/24 101/25
**up [34]** 5/23 15/11 18/10 22/18 29/12 29/16 44/5 46/16 49/18 50/19 52/1 57/22 58/21 67/10 72/12 76/17 76/18 79/2 86/18 91/4 91/6 93/3 93/3 96/9 96/15 103/3 103/14 104/1 107/3 107/19 111/24 112/19 113/6 115/3
**upcoming [1]** 109/13
**upfront [1]** 55/7
**UPM [61]** 1/7 1/7 4/8 6/16 6/25 7/2 7/12 7/21 9/17 9/21 10/4 11/11 13/21 14/16 15/7 15/19 15/21 16/10 17/14 22/17 26/21 30/1 30/1 30/5 31/17 32/19 33/9 33/10 33/13 34/5 34/16 36/22 36/25 37/25 39/16 39/18 39/20 39/21 48/14 49/13 53/11 54/10 54/17 54/19 57/17 58/19 59/15 61/9 68/9 68/12 72/11 73/2 73/12 73/24 74/4 83/10 87/23 93/8 99/8 102/11 117/20
**UPM's [16]** 6/19 10/8 14/21 17/10 21/25 30/7 30/9 30/18 31/11 31/19 39/14 45/23 53/8 61/13 64/4 115/25
**upon [17]** 10/19 11/3 14/24 17/9 17/18 18/22 18/23 23/21 27/17 30/6 37/17 39/14 39/16 46/12 52/3 52/8 85/22
**uranium [1]** 75/17
**urgency [1]** 101/18
**urging [1]** 69/3
**us [25]** 9/3 12/2 12/5 14/25 43/5 43/6 49/9 56/7 56/8 73/7 76/25 82/17 82/25 84/22 87/5 95/23 97/5 98/16 100/17 101/19 105/19 106/21 114/13 119/9 121/1
**usage [2]** 60/21 86/3
**use [17]** 12/1 21/9 31/23 45/22 55/25 56/2 56/20 60/19 67/10 67/23 68/8 70/22 72/2 75/8 91/4 110/5 114/11
**used [14]** 7/21 12/1 13/21 15/4 15/8 21/20 23/3 34/10 43/13 61/10 87/7 91/4 91/6 103/8
**user [2]** 55/24 56/1
**uses [1]** 92/24
**using [12]** 16/17 24/19 26/15 43/7 43/21 53/11 54/1 55/8 57/11 57/25 67/23 103/6
**utilize [1]** 107/24
**utilized [1]** 28/5
**utilizing [2]** 36/23 37/20

**V**

**vacation [3]** 66/8 101/24 120/23
**vague [1]** 84/23
**Valbrun [2]** 2/3 4/11
**value [1]** 45/2
**Van [2]** 2/16 5/3
**varied [1]** 39/23
**various [4]** 63/8 103/18 104/21 112/10
**Vaughan [34]** 2/3 2/4 4/10 4/11 5/15 5/22 8/3 64/14 73/21

**V**

**Vaughan... [25]** 74/8 74/25 82/16 85/25 88/22 89/9 89/20 90/24 91/8 92/5 94/14 95/21 106/3 108/7 111/9 112/8 112/10 112/18 113/2 113/11 113/12 117/13 119/18 121/12 121/13

**Vaughan's [2]** 80/25 94/23

**vehicle [1]** 100/6

**vending [6]** 77/13 77/18 78/9 78/9 78/20 80/18

**vendor [1]** 93/15

**veracity [2]** 23/1 23/2

**verdict [1]** 122/10

**verifiable [1]** 48/24

**verification [1]** 6/14

**verify [1]** 46/25

**Verizon [2]** 97/1 103/2

**Verizon's [1]** 103/2

**version [3]** 83/17 96/13 97/14

**versus [8]** 4/8 20/19 33/5 45/6 75/16 77/8 79/22 88/4

**very [23]** 20/18 20/23 36/1 36/2 37/18 39/25 48/18 54/3 54/5 68/15 77/24 83/10 89/13 89/20 92/4 105/7 105/20 111/10 113/5 115/20 117/2 122/1 124/10

**vetted [1]** 103/24

**via [1]** 7/24

**victim [2]** 47/18 47/20

**victimizing [1]** 47/9

**video [2]** 108/12 109/10

**vie [1]** 92/11

**view [2]** 81/3 102/22

**violate [1]** 75/19

**violation [1]** 76/3

**virtue [1]** 86/20

**vis [2]** 28/4 28/4

**vis-à-vis [1]** 28/4

**visiting [1]** 103/9

**voice [2]** 7/24 60/2

**VOIP [2]** 7/25 8/24

**voir [1]** 122/9

**volume [1]** 90/11

**W**

**wait [6]** 5/22 29/14 40/20 89/16 112/8 112/11

**waiting [1]** 55/18

**waking [2]** 26/13 27/1

**Wakinson [1]** 7/13

**walking [1]** 14/25

**wallet [1]** 71/21

**want [74]** 5/7 5/8 5/14 5/19 10/22 14/1 15/14 18/25 22/16 22/18 22/19 22/21 24/9 25/4 29/24 33/14 35/9 37/2 37/4 38/13 44/10 44/20 45/22 49/18 52/6 52/12 52/14 52/17 56/10 57/7 58/16 58/18 65/4 67/23 68/5 71/1 74/10 76/2 76/18 78/11 79/3 80/14 81/16 84/5 89/17 89/18 93/25 95/10 98/6 98/9 100/22 101/10 105/19 106/24 107/18 107/21 110/4 110/22 111/3 112/2 113/17 114/23 114/24 117/21 117/22 118/3 120/1 120/2 120/10 121/13 121/15 121/16 124/13 124/22

**wanted [11]** 23/15 23/15 30/17 38/4 83/3 85/23 100/18 101/8 111/11 115/14 122/13

**wants [6]** 61/14 98/25 109/8 109/9 121/21 124/19

**was [182]**

**was pulled [1]** 56/11

**Washington [2]** 2/8 2/15

**wasn't [7]** 9/5 36/14 42/8 96/15 112/19 119/3 120/16

**wasting [1]** 29/16

**water [1]** 33/14

**way [39]** 5/21 19/18 21/8 24/18 30/20 31/17 36/9 40/4 43/4 44/20 45/5 45/17 45/18 49/13 54/16 56/9 56/11 57/2 63/1 65/24 67/23 74/11 77/4 77/6 81/3 85/4 86/18 87/14 88/14

90/25 93/3 96/8 98/10 99/11 110/3 110/14 111/1 117/5 123/2

**Wayback [1]** 53/5

**ways [4]** 14/1 14/18 34/19 63/6

**we [257]**

**we're [12]** 16/8 17/19 31/12 31/13 43/7 48/17 56/15 75/25 85/14 85/15 94/4 122/12

**we've [3]** 31/13 70/4 79/23

**web [2]** 53/2 107/24

**website [3]** 56/2 56/17 56/25

**websites [1]** 53/17

**week [9]** 26/2 94/8 100/12 100/25 101/1 101/9 101/11 111/16 120/21

**weeks [3]** 101/2 102/2 120/20

**weigh [1]** 88/2

**welcome [8]** 4/21 5/15 5/16 20/10 20/24 30/25 121/14 122/25

**well [38]** 11/6 11/7 22/4 27/21 32/8 41/4 42/21 45/11 45/13 49/13 50/10 54/15 57/20 58/24 63/17 65/13 69/25 75/2 75/13 75/20 82/17 82/23 82/25 84/9 84/20 84/21 85/16 85/21 86/9 88/25 89/22 90/16 91/10 92/1 92/19 96/9 99/7 99/16

**went [4]** 16/19 53/4 96/24 120/25

**were [99]** 6/18 6/25 7/1 7/1 7/11 7/20 8/1 9/11 11/6 11/12 13/21 17/8 18/16 20/15 21/13 22/8 22/13 23/1 23/8 23/9 23/9 23/21 24/12 25/23 30/6 30/7 30/9 30/18 34/10 37/6 38/2 38/2 40/5 41/12 43/10 44/12 46/7 46/14 46/20 48/23 50/7 53/10 53/24 53/25 54/19 61/6 61/8 61/10 61/11 61/24 62/21 62/23 63/9 63/14 67/1 68/16 68/17 68/18 68/20 68/21 68/21 68/22 68/23 68/24 69/5 69/8 71/13 71/16 73/6 75/8 80/24 84/17 84/18 86/6 86/6 86/8 89/21 89/22 89/24 89/24 90/15 91/6 91/19 93/19 93/20 96/5 96/22 98/20 100/17 102/6 107/3 111/10 111/22 112/7 112/9 115/7 116/15 117/2 117/18

**weren't [4]** 75/9 87/6 90/12 98/18

**what [170]**

**what's [16]** 8/16 8/17 32/25 50/14 54/3 58/3 68/11 70/9 71/7 73/13 75/22 90/2 97/24 108/7 113/6 118/22

**whatever [18]** 5/8 5/8 49/4 52/14 52/17 65/20 67/4 67/12 67/15 71/25 89/18 93/13 98/6 98/13 98/25 100/22 111/3 121/20

**when [60]** 8/22 9/8 16/23 17/16 23/21 24/24 26/25 37/23 42/6 42/8 45/18 45/25 47/12 48/2 48/8 48/13 50/17 54/10 54/19 55/6 57/17 58/10 64/12 64/17 66/2 66/10 69/1 71/1 75/25 80/13 80/24 82/13 85/20 89/20 90/7 91/6 92/4 94/7 95/24 97/17 98/11 99/2 103/3 106/2 106/5 106/25 108/23 109/14 109/21 110/22 111/13 111/17 112/22 113/13 113/21 115/2 116/16 117/9 117/23 118/18

**whenever [4]** 5/24 32/13 83/16 112/14

**where [59]** 10/13 12/16 13/8 13/11 14/13 15/14 16/8 17/14 18/10 19/4 19/11 21/6 21/23 22/16 25/10 26/5 27/6 27/13 28/18 30/20 32/2 34/15 36/11 36/16 38/15 39/2 39/3 40/7 40/12 42/23 47/10 47/17 47/19 49/7 49/11 51/16 53/16 56/8 56/14 56/24 57/10 57/22 58/5 66/17 68/22 73/4 75/16 75/25 78/1 78/2 84/1 85/19 86/23 86/24 88/21 97/25 110/11 114/13 122/2

**whether [23]** 31/9 42/22 44/21 50/9 58/19 63/9 63/13 63/18 64/6 69/7 70/19 73/17 74/22 76/14 80/1 81/18 99/22 102/9 103/21 106/9 114/25 115/9 120/1

**which [62]** 6/14 6/15 6/22 6/24 7/10 11/20 12/2 12/3 12/5 12/6 13/22 14/6 15/20 17/13 18/5 19/1 23/6 23/8 23/17 23/18 24/12 24/13 24/14 25/3 25/22 30/6 37/9 37/17 44/3 44/5 50/2 56/12 59/4 59/23 61/23 65/21 65/25 69/18 75/6 78/11 78/20 82/16 83/3 89/15 90/9 91/5 95/3 96/5 98/4 98/20 111/4 111/5 111/6 111/12 112/13 114/15 115/20 118/24 119/1 119/8 121/25 122/16

**while [9]** 27/23 33/19 38/1 38/2 47/1 68/2 99/25 101/21

**while... [1]** 120/7
**who [28]** 10/18 13/13 23/19 26/14 27/18 35/7 41/22 41/24 47/8 48/19 49/8 52/9 61/21 66/6 69/6 70/14 70/16 80/18 88/10 88/11 93/8 93/11 93/15 95/2 96/21 101/20 107/25 117/9
**whole [2]** 26/12 82/20
**wholesale [1]** 68/23
**whom [1]** 67/24
**whose [3]** 7/7 7/10 103/5
**why [62]** 9/1 11/1 14/3 16/16 17/5 19/12 19/19 21/8 22/3 26/7 27/6 27/14 27/25 28/6 29/1 30/25 32/6 33/24 36/10 38/20 39/20 40/8 40/24 41/2 41/8 41/13 41/19 42/2 42/3 42/17 42/18 49/15 50/15 58/19 62/15 64/11 74/1 78/20 81/10 81/11 82/2 82/9 82/12 82/19 84/8 88/7 90/9 91/5 94/7 95/13 95/19 111/13 111/15 112/18 114/15 114/18 114/25 115/15 116/1 116/19 117/1 120/18
**wide [1]** 106/22
**wider [1]** 61/1
**will [120]** 4/13 5/6 5/20 8/13 8/15 10/13 10/14 10/16 10/17 10/18 10/25 11/2 11/22 12/17 13/8 13/11 13/12 13/12 13/19 14/14 14/18 14/25 15/1 16/4 16/8 17/12 19/7 23/3 23/24 25/10 26/6 26/17 26/18 26/20 26/23 28/3 29/16 30/15 35/7 39/13 39/17 39/20 42/20 45/16 48/9 52/4 54/6 55/22 56/5 58/10 58/12 58/13 59/3 61/14 66/11 70/23 71/20 72/22 73/5 74/16 76/20 77/2 82/4 82/7 83/1 83/7 84/25 85/2 85/3 85/3 85/11 86/21 86/25 87/9 87/16 88/12 88/13 88/20 88/22 88/23 88/23 90/22 90/23 91/25 94/8 94/8 96/25 103/5 103/14 105/6 105/22 106/12 107/6 107/15 107/16 107/20 108/1 109/2 109/8 109/10 110/9 111/12 111/20 113/3 113/10 121/20 122/4 122/4 122/5 122/8 122/18 122/21 123/3 123/14 123/17 124/1 124/2 124/3 124/13 124/18
**Williamson [1]** 2/10
**willing [1]** 117/21
**willingness [1]** 105/5
**Wiltshire [1]** 2/7
**win [6]** 88/10 88/12 88/20 88/21 89/7 89/11
**wins [1]** 82/5
**wireless [6]** 97/11 98/4 98/5 98/6 98/8 98/19
**wish [1]** 5/17
**within [16]** 6/9 6/10 6/11 11/10 11/10 13/16 19/2 20/11 24/24 80/9 85/16 98/22 99/24 103/6 110/12 116/18
**without [11]** 14/16 16/14 24/19 24/22 31/18 34/17 46/1 69/9 77/16 83/14 125/6
**witness [30]** 23/1 23/2 28/8 28/11 28/12 29/1 29/8 34/20 35/9 35/10 35/11 35/19 41/3 60/8 66/14 109/14 113/15 113/23 115/13 115/15 115/23 116/5 116/11 116/22 116/24 117/25 118/12 118/12 119/10 124/19
**witnesses [6]** 10/18 109/15 119/7 124/15 124/16 124/18
**won't [4]** 68/6 84/6 89/4 122/2
**Wood [3]** 31/1 31/2 31/21
**word [2]** 92/6 121/8
**wording [2]** 74/14 74/16
**words [4]** 44/9 53/24 82/21 98/18
**work [11]** 65/5 65/6 94/17 105/10 105/22 106/12 107/21 109/7 109/10 116/17 123/3
**worked [2]** 91/6 106/15
**working [5]** 41/4 46/12 71/25 82/24 86/16
**works [3]** 65/3 91/9 111/1
**world [17]** 32/23 44/24 44/25 45/2 45/5 45/5 45/8 45/12 45/15 45/18 46/13 66/10 66/16 79/14 97/1 104/2 122/16
**worldwide [1]** 77/25
**worried [1]** 112/21
**worry [2]** 30/17 53/12
**would [86]** 5/11 12/3 14/19 14/21 20/3 21/2 22/25 24/10 25/13 26/10 26/15 27/11 30/20 30/22 32/20 33/2 33/21 41/5 42/5 43/1 43/2 43/3 43/16 43/17 43/18 49/1 51/2 52/7 52/15

54/10 54/11 56/18 58/22 66/9 66/21 69/2 74/5 74/8 74/11 74/23 76/4 86/7 80/13 80/20 82/8 84/10 84/12 84/16 84/20 84/21 85/13 88/11 88/11 90/15 91/8 92/1 95/13 100/2 100/4 100/11 100/13 100/14 100/22 101/19 102/20 106/1 106/5 106/25 107/8 107/23 108/6 108/11 108/14 109/14 111/14 111/17 111/20 113/5 114/11 115/8 116/14 117/17 117/17 117/20 118/11 120/12
**wrap [2]** 56/13 58/21
**wrapped [2]** 53/25 56/12
**wrapping [1]** 53/25
**Wright [2]** 2/14 4/24
**write [1]** 79/13
**written [1]** 78/15
**wrong [14]** 22/6 31/1 32/25 35/21 35/22 38/25 64/12 69/12 80/10 88/13 94/7 95/13 97/25 98/1
**Wyatt [1]** 2/10

**X**

**Xerox [2]** 46/7 46/8
**XYZ [1]** 93/12

**Y**

**yeah [3]** 80/13 83/19 97/9
**year [7]** 12/4 46/9 47/9 62/5 80/23 87/23 114/2
**years [12]** 8/14 8/15 45/4 46/13 46/23 47/6 71/25 72/8 72/9 72/15 88/17 89/4
**Yep [1]** 79/4
**yes [47]** 4/16 6/2 6/5 6/8 8/4 9/9 9/15 10/24 11/21 11/21 12/8 17/25 18/4 18/8 20/14 21/18 22/1 24/6 25/21 25/25 32/1 34/14 36/21 49/6 56/22 59/9 61/16 61/24 62/5 62/19 63/6 64/2 66/4 66/13 75/10 95/19 99/5 102/1 102/4 105/4 106/7 115/6 115/18 116/7 122/20 123/24 124/9
**yet [3]** 45/21 88/2 91/9
**York [2]** 69/7 70/20
**you [456]**
**you'd [1]** 74/9
**you'll [1]** 39/25
**you're [103]** 5/15 5/16 5/24 7/23 8/2 8/6 8/7 8/13 8/18 8/24 9/18 10/10 10/15 10/20 11/7 11/17 11/19 12/18 13/4 13/9 13/14 13/16 13/21 14/2 14/15 14/20 14/22 15/1 15/8 16/1 16/6 16/12 16/18 18/13 20/10 20/16 20/19 20/24 21/3 21/10 22/5 25/9 30/25 31/14 31/23 32/8 32/14 35/5 44/23 51/11 51/13 55/6 55/16 58/1 61/11 64/14 64/18 64/22 65/3 66/16 66/21 67/2 67/3 67/9 67/10 67/12 67/16 67/20 67/22 67/23 68/8 68/13 69/5 69/8 70/22 72/2 72/5 72/10 72/16 73/25 75/2 75/5 77/6 78/7 78/8 80/8 82/21 83/5 86/24 87/2 87/24 88/4 88/12 88/13 90/7 96/22 98/25 103/13 103/16 105/8 105/9 122/24 122/25
**You're Home [1]** 67/22
**you've [14]** 28/10 28/25 29/9 30/24 32/12 37/13 46/17 46/24 61/15 83/24 106/9 114/5 115/16 117/11
**you.' [1]** 95/1
**your [151]**
**Your Honor [38]** 9/21 15/18 20/13 22/10 35/19 38/9 42/5 42/19 43/15 47/17 49/16 51/11 52/25 53/14 55/12 55/14 62/10 71/3 85/7 100/24 101/4 101/5 101/16 103/17 105/8 107/3 107/23 111/8 112/5 113/13 116/4 117/5 118/16 119/9 119/13 120/15 121/7 122/14
**yours [1]** 120/21
**yourself [1]** 13/8

**Z**

**Zile [2]** 2/16 5/3
**Zoom [5]** 124/11 124/14 124/17 124/19 124/21