**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Bragar DuBay
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

   Attorneys for Counterclaim Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**, <br><br>   Plaintiff & Counterclaim-Defendant, <br><br>   v. <br><br> **UPM TECHNOLOGY, INC**., *et al.,* <br><br>   Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI <br><br> **COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS** |

Pursuant to the Court's Trial Management Order (ECF #191), Counterclaim Plaintiff UPM Technology, Inc. ("UPM") submits its lay witness statements.

### A.    Bruce Tran

#### 1.    Background Information

Mr. Tran is CEO of UPM. His business address is 3000 NE Stucki Avenue, Suite 100, Hillsboro, Oregon 97124.  Mr. Tran is a Vietnamese immigrant who first immigrated to Germany where he obtained a degree in electrical engineering from Hochschule Niederhein, University of Applied Sciences.  Mr. Tran moved to the United States in 2000 and later became a United States citizen. In the early and mid-2000s, he became aware of the international call termination market, and founded UPM in 2007.

#### 2.    Substance of Testimony

Mr. Tran may testify as follows:

**UPM's Business Models**

a.    In order to understand UPM's services, Mr. Tran will provide a brief history of its business model. Essentially, it had a two-part business model of arbitrage and in-country bypass.

i.    *Arbitrage*: In an arbitrage arrangement, UPM is a middle-man between carriers with calls to get to a destination country, and other companies that already have a way to get calls to that other country. The calls come into UPM's network from carriers with calls to be completed, and are immediately switched out of UPM's network to carriers who have the capacity to terminate calls in the destination country. To succeed in this aspect of the business requires developing extensive contacts among both groups of companies – those with calls to get to destination countries, and those who have the ability to get calls there. UPM did this. In Mr. Tran's experience, almost all countries with high "official" termination rates had several different companies with the ability to get calls to those countries at a lower price than the "official" rate.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Mr. Tran, on behalf of UPM, spent considerable time and effort building contacts and a strong reputation in the international termination marketplace to be able to be in the arbitrage business.

ii.    *Call Termination/Bypass*: In a call termination ("bypass") arrangement, UPM itself took the steps needed to deliver calls from the United States to destination countries. Broadly speaking, this involved two activities: (a) setting up a softswitch, SIM management, and server infrastructure in the United States that can receive calls *from* the Internet (the calls that customers want to get to destination countries) and (b) setting up equipment in the destination country so that calls can be routed to that country *via* the Internet and terminated there.

iii.    In either case, UPM's role in the international call termination marketplace was to find customers with calls bound for the destination country and get them to choose UPM to handle call termination – that is, to sell UPM's services to third parties. UPM did this successfully for many years.

b.    In order to set up a bypass business in a destination country, UPM needed the following elements in place:

i.    A supply of SIM cards for the network of the mobile operator in the destination country;

ii.    Agents in-country who would provide locations for UPM's Gateway devices. These devices connect to the Internet in the destination country (to receive inbound calls), and contain wireless telephone radios to send outbound calls to the mobile operator's network.

iii.    Reliable power to keep the Gateways functioning;

iv.    Reliable reasonably high-bandwidth Internet connectivity so that the calls could actually get through; and

v.    A sufficiently developed cellular network in the destination country such that cell sites on the mobile operator's network had enough capacity to handle at least 8 or 16 calls from the Gateway at the same time. If the network operator's cell sites could not handle

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

enough calls, then it would be necessary to place Gateways in a larger number of different locations, each of which would be subject to problems with electrical power and Internet access.

       c.     Destination countries with high official termination rates tend to be less developed. This means that those countries often lack reliable electrical power and Internet access, as well has having, in some cases, inadequate cellular network capacity. These limitations inherently make the in-country bypass business extremely challenging as a technical/operational matter.

       d.     In the bypass model, UPM always paid full retail rates for the services it was selling. When a call gets sent to a destination country via the Internet, the call travels (via an Internet connection) to a Gateway device in that country. Functionally, the gateway device is basically the radio part of a typical cell phone. That radio cannot make any calls without the call being associated with a valid SIM, card with money in the SIM card's account – that is, without money already having been paid, in advance, to the mobile network operator. With paid-up SIM cards in place, UPM sent calls via the Internet to the Gateway, and the Gateway then used its radio to make a local call on the mobile operator's network. This call would only go through if UPM has already paid the mobile operator for the right to make calls on its network. As UPM saw things (and sees things), the only use it was making of the mobile operator's network was to make local calls – that is, calls that physically touch that network for the first time when the calls are already in-country. The mobile operator had no involvement in getting those calls from the United States to the destination country and so, as a business matter, had no basis for charging for that international transport function. By using the (modern and more efficient) Internet, UPM did the work of getting the call from the United States down to the destination country. The only service the mobile operator provided was to complete a local call on its network, and UPM always paid the full retail rate for that service.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Blocking by the Mobile Operator**

e.        Another significant challenge with the bypass business was that the mobile operator in the destination country would actively work to identify SIM cards being used for bypass and block them (that is, deactivate them and make them useless). They did this to protect the revenue they were receiving by charging excessive international call termination rates. Bypass involves using modern technology (the Internet) to provide consumers (the people making the calls) with a less expensive alternative to old, traditional technology (plain old phone calls) that were provided using older, more expensive technology and operated on essentially a monopoly basis. This monopoly existed because, as a practical matter, the only way to reach someone who is a subscriber of a mobile operator is to connect to the network of that specific operator. The operator has monopoly control over access to its own customers. And to protect its monopoly, it naturally tried to squash competition, including competition from the Internet. It made more money if the calls got to their customers via their own monopoly routing for inbound international calls. So, the mobile operators, whose local services UPM was using to handle calls coming out of the Internet, did not like what UPM and similar companies (there were always many of them) were doing, and typically would try to stop them from local calls in that way. Specifically, they would try to identify the SIM cards being used for bypass and then turn them off so they could not be used anymore.

f.        Unfortunately for UPM, identifying SIM cards being used for bypass is not very difficult. SIM cards being used for bypass inherently make calls in a different pattern than SIM cards being used by individuals. An individual makes calls from time to time and, as the individual moves over the course of the day, from varying locations. SIM cards being used for bypass make calls more or less continuously and often from a single location (where the Gateway is located). In addition, a SIM card being used by an individual will typically be used to call a small group of other telephone numbers (the subscriber's friends, family, and business associates), while a SIM card being used for bypass will call a very large number of different, essentially

Page 5 – COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS
UPM-L1\00687023.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

random telephone numbers. Moreover, SIM cards used by individuals both *make* and *receive* calls (as friends, family, and business associates call the individual). There is typically a reasonably close ratio between inbound and outbound calls. However, SIM cards being used for bypass receive essentially no calls at all. These differences in calling pattern makes it relatively straightforward for mobile operators to look at the usage patterns of SIM cards, identify those being used for bypass, and cut them off. The mobile operators have developed sophisticated artificial-intelligence engines (AIs) to identify SIM cards being used for bypass and to cut them off, and there is an international market for providing such systems to mobile operators.

g.      Now, consider what a call termination company (like UPM) needed to do to handle calls bound for a given destination country. When a call came in to UPM, it had to rapidly assign the call to an active, valid SIM card and also to a specific Gateway in the destination country; the Gateway then has to assign the call to an active radio connected to the destination mobile network (called a "port"). With hundreds or thousands of calls rapidly coming in, it would be physically impossible for a human person to somehow manually decide which SIM cards should be assigned to which Gateways to handle the calls. Instead, when a call came in, UPM had a pool of valid, activated SIM cards for the termination network, and its equipment would randomly select a SIM card from that pool. In the destination country, UPM had a pool (often not very large) of Gateways whose ports had active connections to the mobile operator's network. UPM's system would randomly select a port from those available and route the call (along with the associated SIM data) to that Gateway for completion over that port.

h.      All of this was done by software. The software ran on devices called "SIM servers." These are basically computers that are configured to perform the task of assigning SIM cards, randomly selected from a pool of active cards, to a pool of Gateway ports and managing the relevant data flows (authentication data from SIM cards, Internet-protocol data streams representing the actual content of calls) so that the calls would be accepted by the destination network.

Page 6 – COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS
UPM-L1\00687023.000

i.    This discussion provides some context to understand so-called "human behavior software," or HBS. Given that the mobile operators would try to block SIM cards used for bypass, the companies that made SIM server devices and software saw that their customers (companies that did international call termination, like UPM) were having their SIM cards blocked by the mobile operators in destination countries, and saw a marketing opportunity. These device makers said that they could write software that would make the usage patterns of SIM cards being used for bypass look just like the usage patterns of SIM cards being used by individual people – "human behavior software" – and that, if the call termination companies (like UPM) bought and used this software, their SIM cards would not be cut off and their businesses would be more successful. These HBS programs were talked about for quite some time and, by the time UPM was getting its business up and running (the 2008-2010 time frame), they were standard features included with SIM management devices and software.

j.    Despite the marketing claims of the equipment vendors, in practice, HBS did not work. Perhaps in some countries for some period of time HBS might have made some SIM cards last longer before being cut off. But very quickly after HBS was introduced by the device manufacturers, the capacities of the bypass detection AIs used by the mobile operators were able to defeat the HBS programs – in large part because the pattern of calls made by a SIM being used for bypass is inherently and unavoidably quite different from the pattern of calls made by a SIM being used by and individual. UPM experimented with using HBS in a few countries during the 2008-2010 time frame, but it found that the use of HBS did not significantly extend the useful life of SIM cards before they were cut off. UPM did not know (and does not know) the details of the anti-bypass AI engines that the mobile operators used; it only knew that trying to use HBS was a waste of time and effort. Instead, in UPM's experience, the way to get the most value out of a SIM card before it was blocked, was simply to send as many calls onto the network as possible until the SIM card was blocked. For this reason, UPM did not use HBS in its operations after the 2010 time frame. After that time, UPM tested some versions of HBS in a lab environment from time to

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

time, to test its engineers' theories for minimizing blocking, but these ideas were not implemented in any production environment.

k.    UPM does not have any direct knowledge of how Digicel-Haiti's anti-bypass AI worked. However, based on UPM's experience with the AI's behavior – its effectiveness in blocking UPM's SIM cards – UPM can draw some solid conclusions. First, as noted above, two of the features of bypass calling are inherent in the business model and cannot be hidden. First is the fact that a bypass SIM will call a random set of numbers, while a SIM being used by an individual will call a small group of other numbers. Second is the fact that a SIM being used by an individual will make and receive calls in a reasonably even ratio, while a SIM being used for bypass will receive no calls, or only a tiny number of calls, so that the ratio of calls made to calls received will always and inevitably be distinctive for bypass SIMs. These facts are what make HBS unworkable. In Haiti, based on UPM's observations, Digicel-Haiti's AI was extremely sensitive to departures from a normal, human ration of incoming to outgoing calls, and even a new SIM card would be blocked almost immediately after it called only 2 or 3 different new numbers, within the first 20 minutes of its being used.

l.    UPM also observed that Digicel-Haiti's anti-bypass AI looked at how frequently and by what means a SIM card was recharged, and would block SIM cards based on the fact that they were being recharged relatively frequently. In its operation, Digicel-Haiti's AI compared when UPM's SIM cards were activated with the time the cards were recharged, and if they were recharged too frequently, they were blocked. For example, if a batch of SIM cards were activated on a specific time frame and the same batch was also recharged within a specific time frame, those were immediately blocked – right after Digicel-Haiti received the recharge money. From UPM's perspective, Digicel-Haiti would wait until UPM had recharged one of its SIM cards, and only then cut it off and keep the money.

### UPM's Operations in Haiti

m.    UPM engaged in the business of terminating calls onto Digicel-Haiti's

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

network from August 2011 through March 2012, and then again from April 2014 through October 2014. It got calls to Digicel-Haiti's network either by means of in-country bypass, described above, or by means of reselling Digicel-Haiti's "Roam Like You're Home" ("RLYH") service from within the United States, as described below. UPM is no longer in the business of terminating voice calls onto the network of Digicel-Haiti

n.      In mid-2011, UPM sent an employee to locate people in-country who could (a) acquire SIM cards to send back to Oregon to authenticate calls; and (b) physically host the Gateway devices needed to receive calls from the Internet and make local calls on Digicel-Haiti's network.  Operations in Haiti were extremely challenging for several reasons:

i.      **First, *electrical power.*** Electrical power in Haiti was very unreliable; power outages were common, often in the range of three to five outages per day. When the power went out, the Gateway device would suddenly shut down, not only cutting off any calls in progress, but also sometimes damaging the device and/or interfering with the operation of its software. This meant that, even when the power came back on, the devices would frequently not work as they should. Sometimes the Gateways would need to be manually "re-booted." Sometimes the Gateways would try to automatically reboot, but get stuck in a loop of booting, and re-booting, etc., never reaching a state in which they could perform. Sometimes they would simply stop working. The people who were physically hosting the Gateways were not technically capable of troubleshooting or repairing a Gateway, so replacements had to be shipped in and installed.

ii.     **Second, *acceptable Gateway locations.*** For a gateway to work, it had to be in a location with good cell reception – steady, solid, three- or four-bar coverage. Digicel-Haiti's network was not always reliable, and the strength of its coverage even in one location could vary over time based on issues internal to Digicel-Haiti. Finding a workable location was challenging, and it was necessary to have Gateways in several locations in order to have a reasonable chance that a call could get through at any given time.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

iii.        **Third,** *reliable Internet connectivity.* For a Gateway to work, there had to be a reliable internet connection between the Gateway and a local Internet Service Provider. At least when UPM was operating in Haiti, there was little or no availability of "wired" broadband connectivity to the Internet (that is, nothing like the cable-TV-delivered Internet we are familiar with in the U.S.). This meant that the Gateways had to be connected via wireless Internet technology, which was also hard to come by. The available Internet data rates in Haiti were not able to support more than four (4) concurrent calls per site. In the United States, adequate Internet bandwidth is readily available, but it simply did not exist in Haiti. Because of this limitation, it was technically and physically impossible for any single location in Haiti to handle more than a few concurrent calls, no matter how many Gateway devices or how many ports might exist at that location.

iv.        **Fourth,** *Digicel-Haiti had very effective blocking,* so that even when things were working from a technical perspective, it was hard to get enough usage out of a SIM card before it was blocked to make the business economically worthwhile.

v.        **Fifth,** *theft was common.* The electronic equipment represented by a Gateway had value and could readily be sold on the black market. In addition, associated devices (Internet modems, cabling, backup power supplies) also all had value and could be stolen and sold. Moreover, as noted above, money that UPM sent for the purchase of SIM cards could be stolen as well.

o.        Because of these challenges, the economics of doing in-country call termination in Haiti were quite unfavorable. UPM kept at it for about six months – from late August 2011 until March 2012 – and then abandoned the market. UPM tried again during 2014, from about April until about October or November, but gave up again due to the same challenges. Instead, as discussed below, UPM shifted from in-country call termination to resale, within the United States, of Digicel-Haiti's RLYH service.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

p.    Economically, over both periods combined, UPM paid Digicel-Haiti a total of $279,129 for top-ups/recharges, and completed a total of 1,427,255 minutes. From UPM's perspective, applying the "local" rate for calls on Digicel-Haiti's network (approximately $0.095 per minute), UPM *paid* $279,129 to Digicel-Haiti, but only received services (call termination) worth $135,589. This means that Digicel-Haiti has kept $143,540 of UPM's money that, as a business matter, it has no right to keep.

**Resale of RLYH Service**

q.    At some point in early-to-mid 2014, UPM learned that Digicel-Haiti offered a service to SIM card holders in the United States called "Roam Like You're Home." After paying an enrollment fee of $25, the SIM card could be used to make calls back to Haiti from the United States and would be charged the same local per-minute rate as if the call were being made locally in Haiti. The $25 fee was significant, but from UPM's perspective, being able to make calls from the United States (Oregon) was a critical benefit because, by locating Gateways in Oregon, UPM could entirely avoid most of the problems identified above:

i.    ***Reliable Electrical Power.*** Using RLYH, the Gateways would be located in Oregon. They could be placed in an apartment, home, or office building with reliable power, and easily backed up by readily available "uninterruptible power supply" devices that can be obtained at any computer or office supply store.

ii.    ***Gateway locations.*** Wireless coverage in the Portland area from AT&T and T-Mobile – the two networks on which Digicel-Haiti SIM cards could "roam" in the United States – was enormously better than wireless coverage on Digicel-Haiti's network in Haiti. It was relatively simple to find locations with good wireless service.

iii.    ***Internet connectivity.*** Reliable broadband internet access for the Gateways was easy to obtain from the local cable company or other sources.

iv.    ***Staffing.*** With the Gateways in Oregon, reliable, honest technical staff were readily available to manage the Gateways and address any technical issues.

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

r.    Despite these strong benefits of reselling Digicel-Haiti's RLYH service as compared to doing in-country bypass, it turned out that Digicel-Haiti's anti-bypass AI engine was essentially just as effective at identifying SIMs that were being used to authenticate RLYH calls as it was at identifying SIMs that were being used to authenticate local calls in Haiti. This is almost certainly because the two key features of SIMs being used for bypass noted above – making calls to a large, random group of numbers, and not receiving any incoming calls – applied just as strongly to SIMs being used to resell RLYH service as they did to SIMs being used for in-country bypass. But, whatever the specific reason, Digicel-Haiti cut off UPM's RLYH SIM cards.

s.    By late 2014 it was clear that even with the technical advantages of RLYH described above, reselling Digicel-Haiti's service was not economically viable for UPM and it entirely left the business of trying to terminate calls onto Digicel-Haiti's network.

t.    Over the course of 2014, UPM subscribed 2,307 SIM cards to the RLYH rate plan, at a cost of $57,675.

### Activating SIM Cards, Topping them Up, and Subscribing them RLYH

u.    Digicel-Haiti set up its network and systems so that there was no need to interact with the company in any way in order to buy and use service on its network. SIM cards for its network were available for purchase "on the street" in Haiti. They could be purchased at convenience stores, from kiosks, and from people selling them from the back of trucks. UPM paid agents in Haiti to buy large quantities of SIM cards – many thousands of them – and ship them back to UPM in the United States.

v.    The process of activating a SIM card is entirely electronic. Once a SIM card is connected to a radio that is connected to the wireless network, the SIM card and the network automatically exchange a series of technical codes that lets the network know that the SIM card is valid (that is, that it was manufactured on behalf of Digicel-Haiti). A SIM card could be activated entirely within the United States, because it would automatically connect to the network of a Digicel-Haiti roaming partner such as AT&T or T-Mobile. Once connected in the United States,

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

the SIM card would receive a welcome message from Digicel-Haiti, along with an invitation to the user to sign up for RLYH service in order to call Haiti at the rate for local calls in Haiti. In practical, physical terms, Digicel-Haiti arranged things so that any SIM card activated in the United States automatically received an invitation to subscribe to RLYH service. Moreover, even without such an invitation, all that a SIM card holder had to do to subscribe to the service was to send some pre-set codes (established by Digicel-Haiti) to the network, and then confirm that the SIM card should be enrolled in the RLYH service. At no point in the process was the SIM card holder asked or required to indicate or explain where or how the SIM card had been acquired, and at no point in the process was the SIM card holder asked or required to click "I agree" or to review any terms of service or limitations on the use of the SIM card.

w.     A SIM card could only subscribe to and use the RLYH service if there was enough money in the SIM card's account with Digicel-Haiti to cover the enrollment fee and the price of making calls. Digicel-Haiti configured things so that the process of "topping up" a SIM card (that is, adding money to the SIM card's account) was, like activating the SIM card and signing up for RLYH service, entirely electronic. By 2014, SIM cards were topped up by means of online top-up services. There were (and are) several vendors that sell online top-ups. All that was necessary was that the SIM card holder enter the SIM card's telephone number; the top-up service then took credit card data from the SIM card holder and passed the money on to Digicel-Haiti, which accepted it for the SIM card's account. Digicel-Haiti's receipt of the money could readily be confirmed by sending a specific code to the network; the balance of the account was then sent back to the SIM card. As with activating SIM cards, at no point in the process was the SIM card holder asked or required to indicate or explain where or how the SIM card had been acquired, and at no point in the process was the SIM card holder asked or required to click "I agree" or to review any terms of service or limitations on the use of the SIM card. As a practical matter, Digicel-Haiti's network was open to anyone with a Digicel-Haiti SIM card, and both

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

RLYH service and the ability to make calls was available to anyone who had paid enough money, in advance, to Digicel-Haiti for the SIM card's account.

x.    UPM had electronic or largely electronic systems for adding money to the accounts of the SIM cards it had purchased. Once a SIM card was topped up, the network would let it make calls, in theory until the money in the SIM card's account was used up. Then UPM could add more money to the SIM card's account and make more calls. Of course, that ended when a SIM card was blocked. As a result, UPM normally only added relatively small amounts ($5 to $10, not counting RLYH enrollment fees) to any given SIM card so that less money would be taken by Digicel-Haiti when the card was blocked.

y.    Like activating SIM cards and topping them up, the process of subscribing to RLYH was also electronic. The SIM card sent some Digicel-Haiti-specified codes to the network requesting that the SIM card be enrolled in the RLYH service. Digicel-Haiti's system then deducted the enrollment fee from the amount of money in the SIM card's account and sent a message confirming enrollment. At that point the SIM card could make calls, and the amount deducted for each minute would be the local rate (about $0.09) rather than the much more expensive roaming rate.

z.    Again, at no point in this process does the network ask for anything like "I agree to terms of service by clicking here" or, "By using this service I agree to terms and conditions." All that was necessary was to have a valid SIM card, to send money to Digicel-Haiti for the SIM card's account, and to send the codes that Digicel-Haiti's network requires to enroll in RLYH service.

aa.    There was nothing special or unusual about what UPM did to activate SIM cards on Digicel-Haiti's network and enroll them into RLYH. It was simply a matter of following the technical steps that Digicel-Haiti itself had established, and paying money to Digicel-Haiti. Anyone with a SIM card could do the same thing.

Page 14 – COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS
UPM-L1\00687023.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Harm to UPM from Digicel-Haiti Blocking RLYH SIM Cards**

bb.    Digicel-Haiti's blocking UPM's use of its SIM cards to resell RLYH service directly and predictably caused UPM severe financial harm.

cc.    The overall size of the market for calls from the United States to Haiti was large – approximately 20,560,000 minutes each month during 2014, according to data from the Federal Communications Commission ("FCC"). If Digicel-Haiti had not blocked UPM's SIM cards, UPM could easily have handled 15% to 20% of that total using the SIM cards and equipment (Gateways, SIM servers, etc.) that it had on hand.

dd.    Given the good technical quality of RLYH calls, UPM without question would have been able to sell (to its customers, who were carriers with calls to get to Haiti) a very large fraction of the total market. Based on Mr. Tran's knowledge and experience in the market, these customers were very price-sensitive, meaning that a very small discount off the price they would have to pay to get a call to Digicel-Haiti using the "official" routing would be enough to motivate them to use UPM's service instead. In this regard, UPM was known in the industry to provide high-quality service. Among other things, UPM provided its customers with significant value by not charging for calls with a duration of 30 seconds or less. This eliminated charging UPM's customers for voicemail or dropped calls, which provided superior customer experience and additional cost savings.

ee.    The minimum price that Digicel-Haiti would charge for calls to Haiti from the United States was $0.23 per minute. With RLYH resale, UPM could obtain call termination to Digicel-Haiti subscribers in Haiti for only approximately $0.095 per minute. UPM's longstanding experience in the international call termination market confirmed that a 10% to 20% discount off of Digicel-Haiti's $0.23 per minute rate more would have been more than sufficient to attract a very substantial fraction of the overall market to UPM's service. A conservative estimate is that with a 20% discount off of Digicel-Haiti's price, and the reliability of United-States-based Gateways and connections to mobile operators, UPM could have captured 15% of the United-

Page 15 – COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS
UPM-L1\00687023.000

States-to-Haiti calling market in 2014, with an additional 5% added each year over time. Among other things, this is based on Mr. Tran's years of successful experience in the international call termination market, which shows that carriers seeking to send calls to countries such as Haiti are very price sensitive, and very willing to shift their business to a high-quality, lower-priced provider, such as UPM would have been but for Digicel-Haiti's blocking of its RLYH SIMs. These estimates are entirely reasonable based on that experience.

ff.    While there would have been some small additional costs to UPM to handle 15% to 50% of the market for calls to Haiti, those cost would have been entirely insignificant in comparison to the profits that UPM lost as a direct result of Digicel-Haiti's blocking of UPM's SIM cards. For example, it would have been necessary to construct some additional Gateway devices for deployment in Oregon to handle the volume of outgoing calls to Digicel-Haiti subscribers that UPM would have been able to sell using RLYH service. These costs would not have been significant over time, however. A Gateway with sixteen radios (the largest Gateway that UPM ever built or used) cost UPM about $500 to build. The operating profit from reselling a minute of RLYH service, with a 20% discount off of Digicel-Haiti's rate, was about $0.09 per minute. So once a Gateway had handled only 5,600 minutes of traffic, it would have fully paid for itself. That is a small fraction of the minutes in a month (43,200) available for making calls. Once Gateways were constructed to handle the volume of traffic on an ongoing basis, their cost would be effectively zero after the first month.

gg.    Similarly, the cost of Internet connectivity needed to handle the volume of traffic under consideration would not have been significant. The actual bandwidth consumed by a voice call in Internet Protocol format is relatively small. UPM had more than enough Internet capacity already being paid for to handle the required volume of traffic. But even if additional Internet capacity was required, the cost would have been insignificant. The same is true for the cost of electricity to power the required equipment. All of these additional costs are entirely immaterial in the context of the many millions of dollars of lost profit that UPM experienced by

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

virtue of Digicel-Haiti's cutting off UPM's SIM cards, and can be disregarded in estimating the profits that UPM lost by virtue of Digicel-Haiti cutting of its RLYH SIM cards.

### B.    Tyler Allen

#### 1.    Background Information

Mr. Allen is a SQC Technician at UPM, in addition to other roles held by Mr. Allen at UPM over time.

#### 2.    Substance of Testimony

Mr. Allen may testify as follows:

a.    During the 2011-2012 time frame, his responsibilities included recharging SIMs, including Digicel-Haiti SIMs. This meant that he was responsible for sending money for specific Digicel-Haiti phone numbers to top-up vendors to add value to a SIM card's account. As a routine business practice, when Mr. Allen completed recharging a SIM card, he would send a confirming email that the task was complete.

b.    The payments made to the top-up vendors would be routinely entered into UPM's accounting system.

c.    Mr. Allen's responsibilities also included physically receiving SIM cards that had been shipped from Haiti and physically mounting them into a SIM server. During the 2011-2012 and 2014 periods, he received many thousands of SIMs cards.

d.    By 2014, UPM's systems would automatically record data from the SIM cards (their assigned phone number, usage, etc.).

### C.    Daniel Barbosa Romero

#### 1.    Background Information

Mr. Romero is a UPM employee/contractor located in Mexico. He is one of UPM's SIM Managers. His responsibilities included working with UPM's SIM management software. This included the process of assigning SIMs to active SIM pools to be used to authenticate calls, managing automatic recharges of SIMs as their recharge/top-up balances were depleted, and other

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

related activities.

### 2. Substance of Testimony

a.    Mr. Barbosa will testify that he has worked for UPM since at least 2010 (with a break in employment during or about 2016), and that his responsibilities have included SIM management from at least 2011 through 2014.

b.    He will testify that he was involved in the day-to-day process of SIM management in connection with UPM's operations in Haiti during the periods of time relevant to this case.

c.    He will testify that UPM did not configure its SIM management software to mimic or simulate human behavior with regard to the selection of SIMs or the pattern of calls placed using the SIMs. To the contrary, it configured the software to randomly select a SIM and then place calls over that SIM essentially continuously until the SIM was cut off by Digicel-Haiti.

d.    He will testify that UPM's objective regarding SIM management was to complete as many calls as possible using a SIM before it was cut off. He will testify that, while he did not know what processes Digicel-Haiti used to identify UPM's SIMs, Digicel-Haiti was extremely efficient at identifying and cutting off the SIMs. This fact made it impractical for UPM to try to manage the calling pattern associated with any SIMs, because any delay in making use of a SIM created too much risk that the SIM would be cut off while it still had substantial funds in its account. Instead, as noted above, UPM's SIM management software was configured to send as many calls as possible, one after another, using a given SIM card,

### E.    Maarten Boute

#### 1. Background Information

Mr. Boute is the CEO and Chairman of Digicel-Haiti.

#### 2. Substance of Testimony

Mr. Boute may testify as follows:

a.    Digicel-Haiti provides the RLYH program to Digicel-Haiti SIM card

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

holders in the United States. Anyone with a Digicel-Haiti SIM card in the United States can activate that SIM card by connecting it to the network of a Digicel-Haiti roaming partner (such as AT&T Wireless or T-Mobile). Once it is activated, the SIM card holder may "top it up" or "recharge" it – that is, pay money to Digicel-Haiti for that specific SIM card's account – using third-party top-up websites.

b.     Digicel-Haiti has configured its network and systems so that all holders of Digicel-Haiti SIM cards in the United States can activate those cards automatically on the network of Digicel-Haiti's roaming partner; top them up via third-party, online web services; and sign them up for RLYH service by entering a few codes into the system. The system then automatically deducts the enrollment fee from the SIM card's account, and the SIM card holder can make calls using the service, which permits calls back to Digicel-Haiti subscribers in Haiti at local rates (roughly $0.09 per minute). Given the way the system is set up, there is no opportunity for direct human communication between Digicel-Haiti and the SIM card holder; to the contrary, the process is non-negotiable, electronic and, on Digicel-Haiti's part, entirely automatic.

c.     After there is enough money in a SIM card's account, the SIM card holder can subscribe to RLYH service through an electronic process that is automatic on Digicel-Haiti's part. It is accomplished by sending Digicel-Haiti-specified codes to the network, which, in response, deducts the enrollment fee (roughly $25 for a month of service) and sends the SIM card a message confirming that the service is active. At that point, the SIM card holder can make calls using the RLYH service, which permits calls back to Digicel-Haiti subscribers in Haiti at "local" rates (roughly $0.09 per minute).

d.     Digicel-Haiti's network will not permit a SIM card to be used to make a call unless there is enough money in the account; it deducts charges for the call in real time as it is in progress; and it cuts off even an ongoing call if the money runs out.

e.     Digicel-Haiti lost all of its switch data and call detail records from the relevant period.

Page 19 – COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS
UPM-L1\00687023.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

f.    When Digicel-Haiti concluded that a SIM card was being used for resale (*i.e.,* when UPM linked calls from third parties to a call established using one of its SIM cards), it deactivated (or de-authenticated) that card, thereby blocking UPM from continuing to use that SIM card. The purpose and effect of cutting off of UPM's RLYH SIM cards was to prevent UPM from reselling RLYH service.

g.    When Digicel-Haiti deactivated a SIM card, it kept for itself any money in the SIM card's account at that time.

Dated: September 30, 2022.

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Counterclaim Plaintiff

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I served the foregoing **COUNTERCLAIM PLAINTIFF'S LAY WITNESS STATEMENTS** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Anisha Carla Atchanah
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com
Email: aatchanah@kvllaw.com

Kent D. Bressie
HWG LLP
1919 M Street N.W., Suite 800
Washington, D.C. 20036
Email: kbressie@hwglaw.com

Anne M. Talcott
Kathryn E. Kelly
Andrew J. Lee
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com
Email: ajlee@schwabe.com

Dated: September 30, 2022.

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
Kathryn P. Salyer, OSB #883017
Eleanor A. DuBay, OSB #073755
Blake Van Zile, OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
Christopher W. Savage, D.C. Bar #362657
chrissavage@dwt.com
*(Admitted Pro Hac Vice)*
Katherine Sheriff
katherinesheriff@dwt.com
Telephone: (202) 973-4200

Of Attorneys for Counterclaim Plaintiff

Page 1 – CERTIFICATE OF SERVICE
UPM-L1\00687023.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236