**Kathryn P. Salyer**, OSB #883017
**Eleanor A. DuBay**, OSB #073755
**Blake Van Zile,** OSB #184672
ksalyer@tomasilegal.com
edubay@tomasilegal.com
bvanzile@tomasilegal.com
Tomasi Bragar DuBay
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204-3136
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

**Christopher W. Savage**, D.C. Bar #362657
chrissavage@dwt.com
(Admitted *Pro Hac Vice*)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC 20005-3317
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

        Attorneys for Defendants / Counterclaim Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNIGESTION HOLDING, S.A**., a foreign corporation, d/b/a **DIGICEL HAITI**,<br><br>        Plaintiff & Counterclaim-Defendant,<br><br>        v.<br><br>**UPM TECHNOLOGY, INC**., *et al.,*<br><br>        Defendants & Counterclaim-Plaintiffs | Case No. 3:15-CV-00185-SI<br><br>**DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF UPM'S OPPOSITION TO MOTION TO STAY DEFENDANT'S COUNTERCLAIMS PENDING RESOLUTION OF ISSUES ARISING UNDER THE COMMUNICATIONS ACT OF 1934, AS AMENDED** |

Page 1 - DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF UPM'S
OPPOSITION TO MOTION TO STAY DEFENDANT'S COUNTERCLAIMS PENDING
RESOLUTION OF ISSUES ARISING UNDER THE COMMUNICATIONS ACT OF 1934,
AS AMENDED
UPM-L1\00687230.000

I, Christopher W. Savage, declare under penalty of perjury:

1.    I am an attorney at Davis Wright Tremaine LLP. I am one of the attorneys representing the defendants in the above-captioned action. I make this declaration based on personal knowledge and my review of the records and files in this proceeding and public records referenced herein. I am competent to testify if called to do so.

2.    I make this declaration in support of UPM'S Opposition to Motion to Stay Defendant's Counterclaims Pending Resolution of Issues Arising Under the Communications Act of 1934, As Amended ("Stay Opposition") filed concurrently herewith.

3.    For the Court's convenience and ease of reference, attached hereto as Exhibit 1 is a true and correct copy of *Amendment of Parts 1 and 63 of the Commission's Rules,* Notice of Proposed Rulemaking, 19 FCC Rcd 4231 (2004), with the portions cited in UPM's Reply in Support of Motion for Summary Judgment and Opposition to Digicel-Haiti's Motion for Summary Judgment (ECF #402), and referred to in UPM's Stay Opposition, highlighted.

4.    Attached hereto as Exhibit 2 is a true and correct copy of *Amendment of Parts 1 and 63 of the Commission's Rules,* Report and Order, 22 FCC Rcd 11398 (2007), with the portions cited in UPM's Reply in Support of Motion for Summary Judgment and Opposition to Digicel-Haiti's Motion for Summary Judgment (ECF #402), and referred to in UPM's Stay Opposition, highlighted.

5.    Attached hereto as Exhibit 3 is a true and correct copy of *Amendment of Parts 1 and 63 of the Commission's Rules,* Order on Reconsideration, 25 FCC Rcd 15706 (2010). UPM did not cite or rely on this ruling, but it was referred to at the recent hearing in this matter.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Page 2 - DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF UPM'S OPPOSITION TO MOTION TO STAY DEFENDANT'S COUNTERCLAIMS PENDING RESOLUTION OF ISSUES ARISING UNDER THE COMMUNICATIONS ACT OF 1934, AS AMENDED
UPM-L1\00687230.000

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

Dated: October 3, 2022.

_____
Christopher W. Savage
Bethesda, Maryland

*TOMASI BRAGAR DUBAY*
121 SW Morrison Street, Suite 1850
Portland, Oregon 97204
Telephone: (503) 894-9900
Facsimile: (971) 544-7236

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I served the foregoing **DECLARATION OF CHRISTOPHER SAVAGE IN SUPPORT OF UPM'S OPPOSITION TO MOTION TO STAY DEFENDANT'S COUNTERCLAIMS PENDING RESOLUTION OF ISSUES ARISING UNDER THE COMMUNICATIONS ACT OF 1934, AS AMENDED** on the following individuals by electronic service to said individuals:

Robert C.L. Vaughan
Cherine Smith Valbrun
Leah Storie
Anisha Carla Atchanah
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue • Suite 2001
Fort Lauderdale, FL 33394
Email: rvaughan@kvllaw.com
Email: cvalbrun@kvllaw.com
Email: lstorie@kvllaw.com
Email: aatchanah@kvllaw.com

Anne M. Talcott
Kathryn E. Kelly
Andrew J. Lee
Schwabe, Williamson & Wyatt, PC
Pacwest Center
1211 SW 5th Ave., Suite 1900
Portland, OR 97204
Email: atalcott@schwabe.com
Email: kkelly@schwabe.com
Email: ajlee@schwabe.com

Kent D. Bressie
HWG LLP
1919 M Street N.W., Suite 800
Washington, D.C. 20036
Email: kbressie@hwglaw.com

Dated: October 3, 2022.

TOMASI BRAGAR DUBAY

By: /s/ Eleanor A. DuBay
    Kathryn P. Salyer, OSB #883017
    Eleanor A. DuBay, OSB #073755
    Blake Van Zile, OSB #184672
    ksalyer@tomasilegal.com
    edubay@tomasilegal.com
    bvanzile@tomasilegal.com
    Telephone: (503) 894-9900

DAVIS WRIGHT TREMAINE LLP

By: /s/ Christopher W. Savage
    Christopher W. Savage, D.C. Bar #362657
    chrissavage@dwt.com
    *(Admitted Pro Hac Vice)*
    Katherine Sheriff
    katherinesheriff@dwt.com
    Telephone: (202) 973-4200

Of Attorneys for Defendants / Counterclaim Plaintiff

## *19 FCC Rcd 4231;  2004 FCC LEXIS 1114*

Federal Communications Commission

March 4, 2004, Released; February 25, 2004, Adopted

IB Docket No. 04-47

Release No. FCC 04-40

**Reporter**
19 FCC Rcd 4231 *;  2004 FCC LEXIS 1114 **

## In the matter of Amendment of Parts 1 and 63 of the Commission's Rules

## Core Terms

carrier, authorization, discontinuance, customers, comments, Notice, resale, subsidiaries, resell, Biennial, modify, commonly-controlled, license, domestic service, cable, certification, amend, affiliated, landing, notify, recommended, electronic, ownership, public notice, entities, changes, inbound, non-dominant, processing, domestic

**Panel:** By the Commission

## Action

**[**1]**

NOTICE OF PROPOSED RULEMAKING

## Opinion

**[*4231]  COMMENT DATE:** 45 days after Federal Register publication

**REPLY COMMENT DATE:** 75 days after Federal Register publication

**[*4232]  I. INTRODUCTION**

1. In this Notice of Proposed Rulemaking, we seek comment on several potential changes to our international *section 214* authorization process [1] and the rules relating to the provision of United States (U.S.)-international telecommunications services. Specifically, we seek comment on whether to amend the procedures for discontinuing an international service to be more consistent

---

[1] *47 U.S.C. § 214 (2002)*.

EXHIBIT 1
Page 1 of 25

with the procedures for discontinuing a domestic service. We also seek comment on ways to lessen the burdens placed on Commercial Mobile Radio Service (CMRS) carriers by the international *section 214* application process. In particular, we seek comment on whether to establish international *section 214* authority for CMRS carriers to provide international resale service subject to their notifying the Commission within 30 days of when they begin to provide international service. We propose to amend our rules to clarify that U.S.-authorized resale carriers can resell the U.S.-inbound international services of either U.S. **[\*\*2]** carriers or foreign carriers. We seek comment on whether to amend our rules to allow commonly-controlled subsidiaries to use their parent's *section 214* authorization to provide international service. Additionally, we seek comment on whether to amend *section 1.767* of the Commission's rules [2] regarding procedures for Commission consideration of applications for cable landing licenses in order to assure compliance with the Coastal Zone Management Act of 1972 (CZMA). [3] Finally, we propose to amend other rules to clarify their intent.

## II. BACKGROUND

2. The Commission has continually reviewed its rules regarding the authorization of international services under *section 214* of the Act. [4] Through this review, the Commission has sought to facilitate the introduction of new services, and to provide customers with more choices, more innovative services, and competitive prices. Where the Commission has found that a rule is no longer necessary or could be streamlined, it has acted to **[\*\*3]** amend the rule so that it can improve its processing of authorization applications and regulation of international telecommunications services.

3. In 1996, the Commission created an expedited process for global, facilities-based, and resale *section 214* applications. [5] The Commission permitted applicants to apply for *section 214* authorizations on a global or limited basis, reduced paperwork obligations, streamlined tariff requirements for non-dominant international carriers, and ensured that essential information is readily available to all carriers and users. The Commission also adopted streamlined processing for international *section 214* authorizations, which allowed for grant of such applications 35 days after the date of the public notice listing the application as accepted for filing. This expedited process has facilitated entry into the U.S.-international telecommunications market and the  **[\*4233]** expansion of international services to the benefit of U.S. consumers and competition.

---

[2] *47 C.F.R. § 1.767 (2002)*.

[3] Coastal Zone Management Act of 1972, *16 U.S.C. § 1456 (1972)*.

[4] *47 U.S.C. § 214*.

[5] *Streamlining the International Section 214 Authorization Process and Tariff Requirements,* IB Docket No. 95-118, *Report and Order, 11 FCC Rcd 12884 (1996)* (*1996 Streamlining Order*). The Commission had begun the international *Section 214* streamlining process in 1985. See *International Competitive Carrier Policies,* CC Docket No. 85-107, *Report and Order, 102 FCC 2d 812 (1985)*; *recon. denied, 60 RR2d 1435 (1986)*; *modified, Regulation of International Common Carrier Services,* CC Docket No. 91-360, *Report and Order, 7 FCC Rcd 7331 (1992)*.

**[**4]**

4. Starting in 1998, the Commission made numerous changes to its regulations as part of the biennial regulatory review process. [6] In the *1998 International Biennial Review Order,* the Commission took additional steps to reduce certain regulatory burdens placed on providers of international telecommunications services in light of market changes. The Commission further streamlined its procedures for granting international *section 214* authorizations to provide international services, and expanded the categories of applications eligible for streamlined processing. [7] The processing time was further reduced so that an applicant qualifying for streamlined processing is authorized to provide international services 14 days after public notice of an application. The vast majority of international *section 214* applicants now qualify for streamlined processing, and carriers can then provide service starting on the fifteenth day after public notice.

**[**5]**

5. As part of the 2000 biennial regulatory review, the Commission amended several rules to clarify their intent and eliminated rules that no longer had any application. In the *2000 International Biennial Review Order,* the Commission revised the rules for *pro forma* transfers and assignments of international *section 214* authorizations to give carriers greater flexibility in structuring transactions. [8] These changes also assist carriers by making the rules more consistent with those procedures used for other service authorizations, particularly for the CMRS. [9] The Commission also clarified the international discontinuance rules and, consistent with domestic service rules, exempted CMRS carriers from the discontinuance requirements. The Commission further narrowed one of the *section 214* benchmark conditions, so that it only applies to the provision of the U.S.-international facilities-based switched services for facilities-based U.S. carriers affiliated **[**6]**  with dominant foreign carriers. [10]

---

[6] The Telecommunications Act of 1996 (1996 Act), Pub. L. No. 104-104, 110 Stat. 56 (1996), directs the Commission to undertake, in every even-numbered year beginning in 1998, a review of all regulations issued under the Communications Act of 1934, as amended (Communications Act), *47 U.S.C. §§ 151 et seq. (2002),* that apply to operations or activities of any provider of telecommunications service, and to repeal or modify any regulation it determines to be "no longer necessary in the public interest." *47 U.S.C. § 161 (2002).* In particular, the 1996 Act directs the Commission to determine whether any such regulation is no longer necessary "as the result of meaningful economic competition between providers of such service." *47 U.S.C. § 161(a)(2).*

[7] *1998 Biennial Regulatory Review-Review of International Common Carrier Regulations,* IB Docket 98-118, *Report and Order, 14 FCC Rcd 4909 (1999)* (*1998 International Biennial Review Order*).

[8] *2000 Biennial Regulatory Review: Amendment of Parts 43 and 63 of the Commission's Rules,* IB Docket 00-231, *Report and Order, 17 FCC Rcd 11416 (2002)* (*2000 International Biennial Review Order*), *aff'd sub nom. Cellco Partnership d/b/a Verizon Wireless v. FCC & USA,* No. 02-1262 (D.C. Circuit Feb 13, 2004).

[9] *2000 International Biennial Review Order, 17 FCC Rcd at 11418*, P4.

[10] In the *Benchmarks Order,* the Commission established benchmarks that govern the international settlement rates at or below which U.S. carriers may pay foreign carriers to terminate international traffic originating in the United States. *See International Settlement Rates,* IB Docket No. 96-261, *Report and Order, 12 FCC Rcd 19806 (1997)* (*Benchmarks Order*), *aff'd sub nom. Cable and Wireless Plc v. FCC, 166*

**[\*\*7]**  **[\*4234]**  6. As part of the 2002 biennial regulatory review, [11] the International Bureau ("Bureau") released a staff report that set forth various recommendations for reviewing our rules regarding the provision of international telecommunications. [12] The Bureau reviewed rules that fall within and outside the scope of section 11 of the Communications Act, [13] and made recommendations based both on changes in the competitive level of the marketplace and on other public interest reasons. [14] The Bureau recommended in the *2002 IB Biennial Review Staff Report* that we undertake a proceeding to review certain rules within Part 63 of the Commission's rules. [15]

**[\*\*8]**

7. As part of the 2002 biennial regulatory review proceeding, the Commission received comments on proposed changes to the rules contained in Part 63. [16] In its comments, Cingular argued that the *section 214* authorization process and regulation unduly burden CMRS carriers and requested that the Commission take action to lessen the burdens placed on CMRS carriers. [17] Cingular stated that even if the Commission continues to require CMRS carriers to obtain *section 214* authorization to provide international service, it should modify *section 63.21(h)* to allow commonly-controlled subsidiaries to use their parent corporation's authorization rather than having to obtain their own authorizations. [18] Verizon requested that we modify *section 63.19* to conform the notice period for discontinuance of international services to  **[\*\*9]**  that for domestic services. [19]

---

*F.3d 1224 (D.C. Cir. 1999)*, *Report and Order on Reconsideration and Order Lifting Stay, 14 FCC Rcd 9256 (1999)* (*Benchmarks Reconsideration Order*). In that Order, the Commission also adopted a condition requiring that, before a U.S. carrier may provide facilities-based switched or private line service on a route where it is affiliated with a carrier with market power on the foreign end of the route, the foreign affiliate must offer all U.S. carriers on the route a rate for settling traffic that is at or below the relevant benchmark rate. In the *2000 IB Biennial Review Order,* the Commission found that application of the benchmarks condition to facilities-based private line service was no longer necessary to prevent carriers from evading the condition as it applies to facilities-based switched service. *2000 International Biennial Review Order, 17 FCC Rcd at 11417-19*, PP11-16.

[11] *2002 Biennial Regulatory Review,* GC Docket No. 02-390, *Report, 18 FCC Rcd 4726 (2003)*.

[12] *International Bureau, Federal Communications Commission, Biennial Regulatory Review 2002,* IB Docket No. 03-309, GC Docket 02-390, *18 FCC Rcd 4196 (2003)* (*2002 IB Biennial Review Staff Report*).

[13] *47 U.S.C. § 161*.

[14] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4197*, P3 and *in passim.*

[15] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4211*, PP35-36, 4236-39, PP12-19. We will consider the other recommendations in the staff report relating to the reporting requirements of carriers providing U.S.-international services in a separate proceeding. *See id.* at 4210-11, P34, 4232, PP13-14.

[16] *Commission Seeks Public Comments in 2002 Biennial Regulatory Review of Telecommunications Regulations within the Purview of the International Bureau,* Public Notice, IB Docket No. 09-309, *17 FCC Rcd 18929 (2002)*. Parties also commented on the continued need for other regulations within the purview of the International Bureau in response to the Public Notice. *See 2002 IB Biennial Review Staff Report, 18 FCC Rcd 4196*.

[17] Cingular comments, IB Docket No. 02-309, at 7.

[18] Cingular comments, IB Docket No. 02-309, at 8-12.

[19] Verizon comments, IB Docket No. 02-309, at 11-12.

EXHIBIT 1
Page 4 of 25

8. Based on its review of the rules and various comments, the Bureau recommended that the Commission undertake a proceeding to review several rules in Part 63 for reasons other than developments in the level of competition. [20] The Bureau recommended that the Commission institute a proceeding to explore whether there are less burdensome means of applying the public interest goals of Part 63 to CMRS carriers. [21] The Bureau, however, disagreed with Cingular that the Commission should modify *section 63.21(h)* **[\*\*10]** to allow commonly-controlled subsidiaries to **[\*4235]** use their parent's international *section 214* authorization. [22] The Bureau also recommended that the Commission modify the rules specifically to permit all U.S.-authorized resale carriers to resell the international services of foreign-authorized carriers. [23] The Bureau also recommended that the Commission initiate a proceeding to modify the requirements for discontinuance of an international service, and consider whether those requirements should conform with the requirements for discontinuance of a domestic service. [24]

## III. DISCUSSION

### A. Discontinuance of International Service

9. We seek comment on whether to amend the procedures for discontinuance, reduction, or impairment of an international service by a U.S. carrier to be more consistent with our procedures **[\*\*11]** for discontinuance of a domestic service. At present there are several differences between the discontinuance procedures for international and domestic services, including the length of notice required. These differences can be confusing to a carrier and its customers if the carrier is discontinuing both domestic and international services.

10. The procedures for discontinuing an international service are contained in *section 63.19* of the Commission's rules. [25] The rule distinguishes among three categories of U.S. international carriers in setting out the discontinuance procedures. A non-dominant international carrier [26] must notify its affected customers at least 60 days prior to a planned discontinuance, reduction, or impairment of service. [27] The carrier must also file a copy of the notification with the Commission on or after

---

[20] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4236*, P12.

[21] *Id.* at 4211, P36, 4238, P16.

[22] *Id.* at 4211, P36, 4237-38, P15.

[23] *Id.* at 4211, P36, 4238, P17.

[24] *Id.* at 4211, P35, 4239, P19.

[25] *47 C.F.R. § 63.19 (2002)*.

[26] For the purpose of this discussion, a "non-dominant" international carrier is a carrier that does not have market power on the U.S.-end of the international route. *Compare with* *47 C.F.R. § 63.10* (non-dominant carrier is one that is not affiliated with a foreign carrier with market power on the foreign-end of the U.S.-international route) (2002).

[27] *47 C.F.R. § 63.19(a)(1)*.

    EXHIBIT 1
Page 5 of 25

the date on which notice has been given to all affected customers. [28] A carrier that has been classified as dominant due to its having market power in the provision of an international service on the U.S. end of the route [29] must obtain prior approval before a planned discontinuance, reduction, or impairment of service on that route. [30] A CMRS carrier **[**12]** is **[*4236]** exempt from the discontinuance procedures. [31]

 **[**13]**

11. The procedures for a planned discontinuance of a domestic service are contained in *section 63.71*. [32] Under that rule, a domestic carrier must notify all affected customers of the planned discontinuance, reduction, or impairment of services in writing. [33] The rule sets out specific information that the carrier must use in its notice to customers as well as specific language regarding the processing of the discontinuance application at the Commission and how customers can file comments with the Commission. [34] The carrier must file an application with the Commission, [35] and must submit a copy of the application to the public utility commission and

_____

[28] *47 C.F.R. § 63.19(a)(2)*.

[29] In the *2000 International Biennial Review Order,* the Commission clarified that the requirement for prior approval before discontinuance, impairment, or reduction of an international service applies only to a carrier classified as dominant due to its having market power in the provision of that international service on the U.S.-end of the route and not due to classification as a dominant carrier pursuant to *section 63.10*. *2000 International Biennial Review Order, 17 FCC Rcd at 11423-24*, P18.

[30] *47 C.F.R. § 63.19(b)*. If such a carrier only seeks to retire international facilities, or dismantle or remove international trunk lines, but does not discontinue, reduce, or impair the dominant services being provided through these facilities, it does not need prior approval but must provide customers at least 60 days written notice, and file a copy of the notice with the Commission. *Id.*

[31] *47 C.F.R. § 63.19(c)*.

[32] *47 C.F.R. § 63.71 (2002)*. *Section 63.63* describes the procedures to be followed in exceptional cases involving an emergency discontinuance. *47 C.F.R. § 63.63 (2002)*.

[33] The Commission has forborne from exercising its *section 214* authority on CMRS carriers for domestic services. *See Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services,* GN Docket 93-252, *Second Report and Order, 9 FCC Rcd 1411, 1481, P182 (1994)*. Thus, *section 63.71*, unlike *section 63.19*, does not specifically address the applicability of the discontinuance procedures to CMRS carriers.

[34] There are two similar statements that are to be used depending on whether the carrier is dominant or non-dominant for the service being discontinued, reduced, or impaired. The statement for a non-dominant carrier is:

> The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments within 15 days after receipt of this notification. Address them to the Federal Communications Commission, Washington, DC 20554, referencing the *Sec. 63.71* Application of (carrier's name). Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service.

*47 C.F.R. § 63.71(a)(5)(i)*. The language for a dominant carrier is similar, except that it states that a customer has 30 days to file comments. *47 C.F.R. § 63.71(a)(5)(ii)*.

[35] *47 C.F.R. § 63.71(b)*.

EXHIBIT 1
Page 6 of 25

Governor of each state in which the discontinuance, reduction, or impairment is proposed, as well as to the Department of Defense. [36] The Commission places the application on public notice, and the date of the public notice is the date the application is deemed filed for purpose of determining the automatic grant period. [37] A non-dominant carrier's application will be granted automatically 31 days after the public notice and a dominant carrier's application will be granted automatically 60 days after **[\*\*14]** the public notice, unless the Commission notifies the carrier that the application will not be automatically granted. [38]

**[\*\*15]**

12. In its comments in the 2002 biennial review proceeding, Verizon stated that the Commission should conform the notice period for discontinuance of international services by a non-dominant U.S.-international carrier to that for discontinuance of a domestic service by a non-dominant carrier. [39] Verizon argued that this change would eliminate the potential for **[\*4237]** disjointed notices to affected customers when a non-dominant carrier discontinues both domestic and international services, and would make the rules more consistent and rational. [40] In the *2002 IB Biennial Review Staff Report,* the Bureau agreed with Verizon, finding that, when a carrier that provides both domestic and international service seeks to discontinue service, the different requirements for the two services place unnecessary burdens on the carrier and the Commission, which can lead to confusion for the carrier's customers. [41] The Bureau thus recommended that the Commission consider modifying the rule to conform more closely with the discontinuance requirements for domestic service. [42]

**[\*\*16]**

13. We seek comment on whether we should modify the international 214 discontinuance procedures so that they are more consistent for international and domestic services. Verizon requested that we reduce the notification period for a non-dominant carrier's discontinuance of international services from 60 days to 30 days to be consistent with the domestic procedures. [43] We seek comment on this proposal. Specifically we seek comment on the appropriate notice period so that a carrier's customers will have sufficient time to secure an alternative provider for

---

[36] *47 C.F.R. § 63.71(a).*

[37] *47 C.F.R. § 63.71(c).*

[38] *Id.*

[39] Verizon comments, IB Docket No. 02-309, at 11.

[40] *Id.* at 12.

[41] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4239*, P19.

[42] *Id.* (finding that modification of the rule may be in the public interest for reasons other than the development of competition, and thus outside the scope of *47 U.S.C. § 161*).

[43] Verizon comments, IB Docket No. 02-309, at 11.

EXHIBIT 1
Page 7 of 25

their U.S.-international services before their existing service is discontinued. In 1996, the Commission found that the increase in the number of international carriers and competition in the international service market allowed us to decrease the notice period from 120 days to 60 days. [**17] [44] We seek comment on whether the market changed sufficiently in the intervening time to allow us to further decrease the notice period. We also seek comment on whether there are differences between the domestic and international services markets that justify having a different notification period. Do different classes of customers (e.g., residential end-users, business users, resale carriers, government agencies) have different needs regarding the time necessary to secure an alternative carrier for U.S.-international service?

14. We note that, under the current rules, the notification periods are triggered by different events. Under the procedures for a non-dominant international carrier to discontinue international service, the 60-day period begins with the notification to the affected customers. [45] In contrast, under the procedures for a non-dominant carrier to discontinue a domestic service, the 30-day period does not start until the Commission places the application for discontinuance on public notice. [46] Should we modify the international [**18] procedures so that the notification period commences upon public notice of the discontinuance request? Similarly, should we set forth language that a U.S.-international carrier should use in the discontinuance notification to its customers advising the customers of the Commission's procedures regarding grant of a discontinuance request and how they can file comments with the Commission, as we require for carriers seeking to discontinue domestic services? [47] Generally, we seek comment on which, if any, of the procedures for discontinuance of a domestic service should also be used for the [*4238] discontinuance of an international service by a U.S.-carrier and which procedures should be different. Commenters should explain why the procedures should be the same or should be different.

## B. International 214 Authorizations for CMRS Carriers

15. Currently, CMRS carriers only provide international service on a resale basis. Their primary service is domestic wireless service, and they generally provide international service as a convenience to their customers. [48] We request comment [**19] on a post-notification process for granting international *section 214* authority to CMRS carriers seeking to provide international service to their customers through the pure resale of the switched services of other U.S. carriers. [49]

---

[44] *1996 Streamlining Order, 11 FCC Rcd 12905, P49*.

[45] *47 C.F.R. § 63.19(a)(1)*.

[46] *47 C.F.R. § 63.71(c)*.

[47] *See 47 C.F.R. § 63.71(a)(5)(i)*, *(ii)*.

[48] *See* Cingular comments, IB Docket No. 02-309, at 5.

[49] Carriers providing "pure resale" of international service switch traffic to (and resell the switched services of) underlying facilities-based U.S. carriers. The underlying carriers control the circuit that carries the traffic to the international point, arrange for termination of the traffic, and report the traffic to the Commission on a country-by-country basis. *See, e.g.,* 2001 International Telecommunications Data, Industry

EXHIBIT 1
Page 8 of 25

In particular, we seek comment on whether we should exempt from the requirement to file an application for international *section 214* authority prior to providing service a CMRS carrier that provides international service on a purely switched resale basis, and is either (1) unaffiliated with a foreign carrier with market power at the foreign end of the route, [50] or (2) where the CMRS provider has an affiliation with such a foreign carrier and seeks to provide international service by reselling directly or indirectly the international switched services of U.S. carriers with which it is not affiliated. [51]

 **[**20]**

16. The Commission previously has considered proposals to forbear from regulating, or to grant blanket authority to, CMRS carriers and other entities seeking to provide international services. In the *PCIA Forbearance Order,* the Commission denied a request to forbear, under *section 10* of the 1996 Act, from applying international Title II regulation, including *section 214* regulation, to providers of broadband personal communications services (PCS). [52] The Commission noted that, among other things, the review of international *section 214* applications includes consultation with the Executive Branch on national security, law enforcement, foreign policy, and trade concerns. **[**21]** [53] The Commission found that there was a continued need to impose certain conditions on all international *section 214* authorizations, and, in particular cases, to impose dominant carrier regulation. [54] The Commission stated its concern that a broadband PCS provider, like any other carrier of international traffic, could acquire an affiliation with a foreign **[*4239]** carrier that has market power at the foreign end of a U.S. route, and that the foreign affiliate could leverage that power to discriminate against U.S. competitors on that affiliated route. [55] The Commission therefore concluded that international service must continue to be provided only pursuant to an authorization that can be conditioned or revoked, if necessary. [56] The Commission

---

Analysis & Technology Division, Wireline Competition Bureau, Federal Communications Commission (Jan. 2003), available at *www.fcc.gov/wcb/iatd/stats* (2001 International Telecommunications Data), at 4.

[50] *Section 63.09* defines when a carrier is affiliated with another carrier. *47 C.F.R. § 63.09(e) (2002)*.

[51] A CMRS carrier intending to provide international service through other means, e.g., as a facilities-based carrier, or that has an affiliation with a foreign carrier with market power at the foreign end of the route and would resell the switched services of a U.S. carrier with which it has an affiliation, would continue to seek authority through our current procedures. *See 47 C.F.R. §§ 63.12*, *63.18*.

[52] *Personal Communications Industry Association's Broadband Personal Communications Services Alliance's Petition for Forbearance for Broadband Personal Communications Services,* WT Docket 98-100, *13 FCC Rcd 16857, 16881-84, PP45-54 (1998)* (*PCIA Forbearance Order*).

[53] *Id.* at 16882, P50.

[54] *Id.* at 16883, P52.

[55] *Id.* at 16883, P51.

[56] *Id.* at 16883-84, P52.

EXHIBIT 1
Page 9 of 25

stated that the 1998 biennial review proceeding would consider steps to minimize burdens on international carriers, including PCS providers. [57]

**[\*\*22]**

17. Shortly thereafter, in the *1998 International Biennial Review NPRM,* the Commission proposed a blanket authorization that would have permitted any entity that would be a non-dominant international communications common carrier to provide, without prior approval from the Commission, resale and facilities-based service on any route where it had no affiliation with a foreign carrier with market power operating on the foreign end of the route. [58] The proposed rule would have required the entity to notify the Commission within 30 days that it had commenced service under blanket authorization, and would have reserved the right to condition or revoke the blanket authorization of any entity for a violation of the Commission's rules or policies. [59] The Commission sought particular comment on whether international *section 214* blanket authorizations would be more appropriate for CMRS carriers than for other entities seeking to provide international service. **[\*\*23]** [60] Various Executive Branch agencies opposed the proposal on national security and law enforcement grounds. [61] Therefore, in the *1998 International Biennial Review Order,* the Commission declined to adopt an international *section 214* blanket authorization for CMRS and other providers, but rather adopted further streamlining procedures for international *section 214* applications. [62]

---

[57] *Id.* at 16881, P48.

[58] *1998 International Biennial Review-Review of International Common Carrier Regulations,* IB Docket 98-118, *Notice of Proposed Rule Making, 13 FCC Rcd 13713, 13745 (1998)* (*1998 International Biennial Review NPRM),* Section 63.25 (a proposed rule entitled Special Procedures for Non-dominant International Common Carriers).

[59] *Id.* In tentatively concluding that grant of blanket *section 214* authority would be a better approach than forbearance from regulating international *section 214* authorizations for any class of applicants, the Commission noted the importance of continuing to require that service be provided only pursuant to an authorization that can be conditioned or revoked. *See id.* at 13718, P10.

[60] *Id.* at 13719, P11.

[61] Reply Comments of the Secretary of Defense, IB Docket No. 98-118 (filed Aug. 28, 1998), at 3 (disagreeing with proposal); Comments of the Federal Bureau of Investigation, IB Docket No. 98-118 (filed Aug. 13, 1998), at 3 ("strongly opposing" the proposal). *See also 1998 International Biennial Review Order, 14 FCC Rcd at 4914-15*, P14 (noting that Federal Bureau of Investigation had raised concerns that national security and law enforcement could be jeopardized by provision of service by entities whose interests may be contrary to those of the United States, such as where carrier has relationship with subject of investigation).

[62] *1998 International Biennial Review Order, 14 FCC Rcd at 4911*, P5 (noting that the Commission had worked with representatives of the Executive Branch to reconcile public interest concerns while granting industry regulatory relief) and 4915, P15 (stating that new streamlined procedures would allow the Executive Branch appropriate opportunity to raise national security, law enforcement, foreign policy, and trade policy considerations in context of individual applications). The Commission found that the public interest reasons for maintaining prior review of all international *section 214* applications applied equally to CMRS carriers, and concluded that applications from CMRS carriers would be eligible for the new streamlined procedures. *See id.* at 4926, P38. The Commission also found that the decision not to forbear from requiring *section 214* authorizations for any class of applications applied equally to CMRS providers. The Commission stated that although forbearance might further enhance competition in the CMRS market, the extent to which forbearance would enhance competition was substantially outweighed by public interest considerations, particularly that prior review is needed to address national security and law enforcement concerns raised by the Executive Branch. *See id.* at 4927, P39.

**[\*\*24]  [\*\*25]**

**[\*4240]**  18. In the *2002 IB Biennial Review Staff Report,* the Bureau recommended that the Commission explore the possibility of using blanket *section 214* resale authorizations for CMRS carriers with a *de minimis* share of the U.S. international services market. [63] Under such an approach, a CMRS licensee would not be required to obtain *section 214* authorization prior to providing resale of international services, but would be subject to the requirements of Part 63, including its foreign carrier affiliation notice requirements, competitive safeguards, and reporting requirements. [64] The Bureau recognized that this approach may raise concerns for the Executive Branch since it would no longer have the opportunity to review applications for national security, law enforcement, foreign policy, and trade issues prior to the CMRS carrier initiating international service. [65] The Bureau therefore recommended that the Commission seek comment on means to address any Executive Branch concerns while lessening the burdens on CMRS carriers. [66]

**[\*\*26]**

19. We seek comment on what would be a narrow exemption from the Commission's rules for authorizing the provision of international services. Today, an entity that has been licensed by the Commission under Title III of the Communications Act to provide CMRS in the United States and also seeks to provide its U.S. customers with international calling capability from or to the United States must file an application for Title II international *section 214* authority. **[\*\*27]** We seek comment on whether we should exempt from the requirement to file a prior application for international *section 214* authority those CMRS carriers that are: (1) unaffiliated with a foreign carrier with market power operating at the foreign end of a route; [67] or (2) where the CMRS provider has an affiliation with such a foreign carrier, seeks to provide international service by

---

[63] *Id.* at 4238, P16.

[64] *E.g.,* *47 C.F.R. §§ 63.10* (regulatory classification of U.S. international carriers), 63.11 (foreign carrier affiliation notifications), 63.21 (conditions applicable to all international *section 214* authorizations), 63.23 (resale-based international common carriers), 63.24 (assignments and transfers of control) (2002).

[65] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4238*, P16. *See also Rules and Policies on Foreign Participation in the U.S. Telecommunications Market, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23919-21, PP61-66 (1997)* (*Foreign Participation Order*) (Commission accords deference to the expertise of the Executive Branch regarding issues of national security, law enforcement, foreign policy, and trade policy related to an international *section 214* application), *Order on Reconsideration, 15 FCC Rcd 18158 (2000)*.

[66] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4238*, P16.

[67] *See 47 C.F.R. § 63.09(e)* (defining affiliation with a foreign carrier) (2002). *See also 47 C.F.R. § 63.10(a)(4)* (reseller that resells affiliated U.S. facilities-based carrier's international switched services presumptively is deemed dominant carrier). The carrier may rely on the Commission's "List of Foreign Telecommunications Carriers that Are Presumed to Possess Market Power in Foreign Telecommunications Markets." *See The International Bureau Revises and Reissues the Commission's List of Foreign Telecommunications Carriers that Are Presumed to Possess Market Power in Foreign Telecommunications Markets,* Public Notice, DA-03-1812 (rel June 5, 2003) (available on the FCC website at *http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-03-1812A1.pdf*).

reselling directly or indirectly the international switched services of U.S. carriers with which it is not affiliated.

 **[\*\*28]**

 **[\*4241]**  20. In particular, we seek comment on whether there may be national security, law enforcement, foreign policy, or trade issues when a CMRS carrier does not provide international service over its own facilities or the facilities of an affiliated carrier, but rather merely resells the switched services of unaffiliated U.S. carriers in order to provide international calling capabilities to its customers. We seek comment on whether any such issues could be addressed by requiring a CMRS carrier to notify the Commission within 30 days of when it begins to provide international service through the resale of an unaffiliated U.S. carrier. Under such a requirement, after the Commission received the notification from the CMRS carrier, the Commission would issue a public notice that the CMRS carrier had begun providing international resale service. This approach is similar to the 30-day notification requirement the Commission proposed in the *1998 International Biennial Review NPRM* to ensure that the Commission could condition or revoke a blanket authorization, if necessary. [68]

 **[\*\*29]**

21. We also seek comment on whether the *de minimis* nature of CMRS resale of switched voice services and the fact that CMRS carriers also hold Title III licenses from the Commission are factors that would distinguish CMRS carriers from other pure resellers on unaffiliated routes that would remain subject to prior Commission approval of international *section 214* authority. [69] We also seek comment on whether we should re-evaluate any blanket authorization approach if CMRS carriers' international traffic and revenue grow to the extent that they are no longer *de minimis.*

## C. International Roaming

22. We propose to modify *sections 63.18(e)(2)* and *63.23* of the rules  **[\*\*30]**  [70] to permit explicitly all U.S.-authorized resale carriers to resell U.S.-inbound international services of both U.S. or foreign carriers. This would apply to carriers providing service through a global resale

---

[68] *1998 International Biennial Review NPRM, 13 FCC Rcd at 13718-19*, P10 (notification necessary to review foreign affiliations, enforce requirements, and review any national security concerns). *See also* *PCIA Forbearance Order, 13 FCC Rcd at 16883-84*, P52 (authorization that can be conditioned or revoked is needed to ensure that rates and conditions of service are just, reasonable, and nondiscriminatory and to protect consumers).

[69] We also observe that the Communications Act specifically provides the Commission with authority to refrain from applying certain Title II provisions to CMRS carriers. *See* *47 U.S.C. § 332(c)(1)* (treating CMRS licensees as common carriers but providing Commission, under three prongs of *section 332(c)(1)* test, the authority to specify by regulation that any Title II provision, except any provision of *sections 201*, *202*, and *208*, is inapplicable to CMRS carriers) (2002).

[70] *47 C.F.R. §§ 63.18(e)(2)*, *63.23 (2002)*.

authorization as well as those providing service through a limited-global or individual service authorization. We seek comment on this proposal.

23. In the *2002 IB Biennial Review Staff Report,* the Bureau recommended that the Commission modify the rules specifically to permit all U.S.-authorized resale carriers to resell the U.S.-inbound services of foreign carriers. According to the Bureau, this rule change would clarify that any U.S. carrier that is authorized to provide resale service may resell foreign carrier services in order to provide international calling capability to U.S. customers that are roaming in foreign markets and want to call back to the United States. [71]

 **[*4242]** 24. Under *section 214* of the Act and *section 63.18* of our rules, a carrier must obtain authority to provide U.S.-international service, including **[**31]** service from a foreign point to the United States (inbound traffic). [72] To the extent that a CMRS carrier's customer is roaming in a foreign country and calls back to the United States, the service provided to that customer includes termination of the call in the United States, which includes the inbound delivery that must be provided by a carrier with an international *section 214* authorization. The U.S.-CMRS carrier, by providing to a U.S. customer foreign-to-U.S. calling (which would include roaming service in the foreign country), is reselling the in-bound delivery of an authorized carrier. [73] Under the language of *section 63.18*, the U.S.-CMRS carrier would be "engaging in transmission over or by means of [a] line for the provision of common carrier communications services between the United States and a foreign point" and thus would need to obtain international *section 214* authorization.

 **[**32]**

25. *Section 63.18(e)(2)* allows a carrier to request global resale authority and under *section 63.18(e)(3)* a carrier may seek authority to resell services between the United States and particular international points. [74] *Section 63.23* sets forth the conditions that apply to a U.S. carrier that is authorized to provide U.S.-international service through resale. [75] Currently, *section 63.18(e)(2)* only allows a carrier to request authority to resell the international services of authorized U.S. common carriers, and does not authorize the resale of service from foreign carriers. *Section 63.23* does not specifically address the ability of a carrier with an international resale authorization to resell the service of a foreign carrier for inbound U.S.-international service. This lack of clarity

---

[71] *2002 IB Biennial Review Staff Report, 18 FCC Rcd at 4211*, P36, 4238, P17.

[72] *47 U.S.C. § 214*; *47 C.F.R. § 63.18*.

[73] The CMRS carrier is reselling the service of the foreign carrier. That foreign carrier may provide the termination of the in-bound U.S. call if it has its own international *section 214* authority or it may hand the call off to its U.S.-correspondent carrier to terminate the call in the United States.

[74] *47 C.F.R. § 63.18(e)(2)*, *(3)*. Under *section 63.18(e)(3)*, a carrier may apply for authority to provide services not covered in paragraphs (e)(1) -- global facilities-based authority -- and (e)(2) -- global resale authority. *47 C.F.R. § 63.18(e)(3)*.

[75] *47 C.F.R. § 63.23*.

may cause some confusion as to whether a CMRS carrier can resell U.S. inbound service of a foreign carrier for the U.S.-CMRS carrier's customers that are roaming in a foreign country. The rule would also appear to require the CMRS carrier to obtain resale authority under *section 63.18(e)(3)* rather than global resale authority under section 63.81(e)(2) in order to resell the service of a foreign carrier.  **[**33]**

26. We believe that a U.S.-CMRS carrier should be able to provide international roaming service to its customers through its global resale authority. We do not believe that it should be necessary for the carrier to seek specific authority to resell the U.S.-inbound service of a foreign carrier. We believe that the review conducted to obtain resale authorization is sufficient to protect against possible anticompetitive conduct by foreign carriers. The initial review also provides the Commission with the opportunity to review foreign ownership and allows opportunity for Executive Branch input on national security, law enforcement, foreign policy, and trade matters. We seek comment on this analysis and whether there is a need to conduct a separate review for a carrier's provision of international roaming for national security or other reasons. We propose to amend *section 63.18(e)(2)* to allow all carriers,  **[**34]**  including CMRS carriers, with global resale authority to resell the international services of any common carrier, whether a U.S. or a foreign carrier, and to amend *section 63.23* to allow all authorized resale  **[*4243]**  carriers to resell services between the United States and all international points. We seek comment on these proposed changes to *sections 63.18(e)(2)* and *63.23*.

## D. Commonly-controlled Subsidiaries

27. We seek comment on whether to amend our rules to allow a commonly-controlled subsidiary to provide service pursuant to its parent's international *section 214* authorization. Currently only a wholly-owned subsidiary may provide international service pursuant to its parent corporation's authorization. A commonly-controlled subsidiary must obtain its own international *section 214* authorization.

28. *Section 63.21(h)* provides that any carrier authorized under *section 214* to provide international services may provide service through any wholly-owned subsidiaries. [76] Under this rule, a carrier must notify the Commission within 30 days after the subsidiary begins providing service. [77]

29. In the *2000 International Biennial Review Order,* **[**35]**  the Commission considered a request from Cingular that *section 63.21(h)* be modified to allow commonly-controlled subsidiaries to use their parent's international *section 214* authorization. [78] The Commission declined to adopt that request. It stated that a controlling interest that does not amount to 100-

---

[76] *47 C.F.R. § 63.21(i)*.

[77] *Id.*

[78] *2000 International Biennial Review Order, 17 FCC Rcd at 11433*, P41.

EXHIBIT 1
Page 14 of 25

percent ownership may raise issues that require separate review, such as additional foreign affiliations or minority ownership or beneficial interest by persons or entities that are barred from holding a Commission authorization. [79] On the other hand, a wholly-owned subsidiary by definition does not have different affiliations than its parent and thus, any review of an application would provide no new information for the purpose of national security, law enforcement, foreign policy, or trade evaluation. The Commission found that the rationale for limiting the authority to use a carrier's international *section 214* authority to wholly-owned subsidiaries is still valid, and declined to expand the reach of *section 63.21(h)* to commonly-controlled subsidiaries. [80]

 **[\*\*36]**

30. In its comments in the 2002 biennial regulatory review proceeding, Cingular renewed its request that the Commission modify *section 63.21(h)* to allow commonly-controlled subsidiaries to use their parent's authorization rather than having to obtain their own authorizations. [81] Cingular argued that there is no competition-related basis for requiring a commonly-controlled CMRS subsidiary offering international service on a resale basis to obtain an international *section 214* authorization when the parent already has such authorization. [82] **[\*4244]** Cingular also questioned the rationale for requiring a separate authorization because the international *section 214* application process only requires applicants to disclose information regarding minority interests of ten percent or more. [83]

31. In the *2002 IB Biennial Review Staff Report,* the **[\*\*37]** Bureau found that Cingular did not present any new arguments that warrant a change to *section 63.21(h)* at this time. [84] The Bureau also stated that the basis for the rule is not affected by changes in the level of competition in the market. Accordingly, the Bureau concluded that *section 63.21(h)* remains necessary in the public interest and recommended against repeal or modification. [85] The Bureau noted that applications for *section 214* authority for a commonly-controlled subsidiary will usually be eligible for streamlined processing and thus will be approved within 14 days of public notice. [86]

---

[79] *2000 International Biennial Review Order, 17 FCC Rcd at 11433* P41, citing *1998 International Biennial Review Order, 14 FCC Rcd at 4932-33*, P56. The provisions of *section 63.21(h)* were contained in *section 63.21(i)* when the Commission reviewed the requirement in the *2000 International Biennial Review Order.*

[80] The D.C. Circuit has upheld the Commission's decision in the *2000 International Biennial Review Order* to retain the rule. *Cellco Partnership d/b/a Verizon Wireless v. FCC & USA,* No. 02-1262, slip op. at 23-24 (D.C. Circuit Feb 13, 2004).

[81] Cingular comments, IB Docket No. 02-309, at 8-12.

[82] *Id.* at 9.

[83] *Id.* at 10.

[84] *2002 IB Biennial Regulatory Review Staff Report, 18 FCC Rcd at 4237-38*, P15.

[85] *Id.* at 4238, P15.

[86] *Id.*

32. We recognize the concerns raised by the Bureau about Cingular's request. Nevertheless, we believe that it would be beneficial to develop a fuller record on this issue, and therefore seek comment on whether to amend *section 63.21(h)* to allow commonly-controlled subsidiaries to provide international service pursuant to their parent's international *section 214* authorization. We seek comment on whether **[**38]** there is a maximum percent of differing ownership that should be allowed, e.g., 10 percent, 20 percent, before a subsidiary would be required to obtain its own authorization, if we allow commonly-controlled subsidiaries to provide service under their parent's authorization. We also seek comment on the potential national security, law enforcement, foreign policy, or trade issues that may be raised by allowing a commonly-controlled subsidiary to provide international service under its parent's authorization. Would a requirement that the subsidiary notify the Commission within 30 days after beginning to provide service under its parent's authorization, as is currently required for wholly-owned subsidiaries, [87] alleviate or diminish those concerns?

## E. Modification of Cable Landing License Rules

33. *Section 1.767* of the Commission's rules provides procedures for Commission consideration of applications for cable landing licenses. [88] We seek comment on whether to amend these rules to assure compliance with the Coastal Zone Management Act of 1972 (CZMA). [89] Under *section 1.767(g)(9)*, the Commission reserves the right to require a licensee to file an environmental **[**39]** assessment under its rules implementing the National Environmental Policy Act of 1969. [90] The CZMA is separate from the National Environmental Policy Act, with **[*4245]** a different set of obligations triggered by a different threshold test. The Commission's rules, however, may not address adequately the responsibilities under the CZMA of an applicant for a cable landing license.

34. The CZMA authorizes **[**40]** coastal states to develop coastal management plans, subject to federal approval through the National Oceanic and Atmospheric Administration (NOAA). Under the CZMA, states with federally-approved programs are entitled to review for consistency with those programs any "required federal license or permit to conduct an activity, in or outside of the coastal zone, "affecting any land or water use or natural resource of the coastal zone of that state." [91] It appears that, because a license is required to operate a cable landing station and because the

---

[87] *47 C.F.R. § 63.21(h)*.

[88] *47 C.F.R. § 1.767*. We note that consideration of whether to amend *section 1.767* to assure compliance with the CZMA does not fall within the 2002 biennial regulatory review proceeding. Cable landing licenses are issued pursuant to the Cable Landing License Act, and not under the Communications Act, thus, they do not fall under the biennial review directive of the 1996 Act. Furthermore, our review of *section 1.767* is not prompted by "the result of meaningful economic competition between providers of such service," but, rather by our desire to be in compliance with all applicable statutes.

[89] *16 U.S.C. § 1456 (1972)*.

[90] National Environmental Policy Act of 1969, as amended, *42 U.S.C. §§ 4321-4335 (1969)*.

[91] *16 U.S.C. § 1456(c)(3)(A)*.

landing of a cable potentially may affect coastal uses or resources, Commission issuance of a cable landing license could be subject to CZMA's federal consistency requirements. If submarine cable landing licenses are covered by the CZMA and a coastal state wishes to review such licenses, the CZMA would require an applicant to provide in its application to the Commission a certification that its proposed cable "complies with the enforceable policies of the state's approved program and such activity will be conducted in a manner consistent with its program" and with the approved program of any other states whose coastal zones will be affected. **[**41]** [92] In addition, it would seem that the applicant must provide a copy of this certification to the state with supporting documentation. [93] It appears further that the Commission would be required to provide the state an opportunity to concur or object to the certification and could not grant the license until the state has done so or has failed to do so within six months of receiving the certification from the cable landing license applicant. [94]

35. We request comment on whether the CZMA applies to cable landing license applications, and, if so, whether we should modify *section 1.767* of the rules to ensure compliance with the CZMA. To the extent we modify our rules, any modification should be narrowly targeted to incorporate relevant CZMA obligations **[**42]** with minimal affect on Commission and applicant resources and timing of Commission action. Specifically, we request comments on two possible alternatives. First, we look to consider whether we should amend the rules so that we make explicit the obligation in the CZMA that applicants must provide with their application certification that the proposed cable will comply with the NOAA approved programs of any relevant states. [95] Under this alternative, we also would amend our cable landing application processing rules to specify that the Commission cannot take action on such applications until all relevant states have notified the Commission that they concur with or object to the applicant's certification (or, alternatively, until the six months default period expires). As a second option, we seek comment on whether applicants should be required under our rules to file both the certifications required by the CZMA and a certification that the relevant states have concurred with the certification (or, alternatively, proof that all relevant states have failed to act on any appropriate certifications). In both cases we would anticipate that applicants would have been working in consultation **[**43]** with the states as to such issues well in advance of presenting an

---

[92] *Id.*

[93] *Id.*

[94] *Id.* The CZMA would require the state to inform the Commission of its concurrence or objection at the earliest practicable time, but also would provide that the state's concurrence can be conclusively presumed if the state fails to notify the Commission within six months of receipt of a copy of the applicant's certification.

[95] *16 U.S.C. § 1456(c)(3)(A)*.

 **[\*4246]** application to the Commission. [96] We further request comment or proposals on any alternative approaches to assure compliance with the CZMA.

## F. Other Rules

### 1. Change to Less than 50 Percent Ownership

36. We propose to amend *section 63.24* to clarify that an international *section 214* authorization holder must notify the Commission of a change from more than 50 percent ownership to 50 percent or less but still controlling ownership interest. Currently, the rule states that a change from less than 50 percent ownership to 50 percent or more ownership shall always be considered a transfer of control. [97] Consistent with that concept, we clarify that an ownership change in the other direction, to less than 50 **[\*\*44]** percent ownership, but still with control, should also be considered a transfer of control. When an owner's interest drops below 50 percent, it loses *de jure* control of the carrier. Where an owner retains *de facto* control of the carrier (based on a case-by-case determination pursuant to *section 63.24*), [98] it is important for the Commission to be aware of such transactions to ensure that the owner has maintained *de facto* control. As long as the owner maintains control, this would constitute a *pro forma* transfer, and under the rule the applicant would notify the Commission after the transfer was completed. We seek comment on this proposed clarification of *section 63.24*.

### 2. Asset Acquisitions

37. We propose to clarify our rules that an asset acquisition that will not result in a loss of service for customers should be treated as an assignment of assets rather than a discontinuance **[\*\*45]** of service. [99] Consistent with the procedures used for the acquisition of domestic wireline assets, [100] the International Bureau advises carriers to file a transfer of control application with the Commission when carriers undertake to sell their customers, or portions thereof, to another carrier. [101] As we noted when we changed the rules for domestic carriers, requiring a carrier to

---

[96] Prior consultation with the affected state to satisfy coastal management plan concerns would be critical to enable Commission processing of eligible applications under either the Commission's streamlined procedures (45 days of public notice) or non-streamlined procedures (90 days from public notice). *See 47 C.F.R. § 1.767(i)*.

[97] *47 C.F.R. § 63.24(c)*.

[98] An ownership change where the current owner goes from greater than 50 percent ownership to less than 50 percent ownership and relinquishes control is a transfer of control that requires prior authorization from the Commission. *See 47 C.F.R. § 63.24(e)*.

[99] Where an asset acquisition will result in the loss of service, the procedures under *section 63.19* regarding discontinuance, reduction, or impairment of service continue to apply. *47 C.F.R. § 63.19*.

[100] *See Implementation of Further Streamlining for Domestic Section 214 Authorizations,* CC Docket 01-150, *Report and Order, 17 FCC Rcd 5517, 5547-49, PP59-64 (2002)* (*Domestic Section 214 Streamlining Order*). We note that the rules governing the acquisition of domestic wireline assets refer to these transactions as transfers of control and require the filing of a transfer of control application. *See 47 C.F.R. §§ 63.03, 63.04*. The International Bureau, by contrast, has characterized such transactions as assignments because, historically, the international *section 214* certificate under which the selling carrier provides international service is one of the assets being acquired by the buyer.

EXHIBIT 1
Page 18 of 25

send out notices of discontinuance to customers when there is an asset sale and **[*4247]** customers will not lose service is both misleading and confusing to customers. [102] In addition, having consistent rules for both domestic and international services should benefit both carriers and customers. We tentatively conclude that it would be in the public interest to amend *section 63.24* to make it clear that whenever a carrier undertakes to sell its customers, or portions thereof, to another carrier, the sale of assets should be treated as an assignment. [103] We seek comment on this tentative conclusion.

 **[**46]**

## IV. CONCLUSION

38. In this proceeding, we seek comment on whether to amend several of the Commission's rules regarding the provision of international telecommunications service. We seek comment on whether to amend the procedures for discontinuing an international service to be more consistent with the procedures for discontinuance of a domestic service. We also seek comment on whether to establish blanket international *section 214* authority for CMRS carriers to provide international resale service subject to their notifying the Commission within 30 days of when they begin to provide international service. We propose to amend our rules to clarify that carriers with global **[**47]**  resale authority can resell the U.S.-inbound service of either a U.S. carrier or a foreign carrier. We seek comment on whether to amend our rules to allow commonly-controlled subsidiaries to use their parent's *section 214* authorization to provide international service. We propose to require carriers to notify us when there is a change of ownership to a less than 50 percent but still controlling interest. Additionally, we seek comment on whether to amend *section 1.767* of the Commission's rules [104] in order to assure compliance with the CZMA. We also propose to clarify that an asset acquisition that does not result in the loss of service for customers should be treated as a transfer of control. These proposals, if adopted, will permit the Commission to ensure that consumer's interests are protected, while reducing carriers' filing burdens.

## V. ADMINISTRATIVE MATTERS

## A. Ex Parte Presentations

---

[101] The transfer of control may be a substantive transfer or a *pro forma* transfer; carriers would be required to follow the guidelines set forth in *section 63.24* to make that determination. *See 47 C.F.R. § 63.24(d)* Notes 1 and 2.

[102] *Domestic Section 214 Streamlining Order, 17 FCC Rcd at 5548*, P64.

[103] The carrier must continue to comply with the streamlined procedures for verification of orders for telecommunications service. *47 C.F.R. § 64.1120(e) (2002)*.

[104] *47 C.F.R. § 1.767*.

EXHIBIT 1
Page 19 of 25

39. This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules. [105] Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentations must contain summaries **[\*\*48]** of the substance of the presentations and not merely a listing of the subjects discussed. More than a one or two sentence description of the views and arguments presented is generally required. [106] Other rules pertaining to oral and written presentations are set forth in *section 1.1206(b)* of the Commission's rules as well.

## [\*4248]  B. Initial Regulatory Flexibility Certification

40. The Regulatory Flexibility Act of 1980, as amended (RFA) [107] requires that a Regulatory Flexibility Act analysis be prepared for notice-and-comment rule making proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." [108] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [109] In addition, the term "small business" has **[\*\*49]** the same meaning as the term "small business concern" under the Small Business Act. [110] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA). [111]

 **[\*\*50]**

41. In this Notice, the Commission seeks comment on possible changes to its international *section 214* authorization process, cable landing license process, and the rules relating to the provision of U.S.-international telecommunications services. As discussed above, the Commission has continually reviewed its rules regarding the authorization of international services under *section 214* of the Act. [112] Through this review, we have sought to: facilitate the introduction of new

---

[105] *47 C.F.R. §§ 1.1200*, *1.1206 (2002)*; *Amendment of 47 C.F.R. § 1.1200 et seq. Concerning Ex Parte Presentations in Commission Proceedings,* GC Docket No. 95-21, *Report and Order, 12 FCC Rcd 7348 (1997)*.

[106] *47 C.F.R. § 1.1206(b)(2)*.

[107] *See 5 U.S.C. § 603*. The RFA, *see 5 U.S.C. § 601 -- 602*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Publ. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[108] *5 U.S.C. § 605(b)*.

[109] *5 U.S.C. § 601(6)*.

[110] *5 U.S.C. § 601(3)* (incorporating by reference the definition of "small-business concern" in the Small Business Act, *15 U.S.C. § 632*). Pursuant to *5 U.S.C. § 601(3)*, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[111] *15 U.S.C. § 632*.

services; provide customers with more choices, innovative services, and competitive prices; improve our processing of authorization applications and regulation of international services; and lessen regulatory burdens placed on carriers. As part of our 2002 biennial regulatory review proceeding, the Commission received comments on proposed changes to the rules contained in Part 63. This proceeding reviews several rules in Part 63.

42. The rule changes discussed in the Notice, if adopted, would make the international discontinuance rules more consistent with domestic service rules. In addition, we seek comment on whether **[\*\*51]** to eliminate the requirement for CMRS carriers to apply for *section 214* authority to provide international service to their customers through the pure resale of the switched services of other U.S. carriers. The proposal in the Notice would remove confusion as to whether a CMRS carrier requires authority to resell U.S. inbound service of a foreign carrier for the U.S.-CMRS carrier's customers that are roaming in a foreign country. We also seek comment on whether to amend *section 1.767* of its rules to assure compliance with the CZMA. Finally, the Notice seeks comment on whether to expand the authority of a carrier's international *section 214* authority to commonly-controlled subsidiaries.

 **[\*4249]**  43. We believe that the proposals are in the public interest and will lessen the burdens on all carriers providing international common carrier service pursuant to *section 214* of the Act, including those carriers that are small entities. Therefore, we certify that the proposals in this Notice, if adopted, will not have a significant economic impact on a substantial number of entities. If commenters believe that the proposals discussed in the Notice require additional RFA analysis, they should include **[\*\*52]** a discussion of the issues in their comment and label them as RFA comments. The Commission will send a copy of the Notice, including this initial certification, to the Chief Counsel for Advocacy of the Small Business Administration. [113] In addition, summaries of the Notice and initial certification will be published in the Federal Register. [114]

## C. Initial Paperwork Reduction Act of 1995 Analysis

44. This Notice contains either proposed and/or modified information collections. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on the information collections contained in this Notice, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. Public and agency comments are due 60 days from date of publication of the Notice in the Federal Register. Comments should address: (a) whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information shall have practical utility; (b) the accuracy **[\*\*53]** of the

---

[112] *See infra* at II.

[113] *See 5 U.S.C. § 603(a).*

[114] *Id.*

EXHIBIT 1
Page 21 of 25

Commission's burden estimates; (c) ways to enhance the quality, utility, and clarity of the information collected; and (d) ways to minimize the burden of the collection of information on the respondents, including the use of automated collection techniques or other forms of information technology.

## D. Comment Filing Procedures

45. Pursuant to *sections 1.415* and *1.419* of the Commission's rules, *47 C.F.R. §§ 1.415*, *1.419*, interested parties may file comments on or before [45 days after Federal Register publication], and reply comments on or before [75 days after Federal Register publication]. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS) or by filing paper copies. Parties are strongly encouraged to file electronically. *See Electronic Filing of Documents in Rulemaking Proceedings, 63 Fed. Reg. 24,121 (1998)*.

46. Comments filed through the ECFS can be sent as an electronic file via the Internet to *http://www.fcc/gov/cgb/ecfs.html.* Generally, only one copy of an electronic submission must be filed. If multiple docket or rulemaking numbers appear in the caption of this Notice, however, commenters must transmit **[**54]** one copy of their comments to each docket or rulemaking number referenced in the Notice. In completing the transmittal screen, commenters should include their full name, U.S. Postal Service mailing address, and the applicable docket or rulemaking number. Parties may also submit an electronic comment by Internet e-mail. To get filing instructions for e-mail comments, commenters should send an e-mail to *ecfs@fcc.gov* and should include the following words in the body of the message, "get form." A sample form and directions will be sent in reply.

 **[*4250]**  47. Parties who choose to file by paper must file an original and four copies of each filing. Each filing should also include an electronic version of the comments filed. If more than one docket or rulemaking number appears in the caption of this Notice, commenters must submit two additional copies for each additional docket or rulemaking number. Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first class or overnight U.S. Postal Service mail (although we continue to experience delays in receiving U.S. Postal Service mail). The Commission's mail contractor, Natek, Inc., will receive hand-delivered **[**55]**  or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, N.E., Suite 110, Washington, D.C. 20002. The filing hours at this location are 8:00 a.m. to 7:00 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes must be disposed of before entering the building. Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743. U.S. Postal Service first-class mail, Express Mail, and Priority Mail should be addressed to 445 12th Street, S.W., Washington, D.C. 20554. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

48. Comments submitted on diskette should be on a 3.5 inch diskette formatted in an IBM-compatible format using Word for Windows or compatible software. The diskette should be

clearly labeled with the commenter's name, proceeding (including the docket number in the caption of this Notice), type of pleading (comment or reply comment), date of submission, and the name of the electronic file on the diskette. The label should also include the **[\*\*56]** following phrase "Disk Copy -- Not an Original." Each diskette should contain only one party's pleadings, preferably in a single electronic file.

49. All parties must file one copy of each pleading electronically or by paper to each of the following:

> (1) The Commission's duplicating contractor, Qualex International, 445 12th Street, S.W., Room CY-B402, Washington, D.C. 20554; e-mail: *qualexint@aol.com*; facsimile: (202) 863-2898; phone (202) 863-2893.

> (2) James Ball, Chief, Policy Division, International Bureau, 445 12th Street, S.W., Washington, D.C. 20554; e-mail: *James.Ball@fcc.gov*.

> (3) David Krech, Senior Legal Advisor, Policy Division, International Bureau, 445 12th Street, S.W., Washington, D.C. 20554; e-mail: *David.Krech@fcc.gov*.

> (4) Belinda E. Nixon, Attorney, Policy Division, International Bureau, 445 12th Street, S.W., Washington, D.C. 20554; e-mail: *Belinda.Nixon@fcc.gov*.

50. Comments and reply comments and any other filed documents in this matter may be obtained from Qualex International, in person at 445 12th Street, S.W., Room CY-B402, Washington, D.C. 20554, via telephone at (202) 863-2893, via facsimile at (202) 863-2898, or via e-mail at *qualexint@aol.com.* **[\*\*57]** The pleadings will be also available for public inspection and copying during regular business hours in the FCC Reference Information Center, Room CY-A257, 445 Twelfth Street, S.W., Washington, D.C. 20554 and through the Commission's Electronic Filing System (ECFS) accessible on the Commission's World Wide Website, *www.fcc.gov*.

 **[\*4251]**  51. Comments and reply comments must include a short and concise summary of the substantive arguments raised in the pleading. Comments and reply comments must also comply with *section 1.49* and all other applicable sections of the Commission's rules. [115] All parties are encouraged to utilize a table of contents, to include the name of the filing party and the date of the filing on each page of their comments' length of their submission. We also strongly encourage that parties track the organization set forth in this Notice in order to facilitate our internal review process.

52. Written comments by the public on the proposed and/or modified information collections are due 60 days from the date of publication of the Notice in the Federal Register. Written comments must be submitted by the public, Office of Management and **[\*\*58]** Budget (OMB), and other

---

[115] *47 C.F.R. § 1.49 (2002)*.

interested parties on the proposed and/or modified information collections on or before 60 days after the date of publication in the Federal Register of the Notice. In addition to filing comments with the Secretary, Marlene H. Dortch, a copy of any comments on the information collection(s) contained herein should be submitted to Judith B. Herman, Federal Communications Commission, Room 1-C804, 445 12th Street, SW, Washington, DC 20554, or via the Internet to *Judith.BHerman@fcc.gov* and to Kim A. Johnson, OMB Desk Officer, Room 10236 NEOB, 725 17th Street, N.W., Washington, DC 20503 or via the Internet to *Kim_A._Johnson@omb.eop.gov.*

53. Commenters that file what they consider to be proprietary information may request confidential treatment pursuant to section 0.459 of the Commission's rules. Commenters should file both their original comments for which they request confidentiality and redacted comments, along with their request for confidential treatment. Commenters should not file proprietary information electronically. *See Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission, Report and Order, 13 FCC Rcd 24816 (1998), [**59] Order on Reconsideration, 14 FCC Rcd 20128 (1999)*. Even if the Commission grants confidential treatment, information that does not fall within a specific exemption pursuant to the Freedom of Information Act (FOIA) must be publicly disclosed pursuant to an appropriate request. *See 47 C.F.R. § 0.461*; *5 U.S.C. § 552*. We note that the Commission may grant requests for confidential treatment either conditionally or unconditionally. As such, we note that the Commission has the discretion to release information on public interest grounds that does fall within the scope of a FOIA exemption.

## E. Further Information

54. For further information regarding this proceeding, contact James Ball, Chief, Policy Division, International Bureau, David Krech, Senior Legal Advisor, Policy Division, International Bureau, or Belinda Nixon, Attorney, Policy Division, International Bureau at (202) 418-1460. Information regarding this proceeding and others may also be found on the Commission's website at *www.fcc.gov.*

## [*4252]  VI. ORDERING CLAUSES

55. Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 4(i), 4(j) [**60]  11, 201-205, 211, 214, 219, 220, 303(r), 309, and 403 of the Communications Act of 1934, as amended, *47 U.S.C. §§ 151*, *154(i)*, *154(j)*, *161*, 201-205, *21*, *214*, *219*, 220303(r), *309* and *403*, and sections 34-39 of the Cable Landing License Act, *47 U.S.C. §§ 34-39*, this NOTICE OF PROPOSED RULEMAKING IS HEREBY ADOPTED and COMMENTS ARE REQUESTED as described above.

56. IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this NOTICE OF PROPOSED RULEMAKING, including the Initial Regulatory Flexibility Act Certification, to the Chief Counsel for Advocacy of the Small Business Administration in accordance with *section 603(a)* of the Regulatory Flexibility Act, *5 U.S.C. § 601 et seq.*

EXHIBIT 1
Page 24 of 25

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch

Secretary

---

**End of Document**

## *22 FCC Rcd 11398;  2007 FCC LEXIS 4848;  41 Comm. Reg. (P & F) 929*

Federal Communications Commission

June 22, 2007 Released; Adopted June 20, 2007

IB Docket No. 04-47

Release No. FCC 07-118

**Reporter**

22 FCC Rcd 11398 *;  2007 FCC LEXIS 4848 **;  41 Comm. Reg. (P & F) 929

## In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules

## Subsequent History:

Affirmed in part and modified in part by, On reconsideration by, in part *In re Amendment of Parts 1 & 63 of the Commission's Rules, 2010 FCC LEXIS 6540 (F.C.C., Nov. 2, 2010)*

## Core Terms

carrier, license, cable, discontinuance, landing, customers, authorization, subsidiaries, certification, ownership, consistency, roaming, resale, coastal, notification, submarine, amend, management program, commonly-controlled, entities, modify, national security, notify, cable system, regulations, provider, clarify, inbound, law enforcement, coastal zone

## Action

 [**1]

 REPORT AND ORDER

**Opinion By:**

DORTCH

## Opinion

By the Commission

 [*11399]

## I. INTRODUCTION AND BACKGROUND

EXHIBIT 2
Page 1 of 36

22 FCC Rcd 11398, *11399; 2007 FCC LEXIS 4848, **1

1. The Telecommunications Act of 1996 (1996 Act) [1] directs the Commission to undertake, in every even-numbered year beginning in 1998, a review of all regulations issued under the Communications Act of 1934, as amended (Act), [2] that apply to operations or activities of any provider of telecommunications service and to repeal or modify any regulation it determines to be "no longer necessary in the public interest." [3] In particular, the 1996 Act directs the Commission to determine whether any such regulation is no longer necessary "as the result of meaningful economic competition between providers of such service." [4]

2. As part of the *2002 Biennial Regulatory Review,* [5] the International Bureau **[**2]** (Bureau) released a staff report that set forth various recommendations for reviewing the Commission's rules governing the provision of international telecommunications. [6] The Bureau recommended in the *2002 IB Biennial Review Staff Report* that the Commission undertake a proceeding to review certain provisions of Part 63 of its rules. [7]

**[**3]**

3. Based upon the Bureau's recommendations, the Commission released a Notice of Proposed Rulemaking (NPRM) [8] on March 4, 2004, seeking comment on several potential changes to its

---

[1]

Pub. L. No. 104-104, 110 Stat. 56 (1996).

[2]

47 U.S.C. §§ 151 *et seq.*

[3]

47 U.S.C. § 161.

[4]

47 U.S.C. § 161(a)(2).

[5]

*2002 Biennial Regulatory Review,* GC Docket No. 02-390, Report, 18 FCC Rcd 4726 (2003).

[6]

The Bureau reviewed rules that fall both within and outside the scope of section 11 of the Communications Act, and made recommendations based on changes in the competitive level of the international telecommunications market and on other public interest considerations. *2002 IB Biennial Review Staff Report,* 18 FCC Rcd at 4197, P 3 and *in passim.*

[7]

*2002 IB Biennial Review Staff Report,* 18 FCC Rcd at 4211, PP 35-36, 4236-39, PP 12-19. We will consider the other recommendations in the staff report relating to the reporting requirements of carriers providing U.S.- international services in a separate proceeding. *See id.* at 4210-11, P 34, 4232, PP 13-14. *See also Reporting Requirements for U.S. Providers of International Telecommunications Services,* IB Docket No. 04-112, Notice of Proposed Rulemaking, 19 FCC Rcd 6460 (2004).

[8]

*See Amendment of Parts 1 and 63 of the Commission's Rules,* IB Docket No. 04-47, Notice of Proposed Rulemaking, FCC 04-40, 19 FCC Rcd 4231 (2004) (NPRM).

EXHIBIT 2
Page 2 of 36

international section 214 authorization process [9] and to rules relating to the provision of U.S.-international telecommunications services. [10] The Commission sought comment on whether: (1) to amend the procedures for discontinuance of an international service; [11] (2) to amend the rules to clarify that U.S.- authorized resale carriers can resell the U.S.-inbound international services of either U.S. carriers or foreign carriers; [12] (3) to amend the rules to allow commonly controlled subsidiaries to provide international service under their parent's section 214 authorization; [13] (4) to revise the international section 214 requirements placed on Commercial Mobile Radio Service (CMRS) carriers; [14] (5) to permit a 30 day **[*11400]** notification period for CMRS carriers to provide international resale service; [15] (6) to amend the ownership and other rules to clarify their intent; [16] and (7) to amend section 1.767 of the Commission's rules [17] governing procedures for consideration of applications for cable landing **[**4]** licenses in order to assure compliance with the Coastal Zone Management Act of 1972 (CZMA). [18]

4. Ten parties filed **[**5]** comments in response to the NPRM: Cingular Wireless LLC (Cingular); the Cellular Telecommunications and Internet Association (CTIA); Nextel Communications, Inc. (Nextel); the Department of Defense (DOD); Verizon; the International Cable Protection Committee (ICPC); the North American Submarine Cable Association (NASCA); and the "Executive Branch Agencies" -- the Department of Justice, jointly on behalf of

---

[9]

47 U.S.C. § 214.

[10]

NPRM, 19 FCC Rcd at 4232, P 1.

[11]

NPRM, 19 FCC Rcd at 4235, P 9.

[12]

NPRM, 19 FCC Rcd at 4241, P 22.

[13]

NPRM, 19 FCC Rcd at 4243, P 27.

[14]

NPRM, 19 FCC Rcd at 4238, P 15.

[15]

*Id.*

[16]

NPRM, 19 FCC Rcd at 4246, P 36.

[17]

47 C.F.R. § 1.767.

[18]

Coastal Zone Management Act of 1972, 16 U.S.C. § 1456 (1972); *see* NPRM, 19 FCC Rcd at 4244-4245, P 33.

EXHIBIT 2
Page 3 of 36

the Federal Bureau of Investigation, and the Department of Homeland Security. CTIA, Verizon Wireless, and the National Oceanic and Atmospheric Administration (NOAA) filed reply comments.

5. Based upon our review of the record and for the reasons we discuss below, we modify the rules and procedures governing the provision of international telecommunications service. We revise the procedures for the discontinuance of international services to reflect the changes in the international telecommunications services market by reducing the notice period to 30 days. We also clarify our rules governing the provision of international roaming service by U.S.-CMRS carriers, changes in *de jure* control of an international section 214 authorization holder, and the treatment of asset acquisitions. **[\*\*6]** We decline, however, to modify at this time our rule governing the provision of services by a subsidiary of an international section 214 authorization holder. We also decline at this time to adopt changes to our rules governing a CMRS carrier's 214 authorization process. Finally, we amend our cable landing license application rules and application procedures to require applicants to certify their compliance with the CZMA.

## II. DISCUSSION

### A. Discontinuance of International Service

### 1. Background

6. The procedures for discontinuing an international service are contained in section 63.19 of the Commission's rules. [19] This rule sets forth different procedures for discontinuing international service, depending on whether a carrier is classified as a non-dominant, dominant, or a CMRS carrier.

7. Under the current rules, a non-dominant international carrier must notify its affected customers at least 60 days prior to a planned discontinuance, reduction, **[\*\*7]** or impairment of service. [20] The carrier must file a copy of the notification with the Commission on or after the date on which notice has been given to all affected customers. [21] A carrier that has been classified as dominant because it possesses market power in the provision of an international service on the U.S. end of the route must obtain prior **[\*11401]** approval before a planned discontinuance, reduction, or

---

[19]

47 C.F.R. § 63.19.

[20]

47 C.F.R. § 63.19(a). For the purpose of this discussion, a "non-dominant" international carrier is a carrier that does not have market power on the U.S.-end of the international route. *Compare with* 47 C.F.R. § 63.10 (non-dominant carrier is one that is not affiliated with a foreign carrier with market power on the foreign-end of the U.S.-international route).

[21]

47 C.F.R. § 63.19(a)(2).

EXHIBIT 2
Page 4 of 36

impairment of service on that route. [22] Finally, a CMRS carrier is exempt from the discontinuance procedures. [23]

 [**8]

8. The rules governing the discontinuance of international service by non-dominant carriers differ from those governing the discontinuance of a domestic service provided by such carriers. Among other things, non-dominant domestic carriers seeking to discontinue a domestic service must seek prior approval from the Commission. [24] The domestic rules also require a carrier to use specific language to notify its customers of discontinuance in service. [25] In addition, the domestic carrier must file an application with the Commission, [26] which the Commission places on public notice for public comment. [27] Unless the Commission notifies the carrier otherwise, a non-dominant

---

[22]

47 C.F.R. § 63.19(b). If a dominant carrier only seeks to retire international facilities, or dismantle or remove international trunk lines, but does not discontinue, reduce, or impair the dominant services being provided through these facilities, it does not need prior approval. Rather, it must provide customers at least 60 days written notice, and file a copy of the notice with the Commission. The Commission noted in the *2000 International Biennial Review Order,* that the requirement for prior approval before discontinuance, impairment, or reduction of an international service applies only to a carrier classified as dominant due to its having market power in the provision of that international service on the U.S.-end of the route and not due to classification as a dominant carrier pursuant to section 63.10. *See 2000 International Biennial Review Order,* 17 FCC Rcd at 11423-24, P 18.

[23]

47 C.F.R. § 63.19(c); *see also Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services,* GN Docket 93-252, Second Report and Order, 9 FCC Rcd at 1411, 1480-1481, P 182 (1994).

[24]

*See* 47 C.F.R. § 63.71.

[25]

There are two similar statements that are to be used depending on whether the carrier is dominant or non-dominant for the service being discontinued, reduced, or impaired. The statement for a non-dominant carrier is:

> The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected. If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance. Address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20054, and include in your comments a reference to the Section 63.71 Application of (carrier's name).

47 C.F.R. § 63.71(a)(5)(i). The language for a dominant carrier is similar, except that it states that a customer has 30 days to file comments. 47 C.F.R. § 63.71(a)(5)(ii).

[26]

47 C.F.R. § 63.71(b). "A carrier must also submit a copy of the application to the public utility commission and Governor of each state in which the discontinuance, reduction, or impairment is proposed, as well as to the Secretary of Defense, Attn. Special Assistant for Telecommunications." *See* 47 C.F.R. § 63.71(a).

[27]

47 C.F.R. § 63.71(c).

EXHIBIT 2
Page 5 of 36

carrier's application for discontinuance of domestic service is granted automatically 31 days after the public notice. [28]

**[**9]   [**10]**

9. In the *2002 Biennial Regulatory Review* proceeding, Verizon argued that the Commission should conform the notice period for discontinuance of international services by a non-dominant U.S.-international carrier to the relevant rules regarding discontinuance of a domestic service by a non- dominant domestic carrier. [29] Verizon stated that conforming the notice requirement would eliminate the potential for disjointed notices to affected customers when a non-dominant carrier discontinues both **[*11402]** domestic and international services, and would make the rules more consistent and rational. [30] In the NPRM, the Commission sought comment on Verizon's proposal to reduce the notification period for non- dominant international carriers from 60 days to 30 days. [31] The Commission also sought comment on whether to amend any other procedures for discontinuance of an international service to be more consistent with the procedures for discontinuance of a domestic service.

**[**11]**

## 2. Discussion

10. We amend our rules to reduce the notification period for a non-dominant carrier's discontinuance of international service from 60 days to 30 days, to be more consistent with the minimum period generally allowed before a non-dominant carrier can receive authority to discontinue domestic service. [32] In addition, we modify our rules to require international carriers to file a copy of the notification with the Commission at the same time they provide notification to their affected customers.

11. The Commission last modified its notification period for discontinuing international service in 1996 when it reduced the notification period **[**12]** for the discontinuance of international service from 120 days to 60 days. [33] The Commission based its decision to reduce the notification

---

[28]

*Id.*

[29]

Verizon Comments, IB Docket No. 02-309, at 11.

[30]

*Id.* at 12.

[31]

NPRM, 19 FCC Rcd at 4237, P 13.

[32]

*See* 47 C.F.R. § 63.71. Section 63.63 describes the procedures for emergency discontinuance. 47 C.F.R. § 63.63.

EXHIBIT 2
Page 6 of 36

period for discontinuance of international service on the large number of available international carriers and increased competition in international services, which allowed customers to switch to another international carrier if service is discontinued by their current carrier. [34] The Commission decided that a 60 day notification requirement would provide customers sufficient time to secure an alternative service provider before their service is discontinued. [35]

 [**13]

12. We now find that the further increase in the number of carriers and competition in the U.S. international telecommunications market since 1996 justifies a further reduction in our discontinuance notice period for international services. According to Commission reports, 857 carriers reported that they provided international service in 2005, [36] whereas in 1996, 315 carriers reported that they provided international service. [37] Given the greater number of carriers, we do not believe a customer needs 60 days to replace its international carrier if its international service is discontinued. No party opposes a reduction in the notice period and there is nothing in the record that demonstrates that customers need 60 days to find a replacement service. We are persuaded that conforming the notification period for international and domestic non-dominant carriers will, as Verizon asserts, reduce confusion and promote consistency. [38] Thus, we find that reducing the notice period from 60 days to 30  [**14]  days is warranted.

 [*11403]

13. Additionally, we amend our rules to require carriers to notify the Commission at the same time they notify their affected customers. [39] A carrier that is discontinuing service should file a

---

[33]

*1996 Streamlining Order,* 11 FCC Rcd at 12905, P 49; *see also In the Matter of International Competitive Carrier Policies,* CC Docket No. 85-107, Report and Order, 102 FCC 2nd 812, 846, P 83 (1985). The Commission had previously adopted the 120 day notification period in 1985 based upon concerns about the length of time it took to obtain substitute international service. The Commission then concluded that it would require non-dominant carriers to give 120 days notice prior to discontinuing service, insuring that customers would not encounter service interruptions.

[34]

*1996 Streamlining Order,* 11 FCC Rcd at 12905, P 49.

[35]

*Id.*

[36]

*See* 2005 International Telecommunications Data (released April 2007), Table 5 at 13.

[37]

*See* 1996 Section 43.61 International Telecommunications Data (released January 1998), Figure 6 at 13.

[38]

Verizon comments at 1.

[39]

EXHIBIT 2
Page 7 of 36

discontinuance notice with the Commission's Secretary, with a copy to the Chief of the International Bureau, must identify the file number(s) of the international section 214 authorization(s) pursuant to which the carrier provides service, and include a copy of the notice provided to the affected customers.

 **[\*\*15]**

14. With regard to whether to amend other aspects of the procedures for discontinuance, reduction, or impairment of an international service by a U.S. carrier to be more consistent with the procedures for discontinuance of a domestic service, [40] we decline to modify our discontinuance procedures at this time. We also find that it is not appropriate to completely align our international discontinuance rules with the domestic discontinuance rules which would increase the requirements placed on carriers seeking to discontinue service without an offsetting benefit to the public. No parties suggested additional discontinuance procedure modifications. Unlike our domestic rules of discontinuance, we conclude that it is not necessary for international carriers to use specific discontinuance language in their notification. [41] Similarly, we also find that it is not necessary to issue a public notice that would notify customers and carriers that an international carrier will no longer provide international service. [42] Consequently, we make no other changes to the discontinuance notification requirement in this Order.

 **[\*\*16]**

## B. International Roaming

## 1. Background

15. International roaming allows the customers of U.S.-licensed CMRS carriers to use the networks of foreign-licensed wireless carriers to make calls while traveling in foreign countries. Roaming agreements between U.S and foreign carriers may permit U.S. carriers' customers that are roaming in other countries to call the United States or other countries. U.S.-CMRS carriers bill their customers for international roaming service, and their international roaming rates and plans are available on the carriers' websites. [43]

---

Under the current rules, carriers are allowed to file the notification with the Commission either at the time of or subsequent to notification of the affected customers. 47 C.F.R. § 63.19 (2002).

40

*See* NPRM, 19 FCC Rcd at 4237, P 13.

41

*Compare* 47 C.F.R. § 63.71(a)(5)(i).

42

*Compare* 47 C.F.R. § 63.71(c).

43

EXHIBIT 2
Page 8 of 36

22 FCC Rcd 11398, *11403;  2007 FCC LEXIS 4848, **16

16. In the NPRM, the Commission noted that the rules do not specifically address whether a U.S-CMRS carrier's international section 214 authority permits it to resell **[\*\*17]**  the U.S.-inbound service of foreign carriers to allow U.S.-CMRS customers roaming abroad to call back to the United States. [44] The Commission therefore proposed to amend sections 63.18(e)(2) and 63.23 of its rules to permit explicitly all U.S.-authorized resale carriers to resell U.S.-inbound international services of any common carrier, whether that carrier is a U.S. carrier or a foreign carrier. [45]

**[\*\*18]**  **[\*11404]**

17. Several commenters argue that U.S-CMRS carrier provision of international roaming service that allows customers roaming abroad to call back to the United States does not involve the "resale" of the U.S.-inbound service of foreign carriers. [46] The commenters further argue that the provision of such international roaming service falls outside the Commission's jurisdiction. [47] CTIA specifically argues that under an international roaming agreement, even an agreement that includes call termination in the United States, international service is provided exclusively by the foreign mobile carrier and does not become a U.S.-international service merely because the call is terminated in the United States. [48] Similarly, Cingular asserts that the service a foreign mobile carrier provides via its own network, whether it be to its own subscribers or to U.S. subscribers

---

*See* Cingular comments at 8 n.22.

[44]

NPRM, 19 FCC Rcd at 4242, P 25. Section 63.18(e)(2) allows carriers to request authority to resell the international services of "authorized U.S. common carriers" but does not expressly authorize resale of service provided by foreign carriers. *See* NPRM, at P 25. Likewise, Section 63.23 of the rules, which sets forth conditions applicable to authorized resale carriers, does not specifically address the ability of authorized resale carriers to resell the service of a foreign carrier for the provision of U.S.-inbound service.

[45]

In the *2002 IB Biennial Review Staff Report,* the Bureau recommended that the Commission modify the rules specifically to permit all U.S.-authorized resale carriers to resell the U.S.-inbound services of foreign carriers. The Commission's proposal included carriers providing service through a global resale authorization as well as those providing service through a limited-global or individual service authorization. See NPRM, 19 FCC Rcd at 4241, P 23 (citing *2002 IB Biennial Review Staff Report,* 18 FCC Rcd at 4211, P 36, 4238, P 17).

[46]

Commenters generally argue that roaming involves reciprocal arrangements among facilities-based wireless carriers whereby one carrier agrees to carry on its wireless network the traffic of another carrier's customers, typically when their customers travel outside their respective service areas. *See* Cingular comments at 8; CTIA comments at 9; Verizon Wireless reply comments at 5. Cingular notes that a number of carriers with section 63.18(e)(2) authority already provide international roaming to U.S. customers. Cingular further argues that the Commission's rules currently distinguish between roaming and resale by CMRS carriers, and it is unnecessary for the Commission to blur that distinction. Cingular comments at 8.

[47]

*See generally* Cingular comments at 8; CTIA comments at 9; Verizon Wireless reply comments at 5.

[48]

CTIA comments at 9.

EXHIBIT 2
Page 9 of 36

<mark>roaming onto its network, does not become a U.S.-international service because the call is terminated in the United States. [49]</mark>

 [**19]

## 2. Discussion

18. Upon consideration of the comments submitted in this proceeding, we amend sections 63.18(e)(2) and 63.23(c) of our rules to permit explicitly all U.S.-authorized resale carriers to provide international service by reselling the international services of any other authorized U.S. common carrier or foreign carrier, or by entering into a roaming or other arrangement with a foreign carrier. [50] We thereby clarify that a U.S. carrier's resale authority includes authority to provide U.S.- inbound or -outbound service via resale or other arrangement between the carrier and any other authorized U.S. carrier or foreign carrier. This rule change eliminates uncertainty about the ability of U.S.-authorized resale carriers to provide U.S.-inbound service to customers under a roaming or other arrangement that a U.S. carrier has with a foreign carrier, including arrangements that allow for customer use of a calling card issued [**20]  by a U.S. carrier.

<mark>19. As an initial matter, we disagree with those commenters that argue that international roaming that involves call termination in the United States falls outside the Commission's jurisdiction. [51] For purposes of establishing jurisdiction under the Act, we find determinative that a U.S.-licensed CMRS carrier offers its customers a telecommunications service from a point outside the United States to a point within the United States. Section 2 of the Act establishes that the provisions of the Act apply [**21]  to, *inter alia,* "all interstate and *foreign* communication by wire or radio ... which originates *and/or is received within the United States* and to all persons engaged within the United States in such communication...." [52] Accordingly, the fact that the U.S.-CMRS carrier's customer originates a U.S.-inbound call on the [*11405]  facilities of a foreign carrier does not affect our jurisdiction. The use of a foreign-authorized facility by a U.S.-licensed telecommunications carrier to provide its customers a telecommunications service that originates</mark>

---

[49]

Cingular comments at 8.

[50]

This amendment applies to carriers providing service through a global resale authorization as well as those providing service through a limited-global or individual service authorization. Revised section 63.23(c) will be subject to the conditions that apply to carriers engaged in "switched hubbing" of U.S.-inbound or -outbound international traffic through intermediate foreign points under the provisions of section 63.17(b) of the rules. 47 C.F.R. § 63.17(b).

[51]

*See* Cingular comments at 8; CTIA comments at 9; Verizon Wireless reply comments at 5.

[52]

47 U.S.C. § 152(a) (emphasis added). Section 3(17) of the Act defines the term "foreign communications" to mean communication "from or to any place in the United States to or from a foreign country." 47 U.S.C. § 153(17).

==in a foreign point and terminates within the United States does not divest the Commission of its Title II jurisdiction over the offer of that service.== [53]

[**22]

20. We agree with commenters that Commission rules governing the provision of CMRS distinguish between roaming and resale by CMRS carriers. [54] Roaming occurs when the subscriber of one CMRS carrier utilizes the facilities of another CMRS provider with which the subscriber has no direct pre-existing service or financial relationship to place an outgoing call, to receive an incoming call, or to continue an in-progress call. [55] Typically, but not always, roaming occurs when a subscriber places or receives a call while physically located outside the service area of the "home" CMRS provider. [56] Resale has been described by the Commission as "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications services and facilities to the public (with or without adding value) for profit." [57] CMRS resale entails a reseller's purchase of CMRS service provided by a facilities-based CMRS carrier for the provision of resold service within the same geographic market as the facilities-based provider. [58]

---

[53]

The Commission has previously concluded, in the *Philippine Long Distance Order,* that the offer of international telephone service inbound to the United States may properly be classified as a common carrier activity for which a certificate of public convenience and necessity is required under Section 214 of the Act. *See In the Matter of Philippine Long Distance Telephone, Order and Notice of Apparent Liability for Forfeitures,* 8 FCC Rcd at 755, PP 12-13. The arrangement presented in the *Philippine Long Distance Order* involved the carriage of telephone calls into the United States by a foreign-based entity that routed the U.S.-inbound traffic over an international private line that it leased from a U.S.-authorized facilities-based carrier. *Id.* at 757, PP 11-13.

[54]

Prior to the November 24, 2002 sunset date, section 20.12(b) of the rules required that each carrier subject to the rule "shall not restrict the resale of its services, unless the carrier demonstrates that the restriction is reasonable." 47 C.F.R. § 20.12(b). A separate rule, section 20.12(c), governs CMRS roaming service. Section 20.12(c) requires that each carrier subject to the rule "provide mobile radio service upon request to all subscribers in good standing to the services of any carrier subject to this section, including roamers, while such subscribers are located within any portion of the licensee's licensed service area where facilities have been constructed and service to subscribers has commenced, if such subscribers are using mobile equipment that is technically compatible with the licensee's base stations." *Id.* § 20.12(c).

[55]

*In the Matter of Reexamination of Roaming Obligations of Commercial Mobile Radio Services,* WT Docket Nos. 05-265 and 00-193, Memorandum Opinion & Order and Notice of Proposed Rulemaking, FCC 05-160, 20 FCC Rcd at 15047, 15048, P 2 (2005) (*Reexamination of Roaming Obligations*).

[56]

*Reexamination of Roaming Obligations,* 20 FCC Rcd at 15047, P 2.

[57]

*Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities,* 60 FCC 2d 261, 271 P 17 (1976), *aff'd on reconsideration,* 62 FCC 2d 588 (1977), *aff'd sub nom. AT&T v. FCC,* 572 F.2d 17 (2d Cir.), *cert. denied,* 439 U.S. 875 (1978).

[58]

Cingular comments at 8.

**[\*\*23]**

21. We disagree, however, with certain commenters who argue that U.S-CMRS carriers' offering of international roaming service which allows customers roaming abroad to call back to the United States does not involve the "resale" of the U.S.-inbound **[\*\*24]** service of a foreign carrier. [59] For the purposes of our international service authorization rules, unless a U.S.-international carrier provides U.S.-inbound service to its customers on a facilities basis pursuant to section 63.18(e)(1) of the rules, the carrier effectively resells the U.S.-inbound service of another carrier, regardless of whether the underlying carrier-to-carrier arrangement is a resale, roaming, or other type of arrangement. In any case, our rules require that all providers of U.S.-international telecommunications services obtain a section 214 authorization. Accordingly, the relevant question is not whether a U.S.-CMRS carrier is operating as a **[\*11406]** reseller, within the meaning of existing Commission precedent regarding domestic resale, [60] but whether the CMRS carrier provides its customers with the ability to place a US -inbound call by entering into an arrangement with a foreign carrier to provide that international service.

22. Under section **[\*\*25]** 332(c) of the Act, [61] a CMRS provider is treated as a common carrier except for such provisions in Title II of the Act as the Commission may specify by regulation are inapplicable to these service providers. CMRS carriers are required to obtain section 214 authorization to provide international service to their customers. [62] Thus, a CMRS carrier requires authorization under our rules when it offers to its subscribers traveling abroad the ability to call back to the United States, regardless of whether the underlying CMRS carrier's arrangement with a foreign carrier is in fact a resale, roaming, or other type of arrangement.

23. We will not require U.S.-authorized carriers to obtain additional, separate authority for the provision of roaming **[\*\*26]** service, or any other U.S.-international service provided by resale or any other arrangement with a foreign carrier. As the Commission stated in the NPRM, the review the Commission conducts in issuing resale authorizations is sufficient to protect against possible anticompetitive conduct by foreign carriers. [63] We find that our initial review of carrier

---

[59]

*See supra* note 46.

[60]

*See supra* note 57.

[61]

47 U.S.C. § 332(c).

[62]

*See 1998 Biennial Regulatory Review -- Review of International Common Carrier Regulations,* IB Docket No. 98-118, Report and Order, 14 FCC Rcd at 4909, 4926-4927 PP 38-40 (1999).

[63]

NPRM, 19 FCC Rcd at 4242-4243, P 26.

EXHIBIT 2
Page 12 of 36

applications for international section 214 resale authority provides the Commission with the opportunity to review an applicant's foreign ownership and foreign carrier affiliations, if any. The initial authorization process also allows opportunity for Executive Branch input on any national security, law enforcement, foreign policy and trade policy concerns. [64] Therefore, we amend sections 63.18(e)(2) and 63.23(c) of our rules to allow for the provision of U.S.-international service by the use of resale, roaming and other arrangements that U.S. carriers enter into with foreign carriers under a U.S. carrier's resale authority.

[**27]

## C. Commonly-controlled Subsidiaries

### 1. Background

24. Under the Commission's rules, a commonly-controlled subsidiary must obtain its own international section 214 authorization, while a wholly-owned subsidiary may provide service pursuant to its parent company's authorization. [65] Applications for section 214 authority for a commonly-controlled subsidiary will usually be eligible for streamlined processing, subject to Executive Branch review in instances where there is foreign ownership. [66]

[**28]

25. In the *2000 International Biennial Review Order,* the Commission considered a request from Cingular to amend section 63.21(h) to allow commonly-controlled subsidiaries to use their parent's [*11407] international section 214 authorization. [67] In that proceeding, the Commission found, however, that a controlling interest that does not amount to 100-percent ownership may raise issues that require separate review, such as additional foreign affiliations or minority ownership or beneficial interest by persons or entities that are barred from holding a Commission

---

[64]

Although we received no comment on this issue from the Executive Branch, we find that the initial review of an application affords the Commission and the Executive Branch with the opportunity to consider any national security, law enforcement, foreign policy, or trade policy concerns.

[65]

Section 63.21(h) provides that any carrier authorized under section 214 to provide international services may provide service through any wholly-owned subsidiaries. Under this rule, a carrier must notify the Commission within 30 days after the subsidiary begins providing service. *See* 47 C.F.R. § 63.21(h).

[66]

The International Bureau provides the Executive Branch with notification of all international 214 applications that identify a foreign entity or entities as 10 percent or greater owners of the applicant. The Bureau may remove an application from streamlining should the Executive Branch require additional time to review it beyond the streamlined processing date and the Bureau will reinstate streamlined processing when that review is complete.

[67]

*2000 International Biennial Review Order,* 17 FCC Rcd at 11433, P 41.

EXHIBIT 2
Page 13 of 36

authorization. [68] The Commission stated that a wholly-owned subsidiary by definition does not have different affiliations than its parent, and that review of a wholly-owned subsidiary's application would provide no new information for the purpose of national security, law enforcement, foreign policy, or trade evaluation. Accordingly, the Commission declined to adopt Cingular's request. [69] The Commission's decision was subsequently affirmed. [70]

 **[\*\*29]**

26. In the NPRM in this proceeding, the Commission sought to develop a fuller record on the issue of commonly-controlled subsidiaries, and therefore requested comment on whether to reconsider section 63.21(h) to allow commonly-controlled subsidiaries to provide international service pursuant to their parent's international section 214 authorization. [71] Specifically, the Commission sought **[\*\*30]** comment on whether there is a maximum percent of differing ownership that should be allowed, (e.g., 10 percent, 20 percent), before requiring a subsidiary to obtain its own 214 authorization, should it allow commonly-controlled subsidiaries to provide service under their parent's authorization. [72] The Commission also sought comment on any potential national security, law enforcement, foreign policy, or trade issues that may be raised by allowing commonly-controlled subsidiaries to provide international service under their parent's authorization. [73] In addition, the Commission asked whether a requirement that the subsidiary notify the Commission within 30 days after beginning to provide service under their parent's

───────────────

[68]

*Id.*

[69]

*See id.* (citing *1998 International Biennial Review Order,* 14 FCC Rcd at 4932-33, P 56). The provisions of section 63.21(h) were contained in section 63.21(i) when the Commission reviewed the requirement in the *2000 International Biennial Review Order.*

[70]

*See Cellco Partnership d/b/a Verizon Wireless v. FCC & USA,* 357 F.3d 88 (D.C. Cir. 2004) (upholding the Commission's decision in the *2000 International Biennial Review Order* that declined to modify section 63.21(h) of the Commissions rules to allow commonly-controlled subsidiaries to provide service pursuant to their parent's international section 214 authorization).

[71]

*See* NPRM, 19 FCC Rcd at 4243, P 27. In the 2002 Biennial Regulatory Review proceeding, Cingular renewed its request that the Commission modify section 63.21(h) to allow commonly-controlled subsidiaries to use their parent's authorization rather than having to obtain their own authorizations. In the *2002 IB Biennial Review Staff Report,* the Bureau found that Cingular did not present any new arguments that warrant change of the rule. The Bureau concluded that the rule remains necessary in the public interest. *2002 IB Biennial Regulatory Review Staff Report,* 18 FCC Rcd at 4237-38, P 15.

[72]

*See* NPRM, 19 FCC Rcd at 4244, P 32.

[73]

*Id.*

authorization, as is currently required for wholly-owned subsidiaries, [74] would alleviate or diminish any potential national security or law enforcement concerns. [75]

 **[\*\*31]**

27. Cingular, Nextel, CTIA, and Verizon Wireless request that the Commission amend its rules to allow commonly-controlled subsidiaries to use their parent's 214 authorization to provide international service. [76] They argue that CMRS carriers normally operate with several subsidiaries that are commonly controlled, which makes the requirement to seek prior separate 214 approvals for each **[\*11408]** subsidiary a duplicative and unnecessary burden. [77] CTIA proposes that the Commission revise its current restrictions only with respect to CMRS licenses. [78] The Executive Branch, however, opposes amending the rule as proposed by the CMRS carriers and requests the Commission to retain its current rule because of national security and law enforcement concerns. [79] The Executive Branch also does not support an approach that would permit a maximum percent of ownership before a commonly-controlled **[\*\*32]** subsidiary would be required to file an application. [80] With regard to this issue, CTIA counters that Form 602 filings and section 310 petitions for declaratory rulings afford the Executive Branch with the opportunity to address national security concerns related to CMRS foreign ownership. [81] CTIA believes that a 30 day

---

[74]

*See* 47 C.F.R. § 63.21(h).

[75]

*See* NPRM, 19 FCC Rcd at 4244, P 32.

[76]

*See* Cingular comments at 6-7; Nextel comments at 4; CTIA reply comments at 2, 8; Verizon Wireless reply comments at 4-5.

[77]

*Id.*

[78]

CTIA reply comments at 2-3.

[79]

Executive Branch comments at 3-4.

[80]

In its comments, the Executive Branch stated, "[W]hile such a bright-line rule may be appealing for administrative reasons, national security and law enforcement interests cannot be adequately protected if all risks other than those created by a particular percentage ownership are excluded." The Executive Branch notes that percentage ownership is only one factor among many that must be considered. The Executive Branch comments, at 3.

[81]

CTIA reply comments at 2-3.

EXHIBIT 2
Page 15 of 36

post notification requirement is sufficient to give the Executive Branch an opportunity to review the ownership of a commonly-controlled subsidiary. [82]

 **[**33]**

**2. Discussion**

28. We find that it would not be in the public interest to amend our rules to allow commonly-controlled subsidiaries to provide international service pursuant to their parent's international section 214 authorization. We reiterate that the differences in ownership between a parent and a subsidiary that it controls but does not wholly own may raise issues that require separate review. [83] Consequently, we will retain our current rule that allows only wholly-owned subsidiaries to provide service pursuant to their parent's international section 214 authorization.

29. As the Commission noted in the *2000 Biennial Review Order,* a subsidiary often has different ownership than its controlling parent. [84] The record in this proceeding demonstrates that different **[**34]** ownership may raise issues that are not present with the parent or with wholly-owned subsidiaries. An ownership interest that constitutes a controlling interest but that does not amount to 100-percent ownership may require additional review because of different foreign affiliations or minority ownership or beneficial interest by persons or entities that are barred from holding a Commission authorization. [85] In addition, such a structure may include entities that require scrutiny on those matters for which the Commission defers to the Executive Branch. In this respect, the Executive Branch agencies and DOD maintain that it is important to their national security and law enforcement review of telecommunications services that they be allowed to review the applications for commonly-controlled subsidiaries before those carriers begin to provide international services. [86] They state that they review on a case-by-case **[*11409]** basis

---

[82]

*Id.* at 4.

[83]

*2000 International Biennial Review Order,* 17 FCC Rcd at 11433-11434, P 41.

[84]

*Id.*

[85]

The record does not change the Commission's conclusion in the *2000 Biennial Review Order* that a wholly-owned subsidiary by definition does not have different affiliations than its parent and thus, any review of an application would provide no new information for the purpose of national security, law enforcement, foreign policy, or trade evaluation concerns. *2000 International Biennial Review Order,* 17 FCC Rcd at 11433, P 41.

[86]

Executive Branch comments at 3-4, DOD comments at 4-5.

EXHIBIT 2
Page 16 of 36

international 214 applications for possible threats to national security or law enforcement interests. [87]

**[\*\*35]**

30. In considering applications under section 214, the Commission's public interest review includes consideration of national security, law enforcement, foreign policy, and trade issues. The Commission accords the Executive Branch deference on these matters. However, it "will make an independent decision on applications to be considered and will evaluate concerns raised by the Executive Branch agencies in light of all the issues raised (and comments in response) in the context of a particular application." [88]

**[\*\*36]**

31. In view of its concerns that the ownership of commonly-controlled subsidiaries may raise national security and law enforcement issues, we find that the Executive Branch should be given a reasonable opportunity to review that ownership prior to the subsidiaries initiating U.S.-international service. We further find that the current requirements of section 63.21 provide that opportunity. We do not agree with the CMRS carriers that reliance upon Form 602 and section 310 declaratory rulings (which a subsidiary may not have to file if its foreign ownership does not exceed the 25 percent benchmark in section 310(b)(4)) provides a reasonable opportunity for Executive Branch review. Nor would a 30 day post-notification provide that opportunity. The current rule preserves the Commission's ability to consider Executive Branch concerns, and if necessary, prevent parties who should not obtain international section 214 authorizations from obtaining them indirectly.

32. We recognize the concerns of CMRS carriers that the rule imposes a filing requirement upon their commonly-controlled subsidiaries. On balance, however, we find that Executive Branch national security and law enforcement concerns **[\*\*37]** should be given more weight. Because the Executive Branch relies on the Commission's 214 application process for notice of and information about applicants that may pose potential national security and law enforcement risks, we will retain and not modify the current rule 63.21(h), at this time. [89]

---

[87]

*Id.*

[88]

*Rules and Policies on Foreign Participation in the U.S. Telecommunications Market,* Report and Order and Order on Reconsideration, 12 FCC Rcd at 23891, 23919-921, P 66 (1997), Order on Reconsideration, 15 FCC Rcd 18158 (2000) (*Foreign Participation Order*). The Commission further stated, "We expect that the Executive Branch will advise us of concerns related to national security, law enforcement, foreign policy, and trade concerns only in very rare circumstances. Any such advice must occur only after appropriate coordination among Executive Branch agencies, must be communicated in writing, and will be part of the public file in the relevant proceeding." *Id.* at 66.

[89]

Executive Branch comments at 3-4.

22 FCC Rcd 11398, *11409;  2007 FCC LEXIS 4848, **37

## D. International 214 Authorizations for CMRS Carriers

### 1. Background

33. In the NPRM, the Commission requested comment on a post-notification process for granting international section 214 authority to CMRS carriers seeking to provide international service to their customers through the pure resale of the switched services of other U.S. carriers. [90] Specifically, the Commission sought comment on whether it should exempt CMRS carriers from the requirement to file an application for international section 214 authority prior to providing service. [91] The CMRS carriers **[*11410]** support exempting CMRS carriers providing international service on a purely switched resale basis, from the requirement **[**38]** to file an application for international section 214 authority prior to providing service. [92]

 **[**39]**

### 2. Discussion

34. We will not make any changes to the procedures for granting international section 214 authorizations at this time. Instead we intend to develop a fuller record on possible changes further streamlining the application process that would apply to all carriers providing international service, including, but not limited to, CMRS carriers. In the *2006 Biennial Review Staff Report,* the International Bureau recommended that that Commission undertake a comprehensive review of the Part 63 rules and the procedures for reviewing applications to provide international service. [93] In the context of this larger review, we will consider how to treat the provision of international service by CMRS carriers. We intend to minimize any potential national security, law enforcement, foreign policy and trade concerns when further streamlining the international 214 authorization process. We also intend to address CMRS carrier **[**40]** issues as a part of that proceeding, and we will keep this docket open until that time.

---

[90]

NPRM, 19 FCC RCd at 4238, P 15. Carriers providing "pure resale" of international service switch traffic to (and resell the switched services of) underlying facilities-based U.S. carriers. The underlying carriers control the circuit that carries the traffic to the international point, arrange for termination of the traffic, and report the traffic to the Commission on a country-by-country basis. *See* 2005 International Telecommunications Data.

[91]

The Commission sought comment on whether to exempt a CMRS carrier that provides international service on a purely switched resale basis, and is either (1) unaffiliated with a foreign carrier with market power at the foreign end of the route, or (2) where the CMRS provider has an affiliation with such a foreign carrier and seeks to provide international service by reselling directly or indirectly the international switched services of U.S. carriers with which it is not affiliated.  NPRM, 19 FCC Rcd at 4238-41, PP 15-21.

[92]

*See generally* Cingular comments at 2-5; CTIA comments at 9; CTIA reply comments at 2-3; Nextel Communications comments at 2-4; Verizon Wireless reply comments at 2.

[93]

*See 2006 Biennial Regulatory Review,* IB Docket No. 06-154, International Bureau Staff Report, 22 FCC Rcd 3138 (2007).

EXHIBIT 2
Page 18 of 36

## E. Transfer of Ownership

### 1. Background

35. In the NPRM, the Commission asked whether it should amend its rules to clarify that a diminution of an entity's ownership interest in a carrier from more than 50 percent to 50 percent or less constitutes a transfer of control that must be reported to the Commission. [94] Currently, section 63.24 states that a change from less than 50 percent ownership to 50 percent or more ownership shall always be considered a transfer of control. [95] The Commission tentatively concluded in the NPRM that when an owner's interest drops below 50 percent, it loses *de jure* control of the carrier but may retain *de facto* control (based on a case-by-case determination pursuant to section 63.24). [96] The Commission also tentatively concluded that, **[\*\*41]** in these instances, it is important for the Commission to be notified of such transactions to ensure that the owner has maintained *de facto* control.

### 2. Discussion

36. We conclude that a diminution of an entity's ownership interest in a carrier to 50 percent or less constitutes a transfer of control that must be reported to the Commission. [97] In its comments, DOD asserted that the Commission's proposed rule requiring telecommunications service providers to report changes to foreign controlling interests would assist the DOD in assessing any potential impact on national security. [98] Similarly, we believe that a service provider must notify the Commission of such transactions to ensure that we have accurate information as to who controls the carrier and the nature of that control, and to ensure that there has not **[\*\*42]** been an unauthorized substantial change in ownership or control. Under section 63.24(f), carriers may submit post-transaction notifications for non-substantial, or **[\*11411]** *pro forma,* transfers and assignments. [99] Thus, for example, where the owner maintains *de facto* control of the carrier, less than 50 percent of the carrier's voting interests changes hands, and no new party gains negative or

---

[94]

NPRM, 19 FCC Rcd at 4246, P 36.

[95]

47 C.F.R. § 63.24(c).

[96]

NPRM, 19 FCC Rcd at 4246, P 36.

[97]

Section 63.24(c), as amended, will continue to provide that: "In all other situations, whether the interest being transferred is controlling must be determined on a case-by-case basis with reference to the factors listed in the Note to this paragraph (c)."

[98]

DOD comments at 5-6.

[99]

47 C.F.R. § 63.24(f).

*de jure* control as a result of the transaction or series of transactions, the transaction would constitute a *pro forma* transfer of control. Under section 63.24(f), the carrier can notify the Commission of the transaction after the transfer is completed.

## F. Asset  [**43] Acquisition

### 1. Background

37. In the NPRM, the Commission proposed to clarify that an asset acquisition that will not result in a loss of service for its customers should be treated as an assignment rather than a discontinuance of service. [100] In response to the Commission's proposal, Cingular argues that any requirement regarding asset acquisition should not apply to CMRS carriers. [101] Cingular comments that Title III of the Act does not require CMRS providers to obtain prior approval to sell their customers or portions thereof to another carrier unless a spectrum license is involved. [102] It notes that that the Commission has previously declined to apply international section 214 obligations on CMRS providers, which are without parallel in the Title III context, citing specifically to the CMRS carrier exemption from the discontinuance requirements in section 63.19. [103]

 [**44]

### 2. Discussion

38. We adopt our proposal in the NPRM and clarify that an asset acquisition that will not result in a loss of service for its customers should be treated as an assignment rather than a discontinuance of service. Specifically, we add a note to section 63.24 to clarify that when a carrier sells its customer base, or a portion of its customer base, to another carrier, the sale of assets will be treated as an assignment, which requires prior Commission approval under section 63.24 of the rules.

---

[100]

NPRM, 19 FCC Rcd at 4246-47, P 37.

[101]

Cingular comments at 9-10.

[102]

*Id.*

[103]

Cingular argues that, similar to discontinuance requirements, CMRS carriers are exempt from Part 64 carrier change requirements. Cingular comments at 9-10. We note, however, that the Commission has forborne from regulating CMRS carriers in their provision of domestic service under Section 214 Act. *See Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services,* GN Docket 93-252, Second Report and Order, 9 FCC Rcd at 1411, 1480-1481, P 182 (1994).

39. We disagree with Cingular that CMRS carriers should be considered exempt from asset acquisition obligations. [104] The Commission's decision to **[*11412]** exempt CMRS carriers from the international discontinuance requirements does not, by itself, support an exemption from the section 214 requirement that carriers obtain prior Commission approval before engaging in a stock acquisition or an asset acquisition that does not result in a discontinuance of service to customers. The Commission determined in the *2002 Domestic Streamlining Order* that section 214 makes a distinction between the treatment of asset acquisitions and discontinuances, and that there are legal and policy reasons, **[**45]** which Cingular does not address, for treating these transactions differently. [105] In addition, the mere fact that there is no companion requirement to obtain prior approval for the sale of a customer base under Title III does not lead automatically to the conclusion that there is no public interest reason under section 214 to require prior Commission review of such transactions. Without further record support, we find no basis here to exempt CMRS carriers from the obligation to obtain Commission approval before a CMRS carrier sells all or a portion of its customer base in circumstances where it is not also assigning its spectrum license. However, because our concern is with the provision of service to customers, we will not require an international section 214 filing for pure spectrum swaps between carriers where no customers are being affected by the transaction. [106]

 **[**46]**

## G. Modification of Cable Landing License Rules

## 1. Background

40. Section 1.767 of the Commission's rules provides procedures for Commission consideration of applications for cable landing licenses. [107] Among other requirements, an applicant for a cable landing license is subject to environmental obligations and requirements under the Commission's rules. The rules specifically require an applicant to comply with National Environmental Policy Act of 1969 (NEPA). [108] In the NPRM, the Commission sought comment on whether to amend its rules to require applicants for a cable landing license to comply with the Coastal Zone

---

[104]

Cingular comments at 9.

[105]

*Implementation of Further Streamlining Measures for Domestic Section 214 Authorizations,* CC Docket No. 01-150, Report and Order, FCC 02-78, 17 FCC Rcd at 5547-5549, PP 59-64 (2002) (*2002 Domestic Streamlining Order*).

[106]

The Commission will review pure swap of the spectrum under the Title III.

[107]

47 C.F.R. § 1.767.

[108]

National Environmental Policy Act of 1969, as amended, 42 U.S.C. §§ 4321-4335.

Management Act of 1972 (CZMA), [109] which is a separate statute from NEPA and contains a different set of obligations. [110]

 **[**47]   [**48]**

41. The CZMA was enacted to encourage the participation of and cooperation among state, local, regional, and federal government agencies that have programs that affect the coastlines. [111] The statute authorizes states to develop coastal management programs, subject to federal approval by NOAA. [112] A coastal management program defines permissible land and water use within the state coastal zone. States with federally-approved management programs are entitled to review such uses for consistency with those programs any "required federal license or permit to conduct an activity, in or outside of the coastal zone, affecting any land or water use or natural resource of the coastal zone of that state." [113] NOAA has regulatory responsibility over the state certification process and requirements for all applicants for federal licenses for activities in or outside of coastal zones under CZMA section 1456(c)(3)(A). [114] Its regulations, 15 C.F.R. part 930, subpart D, provide a process to determine when **[*11413]** federal license or permit activities are subject to consistency review. If review is required, the applicant must certify that the proposed activity

_____

[109]

Coastal Zone Management Act of 1972, as amended, 16 U.S.C. § 1456. The goal of the CZMA is to preserve, protect, develop and, where possible, restore and enhance the nation's coastal resources.

[110]

NPRM, 19 FCC Rcd at 4244-46, PP 33-35. We note that consideration of whether to amend the Commission's rules to assure compliance with the CZMA does not fall within the scope of the *2002 Biennial Regulatory Review* proceeding. Cable landing licenses are issued pursuant to the Cable Landing License Act, and not under the Communications Act; thus, they do not fall under the biennial review directive of the 1996 Act. Our review of section 1.767 is not prompted by "the result of meaningful economic competition between providers of such service," but, rather by our desire to be in compliance with all applicable statutes. *See* Pub. Law No. 8, 67<th> Congress, 42 Stat. 8 (1921); 47 U.S.C. §§ 34-39; *see also Review of Commission Consideration of Applications under the Cable Landing License Act,* IB Docket No. 00-106, Report and Order, 16 FCC Rcd at 22168, P 2 (2001) (*Submarine Cable Report and Order*).

[111]

Coastal Zone Management Act of 1972, as amended, 16 U.S.C. § 1456.

[112]

*Id.*

[113]

16 U.S.C. § 1456(c)(3)(A).

[114]

This provision is applicable to "*any* applicant for a required Federal license or permit to conduct activity, in or outside of the coastal zone, affecting any land or water use or natural resource of the coastal zone of that state." 16 U.S.C § 1456(c)(3)(A) (emphasis added); *see also* National Oceanic and Atmospheric Administration reply comments at 7. Subject to a determination by NOAA that a federal license activity has a reasonably foreseeable coastal effect, it may be reviewed either as a listed activity in a state's federally-approved management program, or as an unlisted activity in the context of a particular license application. *See* 15 C.F.R. §§ 930.53 (Listed federal license or permit activities); 930.54 (Unlisted federal license or permit activities).

complies with the enforceable policies of **[\*\*49]** a state management program, and all relevant states must concur in the applicant's certification before the Federal agency grants the license. [115]

**[\*\*50]**

42. The Commission noted in the NPRM that the CZMA is separate from the NEPA, with a different set of obligations triggered by a different threshold test. [116] The Commission asked whether Commission rules adequately addressed the responsibilities of an applicant applying for a cable landing license under the CZMA. [117] The Commission sought comment on: (1) whether the CZMA applies to the Commission's cable landing licenses; and (2) whether the Commission should amend its current rules to assure compliance with the CZMA. [118] In particular, the Commission sought comment on two specific alternative proposals that would have required an applicant seeking a Commission license to certify to the Commission prior to construction that the proposed cable complied with the CZMA as well as NOAA approved programs **[\*\*51]** of any relevant states. [119] In addition, the Commission requested comment on alternative approaches to assure compliance with the CZMA. [120]

**[\*\*52]**

---

[115]

16 U.S.C. § 1456(c)(3)(A). The state is conclusively presumed to have concurred if it does not notify the Federal agency within six months after receipt of the applicant's consistency certification that it concurs with or objects to the applicant's certification.

[116]

*See* NPRM, 19 FCC Rcd at 4244-4245, P 33.

[117]

*See* NPRM, 19 FCC Rcd at 4244-4246, P 33-35.

[118]

In the NPRM the Commission tentatively concluded that any modification to its rules should be narrowly targeted to incorporate relevant CZMA obligations with minimal effect on Commission and applicant resources and the timing of Commission action. *See* NPRM, 19 FCC Rcd at 4244-4246, P 33-35; 16 U.S.C. § 1456 (1972).

[119]

Under the first alternative, the Commission suggested that it would amend its cable landing application processing rules to specify that the Commission cannot take action on such applications until all relevant states have notified the Commission that they concur with or object to the applicant's certification (or, alternatively, until the six-month default period expires). *See* NPRM, 19 FCC Rcd at 4245-4246, P 35; 16 U.S.C. § 1456(c)(3)(A). As a second alternative, the Commission sought comment on whether applicants should be required under our rules to file both the certifications required by the CZMA and a certification that the relevant states have concurred with the certification (or, alternatively, proof that all relevant states have failed to act on any appropriate certifications). The Commission tentatively concluded that prior consultation with the affected state to satisfy coastal management plan concerns would be critical to enable Commission processing of eligible applications under either the Commission's streamlined procedures (45 days of public notice) or non-streamlined procedures (90 days from public notice). In both cases, the Commission expected that applicants would have been working in consultation with the states as to such issues well in advance of presenting an application to the Commission. *See* NPRM, 19 FCC Rcd at 4245-4246, P 35; *see also* 47 C.F.R. § 1.767(i).

[120]

*See* NPRM, 19 FCC Rcd at 4245-4246, P 34 and 35.

EXHIBIT 2
Page 23 of 36

43. NASCA, ICPC, and NOAA filed comments. NASCA and ICPC argue that the CZMA is not applicable to the Commission's cable licensing rules and oppose the Commission's proposals in the NPRM for amending its rules. [121] They also expressed concern that subjecting cable landing licenses to **[*11414]** the CZMA would disrupt the Commission's streamlined authorization process. [122] NOAA filed reply comments stating that the CZMA is applicable to cable landing licenses. [123] However, NOAA objects to the amendments proposed in the NPRM as duplicative of NOAA regulations and processes that already provide a basis for the Commission and applicants for FCC licenses to determine when consistency review is required. [124] It notes that to date no state has listed submarine cable landing licenses in its coastal management program or sought NOAA approval to review a particular license application on a case-by-case basis as an unlisted activity. [125] NOAA cautions the Commission not to adopt regulations mandating state consistency reviews of **[**53]** cable landing license applications that are inconsistent with its own regulations and processes. [126]

 **[**54]**

## 2. Discussion

44. We amend our cable landing license rules and application procedures to ensure that our processing of such applications comports fully with the consistency review procedures specified in the CZMA. The CZMA provides that absent a special determination by the Secretary of

_____

[121]

ICPC argues that there is no legal requirement that a license issued pursuant to the Cable Landing Act of 1921 comply with the CZMA. NASCA also argues that the CZMA and NOAA's regulations clearly state that a cable landing license does not fall within the category of a required federal license or permit to conduct activity that would affect land or water use or natural resource of a coastal zone. *See* International Cable Protection Committee reply comments at 2; NASCA comments at 3-4.

[122]

ICPC and NASCA assert that the Commission's proposed modification is irreconcilable with earlier Commission rulemakings. They argue that the Commission's proposed modifications would undermine the Commission's objectives in adopting streamlined rules. *See* NASCA comments at 13; ICPC reply comments at 3-4.

[123]

NOAA reply comments at 7.

[124]

In its reply comments as well as in an *ex parte* conversation, NOAA outlined the CZMA process and NOAA's role in that process. NOAA orally explained its regulatory authority over the consistency review process of federal license or permit activities. NOAA reply comments at 2. NOAA's rules regarding the CZMA are located in 15 C.F.R. Part 939, Subpart D.

[125]

NOAA reply comments at 6. NOAA approval is based on whether the activity in question will have reasonably foreseeable effects on the uses or resources of the state's coastal zone. 15 C.F.R. §§ 930.53 (Listed federal license or permit activities); 930.54 (Unlisted federal license or permit activities).

[126]

NOAA reply comments at 8-9.

EXHIBIT 2
Page 24 of 36

Commerce, "[n]o Federal license...may be granted by the Federal agency" until a state entitled to review the proposed activity for consistency with its approved management program under section 1456(c)(3)(A) concurs or is presumed to have concurred with the applicant's certification that "the proposed activity complies with the enforceable policies of the state's approved program and such activity will be conducted in a manner consistent **[\*\*55]** with the program." [127] The CZMA mandates that an applicant for a required federal license "shall provide [this certification] in the application to the licensing or permitting agency [and] shall furnish to the state or its designated agency a copy of the certification. . . . [a]t the same time." [128] The state must notify the federal agency that it concurs with or objects to the applicant's certification "[a]t the earliest practicable time," and its concurrence is conclusively presumed if it does not do so within six months after receiving the applicant's certification.

45. As a threshold matter, we agree with NOAA, the federal agency statutorily charged with implementing CZMA, that cable landing licenses issued by the Commission may be subject to consistency review under section 1456(c)(3)(A). The statutory language is unambiguous that such review applies to any activity requiring a federal license or permit that will have coastal **[\*\*56]** effects. The obligation to provide a consistency certification expressly applies to "*any* applicant for a required federal license or permit to conduct an activity, in or outside of the coastal zone, affecting any land or water use or natural resource of the coastal zone" shall certify that the proposed activity complies with the state's approved program." [129] The legislative history confirms that Congress intended for section 1456(c)'s consistency requirements to apply broadly to any federal agency activities regardless of their location, and that no **[\*11415]** activities having coastal effects will be categorically exempt. [130] The threshold test for determining whether consistency review is required involves a question of fact as to the effect of the proposed Federal activity on coastal uses or resources of a state coastal zone.

---

[127]

16 U.S.C. § 1456(c)(3)(A).

[128]

*Id.*

[129]

16 U.S.C. § 1456(c)(3)(A).

[130]

H.R. Conf. Rep. No. 964, 10<1st> Cong., 2d Sess. 968-975 ("The amended provision establishes a generally applicable rule of law that any federal agency activity (regardless of its location) is subject to the CZMA requirement for consistency if it will affect any natural resources, land uses, or water uses in the coastal zone. No federal agency activities are categorically exempt from this requirement.") *See generally Coastal Zone Management Federal Consistency Regulations,* 65 F.R. 77124, 77124-25 (2000) ("These changes reflect an unambiguous Congressional intent that all Federal agency activities meeting the 'effects' test are subject to the CZMA consistency requirement; that there are no exceptions or exclusions from the requirement as a matter of law; and that the 'uniform threshold standard' requires a factual determination, based on the effects of such activities on the coastal zone, to be applied on a case-by-case basis."); *see also Proposed Rules,* 68 F.R. 34851, 34854 (June 11, 2003) (rejecting as not authorized by CZMA a suggestion that federal consistency regulations rely on agencies' categorical exclusion definitions under NEPA).

EXHIBIT 2
Page 25 of 36

**[\*\*57]**

46. Nothing in the CZMA, nor in the nature of the activities conducted by cable landing licensees, provides a basis to conclude that licenses issued by the Commission under the Cable Landing License Act to construct or operate a cable landing station are categorically exempt from section 1456(c)(3)(A)'s consistency requirement. In this regard, we reject NASCA's characterization of cable landing licenses as not possibly "affecting any land or water use or natural resources of the coastal zone" within the meaning of section 1456(c)(3). A cable landing license issued by the Commission is necessary to land or operate a submarine cable within the United States. [131] There is no merit to the suggestion that, because additional approvals are required to construct and locate the cable, the landing and operation of a cable, which require a Commission license, cannot have a coastal effect. We recognize that the construction and location of the cable requires approval from the Army Corps of Engineers, whose permitting process may also be subject to consistency review under many state management programs. Such review, however, does not satisfy the Commission's CZMA responsibility as the Federal **[\*\*58]** licensing agency insofar as any state requires that cable landing license applications undergo consistency review and NOAA has approved such review. We therefore reject the views of various commenters that cable landing licenses are beyond the scope of section 1456(c)(3)(A). [132]

47. In modifying our cable landing licensing rules, as discussed below, we will consider the CZMA requirements to apply **[\*\*59]** to applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system. We will not, however, consider the requirements of the CZMA to apply to applications for changes of ownership of the submarine cable system or landing stations (transfers or control or assignments) or other modifications of the cable landing license that do not effect the construction of the submarine cable system (such as the adding or removing of licensees). While applications that involve the construction of the submarine cable system may affect the coastal zone of a state, changes of ownership will not have the same affect. Indeed, any new owner will be required to follow any existing construction requirements for the submarine cable system or landing station.

48. As NOAA has requested, we will not adopt regulations that mandate consistency reviews of every cable landing license application or that supplant regulations or processes whereby NOAA, at the request of a state with an approved management program, determines that consistency review is warranted because a proposed activity requiring a federal license will have

---

131

The Commission's power to issue cable landing licenses is derived from the Submarine Cable Act, 47 U.S.C. §§ 34-39, which provides that submarine cables may not land in the United States unless the President has issued a written license. By Executive Order the President has delegated authority to issue such licenses to the Commission. *See* Executive Order No. 10,530 § 5(a), *codified at* 3 C.F.R. § 189 (1954-58), reprinted in 3 U.S.C. § 301 app. (1988).

132

*See* NASCA comments at 3; ICPC comments at 2.

reasonably **[\*\*60]** foreseeable coastal effects. We understand that no state currently includes cable landing licenses in its management program **[\*11416]** and that, thus far, no state has requested NOAA approval to review a particular cable landing license application on a case-by-case basis. We understand further that our applicants may be subject to Army Corps of Engineers requirements that incorporate CZMA review in certain instances and that this may ensure consistency review of submarine cable projects, even where cable landing licenses have not been identified as requiring review.

49. Nonetheless, we remain concerned that the Commission, as the Federal licensing agency, not inadvertently foreclose the consistency review rights of any coastal state with an approved management program or otherwise violate the express dictate of section 1456(c)(3)(A) that no federal license be granted until all required state concurrences, express or presumed, are received. Insofar as any state, in conjunction with NOAA, has identified cable landing licenses as requiring consistency review, we determine that we may not rely on the permitting procedures of another agency to fulfill our CZMA responsibility as the Federal licensing **[\*\*61]** agency. We will therefore add a note to section 1.767(a) of our rules clarifying that, in accordance with the express requirement that a federal license applicant "shall provide [the certification] in the application to the licensing or permitting agency," all consistency certifications required by section 1456(c)(3)(A) must be included in the application filed with the Commission for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system.

50. To ascertain whether any such certification is required, the note directs applicants for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system to consult NOAA regulations and applicable state procedures to verify that this type of application has not been added to the list of activities in a state management program that routinely require consistency review. A cable landing license applicant would not be required to provide any such certification in its application or to any coastal state unless a potentially affected state or states had modified its NOAA-approved management program **[\*\*62]** to include the construction or operation of a cable landing station as a listed activity that routinely requires consistency review, or had secured NOAA approval to review a particular cable landing application as an unlisted activity. In that event, the applicant would be required to furnish each such state "a certification that the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program" and include all such certifications in the application filed with the Commission or amend its application to reflect any subsequently required certification.

51. The applicant should consult the relevant state(s) (or any designated state agency) to determine the contents of any required certification. Given that the statute explicitly confers consistency review rights with respect to "activit[ies], *in or outside of the coastal zone,* affecting any land or water or natural resources of the coastal zone of that state," applicants should consult the approved management programs of any states with a coastal zone potentially affected by the

EXHIBIT 2
Page 27 of 36

applicant's proposed activities, as well as those **[\*\*63]** states within a reasonable vicinity of the proposed cable landing station.

52. In accordance with the requirement that state concurrence is to precede the grant of the cable landing license and to prevent the construction of any submarine cable system or cable landing station while a coastal state is reviewing the applicant's consistency certification, the Commission will not streamline the application or take any action on a cable landing license application pending notification, or documentation from the applicant, that all required state concurrences have been received or may be presumed. [133] In this manner we ensure that no state consistency review right conferred by section 1456(c)(3)(A) is foreclosed. We expect that this requirement will result in only minimal delays in **[\*11417]** the inauguration of new service. The statute directs the affected coastal state to notify the concerned federal agency at the earliest practicable time that it concurs with or rejects the applicant's certification and that state concurrence is presumed if the state has not provided such notification within six months after receipt of the applicant's certification. Accordingly, construction of the submarine cable **[\*\*64]** system will be delayed no more than six months after the state's receipt of the applicant's certification. And in the usual case in which, as contemplated by section 1456(c)(3)(A), the certification is furnished to the state when the applicant submits the application to the Commission, [134] the construction actual delay attributable to the certification process, will be less than six months, whether the licensing action takes place pursuant to a streamlined applications or non-streamlined application. [135] Applicants can further reduce any potential delay by working with individual states to secure the required concurrence well in advance of the end of the six-month period when a non-responsive state is deemed to have concurred.

 **[\*\*65]**

53. We also encourage applicants, contemporaneously with the filing of the application with the Commission, to send a notification of such filing to any potentially affected coastal state that does

---

[133]

Applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system that will not be located in any states where the cable landing licenses may be subject to the consistency certification requirements of the Coastal Zone Management Act are still eligible for the streamlined grant procedures pursuant to 47 C.F.R. § 1.767(j), (k). Also, all applications for transfer of control or assignment of a cable landing station license or modification that does not affect the construction of a submarine cable system or cable landing station are eligible for the streamlined grant procedures pursuant to 47 C.F.R. § 1.767(j), (k).

[134]

Section 1456(c)(3)(A) specifies that "any applicant for a required Federal license . . . shall provide in the application to the licensing or permitting agency a certification that the proposed activity complies with the enforceable policies of the state's approved program and that such activity will be conducted in a manner consistent with the program. *At the same time,* the applicant shall furnish to the state or its designated agency a copy of the certification." (Emphasis added).

[135]

There might be additional delay in the effective date of action on the license application where the application is reviewed by the state as an unlisted activity rather than as a listed activity within its NOAA-approved management program. *See supra* note 135.

not list this activity within its approved management program. NOAA regulations, 15 C.F.R. § 930.54, afford **[\*\*66]** states 30 days from notice of the submission of the application to the Federal licensing agency to advise the concerned federal agency of unlisted activities affecting any coastal use. A state that does not respond within 30 days waives any right to review the application as an unlisted Federal license activity. [136] Providing actual notice of such filing to all potentially affect coastal states will effectively create a date certain (i.e., 30 days after notification of the filing) when the Commission can unequivocally grant the application assured that any CZMA obligation has been satisfied. Given that no state to date has sought to review the landing/operation of a submarine cable as an unlisted activity, we expect that the streamlined processing of these applications will rarely be disrupted by a state seeking to review this as an unlisted activity. Finally, notifying potentially affected states when a cable landing application is filed with the Commission would impose minimal burdens on the applicant because the same notification can be sent to each potentially affected coastal state.

 **[\*\*67]**

54. In sum, we find that, although no coastal state currently includes the landing and operation of a cable in its federally approved management program or has requested approval to review this as an unlisted activity, cable landing licenses issued by the Commission may be subject the consistency review requirements set forth in section 1456(c)(3)(A) of the CZMA. We do not adopt either of the proposals set forth in the NPRM. Instead, we revise section 1.767 to clarify that any consistency certifications required by section 1456(c)(3)(A) must be included in cable landing license applications filed with the Commission to construct and operate or modify construction of a previously approved  **[\*11418]**  submarine cable system, and that construction or modification may not commence until all coastal states have concurred or may be presumed to have concurred with any required certifications included in the cable landing application.

## III. ADMINISTRATIVE MATTERS

### A. Final Regulatory Flexibility Certification

55. The Regulatory Flexibility Act of 1980, as amended (RFA) [137] requires that a Regulatory Flexibility Act analysis be prepared for notice-and-comment rule making proceedings, unless

---

136

15 C.F.R. § 930.54(a) (providing that the waiver applies only if the state agency receives notification of the Federal license application). In the event any state so notified, advises within 30 days that the application requires consistency review, the Commission as well as applicant would be entitled to participate in the Director's decision regarding the state's request to review the application as an unlisted activity. The certification described by section 1456(c)(3)(A) will be required only if the Director determines that the proposed activity will have reasonably foreseeable coastal effects. *Id.* at § 930.54(d). However, the applicant could reduce any resulting delay in the processing of its pending application by immediately providing the certification without waiting for the Director's decision and working with the state to secure its concurrence as soon as possible thereafter. *Id.* at § 930.54(f). Concurrence is presumed six months after state receives notice of the application, or three months after the state receives the applicant's certification, whichever is later. *Id.* at § 930.54(e).

137

EXHIBIT 2
Page 29 of 36

the **[\*\*68]** agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." [138] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [139] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. [140] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA). [141]

 **[\*\*69]**

56. As stated in the Order, this proceeding was initiated as part of the Commission's 2002 biennial regulatory review process. Through this review, the Commission has sought to: facilitate the introduction of new services; provide customers with more choices, innovative services, and competitive prices; improve the processing of authorization applications and regulation of international services; and lessen the regulatory burdens placed on carriers. In this proceeding, the Commission examined the rules regarding the authorization of international services under section 214 of the Act. [142]

57. In the NPRM, the Commission certified that the rules proposed in this proceeding would not have a significant economic impact on a substantial number of small entities. [143] The Commission stated that the proposals would be in **[\*\*70]** the public interest and would lessen the burdens on all carriers, both small and large, providing international common carrier service pursuant to section 214 of the Act. In the Order, the Commission adopts many of the rule changes proposed in

---

*See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 -- 602, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

138

5 U.S.C. § 605(b).

139

*Id.*

140

5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

141

15 U.S.C. § 632.

142

47 U.S.C. § 214.

143

*See* NPRM, 19 FCC Rcd at 4249, P 43.

the NPRM. Thus, we certify that rule changes adopted in this Order will have no significant economic impact on a substantial number of small entities.

58. In the Order, the Commission amends its rules regarding the discontinuance of international service thereby aligning the international rules with those rules for domestic service. The Order will amend the submarine cable landing rules to require applicants to include information regarding an applicant's compliance with the Coastal Zone Management Act of l972. The Order clarifies the rules to eliminate confusion as to whether a CMRS carrier requires authority to resell U.S. inbound service of a foreign carrier for the U.S.-CMRS carrier's customers that are **[\*\*71]** roaming in a foreign country. The Order requires a carrier to notify the Commission when there is a change in ownership to 50 percent or less.  **[\*11419]**  Also, an ownership change to less than 50 percent ownership, but with control, will be considered a transfer of control. The Order amends its rules to clarify that an asset acquisition that will not result in a loss of service for its customers should be treated as an assignment rather than a discontinuance of service. In addition, the Order amends the rules so that when a carrier sells its customers or a portion of its customers to another carrier, the sale of assets will be treated as an assignment.

59. The rule changes adopted in this Order will benefit all entities, both small and large. The rules for discontinuing international service will be consistent with the rules for discontinuing domestic service, thereby eliminating the disparities between domestic and international service rules. The Commission finds that it will be in the public interest to eliminate the requirement that CMRS carriers seek authority for the resale of inbound traffic. Rather, this authority will be included in the carrier's global resale authority. This rule change **[\*\*72]**  will reduce the filing requirements on CMRS carriers, many of which are small entities. Although the majority of submarine cable landing license applicants is not considered small entities, the rule changes affecting these applicants are nominal and will ensure that our rules are consistent with the Coastal Zone Management Act of 1972.

60. The rules adopted in the Order are administrative and will streamline and clarify our processes. Therefore, we find that the rules adopted in this Order will not have a significant economic impact on a substantial number of small entities.

61. <u>Report to Congress.</u> The Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, in a report to Congress. [144] In addition, the Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and Final Regulatory Flexibility Certification will also be published in the Federal Register. [145]

---

[144]

*See* 5 U.S.C. § 801(a)(1)(A).

[145]

See 5 U.S.C. § 605(b).

EXHIBIT 2
Page 31 of 36

[**73]

## B. Final Paperwork Reduction Act of 1995 Analysis

62. This Report and Order contains either new or modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office Of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law No. 107-198, (*see* 44 U.S.C. § 3506 (c)(4)), the Commission previously sought specific comment on how the Commission might "further reduce the information collection burden for small business concerns with fewer than 25 employees."

63. All comments regarding the requests for approval of the information collection should be submitted to Judith B. Herman, Federal Communications Commission, Room 1-C804, 445 12<th> Street, SW, Washington, **[**74]** DC 20554, or via the Internet to *Judith-B.Herman@fcc.gov*; phone 202-418-0214.

## IV. ORDERING CLAUSES

64. Accordingly, IT IS ORDERED that, pursuant to the authority contained in sections 1, 4(i), 4(j) 11, 201-205, 211, 214, 219, 220, 303(r), 309, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 161, 201-205, 211, 214, 219, 220, 303(r), 309 and 403, and sections 34-39 of the Cable Landing License Act, 47 U.S.C. §§ 34-39, this REPORT AND ORDER IS HEREBY ADOPTED.

65. IT IS ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this REPORT AND ORDER, **[**75]** including the Final Regulatory Flexibility Act Certification, to the Chief Counsel for Advocacy of the Small Business Administration in accordance with section 603(a) of the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* **[*11420]**

66. IT IS FURTHER ORDERED that the Regulatory Flexibility Certification, as required by section 604 of the Regulatory Flexibility Act and as set forth above IS ADOPTED.

Marlene H. Dortch

Secretary

## Appendix

## APPENDIX

**Final Rules**

Parts 1 and 63 of the Commission's rules are amended as follows:

PART 1 -- PRACTICE AND PROCEDURE

1. The authority citation for part 1 continues to read as follows: Authority: 47 U.S.C. 151, 154(i), 154(j), 155, 225, 303(r), 309 and 325(e).

2. Section 1.767 is amended by adding note to paragraph (a)(10); adding new paragraph (g)(9); and redesignating paragraphs (g)(9) through (g)(14) as paragraphs (g)(10) though (g)(15).  **[**76]** § 1.767 Cable landing licenses.

(a) ****

Note to paragraph (a)(10) -- Applicants for cable landing licenses may be subject to the consistency certification requirements of the Coastal Zone Management Act, 16 U.S.C. 1456, if they propose to conduct activities, in or outside of a coastal zone of a state with a federally-approved management plan, affecting any land or water use or natural resource of that state's coastal zone. Before filing their applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system, applicants must determine whether they are required to certify that that their proposed activities will comply with the enforceable policies of a coastal state's approved management program. In order to make this determination, applicants should consult National Oceanic Atmospheric Administration (NOAA) regulations, 15 C.F.R. part 930, subpart D, and review the approved management programs of coastal states in the vicinity of the proposed landing station to verify that this type of application is not a listed federal license activity requiring review **[**77]** and that no state has sought or received NOAA approval to review the application as an unlisted activity. If it is determined that any certification is required, applicants shall consult the affected coastal state(s) (or designated state agency(ies)) in determining the contents of any required consistency certification(s). Applicants may also consult the Office of Ocean and Coastal Management (OCRM) within NOAA for guidance. The cable landing license application filed with the Commission shall include any consistency certification required by section 1456(c)(3)(A) for any affected coastal state(s). Upon documentation from the applicant, or notification from each affected coastal state, that the state has either concurred, or by its inaction, is conclusively presumed to have concurred with the applicant's consistency certification, the Commission may take action on the application.

(k) ****

(4) Certifying that for applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system, the submarine

EXHIBIT 2
Page 33 of 36

cable system will not be located in any states where the cable landing licenses may be subject to the **[\*\*78]** consistency certification requirements of the Coastal Zone Management Act, 16 U.S.C. 1456.

PART 63 -- EXTENSION OF LINES, NEW LINES AND DISCONTINUANCE, REDUCTION, OUTAGE AND IMPAIRMENT OF SERVICE BY COMMON CARRIERS; AND GRANTS OF RECOGNIZED PRIVATE OPERATING AGENCY STATUS

3. The authority citation for part 63 continues to read as follows:

Authority: Sections 1, 4(i), 4(j), 10, 11, 201-205, 214, 218, 403 and 651 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 154(i), 154(j), 160, 201-205, 214, 218, 403, and 571, unless otherwise noted.

4. Section 63.18 is amended by revising paragraph (e)(2) to read as follows:

§ 63.18 Contents of applications for international common carriers.

****

(e) ***

(2) <u>Global Resale Authority.</u> If applying for authority to resell the international **[\*\*79]** services of authorized common carriers subject to § 63.23, the applicant shall:

5. Section 63.19 is amended by revising paragraphs (a)(1) and (a)(2) as follows:

§ 63.19 Special procedures for discontinuances of international services.

(a) ***

(1) The carrier shall notify all affected customers of the planned discontinuance, reduction or impairment at least 30 days prior to its planned action. Notice shall be in writing to each affected customer unless the Commission authorizes in advance, for good cause shown, another form of notice.

(2) The carrier shall file with this Commission a copy of the notification on the date on which notice has been given to all affected customers. The filing may be made by letter (sending an original and five copies to the Office of the Secretary, and a copy to the Chief, International Bureau) and shall identify the geographic areas of the planned discontinuance, reduction or impairment and the authorization(s) pursuant to which the carrier provides service.

EXHIBIT 2
Page 34 of 36

22 FCC Rcd 11398, *11420;  2007 FCC LEXIS 4848, **79

6. Section 63.23 is amended by revising paragraph (c) as follows:

§ 63.23 Resale-based international common carriers.

\*\*\*\*

(c) Subject to the limitations specified in paragraph (b) of this section **[\*\*80]** and in section 63.17(b), the carrier may provide service by reselling the international services of any other authorized U.S. common carrier or foreign carrier, or by entering into a roaming or other arrangement with a foreign carrier, for the provision of international basic switched, private line, data, television and business services to all international points.

Note to section 63.23(c): For purposes of this paragraph, a roaming arrangement with a foreign carrier is defined as an arrangement under which the subscribers of a U.S. commercial mobile radio service provider use the facilities of a foreign carrier with which the subscriber has no direct pre-existing service or financial relationship to place a call from the foreign country to the United States.

\*\*\*\*

7. Section 63.24 is amended by adding a Note after paragraph (b) as follows:

§ 63.24 Assignments and transfers of control.

\*\*\*\*

(b) \*\*\*

NOTE TO PARAGRAPH (b): The sale of a customer base, or a portion of a customer base, by a carrier to another carrier, is a sale of assets and shall be treated as an assignment, which requires prior Commission approval under this section.

8. Section 63.24 is amended by revising paragraph **[\*\*81]** (c) as follows:

§ 63.24 Assignments and transfers of control.

\*\*\*\*

(c) Transfers of control. For purposes of this section, a transfer of control is a transaction in which the authorization remains held by the same entity, but there is a change in the entity or entities that control the authorization holder. A change from less than 50 percent ownership to 50 percent

EXHIBIT 2
Page 35 of 36

or more ownership shall always be considered a transfer of control. A change from 50 percent or more ownership to less than 50 percent ownership shall always be considered a transfer of control. In all other situations, whether the interest being transferred is controlling must be determined on a case-by-case basis with reference to the factors listed in Note to paragraph (c).

---

**End of Document**

*25 FCC Rcd 15706;  2010 FCC LEXIS 6540;  51 Comm. Reg. (P & F) 1018*

Federal Communications Commission

November 2, 2010, Released  ; October 29, 2010, Adopted

IB Docket No. 04-47

Release No. FCC 10-187

**Reporter**

 25 FCC Rcd 15706 *;  2010 FCC LEXIS 6540 **;  51 Comm. Reg. (P & F) 1018

## In the Matter of Amendment of Parts 1 and 63 of the Commission's Rules

**Prior History:**

*22 F.C.C.R. 11398, 2007 FCC LEXIS 4848*

## Core Terms

cable, landing, license, consistency, coastal, unlisted, license application, certification, Notice, processing, petition for reconsideration, submarine, argues, streamlined, management plan, small business, clarify, amend, certification requirements, management program, federal agency, defer, accepted-for-filing, compliance, Sections, entities, certify

**Panel:** By the Commission

## Action

 [**1]

 ORDER ON RECONSIDERATION

**Opinion By:**

DORTCH

## Opinion

 [*15706]  I. INTRODUCTION

EXHIBIT 3
Page 1 of 17

1. In this Order on Reconsideration, we grant in part the *Petition for Reconsideration* filed by the North American Submarine Cable Association (NASCA) [1] and otherwise affirm the Commission's *Report and Order* [2] establishing that the Coastal Zone Management Act of 1972 (CZMA) applies to cable landing licenses granted by the Commission. NASCA's *Petition for Reconsideration* argues that the Commission should rescind the rules adopted in that *Report and Order.* [3] Although we decline to rescind the rules, we amend them to clarify the applicable licensing requirements and to ensure that the Commission's process for evaluating cable landing licenses complies with the CZMA review procedures established by the National Oceanic and Atmospheric Administration (NOAA).

 [**2]

## II. BACKGROUND

2. On February 25, 2004, the Commission adopted a Notice of Proposed Rulemaking seeking comment on, among other things, whether the CZMA applies to cable landing license applications, and, if so, whether the Commission should modify section 1.767 of its rules to ensure compliance with the CZMA. [4] Three parties, including NASCA, submitted comments regarding the CZMA issue. [5] On June 20, 2007, the Commission adopted a *Report and Order* that found that the CZMA applied to cable landing license applications. [6]

 [**3]

---

1

*See* NASCA Petition for Reconsideration, IB Docket No. 04-47 (filed November 26, 2007) (*Petition for Reconsideration*).

2

*See* *Amendment of Parts 1 and 63 of the Commission's Rules, IB Docket No. 04-47, Report and Order, FCC 07-118, 22 FCC Rcd 11398, 11414, P 45 (2007)* (*Report and Order*).

3

*Id.*

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

4

*See* *Amendment of Parts 1 and 63 of the Commission's Rules, IB Docket No. 04-47, Notice of Proposed Rulemaking, FCC 04-40, 19 FCC Rcd 4231 at 4244-6, PP 33-35 (2004)* (*NPRM*).

5

*See* NASCA Comments and NASCA Reply Comments; International Cable Protection Committee (ICPC) Comments; National Oceanic and Atmospheric Administration (NOAA) Reply Comments.

6

*See* *Report and Order, 22 FCC Rcd at 11414-15*, PP 44-46.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

EXHIBIT 3
Page 2 of 17

3. In the *Report and Order,* the Commission amended its cable landing license rules and application procedures to ensure that its processing of such applications comports with the consistency **[*15707]** review procedures specified in the CZMA. [7] The CZMA states that no federal agency may grant a license to conduct an activity affecting a coastal area until a state concurs or is presumed to concur with the applicant's certification that a proposed activity is consistent with the state's coastal management plan. [8] If the state includes FCC cable landing licensing in its coastal management plan, FCC licensing is considered a "listed activity." [9] As such, the state has six months to review and either concur with or object to the certification that is required if CZMA state consistency review is triggered by the filing of a cable landing license with the Commission. [10] The state's concurrence is conclusively presumed if it does not act within six months after receiving the applicant's certification. [11] At this time, no state has included FCC licensing in its coastal management plan. If the state does not include FCC licensing in its coastal management plan, such licensing is an "unlisted **[**4]** activity." [12] For unlisted activities, NOAA rules require that the state notify the relevant federal agencies, applicants, and the Director of the Office of Ocean and Coastal Resource Management (OCRM) (within NOAA) of the state's request to review the activity within thirty days of notice of the license or permit application, or otherwise be deemed to have waived the right to review the unlisted activity. [13]

---

[7]

*Id at 11416-8, PP 47-54*. The Commission noted in the *Report and Order* that the CZMA requirements only apply to applications for a license to construct and operate a submarine cable system or to modify the construction of a previously licensed system and not to applications for changes of ownership of the system or other modifications that do not affect the construction of the system. *Id. at 11415, P 47*.

[8]

The CZMA provides that, absent a special determination by the Secretary of Commerce, "[n]o Federal license . . . may be granted by the Federal agency" until a state entitled to review the proposed activity for consistency with its approved management program under section 1456(c)(3)(A) concurs or is presumed to have concurred with the applicant's certification that "the proposed activity complies with the enforceable policies of the state's approved program and such activity will be conducted in a manner consistent with the program." *See 16 U.S.C. § 1456(c)(3)(A). See also Report and Order, 22 FCC Rcd at 11414*, P 44 n.127.

[9]

*See 15 C.F.R. § 930.53*.

[10]

*See 16 U.S.C. § 1456(c)(3)(A)*; *see also Report and Order, 22 FCC Rcd at 11414*, P 44.

[11]

*Id.*

[12]

*See 15 C.F.R. § 930.54*.

[13]

*Id.*

**[\*\*5]**

4. As a threshold matter, the Commission agreed with NOAA, which is statutorily charged with implementing the CZMA, that cable landing licenses issued by the Commission may be subject to consistency review under section 1456(c)(3)(A). [14] The Commission found that the statutory language is unambiguous that such review applies to any activity requiring a federal license or permit that will have coastal effects. [15] The Commission further found that the legislative history confirms that Congress intended for the consistency requirements of section 1456(c) to apply broadly to *any* federal agency activities having coastal effects, regardless of their location, and that no activities having coastal effects will be categorically exempt. [16]

**[\*\*6]**

**[\*\*7]**

**[\*15708]**  5. On October 29, 2007, NASCA filed a consolidated petition for reconsideration and petition to defer the effective date. [17] NASCA filed a reply on January 28, 2008. On March 17, 2008, OCRM/NOAA filed an *ex parte* letter regarding NASCA's *Petition for Reconsideration.* [18]

---

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

14

*See [Report and Order, 22 FCC Rcd at 11414](#)*, P 45.

15

*See id.*

16

*See [Report and Order, 22 FCC Rcd at 11414](#)*, P 45 (citing H.R. Conf. Rep. No. 964, 101st Cong., 2d Sess. 968-975) ("The amended provision establishes a generally applicable rule of law that *any* federal agency activity (regardless of its location) is subject to the CZMA requirement for consistency if it will affect any natural resources, land uses, or water uses in the coastal zone. No federal agency activities are categorically exempt from this requirement."). *See generally [Coastal Zone Management Act Federal Consistency Regulations, 65 F.R. 77124, 77124-25 (2000)](#)* ("These changes reflect an unambiguous requirement; that there are no exceptions or exclusions from the requirement as a matter of law; and that the 'uniform threshold standard' requires a factual determination, based on the effects of such activities on the coastal zone, to be applied on a case-by-case basis."); *see also [Proposed Rules, 68 F.R. 34851, 34854 (June 11, 2003)](#)* (rejecting as not authorized by CZMA a suggestion that federal consistency regulations rely on agencies' categorical exclusion definitions under the National Environmental Protection Act).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

17

*See Petition for Reconsideration.*

18

*See* Letter from David M. Kennedy, Director, Office of Ocean and Coastal Resource Management, National Oceanic and Atmospheric Administration, to Arthur Lechtman, International Bureau, Federal Communications Commission, at 1 (dated March 17, 2008) (*March 17, 2008 NOAA letter*).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

25 FCC Rcd 15706, *15708;  2010 FCC LEXIS 6540, **7

## III. DISCUSSION

6. Pursuant to section 1.429 of our rules, parties may petition for reconsideration of final Commission actions. [19] Reconsideration is generally appropriate only where the petitioner shows either a material error or omission in the original order or raises additional facts not known or not existing until after the petitioner's last opportunity to respond. [20]

 [**8]

7. In its *Petition for Reconsideration,* NASCA makes several arguments that we address below. NASCA argues that: (1) the CZMA does not require the Commission to promulgate rules with respect to processing of cable landing license applications; (2) cable landing license applicants cannot comply with the rules as adopted; (3) the Commission erred in assessing the burdens and benefits of the CZMA rules; (4) the CZMA rules are unworkable; and (5) the CZMA rules are inconsistent with World Trade Organization (WTO) commitments. NASCA also petitioned the Commission to defer the effective date of the rules pending resolution of the *Petition for Reconsideration.*

8. *First,* we reject NASCA's argument that the CZMA does not require the Commission to promulgate rules with respect to processing of cable landing license applications. [21] We find that the Commission correctly found in the *Report and Order* that **[**9]** the CZMA applies to cable landing license applications. [22] Indeed, NOAA, the federal agency charged with implementation of CZMA, finds that an FCC license is a federal license or permit that could be reviewed by coastal states, pursuant to the CZMA. [23] Further, NOAA states that "NASCA has misapplied

---

[19]

Section 1.429 of the Commission's rules, *47 C.F.R. § 1.429*, states in part that:

(b) A petition for reconsideration which relies on facts which previously have been presented to the Commission will be granted only under the following circumstances: (1) The facts relied on relate to events which have occurred or circumstances which have changed since the last opportunity to present such matters; (2) The facts relied on were unknown to petitioner until after his last opportunity to present them to the Commission, and he could not, through the exercise of ordinary due diligence, have learned of the facts in question prior to such opportunity.

[20]

*Petition for Reconsideration by Acadiana Cellular General Partnership, WT Docket No. 04-323, Order on Reconsideration, FCC 05-88, 20 FCC Rcd 8660, 8663, P 8 (2006).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[21]

*See Petition for Reconsideration* at 3-11.

[22]

*See Report and Order, 22 FCC Rcd at 11414*, P 45.

[23]

EXHIBIT 3
Page 5 of 17

portions of NOAA's June 3, 2004 **[*15709]** comments to the FCC and inaccurately applied CZMA statutory and regulatory requirements." [24] Specifically, NOAA asserts that:

> an FCC license is a federal license or permit that could be reviewed by coastal states, pursuant to the "listing" and "unlisted activity" provisions in NOAA's regulations at *15 C.F.R. §§ 930.53* and 930.54. Even if other federal permits are needed for a project and are reviewed by coastal states under the CZMA review, additional federal authorizations are also subject to state CZMA review pursuant to NOAA's regulations. [25]

Thus, in deference to NOAA's statutory and regulatory authority and in furtherance of the Commission's cable landing licensing authority under the Cable Landing License Act, [26] as delegated to the Commission by Executive Order 10530, [27] the FCC must ensure that its cable landing license rules and **[**10]** application procedures comport with the consistency review procedures specified in the CZMA. [28]

**[**11]**

9. *Second,* in response to NASCA's argument that cable landing license applicants cannot comply with the rules as adopted, [29] we believe that amendment and clarification of our certification requirement for cable landing licenses adequately address that concern. NASCA argues that the

---

*See March 17, 2008 NOAA letter; see also Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*; *Petition for Reconsideration* at 8 ("Upon judicial review, therefore, NOAA . . . . would be entitled to *Chevron* deference.").

24

*See March 17, 2008 NOAA Letter* at 1; *see also Chevron, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694*.

25

*See March 17, 2008 NOAA Letter* at 1.

26

*47 U.S.C. §§ 34-39*.

27

Exec. Ord. No. 10530 § 5(a) (May 21, 1954), reprinted as amended in *3 U.S.C. § 301*.

28

As the Commission noted in the *Report and Order,* the CZMA requirements only apply to applications for a license to construct and operate a submarine cable system or to modify the construction of a previously licensed system. We will not apply them to applications for changes of ownership of the system or other modifications that do not affect the construction of the system. *Id. at 11415, P 47*.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

29

*See Petition for Reconsideration* at 12-13.

Commission failed to account for states' authority to review unlisted license activities. As discussed above, section 1456(c)(3)(A) of CZMA affords a state six months to review an applicant's consistency certification that is required for this type of federal license if it is a listed activity under the state's federally approved coastal management program. In contrast, pursuant to section 930.54 of NOAA's rules, a state must request approval from the Director of OCRM to review unlisted activities within thirty days from notice of the license or permit application or be deemed to have waived the right to review the unlisted activity. [30]

 **[\*\*12]**

10. As adopted in the *Report and Order,* Section 1.767 of the Commission's rules currently requires an applicant to certify that the proposed submarine cable will not be located in or impact any states where the cable landing licenses *may be subject* to the consistency certification requirements of the CZMA. [31] We agree with NASCA that where a cable landing license is not included in a state's coastal management plan, and thus is an unlisted activity, the applicants cannot certify whether a state is entitled to a consistency review prior to filing the application with the Commission. We therefore amend the certification requirement of section 1.767 to clarify that the applicant need only certify that the proposed submarine cable will not be located in or impact any state that requires review of FCC cable landing applications as a "listed" activity in its coastal management plan. (We note that, to date, no state has placed the FCC's cable landing license on its coastal management plan as a listed activity.) Thus if the proposed submarine cable will be located only in states where FCC cable licensing is an "unlisted **[\*15710]** activity," the application may be eligible for streamlined processing **[\*\*13]** if the applicant includes the certification set forth in section 1.767(k)(4).

11. Further, we clarify that the thirty-day time period for a state to request NOAA approval for consistency review of the application as an unlisted activity will commence with the issuance of the Public Notice that the submarine cable landing license application has been accepted for filing. NOAA rules allow for constructive notice to a state of submission of an application for licenses for unlisted activities. [32] Issuance of the accepted-for-filing Public Notice provides constructive notice to a state of the submission of submarine cable landing license application and

---

[30]

*See 15 C.F.R. § 930.54(a).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[31]

*See 47 C.F.R. § 1.767(k)(4)* (emphasis added).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[32]

"Notice to the State agency may be constructive if notice is published in an official federal public notification document or through an official State clearinghouse . . . ." *15 C.F.R. § 930.54(a)(2).*

EXHIBIT 3
Page 7 of 17

25 FCC Rcd 15706, *15710;  2010 FCC LEXIS 6540, **13

commences the thirty-day period specified in section 930.54(a)(1). [33] The accepted-for-filing Public Notice provides a description of the proposed submarine cable, including the location of the landing points. The Public Notice also provides the file number for the application so that interested parties can **[\*\*14]** access the application itself through the FCC website. [34] The Public Notice thus contains sufficient information about the proposed activity requiring a cable landing license to permit potentially affected states to evaluate whether there will be an impact that, subject to NOAA's agreement, warrants consistency review.

**[\*\*15]**

12. The accepted-for-filing Public Notices are available on the FCC website and are included in the FCC's Daily Digest. The Daily Digest provides a brief synopsis of Commission documents, including Public Notices, released each business day. The Daily Digest is available on the FCC website, [35] and one can also subscribe to the Daily Digest and have a copy sent via email. [36]

13. This process should allow the Commission to comply with its obligations under the CZMA while minimizing the effect on the streamlined processing of submarine cable landing license applications. Streamlined processing will be available for all applications where the states have waived, or are deemed to have waived, any section 1456(c)(3)(A) right to review the application as an unlisted activity. [37] **[\*\*16]** Also, as the Commission found in the *Report and Order,* all

---

[33]

Publication of this Reconsideration Order in the Federal Register provides constructive notice to the states of this finding and of the utility of monitoring Public Notices for federal license activities that may be subject to consistency review. *See 15 C.F.R. § 930.54(a)(1)*, providing that "[w]ith the assistance of Federal agencies, State agencies should monitor unlisted federal license or permit activities."

[34]

A cable landing license application is publicly available before an accepted-for-filing Public Notice is released. The application must be filed electronically via the International Bureau Filing System (IBFS), *47 C.F.R. § 1.767(n)*; *see also 47 C.F.R. §§ 1.10000 et seq.,* and is available for viewing though IBFS once it is filed. IBFS includes a Submarine Cable Landing Pending Application List as a pre-defined report, and also allows for searches for pending applications, as well as current cable landing licenses.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[35]

The Daily Digest is available on the FCC website at *www.fcc.gov/Daily_Releases/Daily_Digest*.

[36]

One can subscribe to the Daily Digest through the FCC website at *www.fcc.gov/Daily_Releases/Daily_Digest/subscribe.html*.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[37]

NOAA rules require that the state notify Federal agencies, applicants and the Director of OCRM of unlisted activities affecting any coastal use or resource which require state review within thirty days from notice of the application. If the state does not provide notice within the thirty day period it waives the right to review the unlisted activity. See *15 C.F.R. § 930.54*. Due to the fact that states will be considered to have received constructive notice of an application for a cable landing license upon the FCC's issuance of a public notice, which can be found on the Commission's website at *www.fcc.gov*, the thirty-day period for a state to assert CZMA rights would likely expire before the

25 FCC Rcd 15706, *15710;  2010 FCC LEXIS 6540, **16

applications for transfer of control **[*15711]** or assignment of a cable landing station license or modification that do not affect the construction of a submarine cable system or cable landing station are not subject to a consistency review and are eligible for the streamlined grant procedures. [38]

**[**17]**

14. *Third,* we reject NASCA's argument that the Commission erred in assessing the burdens and benefits of its CZMA rules. NASCA argues that the Commission underestimated the burdens imposed by the CZMA rules. While there may be some potential processing delay, in most instances the applicant may be able to minimize that delay by working with affected states on consistency review issues, as we pointed out in the *Report and Order.* [39] Further, NASCA argues that the Commission "needlessly gut[ted] the Commission's streamlined processing rules." [40] NASCA also argues that the Commission failed to reconcile its new rules with its policy of encouraging investment and infrastructure development. The Commission's obligation to comply with the CZMA precludes it from processing cable landing license applications without regard to whether an application is subject to state consistency review under section 1456(c)(3)(A). Furthermore, as NASCA itself repeatedly points out, no state to date has included the FCC's cable landing **[**18]** license as a listed activity. [41] Thus, there has been no change in the availability of streamlined treatment for an application for a cable landing license.

15. With the above-discussed clarification of our rules, we anticipate that the CZMA requirements will rarely if ever disrupt the streamlined processing of cable landing license applications. Unless a state were to change its coastal management program to include FCC cable landing licenses as a

---

Commission would ordinarily act on a pending application, whether or not the application qualifies for streamlined processing. Section 1.767(i) of the Commission's Rules, *47 C.F.R. § 1.767(i)*, specifies that the Commission will take action upon an application eligible for streamlined processing within 45 days after the release of the Public Notice announcing it has been accepted for filing and is eligible for streamlined processing, or within 90 days after the Public Notice if the application is ineligible for, or the applicant does not seek, streamlined processing. In the event that the Commission receives notification from a state that it has requested to review the application as an unlisted activity during the streamlining public notice period, then the Commission by Public Notice will withdraw the application from streamlined processing and process the application on a non-streamlined basis.

38

*See Report and Order, 22 FCC Rcd at 11416*, P 52.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

39

*Id. at P 52* & n.136.

40

*See Petition for Reconsideration* at 16-17.

41

*See, e.g., id.* at 7, 8.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

EXHIBIT 3
Page 9 of 17

listed activity, or were to timely request NOAA approval for consistency review of a particular cable landing application as an unlisted federal license activity, there would be no change to our streamlined process. [42] We have minimized licensee burdens associated with compliance with the CZMA by removing any ambiguity about the consistency certification that section 1456(c)(3)(A) requires to be included in the application (with a copy to **[**19]** the state) if this is a listed activity, [43] and clarifying the requirements with respect to states that do not list this type of application in their federally approved state programs. As long as no state amends its coastal management program to designate this type of application as a listed activity, the Commission must remove from streamlined processing only those applications that a state, within thirty days of constructive notice of the application, has identified as involving an unlisted activity that it believes requires consistency review. In that case, the applicant would be required to amend its application to submit a consistency certification (with a copy to the state) only if OCRM ultimately approved state consistency review of the unlisted activity. In that event, a delay of up to six months from the original Federal agency notice to the state agency or three months after the state receives the **[*15712]** applicant's required consistency certification, whichever period terminates last, is unavoidable under applicable statutory and regulatory provisions. [44]

**[**20]**

16. *Fourth,* NASCA argues that the Commission's CZMA rules are unworkable. NASCA argues that it can be difficult for an applicant to determine whether or not a state requires a consistency **[**21]** certification for a cable landing license. [45] In an *ex parte* presentation, NASCA also argues that, under the CZMA rules, applicants face a "Catch 22" in Florida. [46] NASCA states that to obtain approval for undersea cable installations, Florida requires applicants

---

[42]

*See* note 37 *supra.*

[43]

*16 U.S.C. § 1456(c)(3)(A)* ("At the earliest practicable time, the state or its designated agency shall notify the Federal agency concerned that the state concurs with or objects to the applicant's certification. If the state or its designated agency fails to furnish the required notification within six months after receipt of its copy of the applicant's certification, the state's concurrence is conclusively presumed.").

[44]

*15 C.F.R. § 930.54* ("For purposes of this section, concurrence by the State agency shall be conclusively presumed in the absence of a State agency objection within six months from the original Federal agency notice to the State agency [that the application was filed with the federal licensing agency] or within three months from receipt of the applicant's consistency certification and necessary data and information, whichever period terminates last.").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[45]

*See Petition for Reconsideration* at 19-20.

[46]

NASCA Reply Comments.

EXHIBIT 3
Page 10 of 17

to first obtain and submit a copy of their cable landing license. [47] Thus, NASCA argues that under the CZMA rules, there is no way to obtain the federal and state approvals needed to land an undersea cable in Florida. [48] We disagree. We note that there is no current requirement that a cable landing license application must include a certification regarding the consistency of proposed activities with Florida's coastal management program, because Florida has not included FCC cable landing licenses as a listed activity in its coastal management plan. Consequently, with the clarification to our rules discussed above, there is no "Catch-22" situation in Florida, because the certification requirement only applies to listed activities and Applicants only need to comply with the procedures for unlisted activities discussed above. [49] We further note that any problem with Florida's specific situation that may arise in the future **[\*\*22]** could be addressed in consultation among the affected parties, including the state licensing agency, the FCC, and the Director of OCRM, as would be required if Florida were to amend its coastal management program to designate this type of application as a listed activity or to receive approval to review a particular application as an unlisted activity. [50] Thus, if Florida amends its coastal management program to designate a cable landing license application as a listed activity, the FCC will take appropriate steps to address NASCA's concerns.

17. NASCA also argues that the rules are unworkable because cable landing license applications will not contain, and applicants may not possess, sufficient information for a state to make a consistency decision. We disagree. The new rules do not change what applicants **[\*\*23]** for a cable landing license are required to provide the FCC other than the certification requirements necessary to alert the Commission of any outstanding state consistency review and to ensure Commission compliance with the CZMA. The new requirements relate to assuring compliance with the CZMA, and, as discussed above, we defer to NOAA's expertise in the applicability of the consistency review procedures specified in the CZMA.

18. *Fifth,* we reject NASCA's argument that the Commission's CZMA rules are inconsistent with WTO commitments regarding licensing criteria. [51] In this regard, NASCA argues that the

---

47

*Id.* at 2.

48

*Id.*

49

*See* para. 11, *supra.*

50

*See* 15 C.F.R. § 930.53(c).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

51

*See Petition for Reconsideration* at 21-22.

EXHIBIT 3
Page 11 of 17

Commission must publicly disclose the period of time normally required to reach a decision concerning **[*15713]** an application for a license. [52] Our CZMA procedures, as clarified herein, interject no ambiguity concerning the time normally required to reach a decision on a license application. Rather, as required by our WTO commitments, all license processing requirements, including any delays attributable to CZMA, are transparent and spelled out in the applicable statutes and rules. [53] Moreover, for the reasons set forth above, we anticipate minimal disruption to our streamlined processing **[**24]** of cable landing license applications as a result of these procedures. Where there would be an unavoidable processing delay related to NOAA authorization of state consistency review of an unlisted activity, the extent of the delay is limited by provisions that prescribe strict time periods for the state's response to the applicant's consistency certification. [54] Moreover, consistent with our WTO commitments and to rapid infrastructure deployment through expedited application processing, the Commission will process any such application as expeditiously as possible once state consistency review has been completed and any statutory impediment to grant of the federal license is removed.

19. In addition, NASCA also petitioned the Commission to defer the effective date of the certification requirement pending resolution of the *Petition for Reconsideration.* We find that NASCA's request **[**25]** to defer the effective date of the rules is moot since the Commission did not put the new rules into effect while NASCA's *Petition for Reconsideration* was pending.


## IV. CONCLUSION

20. We grant, herein, NASCA's *Petition for Reconsideration* to the extent we modify our rules to clarify that in order to qualify for streamlined processing the applicant need only certify that the proposed submarine cable will not be located in or impact any state that requires review of FCC cable landing applications as a "listed" activity in its coastal management plan. We also clarify that for "unlisted" activities, the release of the accepted-for-filing Public Notice for the cable landing license application provides the states with constructive notice of the application. Thus the thirty-day period for a state to request a review of the application as an unlisted activity under NOAA rules will commence with the release of the accepted-for-filing Public Notice. [55] Also

---

52

*Id.*

53

*See* n.37, *supra.*

54

*Id.*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

55

*See* 15 C.F.R. § 930.54.

EXHIBIT 3
Page 12 of 17

there is no requirement to include a consistency certification in a cable landing license application filed under section 1.767 of the Commission's Rules unless FCC licensing is a listed activity in a state's coastal management **[\*\*26]** plan (though the application must be updated to include a consistency certification if NOAA subsequently authorizes state consistency review of the application as an unlisted activity). We otherwise deny NASCA's *Petition for Reconsideration.*

## V. ADMINISTRATIVE MATTERS

## A. Final Regulatory Flexibility Certification

21. The Regulatory Flexibility Act of 1980, as amended (RFA) [56] requires that a Regulatory Flexibility Act analysis be prepared for notice-and-comment rule making proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." [57] The RFA generally defines the term "small entity" as having the same **[\*15714]** meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [58] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. [59] A "small business concern" **[\*\*27]** is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA). [60]

**[\*\*28]**

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

56

*See* [5 U.S.C. § 603](#). The RFA, *see* 5 U.S.C. § 601 - 602, has been amended by the ***Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996)***.

57

[5 U.S.C. § 605(b)](#).

58

*Id.*

59

[5 U.S.C. § 601(3)](#) (incorporating by reference the definition of "small-business concern" in the Small Business Act, ***15 U.S.C. § 632***). Pursuant to [5 U.S.C. § 601(3)](#), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such terms which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

60

***15 U.S.C. § 632***.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

EXHIBIT 3
Page 13 of 17

22. In the NPRM, the Commission certified that the rules proposed in this proceeding would not have a significant economic impact on a substantial number of small entities. [61] This Order on Reconsideration will amend the submarine cable landing rules to require applicants to include information regarding an applicant's compliance with the Coastal Zone Management Act of l972. Although the majority of submarine cable landing license applicants are not considered small entities, the rule changes affecting these applicants are nominal and will ensure that our rules are consistent with the Coastal Zone Management Act of 1972. Therefore, we find that the rules adopted in this Order on Reconsideration will not have a significant economic impact on a substantial number of small entities.

23. **Report to Congress.** The **[**29]** Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, in a report to Congress. [62] In addition, the Commission will send a copy of the Order, including a copy of the Final Regulatory Flexibility Certification, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and Final Regulatory Flexibility Certification will also be published in the Federal Register. [63]

## B. Final Paperwork Reduction Act of 1995 Analysis

24. This Report and Order contains either new or modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office Of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the modified information collection requirements contained in this proceeding. **[**30]** In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law No. 107-198, (*see 44 U.S.C. § 3506 (c)(4)*), the Commission previously sought specific comment on how the Commission might "further reduce the information collection burden for small business concerns with fewer than 25 employees."

25. All comments regarding the requests for approval of the information collection should be submitted to Judith B. Herman, Federal Communications Commission, Room 1-C804, 445 12 nth Street, SW, Washington, DC 20554, or via the Internet to *Judith-B.Herman@fcc.gov*; phone 202-418-0214.



61

*See NPRM, 19 FCC Rcd at 4249*, P 43.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

62

*See 5 U.S.C. § 801(a)(1)(A).*

63

*See 5 U.S.C. § 605(b).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## VI. ORDERING CLAUSES

26. For the reasons discussed above, IT IS ORDERED, pursuant to Sections 1, 4(i), 4(j), and 5, of the Communications Act of 1934, as amended, *47 U.S.C. §§ 151*, 154(i), 154(j), 155, sections 34-39 of the Cable Landing License Act, *47 U.S.C. §§ 34-39*, and Sections 1.3 and 1.115 of the Commission's **[*15715]** rules, *47 C.F.R. §§ 1.3*, 1.115, that the *Petition for Reconsideration* of the Commission's *Report and Order* filed by NASCA is GRANTED to the extent described in this Order and **[**31]** is otherwise DENIED.

27. IT IS FURTHER ORDERED that, pursuant to Sections 1, 4(i), 4(j), and 5 of the Communications Act of 1934, as amended, *47 U.S.C. §§ 151*, 154(i), 154(j), 155, and sections 34-39 of the Cable Landing License Act, *47 U.S.C. §§ 34-39*, Part 1 of the Commission's rules IS AMENDED as set forth in the APPENDIX.

28. IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this REPORT AND ORDER, including the Final Regulatory Flexibility Act Certification, to the Chief Counsel for Advocacy of the Small Business Administration in accordance with section 603(a) of the Regulatory Flexibility Act, *5 U.S.C. § 601 et seq.*

29. IT IS FURTHER ORDERED that the Regulatory Flexibility Certification, as required by section 604 of the Regulatory Flexibility Act and as set forth above IS ADOPTED.

Marlene H. Dortch

Secretary

## Appendix

**[*15716]  APPENDIX**

**Final Rules**

Part 1 of the Commission's rules are amended as follows:

PART 1 -- PRACTICE AND PROCEDURE

1. The authority citation for part 1 continues to read as follows: Authority:  **[**32]** *47 U.S.C. §§ 151*, 154(i), 154(j), 155, 225, 303(r), and 309.

2. Section 1.767 is amended by amending note to paragraph (a)(10).

(a) ****

EXHIBIT 3
Page 15 of 17

25 FCC Rcd 15706, *15716;  2010 FCC LEXIS 6540, **32

Note to paragraph (a)(10) -- Applicants for cable landing licenses may be subject to the consistency certification requirements of the Coastal Zone Management Act (CZMA), *16 U.S.C. § 1456*, if they propose to conduct activities, in or outside of a coastal zone of a state with a federally-approved management plan, affecting any land or water use or natural resource of that state's coastal zone. Before filing their applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system, applicants must determine whether they are required to certify that that their proposed activities will comply with the enforceable policies of a coastal state's approved management program. In order to make this determination, applicants should consult National Oceanic Atmospheric Administration (NOAA) regulations, 15 C.F.R. Part 930, Subpart D, and review the approved management programs of coastal states in the vicinity of the proposed **[\*\*33]** landing station to verify that this type of application is not a listed federal license activity requiring review. After the application is filed, applicants should follow the procedures specified in *15 C.F.R. § 930.54* to determine whether any potentially affected state has sought or received NOAA approval to review the application as an unlisted activity. If it is determined that any certification is required, applicants shall consult the affected coastal state(s) (or designated state agency(ies)) in determining the contents of any required consistency certification(s). Applicants may also consult the Office of Ocean and Coastal Management (OCRM) within NOAA for guidance. The cable landing license application filed with the Commission shall include any consistency certification required by section 1456(c)(3)(A) for any affected coastal state(s) that lists this type of application in its NOAA-approved coastal management program and shall be updated pursuant to section 1.65 of the Commission's rules, *47 C.F.R. § 1.65*, to include any subsequently required consistency certification with respect to any state that has received NOAA approval to review the application as an unlisted federal **[\*\*34]** license activity. Upon documentation from the applicant--or notification from each coastal state entitled to review the license application for consistency with a federally approved coastal management program--that the state has either concurred, or by its inaction, is conclusively presumed to have concurred with the applicant's consistency certification, the Commission may take action on the application.

3. Section 1.767 is amended by amending (k)(4).

(k) \*\*\*\*

(4) Certifying that for applications for a license to construct and operate a submarine cable system or to modify the construction of a previously approved submarine cable system the applicant is not required to **[\*15717]** submit a consistency certification to any state pursuant to section 1456(c)(3)(A) of the Coastal Zone Management Act (CZMA), *16 U.S.C. § 1456*.

Note to paragraph (k)(4) -- Streamlining of cable landing license applications will be limited to those applications where all potentially affected states, having constructive notice that the application was filed with the Commission, have waived, or are deemed to have waived, any section 1456(c)(3)(A) right to review the application within the **[\*\*35]** thirty-day period prescribed by *15 C.F.R. § 930.54*.

---

**End of Document**