# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDING, S.A.,**<br>**d/b/a DIGICEL-HAITI**, | Case No. 3:15-cv-185-SI |
| Plaintiff, | **OPINION AND ORDER ON MOTIONS**<br>***IN LIMINE* AND OTHER**<br>**OBJECTIONS** |
| v. | |
| **UPM TECHNOLOGY, INC. and**<br>**DUY BRUCE TRAN**, | |
| Defendants. | |

Robert C.L. Vaughan, Cherine Smith Valbrun, Leah B. Storie, and Anisha Carla Atchanah, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394; Anne M. Talcott, Kathryn E. Kelly, Andrew J. Lee, and Matthew R. Berry, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; and Kent D. Bressie, HARRIS, WILTSHIRE & GRANNIS LLP, 1919 M Street, N.W., Washington, DC 20036. Of Attorneys for Plaintiff.

Christopher W. Savage and Katherine D. Sheriff, DAVIS WRIGHT TREMAINE LLP, 1919 Pennsylvania Avenue NW, Suite 800, Washington, DC 20006; and Kathryn P. Salyer, Eleanor A. DuBay, and Blake Van Zile, TOMASI SALYER MARTIN, 121 SW Morrison Street, Suite 1850, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

On January 18, 2022, the Court granted in part and denied in part the parties' cross-

motions for summary judgment. ECF 294. Among other things, the Court bifurcated and stayed

all counterclaims asserted by Defendant UPM Technology, Inc. (UPM) against Plaintiff

Unigestion Holding, S.A., doing business as Digicel-Haiti, Inc. (Digicel-Haiti). The Court also

dismissed Digicel-Haiti's allegations of fraud by affirmative misrepresentations, half-truths, or

omissions, leaving for trial only a single claim (with two counts), alleging fraud by active

concealment, in violation of Oregon common law. The Court ruled that this claim may proceed

to trial against UPM and its founder and Chief Executive Officer, Duy Bruce Tran. *Id*. On

October 4, 2022, the Court granted Digicel-Haiti's motion to stay UPM's counterclaims pending

resolution of issues by the Federal Communications Commission (FCC). ECF 442. The Court

has scheduled a jury trial on Digicel-Haiti's two counts of fraud by active concealment to begin

on November 14, 2022. Now before the Court are the parties' motions *in limine*, as well as other

evidentiary issues and objections. In this Opinion and Order, the Court resolves many of the

parties' motions and objections. Any motion or objection not expressly resolved below is

reserved for trial or separate order.

For purposes of resolving these pretrial issues, the Court notes that it previously

concluded in its summary judgment decision (ECF 294) that Digicel-Haiti failed to show a

genuine dispute for trial regarding whether UPM made to Digicel-Haiti any affirmative

misrepresentations, half-truths, or omissions while under a duty to disclose, and whether UPM

"cloned" any SIM cards.[1] The sole issue remaining for trial is whether Defendants employed

---

[1] "SIM" is an acronym for "Subscriber Identity Module." Each SIM card contains a unique identification number and other information used to "authenticate" the card on a telecommunication carrier's network, enabling the card to be used to make calls. Typically, an individual mobile phone user would purchase a SIM card to be used for making calls from a specific mobile phone, or handset. The SIM card would often include a certain monetary value, or "prepaid" amount, but could be recharged, or "topped off," with new payments. If a carrier, such as Digicel-Haiti, deactivated (or de-authenticated) a SIM card, that card could no longer be used to make calls.

human behavior simulation (HBS) software for the purpose of actively concealing the fact that calls routed by UPM from the United States to Digicel-Haiti's network in Haiti were not being made by individual subscribers who were customers of Digicel-Haiti, and, if so, whether such fraud by active concealment caused damage to Digicel-Haiti and, if so, in what amount.

## I.  BACKGROUND

Digicel-Haiti owns and operates a wireless telecommunications network in Haiti. UPM is a telecommunications company based in Hillsboro, Oregon. In general, it is more expensive to place an international call from the United States to Haiti than it is to place a local call within Haiti, even when both calls end (or terminate) with a customer in Haiti on Digicel-Haiti's wireless network. Digicel-Haiti charges at least $0.23 (23 cents) per minute for international calls from the United States to Haiti and approximately $0.09 (9 cents) per minute for local calls within Haiti. In the telecommunications industry, making a phone call is also referred to as "terminating" a call.

Plaintiff alleges that UPM terminated international calls on Digicel-Haiti's network without paying Digicel-Haiti's rate for terminating international calls. Digicel-Haiti alleges that UPM accomplished this by fraudulently concealing its activities, as explained more fully below.

Digicel-Haiti alleges two different ways that UPM circumvented Digicel-Haiti's international pricing. Digicel-Haiti calls these two methods "traditional bypass" and "Roam Like You Are Home bypass," or "RLYH bypass." UPM uses the labels "in-country bypass" for the first way and simply "Roam Like You Are Home service," or just "RLYH," for the second way.

For both methods, Digicel-Haiti alleges that UPM used a combination of telecommunications technology and the Internet to "bypass" Digicel-Haiti's international rate. UPM allegedly did this by acquiring Digicel-Haiti's SIM cards, which are small computer chips often put in cell phones that allow a cellular device to access a cellular network. For example, if

a phone has a Digicel-Haiti SIM card, then the Digicel-Haiti cellular network could recognize that phone and card as valid and give it access to Digicel-Haiti's wireless network in Haiti. UPM used prepaid Digicel-Haiti SIM cards to access its wireless network. This means that UPM's calls would go through to Haiti only if the SIM card's account had enough money to make the call. When the money in an account ran out, a call could disconnect, even if the SIM card was valid.

When a call originates in the United States and terminates in Haiti through Digicel-Haiti's network, it usually goes through one of Digicel-Haiti's two "international switches" located in the United States. These switches let Digicel-Haiti recognize that an international call is coming through and charge $0.23 per minute for those calls. For traditional or in-country bypass, UPM arranged for calls coming from the United States to avoid Digicel-Haiti's international switches. Instead, UPM used computer servers in Oregon that connected calls over the Internet to UPM's Gateway devices in Haiti. This use of the Internet is sometimes known as "Voice over Internet Protocol," or VoIP. When UPM sends a call to Haiti over the Internet, the call arrives in Haiti at a device called a "Gateway." Gateways are similar to wireless radios. They transmit calls received in Haiti over the Internet from UPM's servers in the United States directly to Digicel-Haiti's local cellular network. Gateways can make multiple calls at the same time. Because UPM used these Gateways rather than Digicel-Haiti's international switches, Digicel-Haiti did not charge UPM the international rate of 23 cents per minute. Instead, Digicel-Haiti registered these types of calls sent by UPM as local calls made entirely with Haiti and charged them the local rate of about 9 cents per minute.

RLYH, or RLYH bypass, is different from traditional, or in-country, bypass. RLYH is a special discount program. By paying a subscription fee, subscribers to the RLYH program can

make calls to Haiti from the United States without paying international and roaming rates. Instead, these customers can make calls to Haiti at the local per-minute rate. Digicel-Haiti contends that RLYH is offered to customers in Haiti. UPM contends that RLYH is offered to anyone with a Digicel-Haiti SIM card, whether in Haiti or in the United States. Digicel-Haiti alleges that UPM obtained Digicel-Haiti's SIM cards and enrolled some of those cards in Digicel-Haiti's RLYH program. UPM then used its computer servers to connect international calls from the United States to Digicel-Haiti's roaming partners in the United States. Digicel-Haiti's roaming partners in the United States are U.S. telecommunications carriers that provide communications services in this country. With RLYH, Digicel-Haiti's United States roaming partners paid Digicel-Haiti the 23 cents per minute international termination rate for each RLYH call, while UPM was charged 9 cents per minute for such calls. For RLYH, UPM contends that it used Gateway radios in the United States, rather than Gateway radios in Haiti.

Digicel-Haiti sought to prevent companies like UPM from engaging in both traditional bypass and RLYH bypass in Haiti. When Digicel-Haiti believed that one of its SIM cards was being used in either of those ways, Digicel-Haiti would deactivate that card so that it could no longer be used to make calls. UPM contends that after Digicel-Haiti would deactivate a SIM card that it believed was being used for bypass, Digicel-Haiti generally would keep any money left over in that SIM card's account.

Most relevant to Digicel-Haiti's claim of fraud by active concealment, Digicel-Haiti alleges that UPM used special computer software, sometimes called "Human Behavior Simulation" software (or HBS software), when placing calls from the United States to Haiti. According to Digicel-Haiti, HBS software allowed UPM to mimic how real human beings make calls. Allegedly, this software would control when each SIM card would be used to make a call,

how long it stayed on calls, how often it made a call, and similar factors. Digicel-Haiti alleges that UPM used this HBS software to try to avoid Digicel-Haiti's efforts to detect and deactivate SIM cards being used by UPM. In other words, Digicel-Haiti alleges that UPM used Human Behavior Simulation software to commit fraud by actively concealing, or hiding, UPM's bypass and RLYH activities from Digicel-Haiti.

The Court has already ruled that bypass, by itself, is not fraud under Oregon law. Thus, the only questions of alleged fraud in this trial are: (1) whether Defendants UPM and Mr. Tran actively concealed their activities from Digicel-Haiti by using Human Behavior Simulation software; (2) if they did, whether UPM's use of HBS software caused harm to Digicel-Haiti; and (3) if it did, what is a reasonable estimate of that harm, without speculating. Specifically, the first question is whether UPM and Mr. Tran used Human Behavior Simulation software to mimic the patterns of individual human callers to disguise the fact that they were a business using multiple SIM cards and terminating multiple calls on Digicel-Haiti's network. UPM and Mr. Tran deny using HBS, and Digicel-Haiti alleges that they did.

## II.  MOTIONS *IN LIMINE*

### A.  Plaintiff's Motions *in Limine*

Plaintiff has filed an amended set of twelve motions *in limine*. ECF 452. Defendants responded (ECF 469), and Plaintiff replied (ECF 478). The Court addresses each motion as follows.

#### 1.  Plaintiff's MIL 1: DIGICEL-HAITI'S 2018 SERVER CRASH

RULING: GRANTED IN PART AND DENIED IN PART.

Digicel-Haiti experienced a server crash in 2018 that caused data saved on backup files to become corrupted or otherwise inaccessible. Email communications archived in this server were lost in this crash. After a diligent search, Digicel-Haiti retrieved some email communications

from key people that were available on local machines. Digicel-Haiti moves to exclude any mention of its server crash or speculation regarding what any purported missing documents might have shown. Defendants do not oppose the motion to the extent that they will not ask Plaintiff's witnesses about missing emails. To this extent, the Court grants in part Plaintiff's MIL 1.

Defendants, however, explain that Plaintiff's Call Detail Records (CDRs) and related network data remain missing. Defendants ask the Court to instruct the jury: "You may, but are not required to, draw an inference that by reason of the loss of the Call Detail Records and related information, the lost evidence was unfavorable to Digicel-Haiti." ECF 473 at 9 (Defendants' Proposed Jury Instructions). Defendants neither contend nor present any evidence that Digicel-Haiti "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e). Thus, pursuant to Rule 37(e)(2), as amended in 2015, the Court may not "instruct the jury that it may or must presume the information was unfavorable to the party." *Id*. The cases cited by Defendants in support of their proposed jury instruction do not address the 2015 amendment to Rule 37(e).

The Court finds that Digicel-Haiti's loss of information prejudices Defendants in their ability to present defenses on both liability and damages. Accordingly, Defendants may present evidence and argument regarding Digicel-Haiti's loss of information. The Court finds that allowing Defendants to do so is a measure "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). To this extent, the Court denies in part Plaintiff's MIL 1.

### 2. Plaintiff's MIL 2: FEES IMPOSED BY THE HAITIAN GOVERNMENT
RULING: DENIED IN PART.

Plaintiff moves to exclude references to the Haitian government's spending or its taxation of international calls. The Court agrees that, in general, these issues are legally irrelevant.

Defendants, however, argue that the Haitian government imposed a 5 cents per minute fee on incoming international calls for which Digicel-Haiti charged a total of 23 cents per minute. On October 27, 2022, during his Rule 702 hearing, Digicel-Haiti's expert witness Charles Castel confirmed this and explained that 5 cents per minute is a fee, not a tax, charged by the government of Haiti. Defendants assert that the Haitian government does not impose this fee on calls found to be terminated in Haiti through bypass. Thus, according to Defendants, they should be permitted to argument that if Digicel-Haiti has been damaged by not being able to charge the full 23 cent per minute international rate, only 18 cents per minute accurately reflects Digicel-Haiti's loss. The Court will allow Defendants to present this evidence in response to Digicel-Haiti's theory of damage.

### 3. Plaintiff's MIL 3: DISMISSED INDIVIDUAL DEFENDANTS

RULING: GRANTED.

Plaintiff moves to exclude any reference to the dismissal of Defendants Tyler Allen, Balthazar Ruiz, and Benjamin Sanchez. Defendants do not oppose this motion. The Court grants Plaintiff's MIL 3.

### 4. Plaintiff's MIL 4: COMMUNICATIONS ACT OF 1934

RULING: GRANTED.

Plaintiff moves to exclude references to evidence that is relevant only to UPM's bifurcated and stayed counterclaims. Defendants do not oppose this motion. Defendants, however, object to any blanket prohibition on Defendants' ability to refer to the Communications Act of 1934 and what Defendants contend are Plaintiff's obligations under that law. Defendants argue that Plaintiff must prove that it had a right under United States law to deactivate the SIM cards that UPM was using. Defendants also argue that they have the right to argue that Digicel-Haiti entered and was bound by an "implied-in-fact" contract that required Digicel-Haiti to

permit UPM to use the SIM cards that it acquired. The Court disagrees. Whether Digicel-Haiti violated United States by deactivating UPM's SIM cards and even whether an implied-in fact contract existed between Digicel-Haiti and UPM will be addressed after the FCC addresses the issues that are the subject of the Court's ruling on primary jurisdiction. The Court grants Plaintiff's MIL 4.

### 5.  Plaintiff's MIL 5: FCC POLICIES

RULING: GRANTED.

Plaintiff moves to exclude references to the FCC and its rules, regulations, and policies. The Court agrees that these issues are legally irrelevant. Defendants, however, argue that Digicel-Haiti must prove that UPM acted with fraudulent intent and that UPM's awareness of certain FCC policies that encouraged and even supported bypass tends to negate any inference of UPM's fraudulent intent. The Court disagrees with Defendants. The relevant intent issue is whether Defendants had the intent to deceive or mislead Digicel-Haiti by using human behavior simulation software. Even if Defendants believed that Digicel-Haiti had no legal right to deactivate UPM's SIM cards, that is irrelevant to the issue of whether Defendants intended to deceive and mislead Digicel-Haiti so that Digicel-Haiti could not deactivate those cards.[2] If Defendants are correct about the illegality of Digicel-Haiti's conduct, that can be addressed after the FCC's proceedings have concluded. The Court grants Plaintiff's MIL 5.

### 6.  Plaintiff's MIL 6: OTHER LITIGATION INVOLVING PLAINTIFF

RULING: GRANTED.

---

[2] The Court, however, is still considering whether Defendants' belief that Digicel-Haiti's conduct was illegal might be relevant to Digicel-Haiti's claim for punitive damages. If it is relevant, then such evidence would be admissible for that limited purpose so long as Digicel-Haiti seeks punitive damages. The parties have leave further to brief this question.

Plaintiff moves to exclude references to other, or "outside," litigation involving Digicel-Haiti or affiliated entities Digicel USA, Inc. (Digicel-USA) and Digicel Holding, Ltd. and their corporate officers. Defendants do not oppose this motion on the condition that Plaintiff also is precluded from referring to any outside litigation involving UPM or Mr. Tran. The Court grants Plaintiff's MIL 6. Neither party may refer to any other litigation regarding any other party without prior leave of the Court.

### 7.  Plaintiff's MIL 7: PURCHASING SIM CARDS FROM DIGICEL-HAITI

RULING: GRANTED.

Plaintiff moves to exclude references or argument about UPM purchasing SIM cards directly from Digicel-Haiti. Defendants do not oppose this motion. The Court grants Plaintiff's MIL 7.

### 8.  Plaintiff's MIL 8: BUYING RECHARGES, TOP-UPS, AND RLYH

RULING: GRANTED IN PART AND DENIED IN PART.

Plaintiff moves to exclude all evidence, references, and argument that UPM purchased SIM cards, recharges/top-ups, and RLYH plans directly from Digicel-Haiti if "offered to support Defendants' First and Second Affirmative Defenses of Payment and Justification." ECF 452 at 7-8. Digicel-Haiti explains that it "is concerned that in support of its first and second affirmative defenses, Defendants will suggest or otherwise imply that UPM purchased the SIM cards directly from Digicel-Haiti even though the record evidence is that no direct purchase from Digicel-Haiti occurred." *Id*. at 8. As the Court ruled in granting Plaintiff's MIL 7, Defendants may not present evidence or argument, or even imply, that UPM purchased SIM cards or recharges/top-ups "directly" from Digicel-Haiti. The Court, however, will not preclude UPM from presenting evidence or arguing that the only way for UPM to have sent calls using RLYH would be if UPM first electronically enrolled a SIM card with Digicel-Haiti in its RLYH program. The Court also

will not preclude UPM from presenting evidence or arguing that it is entitled to a credit against any damages owed to Digicel-Haiti for the amounts that UPM paid but could not use after Digicel-Haiti deactivated UPM's SIM cards.

### 9. Plaintiff's MIL 9: THIRD AFFIRMATIVE DEFENSE – UNCLEAN HANDS

RULING: GRANTED.

Plaintiff moves to exclude all references and argument to Defendants' Third Affirmative Defense of "unclean hands." Plaintiff argues that "unclean hands" is an equitable defense that presents questions for the Court, not the jury, citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245-46 (1933). ECF 452 at 8-9. The Court agrees and grants Plaintiff's MIL 9. As previously noted, however, the Court will not preclude UPM from arguing that it is entitled to a credit on any alleged damages owed to Digicel-Haiti for the amounts that UPM paid but could not use after Digicel-Haiti deactivated UPM's SIM cards, if there is evidence that Digicel-Haiti kept all or some of the money received.

### 10. Plaintiff's MIL 10: DIGICEL USA

RULING: GRANTED IN PART AND DENIED IN PART.

Plaintiff correctly notes that Digicel USA was dismissed from this litigation. *See* ECF 188. Plaintiff argues that the Court should exclude any evidence regarding Digicel USA "that solely supports Defendants' unclean hands and illegality affirmative defenses" or UPM's stayed counterclaims. ECF 452 at 9-10. To this extent, the Court grants in part Plaintiff's MIL 10.

Defendants, however, note that they may refer to the existence or function of Digicel USA in routing calls to Digicel-Haiti. Defendants also state they will not characterize Digicel USA's role in getting traffic from the United States to Haiti as "illegal" or "inappropriate." To this extent, the Court denies in part Plaintiff's MIL 10.

**11. Plaintiff's MIL 11: "MONOPOLY" AND "ANTI-COMPETITIVE"**

RULING: GRANT IN PART AND DENIED IN PART.

Plaintiff moves to exclude any reference to the terms "monopoly," "anticompetitive," or any similar words or expressions. Plaintiff asserts that these terms are irrelevant in the trial of Digicel-Haiti's claim of fraud by active concealment against UPM and Mr. Tran. In response, Defendants state that Digicel-Haiti has a monopoly or near-monopoly on the provision of telephone service in Haiti and has an absolute monopoly on getting calls to its own customers in Haiti. According to Defendants, this fact is relevant to understanding why the FCC's prohibition on resale restrictions applies to Digicel-Haiti's offering of RLYH service. The Court, however, has ruled, including in this Opinion and Order, that the FCC's rules, regulations, and policies are not relevant to any of the issues to be tried in the November 14th trial.

Defendants also argue that Digicel-Haiti must prove that Defendants acted with fraudulent intent and, to the extent that Defendants' intent was related to or developed in the context of Digicel-Haiti's status as possessing market power, it would be inappropriate to preclude testimony on that point. Although the Court agrees that Digicel-Haiti must prove fraudulent intent, the fact that Digicel-Haiti has (or may have) monopoly power is irrelevant to the question of whether Defendants acted with the requisite fraudulent intent to engage in active concealment of their activities.

But Digicel-Haiti also seeks punitive damages. The Court will allow UPM's witnesses to testify about the reasons why they did what they did so that the jury may consider that evidence in connection with Digicel-Haiti's claim for punitive damages. This may include testimony about how UPM viewed Digicel-Haiti and its pricing power and decisions. UPM, however, may not inquire from Digicel-Haiti's witnesses any information about Digicel-Haiti's pricing power or decisions for the purpose of corroborating that Digicel-Haiti may have held monopoly power or

engaged in supra-competitive pricing. Although perhaps marginally relevant, any probative value would be substantially outweighed by the risk of jury confusion or unfair prejudice to Digicel-Haiti. Accordingly, the Court precludes such evidence and argument under Rule 403 except that the Court will allow questioning of UPM's personnel when relevant to UPM's intentions.

### 12. Plaintiff's MIL 12: J. GILLAN AND D. WOOD.

RULING: GRANTED.

Plaintiff moves to exclude the testimony of UPM's expert witnesses Joseph Gillan and Don Wood from testifying during the trial that is scheduled to begin on November 14, 2022. Defendants do not oppose this motion. ECF 469 at 18. The Court grants Plaintiff's MIL 12.

## B.  Defendants' Motions *in Limine*

Defendants have filed an amended set of twelve motions *in limine*. ECF 461. Plaintiff responded (ECF 485). The Court addresses each motion as follows

### 1.  Defendants' MIL 1: C. CASTEL, K. MCEWEN, AND P. CROSS

Defendants move to exclude all testimony from Plaintiff's witnesses Charles Castel, Kenneth McEwen, and Philip Cross, pursuant to Rule 702. On October 27, 2022, the Court held a *Daubert* hearing regarding Plaintiff's expert witness Charles Castel.

#### a.  Standards Under Rule 702

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> > (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Under *Daubert* and its progeny, including *Daubert II*,[3] a district court's inquiry into admissibility is a flexible one." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quotation marks omitted). "[T]he trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 564 (quotation marks omitted). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564. The judge must "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona*, 750 F.3d at 1043 (quoting *Alaska Rent-A-Car*, 738 F.3d at 969). In short, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70 (alteration in original) (quoting *Alaska Rent-A-Car*, 738 F.3d at 969-70).

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995).

Further, a court must assess an expert's reasoning or methodology, using, when appropriate, criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *See Estate of Barabin v. AstenJohnson, Inc*., 740 F.3d 457, 463-64 (9th Cir. 2014) (en banc). But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted).

The test "is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 598 F.3d at 564 (quotation marks omitted). "The objective of [*Daubert's* gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 149. When an expert meets the threshold established by FRE 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. *City of Pomona*, 750 F.3d at 1044. "A district court should not make credibility determinations that are reserved for the jury." *Id*.

### b. Charles Castel

The Court finds that Mr. Castel, an economist, is qualified by experience, training, and education to provide expert testimony regarding an appropriate damages model in this case. Mr. Castel opines that an appropriate damage model here involves taking a Gateway device, (1) assuming an appropriate capacity; (2) discounting that capacity by an appropriate reduction to reflect that it does not operate at full capacity one hundred percent of the time; (3) assuming

the number of minutes per day that it would be used; (4) assuming the number of days, weeks, or months used; (5) assuming an appropriate loss rate per minute; and (6) assuming an appropriate consideration for whether and how long HBS software was used. Giving his opinion on such a damage model is within his expertise and will be helpful to the jury. Further, Mr. Castel may be asked by Plaintiff's counsel to "assume" certain numbers for this model and the results yielded, if there is a good faith basis to believe that admissible evidence supporting those assumptions will be presented to the jury at trial. Mr. Castel may not, however, disclose to the jury any inadmissible hearsay or otherwise act as a conduit for the disclosure of otherwise inadmissible evidence to be presented to the jury.

In addition, Mr. Castel has an alternative damage model based on why he contends are assumptions about UPM's market share. As discussed on the record during the *Daubert* hearing, however, Mr. Castel has misunderstood or misstated those assumptions, which derive from UPM's stayed counterclaims under the Communications Act. In connection with those counterclaims, UPM's expert witness Mr. Don Wood opined about the incremental financial loss to UPM caused by Digicel-Haiti preventing UPM from reselling Digicel-Haiti's RLYH service in the United States. *See* ECF 358-3 at 2, ¶ 9 (Expert Report of Don J. Wood). According to Mr. Wood, if Digicel-Haiti would not have interfered with UPM's ability to resell RLYH services in the United States, Mr. Wood assumes that UPM would have achieved a market share of 15 percent in 2014, increasing by five percent each calendar year through 2021. *Id*. at 3, ¶ 13. That, however, is not the same as UPM's "market share" resulting from either in-country bypass or RLYH without interference by Digicel-Haiti. Thus, Mr. Castel's alternative damage model based on Mr. Wood's report is not reliable and is excluded.

### c. Kenneth McEwen

The Court finds that Mr. McEwen, a telecom engineer, is qualified by experience, training, and education to provide expert testimony explaining the basics of how bypass works in general, from an telecommunications or engineering perspective. He may not, however, refer to bypass generally as "fraud" or "illegal." He also may not testify about what bypassers "typically" do, as he has not shown an adequate foundation for that knowledge. Thus, it would be speculation. Similarly, Mr. Ewen has testified in deposition that he has no specific knowledge about what UPM has done or how UPM operates. Thus, he may not provide that testimony because it would be speculation. He may, however, be asked to assume certain facts and then explain the consequences if those assumptions are correct, provided there is a good faith basis to believe that admissible evidence supporting those assumptions will be presented to the jury at trial. Mr. McEwen may not, however, disclose to the jury any inadmissible hearsay or otherwise act as a conduit for the disclosure of otherwise inadmissible evidence to be presented to the jury

### d. Philip Cross

In response to Defendants' motion *in limine* to exclude Plaintiff's expert witness Philip Cross, Plaintiff states that "Mr. Cross has been offered as a rebuttal expert to [Defendants' expert witness] Mr. Gillan." ECF 485 at 9. Plaintiff adds that "Mr. Cross's testimony and expert opinions are *only* necessary to the extent that Defendants attempt to submit to the jury the opinions of its proposed economist, Mr. Gillan." *Id*. (emphasis in original). Defendants, however, did not oppose Plaintiff's Motion *in Limine* No. 12 to exclude the testimony of Mr. Gillan. *See* Ruling on Plaintiff's MIL 12*, supra*. Accordingly, neither Mr. Gillan nor Mr. Cross will testify at the trial commencing November 14, 2022.

## 2.  Defendants' MIL 2: M. BOUTE AND G. LABORDE AND LAY OPINIONS
RULING: GRANTED IN PART.

Defendants object to Plaintiff presenting "lay opinion" testimony outside of the scope of Rule 701 of the Federal Rules of Evidence. Defendants also object to Plaintiff's witness Maarten Boute testifying about "Haitian law" and how the law of Haiti affects Digicel-Haiti. The Court agrees with Defendants. The law of Haiti is not relevant to any of the issues at the trial that begins November 14, 2022. This testimony is excluded unless Defendants "open the door" at trial to its admission.

Defendants also object to Plaintiff's witness Gerard Laborde testifying about Digicel-Haiti's "obligations to serve the public" and the licensing, franchising, and authorizations from the Haitian Government. Again, the Court agrees with Defendants. Digicel-Haiti's obligations to serve the public and its licensing, franchising, and authorizations from the Haitian Government are not relevant to this lawsuit. This testimony will be excluded unless Defendants "open the door" at trial to its admission.

Defendants also object to any lay witnesses called by Plaintiff using words like "illegal," "unlawful," "fraud," "fraudulent," "misrepresentation," "concealment" or the like to describe UPM's conduct. The Court agrees, in general, except regarding the use of the words misrepresentation or concealment. The only issue of fraud remaining in this case is Plaintiff's allegation that Defendants engaged in fraud by active concealment by using human behavior simulation software. Because the use of that software involves "specialized knowledge within the scope of Rule 702," it does not fall within the scope of lay opinion testimony. *See* Fed. R. Evid. 701. Accordingly, Plaintiff's lay witnesses may not use these terms to describe Defendants' conduct generally, especially Defendants' bypass activities. The Court grants in part Defendants' MIL 2. Plaintiff's counsel, however, may use these terms in opening statement to describe what counsel believes the evidence at trial will show, as well as in closing argument,

regarding the specific issue of whether Defendants engaged in fraud by active concealment by using human behavior simulation software. Also, the Court will be flexible if Plaintiff's witnesses use the terms "misrepresentation" or "concealment" when discussing UPM's alleged use of HBS software.

### 3.  Defendants' MIL 3: DISMISSED CLAIMS

RULING: GRANTED IN PART AND DENIED IN PART.

Defendants move to exclude all references relating to the various claims that have been dismissed. Plaintiff may not refer to claims alleging: (1) fraud by affirmative misrepresentation, half-truth, or omission; or (2) any purported misuse of registration forms or Digicel-Haiti's Distribution Contract for Electronic Recharge. To the extent, however, that Defendants seek to exclude all references and evidence relating to Defendants' alleged scheme to avoid international calling rates by engaging in active concealment by using human behavior simulation software, the Court will reserve ruling and instead address any specific objection made at trial to a specific question, answer, or argument. Similarly, Defendants move to exclude all reference to any purported "cloning" of SIM cards. Here, much will likely depend on the context and the precise phrasing of the question. Accordingly, the Court will reserve ruling on that issue and address any specific objection made at trial.

### 4.  Defendants' MIL 4: "ILLEGAL" PURCHASE OF SIM CARDS, ETC.

RULING: GRANTED.

Defendants move to prohibit Digicel-Haiti from eliciting testimony, offering evidence or argument, or otherwise contending that UPM illegally or illegitimately purchased SIM cards, illegally or illegitimately "topped them up," or illegally or illegitimately enrolled those cards in Plaintiff's RLYH program. The includes any evidence or argument that Defendants' conduct was

"illegal" or "illegitimate" in Haiti, which the Court prohibits. The Court grants Defendants'

MIL 4. *See also* Court's ruling on Defendants' MIL 2.

### 5.   **Defendants' MIL 5: SHIPMENTS TO HAITI AND WIRE TRANSFERS**

RULING: DENIED.

Defendants move to exclude all reference, including evidence, testimony, and argument,

related to UPM's shipping of items between UPM in Oregon and its agents in Haiti, and

Defendants' wire transfers between UPM and its agents in Haiti. Defendants argue that such

evidence is inadmissible under Rule 404(b)(1). Such evidence, however, is admissible under

Rule 404(b)(2) for the purpose of proving motive, intent, and absence of mistake. Upon timely

request by Defendants, the Court will give an appropriate limiting instruction regarding this

evidence, and Defendants are invited to submit an appropriate limiting instruction for the Court's

consideration.

### 6.   **Defendants' MIL 6: OTHER INVESTIGATIONS AND THIRD PARTIES**

RULING: GRANTED IN PART.

According to Defendants, Digicel-Haiti contends that certain third parties had

investigated UPM's bypass activities in Haiti. These third parties include an entity known as

"Shields Crime & Security Consultants" (Shield CSC), the Haitian police, and the Haitian

telecommunications regulator CONATEL. Defendants state that no percipient fact witnesses

appear on Digicel-Haiti's witness list and thus any testimony about what anyone from these third

parties may have done, seen, or discovered must necessarily be inadmissible hearsay, if offered

for the truth of the matters asserted. Defendants offer, as an example, the description in Digicel-

Haiti's witness statement that Mr. Laborde will discuss the investigations of Shield CSC and

local Haitian police, including what they found. Defendants assert that none of Digicel-Haiti's

witnesses claim to have been personally involved in these activities, thus making their testimony

dependent on inadmissible hearsay. Defendants move *in limine* to exclude such evidence. The

Court will not allow Digicel-Haiti to present evidence or argument that bypass generally in

illegal or fraudulent.

In response, Digicel-Haiti argues that "[t]o the extent that Defendants seek to challenge

the admissibility of specific testimony or exhibits, such challenges should be raised at the

appropriate time—trial." ECF 485 at 15. This would allow Digicel-Haiti the opportunity to "lay

appropriate foundation" for admissibility. *Id*. at 16. Digicel-Haiti adds that certain documents are

"self-authenticating." *Id*. at 15.

The Court defers ruling on Defendants' objections to exhibits and will wait to rule on

specific objections to specific questions, answers, or exhibits until after the proponent has had a

reasonable opportunity to lay a foundation for admissibility. The Court, however, reminds the

parties of the following Federal Rules of Evidence:

> 1.      Other than what may be allowed under Rule 703, "[a]
> witness may testify only if evidence is introduced sufficient to
> support a finding that the witness has personal knowledge of the
> matter." Fed. R. Evid. 602.[4]
>
> 2.      If facts or data upon which an expert witness bases an
> opinion are otherwise inadmissible, "the proponent of the opinion
> may disclose them to the jury only if their probative value in
> helping the jury evaluate the opinion substantially outweighs their
> prejudicial effect." Fed. R. Evid. 703. (This is the reverse of

---

[4] Plaintiff asserts that "[p]ersonal knowledge can also be obtained 'though participation in the business' day-to-day affairs,'" citing *United States v. Kerley*, 784 F.3d 327, 337 (6th Cir. 2015). ECF 485 at 10 n.4. That case, however, does not allow a person who works for a business to testify with free rein about whatever factual material that person may have learned from others at the business. Instead, the case simply supports the rather unremarkable conclusion that "courts have permitted witnesses to give lay opinion testimony *about a business's policies, practices, or procedures*, based on an after-the-fact review or analysis of documents or facts, if the witness's testimony derived from personal knowledge gained through participation in the business's day-to-day affairs." *Kerley*, 784 F.3d at 337 (emphasis added). Thus, Digicel-Haiti's witnesses Boute and Laborde likely will be allowed to testify about Digicel-Haiti's "policies, practices, or procedures" to the extent such testimony is relevant.

Rule 403's exclusion of otherwise relevant and admissible evidence.)

3.    "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

In summary, the Court will not allow Digicel-Haiti to present evidence or argument that bypass is generally considered fraudulent or illegal. To the extent that Digicel-Haiti incurred expenses attempting to prevent the use of HBS software as part of a bypass program and seeks to recover those expenses as damages, the Court will not preclude that evidence or argument.

### 7.  Defendants' MIL 7: ACTIVITIES IN OTHER COUNTRIES OR TIMES

RULING: GRANTED IN PART AND DENIED IN PART, AS EXPLAINED.

Defendants move to exclude any evidence regarding UPM's business model, practices, policies, or conduct in jurisdictions other than Haiti. Defendants argue that such matters are irrelevant. The Court agrees. In addition, even if there were some modest probative value of such evidence, perhaps related to punitive damages, it would be substantially outweighed by the danger of confusing the issues, misleading the jury, and wasting time. If Digicel-Haiti were to present evidence of what UPM was doing in other countries, then UPM likely would want to present evidence refuting, distinguishing, or explaining what it was doing in other countries. This could lead to multiple minitrials far afield from the core of this case. Pursuant to Rule 403, the Court limits the trial evidence here to Defendants' actions in Haiti as well as in the United States or elsewhere that affected Digicel-Haiti in Haiti.

Defendants similarly move to exclude any evidence regarding UPM's alleged conduct in Haiti "outside the time periods at issue in this case," arguing that such evidence also is irrelevant. ECF 461 at 29. Defendants contend that, based on UPM's evidence, the only relevant time periods are: August 2011 through March 2012 and March through October 2014. In response,

Digicel-Haiti contends that the relevant timeframe of the alleged fraud at issue in "2011-2015." ECF 485 at 16. The Court will not exclude otherwise admissible evidence of Defendants' actions affecting Haiti between 2011 and 2015. Whether Defendants' only relevant actions took place between August 2011 through March 2012 and March through October 2014 appears to be disputed by the parties and should be addressed with admissible evidence at trial.

### 8.  Defendants' MIL 8: ROAMING AGREEMENTS

RULING: DEFFERRED.

Defendants move to exclude all evidence, testimony, and argument regarding the roaming agreements between Digicel-Haiti and its third-party roaming partners on the ground that Plaintiff refused to produce copies of those agreements during discovery. In response, Digicel-Haiti states that it has no intention of discussing the "financial and contractual details of its individual roaming agreements with third-party carriers." ECF 485 at 17. Instead, Digicel-Haiti explains that it merely intends to present testimony regarding what roaming agreements are and how they work to facilitate international calling. *Id*. The Court defers ruling on this motion *in limine* and will wait until trial to rule on specific objections to specific questions, answers, or exhibits.

### 9.  Defendants' MIL 9: "BYPASS" IN THE CONTEXT OF RLYH

RULING: DENIED.

Defendants move to exclude Plaintiff from using the term "bypass" when referencing UPM's activities regarding Plaintiff's RLYH program. In response, Plaintiff states that "bypass" refers to bypassing higher call rates. The Court will allow each party to define "bypass" as that party shows the evidence will support.

### 10. Defendants' MIL  10: PUNITIVE DAMAGES

RULING: RULING RESERVED FOR JURY INSTRUCTIONS.

Defendants move to limit any evidence or argument regarding punitive damages to actions that UPM allegedly took in Oregon, are illegal in Oregon, and that harmed Digicel-Haiti. The Court will not address this issue in the context of a motion *in limine*. Instead, the Court will appropriately instruct the jury on punitive damages if they remain at issue in the case.

### 11. Defendants' MIL 11: EXCLUSION OF WITNESSES

RULING: GRANTED.

The Court will exclude witnesses consistent with Rule 615. Each entity party may have one representative who is not excluded, and the Court will not exclude a party's outside expert witnesses.

### 12. Defendants' MIL 12: STATEMENTS OF COUNSEL'S KNOWLEDGE

RULING: GRANTED.

Counsel may not suggest to the jury counsel's personal knowledge of the facts or express counsel's personal opinions of the testimony, facts, credibility of witnesses, or justice of the case.

### III.  DEPOSITION DESIGNATIONS

Plaintiff has designated excerpts from the depositions of Tyler Allen and Baltazar Ruiz. Mr. Allen lives in the Portland area and is employed by UPM. He also was employed by UPM when his deposition was taken on October 29, 2021. Mr. Ruiz also lives in the Portland area. He was formerly employed by UPM and had already left UPM when his deposition was taken on October 15, 2021. Defendants object to Plaintiff's designation of deposition excerpts from these two depositions being read to the jury in lieu of live testimony. Defendants argue that these two witnesses are not "unavailable," as that term is used in Rule 32(a)(4) of the Federal Rules of Civil Procedure. In reply, Plaintiff states that it filed deposition designations out of an abundance of caution if either witness does not appear to present live testimony at trial. ECF 475 at 2. Plaintiff adds that UPM has agreed to accept service of witness subpoenas on behalf of these two

individuals. *Id*. at 2 n.1. Thus, the Court anticipates that these two witnesses will not be unavailable for trial.

## IV.  TRIAL EXHIBITS

### A.  Plaintiff's Trial Exhibits

Plaintiff's amended trial exhibit list identifies approximately 400 potential trial exhibits. ECF 448. Defendants object to every one of Plaintiff's proposed exhibits. ECF 466. The Court reserves ruling on Plaintiff's exhibits until trial. The Court, however, reminds the parties of the following Federal Rules of Evidence, which may have relevance to Plaintiff's Exhibits 400 (Haitian police report and confession of Macéus Outger), 405 (news release from Conatel), and 406 (news story from Haitilibre dated August 23, 2014):

> 1.     "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

> 2.     A record or statement of a public office may be admissible in a civil case if it sets out "factual *findings* from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii) (emphasis added). In addition, "[e]ntries in a police report based on an officer's observation and knowledge may be admitted, but statements attributed to other persons are clearly hearsay, and inadmissible under the common law exception to the hearsay rule[.]" *Colvin v. United States*, 479 F.2d 998, 1003 (9th Cir. 1973).

> 3.     When a declarant is unavailable, a statement may be admissible if it is a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3)(A). However, "[w]hether a statement is in fact against interest must be determined from the circumstances of each case. *Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as*

*against interest*." Fed. R. Evid. 804 Notes of Advisory Committee on Proposed Rules (emphasis added).

## B.  Defendants' Trial Exhibits

Defendants' trial exhibit list identifies approximately 150 potential trial exhibits. ECF 457. Plaintiff objects to all but one of Defendants' proposed exhibits. ECF 484. (Plaintiff's failure to object to Defendants' Ex. 652 may have been inadvertent.) The Court reserves ruling on Defendants' exhibits until trial.

# V.  LAY WITNESSES

## A.  Plaintiff's Lay Witnesses

Plaintiff has identified the following five lay witnesses to be called at trial: Tyler Allen, Maarten Boute, Gerard Pierre Laborde, Baltazar Ruiz, and Bruce Tran. ECF 445. Defendants object on two grounds. First, Defendants state that the witness statements are insufficiently specific to be a fair narrative statement summarizing the substance of a witness's testimony. ECF 467. Second, Defendants assert that the proposed testimony from Maarten Boute and Gerard Laborde contain inadmissible material. *Id*. Regarding Defendants' first objection, the Court will follow its Civil Trial Management Order. ECF 191. Specifically,

> Testimony at trial will be limited to the material fairly summarized in the witness statement, absent a showing of good cause for the omission, balanced against any prejudice to the opposing party. If an issue is not fairly and accurately disclosed, the Court may exclude that portion of the witness's direct examination, even though that issue may have been fully revealed during that witness's deposition.

ECF 191 at 2. Regarding Defendants' second objection, the Court will rule at trial on any timely objections to inadmissible testimony.

**B. Defendants' Lay Witnesses**

Defendants have identified the following three lay witnesses to be called at trial: Bruce Tran, Daniel Romero, and Tyler Allen. ECF 459. Plaintiff objects to the disclosed testimony of Mr. Tran and Mr. Romero, arguing that the witness statements reflect inadmissible testimony. ECF 481. The Court will rule at trial on any timely objections to inadmissible testimony.

Plaintiff also objects to the inclusion of Mr. Romero as a lay witness in this matter. Plaintiff states that "in its interrogatory responses, UPM described Mr. Romero's role and knowledge in this case as merely 'activating and recharging the SIM cards UPM used in connection with resale of Digicel-Haiti.'" ECF 481 at 4, citing ECF 483-1 at 2. Plaintiff argues:

> Now UPM seeks to have Mr. Romero testify well beyond the task of activating and recharging SIM cards to previously undisclosed topics including UPM's SIM management software, UPM's objectives in utilizing SIM cards, Digicel-Haiti's efficiency in detecting and deactivating SIM cards used by UPM, and the cost/benefit analysis UPM employed in maximizing the use of SIM cards while minimizing their detection by Digicel-Haiti. Because UPM failed to disclose any of these core topics as within Mr. Romero's knowledge prior to filing its witness statements, it should be precluded from presenting his testimony on these topics at trial.

ECF 481 at 4-5. Plaintiff then requests:

> If the Court is inclined to allow Mr. Romero's testimony, Digicel Haiti respectfully requests that Defendants confirm that Mr. Romero was personally asked to produce documents consistent with the discovery taken in this matter and that those documents were provided to Digicel Haiti. Digicel Haiti also requests that the Court order Defendants make Mr. Romero available for deposition within the next two weeks.

*Id*. at 5.

In response, Defendants states

> [I]n response to an interrogatory, UPM identified Mr. Romero as an individual who had personal knowledge of the relevant facts. Indeed, UPM stated that Mr. Romero's job title was "SIM

Manager." Later, Digicel-Haiti identified Mr. Romero as an individual who Digicel-Haiti wanted to depose. Counsel for the parties communicated extensively by email regarding the various depositions, including arranging for Mr. Romero's deposition. However, after UPM offered to make Mr. Romero available, Digicel-Haiti for whatever reason abandoned its attempt to depose him.

ECF 493 at 8 (footnotes omitted).

Plaintiff is correct that in response to Plaintiff's First Set of Interrogatories, served in 2020, Defendants stated about Mr. Romero: "Mr. Romero was a contractor to UPM, in charge of activating and recharging the SIM cards UPM used in connection with resale of Digicel-Haiti services." ECF 494 at 8. That is a far cry from what Defendants now disclose they intend to elicit from Mr. Romero on direct examination. See ECF 459 at 20-21. Among other things, Defendants now disclose regarding Mr. Romero that:

> c.      He will testify that UPM did not configure its SIM management software to mimic or simulate human behavior. To the contrary, it configured the software to randomly select a SIM and then place calls over that SIM essentially continuously until the SIM was cut off by Digicel-Haiti.

> d.      He will testify that UPM's objective regarding SIM management was to complete as many calls as possible using a SIM before it was cut off. He will testify that while he did not know what processes Digicel-Haiti used to identify UPM's SIMs, Digicel-Haiti was extremely efficient at identifying and cutting off the SIMs. This fact made it impractical for UPM to try to manage the calling pattern associated with any SIMs, because any delay in making use of a SIM created too much risk that the SIM would be cut off while it still had substantial funds in its account. Instead, as noted above, UPM's SIM management software was configured to send as many calls as possible, one after another, using a given SIM.

*Id*. at 21. The Court will allow Mr. Romero to testify at trial provided that Defendants promptly make Mr. Romero available to Plaintiffs for deposition.

## VI.  CONCLUSION

**IT IS SO ORDERED**.

DATED this 28th day of October, 2022.

_/s/ Michael H. Simon_
Michael H. Simon
United States District Judge