# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNIGESTION HOLDING, S.A., a foreign corporation, d/b/a DIGICEL HAITI**,<br><br>        Plaintiff and<br>        Counter-Claim Defendant,<br><br>   v.<br><br>**UPM TECHNOLOGY, INC., *et al.*,**<br><br>        Defendants and<br>        Counter-Claim Plaintiffs. | Case No. 3:15-cv-185-SI<br><br>**OPINION AND ORDER** |

Robert C.L. Vaughan, Cherine Smith Valbrun, Leah B. Storie, and Anisha Carla Atchanah, KIM VAUGHAN LERNER LLP, One Financial Plaza, Suite 2001, Fort Lauderdale, FL 33394; Anne M. Talcott, Kathryn E. Kelly, Andrew J. Lee, and Matthew R. Berry, SCHWABE, WILLIAMSON & WYATT PC, 1211 SW Fifth Avenue, Suite 1900, Portland, OR 97204; and Kent D. Bressie, HARRIS, WILTSHIRE & GRANNIS LLP, 1919 M Street, N.W., Washington, DC 20036. Of Attorneys for Plaintiff.

Christopher W. Savage and Katherine Dale Sheriff, DAVIS WRIGHT TREMAINE LLP, 1919 Pennsylvania Avenue NW, Suite 800, Washington, DC 20006; Eleanor A. DuBay, TOMASI BRAGAR DUBAY, 121 SW Morrison Street, Suite 1850, Portland, OR 97204; Blake Van Zile, CHENOWETH LAW GROUP PC, 5410 SW 5th Avenue, Suite 400, Portland, OR 97204; and Tacy F. Flint, Daniel Epstein, and Stephen Beemsterboer, SIDLEY AUSTIN LLP, One South Dearborn Street, Chicago, IL 60603. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

After a five-day trial, the jury returned a verdict in the amount of $5.4 million in total compensatory damages and $4.3 million in total punitive damages in favor of Plaintiff Unigestion Holding, S.A., doing business as Digicel Haiti, Inc. ("Digicel Haiti"), and against Defendants UPM Technology, Inc. ("UPM") and its founder and Chief Executive Officer, Duy "Bruce" Tran ("Mr. Tran"). The jury found that both UPM and Mr. Tran (collectively, "Defendants") had engaged in fraud by active concealment by using Human Behavior Simulation ("HBS") software to conceal the fact that they were placing international phone calls on Digicel Haiti's communications network in Haiti without paying Digicel Haiti's rate for international calls. The jury apportioned liability at 75 percent as the sole responsibility of UPM and 25 percent as the sole responsibility of Mr. Tran. The jury also awarded punitive damages against UPM in the amount of $3.6 million and against Mr. Tran in the amount of $700,000. The Court received the jury's verdict and discharged the jury but deferred entering judgment. Now before the Court is UPM's renewed motion for judgment as a matter of law and alternative motion for new trial. The Court heard oral argument, during which Mr. Tran orally joined UPM's motion and alternative motion without objection by Digicel Haiti. For the reasons explained below, the Court grants in part and denies in part UPM and Mr. Trans's renewed motion for judgment as a matter of law and denies their alternative motion for new trial.

Digicel Haiti owns and operates a wireless telecommunications network in Haiti. UPM is a telecommunications company based in Hillsboro, Oregon. Mr. Tran is the founder and Chief Executive Officer of UPM. In general, it is more expensive to place an international call from the United States to Haiti than it is to place a local call within Haiti, even when both calls end (or, "terminate") with a customer in Haiti on Digicel Haiti's wireless network. Digicel Haiti charges

at least $0.23 (23 cents) per minute for international calls from the United States to Haiti and approximately $0.09 (9 cents) per minute for local calls made within Haiti. As shown by the trial evidence, UPM terminated international calls from the United States on Digicel Haiti's network in Haiti without paying Digicel Haiti's international rate. Digicel Haiti presented evidence of two ways that UPM circumvented Digicel Haiti's international pricing. Digicel Haiti calls these two methods "traditional bypass" and "Roam Like Your Home ('RLYH') bypass."

For both methods, UPM used a combination of telecommunications technology and the internet to "bypass" Digicel Haiti's rate for international calls. When a call originates in the United States and terminates in Haiti through Digicel Haiti's network, it usually goes through one of Digicel Haiti's two "international switches" located in the United States. These switches let Digicel Haiti recognize that an international call is coming through, and Digicel Haiti then typically charges 23 cents per minute for those calls. For traditional bypass, UPM arranged for calls coming from the United States to avoid Digicel Haiti's international switches. Instead, UPM obtained Digicel Haiti's subscriber identify module ("SIM") cards in Haiti, placed these SIM cards in UPM's computer servers in Oregon, and then used these servers to connect calls over the internet to UPM's "gateway" devices in Haiti.

Gateways are wireless radios that transmit calls received in Haiti over the internet directly to Digicel Haiti's local cellular network. Gateways can make multiple calls at the same time. Because UPM used these gateways to forward calls from servers in Oregon using Digicel Haiti's SIM cards, rather using Digicel Haiti's international switches, Digicel Haiti did not recognize these calls as coming from the United States and thus did not charge UPM the international rate of 23 cents per minute. Instead, Digicel Haiti registered these calls as local calls made entirely within Haiti and thus charged only the local rate of 9 cents per minute.

RLYH, or RLYH bypass, is different from traditional bypass. RLYH is a special discount program offered by Digicel Haiti. By paying a subscription fee to Digicel Haiti, subscribers to the RLYH program can make calls to Haiti from the United States without paying international rates. Instead, these customers can make calls to Haiti at the local per-minute rate. UPM obtained Digicel Haiti's SIM cards in Haiti and enrolled some of those cards in Digicel Haiti's RLYH program. UPM then used its computer servers to connect international calls from the United States to Digicel Haiti's roaming partners in the United States. Digicel Haiti's roaming partners in the United States are U.S. telecommunications carriers that provide communications services in this country. With RLYH, Digicel Haiti's United States roaming partners paid Digicel Haiti the 23 cents per minute international termination rate for each RLYH call, while UPM was charged only 9 cents per minute for such calls.

The Court has already ruled that merely using bypass technology, by itself, is not fraud under Oregon law. Thus, as relevant to the jury's finding that Defendants committed fraud by active concealment, UPM used HBS software when placing calls from the United States to Haiti to disguise the fact that these calls were coming from computer servers in the United States using multiple SIM cards, rather than from an individual subscriber located in Haiti using only that subscriber's SIM card. Digicel Haiti presented evidence that HBS software allowed UPM to mimic how real human beings make calls. This software would control when each SIM card would be used to make a call, how long it stayed on calls, how often it made a call, and similar factors. UPM used this HBS software to try to avoid Digicel Haiti's efforts to detect and deactivate SIM cards being used by UPM. In other words, UPM used HBS software to commit fraud by actively concealing, or hiding, from Digicel Haiti UPM's bypass activities.

The jury found $5.4 million in total actual damages and specifically $1.8 million in lost net profits due to traditional bypass, $1.8 million in lost net profits due to RLYH bypass, and $1.8 million in Digicel Haiti's out-of-pocket damages. The jury determined that UPM was solely responsible for 75 percent of Digicel Haiti's actual damages and Mr. Tran was solely responsible for 25 percent of Digicel Haiti's actual damages. At trial, Digicel Haiti presented evidence only of its out-of-pocket costs and its loss of gross revenues. For the reasons explained below, the Court does not disturb the jury's findings on either liability or actual damages based on Digicel Haiti's out-of-pocket costs. Digicel Haiti, however, presented no evidence at trial of its lost net profits. Accordingly, the Court eliminates in full the jury's award of compensatory damages for lost net profits and reduces the jury's punitive damage awards by the same percentage reduction that applies to the Court's reduction of Digicel Haiti's award of compensatory damages, namely two-thirds.

## STANDARDS

### A.  Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure, judgment as a matter of law is proper if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quotation marks omitted); *see also Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (explaining that a motion for judgment as a matter of law must be granted if "the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party" (quotation marks omitted)). Because a motion under Rule 50(b) is a renewed motion, "a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law . . . that it did not first raise in its pre-verdict Rule 50(a) motion.'" *Go Daddy*, 581 F.3d at 961 (quoting *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)).

A court reviews properly raised arguments challenging the factual sufficiency of a jury's verdict for substantial evidence. That means that "the jury's verdict must be upheld if there is 'evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'" *Id.* at 963 (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)); *see also Weaving*, 763 F.3d at 1111 (noting that substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion[,] even if it is possible to draw two inconsistent conclusions from the evidence" (quotation marks omitted)).

In evaluating a motion for judgment as a matter of law, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). Further, the Court may not make credibility determinations, weigh the evidence, or "substitute its view of the evidence for that of the jury." *Krechman v. County of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (cleaned up).

## B. New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a district court may "on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation marks omitted). "Rather, the court is 'bound by those grounds that have been historically recognized.'" *Id.* (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Id.* (quoting *Montgomery Ward & Co. v.*

*Duncan*, 311 U.S. 243, 251 (1940)); *see also Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007).

Unlike a motion (or renewed motion) for judgment as a matter of law under Rule 50, when considering a motion for new trial under Rule 59 the Court is not limited to viewing the evidence in the light most favorable to the nonmoving party. *Experience Hendrix*, 762 F.3d at 842. Rather, the Court "can weigh the evidence and assess the credibility of the witnesses." *Id.* "The district court also is not limited to the grounds a party asserts to justify a new trial but may sua sponte raise its own concerns about the damages verdict." *Id.* Although a district court may view the evidence differently than the jury, it may not substitute its "evaluations for those of the jurors." *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003); *see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001) ("[A] district court may not grant a new trial simply because it would have arrived at a different verdict."); *France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892, at *1 (N.D. Cal. Mar. 2, 2015) (noting that a judge should not grant a new trial unless "left with the definite and firm conviction that a mistake has been committed" (quoting *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371-72 (9th Cir. 1987))).

A "trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). In determining the clear weight of the evidence, "the district court has the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence.'" *Id.* (cleaned up).

**DISCUSSION**

**A.  Motion for Judgment as a Matter of Law**

    **1.  Waiver**

Although "Rule 50(b) may be satisfied by an ambiguous or inartfully made motion under Rule 50(a)," a moving party waives any arguments not made in its Rule 50(a) motion. *Go Daddy*, 581 F.3d at 961 (quotation marks omitted). In its Rule 50(a) motion, UPM argued that there was insufficient evidence: (1) that UPM used HBS; (2) that any use of HBS by UPM caused any more bypass minutes than would have occurred without the use of HBS; (3) that Digicel Haiti "suffered any harm at all under any theory"; (4) of any damages or causation; and (5) that Mr. Tran was personally liable. ECF 537 at 120-22 (Tr. 1060:23-1062:2). Similarly, in UPM's supplemental briefing on its Rule 50(a) motion (ECF 516), it argued that there was insufficient evidence of proximate cause, reasonably certain damages, or harm to Digicel Haiti.

In its Rule 50(b) motion, UPM, joined by Mr. Tran, raises new arguments not previously made at trial, including: (1) that Digicel Haiti did not reasonably rely on UPM's representations; (2) that UPM's misrepresentations were not material; (3) that mitigation costs cannot serve as the sole form of actual damages; and (4) that Digicel Haiti did not suffer a cognizable injury because it was merely fulfilling its legal obligations under an implied-in-fact contract. Thus, UPM waived these arguments, and the Court will not consider them in UPM's Rule 50(b) motion.

The arguments raised in UPM's Rule 50(b) motion that have not been waived are: (1) that Digicel Haiti did not suffer any harm because it was fully compensated for every call placed using UPM's SIM cards and did not suffer any out-of-pocket costs caused by UPM; and (2) that Digicel Haiti did not prove its amount of actual damages with reasonable certainty, and thus cannot receive actual or punitive damages. The Court addresses these arguments in turn.

### 2. Harm Suffered

UPM argues that Digicel Haiti did not prove that it was worse off due to UPM's use of HBS, and therefore that Digicel Haiti did not suffer any harm because: (1) Digicel Haiti was fully compensated for the services it provided; (2) Digicel Haiti provided only speculative evidence of lost opportunities and revenue; and (3) Digicel Haiti's out-of-pocket expenses do not establish harm.

### i. Compensation

UPM argues that Digicel Haiti received complete compensation for the services it provided with respect to the calls placed using its SIM cards. Because UPM's traditional bypass calls did not use Digicel Haiti's international switches, UPM insists that it only used Digicel Haiti's domestic service and Digicel Haiti was not entitled to receive the international rate of 23 cents per minute for these calls. UPM contends that Digicel Haiti's compensation for a call was calculated based on whether the call used an international switch, not the underlying characteristics of the call. Although that may be the mechanism by which Digicel Haiti was able to organize and charge for calls, this argument ignores the underlying theory of Digicel Haiti's entire case: that UPM committed fraud by disguising calls made between different countries as domestic calls, thereby bypassing the international switch and avoiding the higher price for international calls. Digicel Haiti presented evidence that UPM's HBS-assisted bypass used encapsulation to misrepresent an international call as a local call that does not go through the international switch, ECF 536 at 189 (Tr. 874:15-25); Digicel Haiti received 9 cents per minute for domestic calls, ECF 535 at 239 (Tr. 652:15-18), and 23 cents per minute for international calls, ECF 534 at 9 (Tr. 151:2-6); and if a call that is made internationally does not go through an international switch, Digicel Haiti could not recognize it as an international call and would therefore only charge 9 cents per minute instead of 23 cents per minute, *id.* at 8-9 (Tr. 150:19-

151:6). From this evidence, a jury reasonably could find that Digicel Haiti did not receive full compensation for these calls. The calls were international in that they were made between two countries—even if they did not use the international gateway—but were charged at the lower domestic rate. Thus, the evidence, particularly when viewed in the light most favorable to Digicel Haiti, cannot be said to support "only one reasonable conclusion," with that conclusion being "contrary to the jury's verdict." *Go Daddy*, 581 F.3d at 961.

As to RLYH bypass, UPM argues that Digicel Haiti was fully compensated because it received 9 cents per minute from the subscriber *and* 23 cents per minute from the U.S. wireless carrier, which is more than Digicel Haiti would have received if the call had been placed through traditional methods. ECF 536 at 251 (Tr. 936:14-18); ECF 537 at 49-50 (Tr. 989:16-990:16) (parties stipulating to that fact). Digicel Haiti does not dispute that it received full compensation for the calls themselves but provides other evidence of out-of-pocket expenses caused by UPM's RLYH bypass, discussed *infra*. Although Digicel Haiti did not provide evidence of lost compensation due to RLYH bypass, it provided other sufficient evidence of harm to support the jury's conclusion that UPM caused at least some harm to Digicel Haiti. The Court therefore analyzes the amount of damages, as discussed below.

### ii.  Evidence of Lost Opportunities

UPM argues that Digicel Haiti only offered speculative evidence about its lost revenue and business opportunities due to the use of HBS. Specifically, UPM argues that Digicel Haiti's analysis to determine the number of minutes placed using HBS-assisted bypass or RLYH bypass was unreliable. This argument is tied to Digicel Haiti's claim for damages from lost profits. Because, as explained below, the Court holds that Digicel Haiti offered no evidence that would allow the jury to calculate lost profits in a non-speculative manner, this argument is moot.

### iii. Out-of-Pocket Costs

UPM argues that Digicel Haiti did not prove that it suffered harm in the form of increased out-of-pocket expenses caused by UPM.[1] As the Court instructed the jury, "[t]o prevail on its claim of fraud by active concealment, Digicel Haiti must prove . . . its damages were caused by its reliance on the false representation." ECF 521, Final Jury Instr. No. 18. The Court also instructed the jury that Digicel Haiti's damages may include "its actual out-of-pocket costs that it reasonably incurred in trying to reduce any losses *caused* by a defendant's fraud by active concealment." *Id.*, Final Jury Instr. No. 19 (emphasis added).

UPM argues that Digicel Haiti's efforts were aimed at bypass in general, beyond UPM's HBS-assisted bypass, and thus its out-of-pocket costs were not caused solely by UPM's false representation. *See* ECF 534 at 51-54 (Tr. 193:22-196:7) (stating that 90 to 95 percent of the bypass detected was HBS-assisted bypass and explaining that it took more calls to detect HBS-assisted bypass than traditional bypass); *id.* at 57 (Tr. 199:13-23) (testifying that Digicel Haiti identified other individuals or companies engaged in bypass); *id.* at 22-26 (Tr. 164:10-168:18) (explaining how one method to detect bypass, the test call system, detected bypass from "all over the world"). UPM also argues that Digicel Haiti was obligated to intercept and stop bypass for other reasons besides its own "preferences and wishes," *id.* at 12 (Tr. 154:8-11), and thus Digicel Haiti would have taken these measures regardless of any conduct by UPM.

The jury also heard evidence that Digicel Haiti suffered out-of-pocket expenses from 2011 to 2014 of approximately $7.5 million, comprised of the direct costs of people hired and systems and processes implemented to combat HBS-assisted bypass. ECF 537 at 28-29

---

[1] Contrary to UPM's representations, Digicel Haiti's response addressed whether it had adequately proven injury due to out-of-pocket costs and did not waive this argument.

(Tr. 968:11-969:12). Digicel Haiti and its experts did not identify any other company or individual that committed the same level of bypass as UPM, ECF 534 at 57-58 (Tr. 199:13-200:6); that is, UPM was the primary cause of the HBS-assisted bypass. Digicel Haiti's measures to detect and combat bypass did not precede the alleged fraud, as UPM contends, but rather Digicel Haiti needed to expend more resources to detect bypass after widespread use of HBS began in late 2010 or early 2011. *Id.* at 29-30 (Tr. 171:16-172:8). Digicel Haiti had learned that some of its customers engaged in HBS-assisted bypass when it incurred roughly $7.5 million in out-of-pocket expenses and took these measures to reduce losses caused by concealment of bypass. Although Digicel Haiti did not know that UPM was the primary perpetrator of HBS-assisted bypass until after taking preventive and protective measures, there is sufficient evidence in the trial record to support the jury's conclusion that the expenses were caused in large part by UPM's fraud. Digicel Haiti's expenses were aimed at catching bypass all over the world; that fact does not mean that Digicel Haiti did not incur costs as a direct result of UPM's fraud involving Haiti.

Further, even if Digicel Haiti were obligated take some measures to monitor for bypass, Digicel Haiti presented evidence that UPM was the primary user of HBS-assisted bypass identified by Digicel Haiti. This evidence supports that at least some of Digicel Haiti's expenses were caused by UPM. UPM need not be the *only* cause of Digicel Haiti's expenses; in fact, the jury's award of damages reflected that only a fraction of the out-of-pocket expenses claimed by Digicel Haiti were attributable to UPM. Therefore, it was reasonable for the jury to find that UPM caused $1.8 million of Digicel Haiti's out-of-pocket expenses, and that is harm.

### 3. Damages

UPM also argues that Digicel Haiti failed to prove, to a reasonable certainty, the amount of its claimed damages. UPM contends that Digicel Haiti did not prove the amount of the two

compensatory damages at issue: lost net profits and out-of-pocket expenses. UPM thus argues that Digicel Haiti is not entitled to recover any damages, including punitive damages.

"'Reasonable certainty' is not a demanding standard; it requires 'reasonable probability,' not 'absolute certainty.'" *Weiner v. Int'l Animal Semen Bank, LLC*, 330 Or. App. 273, 279 (2024) (quoting *City of Eugene v. Monaco*, 171 Or. App. 681, 688 (2000)). UPM must therefore demonstrate that a jury could not reasonably find that Digicel Haiti had proven the amount of damages with a reasonable probability.

### i.  Lost Net Profits

UPM contends that Digicel Haiti only provided evidence of its lost gross revenues, not lost net profits. The Court held at trial that lost gross revenues are not a proper measure of damages under Oregon law, which the jury instructions reflect by instructing that compensatory damages can be awarded only for lost net profits or out-of-pocket costs. ECF 521, Final Jury Instr. No. 19. Digicel Haiti repeats its argument made at trial that lost revenues are a proper measure of damages under Oregon law, but Digicel Haiti's cited cases are inapposite. In *Huffman & Wright Logging Co. v. Wade*, 317 Or. 445 (1993), the issue before the Oregon Supreme Court was entitlement to punitive damages, with no explanation of how the jury reached its verdict. And in *City of Portland v. Boeing Co.*, 2002 WL 220938 (D. Or. Jan. 15, 2002), "the sole issue before the court [was] whether the City [had] presented sufficient evidence to create a genuine issue of material fact on the issue of whether the contamination of the groundwater by Defendants had any effect on the [Water] District's decision." *Id.* at *2. Nothing in either opinion discusses whether lost gross revenues are a valid form of damage. The Court agrees with UPM that Digicel Haiti needed to introduce evidence of lost net profits; evidence of lost gross revenues does not suffice.

Digicel Haiti further argues that it incurred negligible variable costs, and therefore its lost revenue analysis was analogous to a lost profit analysis. But Digicel Haiti presented no evidence at trial of its purported "negligible" variable costs. In fact, the Court explicitly held that Digicel Haiti had not properly and timely disclosed that there would be any testimony on this issue, and therefore that Digicel Haiti's witness could not testify that costs were negligible. ECF 537 at 23 (Tr. 963:7-16). And Digicel Haiti admitted in its closing argument that it only provided lost revenues, not costs and expenses, and even invited the jury to speculate on expenses. *Id.* at 162 (Tr. 1102:4-15) (admitting "all I gave you was revenues"); *id.* at 169-70 (Tr. 1109:17-1110:3) (inviting the jury to "chop off" 30 or 40 percent for expenses). The Court finds that the evidence received at trial permits only one reasonable conclusion—that Digicel Haiti did not provide sufficient evidence to prove damages through lost profits. Because the jury's verdict explicitly stated that $3.6 million of the compensatory damages were due to lost profits, the Court reduces the award of compensatory damages by $3.6 million, to a total of $1.8 million.

### ii.  Out-of-Pocket Expenses

The Court instructed the jury that Digicel Haiti could establish compensatory damages through "its actual out-of-pocket costs that it reasonably incurred in trying to reduce any losses caused by a defendant's fraud by active concealment." ECF 521, Final Jury Instr. No. 19. As discussed above, Digicel Haiti established its out-of-pocket costs with sufficient reasonable certainty and therefore is entitled to compensatory damages in the amount of those costs.

### iii.  Punitive Damages

UPM argues that Digicel Haiti may not recover punitive damages because punitive damages may be awarded only if actual damages exist. *See Belleville v. Davis*, 262 Or. 387, 405 (1972) ("[A]n award of punitive damages is not proper in the absence of proof that a plaintiff is entitled to an award of actual damages."); *Klinicki v. Lundgren*, 298 Or. 662, 687 (1985)

("Punitive damages cannot exist alone."); *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 730 n.13 (9th Cir. 2022) ("[A] court may not award punitive damages where compensatory damages cannot be awarded."). Digicel Haiti adequately has established actual damages based on its out-of-pocket expenses. Therefore, punitive damages are appropriate on this basis.

UPM further contends that a state cannot punish a defendant for out-of-state conduct that causes out-of-state harm. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 573-74 (1996). But when a state has made a legitimate policy choice to punish certain in-state conduct, punishing a defendant for that conduct when it causes only out-of-state harm "necessarily depends on the state of the evidentiary record." *Est. of Schwarz v. Philip Morris, Inc.*, 206 Or. App. 20, 49-50 (2006). Oregon has a policy that prohibits fraud, including fraud by active concealment. The jury determined that UPM engaged in fraud by active concealment in Oregon, conduct which is contrary to Oregon law and policy sufficient to permit an award of punitive damages consistent with the Supreme Court's holding in *BMW*.

Finally, UPM argues that punitive damages are improper because UPM did not act reprehensibly. Under Oregon law, an award of punitive damages requires "clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." Or. Rev. Stat. § 31.730(1). The Court instructed the jury that the "purposes of punitive damages are to punish a defendant and to deter similar acts in the future," and thus the jury "may award punitive damages against a defendant if the plaintiff shows by clear and convincing evidence that a defendant acted with malice. In this context, 'malice' means intentionally doing an injurious or wrongful act without justification or excuse." ECF 521, Final Jury Instr. No. 20. At trial, Digicel Haiti

presented sufficient evidence to satisfy this standard: its evidence showed that UPM intentionally engaged in HBS-assisted bypass, which injured Digicel Haiti.

The Court, however, finds that the punitive damages must be decreased in accordance with the decrease in actual damages. It is a well-recognized principle that punitive "damages must bear a 'reasonable relationship' to compensatory damages." *BMW*, 517 U.S. at 580. The Court instructed the jury that in awarding punitive damages, they should consider if there is "a reasonable relationship between the amount of punitive damages and the plaintiff's harm." ECF 521, Final Jury Instr. No. 20. The jury's determination of punitive damages, therefore, was in part premised on their determination of actual damages, which is especially evident in that the $3.6 million the jury awarded in punitive damages against UPM is exactly two-thirds of the $5.4 million actual damages. Because the Court decreases actual damages by two-thirds, the Court finds that it is reasonable also to decrease punitive damages by two-thirds. Accordingly, the punitive damage award against UPM is decreased to $1.2 million and the punitive damage award against Mr. Tran is decreased to $233,333.33.

## B.  Motion for a New Trial

UPM, joined by Mr. Tran, moves in the alternative for a new trial under Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure, arguing that Digicel Haiti failed to establish that: (1) it reasonably relied on UPM's misrepresentation; (2) UPM's misrepresentation was material; (3) it suffered any harm from UPM's conduct; and (4) it is entitled to *any* damages. UPM also argues that evidentiary errors necessitate a new trial. The arguments here are not waived by not being raised in a Rule 50(a) motion. Thus, the Court addresses each argument in turn.

### 1.  Reasonable Reliance

UPM argues that Digicel Haiti did not establish its claim for fraud by active concealment because Digicel Haiti did not establish reasonable reliance on any misrepresented information.

UPM insists that Digicel Haiti knew that purchasers used its SIM cards for bypass and resale calls, including through HBS-assisted bypass, yet did not take reasonably available precautionary measures to restrict who could buy these SIM cards or to control the authorized uses for the SIM cards. Further, UPM contends that because Digicel Haiti knew that some consumers were using HBS-assisted bypass, there was no misrepresentation on which Digicel Haiti could have relied. The Court emphasized in its jury instructions that "[b]ypass by itself is not fraudulent," ECF 521, Final Jury Instr. No. 18, and thus it is insufficient for Digicel Haiti to establish that it relied on a misrepresentation that bypass was not used. Instead, Digicel Haiti needed to establish that UPM used HBS to conduct this bypass and that Digicel Haiti relied on UPM's concealment of bypass by using HBS.

Digicel Haiti argues that reliance is not an essential element of fraud through active concealment. Regardless of whether this argument has merit, Digicel Haiti waived this argument by both proposing a jury instruction that included the reliance requirement and by failing to object to the Court instructing the jury that Digicel Haiti must prove that it "reasonably relied on the false representation" to succeed on its fraud through active concealment claim. ECF 521, Final Jury Instr. No. 18; *see also United States v. Kaplan*, 836 F.3d 1199, 1217 (9th Cir. 2016) ("Waiver of a jury instruction occurs when a party . . . 'proposed or accepted a flawed instruction.'") (quoting *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)).

Thus, Digicel Haiti needed to present evidence at trial that it relied on Defendants' active concealment of the use of HBS-assisted bypass, which is equivalent to relying on a representation that UPM did not use HBS-assisted bypass. The reasonableness of such reliance is "measured in the totality of the parties' circumstances and conduct." *Or. Pub. Emps. Ret. Bd. ex rel. Or. Pub. Emps. Ret. Fund v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428 (2004).

UPM argues that Digicel Haiti's position as a "large and sophisticated" international telecommunications provider with significant resources is a relevant consideration in determining if its reliance was reasonable. *See id.*; ECF 533 at 110 (Tr. 110:8-17) (Digicel Haiti was a major telecom operator in Haiti between 2011 and 2014); ECF 534 at 62-63 (Tr. 204:6-205:21) (Digicel Haiti had between 2.5 and 4.7 million subscribers between 2011 and 2014). Specifically, UPM contends that, given Digicel Haiti's resources, it did not take "reasonable precautions to safeguard [its] own interests." *Vukanovich v. Kine*, 268 Or. App. 623, 635 (2015). UPM cites evidence that, for Digicel Haiti's third-party provider network, Digicel Haiti did not require customers to agree to any terms or conditions. ECF 533 at 133 (Tr. 133:15-25) (the Court discussing its earlier rulings and stating that there was no evidence of "shrinkwrap agreements or click agreements that UPM had to agree to in order to activate these SIM cards").

Further, Digicel Haiti did not inquire into who was using a SIM card or for what purpose. *Id.* at 123-25 (Tr. 123:19-125:16) (SIM cards are activated by making a single call); ECF 536 at 239 (Tr. 924:17-24) (RLYH is activated with a code or using the mobile app). In contrast, Digicel Haiti did impose terms and conditions on those who purchased SIM cards directly from Digicel Haiti. ECF 533 at 115-16 (Tr. 115:25-116:6). UPM also cites trial testimony that Digicel Haiti was able to "identify and detect bypass" to argue that Digicel Haiti was not deceived by UPM's actions, but already knew that HBS-assisted bypass was occurring. ECF 534 at 29-30 (Tr. 171:25-172:3) (Digicel Haiti became aware of the use of HBS in late 2010 or early 2011); *id.* at 53-54 (Tr. 195:19-196:7) (Digicel Haiti was able to "identify and detect bypass").

The jury also heard the following evidence: (1) a SIM card needed to place at least five to ten calls for Digicel Haiti to be able to detect HBS-assisted bypass, *id.* at 53-54 (Tr. 195:19-196:7); (2) Digicel Haiti became aware of the use of HBS-assisted bypass beginning in late 2010

PAGE 18 – OPINION AND ORDER

or early 2011 and then invested in software and experts, including a private security company and private investigator, to investigate and combat this bypass, *id.* at 28 (Tr. 170:2-18) (estimating expenses of $30,000 to $100,000 per month on a test call program to detect bypass); *id.* at 29-30 (Tr. 171:16-172:8) (hiring experts); *id.* at 31-32 (Tr. 173:15-174:9) (hiring experts and estimating increased costs of $1.5 million per year); *id.* at 33 (Tr. 175:20-23) (hiring a private investigator); (3) that Digicel Haiti did not identify any other company or individual committing the same amount of HBS-assisted bypass as UPM, *id.* at 57-58 (Tr. 199:13-200:6); and (4) Digicel Haiti did not learn that UPM was the main source of the bypass until 2014, after Digicel Haiti took steps to detect bypass, *id.* at 141-42 (Tr. 283:25-284:3).

Digicel Haiti presented evidence that UPM was the primary user of HBS-assisted bypass that they could identify. This evidence supports that UPM caused at least some of Digicel Haiti's out-of-pocket expenses, which were reasonably incurred based on UPM's active concealment of its use of HBS-assisted bypass. Digicel Haiti took its protective measures after it learned of the use of HBS in bypass. Though Digicel Haiti knew that some users were engaging in HBS-assisted bypass, it was still reasonable to believe that most users were not engaging in HBS-assisted bypass and to rely on a lack of disclosure of the use of HBS-assisted bypass. Imposing conditions or limitations on the use of the SIM cards, as UPM suggests Digicel Haiti should have done, would not practically restrict the use of HBS-bypass because consumers could just ignore these terms and conditions. The weight of evidence shows that even with terms and conditions, Digicel Haiti could not have identified the violating SIM cards any earlier. Instead, Digicel Haiti took reasonable steps to reduce losses due to HBS-assisted bypass. Thus, the weight of the evidence shows that Digicel Haiti had reasonably relied on UPM's active concealment of the use

of HBS-assisted bypass, as Digicel Haiti took reasonable precautions to detect and combat bypass.

### 2.  Materiality

UPM also argues that Digicel Haiti did not establish that the actively concealed fact that UPM was engaged in HBS-bypass was material. UPM contends that the identity of the SIM card holder was not material because Digicel Haiti entered an implied-in-fact contract with the SIM card holder to provide telephone services, no matter who held the SIM card. Accordingly, UPM argues that Digicel Haiti would not have changed its behavior if it knew of UPM's use of bypass because Digicel Haiti was obligated to service the SIM cards. In essence, UPM asserts that the alleged implied-in-fact contract constitutes a defense to their active concealment.

UPM, however, did not raise the issue of the purported implied-in-fact contract during the trial. It did not propose a jury instruction relating to implied-in-fact contracts. It also did not object to the final jury instructions as excluding this potential defense to a claim of active concealment. UPM has thus waived this argument with respect to their motion for a new trial.

### 3.  Harm Suffered and Damages

As discussed above in resolving UPM's renewed motion for judgment as a matter of law, the clear weight of evidence at trial demonstrated that Digicel Haiti was harmed by UPM's fraudulent conduct. Digicel Haiti was not fully compensated for all phone calls placed using HBS-assisted bypass, and it sufficiently proved out-of-pocket costs caused by UPM's fraudulent conduct. Further, UPM waived its argument that mitigation costs cannot be the only basis for actual damages because UPM did not object to the jury instructions that Digicel Haiti may also establish compensatory damages through "its actual out-of-pocket costs that it reasonably incurred in trying to reduce any losses caused by a defendant's fraud by active concealment." ECF 521, Final Jury Instr. No. 19. Regarding the amount of damages, as described in granting in

part UPM's renewed motion for judgment as a matter of law, the Court adjusts the actual and punitive damages. This adjustment is sufficient relief, and a new trial is not needed.

UPM also contends that Digicel Haiti was merely fulfilling its legal obligation with respect to the implied-in-fact contract to provide telephone services. As noted above, UPM did not raise the implied-in-fact contract during trial, nor did it object to the jury instructions. UPM has therefore waived this argument.

### 4.   Evidentiary Errors

UPM contends that the Court should order a new trial due to three asserted evidentiary errors: (1) Digicel Haiti's witness, Mr. Charles Castel, provided improper testimony; (2) Digicel Haiti improperly introduced evidence of a Haitian governmental investigation; and (3) Digicel Haiti's witness, Mr. Gerard Laborde, provided testimony based on underlying data that had not been disclosed before the testimony. The Court addresses each argument in turn.

#### a.   Mr. Castel's Testimony

UPM argues that Digicel Haiti's witness, Mr. Castel, gave improper testimony that was irrelevant, confusing, and prejudicial because it focused entirely on lost revenues, not lost profits. UPM only takes issue with this testimony as it relates to the amount of damages awarded, not to UPM's liability. Because the Court grants in part UPM's renewed motion for judgment as a matter of law and removes the award of damages from lost net profits, this argument is moot.

#### b.   Evidence of Haitian Governmental "Investigation"

UPM also insists that Digicel Haiti introduced evidence of a Haitian governmental investigation that was irrelevant and highly prejudicial, in violation of the Court's bar on presenting evidence that Defendants' conduct was "illegal" or "illegitimate" in Haiti. The Court ruled on motions *in limine* that "[t]he law of Haiti is not relevant to any of the issues at the trial" and excluded any testimony on Haitian law or Digicel Haiti's "licensing, franchising, and

authorizations from the Haitian Government" unless Defendants "open the door" at trial.
ECF 504 at 18. UPM argues that Digicel Haiti's witnesses repeatedly discussed the law of Haiti
by referring to a "writ," "seizure," "legal compliance," and a raid. *See* ECF 534 at 13
(Tr. 155:17-20) (Digicel Haiti "ha[s] to report to the regulator" bypass); *id.* at 21 (Tr. 163:5-18)
(testimony about an "operation" that "identified" and "[b]reached" a "bypass location," and the
"writ" that led to the investigation); *id.* at 102 (Tr. 244:4-11) (Mr. Laborde stating that "[t]here
was a writ"); *id.* at 102-03 (Tr. 244:21-245:7) (Mr. Laborde mentioning a "writ"); *id.* at 131-64
(Tr. 273:23-306:4) (Digicel Haiti's counsel using the word "seized" or "seizure"); *id.* at 140-41
(Tr. 282:14-283:2) (mentioning a "raid"); *id.* at 155-56 (Tr. 297:23-298:6) (using the term "legal
compliance"). UPM also contends that the Court's admission of photographs from the
investigation, Trial Ex. 401, made it clear to the jury that UPM was subject to an investigation by
Haitian officials because bypass is forbidden under Haitian law, improperly and irrelevantly
introducing evidence of Haitian law.

UPM has waived many of these arguments by failing to object to the testimony during
trial. *Rivas v. Knight Transp. Inc.*, 2017 WL 3453365, at *2 (C.D. Cal. Mar. 24, 2017)
(collecting cases). UPM did not object to any uses of the terms "seizure" or "seized." The Court
immediately struck Mr. Laborde's first reference to a "writ" upon UPM's objection, ECF 534
at 21 (Tr. 163:18-24), which served as a sufficient curative instruction, and UPM did not object
to the other two mentions of "writ," *id.* at 102, 103 (Tr. 244:7, 245:1-7). UPM also did not object
to the use of the term "raid," *id.* at 140 (Tr. 282:14-20), nor to the term "legal compliance," *id.*
at 156 (Tr. 298:3-5).

UPM did object to Mr. Laborde's testimony that Digicel Haiti must report to a regulator
when a bypass SIM has been intercepted. *Id.* at 13 (Tr. 155:17-23). This testimony was relevant,

as it helped to explain why Digicel Haiti needed to detect bypass. Though it did reference a regulator, which could be construed as the "law of Haiti" or Digicel Haiti's "authorizations" from the Haitian government, the testimony did not indicate that bypass itself is illegal under Haitian law—the purpose of excluding testimony on Haitian law. If anything, this testimony went *against* Digicel Haiti, as it provided another reason for Digicel Haiti's out-of-pocket expenses, decreasing the proportion of these expenses that were attributable to UPM. Thus, the testimony was not unfairly prejudicial to UPM. Further, "[a] new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (quoting *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992)). The Court does not conclude that this evidence, even if erroneously admitted, *substantially prejudiced* Defendants.

As to UPM's arguments about the admission of Trial Ex. 401, this exhibit included photographs of equipment that UPM used for its HBS-assisted bypass. Mr. Laborde explained, without mentioning the Haitian government, that there was an investigation that seized UPM's equipment, and that Digicel Haiti was permitted to examine the equipment in a separate location. Mr. Laborde adequately testified that the photographs were fair and accurate representations of the equipment that he saw during the investigation. This exhibit was relevant to demonstrate that UPM used HBS to conduct bypass, and the evidence was not unfairly prejudicial. Digicel Haiti did not violate this Court's order on discussing the law of Haiti or any authorizations from the Haitian government. The Court thus finds that admission of this evidence was proper.

### c.  Mr. Laborde's Testimony

Finally, UPM argues that Mr. Laborde's testimony regarding the variance analysis was improper because it relied on data that Digicel Haiti did not produce in discovery. UPM objects only to Mr. Laborde's testimony relating to Digicel Haiti's damages theory of lost revenues.

Because the Court grants in part UPM's renewed motion for judgment as a matter of law and removes from the award of damages all purported lost net profits, this argument is moot.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendants' renewed motion for judgment as a matter of law and alternative motion for new trial. ECF 554. The Court holds that the evidence received at trial does not support any award of damages for lost net profits, which the jury found to be $3.6 million. The Court therefore decreases Plaintiff's total compensatory damages from $5.4 million to $1.8 million. In addition, because the jury was instructed that in determining the amount of punitive damages, if any, it should consider, among other things, the relationship between punitive damages and the plaintiff's harm, the Court decreases the jury's punitive damage award against UPM from $3.6 million to $1.2 million and decreases the jury's punitive damage award against Mr. Tran from $700,000 to $233,333.33.

**IT IS SO ORDERED**.

DATED this 6th day of January, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge